**Marc P. Berger**
**Jorge G. Tenreiro**
**Kevin McGrath**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-9145 (Tenreiro)**
**Email: TenreiroJ@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **19 Civ. 9439 (PKC)** |
| | : | |
| **- against -** | : | **ECF Case** |
| | : | |
| **TELEGRAM GROUP INC. and TON ISSUER INC.,** | : | **Complaint** |
| | : | **Jury Trial** |
| **Defendants.** | : | **Demanded** |
| | : | |

-------------------------------------------------------------------- x

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its

Complaint against Defendants Telegram Group Inc. and its wholly owned subsidiary TON Issuer

Inc. (together "Telegram" or "Defendants"), alleges as follows:

## SUMMARY

1.      The SEC brings this emergency action to stop Defendants—owners and operators

of the mobile messaging application Telegram Messenger ("Messenger")—from continuing their

ongoing illegal offering of digital-asset securities called "Grams."  This offering is occurring in

violation of the registration provisions of the federal securities laws.  Defendants have committed

to flood the U.S. capital markets with billions of Grams by October 31, 2019 and may do so as

early as next week.  Unless enjoined, Defendants will go forward without filing a registration

statement for the Grams as they are required to do under the Securities Act of 1933 ("Securities

Act").  In other words, Defendants plan to sell billions of securities that will quickly come to rest in the hands of U.S. investors without providing those investors important information about their business operations, financial condition, risk factors and management.

2.      Telegram's illegal offering (the "Offering") had an initial stage, which took place between January and March 2018.  During this stage, Telegram raised approximately $1.7 billion from sales of approximately 2.9 billion Grams to 171 purchasers (the "Initial Purchasers").  A large portion of this capital came from U.S. investors: Telegram sold more than 1 billion Grams to 39 U.S. Purchasers, raising $424.5 million from the U.S. market.  Telegram is using the proceeds of this initial offering to capitalize its business and finance the creation of its blockchain—the "Telegram Open Network" or "TON Blockchain."

3.      Grams are securities because the Initial Purchasers and subsequent investors expect to profit from Telegram's work:  the development of a TON "ecosystem," integration with Messenger, and implementation of the new TON Blockchain.  Grams are not a currency because, among other things, there are not any products or services that can be purchased with Grams.  Rather, there is an expectation on the part of investors that they will profit if Telegram builds out the functionalities it has promised.

4.      Telegram committed to deliver Grams to the Initial Purchasers in conjunction with the launch of the TON Blockchain by no later than October 31, 2019 and it plans to sell millions of additional Grams at the same time.  As of October 11, 2019, Telegram has not filed a registration statement with the SEC for this planned offering of securities.

5.      Once Telegram delivers the Grams to the Initial Purchasers, they will be able to resell billions of Grams on the open market to the investing public.  Telegram and/or its affiliates will facilitate these sales on digital-asset trading platforms.  Once these resales occur, Telegram

will have completed its unregistered offering with billions of Grams trading on multiple platforms to a dispersed group of investors.

6.      Sections 5(a) and 5(c) of the Securities Act require that an issuer of securities like Telegram register its offers and sales of securities with the SEC.  Telegram failed to file a registration statement and plans to sell billions of Grams to investors without providing them the type of basic information about the nature of the investment being offered, information that is included in hundreds of registration statements that are filed with the SEC every year.

7.      Unless enjoined, Telegram's completion of the Offering will allow it to have circumvented the Securities Act's registration requirements, leaving U.S. investors to buy and sell Grams without the vital information about those securities and about Telegram that Congress intended registration to provide.

8.      Once Grams reach the public markets, it will be virtually impossible to unwind the Offering, given that many purchasers' identities will be shrouded in secrecy, and given the variety of unregulated markets where Grams may be sold, including platforms that promise anonymity and encryption capability to mask transactions.  Accordingly, a temporary restraining order and preliminary injunction are necessary to prevent the imminent delivery of Grams to the Initial Purchasers (who are likely to promptly resell millions of them into the public markets) and to prevent Defendants from offering, selling, transferring, or otherwise distributing or delivering Grams to any other persons and entities absent registration pursuant to the securities laws.

## VIOLATIONS

9.      By engaging in the conduct set forth in this Complaint, Defendants engaged in and are engaging in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

10.     Unless the Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

### NATURE OF THE PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

12.     The Commission seeks, as immediate relief:

(1) a temporary restraining order and a preliminary injunction against Defendants prohibiting them from participating in any offerings of unregistered securities or otherwise violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)], including but, not limited to, by distributing Grams to any persons;

(2) an order permitting the Commission to conduct expedited discovery and prohibiting Defendants from destroying or altering documents; and

(3) an order permitting service by alternative means, including service on Defendants' counsel in the underlying investigation by email.

13.     The Commission also seeks a final judgment: (a) permanently enjoining the Defendants from engaging in the acts, practices, and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Defendants, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in an offering of digital securities; and (d) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)].

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v].

Defendants, directly or indirectly, have made use of the means or instruments of transportation or

communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in

connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of

the Securities Act [15 U.S.C. § 77v(a)].  Among other acts, Defendants sold the securities at

issue in this case to purchasers with domiciles in this District, and also directed payments of

funds denominated in U.S. dollars through a correspondent bank in this District.

## DEFENDANTS

16.     **Telegram Group Inc.** is a privately owned British Virgin Islands company with

its principal place of business in Dubai, United Arab Emirates.  Its primary product is

Messenger, an encrypted messaging application with approximately 300 million monthly users

worldwide that has been called the "cryptocurrency world's preferred messaging app."

17.     **TON Issuer Inc.** is a British Virgin Islands company, wholly owned by Telegram

Group Inc., with its principal place of business in Tortola.

## RELATED INDIVIDUALS AND ENTITY

18.     **Pavel Durov**, age 35, is a Russian and St. Kitts and Nevis citizen, and the co-

founder, 100% owner, and CEO of Telegram Group Inc.  In 2006, he founded a website called

"VKontakte" or "VK," a social networking site similar to Facebook that later became the largest

Europe-based social network.  Pavel is a self-described "outspoken libertarian" who "published

free market manifestos urging the Russian government to deregulate" the economy.  After a clash with the government in 2014, Pavel lost ownership of and control over VK and left Russia.

19.     **Dr. Nikolai Durov**, age 39, is a Russian citizen, the co-founder, co-owner, and Chief Technology Officer of Telegram Group Inc., and Pavel Durov's brother.

20.     **TON Foundation** is company that has been or is about to be incorporated as a Cayman Islands limited liability company.  The TON Foundation's stated mission is to "promote and support the TON Blockchain" and includes management of Grams distributed to the TON Foundation by Defendant TON Issuer.  Pavel and Nikolai Durov will be or are the sole members of the TON Foundation's board.

## STATUTORY FRAMEWORK

21.     Congress enacted the Securities Act of 1933 ("Securities Act") to regulate the offer and sale of securities.  In contrast to ordinary commerce, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest. Registration statements relating to an offering thus provide public investors with financial and managerial information about the issuer and the risks and trends that would affect the enterprise.

22.     Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce.  Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed or an exemption from registration applies.  Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption.  These prohibitions apply to a

"distribution" of securities, the entire process by which, in a public offering, a block of securities is dispersed and ultimately comes to rest in the hands of the investing public.

23.     The registration statements contemplated by the Securities Act require disclosures that provide the public with the information necessary to make an informed investment decision. Disclosures in a registration statement typically require items of information concerning financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.  They also impose on issuers a duty periodically to update this information.

24.     For example, Item 3 on a Form S-1 registration statement calls for management's assessment of significant factors that make the offering speculative or risky.  In addition, Rule 421(d) of Regulation S-K requires plain English disclosure (important for unsophisticated investors in a nascent or unproven tech innovation) [17 C.F.R. § 230.421(d)].  Finally, Sections 11 and 12 of the Securities Act [15 U.S.C. §§ 77k, 77*l*] impose strict liability on the issuer and underwriters of securities for false statements in registration statements.

25.     Section 5 of the Securities Act, by its terms, is all embracing; it prohibits any unregistered securities offering.  Through exemption provisions like Section 4 of the Securities Act [15 U.S.C. § 77(d)], however, Congress distinguished between (1) those transactions that occur during the process by which securities are distributed to the public in an offering that emanates from the issuer of the securities, and (2) subsequent trading transactions in the market by investors once the securities have come to rest with investors.

26.     In drawing this distinction between distributions and trading, Congress sought to provide the protections afforded by registration both where securities are sold to the public by

the issuer, and where they are publicly sold through an intermediary who buys the stock from the issuer with a view to public resale, defined as "underwriters." 15 U.S.C. § 77b(a)(11). Congress enacted a broad definition of underwriter to include all persons who might operate as conduits for securities being placed into the hands of the investing public.

27.     A distribution by issuers and/or underwriters is not exempt under Section 4 and requires registration unless some other exemption or safe harbor applies. The exemptions and safe harbors are structured to exempt transactions where the purpose and protections of registration have been otherwise satisfied. The party claiming that a distribution is entitled to an exemption bears the burden of claiming the exemption.

28.     The definition of a "security" includes a wide range of investment vehicles, including "investment contracts." Investment contracts are instruments through which an individual invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. In a variety of circumstances, courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet. As the U.S. Supreme Court has noted, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

## BACKGROUND ON DIGITAL TOKENS

29.     The term "digital asset" or "digital token" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not

limited to, so-called "cryptocurrencies," "coins," and "tokens."[1]  Entities have offered and sold digital tokens in fundraising events, often called "ICOs," in exchange for consideration.

30.     Generally, digital tokens may entitle holders to certain rights related to a venture underlying the fundraising event, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  These digital tokens may also be traded on digital-asset trading platforms where they are tradeable for other digital assets or fiat currency. The coins or tokens are often tradeable upon delivery to investors.

31.     Issuers of digital tokens typically release a "whitepaper" or marketing materials describing the project and the terms of the issuance.  To participate, investors typically transfer funds to the issuer's accounts.  After the completion of the issuance, the issuer will deliver its unique token to the participant's unique address on a distributed ledger or blockchain.

32.     In some instances, the digital tokens may continue to be sold by the issuer.  In others, they may only be obtained after issuance by purchasing them in secondary markets.

33.     On July 25, 2017, the SEC issued what is often called the "DAO Report," advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of digital assets at issue in that report were investment contracts.

---

[1]     A blockchain or distributed ledger is a peer-to-peer database spread across a network, that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.  Blockchains or distributed ledgers can also record "smart contracts," essentially computer programs designed to execute the terms of a contract when certain triggering conditions are met.

**FACTS**

A.     **The Durovs Create Telegram Messenger and Plan a Public Offering of Grams**

34.     The Durovs launched a beta version of Telegram Messenger in late 2013, capitalizing the project with funds from Pavel and a private, Buffalo, New York-based investor. Telegram, however, does not make money from Messenger and has "declared not-for-profit" goals. Telegram tells potential users before they download Messenger that "Telegram is free and will always be free" and that Telegram is "not going to sell ads or introduce subscription fees."

35.     Telegram also informs Messenger users that Telegram "take[s] your privacy seriously and will never give third parties access to your data." For example, Telegram promotes the "Secret Chats" of Messenger, which allows users to "send all types of disappearing content," and employs an infrastructure that synchronizes "encrypted data across multiple independent server[s] . . . spread across different continents and jurisdictions." Telegram similarly boasts that it has "disclosed 0 bytes of user data to third parties, including governments."

36.     Messenger has become a ubiquitous messaging application for the cryptocurrency community. Telegram estimates that at least 500,000 new users join Messenger daily and recent estimates suggest that Telegram now has 300 million monthly users and that more than 84% of projects involving blockchain technology have an active community of Messenger users. Because of the privacy protections embedded in the service, Messenger has also been cited as a popular messaging app for individuals engaged in illicit activities.

37.     Although Messenger incorporates ad hoc functionality that lets users exchange goods and services for both fiat and digital currency, Telegram wished to integrate the ability seamlessly to exchange digital assets directly into Messenger. The Durovs concluded, however, that existing networks such as the Bitcoin and Ethereum blockchains do not have the capability to replace high-volume transaction mechanisms like credit cards and fiat currency.

38.     In late 2017, Telegram announced its intent to introduce "next-generation multi-blockchain" systems "designed to host a new generation of cryptocurrencies and decentralized applications, at a massive scale."  Telegram described this yet-to-be-created "Telegram Open Network" or "TON," as "an always expanding and contracting decentralized supercomputer and value transfer system."  Telegram solicited investments to fund TON's launch.

39.     Telegram's decision to raise funds in the Offering coincided with a dramatic uptick in the number of "Initial Coin Offerings" ("ICOs"), fundraising events in which an entity offers participants a unique digital asset in exchange for consideration (most commonly Bitcoin, Ether, or fiat currency), and with increased market discussion of outsized returns obtained in ICOs.  One service reported that at least 343 ICOs occurred in 2017, up from 43 the year prior.

40.     Moreover, during that time, the overall demand for digital tokens and assets had significantly increased, and investors were aware that older digital assets (such as Bitcoin) had dramatically risen in price, generating monumental returns.  The market was also aware of the increasing popularity and adoption of Messenger.

**B.     Telegram Begins Its Intended Offering of Grams to the Public with Unregistered Offers and Sales of Billions of Grams to Initial Purchasers**

41.     From January through March 2018, Telegram entered into Gram Purchase Agreements with the Initial Purchasers.  Under the agreements, TON Issuer Inc., a wholly-owned subsidiary of Telegram Group Inc., would "issue a new cryptocurrency called 'Grams' . . . following the development and launch of a new blockchain platform" called the "TON Network."  The Initial Purchasers, in turn, "subscribe[d]" to Grams by buying them at fixed prices, and Telegram committed to deliver them after the development of the TON Blockchain.

42.     The Gram Purchase Agreements set October 31, 2019, as the "Deadline Date" for Telegram to fulfill its obligations to create a working blockchain and deliver Grams.  If Telegram

fails to meet the Deadline Date, the Gram Purchase Agreements entitle the Initial Purchasers to reimbursement of their investment minus any expenses.  Importantly, this contractual deadline is not tied to any promise or guarantee that Grams could actually be used to buy goods and services and depends solely on Telegram's ability to create and launch the TON Blockchain.

43.    In early 2018, Telegram accepted Euros and Dollars in exchange for Grams.

44.    Telegram's unregistered offers and sales of Grams to Initial Purchasers occurred in two phases.  Telegram sold approximately 2.3 billion Grams in the first phase ("Round One"), raising $850 million, and another approximately 639 million Grams in the second phase ("Round Two"), raising another $850 million, for a total of nearly 2.9 billion Grams sold in exchange for $1.7 billion.  Of the nearly 2.9 billion Grams sold, more than one billion were sold to United States purchasers, who invested a total of $424.5 million.

45.    The prices at which Telegram has sold and will sell Grams during the Offering are predetermined based on a formula that Telegram created (the "Formula"), as explained below in paragraph 87.  Under the Formula, Round One purchasers paid $0.37 per Gram and Round Two purchasers paid $1.33 per Gram.  The "Reference Price" of Grams at launch is $3.62.

46.    Telegram has not prepared or filed any registration statement with respect to any Grams it has offered or sold, or intends to offer or sell in the Offering, and no registration statement has ever been in effect with respect to any Grams.

47.    The Gram Purchase Agreements did not contain information about Telegram's financial history or ability to generate profits, and purchasers who may buy or receive Grams will not receive any document containing information about Defendants' operations, financial condition, or other factors relevant in considering whether to invest in Grams.  Nor will they receive information about how the Durovs are being compensated as a result of the Offering.

48.     Because Telegram did not register the Offering, investors in Grams will be deprived of material information relating to their investment.  Defendants essentially seek to obtain the benefits of a registered public offering without assuming the disclosure responsibilities and legal strictures designed to protect the investing public.

49.     Telegram has taken the position that the Gram Purchase Agreements were investment contracts, *i.e.*, securities, and placed a restrictive legend on the Gram Purchase Agreements.  The legend warned United States residents that "the offer and sale of this security has not been registered under the U.S. Securities Act of 1933" and "may not be offered, sold or otherwise transferred . . . except pursuant to an effective registration statements."

50.     Telegram, however, claimed that Grams, the heart of the Gram Purchase Agreements, without which the agreements have no value or purpose, were not securities but rather currency.  Telegram thus placed no restrictive legends on any Grams, nor were purchasers advised that they may not sell Grams in the United States absent a registration statement. Purchasers of Grams are not restricted from reselling them to others, other than as provided for by certain contractual lockups placed on some Grams sold to Initial Purchasers.

51.     As set forth in more detail below, however, Grams are investment contracts. Based on Telegram's own promotional materials and other acts, a reasonable purchaser of Grams would view their investment as sharing a common interest with other purchasers of Grams as well as sharing a common interest with Defendants in profiting from the success of Grams.  The fortunes of each Gram purchaser were tied to one another and to the success of the overall venture, including the development of a TON "ecosystem," integration with Messenger, and implementation of the new TON Blockchain.  Investors' profits were also tied to Telegram's profits based on Telegram's significant holdings of Grams.

52.     The Gram Purchase Agreements for Round One instituted smart contract-enforced "lock-up periods" during which purchasers could not offer, sell, or contract to sell Grams.  Specifically, Round One purchasers agreed that they could not, without Telegram's prior written consent, offer, sell, or contract to sell Grams that they purchased except in a series of 25% tranches starting three months, six months, twelve months, and eighteen months after they received Grams.  Round Two Gram Purchase Agreements included no such restrictions.

53.     However, Grams were and continue to be investment contracts from which Initial Purchasers and others reasonably expect to reap enormous profits once the Gram market launches.  Grams are not a currency because they have no realistic currency uses at this time.

54.     Telegram sold and will deliver Grams in amounts that far exceed any anticipated "use" on the TON Blockchain.  For example, all but three of the United States Grams Initial Purchasers bought more than 2.5 million Grams each.  Nor did or will Telegram restrict sales only to individuals who would actually "use" Grams.  To the contrary, Telegram contemplated that Initial Purchasers would resell their Grams immediately upon delivery, as evidenced by its inclusion of certain lock-up provisions as to some Grams.

55.     Moreover, the $1.7 billion raised in the Offering so far exceeds what Defendants project they will need to develop the TON Blockchain.  Indeed, Defendants stated in offering documents that the funds raised would be used for both Messenger and development of the TON Blockchain, estimating that Telegram would spend $520 million—or one-third of the funds raised—on Messenger alone between 2019 and 2021.

56.     As of January 31, 2019, Defendants had used approximately $218 million of the $1.7 billion raised to support the development of Messenger and the TON Blockchain.  Investors

14

in Grams do not exercise control over how the proceeds of the Gram sales will be spent; Telegram possesses sole discretion to decide how to do so.

**C.** **Telegram Is Distributing Grams by Leading Investors to Expect Opportunities to Profit from Grams, Including Profits Derived from the Entrepreneurial or Managerial Efforts of Telegram**

57.     Telegram emphasized to investors, and some Initial Purchasers stated in communications that they understood, that Telegram, Messenger, and the Durovs were integral to the success of the TON Blockchain project and Grams.

58.     In addition to private conversations between Pavel and potential purchasers, including purchasers in the United States, Telegram used certain "Offering Documents" to market, offer, and sell Grams in the Offering.  The Offering Documents consisted of:

- two-page and four-page "Teasers" created sometime before the end of 2017;

- at least two versions of the "Primers" authored by Pavel Durov, varying between twenty-three and twenty-six pages in length—an undated primer created before the end of 2017 (the "2017 Primer"), and the other, entitled "Pre-Sale Primer," dated as of January 18, 2018 (the "2018 Primer");

- at least two versions of the "Whitepaper," one dated December 3, 2017 and the other January 18, 2018, a 130-plus page technical document authored by Dr. Durov; and

- at least two versions of an "IOI" sheet entitled "Telegram – Indication of Interest."

59.     From the beginning of the Offering, potential purchasers received and read the various Offering Documents.  Pavel himself forwarded the 2017 Primer to an individual in California, and other Telegram employees distributed the Whitepaper and Primers to potential Initial Purchasers, including in the United States (the Whitepaper, Primers, and Teasers subsequently were intentionally leaked as a part of the Offering and can currently be found on

the Internet).  Pavel and Initial Purchasers signed versions of the IOI, including one with a potential purchaser who signed with an address in this District.

60.     Throughout this period, Pavel marketed the sale of Grams himself, using business and other contacts to solicit investments and spread the word about the impending Offering.

*Telegram Has Led Gram Purchasers to Reasonably Believe that Their Purchase of Grams Constituted an Investment into a Common Enterprise*

61.     The Gram Purchase Agreements themselves explained that the funds raised by the sale of Grams would be committed to "development and launch of the TON Network."

62.     In the Offering Documents and in conversations Pavel had with the Initial Purchasers, Telegram led purchasers to expect that Defendants would use the Offering proceeds to finance Defendants' businesses and that Defendants and their founders would have a stake in these endeavors both because they were holding Grams and because of the inextricable connection between Grams and Messenger.

63.     For example, the four-page Teaser stated that Telegram was "launching a token sale" in Q1 2018 "[t]o obtain the resources required to make TON a reality," and that Telegram would sell up to 44% of the five billion available Grams for that purpose.  Telegram also stated that the remaining Grams would be reserved for its development team and the "TON Reserve," which would use Grams to "allow for a fast and stable evolution of the platform" after its launch.

64.     The 2017 Primer described Telegram's need for "about $620 million to support continuing organic user growth" for Messenger, and stated that more "than 80 percent of collected funds will be spent on equipment, bandwidth, colocation, and user verification cost" and the rest "will be allocated for wages, offices, and legal and consulting services."  The 2018 Primer similarly explained that Telegram intends "to use the proceeds raised from the offering

for the development of the TON Blockchain, for the continued development and maintenance of Telegram Messenger, and for general corporate purposes."

65.     The Whitepaper also led investors to understand that Defendants would pool assets from the Offering to develop Telegram's envisioned products.  It stated, for example, that "the TON Foundation will receive the fiat and cryptocurrency obtained by selling Grams" and "use them for the development and deployment of the TON [Blockchain]."

66.     The Offering Documents made clear that the purpose of the Offering was "[t]o obtain the resources required to make TON a reality," but also to invest in Messenger itself.  As the IOI stated, Telegram will "use proceeds generated by the sale of Grams to develop and launch the TON Network and develop associated functionality within Telegram Messenger."

67.     And the Whitepaper similarly led investors to expect that Telegram's financial interests would be aligned with investors', including after the launch of Grams.  Specifically, it spoke of the "special account" of Grams "controlled by the TON Foundation" that would be used as "rewards" for developers of the TON Blockchain.  Accordingly, some gains from appreciation of the value of Grams would be reinvested into the enterprise.  The IOI further linked Messenger to the success of the TON Blockchain, stating that "[i]ntegrated into Telegram's applications, the TON Wallet should become the world's most adopted cryptocurrency wallet."

68.     The majority of Grams will be tradeable in the market.  All investors will profit equally if the popularity and price of Grams increase, and, other than with respect to the discount on the price paid, no investor will be entitled to a higher proportion of price increases.

*Telegram Led Investors to Reasonably Expect that Telegram's and Others' Entrepreneurial and Managerial Efforts Will Drive the Success or Failure of Grams and Telegram*

69.     Telegram also led potential investors to understand that it would be Telegram's and its principals' and agents' efforts that would determine the success of the enterprise.

70.    In one of the Teasers, for example, Telegram stated that it "will use its expertise to create TON," and touted the Durovs' "over 20 years of experience in building billion dollar companies used by hundreds of millions of people" and its "Team of A-players."

71.    Similarly, the Primers stated that the "Telegram Team will rely on its 10-year experience in building **user-friendly interfaces** for tens of millions to create light wallets . . . that will allow users to get on board with cryptocurrencies" and that "Telegram has a world-class team of 15 developers . . . experience[d] in building scalable projects for tens of millions."  To this end, the 2018 Primer contained a four-page section describing the biographies, professional experience, and skills of these developers, and identifying the names of "notable team members."

72.    The Whitepaper, moreover, contained a detailed list of projects and steps that Telegram and its principals would take to make TON a reality.  This included describing at length Telegram's plans for the TON Blockchain, including why Telegram believed that its blockchain would be technologically superior to others.  It also described a long list of services that Telegram would develop to improve the functionality of Messenger and of the TON Blockchain after its launch, but that, as the Whitepaper explained, Telegram had no reasonable prospect for completion in advance of the delivery of Grams.

73.    The Offering Documents and other communications made clear in other ways that investors could reasonably expect Defendants' efforts for the enterprise to continue after the launch of Grams and that Telegram and/or its founders would retain a financial interest and the primary role in the success of the proposed TON even after the launch of Grams.

74.    For example, with respect to unsold Grams, the Primers described the important role of the TON Foundation after the launch of Grams.  The 2017 Primer explained that "[f]our percent of the supply (200 million Grams) will be reserved for the development team with a 4-

year vesting period" and at least 52% of the supply will be "retained by the TON Reserve to protect the nascent cryptocurrency from speculative trading."  It also explained that the TON Reserve would transfer its Grams to the TON Foundation, and that the "founders of Telegram will be responsible for the efficient use of funds resulting from any [additional] sale[s]."

75.     Like other Offering Documents, the Primers made clear that that Telegram's work would continue for some years after delivery of Grams on the new TON Blockchain and would remain critical for the foreseeable future.  Both documents, for example, included a timeline specifying that the "[l]aunch of TON Services, TON Storage, and TON Proxy" would occur in the year after the "[l]aunch of Telegram Wallet."  The 2017 Primer explained that Telegram's vision will not be "implemented and deployed" until "2021," and that even then "the continuous evolution of the TON Blockchain will be maintained by the TON Foundation."

76.     These representations were important to purchasers who were considering whether to participate in the Offering.  One such purchaser, for example, asked Pavel Durov what his own "personal ownership of tokens" would be after the Offering, because it "would help to know to ensure [his] stake is . . . fundamental[ly] aligned with the success of TON (more is better!)."  The same investor also sought confirmation that "the tokens issued to employees and developers pre launch [sic]" would be "subject to the same lockup as the investors," which he viewed as "what typically happens for IPOs to ensure people needed to deliver the core intellectual property have incentives to stay engaged through the lockup."

### *Telegram Led Investors to Reasonably Expect a Profit from Their Investment*

77.     Telegram also led investors to expect that they could reap substantial profits from Telegram's efforts into their common enterprise, and took steps and is taking steps to make this expectation a reality.  For example, Telegram touted a readily available trading market for Grams, including one leveraging its hundreds of millions of Messenger users; sold Grams to

Initial Purchasers at deeply discounted prices from its own projected secondary market price at launch; and promoted the future transferability of Grams into a liquid market.

78.     The ability to sell investments in liquid markets is an important consideration for investors when determining whether to buy securities because it represents one way in which they can realize profits from their investments.  In this case, at least one potential Initial Purchaser emailed Telegram questions about the availability of this feature.

79.     The two-page Teaser, for example, told investors to expect a listing of Grams "at the major cryptocurrency exchanges" in "January – March 2019," immediately after the "December 2018 [p]rojected date for [Grams] to be issued to all investors," making Grams almost immediately sellable in open markets, including to United States investors.  Telegram itself is currently in conversations with at least four digital-asset trading platforms, some of which are U.S.-based, to discuss listing Grams on their platforms.

80.     On September 13, Blackmoon Crypto, a digital-asset trading platform founded by a Telegram executive and Vice President of Business Development, announced that "[t]raders will have access to Gram tokens on the Blackmoon Exchange right after [the] Telegram Open Network launch.  Real on-chain Grams, available for withdrawal to Telegram native wallet.  No lock-ups.  No futures or other derivatives."

81.     Another person, whose affiliation to Telegram is unknown but who listed himself as the "COO at the largest custod[ian] of Gram tokens (75% of the second round, 50% of the first)," contacted two popular U.S.-based digital-asset trading platforms, requesting that they list Grams.  Telegram's efforts to create a trading market for Grams have thus already begun.

82.     Indeed, even before the official launch of the TON Blockchain and the delivery of Grams, interests in Grams sold for as high as $4 each in secondary trading markets.

83.    Telegram also repeatedly touted the Messenger user base as a ready market for the adoption of Grams.  As stated in the Primers and one of the Teasers, for example, Telegram stated that it would "leverage its **existing ecosystem** of communities . . . to drive demand and value for [Grams]."  Telegram further stated that, because of the large number of existing Messenger users, Grams would be accessible in 170 million wallets, compared to the "Market Cap" of Bitcoin and Ethereum, which Telegram noted were used by far fewer wallets.

84.    On January 21, 2018, Pavel wrote a potential investor in the United States that Telegram planned to "leverage [its] ~200M user base to drive demand and value for a third-generation blockchain platform called TON and its principal currency Grams."

85.    The Primers made similar statements, including that because the TON Wallet would be "[i]ntegrated into Telegram applications" it will "become the world's most adopted cryptocurrency wallet" and that this existing community would "drive demand" for Grams.

86.    Telegram also led the Initial Purchasers to expect profits by selling Grams to them at deep discounts from the price Telegram told them to expect on the day of launch, thereby encouraging those purchasers to immediately distribute Grams to the public.

87.    Under Telegram's Formula, Defendants would price the first Gram at $0.10, and every subsequent Gram at an amount one-billionth higher than the prior sales price.  As such, Telegram designed the price of Grams to increase "exponential[ly]."  Indeed, Telegram sold Grams to Initial Purchasers at a deep discount to an expected market price of $3.62 at launch.

88.    Telegram repeatedly touted to potential purchasers the fact that Round One and Round Two purchasers would get a substantial discount from the eventual market price.  One of the Teasers, for example, touted a potential "discount to the average public sale price [of]

**68.2%**." Another Teaser explained that "additional supply [of Grams] coming from the TON Foundation will always be more expensive than the price paid by any of the existing buyers."

89. In the image below, the 2017 Primer graphically illustrated the effect that the Formula would have on the price of Grams and why it dictated that the price per token would necessarily increase as sales of Gram increased.



90. The IOI and Whitepaper also led investors to expect stability and lower risk from their investment in Grams. The Whitepaper explained in detail the pricing Formula, and explained that because of the pre-arranged amounts to be transferred to the TON Foundation and the Formula, the price "of the Gram will immediately rise by a certain amount, known in advance," depending on the amounts transferred. Defendants then gave a specific example that assumes 10% of Grams are transferred to the TON Foundation and 4% for the "encouragement of the developers," resulting in "the price of the Gram[s] . . . doubling" at launch time. The net

effect of the TON Foundation's ability to buy and sell would provide a guaranteed minimum return to Initial Purchasers and reduce the losses of secondary market purchasers.

91.     Throughout these statements and others, it was also clear that Defendants' efforts were and would continue to be critical in increasing the chances of these potentials for profit.  As the Primers stated, "Telegram will leverage its existing ecosystem of communities, developers, . . . and merchants to drive the demand and value for [the] TON cryptocurrency."

92.     In addition to the common interest that Gram investors will share in developing the TON, the Telegram development team is also needed to complete the TON Blockchain to allow Grams to achieve the value Telegram touted in the Offering Documents.  Accordingly, the Whitepaper also made clear that Defendants would remain in control of the development of the TON Blockchain at least at first, recognizing that "the TON Foundation will have a majority of votes [required to make changes to TON Blockchain protocols] during the first deployment phase of the TON Blockchain."

93.     The foregoing is summed up in Telegram's pitch to one United States-based investor around January 2018.  Telegram spoke of its "A+ engineering team" and the "chance for 0x-50x" returns on the investments.  That Initial Purchaser, in considering whether to invest in early 2018, concluded that due to the ability to "leverag[e] Telegram's 180M (and growing)" users to "bootstrap TON usage and [Gram] acceptance" there was a "plausible 10-50x return" on investments in Grams.  That investor bought $27.5 million worth of Grams in early 2018 for tokens that had no use and would have no use at the time of launch, demonstrating its intent to profit from the potential increase in value of Grams.

94.     In determining whether to buy Grams, this institutional investor commented on his view that the proposed products were "very ambitious and arguably too complicated," but

nevertheless noted that Grams "could be worth an investment" based on Telegram's "huge mobile presence and usability chops try[ing] to force a cryptocurrency onto their users."

95.     Telegram used the same Offering Documents and Gram Purchase Agreements to market, offer, and sell Grams to all investors domiciled inside and outside the United States.

   *No Significant Use for Grams Exists Other than Uses Calculated to Increase Investor Profits*

96.     In the Offering Documents, Telegram spoke of potential future uses for Grams, specifically, as a medium of exchange for goods and services (or "cryptocurrency"), to purchase not-yet-developed tools on the TON (*e.g.*, network storage, blockchain-based domain names, identity-hiding services), and as a token for future unspecified uses that Telegram and other third parties may eventually develop.  None of these uses of Grams existed at any time and Grams do not have legal tender status in any jurisdiction.

97.     The Whitepaper spoke of potential future products and services that investors could use in connection with Grams, but also made clear that these products were not available at the time the Offering began and would not be available by the time Defendants delivered Grams to Initial Purchasers.  Specifically, the Whitepaper described a series of services, including "TON Network," "TON Storage," and "TON Proxy," all of which would simply be parts of the technological innovations surrounding TON Blockchain.  Other features, like "TON Services" would be created so that third-party users could one day create applications for the TON Blockchain "either at [its] very beginning or at a later time."  Still other features like the so-called "TON Payments," a "platform for [instant] (micro) payments" using Grams, would be "likely . . . released later than the core components of the planned TON Blockchain."

98.     The TON "ecosystem" did not exist and does not exist today.  There are not now and have never been any products or services that can be purchased with Grams.  The TON functionalities as pitched by Telegram were (and remain) entirely dependent on the funds

provided by investors.  Meanwhile, the principal means by which investors would reasonably expect to profit is through their resale of Grams.

**D.**      **Telegram Intended a Public Offering of Grams from the Outset**

99.      Telegram has, with its offers and sales to Initial Purchasers, begun a distribution of securities, which involves the flow of securities from an issuer through conduits and out to the public at large.  A large quantity of Grams—56% of all Grams currently issuable—have already been committed by Telegram to institutional and other large Initial Purchasers.  Telegram's imminent planned delivery of those Grams is the next step in the broader distribution to public investors.  This distribution is to be accomplished without furnishing ultimate purchasers the information about Telegram and Grams required in a registration statement.

100.      The two-page Teaser shows, for example, that Telegram originally envisioned the Offering to take places in two steps in early 2018, in a "private" sale round and a public sale round—the first at $600 million and the second, public rounds at "$600M+ . . . in March 2018."

101.      Telegram also made clear that it intended to distribute Grams as soon as possible. One of the Teasers, for example, stated that "the launch of the TON Blockchain . . . is expected to take place in Q4 2018."  The 2017 Primer's timeline of projected events similarly demonstrated that, in early 2018, Telegram wished to distribute Grams to Initial Purchasers as quickly as possible—by Q4 2018, less than one year after the sale of Grams to Initial Purchasers.

102.      Moreover, the Offering Documents made clear that Telegram envisioned from the outset that Grams needed to be held by a large number of individuals for Telegram's project to work.  One Teaser, for example, noted that Telegram's "vision" included "**[a]n engaged user base** that provides pre-existing critical mass necessary for the ecosystem to grow and eventually become adopted by a [sic] hundreds of millions of users."

103.    The Primers similarly made clear that the success of Defendants' project requires and envisions the rapid, widespread adoption of Grams by as many individuals as possible. Both documents speak of the "**engaged user base** that serves as the pre-existing critical mass necessary for the ecosystem to grow." Along those lines, the 2018 Primer predicts that "the TON-Telegram wallet will instantly become the world's most adopted cryptocurrency wallet."

104.    As evidenced by the Offering Documents, Telegram engaged in a coordinated, centralized effort to create the Durovs' vision of a new, scalable blockchain. Defendants knew, however, that to actually implement the TON Blockchain in the real world, the project would require "numerosity": a widespread distribution and use of Grams across the globe. Indeed, by definition, the TON Blockchain can only become truly decentralized (as contemplated and promoted in the Offering Documents) if Grams holders *other than* the original Grams purchasers actually stake Grams and, thereby, act as "validators" of transactions on the TON Blockchain. Stated differently, if the original Grams purchasers alone all immediately staked their holdings, the TON Blockchain would be *centralized* rather than decentralized and, therefore, subject to misuse and majority attacks. This fundamental need for additional Grams holders demonstrates that the TON Blockchain was designed *from inception* to require the Initial Purchasers to immediately distribute their holdings to the public.

E.    **Defendants Are Preparing to Complete Their Distribution of Grams to the Public**

105.    In March 2019, Telegram released a beta version of the TON Blockchain, a network designed to test the functionality of TON and Grams. This was a necessary precursor for Telegram to eventually launch the TON Blockchain and deliver Grams to Initial Purchasers.

106.    Telegram is preparing to imminently deliver Grams sold to Initial Purchasers, and will do so at the latest by the Deadline Date of October 31, 2019. Indeed, Telegram recently

launched the TON Wallet and, on or around October 2, gave Initial Purchasers until October 16, 2019 to provide it with a blockchain address in which to receive Grams.

107.    Defendants also currently intend to set aside 500 million Grams (or approximately 10% of Grams issuable) for use as incentive payments to third-party developers of products for the TON Blockchain.  They also intend to set aside 100 million Grams for the Durovs, 100 million for other Telegram developers, and the remainder—approximately 1.4 billion Grams (or approximately 28% of Grams issuable)—for other uses by the TON Foundation.

108.    Defendants also intend to transfer approximately 250 million "free" Grams (of the 1.4 billion remainder) to Messenger users "in the days/weeks immediately following" the launch in order to help create a liquid market for Grams, including the Grams Telegram still holds.

109.    Defendants are in the process of creating or have recently created the TON Foundation.  Because the TON Foundation will have the Durovs as its sole directors, Telegram will have complete authority over all TON Foundation activities.

110.    Under the terms of Telegram's agreements with the Initial Purchasers and according to its own statements, Defendants will, upon the launch of the TON Blockchain, also be able to sell Grams to public investors through select digital-asset trading platforms that Telegram has or plans to engage with, including one run and touted by a Telegram executive.

111.    Grams are expected to also be immediately available on digital-asset trading platforms, including certain ones located in the United States.  One popular United States-based digital-asset trading platform with which Telegram has engaged, for example, posted on its blog that it is considering whether it will sell Grams, and noted in internal documents that there is high interest from retail investors in investing in Grams.

112.    Defendants have not prepared and will not file or distribute any registration statement or disclosure required under the federal securities laws to any members of the investing public in the hands of whom Grams are intended to and will come to rest.

113.    Defendants failed to file a registration statement even though they cannot claim any exemption to the registration requirements of the Securities Act.  The exemptions for private offerings do not apply to Grams because, among other things, the Initial Purchasers intended to resell Grams that they purchased at a steep discount to new investors.  Indeed, if they could not engage in these resales, none of the Initial Purchasers' investments would be profitable.

114.    Unless a registration statement is filed, the resale of Grams by the Initial Purchasers and the larger distribution of additional Grams by Telegram will violate the federal securities laws.  Defendants intend to complete this violation through the distribution of billions of Grams before October 31, 2019.

115.    Due to Messenger's infrastructure and other features that permit anonymous communications and transactions, once Grams are distributed to the public, it may be difficult, if not impossible, to trace who has purchased Grams and/or to know who is a current investor in Grams.  Although Telegram contemplates requiring Messenger users to fulfill certain "Know Your Customer/Anti-Money Laundering" requirements for users to use future services, Telegram has stated that it "will have no access to this information."  Moreover, it is uncertain whether identification of parties to transactions in the secondary market for Grams will be ascertainable.

## CONCLUSION

116.    The Initial Purchasers' purchases of Grams, and any subsequent purchases of Grams, were and will be an investment of money, in a common enterprise, with an expectation of profits, derived primarily from the current and future entrepreneurial and managerial efforts of

Defendants and their agents to build the TON Blockchain and drive demand for Grams. Consequently, Telegram's offer and sale of Grams to Initial Purchasers, and any upcoming, offers, sales, or distributions of Grams were and will be offers and sales of securities.

117.   Telegram offered and sold securities and intends to offer and sell Grams to the public in the future.  The federal securities laws require that these investors be provided with adequate disclosures regarding the investment and any of the risks associated with it.

118.   Defendants' prior and future unregistered offers and sales of Grams are in violation of Section 5(a) and (c) of the Securities Act.

## CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

119.   The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 118, as though fully set forth herein.

120.   By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

121.   By reason of the conduct described above, Defendants, directly or indirectly violated, are violation, and, unless enjoined will continue to violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

**I.**

An Order temporarily and preliminary, and a Final Judgment permanently, restraining and enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any ongoing and future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], including, but not limited to, by delivering Grams to any persons, or taking any other steps to effect any unregistered offer or sale of Grams;

**II.**

An Order temporarily and preliminarily enjoining and restraining Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents;

**III.**

An Order providing that the Commission may take expedited discovery; and may effect service of the Complaint and the Order to Show Cause moving papers by alternative means, namely by email service on Defendants' U.S.-based legal counsel.

**IV.**

A Final Judgment directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

**V.**

A Final Judgment prohibiting Defendants from participating in any offering of digital asset securities pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

## VI.

A Final Judgment directing the Defendants to pay civil money penalties pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

## VII.

Such other and further relief as the Court deems appropriate and necessary for the benefit

of investors.

Dated: New York, New York
       October 11, 2019

SECURITIES AND EXCHANGE COMMISSION

By: _____

        Marc P. Berger
        Jorge G. Tenreiro
        Kevin McGrath
        200 Vesey Street, Suite 400
        New York, New York 10281-1022
        (212) 336-9145 (Tenreiro)
        Email: TenreiroJ@sec.gov
        Attorneys for Plaintiff

Of Counsel
Lara S. Mehraban
John O. Enright
Daphna A. Waxman
Morgan Ward Doran