**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**     :
    :
                **Plaintiff,**     :       **19 Civ.**
    :
        **- against -**     :       **ECF Case**
    :
**TELEGRAM GROUP INC. and TON ISSUER INC.,**     :
    :
            **Defendants.**     :
    :
----------------------------------------------------------------- x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY APPLICATION FOR**
**AN ORDER TO SHOW CAUSE, TEMPORARY RESTRAINING ORDER, AND ORDER**
**GRANTING EXPEDITED DISCOVERY AND OTHER RELIEF**

Jorge G. Tenreiro
Kevin McGrath
Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

October 11, 2019

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS..................................................................................................... 3

    I.    BACKGROUND ........................................................................................... 3

    II.    TELEGRAM'S UNREGISTERED OFFERS AND SALES OF SECURITIES ............. 4

        A.    Telegram, Its Founders and Its Secrecy Features......................................4

        B.    Telegram Sought to Raise Funds to Supports its Ventures ........................5

        C.    Telegram Raised $1.7 Billion in the Initial Stage of its Offering .........6

        D.    Telegram Marketed Grams as Investment Contracts .............................7

        E.    Telegram Did Not Initially File Any Documents with the SEC In
             Connection with the Offerings to the Initial Purchasers .......................9

    III.  TELEGRAM IS PREPARING TO FLOOD U.S. MARKETS WITH
        UNREGISTERED SECURITIES ................................................................. 10

ARGUMENT........................................................................................................................ 12

    I.    STATUTORY AND REGULATORY FRAMEWORK................................................. 12

        A.    The Registration Requirements of the Securities Act ...........................12

        B.    Exemptions from Registration and Distributions by Issuers.................13

    II.    STANDARD FOR INJUNCTIVE RELIEF IN SEC ACTIONS ................................... 15

    III.  DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
        PRELIMINARILY ENJOINED FROM ONGOING AND ADDITIONAL
        UNREGISTERED OFFERS AND SALES OF SECURITIES ................................... 15

        A.    The Commission Has Made a Prima Facie Showing That the Defendants
             Have Violated the Securities Act .......................................................16

             1.    Grams are "Investment Contracts" and, Therefore, "Securities"............... 16

             2.    Grams Are Not Excluded From the Definition of Security Because
                 of the Characterization Given to Them by Telegram And They
                 Have No "Use" Other Than As Investment Contracts ............... 19

             3.    There Was and Is No Registration Statement Filed or In Effect as
                 to the Offer and Sale of Grams to the Public in Interstate
                 Commerce ................................................................................. 21

      B.     Defendants Engaged in a Public Offering and/or Distribution of Securities to Which No Exemption Applies ........................................................................23

III.  THE COURT SHOULD ORDER DEFENDANTS NOT TO ALTER, DESTROY, OR CONCEAL DOCUMENTS ...................................................................... 26

IV.  EXPEDITED DISCOVERY AND ALTERNATIVE MEANS OF SERVICE ARE NECESSARY TO PREPARE FOR THE SHOW CAUSE HEARING.......................... 26

**CONCLUSION** ......................................................................................................... **29**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38 (1941) ....................................... 13

*Aaron v. SEC*, 446 U.S. 680 (1980) ............................................................................................. 13

*Cameron v. Outdoor Resorts of America*, 608 F.2d 187 (5th Cir. 1979) .................................... 21

*Cont'l Mktg., Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) ........................................................ 19

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992) ............................................................... 22

*FTC v. Pecon Software, Ltd.*, No. 12 Civ. 7186, 2013 WL 4016272 (S.D.N.Y. Aug. 7, 2013) ....... 28

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ............................................................................ 24

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959) ................................................... 14, 23

*In re Alliance Pharmaceutical Corp. Secs. Lit.*, 279 F. Supp. 2d 171 (S.D.N.Y. 2003) .............. 22

*In re GLG Life Tech Corp. Secs. Litig.*, 287 F.R.D. 262 (S.D.N.Y. 2012) .................................. 28

*In the Matter of Oklahoma-Texas*, 2 S.E.C. 764 (Sept. 23, 1937),
    *aff'd* 100 F.2d 888 (10th Cir. 1939) ................................................................................. 23

*Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) .................................................................... 21

*Lewisohn Copper Corp.*, 38 S.E.C. 226 (1958) ......................................................................... 14

*Madu, Edozie & Madu, P. C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106 (S.D.N.Y. 2010) ....... 27

*Pahmer v. Greenberg*, 926 F. Supp. 287 (E.D.N.Y. 1996) .......................................................... 22

*Quinn & Co. v. SEC*, 452 F.2d 943 (10th Cir. 1971) ............................................................ 14, 24

*R.A Holman v. SEC*, 366 F.2d 446 (2d Cir. 1966) ................................................................ 14, 23

*Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972) ...................................... 22

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) .............................................................. 17

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ............................................................................. 17

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ....................................... 28

*Rocky Aspen Management 204 LLC v. Hanford Holdings LLC*,
    230 F. Supp.3d 159 (S.D.N.Y. 2017) ................................................................................ 18

*SEC v. Aaron*, 605 F.2d 612 (2d Cir. 1979) *vacated on other grounds*,
    *Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................................. 13

*SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348 (S.D.N.Y. Apr. 21, 2014) ...................... 28

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1997),
    *aff'd, SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) .................................................. 13, 24

*SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738 (2d Cir. 1941) ................................... 14

*SEC v. Edwards*, 540 U.S. 389 (2004) ............................................................................. 17, 18

*SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019) ............................................................................ 20

*SEC v. Gentile*, __ F.3d __, No. 18-1242, 2019 WL 4686251 (3d Cir. Sept. 26, 2019) ............. 15

*SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476 (9th Cir. 1973) ......................................... 19

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ............................................................ 17, 18

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ..................................................... 15

*SEC v. Middleton*, No. 19 Civ. 4625 (WKF) (E.D.N.Y. Aug. 12, 2019) ...................................... 26, 27

*SEC v. N. American Research & Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970) ................................... 16

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010) ...................................... 13

*SEC v. PlexCorps*, No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017) ............................. 26, 27, 28

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ......................................................... 13, 16, 23

*SEC v. REcoin*, No. 17 Civ. 5725 (RDJ) (E.D.N.Y. Sept. 29, 2017) ......................................... 26, 27

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ................................................................ 17, 18, 21

*SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923 (S.D. Ohio 2009) ........................... 22

*SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) .............. 27

*SEC v. Spongetech Delivery Sys., Inc.*, No. 10 Civ. 2031 (DLI) (JMA),
    2011 WL 887940 (E.D.N.Y. Mar. 14, 2011) ....................................................................... 26

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ................................................................. 15

*SEC v. Universal Major Industries Corp.*, 546 F.2d 1044 (2d Cir. 1976) .................................. 16

*SEC v. W.J. Howey*, 328 U.S. 293 (1946) ............................................................. 2, 16, 17, 19

*SEC v. Zubkis*, No. 97 Civ. 8086 (JGK), 2005 WL 1560489 (S.D.N.Y. June 30, 2005) ............... 27

*Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543 (D.N.J. Dec. 10, 2018) . 20

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ........................................................................... 19

*United Hous. Found., Inc v. Forman*, 421 U.S. 837 (1975) ................................................. 17, 19

*United States v. Lebanese Canadian Bank*, 285 F.R.D. 262 (S.D.N.Y. 2012) ............................ 27

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ............................................................ 21

*United States v. Lindo*, 18 F.3d 353 (6th Cir. 1994) ............................................................... 24

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) ........................................................... 24

**Statutes**

15 U.S.C. § 77b(a)(1) ........................................................................................................... 16

15 U.S.C. § 77b(a)(11) .................................................................................................... 14, 23

15 U.S.C. § 77d ................................................................................................................... 13

15 U.S.C. § 77d(a)(2) ........................................................................................................... 23

**Other Authorities**

Milton H. Cohen, "TRUTH IN SECURITIES" REVISITED, 79 Harv. L.Rev. 1340, 1345 (1966) ...... 13

Securities Act Rel. No. 33-10649, 84 Fed. Reg. 30460-01, 30466 (June 26, 2019) .................... 26

Securities Act Rel. No. 33-6863, 55 Fed. Reg. 18306-01 (May 2, 1990) ................................... 26

**Rules**

Fed. R. Civ. P. 26(d) ............................................................................................................. 27

Fed. R. Civ. P. 4(f) ............................................................................................................... 27

Fed. R. Civ. P. 65(b)(2) ........................................................................................................ 26

**Regulations**

17 C.F.R. § 230.502(d) ......................................................................................................... 25

17 C.F.R. § 230.506(c) ................................................................................................ 23, 24, 25

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum in support of its emergency application, by order to show cause, for (1) a temporary restraining order and a preliminary injunction enjoining defendants Telegram Group Inc. and TON Issuer Inc. (collectively "Telegram" or "Defendants") from ongoing and future violations of the federal securities laws; (2) temporary and preliminary orders prohibiting Defendants from destroying documents; and (3) expedited discovery and alternate service.

## PRELIMINARY STATEMENT

This emergency application seeks to stop Telegram from flooding United States markets with billions of digital tokens known as "Grams" through an unregistered offering of securities. Without a registration statement in place, Telegram's planned distribution would violate the federal securities laws and deprive investors of the information available in a registered offering.

The Securities Act of 1933 requires securities offerings to be registered with the SEC to provide investors with full and fair disclosures that allow investors to make informed decisions. Defendants have deliberately chosen not to register their offering of Grams (the "Offering"), which does not qualify for an exemption from the registration requirements of federal law.

In early 2018, Telegram began raising capital by selling billions of Grams to fund the growth of its encrypted messaging application Telegram Messenger ("Messenger"). Messenger, boasts over 300 million users worldwide and claims to be developing a "decentralized" digital economy based on a new, technologically advanced distributed ledger or "blockchain."

From January to March 2018, Telegram raised more than $1.7 billion from 171 investors (the "Initial Purchasers"), including $424.5 million from 39 United States investors. The Initial Purchasers entered into agreements with Telegram pursuant to which Telegram promised to deliver to them 2.9 billion Grams (out of five billion minted) by no later than October 31, 2019,

the date by which Telegram would also launch its promised blockchain, the "TON Blockchain." Those offers and sales, which were not registered with the SEC, were the first step in achieving Telegram's stated goal—the mass distribution of Grams to the investing public worldwide.

In representations to the SEC through counsel, Telegram argued that it did not need to register the Offering because Grams are not securities subject to the federal securities laws. In reality, Grams are "investment contracts" and thus securities under the Securities Act and the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Indeed, Telegram's own promotional materials and other actions show that Grams satisfy *Howey*. That is, a reasonable purchaser of Grams would view their purchase as an investment of money with a reasonable expectation of profiting from Telegram's managerial efforts to be shared with other purchasers and with Defendants. Telegram created these reasonable expectations in offerees and purchasers by, among other things, repeatedly touting the experience of its "team" to increase "demand" and "value" for Grams, by leading purchasers to expect readily available markets to resell Grams, including some that Telegram itself is avidly attempting to create, and by selling Grams at a steep discount—an average price of $0.37 and $1.38 per Gram—to Telegram's expected selling price of $3.62 for Grams upon the launch of the TON Blockchain.

Telegram also incorrectly claimed that even if Grams are securities, its purely "private" offering is exempt from registration. Yet Telegram's styling of its offering as "private" is belied by Telegram's own stated desire and efforts to ensure that Grams sold to the Initial Purchasers are further distributed to a wide range of public investors.

At present, Telegram has committed to deliver the 2.9 billion Grams to the Initial Purchasers by no later than October 31, 2019, when, absent an injunction, they will likely resell large quantities of Grams to the investing public. In addition, Telegram has stated that it intends

to distribute another approximately 250 million Grams to Messenger users, dispossessing itself of well over 60% of its Grams holdings. Unless Telegram is enjoined, the ultimate purchasers of those Grams will lack the required disclosures necessary to facilitate informed investment decisions, given Telegram's failure to register the Offering.

Once Telegram and Initial Purchasers—essentially Telegram's underwriters—distribute Grams to hundreds of millions of public investors, the transactions will be difficult. if not impossible. to unwind. The large number of purchasers, the many unregistered potential markets where Grams may be sold, and the high potential for anonymity on Telegram's blockchain and similar networks will make it extremely difficult, if not impossible, to trace these transactions.

Accordingly, the SEC makes this application to protect the strong public interest in enforcing the registration requirements for investments targeted at the general public. The SEC respectfully requests that the Court enjoin Telegram from delivering Grams to Initial Purchasers (who may in turn make additional unregistered offers and sales) or otherwise offering, selling, or distributing Grams to any other person without complying with the registration requirements.

## STATEMENT OF FACTS

### I.     BACKGROUND

The term "digital asset" or "digital token" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens." Entities have offered and sold digital tokens in fundraising events in exchange for consideration. These distributed ledgers or "blockchains" are cryptographically secured.[1] *See* Decl. of Daphna Waxman, dated October 11, 2019 ("Decl."), at

---

[1]      A distributed ledger is a peer-to-peer database spread across a network that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages. The system relies on cryptographic techniques for secure recording. A distributed ledger can be shared and accessed

¶ 1, n.1. Generally, digital tokens may entitle holders to certain rights related to a venture underlying the fundraising event, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These digital tokens may also be traded on online platforms, often called exchanges, and traded for other digital assets or fiat currency. Often, the coins or tokens are tradable upon issuance and delivery to purchasers. *Id.* at ¶ 5.

Issuers of digital tokens typically release a "whitepaper" or other marketing materials describing the project and the terms of the issuance. To participate, purchasers are generally required to transfer funds to the issuer's address, online wallet, payment processor, or other account. *Id.* at ¶ 6. After the completion of the issuance, the issuer will distribute its unique token to the participants' unique address on the blockchain. In some instances, the digital tokens may continue to be sold by the issuer. In other instances, they may only be obtained after issuance by purchasing them on secondary markets. *Id.* at ¶¶ 6, 7.

## II. TELEGRAM'S UNREGISTERED OFFERS AND SALES OF SECURITIES

### A. Telegram, Its Founders and Its Secrecy Features

Starting in 2006, brothers Pavel and Dr. Nikolai Durov, Russian nationals, had success creating a social media networking application ("app") similar to Facebook. Following that venture, the Durovs launched a beta version of Messenger, an encrypted messaging application for handheld devices that is estimated to have 300 million monthly users and is considered the leading messaging application for the blockchain technology community.

Telegram, however, does not charge any fees for use of Messenger and has "declared not-for-profit" goals. As Telegram tells potential users before they download Messenger, "Telegram

---

by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, essentially computer programs designed to execute the terms of a contract when certain triggering conditions are met. Decl. at ¶ 1, n.1. Citations to "Ex." are to the Waxman Declaration.

is free and will always be free," and Telegram is "not going to sell ads or introduce subscription fees." Ex. D. Telegram also informs Messenger users that it "take[s] your privacy seriously and will never give third parties access to your data." *Id.* For example, Telegram promotes the "Secret Chats" feature of Messenger, which allows users to "send all types of disappearing content," and employs an infrastructure that synchronizes "encrypted data across multiple independent server[s] . . . spread across different continents and jurisdictions." Telegram boasts that it has "disclosed 0 bytes of user data to third parties, including governments." *Id.* Although Telegram contemplates requiring Messenger users to fulfill certain "Know Your Customer/Anti-Money Laundering" requirements in order for users to take advantage of future services, Telegram has stated that it will have not have access to this information.

Although Messenger incorporates ad hoc functionality that lets users exchange goods and services for fiat and digital currency, Telegram wished to integrate the ability to exchange digital assets directly into Messenger. The Durovs concluded, however, that existing networks such as the Bitcoin and Ethereum blockchains did not yet have the capability to replace high-transaction mechanisms like credit cards and fiat currency. In late 2017, Telegram thus stated its intent to introduce "next-generation multi-blockchain" systems "designed to host a new generation of cryptocurrencies and decentralized applications, at a massive scale." Ex. 4. Telegram called this yet to be created "ecosystem," the "Telegram Open Network" or "TON."

### B. Telegram Sought to Raise Funds to Supports its Ventures

In late 2017, to make its vision of a "TON ecosystem" a reality, Telegram began plans to solicit funds from investors. Initially, Telegram envisioned a two-part offering to occur in 2018, with a "private" sale round to raise $600 million, to be immediately followed by a "public sale" for "$600M+ . . . in March 2018." Ex. E at 1. At this point, Telegram also envisioned that Grams sold in this offering would "be issued to all investors" by December 2018. *Id.*

Telegram later changed the way it structured its Offering of Grams to the public. First, in early 2018, Telegram initiated a global offering to wealthy individuals, venture capitalists, and large hedge funds (the "Initial Purchasers"), whereby it ultimately raised $1.7 billion in two rounds (the "Initial Stage"). Second, as provided under the terms of the purchase agreements governing those sales (the "Gram Purchase Agreements"), Telegram would deliver Grams to Initial Purchasers as soon as possible (but no later than October 31, 2019). Telegram fostered the expectation, including by the way it structured the Initial Stage, that the Initial Purchasers would act as conduits for reselling or otherwise distributing Grams to the investing public.

### C. Telegram Raised $1.7 Billion in the Initial Stage of its Offering

From approximately January through March 2018, each Initial Purchaser entered into a Gram Purchase Agreement with Telegram Group Inc. and TON Issuer Inc. Exs. CC, DD. The Gram Purchase Agreements stated that Telegram intended to create the TON Blockchain and issue Grams for use on the blockchain, and that purchasers would pay Euros or Dollars to receive the Grams. The Gram Purchase Agreements further committed Telegram to provide Grams to the Initial Purchasers by no later than a "Deadline Date" of October 31, 2019 (or be obligated to return Initial Purchasers' funds minus expenses), regardless of whether Telegram or anyone else had developed any "use" of Grams as a currency by that date.

Initial Purchasers paid $0.38 and $1.33 per Gram in the first and second rounds, respectively. Exs. CC, DD. According to the Offering Documents, the purchase price was at a deep discount to the price at which Grams will be sold upon launch, which Telegram set at $3.62 per Gram. Exs. E, F, G, H. EE.

The Gram Purchase Agreements further specified that:

- Purchasers were prohibited from assigning the rights created by the Purchase Agreement to third parties;

- Grams sold during the *first* but not the second round will be subject to lock-up restrictions via a smart contract. These Grams will be released from the lock-up restrictions automatically and in 25% increments over an 18-month period following launch at periods ranging from 3 to 18 months; and
- Purchasers were purchasing the Grams for "[their] own account and not with a view towards, or for resale."

Exs. CC, DD.

Telegram ultimately raised $850,000,000 in each of the Initial Stage's two rounds, in exchange for a promise to deliver 1.7 billion Grams. In Round One, U.S. Initial Purchasers invested $385,500,000, or 45.4% of the total raised. In Round Two, U.S. Initial Purchasers invested $424,500,000, or 36.3% of the total raised. In total, U.S. Initial Purchasers purchased over 1 billion of the 1.7 billion Grams Telegram sold in the Initial Stage. Exs. R, EE.

### D. Telegram Marketed Grams as Investment Contracts

Telegram used certain "Offering Documents" to market, offer, and sell Grams. Specifically, Telegram described the TON Blockchain and Grams in an unpublished but widely circulated technical white paper authored by Nikolai Durov (the "Whitepaper") Exs. I, J, K; various "primers" (the "Primers") Exs. G, H, a teaser brochure (the "Teaser") Exs.E, F, and a Letter of Intent (the "LOI,") Ex. L, M (collectively, the "Offering Documents") describing a "vision for a new cryptocurrency and . . . ecosystem." Telegram's statements in these Offering Documents and elsewhere reasonably led purchasers of Grams to view their purchases as an investment in a common enterprise from which they could expect future profits based on Telegram's managerial efforts to develop a business.

Telegram stated in the Offering Documents that it would use the proceeds of the Offering to create and develop the TON Blockchain, *see, e.g.*, Exs. G, H, CC, DD, and described in detail the various services and applications it would develop. Telegram also told potential purchasers the following:

- that the TON Blockchain would act "as a decentralized supercomputer and value transfer system" that will facilitate both the transfer of digital assets and the creation and implementation of digital contracts, *see*, e.g., Ex. at H at 1;

- that the TON Blockchain will include several novel features designed to improve speed and scalability compared to first generation blockchains such as the Bitcoin and Ethereum blockchains,[2] *see, e.g.*, Ex. H at 35;

- that the TON Blockchain will be an "entire blockchain ecosystem" that will integrate multiple platforms and services, including Telegram Messenger; a network storage solution; an internet proxy and DNS service; a web application host; and a payment channel network, *see, e.g.*, Ex. H at 13; and

- that Telegram would use funds raised in the Offering to integrate Telegram Messenger into TON Blockchain to promote the immediate and widespread distribution of Grams (the Pre-Sale Primer touted that the TON Blockchain "will leverage [Telegram's] **existing ecosystem** of communities, developers, payment providers, and merchants to drive demand for [Grams]." (emphasis in original)), *see, e.g.*, Ex. H at 5.

Telegram further led reasonable purchasers to expect that Telegram's financial fortunes would continue to be tied with those of the purchasers, and that Telegram's efforts to increase demand and "value" for Grams would continue. Specifically, the Offering Documents contemplated Telegram's creation of a not-for-profit organization called the "TON Foundation" to which it would transfer Telegram's unsold Grams to promote and support the TON Blockchain. Ex. H at 19. Defendants are in the process of forming the TON Foundation in the Cayman Islands. Ex. T. The Durovs will, at least initially, manage the TON Foundation as sole members of the board. Telegram plans to establish the TON Foundation with an initial capital contribution of $5 million to cover operational expenses. Telegram states that it does not expect to provide further funding for the TON Foundation, though nothing prohibits it from doing so.

---

[2] The TON Blockchain will use a "proof-of-stake" consensus mechanism to validate transactions on the network. The platform will "automatically" select validators each month based on the size of their respective stakes. Validators must then "stake" all or part of their Grams tokens, and groups of potential validators can aggregate their stakes to increase the likelihood that they will be selected. Validators will be rewarded with newly minted Grams for their role validating transactions on the network, processing users' transactions and smart contracts, and storing data. *See generally* Exs. H at 8, J at 45.

Any cash generated from the TON Foundation's sale of Grams may be used to provide cash rewards to bug hunters, offer cash grants to developers to improve the TON Blockchain's code, and fund the development of new functionality on the TON Blockchain.  Ex. H at 19, J at 31.[3]

The TON Foundation plans to use third-party digital-asset platforms to facilitate its trading of Grams in the secondary market.  In one of the Offering Document, Telegram told Purchasers to expect a listing of Grams "at the major cryptocurrency exchanges" in "January – March 2019," immediately after the "December 2018 [p]rojected date for [Grams] to be issued to all investors."  Ex. E.  Indeed, Coinbase, a large digital-asset platform in the United States, plans to make Gram tokens available to U.S. customers to buy and sell on its platform immediately following launch.  According to an internal memo produced by Coinbase, Grams "[are] a high visibility asset that we want to support as close to launch as possible" due to the likely "unmatched distribution" of Grams and the "***high expected retail interest***" (emphasis added) as a result of the integration of Grams with Telegram Messenger.  Ex. AA.

### E.    Telegram Did Not Initially File Any Documents with the SEC In Connection with the Offerings to the Initial Purchasers

Telegram did not initially file any documents with the SEC in connection with the first rounds of the Offering to the Initial Purchasers.  However, after the SEC's Enforcement staff learned of the offering and contacted counsel for Telegram, it filed Forms D with the SEC on February 13 and March 29, 2018.  The Forms D disclosed that Telegram had sold $850,000,000 in each of two rounds of the Offering and that it intended to use Offering proceeds "for the development of the TON Blockchain, the development and maintenance of the Telegram Messenger and the other purposes described in the offering materials."  Exs. A, B; *see also* Decl.

---

[3]    Telegram initially planned for the TON Foundation to also buy Grams but has informed investors that the TON Foundation will no longer be able to buy Grams.  Exs. J at 131, U at 2.

¶¶ 8-10, 14.  Telegram's Offering materials also stated that Telegram reserved the right to use "a significant portion of the funds . . . for its own purposes rather than commit solely to the development and launch of the TON network."

## III.   TELEGRAM IS PREPARING TO FLOOD U.S. MARKETS WITH UNREGISTERED SECURITIES

Telegram has not filed any registration statement with the SEC or distributed any disclosure documents to potential investors.  Meanwhile, Telegram is preparing to complete its unregistered offering of Grams, including into United States markets, in three ways calculated to ensure widespread distribution of Grams.

*First*, Telegram is preparing to imminently deliver Grams sold in the Initial Stage to purchasers, and to do so at the latest by the Deadline Date of October 31, 2019.  In March 2019, Telegram released a beta version of the TON Blockchain, a network designed to test the functionality of TON and Grams.  Decl. ¶ 14.  This was a necessary precursor for Telegram to eventually launch the TON Blockchain and distribute Grams to purchasers.  Telegram then launched the TON Wallet and, on or around October 2, gave purchasers until October 16, 2019 to provide Telegram with a blockchain address in which to receive Grams.  *Id.* at ¶ 41.

Telegram's release of Grams can occur on any day before October 31 and Telegram has repeatedly failed to provide the SEC with any more specific information regarding the timing of the Grams' release.  For example, in emails dated August 29, September 4,  and September 26, 2019, to Defendants' counsel, Enforcement staff requested that Telegram provide, among other things, the precise timing of the launch of the TON Blockchain.  In response, Defendants' counsel stated that the launch would occur in "mid or late October, and in all events prior to the [October 31, 2019] deadline set forth in the Purchase Agreements."  *Id. at* ¶ 56.   In a letter dated October 9, 2019 to Defendants' counsel, Enforcement staff again requested that Telegram

provide, among other things, the precise timing of the launch of the TON Blockchain information. In an email dated October 10, 2019, Defendants' counsel confirmed receipt of the inquiry and stated as follows: "We're endeavoring to get answers to your questions as quickly as possible, though it's possible it may not be by your deadline of COB [October 10, 2019]." And counsel failed to respond on October 10 to an email request later that day from the Enforcement Staff for a "rolling response" to its inquiries. *Id.* at ¶ 57.

*Second*, Telegram is also preparing to make additional sales of Grams in the open market. It first intends to set aside 500 million Grams (approximately 10% of Grams issuable) for use as incentive payments to third-party developers of products for the TON ecosystem, 100 million Grams for the Durovs, and 100 million for other Telegram developers. Ex. EE. The remainder, approximately 1.4 billion Grams (or approximately 28% of Grams issuable), will be transferred to the TON Foundation for its stated purposes, including sales to attempt to stabilize the market price for Grams or to raise additional funds. Exs. EE, H at 19, J at 131.[4]

*Third*, Defendants intend to transfer approximately 250 million "free" Grams (of the 1.4 billion remainder) to Messenger users "in the days/weeks immediately following" the launch. Ex. EE. Sending a larger number of Grams to Messenger users will inure to Defendants' economic benefit by helping to create a liquid market for Grams and a large investor base.

Telegram and/or its executives, among others, also appear to be facilitating Grams' availability for public trading on unregistered digital asset trading markets. On September 13, Blackmoon Crypto, a digital asset exchange founded by a Telegram executive announced that "[t]raders will have access to Gram tokens on the Blackmoon Exchange right after Telegram

---

[4]     Defendants are in the process of creating or have recently created the TON Foundation. Because the TON Foundation will have the Durovs as its sole directors, Telegram will have complete authority over all TON Foundation activities. *See* Ex. T, EE.

Open Network launch. Real on-chain Grams, available for withdrawal to Telegram native wallet. No lock-ups. No futures or other derivatives." Ex. BB. Another person, whose affiliation to Telegram is unknown but who listed himself as the "COO at the largest custod[ian] of Gram tokens (75% of the second round, 50% of the first)," contacted popular, U.S.-based digital asset platforms, requesting that they list Grams. Exs. X, Y. Thus, efforts to create a trading market for Grams have already begun. And one popular United States-based digital asset platform posted on its blog that it is considering whether it will sell Grams, and noted in internal documents that there is high interest from retail investors to invest in Grams. Ex. AA.

Based on their current distribution plan, Defendants have not prepared and will not file or distribute any registration or disclosure documents required under the federal securities laws to any members of the investing public before the Offering. Decl. ¶¶ 58. Finally, if Defendants' offering proceeds and Grams flood the U.S. markets, the transactions may be impossible to reverse. Due to Messenger's infrastructure and other features that permit anonymous communications and transactions, once Grams are distributed to the public at large, it may be difficult, if not impossible, to trace who has purchased Grams and/or who is a current investor in Grams. Although Telegram contemplates requiring Messenger users to fulfill certain "Know Your Customer/Anti-Money Laundering" requirements in order to for users to use future services, Telegram has stated that it "will have no access to this information." Ex. H at 12.

## ARGUMENT

## I. STATUTORY AND REGULATORY FRAMEWORK

### A. The Registration Requirements of the Securities Act

The registration provisions contemplate that the offer or sale of securities to the public must be accompanied by the "full disclosure" afforded by registration and delivery of a statutory prospectus containing information necessary to enable investors to make an informed investment

decision.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).  Registration entails disclosure of "information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered."  *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1997), *aff'd, SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998).  "The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors."  *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *Ralston Purina*, 346 U.S. at 124), *vacated on other grounds, Aaron v. SEC*, 446 U.S. 680 (1980).

"By imposing a registration requirement, Congress put the burden on companies issuing securities to inform truthfully the public about themselves and the securities being issued."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010) (citing *A.C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40 (1941); Milton H. Cohen, "TRUTH IN SECURITIES" REVISITED, 79 Harv. L.Rev. 1340, 1345 (1966)).  "When a company fails entirely to register its securities and nonetheless proceeds to sell them generally to the public . . . the entire system of mandatory public disclosure is evaded to public detriment."  *Id*.

## B. Exemptions from Registration and Distributions by Issuers

Through the inclusion in the Securities Act of exemption provisions from Section 5 registration requirements,  like Section 4 of the Securities Act, Congress distinguished between transactions that occur during the process by which securities are distributed to the public in an offering that emanates from the issuer of the securities (which must be registered), and ordinary trading transactions in the market by investors once the securities have come to rest with investors (which are in most cases exempt from registration).  *See* 15 U.S.C. § 77d.

In drawing this distinction between issuer distributions and secondary trading, Congress sought to provide the protections afforded by registration both where securities are sold to the

public by the issuer, and where they are publicly sold through an intermediary who buys the stock from the issuer with a view to public resale, defined as "underwriters." 15 U.S.C. § 77b(a)(11). Congress enacted a broad definition of underwriter in order to include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public. "The term underwriter is not limited to its common definition, but rather is a word of art." *Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).

A "distribution" under the Securities Act is equivalent to a public offering of securities. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959). As the Second Circuit observed in *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941), Section 4(a)(1) "does not in terms or by fair implication protect those who are engaged in steps necessary to the distribution of security issues." As explained in full below, a distribution "comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" *R.A Holman v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (*quoting Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)).

A public distribution by issuers and underwriters is not exempt from the registration requirements of Section 5 under Section 4 and requires registration pursuant to Section 5 unless some other exemption or safe harbor applies. Such exemptions and safe harbors have been structured to exempt from the registration requirements of Section 5 transactions where the purpose and protections of registration have been otherwise satisfied or are unnecessary. In addition, the burden to establish entitlement to an exemption is on the party claiming it and "[t]he exemption relied upon must be strictly construed against the person claiming its benefit, as public policy strongly supports registration." *Quinn*, 452 F.2d at 946 (citations omitted).

## II. STANDARD FOR INJUNCTIVE RELIEF IN SEC ACTIONS

Section 20(b) of the Securities Act authorizes the SEC, upon a proper showing, to seek and obtain in federal district court a "temporary injunction or restraining order" when "any person is engaged or about to engage in any acts . . . which constitute or will constitute a violation" of the securities laws. 15 U.S.C. § 77t(b). As the Third Circuit recently said, "the most basic rule of preventive injunctive relief [is] that the plaintiff must show a cognizable risk of future harm." *SEC v. Gentile*, __ F.3d __, No. 18-1242, 2019 WL 4686251, at *4 (3d Cir. Sept. 26, 2019) (citation omitted). A "proper showing" requires that the Commission demonstrate (1) a *prima facie* case that a violation of the federal securities laws has occurred and (2) a likelihood that a violation will occur again in the future. *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir. 1990). The Commission need not show risk of irreparable injury or the unavailability of remedies at law. *Id*. at 1036. "[B]y making the showing required by statute that the defendant 'is engaged or about to engage' in illegal acts, the Commission is seeking to protect the public interest." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). Accordingly, and because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *Id.*

## III. DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM ONGOING AND ADDITIONAL UNREGISTERED OFFERS AND SALES OF SECURITIES

A *prima facie* case for a Section 5 violation requires: (1) no registration statement was filed or in effect as to the transaction; (2) the defendant directly or indirectly sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce. *See, e.g.*, *Cavanagh*, 445 F.3d at 111 n. 13 (2d Cir. 2006) (citations and internal quotations omitted).

The SEC need not prove scienter.  *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).  If the SEC establishes a *prima facie* case, the burden shifts to the defendant to prove that his securities transactions were exempt from the registration requirements.  *Ralston Purina*, 346 U.S. at 126; *Cavanagh*, 155 F.3d at 133).  "Any exemption from this [registration] requirement must be strictly construed."  *Aaron*, 605 F.2d at 618 (citing *SEC v. N. American Research & Dev. Corp.*, 424 F.2d 63, 71-72 (2d Cir. 1970)).

At bottom, Telegram claims Grams were and are not subject to the registration requirements because, Telegram claims, Grams are not "securities" under the Securities Act.  Considering the economic substance of purchases of Grams, however, makes clear that Grams are quintessential "investment contracts" and therefore securities.  Telegram should have complied with the registration requirements of the Securities Act relating to its offers and sales to Initial Purchasers with the SEC, and must register its impending offers and sales of Grams to the investing public.  Because it has not done so, Telegram has violated and is on the precipice of violating the Securities Act and should be enjoined.

## A.     The Commission Has Made a Prima Facie Showing That the Defendants Have Violated the Securities Act

### 1.  Grams are "Investment Contracts" and, Therefore, "Securities"

Defendants sold and are about to offer and sell Grams, which are securities.  This satisfies the first element of the SEC's *prima facie* case of a Section 5 violation.  Section 2(a)(1) of the Securities Act includes "investment contract[s]" in the definition of "security."  15 U.S.C. § 77b(a)(1).  The interests offered and sold in Grams are investment contracts and therefore securities under *SEC v. W.J. Howey*, 328 U.S. 293 (1946).

The *Howey* test asks whether there was: (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or

managerial efforts of others.  *Id.* at 301; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004).

This definition embodies a "flexible rather than a static principle, one that is capable of

adaptation to meet the countless and variable schemes devised by those who seek the use of the

money of others on the promise of profits." *Howey*, 328 U.S. at 299; *see also Reves v. Ernst &

Young*, 494 U.S. 56, 60-61 (1990) (Congress crafted "a definition of 'security' sufficiently broad

to encompass virtually any instrument that might be sold as an investment").  As the Supreme

Court has recognized, "Congress intended the application of these [securities] statutes to turn on

the economic realities underlying a transaction, and not on the name appended."  *United Hous.*

*Found., Inc v. Forman*, 421 U.S. 837, 849 (1975).  Courts are particularly vigilant to avoid

reading the *Howey* test to permit "unscrupulous marketers of investments" to cleverly evade the

securities laws.  *Edwards*, 540 U.S. at 394.  Here, all three *Howey* factors are met.

    *First*, Defendants solicited and received payments of "money" in exchange for a promise

to deliver Grams when they directed the Purchasers to remit Euros and U.S. Dollars for Grams.

    *Second*, the Purchasers' assets were pooled for Telegram's business ventures and they

were led to believe that their fortunes would rise and fall together, and with Defendants'.  In the

Second Circuit, a common enterprise can be established by showing "horizontal commonality,"

*i.e.*, "the tying of each individual investor's fortunes to the fortunes of the other investors by the

pooling of assets."  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994).

    Courts that have found commonality recognize that it is sufficient that "each investor was

entitled to receive returns directly proportionate to his or her investment stake," "either for direct

distribution or as an increase in the value of the investment."  *SEC v. SG Ltd.*, 265 F.3d 42, 46-

47, 51 (1st Cir. 2001) (finding horizontal commonality); *accord SEC v. Infinity Grp. Co.*, 212

F.3d 180, 188 (3d Cir. 2000) (finding horizontal commonality where the "return on investment

was to be apportioned according to the amounts committed by the investor" and was "directly proportional to the amount of that investment"). A common enterprise can be established if there is "a direct relationship between the fortunes of the investor and seller or promoter of the investment such that 'their fortunes rise and fall together,'" *Rocky Aspen Management 204 LLC v. Hanford Holdings LLC*, 230 F. Supp.3d 159, 165 (S.D.N.Y. 2017) (quoting *In re Gas Reclamation, Inc. Secs. Litig.*, 659 F. Supp. 493, 501-02 (S.D.N.Y. 1987)).

Here, Telegram told Purchasers it would pool the proceeds of the Gram sales to develop the Grams themselves, the TON Blockchain, the TON Wallet and related Telegram products and told the Purchasers and others that it will use future proceeds from future sales of Grams by the TON Foundation to support the Gram and TON Blockchain ecosystem. Moreover, the fortunes of a Gram purchaser rises and falls together with the fortunes of other purchasers, of Telegram itself, and of Telegram's principals and developers. This is so because if the price of Gram rises or falls, it rises and falls for all Gram purchasers, because the TON Foundation will continue to hold a significant portion of Grams, and because Telegram developers and executives will receive Grams as incentive compensation. *See SG Ltd.*, 265 F.3d at 51 (finding horizontal commonality and recognizing that it is sufficient that "each investor was entitled to receive returns directly proportionate to his or her investment stake," "either for direct distribution or as an increase in the value of the investment"); *see also Infinity Grp. Co.*, 212 F.3d at 188-89.

*Third*, purchasers of Grams were led by Telegram to reasonably expect profits, and, specifically, that these profits would derive from the entrepreneurial and managerial efforts of Telegram and its "team." The term "profit" as used in *Howey* includes "income or return . . . or the increased value of the investment," including a preset fixed return. *Edwards*, 540 U.S. at 394. Here, Telegram told at least some Purchasers (and, therefore, the market) that Grams would

be available on "major" exchanges by early 2019. It also repeatedly stated that the "ecosystem" of hundreds of millions of Telegram users that would "drive the demand and value" of Grams. In doing so, Telegram also repeatedly emphasized the quality of its "team" and listed specific steps that they would take to create the TON ecosystem in the future, which features would not be completely ready upon the launch of Grams. Telegram also told and is telling purchasers that Grams will be sold according to a formula that guarantees an increase in the price of Grams over time, such that the price at launch could potentially "double" for the Purchasers. Finally, Telegram told and is telling purchasers that it will develop products that will require the use of Grams, such that potential users will want to buy Grams, driving their "demand" and "value."

The foregoing more than suffices to meet *Howey*'s last prong, where the essential inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *see also Cont'l Mktg., Corp. v. SEC*, 387 F.2d 466, 470-71 (10th Cir. 1967) (promoters' efforts to "develop" a "structure into which investors entered" was part of efforts to increase the value of the investment).

### 2. Grams Are Not Excluded From the Definition of Security Because of the Characterization Given to Them by Telegram And They Have No "Use" Other Than As Investment Contracts

Defendants may seek to argue that Grams are not securities under the federal securities laws because they have characteristics of a fiat currency. The label that is put on a financial instrument does not determine its characterization under the federal securities laws. Rather, the economic substance of these transactions makes clear that any label that Telegram puts on the Gram makes no difference. In analyzing whether something is a security, "form should be disregarded for substance." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also Forman*, 421 U.S. 837, 849 (1975). As one court in this Circuit held, "simply labeling an investment

opportunity as 'virtual currency' or 'cryptocurrency' does not transform an investment contract—a security—into a currency." *Zaslavskiy*, 2018 WL 4346339, at *7.

Defendants may also argue that because holders can "use" Grams for unspecified other purposes, the Purchasers bought them for "use" or "consumption," and not investment. Here, even if Defendants' intent is to issue Grams to encourage the development of products that would require the use of the tokens in a blockchain-based ecosystem, building such an ecosystem has required and will require Defendants' efforts before any Grams could be used within it. Defendants' supposed plan that the tokens would, one day, be useful in that ecosystem that they had not built does not alter the nature of Defendants' promise to the Purchasers and others. Defendants offered and sold the investment opportunity to profit from their development of that ecosystem. Defendants' fund-raising effort to obtain capital thus bears all the hallmarks of a securities offering. Accordingly, at least one court has already rejected the argument that because tokens could have theoretical "utility" they are withdrawn from the broad ambit of instruments that the securities laws are meant to capture. *See Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (denying motion to dismiss unregistered sales claim, noting that "[n]otwithstanding the functionality of the . . . tokens (i.e., to pay for labor on [the issuer's] platform), the Complaint details myriad ways in which 'Defendants led investors . . . to expect a profit from the purchase of . . . tokens.'").

The fundamental nature of the transactions at issue here makes further far-fetched any contention that Grams have been purchased or will be purchased in the near future for anything other than to speculate on the future price of Grams. As noted, no consumptive use existed at the time of sales to Initial Purchasers and no consumptive uses currently exist. *SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019) (reasonable expectation of profit prong met even when "the

investors' primary reason to participate" in scheme was consumptive).  Whereas Telegram has

not yet created any functionality, as noted above, it has promoted and sought to create an

immediate trading platform for purchase and sale of Grams.  Moreover, the amounts offered and

sold to purchasers did not and will not correlate to amounts indicative of consumptive intent.

*See Cameron v. Outdoor Resorts of America*, 608 F.2d 187, 193 (5th Cir. 1979) (purchase of

unlimited units that the purchaser "manifestly could not use" indicates investment, not

consumptive intent); *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001) (representations that

"fueled expectations of profit" enough to meet third prong).  To the contrary, Initial Purchasers

in the Offering constituted large hedge funds and other high net worth individuals, suggesting

they purchased large quantities of Grams with view of profiting from an increase in their value

upon resale, not for use as currency.  *See United States v. Leonard*, 529 F.3d 83, 88 (2d Cir.

2008); *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971).  Moreover, the enormous number of

Grams each Purchaser bought is fundamentally inconsistent with consumptive use.

 Finally the structure of the sale of the Grams through the initial purchasers contemplated

a distribution of the Grams by a fixed date and not on a date when the Grams may have a

functional and real use. In other words, Grams could be sold to the public regardless of their

utility and at a time when the creation of that utility and any attendant value would depend on the

the efforts of Telegram and its affiliates. Thus, any claim that Grams are currency and not

investment contracts ignores their economic reality and is insufficient to rebut the SEC's

showing that Grams are securities.

### 3. *There Was and Is No Registration Statement Filed or In Effect as to the Offer and Sale of Grams to the Public in Interstate Commerce*

The second and third elements of the SEC's *prima facie* case are also met, both with

respect to the offers and sales of Grams to Initial Purchasers and as to the impending sales of

Grams by Telegram. No registration statement was filed or is in effect as to the offer and sale of Grams. *See* Decl. ¶ 58. Nor can there be any dispute that interstate commerce was used and will be used to distribute Grams. *See, e.g.*, Decl. ¶ 33 and Ex. N.

Telegram's offers and sales of Grams to Initial Purchasers constitute a past violation of the Securities Act. Though Telegram did not deliver the Grams sold to Initial Purchasers when it entered into the Grams Purchase Agreements, courts have held consistently that the date of a sale is the date of contractual commitment, not the date that a confirmation is sent or received or payment is made. *See, e.g., Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) (holding that a purchase occurs at "the time when the parties to the transaction are committed to one another"); *In re Alliance Pharmaceutical Corp. Secs. Lit.*, 279 F. Supp. 2d 171, 186-187 (S.D.N.Y. 2003) (following the holding in *Radiation Dynamics* with respect to the timing of a contract of sale); *Pahmer v. Greenberg*, 926 F. Supp. 287, 299 (E.D.N.Y. 1996) (citing *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992) ("[A] sale occurs for Section 12[(a)](2) purposes when the parties obligate themselves to perform what they have agreed to perform even if the formal performance of their agreement is to be after a lapse of time")).

Telegram's intended "free" distributions of Grams to Messenger users will constitute additional unregistered offers and sales of securities. A gift of stock is still a 'sale' within the meaning of the Securities Act when the purpose of the 'gift' is to advance the donor's economic objectives rather than to make a gift for simple reasons of generosity. *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 941 (S.D. Ohio 2009).

More importantly, Telegram's impending delivery of Grams to Initial Purchasers will itself constitute a violation of the Securities Act, as this delivery is part of a "distribution" of securities to which no exemption applies and which must be registered with the SEC.

**B.     Defendants Engaged in a Public Offering and/or Distribution of Securities to Which No Exemption Applies**

Telegram has claimed certain exemptions from the registration requirements (for example it contended in two Forms D that the sales of Gram Purchase Agreements in 2018 were exempt under Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c)).  Exs. A, B.  A Rule 506(c) exemption, however, only applies to private not "public" offerings.  And, because the Offering is a "public offering" or "distribution" of Grams as those terms are used in the Securities Act, 15 U.S.C. §§ 77b(a)(11), 77d(a)(2), the Offering qualifies for no exemption from the registration requirements of the Securities Act.

As explained, a "distribution" is equivalent to a public offering of securities and is by definition not exempt from the registration requirements.  *Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959).  A "'distribution' . . . comprises the entire process by which in the course of a public offering a block of securities is dispersed and ultimately comes to rest in the hands of the investing public."  *In the Matter of Oklahoma-Texas*, 2 S.E.C. 764, 769 (Sept. 23, 1937), *aff'd* 100 F.2d 888 (10th Cir. 1939); *Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958) (*cited in R.A Holman v. SEC*, 366 F.2d 446 (2d Cir. 1966)).

Whether sales of securities rise to the level of a "distribution" is a fact-specific inquiry.  "[T]he original distribution may be connected in varying degrees of proximity with secondary distributions of substantial blocks of the security."  *Id.*  Courts typically look to the manner of offering, the access to information that the offerees possess, the sophistication of the ultimate offerees and their ability to ask questions and the likelihood that they will be answered, the number of offerees, and the amount of securities distributed.  *See Ralston Purina*, 346 U.S. at 125 ("the applicability of [the private offering exemption] should turn on whether the particular class of persons affected needs the protection of the [Securities] Act"); *United States v. Lindo*, 18

F.3d 353 (6th Cir. 1994) (finding a transaction was a public offering because the numerous buyers of the stock did not have access to the information found in registration statements).

There is no bright-line quantitative metric for finding a distribution, *Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ("distribution" does not turn on the percentage of shares involved), but generally, larger amounts of securities are more likely to result in a distribution. *See, e.g., United States v. Wolfson*, 405 F.2d 779, 783 (2d Cir. 1968) ("there can be no doubt that appellants' sale of 633,000 shares (25 percent of the outstanding shares . . . and more than 55 percent of their own holdings), was a distribution"); *Quinn*, 452 F.2d at 943 (the sale of 25,000 shares at a time when in excess of 3 million shares were issued and outstanding constituted a public distribution). Claiming an exemption under Section 4 of the Securities Act requires "establishing that [the] sales do not constitute a disguised public distribution." *Cavanagh*, 1 F. Supp. 2d at 337. The same rule applies to a claimed Rule 506(c) exemption.

Here, as Defendants themselves have made clear, their ultimate goal is the wide dispersal of Grams into the public markets and they have incentivized the Initial Purchasers to participate in that distribution by selling them Grams at a price that is steeply discounted from the expected price at the imminent launch of the Grams which the Initial Purchasers can then resell into the public markets at huge profits.

This first step in the distribution allowed Telegram to place the Grams while it continued to develop the network on which they could operate. The discounted price offered to the initial purchasers reflects the compensation they would earn for participating in the ultimate distribution to the public. Because the Grams were to be distributed by a date certain and regardless of their utility at that time, it is evident that Telegram and the initial purchasers were not interested in only distributing at a time where they had any level of functionality that might

distinguish them from a security. In other words they were to be distributed without securities laws based restrictions on transfer and regardless of whether the public would be investing in them for a return based on the efforts of Telegram and its affiliates.

Moreover, Defendants are further incentivizing the distribution of Grams to the investing public by helping create liquid public markets for Grams, including by communicating with digital asset trading platforms to list Grams, and by promising dispersion of hundreds of millions of Grams to Messenger users. Defendants have sold nearly 60% of total Grams issued to Initial Purchasers, and are prepared to make additional distributions to the public at large. There can be no doubt that the hundreds of millions of Messenger users to whom certain Grams will be distributed are the type of offerees to whom the Securities Act looks to protect with the disclosures requirements of the registration statements.

Thus, because Defendants' Offering is a distribution, it does not qualify for an exemption under Rule 506(c), 17 C.F.R. § 230.506(c), and no other exemptions from registration apply.[5]

---

[5] Telegram has also not satisfied the Rule 506(c) exemption with respect to sales to Initial Purchasers for various other reasons. Among other things, Rule 506(c) requires an issuer to comply with the requirements of Rule 502(d), which states that "securities acquired in a transaction under Regulation D shall have the status of securities acquired in a transaction under Section 4(a)(2) of the Act" and that issuers must "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of" the Securities Act. 17 C.F.R. § 230.502(d). It goes on to state that such "reasonable care" may be demonstrated by (1) reasonably inquiring to determine whether the purchaser is acquiring the securities for himself or another party; (2) disclosing in writing to purchasers that the securities have not been registered and cannot be resold absent registration or an applicable exemption; and (3) placing a legend on the "certificate or other document" evidencing that the securities have not been registered and referencing restrictions on their sale and transferability. *Id.* Telegram did not restrict the resale of all Grams, and did not reasonably inquire to determine whether the Initial Purchasers were purchasing the Grams for themselves or third parties. To the contrary, Telegram has made significant efforts to facilitate—indeed, encourage—immediate resale of Grams by the Initial Purchasers in a planned public distribution to achieve both the "network effect" necessary for the widespread ownership and adoption of Grams and to deliver the promised returns to Initial Purchasers in the Offering who bought a right to Grams at a discount to market.

Telegram's offers and sales to Initial Purchasers also did not comply with Regulation S, which provides a safe harbor available for offers and sales of securities outside the United States without

## III.    THE COURT SHOULD ORDER DEFENDANTS NOT TO ALTER, DESTROY, OR CONCEAL DOCUMENTS

The Commission seeks an order prohibiting Defendants from altering, destroying, or concealing documents, including documents concerning the allegations of the Complaint.  Such orders are routinely granted "to preserve the status quo until a final resolution of the merits."  *SEC v. Spongetech Delivery Sys., Inc.*, No. 10 Civ. 2031 (DLI) (JMA), 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (citing *Unifund*, 910 F.2d at 1040 n. 11); *see also* Order, *SEC v. REcoin*, No. 17 Civ. 5725 (RDJ) (E.D.N.Y. Sept. 29, 2017) ("*REcoin* TRO") (Ex. A hereto) (ordering issuer of unregistered ICO not to destroy documents); Order, *SEC v. PlexCorps*, No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017) ("*PlexCorps* TRO") (Ex. B hereto) (same); Order, *SEC v. Middleton*, No. 19 Civ. 4625 (WKF) (E.D.N.Y. Aug. 12, 2019) ("*Middleton* TRO") (Ex. C hereto) (same).

## IV.    EXPEDITED DISCOVERY AND ALTERNATIVE MEANS OF SERVICE ARE NECESSARY TO PREPARE FOR THE SHOW CAUSE HEARING

To avoid any expiration of the temporary restraining order after fourteen days under Federal Rule of Civil Procedure 65(b)(2), the SEC seeks an order requiring Defendants to show cause why a preliminary injunction, imposing the same relief set forth in any temporary restraining order the Court may issue, should not be entered at a date and time set by the Court, as soon as practicable within the next two weeks.  To allow it to prepare for that hearing, the SEC requests that the Court order expedited discovery and alternative means of service.

---

registration.  *See* Securities Act Rel. No. 33-6863, 55 Fed. Reg. 18306-01 (May 2, 1990).  "Regulation S provides a safe harbor for offers and sales of securities outside the United States so long as the securities are sold in an offshore transaction and there are no 'directed selling efforts' in the United States."  *See* Securities Act Rel. No. 33-10649, 84 Fed. Reg. 30460-01, 30466 (June 26, 2019).  Telegram made no effort to exclude U.S. persons from its offering, and, instead, intentionally offered and sold securities to persons in the United States, using the same Offering Documents and Gram Purchase Agreements for both U.S. and foreign persons.

In this case, where Defendants have refused to accept service of an SEC administrative subpoena and to produce complete information about the Initial Purchasers, an order expediting discovery is particularly necessary. The Court should therefore permit such limited expedited discovery under Federal Rule of Civil Procedure 26(d). *See* Fed. R. Civ. P. 26(d) (allowing a party to seek discovery "from any source before the parties have conferred as required by Rule 26(f) . . . when authorized . . . by court order"); *SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) (ordering expedited discovery in connection with order to show cause to a foreign defendant); *SEC v. Zubkis*, No. 97 Civ. 8086 (JGK), 2005 WL 1560489, at *3 (S.D.N.Y. June 30, 2005) (noting that the court's temporary restraining order had granted expedited discovery); *REcoin* TRO at ¶ XI (granting expedited discovery); *Middleton* TRO at ¶ VII (same); *PlexCorps* TRO at ¶ XI (granting expedited discovery as to foreign defendants).

Additionally, the Commission requests that the Court permit alternative means of service, specifically service by email to Defendants' principals and to their United States counsel. Federal Rule of Civil Procedure 4(f)(3) allows service on an individual in a foreign country "by other means not prohibited by international agreement, as the court orders." The core consideration under Rule 4(f) is whether service is "reasonably calculated to give notice" to Defendants. Fed. R. Civ. P. 4(f). "Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant." *Madu, Edozie & Madu, P. C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (citation omitted). "The decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court'" *United States v. Lebanese Canadian Bank*, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (quoting *Madu*, 265 F.R.D. at 115). Further, a "plaintiff is not required to attempt service through the other provisions of Rule 4(f) before the Court may order service

pursuant to Rule 4(f)(3) . . . ." *FTC v. Pecon Software, Ltd.*, No. 12 Civ. 7186, 2013 WL 4016272, at *4 (S.D.N.Y. Aug. 7, 2013). Alternative service is appropriate where traditional service under the Hague Convention would take numerous months. *In re GLG Life Tech Corp. Secs. Litig.*, 287 F.R.D. 262, 266-67 (S.D.N.Y. 2012) ("Courts have frequently cited delays in service under the Hague Convention as supporting an order of alternative service under Rule 4(f)(3).") (citing cases); *see also Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("[T]he advisory notes [to Rule 4] suggest that in cases of 'urgency,' Rule 4(f)(3) may allow the district court to order a 'special method of service,' even if other methods remain incomplete or unattempted.").

In this case, service by email is reasonably calculated to reach—and will reach—Defendants because their principal, Pavel Durov, used the proposed email addresses to communicate with Purchasers in the Offering, and because Defendants have already communicated with the SEC through the United States counsel whom the SEC requests to serve by email. By contrast, the delays in service under the Hague Convention here would unduly burden the parties' ability to address the requested show cause order and the SEC's request for preliminary relief. For that reason, alternative service by email on a foreign citizen is particularly appropriate when the SEC obtains an order to show cause. *See PlexCorps* TRO ¶¶ XI, XIII (granting, among other things, an order to show cause, and service by e-mail on a foreign citizen, including a foreign unincorporated association and its presumed foreign counsel, for alleged securities laws violations); *SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348, at *1 (S.D.N.Y. Apr. 21, 2014) (granting order to show cause and service by email).

## CONCLUSION

In sum, for the foregoing reasons, the SEC has set forth a cognizable risk of future harm sufficient to preserve the status quo by temporarily enjoining an unregistered offering and ordering additional discovery. Thus, the SEC respectfully requests that the Court grant the SEC's emergency application in its entirety.

Dated: New York, New York
       October 11, 2019

_____
Jorge G. Tenreiro
Kevin McGrath
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov