**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,                                     :
                                                                        :
                                                       Plaintiff,       :          19 Civ.      (    )
                                                                        :
                           - against -                                  :          ECF Case
                                                                        :
TELEGRAM GROUP INC. and TON ISSUER INC.,                                :
                                                                        :
                                                       Defendants.      :
                                                                        :
----------------------------------------------------------------------- x

**LOCAL RULE 6.1 DECLARATION OF JORGE G. TENREIRO IN SUPPORT OF**
**PLAINTIFF'S APPLICATION FOR EMERGENCY RELIEF**

I, Jorge G. Tenreiro, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am a member of the bar of the State of New York and of the United States

District Court for the Southern District of New York.  I am employed by Plaintiff Securities and

Exchange Commission (the "Commission") in its New York Regional Office as an attorney in

the Enforcement Division.

2.       I make this declaration (a) pursuant to Local Civil Rule 6.1(d) to show that good

and sufficient reason exists for bringing this matter before the Court by an application and order

to show cause rather than by notice of motion; and (b) in support of Plaintiff's Emergency

Application for an Order to Show Cause, Temporary Restraining Order, and Order Granting

Expedited Discovery and Other Relief (the "Application").

3.       In addition to personal knowledge, I base this declaration on the concurrently

filed Declaration of Daphna A. Waxman with exhibits (the "Waxman Declaration").

4.       No previous application for the relief requested herein or any similar relief has

been made.

5.    The Commission makes this emergency application by order to show cause to halt ongoing and impending unregistered offers and sales of securities into United States markets. These unregistered offers and sales have been made and are about to be made without providing to members of the investing public the disclosures required by the federal securities laws that would permit them to make fully informed decisions with respect to their investments.

6.    The Commission's Application seeks an Order:

(a)    Directing Defendants Telegram Group Inc. and TON Issuer Inc. (collectively, "Defendants") to show cause why an order should not be entered, pending a final disposition of this action:

(i)    preliminarily enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any ongoing and future violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e(a), 77e(c)], including but not limited to by delivering Grams to any person or entity or taking any other steps to effect any unregistered offer or sale of Grams; and

(ii)    prohibiting Defendants from destroying, altering, or concealing documents in their possession, custody, or control, including documents concerning the allegations in the Complaint; and

(b)    Pending adjudication of the relief described in paragraph 6(a) above, an order:

(i)    temporarily restraining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or

participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any ongoing and future violations of Sections 5(a) and 5(c) of the Securities Act, including but not limited to by delivering Grams to any person or entity or taking any other steps to effect any unregistered offer or sale of Grams;

(ii)   temporarily prohibiting Defendants from destroying, altering, or concealing documents in their possession, custody, or control, including documents concerning the allegations in the Complaint; and

(iii)   providing that the Commission may take expedited discovery and effect service of the Application and expedited discovery notices and requests on Defendants by email, including through their attorneys in the United States, in preparation for a hearing on this Order to Show Cause.

7.    The Commission makes its Application by order to show cause to: (i) preserve the *status quo* pending adjudication of the Application; (ii) halt any ongoing violations of the federal securities laws; (iii) protect the public interest in prohibiting unregistered offers and sales of securities from flooding the United States' capital markets; (iv) protect this Court's jurisdiction over the subject matter of this action; and (v) prevent the destruction of evidence.  The Commission believes that proceeding by notice of motion may jeopardize the Court's ability to grant full and effective relief both on this Application and on the merits of the Commission's Complaint, and may result in irreparable harm to the public interest.

8.    As alleged in the Complaint filed by the Commission, dated October 11, 2019 ("Complaint"), and as shown in the Waxman Declaration and Plaintiff's Memorandum of Law in Support of Its Emergency Application for an Order to Show Cause, Temporary Restraining

Order, and Order Granting Expedited Discovery and Other Relief, dated October 11, 2019 ("Memorandum"), Defendants have engaged and are engaging in the unregistered offers and sales of securities in the form of digital "tokens" or "coins" known as "Grams."

9.     Specifically, as set forth in the Waxman Declaration and the Memorandum, Defendants raised and are poised to continue to raise funds from certain purchasers and public investors through a series of unregistered offers and sales of Grams.  Nominally, digital tokens are issued to holders on a "blockchain," or cryptographically secured ledger, that may entitle its holders to certain rights related to a venture underlying the fund raise.

10.     From January to March 2018, Defendants raised $1.7 billion in an unregistered offer and sale of approximately 2.9 billion Grams (out of five billion Grams in existence) from 171 purchasers, including approximately $425 million from 39 purchasers in the United States ("Initial Purchasers").  These sales were the first step in Defendants' broader unregistered offering of Grams to the public at large (the "Offering") because the Grams sold are meant to come to rest in the hands of the investing public.  None of these offerings was registered with the SEC and no exemption from the registration requirements applies to them.  The Offering thus violates and will continue to violate the securities laws unless halted.

11.     As described in more detail in the Memorandum, Grams are "investment contracts" and therefore "securities" because their purchasers are investing money into a common enterprise with the reasonable expectation of profiting from their purchase based on the efforts of Defendants and others.  Specifically, to obtain investor funds (denominated in Euros and U.S. dollars), Defendants represented to investors that they would use Gram sales proceeds to develop an "ecosystem" for use with Defendants' popular "Messenger" app and in a new blockchain that Defendants would develop.  Defendants also led investors to expect that their

managerial efforts in connection therewith would increase the "demand" for Grams.  Defendants

further led investors to expect profit from their investments in Grams by, among other things,

selling the approximately 2.9 billion Grams at prices deeply discounted from the price

Defendants represented Grams would sell for in the open market upon delivery.

12.     Under the terms of these initial sales, Defendants committed to deliver Grams

after Defendants had had an opportunity to use the proceeds of the Offering to develop their own

blockchain for the Grams, but in any event no later than October 31, 2019. (Defendants have

promised to return proceeds minus expenses if they do not meet this upcoming deadline.)

Hundreds of millions, if not billions, of the Grams that Defendants will deliver to purchasers will

become re-sellable immediately, including to public investors in the United States.

13.     Defendants appear poised to distribute Grams to the public imminently.  On or

around October 2, 2019, they asked purchasers for transfer information so that they may deliver

Grams starting on October 16, 2019.  Many purchasers who receive Grams will likely further

distribute them into the hands of the investing public.  Not only did the Initial Purchasers buy

Grams at a deep discount from the price Grams will sell for upon launch, but, as contemplated by

Defendants, the only way that Defendants' proposed "decentralized economy" using Grams can

succeed is if users worldwide immediately and widely adopt Grams.  This cannot be

accomplished if Grams remain in the hands of Defendants and the Initial Purchasers alone.

14.     Defendants have also indicated that they plan to distribute an additional

approximately 250 million Grams to Messenger users within "days or weeks" of Grams' launch,

in order to further Defendants' financial interest in creating a market for Grams, and that they

may make additional sales of Grams into the market for the intended purpose of stabilizing the

price of Grams.  As Defendants have explained to the market, they intend to accomplish some of

these steps by transferring the unsold Grams to a soon-to-be incorporated entity called "TON Foundation," which will be under the direct control of Defendants' two principals.

15.     Public investors who will likely come to buy Grams, however, have not received and will not receive the disclosures required by the federal securities laws, including disclosures regarding Defendants' financial conditions and the risks involved with investing in Grams.

16.     Because of Messenger's privacy features, and given the anonymous nature of blockchain transactions, it may be difficult if not impossible to obtain a full rescission of these unregistered offers and sales once Grams are widely dispersed to hundreds of millions of users, jeopardizing the Court's ability to grant the Commission full and meaningful relief.

17.     Accordingly, unless Defendants are temporarily restrained and enjoined, they will continue to engage in illegal unregistered offerings and sales of securities.  Moreover, because of the substantial harm to the United States' public interest that would result from Defendants' conduct it is necessary for the Commission to seek relief by way of order to show cause.

18.     In addition to the temporary injunctive relief set forth above, to preserve the *status quo* and protect the integrity of this litigation and to aid in the Commission's preparation for a hearing on its order to show cause, the Commission also seeks emergency relief prohibiting Defendants from destroying or fabricating documents, providing that the Commission may engage in expedited discovery against Defendants and their principals and in expedited discovery against United States-based purchasers of Grams, and permitting service of the Commission's Application on Defendants by email and by emailing their United States counsel.

19.     Defendants are foreign corporations, and their principals and owners are citizens of Russia and St. Kitts and Nevis and reside outside the United States.

20.     On July 25, 2017, approximately seven months before the Offering began, the Commission issued what is often called the "DAO Report."  The DAO Report was widely publicized in the cryptocurrency community.  It "advise[d] those who would use . . . blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and found that the digital assets at issue were securities.

21.     Despite the DAO Report, and despite having retained the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), as counsel in Washington, D.C., Defendants did not contact any member of the Commission staff prior to the beginning of the Offering.  Instead, Commission staff learned of the sales to the Initial Purchasers independently and reached out to Defendants and their agents to discuss their compliance with the federal securities laws.

22.     Defendants retained Colleen P. Mahoney and Alexander Drylewski of Skadden to represent them in connection with the Commission staff's investigation into the legality of their Offering.  Although counsel has produced documents in response to informal requests for information about the Offering, Defendants have recently indicated to Commission staff that they would not accept service of an administrative subpoena from the staff.  Defendants' counsel have also failed to adequately respond to a number of requests from Commission staff as to when specifically Telegram intends to deliver the Grams.

23.     Accordingly, an order prohibiting Defendants from destroying or fabricating documents and providing that the Commission may engage in expedited discovery of Defendants and their principals and may engage in expedited discovery of any United States-based purchasers in Grams, is also necessary.  Moreover, service by email is reasonably calculated to give Defendants notice of this action, particularly given their engagement with Commission staff through their U.S. counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       October 11, 2019

                                    Jorge G. Tenreiro