UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : 19 Civ. 9439 (PKC) |
| Plaintiff, | : |
| | : **ECF Case** |
| -against- | : |
| | : **Electronically Filed** |
| TELEGRAM GROUP INC. and TON ISSUER INC., | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' ANSWER, DEFENSES AND
<u>AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT</u>**

Defendants Telegram Group Inc. ("Telegram") and TON Issuer Inc (collectively,

"Defendants"), by and through their undersigned counsel, hereby answer the Complaint of

Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") as follows[1]:

1.      Defendants deny the allegations in Paragraph 1, except admit that Telegram is the

owner of the mobile messaging application Telegram Messenger.  To the contrary, Plaintiff's

claims are without merit as Telegram's private placement to highly sophisticated, accredited

investors was conducted pursuant to valid exemptions to registration under the federal securities

laws and Grams will not be securities when they are created at the time of launch of the TON

Blockchain.  As set forth below in connection with Defendants' affirmative and other defenses,

Plaintiff has engaged in improper "regulation by enforcement" in this nascent area of the law,

failed to provide clear guidance and fair notice of its views as to what conduct constitutes a

violation of the federal securities laws, and has now adopted an *ad hoc* legal position that is

contrary to judicial precedent and the publicly expressed views of its own high-ranking officials.

---

[1]  To the extent any response is required, Defendants deny the allegations contained in all headings, titles, captions, footnotes or charts in the Complaint.

As Plaintiff was well aware based on its regular communications with Defendants over the past nearly two years, Defendants voluntarily engaged with Plaintiff for the specific purpose of obtaining meaningful guidance on these issues and to avoid any violations of the federal securities laws, which Plaintiff failed to provide prior to bringing this enforcement action.

2.      Defendants deny the allegations in Paragraph 2, except admit that Defendants engaged in a legal private placement pursuant to valid exemptions to registration between January 2018 and March 2018 through which they raised approximately $1.7 billion from 171 purchasers and used the proceeds of the placement, in part, to finance the creation and development of the TON Blockchain.

3.      Defendants deny the allegations in Paragraph 3.  Grams do not exist yet but if and when they do, they will constitute a currency and/or commodity — not securities under the federal securities laws.

4.      Defendants deny the allegations in Paragraph 4, except admit that Telegram has not filed any registration statement with the SEC because none was, is or will be required under the federal securities laws.

5.      Defendants deny the allegations in Paragraph 5.

6.      Defendants deny the allegations in Paragraph 6.

7.      Defendants deny the allegations in Paragraph 7.

8.      Defendants deny the allegations in Paragraph 8.

9.      The allegations in Paragraph 9 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 9.

10.     The allegations in Paragraph 10 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 10.

11.     The allegations in Paragraph 11 purport to state conclusions of law, to which no response is required.

12.     Defendants deny the allegations in Paragraph 12 or that Plaintiff is entitled to any of the relief sought in this action.

13.     Defendants deny the allegations in Paragraph 13 or that Plaintiff is entitled to any of the relief sought in this action.

14.     The allegations in Paragraph 14 purport to state conclusions of law, to which no response is required.

15.     The allegations in Paragraph 15 purport to state conclusions of law, to which no response is required.  To the extent any additional response is required, Defendants deny the allegations in Paragraph 15.

16.     Defendants admit the allegations in Paragraph 16.

17.     Defendants admit the allegations in Paragraph 17.

18.     Defendants deny the allegations in Paragraph 18, except admit that Pavel Durov is a Russian and St. Kitts and Nevis citizen; that he founded a website called VKontakte; that he is the co-founder and CEO of Telegram Group Inc.; that he has been an outspoken critic of the Russian government; and that he lost ownership and control over VKontakte and left Russia.

19.     Defendants deny the allegations in Paragraph 19, except admit that Nikolai Durov is a Russian citizen; that he is a co-founder and CTO of Telegram Group Inc.; and that he is Pavel Durov's brother.

20.     Defendants deny the allegations in Paragraph 20.

21.     The allegations in Paragraph 21 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of the Securities Act, which speaks for itself.

22.     The allegations in Paragraph 22 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of Sections 5(a) and 5(c) of the Securities Act, which speak for themselves.

23.     The allegations in Paragraph 23 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of the Securities Act, which speaks for itself.

24.     The allegations in Paragraph 24 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of the referenced forms and provisions, which speaks for itself.

25.     The allegations in Paragraph 25 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of the Securities Act, which speaks for itself.

26.     The allegations in Paragraph 26 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of the Securities Act, which speaks for itself.

27.     The allegations in Paragraph 27 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants respectfully refer the Court to the actual text of the Securities Act, which speaks for itself.

28.     The allegations in Paragraph 28 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 28.

29.     Defendants deny the allegations in Paragraph 29 on the ground that the terms used therein, including "digital asset," "digital token," "blockchain technology," "ICOs," and others, involve circumstances, facts and details which vary significantly.

30.     Defendants deny the allegations in Paragraph 30 on the ground that the terms used therein, including "digital token," involve circumstances, facts and details which vary significantly.

31.     Defendants deny the allegations in Paragraph 31 on the ground that the terms used therein, including "white paper" and "blockchain," involve circumstances, facts and details which vary significantly.

32.     Defendants deny the allegations in Paragraph 32 on the ground that the terms used therein, including "digital tokens," involve circumstances, facts and details which vary significantly.

33.     Defendants deny the allegations in Paragraph 33, and respectfully refer the Court to the "DAO Report" for its true and complete contents.

34.     Defendants deny the allegations in Paragraph 34, except admit that Telegram Messenger was launched in late 2013 in beta version and Telegram is a not-for-profit company that does not make any money from Messenger, and respectfully refer the Court to Telegram's website for the true and complete statements contained therein.

35.     Defendants deny the allegations in Paragraph 35, except admit that Telegram Messenger includes a wide variety of features, including, among others, Secret Chats, and seeks

to protect its users' privacy.  Defendants respectfully refer the Court to Defendants' website for the true and complete statements contained therein.

36.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, except admit that Telegram estimates that it currently has more than 300 million users, and respectfully refer the Court to the referenced sources for their true and complete contents.

37.     Defendants deny the allegations in Paragraph 37, except admit that Messenger incorporates functionality to allow users to buy goods and services from providers and that Pavel Durov and Nikolai Durov concluded that Bitcoin and Ethereum blockchains have certain limitations that prevented their widespread adoption as bona fide currencies, which they have attempted to solve with Grams.

38.     Defendants deny the allegations in Paragraph 38, except admit that Telegram announced the "Telegram Open Network" in late 2017 and that Plaintiff purports to quote from certain materials, and respectfully refer the Court to the referenced sources for their true and complete contents.

39.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and respectfully refer the Court to the referenced sources for their true and complete contents.

40.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.     Defendants deny the allegations in Paragraph 41, except admit that from January through March 2018, Telegram entered into certain purchase agreements with private placement purchasers under which the purchasers received an entitlement to an allocation of Grams only in

the event that a fully functional TON Blockchain platform was successfully built and launched, and respectfully refer the Court to the purchase agreements for their true and complete contents.

42.     Defendants deny the allegations in Paragraph 42, except admit that the purchase agreements originally defined the "Deadline Date" as October 31, 2019, and respectfully refer the Court to the purchase agreements and any amendments thereto for their true and complete contents.

43.     Defendants deny the allegations in Paragraph 43.

44.     Defendants admit the allegations of Paragraph 44, except deny the allegation in the last sentence of Paragraph 44.

45.     Defendants deny the allegations in Paragraph 45, and respectfully refer the Court to the purchase agreements for their true and complete contents.  Defendants further incorporate by reference their answer to Paragraph 87 as if set forth fully herein.

46.     Defendants deny the allegations in Paragraph 46, except admit that they have not filed any registration statements with the SEC regarding Grams or the TON Blockchain because none were required.

47.     Defendants deny the allegations in Paragraph 47, and respectfully refer the Court to the purchase agreements and all related documents for their true and complete contents.

48.     Defendants deny the allegations of Paragraph 48.

49.     Defendants admit the allegations in Paragraph 49 insofar as it purports to characterize Telegram's position that the purchase agreements were treated as investment contracts, on which Telegram placed a restrictive legend that restricted the ability to offer, sell or transfer them, and respectfully refer the Court to the purchase agreements for their true and complete contents.

50.     Defendants deny the allegations in Paragraph 50, except admit that Telegram believes that Grams are not a security and will not be a security at the time of the launch of the TON Blockchain, and thus that Grams are not required to be restricted or contain restrictive legends (to the extent it is even possible to include a restrictive legend on them), and that certain private placement purchasers will be subject to certain lockup provisions regarding Grams following the launch of the TON Blockchain.

51.     The allegations in Paragraph 51 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 51.

52.     Defendants deny the allegations in Paragraph 52, except admit that the round one private placement purchasers are subject to certain lockup restrictions with respect to any Grams that may be delivered pursuant to the purchase agreements, and respectfully refer the Court to the purchase agreements for their true and complete contents.

53.     Defendants deny the allegations in Paragraph 53.

54.     Defendants deny the allegations in Paragraph 54.

55.     Defendants deny the allegations in Paragraph 55, except admit that Telegram disclosed to private placement purchasers that not all of the funds raised in the private placement would be used to develop the TON Blockchain and provided certain estimates to the private placement purchasers, and respectfully refer the Court to the referenced materials and purchase agreements for their true and complete contents.

56.     Defendants deny the allegations in Paragraph 56, except admit that as of January 31, 2019, Defendants had used approximately $218 million of the $1.7 billion raised and that Telegram disclosed to private purchasers how funds raised in the private placement could be

used, and respectfully refer the Court to the offering materials and purchase agreements for their true and complete contents.

57.     Defendants deny knowledge or information sufficient to form a belief as to what the "Initial Purchasers" understood, and otherwise deny the allegations in Paragraph 57.

58.     Defendants deny the allegations in Paragraph 58, except admit that Telegram provided private placement purchasers with certain materials regarding the TON Blockchain and Grams, and respectfully refer the Court to these materials for their true and complete contents.

59.     Defendants deny knowledge or information sufficient to form a belief as to what potential purchasers read, and otherwise deny the allegations in Paragraph 59, except admit that Telegram employees provided certain materials to potential purchasers regarding the TON Blockchain and Grams, and respectfully refer the Court to those materials for their true and complete content.

60.     Defendants deny the allegations in Paragraph 60, except admit that Pavel Durov had discussions with certain purchasers and potential purchasers regarding the private placement and Grams.

61.     Defendants deny the allegations in Paragraph 61, and respectfully refer the Court to the purchase agreements for their true and complete contents.

62.     Defendants deny the allegations in Paragraph 62, and respectfully refer the Court to the referenced communications for their true and complete contents.

63.     Defendants deny the allegations in Paragraph 63, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

64.     Defendants deny the allegations in Paragraph 64, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

65.     Defendants deny the allegations in Paragraph 65, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

66.     Defendants deny the allegations in Paragraph 66, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

67.     Defendants deny the allegations in Paragraph 67, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

68.     Defendants deny the allegations in Paragraph 68.

69.     Defendants deny the allegations in Paragraph 69.

70.     Defendants deny the allegations in Paragraph 70, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

71.     Defendants deny the allegations in Paragraph 71, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to those documents for their true and complete contents.

72.     Defendants deny the allegations in Paragraph 72, and respectfully refer the Court to the referenced document and all related documents for their true and complete contents.

73.     Defendants deny the allegations in Paragraph 73, and respectfully refer the Court to the referenced documents for their true and complete contents.

74.     Defendants deny the allegations in Paragraph 74, and respectfully refer the Court to the referenced documents for their true and complete contents.

75.     Defendants deny the allegations in Paragraph 75, and respectfully refer the Court to the referenced documents and all related documents for their true and complete contents.

76.     Defendants deny the allegations in Paragraph 76, and respectfully refer the Court to the referenced communications for their true and complete contents.

77.     Defendants deny the allegations in Paragraph 77, and respectfully refer the Court to the referenced materials for their true and complete contents.

78.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78, and respectfully refer the Court to the referenced communication for its true and complete contents.

79.     Defendants deny the allegations in Paragraph 79, and respectfully refer the Court to the referenced materials for their true and complete contents.

80.     Defendants deny the allegations in Paragraph 80, except deny knowledge or information sufficient to form a belief as to the purported announcement referenced in Paragraph 80.

81.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, except deny the allegations in the last sentence of Paragraph 81.

82.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82.

11

83.     Defendants deny the allegations in Paragraph 83, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to the referenced documents for their true and complete contents.

84.     Defendants deny the allegations in Paragraph 84, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to the referenced documents for their true and complete contents.

85.     Defendants deny the allegations in Paragraph 85, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to the referenced documents for their true and complete contents.

86.     Defendants deny the allegations in Paragraph 86.

87.     Defendants deny the allegations in Paragraph 87.

88.     Defendants deny the allegations in Paragraph 88, and respectfully refer the Court to the referenced documents for their true and complete contents.

89.     Defendants deny the allegations in Paragraph 89, and respectfully refer the Court to the referenced document for its true and complete contents.

90.     Defendants deny the allegations in Paragraph 90, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to the referenced documents for their true and complete contents.

91.     Defendants deny the allegations in Paragraph 91, and respectfully refer the Court to the referenced documents for their true and complete contents.

92.     Defendants deny the allegations in Paragraph 92, and respectfully refer the Court to the referenced document for its true and complete contents.

93.    Defendants deny the allegations in Paragraph 93, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to the referenced documents for their true and complete contents.

94.    Defendants deny knowledge or information regarding the truth of the allegations in Paragraph 94, and respectfully refer the Court to the referenced document for its true and complete contents.

95.    Defendants deny the allegations in Paragraph 95.

96.    Defendants deny the allegations in Paragraph 96, except admit that the referenced materials addressed potential future uses of Grams, including as a medium of exchange and other potential uses, and respectfully refer the Court to the referenced documents for their true and complete contents.

97.    Defendants deny the allegations in Paragraph 97, except admit that Plaintiff purports to quote from certain documents, and respectfully refer the Court to the referenced documents for their true and complete contents.

98.    Defendants deny the allegations in Paragraph 98, except admit that the TON Blockchain has not launched and Grams do not yet exist and will not exist unless and until the fully functioning TON Blockchain platform is launched.

99.    The allegations in Paragraph 99 purport to state conclusions of law, to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 99.

100.    Defendants deny  the allegations in Paragraph 100, and respectfully refer the Court to the referenced document for its true and complete contents.

101.    Defendants deny  the allegations in Paragraph 101, and respectfully refer the Court to the referenced documents for their true and complete contents.

102.    Defendants deny  the allegations in Paragraph 102, and respectfully refer the Court to the referenced documents for their true and complete contents.

103.    Defendants deny  the allegations in Paragraph 103, and respectfully refer the Court to the referenced documents for their true and complete contents.

104.    Defendants deny  the allegations in Paragraph 104, and respectfully refer the Court to the referenced documents for their true and complete contents.

105.    Defendants deny the allegations in Paragraph 105 and the accompanying heading, but admit that Telegram began to roll out a beta version of the TON Blockchain in March 2019, in order to test the functionality of the TON Blockchain prior to the launch of the TON Blockchain and any delivery of Grams.

106.    Defendants deny the allegations in Paragraph 106, except admit that no Grams have been delivered to any private placement purchasers.

107.    Defendants deny the allegations in Paragraph 107.

108.    Defendants deny the allegations in Paragraph 108.

109.    Defendants deny the allegations in Paragraph 109.

110.    Defendants deny the allegations in Paragraph 110.

111.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111.

112.    Defendants deny the allegations in Paragraph 112, except admit that Defendants have not filed a registration statement with the SEC because none is required.

113.     Defendants deny the allegations in Paragraph 113, except admit that Defendants have not filed a registration statement with the SEC because none is required.

114.     The allegations in Paragraph 114 purport to state conclusions of law to which no response is required.  To the extent any response is required, Defendants deny the allegations in Paragraph 114.

115.     Defendants deny the allegations in Paragraph 115, except admit that Telegram has stated to the SEC that its contemplated TON Wallet application will be non-custodial, meaning that Telegram will have no greater insight or access to transactions on the TON Blockchain than any other user of the TON Blockchain.

116.     Defendants deny the allegations in Paragraph 116.

117.     Defendants deny the allegations in Paragraph 117.

118.     Defendants deny the allegations in Paragraph 118.

119.     Defendants incorporate by reference each of the above answers as though fully set forth herein.

120.     Defendants deny the allegations in Paragraph 120.

121.     Defendants deny the allegations in Paragraph 121.

Defendants deny that Plaintiff is entitled to any relief, and respectfully request that the Court dismiss the claims against Defendants with prejudice and order such further relief as the Court deems just and proper.

## GENERAL DENIAL

Defendants deny each and every allegation, statement, matter, and thing in the Complaint not expressly admitted or qualified herein.

## DEFENDANTS' AFFIRMATIVE AND OTHER DEFENSES

1.     Without assuming the burden of proof on any matters where that burden rests on Plaintiff, Defendants assert the following affirmative and other defenses with respect to the claims Plaintiff purports to assert in the Complaint.

2.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations omitted).  "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

3.     Where an enforcement action serves as the "'initial means for announcing a particular interpretation'—or for making [the agency's] interpretation clear," the court "must ask whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations."  *Gen. Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (citation omitted).  "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects

parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Id.* (quoting *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)).

4.     When evaluating an "as-applied" challenge to a statute for vagueness, the Second Circuit employs a "two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Farrell v. Burke*, 449 F.3d 470, 486, 494 (2d Cir. 2006) (citation omitted) (Sotomayor, J.) (adding that, with respect to the second prong, a court may determine "either (1) that a statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute").

5.     Here, Telegram has not been provided legally and constitutionally sufficient notice that its actions do and would violate the Securities Act of 1933.  The term "investment contract," in this context, is open-ended: while the Supreme Court interpreted it in *Howey*, the application of *Howey* to digital assets raises unique issues that require more specific guidance to avoid trapping the unwary.  But to date, the SEC has failed to provide consistent and meaningful guidance on whether and how it will regulate cryptocurrencies like Grams.  Moreover, the SEC never provided fair notice that it believed Telegram's actions had violated and would violate the federal securities law, even as it knew Telegram was expending significant time and resources, including investor funds, to prepare to launch the TON Blockchain and Grams.

### A.   Telegram Conducts a Private Placement
### Pursuant to Valid Exemptions to Registration

6.       In January 2018, Telegram conducted the first round of a private placement whereby it raised $850 million from a select group of high-net-worth, highly sophisticated purchasers ("Private Placement").  The offering was made pursuant to the exemptions to registration contained in Rule 506(c) of Regulation D (for U.S. purchasers) and Regulation S (for foreign purchasers) under the Securities Act of 1933.

7.       Local counsel was engaged in approximately 30 non-U.S. jurisdictions to advise on local securities law compliance, while purchasers from certain jurisdictions (for example, all "sanctioned jurisdictions") were excluded.

8.       The investors in the private placement were highly sophisticated, with an average investment of approximately $8-10 million.  Investors were vetted by third-party Know Your Customer ("KYC") providers based on responses to KYC forms and supporting documentation.

9.       In the Private Placement, Telegram entered into Purchase Agreements with the purchasers whereby Telegram agreed to use the funds raised to develop and build the TON Blockchain.  The Purchase Agreements provided that Telegram would only distribute Grams if the fully functional TON Blockchain was launched, which is a necessary predicate for the creation of any Grams.

10.      The Purchase Agreements also originally provided that if the TON Blockchain was not developed and launched by October 31, 2019 (i.e., the "Deadline Date"), then Telegram would return the funds to the Private Placement Purchasers net of any amounts spent under the Purchase Agreements.

11.      On February 13, 2018, Telegram filed its Notice of Exempt Offering of Securities with the SEC detailing the first round of the private placement.

12.     In March 2018, Telegram completed the second and final round of the Private Placement whereby it raised another $850 million pursuant to substantially identical procedures as the first round.  On March 29, 2018, Telegram filed its Notice of Exempt Offering of Securities with the SEC detailing the second round of the Private Placement.

### B.    The SEC Has Failed to Provide Necessary Clarity And Notice Regarding the Securities Law Violations Alleged, Which Has Led to Arbitrary Enforcement

13.     Public comments by high-ranking SEC officials have supported Telegram's good faith belief that its Private Placement and TON Blockchain project was compliant with the U.S. securities laws in a new and developing area of the law where the SEC has failed to provide any concrete public guidance.

14.     For example, in a 2017 statement, SEC Chairman Jay Clayton stated the technology underlying cryptocurrencies may prove to be "disruptive, transformative and efficiency enhancing," opining: "I am confident that developments in fintech will help facilitate capital formation and provide promising investment opportunities for institutional and Main Street investors alike."  Chairman Clayton added:  "It is possible to conduct an [Initial Coin Offering or "ICO"] without triggering the SEC's registration requirements.  For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements."[2]

---

[2]  Chairman Jay Clayton, Statement on Cryptocurrencies and Initial Coin Offerings (December 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (last visited December 20, 2018).

15.     On April 5, 2018, Chairman Clayton suggested that the application of the federal securities laws to a given cryptocurrency could vary over time, noting that "[j]ust because it's a security today doesn't mean it'll be a security tomorrow, and vice-versa."[3]

16.     On June 6, 2018, Chairman Clayton discussed cryptocurrencies in an interview with CNBC:

> "Cryptocurrencies: These are replacements for sovereign currencies, replace the dollar, the euro, the yen with bitcoin," Clayton said. "That type of currency is not a security."  "A token, a digital asset, where I give you my money and you go off and make a venture, and in return for giving you my money I say 'you can get a return' that is a security and we regulate that," Clayton said.[4]

17.     During a talk in November 2018, Chairman Clayton gave an example of a digital asset that starts out as a security but may morph into a non-security asset, by way of analogy, whereby a person provides funds to producers of a Broadway play in exchange for a suite of tickets.[5]  The agreement to provide funds for production costs may be treated as securities because the ticket holders expect to receive profits from their tickets and while the production is being built, the tickets may look like a right in the enterprise with a return.  However, once the play is up and running, tickets would provide access to the play and should ***not*** be securities.[6]  At that point, the production has largely been completed and the work of the promoter is less crucial to the success of the play, and the tickets granting access to the play are not likely to be

---

[3]  Nikhilesh De, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (April 5, 2018), https://www.coindesk.com/sec-chief-not-icos-bad.

[4]  Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws To Cater To Cryptocurrencies*, CNBC (June 6, 2018), https://www.cnbc.com/2018/06/06/sec-chairman-clayton-says-agency-wont-change-definition-of-a-security.html.

[5]  Times Talks, *SEC Chairman Jay Clayton & Andrew Ross Sorkin* (November 29, 2018), https://www.timestalks.com/talks/timestalksdealbook-andrew-ross-sorkin-and-s-e-c-chairman-jon-clayton/.

[6]  *Id.*

securities, even if there is some trading of tickets in some type of ticket exchange or secondary market.

18.     The SEC's Director of Corporate Finance, William Hinman, has made similar public comments.  On June 14, 2018, Director Hinman stated:

> I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way [than through an "initial coin offering"].  In other words, conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and digital assets offer.  This allows the tokens or coins to be structured and offered in a way where it is evident that purchasers [post-blockchain launch] are not making an investment in the development of the enterprise.[7]

19.     Director Hinman continued:

> **The digital asset itself is simply code**.  But the way it is sold [determines whether it is a security.]  But this also points the way to when a digital asset transaction may no longer represent a security offering.  If the network on which the token or coin is to function is sufficiently decentralized—where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts—the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede" and "the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.[8]

Director Hinman emphasized that "the analysis of whether something is a security is not static and does not strictly inhere to the instrument."[9]

20.     On the basis of this analysis, Director Hinman further opined that cryptocurrencies Bitcoin and Ether, analyzed "today," do not resemble securities and thus

---

[7]  Director William Hinman, Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[8]  *Id.*

[9]  *Id.*

applying the securities laws "would seem to add little value."[10]  He added:  "Over time, there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required."[11]  Director Hinman further stated: "it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction," and "I encourage anyone that has questions on a particular [offering] structure to consult with knowledgeable securities counsel or the staff."[12]

21.     In March 2019, in a letter to Rep. Ted Budd, Chairman Clayton publicly endorsed Director Hinman's comments, including his opinion that Ether is not a security.[13]  Chairman Clayton wrote:

> I agree with Director Hinman's explanation of how a digital asset transaction may no longer represent an investment contract if, for example, purchasers would no longer reasonably expect a person or group to carry out the essential managerial or entrepreneurial efforts. Under those circumstances, the digital asset may not represent an investment contract under the *Howey* framework.[14]

22.     In April 2019, the SEC's Strategic Hub for Innovation and Financial Technology ("FinHub") published its "Framework for 'Investment Contract' Analysis of Digital Assets" ("Framework").[15]  FinHub specifically stated that the Framework "is not a rule, regulation, or

---

[10]  *Id.*

[11]  *Id.*

[12]  *Id.*

[13]  Letter from Jay Clayton to Ted Budd (Mar. 7, 2019), https://coincenter.org/files/2019-03/clayton-token-response.pdf.

[14]  *Id.*

[15]  SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (last modified Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_edn1.

statement of the Commission, and the Commission has neither approved nor disapproved its content."

23.     While the Framework states that it provides guidance "for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions," the Framework falls far short of this goal.[16]  Rather, the Framework simply provides a list of no fewer than 38 factors or "characteristics" (plus nearly 30 additional sub-factors) that FinHub claims are "especially relevant" to determining one prong of the *Howey* test.[17]  The Framework does not provide any guidance for weighing these numerous factors or how to apply them to the facts of any particular matter; to the contrary, the Framework states that "no one of the following characteristics is necessarily determinative" and they are "not intended to be exhaustive in evaluating whether a digital asset is an investment contract or any other type of security."[18]

24.     SEC Commissioner Hester Peirce publicly criticized the Framework:  "Pages worth of factors, many of which seemingly apply to all decentralized networks, might contribute to the feeling that navigating the securities laws in this area is perilous business.  Rather than sorting through the factors or hiring an expensive lawyer to do so, a wary company may reasonably decide to forgo certain opportunities or to pursue them in a more crypto-friendly jurisdiction overseas."[19]

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19]  Commissioner Hester M. Peirce, How We Howey (May 9, 2019), https://www.sec.gov/news/speech/peirce-how-we-howey-050919.

25.     The Framework further supported the views of Chairman Clayton and Director Hinman, set forth above, that an instrument that is deemed a security at one point in time can become a non-security at a later point in time.  Indeed, the Framework specifically splits its analysis into two different points in time:  (1) where the digital asset is originally offered; and (2) where a "digital asset previously sold as a security should be reevaluated at the time of later offers or sales."[20]  Thus, under the Framework, a digital currency that may have been a security in one setting may not be a security "at the time of later offers or sales."[21]

26.     All of the above statements by the SEC and its high-ranking officials—which have taken the place of any formal SEC rulemaking, interpretation or other Commission action, and thus remain the only ways in which developers like Telegram can glean any guidance  have been woefully insufficient to provide Telegram with legally and constitutionally required notice as to whether its conduct violated federal securities laws, and have led to arbitrary enforcement efforts whereby Bitcoin and Ethereum are presumed to not be securities while other cryptocurrencies with the same or substantially similar characteristics are deemed to be securities.

27.     In fact, U.S. Representative Warren Davidson recently referred to this approach of "regulation by enforcement" rather than by guidance—specifically in the context of Grams—as having "all the charm and inefficiency of third-world power structures."[22]  Representative Davidson further stated:

---

[20] SEC, *supra* n.15.

[21] *Id.*

[22]  Kollen Post, *Rep. Warren Davidson: You Have to Defend Money to Defend Freedom*, Cointelegraph (Oct. 22, 2019), https://cointelegraph.com/news/rep-warren-davidson-you-have-to-defend-money-to-defend-freedom.

> The SEC is doing a complete patchwork of regulation.  No one knows where they're going. They're literally told if you want to launch a token, whatever you think you want to do with it, come check with the SEC first. . . .  And you can grovel.  If you grovel well enough, then we'll give you a no-action letter. You have hundreds of companies waiting on no-action letters.  They've approved two. You can't raise capital while you're waiting for that.
>
> . . . .
>
> So what are people doing?  They're like, 'Screw you guys, we're just gonna launch it in Switzerland, Singapore, Malta — wherever.'  And they're not going to avoid our laws — **we don't have a law**. [23]

28.     Similarly, the SEC's approach here flies in the face of a recently issued executive order, which directs agencies to provide notice-type "above and beyond those" that the Due Process Clause requires.[24]  The order emphasizes that actions must be based solely on "standards of conduct that have been publicly stated in a manner that would not cause unfair surprise."[25]

29.     Such an approach is also inconsistent with the SEC's publicly expressed desire to engage with developers in this area.  *See, e.g.*, SEC Press Release 2018-240, SEC Launches New Strategic Hub for Innovation and Financial Technology (Oct. 18, 2018), https://www.sec.gov/news/press-release/2018-240.  For example, when the SEC announced the launch of FinHub, Valerie A. Szczepanik, Senior Advisor for Digital Assets and Innovation and Associate Director in the SEC's Division of Corporation Finance, explained, "By launching FinHub, we hope to provide a clear path for entrepreneurs, developers, and their advisers **to engage with SEC staff**, seek input, and test ideas."  *Id.* (emphasis added).  Additionally, Chairman Clayton stated, "The SEC is committed to working with investors and market participants on new approaches to capital formation, market structure, and financial services, with an eye toward enhancing, and in

---

[23]  *Id.* (alteration in original)(emphasis added).

[24] EXECUTIVE ORDER ON PROMOTING THE RULE OF LAW THROUGH TRANSPARENCY AND FAIRNESS IN CIVIL ADMINISTRATIVE ENFORCEMENT AND ADJUDICATION, 2019 WL 5061295, at *1

[25] *Id.* at *3.

no way reducing, investor protection. . . .  The FinHub provides a central point of focus for our

efforts to monitor and engage on innovations in the securities markets that hold promise, but

which also require a flexible, prompt regulatory response to execute our mission." *Id.*

30.     In fact, SEC Commissioner Peirce recently criticized the SEC's current approach

of leading with enforcement without clear regulatory guidelines.[26]  As she explained:

> I am concerned about how the SEC has regulated this space, because I believe our
> lack of a workable regulatory framework has hindered innovation and growth.
> The only guidance out of the SEC is a parade of enforcement actions and a set of
> staff guidance documents and staff no-action letters. For example, the SEC's web
> page "Spotlight on Initial Coin Offerings (ICOs)," has an "ICO Updates" section
> that is headlined by enforcement actions brought by the Commission. Only when
> you click through to "More" do you see other materials. Of particular concern is
> that these enforcement actions and guidance pieces, taken together, offer no clear
> path for a functioning token network to emerge.[27]

She continued:

> Another implication of our enforcement program to which we need to be more
> sensitive is the effect enforcement actions have on third parties. We at the
> Commission embrace the third-party deterrent message that enforcement actions
> convey, but we generally fail to realize how muted that message is. The terms of a
> settled enforcement action, for example, may turn on considerations that will not
> be obviously determinative to someone reading the facts set forth in the settlement
> order. I am thinking of one recent enforcement action that generated quite a buzz
> in the crypto world because some thought its penalty was too low relative to the
> amount raised in the offering. Yet, there were some underlying facts that might
> have argued for the opposite conclusion — that the penalty was too high.[28]

31.     Telegram's TON project is an entirely new business model, and the SEC's

position that it fits into the definition of "security" based on existing frameworks is clearly

unreasonable, particularly since Grams align with other cryptocurrencies that the SEC has not

---

[26] Commissioner Hester M. Peirce, Broken Windows: Remarks before the 51st Annual Institute on Securities
Regulation (Nov. 4, 2019), https://www.sec.gov/news/speech/peirce-broken-windows-51st-annual-institute-
securities-regulation.

[27] *Id.* (citations omitted).

[28] *Id.* (citation omitted).

deemed securities.  Even though the SEC has recognized that digital currencies present novel questions under the securities laws, it has not provided any formal, clear or workable guidance regarding how it would determine whether Grams qualify as securities.

32.     A formal rulemaking or at the very least an interpretation or policy statement from the SEC itself, with commentary from the public, is necessary for a paradigm shift such as this (the U.S. Commodity Futures Trading Commission has at least started this type of process with a Commission-level proposal and public comment on how to deal with the actual delivery of cryptocurrency).  "Furthermore, deferring to agencies' litigating positions interpreting statutes they are charged with administering would create a danger that agencies would avoid promulgating regulations altogether, given the comparative ease of announcing a new statutory interpretation in a brief rather than through formal rulemaking. This result would severely undermine the notice and predictability to regulated parties that formal rulemaking is meant to promote."  *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 830 (9th Cir. 2012).

33.     The SEC repeatedly failed to clarify Telegram's regulatory obligations despite Telegram's stated flexibility and efforts for compliance, and seeks to punish Telegram for conduct that the SEC now finds to violate the securities laws by imposing severe sanctions. Grams are intended to be an alternative currency that can be used to buy goods and services on the TON Blockchain.  Grams cannot function as intended — as a medium of exchange — if they are deemed a security.  Given that Grams are intended to function as a currency, which is expressly defined not to be a security and cannot function as intended if classified as a security, and given the recognition by the Chairman of the Commission and high-ranking staff that digital currencies can morph from a security into a non-security — a characteristic that the SEC's

claims in this action do not appear to even address — the need for regulatory clarity here is paramount but entirely absent.

34.     As particularly relevant here, the SEC has not initiated any actions with respect to cryptocurrencies Bitcoin and Ether, which share similar characteristics with Grams.

### C.     The SEC Failed to Provide Guidance While Telegram Was Expending Funds to Build the TON Blockchain

35.     Against this backdrop of public uncertainty and the SEC's repeated invitations for developers to engage with its staff on the specifics of their particular projects, Telegram attempted to receive SEC guidance and feedback on the TON Blockchain.

36.     On February 2, 2018, counsel for Telegram reached out to the SEC regarding the TON Blockchain platform.  That same day, the SEC sent a letter to "Telegram LLC" which stated that "[t]he staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above and requests that your client, Telegram LLC ('Telegram'), voluntarily produce to the staff" a number of categories of documents.  Both sides agreed to the scope of Telegram's voluntary production of documents, and over the next 18 months, Telegram engaged in good faith and voluntary discussions with the SEC in order to explain the details of its project and to obtain guidance regarding the potential application of the federal securities laws.

37.     During this time, Telegram voluntarily: (i) provided productions of thousands of pages of messages and communications with U.S. purchasers; (ii) submitted a detailed legal memorandum on June 26, 2018, regarding its securities analysis of Grams, along with four supplemental memoranda dated November 28, 2018, February 27, 2019, March 18, 2019, and July 25, 2019; (iii) participated in three in-person presentations to the SEC, during which it answered hundreds of questions regarding the TON Blockchain, the TON Foundation, Grams

and related matters; and (iv) engaged in regular email and telephone discussions with the SEC

and promptly answered questions and provided additional information regarding a wide range of

topics relating to the above.  These efforts were both time-consuming and expensive, but were

undertaken in a good faith attempt to engage with the SEC and receive guidance on these matters

in light of the SEC's public statements encouraging such engagement, as described *supra*.

38.   Below is a timeline of Telegram's voluntary efforts:

| Date | Event |
| --- | --- |
| February 6, 2018 | Voluntary production of documents (Vol. 1) |
| February 13, 2018 | Voluntary production of documents (Vol. 2) |
| March 9, 2018 | Voluntary production of documents (Vol. 3) |
| April 18, 2018 | In-person presentation to SEC |
| May 14, 2018 | Voluntary production of documents (Vol. 4) |
| June 26, 2018 | Submission of Initial Memorandum of Law |
| July 24, 2018 | Call with SEC |
| July 31, 2018 | Call with SEC |
| August 14, 2018 | Call with SEC |
| September 4, 2018 | Call with SEC |
| October 3, 2018 | Voluntary production of documents (Vols. 5 & 6) |
| October 11, 2018 | Call with SEC |
| November 13, 2018 | Voluntary production of documents (Vol. 7) |

| | |
|---|---|
| November 14, 2018 | Call with SEC |
| November 20, 2018 | Submission of Supplemental Memorandum of Law |
| December 13, 2018 | Call with SEC |
| February 6, 2019 | In-person presentation to SEC |
| February 27, 2019 | Submission of Second Supplemental Memorandum of Law |
| March  11, 2019 | Call with SEC |
| March 12, 2019 | Call with SEC |
| March 18, 2019 | Submission of Third Supplemental Memorandum of Law |
| March 25, 2019 | Email response to SEC questions |
| May 28, 2019 | Letter to SEC enclosing documents; email response to SEC questions |
| June 14, 2019 | Email response to SEC questions |
| June 15, 2019 | Email response to SEC questions |
| June 28, 2019 | Call with SEC |
| July 9, 2019 | Email responding to SEC questions |
| July 18, 2019 | In-person presentation to SEC, CFTC and FinCEN |
| July 25, 2019 | Submission of Fourth Supplemental Memorandum of Law |
| September 3, 2019 | Email response to SEC questions |
| September 9, 2019 | Email response to SEC questions |
| September 12, 2019 | Email response to SEC questions |
| September 27, 2019 | Email response to SEC questions |
| September 30, 2019 | Letter to SEC |

| October 1, 2019 | Letter to SEC enclosing documents |
| October 3, 2019 | Letter to SEC enclosing documents |
| October 4, 2019 | Letter to SEC enclosing documents |
| October 10, 2019 | Email response to SEC questions |
| October 11, 2019 | Letter to SEC |

39.     Where the SEC did provide some limited feedback to Telegram regarding the TON Blockchain, Telegram made changes in an attempt to address the SEC's concerns.  As one example, following a February 6, 2019 presentation by Telegram to the SEC, the SEC expressed concerns regarding the TON Foundation's anticipated ability to purchase Grams in the open market following launch.  In response, Telegram submitted a supplemental legal memorandum on March 18, 2019, setting forth its analysis that there should not be any concerns in this respect, but nevertheless confirming that Telegram was willing to remove the TON Foundation's Gram-buying functions.  Telegram also solicited the Commission's views on a number of other issues, including the structure and governance of the TON Foundation and the use of third-party exchanges where the TON Foundation might sell Grams, among others.  The SEC never provided any guidance in response to these specific requests.

40.     On October 11, 2019, the SEC initiated this enforcement action and filed an "Emergency Application for an Order to Show Cause, Temporary Restraining Order, and Order Granting Expedited Discovery and Other Relief," which, among other things, sought to enjoin the launch of the TON Blockchain and any sale, offer or distribution of Grams.

41.     In its complaint, the SEC alleges that Telegram has been engaged in an "ongoing illegal offering of digital-asset securities called 'Grams'" since the Private Placement began in early 2018.  (*See* Compl. at ¶ 1.)  Prior to the filing, the SEC never asked Telegram whether it

would agree to seek to delay the launch of the TON Blockchain and never stated that it would

seek injunctive relief to stop the launch.

42.     The SEC's actions are in direct contradiction to its public statements inviting

developers of digital assets to engage with the SEC to work out securities issues in this new area

of the law.

**FIRST DEFENSE**
**CONSTITUTIONAL VIOLATION –**
**VOID FOR VAGUENESS/LACK OF NOTICE**

43.     Telegram repeats each of its allegations set forth above.

44.     The Due Process Clause of the United States Constitution requires that "laws be

crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable

opportunity to know what is prohibited' and to 'provide explicit standards for those who apply

them.'" *Gen. Media Commc'ns, Inc v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997) (citation

omitted).  As the Supreme Court has put it:  "Vague laws may trap the innocent by not providing

fair warning" and thus "if arbitrary and discriminatory enforcement is to be prevented, laws must

provide explicit standards for those who apply them."  *Village of Hoffman Estates v. Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (citation omitted).

45.     Accordingly, a statute is unconstitutionally vague if either (1) it does not provide

sufficient notice to those who are governed by it, or (2) it does not adequately cabin the

discretion of those who apply it.  *See Farid v. Ellen*, 593 F.3d 233, 243 (2d Cir. 2010).  These

considerations are especially important for statutes, such as Section 5 of the Securities Act of

1933, that purport to impose strict liability, *see Hoffman Estates*, 455 U.S. at 499, or threaten

civil penalties, *see also Fox Television Stations, Inc.*, 567 U.S. at 255 ("[T]he Government's

assurance it will elect not do [levy future penalties] is insufficient to remedy the constitutional

violation.").

46.     As applied to Telegram's Private Placement and any future offers, sales or distributions of Grams, the definition of "investment contract" is unconstitutionally vague because it did not provide sufficient notice to Telegram and because it did not adequately cabin the SEC's discretion to apply it.

47.     Even if the SEC's position that Grams should be regulated as securities were reasonable (and it is not), "announcing it for the first time in the context of [an] adjudication deprives [Telegram] of fair notice." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007); *see also Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 158 (1991) (noting that "the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties").

48.     Before this action, including during its more than 18 months of communications with Telegram, the SEC never stated that it believed Telegram to have been engaged in an "ongoing violation" of the federal securities laws.  It also never asked Telegram whether it was willing to delay its launch of the TON Blockchain (despite Telegram's repeatedly expressed willingness to address any concerns identified), and never informed Telegram that it would seek injunctive relief to stop the launch.

49.     For these reasons, "after a good-faith review of 'the regulations and other public statements issued by the [SEC],'" Telegram acting in good faith would not have been able "to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Fabi Const. Co.*, 508 F.3d at 1089 (citation omitted).

## SECOND DEFENSE
## EXEMPT PRIVATE PLACEMENT

50.  Telegram repeats each of the allegations set forth above.

51.  Under Rule 506(c) of Regulation D, Telegram's Private Placement pursuant to the purchase agreements is exempt from the registration requirement of Section 5.  *See* 17 C.F.R. § 230.506(c).  Telegram has complied with all requirements of Regulation D.

52.  Regulation S provides that offers and sales of securities that occur outside of the United States are exempt from the registration requirements of Section 5 of the Securities Act of 1933.  Telegram has complied with all requirements of Regulation S.

## THIRD DEFENSE
## LACK OF EXTRATERRITORIAL AUTHORITY

53.  Telegram repeats each of the allegations set forth above.

54.  Telegram's purchase agreements with foreign purchasers are not domestic transactions.

55.  Accordingly, the SEC lacks extraterritorial authority over any of the transactions between Telegram and foreign purchasers.

## FOURTH DEFENSE
## JURISDICTION

56.  Telegram repeats each of the allegations set forth above.

57.  The SEC's claims are barred because Defendants are not subject to general or specific jurisdiction in this Court.

## FIFTH DEFENSE
## RESERVATION OF RIGHTS

58.  Telegram presently has insufficient knowledge or information upon which to form a belief as to whether there may be other, as yet unstated, defenses available to Telegram, and

therefore expressly (1) reserves the right to amend or supplement its Answer, defenses and all

other pleadings, and (2) reserves the right to assert any and all additional defenses under any

applicable law in the event that discovery indicates such defenses would be appropriate.

### PRAYER FOR RELIEF

59.     WHEREFORE, Telegram respectfully requests that the Court (1) dismiss

Plaintiffs' claims against Telegram in their entirety and with prejudice; and (2) grant such other

and further relief as it may deem just and proper.

Dated:   New York, New York
         November 12, 2019

       /s/ Scott D. Musoff
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000
george.zimmerman@skadden.com
scott.musoff@skadden.com
christopher.malloy@skadden.com
alexander.drylewski@skadden.com

*Attorneys for Defendants*