

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
BROOKFIELD PLACE
200 VESEY STREET, ROOM 400
NEW YORK, NY 10281-1022

Jorge G. Tenreiro
WRITER'S DIRECT DIAL
TELEPHONE: (212) 336-9145
TenreiroJ@sec.gov

November 7, 2019

<u>Via E-mail</u>

Alexander Drylewski, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10007

      Re:    <u>SEC v. Telegram Group Inc. et al., No. 19 Civ. 9439 (PKC)</u>

Dear Alex:

      We write in response to your ("Defendants") letter dated November 4, 2019 ("Letter") respecting our First and Second Set of Requests for Production of Documents dated October 11 and 16, 2019 ("Requests"), and to address other pending discovery matters in this action.

      As an initial matter, we do not agree that our Requests are "overly broad and unduly burdensome." To the extent Defendants have "already produced" documents in connection with our investigation of this case, we indicated in our Requests that we do not seek that you produce those documents again. We also do not agree with the implication that "legal issues in this case" can be decided in a vacuum, devoid of factual context. This civil action is currently in discovery, and there are facts that will bear on how the Court applies the legal principles that control this case. Nevertheless, in the spirit of compromise and to move this case expeditiously towards a resolution of discovery disputes, our positions and further explanation as to the Requests are set forth below.

      We also request that you propose a schedule for the production of documents in response to all outstanding Requests, which we served over a month ago. To date, we have not received a single document in response to those Requests. You have stated that Defendants will begin production following the entry of a protective order. However, not all documents will require confidentiality protection and we request that you provide us with a proposed production timetable for those documents as soon as possible.

Alexander Drylewski, Esq.                                               November 7, 2019
Page 2

**October 11, 2019 Subpoena**

Requests Nos. 1, 2, 13

In addition to conducting a reasonably diligent search for responsive communications between Telegram and any digital asset exchanges concerning the trading and custody of Grams, you have proposed using search terms to identify additional, internal documents responsive to these Requests. Without waiving our right to request that a search for documents responsive to these Requests be conducted without search terms, we propose that you begin your production of documents by running the following search terms:

- Gram* w/15 trad*
- Gram* w/15 cust*
- Gram* w/15 list*
- Gram* w/5 (sell* or sale or resell or resale)

We also indicated to you that we would provide you additional names of exchanges that you may specifically search in connection with your response to these Requests. Without implying that it is anyone other than your obligation to determine which exchanges you communicated with, we believe that, in addition to previously identified exchanges, the entity known as "Blackmoon Crypto" may also be relevant to these Requests.

You have also requested that we provide our views with respect to "time limitations" regarding these Requests. As we have stated to you in our various meet and confers, we cannot agree to place "time limitations" on your obligations to continually update discovery requests pursuant to Fed. R. Civ. P. 26(e), particularly given your argument in this case that the status of Grams as "investment contracts" under *SEC v. W.J. Howey & Co.* is continually evolving. Nevertheless, in the interest of preserving resources and minimizing burdens, we propose that, after initial productions are complete, each party undertake to update their entire production of non-privileged documents responsive to all existing document requests on November 29, 2019, December 20, 2019, January 13, 2020, January 24, 2020, and February 15, 2020. The foregoing proposal should not be construed as otherwise overriding each party's duty to update an adverse party with documents intended to be used at the hearing scheduled for February 18-19, 2020, and with all documents that each party may use in support of any claim, allegation, or defense.

We look forward to hearing from you regarding the above proposed search terms and production update dates.

Requests No. 3, 7

These Requests seek communications between you and potential and actual Grams investors. You have indicated that you will not produce any such documents for two principal reasons. First, you contend that the requests for "all" communications are too broad. However, we have agreed to limit the Requests to communications regarding Grams.

Alexander Drylewski, Esq.                                            November 7, 2019
Page 3

    Second, your responses to our Requests appear to seek to limit discovery solely to the likelihood of any future violations – whether Grams will be securities at launch – despite simultaneously contending that Telegram has not engaged in any past violation of the registration provisions of the federal securities and, as a result, refusing to produce documents relevant to past violations.  More specifically, you state that "communications with the Private Placement Purchasers is doubly irrelevant to the claims and defenses in this case" because (1) the expectations of Private Placement purchasers have no bearing on the claims and defenses in this litigation; (2) the *Howey* test is an objective one such that "the subjective intentions and expectations of individual purchasers are not relevant;" (3) the communications are not relevant to whether Defendants complied with Regulation D under Rule 506(c) of the Securities and Exchange Act of 1933 because that "turns entirely on whether Grams are securities;" and (4) communications with foreign purchasers are "beyond the scope of Plaintiff's authority."  We do not agree.

    *First*, your position that the Private Placement Agreements were investment contracts and were thus securities but the Grams themselves were not because they must be analyzed separately is incorrect.  In *Howey* itself, the promoters agreed to develop and deliver orange groves at a future date, after the entry of the purchase and management agreements.  The Supreme Court, in holding that the entirety of the instruments were "investment contracts," necessarily rejected the contention that the promoters were simply entering into an investment contract for the delivery of a future commodity.  Thus, it has always been the Commission's position that purchase or sale of a security occurs at the time the parties become contractually bound, not at the time of settlement.  *See* Securities Offering Reform, 70 F.R. 44722 (Aug. 3, 2005).  Unsurprisingly, then, courts have also held consistently that the date of a sale is the date of contractual commitment.  *See, e.g.*, *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) (holding that a purchase occurs at "the time when the parties to the transaction are committed to one another"); *In re Alliance Pharmaceutical Corp. Secs. Lit.*, 279 F. Supp. 2d 171, 186-187 (S.D.N.Y. 2003) (following the holding in *Radiation Dynamics* with respect to the timing of a contract of sale); *Pahmer v. Greenberg*, 926 F. Supp. 287, 299 (E.D.N.Y. 1996) (citing *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992) ("[A] sale occurs for Section 12[(a)](2) purposes when the parties obligate themselves to perform what they have agreed to perform even if the formal performance of their agreement is to be after a lapse of time")).

    *Second*, as we explained in our meet and confers, we do not seek discovery into the "subjective intentions and expectations of individual purchasers," as you suggest.  Telegram's communications with prospective Grams purchasers are relevant because, among other things, the *Howey* test asks "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."  *SEC v. United Ben. Life Ins. Co.*, 387 U.S. 202, 211 (1967) (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-353 (1943)).  Thus, to the extent you contend that Grams themselves are not investment contracts, Telegram's direct communications with prospective purchasers may show

"the economic inducements held out to the prospect[s]" in Grams and are thus highly relevant to the central issue to be decided in this case.[1]

For the foregoing reasons, courts routinely and repeatedly permit inquiry into the specific representations made to individual purchasers, and the specific statements of specific purchasers, in order to conduct analysis into the objective, reasonable expectations of investors. Limiting the inquiry to the bare terms of the legal agreement, as your proposed untenable limitation on discovery would do, is inconsistent with *Howey*'s requirement that substance govern over form and is "an invitation to artful manipulation of business forms to avoid investment contract status." *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 760 (11th Cir. 2007). "Post-investment events can serve as evidence" of the parties' expectations, and thus may be considered in the *Howey* analysis. *Id*. Thus, as the Tenth Circuit recently explained in the specific context of determining what type of evidence is relevant to the *Howey* analysis, "[c]onsistent with *Howey's* focus on substance over form, we look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (citing *Merchant Cap.* 483 F.3d at 756-57); *see also SEC v. Arcturus*, 928 F.3d 400, 411 n.13 (5th Cir. 2019) (describing as "unpersuasive" contention that district court could not consider evidence of post-investment conduct to determine *Howey* analysis, and collecting cases); *Slevin v. Pedersen Assocs., Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y. 1982) ("The original intention of the parties is crucial to the classification of their contract [as an investment contract or otherwise]."); *Wasnowic v. Chicago Bd. of Trade*, 352 F. Supp. 1066, 1070–71 (M.D. Pa. 1972) ("Whether an 'investment contract' exists depends, like any other contract, upon the original intention of the parties to the arrangement."), *aff'd without opinion*, 491 F.2d 752 (3d Cir. 1973).[2]

*Third*, you contend *both* that Grams are not securities *and* that, even if they are, you complied with the exemption from registration under Regulation D. The Commission is thus entitled to discovery on *both* defenses, rather than engage in piecemeal litigation that would require the parties to restart discovery on the Regulation D question after a ruling on the *Howey* question.[3]

---

[1]　　Given your concession that the Private Placement Agreements are "investment contracts," we have proposed a stipulation that, if the Court determines that, as a matter of law, the Grams sold in 2018 cannot be analyzed separately from the Private Placement Agreements used to sell them, then Grams are also "investment contracts." You have rejected this proposed stipulation but have not provided any legal or factual basis for your position.

[2]　　Analogously, the Second Circuit long ago rejected the contention that the expectations of individual investors are wholly irrelevant to an "objective" test applicable to the securities laws. In *SEC v. Texas Gulf Sulphur Company*, 446 F.2d 1301, 1305 (2d Cir. 1971), the Second Circuit explicitly found that "[t]here is little doubt that the testimony offered by the SEC was relevant to whether the release was misleading to the 'reasonable investor'" for purposes of determining the materiality of misstatements. There is no reason why the "reasonable investor" inquiry in the context of *Howey* should be treated any differently, or be wholly divorced from statements made to individual investors.

[3]　　Again, if you are amenable to a stipulation that, if Grams are securities, Regulation D was not met, then this contention would have more force.

Alexander Drylewski, Esq.                                              November 7, 2019
Page 5

*Fourth*, because you have claimed an exemption from the registration requirements of Section 5 of the Securities Act of 1933 under Regulation S, statements made to foreign purchasers are indisputably relevant. Among other things, Regulation S requires "no directed selling efforts" in the United States. 17 C.F.R. § 230.903. "Directed selling efforts," in turn, include "any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered in reliance on this Regulation S." *Id.* § 230.902(c)(1). *Cf. Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship. v. Schwartzberg*, 929 F. Supp. 105, 112 (S.D.N.Y. 1996) (analyzing particular statements to determine whether they had "conditioned the market" in violation of certain registration provisions).[4]

In addition to the arguments stated in your Letter, you have stated more broadly that the question to be determined by the Court relates to the reasonable expectations of secondary market purchasers and not those of Private Placement purchasers and that, therefore, statements to Private Placement purchasers are not relevant. However, as we have indicated to you, the Commission claims both a past as well as an ongoing and likely to recur in the future violation of Section 5. Unless you are prepared to stipulate to the existence of a past violation of Section 5, communications to Private Placement purchasers are relevant for the reasons set forth above. But, more importantly, your argument that statements to Private Placement purchasers have nothing to do with the expectations of reasonable secondary market purchasers of Grams is fundamentally illogical. Statements to Private Placement purchasers could reveal, for example, planned statements to secondary market purchasers. Or individual statements to Private Placement purchasers could have reached the secondary market, thus becoming relevant to that analysis as well. Without describing the myriad ways in which individual statements to Private Placement purchasers are very likely highly relevant to the question of what expectations a reasonable secondary market purchaser had, it is plain that Requests Nos. 3 and 7 seek information that is at the heart of the parties' various contentions in this case.

Accordingly, we respectfully request that Defendants produce documents responsive to these Requests.

Requests Nos. 4 & 8

We accept your proposal to produce KYC/AML documents with respect to foreign purchasers in response to this Request, but ask that you provide the un-redacted names of the foreign individual Grams investors. Moreover, at a minimum, please produce the communications with these individuals with their names and other private data redacted while the parties resolve the data privacy issues.

---

[4] Communications with investors are relevant for myriad other reasons under Section 5. *Howey* itself deals only with whether an instrument is an "investment contract." The Commission must still prove the existence of an "offer" and the use of interstate commerce. Communications with investors are relevant to both points. Communications with investors, indeed, could each constitute a separate, individually actionable "offer" of securities, should the economic inducements for each transaction vary across investors, a contention the Commission is entitled to test in discovery.

Alexander Drylewski, Esq.                                                November 7, 2019
Page 6

Request No. 5

    You have agreed to conduct a reasonably diligent search for documents responsive to our requests for documents concerning the development or potential development of applications for the TON Blockchain.  As we clarified to you over the phone, the existence of interrogatories dealing with this issue does not obviate our request for documents necessary to test your contentions about the development of the TON Blockchain.

Requests Nos. 6, 10, 11, 12

    Thank you for agreeing to produce documents in connection with these Requests.  Please indicate to us when you expect to produce these documents as soon as possible.

Request No. 9

    As we stated, we have requested documents respecting the use of funds raised by the sale of Grams to, among other things, conduct discovery as to the stages of development of the TON Blockchain and ecosystem.  Please indicate whether and when you will produce such documents.

Request No. 14, 15, 16

    As we stated, we believe documents and communications regarding the steps you took to ensure that Grams purchasers were not purchasing them with a view to resell them, as well as information regarding current and potential uses of Grams, are directly relevant to several of the defenses you have asserted in this case.  Please provide all such documents and communications, or indicate the lack of existence thereof, as soon as possible.

**October 16, 2019 Subpoena**

Request No. 1

    We do not agree that a full list of your employees and agents is overbroad or unduly burdensome, nor do we believe that the information is beyond the scope of the claims at issue in this litigation.  It is our understanding that Telegram is a relatively small company, with no more than a few dozen employees, such that a compilation of any such list is not even minimally burdensome.  As to relevance, there is already evidence in the record that individuals associated with, claiming to be associated with, or formerly associated with Telegram have taken affirmative steps to ensure that Grams are publicly distributed, in direct contravention of the requirements of Regulation D, by, for example, attempting to create secondary markets for Grams.  *See, e.g.*, Attachment A hereto (individual claiming association to Telegram contacting BitMex).

    To partially resolve this dispute, we agree to receive a list of employees, former employees, or other agents involved not only "with respect to the selling of Grams" as you suggest in your Letter, but with respect to any and all efforts relating to Grams, including but not limited to development of uses for Grams, custody of Grams, listing of Grams, trading of Grams,

Alexander Drylewski, Esq.                                              November 7, 2019
Page 7

etc. This understanding excludes Telegram employees involved *solely* with the development of the Telegram Messenger application, except to the extent they worked on the integration of the TON Blockchain or Grams into Telegram Messenger. The identities of individuals listed in your offering materials as developers of TON Blockchain and other applications are also critically relevant to understanding the scope of the reliance on the efforts of others that reasonable objective investors may have expected.

In addition, for the avoidance of doubt, the term "employees, agents, independent contractors, attorneys, representatives, and assigns" specifically includes such individuals "from the period starting September 1, 2017 through the present," including any individual who may have been an "employee[], agent[]…" at some point within that time period but is no longer acting in such capacity. Please confirm that your understanding of this Request is consistent with ours.

Finally, for the avoidance of doubt, our Requests seek any compensation or employment agreements, whether formal or informal, for any of the individuals covered by this Request No. 1. Please confirm that you are searching for and producing these documents.

Request No. 2

Please indicate as soon as possible when you will produce the information sought by this Request. We do not understand there to be any proprietary or trade secret issues requiring a confidentiality order with respect to conversations on Telegram Messenger.

**Depositions**

As we indicated, we seek to depose Pavel Durov for somewhere between one and two deposition days (including his role as the 30(b)(6) witness for both Defendants in this action), as well as Ilya Perekopsky and Shyam Parekh, while agreeing to postpone, for now, the deposition of Dr. Nikolai Durov. You have proposed the week of December 2, 2019 for the deposition of Mr. Durov, to take place in Dubai, UAE. We have indicated that a deposition in Dubai will require more lead time to prepare than one in London, England. Please indicate as soon as possible whether Mr. Durov will agree to sit in London for his deposition, which we believe we can arrange, including all required authorizations from foreign authorities, by the week of December 2, 2019. Alternatively, and out of an abundance of caution and to advance the resolution of discovery in this matter, the undersigned has begun the process of seeking authorization from the authorities in Dubai to conduct a deposition there. Because it is our expectation that such authorization will take somewhere between 4-6 weeks, should Mr. Durov wish to remain in Dubai for the deposition, please propose a briefing schedule other than the one currently ordered by the Court that would permit the completion of depositions in this matter.

Finally, in order to expedite the completion of discovery in this case, we ask that you provide us contact information for John Hyman, Kenneth Morton, Oleg Seydak, Sergey Vasin, Alexander Filatov, and Dmitry Goroshevsky, and that, given their claimed affiliations with Telegram, you ask that they appear for depositions in this matter. We are amenable to discussing which of these individuals can be deposed, for example, via telephone or videoconference,

Alexander Drylewski, Esq.  November 7, 2019
Page 8

without the need for travel. Accordingly, we believe that we can reasonably complete the questioning of these witnesses well within the allotted time frame for discovery, if the parties cooperate in securing their depositions. In the alternative, should you choose not to assist us in obtaining the depositions of these individuals, we propose to seek the issuance of Letters Rogatory from the Court.

**Expert Discovery**

You have proposed that we exchange expert reports on December 2, 2019. We propose to exchange expert reports no later than December 20, 2019, but that the parties agree to disclose whether they will utilize experts and, if so, on which topics, no later than December 2, 2019. Please let us know if this proposal is acceptable to you.

Truly yours,

Jorge G. Tenreiro

# ATTACHMENT A

| | |
|---|---|
| **From:** | Google Calendar <calendar-notification@google.com> on behalf of Arthur Hayes <arthur@bitmex.com> |
| **Sent:** | Thu, 8 Mar 2018 10:41:53 +0000 (UTC) |
| **To:** | kennethrmorton@gmail.com |
| **Subject:** | Invitation: Meeting - Kenneth Morton <> Arthur Hayes(BitMEX) @ Fri Mar 9, 2018 6am - 7am (UTC) (Kenneth Morton) |
| **Attachments:** | invite.ics |

more details »

**Meeting - Kenneth Morton <> Arthur Hayes(BitMEX)**

Dawn,

Can you book a meeting at the office 2pm tomorrow Friday.

On Thu, 8 Mar 2018 at 6:32 PM, Kenneth Morton wrote:
That would be fine, what's the address?

My mobile is 9663 6972 just in case

On 8 Mar 2018, at 18:30, Arthur Hayes wrote:

Can you come at 2pm we are in Lai chi kok

On Thu, 8 Mar 2018 at 5:41 PM, Kenneth Morton wrote:
That would be great. Would 12:30 or 12:45 work for you?

Ken

On 8 Mar 2018, at 16:45, Arthur Hayes wrote:

Can you come by our office tomorrow in Kowloon? My BitMEX email is cc'd.

> On 8 Mar 2018, at 10:18 AM, Kenneth Morton wrote:
>
> Arthur, hi
>
> I've been helping the Telegram team get in contact with a few people in the crypto world - historically most of their relationships have been in Europe, the US and Russia, and they're interested in connecting w
>
> They're keen to establish relationships with potential investors in their ICO and to discuss areas of potential cooperation with important players in the ecosystem - the second round of the ICO is basically done
>
> As background, I'm not part of the Telegram team, but I've been working closely with a former colleague who's running the process to help them in Asia. If it'd be helpful, I can get someone at Telegram to con
>
> If you're in HK in the next week or so, perhaps we could get a coffee or something so I can briefly introduce myself and give you a bit more info on their plans and we could see if there are any areas for coope
>
> Ken

--
Arthur Hayes
Co-Founder & CEO
BitMEX

| | |
|---|---|
| When | Fri Mar 9, 2018 6am – 7am<br>Coordinated Universal Time |
| Where | BitMEX office - Suite 1103, 11/F, Saxon Tower, 7 Cheung Shun Street, Cheung Sha Wan, HK (map) |
| Joining info | meet.google.com/ufs-mwgy-znk |
| Calendar | Kenneth Morton |
| Who | • Arthur Hayes - organizer<br>• dawn.wong@bitmex.com - creator<br>• Kenneth Morton |
| Going? | **Yes** - **Maybe** - **No**   more options » |

Invitation from Google Calendar

You are receiving this email at the account kennethrmorton@gmail.com because you are subscribed for invitations on calendar Kenneth Morton.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More.