

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
BROOKFIELD PLACE
200 VESEY STREET, ROOM 400
NEW YORK, NY 10281-1022

Jorge G. Tenreiro
WRITER'S DIRECT DIAL
TELEPHONE: (212) 336-9145
TenreiroJ@sec.gov

January 2, 2020

Via ECF, Facsimile, and Overnight Delivery
Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

*[Handwritten annotation: Defendants shall respond no later than forthwith or the close of business today. SO ORDERED. /s/ P. Kevin Castel, USDJ 1-3-20]*

Re:   SEC v. Telegram Group Inc. et al., No. 19 Civ. 9439 (PKC)

Dear Judge Castel:

Pursuant to Rule 3.B of this Court's Individual Practices, Local Rule 37.2 of the Southern District of New York, and Paragraph II(a) of the parties' October 21, 2019 Stipulation and Consent Order (D.E. 23) ("Order"), Plaintiff respectfully moves to compel Defendants to answer questions and provide documents regarding the amounts, sources, and use of funds raised from investors in connection with the unregistered sale of securities at issue in this case.

Defendants claim to have raised approximately $1.7 billion from investors through the sale of digital tokens called Grams between approximately January through March 2018 in what the SEC has charged to be an unregistered offering of securities. Defendants are now refusing to disclose the bank records concerning how they have spent the $1.7 billion they raised from investors in the past two years and to answer questions about the disposition of investor funds.

Telegram has already once avoided having to provide financial information to investors, including regarding the intended use of their funds, by failing to register its sale of Grams and not therefore providing a statutory prospectus. The requested bank records are highly relevant to the issues in dispute in this case, including how much money Telegram has spent, and in what manner, in developing the TON Blockchain, the Telegram Messenger application to be integrated with the TON Blockchain, and related applications. This evidence is relevant to the efforts Telegram has made to ensure the viability and profitability of the Grams it sold, which is relevant to the "efforts of others" prong of the *Howey* test in determining whether the Grams are securities. Telegram's bank records are also relevant to whether Telegram paid commissions to purchasers who were buying Grams to resell to other investors (as appears to be the case based on documents we have reviewed), which could render them statutory underwriters (such that Telegram's offering would not qualify for an exemption). In turn, Defendants' refusal to fully disclose and answer questions about their disposition of the $1.7 billion they raised from investors is deeply troubling. The SEC respectfully requests that Telegram be compelled to provide complete bank records and answers questions about Telegram's use of these funds.

The SEC seeks this information through Telegram's bank records, as well as from Pavel Durov, the witness designated as Defendants' corporate representative pursuant to Fed. R. Civ. P. 30(b)(6), whose deposition is currently scheduled to take place on January 7 and 8, 2020, in Dubai, United Arab Emirates. Pursuant to Fed. R. Civ. P. 37(a)(1), the undersigned hereby certifies that he has attempted to confer in good faith with Defendants in an effort to obtain the requested bank records and information without court action. After various meet and confers on this subject over the last several weeks, on Friday, December 27, 2019, the undersigned advised Telegram's counsel that it was prepared to file this motion that day if Telegram did not agree to provide its bank records showing credits and debits. Counsel for Defendants represented to the undersigned that, after consultation with their clients, they would produce the "bank records," and prepare Mr. Durov to testify with respect to these topics. However, Defendants produced records showing only credits, and not debits showing how Telegram spent the investors' money. When, on December 30, 2019, the undersigned complained about the incomplete production, counsel for Defendants claimed they had misunderstood the SEC's request to have been limited to credits, even though we had had an extended discussion with them on December 27 regarding our need for bank records including credits and debits and even though our request had been pending for weeks and was reiterated in writing the day before our December 27 call (*see* Exs. A & B). Counsel later informed the undersigned that they would not provide full bank records themselves, but instead only information, culled by them, concerning payments from Telegram to third parties relating to the TON project. They also indicated that they could not immediately produce those records because Telegram was no longer banking at the same institution. In the meet and confer process, the parties also agreed that the SEC would hold off filing this motion sooner, so that counsel could revert back to their client one more time in an attempt to resolve this, but that, if filed, Telegram's response to this submission would be due in one business day, instead of the three set forth in the Order.

At bottom, Telegram does not want to tell the SEC what it has done with the $1.7 billion it raised from investors. Because the deposition of Defendants' corporate representative is slated to take place in Dubai next Tuesday and Wednesday, the SEC is filing this application today.

I. **Background**

In 2018, Telegram offered and sold to investors digital assets known as Grams by touting, among other things, its planned efforts to develop a "Telegram Open Network" ("TON") Blockchain for Grams, and the potential to achieve widespread adoption of Grams through the future growth of its messaging app ("Messenger"). For example, in a "Letter of Interest" that Telegram had prospective purchasers sign, the company explained that it "intend[ed] to use the proceeds raised from the offering for the development of the TON Blockchain, for the continued development and maintenance of Telegram Messenger and for general corporate purposes at Telegram Messenger." Ex. C at 1. In a "Primer" Telegram circulated to prospective investors, Telegram stated that "[a] total spending of about $620 million to support continuing organic user growth should allow Telegram to reach one billion active users by January 1, 2022." Ex. D at 18. Telegram promised to "leverage its **existing ecosystem** of communities, developers, publishers, payment providers, and merchants to drive demand and value for TON cryptocurrency," and noted that "[i]ntegrated into Telegram applications, the TON-Telegram wallet will instantly become the world's most adopted cryptocurrency wallet." *Id.* at 5, 11.

Hon. P. Kevin Castel                                                    January 2, 2020
Page 3

In two Forms D filed with the SEC in February and March 2018, Telegram stated that it raised a total of $1.7 billion through the sale of certain "Purchase Agreements for Grams" ("Purchase Agreements") to purportedly accredited investors (the "Offering"). Exs. E & F. Telegram stated that the Purchase Agreements were securities under the federal securities laws, but claimed that their sale was exempt from the registration requirement of Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, pursuant to Rule 506(c) of Regulation D issued under the Act. *See* 17 C.F.R. § 230.506(c). In its Answer, Telegram has made the same claim D. *See* D.E. 37 at 34 (Second Affirmative Defense).

During the SEC's investigation of Telegram's potential violation of the federal securities laws, Telegram proffered that, as of January 31, 2019, it had expended approximately $218 million for general corporate purposes. But, Telegram has refused to provide any further financial information regarding how much money it has spent on developing the TON Blockchain and what it has done with the rest of the investors' money.

## II. The SEC Sought, and Defendants Refused to Provide, Information About Telegram's Use of Investor Funds

The SEC filed this action on October 11, 2019, and sought an emergency order seeking, among other things, expedited discovery. D.E. 3. The Court granted the SEC's request, D.E. 6, and the SEC served document requests seeking, among other things, a "complete and updated list of all individuals and entities that purchased Grams" and "financial records reflecting the current amount of the funds, and the use to which any funds were put." Ex. G at 11-12 (Requests No. 8 and 9). Telegram objected to these requests, *id.*, and the SEC later explained to Defendants that this information was relevant, among other things, to "the stages of development of the TON Blockchain and ecosystem." Ex. H (SEC Letter of Nov. 7, 2019) at 6. Subsequently, Telegram provided the SEC with redacted, partial copies of its bank statements. The redactions obscure many transactions occurring at the same time as Offering proceeds were received, and what is not obscured by redactions shows only deposits, not Telegram's expenditures.

The SEC has also sought the deposition of a Telegram corporate representative witness pursuant to Fed. R. Civ. P. 30(b)(6). The SEC sought, among other things, a representative to testify regarding "specific expenditures related to [Telegram's] development of TON Blockchain . . . , including up to October 31, 2019, at present, and expected future expenditures, including payments to non-Telegram employees," and the "expected amount of funds remaining from the Initial Offering after the launch, [and] the expected use of those funds." Ex. I at 19-20 (Topics Nos. 26 and 27). Telegram similarly objected to these requests. *Id.*

## III. Information Regarding Use of Investors Funds Are Critical to the Claims and Defenses to be Tried

*Regulation D Exemption.* The SEC contends that the Grams were part of the "investment contract" (and, therefore, securities) offered and sold in 2018 and that Telegram failed to register their offer and sale and failed to make clear that any resale of the Grams to the public would similarly be subject to registration or a valid exemption. Telegram claims that only the Purchase Agreements, but not the Grams which are the subject of the Purchase Agreement are securities,

Hon. P. Kevin Castel  January 2, 2020
Page 4

and that they were sold only to "accredited investors," thus exempting their offer and sale from registration in reliance on Rule 506(c). D.E. 37 (Answer) ¶ 51. However, even assuming *arguendo,* Telegram's claim that the Grams are not securities, exemption from registration under Rule 506(c) of the Purchase Agreements as Defendants construe them nevertheless requires compliance with Rule 502(d) of Regulation D, *i.e.* that the issuer "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(a)(11) of the [Securities] Act." 17 C.F.R. § 230.502(d). The Securities Act defines an "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11). Telegram has the burden to establish its entitlement to an exemption from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *SEC v. Cavanagh*, 455 F.3d 105, 115 (2d Cir. 2006).

The evidence developed in discovery undermines Telegram's claimed affirmative defense. Evidence shows that Telegram made continuous offers and sales of the Purchase Agreements well after the offering for which it claimed a Regulation D exemption, Exs. E, F, and received significant payments on Purchase Agreements between May and November 2018. The SEC also has evidence that certain entities tendered invoices to Telegram for commissions ranging between 10-15% to Telegram based on the sale of certain Purchase Agreements, purportedly on the basis of contracts between those entities and Telegram dated in June 2018. The record shows: (1) Purchase Agreements post-dating March 29, 2018, *e.g.*, Exs. J at 29, L at 29; (2) that certain entities submitted to Telegram "invoices" apparently billing for those entities' sale of the post March 29, 2018, Purchase Agreements, *e.g.*, Exs. K at 1, M; and (3) the entities that entered into some of those Purchase Agreements remitted funds to Telegram via various payments in late 2018, *see* Ex. N at 2-7 (payments from August through November 2018).

These documents undermine Telegram's claimed affirmative defense that the Offering was exempt under Regulation D. *First*, Telegram either raised *more* than the $1.7 billion for which it claimed an exemption, or it did not raise $1.7 billion as of March 29, 2018 and the later funds may have been raised through underwriters. *Second*, the ongoing large deposits Telegram received from certain Purchase Agreement investors after the claimed end of the Offering suggests that those entities had entered into Purchase Agreements with Telegram with a view to reselling those securities to others, and during the latter half of 2018 were raising funds from others on behalf of Telegram. The September and October 2018 invoices for commissions based on certain Purchase Agreements only strengthen the force of that conclusion.

Without fully un-redacted bank records (an example of which is submitted herewith as Exhibit N), the SEC (and the Court) cannot fully understand (1) who made payments under which purchase agreement, (2) whether some of those payments were from entities who were acting as statutory underwriters, and (3) whether Telegram made any payments to such underwriters. Nor should the SEC have to rely on Telegram's own determinations of what constitute relevant entries, or what expenditures are or are not "relating to" the TON project.

*Whether Grams Are "Investment Contracts."* The SEC contends that the "investment contracts" at issue in this case are *both* the Purchase Agreements *and* the Grams sold pursuant to

Hon. P. Kevin Castel  January 2, 2020
Page 5

such agreements. The SEC must establish that such instruments are "investment contracts" under *SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946). The *Howey* test asks whether purchasers tendered money into a common enterprise with a reasonable expectation of profit based on the efforts of others. *Id.* at 301. How much money Telegram has spent to date, and in what manner, to develop the TON Blockchain and related applications, and to integrate them into Telegram Messenger, is highly relevant evidence to whether the investors had a reasonable expectation of profits through the "efforts of others", *i.e.*, Telegram, in developing the TON Blockchain to advance the viability and profitability of Grams to investors.

Telegram has further argued that even if Grams were "investment contracts" under *Howey* when the Purchase Agreements were sold, they will not be upon their distribution because, among other things, Telegram will need to engage in no additional efforts to complete its vision of a decentralized blockchain. Understanding how much of the amounts raised have been spent in developing the "ecosystem" to support Grams, as well as in supporting Messenger, the application it touted as potentially increasing "demand and value" for Grams (Ex. D at 5), is critical to evaluating these claims. Specifically, a financial accounting would show what Telegram has spent to fulfill its promised venture, how it has spent the money (which is relevant to understanding the true economic nature of the Offering), and is probative to test what additional efforts by Telegram will be required before the TON Blockchain will be capable of operating independent of the efforts of Telegram. Because the extent of development, to date, and the potential continuation of efforts by Telegram needed to further develop the TON Blockchain and Grams remains in dispute, financial information relating to these efforts is probative to the issues to be tried.

Accordingly, full disclosure of the sources, amounts, dates, and uses of funds are central to the SEC's claims that Telegram violated Section 5 of the Securities Act by engaging in unregistered offers and sales of Grams, and to Telegram's affirmative defense that its Offering is eligible for the exemption from registration provided by Regulation D of the Act. Because Telegram can claim no burden in producing un-redacted versions of documents it has already produced (and because any confidentiality concerns are resolved by the Protective Order entered in this action, D.E. 36), Telegram should be ordered to produce these documents. Nor is there any burden to Telegram by having its corporate representative prepare and testify about these matters, and he should therefore be compelled to answer deposition questions about them.

### IV. Conclusion

Telegram's refusal to produce this information to the SEC—and its suggestion that it may not have access to its own bank records because it has changed banks—is unfounded and deeply troubling. Because the deposition of Pavel Durov is scheduled to commence next Tuesday, the SEC respectfully requests that the Court issue an order compelling Telegram to provide the discovery sought in this Motion.

Respectfully submitted,

Jorge G. Tenreiro