### SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(212) 735-2129
DIRECT FAX
(917) 777-2129
EMAIL ADDRESS
ALEXANDER.DRYLEWSKI@SKADDEN.COM

January 3, 2020

**VIA ECF AND HAND DELIVERY**
The Hon. P. Kevin Castel
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      RE:     *SEC v. Telegram, et al*, No. 19-cv-9439(PKC)(S.D.N.Y.)

Dear Judge Castel:

      On behalf of Defendants, we write in opposition to the letter motion filed by Plaintiff Securities and Exchange Commission ("Plaintiff" or the "SEC") on January 2, 2020, seeking to compel the production of voluminous and highly sensitive bank records that have little to no bearing on the claims and defenses in this action and would impose undue burdens on Defendants, particularly in light of Plaintiff's delay and the expedited discovery schedule (*see infra* n.1). As set forth below, Plaintiff's letter misconstrues the legal issues in the case and omits critical facts. Defendants respectfully submit that Plaintiff's motion to compel constitutes an unfounded fishing expedition and should be denied.

      This non-fraud action presents the narrow legal question of whether Defendants' yet-to-be-issued digital currency, called Grams, will constitute a "security" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"). This case is fundamentally different from other actions involving digital assets over which the SEC has asserted its jurisdiction because, unlike those cases, Telegram has never offered any Grams to the public. Rather, Telegram entered into private agreements with a select group of high net worth and highly sophisticated purchasers that provided for the future issuance of a currency (Grams) but only following the completion and successful launch of Telegram's anticipated blockchain platform, called the "Telegram Open Network (TON)." Significantly, the purchase agreements offered in this private placement were expressly treated as securities pursuant to exemptions to registration under Rule 506 of Regulation D (for U.S. investors) and Regulation S (for non-U.S. investors). Defendants submit that once Grams are created upon the launch of the TON Blockchain, they will not fit the definition of "investment contracts," as the SEC erroneously alleges. It bears emphasis that the *Howey* test is an objective one; thus, with respect to Defendants' use of funds

The Hon. P. Kevin Castel
January 3, 2020
Page 2

from the private placement, the relevant question, if there is one, is what Defendants told purchasers, not the voluminous bank records concerning their expenditures. *Seagrave Corp. v. Vista Res., Inc.*, 534 F. Supp. 378, 383 (S.D.N.Y. 1982) (Sweet, J.); *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (courts "must focus [the] inquiry on what purchasers were offered or promised").

Despite the narrow nature of this case, which does not involve any allegations of fraud or that Defendants misrepresented how they would use the funds raised, the SEC has taken a "scorched earth" approach to discovery, propounding numerous expansive and burdensome document requests and interrogatories, and serving subpoenas on no fewer than 50 non-parties. Defendants have endeavored to cooperate with the SEC's demands in order to move expeditiously towards resolution of the case, including by (1) producing hundreds of thousands of pages of documents (including all communications between Telegram and private placement purchasers, both domestic and foreign); (2) providing extensive and detailed responses to the SEC's broad interrogatories; and (3) producing multiple witnesses for deposition, including Telegram's CEO and founder. All of this is in addition to the significant efforts by Defendants, including the production of thousands of pages of materials to the SEC, in the 18 months leading up to the filing of the complaint. (Aff. Def's., ¶¶ 36-38, ECF No. 37.)

Unsatisfied with this abundance of discovery, the SEC now seeks every bank record from Defendants reflecting every single transfer or payment to or from Defendants during the time period of the private placement up through the present, regardless of whether they even relate to the TON platform. Plaintiff demands these voluminous records, which reflect sensitive information regarding Telegram's internal operations and commercial relationships, despite the significant burdens imposed on Defendants to cull through these records and redact the personal information of non-U.S. persons and entities subject to foreign data privacy law protections, and despite the fact that Defendants have already provided extensive information regarding Telegram's expenditures from the private placement and have offered to provide additional information through less burdensome means.

I.    **Telegram Has Previously Provided Significant Information Regarding the Use of Funds and Has Offered to Provide More**

The SEC suggests that "Telegram does not want to tell the SEC what it has done with the $1.7 billion it raised from investors," and that Telegram has "avoided having to provide financial information to investors, including regarding the intended use of their funds." These statements are incorrect. First, Telegram already provided the SEC with a detailed breakdown of all expenditures it made between January 1, 2018 and January 31, 2019, as well as an estimate of the proceeds from the private placement that would remain unspent by the time of launch of the TON Blockchain. (Ex. 1 at 5-6; Compl. ¶ 56.) Defendants also offered to provide the SEC with updated information regarding the same and, in the interests of compromise, to "prepare [their] corporate representative to testify regarding the amount of funds received and a general breakdown of Telegram's expenditures" to date. (Ex. 2.) In each case, the SEC rejected Defendants' offers. (*Id.*)

The Hon. P. Kevin Castel
January 3, 2020
Page 3

Moreover, the private placement purchasers were told at the very outset how Telegram intended to use the funds raised in the private placement. In a Pre-Sale Primer dated January 18, 2018, which was provided to all purchasers, Telegram included a section titled "Use of Funds" explaining that Telegram intended "to use the proceeds raised from the offering for the development of the TON Blockchain, for the continued development and maintenance of Telegram Messenger, and for general corporate purposes at Telegram Messenger." (Ex. 3 at 19.) Telegram further disclosed that "a significant portion of the funds . . . are expected to be retained by [Telegram] for its own purposes rather than committed solely to the development and launch of the TON Network," (Ex. 4 § 6.3(c)), and that while Defendants "intend to use the funds as described in the 'Use of Funds' section of the Telegram Stage A Primer, *there is no restriction* on [their] use of the funds generated from the token sale or on Telegram's ability to transfer those funds to, or make payments for the benefit of, its affiliates." (Ex. 5 ¶ 15 (emphasis added).) On October 16, 2019, Defendants updated all private placement purchasers regarding the status of the amounts spent and provided estimates of future expenditures. (Ex. 6.) Significantly, these disclosures were provided to the purchasers in order for them to determine whether to extend their purchase agreements, which an overwhelming majority voted to do. (Ex. 7 at 194:15-195:11.) These communications were produced to the SEC, and, in fact, the SEC questioned one of Telegram's witnesses about them. (*Id.*)

In light of the above, Plaintiff's suggestion that Defendants have not been forthcoming about the nature or amount of their expenditures from the private placement is without basis, and frankly, not well-taken.[1]

## II. The SEC's Request Is Irrelevant, Overly Broad, and Unnecessary

Additionally, the SEC's demand for all of Defendants' remaining bank records should be denied because these materials are irrelevant to the claims and defenses and Plaintiff can obtain the same information through less burdensome means. The SEC puts forth two arguments as to why this information is relevant, neither of which has merit.

First, the SEC argues that detailed records of all of Defendants' expenditures "are highly relevant evidence" as to whether the sophisticated private placement purchasers "had a reasonable expectation of profits through the 'efforts of others'" under *Howey*. (Let. Mot. at 5.) This makes little sense. As discussed above, the expectations of the private placement purchasers are wholly irrelevant here, as the private placement was *expressly treated as a securities offering* and conducted pursuant to exemptions from registration under the Securities Act. (*Supra*; Aff. Def's. ¶ 6, ECF No. 37.) The critical legal issue in this case is whether the

---

[1] Plaintiff's claim of an "emergency" is also unfounded. When Plaintiff first served its discovery request for Defendants' financial records in October 2019, Defendants objected on numerous grounds. (Ex. 8 at 12.) Plaintiff did not push for these materials for months, despite the expedited discovery schedule and despite sending a subsequent letter insisting that Defendants comply with other requests, until just last week on the day after Christmas. (Ex. 2.) Defendants' counsel agreed to raise the issue with Defendants and, in the meantime, produced records of all incoming payments to Telegram from the private placement, which had previously been collected, redacted for data privacy, and produced by Defendants to another federal agency, and were provided to dispel the SEC's unfounded questioning as to whether Telegram in fact raised $1.7 billion (which it did). (*Id.*)

The Hon. P. Kevin Castel
January 3, 2020
Page 4

Grams themselves — as distinct from the privately sold purchase agreements — will be "securities" once they are created upon the launch of the TON Blockchain. At that point, Telegram will not undertake any ongoing entrepreneurial or managerial efforts that will give rise to a reasonable expectation of profits in future Gram purchasers in the market, and thus Grams will more appropriately be considered a currency or commodity subject to oversight by the U.S. Commodity Futures and Trading Commission. As one SEC director publicly expressed, a digital asset like Grams, "all by itself is not a security, just as the orange groves in *Howey* were not."[2] In any event, because the reasonable expectations prong of *Howey* is an <u>objective</u> one (*supra*), what matters is what purchasers were told about how the funds would be used, not the bank records showing Telegram's expenditures.

The SEC claims that Defendants' full banking records are "probative to test what additional efforts by Telegram will be required before the TON Blockchain will be capable of operating independent of the efforts of Telegram." (Let. Mot. at 5.) But the beta version of the TON Blockchain code has been publicly available for months now (*see* https://test.ton.org/), and the SEC has already tested the code itself and served an expert report opining on the blockchain's status. Having full access to Defendants' historical banking records will not tell the SEC anything more about the developmental status of the TON Blockchain than the code itself does, nor will it provide any insight into how much more money Defendants might intend to spend on the TON Blockchain, if any. Accordingly, these materials are completely unnecessary — particularly where Telegram has already provided details regarding its past and expected expenditures and has offered to provide a Rule 30(b)(6) witness to testify to the same. *See Beach v. Citigroup Alt. Invs. LLC*, 2014 WL 904650, at *13 (S.D.N.Y. Mar. 7, 2014) (Castel, J.) ("[D]iscovery on the off chance that the documents may have been drafted here is an inappropriate fishing expedition.").

Second, although the SEC argues that Defendants' full banking records must be produced because "Telegram paid commissions to purchasers who were buying Grams to resell to other investors," thus supposedly making those parties "underwriters" (Let. Mot. at 1), Plaintiff does not provide one shred of evidence to back this up. To the contrary, the agreements upon which Plaintiff relies (which Defendants have produced) show, at most, that certain non-U.S. persons entered agreements with Defendants to receive finder's fees for helping to introduce Defendants to other non-U.S. investors. (*See* Let. Mot. Exs. K, M.) But the mere receipt of a fee for introducing investors does not turn a private placement participant into an underwriter. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (Lynch, J.) (defendants were not underwriters because they did not hold "themselves out in any respect as to the public offering; on the contrary, any role they may have played in that offering was never publicly acknowledged"); *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 508-510 (S.D.N.Y. 2018) (Oetken, J.). Even if it did, the SEC does not provide any support for its assertion that the payment of a finder's fee to a foreign investor would somehow turn the private placement into a "public distribution" — particularly where the purchase agreements at issue contained strict and express prohibitions on the transfer or

---

[2]  William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, at *3 (June 14, 2018).

The Hon. P. Kevin Castel
January 3, 2020
Page 5

resale of the agreements or any interests in Grams until at least after the TON Blockchain has launched.  (*See* Ex. 4 § 10; Ex. 9 § 10.)

In any event, the SEC does not and cannot explain how the production of Defendants' full banking records would shed any light on the issue.  Defendants have already produced all of the private placement purchase agreements; detailed lists of the investors in the private placement and amounts invested; the invoices at issue; and agreements with third parties, which is more than sufficient to identify any such arrangements — and Plaintiff is free to ask witnesses about them in depositions.  At its base, Plaintiff's request boils down to mere speculation that Defendants' banking records will reveal some yet-undiscovered, unspecified, and unparticularized "wrongdoing."  Such conjecture cannot serve as the basis for a discovery request, let alone one of this sprawling nature.  *Noel v. Bank of N.Y. Mellon*, 2011 WL 3279076, at *2 (S.D.N.Y. July 27, 2011) (Castel, J.) ("Coincidence does not establish relevancy.  Nor does it require [defendant] to reveal confidential information, such as the identities of and relationships with its other clients.").

### III.    Plaintiff's Request Would Unduly Burden Defendants

Not only is the SEC's request overly broad but it is also unduly burdensome given its limited relevance and in light of the information Telegram has agreed to provide.  *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 4676806, at *7 (S.D.N.Y. Oct. 17, 2017) (Cott, J.) (denying motion to compel where burden of production "outweighs its likely benefit").  In order to produce these extensive materials, which are located abroad and reflect payments to non-U.S. parties and individuals, Telegram would have to conduct an extensive review and redaction process to comply with foreign data privacy laws.  This process is time-consuming and expensive, and ultimately unnecessary given the limited relevance of the information sought.  *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) (Furman, J.) (under Rule 26(b)(1)'s proportionality requirement, a "conclusory claim is insufficient to support such an expansive discovery request").  It also bears emphasis that, because the documents at issue are sensitive bank records, there is naturally a higher privacy concern and the information is inherently confidential.  *Cf. Mazzaro de Abreu v. Bank of Am. Corp.*, 2008 WL 4787553, at *3 (S.D.N.Y. Oct. 28, 2008) (Eaton, M.J.) (applying stringent standard to requests for tax returns).[3]

For the foregoing reasons, Defendants respectfully request that Plaintiff's letter motion to compel be denied.

---

[3]  As Plaintiff is aware, these significant data privacy issues cannot be solved simply by resort to "the Protective Order entered in this action."  (Let. Mot. at 5.)  Rather, they prevent such information from being disclosed in the first place.  While Plaintiff claims that Telegram's "suggestion that it may not have access to its own bank records because it has changed banks" is "deeply troubling" (Let. Mot. at 5), Plaintiff has requested detailed banking information stretching back over a two-year period.  There is nothing troubling about the fact that certain historical records might need to be requested from Defendants' former bank in the event they must be produced.

The Hon. P. Kevin Castel
January 3, 2020
Page 6

                                Respectfully submitted,

                                Alexander C. Drylewski

cc:     All counsel of record (via ECF and email)