UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

                                        :   19 Civ. 9439 (PKC)

                       Plaintiff,    :

                                          :   **ECF Case**

                  -against-        :

                                          :   **Electronically Filed**

TELEGRAM GROUP INC. and TON ISSUER :
INC.,                                        :

                                          :

                       Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANTS' MEMORANDUM OF LAW (1) IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND (2) IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

                                   SKADDEN, ARPS, SLATE,
                                      MEAGHER & FLOM LLP
                                   George A. Zimmerman
                                   Scott D. Musoff
                                   Christopher P. Malloy
                                   Alexander C. Drylewski
                                   Four Times Square
                                   New York, New York 10036
                                   Phone: (212) 735-3000

                                   *Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...................................................8

    A.    Blockchains and Digital Currencies.................................................................8

    B.    Telegram Determines To Create a Better Blockchain ....................................9

        1.    Telegram and Its Founders.................................................................9

        2.    The TON Blockchain and Grams ......................................................10

        3.    Telegram Conducts a Private Placement To Fund the TON
            Blockchain .........................................................................................11

        4.    The Private Placement Materials .......................................................13

        5.    The Purchase Agreements..................................................................15

    C.    Development of the TON Blockchain ...........................................................17

        1.    The TON Foundation and TON Wallet .............................................18

        2.    The TON Beta Version ......................................................................19

    D.    Public Communications With Potential Gram Purchasers ............................19

    E.    Telegram Seeks Guidance From the SEC and the SEC Brings Suit....................20

ARGUMENT .................................................................................................................22

I.    GRAMS WILL NOT BE SECURITIES FOLLOWING LAUNCH OF THE TON
    BLOCKCHAIN ....................................................................................................22

    A.    Gram Purchasers Will Not Have an Expectation of Profits Based on the
        Managerial Efforts of Others .......................................................................25

        1.    Grams Were Designed and Promoted for Consumptive Use....................25

        2.    Any Expectation of Profits Will Not Be Based on Telegram's
            Efforts ................................................................................................28

            (a)    Telegram Has Disclaimed Any Promise of Future Efforts............28

            (b)    Any Profits Based on Speculative Trading Are Insufficient
                 To Turn Grams Into Securities ....................................................30

(c)     Any Future Efforts By Telegram Would Not Be "Essential"........32

B.     There Will Be No "Common Enterprise" in Grams Following Launch...............34

1.     No Horizontal Commonality.......................................................................35

2.     No Vertical Commonality...........................................................................37

C.     Whether Grams Are Securities Depends on Their Circumstances After
Launch of the TON Blockchain .......................................................................39

D.     The SEC's Failure To Provide Clarity and Fair Notice Regarding Its
Claims Weighs in Favor of Defendants ...........................................................41

II.     DEFENDANTS' PRIVATE PLACEMENT DOES NOT CONSTITUTE A
"PAST VIOLATION" OF THE SECURITIES ACT.........................................................42

A.     The Private Placement Was Conducted Pursuant to Valid Exemptions
Under Rule 506 .................................................................................................42

B.     Defendants Are Entitled to a Valid Exemption  Under Section 4(a)(2) of
the Securities Act .............................................................................................45

III.     THE SEC'S APPLICATION FOR AN INJUNCTION SHOULD BE DENIED ...........47

CONCLUSION....................................................................................................................48

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................22

*Avenue Capital Management II, L.P. v. Schaden*,
    843 F.3d 876 (10th Cir. 2016) ...............................................................................24

*Berman v. Dean Witter & Co.*,
    353 F. Supp. 669 (C.D. Cal. 1973) ..................................................................31, 36

*Charette v. Town of Oyster Bay*,
    159 F.3d 749 (2d Cir. 1998).....................................................................................48

*In re Coinflip, Inc.*,
    CFTC Dkt. No. 15-29, 2015 WL 5535736 (CFTC Sept. 17, 2015) ........................31

*Columbia Natural Resources, Inc. v. Tatum*,
    58 F.3d 1101 (6th Cir. 1995) ..................................................................................41

*Commodity Futures Trading Commission v. McDonnell*,
    287 F. Supp. 3d 213 (E.D.N.Y. 2018) ...................................................................31

*De Luz Ranchos Investment, Ltd. v. Caldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) ................................................................................36

*Demarco v. Lapay*,
    No. 2:09-CV-190 TS, 2009 WL 3855704 (D. Utah Nov. 17, 2009) .......................36

*Frederiksen v. Poloway*,
    637 F.2d 1147 (7th Cir. 1981) ..........................................................................25, 26

*Gordon v. Terry*,
    684 F.2d 736 (11th Cir. 1982) ............................................................................6, 31

*Gugick v. Melville Capital LLC*,
    No. 11-cv-6294 (CS), 2014 WL 349526 (S.D.N.Y. Jan. 31, 2014)........................38

*Happy Investment Group v. Lakeworld Properties, Inc.*,
    396 F. Supp. 175 (N.D. Cal. 1975) ........................................................................30

*Hirsch v. duPont*,
    396 F. Supp. 1214 (S.D.N.Y. 1975), *aff'd sub nom.*, 553 F.2d 750 (2d Cir. 1977)...........23

*Holt v. Continental Group, Inc.*,
   708 F.2d 87 (2d Cir. 1983)..........................................................................48

*International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of*
   *America v. Daniel*, 439 U.S. 551 (1979)..........................................4, 23, 24, 32

*Landreth Timber Co. v. Landreth*
   471 U.S. 681 (1985) ...................................................................................24

*Lavery v. Kearns*,
   792 F. Supp. 847 (D. Me. 1992) ................................................................36

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982)............................................................................24, 32

*Marini v. Adamo*,
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) ...................................................38, 39

*McCurnin v. Kohlmeyer & Co.*,
   340 F. Supp. 1338 (E.D. La. 1972)............................................................36

*Neuwirth Investment Fund, Ltd. v. Swanton*,
   422 F. Supp. 1187 (S.D.N.Y. Nov. 17, 1975) ...........................................46

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) ................................................................31, 36

*Park Yield LLC v. Brown*,
   No. 18 Civ. 1947 (GBD) (SN), 2019 WL 6684127 (S.D.N.Y. Dec. 6, 2019)..................46

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994)....................................................................35, 36

*Rodriguez v. Banco Central Corp.*,
   990 F.2d 7 (1st Cir. 1993)...................................................................29, 30

*Schwartz v. Bache & Co.*,
   340 F. Supp. 995 (S.D. Iowa 1972) .....................................................31, 32

*Seagrave Corp. v. Vista Resources, Inc.*,
   534 F. Supp. 378 (S.D.N.Y. 1982) ............................................................24

*SEC v. Aqua-Sonic Products Corp.*,
   687 F.2d 577 (2d Cir. 1982)......................................................................23

*SEC v. Belmont Reid & Co.*,
  794 F.2d 1388 (9th Cir. 1986) ...........................................................................30, 31, 33

*SEC v. Blockvest, LLC*,
  No. 18CV2287-GPB(BLM), 2019 WL 625163 (S.D. CaL. Feb. 14, 2019), 2019
  WL 625163 (S.D. Cal. Feb. 14, 2019) ..............................................................................2

*SEC v. Cavanagh*,
  155 F.3d 129 (2d Cir. 1998)..........................................................................................47

*SEC v. Edwards*,
  540 U.S. 389 (2004)......................................................................................................27

*SEC v. Glenn W. Turner Enterprises, Inc.*,
  474 F.2d 476 (9th Cir. 1973) ...................................................................................28, 32

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) .......................................................................................23

*SEC v. Petrofunds, Inc.*,
  414 F. Supp. 1191 (S.D.N.Y. 1976)..............................................................................48

*SEC v. R.G. Reynolds Enterprises, Inc.*,
  952 F.2d 1125 (9th Cir. 1991) ......................................................................................26

*SEC v. Ralston Purina Co.*,
  346 U.S. 119 (1953)......................................................................................................46

*SEC v. Shavers*,
  No. 4:13-CV-416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013)....................................27

*SEC v. Thompson*,
  732 F.3d 1151 (10th Cir. 2013) ....................................................................................23

*SEC v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990)........................................................................................47

*SEC v. United Benefit Life Insurance Co.*,
  387 U.S. 202 (1967)................................................................................................24, 40

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)............................................................................................. *passim*

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  253 F. Supp. 359 (S.D.N.Y. 1966) ..........................................................................30, 32

v

*Svets v. Osborne Precious Metals Co.*,
    No. C 92-0357 BAC, 1992 WL 281413 (N.D. Cal. June 8, 1992).................................31

*Teague v. Bakker*,
    139 F.3d 892 (4th Cir. 1998) ...................................................................................24, 27

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975).................................................................................................23, 25

*United States v. Faiella*,
    39 F. Supp. 3d 544 (S.D.N.Y. 2014)...............................................................................27

*United States v. Johnson*,
    700 F.2d 163 (5th Cir.), *on reh'g*, 718 F.2d 1317 (5th Cir. 1983)....................................23

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008)...............................................................................................23

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014)...............................................................................27

*Wals v. Fox Hills Development Corp.*,
    24 F.3d 1016 (7th Cir. 1994) ...........................................................................................36

*Walsh v. International Precious Metals Corp.*,
    510 F. Supp. 867 (D. Utah 1981).....................................................................................32

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) .........................................................................................24

*Woodward v. Terracor*,
    574 F.2d 1023 (10th Cir. 1978) .......................................................................................36

*Zelnik v. Fashion Institute of Technology*,
    464 F.3d 217 (2d Cir. 2006).............................................................................................22

## **STATUTES**

15 U.S.C. § 78c(a)(10)..............................................................................................................27

## **RULES**

Fed. R. Civ. P. 56(a) .................................................................................................................22

## REGULATIONS

17 C.F.R. § 230.501(a)(1)-(5) ................................................................................42

17 C.F.R. § 230.502 .....................................................................................42, 47

17 C.F.R. § 230.502(d) ........................................................................................44

17 C.F.R. § 230.506 .............................................................................................42

31 C.F.R. § 1010.100(ff)(8)(ii) ...........................................................................28

SEC Release No. 33-5347 (1973) ..........................................................................3

SEC Release No. 33-6188 (1980) ..........................................................................3

Offshore Offers and Sales, Securities Act Release No. 6863, Exchange Act Release No. 27,942, Investment Company Act Release No. 17,458, 46 SEC Docket 52 (Apr. 24, 1990) ...........................................................................47

Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Finding, and Imposing a Cease-and Desist Order, *In re Block.one* ..........................................................................34

## OTHER SOURCES

*Currency*, Black's Law Dictionary (10th ed. 2014) ...........................................................................27

Nikhilesh De & Mahishan Gnanaseharan, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018, 11:58 UTC) ...........................................................................40

Letter to Cipher Technologies Management LP, Brent J. Fields, Assoc. Dir., Disclosure Review and Accounting Office, Sec. Exch. Comm'n (Oct. 1, 2019) ...............................26

Speech, William Hinman, Dir., Sec. Exch. Comm'n Div. Corp. Fin., Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), .....7, 24, 41

Sec. Exch. Comm'n, *Framework for "Investment Contract" Analysis of Digital Assets* ...........................................................................21, 21, 24, 28, 40, 41

Press Release No. 8051-19, Heath P. Tarbert, Chairman, U.S. Commodity Futures Trading Comm'n (Oct. 10, 2019) ...........................................................................31

Defendants respectfully submit this memorandum of law (1) in support of their motion for summary judgment and (2) in opposition to the application for a preliminary injunction filed by Plaintiff Securities and Exchange Commission ("SEC").

## PRELIMINARY STATEMENT

This non-fraud action presents the narrow legal question of whether Defendants' yet-to-be-issued digital currency, called Grams, constitutes a "security" subject to the U.S. federal securities laws. Defendants submit that the SEC has impermissibly stretched its jurisdiction far beyond what the law allows and that Grams, when launched, will not be a security but rather a currency or commodity subject to anti-fraud and anti-manipulation oversight by the U.S. Commodity Futures and Trading Commission ("CFTC").

Telegram's development team began building its highly anticipated blockchain platform, called the "Telegram Open Network (TON)," in 2017.[1] Telegram expects Grams to serve as a fully functional, "mass-market" digital currency for buying and selling goods and services on the TON Blockchain upon its launch. Grams have been developed to improve the speed, efficiency and security of commercial transactions in the U.S. and globally, and Telegram believes the technological underpinnings of Grams represent a significant improvement upon existing digital currencies like Bitcoin and Ether — neither of which has been deemed "securities" by the SEC.

Digital assets, which can take many forms, are a new asset class and the regulatory landscape is unsettled in many respects, to say the least. At one end of the spectrum, the SEC has acknowledged that Bitcoin and Ether are commodities, not securities. At the other end of the

---

[1] Generally, a "blockchain platform" is a peer-to-peer network that records and reflects all transactions on a viewable and unalterable system. Many of these networks also allow for the running of "smart contracts" — i.e., programs that automatically execute the terms of an agreement when conditions are met without further input or oversight from any party. (*See infra* p. 10.)

spectrum are digital assets that bear the traditional characteristics of securities.  For example, in an initial coin offering ("ICO"), an issuer raises funds to develop a new blockchain or other product through a public offering where it promises to deliver a digital token when the project is complete — the investors are pooling risk capital for the project and logically expect to profit from a successful launch.  To date, digital assets that have been deemed securities have involved public ICOs and/or fraudulent schemes.  *See, e.g. SEC v. Blockvest, LLC*, No. 18CV2287-GPB(BLM), 2019 WL 625163, at *2 (S.D. Cal. Feb. 14, 2019).

Here, in contrast, Telegram has never offered any Grams to the public through an ICO, and the TON Blockchain will already have been developed by the time Telegram issues any Grams — indeed, it already is.  Instead, Telegram raised capital by privately entering into purchase agreements ("Purchase Agreements") with only a select number of high-net-worth, highly sophisticated purchasers that provided for the future issuance of a currency (Grams), but only following the completion and successful launch of the open source, *decentralized* TON Blockchain ("Private Placement").[2]  These Purchase Agreements were expressly treated as securities and offered pursuant to exemptions to registration under the Securities Act of 1933 ("Securities Act").  If the TON Blockchain does not launch, then Telegram is contractually required to return unspent funds to the Private Placement purchasers and no Grams will be created or issued.  Once the system is launched, Telegram will not have any ongoing managerial or entrepreneurial control over it (and in fact has *publicly disclaimed* any such control).

---

[2]  A "decentralized platform" is one that does not have any central governance, authority or management.  Rather, the system is managed through the platform's computer code and across a wide network of computers or nodes that act as "validators" of transactions that occur on the system, as is the case with Bitcoin.  (Def. 56.1 ¶¶ 3-4, 9-11, 16-18.)

For 18 months leading up to the filing of this action, Telegram attempted to engage with the SEC and solicit guidance regarding its plans for Grams, including producing thousands of pages of communications, conducting countless in-person meetings, phone calls and emails, and even making changes to the contemplated features of the project based on the limited feedback it obtained.  Despite this, the SEC failed to provide meaningful guidance and rushed into this Court at the eleventh hour to enjoin the launch of the TON Blockchain with the urgency it would normally reserve for shutting down a boiler room pump-and-dump scheme.  This was contrary to the SEC's stated desire to engage with developers of digital asset technologies and follows its prolonged failure to provide any workable guidance in this area, which has led to sharp criticism by U.S. lawmakers and one of the SEC's own commissioners.  As Rep. Warren Davidson (R-OH) publicly expressed, "[t]he SEC is doing a complete patchwork of regulation.  No one knows where they're going," and its approach of regulation through enforcement has "all the charm and inefficiencies of third-world power structures."[3]  SEC Commissioner Hester Peirce recently added:  "I am concerned about how the SEC has regulated this space, because I believe our lack of a workable regulatory framework has hindered innovation and growth . . . [and] offer[s] no clear path for a functioning token network to emerge."[4]  The SEC's pursuit of "regulation through enforcement" here stands in contrast to past situations where it provided concrete guidance to resolve uncertainty regarding whether a new asset class fell within the definition of a security.[5]

---

[3]  Kollen Post, *Rep. Warren Davidson: You Have to Defend Money to Defend Freedom*, Cointelegraph (Oct. 22, 2019), https://cointelegraph. com/news/rep-warren-davidson-you-have-to-defend-money-to-defend-freedom.

[4]  Commissioner Hester M. Peirce, Broken Windows: Remarks before the 51st Annual Institute on Securities Regulation (Nov. 4, 2019), https://www.sec.gov/news/speech/peirce-broken-windows-51st-annual-institute-securities-regulation.

[5]  *See, e.g.*, SEC Release No. 33-6188 (1980) ("In an effort to resolve the uncertainty which has developed and

Now, after months of expedited discovery, the undisputed record demonstrates what was already apparent when the SEC first filed suit: that its claims lack any legal basis.  As detailed herein, the SEC's theories run counter to longstanding precedent and the undisputed facts of this case.  Defendants are entitled to summary judgment, and the SEC's request for injunctive relief should be denied, for at least the following separate and independent reasons.

**Grams Will Not Be Securities Subject to Federal Securities Laws (_infra_ § I):**  First, Defendants are entitled to summary judgment because Grams, once they are created upon the launch of the TON Blockchain, will not fit the definition of "security."  Where an instrument has "intermingled security and nonsecurity aspects," it falls within the securities laws only if it has "_substantially_ the characteristics of a security."  _Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel_, 439 U.S. 551, 560 (1979).  Although the SEC contends that Grams will constitute "investment contracts" under the Supreme Court's test in _SEC v. W.J. Howey Co._, 328 U.S. 293 (1946), the SEC cannot establish any common enterprise in Grams or that future Gram buyers will have a reasonable expectation of profits based on the managerial efforts of others, as _Howey_ requires.  _Id._ at 299.

Indeed, Grams will not entitle purchasers to any income, any dividends, or any interests in Telegram (or any other entity), nor do they resemble stock or any other form of equity.  Rather, Grams are intended to serve as a bona fide medium of exchange and means for powering applications on the TON Blockchain, over which Telegram will not have, and in fact has affirmatively disclaimed, any ongoing control or involvement.  This is reflected in Telegram's

---

thereby assist employers and plan participants in complying with the 1933 Act, the Commission has authorized the issuance of this release setting forth the views of its Division of Corporation Finance . . . on the application of the Act to [employee benefit] plans."); SEC Release No. 33-5347 (1973) (providing guidance in the face of "uncertainty about when offerings of condominiums and other types of similar units may be considered to be offerings of securities that should be registered pursuant to the Securities Act").

communications to potential Gram purchasers and the public, which emphasized that "Grams are **NOT** investment products and there should be **NO** expectation of future profit or gain from the purchase, sale or holding of Grams," and that Telegram has "not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram _may never do so_." (_Infra_ p. 18.) The TON Blockchain code will be entirely open source, meaning anyone in the world can access it and build upon it to develop the system. As Telegram stressed, it "won't be able to control the blockchain after it launches. Pretty much like an architect who designed a skyscraper can't control what happens with the building after it's finished – including what gets built around, inside or on top of it." (_Id._)

Aware that Grams themselves do not fit any established definition of security, the SEC attempts a sleight-of-hand, alleging instead that the sophisticated investors who entered into the Private Placement expected to profit from Telegram's pre-launch efforts to build the TON Blockchain. This is beside the point: whether Telegram's private placement constituted a securities offering is not an open question because _Telegram has already treated it as such_, and conducted it pursuant to exemptions to registration under the Securities Act. (_See infra_ pp. 11-12.) Telegram also does not dispute that the Private Placement investors, who have borne the risk that the TON Blockchain might not launch, expect to profit from their purchase of Grams if they are issued. The relevant question here is how Defendants are marketing Grams to potential public buyers and what those buyers' reasonable expectations will be when Grams are issued upon launch of the blockchain. As a result, the SEC's focus on private communications between Telegram and Private Placement investors in early 2018, many of which were subject to confidentiality obligations, is completely misplaced (and in fact, the SEC's actions in filing this

lawsuit have done more to draw public attention to such private communications than anything Defendants have done).

Even if some Gram purchasers acquire Grams with the expectation of trading them for profit, such expectations will be based on the market value of Grams, which, following the launch of the blockchain, will fluctuate due to market factors and the timing of each individual's decisions whether to buy or sell — *not* a common enterprise or the ongoing efforts of Defendants. Courts routinely hold that such speculative trading motive is thus insufficient under *Howey*, as "[a]n investor who has the ability to control the profitability of his investment [] is not dependent upon the managerial skills of others." *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982).

*Howey* itself provides a useful analogy. There, the defendants pooled funds from investors to develop plots of land into orange groves, offering the investors profits from the sale of oranges through what the Court deemed to be a securities offering. (*See infra* Section I.C.) Had the *Howey* defendants registered their offering or conducted it pursuant to an exemption, no one would have claimed that the sale of the oranges themselves violated securities laws. Similarly here, the orange grove has already been developed, and Telegram now intends to distribute the oranges to the investors in the enterprise, at which point the oranges can bought, sold, traded, and used by the recipients as they see fit. Through this action, the SEC has asserted that *both* the orange grove enterprise (the Private Placement) *and* the oranges themselves (Grams) are "securities," even though the oranges will not carry any of the hallmarks of a security or involve any pooling of additional funds. This broad view, which threatens to sweep within the definition of "security" all sorts of consumer goods and products, finds no support in the law and

stands in stark contrast to the views of at least one SEC Director, who stated that a digital asset like Grams "all by itself is not a security, just as the orange groves in *Howey* were not."[6]

**Defendants' Private Placement Did Not Violate the Securities Act (*infra* § II):**

Defendants are also entitled to summary judgment regarding the SEC's claim that they somehow committed a "past violation" of the Securities Act even if Grams will not be a security when issued. Although unclear, the SEC appears to suggest that the Private Placement was in fact a "public distribution" of Grams and that the private purchasers are in fact statutory underwriters because they may sell their Grams in the future. This is belied by the record and common sense. Grams do not exist yet, and may never exist unless the TON platform is successfully launched; thus, there has not been — and can never be — a "public distribution" of a security. Rather, Grams were specifically designed (and intended and understood from the beginning) to be a digital currency, not a security, thus defeating the SEC's "past violation" theory.

Moreover, the undisputed record reflects that Defendants entered into the Purchase Agreements with only highly sophisticated, high-net-worth accredited investors, through which the purchasers were required to represent and warrant that they were purchasing the right to receive Grams for themselves and without any intent to publicly distribute a statutory security. Those same Purchase Agreements contained prominent warnings that they should be treated as unregistered securities, and stated in no uncertain terms that neither the Purchase Agreements, *nor any interests in the underlying Grams themselves*, could be offered, sold, or transferred prior to launch of the TON Blockchain — at which point the Grams will *not* be securities for all of the

---

[6] Speech, William Hinman, Dir. Sec. Exch. Comm'n Div. Corp. Fin., Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418

reasons stated herein.  These facts conclusively establish that Defendants took reasonable care to ensure the purchasers were not underwriters of a statutory security.

**The SEC Is Not Entitled to a Preliminary Injunction (*infra* § III):**  Finally, the SEC's application for a preliminary injunction should be denied.  The SEC must make a "clear showing" of both a prima facie case of a past violation of the securities laws and a "reasonable likelihood" of future violations.  The record demonstrates that the SEC cannot establish either element, let alone both.  Indeed, even if the SEC could raise material factual disputes sufficient to defeat summary judgment regarding its allegations of future or past violations (and it cannot), those same purported factual disputes would preclude its ability to obtain injunctive relief here, particularly in light of its voluntary decision to forgo any evidentiary hearing.

\* \* \* \*

In sum, the SEC's approach of "regulation through enforcement" seeks an unprecedented expansion of its jurisdiction in this emerging area of technology and the law.  Despite the SEC's efforts to enlarge the scope of this case far beyond the narrow legal questions at issue, at base, the record demonstrates the absence of any material issues of fact.  Defendants submit that these legal issues can and should be decided in their favor without resort to any further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[7]

### A.    **Blockchains and Digital Currencies**

A blockchain is a distributed ledger, which tracks the current and historical state of accounts, transactions, and/or events, and is maintained by multiple parties, often referred to as validators, miners and/or nodes.  (Def. 56.1 ¶¶ 1-3.)  These parties collectively, yet individually,

_____

[7]  The facts set forth herein come from Defendants' Local Rule 56.1 Statement in Support of their Motion for Summary Judgment, filed concurrently herewith ("Def. 56.1 __").

manage and operate the blockchain network.  (*Id.* ¶ 4.)  Transactions are grouped together over some time interval and posted to the ledger in "blocks," and each block is cryptographically linked to the previous block, creating an unbroken chain of valid transactions.  (*Id.* ¶¶ 7-8.)  In this respect, many blockchains are described as "decentralized," meaning that any ongoing governance and oversight of the ledger is not conducted by a single or centralized source, but rather by a disperse community of users, thereby eliminating the existence of a central point of failure and encouraging wider participation in the development and functionality of the blockchain code, which is typically open source and thus available to all.  (*Id.* ¶¶ 9-11.)

Digital currencies, or cryptocurrencies, are native units of account on blockchains and serve as incentives for decentralized users to contribute to the platform by "validating" transaction blocks.  (Def. 56.1 ¶¶ 17, 19-20.)  Like traditional fiat currencies, cryptocurrencies are used to store value and as a medium of exchange that can be transferred among users on the platform, but do not require any central authority or intermediary.  (*See id.* ¶ 21-22.)  Together, blockchains and cryptocurrencies facilitate forms of digital commerce that traditionally have been cost prohibitive or functionally challenging with fiat currency.  (*Id.* ¶ 32.)  Examples of currently available cryptocurrencies are Bitcoin, which is native to the Bitcoin blockchain, and Ether, which is native to the Ethereum blockchain.  (*See id.* ¶¶ 22-23.)[8]

**B.**     **Telegram Determines To Create a Better Blockchain**

**1.**     **Telegram and Its Founders**

In 2013, Pavel Durov and Dr. Nikolai Durov launched an encrypted messaging application ("Telegram Messenger") that today has a reported 300 million monthly users.  (Def. 56.1 ¶¶ 42-43.)  Pavel is the CEO of Telegram and the founder of the popular social media site

---

[8]  For a more in-depth discussion of blockchain technologies, *see* McKeon Ex. 1 ¶¶ 25-48.

VKontakte ("VK").  (*Id.* ¶¶ 36-37, 45.)  In 2014, Pavel was named the most promising Northern

European leader under 30 by the Nordic Business Forum.  (*Id.* ¶ 38.)  Nikolai is the Chief

Technology Officer of Telegram and an accomplished mathematician and programmer who has

won two World Championships in programming and three Gold Medals in the International

Mathematical Olympiads, among other achievements.  (*Id.* ¶ 41.)  Telegram Messenger became

publicly available in 2013 and is a free application operated without profit motive.  (*Id.* ¶¶ 42,

44.)

Telegram Messenger is popular with the blockchain community.  (Joint Stipulation of

Undisputed Facts ("JSF") ¶ 23, filed concurrently herewith.)  In connection with that, Pavel and

Nikolai determined that limitations inherent in existing cryptocurrencies, including slow

transaction speeds, inability to scale, and poor user interfaces, would prevent the widescale

adoption of these currencies for consumptive use.  (Def. 56.1 ¶ 46.)  They set out to design a new

distributed ledger technology that could give rise to a mass-market cryptocurrency, which would

improve upon the speed, scalability, and ease of use over existing digital currencies so that

consumers would more widely adopt and use it in commerce and applications for a wide range of

purposes.  (*Id.* ¶¶ 46-48.)

### 2.    The TON Blockchain and Grams

In 2017, relying upon their expertise in coding, encryption and distributed data storage,

the Telegram team began developing a new distributed ledger called the "TON Blockchain."

(*See* Def. 56.1 ¶ 49.)  The TON Blockchain will include a native cryptocurrency called "Grams."

(*Id.* ¶ 52.)  Grams are intended to function as a store of value and medium of exchange on the

TON Blockchain, similar to the functionality of Bitcoin.  (*Id.* ¶ 55.)  At the same time, they are

also intended to power decentralized applications ("dApps") and smart contracts built on the

TON Blockchain, similar to the functionality of Ether.  (*Id.* ¶ 58.)  These uses will support the "TON Virtual Machine," which, similar to the "Ethereum Virtual Machine," is the computation layer for smart contracts and dApps that will be used to execute smart contract logic, thus allowing TON to function as a decentralized supercomputer.  (*See id.* ¶¶ 59-61)

If and when the TON Blockchain is launched, it will be a decentralized system whereby its code will be open source, meaning anyone can access it to build upon the system, and every transaction occurring on it will be observable.  (*See* Def. 56.1 ¶ 51.)  The TON Blockchain will have no central governing body or management.  (*Id.* ¶ 72.)  Because the platform will be decentralized, Telegram will not have superior rights to any third parties on the system.  (*Id.* ¶¶ 72-73.)

### 3.   Telegram Conducts a Private Placement To Fund the TON Blockchain

The development of the TON Blockchain and Grams required funding.  Beginning in early 2018, Telegram raised $1.7 billion in funds through a global private placement (the "Private Placement") whereby Defendants entered into contracts (the "Purchase Agreements") with purchasers who paid U.S. dollars or Euros in exchange for Telegram's promise to develop the TON Blockchain and deliver a contractually agreed upon number of Grams only upon successful launch of the platform.  (Def. 56.1 ¶¶ 103-106.)  The Private Placement was conducted in accordance with Rule 506 of Regulation D (for U.S. purchasers) and Regulation S (for non-U.S. purchasers) under the Securities Act.  (*Id.* ¶ 107.)  The investors were highly sophisticated and of high net worth, with an average investment of over $10 million.  (*Id.* ¶ 100.)

The Private Placement was executed in two $850 million rounds.  (Def. 56.1 ¶¶ 109, 114.)  In Round 1, Defendants entered into Purchase Agreements for a total of $850 million from 81 purchasers.  (*Id.* ¶109.)  On February 13, 2018, Defendants filed a Form D, noticing "purchase

agreements for cryptocurrency" for amounts totaling $850 million that began on January 29, 2018.  (*Id.* ¶ 110.)  In Round 2, Defendants entered into Purchase Agreements for another $850 million from 94 purchasers.  (*Id.* ¶ 114.)  On March 29, 2018, Defendants filed a Form D, noticing an additional $850 million through Purchase Agreements that began on March 14, 2018.  (*Id.* ¶ 115.)

Telegram initially contemplated a public offering of Grams following the Private Placement.  (Def. 56.1 ¶ 187.)  Given the legal uncertainty surrounding ICOs of digital assets at that time, however, Telegram "decided that [it] should take a safer, as safe as possible approach and deal only with highly sophisticated institutional investors in a proper, organized private placement."  (*Id.* ¶ 188.)

The Private Placement purchasers confirmed their status as sophisticated investors, warranting in the Purchase Agreement: "the Purchaser is a sophisticated party with sufficient knowledge and experience in financial and business matters to evaluate properly the merits and risks of entering into this Purchase Agreement, including the merits and risks associated with subscribing for [Grams]," and "can afford a complete loss of its investment hereunder, should such loss occur, and without any financial hardship, should such loss occur."  (Def. 56.1 ¶ 209.) Defendants distributed representation letters to purchasers, which covered numerous jurisdictions and required the purchaser to represent its eligibility to participate in the Private Placement pursuant to applicable local law ("Rep Letters").  (*Id.* ¶¶ 126-128.)  Defendants also undertook extensive Know-Your-Customer ("KYC") processes with respect to the purchasers, through which Defendants distributed KYC forms to potential purchasers requesting detailed information, and engaged a third-party expert KYC firm to conduct an independent review of the forms submitted.  (*Id.* ¶¶ 118-119.)

12

### 4.   **The Private Placement Materials**

In connection with the Private Placement, Telegram distributed certain documents to potential purchasers.  (Def. 56.1 ¶ 159.)  At the very beginning, this included two short, informal documents regarding Telegram's then-contemplated plans for the Telegram Open Network ("Teasers"): first, a two-page document ("Two Page Teaser") and second, a four-page document ( "Four Page Teaser").  (*Id.* ¶¶ 160-162.)  In the Four Page Teaser, Defendants explained that "[t]he blockchain ecosystem needs a decentralized counterpart of everyday money – a truly mass market cryptocurrency."  (*Id.* ¶ 162-164.)  Both documents were created before Telegram decided not to conduct a public offering of Grams following the Private Placement, and thus contained information regarding the potential pricing for the then-contemplated public offering.  (*See id.* ¶¶ 96-97, 160.)  Telegram also published a series of technical whitepapers ("Whitepapers") that explain in specific detail a number of technical aspects of the TON Blockchain.  (JSF ¶ 118.)

Additionally, Telegram provided a "Pre-Sale Primer," dated January 18, 2018, or a "Stage A Primer," dated February 21, 2018, to some potential and all actual Private Placement purchasers.  (Def. 56.1 ¶¶ 165-166.)  Telegram attached to the Primers a document titled "Certain Risks Associated with the Purchase, Sale and Use of Grams" ("Risk Factors").  (*Id.* ¶ 166.)  In the Risk Factors — which each purchaser warranted to have read and understood — Telegram emphasized that "Grams are intended to act as a medium of exchange between users in the TON ecosystem.  *Grams are not investment products.  There should be no expectation of future profit or gain from the purchase or sale of Grams*."  (*Id.* ¶ 180 (emphasis added).)  Telegram also explained that no purchaser was "entitled . . . to vote or receive dividends or be deemed the holder of shares of [Telegram or TON Issuer] for any purpose."  (*Id.* ¶ 200.)

These documents also disclosed that Telegram would not be responsible for the continued development of the TON Blockchain following its launch.  (*See, e.g.*, Def. 56.1 ¶ 165 ("Telegram will serve as a launch pad for TON, ensuring its technological superiority and widespread adoption at launch.  But the future of TON is in the hands of the global open-source community."); *id.* ¶ 184 ("Neither Telegram nor the Issuer has any fiduciary or other obligation to use the funds generated by the token sale for the benefit of the purchasers.").)  The Risk Factors explained that "[t]he Issuer may need to *change its business model* to comply with [certain jurisdictions' licensing or registration requirements] (or any other legal or regulatory requirements) in order to avoid violating applicable laws or regulations or because of the cost of such compliance," adding that "[u]ncertainty in how the legal and regulatory environment will develop could negatively impact the Issuer."  (*Id.* ¶¶ 172, 184 (emphasis added).)

Similarly, Telegram disclosed that enforcement by "governmental authorities" "may result in curtailment, or inability to operate, the TON Blockchain as intended," and that "[a]lthough Telegram intends for the TON Blockchain to have the features and specifications set forth in the 'Telegram Open Network' technical white paper [], *changes* to such features and specifications may be made for any number of reasons" and "[t]here can be no assurance that the TON Blockchain or Grams will function as described in the Technical White Paper or will be launched according to the milestones set forth in the 'Roadmap' section of the Telegram Pre-Sale Primer."  (Def. 56.1 ¶¶ 174, 176 (emphasis added).)

Telegram imposed confidentiality obligations on the prospective purchasers with respect to the above materials, though some of them apparently were leaked by parties other than Defendants and were publicly filed by the SEC when it instituted this action.  (Def. 56.1 ¶¶ 213-218.)  Prior to Telegram's Public Notice (discussed below, *see infra* pp. 19-20), Telegram was

careful not to publicly comment on any of these materials or otherwise make any statements about the details of the anticipated project to the public, particularly in light of the legal and regulatory uncertainty and the flexibility it had reserved regarding those details.  (Def. 56.1 ¶ 218.)

5.     **The Purchase Agreements**

The Private Placement was governed by the Purchase Agreements that Telegram entered into with each Private Placement purchaser.  (*See* Def. 56.1 ¶¶ 97-98.)  The Purchase Agreements explained that Telegram intended "to create and issue a new cryptocurrency called 'Grams' ('Tokens') following the development and launch of a new blockchain platform (the 'TON Network')," and that the purchasers were contracting to "subscribe for Tokens [*i.e.*, Grams]."  (*Id.* ¶ 194 (citation omitted).)  The Purchase Agreements stated that they would terminate if the TON Blockchain had not successfully launched by October 31, 2019, at which point the purchasers were entitled to a return of any unspent funds.  (*Id.* ¶ 201.)

Defendants placed express limitations on the ability of purchasers to transfer their Purchase Agreements or their interests in Grams themselves.  Specifically, the Purchase Agreements provided that purchasers could not:  "offer, pledge, sell, . . . or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement *or any Tokens*" or "enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement *or any Tokens*" until at least the launch of the TON Blockchain platform. (Def. 56.1 ¶ 203 (emphasis added).)  The Round 1 Purchase Agreements contained a "Lock-Up" provision that provided for these restrictions to be gradually released in increments following the launch.  (*Id.* ¶ 230.)

All Purchase Agreements contained the following prominent language on their very first page:

**NOTICE TO RESIDENTS OF THE UNITED STATES**

THE OFFER AND SALE OF THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE '**U.S. SECURITIES ACT**'), OR UNDER THE SECURITIES LAWS OF ANY U.S. STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT OR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

(Def. 56.1 ¶ 193.)  Each purchaser also represented that "it has been advised that the investment contract represented by this Purchase Agreement is a security and that the offers and sales thereof have not been registered under any country's securities laws and, therefore, the investment contract represented by this Purchase Agreement cannot be resold except in compliance with each applicable country's laws . . . ."  (*Id.* ¶ 209.)

In the Purchase Agreements, the purchasers expressly warranted, among other things, that:

- "this Purchase Agreement and the Tokens involve significant risks, all of which the Purchaser fully and completely acknowledges and assumes, including, but not limited to, the risk that the Tokens may decrease in value over time and/or lose all monetary value and the other risks listed in Appendix B to the Telegram [Primers]";

- "the Purchaser has not relied on any representations and warranties made by the Issuer or the Parent outside of this Purchase Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer";

- the Purchaser is "purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof"; and

- "the Purchaser is entering into . . . this Purchase Agreement and purchasing . . . Tokens for its own account and not for the benefit of any other person."

(Def. 56.1 ¶¶ 200, 209.)  These and other warranties were given at the time of the Purchase Agreements and must be repeated at the time of launch as a condition precedent to any delivery of Grams.  (*Id.* ¶ 212.)

## C.     Development of the TON Blockchain

The TON Blockchain platform was fully functional and ready to be launched by October 31, 2019.  (*See* Def. 56.1 ¶ 219.)  Since that date, Defendants have continued to develop additional "nice-to-have" features that could be used on the TON Blockchain, which are designed to increase the potential uses of the TON infrastructure and Grams.  (*Id.* ¶¶ 221-22.)  At all times, Defendants have reserved the right to change, modify or eliminate any aspects of the TON platform or Grams.  (*Id.* ¶ 220.)  However, Defendants have made it clear that Telegram will have no obligation to make any further developments to the TON Blockchain after it is launched.  (*Id.* ¶ 223.)  To the contrary, Defendants made affirmative representations that they are not required to, and indeed may never, make any additional efforts with respect to the development of the TON Blockchain following its launch.  (*Id.* ¶ 224.)

Defendants have also told purchasers that Telegram will not have any control over the development of the TON Blockchain following its launch.  (Def. 56.1 ¶ 73.)  Rather, Defendants will be in the same position as any other TON Blockchain user — able to develop applications for the TON Blockchain using the same source code that will be publicly available to any other developer who wants to develop an application.  (*Id.* ¶ 277.)  This is due to the open source nature of the TON Blockchain, whereby the entire source code for the TON Blockchain will be freely available and can be replicated by anyone, and third-party developers cannot be excluded from developing upon and using the core protocol.  (*See id.* ¶ 71.)  In fact, based on public reports and articles, numerous third parties have already developed, or begun to develop, a

multitude of applications and services in connection with the TON Blockchain and Grams, despite the existence of this ongoing lawsuit.  (*Id.* ¶¶ 273-274.)

### 1.   <u>The TON Foundation and TON Wallet</u>

Originally, Telegram anticipated the creation of a not-for-profit organization, called the "TON Foundation," to promote and support the TON Blockchain in a role similar to that of other digital asset foundations, like the Ethereum Foundation with respect to the Ethereum blockchain. (Def. 56.1 ¶ 186.)  However, Telegram expressly disclosed to Private Placement purchasers (and later the public, *see infra* pp. 18-19) that the TON Foundation may never be established.  (Def. 56.1 ¶¶ 225-227.)  If ever created, the TON Foundation would operate as a not-for-profit organization.  (*Id.* ¶ 225.)

Moreover, if ever established, the TON Foundation would be governed by a board of directors which would consist of a majority of independent directors that are not affiliated with Defendants.  (Def. 56.1 ¶ 235.)  The TON Foundation's role would be limited to (1) publishing non-binding opinions and research regarding the TON Blockchain's development and policy; (2) providing small incentives rewards of Grams to users of the TON Blockchain platform to promote the consumptive use of Grams; and (3) in certain circumstances, selling Grams in the market in order to attempt to dampen upward price volatility in the event that the free market price for Grams gets too high.  (*Id.* ¶¶ 236-238.)[9]  Neither Telegram nor the TON Foundation would have any legal or technical ability to change the TON Blockchain code, its validation

---

[9]  Specifically, if created, the TON Foundation would have the option to sell Grams by comparing the Reference Price and free market price of Grams.  In the event that the market price of Grams exceeds the Reference Price, the TON Foundation may elect (but is not required) to sell Grams where the lowest acceptable bid price would be the Reference Price.  (Def. 56.1 ¶ 239.)  The Reference Price is determined by a formula based on the total number of Grams in existence.  (*Id.* ¶ 240.)  It does not bear any relationship to, or dictate in any way, the free market price for Grams following launch of the TON Blockchain, which will be determined by free market forces.  (*Id.* ¶ 243.)

processes or its parameters, and none of the Grams that could be held by the TON Foundation or any Telegram employee may be used for voting or validating.  (*Id.* ¶ 244-45.)

Telegram has also developed the TON Wallet, a software application that will operate as a non-custodial cryptographic wallet to hold and transfer Grams.  (Def. 56.1 ¶ 68.)  Telegram currently contemplates launching the TON Wallet on a standalone basis and it is expected to compete with other wallet applications designed and offered by third parties, some of which appear to have already been developed.  (*Id.* ¶ 69.)

> **2.     The TON Beta Version**

In anticipation of the launch of the TON Blockchain, Telegram released a test version ("Beta Test Version") to the public, which has allowed third parties to view and test the TON Blockchain's open-source code and security, and to develop and test applications for the TON Blockchain when it launches.  (Def. 56.1 ¶¶ 256-259.)  Telegram has also hosted contests that have allowed the public to identify and fix any potential bugs in the TON code, and have resulted in the development of numerous new smart contracts and decentralized applications for operation on the TON Blockchain following its launch.  (*Id.* ¶¶ 264-266.)  Despite the pall of uncertainty cast by the SEC's precipitous filing of this lawsuit, there has been robust testing and development by third parties.  (*Id.* ¶¶ 256-275.)

**D.     Public Communications With Potential Gram Purchasers**

As discussed above, Telegram historically took care not to publicly comment on the details of the TON project, particularly given the flexibility it maintained regarding those details.  (*See supra* pp. 14-15.)  On January 6, 2020, Telegram published "A Public Notice About the TON Blockchain and Grams" ("Public Notice"), which emphasized the consumptive nature of Grams and clarified several technical and governance aspects of the TON Blockchain in advance

of any launch of the TON platform.  (Def. 56.1 ¶ 277.)  The Public Notice stated, among other

things:

- "Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches.  In fact, it is possible that Telegram may never do so.  Rather, it is Telegram's goal and hope that the **decentralized community of third party developers** and others will contribute to the TON ecosystem through the development of applications and smart contracts.  It will be the sole responsibility of **third parties** and the community to adopt and implement such applications or smart contracts on the TON Blockchain in the manner they choose.  Telegram does not, and cannot, guarantee that anyone will adopt or implement such features or provide such services, on any given timetable or at all."

- Gram purchasers "should **NOT** expect any profits based on your purchase or holding of Grams, and Telegram makes no promises that you will make any profits.  Grams are intended to act as a **medium of exchange** between users in the TON ecosystem.  Grams are **NOT** investment products and there should be **NO** expectation of future profit or gain from the purchase, sale or holding of Grams."

- "Grams do **NOT** represent:
  - Any equity or other ownership interest in Telegram or its affiliates
  - Any rights to dividends or other distribution rights from Telegram or its affiliates
  - Any governance rights in Telegram or its affiliates."

(*Id.* ¶ 277.)  Telegram's Public Notice is available online and through Telegram's website

and social media accounts, and has received significant coverage from media outlets.  (*Id.*

¶ 280.)

**E.**    **Telegram Seeks Guidance From the SEC and the SEC Brings Suit**

From February 2018 until the filing of this lawsuit, Telegram voluntarily engaged with

the SEC regarding its inquiries about TON, including producing thousands of pages of

communications between Telegram's employees and U.S. purchasers in the Private Placement;

submitting multiple detailed legal memoranda setting forth its views as to whether Grams should

be considered "securities"; and attempting to engage with the SEC on various aspects of the TON Blockchain in order to obtain guidance regarding its compliance with the federal securities laws.  For example, when the SEC expressed concerns that the TON Foundation's ability to buy Grams on the open market might give rise to an argument that Grams are securities, Telegram proposed removing the function, even though it disagreed with the SEC's legal analysis.  (Def. 56.1 ¶ 248.)  Over that 18-month period, Telegram repeatedly asked whether the SEC had other concerns with the TON project so that Telegram could attempt to address them.  (*Id.* ¶ 283.) Other than a few relatively minor other examples, about which the SEC never followed up or elaborated, the SEC refused to do so.  (*See id.* ¶ 286-87.)

Also during this 18-month period, SEC officials and its Strategic Hub for Innovation and Financial Technology ("FinHub") made public statements regarding whether a given digital asset should be considered a "security."  (*See supra* pp. 3-4.)  These statements were often vague, sometimes indecipherable, and offered no meaningful insight into the SEC's position regarding the questions addressed.  For example, FinHub's "Framework" lists no fewer than 38 factors or "characteristics" (plus nearly 30 additional sub-factors) that it claims are "especially relevant" to determining the expectation of profits prong of *Howey*.  FinHub, *Framework for "Investment Contract" Analysis of Digital Assets*, https://www.sec.gov/corpfin/ framework-investment-contract-analysis-digital-assets (last modified Apr. 3, 2019) [hereinafter *Framework*].  The Framework does not provide any guidance on weighing these factors or how to apply them, and expressly states that they are "not intended to be exhaustive in evaluating whether a digital asset is an investment contract."  *Id.*  The Framework also states that it "is not a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content."  *Id.* n.1.  The SEC's actions have led lawmakers, commentators, and even one of the

21

SEC's own Commissioners, to criticize the SEC's failure to provide concrete guidance in this new area.  (*See supra* p. 3)

On October 11, 2019, the SEC filed this action and an application for a preliminary injunction, just weeks before the last date that the TON Blockchain could launch under the Purchase Agreements.[10]  The SEC's lawsuit came without any prior request that Telegram attempt to delay the launch of the TON Blockchain or any warning that the SEC would seek injunctive relief.

This Court set a hearing for February 18, 2020, to address the parties' motions for summary judgment and the SEC's application for preliminary injunction.  During a telephonic conference on January 6, 2020, the SEC voluntarily agreed to forgo an evidentiary hearing on the its motion for preliminary injunction and to proceed based on written submissions and oral argument alone.  (ECF No. 58.)

## ARGUMENT[11]

## I.     GRAMS WILL NOT BE SECURITIES FOLLOWING LAUNCH OF THE TON BLOCKCHAIN

Defendants are entitled to summary judgment in their favor because Grams will not be "securities" under the U.S. federal securities laws, and thus no violation of the securities laws has occurred or is likely to occur in the future in connection with their offer or sale.  As set forth

---

[10]  Originally, the last date that the launch could occur was October 31, 2019, but it has since been extended to April 30, 2020, by agreement of a majority of the purchasers in the Private Placement.  (Def. 56.1 ¶ 202.)

[11]  Summary judgment is appropriate where the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Zelnik v. Fashion Inst. Of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006) (the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" (alteration in original)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*

below, upon launch of the TON Blockchain, Grams will more appropriately be characterized as a currency (and thus excluded from the definition of security) or a commodity, like gold or silver, subject to anti-fraud and anti-manipulation protections under the Commodity Exchange Act.

The only basis for the SEC's claim that Grams are securities is that they constitute "investment contracts" under *Howey*. An investment contract "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey, Co.*, 328 U.S. 293, 301 (1946); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975). Although the Second Circuit has "held that the word 'solely' should not be construed as a literal limitation," *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008), both the Second Circuit's and Supreme Court's application of *Howey* suggests that the profits from the efforts of others must be the most significant element of the instrument's character to satisfy *Howey*.[12] The purpose of the test is to determine whether purchasers require the protections of the disclosure regime of the federal securities laws, and where there is no common enterprise or expectations of profits based on the managerial efforts of others, applying that disclosure regime adds little value.[13] In evaluating whether an instrument is a security, the Supreme Court has

---

[12] *See SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982) (assessing "whether, under all the circumstances, the scheme was being promoted *primarily* as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way" (emphasis added)); *see also Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560-61 (1979) (*Howey* requires that interest acquired must be "substantially the characteristics of a security"; holding court below erred by finding "an expectation of profit in the pension plan only by focusing on one of its less important aspects to the exclusion of its more significant elements.") (citation omitted)).

[13] Numerous courts have held that the question of whether an instrument constitutes a "security," including under *Howey*, is a legal one to be decided by the Court. *See Hirsch v. duPont*, 396 F. Supp. 1214, 1217 (S.D.N.Y. 1975) ("[T]he issue of whether . . . the general partnership interests were 'securities' is a question of law which may be resolved by the court on summary judgment."), *aff'd*, 553 F.2d 750 (2d Cir. 1977); *see also SEC v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013) ("[T]he ultimate determination whether an instrument is a security is one of law."); *SEC v. Life Partners, Inc.*, 87 F.3d 536, 540-41 (D.C. Cir. 1996) (analyzing whether transactions were securities as a question of law); *see also United States v. Johnson*, 700 F.2d 163, 170 (5th Cir. 1983), *on reh'g*, 718 F.2d 1317 (5th Cir. 1983) ("[T]here has been a steady line of cases under the Securities Act upholding a finding of a 'security' as a matter of law.").

23

eschewed multi-factor tests that would leave the parties to a transaction unable to determine

"whether they are covered by the Acts until they engage in extended discovery and litigation"

over "elusive" concepts. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 698 (1985). Thus,

instruments will be deemed securities under *Howey* only if they bears "'to *a very substantial*

*degree* elements of investment contracts." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*

*Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979) (emphasis added) (citation omitted)).

Significantly, the *Howey* test is an *objective* one, and thus any particular investor's

subjective intent is insufficient to render an instrument a security. *See Ave. Capital Mgmt. II,*

*L.P. v. Schaden*, 843 F.3d 876, 884 (10th Cir. 2016); *Seagrave Corp. v. Vista Res., Inc.*, 534 F.

Supp. 378, 383 (S.D.N.Y. 1982); *see also Teague v. Bakker*, No. 96-2186, 1998 WL 168876, at

*3 (4th Cir. Apr. 8, 1998) ("The subjective intention of a given purchaser cannot control whether

something is a 'security,' else some might have purchased securities while others did not.").

Rather, courts "must focus [the] inquiry on *what purchasers were offered or promised*" by the

promoter. *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009); *see also* FinHub, Framework

for "Investment Contract" Analysis of Digital Assets (Apr. 3, 2019) ("The inquiry, therefore, is

an objective one, focused on the transaction itself and the manner in which the digital asset is

offered and sold.").

Further, "the analysis of whether something is a security is not static and does not strictly

inhere to the instrument [itself]," and even where an asset that is initially offered to raise funds

may constitute a securities offering, the instrument itself "may no longer represent a security

offering" where circumstances have changed, including the way it is later marketed. *See* Hinman,

*supra* note 4; *see also SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 209 (1967); *Marine*

*Bank v. Weaver*, 455 U.S. 551, 560, n.11 (1982) ("Each transaction must be analyzed and

24

evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").

Here, the record demonstrates that the SEC cannot establish two prongs of *Howey*: (1) following launch of the TON Blockchain, future Gram purchasers will not have an expectation of profits based on the entrepreneurial or managerial efforts of Telegram (*infra* § I.A.); and (2) there will be no common enterprise in Grams (*infra* § I.B.).

### A.   Gram Purchasers Will Not Have an Expectation of Profits Based on the Managerial Efforts of Others

First, the undisputed facts establish that Gram purchasers in the market will not have an expectation of profits based on the managerial efforts of Telegram following launch of the TON Blockchain and creation of Grams.  Indeed, an objective inquiry regarding Grams, their characteristics, and Telegram's public statements about them, makes clear that Defendants have not led future purchasers to expect profits based on Telegram's ongoing efforts.

### 1.   Grams Were Designed and Promoted for Consumptive Use

The record demonstrates that Grams were developed and marketed principally for their consumptive utility and as a medium of exchange to purchase goods and services.  As the Supreme Court explained in *Forman*, "[w]hat distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption."  421 U.S. at 858; *see also Frederiksen v. Poloway*, 637 F.2d 1147, 1150 (7th Cir. 1981).  In other words, "when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply."  *Forman*, 421 U.S. at 852-53.

Similar to Bitcoin (which the SEC has concluded is not a security),[14] Grams were designed from the outset to be a store of value and means of payment for goods and services. (*See supra* p. 10; Def. 56.1 ¶ 55.)  Additionally, like Ether, Grams were designed to have consumptive utility as a means for powering decentralized applications and smart contracts built on the TON Blockchain.  (Def. 56.1 ¶¶ 58.)  In fact, the record reflects that numerous third parties have already begun to develop such applications and uses for Grams in the TON ecosystem (*see supra* pp. 17-18), efforts that underscore the consumptive nature of Grams.  *See Frederiksen*, 637 F.2d at 1150; *see also SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1135 n.13 (9th Cir. 1991).

This is also consistent with Telegram's marketing to future Gram purchasers.  In its Public Notice, Telegram stressed that purchasers "should **NOT** expect any profits based on your purchase or holding of Grams, and Telegram makes no promises that you will make any profits. Grams are intended to act as a **medium of exchange** between users in the TON ecosystem. Grams are **NOT** investment products and there should be **NO** expectation of future profit or gain from the purchase, sale or holding of Grams."  (*Supra* p. 20.)  Similarly, Telegram emphasized that "Grams won't help you get rich," and "[i]f you buy grams at some point in the future, this **won't** mean you 'own a piece of Telegram.' Grams don't give their holders any special rights, just like owning Euros doesn't give you shares in the European Union."  (Def. 56.1 ¶ 277.)

This is consistent with Defendants' statements in the materials provided to Private Placement purchasers, which stated that Grams were being developed as "a cryptocurrency used for regular value exchange in the daily lives of ordinary people . . . a decentralized counterpart of

---

[14]  *See* Letter to Cipher Technologies Management LP, Brent J. Fields, Assoc. Dir., Disclosure Review and Accounting Office, Sec. Exch. Comm'n (Oct. 1, 2019), https://www.sec.gov/Archives/edgar/data/1776589/999999999719007180/filename1.pdf.

everyday money – a truly mass market currency."  (Def. 56.1 ¶ 164.)  In the Risk Factors, Telegram expressly distinguished Grams from an investment like stocks, stating that a purchaser of Grams was not "entitled . . . to vote or receive dividends or be deemed the holder of shares of [Telegram or TON Issuer] for any purpose."  (*Id.* ¶ 200.)  Thus, the clear impetus behind Grams was to resolve the issues that plagued others' attempts to develop a useful, mass-market cryptocurrency, as reflected and bolstered by Defendants' statements emphasizing Grams' consumptive nature.  *See Teague v. Bakker*, 139 F.3d 892 at *3 (4th Cir. 1998) ("If the investors were attracted primarily by the prospect of acquiring use and not [by] financial returns on their investment there is no security." (alteration in original) (citation omitted).)

In this regard, Grams are more appropriately be viewed as a *currency*, which is expressly excluded from the definition of "security."  15 U.S.C. § 78c(a)(10).[15]  Numerous courts have recognized that virtual currencies like Bitcoin share all the common characteristics with currencies.  *See, e.g.*, *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Indeed, the only value for Bitcoin lies in its ability to pay for things – it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case."); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014); *see also SEC v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("The only limitation of Bitcoin is that it is limited to those places that accept it as currency.  However, it can also be

---

[15]  Black's Law Dictionary defines currency as "[a]n item (such as a coin, government note, or banknote) that circulates as a medium of exchange."  *Currency*, Black's Law Dictionary (10th ed. 2014).  Similarly, Merriam-Webster's dictionary defines "currency" as "something (such as coins, treasury notes, and banknotes) that is in circulation as a medium of exchange."  *Currency*, Merriam-Webster, https://www.m-w.com/dictionary/currency (last visited Jan. 13, 2020).  Although the Securities Act does not include the same express exclusion of "currency," the definitions of "security" under both Section 3(a)(10) of the Exchange Act and Section 2(a)(1) of the Securities Act are nearly identical and have been treated as such.  *See SEC v. Edwards*, 540 U.S. 389, 393 (2004).

exchanged for conventional currencies, such as the U.S. dollar, Euro, Yen, and Yuan.  Therefore, Bitcoin is a currency or form of money.").[16]  This reasoning applies equally to Grams.

## 2.     <u>Any Expectation of Profits Will Not Be Based on Telegram's Efforts</u>

### (a)     Telegram Has Disclaimed Any Promise of Future Efforts

Even if some purchasers may expect to profit from their future acquisition of Grams, such expectations would not be based on the future efforts of Defendants following launch of the TON Blockchain.  Courts generally have only found this prong satisfied if "the efforts made by those other than the investor are the *undeniably significant ones*, those *essential* managerial efforts which affect the failure or success of the enterprise."  *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) (emphasis added).  Here, as discussed, Telegram's "essential entrepreneurial efforts" will have been completed by the time the TON Blockchain is launched and Grams are available for purchase, and it will not occupy any managerial position within the ecosystem.  (*See, e.g.*, Def. 56.1 ¶¶ 73, 224.)  At that point, the TON Blockchain and Grams will "operate[] in such a manner that purchasers would no longer reasonably expect [Defendants] to carry out essential managerial or entrepreneurial efforts."  *Framework*.

If there were any doubt on this point, Defendants dispelled it in their Public Notice, in which they stated that they "are creating a decentralized platform for everyone.  Once it launches, Telegram won't be obligated to maintain the platform or create any apps for it.  *It's possible we never will*."  (*Supra* p. 18 (emphasis added).)  Defendants further stated that "once the TON

---

[16]  Consistent with these facts, at least one regulator has already come to the conclusion that Grams are currency or money.  The United States Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), in relation to the provision of Grams to the Private Placement purchasers, considers TON Issuer Inc to be a Money Services Business subject to the Bank Secrecy Act.  (Def. 56.1 ¶ 94.)  As a result of this determination, TON Issuer Inc must register with FinCEN as a Money Services Business in the U.S. (which it did on August 30, 2019).  (*Id.* ¶ 95.)  By definition, Money Services Businesses do "not include: . . . [a] person registered with, and functionally regulated or examined by, the SEC or the CFTC . . . ." 31 C.F.R. § 1010.100(ff)(8)(ii).

Blockchain is launched, Telegram will occupy the same position as any other party with respect to the TON Blockchain, and will not have any control over, any unique rights within, or any responsibility for the management of, the TON Blockchain." (*Supra* p. 18.)

Far from promising continued involvement, Defendants explained in no uncertain terms that they "won't be able to control the blockchain and the ecosystem after it launches. Pretty much like an architect who designed a skyscraper can't control what happens with the building after it's finished – including what gets built around, inside or on top of it." (*Supra* p. 5)[17] Indeed, because the TON Blockchain's code is completely open source,

> it is Telegram's goal and hope that the decentralized community of third party developers and others will contribute to the TON ecosystem through the development of applications and smart contracts. It will be the sole responsibility of third parties and/or the community to adopt and implement such applications or smart contracts on the TON Blockchain in the manner they choose.

(*Supra* p. 19; Def. 56.1 ¶¶ 277.)

Given these undisputed and unequivocal statements, Grams cannot be considered securities under *Howey* even if purchasers generally hope or expect the TON Blockchain to further improve over time. In *Rodriguez v. Banco Central Corp.*, 990 F.2d 7 (1st Cir. 1993), buyers were "sold land in individual parcels with strong and repeated suggestions that the surrounding area would develop into a thriving residential community." *Id.* at 11. The court rejected the argument that these suggestions turned the land sales into securities under *Howey*, holding that "apart from the promise of an existing lodge or a new country club, the evidence did

---

[17] Telegram also expressly disclaimed any such obligations in the Private Placement materials sent to private investors while emphasizing that "the future of TON is in the hands of the global open-source community." (*See* Def. 56.1 ¶ 165.) Although the Private Placement Materials were meant to be kept confidential, some were leaked to the public through parties other than Defendants. (*Id.* ¶ 216.) In any event, Telegram's Public Notice expressly "supersedes" any previous communications between Telegram and private investors to which potential future Gram purchasers may have become privy. (*Id.* ¶ 277.)

not show that the promoter or any other obligated person or entity was promising the buyers to build or provide anything." *Id.*

The same is true here, where the evidence not only fails to show that Defendants promised to continue to develop the TON Blockchain following its launch, but rather establishes that they publicly disclaimed any such commitments. *See Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) ("The [*Howey*] test is not fulfilled when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services."); *see also* Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act of 1933 Release No. 5347 (January 4, 1973) (offer of real estate without any collateral arrangements with seller or others does not involve the offer of a security).

> ### (b)   Any Profits Based on Speculative Trading Are Insufficient To Turn Grams Into Securities

Third, even if some Gram purchasers acquire Grams with the expectation of trading them for potential profit, such expectations will be based on the market value of Grams, which, following the launch of the TON Blockchain, will fluctuate due to market factors and not the ongoing efforts of Defendants.  (*See* Def. 56.1 ¶ 182.)  Courts consistently hold that such profits are insufficient under *Howey* — and, indeed, could be applied to any commodity or speculative consumer good (like comic books).  *See, e.g.*, *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) ("[P]urchasers in this case had as their primary purpose to profit for the anticipated increase in the world price of gold."); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) ("The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the securities acts.").  This is because "[a]n investor who has the ability to

control the profitability of his investment, either by his own efforts or by majority vote in group ventures, is not dependent upon the managerial skills of others." *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982).

Since the value of post-launch Grams will be determined by market forces, any purchaser will have complete control over when to buy and sell them (assuming that they choose to buy and sell rather than consume, which, as described above, is the primary purpose of Grams). (Def. 56.1 ¶¶ 252-255.) In this regard, Grams are more like commodities, subject to fraud and manipulation prohibitions under the CFTC's regulatory regime. Indeed, at least one court has concluded that virtual currencies are commodities within the CFTC's regulatory protections. *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018); *see also In re Coinflip, Inc.*, CFTC Dkt. No. 15-29, 2015 WL 5535736, at *2 (CFTC Sept. 17, 2015) ("Bitcoin and other virtual currencies are . . . properly defined as commodities."). Just recently, the Chairman of the CFTC stated that Ether "is a commodity, and therefore it will be regulated under the [Commodity Exchange Act]."[18] Like other commodities that courts have held are not securities, any expectation of profits will depend upon buyers' affirmative actions and market forces, not the managerial efforts of others. *See Belmont Reid*, 794 F.2d at 1389-91 (gold coins not securities); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980) (silver bars not securities); *Svets v. Osborne Precious Metals Co.*, No. C 92-0357 BAC, 1992 WL 281413, at *2 (N.D. Cal. June 8, 1992) (precious metals not securities); *Berman v. Dean Witter & Co.*, 353 F. Supp. 669, 671 (C.D. Cal. 1973) (yen futures contracts not securities); *Schwartz v.*

---

[18] Press Release No. 8051-19, Heath P. Tarbert, Chairman, U.S. Commodity Futures Trading Comm'n (Oct. 10, 2019), https://cftc.gov/PressRoom/PressReleases/8051-19.

*Bache & Co.*, 340 F. Supp. 995, 998-99 (S.D. Iowa 1972) (contracts for sale of nickel not

securities); *Sinva, Inc.,* 253 F. Supp. at 367 (contracts to purchase sugar not securities).

On this score, the Supreme Court has held that the availability of another federal

regulatory scheme to protect investors is a factor that weighs against extending the federal

securities laws.  *See Marine Bank*, 455 U.S. at 558-59; *Daniel*, 439 U.S. at 569-70; *see also*

*Walsh v. Int'l Precious Metals Corp.*, 510 F. Supp. 867, 872-873 (D. Utah 1981) (declining to

"stretch the protection of the securities laws" where CFTC had "filled the protective regulatory

gap").  This also weighs in favor of the conclusion that Grams are not securities.

> ### (c)    Any Future Efforts By Telegram Would Not Be "Essential"

 Finally, even if Telegram were to continue to contribute to the development of the TON

Blockchain following its launch just like any other third party (and it has not made any promises

or commitments to do so), courts regularly decline to find "investment contracts" when the

promoter maintained non-essential involvement after the investment.  Here, any such efforts by

Telegram would be one of many in the decentralized community at-large following launch, as

Telegram stressed to the public, and certainly not "essential" managerial or entrepreneurial

involvement.  *Glenn W. Turner*, 474 F.2d at 482.

This conclusion is not altered by Telegram's potential establishment of the TON

Foundation at some unknown point in the future.  (*Supra* p. 17.)  First, although Telegram

originally contemplated establishing the TON Foundation with similar functions to other

foundations associated with non-security cryptocurrencies (for example, the Bitcoin and

Ethereum Foundations (*see* Def. 56.1 ¶ 246)), Telegram has consistently disavowed any promise

that the TON Foundation will be created.  (*Id.* ¶¶ 185, 226, 228, 249.)  Moreover, even if the

TON Foundation were to be established, it would be controlled by a board that would include a

majority of independent members with no association or affiliation with Defendants, and its activities would be strictly limited in such a way so as to avoid any expectation of profits by Gram purchasers. (*Id.* ¶¶ 235-38.) For example, the TON Foundation will only be permitted to offer certain incentives for users to adopt Grams for consumptive purposes and to sell Grams into the market in order to dampen the upward volatility in the market price for Grams. (*Id.* ¶¶ 237-38.) Neither function could possibly turn Grams into securities. Indeed, any selling is solely intended to <u>*lower*</u> the market price of Grams in order to reduce volatility and promote the consumptive use of Grams as a currency. (*Id.*) This profit-dampening function is antithetical to investor profits and thus cannot render Grams securities.[19]

Courts have concluded that far more significant efforts by promoters were insufficient to turn the instruments in question into investment contracts. For example, in *Belmont Reid*, the court held that prepayment plans to purchase gold to be extracted by the promoter were not investment contracts even where the promoter, in addition to extracting the gold and minting gold coins therefrom, made commitments to protect investors from its inability to deliver the gold coins or a sharp decline in the world price of gold. *Belmont Reid*, 794 F.2d at 1389. Similarly, in *Noa*, the court concluded that contracts to purchase silver bars were not investment contracts even where the promoter agreed to refine the purchased silver, guaranteed that the silver would be 0.999 pure (or otherwise agreed to repurchase it at any time at the spot price quoted in the *Wall Street Journal*), and then agreed store it at the customer's request for up to a year at no cost. *Noa*, 638 F.2d at 79. Under the reasoning of these decisions, any limited ongoing involvement by Telegram cannot turn a digital asset like Grams into securities.

---

[19] To the extent the Court concludes that either of these functions creates an expectation of profits under *Howey*, Telegram remains willing to commit not to implement them. (Def. 56.1 ¶ 249.)

The SEC appears to have reached the same conclusion recently with respect to a blockchain and virtual currency created by Block.one.  Block.one conducted an ICO of digital tokens to fund completion of its EOSIO blockchain platform.[20]  Upon completion of the platform, the original tokens were automatically converted into "EOS Tokens."  Although the SEC concluded that Block.one's public offer of digital tokens through the ICO violated Section 5 of the Securities Act, notably, the SEC appears to have permitted the EOS Tokens to be bought, sold and traded going forward as _non-securities_.[21]  Moreover, the SEC did so despite the fact that Block.one appears to be playing an ongoing role in the development of the EOSIO platform.  In fact, Block.one currently operates a venture capital business unit that is intended to "provide[] support through venture capital partnership funds that sustain EOSIO software usage" by investing "in a concentrated and diversified portfolio of blockchain-focused companies that build on on [_sic_] the EOSIO [blockchain platform]."  _See_ EOS VC, https://vc.eos.io/about-eos-vc/ (last visited Dec. 24, 2019).

Any further efforts by Telegram following launch of the TON Blockchain (to the extent they even occur, which has not been promised) would be far less significant than those above, and fall far short of the sort of "essential" managerial efforts contemplated under _Howey_.

**B.      There Will Be No "Common Enterprise" in Grams Following Launch**

Grams themselves will not be investment contracts under _Howey_ for the separate reason that there is no post-launch "common enterprise" for Grams.  A common enterprise can be established by showing "horizontal commonality," which is when "each individual investor's

---

[20]  Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Finding, and Imposing a Cease-and Desist Order, _In re Block.one_, Securities Act Release No. 10714, 2019 WL 4793292, ¶¶ 4-6 (Sept. 30, 2019).

[21]  _Id_. at ¶¶ 19-20.

fortunes [are tied] to the fortunes of the other investors by the pooling of assets, [which is] usually combined with the pro rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).  Although the Second Circuit has not explicitly addressed the issue, other courts have indicated that a common enterprise may be established by showing "strict vertical commonality," which is when the "fortunes of investors [are] tied to the *fortunes* of the promoter." *Id.* (citation omitted).[22]  The record makes clear that neither test is met here.

### 1.    No Horizontal Commonality

"In a common enterprise marked by horizontal commonality, the fortunes of each investor depend upon the profitability of the enterprise as a whole: 'Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture.'"  *Id.* at 87 (citation omitted).  "'In fact, a finding of horizontal commonality *requires* a sharing or pooling of funds.'"  *Id.* (citation omitted) (emphasis added).

Here, once Grams are created, there will be no possible "sharing or pooling" of investor funds or any return of profits.  (*See* Def. 56.1 ¶¶ 251-255.)  As Telegram has made clear to purchasers, Grams do not represent any equity or other ownership interest in Telegram, any rights to dividends or other distribution rights from Telegram, or any governance rights in Telegram.  (*Id.* ¶¶ 180, 277.)  Rather, the purchase of Grams is an *individual* enterprise, in which purchasers can decide how long they wish to hold the Grams, whether to use the Grams to pay for smart contracts or other goods, to accept them as payment, to stake them and earn more Grams by acting as validators, or when to exchange Grams for fiat currency or other digital

---

[22]  The Second Circuit has rejected a third test for commonality, called "broad vertical commonality," which requires only that the fortunes of the investors be linked to the managerial efforts of the promoter.  *Id.* at 87-88 (citation omitted).

currency.  (*Id.* ¶ 254.)  Any profits would be specific to that purchaser based on the timing of his or her decisions.  (*Id.* ¶ 255.)

This is the antithesis of a common enterprise.  *See Revak*, 18 F.3d at 88 ("The rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibilities of the unit owner.  Plaintiffs owned individual units, and could make profits or sustain losses independent of the fortunes of other purchasers.  There are simply no indicia of horizontal commonality."); *see also Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (contrasting *pro rata* distribution of profits in stock ownership with rent generated from condominium ownership and holding that the latter did not give rise to common enterprise). Indeed, courts have consistently held that the "common enterprise" prong of *Howey* is not met under similar circumstances, where "[t]he 'enterprise' is an individual one."  *See McCurnin v. Kohlmeyer & Co.*, 340 F. Supp. 1338, 1341 (E.D. La. 1972) (no "common enterprise" where "[t]he expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in [the investor's] favor, permitting purchase or sale at a profit"); *Noa*, 638 F.2d at 80; *Berman*, 353 F. Supp. at 671.

Finally, the fact that Defendants <u>*may*</u> develop applications for the TON Blockchain following its launch does not and cannot transform the purchase of Grams from an individual enterprise into a common one — particularly where Telegram has disavowed any commitment to do so.  *See Demarco v. Lapay*, No. 2:09-CV-190 TS, 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009) ("In establishing the existence of a security, it is not enough to allege a transaction was entered into as an investment without alleging evidence of an additional agreement detailing activities sufficient to form a common enterprise.").  On this point, cases involving purchase agreements for single lots or condos within a planned community are particularly instructive.

For example, in *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978), the court concluded that purchasing a lot from a community developer did not create a common enterprise, even though purchasers likely expected to profit from appreciation due to the developer's development of a community.  *Id.* at 1025; *see also De Luz Ranchos Inv., Ltd. v. Caldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th Cir. 1979) (same).  Similarly, in *Lavery v. Kearns*, 792 F. Supp. 847 (D. Me. 1992), the court held that a promoter's development of a nearby property and a health club on the property at issue did not create a common enterprise with purchasers of condominiums on that property.  *Lavery*, 792 F. Supp. at 859.

In those cases, the purchasers alleged that their purchase agreements constituted securities based on ancillary or implied promises by the promoter/developer of future developments and improvement efforts to the rest of the community.  In each instance, this theory was rejected because the developers had not made any promises in any contract concerning such efforts; investors merely *anticipated* them to occur.  The same reasoning applies squarely here and defeats any conclusion that a horizontal common enterprise for post-launch Grams will exist.

## 2.    No Vertical Commonality

The undisputed record similarly makes clear that there will be no vertical common enterprise in Grams following launch.  "Strict vertical commonality requires that 'the fortunes of plaintiff and defendants are linked so that they rise and fall together.'"  *Id.* (quoting *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002)).  "'Stated otherwise, strict vertical commonality exists where there is a one-to-one relationship between the investor and investment manager such that there is an interdependence

of *both profits and losses* of the investment.'"  *Id.* (quoting *Marini v. Adamo*, 812 F. Supp. 2d 243, 246 (E.D.N.Y. 2011)).

Here, the SEC has alleged only that all Gram purchasers' fortunes will rise and fall together.  This again ignores the heterogenous interests that Gram holders will have after launch. Indeed, Gram purchasers will not all have the same interests or may have mixed motives — for example, some purchasers will be interested in staking their holdings and acting as validators in order to profit by earning newly minted Grams, profits that will not be shared by other Gram owners.  Other Gram purchasers will be interested in using Grams to buy and sell goods and services.  If some investors expect to earn profits if the price of Grams increases due to market forces or as Grams gain traction among consumptive users, these speculators' "fortunes" are actually at odds with the interests of consumptive users.

Further, Telegram's founders and employees have not made any commitment to hold Grams following launch, and, in fact, have affirmatively disclaimed any such commitment.  (Def. 56.1 ¶ 89.)  Although these individuals may decide to hold Grams, there will be no commonality between their profits and losses, if any, and those of independent Gram purchasers for the same reason that there is no commonality between profits and losses among Gram purchasers.  *See Marini*, 812 F. Supp. 2d at 258 ("[B]ecause plaintiff was free to direct the sale of his coins separate and apart from Adamo's decision to sell his coins, the fortunes of Marini and Adamo clearly were not directly linked."); *see also Gugick v. Melville Capital LLC*, No. 11-CV-6294 (CS), 2014 WL 349526, at *4 (S.D.N.Y. Jan. 31, 2014).  Again, when viewed from the standpoint of a currency, there are pros and cons to changes in value of Grams for buyers and sellers.  Meanwhile, those primarily using their Grams for staking and validating will view those

transactions differently. All of this defeats any notion of a "common enterprise" in Grams following launch.

Finally, it is undisputed that Defendants will not be offering Gram purchasers any opportunity to contribute money alongside them and to share in any profits. There simply can be no vertical commonality under these facts. *Marini*, 812 F. Supp. at 258-59 (no commonality where "[defendant] was not offering [plaintiffs] the opportunity to contribute funds and *share* in the profits of a coin portfolio that would be managed by [defendant]," and "there is no allegation here that plaintiffs were investing with others and sharing in profits").

### C.   Whether Grams Are Securities Depends on Their Circumstances After Launch of the TON Blockchain

Perhaps aware that post-launch Grams do not fit within the definition of investment contract under *Howey*, the SEC's Complaint attempts to confuse the issue by conflating two different, and fundamentally distinct, questions: (1) whether the Private Placement is a securities offering; and (2) whether the *Grams themselves* are securities. This is evident from the Complaint's nearly exclusive focus on the alleged expectations of profit by the Private Placement purchasers. (*See, e.g.*, Compl. ¶¶ 77-99.) Telegram has always treated the Purchase Agreements as investment contracts (and thus securities), but that does not mean the underlying Grams themselves, which do not exist yet and will be used, bought and sold by the public following the launch of the TON Blockchain, are also "securities." Quite the opposite.

Through their Purchase Agreements, the Private Placement purchasers pooled money in exchange for Telegram's efforts to build the TON Blockchain and create Grams. (*See supra* pp. 11-12.) The Private Placement investors no doubt sought to profit from that arrangement, in the form of the receipt of Grams if the blockchain is successfully launched — and, indeed, they were offered Grams at a price that reflected the risk that the TON Blockchain would not be

successfully developed.  (*See supra* p. 5.)  But, just like the oranges in *Howey*, Grams will

function like a commodity with its own intrinsic value.  And because Grams will not be created

and issued until after the launch of the TON Blockchain, their sales following launch will be

without any corresponding service agreements that may have caused the Purchase Agreements to

constitute a securities offering.  The SEC conflates the transactions by attempting to assert that,

in the terms of *Howey*, *both* the orange-growing service *and* the oranges themselves are

"securities" subject to SEC jurisdiction.  Defendants submit that this is not, and cannot be, the

law.

Moreover, even assuming that the non-existent Grams could be considered "securities" at

the time of the Private Placement, that still does not mean they should be considered "securities"

following the launch of the TON Blockchain and for all times thereafter.  Rather, as the Supreme

Court and SEC have recognized, the *Howey* test is *transaction-specific* and an instrument that

may be a "security" in one context or transaction can be a "non-security" in another context as

the circumstances of the offering change.  As SEC Chairman Jay Clayton recognized: "The use

[of cryptocurrency] can *evolve* toward or away from a security," and thus "[j]ust because [a

particular instrument is] a security today doesn't mean it'll be a security tomorrow, and vice-

versa."[23]  *See SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 209 (1967).  In its recent

*Framework*, the SEC's FinHub provides a list of factors purportedly meant to help developers

determine whether a digital asset is a "security" and, significantly, splits the analysis into two

different points in time:  first, when the digital asset is originally offered; and second, when a

"digital asset previously sold as a security *should be reevaluated* at the time of later offers or

---

[23]  Nikhilesh De & Mahishan Gnanaseharan, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018, 11:58 UTC), https://www.coindesk.com/sec-chief-not-icos-bad/ (emphasis added).

sales." (*d.* (emphasis added).  By FinHub's own admission then, a digital currency that may have been a security in one setting may not be a security "at the time of later offers or sales."  *Id.*

Thus, even if the Purchase Agreements (or the Grams themselves, despite not existing yet) were "securities" at the time of the Private Placement, Grams must be "reevaluated at the time of later offers or sales" once the launch occurs.  (*Id.*)  That inquiry must be based on the "factual setting as a whole" once the blockchain has launched and Grams are being bought and sold and used in connection with a decentralized platform in which Telegram has no ongoing essential role.  At that point and thereafter, Grams will not be securities and, like Bitcoin or Ether, applying the disclosure regime of the federal securities laws to the post-launch offer and sale of Grams "would seem to add little value."  Hinman, *supra* note 4.

### D.    The SEC's Failure To Provide Clarity and Fair <u>Notice Regarding Its Claims Weighs in Favor of Defendants</u>

Finally, as set forth in Defendants' Answer and Affirmative Defenses, the SEC has failed to provide any workable guidance in this area of the law and thus deprived Defendants of fair notice of the securities law violations they are alleged to have committed.  (Aff. Def. ¶¶ 13-42.) Telegram's TON project is an entirely new technology, yet the SEC — while recognizing that digital currencies present novel questions under the securities laws — has not provided any guidance on how it would determine whether Grams qualify as an investment contract.  To the extent the SEC now seeks to apply some novel variation of the *Howey* test along the lines of its 38-part test set out in the *Framework* (*see supra* p. 21), which is untethered to the factors set forth in the existing case law, that variation would be void for vagueness and a violation of Defendants' rights to fair notice.  (*See supra* pp. 20-21); *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) ("The standards of enforcement must be precise enough to avoid 'involving so many factors of varying effect that neither the person to decide in advance nor the

41

jury after the fact can safely and certainly judge the result.'" (quoting *Cline v. Frink Dairy Co.*, 274 U.S. 445, 465 (1927))).  Although some courts have recognized that the *Howey* test is not vague when applied to common variations of investment contracts, the SEC itself has recognized the uncertainty that can be generated when the test is applied to new asset classes without meaningful guidance, as is the case here.  (*See supra* note 3.)

## II.   DEFENDANTS' PRIVATE PLACEMENT DOES NOT CONSTITUTE A "PAST VIOLATION" OF THE SECURITIES ACT

Defendants are also entitled to summary judgment on the SEC's claim that Defendants committed a "past violation" of Sections 5(a) and 5(c) of the Securities Act.  (Compl. ¶¶ 119-121.)  All offers and sales on interests in Grams effected in the United States via the Purchase Agreements were conducted in compliance with the exemption from registration under the safe harbors contained in Rule 506(c) of Regulation D and/or Section 4(a)(2) of the Securities Act.

### A.   The Private Placement Was Conducted Pursuant to Valid Exemptions Under Rule 506

Under Rule 506(c) of Regulation D, an issuer is exempt from registering any offer or sale of securities made to accredited investors as long as the issuer takes reasonable care, as defined by Rule 502(d), to ensure that the purchasers are not statutory underwriters.  17 C.F.R. § 230.506; 17 C.F.R. § 230.502.[24]  Rule 502(d) provides a list of actions that, when taken, *conclusively* establish reasonable care:

1.   Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;

---

[24]  The Private Placement individual purchasers who submitted Rep Letters for the United States were required to submit a letter from a third party verifying their status as accredited investors.  (*See* Def. 56.1 ¶ 129.)  If the purchaser was an entity, the purchaser was required to indicate whether the purchaser (a) was formed for the purpose of entering into the Purchase Agreement or (b) solicited purchasers to participate in the purchase directly or indirectly through an entity or otherwise.  (*Id.* ¶ 131.)  By limiting the Private Placement to those investors and requiring these representations from potential investors, Defendants took reasonable steps to ensure that any purchasers were "accredited investors" under Rule 501.  *See* 17 C.F.R. § 230.501(a)(1)-(5).

2.      Written disclosure to each purchaser prior to the sale that the securities have not been registered under the [Securities] Act and, therefore, cannot be resold unless they are registered under the [Securities] Act or unless an exemption from registration is available; and

3.      Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the [Securities] Act and setting forth or referring to the restrictions on transferability and sale of the securities.

*Id.* at § 230.502(d).  Defendants took all of the actions outlined in Rule 502(d).  First, Defendants conducted a reasonable inquiry into the investment intent of each Private Placement purchaser, as required by Rule 502(d).  Indeed, in addition to engaging in extensive KYC processes in connection with the Private Placement, Defendants also obtained express representations and warranties from each purchaser confirming it they was "purchasing the Tokens for [its] own account and not with a view towards, or for resale in connection with, the sale or distribution thereof . . . ."  (Def. 56.1 ¶ 209.)  Each purchaser additionally warranted that "the Purchaser is entering into this Purchase Agreement and purchasing tokens on its own behalf and not for the benefit of any other person."  (*Id.* ¶ 210.)  These warranties were given at the time the Purchase Agreements were entered into and must be repeated at the time of launch as a condition precedent to the purchaser receiving any Grams.  (*Id.* ¶ 212 )  Indeed, as Defendants have explained, they purposefully chose highly reputable and sophisticated investors to participate in the Private Placement in order to provide greater assurance that these representations would be honored.  (*Id.* ¶ 98-100, 188, 209.)

Defendants also included express prohibitions on the offer, sale or transfer of any interests in Grams until at least the launch of the TON Blockchain (if not longer, in the case of lock-up provisions for the Round 1 investors).  (Def. 56.1 ¶¶ 203, 205-207.)  Indeed, through the Purchase Agreements, Defendants imposed the greatest penalty possible for breach of these

representations — full cancellation of the applicable Purchase Agreement.  (*Id.*)[25]  Taken

together, it is clear from the undisputed facts that Defendants made a reasonable inquiry to

determine if any purchaser was acquiring the securities for himself or other persons.

Second, the Purchase Agreements included a prominent legend stating that "THE OFFER

AND SALE OF THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S.

SECURITIES ACT OF 1933 . . . [AND] MAY NOT BE OFFERED, SOLD OR OTHERWISE

TRANSFERRED . . . EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION

STATEMENT UNDER THE U.S. SECURITIES ACT OR IN A TRANSACTION EXEMPT

FROM REGISTRATION."  (Def. 56.1 ¶ 193.)  Because the Purchase Agreement is the only

instrument in existence that evinces an interest in the Grams themselves (should they ever be

created), this is sufficient to satisfy the second requirement of Rule 502(d).

Finally, the requirement that a legend appear "on the certificate or other document that

evidences the securities stating that the securities have not been registered under the Act and

setting forth or referring to the restrictions on transferability and sale of the securities," 17 C.F.R.

§ 230.502(d), is satisfied by the prominent language, referenced above, that was included in the

Purchase Agreements.  In its preliminary injunction application, the SEC appeared to suggest

that the statute was not satisfied because "Defendants did not restrict the resale of all Grams, and

did not reasonably inquire to determine whether the Initial Purchasers were purchasing the

Grams for themselves or third parties."  (Pl. PI Br. at 25 n.5.)  But again, at the time of the

Private Placement, the Purchase Agreements were the only physical instruments in existence that

---

[25]  Although irrelevant to whether Defendants made reasonable inquiry at the time the Purchase Agreements were
entered into, Defendants also continued to follow up where facts suggested that specific investors may have taken
actions that resulted in breaches of their contractual representations, and have imposed the penalty of cancellation on
certain investors where necessary.  (Def. 56.1 ¶¶ 133-158.)

represented any interest in Grams, and those instruments contained the all-capitalized language above and further required each purchaser to warrant that it was "purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof" or "for the benefit of any other person." (*See supra* pp. 16.)  Not only were such warranties given at the time of the Purchase Agreements, but they also must be repeated at the time of launch as a condition precedent to any delivery of Grams, effectively countering any concern that the purchasers were purchasing with a view to distribution of a security in violation of the Securities Act.  (Def. 56.1 ¶ 212.)

Just as significantly, it has always been contemplated that Grams would constitute a currency or a commodity, *not* securities, at the time of their creation.  (*See supra* p. 10.)  It would be nonsensical to require some form of additional securities law legend on an instrument that did not exist at the time and was not intended to be a security once it came into existence and was issued.  In this respect, Grams are *necessarily* restricted from transfer, distribution or sale unless and until they are created.  The only instruments evincing interests in Grams, i.e., the Purchase Agreements, specifically prohibit the purchasers from engaging in any conduct to offer, pledge, sell, or transfer, directly or indirectly, the investment contracts represented by the Purchase Agreements *or any Grams* until there is a successful launch of the TON Blockchain, at which point Grams will not constitute securities.  (*See supra* pp. 15.)  Defendants submit that nothing more could reasonably be required.  To take the *Howey* example, Defendants were not required to stamp legends on yet-to-be-grown oranges.

### B.     Defendants Are Entitled to a Valid Exemption Under Section 4(a)(2) of the Securities Act

Even assuming Defendants are somehow unable to rely on the exemption under Rule 506, Defendants nevertheless are entitled to summary judgment on the SEC's "past violation" theory

because any transactions with the Private Placement purchasers are separately exempt from registration under Section 4(a)(2) of the Securities Act.[26]  Section 4(a)(2) exempts "transactions by an issuer not involving any public offering."  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 120 (1953).  When considering what constitutes a public offering, the Supreme Court has explained that the availability of Section 4(a)(2) "should turn on whether the particular class of persons affected need the protection of the [Securities] Act.  An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'"  *Id.* at 125 (citation omitted).  "[T]he governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information."  *Neuwirth Inv. Fund, Ltd. v. Swanton*, 422 F. Supp. 1187, 1196 (S.D.N.Y. 1975) (citation omitted).

Here, as described above, the Private Placement purchasers were all highly sophisticated and high-net-worth investors.  (Def. 56.1 ¶ 100.)  Given this, it is clear that these were the types of investors who were able to "fend for themselves."  *Ralston Purina Co.*, 346 U.S. at 125; *see also Park Yield LLC v. Brown*, No. 18 Civ. 1947 (GBD) (SN), 2019 WL 6684127, at *5-6 (S.D.N.Y. Dec. 6, 2019) (finding securities to be exempt under Section 4(a)(2) where the offerees were both sophisticated and experienced and the securities had restrictions on reselling the interests).

Moreover, it is undisputed that there has been no public offer or distribution of Grams, which cannot, and will never, occur if the Grams are deemed to be statutory securities at the time of the launch.  By definition then, any future sales of Grams to the public will not render the safe

---

[26]  Rule 506 is a non-exclusive safe harbor.  Thus, an issuer's failure to satisfy all of the terms and conditions of Rule 506 "shall not raise any presumption that the exemption provided by section 4(a)(2) of the [Securities] Act is not available."  (*See* 17 C.F.R. § 230.500(c).)

harbor or statutory exemption unavailable because any such future sales simply cannot be part of a public distribution of Grams *as statutory securities* in violation of the Securities Act.[27]

## III.    THE SEC'S APPLICATION FOR AN INJUNCTION SHOULD BE DENIED

To obtain a preliminary injunction enjoining future violations of the securities laws under Section 20(b) of the Securities Act, the SEC must make a "clear showing" of both (i) the likelihood of success by establishing a prima facie case of a past violation of the securities laws, and (ii) a "reasonable likelihood" of future violations absent an injunction. *SEC v. Unifund SAL*, 910 F.2d 1028, 1031, 1038 (2d Cir. 1990) (citation omitted).  The SEC is entitled to a preliminary injunction only upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *see also Unifund*, 910 F.2d at 1039-40.  As the Second Circuit has cautioned, "a preliminary injunction can have very serious consequences," and thus, "the more onerous . . . the burdens" of the injunction sought, the "more persuasive [the] showing of [the SEC's] entitlement" to relief must be. *Unifund*, 910 F.2d at 1039.

Although "[a]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case or when the disputed

---

[27]  The SEC also claims that Defendants "did not comply with Regulation S, which provides a safe harbor available for offers and sales of securities outside the United States without registration" because Defendants "intentionally offered and sold securities to persons in the United States[] using the same Offering Documents and Gram Purchase Agreements for both U.S. and foreign persons." (Pl. PI Br. 25 n.5.)  This argument is without merit.  The Private Placement was conducted pursuant to valid exemptions under Regulation D (for U.S. purchasers) and Regulation S (for non-U.S. purchasers).  It is well established that simultaneous Regulation D and Regulation S offerings are permitted.  Offshore Offers and Sales, Securities Act Release No. 6863, Exchange Act Release No. 27,942, Investment Company Act Release No. 17,458, 46 SEC Docket 52 at *86-87 (Apr. 24, 1990); *see also* 17 C.F.R. § 230.502 ("[T]ransactions otherwise meeting the requirements of an exemption [under Regulation D] will not be integrated with simultaneous offerings being made outside the United States in compliance with Regulation S.").  Where simultaneous Regulation D and Regulation S offerings occur, there is no legal prohibition against using the same offering materials in the Regulation D offering and the Regulation S offering so long as those offering materials are sufficient under each exemption, which was the case here.  Offshore Offers and Sales at *36 ("legitimate marketing efforts made in the U.S. for an offering exempt under Regulation D do not result in the loss of the Regulation S exemption for a simultaneous offshore offering").

facts are amenable to complete resolution on a paper record, . . . the motion 'should not be resolved on the basis of affidavits which evince disputed issues of fact.'" *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (citations omitted).  Where, as here (*see supra* p. 22), a party waives its right to an evidentiary hearing, "it is not entitled to have the court accept its untested representations as true if they are disputed." *Charette*, 159 F.3d at 755; *see also Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 n.2 (2d Cir. 1983).

The SEC cannot make the requisite clear showing of either a past violation or the reasonable likelihood of a future violation.  As discussed above, Defendants complied with all required exemptions from the registration requirements of the Securities Act, and the SEC cannot establish a reasonable likelihood of future violations of the securities laws because, after the launch of the TON Blockchain, Grams will not be securities and thus will not be subject to the registration requirements of the Securities Act.  (*See supra* Part II.)  In any event, because the SEC waived its right to an evidentiary hearing, even if the SEC could demonstrate material issues of disputed fact (and it cannot), any such disputed facts cannot serve as the basis for the SEC's preliminary injunction.  *See SEC v. Petrofunds, Inc.*, 414 F. Supp. 1191, 1195-96 & n.7 (S.D.N.Y. 1976) (SEC "failed to establish its 'requisite "strong prima facie case"' of a violation," in part, because defendants' competing papers created a factual dispute (citations omitted)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment and deny the SEC's application for a preliminary injunction.

Dated:   New York, New York
         January 14, 2020

Respectfully submitted,

/s/ Scott D. Musoff
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

*Attorneys for Defendants*