UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | : | |
| | : | 19 Civ. 9439 (PKC) |
| Plaintiff, | : | |
| | : | **ECF Case** |
| -against- | : | |
| | : | **Electronically Filed** |
| TELEGRAM GROUP INC. and TON ISSUER | : | |
| INC., | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT STIPULATION OF UNDISPUTED FACTS

TABLE OF CONTENTS

Page

I.   BACKGROUND ...................................................................................................................1

II.  TELEGRAM MESSENGER ................................................................................................2

III. TELEGRAM'S EMPLOYEES.............................................................................................2

IV. THE OFFERING ..................................................................................................................3

A.  Background ..........................................................................................................................3

B.  Round One of the the Offering ............................................................................................4

C.  Round Two of the Offering..................................................................................................4

V.  OFFERING MATERIALS ...................................................................................................5

A.  Teasers .................................................................................................................................5

B.  IOIs ......................................................................................................................................6

C.  Primers .................................................................................................................................6

D.  The Process Memorandum ...................................................................................................6

E.  The Purchase Agreements....................................................................................................6

F.  Risk Factors .........................................................................................................................8

VI. KYC PROCESSES ...............................................................................................................8

VII.  ADDITIONAL TELEGRAM DOCUMENTS .....................................................................10

VIII. TON BLOCKCHAIN ...........................................................................................................10

A.  Fundamentals ......................................................................................................................10

B.  Validation.............................................................................................................................10

C.  Beta Test ..............................................................................................................................11

D.  Contemplated Launch and Creation of Grams.....................................................................12

E.  Reference Price ....................................................................................................................12

IX. OTHER PERSONS...............................................................................................................15

X.  MISCELLANEOUS ............................................................................................................17

The parties hereby agree to the following undisputed facts.  By agreeing to the below facts, neither party concedes the relevance or admissibility of any of the facts contained herein, but rather expressly reserves all rights to assert that such facts are irrelevant and/or inadmissible in the above-captioned action.  The parties also reserve all rights to propose to include additional facts, or to change, modify or delete any of the facts contained herein, including in the parties' respective filings pursuant to Rule 56.1 of the Local Rules of the Southern District of New York.

## I.    BACKGROUND

1.    Defendant Telegram Group Inc. is a corporation incorporated in the British Virgin Islands as of January 16, 2018, and is wholly owned by Pavel Durov ("Pavel").

2.    Defendant TON Issuer Inc (together with Telegram Group Inc., "Telegram" or "Defendants") is a corporation incorporated in the British Virgin Islands as of January 22, 2018, and is wholly owned by Telegram Group Inc.

3.    Pavel is the Chief Executive Officer of Telegram Group Inc.

4.    Pavel holds dual citizenship in Russia and Saint Kitts and Nevis.

5.    Pavel currently resides in Dubai, United Arab Emirates.

6.    Dr. Nikolai Durov ("Nikolai," together with Pavel, the "Durovs") resides in Dubai, United Arab Emirates.

7.    Nikolai holds dual citizenship in Russia and Saint Kitts and Nevis.

8.    Nikolai is the Chief Technology Officer of Telegram Group Inc.

9.    In approximately 2006, Pavel founded VKontakte, a social media networking application based in Russia that is similar to Facebook.

10.    Pavel served as the Chief Executive Officer ("CEO") of VKontakte starting in 2006.

11.    Nikolai served as the lead developer of VKontakte starting in 2006.

12.    Nikolai has Ph.D.s from Bonn University and Saint-Petersburg State University and has won two World Championships in programming and three Gold Medals in the International Mathematical Olympiads, among other achievements.

13.    By 2011, Pavel and Nikolai had built VKontakte into the largest social media network in Russia.

14.     Before 2018, Pavel received no income from Messenger.

15.     Before 2018, Nikolai received no income from Messenger.

## II.     TELEGRAM MESSENGER

16.     In 2013, Pavel and Nikolai released to the public a messaging and telephone application called Telegram Messenger ("Messenger").

17.     Pavel funded Messenger in part with the funds received from his VKontakte exit.

18.     Messenger allows users to communicate directly with other Messenger users via chat, channels of up to 200,000 members, and groups of unlimited size.

19.     Messenger allows users to send messages, photos, videos, and files of any type.

20.     Messenger does not charge and has never charged any fees.

21.     Telegram has stated on its website that Messenger "is free and will always be free," and Telegram is "not going to sell ads or introduce subscription fees."

22.     Messenger allows users to purchase and sell products using fiat and digital currency.

23.     Prior to the Offering, Telegram's principal business was operating the Messenger application, which is a heavily used messaging application for the blockchain community.

## III.     TELEGRAM'S EMPLOYEES

24.     Ilya Perekopsky is a Telegram employee.

25.     Ilya Perekopsky's title at Telegram is Head of Business Development and VP of Strategy.

26.     Ilya Perekopsky was the Vice President and Chief Compliance Officer of VKontakte.

27.     John Hyman was a Telegram employee from at least December 1, 2017 until June 2018.

28.     John Hyman's title at Telegram was Head of International.

29.     Shyam Parekh was originally engaged as a consultant by Telegram in January 2018.

30.     Shyam Parekh was then hired as an employee by Telegram Holdings UK Limited, a UK entity established by Telegram, from January 2018 until January 2019.

31.     Since January 2019, Shyam Parekh has been engaged as a consultant by Telegraph Inc., an affiliate of Telegram.

32.     Shyam Parekh's title at Telegram is Financial Services Specialist.

33.    Marta Kudina is a Telegram employee.

34.    Marta Kudina's title at Telegram is Chief Financial Officer.

35.    Victor Ammer is a Telegram employee.

36.    Victor Ammer is the General Manager in Telegram's Dubai office.

**IV.    THE OFFERING**

　　**A.    Background**

37.    Pavel and Nikolai stated that they wished to develop a blockchain that, in their view, operated more efficiently and achieved wider adoption than the Bitcoin and Ethereum blockchains.

38.    To achieve their goal, in late 2017, Defendants began contemplating the idea of raising funds to develop the Durovs' concept for a new blockchain by selling interests in digital assets that would later come to be known as "Grams."

39.    Defendants initially contemplated engaging in a private pre-sale of interests in Grams to occur in January 2018 followed by a public sale of Grams in March 2018 with a listing of Grams on major cryptocurrency exchanges scheduled for January to March 2019.

40.    Defendants ultimately sold interests[1] in Grams (that were to be issued at the launch of the TON Blockchain, the "Network Launch Date") to a limited group of purchasers (the "Initial Purchasers") using purchase agreements (the "Purchase Agreements").

41.    Defendants engaged in two announced rounds of such sales, beginning in January and March 2018 respectively (the "Offering ").

42.    Defendants were the two entities that made the Offering.

43.    In total, Telegram sold interests in nearly 2.9 billion Grams, of which 1,051,832,728.56 were sold to United States purchasers.

44.    Telegram has stated that between January 2018 and October 2019, Telegram spent approximately $390 million of the proceeds of the Offering on developing the TON Blockchain and on Messenger itself.

---

[1] The parties have a legal dispute as to the nature of what was sold pursuant to the Purchase Agreements.  The use of the term "interests in Grams" is intended as a neutral reference and is not intended as a concession by either party as to their factual or legal arguments relating to this issue.

45.     Telegram has stated that between November 2019 and January 7, 2020, Telegram additionally spent approximately $15 million of the proceeds of the Offering developing the TON Blockchain and Telegram Messenger.

**B.      Round One of the Offering**

46.     The first round of the Offering started in January 2018 and had a stated end date of February 9, 2018 ("Round One").

47.     Round One of the Offering was over-subscribed in terms of the dollar amounts the persons and entities who submitted Indications of Interest ("IOIs") sought to invest.

48.     On February 13, 2018, after the parties had been in communication regarding the Offering, Defendants filed a Form D noticing the type of securities offered as "purchase agreements for cryptocurrency" for amounts totaling $850 million and stated that the first sale occurred on January 29, 2018.

49.     The Form D also stated that the offering included 81 initial purchasers worldwide, including in the United States.  In Round One of the Offering, Defendants raised $385.5 million from 34 initial purchasers in the United States.

50.     In Round One of the Offering, Defendants raised $464.5 million from 47 initial purchasers outside of the United States.

51.     Exhibit JX1 is a true and correct copy of the February 13, 2018 Form D.

52.     In the Form D, the Defendants claimed an exemption from the registration requirements for securities under Rule 506(c) of Regulation D and/or Regulation S of the Securities Act of 1933 (the "Securities Act").

53.     The Defendants' Form D stated that: "The issuers intend to use the proceeds for the development of the TON Blockchain, the development and maintenance of Telegram Messenger and the other purposes described in the offering materials."

**C.      Round Two of the Offering**

54.     The second round of the Offering started in February 2018 and was scheduled to end in March 2018 ("Round Two").

55.     On March 29, 2018, Defendants filed a Form D noticing the type of securities offered as "purchase agreements for cryptocurrency" for amounts totaling $850 million from 94 investors and claiming an exemption from the registration requirements under Rule 506(c) of Regulation D and/or Regulation S of the Securities Act.

56.     This included $39 million from five U.S. Initial Purchasers.

57.     Exhibit JX2 is a true and correct copy of the March 29, 2018 Form D.

58.   The Defendants' Round One and Round Two offers and sales of the "purchase agreements for cryptocurrency" to the initial purchasers were not registered with the SEC.

59.   Telegram has not filed any registration statement with the Commission regarding Grams or the Purchase Agreements.

## V.   OFFERING MATERIALS

60.   Defendants used the same materials regarding the TON Blockchain and Grams with U.S. and non-U.S. purchasers in connection with the Offering.

61.   Together, the following documents constitute the "Round One Offering Materials": Round One IOI, the Process Memorandum, including its annexes (and specifically including the Purchase Agreements for Round One), the appendices to the Purchase Agreements for Round One, the Pre-Sale Primer, the appendices to the Pre-Sale Primer, including the Technical White Paper and the Risk Factors.

62.   Together, the following documents constitute the "Round Two Offering Materials": Round Two IOI, the Purchase Agreements for Round Two, the appendices to the Purchase Agreements for Round Two, the Stage A Primer, and the appendices to the Stage A Primer, including the Technical White Paper and the Risk Factors.

63.   Together the Round One Offering Materials, the Round Two Offering Materials, and the Teasers (defined below) constitute the "Offering Materials."

64.   The Offering Materials were sent by Telegram to some potential and all actual Initial Purchasers.

65.   The Offering Materials were sent by Telegram to potential and actual Initial Purchasers through the use of email or Telegram Messenger chats.

### A.   Teasers

66.   In late 2017, Defendants distributed to some prospective and actual purchasers promotional materials regarding then-contemplated plans for the Telegram Open Network ("Teasers").

67.   One of the Teasers was a two-page document (the "Two Page Teaser").

68.   Exhibit JX3 is a true and correct copy of the Two Page Teaser.

69.   Defendants also distributed to some prospective and actual purchasers a four-page teaser (the "Four Page Teaser").

70.   Exhibit JX4 is a true and correct copy of the Four Page Teaser.

**B.     IOIs**

71.   Defendants required potential first round purchasers in the Offering to sign a document titled "Telegram – Indication of Interest" ("Round One IOI") to indicate their interest in participating in the Offering.

72.   Exhibit JX5 is a true and accurate copy of the Round One IOI.

73.   Defendants required potential purchasers in Round Two of the Offering to sign a document titled "Telegram – Indication of Interest Stage A of the Subsequent Sale" ("Round Two IOI") to indicate their interest in participating in the Offering.

74.   Exhibit JX6 is a true and accurate copy of the Round Two IOI.

**C.     Primers**

75.   Telegram created a document entitled "Primer" that it distributed to some potential and all actual purchasers in late 2017 and early 2018.

76.   Exhibit JX7 is a true and accurate copy of the Primer.

77.   Telegram created a document titled "Pre-Sale Primer," dated January 18, 2018, that it distributed to potential investors in Round One of the Offering.

78.   Telegram attached the Risk Factors as Appendix B to the "Pre-Sale Primer."

79.   Exhibit JX8 is a true and correct copy of the Pre-Sale Primer dated January 18, 2018.

80.   Telegram created a document titled "Stage A Primer," that it distributed to potential investors in Round Two of the Offering.

81.   Exhibit JX9 is a true and correct copy of the Stage A Primer, dated February 21, 2018.

**D.     The Process Memorandum**

82.   Telegram distributed a Process Memorandum for entering into a Purchase Agreement for Grams (the "Process Memorandum") to certain potential purchasers that completed the Round One IOI.

83.   The Process Memorandum was dated January 18, 2018, and contained two annexes: a KYC Form as Annex A and a Purchase Agreement as Annex B.

84.   Exhibit JX10 is a true and accurate copy of the Process Memorandum distributed in connection with Round One.

**E.     The Purchase Agreements**

85.   Exhibit JX11 is a true and correct copy of the Purchase Agreement for Round One.

86.    Exhibit JX12 is a true and correct copy of the Purchase Agreement for Round Two.

87.    The Purchase Agreement for Round One defined the Purchase Price as "USD 0.37756101 per Token."

88.    The Purchase Agreements for Round One of the Offering included a "Lock-Up" clause which stated that initial purchasers in Round One could not:

     (a)    offer, pledge, sell, . . . or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement or any Tokens . . .; or

     (b)    enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement or any Tokens,

. . . provided, however, that:

     (i)    one-quarter of the Token Allocation shall be released from the restrictions in this clause 10 on the date that is three months following the Network Launch Date;

     (ii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraph (i) above, equals one-half of the Token Allocation) shall be released from the restrictions in this clause 10 on the date that is six months following the Network Launch Date; and

     (iii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraphs (i) and (ii) above, equals three-quarters of the Token Allocation) shall be released from the restriction in this clause 10 on the date that is 12 months following the Network Launch Date.

89.    The Purchase Agreement for Round One contained a Schedule 2 entitled "Purchaser's Warranties" as well as a number of "rep letters" attached as appendices.

90.    Also attached to the Round One Purchase Agreements as Appendix A was a Technical White Paper entitled "Telegram Open Network" dated January 18, 2018, the "Technical White Paper)" authored by Nikolai Durov.

91.    Exhibit JX13 is a true and accurate copy of the Technical White Paper.

92.    Telegram distributed Purchase Agreements to certain potential purchasers that completed the Round Two IOI (the "Round Two Purchase Agreements").

93.    The Round Two Purchase Agreements did not contain the Lock-Up that was included in the Round One Purchase Agreements.

94.    The Round Two Purchase Agreements defined the "Purchase Price" as "USD 1.33003701 per Token."

95.    Attached to the Round Two Purchase Agreements as Appendix A was a technical white paper, which was identical to the Technical White Paper attached to the Round One Purchase Agreements.

96.    The Round One Purchase Agreements prohibited initial purchasers from offering the Purchase Agreements or any Grams to others and from publicly disclosing the intention to make any such offers.

97.    The Round Two Purchase Agreements required the Round Two initial purchasers not to disclose the information provided by the Defendants to any third parties absent prior written consent of the Defendants.

98.    Despite these restrictions by Telegram, the Offering Materials have become public.

99.    Certain Offering Materials, including the Technical White Paper, the various Primers and the Purchase Agreements, were placed on the Internet and are accessible to the public at large.

## F.    Risk Factors

100.   Attached to the Pre-Sale Primer as Appendix B was a list of risk factors titled "Certain Risks Associated with the Purchase, Sale and Use of Grams" (the "Round One Risk Factors").

101.   Exhibit JX14 is a true and accurate copy of the Round One Risk Factors.

102.   Attached to the Stage A Primer as Appendix B was a list of risk factors titled "Certain Risks Associated with the Purchase, Sale and Use of Grams" (the "Round Two Risk Factors").

103.   Exhibit JX15 is a true and accurate copy of the Round Two Risk Factors.

104.   The Round Two Risk Factors were substantially similar to the Round One Risk Factors, with limited changes.

## VI.   KYC PROCESSES

105.   Defendants undertook know-your-customer ("KYC") processes with respect to the initial purchasers.

106.   Defendants distributed KYC Forms that requested various information from all purchasers.

107.   Exhibits JX16 and JX17 are true and accurate copies of the KYC Forms distributed together with the Round One and Round Two Purchase Agreements, respectively.

108.   Defendants engaged Lawson Conner Services Ltd. ("Lawson Conner"), a UK-based provider of regulatory infrastructure and managed compliance services and software to review the KYC Forms submitted for all the initial purchasers.  After Lawson Conner conducted its KYC process, Defendants engaged Credit Suisse to conduct its own KYC process on the KYC Forms.

109.   Defendants also distributed "rep letters" to potential purchasers ("Rep Letters") as attachments to the Purchase Agreements.

110.   The Rep Letters were prepared by U.S. or applicable local counsel and were required to be completed by each purchaser in respect of each jurisdiction: (a) in which the purchaser resided (if the purchaser was a natural person), (b) in which the purchaser was formed (if the purchaser was an entity), (c) in which the purchaser or its representative(s) received the offer to enter into the Purchase Agreement, and (d) in which the purchaser or its representative(s) would place its buy order.

111.   The Rep Letters covered numerous jurisdictions and required the purchaser to represent as to the purchaser's eligibility to participate in the Offering pursuant to applicable local law.

112.   Certain of the Rep Letters required additional supporting documentation where such supporting documentation was required under applicable law.

113.   Natural persons who submitted Rep Letters for the U.S. were also required to submit a letter from a specific third party verifying their status as an "accredited investor" (as defined in the rules and regulations under the Securities Act).

114.   If the purchaser was an entity, the purchaser was required to indicate whether the purchaser (a) was formed for the purpose of entering into the Purchase Agreement or (b) solicited purchasers to participate in the purchase directly or indirectly through an entity or otherwise.

115.   If the purchaser answered affirmatively to either question above, the purchaser was required to complete and deliver to Defendants a Rep Letter for each person that held an equity or similar interest in the purchaser.

116.   The Purchase Agreement provided that it "will automatically terminate upon the earlier of:  (a) the Issuance; (b) the occurrence of a Dissolution Event prior to the Deadline Date (as defined below); and (c) 31 October 2019 (the "Deadline Date"), if the Network Launch has not occurred as of such date."

117.   Effective October 23, 2019, Round One and Round Two initial purchasers holding a majority of Grams consented to amend the Purchase Agreements to extend the Deadline Date (as defined in the Purchase Agreements) from October 31, 2019, to April 30, 2020.

## VII.   ADDITIONAL TELEGRAM DOCUMENTS

118.   Defendants distributed to various prospective and actual purchasers other versions of the Telegram Open Network Technical White Paper ("White Papers"), which included the following White Papers:

- the White Paper titled "Telegram Open Network," dated December 3, 2017;

- the White Paper titled "Telegram Open Network Blockchain," dated September 5, 2018;

- the White Paper titled "TON Development Status," dated September 5, 2018;

- the White Paper titled "Telegram Open Network Virtual Machine," dated September 5, 2018;

- the White Paper titled "TON Development Status," dated January 28, 2019;

- the White Paper titled "Telegram Open Network," dated March 2, 2019;

- the White Paper titled "Telegram Open Network Virtual Machine," dated September 6, 2019;

- the White Paper titled "TON Blockchain Validation," dated October 2, 2019;

- the White Paper titled "Telegram Open Network Blockchain," dated October 3, 2019;

- the White Paper titled "Fift: A Brief Introduction," dated October 5, 2019; and

- the White Paper titled "Telegram Open Network Virtual Machine," dated December 12, 2019.

119.   Exhibits JX18 through JX28 are true and correct copies of the various White Papers, which were all authored by Nikolai Durov.

120.   Defendants published the March 2, 2019 "Telegram Open Network" White Paper online. It is publicly available at: https://test.ton.org/.

## VIII.   TON BLOCKCHAIN

### A.   Fundamentals

121.   The TON Blockchain has not launched yet and may never launch.

### B.   Validation

122.   Telegram selected a "proof-of-stake" consensus mechanism for the TON Blockchain.

123. Validators for the proposed TON Blockchain will be required to validate proposed blocks, perform computations for smart contracts, and digitally sign valid blocks.

124. Telegram has stated its intention for the TON Blockchain to be decentralized, such that it will allow validators to aggregate stakes to foster decentralization by promoting involvement by a broader group of stakeholders.

125. At launch, Gram holders who wish to be validators must "stake" a minimum of 100,000 Grams. Following launch, that minimum number is a configurable parameter that can be changed by vote of the validators.

126. Once every validation period, any Gram holder or group of Gram holders seeking to be a validator for the next validation period can stake the minimum number of Grams required to be eligible for selection as a validator for the next period. The TON Blockchain will automatically and randomly select a predetermined number of validators from amongst those stakeholders for that period.

127. Validators who correctly validate a block will automatically be rewarded with newly minted, system-generated Grams.

128. If validators incorrectly validate a block, they will automatically lose part of their stake and will be temporarily suspended from acting as a validator.

129. Based on these validation efforts, Telegram expects that the supply of Grams will increase by approximately 2% annually as newly minted Grams are automatically generated and paid to validators.

**C.    Beta Test**

130. Prior to the launch of the production version of the TON Blockchain, Telegram made publicly available a test version of the TON Blockchain (the "Beta Test Version").

131. Telegram began rolling out the Beta Test Version in March 2019 and gradually added information over time until early September 2019.

132. Telegram completed rolling out of the Beta Test Version in early September 2019.

133. The Beta Test Version enables third-party developers to view the TON Blockchain's open-source code and to develop and test certain applications and interfaces that may be offered when the production version of the TON Blockchain launches.

134. The Beta Test Version is currently publicly available at the following domain: https://test.ton.org/download.html.

135. The website includes open source code and step-by-step instructions regarding how to create and test applications and smart contracts on the TON Blockchain.

11

136.   Anyone in the world can access the code and follow the instructions to build and test smart contracts and applications for the TON Blockchain, as well as learn about the process to become a TON validator.

137.   Telegram's current intention is to continue the Beta Test Version until the launch date.

### D.   Contemplated Launch and Creation of Grams

138.   Telegram contemplated that the initial supply of Grams would be set at 5 billion.

139.   From at least the initiation of the Offering, Defendants have hoped that, after launch, Grams will achieve a wide user base, beyond the initial purchasers in the Offering.

140.   Telegram informed the initial purchasers that it hoped to integrate the TON Wallet into Telegram Messenger in part to encourage a wide adoption of Grams after launch.

141.   Grams must be widely adopted if they are to achieve Telegram's stated goal that they become a "truly mass-market cryptocurrency."

142.   Telegram anticipates that, after launch, the wide adoption of Grams by the marketplace may be accomplished in part by the sale of Grams by some of the initial purchasers to the public.

### E.   Reference Price

143.   The "Reference Price" of Grams that Defendants expect at the launch of the TON Blockchain is $3.62475487 according to a formula set forth in Appendix A to the Technical White Paper (the "Reference Price formula").

144.   The "Reference Price" of a Gram at the beginning of each round of the Offering was computed as: $0.1 * e^{n*10^{-9}}$, where $n$ denotes the total number of Grams subscribed for prior to that stage.

145.   The price of Grams subscribed for in each round of the Offering was calculated as: (Total $ Value Raised) / (Total Number of Grams Subscribed For).

146.   The "Total Number of Grams Subscribed For" was calculated as $(10^9) * I_n(1 + (\text{Total } \$ \text{ Value Raised})/((10^9) * P_n))$, where $P_n$ denotes the Reference Price of a Gram.

147.   Defendants informed some potential and all actual investors that they intended to establish an entity called the TON Foundation, which, if established, will be a not-for-profit organization.

148.   Defendants informed some potential and all actual investors that they may never establish the TON Foundation.

149.   Defendants have not yet determined the details of the TON Foundation and have communicated to the public on January 6, 2020, that the TON Foundation will not be

established at the launch of the TON Blockchain and may never be established in the future.

150. If the TON Foundation is established, Telegram currently intends to make an initial capital contribution to the TON Foundation of $5 million.

151. If the TON Foundation is established, the TON Foundation's mission will be to promote and support the TON Blockchain.

152. If the TON Foundation is established, as currently contemplated, the TON Foundation would have the ability to sell Grams under certain circumstances through the TON Reserve.

153. If the TON Foundation is established, as currently contemplated, the TON Foundation will be directed by a board of directors called the TON Foundation Board.

154. If the TON Foundation is established, Telegram currently intends that the TON Foundation Board will be made up of five initial members: (1) Pavel Durov, (2) Nikolai Durov; and (3) three independent directors with no connection to Telegram or its affiliates with experience in blockchain technology and/or TON.

155. If the TON Foundation is established, as currently contemplated, the "TON Foundation" will manage the "TON Reserve" and the incentives pool.

156. As currently contemplated, the "TON Reserve" is the supply of Grams reserved for sale by the TON Foundation.

157. As currently contemplated, the "Incentives Pool" is the supply of Grams reserved for incentive payments to be made to promote the consumptive use of Grams.

158. As currently contemplated, Defendants will allocate 4% of the initial supply of Grams to a "developer pool" of Telegram's employees at the launch of the TON Blockchain.

159. Pavel and Nikolai Durov are currently anticipated to each receive 1% — or 50,000,000 — of the initial 5 billion Grams from the developer pool at the launch of the TON Blockchain.

160. Though no final determination has been made, Telegram has previously stated that the developer pool would have a four-year lock-up period restricting the sale of Grams by developer pool recipients.

161. Telegram informed the public on January 6, 2020 that Pavel Durov, Nikolai Durov, and all Telegram employees may, but are not committed to, holding any Grams following the launch of the TON Blockchain.  Telegram has informed the public on January 6, 2020 that, to the extent Pavel Durov, Nikolai Durov or any Telegram employee holds any Grams following launch of the TON Blockchain, they will not be allowed to take part in any voting or validating activities on the TON Blockchain.

162. As currently contemplated, after the TON Blockchain launches, Defendants may allocate 28% of the initial supply of Grams to the TON Foundation, if it is established.

163. As currently contemplated, after the TON Blockchain launches, Defendants will allocate 10% of the initial supply of Grams to the "Incentives Pool," to be given out or distributed in small amounts to Gram users to promote the consumptive use of Grams. Defendants intend to distribute these Grams to Messenger users upon their distribution of Grams to initial purchasers upon or shortly following the launch of the TON Blockchain.

164. Telegram told some potential and all actual purchasers that the TON Foundation, could, in its discretion, buy and sell Grams after launch at prices dictated by the Reference Price formula.

165. Defendants told potential and actual purchasers that the TON Foundation's discretionary purchase or sale of Grams was intended to limit fluctuations in the price of Grams.

166. Telegram told some potential and all actual purchasers in the Offering Materials that the TON Foundation could, in its discretion, sell Grams allocated to or owned by it after launch at a price not less than the Reference Price of Grams as derived from the Reference Price formula if the market price of Grams rose above the Reference Price at the time of such sales.

167. Telegram told some potential and all actual purchasers in the Offering Materials that the TON Foundation could, in its discretion, buy Grams allocated to or owned by it after launch at a price not less than half the Reference Price of Grams as derived from the Reference Price formula if the market price of Grams dropped below half the Reference Price at the time of such sales.

168. After the Offering was completed, and after consultation with the SEC, Defendants determined not to allow the TON Foundation to purchase Grams.

169. As currently contemplated by Defendants, upon their launch, the Grams will not have any restrictive legends regarding transfer or resale of the Grams by the Initial Purchasers or any subsequent holders of the Grams to the public and will not be restricted from being transferred in any amounts, other than as provided by the lock-up agreements in the Round One Purchase Agreements.

170. Following the launch of the TON Blockchain, the free market price of Grams will be subject to market forces of supply and demand.

171. The Reference Price of Grams does not dictate the free market price of Grams following the launch of the TON Blockchain.

172. Telegram may develop TON Blockchain applications after the launch of the TON Blockchain. However, Telegram issued a statement to the public on January 6, 2020 that it is under no obligation or commitment to develop any applications after launch of the TON Blockchain. The Offering Materials do not explicitly require Telegram to establish the TON Foundation or transfer any money or Grams to it.

173. The Offering Materials do not explicitly obligate Telegram to distribute any Grams to Messenger users at any time.

174. If the TON Foundation is established, as currently contemplated, the TON Foundation is expected to publish guidance and research results regarding the TON Blockchain's development and policy.

175. FinCEN has stated that it considers TON Issuer Inc to be a Money Services Business subject to the Bank Secrecy Act in relation to the issuance of Grams.

176. As a result, TON Issuer Inc registered with FinCEN as a Money Services Business in the U.S. on August 30, 2019.

## IX.   OTHER PERSONS

177. TON Ventures L.P., TON Ventures Ltd, and TON Venture Studio Ltd. ("TON Ventures") are three British Virgin Islands entities formed in October 2018.

178. On April 5, 2019, Pavel signed, on behalf of TON Issuer Inc, a non-exclusive, non-transferable, royalty-free licensing agreement with TON Ventures that permitted TON Ventures to use the "TON" licensed mark solely for the purpose of making portfolio investments in projects connected with the TON Blockchain, and any marketing and business materials, subject to the terms and conditions set forth in the agreement.

179. Defendants believe that Alexander Filatov is the CEO and co-owner of TON Labs.

180. According to its website, http://tonlabs.io, TON Labs is "focused on developing core infrastructure and open source ecosystem for TON (Telegram Open Network)."

181. According to publicly available documents, TON Labs provides an "end-to-end solution for investors in the Telegram Open Network to receive, store, trade and benefit from their Grams."

182. Defendants are not corporate affiliates of TON Labs, nor is TON Labs a corporate affiliate of Defendants.

183. Defendants believe that Oleg Seydak is the founder and CEO of Gram Vault.

184. Defendants believe that Alexander Filatov is one of the co-founders of Gram Vault.

185. Based on certain documents obtained from third parties, it appears that John Hyman began working at Gram Vault at some point after he ceased employment with Telegram and deposited over $700,000 into Gram Vault's bank accounts.

186. Blackmoon Financial Group is a financial technology company.

187. Blackmoon Crypto is a digital asset platform affiliated with Blackmoon Financial Group.

188.    Blackmoon Crypto is a Malta registered entity.

189.    In September 2019, Blackmoon Crypto announced that it would be the first exchange to list Grams for public trading.

190.    In September 2019, Blackmoon Crypto announced that it partnered with Gram Vault.

191.    Ilya Perekopsky, a Telegram employee, purchased interests in $3.72 million Grams in Round One of the Offering.

192.    Ilya Perekopsky is one of the co-founders of Blackmoon Financial Group.

193.    Ilya Perekopsky is a shareholder of Blackmoon Financial Group.

194.    Oleg Seydak indirectly holds beneficial interests in Blackmoon Financial Group, with the remainder owned by minority shareholders.

195.    Prior to joining Telegram in late 2017, Ilya Perekopsky worked as a shareholder advisor to Blackmoon Financial Group, and he is still a shareholder today.

196.    Defendants believe that Oleg Seydak is the CEO of Blackmoon Financial Group and Blackmoon Crypto and that Sergey Vasin is his deputy.

197.    Defendants believe that Moshe Joshua is Blackmoon Crypto's Chief Product Officer.

198.    Oleg Seydak and Moshe Joshua assisted Telegram in identifying potential investors in the Offering.

199.    Oleg Seydak is not, and has never been, an employee of Defendants.

200.    Moshe Joshua is not, and has never been, an employee of Defendants.

201.    Defendants believe that Sergey Vasin is the Chief Operating Officer of Blackmoon Financial.

202.    Sergey Vasin is not, and has never been, an employee of Defendants.

203.    Defendants are not corporate affiliates of Blackmoon Financial Group or Blackmoon Crypto, nor are those entities corporate affiliates of Defendants.

204.    In September 2019, it was reported that Blackmoon Crypto "is eyeing to be one of the first class companies to list Telegram's upcoming Gram token through a collaboration with Swiss crypto custodian Gram Vault."

205.    Attached as Exhibit JX29 is a true and correct copy of this announcement, which can be found at: https://tokenpost.com/Underdog-crypto-exchange-Blackmoon-says-it-will-be-the-first-to-sell-Telegrams-native-token-3373.

16

206.   Coinbase, Binance, OKEx, Liquid and Huobi are digital asset trading platforms that approached Telegram about listing Grams on their platforms and making them available for sales and purchases by users of those platforms.

207.   Defendants have become aware, from time to time, of facts suggesting that some initial purchasers may have sought to sell their interests in Grams prior to issuance of the Grams to them and in violation of the Purchase Agreements.

208.   Defendants were aware by some time in 2019 that an entity named Gram Asia purported to offer to sell Grams or interests in Grams prior to launch of the TON Blockchain using the digital asset platform Liquid.

209.   Defendants are not corporate affiliates of Gram Asia or Liquid nor are those entities corporate affiliates of Defendants.

## X.   MISCELLANEOUS

210.   Since October 31, 2019 through the present, Defendants have continued to undertake efforts to develop certain features that could be used in connection with the TON Blockchain.

211.   Defendants have not made any final determinations regarding the TON Foundation, but currently contemplate that the TON Foundation will determine whether to sell Grams by comparing the Reference Price and current free market price of Grams.

212.   Defendants have not made any final determinations regarding the TON Foundation, but currently contemplate that the TON Foundation will be responsible for determining which exchanges are utilized for this purpose and how such price determination is being made, and currently contemplate that the TON Foundation will make this information publicly available.

213.   It is not currently known whether, at launch, Grams will be accepted as legal tender in any jurisdiction.

214.   Defendants have not contacted any persons or entities to request that they act as validators on the TON Blockchain upon its launch.

Dated:  New York, NY
       January 15, 2020


SECURITIES AND EXCHANGE               SKADDEN, ARPS, SLATE,
COMMISSION                             MEAGHER & FLOM LLP


By:    /s/ Jorge G. Tenreiro          By:    /s/ Scott D. Musoff
       Jorge G. Tenreiro                     Scott D. Musoff

200 Vesey Street, Suite 400           George A. Zimmerman
New York, NY  10281                   Scott D. Musoff
(212) 336-9145 (Tenreiro)             Christopher P. Malloy
                                      Alexander C. Drylewski
*Attorneys for Plaintiff Securities and*   Four Times Square
*Exchange Commission*                 New York, N.Y.  10036
                                      (212) 735-3000

                                      *Attorneys for Defendants*

18