# Exhibit JX11

**Annex B**
**Purchase Agreement**

See attached.

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000014

**PRIVATE & CONFIDENTIAL**

**NOTICE TO RESIDENTS OF THE UNITED STATES**

THE OFFER AND SALE OF THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**U.S. SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF ANY U.S. STATES.  THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT OR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

**NOTICE TO RESIDENTS OF NEW YORK STATE**

THIS SECURITY IS NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF, OR ANY PERSON LOCATED OR DOMICILED IN, THE STATE OF NEW YORK OR ANY ENTITY, INCLUDING, WITHOUT LIMITATION, ANY CORPORATION OR PARTNERSHIP CREATED OR ORGANISED IN OR UNDER THE LAWS OF THE STATE OF NEW YORK ("**NEW YORK PERSON**"). THE ISSUER IS NOT SOLICITING PURCHASES BY NEW YORK PERSONS IN ANY WAY.

**NOTICE TO RESIDENTS OF THE EUROPEAN ECONOMIC AREA ("EEA")**

IN RELATION TO EACH MEMBER STATE OF THE EEA, NO OFFER OF SECURITIES MAY BE MADE TO THE PUBLIC IN THAT MEMBER STATE EXCEPT: (A) TO ANY LEGAL ENTITY WHICH IS A QUALIFIED INVESTOR AS DEFINED IN THE PROSPECTUS DIRECTIVE; (B) TO FEWER THAN 150 NATURAL OR LEGAL PERSONS (OTHER THAN QUALIFIED INVESTORS AS DEFINED IN THE PROSPECTUS DIRECTIVE) AS PERMITTED UNDER THE PROSPECTUS DIRECTIVE; OR (C)  UNDER ANY OTHER CIRCUMSTANCES FALLING WITHIN ARTICLE 3(2) OF THE PROSPECTUS DIRECTIVE, PROVIDED THAT NO SUCH OFFER OF SECURITIES WILL REQUIRE THE ISSUER TO PUBLISH A PROSPECTUS PURSUANT TO ARTICLE 3 OF THE PROSPECTUS DIRECTIVE, OR SUPPLEMENT A PROSPECTUS PURSUANT TO ARTICLE 16 OF THE PROSPECTUS DIRECTIVE.

THIS SECURITY IS NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA. FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU ("**MIFID II**"); OR (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2002/92/EC, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN THE PROSPECTUS DIRECTIVE. CONSEQUENTLY NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "**PRIIPS REGULATION**") FOR OFFERING OR SELLING THIS SECURITY OR OTHERWISE MAKING IT AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THIS SECURITY OR OTHERWISE MAKING IT AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION. IT IS A CONDITION OF YOU RECEIVING AND RETAINING THIS DOCUMENT THAT YOU WARRANT THAT YOU ARE A QUALIFIED INVESTOR.

FOR THE PURPOSES OF THIS NOTICE, THE EXPRESSION AN "OFFER TO THE PUBLIC" IN RELATION TO ANY SECURITIES IN ANY MEMBER STATE MEANS THE COMMUNICATION

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                                         TG-001-00000015

**PRIVATE & CONFIDENTIAL**

IN ANY FORM AND BY ANY MEANS OF SUFFICIENT INFORMATION ON THE TERMS OF THE OFFER AND THE SECURITY BEING OFFERED SO AS TO ENABLE AN INVESTOR TO DECIDE TO PURCHASE THE SECURITY, AS THE SAME MAY BE VARIED IN THAT MEMBER STATE BY ANY MEASURE IMPLEMENTING THE PROSPECTUS DIRECTIVE IN THAT MEMBER STATE. THE EXPRESSION "**PROSPECTUS DIRECTIVE**" MEANS DIRECTIVE 2003/71/EC (AS AMENDED, INCLUDING BY DIRECTIVE 2010/73/EU), AND INCLUDES ANY RELEVANT IMPLEMENTING MEASURE IN ANY MEMBER STATE.

**NOTICE TO RESIDENTS OF THE UNITED KINGDOM**

IN THE UNITED KINGDOM, THIS DOCUMENT IS BEING DISTRIBUTED ONLY TO, AND IS DIRECTED ONLY AT (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) QUALIFIED INVESTORS (WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE), AND WHO HAVE PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005, AS AMENDED (THE "**FPO**") OR WHO FALL WITHIN ARTICLE 49(2) OF THE FPO (ALL SUCH PERSONS BEING REFERRED TO AS "**RELEVANT PERSONS**"). THIS DOCUMENT HAS NOT BEEN APPROVED BY AN AUTHORISED PERSON. ANY INVESTMENT TO WHICH THIS DOCUMENT RELATES IS AVAILABLE ONLY TO (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) RELEVANT PERSONS. THIS DOCUMENT IS DIRECTED ONLY AT RELEVANT PERSONS AND PERSONS WHO ARE NOT RELEVANT PERSONS SHOULD NOT TAKE ANY ACTION BASED UPON THIS DOCUMENT AND SHOULD NOT RELY ON IT. IT IS A CONDITION OF YOU RECEIVING AND RETAINING THIS DOCUMENT THAT YOU WARRANT THAT YOU ARE A RELEVANT PERSON.

**NOTICE TO RESIDENTS OF FRANCE**

THIS DOCUMENT HAS NOT BEEN PREPARED, AND IS NOT DISTRIBUTED, IN THE CONTEXT OF A PUBLIC OFFERING OF FINANCIAL SECURITIES IN FRANCE WITHIN THE MEANING OF ARTICLE L. 411-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER. CONSEQUENTLY, NO FINANCIAL SECURITIES HAVE BEEN OFFERED OR SOLD OR WILL BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, TO THE PUBLIC IN FRANCE, AND ANY OFFERING MATERIAL MAY NOT BE, AND WILL NOT BE, DISTRIBUTED OR CAUSED TO BE DISTRIBUTED TO THE PUBLIC IN FRANCE OR USED IN CONNECTION WITH ANY OFFER TO THE PUBLIC IN FRANCE.

OFFERS, SALES AND DISTRIBUTIONS OF SECURITIES WILL BE MADE ONLY TO QUALIFIED INVESTORS (*INVESTISSEURS QUALIFIÉS*) ACTING FOR THEIR OWN ACCOUNT, ALL AS DEFINED IN, AND IN ACCORDANCE WITH, ARTICLES L. 411-2, D. 411-1, D. 744-1 D. 754-1, AND D. 764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER AND APPLICABLE REGULATIONS THEREUNDER.

PROSPECTIVE INVESTORS ARE INFORMED THAT (I) NO PROSPECTUS HAS BEEN AND WILL BE SUBMITTED TO THE CLEARANCE OF THE FRENCH FINANCIAL MARKET AUTHORITY ("AMF"), (II) IN COMPLIANCE WITH ARTICLES L. 411-1, D. 411-1, D. 744-1, D. 754-1, AND D. 764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER, ANY QUALIFIED INVESTOR SHOULD BE ACTING FOR ITS OWN ACCOUNT, AND (III) THE DIRECT OR INDIRECT DISTRIBUTION OR SALE TO THE PUBLIC OF SECURITIES MAY ONLY BE MADE IN COMPLIANCE WITH ARTICLES L. 411-1, L. 411-2, L. 412-1, AND L. 621-8 THROUGH L. 621-8-3 OF THE FRENCH CODE *MONÉTAIRE ET FINANCIER*.

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000016

**NOTICE TO RESIDENTS OF GERMANY**

IN THE FEDERAL REPUBLIC OF GERMANY THIS DOCUMENT IS DISTRIBUTED ONLY TO, AND IS DIRECTED ONLY AT, QUALIFIED INVESTORS WITHIN THE MEANING OF THE PROSPECTUS DIRECTIVE, THAT PROFESSIONALLY OR COMMERCIALLY PURCHASE OR SELL SECURITIES OR INVESTMENT PRODUCTS (*VERMÖGENSANLAGEN*) WITHIN THE MEANING OF THE GERMAN INVESTMENT PRODUCT ACT (*VERMÖGENSANLAGENGESETZ*) FOR THEIR OWN ACCOUNT OR FOR THE ACCOUNT OF OTHERS. NO SECURITIES PROSPECTUS (*WERTPAPIERPROSPEKT*) OR INVESTMENT PRODUCT PROSPECTUS (*VERMÖGENSANLAGENVERKAUFSPROSPEKT*) HAS BEEN OR WILL BE FILED WITH THE GERMAN FEDERAL FINANCIAL SUPERVISORY AUTHORITY (BAFIN) OR OTHERWISE PUBLISHED IN THE FEDERAL REPUBLIC OF GERMANY. NO PUBLIC OFFER OR DISTRIBUTION OF COPIES OF ANY DOCUMENT RELATING TO THE TON NETWORK OR THE TOKENS INCLUDING THIS DOCUMENT, WILL BE MADE IN THE FEDERAL REPUBLIC OF GERMANY EXCEPT WHERE AN EXPRESS EXEMPTION FROM COMPLIANCE WITH THE PUBLIC OFFER RESTRICTIONS UNDER THE GERMAN SECURITIES PROSPECTUS ACT AND THE INVESTMENT PRODUCT ACT APPLIES.

**NOTICE TO RESIDENTS OF SWITZERLAND**

THIS DOCUMENT (AND ANY OTHER OFFERING OR MARKETING MATERIAL WITH RESPECT TO THE INVESTMENT ACTIVITY TO WHICH THIS DOCUMENT RELATES) MAY BE DISTRIBUTED OR MADE AVAILABLE IN, INTO OR FROM SWITZERLAND ONLY TO QUALIFIED INVESTORS WITHIN THE MEANING OF THE SWISS COLLECTIVE INVESTMENT SCHEMES ACT ("**CISA**"), ITS IMPLEMENTING ORDINANCE AND REGULATORY GUIDANCE (EACH SUCH PERSON A "**QUALIFIED INVESTOR**"). THIS DOCUMENT (NOR ANY OTHER OFFERING OR MARKETING MATERIAL WITH RESPECT TO THE INVESTMENT ACTIVITY TO WHICH THIS DOCUMENT RELATES) HAS NOT BEEN AND WILL NOT BE FILED WITH, OR APPROVED BY, ANY SWISS REGULATORY AUTHORITY. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SUBSCRIBE FOR, BUY OR OTHERWISE ACQUIRE ANY TOKENS AND IT DOES NOT CONSTITUTE A PROSPECTUS PURSUANT TO THE CISA, THE SWISS CODE OF OBLIGATIONS OR THE LISTING RULES OF ANY TRADING VENUE IN SWITZERLAND. ANY INVESTMENT TO WHICH THIS DOCUMENT RELATES IS AVAILABLE ONLY TO (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) QUALIFIED INVESTORS.

**NOTICE TO RESIDENTS OF HONG KONG**

THE CONTENTS OF THIS DOCUMENT HAVE NOT BEEN REVIEWED OR APPROVED BY ANY REGULATORY AUTHORITY IN HONG KONG. YOU ARE ADVISED TO EXERCISE CAUTION IN RELATION TO THIS OFFER. IF YOU ARE IN ANY DOUBT ABOUT ANY OF THE CONTENTS OF THIS DOCUMENT, YOU SHOULD OBTAIN INDEPENDENT PROFESSIONAL ADVICE.

THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR INVITATION TO THE PUBLIC IN HONG KONG TO ACQUIRE THE TOKENS BEING OFFERED HEREIN. ACCORDINGLY, UNLESS PERMITTED BY THE LAWS OF HONG KONG, NO PERSON MAY ISSUE OR HAVE IN ITS POSSESSION FOR THE PURPOSES OF ISSUE, THIS DOCUMENT RELATING TO THE TOKENS BEING OFFERED, WHETHER IN HONG KONG OR ELSEWHERE, WHICH IS DIRECTED AT, OR THE CONTENTS OF WHICH ARE LIKELY TO BE ACCESSED OR READ BY, THE PUBLIC IN HONG KONG OTHER THAN IN CIRCUMSTANCES WHICH DO NOT RESULT IN THIS DOCUMENT CONSTITUTING A "PROSPECTUS" AS DEFINED IN THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE OF HONG KONG (CAP. 32

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                    TG-001-00000017

**PRIVATE & CONFIDENTIAL**

OF THE LAWS OF HONG KONG) (THE "**C(WUMP)O**") OR WHICH DO NOT CONSTITUTE AN OFFER OR AN INVITATION TO THE PUBLIC FOR THE PURPOSES OF THE SECURITIES AND FUTURES ORDINANCE (CAP. 571 OF THE LAWS OF HONG KONG) OR THE C(WUMP)O. THE OFFER OF THE TOKENS IS PERSONAL TO THE PERSON TO WHOM THIS DOCUMENT HAS BEEN DELIVERED, AND THE TOKENS WILL ONLY BE ACCEPTED BY SUCH PERSON. NO PERSON TO WHOM A COPY OF THIS DOCUMENT IS ISSUED MAY ISSUE, CIRCULATE OR DISTRIBUTE THIS DOCUMENT IN HONG KONG OR MAKE OR GIVE A COPY OF THIS DOCUMENT TO ANY OTHER PERSON.

**NOTICE TO RESIDENTS OF SOUTH KOREA**

THIS AGREEMENT IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, AN OFFERING OF SECURITIES IN SOUTH KOREA UNDER THE FINANCIAL INVESTMENT SERVICES AND CAPITAL MARKETS ACT OF SOUTH KOREA (THE "**FISCMA**"). FOR THE PURPOSE OF THIS NOTICE, THE EXPRESSION "OFFERING" IN RELATION TO ANY SECURITIES UNDER FISCMA MEANS THE INVITATION OF SUBSCRIPTION FOR NEWLY ISSUED SECURITIES TO MORE THAN 50 RETAIL INVESTORS.

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE FISCMA, AND THIS SECURITY MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED, DIRECTLY OR INDIRECTLY, OR OFFERED OR SOLD TO ANY PERSON FOR RE-OFFERING OR RE-SALE, DIRECTLY OR INDIRECTLY, IN SOUTH KOREA OR TO ANY RESIDENT OF SOUTH KOREA.

**NOTICE TO RESIDENTS OF AUSTRALIA**

THIS DOCUMENT IS NOT A "PRODUCT DISCLOSURE STATEMENT" OR "DISCLOSURE DOCUMENT" FOR THE PURPOSES OF THE AUSTRALIAN CORPORATIONS ACT 2001 (CTH) ("**CORPORATIONS ACT**") AND IS NOT REQUIRED TO BE LODGED WITH THE AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION ("**ASIC**"). THIS OFFER IS MADE IN CIRCUMSTANCES THAT WOULD NOT REQUIRE DISCLOSURE UNDER CHAPTER 6D OR CHAPTER 7 OF THE CORPORATIONS ACT. THIS DOCUMENT IS NOT REQUIRED TO, AND DOES NOT, CONTAIN ALL THE INFORMATION WHICH WOULD BE REQUIRED IN A DISCLOSURE DOCUMENT OR PRODUCT DISCLOSURE STATEMENT, OR ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE OR SHOULD OBTAIN IN ORDER TO MAKE AN INFORMED INVESTMENT DECISION. BY ACCEPTING RECEIPT OF THIS DOCUMENT, YOU REPRESENT AND WARRANT THAT YOU ARE A "SOPHISTICATED INVESTOR" AS DEFINED UNDER SECTION 708(8) OF THE CORPORATIONS ACT OR A "PROFESSIONAL INVESTOR" UNDER SECTION 708(11) OF THE CORPORATIONS ACT AND A "WHOLESALE CLIENT" UNDER SECTION 761G OF THE CORPORATIONS ACT. THE ISSUER OF THIS DOCUMENT IS NOT REGISTERED AS A MANAGED INVESTMENT SCHEME UNDER THE CORPORATIONS ACT. ANY PERSON TO WHOM THIS DOCUMENT IS ISSUED MUST NOT, WITHIN 12 MONTHS AFTER SUCH ISSUE, OFFER, TRANSFER OR ASSIGN THIS DOCUMENT TO PERSONS IN AUSTRALIA EXCEPT IN CIRCUMSTANCES WHERE DISCLOSURE TO SUCH PERSONS IS NOT REQUIRED UNDER THE CORPORATIONS ACT.

**NOTICE TO RESIDENTS OF ISRAEL**

THIS DOCUMENT DOES NOT CONSTITUTE A PROSPECTUS UNDER THE ISRAELI SECURITIES LAW OF 1968 (THE "**ISRAELI SECURITIES LAW**"), AND HAS NOT BEEN REVIEWED, FILED WITH OR APPROVED BY THE ISRAELI SECURITIES AUTHORITY OR ANY OTHER ISRAELI GOVERNMENT OR REGULATORY BODY. THIS DOCUMENT, ANY INVESTMENT ACTIVITY TO WHICH IT RELATES AND ANY OFFERING OF THE TOKENS IN

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                                          TG-001-00000018

**PRIVATE & CONFIDENTIAL**

ISRAEL IS AND WILL BE EXCLUSIVELY DISTRIBUTED OR MADE TO, AND DIRECTED AT, QUALIFIED INVESTORS, AS DEFINED IN SCHEDULE 1 OF THE ISRAELI SECURITIES LAW. PERSONS WHO ARE NOT QUALIFIED INVESTORS SHOULD NOT TAKE ANY ACTION BASED UPON THIS DOCUMENT AND SHOULD NOT RELY ON IT.

**NOTICE TO RESIDENTS OF RUSSIA**

INFORMATION CONTAINED HEREIN IS NOT AN OFFER, OR AN INVITATION TO MAKE OFFERS, TO SELL, PURCHASE, EXCHANGE OR OTHERWISE TRANSFER SECURITIES OR FOREIGN FINANCIAL INSTRUMENTS IN THE RUSSIAN FEDERATION TO OR FOR THE BENEFIT OF ANY RUSSIAN PERSON OR ENTITY, EXCEPT "QUALIFIED INVESTORS" (AS DEFINED UNDER RUSSIAN SECURITIES LAWS) TO THE EXTENT PERMITTED UNDER RUSSIAN SECURITIES LAWS. THIS DOCUMENT IS NOT AN ADVERTISEMENT IN CONNECTION WITH THE "PLACEMENT" OR "PUBLIC CIRCULATION" (AS BOTH TERMS ARE DEFINED UNDER RUSSIAN SECURITIES LAW) OF ANY SECURITIES, AND ANY FINANCIAL INSTRUMENTS DESCRIBED HEREIN ARE NOT INTENDED FOR "PLACEMENT" OR "PUBLIC CIRCULATION" IN THE RUSSIAN FEDERATION, IN EACH CASE UNLESS OTHERWISE PERMITTED UNDER RUSSIAN SECURITIES LAWS. NEITHER ANY FINANCIAL INSTRUMENTS DESCRIBED HEREIN NOR A PROSPECTUS RELATING TO SUCH FINANCIAL INSTRUMENTS HAS BEEN OR WILL BE REGISTERED WITH THE CENTRAL BANK OF THE RUSSIAN FEDERATION.

**NOTICE TO RESIDENTS OF CUBA, IRAN, NORTH KOREA, SYRIA AND THE CRIMEA REGION**

THIS SECURITY IS NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED IN CUBA, IRAN, NORTH KOREA, SYRIA, THE CRIMEA REGION OR ANY OTHER COUNTRY OR TERRITORY THAT IS SUBJECT OF COUNTRY-WIDE OR TERRITORY-WIDE SANCTIONS.

FOIA Confidential Treatment Requested by Telegram Group, Inc.                    TG-001-00000019

PRIVATE & CONFIDENTIAL

THE UNDERSIGNED PURCHASER

- AND -

THE UNDERSIGNED ISSUER
A WHOLLY OWNED SUBSIDIARY OF TELEGRAM GROUP INC.

- AND -

TELEGRAM GROUP INC.

---

## PURCHASE AGREEMENT FOR GRAMS

---

6

PRIVATE & CONFIDENTIAL

**THIS PURCHASE AGREEMENT** is made on the date set forth on the signature page hereto

**BETWEEN**:

(1)     The purchaser identified as such on the applicable signature page hereto (the "**Purchaser**");

(2)     The issuer identified as such on the applicable signature page hereto (the "**Issuer**"), a wholly owned subsidiary of the Parent (as defined below); and

(3)     Telegram Group Inc., a company incorporated in the British Virgin Islands (registered number 1811220), whose registered office is at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands (the "**Parent**").

**WHEREAS**:

(A)     The Issuer intends to create and issue a new cryptocurrency called "Grams" ("**Tokens**") following the development and launch of a new blockchain platform (the "**TON Network**").

(B)     The Purchaser wishes to subscribe for Tokens.

## 1.     INTERPRETATION

1.1     In this Purchase Agreement (including in the Recitals):

"**Affiliate**" means in relation to any body corporate: (i) each of its parent undertakings; (ii) any subsidiary undertaking of such body corporate or of any of its parent undertakings; and (iii) any founder, initial member or initial shareholder of such body corporate or its parent undertakings.

"**Bank Secrecy Act**" means the Bank Secrecy Act of 1970 (Titles I and II of Pub. L. No. 91-508, codified as amended in various sections of 12 U.S.C. and 31 U.S.C.), as amended, and the regulations promulgated thereunder;

"**Business Day**" means a day on which banks are open for general, commercial business in London and the City of New York (excluding Saturdays, Sundays and public holidays);

"**Companies Act**" means the Companies Act 2006;

"**Dissolution Event**" means: (i) once the Issuer has commenced operations, a voluntary termination of operations of the Issuer; (ii) a general assignment for the benefit of the creditors of the Issuer; or (iii) any other liquidation, dissolution or winding up of the Issuer, whether voluntary or involuntary;

"**Governmental Authority**" means any supranational, national, state, municipal or local government (including any subdivision, court, administrative agency or commission, stock or securities exchange, self-regulatory organisation or other governmental or regulatory body) or any other supranational, intergovernmental, quasi-governmental authority, body, department or organisation, including the European Union, or any regulatory body appointed by any of the foregoing in each case, in any jurisdiction;

"**Issuer's Warranties**" means the Issuer's warranties contained in Schedule 1;

7

FOIA Confidential Treatment Requested by Telegram Group, Inc.
TG-001-00000021

**PRIVATE & CONFIDENTIAL**

"**KYC Form**" means "know your customer" information in a form acceptable to the Issuer in its sole discretion;

"**Money Laundering Laws**" means the applicable laws, rules and regulations of all jurisdictions in which the Purchaser is located, resident, organised or operates concerning or related to anti-money laundering, including but not limited to those contained in the Bank Secrecy Act and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and the rules and regulations thereunder, and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority;

"**Network Launch**" means the public release of a version of the TON Network after completion of the test launch and security audits, as determined by the Issuer in its sole discretion;

"**Network Launch Date**" means the date on which the Network Launch occurs;

"**Other Purchase Agreements**" means one or more purchase agreements entered into by the Issuer, the Parent and a purchasing party that entitle the purchasing party thereto to receive Tokens following the Network Launch Date, substantially similar in form and content to this Purchase Agreement and entered into on or prior to the Payment Date;

"**Parent's Warranties**" means the Parent's warranties contained in Schedule 1;

"**Party**" means a party to this Purchase Agreement and "**Parties**" means more than one or all of them, and shall include any permitted assignee or successor to such party in accordance with this Purchase Agreement;

"**Payment Date**" means February 9, 2018;

"**Prospectus Directive**" means Directive 2003/71/EC, as amended;

"**Purchase Amount**" means the amount indicated on the signature page of the Purchaser attached hereto;

"**Purchase Price**" means USD 0.37756101 per Token;

"**Purchaser's Warranties**" means the Purchaser's warranties contained in Schedule 2;

"**Rep Letter**" means, as applicable, a representation letter in the form attached hereto as Appendix A, B, C, D, E, F, G, H, I or J or such other form as the Issuer may accept in its sole discretion;

"**Restricted Period**" means the period beginning on the date of this Purchase Agreement and ending 18 months after the Network Launch Date;

"**Sanctions**" means the applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by relevant Governmental Authorities, including, but not limited to, those administered by the U.S. government through the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom;

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                        TG-001-00000022

"**Sanctioned Jurisdiction**" means, at any time, a country or territory which is itself the subject or target of any country-wide or territory-wide Sanctions (at the time of this Purchase Agreement, Crimea, Cuba, Iran, North Korea and Syria);

"**Sanctioned Person**" means any Person that is the subject or target of Sanctions, including: (i) any Person listed in any Sanctions-related list of sanctioned Persons maintained by OFAC or the U.S. Department of State, by the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom; (ii) any Person located, organised or resident in a Sanctioned Jurisdiction; or (iii) any Person directly or indirectly owned or controlled by any such Person or Persons described in the foregoing paragraphs (i) and (ii);

"**Telegram Pre-Sale Primer**" means the Telegram Pre-Sale Primer document dated 18 January 2018;

"**Termination Amount**" means the Purchaser's pro rata share of (i) the Purchase Amount under this Purchase Agreement together with the aggregate "Purchase Amounts" under the Other Purchase Agreements *less* (ii) the sum of any expenditures made prior to the date of any termination of this Purchase Agreement under clause 7.1(b) or 7.1(c), to the extent such expenditures were made for the purposes described in the first paragraph of the "Use of Funds" section of the Telegram Pre-Sale Primer (including, but not limited to, in respect of the Parent's obligations under clause 5.2), as determined by the Parent and the Issuer in good faith;

"**Token Allocation**" means the number of Tokens calculated by dividing the Purchase Amount by the Purchase Price; and

"**TON Wallet**" means a light client than can run on mobile devices, and through which users can store, send and receive Tokens.

1.2     In this Purchase Agreement, except where the context otherwise requires:

(a)     a reference to clauses is a reference to clauses of this Purchase Agreement;

(b)     a reference to "**USD**", "**U.S. Dollars**" or "**$**" shall be construed as a reference to the lawful currency of the United States of America;

(c)     words importing the singular include the plural and vice versa;

(d)     a reference to any law or enactment is to that law or enactment, as it may be applied, amended or re-enacted from time to time and includes any legislation in any jurisdiction;

(e)     the expressions "parent undertaking", "subsidiary undertaking" and "undertaking" shall have the meanings given in sections 1161 and 1162 of the Companies Act; and

(f)     headings are included in this Purchase Agreement for convenience only.

1.3     The investment contract represented by this Purchase Agreement is treated as a security in certain jurisdictions and references to "this security" herein shall be construed accordingly.

1.4     Except where expressly indicated otherwise, any provision of this Purchase Agreement that is expressed to bind or be an obligation of the Issuer or the Parent shall bind and be an obligation of each of them severally (and not jointly or jointly and severally).

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                     TG-001-00000023

## 2.   ISSUE AND PURCHASE

2.1   Upon the terms and subject to the conditions of this Purchase Agreement, the Issuer hereby agrees to issue the Token Allocation to the Purchaser on the Network Launch Date (the "**Issuance**").

2.2   In consideration of the foregoing, the Purchaser hereby agrees to pay the Purchase Amount to the Issuer (or at its direction) on or before the Payment Date in accordance with clauses 2.3 and 13.

2.3   The Issuer will accept payment under clause 2.2 in U.S. Dollars (or Euros at the prevailing Euro to USD exchange rate, as agreed upon by the Issuer and the Purchaser).

## 3.   CONDITIONS PRECEDENT

The Issuance is conditional upon the satisfaction by the Purchaser or waiver by the Issuer of the following conditions precedent:

(a)   the Purchaser executing and delivering to the Issuer an executed Rep Letter, a completed KYC Form and such other documents relating to this Purchase Agreement as the Issuer may reasonably request;

(b)   the Purchaser having satisfied its obligations under clause 2.2;

(c)   the Purchaser having provided to the Issuer a network address to which the Tokens comprising the Purchaser's Token Allocation shall be issued pursuant to clause 2.1; <u>provided</u> that if the Purchaser has not provided a network address to the Issuer in accordance with this clause 3(c) on or prior to the date that is twenty-four months following the Network Launch Date, the obligation of the Issuer to deliver Tokens to the Purchaser hereunder shall cease and the Issuer shall have no further obligations to the Purchaser hereunder; and

(d)   the Purchaser's Warranties remaining true, accurate and not misleading on the Network Launch Date.

## 4.   ISSUER'S WARRANTIES

The Issuer warrants to the Purchaser that each of the Issuer's Warranties is true, accurate and not misleading as at the date hereof and as at the Network Launch Date, and, for this purpose, the Issuer's Warranties shall be deemed to be repeated at the Network Launch Date as if any express or implied reference in the Issuer's Warranties to the date of this Purchase Agreement was replaced by a reference to the Network Launch Date.

## 5.   PARENT'S WARRANTIES AND OBLIGATIONS

5.1   The Parent warrants to the Purchaser that each of the Parent's Warranties is true, accurate and not misleading as at the date hereof and as at the Network Launch Date, and, for this purpose, the Parent's Warranties shall be deemed to be repeated at the Network Launch Date as if any express or implied reference in the Parent's Warranties to the date of this Purchase Agreement was replaced by a reference to the Network Launch Date.

5.2   To the extent permitted by applicable law, Governmental Authorities, and technology and mobile platforms, the Parent shall use its reasonable endeavours to facilitate the use of Tokens as the

FOIA Confidential Treatment Requested by Telegram Group, Inc.                              TG-001-00000024

PRIVATE & CONFIDENTIAL

principal currency used on Telegram Messenger by building TON Wallets into Telegram Messenger.

## 6.     PURCHASER'S WARRANTIES AND UNDERTAKINGS

6.1     The Purchaser warrants to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date hereof and as at the Network Launch Date, and, for this purpose, the Purchaser's Warranties shall be deemed to be repeated at the Network Launch Date as if any express or implied reference in the Purchaser's Warranties to the date of this Purchase Agreement was replaced by a reference to the Network Launch Date; provided that the warranties contained in the Rep Letter and the Purchaser's Warranties relating thereto need not be deemed repeated at the Network Launch Date.

6.2     If the Purchaser was formed for the specific purpose of entering into this Purchase Agreement and/or purchasing Tokens, then the Purchaser warrants to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date hereof and will be true, accurate and not misleading at the Network Launch Date, in each case in respect of each person who holds an equity interest in the Purchaser (each, a "**Purchaser Investor**") as if each such Purchaser Investor was the Purchaser hereunder (for this purpose, the Purchaser's Warranties as to each Purchaser Investor shall be deemed to be repeated at the Network Launch Date as if any express or implied reference in the Purchaser's Warranties to the date of this Purchase Agreement was replaced by a reference to the Network Launch Date; provided that the warranties contained in the Rep Letter and the Purchaser's Warranties relating thereto need not be deemed repeated at the Network Launch Date).

6.3     The Purchaser understands and expressly accepts that:

(a)     the Purchaser has read and understands the Telegram Pre-Sale Primer, as well as the "Technical White Paper" attached as Appendix A thereto and the "Risk Factors" attached as Appendix B thereto;

(b)     this Purchase Agreement and the Tokens involve significant risks, all of which the Purchaser fully and completely acknowledges and assumes, including, but not limited to, the risk that the Tokens may decrease in value over time and/or lose all monetary value and the other risks listed in Appendix B to the Telegram Pre-Sale Primer;

(c)     a significant portion of the funds generated by this Purchase Agreement and the Other Purchase Agreements are expected to be retained by the Parent for its own purposes rather than committed solely to the development and launch of the TON Network;

(d)     the Purchaser understands that no federal or state agency or any other Governmental Authority has passed on or made any recommendation or endorsement of this Purchase Agreement or the Tokens or the fairness or suitability of the investment in the Tokens nor has any Governmental Authority passed upon or endorsed the merits of this offering;

(e)     the Tokens will be created and delivered to the Purchaser at the sole risk of the Purchaser on an "as is" basis;

(f)     the Purchaser has not relied on any representations or warranties made by the Issuer or the Parent outside of this Purchase Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer;

11

PRIVATE & CONFIDENTIAL

(g)    the Purchaser bears sole responsibility for any taxes as a result of the matters and transactions the subject of this Purchase Agreement, and any future acquisition, ownership, use, sale or other disposition of Tokens (each a "**relevant matter**") held by or on behalf of the Purchaser. To the extent permitted by law, the Purchaser agrees to indemnify, defend and hold the Issuer, the Parent and any of their respective Affiliates, employees or agents (including developers, auditors, contractors or founders) harmless on an after-tax basis for any claim, liability, assessment or penalty with respect to any taxes (other than any net income taxes of the Issuer that result from the Issuance) associated with or arising from any relevant matter;

(h)    the Purchaser is not entitled, as a Party to this Purchase Agreement, to vote or receive dividends or be deemed the holder of shares of the Issuer or the Parent for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of a shareholder of the Issuer or the Parent or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights to purchase shares of the Issuer or the Parent or otherwise;

(i)    each of the Issuer and the Parent retains all right, title and interest in all of their respective intellectual property, including, without limitation, inventions, ideas, discoveries, software, processes, marks, methods, information and data, whether or not protectable by patent, copyright or trademark. The Purchaser may not use any of the Issuer's or the Parent's intellectual property for any reason without the Issuer's or the Parent's prior written consent. Notwithstanding the foregoing, use by the Purchaser of Telegram Messenger in accordance with the terms and conditions thereof shall not be a violation of this clause 6.3(i);

(j)    none of the documentation prepared by the Issuer or the Parent in connection with the Issuance or the development of the TON Network will constitute a Prospectus for the purposes of the Prospectus Directive and no Prospectus will be prepared, approved by any competent authority or published for the purposes of the Prospectus Directive; and

(k)    the Parent may transfer responsibility for the further development and maintenance of the TON Network to a not-for-profit organisation called the "TON Foundation" at such point in time and on such terms as the Parent shall determine in its sole discretion.

## 7.    TERMINATION

7.1    Subject to clause 7.2, this Purchase Agreement will automatically terminate upon the earlier of:

(a)    the Issuance;

(b)    the occurrence of a Dissolution Event prior to the Deadline Date (as defined below); and

(c)    31 October 2019 (the "**Deadline Date**"), if the Network Launch has not occurred as of such date,

provided that, subject to clause 7.3, if the Purchase Agreement is terminated under clause 7.1(b) or 7.1(c), the Issuer and the Parent shall be jointly and severally liable to the Purchaser for the payment of the Termination Amount upon the occurrence of a Dissolution Event or immediately following the Deadline Date, as applicable. Any Termination Amount shall be paid in U.S. Dollars, unless otherwise agreed by the Parties.

FOIA Confidential Treatment Requested by Telegram Group, Inc.    TG-001-00000026

7.2     Clauses 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 shall survive any termination of this Purchase Agreement under clause 7.1. Clause 5.2 shall survive a termination of this Purchase Agreement only under clause 7.1(a).

7.3     Notwithstanding anything in this clause 7, neither the Issuer nor the Parent shall be required, and neither the Issuer nor the Parent shall have any obligation, to pay, transfer or deliver the Termination Amount, or to pay, transfer, distribute or deliver any other asset, funds, amount or value, if the Purchaser is, or is acting as agent or nominee for or otherwise for or on behalf of, or is a child, spouse, parent or sibling of, a Sanctioned Person.

## 8.     LIMITATION OF LIABILITY

8.1     Notwithstanding anything to the contrary in this Purchase Agreement, the Parties hereby acknowledge and agree that in the event the Termination Amount becomes payable and the Termination Amount is paid by the Issuer and/or the Parent pursuant to clause 7.1, the Termination Amount shall be the Purchaser's sole and exclusive remedy for monetary damages under this Purchase Agreement.

8.2     Neither the Issuer nor the Parent, nor any of their respective representatives or Affiliates, shall be liable under this Purchase Agreement for any consequential or indirect loss, loss of profit or revenue, loss of goodwill or special, punitive or enhanced damages arising out of or relating to any breach of this Purchase Agreement.

8.3     The aggregate combined liability of the Issuer and the Parent arising out of or related to this Purchase Agreement, whether arising out of or as a result of breach of contract, tort or otherwise, shall not exceed the Termination Amount (assuming a termination of this Purchase Agreement pursuant to clause 7.1(c)).

8.4     The limitations of liability contained in this clause 8 shall not apply to any liability for any claim to the extent that the same is attributable to fraud on the part of the Issuer or the Parent.

## 9.     FORCE MAJEURE

The Parent shall not be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this Purchase Agreement, in each case, for any failure or delay in fulfilling or performing clause 5.2 of this Purchase Agreement, if and to the extent that such failure or delay is caused by, or results from, acts beyond the affected party's reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; (e) action by any Governmental Authority; or (f) technological changes (including changes imposed by platforms or networks on which applications related to the Tokens and the TON Network would be made available).

## 10.     LOCK-UP

10.1     Subject to clauses 10.2 and 11.3, the Purchaser agrees and undertakes that during the Restricted Period it shall not, without the prior written consent of the Issuer:

(a)     offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement or any Tokens, or any securities convertible into or exercisable or

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                        TG-001-00000027

exchangeable for the investment contract represented by this Purchase Agreement or any Tokens, or publicly disclose the intention to make any such offer, sale, pledge or disposition; or

(b)    enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement or any Tokens,

whether any such transaction described in paragraphs (a) or (b) above is to be settled by delivery of the investment contract represented by this Purchase Agreement or any Tokens, in cash or otherwise; provided, however, that:

(i)     one-quarter of the Token Allocation shall be released from the restrictions in this clause 10 on the date that is three months following the Network Launch Date;

(ii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraph (i) above, equals one-half of the Token Allocation) shall be released from the restrictions in this clause 10 on the date that is six months following the Network Launch Date; and

(iii)   one-quarter of the Token Allocation (which, when added to the Tokens released under paragraphs (i) and (ii) above, equals three-quarters of the Token Allocation) shall be released from the restrictions in this clause 10 on the date that is 12 months following the Network Launch Date.

10.2    The restrictions set out in clause 10.1 shall not apply to the Purchaser in respect of any transfer of Tokens to any of its Affiliates during the Restricted Period, provided that, prior to any such transfer, the relevant Affiliate has executed and delivered to the Issuer and the Parent a deed of adherence containing substantially identical terms to the terms set out in clause 10.1.

## 11.    ASSIGNMENT

11.1    Subject to clauses 11.2 and 11.3, no Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement or subcontract or delegate in any manner whatsoever its performance under this Purchase Agreement (each of the above, a "**dealing**") without the prior written consent of the Purchaser, in the case of a dealing by the Issuer or the Parent, or the Issuer and the Parent, in the case of dealing by the Purchaser.

11.2    The Issuer and the Parent shall be entitled, without the consent of the Purchaser, after having given no less than three Business Days' prior written notice to the Purchaser, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all their respective obligations and liabilities under this Purchase Agreement (i) to any of their respective Affiliates; or (ii) in connection with a reorganisation of the Issuer or the Parent (including a change in the domicile or jurisdiction of incorporation of the Issuer or the Parent).

11.3    The Purchaser shall be entitled, without the consent of the Issuer or the Parent, after having given no less than three Business Days' prior written notice to the Issuer and the Parent, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all its obligations and liabilities under this Purchase Agreement to any of its Affiliates (an "**Assignee**"), provided that the Assignee: (i) undertakes in writing to the Issuer and the Parent to be bound by the Purchaser's obligations and liabilities under this Purchase Agreement; (ii) warrants in writing to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date of the assignment or transfer with respect to itself (as if each reference to the Purchaser is

14

PRIVATE & CONFIDENTIAL

construed as a reference to the Assignee); and (iii) delivers such other documents to the Issuer relating to this Purchase Agreement as the Issuer may reasonably request.

## 12. NOTICES AND COMMUNICATION

The Parties agree that any notice or other communication to be given or made under or in connection with this Purchase Agreement (a "**Notice**") shall be in writing in the English language and sent to the relevant address specified on the signature page or provided in electronic form (including by email), unless otherwise specified in this Purchase Agreement.

## 13. PAYMENTS

13.1 All amounts payable by the Purchaser under this Purchase Agreement: (a) are exclusive of any applicable value added or other taxes, all of which shall be separately and solely borne and paid by the Purchaser (if and to the extent applicable); (b) shall be paid in full in immediately available funds to the Issuer without any set-off, restriction or condition and without any deduction or withholding (and to the extent any taxes are required to be deducted or withheld therefrom under any applicable law or regulation, then the amounts so payable by the Purchaser under this Purchase Agreement shall be grossed up such that the Issuer shall receive the full Purchase Amount hereunder); and (c) shall be paid to such account as the Issuer shall notify to the Purchaser no later than three Business Days prior to the Payment Date.

13.2 To the extent the Issuer notifies the Purchaser under clause 13.1(c) above to make the payment to an account held in the name of the Parent, the parties agree and acknowledge that the Issuer's right to receive that payment shall be deemed assigned to the Parent in accordance with the Issuer's assignment rights under clause 11.2.

## 14. INVALIDITY

If at any time any provision of this Purchase Agreement shall be held to be illegal, void, invalid or unenforceable in whole or in part under any applicable law, then:

(a)     such provision shall:

(i)     to the extent that it is illegal, void, invalid or unenforceable be given no effect and shall be deemed not to be included in this Purchase Agreement; and

(ii)     not affect or impair the legality, validity or enforceability in that jurisdiction of any other provision of this Purchase Agreement or the legality, validity or enforceability under the applicable law of any other jurisdiction of such provision or any other provision of this Purchase Agreement,

provided that such severance would not materially change the remaining terms of the Purchase Agreement; and

(b)     the Parties shall use all reasonable endeavours to replace such a provision with a valid and enforceable substitute provision that carries out, as closely as possible, the intentions of the Parties under this Purchase Agreement.

15

## 15.   VARIATION AND WAIVER

15.1   Any provision of this Purchase Agreement may be varied only upon the written consent of the Issuer, the Parent and the holders of a majority, in the aggregate, of the Purchase Amounts paid to the Issuer with respect to this Purchase Agreement and the Other Purchase Agreements outstanding at the time of such variation, provided that any non-substantive or immaterial variation to a provision of this Purchase Agreement, or a variation which does not put a purchaser under an Other Purchase Agreement in a less favorable commercial position than the Purchaser (other than as reflected by the different number of Tokens subscribed for by such other purchasers), shall be effective if it is in writing and signed by or on behalf of each of the Parties. The expression "**variation**" shall, in each case, include any variation, supplement, deletion or replacement however effected. Notwithstanding the foregoing, no provision in this Purchase Agreement may be varied and the observance of any term hereof may not be waived with respect to the Purchaser without the written consent of the Purchaser if such variation or waiver adversely affects the Purchaser materially and disproportionately relative to purchasers under Other Purchase Agreements (other than as reflected by the different number of Tokens subscribed for by such other purchasers).

15.2   No waiver of this Purchase Agreement or of any provision hereof will be effective unless it is in writing (which, for this purpose, does not include email) and signed by the Party against whom such waiver is sought to be enforced.

15.3   Any waiver of any right, claim or default hereunder shall be effective only in the instance given and will not operate as or imply a waiver of any other or similar right, claim or default on any subsequent occasion.

15.4   Any failure or delay by any person in exercising, or failure to exercise, any right or remedy provided by law under this Purchase Agreement shall not impair or constitute a waiver of that right or remedy or of any other right or remedy and no single or partial exercise of any right or remedy provided by law or under this Purchase Agreement or otherwise shall prevent any further exercise of the right or remedy or the exercise of any other right or remedy.

## 16.   ENTIRE AGREEMENT

16.1   Each Party confirms that the content of this Purchase Agreement as expressly set out herein represents the entire understanding, and constitutes the entire agreement of the Parties, in relation to the subject matter hereof and the transactions contemplated hereby, and supersedes all previous agreements, understandings or arrangements (whether express, implied, oral or written (whether or not in draft form)) between the Parties with respect thereto (including any letter of intent or indication of interest, but excluding any confidentiality agreement),which shall cease to have any further force or effect.

16.2   Each of the Parties acknowledges that in entering into this Purchase Agreement it has agreed not to rely on any representation, warranty, collateral contract, undertaking or other assurance (except the Issuer's Warranties, the Parent's Warranties and the Purchaser's Warranties and undertakings expressly set out in this Purchase Agreement and in any applicable Rep Letter) made by or on behalf of any other Party before the signature of this Purchase Agreement, including during the course of negotiating this Purchase Agreement.

16.3   Each of the Parties waives all rights and remedies which, but for this clause 16.3, might otherwise be available to it in respect of any such representation, warranty, collateral contract, undertaking

16

or other assurance, <u>provided</u> that nothing in this clause 16.3 or clause 8.4 shall limit or exclude any liability for fraud or fraudulent misrepresentation.

16.4   Each of the Parties acknowledges that all of its rights and remedies are contained or referred to in this Purchase Agreement, and no Party shall have any other right or remedy, including a claim for innocent or negligent misrepresentation or negligent misstatement.

16.5   Every term or condition implied by law in any jurisdiction in relation to the subject matter of this Purchase Agreement shall be excluded to the fullest extent possible, and to the extent that it is not possible to exclude any such term or condition, each Party irrevocably waives any right or remedy in respect of it.

## 17.   FURTHER ASSURANCE

Without limiting any other provision of this Purchase Agreement, the Purchaser shall, and shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by the Issuer to implement and give full effect to this Purchase Agreement, including, without limitation, to enable the Issuer and the Parent to comply with applicable laws.

## 18.   COUNTERPARTS

This Purchase Agreement may be executed in counterparts, and by each Party on separate counterparts, but shall not be effective until each Party has executed at least one counterpart. Each counterpart shall constitute an original of this Purchase Agreement, but the counterparts shall together constitute one and the same instrument.  Delivery of a counterpart of this Purchase Agreement by email attachment shall be an effective mode of delivery.

## 19.   THIRD PARTY RIGHTS

The Parties do not intend that any term of this Purchase Agreement should be enforceable by any person who is not a party to this Purchase Agreement by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise.

## 20.   GOVERNING LAW AND JURISDICTION

20.1   This Purchase Agreement and any claim, dispute or difference (including non-contractual claims, disputes or differences) arising out of, or in connection with, it or its subject matter shall be governed by, and construed in accordance with, English law.

20.2   Any claim, dispute, controversy or difference arising out of or in connection with this Purchase Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by binding arbitration under the Rules of Arbitration of the London Court of International Arbitration, which Rules are deemed to be incorporated by reference into this clause 20.2.

20.3   There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by the Issuer and the Parent, and one arbitrator shall be nominated by the Purchaser, in each case for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party-appointed arbitrators within fourteen days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court.

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                                                TG-001-00000031

20.4    The Parties consent to the consolidation of arbitrations commenced under this Purchase Agreement and Other Purchase Agreements as follows:

(a)     if two or more arbitrations are commenced under this Purchase Agreement and/or Other Purchase Agreements, the arbitral tribunal shall have the power, upon the application of any party, to order that the arbitrations be consolidated into a single arbitration before that arbitral tribunal (a "**Consolidation Order**");

(b)     the party making the request shall provide copies of any request for consolidation to all other applicable parties and to any appointed arbitrators;

(c)     in determining whether to make such a Consolidation Order, the arbitral tribunal shall take into account the circumstances of the case, including whether the arbitrations raise common issues of law and fact, and whether a Consolidation Order would serve the interests of justice and efficiency;

(d)     if, before a Consolidation Order is made by an arbitral tribunal with respect to another arbitration, arbitrators have already been appointed by the LCIA Court in that other arbitration, their appointment shall be terminated upon the making of such Consolidation Order.  Such termination is without prejudice to the validity of any act done or order made by an arbitrator prior to his or her termination; his or her entitlement to fees and disbursements, or any Party's entitlement to legal and other costs incurred before termination; and the date when any claim or defence was raised for the purpose of applying any limitation bar or any like rule or provision; and

(e)     in the event of two or more conflicting Consolidation Orders, the Consolidation Order that was made first in time shall prevail, unless all parties agree otherwise.

20.5    The seat, or legal place, of arbitration shall be London, England.

20.6    The language to be used in the arbitral proceedings shall be English.

20.7    The award shall be final and binding on the Parties and may be entered and enforced in any court having jurisdiction.

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000032

PRIVATE & CONFIDENTIAL

**SCHEDULE 1**
**ISSUER'S WARRANTIES AND PARENT'S WARRANTIES**

Each of the Issuer and the Parent severally warrants to the Purchaser that:

1.      it is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation;

2.      the execution, delivery and performance by it of this Purchase Agreement is within its power and has been duly authorised by all necessary action on its part;

3.      this Purchase Agreement will, when executed, constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

4.      to its knowledge, the performance and consummation of the transactions contemplated by this Purchase Agreement do not and will not:

   (a)     violate any judgment, statute, rule or regulation applicable to it (assuming the accuracy of the Purchaser's Warranties);

   (b)     result in the acceleration of any material contract to which it is a party or by which it is bound; or

   (c)     result in the creation or imposition of any lien upon any of its material properties, assets or revenues or the suspension, forfeiture, or nonrenewal of any material permit, license or authorisation applicable to it, its business or operations; and

5.      no consents or approvals are required by it in connection with the performance of this Purchase Agreement, other than its corporate approvals.

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                        TG-001-00000033

PRIVATE & CONFIDENTIAL

## SCHEDULE 2
## PURCHASER'S WARRANTIES

The Purchaser warrants to the Issuer and the Parent that:

1.  if the Purchaser is an entity, the Purchaser is validly formed, in existence and duly registered under the laws of its jurisdiction of formation;

2.  the Purchaser has the full legal capacity, power and authority to execute and deliver this Purchase Agreement and to perform its obligations hereunder;

3.  this Purchase Agreement will, when executed, constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

4.  the entry into this Purchase Agreement and the consummation of the transactions contemplated thereby is lawful under the laws of the jurisdiction of the Purchaser's incorporation and the jurisdiction in which it operates (if different), and such purchase will not contravene any law, regulation or regulatory policy applicable to the Purchaser;

5.  it has been advised that the investment contract represented by this Purchase Agreement is a security and that the offers and sales thereof have not been registered under any country's securities laws and, therefore, the investment contract represented by this Purchase Agreement cannot be resold except in compliance with each applicable country's laws;

6.  the Purchaser is purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof (provided, however, that by making the representations and warranties herein, except as set forth in this Purchase Agreement, the Purchaser does not agree to hold any of the Tokens for any minimum or other specific term and reserves the right to dispose of the Tokens at any time in accordance with applicable securities laws and the terms of this Purchase Agreement). The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Tokens;

7.  the Purchaser is a sophisticated party with sufficient knowledge and experience in financial and business matters to evaluate properly the merits and risks of entering into this Purchase Agreement, including the merits and risks associated with subscribing for Tokens. The Purchaser understands that its investment hereunder and in the Tokens involves a high degree of risk. The Purchaser has conducted its own analysis and made its own decision to enter into this Purchase Agreement and agree to purchase the Tokens and has obtained such independent advice (including accounting, legal and tax advice) in this regard as it deemed appropriate; and the Purchaser has not relied in such analysis or decision on any Person other than its own independent representatives. The Purchaser and its representatives have been afforded the opportunity to make inquiries of the Issuer and/or the Parent. The Purchaser can afford a complete loss of its investment hereunder, should such loss occur, and without any financial hardship, should such loss occur;

8.  if the Purchaser is in the United States or is a U.S. Person (as such term is defined in Regulation S under the U.S. Securities Act), (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix A and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

9.  if the Purchaser is located or resident within the European Economic Area (but outside of the United Kingdom and Germany), (i) the Purchaser has completed and delivered to the Issuer a Rep

PRIVATE & CONFIDENTIAL

Letter in the form of Appendix B and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

10.      if the Purchaser is located or resident in the United Kingdom, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix C and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

11.      if the Purchaser is located or resident within Germany, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix D and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

12.      if the Purchaser is located or resident within Switzerland, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix E and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

13.      if the Purchaser is located or resident within Hong Kong, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix F and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

14.      if the Purchaser is located or resident within South Korea, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix G and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

15.      if the Purchaser is located or resident within Australia, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix H and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

16.      if the Purchaser is located or resident within Israel, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix I and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

17.      if the Purchaser is located or resident within Russia, (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in the form of Appendix J and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

18.      if the Purchaser is not located or resident in the United States, the European Economic Area (including the United Kingdom and Germany), Switzerland, Hong Kong, South Korea, Australia, Israel or Russia and is not a U.S. Person (as such term is defined in Regulation S under the U.S. Securities Act), (i) the Purchaser has completed and delivered to the Issuer a Rep Letter in a form acceptable to the Issuer and (ii) the warranties contained in such Rep Letter are true, accurate and not misleading as at the date hereof;

19.      subject to clause 6.2, the Purchaser is entering into this Purchase Agreement and purchasing Tokens on its own behalf and not for the benefit of any other person;

20.      the Purchaser has completed and delivered to the Issuer a KYC Form and the information contained in such KYC Form is true, accurate and not misleading as at the date hereof;

21.      to the extent required by applicable laws, the Purchaser is in compliance with all Money Laundering Laws;

22.      neither the Purchaser, nor any person having a direct or indirect beneficial interest in the Purchaser or the Tokens to be acquired by the Purchaser, is a Sanctioned Person, or a child, spouse, parent or sibling of a Sanctioned Person;

23.      the Purchaser will not use any Tokens, directly or indirectly, in connection with any transaction, dealing or activity in violation of Money Laundering Laws or Sanctions; and

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000035

PRIVATE & CONFIDENTIAL

24.    none of the proceeds paid to the Issuer by the Purchaser have been derived in violation of applicable laws, including applicable Money Laundering Laws, counter terrorism laws, and laws relating to bribery or corruption.

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                    TG-001-00000036

PRIVATE & CONFIDENTIAL

IN WITNESS WHEREOF, each of the undersigned has caused this Purchase Agreement to be duly executed this ___ day of _____, 2018.

**SIGNED** by ............................................

for and on behalf of ..............................**, as the Issuer**        ....................................................

                                                                                 Authorised signatory

Address:        .....................................................

                     .....................................................

Telephone:     .....................................................

Fax:               .....................................................

Email:            .....................................................

FOIA Confidential Treatment Requested by Telegram Group, Inc.                                    TG-001-00000037

PRIVATE & CONFIDENTIAL

**SIGNED** by ........................................

for and on behalf of **TELEGRAM GROUP INC.**

....................................................
Authorised signatory

Address:      Geneva Place
Waterfront Drive
P.O. Box 3469
Road Town
Tortola
British Virgin Islands

Telephone:    .......................................

Fax:    .......................................

Email:    .......................................

24

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000038

PRIVATE & CONFIDENTIAL

**SIGNED** by  .............................................

for and on behalf of  ................................**, as the Purchaser**         .....................................................

Authorised signatory

Purchase Amount:          .......................................

Address:          .....................................................

.....................................................

Telephone:          .....................................................

Fax:          .....................................................

Email:          .....................................................

25

FOIA Confidential Treatment Requested by Telegram Group, Inc.                    TG-001-00000039

**PRIVATE & CONFIDENTIAL**

## APPENDIX A

### UNITED STATES REP LETTER

1.    The Purchaser is an "accredited investor" as such term is defined in Rule 501(a) of Regulation D ("Regulation D") promulgated by the United States Securities and Exchange Commission under the Securities Act of 1933, as amended (the "U.S. Securities Act") because the Purchaser comes within any of the following categories at the time of entry into the Purchase Agreement.

**NOTE: THE PURCHASER SHOULD INITIAL BESIDE THE CATEGORIES BELOW APPLICABLE TO IT. ALL MONETARY REFERENCES BELOW ARE IN UNITED STATES DOLLARS.**

a.    _____    A bank (as defined in Section 3(a)(2) of the U.S. Securities Act, or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the U.S. Securities Act), whether acting in its individual or fiduciary capacity.

b.    _____    A broker or dealer registered under Section 15 of the U.S. Securities Exchange Act of 1934, as amended.

c.    _____    An insurance company (as defined in Section 2(a)(13) of the U.S. Securities Act).

d.    _____    An investment company registered under the U.S. Investment Company Act of 1940, as amended.

e.    _____    A business development company (as defined in Section 2(a)(48) of the U.S. Investment Company Act of 1940, as amended).

f.    _____    A Small Business Investment Company (licensed by the United States Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended).

g.    _____    An employee benefit plan with total assets of more than US$5,000,000, established and maintained by a state, a political subdivision of a state, or any agency or instrumentality of a state or its political subdivisions.

h.    _____    Any employee benefit plan within the meaning of U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of US$5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

i.    _____    A private business development company (as defined in Section 202(a)(22) of the U.S. Investment Advisers Act of 1940, as amended).

j.    _____    An organization described in Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended, not formed for the specific purpose of acquiring the securities offered, with total assets of more than US$5,000,000.

k.    _____    A corporation, Massachusetts or similar business trust, or partnership not formed for the specific purpose of acquiring the securities offered, with total assets of more than US$5,000,000.

l.    _____    Any director, executive officer or general partner of the issuer of the securities being offered or sold, or any director, executive officer or general partner of a general partner of that issuer.

m.    _____    A **natural person**** whose individual net worth, or joint net worth with that person's spouse, at the time of the Distribution exceeds US$1,000,000.

26

PRIVATE & CONFIDENTIAL

n.  \_\_\_\_\_  A **natural person\*\*** who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with that person's spouse in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

o.  \_\_\_\_\_  Any trust, with total assets in excess of US$5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in rule 506(b)(2)(ii) under the U.S. Securities Act.

p.  \_\_\_\_\_  Any entity in which all of the equity owners are accredited investors. **If only this category (p) is applicable to the Purchaser (i.e., not any of the preceding categories (a) through (o)), please have each equity owner also complete and deliver to the Issuer a Rep Letter in the form of this Appendix A.**

---

**\*\* IF THE PURCHASER IS AN INDIVIDUAL WHO HAS INITIALED BESIDE CATEGORIES (M) OR (N), SUCH PURCHASER SHALL PROVIDE THE ADDITIONAL DOCUMENTATION SET FORTH IN SCHEDULE A HERETO.**

---

2.  The Purchaser acknowledges that (i) this security has not been registered under the U.S. Securities Act or under the securities laws of any state or other jurisdiction in the United States and (ii) this security is characterized as a "restricted security" under the U.S. federal securities laws because it is being acquired from the Issuer in a transaction not involving a public offering. The Purchaser further acknowledges that this security is being offered, issued and sold to the Purchaser in reliance on specific exemptions from the registration requirements of the U.S. Securities Act and applicable state securities laws and that the Issuer is relying in part upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgements and understandings of the Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to enter into the Purchase Agreement.

3.  The Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the U.S. Securities Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3).

By:_____
*(Print Name of Purchaser)*

By:_____
      Name:
      Title:

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000041

**SCHEDULE A TO APPENDIX A**

**LIST OF DOCUMENTATION REQUIRED TO BE PROVIDED BY
U.S. INDIVIDUAL ACCREDITED INVESTORS**
***(to be completed only if you are an individual)***

**(ALL INFORMATION HEREIN WILL BE TREATED CONFIDENTIALLY)**

In connection with the execution of the Purchase Agreement, the Purchaser, who is an Individual Accredited Investor and who has checked item (M) or (N) from the Accredited Investor definition in the United States Rep Letter, shall provide one or more items from the categories below confirming its status as an Accredited Investor. When submitting the documentation, include this list and check all that apply. References to "Accredited Investor" in this Schedule refer to "accredited investor" as defined by Rule 501(a) of Regulation D under the U.S. Securities Act of 1933, as amended.

**(A) Proof of accredited investor status on the basis of net worth (to be provided if you checked item (M) from the Accredited Investor definition in the United States Rep Letter):**

- [   ] one or more of the types of documentation listed below with respect to assets and with respect to liabilities; and

- [   ] written representation from the Purchaser that all liabilities necessary to make a determination of net worth have been disclosed:

     **(1)** with respect to assets, one or more of the following types of documentation dated within the prior three months:

- [   ] bank statements,

- [   ] brokerage statements,

- [   ] other statements of securities holdings,

- [   ] certificates of deposit,

- [   ] tax assessments issued by independent third parties, and

- [   ] appraisal reports issued by independent third parties; and

     **(2)** with respect to liabilities:

- [   ] a consumer report from at least one of the nationwide (U.S. only) consumer reporting agencies dated within the prior three months;

**OR**

**(B) Proof of accredited investor status on the basis of income (to be provided if you checked item (N) from the Accredited Investor definition in the United States Rep Letter):**

- [   ] any Internal Revenue Service form that reports the Purchaser's income for the two most recent years (including, but not limited to, Form W-2, Form 1099, Schedule K-1 to Form 1065, and Form 1040); and

- [   ] a written representation from the Purchaser that he or she has a reasonable expectation of reaching the income level necessary to qualify as an accredited investor during the current year;

28

**PRIVATE & CONFIDENTIAL**

**OR**

**(C) Written confirmation** from one of the following persons or entities that such person or entity has taken reasonable steps to verify that the Purchaser is an accredited investor <u>within the prior three months</u> and has determined that such Purchaser is an accredited investor:

- [   ] a registered broker-dealer;

- [   ] an investment adviser registered with the U.S. Securities and Exchange Commission;

- [   ] a licensed attorney who is in good standing under the laws of the jurisdictions in which he or she is admitted to practice law; <u>or</u>

- [   ] a certified public accountant who is duly registered and in good standing under the laws of the place of his or her residence or principal office.

FOIA Confidential Treatment Requested by Telegram Group, Inc.                    TG-001-00000043

PRIVATE & CONFIDENTIAL

**APPENDIX B**

**EUROPEAN ECONOMIC AREA**
**(OUTSIDE OF THE UNITED KINGDOM AND GERMANY) REP LETTER**

1.      The Purchaser is a "qualified investor" within the meaning of Directive 2003/71/EC, as amended.


By:_____
*(Print Name of Purchaser)*

By:_____
          Name:
          Title:


30

FOIA Confidential Treatment Requested by Telegram Group, Inc.                    TG-001-00000044

## APPENDIX C

### UNITED KINGDOM REP LETTER

1.  The Purchaser is an "investment professional" within the meaning of Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "**FPO**") or a "sophisticated investor" within the meaning of Article 50(1) of the FPO.

2.  The Purchaser is a "qualified investor" within the meaning of Directive 2003/71/EC, as amended.

By:_____
*(Print Name of Purchaser)*

By:_____
            Name:
            Title:

31

## APPENDIX D

## GERMANY REP LETTER

1.      The Purchaser is a "qualified investor" within the meaning of Directive 2003/71/EC, as amended, and it professionally or commercially purchases or sells securities or investment products (*Vermögensanlagen*) within the meaning of the German Investment Product Act (*Vermögensanlagengesetz*) for its own account or for the account of others.


By:_____
*(Print Name of Purchaser)*

By:_____
            Name:
            Title:

32

PRIVATE & CONFIDENTIAL

## APPENDIX E

## SWITZERLAND REP LETTER

1.     The Purchaser is a "qualified investor" within the meaning of the Swiss Collective Investment Schemes Act of June 23, 2006, as amended, its implementing ordinance and regulatory guidance.

By:_____
*(Print Name of Purchaser)*

By:_____
        Name:
        Title:

33

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000047

PRIVATE & CONFIDENTIAL

## APPENDIX F

## HONG KONG REP LETTER

1.      The Purchaser is a professional investor (as such term is defined in Part 1 of Schedule 1 to the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong)).


By:_____
*(Print Name of Purchaser)*

By:_____
        Name:
        Title:

FOIA Confidential Treatment Requested by Telegram Group, Inc.    TG-001-00000048

# APPENDIX G

## SOUTH KOREA REP LETTER

1.    The Purchaser is an "investment professional" within the meaning of Article 11(1) of the Enforcement Decree of the Financial Investment Services and Capital Markets Act of South Korea.

By:_____
*(Print Name of Purchaser)*

By:_____
      Name:
      Title:

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000049

PRIVATE & CONFIDENTIAL

## APPENDIX H

## AUSTRALIA REP LETTER

1.  The Purchaser is a "sophisticated investor" or a "professional investor" and a "wholesale client" (and not a "retail client") as defined under the *Corporations Act* (Cth) 2001 in relation to whom a disclosure document or product disclosure statement is not required.

By:_____
*(Print Name of Purchaser)*

By:_____
        Name:
        Title:

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000050

PRIVATE & CONFIDENTIAL

## APPENDIX I

## ISRAEL REP LETTER

1.　　In connection with the Purchase Agreement, the undersigned Purchaser hereby represents, warrants and certifies that the category or categories marked and signed below are true, correct and complete in all respects. The Purchaser consents to being treated as a "Qualified Investor" under the Israeli Securities Law, 5728-1968 (the "**Securities Law**") and acknowledges that the Issuer is relying in part upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgements and understandings of the Purchaser set forth herein in order to determine the availability of exemptions under the Securities Law and the eligibility of the Purchaser to enter into the Purchase Agreement. The Purchaser is aware of the legal consequences of the foregoing.

**NOTE: THE PURCHASER SHOULD INITIAL BESIDE THE CATEGORIES BELOW THAT ARE APPLICABLE TO IT.**

1.　　_____ A fund for joint investments in trust (i.e., mutual fund), as such term is defined in the Law for Joint Investments in Trust, 5754-1994, or a management company thereof;

2.　　_____ A provident fund as defined in Law for Oversight of Financial Services (Provident Funds), 5765-2005, or a management company of such a fund;

3.　　_____ An insurer, as defined in the Law for Oversight of Insurance, 5741-1981;

4.　　_____ A banking entity or satellite entity, as such terms are defined in the Banking Law (Licensing), 5741-1981, other than a joint services company, purchasing for its own account or for the account of clients that are investors of the type listed in Section 15A(b) of the Securities Law [NOTE: Any bank that purchases units on behalf of a client or other third party must obtain a copy of this form signed by such person];

5.　　_____ a portfolio manager, as such term is defined in Section 8(b) of the Israeli Law for the Regulation of Investment Advice, Investment Marketing and Portfolio Management, 5755-1995, purchasing for its own account or for the account of clients that are investors of the type listed in Section 15A(b) of the Securities Law [NOTE: Any portfolio manager that purchases units on behalf of a client or other third party must obtain a copy of this form signed by such person];

6.　　_____ A company that is licensed as an investment advisor or investment marketer, as such terms are defined in Section 7(c) of the Law for the Regulation of Investment Advisors and Portfolio Managers, 5755-1995, purchasing for its own account;

7.　　_____ A company that is a member of the Tel Aviv Stock Exchange, purchasing for its own account or for the account of clients that are investors of the type listed in Section 15A(b) of the Securities Law [NOTE: Any stock exchange member that purchases units on behalf of a client or other third party must obtain a copy of this form signed by such person];

8.　　_____ An underwriter fulfilling the conditions of Section 56(c) of the Securities Law, 5728-1968, purchasing for its own account;

9.　　_____ A venture capital fund (defined as an entity primarily involved in investments in companies which, at the time of investment, (i) are primarily engaged in research and development or manufacture of new technological products or processes and (ii) involve above-average risk);

10.　　_____ An entity in which all of the equity owners meet one or more of the above criteria;

11.　　_____ An entity with shareholder's equity exceeding NIS 50 million, not formed specifically for the purpose of acquiring shares in the issuer of the relevant securities ("Large Companies")

FOIA Confidential Treatment Requested by Telegram Group, Inc.　　　　　　　　　　　　　　　　　　　　　　TG-001-00000051

[NOTE: If this category is marked, the Purchaser should attach an attorney or CPA confirmation dated no earlier than 3 months prior to the offer or other evidence satisfactory to the Issuer].

**12.** _____ An individual who meets one of the following conditions:

    **a.** the total value of Liquid Assets[1] owned by the individual exceeds NIS8 million [NOTE: If this category is marked, the Purchaser should attach an attorney or CPA confirmation dated no earlier than 3 months prior to the offer or other evidence satisfactory to the Issuer];

    **b.** the individual's income in each of the past two years exceeds NIS 1.2 million; or the income of such individual's Family Unit[2] exceeds NIS 1.8 million [NOTE: If this category is marked, the Purchaser should attach an attorney or CPA confirmation dated no earlier than 3 months prior to the offer or other evidence satisfactory to the Issuer]; and

    **c.** the individual's total Liquid Assets exceeds NIS 5 million and his/her income in each of the last two years exceeds NIS 600,000 or the income of such individual's Family Unit exceeds NIS 900,000 [NOTE: If this category is marked, the Purchaser should attach an attorney or CPA confirmation dated no earlier than 3 months prior to the offer or other evidence satisfactory to the Issuer].

By:_____
*(Print Name of Purchaser)*

By:_____
        Name:
        Title:

---

[1] "Liquid Assets" – cash, deposits, financial assets (as defined in the Law for the Regulation of Investment Advice, Investment Marketing and Investment Portfolio Management – 1995), and other traded securities.

[2] "Family Unit" – an individual and the family members who are living with him/her or who are financially supporting each other.

FOIA Confidential Treatment Requested by Telegram Group, Inc.

TG-001-00000052

PRIVATE & CONFIDENTIAL

## APPENDIX J

### RUSSIA REP LETTER

1.      In connection with the Purchase Agreement, the undersigned Purchaser hereby represents, warrants and certifies that (i) it is a "qualified investor" within the meaning of the Federal Law of the Russian Federation "On Securities Market" No. 39-FZ dated April 22, 1996, as amended, (ii) the execution and performance by it of the Purchase Agreement does not violate applicable laws of the Russian Federation and (iii) in making any payments under the Purchase Agreement, it has complied or will comply with the requirements of all applicable laws of the Russian Federation, including with respect to foreign currency transactions. The Purchaser acknowledges that the Issuer is relying in part upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgements and understandings of the Purchaser set forth herein in order to determine the eligibility of the Purchaser to enter into the Purchase Agreement. The Purchaser is aware of the legal consequences of the foregoing.

2.      [*If the Purchaser is a natural person:*] The undersigned Purchaser, [*last name, first name, patronymic, address, identity document number, date of ID document issuance and issuing authority*], hereby grants his consent for the processing of his or her personal data (last name, first name, patronymic, place of residence, TIN, identity document number, date of ID document issuance and issuing authority) to the Issuer and any affiliate of the Issuer. Actions related to personal data processing by aforementioned operators include: data collection, recording, systematization, accumulation, storing, improvement (updating, amending), retrieval, blocking, deletion and destruction. The Purchaser's personal data may be processed whether with or without the use of automated information systems to the extent necessary for personal data processing. This consent for personal data processing shall be valid without limitation until it is revoked by the Purchaser by a written notice sent to the Issuer to the address specified in the Purchase Agreement, or for such earlier term as may be mandated by imperative provisions of applicable laws of the Russian Federation.

By:_____
*(Print Name of Purchaser)*

By:_____
         Name:
         Title:

FOIA Confidential Treatment Requested by Telegram Group, Inc.                TG-001-00000053