# Exhibit 2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
                     Plaintiff,     )
 6                                  ) 19 Civ. 9439 (PKC)
          - against -              )
 7                                  )
     TELEGRAM GROUP INC. and        )
 8   TON ISSUER INC.,               )
                                    )
 9                   Defendants.    )
     _____)

10

11      **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13            Videotaped deposition of PAVEL DUROV (as

14   30(b)(6) corporate representative of Defendants and

15   also in his personal capacity), Volume 1, taken on

16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17   Square, Building 3, Level 5, Downtown Dubai, Dubai,

18   United Arab Emirates, beginning at 11:21 a.m. and

19   ending at 9:54 p.m., on Tuesday, January 7, 2020,

20   before LEAH WILLERSDORF, Member of the British

21   Institute of Verbatim Reporters, Accredited Verbatim

22   Reporter, Qualified Realtime Reporter - Level 2,

23   International Participating Member NCRA.

24

25   JOB No. 200107LWI
```

1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
11:35:26   1              MR. TENREIRO:  I'm just asking about --
11:35:28   2      I'm not sure it relates to any topic.  I'm just
11:35:31   3      asking about the --
11:35:31   4              MR. DRYLEWSKI:  Okay.  Objection, based on
11:35:34   5      scope.
11:35:34   6              You can answer that question in your
11:35:36   7      personal capacity.  And I'd instruct the witness
11:35:38   8      to exclude from the answer the substance of any
11:35:41   9      conversations with counsel.
11:35:42  10              THE WITNESS:  Sure.  So, as you know,
11:35:59  11      Telegram, until yesterday, didn't comment on its work
11:36:07  12      related to TON, and the reason why we did not comment
11:36:15  13      is we didn't want our users and consumers in general
11:36:25  14      to have any expectations in relation to TON; however,
11:36:31  15      it came to our attention that due to this vacuum, or
11:36:41  16      the perceived vacuum of announcements from our team,
11:36:45  17      some users were being scammed by certain third
11:36:53  18      parties, and while we warned our users against --
11:37:01  19      about those scams on numerous occasions before, we
11:37:04  20      decided that it is worth posting a more extensive
11:37:09  21      piece explaining to the users the current status of
11:37:18  22      TON and Grams so that they wouldn't be misled by bad
11:37:24  23      actors trying to trick them into, you know, buying
11:37:30  24      something that is not related to what we are trying to
11:37:32  25      build.
```

23

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:46:37   1   private placement?

17:46:37   2        A.   I don't think we reached out to the SEC

17:46:40   3   before I signed the first purchase agreement.  The way

17:46:44   4   we designed it is, the private placement, was that we

17:46:59   5   reserved a lot of flexibility to how the project and

17:47:10   6   its parts could look like, and this flexibility is

17:47:17   7   reflected in the purchase agreements and its

17:47:20   8   appendices.

17:47:36   9        That gave us a comfort of knowing that

17:47:44  10   we would be able to change certain, if not all,

17:47:49  11   aspects of what we're trying to build based on the

17:47:59  12   feedback that we could receive from the regulators,

17:48:04  13   including the SEC, in the following months.

17:48:08  14        Q.   So is it fair to say the answer to my

17:48:10  15   question is no, you do not?

17:48:13  16        A.   No; that was the first sentence,

17:48:17  17   I believe.

17:48:17  18        Q.   Okay.  Now, in terms of the remainder of

17:48:21  19   your answer and the flexibility, is it fair to say

17:48:24  20   that you today still retain that flexibility to

17:48:46  21   change ...

17:48:48  22        Right.  Is it fair to say that -- so you

17:48:48  23   said the way you designed it was that you had

17:48:52  24   flexibility to change some features of the project.

17:49:03  25   Is it fair to say that you, to this day, retain that

159

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
17:49:06  1   flexibility to change features of how a project might
17:49:11  2   look like in the future?
17:49:12  3        A.   That's correct.
17:49:12  4        Q.   I mean, just as one example, I think at
17:49:15  5   some point originally there was at least the idea
17:49:17  6   conveyed to investors that TON Wallet might be
17:49:23  7   integrated into Messenger, but in Exhibit 38, which we
17:49:27  8   began the morning with, which was the statement that
17:49:29  9   you posted yesterday, there is a statement that TON
17:49:35 10   Wallet will no longer be integrated into Messenger;
17:49:38 11   is that correct?
17:49:38 12             MR. DRYLEWSKI:  Objection to form.
17:49:40 13   Objection to the characterization of the document.
17:49:45 14             THE WITNESS:  I believe in that
17:49:46 15   announcement we made clear that the Wallet would not
17:49:51 16   be integrated into the Messenger applications at
17:49:55 17   launch.
17:49:56 18   BY MR. TENREIRO:
17:49:56 19        Q.   Right.
17:50:05 20        A.   And we reserved the right to do that
17:50:08 21   later, subject to regulatory approval.
17:50:10 22        Q.   Right.  Thank you.  Thanks for clarifying.
17:50:13 23             "Telegram may integrate the TON Wallet
17:50:15 24   application with the Telegram Messenger service in the
17:50:17 25   future, to the extent permitted under applicable law
```

160

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:50:20  1    and governmental authorities."

17:50:22  2                I just read that from Exhibit 38.

17:50:25  3         A.    Yeah.

17:50:25  4         Q.    Is that what you were referring to?

17:50:27  5         A.    Correct.

17:50:27  6         Q.    Okay.  So that's one example of where you

17:50:30  7    retained flexibility, and retain flexibility today,

17:50:33  8    in terms of how you structure the TON Blockchain and

17:50:37  9    surrounding ecosystem?  Is that one example?

17:50:41 10         A.    That's one example.  The other, I think,

17:50:54 11    even more relevant example is when we received

17:50:56 12    feedback from the SEC in relation to the contemplated

17:51:10 13    Gram-buying function of the TON Foundation that may be

17:51:17 14    established in the future, and we understood that the

17:51:27 15    SEC was concerned with that function, and although we

17:51:40 16    might not fully -- might not have fully understood or

17:51:48 17    agreed with that view, we instantly changed our plans,

17:52:09 18    and at a certain point in time later informed all the

17:52:13 19    private placement purchasers about this change.

17:52:16 20         Q.    Thank you.  And is another example of

17:52:19 21    where you have some flexibility the existence of or

17:52:24 22    the parameters for functioning of the TON Foundation?

17:52:27 23    Is that another example?

17:52:29 24         A.    Yes.  I believe that flexibility is

17:52:34 25    allowed for in the risk factors of appendix to the

                                                                 161

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 17:54:53 | 1 | the TON Foundation cannot serve as a validator on the |
| 17:55:05 | 2 | TON Blockchain; is that correct? |
| 17:55:16 | 3 | A. ███ ██████████████████ |
| ████ | █ | ██████████████████████████████ |
| ████ | █ | ████████████████████████████ |
| ████ | █ | ██████████████████████ |
| ████ | █ | ███████████████████████████ |
| 17:56:06 | 8 | Q.   I just want to make sure I have a clear |
| 17:56:09 | 9 | record. |
| 17:56:09 | 10 | MR. DRYLEWSKI:  Yeah. |
| 17:56:09 | 11 | BY MR. TENREIRO: |
| 17:56:10 | 12 | Q.   So you believe you have a plan to allow |
| 17:56:12 | 13 | the TON Foundation to act as a validator? |
| 17:56:14 | 14 | A.   No. |
| 17:56:15 | 15 | Q.   Oh, okay. |
| 17:56:16 | 16 | MR. DRYLEWSKI:  Yeah.  So "could," I think |
| 17:56:16 | 17 | it was "could not." |
| 17:56:18 | 18 | MR. TENREIRO:  Okay. |
| 17:56:18 | 19 | THE WITNESS:  Sorry. |
| 17:56:19 | 20 | MR. TENREIRO:  Yeah. |
| 17:56:19 | 21 | THE WITNESS:  Could not. |
| 17:56:19 | 22 | MR. TENREIRO:  Okay. |
| 17:56:20 | 23 | BY MR. TENREIRO: |
| 17:56:23 | 24 | Q.   Okay.  So my followup question is, |
| 17:56:26 | 25 | is there flexibility, from your perspective, on that |

163

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
17:56:28  1   point as well, such that you could at some point later
17:56:33  2   in the future change your mind and permit the TON
17:56:35  3   Reserve to act as one of many validators on the TON
17:56:56  4   Blockchain?
17:56:56  5        A.   No, we never wanted to retain that
17:57:00  6   flexibility.  It was our -- it has been our plan
17:57:10  7   to disallow that kind of use of Grams by the TON
17:57:18  8   Foundation in order to make sure that the public
17:57:31  9   perception of the network is in line with expectations
17:57:54 10   people would reasonably have from a decentralized
17:58:00 11   network.
17:58:00 12        Q.   Okay.  We can set that document aside,
17:58:07 13   which is Exhibit 50.
17:58:08 14             You were talking about banking
17:58:10 15   relationships and I believe that -- is it fair to say
17:58:13 16   that during the term of the private placement, your
17:58:16 17   primary banking relationship -- ███████████████
         18   ███████████  ████████████████████████████████████
17:58:22 19             MR. DRYLEWSKI:  Objection, I think to
17:58:24 20   scope.
17:58:25 21             Is that in one of the topics?
17:58:26 22             MR. TENREIRO:  It's the Use of Funds
17:58:29 23   topic.
17:58:32 24             MR. DRYLEWSKI:  Use of Funds topic, okay.
17:58:45 25             THE WITNESS:  Yes, I think you could say
```

164

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 20:08:36 | 1 | completely or because the purchaser suddenly decided |
| 20:08:42 | 2 | to change their plans and, given the situation -- |
| 20:09:17 | 3 | I'm sorry.  So as a result of the situation |
| 20:09:21 | 4 | surrounding this specific investor, decided to |
| 20:09:27 | 5 | decrease the number of Grams that they would subscribe |
| 20:09:30 | 6 | for in the purchase agreements. |
| 20:09:34 | 7 | So those agreements had to be canceled in |
| 20:09:36 | 8 | order to have new agreements signed reflecting the |
| 20:09:42 | 9 | updated number of Grams and amounts in US dollars or |
| 20:09:57 | 10 | euro. |
| 20:09:58 | 11 | Q.   So tens of purchase agreements is your |
| 20:10:01 | 12 | kind of estimate? |
| 20:10:01 | 13 | A.   That's my estimate. |
| 20:10:03 | 14 | Q.   Okay.  And in terms of these funds -- |
| 20:10:06 | 15 | I'll go on a break after this. |
| 20:10:08 | 16 | MR. DRYLEWSKI:  Thank you. |
| 20:10:08 | 17 | BY MR. TENREIRO: |
| 20:10:09 | 18 | Q.   I'm sorry, did you want to say something |
| 20:10:12 | 19 | else? |
| 20:10:13 | 20 | A.   Just to clarify, that by tens of |
| 20:10:23 | 21 | agreements, I don't mean investors, I don't mean |
| 20:10:26 | 22 | purchasers; I mean separate purchase agreements -- |
| 20:10:31 | 23 | Q.   Sure. |
| 20:10:32 | 24 | A.   -- and one purchaser may have entered into |
| 20:10:36 | 25 | multiple purchase agreements. |

209

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3

 4  SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
 5                                   )
                       Plaintiff,    )
 6                                   ) 19 Civ. 9439 (PKC)
           - against -              )
 7                                   )
    TELEGRAM GROUP INC. and          )
 8  TON ISSUER INC.,                 )
                                     )
 9                     Defendants.   )
    _____)

10

11      **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13            Videotaped deposition of PAVEL DUROV (as

14  30(b)(6) corporate representative of Defendants and

15  also in his personal capacity), Volume 2, taken on

16  behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17  Square, Building 3, Level 5, Downtown Dubai, Dubai,

18  United Arab Emirates, beginning at 10:23 a.m. and

19  ending at 6:09 p.m., on Wednesday, January 8, 2020,

20  before LEAH WILLERSDORF, Member of the British

21  Institute of Verbatim Reporters, Accredited Verbatim

22  Reporter, Qualified Realtime Reporter - Level 2,

23  International Participating Member NCRA.

24

25  JOB No. 200108LWI
```

250

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:25:37 | 1 | Q.   Okay.   So with respect to the 1.3 billion |
| 10:25:40 | 2 | that is left from the private placement, sitting here |
| 10:25:43 | 3 | today, what are Telegram's plans for those funds, |
| 10:25:46 | 4 | the use of those funds? |
| 10:25:57 | 5 | A.   Would you mind specifying the period of |
| 10:25:59 | 6 | time for ... |
| 10:26:00 | 7 | Q.   Let's say for the next year. |
| 10:26:19 | 8 | A.   My expectation is that we will continue |
| 10:26:26 | 9 | to spend funds in a manner similar to which took place |
| 10:26:39 | 10 | last year or this year -- or, yeah, last year and the |
| 10:26:43 | 11 | beginning of this year.   So we don't anticipate big |
| 10:26:51 | 12 | changes up until the launch of TON when we expect that |
| 10:27:07 | 13 | certain expenses might go down due to the fact that we |
| 10:27:10 | 14 | will no longer be spending resources on developing and |
| 10:27:18 | 15 | testing TON. |
| 10:27:19 | 16 | Q.   So is it your expectation that after the |
| 10:27:21 | 17 | launch of the blockchain, Telegram will spend no funds |
| 10:27:25 | 18 | at all on TON or the blockchain? |
| 10:27:36 | 19 | A.   ███████████████████████████ |
| ████████ | | █████████████████████████████████ |
| ████████ | | ██████████ |
| 10:28:01 | 22 | Q.   So is it -- is the testing of the |
| 10:28:05 | 23 | TON Blockchain complete as of today, or do you expect |
| 10:28:09 | 24 | it will be complete by the launch?   What's the status |
| 10:28:12 | 25 | of the testing? |

257

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
10:28:16   1            MR. DRYLEWSKI:  Objection to form.
10:28:18   2            Do you mean Telegram's testing?  Because
10:28:20   3   there's also a testnet, I just want to be clear.
10:28:25   4            MR. TENREIRO:  Telegram's testing,
10:28:27   5   mmm-hmm.
10:28:28   6            MR. DRYLEWSKI:  Okay.
10:28:29   7            Objection to form.  Objection to
10:28:34   8   foundation.
10:28:57   9            THE WITNESS:  We consider the testing of
10:29:06  10   the core components of the TON network to be complete;
10:29:21  11   however, certain additional functionality of TON, that
10:29:35  12   would be nice to have, but that would not be necessary
10:29:42  13   for the launch.  It's still required and that is the
10:29:57  14   kind of testing that we are focused on right now.
10:30:04  15   BY MR. TENREIRO:
10:30:04  16       Q.   So let me take it in steps.  Some of the
10:30:06  17   functionality that would be nice to have but not
10:30:08  18   required, can you be more specific about what you
10:30:11  19   mean, what functionalities?
10:30:14  20            MR. DRYLEWSKI:  And just for the record,
10:30:15  21   about which topic are we in right now?
10:30:18  22            MR. TENREIRO:  I think this is -- hold on
10:30:20  23   a second.
10:30:31  24            MR. DRYLEWSKI:  I'll answer my own
10:30:33  25   question.  Is it 13?
```

                                                         258

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:47:09 | 1 | voted on or -- under the protocols and procedures of |
| 10:47:13 | 2 | the TON Blockchain?  Is that one of the things that, |
| 10:47:15 | 3 | in theory, the TON Foundation could do if it ever |
| 10:47:18 | 4 | existed? |
| 10:48:11 | 5 | A.   Since the TON Foundation, as contemplated |
| 10:48:27 | 6 | at a certain point in time in the past, was modeled |
| 10:48:35 | 7 | after the Ethereum foundation and the Bitcoin |
| 10:48:41 | 8 | foundation, foundations relevant to the similar but |
| 10:48:52 | 9 | older and less, we believe, efficient networks, one of |
| 10:49:02 | 10 | its planned functions that we discussed was to be |
| 10:49:20 | 11 | able to, based on the input from the blockchain |
| 10:49:26 | 12 | community and relevant experts, put forward proposals |
| 10:49:47 | 13 | in relation to the future of TON Blockchain in the |
| 10:49:59 | 14 | same way as any other organization or group of people, |
| 10:50:17 | 15 | if they would like so, will be able to put forward |
| 10:50:24 | 16 | proposals in relation to the future of TON Blockchain. |
| 10:50:39 | 17 | Those proposals, though, would not, and will not, |
| 10:50:51 | 18 | be able to affect any property or functionality in the |
| 10:51:03 | 19 | TON Blockchain, or change the way how it would work, |
| 10:51:32 | 20 | unless validators/parties that will be hosting |
| 10:51:45 | 21 | the network agree, in their majority, to implement |
| 10:52:05 | 22 | proposed changes, be it changes proposed by the |
| 10:52:18 | 23 | hypothetical TON Foundation or any other organization |
| 10:52:33 | 24 | of that kind that may be established in the future by |
| 10:52:46 | 25 | third parties. |

264

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:57:07 | 1 | Q.   And for that reason, Telegram has retained |
| 10:57:09 | 2 | flexibility in its offering documents for the private |
| 10:57:13 | 3 | placement to change its mind about the level of |
| 10:57:16 | 4 | involvement it might have with some of these issues; |
| 10:57:18 | 5 | is that correct? |
| 10:57:30 | 6 | A.   Generally speaking, Telegram reserved |
| 10:57:39 | 7 | a very large degree of flexibility described in the |
| 10:57:48 | 8 | offering materials, in the purchase agreement and |
| 10:57:54 | 9 | its appendices.  I believe that in certain parts of |
| 10:58:22 | 10 | the offering materials we make it clear for the |
| 10:58:36 | 11 | purchasers that the future of the TON Blockchain is -- |
| 10:58:52 | 12 | would be in the hands of decentralized, open source |
| 10:59:05 | 13 | community.  I think this was almost a direct quote |
| 10:59:19 | 14 | from the primer, if I'm not mistaken. |
| 10:59:21 | 15 | MR. TENREIRO:  It's "decentralized." |
| 10:59:22 | 16 | MR. DRYLEWSKI:  I was going to check after |
| 10:59:24 | 17 | the answer was done. |
| 10:59:25 | 18 | MR. TENREIRO:  Yeah.  I got it. |
| 10:59:30 | 19 | THE WITNESS:  Thank you. |
| 10:59:30 | 20 | MR. TENREIRO:  I'm sorry.  Were you |
| 10:59:33 | 21 | finished?  I apologize. |
| 10:59:40 | 22 | THE WITNESS:  And based on that, I think |
| 11:00:08 | 23 | it was -- it is clear that the degree of Telegram's |
| 11:00:24 | 24 | involvement in developing and supporting TON |
| 11:00:36 | 25 | post-launch would be limited. |

266

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 11:10:46 | 1 | BY MR. TENREIRO: |
| 11:10:46 | 2 | Q.   But let's, I think -- let's break -- |
| 11:10:48 | 3 | MR. DRYLEWSKI:  Telegram, the entity. |
| 11:10:48 | 4 | MR. TENREIRO:  Yeah, let's break it up |
| 11:10:51 | 5 | because he might be struggling. |
| 11:10:53 | 6 | THE WITNESS:  Sure. |
| 11:10:53 | 7 | BY MR. TENREIRO: |
| 11:10:54 | 8 | Q.   So let's try Telegram first. |
| 11:10:56 | 9 | A.   Okay.  So Telegram does not intend to hold |
| 11:10:58 | 10 | any Grams post launch. |
| 11:11:02 | 11 | Q.   So the unsold Grams will go to who? |
| 11:11:17 | 12 | A.   The unsold Grams, provided the network |
| 11:11:30 | 13 | is launched with unsold Grams, will be locked until |
| 11:11:38 | 14 | the creation of, the establishment of the |
| 11:11:41 | 15 | TON Foundation.  If the TON Foundation is never |
| 11:11:51 | 16 | established, those unsold Grams will be locked for |
| 11:11:57 | 17 | perpetuity. |
| 11:11:58 | 18 | Q.   And what's the percentage of the 5 billion |
| 11:12:02 | 19 | that those locked Grams would be? |
| 11:12:08 | 20 | A.   I think we had the -- |
| 11:12:13 | 21 | MR. DRYLEWSKI:  Let's go off the record |
| 11:12:14 | 22 | for one second if that's okay. |
| 11:12:16 | 23 | MR. TENREIRO:  Okay. |
| 11:12:16 | 24 | THE VIDEOGRAPHER:  We are going off the |
| 11:12:18 | 25 | record.  The time is 11:12. |

269

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 11:23:31 | 1 | "28 percent of the initial supply of Grams would be |
| 11:23:31 | 2 | allocated to the TON Reserve to be used by the |
| 11:23:33 | 3 | TON Foundation as described [therein]"? |
| 11:23:44 | 4 | A.   I think this is an accurate reflection |
| 11:24:05 | 5 | of our plans -- |
| 11:24:06 | 6 | Q.   Accurate and. |
| 11:24:08 | 7 | A.   ... reflection of our plans, yeah. |
| 11:24:10 | 8 | Q.   An accurate reflection, okay. |
| 11:24:11 | 9 | Then if you go to page 29 where there is |
| 11:24:18 | 10 | Interrogatory No. 15 and a response also.  If you |
| 11:24:21 | 11 | could focus on the first paragraph first that |
| 11:24:23 | 12 | describes: |
| 11:24:24 | 13 | "... Defendants currently contemplate that |
| 11:24:25 | 14 | approximately 10% of the initial supply of Grams will |
| 11:24:29 | 15 | be allocated for incentive payments to TON Blockchain |
| 11:24:29 | 16 | users... The Incentives Pool is expected to managed by |
| 11:24:33 | 17 | the TON Foundation." |
| 11:24:34 | 18 | Oh, page 29. |
| 11:24:36 | 19 | A.   Yes, okay. |
| 11:24:46 | 20 | Q.   So is that statement accurate? |
| 11:25:42 | 21 | A.   It is accurate that we plan to distribute |
| 11:26:00 | 22 | approximately 10 percent in the initial supply of |
| 11:26:03 | 23 | Grams among the users of the TON Blockchain, subject |
| 11:26:15 | 24 | to certain conditions.  It is, however, worth noting |
| 11:26:23 | 25 | that in light of the uncertain status of the |

271

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:26:36 | 1 | TON Foundation, one of the mechanics of distributing |
| 11:26:59 | 2 | those 10 percent of Grams that we have been discussing |
| 11:27:14 | 3 | is that in case the TON Foundation is not established |
| 11:27:33 | 4 | or, theoretically speaking, for some reasons could |
| 11:27:54 | 5 | never be established and we come to such a conclusion, |
| 11:28:03 | 6 | then we were discussing ways to distribute those |
| 11:28:29 | 7 | 10 percent of the initial supply among the users |
| 11:28:39 | 8 | directly at launch so that if the incentive pool, |
| 11:29:28 | 9 | as a concept, is considered to be applicable as |
| 11:30:23 | 10 | a result of the ongoing analysis and continuing legal |
| 11:30:29 | 11 | processes, while the TON Foundation, for some reasons, |
| 11:30:45 | 12 | is not feasible as a concept, we could treat the |
| 11:31:04 | 13 | incentives pool separately from the TON Foundation and |
| 11:31:18 | 14 | could still try to find compliant ways to implement |
| 11:31:39 | 15 | the idea of distributing 10 percent among the users |
| 11:31:50 | 16 | in order to increase and promote the consumptive use |
| 11:32:00 | 17 | of the new currency. |
| 11:32:06 | 18 |      Q.   Thank you.  I'm just trying to get an |
| 11:32:09 | 19 | answer to my question now, which is: What percentage |
| 11:32:11 | 20 | of Grams of the 5 billion is Telegram's employees |
| 11:32:14 | 21 | going to have upon the launch?  It's just a number. |
| 11:32:17 | 22 |      MR. DRYLEWSKI:  I think he just answered |
| 11:32:18 | 23 | that question. |
| 11:32:19 | 24 |      MR. TENREIRO:  I don't think so. |
| | 25 | /// |

272

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:32:20 | 1 | BY MR. TENREIRO: |
| 11:32:21 | 2 | Q.   I just want a number. |
| 11:32:37 | 3 | A.   I can reconfirm that Telegram will not |
| 11:32:39 | 4 | hold any Grams post launch.  We mentioned in the |
| 11:32:59 | 5 | offering materials that we plan to distribute |
| 11:33:06 | 6 | 4 percent of Grams, which should be around 200 million |
| 11:33:20 | 7 | Grams, I believe, among the development team, and |
| 11:33:57 | 8 | we are still evaluating, under the circumstances, |
| 11:34:08 | 9 | whether we would proceed with that initial plan of |
| 11:34:19 | 10 | distributing all or some of those 200 million Grams |
| 11:34:40 | 11 | among the developers that worked on TON. |
| 11:34:50 | 12 | Q.   So what percentage of the Grams were sold |
| 11:34:53 | 13 | in the private placement? |
| 11:36:00 | 14 | A.   In order to make sure I accurately answer |
| 11:36:03 | 15 | your question, may I look at the documents in my email |
| 11:36:19 | 16 | and ... |
| 11:36:20 | 17 | MR. DRYLEWSKI:  What we can do, I think, |
| 11:36:22 | 18 | Jorge, this isn't meant to be a memory test, is we can |
| 11:36:25 | 19 | get the information for you, we can take a quick break |
| 11:36:28 | 20 | and he can answer the question because it's a knowable |
| 11:36:31 | 21 | answer; he just doesn't know the percentages right |
| 11:36:33 | 22 | now.  We're talking about a lot of different numbers. |
| 11:36:35 | 23 | So does that work for you? |
| 11:36:37 | 24 | MR. TENREIRO:  Sure.  Let's just get the |
| 11:36:38 | 25 | numbers and get an answer.  We've been at this for, |

273

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:44:25 | 1 | Q.   Okay.  And the remaining 42 percent, |
| 11:44:30 | 2 | who currently, as we sit here today, will have the |
| 11:44:34 | 3 | authority to decide what to do and how to allocate the |
| 11:44:38 | 4 | remainder of the 42 percent? |
| 11:45:06 | 5 | A.   The creators of the network will be |
| 11:45:09 | 6 | responsible for the distribution mechanism at launch. |
| 11:45:21 | 7 | Q.   So the creators of the network, you mean |
| 11:45:26 | 8 | Telegram? |
| 11:45:26 | 9 | A.   Yes. |
| 11:45:26 | 10 | Q.   Okay.  And moving on to a separate topic |
| 11:45:31 | 11 | or, I guess, just moving on from this line of |
| 11:45:33 | 12 | questioning, I think yesterday we talked about whether |
| 11:45:38 | 13 | Telegram or its employees may take part in voting or |
| 11:45:42 | 14 | validation.  Do you recall generally we talked about |
| 11:45:45 | 15 | that a little bit? |
| 11:45:45 | 16 | A.   Yes. |
| 11:45:46 | 17 | Q.   And I think you said in your public notice |
| 11:45:49 | 18 | of the 6th, which I think was Monday, and if you want |
| 11:45:53 | 19 | to refer to it, it's Exhibit 38, but you said, |
| 11:45:58 | 20 | you know, Telegram and its employees -- |
| 11:46:00 | 21 | I'm paraphrasing -- will not take part in voting or |
| 11:46:02 | 22 | validating in connection with the TON Blockchain. |
| 11:46:05 | 23 | This voluntary decision was made in order to avoid any |
| 11:46:07 | 24 | perception that Telegram or its employees can or will |
| 11:46:10 | 25 | exercise control over the TON Blockchain following its |

276

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
11:46:13  1   launch.
11:46:15  2            Does that sound more or less like what you
11:46:18  3   said?
11:46:18  4        A.   Yes.
11:46:18  5        Q.   Okay.  Now, at some point, though, prior,
11:46:22  6   Telegram's employees were -- it was contemplated that
11:46:27  7   they could participate in validating up to a certain
11:46:31  8   percentage of Grams available; is that not correct?
11:46:43  9            MR. DRYLEWSKI:  Sorry, could I have that
11:46:44 10   question read back.  I want to know if I need to
11:46:47 11   object.
11:47:01 12            (Whereupon, the record was read back by
11:47:02 13            the court reporter.)
11:47:02 14            MR. DRYLEWSKI:  Okay.  I wanted to know if
11:47:04 15   you said "disclosed" or "contemplated."  I do not
11:47:08 16   object.
11:47:48 17            THE WITNESS:  If I remember it right, when
11:48:10 18   we were drafting our plans in relation to the
11:48:12 19   distribution of Grams -- and those plans were drafted
11:48:20 20   in, I believe, 2017, or started to be drafted in
11:48:27 21   2017 -- we didn't specifically emphasize in those
11:48:52 22   plans that we would limit the holders of this
11:49:13 23   hypothetical 4 percent from participating in
11:49:22 24   validation.
         25   ///
```

277

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:12:09 | 1 | "We were planning to provide you with the |
| 12:12:11 | 2 | same level of allocation we grant other tier-1 firms |
| 12:12:15 | 3 | such as ███████████, which is 15 [million]." |
| 12:12:20 | 4 | Do you see that? |
| 12:12:21 | 5 | A.   Yes. |
| 12:12:22 | 6 | Q.   Can you tell me what you meant by "tier-1 |
| 12:12:26 | 7 | firms"? |
| 12:12:26 | 8 | MR. DRYLEWSKI:  And this is a question |
| 12:12:28 | 9 | to him in his personal capacity? |
| 12:12:30 | 10 | MR. TENREIRO:  Yeah. |
| 12:12:30 | 11 | MR. DRYLEWSKI:  Thank you. |
| 12:12:44 | 12 | THE WITNESS:  I think it is common |
| 12:12:46 | 13 | knowledge that there are certain venture capital funds |
| 12:12:56 | 14 | in Silicon Valley and elsewhere that are universally |
| 12:13:05 | 15 | considered to have the best track record in the |
| 12:13:29 | 16 | industry, and such VCs, and in some cases individual |
| 12:13:37 | 17 | investors, are often referred to as "tier 1 funds," |
| 12:13:45 | 18 | at least the firms.  At least that is how I use this |
| 12:13:51 | 19 | word. |
| 12:13:52 | 20 | BY MR. TENREIRO: |
| 12:13:52 | 21 | Q.   Okay.  And why -- I think you mentioned |
| 12:13:56 | 22 | reputation a couple times.  Why does reputation -- why |
| 12:14:01 | 23 | was that a factor that Telegram considered in the |
| 12:14:04 | 24 | allocation decision? |
| 12:14:24 | 25 | A.   Reputation was very important if -- a very |

287

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:14:30 | 1 | important factor for us when deciding which purchasers |
| 12:14:43 | 2 | should be admitted to participating in the private |
| 12:14:51 | 3 | placement, because when entering the purchase |
| 12:15:00 | 4 | agreements, investors were obliged by the agreement |
| 12:15:20 | 5 | to make representations, including representations |
| 12:15:38 | 6 | that confirmed that they're buying an interest in |
| 12:15:57 | 7 | Grams on their own behalf and not on behalf of some |
| 12:16:07 | 8 | other parties, and not with the view to reselling this |
| 12:16:18 | 9 | interest in Grams.  They would then have to reconfirm |
| 12:16:35 | 10 | those representations at the time when Grams would be |
| 12:16:56 | 11 | issued to them, and it was a clear condition that they |
| 12:17:03 | 12 | would have to reconfirm those representations in order |
| 12:17:08 | 13 | to receive Grams at launch. |
| 12:17:22 | 14 | It was important that we have reputable |
| 12:17:28 | 15 | investors, to the extent it is possible, and other |
| 12:17:51 | 16 | considerations that we have most confidence in the |
| 12:18:09 | 17 | fact that the people making these representations |
| 12:18:28 | 18 | can be trusted and those representations can be relied |
| 12:18:30 | 19 | on. |
| 12:18:31 | 20 | Q.   Is there any other reason why their |
| 12:18:35 | 21 | reputation matter, other than the reasons you just |
| 12:18:38 | 22 | mentioned, or was that it? |
| 12:18:56 | 23 | A.   Well, having well-known, reputable firms |
| 12:19:06 | 24 | as parties in the purchase agreements could also allow |
| 12:19:17 | 25 | to decrease complexity in terms of necessary |

288

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12:19:40  1    processes, such as obtaining KYC source-of-wealth

12:19:51  2    information for these purchasers.

12:19:55  3        Q.   And why does a VC, a venture capitalist

12:20:00  4    firm's, track record matter?  Why is that a factor?

12:20:11  5        A.   VCs with track record, in our view, could

12:21:16  6    be trusted and would, with a high degree of

12:21:30  7    probability, be able to better understand the nature

12:21:39  8    of the project that we were undertaking.

12:21:50  9        Q.   Other than I think you mentioned

12:21:54 10    reputation, track record, brand name, experience in

12:21:58 11    this space, were there other factors -- and you said

12:22:02 12    those were the -- I'm just trying to make sure

12:22:05 13    I understood.

12:22:05 14             You said those were the factors, also

12:22:07 15    potentially personal relationships that you might have

12:22:09 16    had.  Any other factors that I am missing that

12:22:14 17    Telegram considered in deciding the allocations in the

12:22:22 18    pre-sale round?

12:22:30 19        A.   I believe there could be certain other

12:22:33 20    factors which include the fact that those purchasers

12:22:50 21    were only admitted to the allocation if -- to the

12:22:54 22    purchase -- private placement if they were

12:22:58 23    sophisticated, accredited investors, and high

12:23:11 24    net-worth individuals.  Another factor I could think

12:23:17 25    of, for example, is if, after meeting or speaking or

                                                            289

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
12:23:36   1   communicating in another way with a potential
12:23:40   2   purchaser, we were not able to get confident that the
12:24:04   3   purchaser, potential purchaser clearly understands the
12:24:15   4   nature of our project and its limitations, including
12:24:19   5   some of the limitations later reflected in the
12:24:33   6   purchase agreement and the appendices to the primer,
12:24:37   7   we would, with a higher degree of probability, decline
12:24:54   8   to admit such a potential purchaser to the private
12:24:59   9   placement.
12:25:00  10          Another example could be when we would,
12:25:26  11   during the process of defining the allocation, receive
12:25:38  12   certain rumors from the market that would indicate
12:25:41  13   that this potential purchaser did not fully understand
12:25:52  14   the nature of what we were doing or the limitations
12:25:59  15   imposed for the purchase agreement, we would, with
12:26:08  16   a very high degree of probability, cancel the
12:26:16  17   allocation of such a potential purchaser or, if this
12:26:24  18   allocation hadn't even been considered prior to that,
12:26:39  19   we would not pursue this opportunity related to such
12:27:18  20   purchaser in any way.
12:27:34  21          Q.   And in terms of ensuring that these
12:27:36  22   initial purchasers were not buying the Grams to resell
12:27:40  23   them, why not just lock up the Grams, all the Grams
12:27:46  24   from being resold?
12:27:47  25          MR. DRYLEWSKI:   Objection; form.
```

290

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:31:52 | 1 | restricting the ability of those Grams to be |
| 12:31:56 | 2 | transferred for resale as opposed to be transferred |
| 12:32:00 | 3 | for validation or use in applications or some other |
| 12:32:06 | 4 | use with respect to the blockchain? |
| 12:32:08 | 5 | Let me strike this and just lay |
| 12:32:10 | 6 | a foundation. |
| 12:32:11 | 7 | You're familiar that in blockchain |
| 12:32:14 | 8 | technology, are you not, that you can restrict the |
| 12:32:16 | 9 | transfer of tokens on blockchains for certain -- |
| 12:32:19 | 10 | within certain parameters?  Are you familiar with that |
| 12:32:21 | 11 | generally? |
| 12:32:29 | 12 | A.   I understand that developers of some |
| 12:32:34 | 13 | blockchain projects may seek to do so. |
| 12:32:36 | 14 | Q.   Okay.  So why didn't Telegram seek -- why |
| 12:32:40 | 15 | isn't Telegram seeking to do so, to restrict the |
| 12:32:43 | 16 | ability of the initial purchasers in Stage A to |
| 12:32:47 | 17 | transfer the Grams, except for certain uses only? |
| 12:33:11 | 18 | A.   Grams were designed to be a mass-market |
| 12:33:20 | 19 | currency, used for consumptive purposes.  We were |
| 12:33:35 | 20 | hoping to build upon the ideas of older, decentralized |
| 12:33:45 | 21 | networks such as Bitcoin and Ethereum, and |
| 12:33:54 | 22 | significantly improve their speed, scaleability and |
| 12:34:02 | 23 | ease of use, so that consumers that are currently |
| 12:34:14 | 24 | struggling with limitations existing in these older |
| 12:34:24 | 25 | networks that I just mentioned would be able to enjoy |

293

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:34:41 | 1 | a more efficient service and achieve their goals in |
| 12:34:51 | 2 | a more efficient and user-friendly way so that, |
| 12:34:59 | 3 | as a result, the resulting cryptocurrency will -- |
| 12:35:07 | 4 | the resulting cryptocurrency could achieve wider |
| 12:35:17 | 5 | adoption and be used in commerce and all sorts of |
| 12:35:39 | 6 | applications for a wide range of purposes. |
| 12:36:06 | 7 | We thought that given these |
| 12:36:27 | 8 | considerations, it was necessary to make sure that |
| 12:36:44 | 9 | consumers can interact with this new currency in the |
| 12:36:56 | 10 | similar way they interact with less efficient and |
| 12:37:15 | 11 | older blockchain networks.  We believe that to achieve |
| 12:37:30 | 12 | these goals, it would not be beneficial to impose |
| 12:37:48 | 13 | limitations on the participants in the ecosystem that |
| 12:37:59 | 14 | are absent in other similar networks such as Bitcoin |
| 12:38:09 | 15 | and Ethereum. |
| 12:38:10 | 16 | Q.  So my question was not about imposing |
| 12:38:13 | 17 | limitations on the participants in the ecosystem but |
| 12:38:15 | 18 | simply limitations on the ability of the initial |
| 12:38:18 | 19 | purchasers to transfer their Grams for sale as opposed |
| 12:38:21 | 20 | to giving them to mass markets for adoption for the |
| 12:38:25 | 21 | purposes you just described. |
| 12:38:48 | 22 | A.  As I just mentioned, it was critical |
| 12:39:04 | 23 | to achieve a wide adoption for this new cryptocurrency |
| 12:39:12 | 24 | in order for it to have the utility and consumptive |
| 12:39:27 | 25 | use for consumers.  Based on that, it was beneficial |

294

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
12:44:56  1  BY MR. TENREIRO:
12:44:56  2       Q.   Maybe I should ask it this way: Is there
12:45:01  3  a belief -- was there a belief, when this
12:45:04  4  interrogatory answer was submitted, that Grams
12:45:07  5  would be worth $3 to $7 at some point?
12:45:10  6            MR. DRYLEWSKI:  Objection to form.
12:45:12  7            Grams worth 3 to 7 -- I guess, what do you
12:45:16  8  mean Grams that would be worth that?  In the
12:45:17  9  aggregate?  All Grams?  A Gram?
12:45:17 10  BY MR. TENREIRO:
12:45:19 11       Q.   You wrote the answer; so what did you mean
12:45:22 12  there, "Grams worth approximately 3 to 7" --
12:45:26 13            MR. DRYLEWSKI:  Okay, that's a different
12:45:27 14  question.  Okay.
12:45:28 15            THE WITNESS:  I think, to avoid confusion,
12:45:31 16  it is important to point out that it is not implied
12:45:34 17  here that one Gram will be worth $3 to $7.
12:45:41 18  BY MR. TENREIRO:
12:45:42 19       Q.   Okay.
12:46:07 20       A.   What is implied here is that after the
12:46:09 21  successful launch of the network as it is currently
12:46:19 22  contemplated, there will be a certain market price of
12:46:26 23  Grams formed by market forces.
12:46:45 24       Q.   So it's whatever the price -- so if the
12:46:48 25  price, by market forces, is, I don't know, $20, then
```

297

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:50:45  1   Was the potential amount that you allocated to each
12:50:49  2   investor related to, you know, their ability to have
12:50:58  3   considerable disk space, computing power, network
12:51:02  4   bandwidth, as well as a continual commitment to
12:51:06  5   100 percent uptime?
12:51:08  6              MR. DRYLEWSKI:  Objection; form.
12:51:44  7              THE WITNESS:  As you know, we only
12:51:48  8   admitted high net-worth individuals and established
12:52:02  9   funds in private placement, and it was an inevitable
12:52:32 10   consequence of this that such individuals or funds
12:52:41 11   would be able to rent -- to afford to pay for the
12:53:07 12   computing power necessary in the validation process,
12:53:14 13   because, in my understanding, the cost of renting or
12:53:38 14   acquiring equipment for validation, although
12:53:43 15   considerable for an average person, can be regarded
12:53:52 16   as negligible compared to the amounts of funds
12:53:57 17   invested by each of the purchasers.
12:54:03 18   BY MR. TENREIRO:
12:54:03 19        Q.   And the average person, if the
12:54:06 20   TON Blockchain launches, will be able to buy Grams
12:54:09 21   in any quantity, even in fractional quantities, right?
12:54:17 22              MR. DRYLEWSKI:  Objection; form.
12:54:22 23              THE WITNESS:  This is dependent on several
12:54:25 24   factors but this is the plan.
         25   ///
```

300

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

13:44:13  1  would be used as a number required for the network

13:44:34  2  to function, unlike in some maybe other competing

13:44:41  3  blockchain projects; so there was no way to

13:44:49  4  definitively answer that question.

13:44:53  5        MR. TENREIRO:  Okay.  Just a couple more

13:44:55  6  questions and then we can -- just to finish this

13:44:57  7  topic, if you don't mind?

13:44:59  8        MR. DRYLEWSKI:  Sure.

13:44:59  9  BY MR. TENREIRO:

13:45:00  10     Q.   I think you mentioned at some point today,

13:45:02  11  but correct me, has Telegram completed all of the

13:45:05  12  tests on the TON Blockchain for the TON Blockchain?

13:45:09  13        MR. DRYLEWSKI:  Objection; form.

13:45:35  14        THE WITNESS:  As I previously indicated,

13:45:39  15  by October 2019 we concluded the vigorous testing of

13:46:01  16  the core components of the TON Blockchain that

13:46:16  17  we considered necessary for the project to be able to

13:46:31  18  be launched as a decentralized network.  At the same

13:46:59  19  time, we, given the change of the deadline date for

13:47:08  20  this project, are using this additional time to work

13:47:33  21  on a few nice-to-have features.  In addition, we keep

13:48:07  22  reviewing the feedback from the open-source community

13:48:21  23  security researchers that we previously incentivized

13:48:34  24  to help us with the testing process.

          25  ///

                                                    316

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:50:09 | 1 | Q.   Can you tell me who these individuals or |
| 14:50:12 | 2 | entities are, these open-source community security |
| 14:50:18 | 3 | researchers that you had previously incentivized? |
| 14:50:29 | 4 | A.   I think that in September last year |
| 14:50:35 | 5 | we launched a contest for smart contract engineers and |
| 14:50:54 | 6 | security researchers that promised a price fund of |
| 14:51:08 | 7 | up to $400,000 to be distributed among the winners in |
| 14:51:24 | 8 | this competition.  As a result, we had a lot of people |
| 14:51:48 | 9 | from the industry looking at the code of the |
| 14:51:53 | 10 | TON Blockchain, testing how the TON Blockchain and |
| 14:52:07 | 11 | its virtual machine work, and seeing whether they |
| 14:52:14 | 12 | could find any security issues with the project. |
| 14:52:26 | 13 | Q.   And these people are still doing some of |
| 14:52:28 | 14 | that work is what you're saying? |
| 14:52:31 | 15 | MR. DRYLEWSKI:  Objection; form. |
| 14:52:42 | 16 | THE WITNESS:  The prize budget that we |
| 14:52:52 | 17 | intended to be distributed among security researchers |
| 14:53:04 | 18 | which would be able to alert us to critical issues |
| 14:53:19 | 19 | that they may find in the code of the TON Blockchain |
| 14:53:34 | 20 | is still there and we have indicated publicly that |
| 14:53:43 | 21 | we continue accepting and rewarding individuals that |
| 14:53:51 | 22 | could help us test the network in the way I just |
| 14:54:10 | 23 | described. |
| 14:54:11 | 24 | MR. TENREIRO:  Let's look at Exhibit 73, |
| 14:54:14 | 25 | please.  We just marked it.  It's 17-332. |

318

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 17:12:47 | 1 | from other sources publicly available for anybody. |
| 17:12:58 | 2 | Q.   And a moment or two ago you mentioned that |
| 17:13:01 | 3 | in October, Telegram disclosed certain financial |
| 17:13:06 | 4 | information.  Was that information emailed directly |
| 17:13:10 | 5 | to the private placement purchasers, or how was it |
| 17:13:17 | 6 | disclosed to them? |
| 17:13:21 | 7 | A.   Yes, I believe it was part of the update |
| 17:13:24 | 8 | we sent to all of the purchasers by email. |
| 17:13:27 | 9 | Q.   And is there is any current plan in place |
| 17:13:33 | 10 | by Telegram in terms of what sort of financial |
| 17:13:37 | 11 | information about itself it might disclose after the |
| 17:13:41 | 12 | launch of the TON Blockchain? |
| 17:14:01 | 13 | A.   In our view, Telegram's obligations under |
| 17:14:09 | 14 | the purchase agreement, for the most part, will be met |
| 17:14:32 | 15 | at the time of launch, meaning that after the launch |
| 17:14:36 | 16 | of the TON Blockchain, Telegram will no longer be |
| 17:14:39 | 17 | actively developing TON and, as such, it is not |
| 17:15:08 | 18 | obvious why purchasers who have received Grams in the |
| 17:15:14 | 19 | event of a successful launch of the TON Blockchain |
| 17:15:23 | 20 | would need any information -- |
| 17:15:23 | 21 | Q.   So -- I'm sorry. |
| 17:15:34 | 22 | A.   -- from Telegram Messenger other than the |
| 17:15:41 | 23 | information that will be already available from public |
| 17:15:45 | 24 | sources. |
| 17:15:46 | 25 | Q.   Sorry.  So my question was not about plans |

358