# Exhibit 7

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
    ---------------------------------------x
 4                                         )
    SECURITIES AND EXCHANGE COMMISSION,    )
 5                                         )
                         Plaintiff,        ) 19 Civ. 9439 (PKC)
 6                                         )
        v.                                 )
 7                                         )
    TELEGRAM GROUP INC. and                )
 7   TON ISSUER INC.,                      )
 8                                         )
                         Defendants.       )
 9                                         )
    ---------------------------------------x
10
11
12                       CONFIDENTIAL
13                  VIDEOTAPED DEPOSITION OF
14                       SHYAM PAREKH
15                     December 10, 2019
16
17
18                        Taken at:
19    Skadden, Arps, Slate, Meagher & Flom (UK) LLP
                       40 Bank Street
20                      Canary Wharf
                      London, E14 5DS
21
22
23
    Reported by:
24  AILSA WILLIAMS,
    Certified Court Reporter
25  JOB No. 191210MWC
```

1

```
 1              A.   Yes.
 2              Q.   Did he indicate to you why they had
 3    made that decision, what factors had come into
 4    play, given what you have just indicated?
 5              MR. DRYLEWSKI:  I am going to give the
 6    same instruction I gave on the last question.
 7              A.   I can only say what I said before,
 8    which is that, as there was perceived to be
 9    meaningful regulatory uncertainty, John said that
10    we, the proverbial "we" decided that we should
11    take a safer, as safe as possible approach and
12    deal only with highly sophisticated institutional
13    investors in a proper, organized private
14    placement.
15              Q.   Did you have any understanding
16    that -- in one of my prior questions I made
17    reference to an initial private raise of
18    600 million and then a public raise of
19    600 million.  Did you have an understanding that
20    that was the amount Telegram was initially
21    considering raising, prior to your joining the
22    company?
23              A.   First of all, can your colleague
24    hear now?  Is that okay, just to check.
25              MR. McGRATH:  Jorge, can you hear the
```

```
 1    meaningful, because the price will be what it will
 2    be, based on supply and demand for any currency,
 3    dollar, euro, pound.  It will be up, down,
 4    sideways.  It has nothing to do with the reference
 5    price.
 6              Q.  Do you have any understanding that
 7    there has been reference made in documents that
 8    Telegram has communicated to the initial
 9    purchasers that the price of Grams at the time of
10    launch will be set at approximately $3.62?
11              MR. DRYLEWSKI:  Objection to form.  If
12    you want to show him the documents that you are
13    referencing, he is happy to review them and answer
14    the questions with the documents in front of him.
15              MR. McGRATH:  Right.  Do you need to
16    look at the document to answer that question or
17    can you answer the question without me showing you
18    the document?
19              A.  I can answer the general, and what I
20    would say as a general matter is that any such
21    calculation of a reference price was purely a
22    mathematical output and is not a reflection of
23    what any of us or any of the investors actually
24    expected the actual price to be.  There was a very
25    clear understanding internally, and with the
```

CONFIDENTIAL

```
 1   investors I spoke to at least that supply and
 2   demand would set the actual market price
 3   independent of whatever reference price is
 4   involved.
 5           Q.  That was not my question.  I was not
 6   asking you what your understanding of what the
 7   investors thought, at least not yet.  My
 8   understanding is -- do you have any recollection
 9   that there was an indication in offering documents
10   that the price of Grams would be set at $3.62
11   approximately, at the time of launch of the TON
12   Blockchain?
13           MR. DRYLEWSKI:  Same objection.  If you
14   want to point him to a document to help him on
15   this, we are more than happy.
16           MR. McGRATH:  It is fine.
17           A.  I think we would have to look at the
18   document.  As I say, I don't personally recognize
19   the way in which that question is being phrased.
20           Q.  We can come back to that.  During
21   the initial -- what we call the first round of the
22   initial offering, was there more demand for
23   investors to subscribe to that offering than the
24   $850 million that was allocated to the offering?
25           A.  Yes.  The volume or value,
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

1          Did Mr. Hyman ever tell you that he had
2     heard from any third-party that people were
3     willing to pay up to a dollar per Gram in the
4     secondary market during the time that the initial
5     offering was taking place?
6          A.  No, he didn't tell that to me, at
7     least in conversation.  It may have been I was
8     copied on an email, in which case we could look at
9     it, but I don't recall that either.
10         Q.  Are you aware of any instance where
11    Telegram denied somebody an allocation in either
12    the first or second round because they obtained
13    information that that party was offering to sell
14    Grams to third parties?
15         A.  I vaguely recall Ilya making some
16    references to "such and such should be excluded
17    because they may have looked at selling", or
18    something like that, but I don't remember any
19    details.
20         Q.  Do you remember the name of the
21    investor?
22         A.  No, I don't.
23         Q.  This question I believe is slightly
24    different.  I want to just ask you, do you
25    remember -- do you have any understanding as to

79

CONFIDENTIAL

```
 1    whether Telegram ever revoked somebody's right to
 2    receive Grams, after they had entered into a
 3    purchase agreement, based on information that they
 4    had received that that party was offering Grams in
 5    a secondary market?
 6              A.  So have we revoked or canceled any
 7    purchase agreements?
 8              Q.  Yes.
 9              A.  There have been several -- two
10    parts.  There have been several purchase
11    agreements that have been canceled, as you
12    probably know, and there have been a number of
13    requests for assignments or transfers which have
14    been rejected.
15              Q.  Do you recall, as you sit here
16    today, which rights to receive Grams have been
17    canceled?
18              MR. DRYLEWSKI:  If you are asking the
19    individuals or the entities that are involved --
20              MR. McGRATH:  Yes.
21              MR. DRYLEWSKI:  -- I will just caution
22    the witness, if it is a foreign entity or
23    individual, that perhaps we have a conversation
24    off the record before that.
25              A.  Well, they both are.
```

80

CONFIDENTIAL

```
 1            MR. DRYLEWSKI:  -- before those
 2   identities are given.
 3            MR. McGRATH:  They are both foreign
 4   investors?
 5            A.  Yes.
 6            Q.  Follow on question.  You made
 7   reference to requests that certain investors had
 8   made to transfer their allocations to another
 9   person or entity?
10            A.  Correct.
11            Q.  That had been had denied?
12            A.  Yes.
13            Q.  Were those requests from US or
14   foreign investors?
15            A.  From both, requests that have come
16   from both US and foreign.
17            Q.  Which US investors made requests to
18   reallocate or reassign their entitlement to Grams
19   that were denied?
20            A.  I am trying to remember the names.
21   I mean there was an instance -- I can mention US
22   investors?
23            MR. DRYLEWSKI:  Yes.
24            A.  There was one I think, ███████
25   ███ I believe it is called, which actually just
```

81

```
 1    Ventures, in connection with your work at
 2    Telegram?
 3            A.  Only Alexander, to the extent that
 4    he has a shared role or responsibility or any ...
 5            Q.  Was the TON Blockchain ecosystem
 6    ready to be launched as of October 31, 2019, as of
 7    the day that the SEC filed its complaint in this
 8    case?
 9            A.  May I just amend one thing.  So for
10    completeness I have also met some of the others on
11    the TON Labs/Ventures team.  Pavel Prigolvolko,
12    for example.
13            Q.  And what is Pavel's role in
14    connection with TON Labs/TON Ventures, as far as
15    you understand?
16            A.  I think he is more of a technical --
17    Alexander is more of a business development,
18    whereas Pavel is a technical expert.  Sorry.
19            Q.  That is fine.  I will ask the court
20    reporter to read the question I put to you before
21    you clarified your prior answer.
22                    (Read back)
23            MR. DRYLEWSKI:  Objection to form.  You
24    can answer if you understand.
25            A.  Yes.
```

169

```
 1            Q.  I will just get some water.  What is
 2   your basis for answering "yes" to that question?
 3   How do you know that?
 4            A.  As you know, in early October, I
 5   sent out a communication on behalf of Telegram to
 6   all initial purchasers, essentially communicating
 7   that we were ready to launch by the end of the
 8   month, and setting out the procedures and the
 9   process, in terms of how the distribution of Grams
10   would work mechanically and what steps the
11   investors needed to take.
12            Q.  Understood.  So your answer was that
13   you sent out communications to investors advising
14   them what you have just said.  My question is how
15   did you know, what was the basis of your
16   information that the TON Blockchain was ready to
17   launch as of October 31, 2019, that formed the
18   communications that you sent?  In other words, who
19   told you that or how did you know it?
20            A.  Only the fact that we sent out this
21   official communication.
22            Q.  Right.  Did you draft that
23   communication?
24            A.  No.  I received the draft of the
25   communication and I may have made a few
```

170

```
 1   on a different topic.  You testified earlier today
 2   that at some point after the SEC filed its
 3   lawsuit, on October 11, 2019, Telegram asked the
 4   initial purchasers whether they would consent to
 5   certain modifications of the purchase agreements,
 6   including extending the termination date.  Do you
 7   remember me asking those questions?
 8            A.  I do.
 9            Q.  I think I asked you whether the
10   majority of the initial purchasers agreed to the
11   requested modifications and I think you answered
12   yes, they did.  Is that a fair statement of your
13   testimony?
14            A.  That is correct.
15            Q.  Do you know how many initial
16   purchasers declined to agree to the extension that
17   was requested?
18            A.  I know the percentages, because this
19   is the basis on which the consent was structured,
20   and under the agreement I know the percentages
21   that approved and declined to approve or failed to
22   reply, but I can't tell you the number of
23   investors, if that is your question.
24            Q.  That was my question but I will
25   accept your percentages, if you can provide them?
```

194

```
1         A.   For the presale round, it was
2    roughly 70 percent that approved and 30 percent
3    that either didn't approve or simply failed to
4    respond.  In the stage A round, it was roughly
5    90 percent, and the balance again largely failed
6    to reply.
7         Q.   When you say the pre-stage round,
8    are you referring to what we have been referring
9    to as the first round of investors that entered
10   into the purchase agreements in February 2018?
11        A.   That is correct.
12        Q.   And when you refer to the stage A
13   investors, you are referring to what we have been
14   referring to as the second round investors who
15   entered into the purchase agreements in
16   March 2018?
17        A.   That is correct.
18        Q.   If I were to ask you to look at
19   Exhibits 1 and 2, would you be able to identify
20   which initial purchasers declined to agree to the
21   extensions.  Instead of me asking if I were to
22   give you, let me just ask you to look at Exhibit 1
23   and 2, and to the extent you can identify the
24   entities that declined to agree to the extension?
25        A.   I could, but if this is a question
```

195