UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

                Plaintiff, :

        -against- :

TELEGRAM GROUP INC. and TON ISSUER :
INC., :
                 :
           Defendants. :

19 Civ. 9439 (PKC)

**ECF Case**

**Electronically Filed**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

I. Blockchains and Digital Currencies ...............................................................1

    A.   Blockchains ......................................................................................1

    B.   Digital Currencies ...........................................................................3

    C.   Problems with Current Blockchains and Their Cryptocurrencies .........................4

II. Telegram Decides to Create a Better Blockchain ...........................................5

    A.   Telegram and its Founders .............................................................5

    B.   The TON Blockchain and Grams ...................................................6

        1.   Features of the TON Blockchain .......................................7

        2.   Validation ...........................................................................9

    C.   Telegram Conducts a Private Placement .....................................11

        1.   Round 1 of the Private Placement ...................................13

        2.   Round 2 of the Private Placement ...................................13

        3.   KYC Processes ................................................................14

            (a)   Lawson Conner KYC .........................................15

            (b)   Credit Suisse KYC .............................................15

            (c)   Rep Letters ........................................................15

    D.   The Private Placement Materials ...................................................20

    E.   The Purchase Agreements .............................................................26

        1.   Public Availability of the Private Placement Materials...........37

III. Development of the TON Blockchain ..........................................................38

    A.   The TON Foundation and TON Reserve ......................................39

    B.   Contemplated Launch and Creation of Grams .............................42

    C.   The TON Beta Version and Early Third Party Developments ..............42

i

IV.    Telegram's Public Communications ............................................................ 50

V.    Telegram Sought Guidance from and Actively Engaged With the SEC .......................... 54

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and Section 4.G. of this Court's Individual Practices, Defendants Telegram Group Inc. ("Telegram") and TON Issuer Inc ("TON Issuer" and collectively with Telegram, "Defendants"), in connection with their Motion for Summary Judgment, set forth the following statements of material facts as to which no genuine issue exists.[1]

## I.    BLOCKCHAINS AND DIGITAL CURRENCIES

### A.    Blockchains

1.    A blockchain is a ledger.  McKeon Ex. 1 ¶¶ 26-27.

2.    A ledger is a mechanism that is used to reach consensus and agreement about a set of facts, serving as the source of truth regarding the current and historical state of accounts, transactions, and/or events.  McKeon Ex. 1 ¶ 26.

3.    In contrast to standard ledgers, a blockchain is decentralized and distributed, meaning the ledger is maintained by multiple parties, often referred to as validators, miners, and/or nodes.  McKeon Ex. 1 ¶ 26.

4.    These parties (validators, miners, and/or nodes) manage and operate the blockchain network.  McKeon Ex. 1 ¶ 27.

5.    A public blockchain ecosystem typically consists of core blockchain developers and/or an ecosystem foundation (organizations that contribute to open source development by funding projects by third party developers and/or contributing to core protocol development), validators, application and services developers, and users.  McKeon Ex. 1 ¶ 78.

---

[1] Citations to "Ex." refer to the exhibits attached to the Declarations in Support of the Defendants' Motion for Summary Judgment, submitted concurrently herewith. Deposition transcript excerpts are attached to the Declaration of Alexander C. Drylewski and are cited herein as "[Deponent] Dep. []." Deposition exhibits are also attached to the Declaration of Alexander C. Drylewski and are cited herein as "[Deponent] Dep. Ex. []."

6. These categories of participants are not mutually exclusive. McKeon Ex. 1 ¶ 79.

7. In a blockchain network, transactions are grouped together over some time interval and posted to the ledger in "blocks." McKeon Ex. 1 ¶ 27.

8. Each "block" is cryptographically linked to the previous block, creating an unbroken chain of valid transactions, hence the term "blockchain." McKeon Ex. 1 ¶ 27.

9. Many blockchains are described as "decentralized," meaning that any ongoing governance and oversight of the ledger is not conducted by a single or centralized source, but rather by a decentralized community of users. McKeon Ex. 1 ¶ 27.

10. Decentralization eliminates the existence of a central point of failure, thereby generating ledgers that are more resistant to manipulation or control by a single party. McKeon Ex. 1 ¶ 28.

11. Decentralization reduces the ability of centralized parties to extract rents from users of the ledgers. McKeon Ex. 1 ¶ 28.

12. Decentralization incentivizes broad based participation by third party software developers to create applications that utilize the ledger and expand its functionality. McKeon Ex. 1 ¶ 28.

13. A "smart contract" is software code, incorporated into certain blockchain protocols, that executes an outcome automatically based on a set of pre-specified conditions. McKeon Ex. 1 ¶ 31.

14. Smart contracts control the value to be exchanged in a given transaction. McKeon Ex. 1 ¶ 31.

15. In a blockchain protocol that includes smart contracts, the ledger is recording not only accounts and balances, but also the state of the contracts. McKeon Ex. 1 ¶ 32.

16.     The typical essential function of a blockchain is the processing of transactions and posting them to the ledger, commonly referred to as "validation." McKeon Ex. 1 ¶ 79.

17.     The "validation" function is performed by validators. McKeon Ex. 1 ¶ 79.

18.     Validators are typically compensated for performing their work in the form of cryptoassets. McKeon Ex. 1 ¶ 80.

19.     In order to achieve consensus regarding the validity of transactions within a block, an algorithm must exist that makes it difficult for validators to post invalid blocks. McKeon Ex. 1 ¶ 81.

**B.     Digital Currencies**

20.     Digital assets, or "cryptoassets," are units of account that are native to blockchains. McKeon Ex. 1 ¶ 33.

21.     Digital currencies, or "cryptocurrencies," are a subset of cryptoassets that are used to store value or as a medium of exchange. McKeon Ex. 1 ¶ 33.

22.     Bitcoin was the first decentralized cryptocurrency. McKeon Ex. 1 ¶ 33.

23.     Ether is another cryptocurrency, which is the native asset of the Ethereum blockchain. McKeon Ex. 1 ¶ 49.

24.     In contrast to fiat currencies, which are those managed by central banks, cryptocurrencies can be transferred solely by software, removing third party intermediation from the transaction. McKeon Ex. 1 ¶ 34.

25.     Ownership of cryptocurrency is proven through possession of "private keys." McKeon Ex. 1 ¶ 35.

26.     A "private key" is similar to a password. McKeon Ex. 1 ¶ 35.

27.     Users of a blockchain and its native assets store private keys in a "digital wallet." McKeon Ex. 1 ¶ 35.

3

28. A "digital wallet" is similar to a bank account, but rather than being maintained by a bank, a digital wallet is simply a piece of software through which custody of the assets remains with the user. McKeon Ex. 1 ¶ 35.

29. Blockchain ledgers record the addresses of digital wallets and the balance of any unspent native assets in each account. McKeon Ex. 1 ¶ 30.

30. Cryptocurrencies are a completely separate yet similar method for recording and transferring value and ownership in comparison to traditional fiat currencies. McKeon Ex. 1 ¶ 36.

31. Cryptocurrencies possess functionality with regard to electronic transmission of value that is not easily replicated within systems that administer transmission of value via fiat currencies. McKeon Ex. 1 ¶ 36.

32. Blockchains and cryptocurrencies facilitate types of digital commerce that are cost prohibitive or functionally challenging with fiat currency. McKeon Ex. 1 ¶ 45.

**C.    Problems with Current Blockchains and Their Cryptocurrencies**

33. Currently available cryptocurrencies, such as Bitcoin and Ether, have problems relating to their scalability (the ability to increase transaction volume), transactions speeds, and usability. McKeon Ex. 1 ¶ 50.

34. In particular, the consensus mechanism for validation known as "Proof of Work," which is used by both Bitcoin and Ethereum, inherently suffers from problems relating to resource consumption and scalability. McKeon Ex. 1 ¶ 83.

35. Bitcoin and Ethereum's Proof of Work systems also suffer from a lack of decentralization of the primary function of the network—block production—due to mining pools. McKeon Ex. 1 ¶¶ 172-73.

## II.    TELEGRAM DECIDES TO CREATE A BETTER BLOCKCHAIN

### A.    Telegram and its Founders

36.    In approximately 2006, Pavel Valeryvich Durov founded VKontakte, a social media networking application based in Russia that is similar to Facebook. Joint Stipulation of Undisputed Facts ("JSF") ¶ 9, filed concurrently herewith.

37.    Pavel served as the CEO of VKontakte starting in 2006. Drylewski Ex. 1 at 1; JSF ¶ 10.

38.    In 2014, Pavel was named the most promising Northern European leader under 30 by the Nordic Business Forum. Drylewski Ex. 1, Nordic Business Forum article; JX7, Primer at 21.

39.    Dr. Nikolai Durov, Pavel's brother, served as the lead developer of VKontakte starting in 2006. JSF ¶ 11.

40.    Nikolai has Ph.D.'s from Bonn University and Saint-Petersburg State University. JSF ¶ 12.

41.    Nikolai is the Chief Technology Officer of Telegram and an accomplished mathematician and programmer who has won two World Championships in programming and three Gold Medals in the International Mathematical Olympiads, among other achievements. JSF ¶¶ 8, 12.

42.    Telegram was founded in 2013 by Pavel and Nikolai. JSF ¶ 16.

43.    Telegram Messenger has 300 million monthly users, as of October 2019. ECF No. 1 ¶ 16.

44.    Telegram operates Telegram Messenger without profit motive. JX8, Pre-Sale Primer, at TG-001-00000058.

45.    Pavel Durov is the Chief Executive Officer ("CEO") of Telegram. JSF ¶ 3.

46.     Pavel and Nikolai determined that limitations inherent in existing cryptocurrencies, including slow transaction speeds, inability to scale, and poor user interfaces, would prevent the widescale adoption of these currencies for consumptive use. *See* Drylewski Ex. 2, Pavel Durov Deposition ("Durov Dep.") at 293:18-294:15.

47.     Pavel and Nikolai instead set out to design a new distributed ledger technology that would dramatically reduce transaction time, as well as be fully scalable and user friendly. JSF ¶ 37; Drylewski Ex. 2, Durov Dep. at 293:18-294:15.

48.     Pavel and Nikolai also wanted to create a native asset on their blockchain that could develop into a truly mass-market cryptocurrency. JSF ¶¶ 139, 141; Drylewski Ex. 2, Durov Dep. at 293:18-294:15.

**B.      The TON Blockchain and Grams**

49.     In 2017, Telegram began developing a new blockchain network, the "Telegram Open Network" or "TON Blockchain." Drylewski Ex. 3, Public Notice.

50.     The TON Blockchain will be decentralized after it is launched. McKeon Ex. 1 ¶¶ 19, 188-93.

51.     The TON Blockchain will be released as entirely open source code. Drylewski Ex. 4. Defendants' Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, at 8-9.

52.     In late 2017, Telegram also began developing a native cryptocurrency for the TON Blockchain, called "Grams." JSF ¶ 38.

53.     Grams will not be created unless and until the TON Blockchain is launched. Drylewski Ex. 3 at 1.

54.     Grams will not be distributed to anyone unless and until the TON Blockchain is launched. Drylewski Ex. 3.

6

55.     Grams are intended to function as a store of value and medium of exchange on the

TON Blockchain, similar to the functionality of Bitcoin.  McKeon Ex. 1 ¶ 221; JX14, Round 1

Risk Factors, at 6.

56.     Telegram anticipates that Grams will be immediately useable (i) as tender for

commercial transactions and a medium of exchange for users on the TON Blockchain, which

will be capable of quickly processing and recording such transactions; (ii) to serve as stakes

deposited by third parties in order to be randomly selected to serve as validators to validate

transactions on the TON Blockchain and thereby be awarded more Grams; (iii) to serve as

capital lent out to validators and others; and (iv) to serve as voting power for Gram holders

required to support or oppose changes in the TON Blockchain protocol.  Drylewski Ex. 4,

Defendants' Responses and Objections to Plaintiff's First Set of Interrogatories, at 7.

57.     Grams' faster intended transaction speeds were designed to make Grams superior

to other available virtual currencies, such as Bitcoin and Ether, in order to fulfill their primary

consumptive purpose.  Drylewski Ex. 2, Durov. Dep. at 293:18-294:15.

58.     Grams are also intended to be used as a means to power decentralized

applications ("dApps") and smart contracts built on the TON Blockchain, similar to the

functionality of Ether.  McKeon Ex. 1 ¶¶ 151-52, 221.

### 1.     Features of the TON Blockchain

59.     Smart contracts and dApps on the TON Blockchain will run on a computation

layer known as the Telegram Virtual Machine ("TVM").  JX24, Telegram Open Network Virtual

Machine (September 6, 2019), at 1; McKeon Ex. 1 ¶151.

60.     The TVM will be used to execute smart contract logic.  JX24 at 32; McKeon Ex.

1 ¶151.

7

61.     The ability of TON to function as a decentralized supercomputer is driven by the TVM. McKeon Ex. 1 ¶ 151.

62.     Telegram has developed two features, TON DNS and TON Payments, to be available to be launched with the TON Blockchain. Drylewski Ex. 4 at 11.

63.     TON DNS is "a service for assigning human-readable names to accounts, smart contracts, services, and network nodes." JX9, Stage A Primer at 10.

64.     TON Payments is "a platform for micropayments and a micropayment channel network," which "can be used for instant off-chain value transfers between users, bots, and other services." JX9 at 10.

65.     Telegram is planning to have two additional features, TON Storage and TON Proxy, developed and implemented into the TON Blockchain at launch. Drylewski Ex. 4 at 11.

66.     TON Storage will be "a distributed file-storage technology, accessible through the TON [Peer-to-Peer] Network and available for storing arbitrary files, with torrent-like access technology and smart contracts used to enforce availability." JX9 at 9.

67.     TON Proxy will be "a network proxy/anonymizer layer used to hide the identity and IP addresses of TON nodes," which "can be used to create decentralized VPN services and blockchain-based TOR alternatives to achieve anonymity and protect online privacy," similar to the Invisible Internet Project. JX9 at 9.

68.     Telegram has developed the TON Wallet, a software application which will operate as a non-custodial cryptographic wallet to hold and transfer Grams at the time of launch. Drylewski Ex. 4 at 11.

69.     Telegram intends to release the TON Wallet as a stand-alone application that will compete with other wallet applications developed by third parties. Drylewski Ex. 2, Durov Dep. at 160:4-161:5; McKeon Ex. 1 ¶¶ 157-62.

70.     Following the launch of the TON Blockchain, any third party will be able to see the TON Blockchain code and develop applications for the TON Blockchain. McKeon Ex. 1 ¶ 99.

71.     As an open source code, third party developers cannot be excluded from developing upon, and using the functionality of, the core protocol. McKeon Ex. 1 ¶ 222.

72.     The TON Blockchain will be a decentralized system with no central governing body or management. Drylewski Ex. 3.

73.     Telegram has informed the public that it will not have any control over, any unique rights within, or any responsibility for the management of the TON Blockchain. Drylewski Ex. 3; Drylewski Ex. 4 at 31.

      2.     *Validation*

74.     Telegram selected a "Proof of Stake" consensus mechanism for the TON Blockchain. JSF ¶ 122.

75.     Validators for the TON Blockchain will be required to validate proposed blocks, perform computations for smart contracts, and digitally sign valid blocks. JSF ¶ 123.

76.     The TON Blockchain will allow validators to aggregate stakes to foster decentralization by promoting involvement by a broader group of stakeholders. JSF ¶ 124.

77.     At launch, Gram holders who wish to be validators must "stake" a minimum of 100,000 Grams. JSF ¶ 125.

78.     Following launch, the minimum number of Grams required to be staked will be a configurable parameter that can be changed by vote of the validators. JSF ¶ 125.

9

79.     Once every validation period, any Gram holder or group of Gram holders seeking to be a validator for the next validation period can stake the minimum number of Grams required to be eligible for selection as a validator for the next period. JSF ¶ 126.

80.     The TON Blockchain will automatically and randomly select a predetermined number of validators from amongst the largest stakeholders for that period. JSF ¶ 126.

81.     Validators who correctly validate a block will automatically be rewarded with newly minted, system-generated Grams. JSF ¶ 127.

82.     If validators incorrectly validate a block, they will automatically lose part of their stake and will be temporarily suspended from acting as a validator. JSF ¶ 128.

83.     Based on these validation efforts, Telegram expects that the supply of Grams will increase by approximately 2% annually as newly minted Grams are automatically generated and paid to validators. JSF ¶ 129.

84.     As currently contemplated, after the TON Blockchain launches, Defendants will allocate 4% of Grams to a "Developer Pool." JSF ¶ 158.

85.     Pavel and Nikolai Durov are currently anticipated to each receive 1% of the initial supply of Grams from the Developer Pool. Drylewski Ex. 5 at 4; JSF ¶ 159.

86.     Telegram has stated that the developer pool will have a four-year lock-up period restricting the sale of Grams by developer pool recipients. JSF ¶ 160.

87.     Telegram informed the public on January 6, 2020 that, to the extent Pavel Durov, Nikolai Durov, or any Telegram employees holds any Grams following launch of the TON Blockchain, they will not be allowed to take part in any voting or validating activities on the TON Blockchain. JSF ¶ 161.

88.     Telegram will not hold any Grams after the launch of the TON Blockchain. Drylewski Ex. 2, Durov Dep. at 273:3-11.

89.     Telegram has told the public that its employees and founders may, but have not committed, hold Grams following launch of the TON Blockchain.  Drylewski Ex. 3.

90.     Telegram has told the public that any Grams held by its employees or founders cannot be used for voting of validating functions in connection with the TON Blockchain. Drylewski Ex. 3.

**C.     Telegram Conducts a Private Placement**

91.     In order to develop the TON Blockchain, Telegram needed to raise funds.  JSF ¶ 38.

92.     Telegram decided to raise the funds by selling interests in the right to receive Grams.  JSF ¶ 38.

93.     Telegram created a wholly owned subsidiary, TON Issuer, to sell the interests in the right to receive Grams.  *See* JSF ¶ 2.

94.     The United States Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") considers TON Issuer to be a Money Services Business subject to the Bank Secrecy Act.  JSF ¶ 175; Drylewski Ex. 6, Money Services Business Registration.

95.     TON Issuer registered as a Money Services Business in the U.S. with FinCEN on August 30, 2019.  JSF ¶ 176; *see also* Drylewski Ex. 6.

96.     Defendants initially contemplated engaging in a private pre-sale of the right to receive Grams in January 2018, followed by a public sale of Grams in March 2018.  JSF ¶ 39.

97.     Defendants instead opted to sell the right to receive Grams to a limited group of private purchasers (the "Private Placement purchasers") using contracts (the "Purchase Agreements").  JSF ¶ 40.

98. Defendants chose to sell the right to receive Grams to the Private Placement purchasers through the Purchase Agreements because they wanted to take "as safe as possible [of an] approach and deal only with highly sophisticated institutional investors in a proper, organized private placement." Drylewski Ex. 7, Shyam Parekh Deposition ("Parekh Dep.") at 28:11-14; Drylewski Ex. 8, Ilya Perekopsky Deposition ("Perekopsky Dep.") at 86:15-18 ("we decided to focus on private placements and we decided to focus on working only with sophisticated, reputable investors").

99. Defendants hired John Hyman, in part, because "he . . . had a set of skills required to work with a wide group of sophisticated investors globally." Drylewski Ex. 8, Perekopsky Dep. at 66:16-18.

100. The Private Placement purchasers were highly sophisticated and of high net worth, with an average investment of approximately $10 million. Drylewski Ex. 2, Durov Dep. at 300:7-17.

101. Defendants ultimately engaged in two rounds of such sales, which took place between January 2018 and March 2018 (the "Private Placement"). JSF ¶¶ 40-41.

102. In total, Telegram sold the right to receive nearly 2.9 billion Grams. JSF ¶ 43.

103. In total, Telegram raised $1.7 billion in the Private Placement. JX1, Round 1 Form D, at 5; JX2, Round 2 Form D, at 5.

104. In determining allocations in the Private Placement, Telegram focused on a number of factors, including, but not limited to, reputation, track record, brand name and experience with blockchain technology. Drylewski Ex. 2, Durov Dep. at 287:21-290:20.

105. Telegram considered reputation, in particular, to be very important in the allocation process. Drylewski Ex. 2, Durov Dep. at 287:21-290:20.

106. Defendants accepted payments in the Private Placement in either U.S. dollars or Euros. *See* Drylewski Ex. 2, Durov Dep. at 209:7-10.

107. The Private Placement was conducted in accordance with Rule 506 of Regulation D (for U.S. purchasers) and Regulation S (for non-U.S. purchasers) under the Securities Act of 1933 ("Securities Act"). JX1 at 5; JX2 at 5; Drylewski Ex. 4 at 6.

   *1.    Round 1 of the Private Placement*

108. The first round of the Private Placement ("Round 1") began in January 2018. JSF ¶ 46.

109. In Round 1, Defendants raised a total of $850 million from 81 Private Placement purchasers worldwide. JSF ¶¶ 48, 49.

110. On February 13, 2018, Defendants filed a Form D noticing "purchase agreements for cryptocurrency" for amounts totaling $850 million that began on January 29, 2018. JSF ¶ 48.

111. Round 1 was exempt from the registration requirements for securities under Rule 506(c) of the Regulation D and/or Regulation S of the Securities Act. JX1 at 5.

112. Defendants' Form D for Round 1 stated: "The issuers intend to use the proceeds for the development of the TON Blockchain, the development and maintenance of Telegram Messenger and the other purposes described in the offering materials." JX1 at 5.

   *2.    Round 2 of the Private Placement*

113. The second round of the Private Placement ("Round 2") began in February 2018. JSF ¶ 54.

114. In Round 2, Defendants raised a total of $850 million from 94 Private Placement purchasers worldwide. JSF ¶ 55.

115. On March 29, 2018, Defendants filed a Form D noticing "purchase agreements for cryptocurrency" for amounts totaling $850 million. JSF ¶ 58.

116.    Round 2 was exempt from the registration requirements for securities under Rule 506(c) of the Regulation D and/or Regulation S of the Securities Act.  JX2 at 5.

117.    Defendants' Form D for Round 2 stated: "The issuers intend to use the proceeds for the development of the TON Blockchain, the development and maintenance of Telegram Messenger and the other purposes described in the offering materials."  JX2 at 6.

### 3.    KYC Processes

118.    In connection with the Private Placement, Defendants undertook know-your-customer ("KYC") and anti-money laundering ("AML") processes for all Private Placement purchasers.  Drylewski Ex. 4 at 19.

119.    As part of these KYC and AML processes, Defendants distributed the Purchase Agreements alongside KYC Forms that requested information from all Private Placement purchasers concerning their ownership structure (if they were entities).  Drylewski Ex. 4 at 19.

120.    The KYC Forms required natural persons to provide a certified copy of a valid, government-issued photo identification card, such as a driver's license or passport.  Drylewski Ex. 4 at 19.

121.    For Private Placement purchasers other than natural persons (such as corporations, partnerships, and trusts), the KYC Forms required that they provide the following:

    a.    a document evidencing legal existence of the entity such as the certified copy of articles of incorporation, a government issued business license, partnership agreement or trust instrument; and

    b.    a certified copy of a valid, government-issued photo identification card such as a driver's license or passport for at least one of the following:
        i.    a director of the entity;
        ii.    persons with 25% or more ultimate beneficial ownership of the entity;
        iii.    a partner/member of the equity; or
        iv.    a managing executive of the entity.

Drylewski Ex. 4 at 19.

14

(a)   Lawson Conner KYC

122.   In connection with the Private Placement, Defendants also engaged Lawson Conner Services Ltd. ("Lawson Conner"), a UK-based provider of regulatory infrastructure and managed compliance services and software. Drylewski Ex. 4 at 19.

123.   Lawson Conner reviewed the KYC Forms submitted for all Private Placement purchasers (the "KYC Process"). Drylewski Ex. 4 at 19-20.

(b)   Credit Suisse KYC

124.   After Lawson Conner conducted its KYC/AML Process, Defendants engaged Credit Suisse to conduct an additional review of the KYC Forms. Drylewski Ex. 4 at 20.

125.   Credit Suisse conducted its own proprietary KYC process on the KYC Forms. Drylewski Ex. 4 at 20.

(c)   Rep Letters

126.   Representation letter questionnaires ("Rep Letters") were prepared by U.S. or applicable local counsel and completed by each Private Placement purchaser for each jurisdiction (a) in which the Private Placement purchaser resides (if the Private Placement purchaser was a natural person), (b) in which the Private Placement purchaser was formed (if the Private Placement purchaser was an entity), (c) in which the Private Placement purchaser or its representative(s) received the offer to enter into the Purchase Agreement and (d) in which the Private Placement purchaser or its representative(s) would place its buy order. Drylewski Ex. 4 at 20.

127.   The Rep Letters covered numerous jurisdictions. Drylewski Ex. 4 at 20.

128.   The Rep Letters required the Private Placement purchaser to represent that the Private Placement purchaser was eligible to participate in the Private Placement pursuant to applicable local law. Drylewski Ex. 4 at 20.

129.     Certain of the Rep Letters required additional supporting documentation where such supporting documentation was required under applicable law.   Drylewski Ex. 4 at 20.

130.     Natural persons who submitted U.S. Rep Letters were also required to submit a letter from a specified third party, verifying their status as an "accredited investor" (as defined in the rules and regulations under the Securities Act).  Drylewski Ex. 4 at 20.

131.     If the Private Placement purchaser was an entity, the Private Placement purchaser was required to indicated whether the Private Placement purchaser (a) was formed for the purpose of entering into the Purchase Agreement and/or purchasing Grams or (b) solicited investors to participate in the investment directly or indirectly through an entity or otherwise. Drylewski Ex. 4 at 20.

132.     If the Private Placement purchaser answered affirmatively to either question, the Private Placement purchaser was required to complete and deliver to the Defendants a Rep Letter for each person that held an equity or similar interest in the Private Placement purchaser. Drylewski Ex. 4 at 20.

133.     From time to time, Defendants have inquired as to whether certain Private Placement purchasers had agreed to transfer or sell their interests in Grams, and, in some instances, sought assurances that no transfers or sales had or would take place, advised the Private Placement purchasers not to make such transfers or sales, and/or canceled the relevant Purchase Agreements.  Drylewski Ex. 5 at 2; Drylewski Ex. 9, Requests for Consent to Amend Pre-Sale and Stage A Purchase Agreements, at TLGRM-005-00005508 and TLGRM-005-00005588 ("Pursuant to the terms of your Purchase Agreement, prior to any issuance of Grams to you, you are required to represent to us that you have not violated these [transferability restriction] provisions.  In addition, it is possible that we may require further information from

you, including as part of our ongoing AML procedures and our interactions with Governmental Authorities."); Drylewski Ex. 8, Perekopsky Dep. at 183:19-185:20; Drylewski Ex. 7, Parekh Dep. at 79:10-81:5.

134.    On February 15, 2018, Ilya Perekopsky reached out to  of stating that an article reporting that ▇ was reselling Grams raised "concern[s]." Drylewski Ex. 10, Defendants' Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories at 6.

135.    Ilya Perekopsky requested that ▇ confirm whether the statements in the article were false and reaffirm its representations under the Purchase Agreement that ▇ will not transfer any interest in its rights to receive Grams. Drylewski Ex. 10 at 6.

136.    In response, ▇ confirmed that the article was false and reaffirmed its continued compliance with the terms of its Purchase Agreement. Drylewski Ex. 10 at 6-7.

137.    On March 7, 2018, Ilya Perekopsky spoke with ▇▇▇ regarding whether ▇ had entered into an agreement for an impermissible transfer of interests in Grams. Drylewski Ex. 10 at 7.

138.    ▇ stated that pursuant to counsel's and Telegram's instructions prohibiting the transfer, it did not, and would not, pursue a transfer. Drylewski Ex. 10 at 7.

139.    On August 20, 2018, ▇ requested permission to assign part of its interests under its Purchase Agreements to a third party. Drylewski Ex. 10 at 7.

140.    Telegram declined ▇ s request and stated that such an assignment and amendment to its Purchase Agreements was impermissible. Drylewski Ex. 10 at 7.

141.    On May 25, 2019, a Private Placement purchaser informed Telegram that they had received an offer to purchase Grams from another investor called ▇▇▇



_____. Drylewski Ex. 10 at 7.

142.   Ilya Perekopsky reached out to ▮▮▮▮▮ and requested that the company address these allegations and affirm that they were not in breach of their purchase agreement.   Drylewski Ex. 10 at 7.

143.   ▮▮▮▮▮ denied that they were engaged in any activities that would constitute a breach of their purchase agreement.   Drylewski Ex. 10 at 7.

144.   On June 7, 2018, ▮▮▮▮▮▮▮ requested Telegram's permission to pay for its right to receive Grams via an assignment of its Purchase Agreement to ▮▮▮▮▮▮▮. Drylewski Ex. 10 at 7.

145.   Under this proposed arrangement, ▮▮▮▮▮▮▮▮ would subsequently pay the purchase amount to Telegram and transfer any Grams to ▮▮▮▮▮▮ once they were issued. Drylewski Ex. 10 at 7.

146.   Telegram advised ▮▮▮▮▮▮▮ that the proposed structure was not permissible because it would violate the representations and provisions in the Purchase Agreement and denied the request.   Drylewski Ex. 10 at 7-8.

147.   On April 14, 2018, Telegram became aware of facts indicating that ▮▮▮▮▮▮ ▮▮▮ was running an online syndicate to invest in TON.   Drylewski Ex. 10 at 8.

148.   Telegram investigated this information and rejected ▮▮▮▮▮▮▮s investment for Round 2 of the Private Placement.   Drylewski Ex. 10 at 8.

149.   In February 2018, Telegram became aware of facts indicating that ▮▮▮▮ had failed to disclose the fact that it was a Special Purpose Vehicle that solicited funds for investment in the Private Placement and was therefore in breach of its Purchase Agreement.   Drylewski Ex.

18

10 at 8.

150.    Based upon its investigation, Telegram terminated ███████ 's Purchase Agreement. Drylewski Ex. 10 at 8.

151.    In June 2018, Telegram became aware of facts indicating that ███████ may have been in breach of his Purchase Agreement by failing to disclose the source of funds for his investment. Drylewski Ex. 10 at 8.

152.    Following its investigation into the matter and discussions with Mr. ███████ Telegram terminated Mr. ██████ 's Purchase Agreement. Drylewski Ex. 10 at 8.

153.    Telegram also received requests to transfer Purchase Agreements by ███████ ██████████████ and ████████████████████████ , both of which Telegram declined. Drylewski Ex. 10 at 8.

154.    In January 2018, Ilya Perekopsky reached out to ████████████████████ stating that Telegram had received information suggesting that ██████ was purporting to be selling Grams. Drylewski Ex. 5 at 2.

155.    Mr. Perekopsky requested that ██████ confirm whether the information regarding their purported sales was false. Drylewski Ex. 5 at 2.

156.    ██████ confirmed that it was not selling Grams and affirmed its compliance with the terms of its Purchase Agreement. Drylewski Ex. 5 at 2.

157.    On January 11, 2020, Telegram reached out to ████████████████████ ████████████████ stating that it became aware of facts suggesting that ████████████ s may have had involvement with an entity called Liquid.com (which purports to be a cryptocurrency exchange in Japan) regarding an initial exchange offering of Grams. Drylewski Ex. 5 at 2.

158.    Telegram referred ███████████ to its representations under the Purchase Agreement and asked ███████████ to confirm that it is not (and has not been) cooperating with Liquid.com in this regard and that it has at all times acted (and will continue to act) in accordance with the terms of the Purchase Agreement.  Drylewski Ex. 5 at 2.

### D.    The Private Placement Materials

159.    The Private Placement Materials were sent by Telegram to some potential and all actual Private Placement purchasers.  JSF ¶ 64.

160.    In late 2017, Defendants distributed to some prospective and actual purchasers preliminary materials regarding certain anticipated plans for TON ("Teasers").  JSF ¶ 66.

161.    One of the Teasers was a two-page document (the "Two Page Teaser").  JSF ¶ 67.

162.    Defendants also distributed a four-page document (the "Four Page Teaser").  JSF ¶ 69.

163.    In the Four Page Teaser, Defendants stated that the Durovs have "[b]etween them . . . over 20 years of experience in building billion dollar companies used by hundreds of millions of people."  JX4, Four Page Teaser, at 4.

164.    In the Four Page Teaser, Defendants described the "challenge" behind creating Grams as follows:

> Bitcoin has established itself as the <<digital gold>>, and Ethereum proved to be an efficient platform for token crowd sales.  However, a cryptocurrency used for regular value exchange in the daily lives of ordinary people is yet to be created. The blockchain ecosystem needs a decentralized counterpart of everyday money – a truly mass market cryptocurrency.

JX4 at 1.

165.    Telegram created a document titled "Pre-Sale Primer," dated January 18, 2018, that it distributed to potential investors in Round 1 of the Private Placement.  JSF ¶ 77; JX8.

166.    Attached to the Pre-Sale and Stage A Primers as Appendix B was a list of risk

factors titled "Certain Risks Associated with the Purchase, Sale and Use of Grams," the "Round

1 Risk Factors" and "Round 2 Risk Factors," respectively, and the "Risk Factors," collectively.

JSF ¶¶ 78, 100, 102; JX14, Round 1 Risk Factors; JX15, Round 2 Risk Factors.

167.    The Risk Factors warned: "**A purchase of Grams involves a high degree of**

**risk.  You should carefully consider the risks and uncertainties described below before**

**deciding to purchase Grams.  The occurrence of any of the following risks could result in**

**you losing all or part of your investment**." JX14, JX15 at 1 (emphasis original).

168.    The Risk Factors' first paragraph was titled "Uncertain Regulatory Framework."

JX14, JX15 at 1.

169.    The Uncertain Regulatory Framework paragraph read as follows in the Round 1

Risk Factors:

> The regulatory status of cryptographic tokens, digital assets and blockchain
> technology is unclear or unsettled in many jurisdictions. . . .  Telegram and the
> wholly owned subsidiary that Telegram intends to create to act as the issuer in the
> token sale (the "**Issuer**"), as applicable, may cease the distribution of Grams,
> cease the development of the TON Blockchain or cease operations in a
> jurisdiction in the event that governmental or other actions make such
> distribution, development and/or operations unlawful or commercially undesirable
> to continue.

JX14 at 1.

170.    The Uncertain Regulatory Framework paragraph read as follows in the Round 2

Risk Factors:

> The regulatory status of cryptographic tokens, digital assets and blockchain
> technology and its applications is unclear or unsettled in many jurisdictions. . . .
> Telegram and TON Issuer Inc, the wholly owned subsidiary that Telegram formed
> to act as the issuer in the token sale (the "**Issuer**"), as applicable, may cease the
> distribution of Grams, cease the development of the TON Blockchain or cease
> operations in a jurisdiction in the event that governmental or other actions make

such distribution, development and/or operations unlawful or commercially undesirable to continue.

JX15 at 1.

171. The Risk Factors' second paragraph was titled "Legal and Regulatory Factors Relating to Telegram's Business Model Might Present Barriers to Success." JX14 at 1.

172. The Legal and Regulatory Factors Relating to Telegram's Business Model Might Present Barriers to Success read as follows:

> The TON Blockchain will operate in a new and developing legal and regulatory environment. There is no established body of law or court decisions concerning blockchain and smart contracts, and the law regarding token sales and cryptocurrencies is developing. As a result, it is possible that there could be legal disputes over the interpretation of smart contracts used in connection with the TON Blockchain, thus undermining the functionality of the TON Blockchain and Grams. To the extent licenses or other authorizations are required in one or more jurisdictions in which the Issuer operates or will operate, there is no guarantee that the Issuer will be granted such licenses or authorizations. The Issuer may need to change its business model to comply with these licensing and/or registration requirements (or any other legal or regulatory requirements) in order to avoid violating applicable laws or regulations or because of the cost of such compliance. Uncertainty in how the legal and regulatory environment will develop could negatively impact the Issuer.

JX14 at 1; JX15 at 1-2.

173. The Risk Factors' third paragraph was titled "Risks of Government and Private Actions." JX14, JX15 at 2.

174. The Risks of Government and Private Actions paragraph read as follows:

> The cryptocurrency market is new and may be subject to heightened oversight and scrutiny, including investigations or enforcement actions. There can be no assurance that governmental authorities will not examine the operations of Telegram and the Issuer, or enact regulations or pursue enforcement actions against Telegram or the Issuer, which may result in curtailment of, or inability to operate, the TON Blockchain as intended, or judgments, settlements, fines or penalties against Telegram and the Issuer. In addition, non-governmental parties may bring private legal actions against Telegram or the Issuer, either individually or as a class, which may result in curtailment of, or inability to operate, the TON

Blockchain as intended, or judgments, settlements, fines or penalties against Telegram and the Issuer.

JX14, JX15 at 2.

175.   The Round 1 Risk Factors' fifth paragraph was titled "Risks Associated with the Development and Launch of the TON Blockchain." JX14 at 2; JX15 at 3.

176.   The Risks Associated with the Development and Launch of the TON Blockchain paragraph read as follows:

> The TON Blockchain (which for purposes of these risk factors, includes the TON "light wallet") has not yet been developed and its development will require significant capital, the expertise of Telegram's management and substantial time and effort by skilled developers and other parties. Telegram may not retain the services of developers with the technical skills and expertise needed to successfully develop the TON Blockchain and progress it to a successful launch. In addition, even if the TON Blockchain is successfully developed and launched, there can be no assurance that the TON Blockchain will function as intended or that it will be able to sustain long-term operation of Grams or other large scale D-apps or cryptocurrencies. Although Telegram intends for the TON Blockchain to have the features and specifications set forth in the "Telegram Open Network" technical white paper (the **Technical White Paper**"), changes to such features and specifications may be made for any number of reasons. There can be no assurance that the TON Blockchain or Grams will function as described in the Technical White Paper or will be launched according to the milestones set forth in the "Roadmap" section of the [relevant] Primer.
>
> Telegram plans to incorporate various technology solutions into the TON Blockchain, including, but not limited to, the various components of the TON Platform, infinite sharding, instant hybercube routing, 2-D distributed ledgers and proof-of-stake approach (each as described in the "Telegram Open Network (TON)" section of the [relevant] Primer). Some or all of these technology solutions may be new and/or relatively untested. There is significant risk to building and implementing such new technologies that may have never been used, or that are being used in different ways. There is no guarantee that such technologies will operate as intended or as described in the Technical White Paper or the [relevant] Primer or will be launched according to the milestones set forth in the "Roadmap" section of the [relevant] Primer.

JX14 at 2-3; JX15 at 3.

177. The Risk Factors' twelfth paragraph was titled "Risks Associated With Integrating the TON Blockchain and Telegram Messenger." JX14, JX15 at 5.

178. The Risks Associated With Integrating the TON Blockchain and Telegram Messenger paragraph read as follows:

> Although Telegram intends to integrate the TON Blockchain with Telegram Messenger as described in the "Telegram Messenger-TON Integration" section of the [relevant] Primer, Telegram may be unable to achieve the intended technical integration between the TON Blockchain and Telegram Messenger on the terms described in the [relevant] Primer. As a result, adoption of Grams as a form of currency within Telegram Messenger's existing ecosystem may be more limited than anticipated.

JX14 at 5; JX15 at 6.

179. The Risk Factors' thirteenth paragraph was titled "Risks Associated With The Offer and Sale of Grams." JX14, JX15 at 6.

180. The Risks Associated With The Offer and Sale of Grams paragraph contained the following disclosures:

> Telegram and the Issuer intend to complete the . . . sale in two stages, as described in the "Token Distribution" section of the [relevant] Primer.
>
> * * *
>
> Grams are intended to act as a medium of exchange between users in the TON ecosystem. Grams are not investment products. There should be no expectation of future profit or gain from the purchase or sale of Grams. Grams do not represent (i) any equity or other ownership interest in Telegram or the Issuer, (ii) any rights to dividends or other distribution rights from Telegram or the Issuer or (iii) any governance rights in Telegram or the Issuer.

JX14, JX15 at 6.

181. The Risk Factors' fourteenth paragraph was titled "Risk of Price Volatility." JX14 at 6; JX15 at 7.

182.    The Risk of Price Volatility paragraph explained that the price of Grams would be subject to market forces, stating as follows:

> The prices of cryptocurrencies have historically been subject to dramatic fluctuations and are highly volatile, and the market price of Grams may also be highly volatile. Several factors may influence the market price of Grams, including, but not limited to:
>
> - Global supply of cryptocurrencies, both with respect to the number of different cryptocurrencies and the supply of each individual cryptocurrency;
>
> - Global demand for cryptocurrencies, which can be influenced by the growth of acceptance of cryptocurrencies as payment for goods and services, the security of online cryptocurrency exchanges and digital wallets that hold cryptocurrencies, the perception that the use and holding of cryptocurrencies is safe and secure, and the regulatory restrictions on their use;
>
> - Changes in software, software requirements or hardware requirements underlying blockchain technologies;
>
> - Fiat currency withdrawal and deposit policies of cryptocurrency exchanges on which cryptocurrencies may be traded and liquidity on such exchanges;
>
> - Interruptions in service from or failures of major cryptocurrency exchanges;
>
> - Investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in cryptocurrencies;
>
> - Monetary policies of governments, trade restrictions, currency devaluations and revaluations; and
>
> - Regulatory measures, if any, that affect the use of cryptocurrencies.
>
> A decrease in the price of a single cryptocurrency may cause volatility in the entire cryptocurrency industry and may affect other cryptocurrencies, including Grams. For example, a security breach that affects investor or user confidence in Bitcoin or Ethereum may affect the industry as a whole and may also cause the price of Grams and other cryptocurrencies to fluctuate.

JX14 at 6-7; JX15 at 7; JSF ¶ 170.

183. The Risk Factors' fifteenth paragraph was titled "Risks Associated with the Issuer and Use of Funds." JX14 at 7.

184. The Risks Associated with the Issuer and Use of Funds paragraph read as follows:

Telegram expects the Issuer to transfer all or a significant portion of the funds generated by the token sale to Telegram. While Telegram and the Issuer intend to use the funds as described in the "Use of Funds" Section of the [relevant] Primer, there is no restriction on Telegram's or the Issuer's use of the funds generated from the token sale or on Telegram's ability to transfer those funds to, or make payments for the benefit of, its affiliates. There can be no assurance that the Issuer or Telegram will have sufficient funds to make payments of any Termination Amount (as defined in the Purchase Agreements) as and when required under the terms of the Purchase Agreements. Neither Telegram nor the Issuer has any fiduciary or other obligation to use the funds generated by the token sale for the benefit of the purchasers, except as otherwise expressly provided in the Purchase Agreements in connection with Telegram's and the Issuer's contingent obligation to repay any Termination Amount.

JX14 at 7; JX15 at 7-8.

185. The Risk Factors' sixteenth paragraph was titled "Risk Associated with the TON Foundation." JX14, JX15 at 8.

186. The Risks Associated with the TON Foundation paragraph read as follows:

Over time, Telegram intends to establish the TON Foundation and to transfer responsibilities related to TON and the TON Reserve to the TON Foundation, as described in the "Governance" section of the [relevant] Primer. There is, however, no timetable for the establishment of the TON Foundation or the transfer of the responsibilities related to TON and the TON Reserve to the TON Foundation, and it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON Foundation may differ from current expectations.

JX14, JX15 at 8.

### E.  The Purchase Agreements

187. Telegram initially contemplated a public offering of Grams following the Private Placement. JSF ¶ 39.

188.    Given the legal uncertainty surrounding public offerings of digital assets, however, Telegram "decided that [it] should take a safer, as safe as possible approach and deal only with highly sophisticated institutional investors in a proper, organized private placement." Drylewski Ex. 7, Parekh Dep. at 28:10-14.

189.    Defendants ultimately determined that they would sell the right to receive Grams to Private Placement purchasers using the Purchase Agreements.  JSF ¶ 40.

190.    Defendants used separate Purchase Agreements for each round of the Private Placement: one for Round 1 (the "Round 1 Purchase Agreements") and one for Round 2 (the "Round 2 Purchase Agreements").  JSF ¶¶ 40, 85-86.

191.    At the time of the Private Placement, the Purchase Agreements were the only physical instrument in existence that represented any interest in Grams.  *See* JX11, Round 1 Purchase Agreement; JX12, Round 2 Purchase Agreement § 6.3(f).

192.    Defendants distributed the Purchase Agreements to certain potential purchasers who completed indications of interest.  JSF ¶ 82, 92.

193.    The Purchase Agreements contained, among other things, the following legend:

**NOTICE TO RESIDENTS OF THE UNITED STATES**

THE OFFER AND SALE OF THIS SECURITY HAS NOT BEEN
REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS
AMENDED (THE "**U.S. SECURITIES ACT**"), OR UNDER THE
SECURITIES LAWS OF ANY U.S. STATES. THIS SECURITY MAY NOT BE
OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR
HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE
REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT OR IN
A TRANSACTION EXEMPT FROM THE REGISTRATION
REQUIREMENTS OF THE U.S. SECURITIES ACT AND APPLICABLE
STATE SECURITIES LAWS.

JX11, JX12 at 1 (emphasis original).

194. As explained in the Purchase Agreements, the Purchase Agreements were designed to allow Defendants "to create and issue a new cryptocurrency called '**Grams**' ('**Tokens**') following the development and launch of a new blockchain platform (the '**TON Network**')" and the Private Placement purchasers to "subscribe for Tokens." JX11 at 7 (emphasis original); JX12 at 11 (emphasis original).

195. Per the Round 1 Purchase Agreements, the issuance of Grams "is conditional upon the satisfaction by the [Private Placement] Purchaser or waiver by [TON] Issuer of the following conditions precedent:

> (a) the Purchaser executing and delivering to the Issuer an executed Rep Letter, a completed KYC Form and such other documents relating to this Purchase Agreement as the Issuer may reasonably request;
>
> (b) the Purchaser having satisfied its obligations under clause 2.2;
>
> (c) the Purchaser having provided to the Issuer a network address to which the Tokens comprising the Purchaser's Token Allocation shall be issued pursuant to clause 2.1; provided that if the Purchaser has not provided a network address to the Issuer in accordance with this clause 3(c) on or prior to the date that is twenty-four months following the Network Launch Date, the obligation of the Issuer to deliver Tokens to the Purchaser hereunder shall cease and the Issuer shall have no further obligations to the Purchaser hereunder; and
>
> (d) the Purchaser's Warranties remaining true, accurate and not misleading on the Network Launch Date.

JX11 § 3.

196. The Rep Letters referenced in the Round 1 conditions precedent was attached to the Round 1 Purchase Agreements. JSF ¶ 89.

197. The Round 2 Purchase Agreements contained similar conditions precedent:

> (a) the Purchaser executing and delivering to the Issuer (i) a completed Rep Letter Questionnaire; (ii) all executed Rep Letters required pursuant to the Rep Letter Questionnaire or otherwise required by the Issuer in its sole discretion; (iii) a completed KYC Form; and (iv) such other documents relating to this Purchase Agreement as the Issuer may reasonably request (including, but not limited to, a

28

certification that neither the Purchaser nor any Purchaser Investor has breached any provision of this Purchase Agreement, including, but not limited to, clause 10);

(b) the Purchaser having satisfied its obligations under clause 2.2;

(c) the Purchaser having provided to the Issuer a network address to which the Tokens comprising the Purchaser's Token Allocation shall be issued pursuant to clause 2.1; provided that if the Purchaser has not provided a network address to the Issuer in accordance with this clause 3(c) on or prior to the date that is twenty-four months following the Network Launch Date, the obligation of the Issuer to deliver Tokens to the Purchaser hereunder shall cease and the Issuer shall have no further obligations to the Purchaser hereunder; and

(d) the Purchaser's Warranties remaining true, accurate and not misleading on the Network Launch Date.

JX12 § 3.

198.    Telegram distributed the Rep Letters referenced in the Round 2 conditions

precedent alongside (but not attached to) the Round 2 Purchase Agreements. Drylewski Ex. 11,

Rep Letter Questionnaire.

199.    Private Placement purchasers agreed to a series of "Warranties and Undertakings"

in the Purchase Agreements. JX11, JX12 § 6.

200.    As part of these Warranties and Undertakings, the Private Placement purchasers

warranted that they understood and expressly accepted the following:

(a) the Purchaser has read and understands the [relevant] Primer, as well as the "Technical White Paper" attached as Appendix A thereto and the "Risk Factors" attached as Appendix B thereto;

(b) this Purchase Agreement and the Tokens involve significant risks, all of which the Purchaser fully and completely acknowledges and assumes, including, but not limited to, the risk that the Tokens may decrease in value over time and/or lose all monetary value and the other risks listed in Appendix B to the [relevant] Primer;

(c) a significant portion of the funds generated by this Purchase Agreement and the . . . Purchase Agreements are expected to be retained by the Parent for its own purposes rather than committed solely to the development and launch of the TON Network;

29

(d) . . . no federal or state agency or any other Governmental Authority has passed on or made any recommendation or endorsement of this Purchase Agreement or the Tokens or the fairness or suitability of the investment in the Tokens, nor has any Governmental Authority passed upon or endorsed the merits of this offering;

(e) the Tokens will be created and delivered to the Purchaser at the sole risk of the Purchaser on an "as is" basis;

(f) the Purchaser has not relied on any representations or warranties made by the Issuer or the Parent outside of this Purchase Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer;

(g) the Purchaser bears sole responsibility for any taxes as a result of the matters and transactions the subject of this Purchase Agreement, and any future acquisition, ownership, use, sale or other disposition of Tokens (each a "**relevant matter**") held by or on behalf of the Purchaser. To the extent permitted by law, the Purchaser agrees to indemnify, defend and hold the Issuer, the Parent and any of their respective Affiliates, employees or agents (including developers, auditors, contractors or founders) harmless on an after-tax basis for any claim, liability, assessment or penalty with respect to any taxes (other than any net income taxes of the Issuer that result from the Issuance) associated with or arising from any relevant matter;

(h) the Purchaser is not entitled, as a Party to this Purchase Agreement, to vote or receive dividends or be deemed the holder of shares of the Issuer or the Parent for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of a shareholder of the Issuer or the Parent or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights to purchase shares of the Issuer or the Parent or otherwise;

(i) each of the Issuer and the Parent retains all right, title and interest in all of their respective intellectual property, including, without limitation, inventions, ideas, discoveries, software, processes, marks, methods, information and data, whether or not protectable by patent, copyright or trademark. The Purchaser may not use any of the Issuer's or the Parent's intellectual property for any reason without the Issuer's or the Parent's prior written consent. Notwithstanding the foregoing, use by the Purchaser of Telegram Messenger in accordance with the terms and conditions thereof shall not be a violation of this clause 6.3(i);

(j) none of the documentation prepared by the Issuer or the Parent in connection with the Issuance or the development of the TON Network will constitute a Prospectus for the purposes of the Prospectus Directive and no Prospectus will be

prepared, approved by any competent authority or published for the purposes of the Prospectus Directive; and

(k) the Parent may transfer responsibility for the further development and maintenance of the TON Network to a not-for-profit organization [expected to be] called the "TON Foundation" at such point in time and on such terms as the Parent shall determine in its sole discretion.

JX11, JX12 § 6.3.

201. The Purchase Agreements further provided that they "will automatically terminate upon the earlier of:

(a) the Issuance;

(b) the occurrence of a Dissolution Event prior to the Deadline Date (as defined below); and

(c) 31 October 2019 (the "**Deadline Date**"), if the Network Launch has not occurred as of such date,

provided that . . . if the Purchase Agreement is terminated under clause 7.1(b) or 7.1(c), the Issuer and the Parent shall be jointly and severally liable to the Purchaser for the payment of the Termination Amount upon the occurrence of a Dissolution Event or immediately following the Deadline Date, as applicable. Any Termination Amount shall be paid in U.S. Dollars, unless otherwise agreed by the Parties.

JX11, JX12 § 7.1.

202. Effective October 23, 2019, a majority of the Private Placement purchasers consented to amend the Purchase Agreements to extend the Deadline Date (as defined in the Purchase Agreements) from October 31, 2019, to April 30, 2020. Drylewski Ex. 7, Parekh Dep. at 194:15-195:11.

203. The Round 1 Purchase Agreement included a "Lock-Up" clause, which stated that Private Placement purchasers in Round 1 could not:

(a)     offer, pledge, sell, . . . or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement or any Tokens . . .; or

(b)    enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement or any Tokens,

. . . provided, however, that:

(i)    one-quarter of the Token Allocation shall be released from the restrictions in this clause 10 on the date that is three months following the Network Launch Date;

(ii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraph (i) above, equals one-half of the Token Allocation) shall be released from the restrictions in this clause 10 on the date that is six months following the Network Launch Date; and

(iii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraphs (i) and (ii) above, equals three-quarters of the Token Allocation) shall be released from the restriction in this clause 10 on the date that is 12 months following the Network Launch Date.

JSF ¶ 95; JX11 § 10.

204.    The Round 2 Purchase Agreement did not contain the "Lock-Up" clause that was included in the Round 1 Purchase Agreement. JSF ¶ 93.

205.    The Purchase Agreements contained an express restriction on assignments. JX11 § 11; JX12 § 10.

206.    The Round 1 Assignment Clause read as follows:

11.1 Subject to clauses 11.2 and 11.3, no Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement or subcontract or delegate in any manner whatsoever its performance under this Purchase Agreement (each of the above, a "**dealing**") without the prior written consent of the Purchaser, in the case of a dealing by the Issuer or the Parent, or the Issuer and the Parent, in the case of dealing by the Purchaser.

11.2 The Issuer and the Parent shall be entitled, without the consent of the Purchaser, after having given no less than three Business Days' prior written notice to the Purchaser, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all their respective obligations and liabilities

under this Purchase Agreement (i) to any of their respective Affiliates; or (ii) in connection with a reorganisation of the Issuer or the Parent (including a change in the domicile or jurisdiction of incorporation of the Issuer or the Parent).

11.3 The Purchaser shall be entitled, without the consent of the Issuer or the Parent, after having given no less than three Business Days' prior written notice to the Issuer and the Parent, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all its obligations and liabilities under this Purchase Agreement to any of its Affiliates (an **"Assignee"),** provided that the Assignee: (i) undertakes in writing to the Issuer and the Parent to be bound by the Purchaser's obligations and liabilities under this Purchase Agreement; (ii) warrants in writing to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date of the assignment or transfer with respect to itself (as if each reference to the Purchaser is construed as a reference to the Assignee); and (iii) delivers such other documents to the Issuer relating to this Purchase Agreement as the Issuer may reasonably request.

JX11 § 11 (emphasis original).

207.    The Round 2 Assignment Clause read as follows:

10.1 Subject to clause 10.4, the Purchaser agrees and undertakes that during the Restricted Period it shall not, without the prior written consent of the Issuer and the Parent:

> (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer, encumber or dispose of, directly or indirectly (through a direct or indirect transfer, encumbrance or disposition of any interest in any entity, contract or otherwise), the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, or any securities convertible into or exercisable or exchangeable for the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, or publicly disclose the intention to make any such offer, sale, pledge or disposition; or

> (b) enter into any swap or other agreement that transfers, directly or indirectly, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, whether any such transaction described in paragraphs (a) or (b) of this clause 10.1 is to be settled by delivery of the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, in cash or otherwise.

10.2 Subject to clauses 10.3 and 10.4, no Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement or subcontract or delegate in any manner whatsoever its performance under this Purchase Agreement (each of the above, a **"dealing"**) without the prior written consent of the Purchaser, in the case of a dealing by the Issuer or the Parent, or the Issuer and the Parent, in the case of dealing by the Purchaser.

10.3 The Issuer and the Parent shall be entitled, without the consent of the Purchaser, after having given no less than three Business Days' prior written notice to the Purchaser, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all of their respective obligations and liabilities under this Purchase Agreement (i) to any of their respective Affiliates; or (ii) in connection with a reorganisation of the Issuer or the Parent (including a change in the domicile or jurisdiction of incorporation of the Issuer or the Parent).

10.4 The Purchaser shall be entitled, without the consent of the Issuer or the Parent, after having given no less than three Business Days' prior written notice to the Issuer and the Parent, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all its obligations and liabilities under this Purchase Agreement to any of its Affiliates (an **"Assignee"**), <u>provided</u> that the Assignee: (i) undertakes in writing to the Issuer and the Parent to be bound by the Purchaser's obligations and liabilities under this Purchase Agreement; (ii) warrants in writing to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date of the assignment or transfer with respect to itself (as if each reference to the Purchaser is construed as a reference to the Assignee); and (iii) delivers such other documents to the Issuer relating to this Purchase Agreement as the Issuer or the Parent may reasonably request.

JX12 § 10 (emphasis original).

208.     The Purchase Agreements contained a Schedule 2, titled "Purchaser's Warranties." JSF ¶ 89; JX11, JX12.

209.     The Private Placement purchasers warranted, in part, the following to Defendants under the Purchaser's Warranties in the Round 1 Purchase Agreement:

1. if the Purchaser is an entity, the Purchaser is validly formed, in existence and duly registered under the laws of its jurisdiction of formation;

2. the Purchaser has the full legal capacity, power and authority to execute and deliver this Purchase Agreement and to perform its obligations hereunder;

3. this Purchase Agreement will, when executed, constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

4. the entry into this Purchase Agreement and the consummation of the transactions contemplated thereby is lawful under the laws of the jurisdiction of the Purchaser's incorporation and the jurisdiction in which it operates (if different), and such purchase will not contravene any law, regulation or regulatory policy applicable to the Purchaser;

5. it has been advised that the investment contract represented by this Purchase Agreement is a security and that the offers and sales thereof have not been registered under any country's securities laws and, therefore, the investment contract represented by this Purchase Agreement cannot be resold except in compliance with each applicable country's laws;

6. the Purchaser is purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof (provided, however, that by making the representations and warranties herein, except as set forth in this Purchase Agreement, the Purchaser does not agree to hold any of the Tokens for any minimum or other specific term and reserves the right to dispose of the Tokens at any time in accordance with applicable securities laws and the terms of this Purchase Agreement). The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Tokens;

7. the Purchaser is a sophisticated party with sufficient knowledge and experience in financial and business matters to evaluate properly the merits and risks of entering into this Purchase Agreement, including the merits and risks associated with subscribing for Tokens. The Purchaser understands that its investment hereunder and in the Tokens involves a high degree of risk. The Purchaser has conducted its own analysis and made its own decision to enter into this Purchase Agreement and agree to purchase the Tokens and has obtained such independent advice (including accounting, legal and tax advice) in this regard as it deemed appropriate; and the Purchaser has not relied in such analysis or decision on any Person other than its own independent representatives. The Purchaser and its representatives have been afforded the opportunity to make inquiries of the Issuer and/or the Parent. The Purchaser can afford a complete loss of its investment hereunder, should such loss occur, and without any financial hardship, should such loss occur;

JX11 Schedule 2.

35

210. The Round 2 Purchase Agreement contained identical Purchaser's Warranties as Round 1 above, except for the following:

> 6. the Purchaser is entering into the investment contract represented by this Purchase Agreement and purchasing this security and the Tokens for its own account, not for the benefit of any other person (other than any Purchaser Investor) and not with a view towards, or for resale in connection with, the sale or distribution thereof (provided, however, that by making the representations and warranties herein, except as set forth in this Purchase Agreement, the Purchaser does not agree to hold any of the Tokens for any minimum or other specific term and reserves the right to dispose of the Tokens at any time in accordance with applicable securities laws and the terms of this Purchase Agreement). The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute this security or any of the Tokens;

JX12 Schedule 2.

211. The Round 2 Purchase Agreement was labeled "**PRIVATE & CONFIDENTIAL**" and included the following confidentiality clause:

> 13.1 Subject to clause 13.2, the Purchaser agrees that:
>
>> (a) the Purchaser shall, and shall cause its Affiliates and representatives and any Purchaser Investor to, (i) keep this Purchase Agreement and any other information provided to the Purchaser or its Affiliates or representatives or any Purchaser Investor by or on behalf of the Issuer or the Parent secret at all times, except with the prior written consent of the Issuer and the Parent, (ii) not disclose such information or allow such information to be disclosed in whole or in part to any third party without the prior written consent of the Issuer and the Parent, (iii) not use such information in whole or in part for any purpose other than in connection with the transactions contemplated by this Purchase Agreement, and (iv) undertake to take all reasonable measures to ensure the confidentiality of this Purchase Agreement and any other information provided to the Purchaser or its Affiliates or representatives or any Purchaser Investor by the Issuer or the Parent; and
>
>> (b) the Purchaser shall not, and shall cause its Affiliates and representatives and any Purchaser Investor to not, without the prior written consent of the Issuer and the Parent, use the Issuer or the Parent's name or logo, or the name or logo of any of their Affiliates or representatives, in any manner or format (including in any reference in or links to websites, press releases or otherwise).

13.2 Notwithstanding the obligations set forth in clause 13.1, the Purchaser may, without the prior written consent of the Issuer or the Parent, disclose to a third party this Purchase Agreement and any other information provided to the Purchaser or its Affiliates or representatives or any Purchaser Investor by or on behalf of the Issuer or the Parent to the extent required by applicable law (including any applicable rule or regulation or by subpoena, writ, warrant, order or directive of a court, arbitrator or governmental regulatory body, agency or authority), in which case the Purchaser shall (i) promptly notify the Issuer and the Parent of such requirement and cooperate with the Issuer and the Parent to limit the information disclosed to only such information that the Purchaser, as advised by counsel, is required by applicable law to disclose and (ii) seek to obtain a protective order over, or confidential treatment of, such information.

JX12 § 13 (emphasis original).

212.    Telegram intends to require each Private Placement purchaser to repeat its representations at the launch of the TON Blockchain as a condition precedent to receiving any allocation of Grams.  Drylewski Ex. 2, Durov Dep. at 287:25-288:13.

### 1.    *Public Availability of the Private Placement Materials*

213.    The Round 1 Purchase Agreements prohibited Private Placement purchasers from offering the Purchase Agreements or any Grams to others and from publicly disclosing the intention to make any such offers.  JSF ¶ 96.

214.    The Round 2 Purchase Agreements prohibited Private Placement purchasers from offering the Purchase Agreements or any Grams to others and from publicly disclosing the intention to make any such offers.  JX12 § 10.1(a).

215.    The Round 2 Purchase Agreements required Round 2 Private Placement purchasers not to disclose the information provided by the Defendants to any third parties absent prior written consent of the Defendants.  JSF ¶ 97.

216.    Despite these restrictions by Telegram, the Private Placement Materials have become public.  JSF ¶ 98.

217. Additionally, certain of the Private Placement Materials, including the Technical Whitepaper, the Primers, and the Purchase Agreements, were placed on the Internet and, as such, are accessible to the public at large. JSF ¶ 99.

218. Telegram was careful not to publicly comment on any of these materials or otherwise make any statements about the details of the anticipated project to the public, particularly in light of the legal and regulatory uncertainty and the flexibility it had reserved regarding those details. Drylewski Ex. 3; Drylewski Ex. 2, Durov Dep. at 23:10-25.

## III. **DEVELOPMENT OF THE TON BLOCKCHAIN**

219. The TON Blockchain was fully developed and ready to be launched as of October 31, 2019. Drylewski Ex. 7, Parekh Dep. at 169:5-8, 169:25-170:11; *see also* Drylewski Ex. 2, Durov Dep. at 258:9-14 (describing the testing of the core components of the TON network as complete).

220. Defendants have reserved the right to change, modify or eliminate any aspects of the TON Blockchain platform until its launch. Drylewski Ex. 9 at TLGRM-005-00005507 – TLGRM-005-00005508, TLGRM-005-00005587 – TLGRM-005-00005588; Drylewski Ex. 2, Durov Dep. at 159:18-160:3, 161:6-19.

221. From October 31, 2019 to the present, Defendants continued to undertake efforts to develop certain features that could be used on the TON Blockchain. JSF ¶ 210.

222. These are "nice-to-have" features but not essential to the operation of the TON Blockchain. Drylewski Ex. 2, Durov Dep. at 316:14-24.

223. After the launch of the TON Blockchain, Defendants will have no obligation to develop TON Blockchain applications. JSF ¶ 172; Drylewski Ex. 2, Durov Dep. at 358:13-24.

224. To the contrary, Defendants made representations to investors at all times that they were not required to, and indeed may not, make any additional efforts with respect to the

development of the TON Blockchain following its launch. Drylewski Ex. 3; *see also* Drylewski Ex. 2, Durov Dep. at 257:16-21, 266:22-25; JX11 § 7.1.

## A. The TON Foundation and TON Reserve

225. Defendants informed some potential and all actual Private Placement purchasers that they intended to establish an entity called the TON Foundation, which, if established, will be a not-for-profit organization. JSF ¶ 147.

226. Defendants have not yet decided whether to establish the TON Foundation. JSF ¶ 149.

227. Defendants have communicated to the public that the TON Foundation may never be established. JSF ¶ 149.

228. Defendants previously communicated to the Private Placement purchasers that the TON Foundation may never be established. JSF ¶ 148.

229. From its inception, the TON Foundation was intended to "retain flexibility" so as to comply with regulations. Drylewski Ex. 12, January 22, 2018 Email; JX14, JX15 ¶ 16.

230. Pavel explained to an individual investor in 2018:

> We've talked a lot with [counsel] about our ideas re Foundation. While I was pushing it forward, their advice was clear – in times when the future (and current) regulation is uncertain, retain flexibility. It made a lot of sense to me, as it seems to go in line with the larger Telegram approach, which we employ not only on legal matters, but also on the engineering side and product-wise.

Drylewski Ex. 12.

231. In the event the TON Foundation is never founded, the Grams allocated to it will be locked for perpetuity. Drylewski Ex. 2, Durov Dep. at 269:9-17; Drylewski Ex. 5 at 5.

232. The TON Foundation will be directed by a board of directors called the TON Foundation Board. JSF ¶ 153; Drylewski Ex. 5 at 3.

233.    If established in the future, it is currently contemplated that the TON Foundation Board will have five members.  JSF ¶ 154; Drylewski Ex. 5 at 3.

234.    Pavel and Nikolai Durov intend to be two of the TON Foundation Board members.  JSF ¶ 154; Drylewski Ex. 5 at 3.

235.    As currently contemplated, the other members of the TON Foundation Board will be independent directors with no connection to Telegram or its affiliates and with experience in blockchain technology and/or TON.  JSF ¶ 154; Drylewski Ex. 5 at 3.

236.    If established in the future, it is currently contemplated that the TON Foundation could publish non-binding opinions and research results regarding the TON Blockchain's development and policy.  JSF ¶ 174.

237.    If established in the future, it is currently contemplated that the TON Foundation is expected to provide small incentives rewards of Grams to users of the TON Blockchain platform to promote the consumptive use of Grams.  JSF ¶¶ 155, 157; *see also* Drylewski Ex. 2, Durov Dep. at 271:13-272:17.

238.    If established in the future, it is currently contemplated that the TON Foundation is expected to, in certain circumstances, sell Grams in the market in order to attempt to dampen the upward volatility in the event that the free market price for Grams gets too high.  JSF ¶¶ 152, 165-66, 211.

239.    In the event that the market price of Grams exceeds the Reference Price, the TON Foundation may elect (but is not required) to sell Grams from the TON Reserve where the lowest acceptable bid price would be the Reference Price.  JSF ¶¶ 165-66.

240.     The Reference Price is determined by a formula based on the total number of Grams in existence, which is set forth in Appendix A to the Technical Whitepaper.  JSF ¶¶ 143-44.

241.     The Reference Price of a Gram at the beginning of each round of the Private Placement was computed as: $0.1 * e^{n*10^{-9}}$, where n denotes the total number of Grams subscribed for prior to that stage.  JSF ¶ 144.

242.     Defendants expect that the Reference Price of a Gram will be $3.62475487 at the launch of the TON Blockchain.  JSF ¶ 143.

243.     The Reference Price does not bear any relationship to, or dictate in any way, the free market price for Grams following launch of the TON Blockchain.  JSF ¶ 171.

244.     The TON Foundation will not have any legal or technical ability to change the TON Blockchain code, its validation processes or its parameters.  Drylewski Ex. 2, Durov Dep. at 264:5-25.

245.     None of the Grams held by the TON Foundation could be used for voting or validating.  Drylewski Ex. 2, Durov Dep. at 163:24-164:11, 276:10-277:4; Drylewski Ex. 13, October 2, 2019 Email.

246.     The TON Foundation's anticipated functions were modeled after, and are similar to, the role the Ethereum Foundation plays with respect to the Ethereum blockchain.  McKeon Ex. 1 ¶¶ 129-34; Drylewski Ex. 2, Durov Dep. at 264:5-25.

247.     As originally contemplated, the TON Foundation would also have had the ability to buy Grams from the market in order to attempt to prevent the price of Grams from getting too low.  JSF ¶¶ 165, 167.

248.    Through discussions with the SEC, Defendants decided to remove the TON

Foundation's Gram-buying function to alleviate concerns articulated by the SEC.  JSF ¶ 168.

249.    Telegram is willing to consider other changes to the TON Foundation's functions

from what is currently contemplated or to forego the TON Foundation entirely.  Drylewski Ex. 2,

Durov Dep. at 271:24-272:5; Drylewski Ex. 5 at 3.

**B.    Contemplated Launch and Creation of Grams**

250.    The initial supply of Grams will be set at 5 billion.  JSF ¶ 138.

251.    Telegram hopes that, after launch, Grams will achieve a wide user base, beyond

the Private Placement purchasers.  JSF ¶ 139.

252.    Following the launch of the TON Blockchain, the free market price of Grams will

be subject to the market forces of supply and demand.  JSF ¶ 170; Drylewski Ex. 2, Durov Dep.

at 297:20-23; McKeon Ex. 1 ¶¶ 209-10, 215.

253.    After launch, holders of Grams will be able to individually determine how to use

their Grams.  *See* Drylewski Ex. 4 at 7; *See also* McKeon Ex. 1 ¶ 51.

254.    Gram holders can individually decide to use the Grams, exchange them for fiat

currency, stake them, or simply hold them, among other uses.  *See* Drylewski Ex. 4 at 7;

McKeon Ex. 1 ¶¶ 51, 63-68, 137, 154.

255.    Any profits that Gram holders achieve will be the result of their own decisions

(and market forces) and based on the timing of those decisions.  Drylewski Ex. 7, Parekh Dep. at

70:6-71:4; McKeon Ex. 1 ¶¶ 209-10, 215.

**C.    The TON Beta Version and Early Third Party Developments**

256.    Prior to the launch of the production version of the TON Blockchain, Telegram

made publicly available a test version of the TON Blockchain (the "Beta Test Version").  JSF

¶ 130.

257.     Telegram began rolling out the Beta Test Version in March 2019 and gradually added information over time until early September 2019.  JSF ¶ 131.

258.     Telegram completed rolling out of the beta-test network in early September 2019. JSF ¶ 132.

259.     The Beta Test Version enables third-party developers to view the TON Blockchain's open-source code and to develop and test certain applications and interfaces that may be offered when the production version of the TON Blockchain launches.  JSF ¶ 133.

260.     The Beta Test Version is currently publicly available at the following domain: https://test.ton.org/download.html.  JSF ¶ 134.

261.     The website includes open source code and step-by-step instructions regarding how to create and test applications and smart contracts on the TON Blockchain.  JSF ¶ 135.

262.     Anyone in the world can access the code and follow the instructions to build and test smart contracts and applications for the TON Blockchain, as well as learn about the process to become a TON validator.  JSF ¶ 136.

263.     As of November 22, 2019, tens of thousands of parties had downloaded the TON Light Client and TON Light Wallet from the Beta Test website.  Drylewski Ex. 4 at 12.

264.     Defendants hosted a series of contests on Telegram called "TON Contests," in which they solicited submissions from third parties that could be used to improve the TON Blockchain.  Drylewski Ex. 4 at 12; *see also* Drylewski Ex. 2, Durov Dep. at 318:4-23.

265.     In response to the first stage of TON Contests, 66 parties submitted solutions and 41 parties produced working smart contracts.  Drylewski Ex. 4 at 12.

266.     The submissions resulted in at least 50 new smart contracts for use in connection with competing versions of four applications.  Drylewski Ex. 4 at 12.

267. The results of the first stage of the TON Contests are available at: https://contest.com/blockchain. Drylewski Ex. 4 at 12.

268. On December 7, 2019, Telegram announced the second stage of the TON Contests. Drylewski Ex. 14, Telegram Contest Documents at 2.

269. Only winners from the first stage of the TON Contests can participate. Drylewski Ex. 14 at 2.

270. The goal of the second stage of the TON Contests is to "build one or two TON-based smart-contracts (decentralized services) that can become popular with consumers." Drylewski Ex. 14 at 2.

271. There are currently 27 submissions from 27 contestants for the second stage of the TON Contests. Drylewski Ex. 15, Blockchain Contest, Stage 2.

272. Defendants anticipate that the smart contracts developed during the TON Contests are likely to operate on the TON Blockchain at the time of its launch. Drylewski Ex. 4 at 12.

273. There have been numerous public reports, websites, and articles regarding the development of applications and services for the TON Blockchain. Drylewski Ex. 4 at 12.

274. The following is a chart of public reports, websites and other resources regarding the development or potential development of applications and uses for Grams and the TON Blockchain by third parties:

| Name | Developer | Notes Based on Third Party Description | Link(s) |
|------|-----------|---------------------------------------|---------|
| SOL2TVM compiler | TON Labs | Tool to ensure contract compatibility between Ethereum platform and TON Virtual Machine | https://www.coindesk.com/telegrams-blockchain-will-be-compatible-with-ethereum-ton-labs-says<br><br>https://cryptobriefing.com/telegram-ton-labs/ |

| | | | https://cointelegraph.com/news/report-telegrams-ton-blockchain-to-be-compatible-with-ethereum-dapps<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |
|---|---|---|---|
| LLVM compiler | TON Labs | LLVM-based compiler designed to convert sources from multiple high-level languages into its IR and then into TVM bytecode | https://ton.dev/toolchain<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |
| TON Labs Local Node | TON Labs | TON Labs proprietary implementation of TON Node | https://ton.dev/node-se<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |
| TON Labs SDK | TON Labs | CLI tool for streamlined usage | https://ton.dev/node-se<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |
| TON Labs Toolchain | TON Labs | Compiler kit with the latest versions of TON Labs LLVM and Sol2TMV compilers | https://ton.dev/node-se<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |
| Ton Labs Node SE | TON Labs | Provides a set of developer tools to develop and compile smart contracts in Solidity, C and C ++; run, deploy and test contracts locally using client libraries for Rust, React Native, Web and Node.js; and make various queries to key blockchain objects using GraphQL protocol with subscription options | https://ton.dev/node-se |
| Button Wallet | Button | Wallet that supports BTC, ETH, LTC, BCH, ETC, Waves, Stellar Lumens (XLM) and ERC-20 tokens; will facilitate exchange of Grams for other cryptocurrencies | https://www.forbes.com/sites/billybambrough/2019/08/26/telegrams-300-million-users-could-soon-be-trading-bitcoin-and-cryptodespite-serious-security-warning/#1aa7fb523fe9<br><br>https://buttonwallet.com/ |
| Mercuryo Pay | Mercuryo | Allows customers to pay with BTC & ETH; will process Grams once TON Blockchain launches | https://mercuryo.io/business/acquiring/ |

| AdGram | AdGram | Advertising platform that allows advertisers to create advertising campaigns and channel owners to monetize their audience | https://adgram.io/ |
|---|---|---|---|
| BeProducers | BeProducers | Facilitates production of films for Gram holders | https://beproducer.pro/news-and-analytics/d1f08a5e-262f-48d3-87be-020530e2317d |
| TON dApps Marketplace | CryptoBazar | Includes pre-selected projects to be launched on TON Blockchain | https://ton.cryptobazar.io/ |
| Drimsim SIM | Drimsim Global | Universal SIM and mobile expense card | https://m.facebook.com/334908950536095/posts/432905817403074?d=n&substory_index=0&sfns=mo<br><br>https://twitter.com/drimsimglobal/status/1197175207649304577?s=21<br><br>https://blog.drimsim.com/drimsim-budet-prinimat-crypto-gram |
| Denim | Denim | Dating application for TON Blockchain | https://dcntrlzd.app/2019/11/17/denim/ |
| Unovis | Unovis Forum | Marketplace for art using TON Blockchain | https://dcntrlzd.app/2019/10/23/unovis/ |
| DareApp | Eristica | Mobile video platform | https://dcntrlzd.app/2019/10/13/dareapp/ |
| Posh.space | Posh.space | Digital fashion store | https://dcntrlzd.app/2019/10/12/poshspace/<br><br>https://posh.space/ |
| Pregnancy Tracker | Mobile Dimension LLC | Pregnancy related app | https://dcntrlzd.app/2019/10/10/pregnancy-tracker/<br><br>https://pregnancytracker.app/ |
| U-Robot | u-robot | Chat-bot app; customized online store or personal page | https://dcntrlzd.app/2019/10/09/urobot/<br><br>http://u-robot.net |

| | | | |
|---|---|---|---|
| Incognito | Incognito | Mobile network related app | https://dcntrlzd.app/2019/10/08/incognito/ |
| Kelvpn | Kelvpn | VPN marketplace operating on top of decentralized network | https://dcntrlzd.app/2019/10/07/kelvpn/ https://kelvpn.com/ |
| EzDapps | Apla | Dapps Marketplace | https://dcntrlzd.app/2019/10/06/ezapps/ |
| Spatium | Spatium | Wallet with enterprise-level security | https://dcntrlzd.app/2019/10/05/spatium/ https://spatium.net/ |
| Viewst | Viewst | Uses micropayments channel network to accept payments from users on TON Blockchain network as well as from other services; uses file-distributed storage technology for keeping assets and optimizing storage for large video files; provides optimized templates to create digital graphic assets for Telegram channels and other TON Services | https://viewst.com/ |
| Worldwide Hackathon | Optimal.one | Worldwide Hackathon for the promotion of TON Blockchain projects | http://www.optimal.one/ |
| ParJar | Parachute | Allows users to send cryptocurrency tips on Telegram | https://beincrypto.com/cryptocurrency-tips-on-telegram-reach-500000-milestone-in-just-a-year/ |
| TON-based real-time advertising platform | Appreciate | Proposed real-time advertising platform on top of TON Blockchain | |
| copperbits/TON | Copperbits (on GitHub) | R&D group focused on TON Blockchain on GitHub | https://github.com/copperbits/TON https://t.me/ton_research |
| TON.Broxus | Finex Future | Java wrapper for TON | https://github.com/broxus/ton-client |
| Atomic TON Wallet | Atomic | Universal cryptocurrency wallet | https://atomicwallet.io/ton-wallet |
| TON_tokens | EmelyanenkoK | Simple tokens for TON | https://github.com/EmelyanenkoK/TON_tokens |

| | | | |
|---|---|---|---|
| ton_client | formony | Python API client for TON | https://github.com/formony/ton_client |
| TON Watcher | TON Center | Will allow users to search for addresses or blocks on TON Blockchain | https://tonwatcher.com/ |
| TON.shi Public API | TON.sh | HTTP-based experimental interface for developers; explorer to search for addresses or transactions on TON Blockchain | https://ton.sh/api |
| School register project | Andrei Marchenko | Project implements a register for giving grades to students in a school or university | https://github.com/ftkvyn/ton-register |
| Goods purchasing ecosystem project | Andrei Marchenko | Project creates an ecosystem for selling and purchasing goods on TON blockchain | https://github.com/ftkvyn/ton-goods |
| TON Auction | Denis Olshin | Multi-purpose smart-contract for TON blockchain implementing both an auction system and a shop | https://github.com/deNULL/ton-auction |
| TRC20 Token | Github user | A standard interface for tokens in TON (like ERC20 in Etherium) | https://github.com/cod1ng-studio/TRC20 https://tontalk.org/threads/184/ |
| TON Lotto | @combot / TON.sh | Lottery bot for TON testnet implemented as a Telegram bot that interacts with the TON smart contract | https://tontalk.org/threads/156/ |
| The Chat Game | EmelyanenkoK | RPG game with random items drop based on activity in chat rooms | https://ton.sh/e/tcg https://github.com/EmelyanenkoK/TheChatGame |
| OracleHub | EmelyanenkoK | Data provider platform that aims to create transparent registry of independent oracles | https://github.com/EmelyanenkoK/OracleHub |
| TON Mixer | @dkaraush | Project tries to transfer Grams through mixer nodes so they cannot be tracked in the open network | https://tonweb.site/-1:2bcc9840e7b9ec6b77fe3543b4eefbf3ba6c69fd98f362b3d3b2f4b752adb5e8/index.html https://github.com/dkaraush/ton-mixer |
| dApp for TON that allows delegation of GRAMs to validators in non-custodial way | BUTTON Wallet team | Project allows anyone to create delegation pool and become validator; allows anyone to earn interest by delegating Grams to potential Validators. (Risks will be handled by reputation system and security deposits); non-custodial web-based solution | https://github.com/button-tech/ton-delegation-pool |
| TON Decentralized Exchange | Github user | Implements a fully decentralized exchange with the support of the exchange of grams, extra currencies and TRC20 tokens | https://github.com/cod1ng-studio/ton-exchange |

| A Charity Foundation TON Smart Contract | Github user | Implements simple Foundation model where each incoming payment will be multiplied by specified campaign factor and sent to the destination | https://github.com/dblokhin/ton-charity-foundation |
|---|---|---|---|
| Smart contract lottery | Github user | Lottery smart contract where players buy any of 64 squares (or several), after a while the smart contract sets a win amount for each square | https://github.com/Arseny271/tonGame |
| Ring signature based mixer contract | Github user | Smart contract that can help obfuscates Grams | https://github.com/adoriasoft/ton_payment_mixer |
| Pool TON Service | vanasprin and alexhol | Allows to pool user funds in the TON blockchain network for some specific purpose and the subsequent proportional distribution of the funds (if necessary) | https://github.com/vanasprin/pool_ton |
| TON Staking Solutions | Eugene Koinov | Fully decentralized solution based on mutual mistrust principle at the crossroad of blockchain, finance and security | https://github.com/koinov/ton-staking |
| ICO smart contract | Github user | Allows user to conduct a fundraising event for the initial coin offer (ICO) for various projects | https://github.com/plexar88/ico |
| Dota2 auto chess | Github user | Project uses TON as a payment system and trust source for a popular game, Dota2 Autochess | https://github.com/KStasi/Ton-Dich5 |
| TON Web | @dkaraush | A website portal for TON | https://tonweb.site/-1:d9bb6fde2410a2445f4e213013f5a0ac584a580a67478fa2992be4bae24c3079/index.html |
| Fungible token smart contract | Github user | Fungible token smart contract | https://github.com/adoriasoft/ton_fungible_token |
| messenger | Github user | Messenger for TON | https://github.com/AlexGor-dev/messenger |
| contract_manager | Github user | Manager contracts for ton blockchain | https://github.com/AlexGor-dev/contract_manager |
| A gambling smartcontract for Telegram Open Network (TON) | Denis Olshin | Smart-contract for TON blockchain implements a platform for different gambling activities (such as lotteries or card games) | https://github.com/deNULL/ton-gamble |
| Lottery "3 of 13" smart-contract | Github user | Lottery smart contract | https://github.com/alunegov/ton-contest-2 |

| MadelineTon.js | Daniil Gentili | Pure JS client-side implementation of the Telegram TON blockchain protocol | https://github.com/danog/madelineTon.js |
| TON freestyle | Github user | Tools for creating freestyle smart contracts | https://github.com/Skydev0h/ton-freestyle |
| Ton (Gram) Validator Staking Pool | 2masternodes | Validation aggregator | https://2masternodes.com/ton-validator-pool |
| Xeus-Fift | Github user | Jupyter kernels for Fift, FunC and TVM assembler | https://github.com/atomex-me/xeus-fift https://tontalk.org/threads/158/ |
| TON Labs Cloud | TON Labs | Public cloud providing access to testnet | https://eu-central-1.large.testnet.ton.dev/graphql https://tontalk.org/threads/149/ https://decrypt.co/12531/telegrams-sec-battle-hasnt-stopped-ton-labs-pressing-ahead |

Drylewski Ex. 4 at 12-16; Drylewski Ex. 10 at 2-6.

275. From time to time, Defendants have had communications with numerous parties regarding the potential development of applications and uses for Grams on the TON Blockchain, including TON Labs, ▇▇ (potential integration with TON), ▇▇ (proposed real-time advertising platform on top of TON Blockchain), DrimSim, Telefonica, Payphone, CryptoBazaar, Beproducer, Everstake, Mercuryo, PrivatBank, KupiBilet, WEBPAY, participants in TON Contests, and Private Placement purchasers. Drylewski Ex. 4 at 9.

## IV. TELEGRAM'S PUBLIC COMMUNICATIONS

276. During the Private Placement, on January 21, 2018, Pavel Durov sent the following tweet: "If you see or receive offers to 'buy Grams', let us know at http://t.me/notoscam." Drylewski Ex. 16, Pavel Durov (@durov) Twitter at SEC-SEC-E-0002661.

277. On January 6, 2020, Telegram published a notice (the "Public Notice"), which explained the following:

You may have heard that since **2017** the team at Telegram has been developing a new blockchain platform called the **TON Blockchain** and native cryptocurrency called **Grams**. We hope that as a result of this project Grams will become a true complement to traditional currencies, improving the **speed, efficiency** and **security** of everyday commercial transactions globally. We believe that the TON Blockchain technology will create a stable ecosystem and represents a significant improvement upon previous platforms in terms of **speed, usability** and **scalability**.

There have been a lot of rumors in the media and speculation about the details of this project. Telegram has been careful **not to speak publicly** about these rumors while we continue to build the TON Blockchain platform and work out the exact details of the project to ensure that the TON Blockchain and Grams can operate in a way that is **compliant** with all relevant **laws and regulations**.

In light of recent events, we wanted to take the time to publicly clarify certain aspects of the TON Blockchain and Grams as we continue to prepare for a successful launch of the project.

* * *

### Nobody can buy or sell grams yet

First, it has come to our attention that certain websites appear to be offering Grams to the public. These websites sometimes refer to the offers as "token presales," and some pretend to be affiliated with Telegram. As we've warned you on numerous occasions, these are **NOT** official Telegram websites, they have **NO** affiliation with Telegram, and **NO** Grams have been issued yet to anyone. Neither Telegram nor any of its affiliates are involved in any public sales or presales of Grams. To the contrary, the TON Blockchain on which Grams will function is still in a **Beta Test** phase and you can access the Beta Test website at https://test.ton.org/download.html. Only once the TON Blockchain launches will Grams be created and available to purchase.

* * *

### TON will be decentralized and maintained by third parties

Second, if you are considering whether to purchase Grams once the TON Blockchain platform is launched, we want you to know certain things. Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram may never do so. Rather, it is Telegram's goal and hope that the **decentralized community of third party developers** and others will contribute to the TON ecosystem through the development of applications and smart contracts. It will be the sole responsibility of **third parties** and the community to

51

\* \* \*

**And if you already heard about TON...**

Finally, we wanted to provide further clarity regarding some technical and governance aspects of the TON Blockchain. Please note that the below is intended to **supersede and replace** all prior materials or communications regarding the TON Blockchain and Grams to the extent of any conflict or potential conflict, including the information and details set forth in the TON Whitepapers or any previous communications or materials by Telegram or anyone else:

**(1)** Telegram is under no obligation, and makes no promise or commitment, to ever establish a **TON Foundation** or similar entity in the future.

**(2)** At the time of the anticipated launch of the TON Blockchain, Telegram's TON Wallet application is expected to be made available solely on a **stand-alone basis** and will not be integrated with the Telegram Messenger service. In this regard, the TON Wallet is expected to **compete** with any other wallet applications designed and offered by **third parties**. Telegram may integrate the TON Wallet application with the Telegram Messenger service in the future to the extent permitted under applicable laws and governmental authorities.

Telegram reserves all rights to further add to, clarify or revise these or any other aspects of the TON Blockchain or Grams. We look forward to providing more information as we get closer to the anticipated launch of the TON Blockchain.

*January 6, 2020*
*The Telegram Team*

*This communication contains forward-looking statements, including statements of plans, objectives, expectations, development status and intentions. Any number of factors could cause actual results to differ materially from those contemplated by any forward-looking statements, including but not limited to the risks identified herein.*

Drylewski Ex. 3 (emphasis original).

278.    Telegram's Public Notice is available online at https://telegram.org/blog/ton-gram-notice. Drylewski Ex. 3.

279.     Telegram also published a link to the Public Notice on its Twitter account, which is available online at https://twitter.com/telegram/status/1214144878071943168. Drylewski Ex. 17, Telegram Messenger Twitter (January 6, 2020).

280.     The Public Notice has also received significant media coverage. *See, e.g.*, Drylewski Ex. 18, "Telegram says TON Wallet won't integrate with its messaging app at launch" (Jan. 6, 2020).

## V.     **TELEGRAM SOUGHT GUIDANCE FROM AND ACTIVELY ENGAGED WITH THE SEC**

281.     On February 2, 2018, counsel for Telegram reached out to the SEC regarding the TON Blockchain. ECF No. 37, Defendants' Affirmative and Other Defenses ("Defenses") ¶ 36.

282.     On February 2, 2018, the SEC sent a letter to "Telegram LLC," which stated that "[t]he staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above and requests that your client, Telegram LLC ('Telegram'), voluntarily produce to the staff" a number of categories of documents. ECF No. 37, Defenses ¶ 36.

283.     Both sides agreed to the scope of Telegram's voluntary production of documents, and over the next 18 months, Telegram engaged in good faith and voluntary discussions with the SEC in order to explain the details of its project and to obtain guidance regarding the potential application of the federal securities laws. ECF No. 37, Defenses ¶ 36.

284.     Between February 2018 and the commencement of this litigation, Telegram voluntarily: (i) provided productions of thousands of pages of messages and communications with U.S. purchasers; (ii) submitted a detailed legal memorandum on June 26, 2018, regarding its securities analysis of Grams, along with four supplemental memoranda dated November 28, 2018, February 27, 2019, March 18, 2019, and July 25, 2019; (iii) participated in three in-person presentations to the SEC, during which it answered hundreds of questions regarding the TON

54

Blockchain, the TON Foundation, Grams and related matters; and (iv) engaged in regular email and telephone discussions with the SEC and promptly answered questions and provided additional information regarding a wide range of topics relating to the above. ECF No. 37, Defenses ¶ 37.

285.    A timeline of Telegram's voluntary efforts follows:

- February 6, 2018 – Voluntary production of documents (Vol. 1)

- February 13, 2018 – Voluntary production of documents (Vol. 2)

- March 9, 2018 – Voluntary production of documents  (Vol. 3)

- April 18, 2018 – In-person presentation to SEC

- May 14, 2018 – Voluntary production of documents (Vol. 4)

- June 26, 2018 – Submission of Initial Memorandum of Law

- July 24, 2018 – Call with SEC

- July 31, 2018 – Call with SEC

- August 14, 2018 – Call with SEC

- September 4, 2018 – Call with SEC

- October 3, 2018 – Voluntary production of documents (Vols. 5 & 6)

- October 11, 2018 – Call with SEC

- November 13, 2018 – Voluntary production of documents (Vol. 7)

- November 14, 2018 – Call with SEC

- November 20, 2018 – Submission of Supplemental Memorandum of Law

- December 13, 2018 – Call with SEC

- February 6, 2019 – In-person presentation to SEC

- February 27, 2019 – Submission of Second Supplemental Memorandum of Law

- March 11, 2019 – Call with SEC

- March 12, 2019 – Call with SEC

- March 18, 2019 – Submission of Third Supplemental Memorandum of Law

- March 25, 2019 – Email response to SEC questions

- May 28, 2019 – Letter to SEC enclosing documents; email response to SEC
  questions

- June 14, 2019 – Email response to SEC questions

- June 15, 2019 – Email response to SEC questions

- June 28, 2019 – Call with SEC

- July 9, 2019 – Email responding to SEC questions

- July 18, 2019 – In-person presentation to SEC, CFTC and FinCEN

- July 25, 2019 – Submission of Fourth Supplemental Memorandum of Law

- September 3, 2019 – Email response to SEC questions

- September 9, 2019 – Email response to SEC questions

- September 12, 2019 – Email response to SEC questions

- September 27, 2019 – Email response to SEC questions

- September 30, 2019 – Letter to SEC

- October 1, 2019 – Letter to SEC enclosing documents

- October 3, 2019 – Letter to SEC enclosing documents

- October 4, 2019 – Letter to SEC enclosing documents

- October 10, 2019 – Email response to SEC questions

- October 11, 2019 – Letter to SEC

ECF No. 37, Defenses ¶ 38.

286.     Where the SEC did provide some limited feedback to Telegram regarding the

TON Blockchain, Telegram made changes in an attempt to address the SEC's concerns.  ECF

No. 37, Defenses ¶ 39.

287.     In March 2018, Telegram provided the SEC with a list of approximately 60

websites that Telegram believed had been fraudulently offering to sell Grams.  Drylewski Ex. 4

at 26.


Dated:    New York, New York
          January 14, 2020

                              Respectfully submitted,

                              /s/ Scott D. Musoff
                              George A. Zimmerman
                              Scott D. Musoff
                              Christopher P. Malloy
                              Alexander C. Drylewski
                              SKADDEN, ARPS, SLATE,
                                MEAGHER & FLOM LLP
                              Four Times Square
                              New York, New York 10036
                              Phone:  (212) 735-3000

                              *Attorneys for Defendants*