**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :
    :
                        **Plaintiff,**    :      **19 Civ. 9439 (PKC)**
    :
               **- against -**    :      **ECF Case**
    :
TELEGRAM GROUP INC. and TON ISSUER INC.,    :
    :
                      **Defendants.**    :
    :
-------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Jorge G. Tenreiro
Kevin P. McGrath
Ladan F. Stewart
Alison R. Levine

Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

January 13, 2020

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................................. iv

**PRELIMINARY STATEMENT** .................................................................................................... 1

**STATEMENT OF FACTS**............................................................................................................. 3

   I.   THE DUROV BROTHERS LAUNCH TELEGRAM MESSENGER. ............................ 3

   II.  TELEGRAM RAISES FUNDS FROM INVESTORS IN AN UNREGISTERED
      OFFERING OF GRAMS. ............................................................................................... 3

        A.   In Need of Cash, Telegram Decides To Raise Funds for Its Operations. ...............3

        B.   Telegram Targets Investment Funds as Initial Purchasers of Grams. .....................5

        C.   Telegram and Its Agents Market Grams as an Investment in Telegram
            Dependent in Part On Widespread Adoption of Grams for Success.......................5

        D.   Telegram Leads Investors To Expect Its Continued Support to the TON
            Network and the Demand for Grams after Launch. ................................................8

        E.   Telegram Enters Into Legally Binding Gram Purchase Agreements. .....................9

        F.   Telegram Builds A Significant Price Discount Into the Price of Grams..............11

        G.   Telegram Claims to Have Raised $1.7 Billion in the Offering. ...........................12

   III. TELEGRAM AND ITS ASSOCIATES MAKE EFFORTS TO INCREASE
      GRAMS' VALUE AND LIQUIDITY AFTER THE LAUNCH. .................................. 13

   IV. A SECONDARY MARKET FOR GRAMS DEVELOPS AFTER THE
      OFFERING............................................................................................................... 14

   V.   TELEGRAM DOES NOT REGISTER THE SALE OF GRAMS WITH THE SEC
      OR OTHERWISE PROVIDE INVESTORS WITH CERTAIN INFORMATION....... 15

**STANDARD OF REVIEW** .......................................................................................................... 15

**ARGUMENT** ............................................................................................................................... 16

   I.   TELEGRAM MADE UNREGISTERED OFFERS AND SALES OF SECURITIES. .. 16

        A.   The *Howey* Analysis Applies as of the Date of the  Gram Purchase
            Agreements..........................................................................................................18

            1.   A "sale" occurs under the Securities Act when the parties become
                irrevocably bound by their agreement........................................................ 18

            2.   The Gram Purchase Agreements were legally binding "sales.".................. 20

ii

B.    The Undisputed Facts Establish that the Grams Were Investment Contracts When They Were Sold. ........................................................................22

    1.    Telegram obtained an investment of money. ................................. 22

    2.    The Initial Purchasers invested in a common enterprise. ........................... 23

    3.    The Initial Purchasers reasonably expected profits derived from Telegram's entrepreneurial efforts. ............................................... 25

C.    Even If Analyzed At TON's Launch, Grams Are Investment Contracts. .............26

II.    TELEGRAM ENGAGED AND IS ENGAGING IN A PUBLIC DISTRIBUTION OF GRAMS TO WHICH NO EXEMPTION CAN APPLY ......................................... 27

    A.    "Distributions" Under the Securities Act and Regulation D ................................28

    B.    Telegram Has Taken Steps Towards, and Seeks to Complete, a Public Distribution of Grams .................................................................................................31

CONCLUSION ........................................................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980)................................................................. 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................... 15

*Berckely Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ....................... 29

*Continental Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) ......................... 22

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163 (2d Cir. 2014)............................... 16

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337 (S.D.N.Y. 2019)........... 15

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992) ....................................... 20

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ................................................. 30

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959)............................... 29, 30

*Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290 (2d Cir. 1992)........................ 20

*Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir. 1984)................. 23

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ............... 23

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140 (2d Cir. 2008)............................. 16

*Lewisohn Copper Corp.*, 38 S.E.C. 226 (1958) ............................................... 29

*Morales v. Quintel Entm't Inc.*, 249 F.3d 115 (2d Cir. 2001) ............................ 16

*Quinn & Co. v. SEC*, 452 F.2d 943 (10th Cir. 1971)..................................... 28, 30

*R.A Holman v. SEC*, 366 F.2d 446 (2d Cir. 1966)............................................ 29

*Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972) ............... 19, 20

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ...................................... 23

*Reves v. Ernst & Young*, 494 U.S. 56 (1990)................................................... 17

*Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*,
 230 F. Supp.3d 159 (S.D.N.Y. 2017) .......................................................... 24

*SEC v. Arcturus*, 928 F.3d 400 (5th Cir. 2019)................................................ 17

**Page(s)**

*SEC v. Cap. Gains Research Bureau*, 375 U.S. 180 (1963) ........................................................ 19

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998), *aff'd* 155 F.3d 129 (2d Cir. 1998) ........ 29

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) .................................................................... 28

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ............................................................... 16, 28

*SEC v. Edwards*, 540 U.S. 389 (2004) ................................................................................. 17

*SEC v. Glenn W. Turner Enter.*, 474 F.2d 476 (9th Cir. 1973) ................................................ 27

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) .......................................................... 23

*SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974) .......................................... 27

*SEC v. Merchant Cap., LLC*, 483 F.3d 747 (11th Cir. 2007) ................................................... 17

*SEC v. Ralston Purina & Co.*, 346 U.S. 119 (1953) ......................................................... passim

*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) .................................................................... 22

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ...................................................................... 23

*SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014) ................................................................... 17

*SEC v. W.J. Howey*, 328 U.S. 293 (1946) ....................................................................... passim

*United Housing Found. v. Forman*, 421 U.S. 837 (1975) ................................................... 17, 27

*United States v. Lindo*, 18 F.3d 353 (6th Cir. 1994) ............................................................. 29

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) ......................................................... 30

*Vacold LLC v. Cerami*, 545 F.3d 114 (2d Cir. 2008) ...................................................... 19, 20, 22

*Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555 (2d Cir. 1985) ..................................... 19

*Zaccaro v. Shah*, 746 F. Supp. 2d 508 (S.D.N.Y. 2010) ........................................................ 16

**Statutes**

15 U.S.C. § 77b(a)(1) ........................................................................................................ 16

15 U.S.C. § 77b(a)(11) .................................................................................................... 28, 29

15 U.S.C. § 77d(a)(1) ........................................................................................................ 29

v

**Page(s)**

15 U.S.C. § 77e ................................................................................................... passim

**Other Authorities**

*Further Definition of 'Swap,' \'Security-Based Swap,' and 'Security-Based Swap Agreement'*, Rel. No. 33-9338, 2012 WL 2927796 (July 18, 2012) ...................................... 20

*Interpretative Releases Relating to the Securities Act of 1933 and General Rules and Regulations Thereunder*, Rel. No. 33-5121, 1970 WL 116591 (Dec. 30, 1970)............... 30, 31

*Non-public Offering Exemption*, Securities Act Rel. No. 33-4552, 1962 WL 69540 (Nov. 6, 1962) ............................................................................................................ 31

*Securities Offering Reform*, 70 F.R. 44722, 44765 n.391 Rel. No. 33-8591, 2005 WL 1811282 (Aug. 3, 2005) ................................................................................................ 20

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum in support of its motion for summary judgment against defendants Telegram Group Inc. and TON Issuer Inc. (collectively "Telegram" or "Defendants"). For the reasons set forth below, the Court should grant the SEC's motion for summary judgment.

## PRELIMINARY STATEMENT

This case concerns Defendants' active promotion and sale of "Grams," a form of digital token that is a security pursuant to *SEC v. W.J. Howey*, 328 U.S. 293 (1946). In 2018, Defendants effected a purportedly private sale of approximately $1.7 billion worth of Grams, with no registration statement in effect. Accordingly, Defendants violated Section 5 of the Securities Act of 1933 ("Securities Act" or "Act"), 15 U.S.C. § 77e. The SEC now seeks summary judgment for this claim because the relevant transactions, the lack of a registration statement, and the fact that Grams are securities can all be established with undisputed evidence.

In *Howey*, the Supreme Court defined "investment contracts," and, thus, "securities," as investments of money into a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *Id.* at 301. Here, the undisputed evidence shows that the investment contract Defendants marketed to institutional investors in exchange for $1.7 billion was the quintessential transaction where investors funded a company's growth hoping to profit from its continued efforts and future successes. Telegram solicited these investments by fueling these expectations. It touted the past successes of its founders in this space and the expertise of its programmers and its promised future efforts to build an ambitiously revolutionary "TON network." And it highlighted the large user base for its preexisting product, Telegram Messenger, and how integrating the network into Messenger could create "demand and value" for the Grams. Telegram also sold Grams at steep discounts from an expected opening

"reference price," according to a formula Telegram promised to use to support market prices; promised to and did facilitate trading Grams on digital asset platforms; and made clear it would retain control of a significant amount of Grams. All of this further fed investors' reasonable expectations of profits from Telegram's economically-aligned efforts.

Given these inducements, objectively reasonable investors who entered into a "Purchase Agreement for Grams" with Telegram knew that, to make a profit, they would need Telegram to deliver on its promised efforts to build the TON network to create value for Grams—otherwise worthless strings of code—and to expand Messenger to foster demand and value for the Grams.

All of this was true when Telegram and its investors entered into the sale agreements. At that moment, the investors incurred a legally binding obligation to pay for and receive Grams, and Telegram similarly entered into a legally binding obligation to deliver them. This common-sense understanding—that the "sale" of Grams was completed at that moment—comports with legal precedent and is confirmed by the parties' behavior. In any event, as explained further below, Grams will remain investment contracts upon delivery.

In sum, in determining that the Grams were securities, this Court should look to the economic reality of what Telegram was doing: raising money to build a platform that would create value and profits for the investors. Much like a stock certificate, a Gram represents an asset. Here, when sold to the investors, that asset was an investment contract. And, upon the launch of the TON network, that asset will remain an investment contract. The sale of Grams was not registered and thus violated Section 5 of the Securities Act.[1]

---

[1] Because it is Telegram's burden to establish any exemption from registration, the SEC will defer addressing, in detail, any claim that the offering was exempt, except to discuss below that Telegram will not be able to sustain its burden given that the economic reality of the transaction at issue demonstrates that Telegram is engaged in a "distribution" and therefore a statutorily non-exempt "public offering."

# STATEMENT OF FACTS[2]

## I. THE DUROV BROTHERS LAUNCH TELEGRAM MESSENGER.

In approximately 2006, Pavel Durov ("Durov") and his brother founded "VK," a social media networking application ("app") that eventually became one of the most widely used in Russia. Stips. at ¶¶ 9, 13.[3] Durov later left VK. *Id.* at ¶ 17.

In 2013, Durov and his brother then launched Telegram Messenger ("Messenger"), an app that permits users to communicate in chats or telephone calls, Stips. at ¶¶ 16, 18-19, and is heavily used by people interested in blockchain technology. *Id.* at ¶ 23. From 2013 through 2017, Durov funded Messenger with the proceeds of the VK sale and personal savings. *Id.* at ¶ 17; 56.1 at ¶ 3. During this period, the overwhelming majority of Telegram's employees' activities were dedicated to Messenger. Stips. at ¶ 23; 56.1 at ¶ 4. Indeed, Durov considers "Telegram" and "Messenger" as synonymous, 56.1 at ¶ 2, and Telegram prides itself on the "size and public perception" of its brand and its ability to create demand for future projects. *Id.* at ¶ 8. Durov, the CEO of Telegram Group, has owned, directly or indirectly, both entities at all relevant times. Stips. at ¶¶ 1-3.

## II. TELEGRAM RAISES FUNDS FROM INVESTORS IN AN UNREGISTERED OFFERING OF GRAMS.

### A. In Need of Cash, Telegram Decides To Raise Funds for Its Operations.

Telegram, emphasizing its privacy features, advertises that it does not share user information with governments—a feature made possible by Telegram's decision to run its own servers (while directly incurring the costly hosting charges). 56.1 at ¶¶ 6-7. Telegram has also

---

[2] This section sets forth facts undisputed for purposes of this motion. The SEC does not necessarily concede each of these facts for all purposes in this action.

[3] "Stips." means the Parties' Stipulation of Undisputed Facts; "56.1" means Pl.'s Local Rule 56.1 Statement in Supp. of its Mot. for Summ. J.; "PX" means Exhibits to the Declaration of Ladan Stewart.

stated on its website that Messenger "is free and will always be free," and that Telegram is "not going to sell ads or introduce subscription fees," Stips. at ¶ 21, and has indeed never charged user fees or sold ads or otherwise generated income for Messenger. *Id.* at ¶¶ 14-15, 20.

In 2017, Durov therefore needed "cash" to buy Messenger's servers and pay for related services. 56.1 at ¶ 16-17. He considered selling traditional voting equity but decided against it, "concerned that [it] would affect the company's integrity [] its values, and [its] ethos." *Id.* at ¶¶ 18, 21. Nor did Telegram wish to start charging users or selling ads, believing that doing so would hamper its ability to expand its user base and keep up with competitors. *Id.* at ¶ 8.

Instead, Telegram eventually decided to raise funds by selling digital assets in an ICO, including, by then, to fund a new venture: creating a cryptographically-secured distributed ledger ("blockchain") and network of applications related thereto that Telegram could integrate into Messenger. *Id.* at ¶¶ 20, 22-26. Defendants first contemplated a discounted private pre-sale, followed by a public sale and the listing of Grams on digital asset trading platforms. Stips. at ¶ 39; 56.1 at ¶¶ 19-20. Telegram later abandoned the private/public approach for the purportedly purely "private" sale at issue in this litigation. Stips. at ¶¶ 40-43, 46-57.

Telegram stated it would sell some of its five billion Grams through purchase agreements "to be converted 1:1 to native TON tokens (Grams)" after the launch of a "Telegram Open Network" or "TON" network. 56.1 at ¶ 63. The sale occurred in two rounds, as Telegram had envisioned, but both rounds purported to be private this time (the "Offering"). Stips. at ¶¶ 46-57. The first round started in January 2018 and ended on February 9, 2018 ("Pre-Sale"). *Id*. at ¶ 46. The second started in February 2018 and was scheduled to end in March 2018, but continued at least through November 2018 ("Stage A"). *Id.* at ¶ 54; 56.1 at ¶¶ 182-86.

**B.     Telegram Targets Investment Funds as Initial Purchasers of Grams.**

Telegram selected Pre-Sale investors based on their "reputation" and "track records" as institutional investors and funds—not based on any knowledge of whether, for example, they intended to eventually use Grams as a "stake" to "validate" new blocks on Telegram's yet-to-be-created blockchain. 56.1 at ¶¶ 139-46. Of the Pre-Sale and Stage A purchasers ("Initial Purchasers") based in the United States, most were, by Telegram's design, institutional investors, or special purpose vehicles created by them, and wealthy individuals—or, as Durov called them "tier-1 firms." *Id.* at ¶¶ 173-76. Consistent with their status as funds or investors in the business of funding (and profiting from) new ventures, most, if not all, U.S. Initial Purchasers purchased large quantities of Grams (at significant discounts), for an average investment of approximately $10.1 million each and a minimum investment of $1 million, Stips. at ¶¶ 49, 56, indicative of their intent—confirmed by their internal documents and sworn affidavits—to eventually sell Grams for a profit in the public market. *See, e.g.*, 56.1 at ¶¶ 173-76.

**C.     Telegram and Its Agents Market Grams as an Investment in Telegram Dependent in Part On Widespread Adoption of Grams for Success.**

In late 2017, Telegram began marketing the Offering, first as a public/private then as a "private" offering, with certain "Offering Materials," including: (1) a two-page and a four-page promotional materials (the "Teasers"), Stips. at ¶¶ 66-70; (2) a "Primer," a "Pre-Sale Primer," and a "Stage A Primer," *id.* at ¶¶ 75-81; (3) a "Telegram – Indication of Interest" letter (essentially, a term sheet) for each round, *id.* at ¶¶ 71-74; (4) certain "Purchase Agreement for Grams" (the "Gram Purchase Agreements"), *id.* at ¶¶ 85-90; (5) various versions of the Whitepaper, *id.* at ¶¶ 118-120, and (6) "Risk Factors" sheet, *id.* at ¶¶ 100-104. Many of these documents eventually reached the public. *Id.* at ¶ 98-99; *see also id.* at ¶¶ 60-65.

Telegram stated in the Offering Materials that it was raising funds to create a "revolutionary" new and potentially massive blockchain ecosystem that would support a "new cryptocurrency" intended to compete with major consumer-transaction giants such as MasterCard and Visa. *See, e.g.*, 56.1 at ¶¶ 56, 78, 85. The Offering Materials outlined this ambitious vision and the significant efforts Telegram would undertake to create an entire blockchain ecosystem integrating multiple platforms and services. *Id.* at ¶¶ 52, 57, 59-61.

The Offering Materials explicitly and variously tied the success of TON to the success of Messenger—that is, of Telegram itself. For example, the materials explained that amounts raised would fund Telegram's business activities. In the Primer, Telegram explained that "[f]unds raised during the Telegram ICO will be used for the development of Telegram and TON and for the ongoing expenses required to support the growth of the ecosystem." *Id.* at ¶ 120; *see also id.* at ¶ 124 (Pre-Sale Primer: "[w]e intend to use the proceeds raised from the offering for the development of the TON Blockchain, for the continued development and maintenance of Telegram Messenger, and for general corporate purposes . . . .").

In addition, the materials stated that "Telegram will serve as a launch pad for TON," because Telegram would "integrate" TON into Messenger, to "leverag[e] Telegram's massive user base and developed ecosystem," and that this would "leverage [Messenger's] **existing ecosystem** of communities, developers, payment providers, and merchants to drive demand and value for [Grams]." *Id.* at ¶¶ 57, 86-87, 128 (emphasis in original); *see also id.* at ¶¶ 52, 54, 81-83 (Telegram would use its "engaged base" of Messenger users that "provides pre-existing critical mass necessary for the ecosystem to grow" and to "drive demand and value" for Grams). The materials also projected how "Telegram [could] reach one billion active users by . . . 2022," which "users can provide the required critical mass" to adopt Grams. *Id.* at ¶¶ 122, 89-90.

In making these statements, Telegram also emphasized the past successes and future efforts of its team of "experts." Its Four-Page Teaser, for example, stated that Telegram would "rely on its 10-year experience in building **user-friendly interfaces** for tens of millions to build light wallets, markets and identification services that will allow users to get on board with cryptocurrencies," such that "the TON Wallet can instantly become the world's most adopted cryptocurrency." *Id.* at ¶ 57 (emphasis in original); *see also id.* at ¶¶ 71, 86, 129.

Relatedly, Telegram stated that Grams would have to be widely adopted if they were to achieve Telegram's stated goal of becoming a "truly mass-market cryptocurrency." Stip. at ¶ 141. Telegram thus proposed integrating TON wallet into Messenger "to encourage a wide adoption of Grams after launch," *id.* at ¶ 140 (further suggesting that TON was a way to enhance use of Messenger and vice versa), and Offering participants understood that the venture would not succeed if Grams were not distributed broadly. *See* PX1-PX8, 56.1 at ¶¶ 28, 173-76.

Finally, Telegram did not market the Offering by itself. It paid 10-15% commissions to several entities to find investors. *Id.* at ¶¶ 318-31. These promoters developed marketing materials, which Telegram—and eventually members of the public as early as February 2018—received. *Id.* at ¶¶ 320-22, 327-28. The promoters' marketing materials touted the "[b]ooming market of crypto assets['] [growth] by 79x," promised to "provide instant liquidity" upon delivery of Grams, and projected returns of "+494%" on Grams. *Id.* at ¶¶ 321, 328.

Based on all of these representations, Initial Purchasers, when evaluating whether to buy Grams, placed significant weight on Messenger's continued success, including its current and expected user base and expected growth, and on Telegram's team's reputation. In other words, reasonable Initial Purchasers were induced by Telegram to view the Offering—and did view the Offering—as an investment in Telegram itself, and to view their chances of success to be

dependent on Telegram's "team" to develop the future TON network, the growth of Messenger, and the success of Grams as an investment. *E.g.*, 56.1 at ¶¶ 147-48, 151, 162, 173-76.[4]

### D. Telegram Leads Investors To Expect Its Continued Support to the TON Network and the Demand for Grams after Launch.

The Offering Materials speak not only in terms of Telegram's efforts to develop the TON Blockchain and Messenger through the launch of the new network—but for years beyond that. The Offering Materials contemplated, for example, Telegram's creation of the "TON Foundation," to which Telegram would transfer unsold Grams to support the new network in various ways. *Id.* at ¶¶ 123, 128. These methods included allocating: (a) 10% of all Grams (500 million) for "incentives for the ecosystem," such as encouraging installation of third-party validators; (b) 4% of Grams (200 million) for distribution to Durov, his brother, and the development team, Stips. at ¶ 158; and (c) a minimum of 1 billion Grams to the "TON Reserve," which would in turn sell Grams at a price no less than the Reference Price and buy Grams at a price no lower than half the Reference Price to ostensibly stabilize the price of Grams and "fund the continued development of the TON Blockchain . . . ." 56.1 at ¶¶ 108, 110.[5]

These materials also explicitly tied the fortunes of the investors and of Telegram and its developers for years to come, noting that investors would potentially hold 44% of Grams, and Telegram and developers the remaining 52% and 4%, respectively. *Id.* at ¶¶ 66-67. Telegram's sophisticated investors understood the importance of aligning incentives through giving Grams

---

[4]     For purposes of this motion, the Court may assume that Telegram indeed acted in line with the expectations with which it induced investors. Its expert describes Telegram as a "primary contributor to productivity growth" so far for the TON Blockchain, 56.1 at ¶ 358, and Telegram claims to have made considerable efforts since the Offering, including using approximately $390 million, without ever distinguishing between funds or employee efforts between Messenger and TON. *Id.* at ¶¶ 12-14; Stips. at ¶ 44.

[5]     However, Telegram's plan to stabilize the price of Grams is inherently flawed. *See* 56.1 at ¶ 382.

to Telegram and to developers. One of Durov's friends told him, for example, that he felt it was important for the "employees and developers" to be "subject to the same lockup restrictions as the investors." *Id*. at ¶ 148. The friend explained that "this is what typically happens for IPOs to ensure the people needed to deliver . . . have incentives to stay engaged through the lockup," and that it "would help to know to ensure your stake is as I assume it is fundamental [sic] aligned with the success of TON (more is better!)." *Id.* Telegram went even further and assured potential investors of its long-term commitment to TON by noting that the 200 million Grams reserved for the development team would be subject to a four-year lockup. *Id.* at ¶ 388.

Moreover, the Offering Materials—projecting that, if Telegram spent $620 million from the Offering, it could grow to one billion engaged users by 2022—emphasized a vision for the continued future growth of Messenger. *Id.* at ¶ 122. The materials further promised that the "founders of Telegram" would "be responsible" for using the funds from subsequent Grams sales, that the "the initial TON vision and architecture" would be "implemented" by 2021, and that thereafter the network would "be maintained" by the TON Foundation. *Id.* at ¶ 127.

### E. Telegram Enters Into Legally Binding Gram Purchase Agreements.

The Gram Purchase Agreements for both rounds were nearly identical. They both accepted U.S. Dollars for Grams. JX11 § 2.3, JX12 § 2.3. And they bound both Initial Purchasers and Telegram to perform their obligations—respectively, to pay for the Grams by a date certain and to deliver Grams upon network launch—subject only to certain conditions, including investors' completion of "know your customer" documentation and their provision of certain warranties and a network address to deposit the Grams. *Id.* § 3. The agreements also provided for automatic termination and the return of funds (minus expenses) if the new network did not launch by October 31, 2019. *Id.* § 7.1(c). At the time of the Offering Telegram expected the new TON Network to launch in the fourth quarter of 2018. *See* 56.1 at ¶ 41.

Based on these agreements, the parties viewed themselves as bound to perform their obligations under the agreements upon execution—Telegram to deliver Grams, the Initial Purchasers to pay for them—and acted in accordance with that understanding. For example, Telegram's Form D, filed with the SEC for Stage A of the Offer, stated that it had "Sold" $850 million and that it had "$0" "Remaining to be Sold" as of March 29, 2018. JX2 at 5. Telegram said so even though, after March 29, it received funds for dozens of new Stage A purchase agreements, PX 136 at 1-7, and did not obtain performance (*i.e.*, payment) from many Stage A purchasers well past March. *Id.* When asked if it was fair to say that Telegram had not actually *received* $850 million as of March 29, Telegram's CEO stated "[y]es" but explained:

> We believed that having all those purchase agreements signed by the purchasers means that we have the comfort of knowing those funds will eventually be transferred, or would eventually be transferred. Those are legally binding agreements and if we decided to do so, we could try to start a litigation with each of the purchasers that failed to meet their obligations. . .

56.1 at ¶ 186; *see also id.* at ¶ 185 (agreeing that Telegram said it had $0 "remaining to be sold" because it had $850 million worth of signed purchase agreements). And when Telegram's investment marketers conveyed to Durov a question from an investor about building in a contingency in case the network launch "doesn't happen," Durov responded with Telegram's "position": "No contingency on delays, our reputation and credibility will suffer if we delay and we are already motivated to launch according to the schedule, if . . . we haven't done any work they can hypothetically sue us for fraud/misrepresentation, the agreement allows for that." *Id.* at ¶ 25. In another example, Telegram represented to one investor's auditors that the investor "invested . . . into [the] [O]ffering," "will be entitled to receive . . . Grams when they are issued," and "has clear title to such securities." *Id.* at ¶ 189; JX2 at 5 (Telegram stating it "had sold" $850 million months before collecting funds).

Similarly, the accredited investors with whom Telegram entered into Gram Purchase Agreements consider themselves owners of Grams. *See* 56.1 at 169, PX1-8. For investors, the TON launch and receipt of the Grams was, from an economic perspective, simply the moment they would have access to liquidity—the option and potential to liquidate their investment—not the moment when they come into legal ownership of their Grams. *See id.*[6]

**F.      Telegram Builds A Significant Price Discount Into the Price of Grams.**

The only two material differences between the Gram Purchase Agreements for the two rounds were "lockup" provisions and the price of Grams. First, the Pre-Sale agreements contained a provision preventing purchasers from reselling their Grams other than in 25% increments staggered over eighteen months after receipt of Grams: 25% each after three, six, twelve, and eighteen months. Stips. at ¶ 88. In contrast, the Stage A agreements contained no lockup provisions. *Id.* at ¶ 93. Second, Telegram sold Grams to Pre-Sale purchasers for $0.37756101 each but to Stage A purchasers at the higher price of $1.33003701. *Id.* at ¶¶ 87, 94.

Telegram set these prices based on a formula in its Technical White Paper (the "Whitepaper"). Stips. at ¶¶ 143-46. The formula set the price of the first Gram sold at $0.10 and every subsequently-sold Gram at an exponentially higher price. Telegram derived the prices for both rounds by first calculating the total number of Grams possibly sold using the targeted amount of the funds raised and then averaging their prices. 56.1 at ¶ 34. This formula further provided for a "Reference Price" at which Telegram could buy and sell Grams into the open market after launch. Stips. at ¶¶ 164-67. Based on the number of Grams sold in the Offering and the Grams Telegram expected to make available at launch, the "Reference Price" for Grams

---

[6]      A Gram is simply a cryptographic key that represents the asset unlocked by the key—just as a stock certificate or bearer instrument (a piece of paper) can represent a security interest, the key represents a security interest.

at launch will be $3.62475487—more than double the price of Grams sold to purchasers in Stage A and almost ten times the price of Grams sold to Pre-Sale purchasers. *Id.* at ¶ 143.

As Telegram graphically represented in one of the Primers, under the formula, the more Grams it sold, the greater the potential price of Grams because "the additional supply coming from the TON Reserve will always be more expensive than the price paid by any of the existing buyers." *Id.* at ¶ 68. This graphical depiction of Grams' expected exponential increase in price was important enough to at least one venture capital fund investor that its employee copied and pasted it into his memorandum recommending that his fund invest in Telegram. PX3 at Ex. C.

### G.     Telegram Claims to Have Raised $1.7 Billion in the Offering.

Telegram raised $850 million from 81 Initial Purchasers in the Pre-Sale, including $385.5 million from 34 purchasers in the United States and, according to Telegram, another $850 million in Stage A, including $39 million from five purchasers in the United States. Stips. at ¶¶ 46-50, 54-58. Stage A was scheduled to end in March 2018, and, on March 29, 2018, Telegram filed a Form D with the SEC stating that, in Stage A, Telegram had "sold" $850 million and had "$0" remaining to be sold. JX2 at 5. Telegram made those statements to the SEC—and to investors who asked about Stage A after the *Wall Street Journal* reported on the results of the Offering, 56.1 at ¶ 179-80—because Telegram viewed executed Gram Purchase Agreements as legally binding contracts. *Id.* at ¶ 185-86. By March 29, 2018, however, Telegram had not yet received $850 million for Stage A. *Id.* at ¶ 185. Between April and November 2018, Telegram continued to offer and sell Grams through dozens of Stage A Gram Purchase Agreements worth more than $200 million. *Id.* at ¶ 183. Telegram continued to accept payments on these purchase agreements as late as November 2018. *Id.* Telegram appears to have sold approximately 2.9 billion of 5 billion available Grams to date. Stips. at ¶ 43.

### III. TELEGRAM AND ITS ASSOCIATES MAKE EFFORTS TO INCREASE GRAMS' VALUE AND LIQUIDITY AFTER THE LAUNCH.

In early Offering Materials, Telegram told Purchasers to expect a listing of Grams "at the major cryptocurrency exchanges" in "January – March 2019." 56.1 at ¶ 46. Telegram discussed with several platforms the prospect of listing Grams continuing at least until the SEC filed this action, *id.* at ¶¶ 195-212, and appears to have been updating at least one such platform on the status of Telegram's development of TON. *Id.* at ¶ 203-04. However, Telegram has outsourced many of its activities surrounding the Offering to a network of associates, agents, and former colleagues. As described above, Telegram paid millions to some of its investors to market Grams and recruit other investors. *See supra at* II.C. Moreover, Telegram enlisted this help both to enable the listing of Grams on digital asset trading platforms and to make efforts to develop the TON network, including, after it launches. *Id.* at ¶ 289-93, 304-17.

For example, a company called TON Ventures, associated with Telegram's former Chief Investment Advisor John Hyman ("Hyman"), as well as TON Ventures' two sister companies, Gram Vault and TON Labs, have worked closely with Telegram on these matters. *Id.* at ¶ 296, 298, 300-09, 311-12, 317. Another company, Blackmoon Financial Group, and its affiliated entity Blackmoon Crypto ("Blackmoon"), has similarly helped Telegram. Telegram's chief marketer Ilya Perekopsky ("Perekopsky") is a founding investor in Blackmoon and receives dividends from it to this day. *Id.* at ¶¶ 272, 280. One of Blackmoon's employees, Moshe Joshua, sent a flurry of emails to his business contacts urging them to invest in the Offering. *Id.* at ¶¶ 281-83. Another Blackmoon associate emailed Perekopsky in 2018 and advised him about how price stabilization activities—similar to those Telegram had agreed to undertake for Grams—worked in IPO markets. *Id.* at ¶ 285. As launch approached, Blackmoon issued a statement noting it would be one of the first platforms to trade Grams without restrictions. *Id.* at

¶¶ 315-16.  Some of these companies have explicitly held themselves out as an extension of Telegram, *see, e.g.*, *id.* at ¶ 290, and Telegram granted TON Ventures a license to the "TON" name.  Stips. at ¶ 178.  Perekopsky together with some of these individuals even answered questions of yet another secondary trading platform about listing Grams.  56.1 at ¶ 311.  As a result of these connections and joint efforts, some market participants do not distinguish between "Telegram" and other entities acting to further TON and its interests.  *Id.* at ¶ 317.

These efforts have succeeded.  One digital asset trading platform in the United States will make Grams available to U.S. customers after efforts by the Telegram "team," including Gram Vault and TON Labs to "try hard to close" the platform on the listing, by arranging calls with that "team" and Telegram's counsel, among other things.  *Id.* at ¶¶ 200-02, 317(e).

## IV.    A SECONDARY MARKET FOR GRAMS DEVELOPS AFTER THE OFFERING.

Although the Gram Purchase Agreements purported to restrict purchasers from selling their Grams before TON's launch (or the lockup in the case of Pre-Sale purchasers), a "grey" market for Grams developed almost instantly.  Hyman, then at Telegram, monitored the price of Grams in that market, *id.* at ¶¶ 213-19, and reported back the results to the "TON Presale" Telegram chat, which included Durov.  *Id.* at ¶¶ 214-15.  And, in 2018 and 2019, working through the "Liquid" platform, an entity called "Gram Asia" appears to have sold at least one million Grams for $4 each.[7]  *Id.* at ¶¶ 241-42.  Reports in the market, which Telegram was aware of, mention the "400%" returns made by Gram investors through these sales.  *Id.* at ¶¶ 229, 254.

---

[7]    During its investigation, SEC staff inquired of Telegram's counsel whether Telegram was aware of the Liquid/Gram Asia sale, to which counsel responded that Telegram "has not had any involvement with Liquid or its announcement; does not know which Gram purchasers (if any) could be involved; does not have any information about and has not had any communications with 'Gram Asia'; and has not had any communications with Liquid or its representatives regarding the purported offering."  56.1 at ¶ 234.  Similarly, at his deposition, Durov stated "definitely no" when asked if anyone from Telegram had met with representatives of Liquid with respect to their sale of Grams, and could not recall ever meeting

## V.	TELEGRAM DOES NOT REGISTER THE SALE OF GRAMS WITH THE SEC OR OTHERWISE PROVIDE INVESTORS WITH CERTAIN INFORMATION.

Telegram did not file any documents with the SEC in connection with the Offering until after the SEC's staff learned of the Offering and asked investors for contact information for Telegram's counsel.  Decl. of Daphna Waxman (D.E. 16) at ¶ 8.  Telegram only then filed Forms D, claiming an exemption for the Gram Purchase Agreements under Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c), and/or Regulation S.  Telegram neither registered its transactions in Grams nor claimed they were exempt from registration.  Stips. at ¶¶ 51-52, 55, 57-59.

During and after the Offering, not even the sophisticated, economically powerful Initial Purchasers received answers to questions about Telegram's finances.  56.1 at ¶¶ 343-47.  Telegram's CEO still "struggle[s] to grasp the relevance [the information] may have for the general public" going forward.  *Id.* at ¶¶ 15, 347.

## STANDARD OF REVIEW

Summary judgment is appropriate when a party shows "that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 345 (S.D.N.Y. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "On a motion for summary

---

anyone from Liquid.  *Id.* at ¶ 233.  In just the last three days, after months of producing redacted documents despite Plaintiff's insistent requests, Telegram has finally produced hundreds of key documents in un-redacted form.  Among these productions are documents that show that both Telegram and its lawyers communicated and/or met with representatives of Liquid in 2018, *id.* at ¶¶ 230-31, calling into question Telegram's prior insistence that it had no information to share about Liquid.  Depending on Telegram's assertions in its own motion for summary judgment with respect to its efforts to prevent secondary market trading in Grams, Telegram's failure to produce these documents before depositions concluded may require the SEC to move to reopen depositions and may hinder the SEC from presenting facts essential to opposing Telegram's cross-motion for summary judgment.  Fed. R. Civ. P. 56(d).

judgment, the court must 'construe the facts in the light most favorable to the non-moving party.'" *Id.* at 346 (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014)).

"It is the initial burden of a movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law." *Id.* (citation omitted). "If the moving party meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" *Id.* (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

"When cross-motions for summary judgment are filed, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against that party whose motion is under consideration.'" *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 519 (S.D.N.Y. 2010) (quoting *Morales v. Quintel Entm't Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## ARGUMENT

## I.     TELEGRAM MADE UNREGISTERED OFFERS AND SALES OF SECURITIES.

Sections 5(a) and (c) of the Securities Act make it "unlawful for any person, directly or indirectly" to "sell," "offer to sell" or "offer to buy," a "security" unless a registration statement is in effect or has been filed as to such security. 15 U.S.C. §§ 77e(a), (c). To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). The parties do not dispute that Telegram has never had a registration statement filed or in effect, *see* Stips. at ¶ 59, or that Telegram made its offer and sales through interstate commerce, *see id.* at ¶ 65. This case turns on whether Telegram offered or sold "securities" under the Act.

Section 2(a)(1) of the Act defines "security" to include "investment contract[s]." 15 U.S.C. § 77b(a)(1). In *Howey*, the Court, relying on established state-law principles, explained

that an "investment contract" involves: (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. 328 U.S. at 301; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004). *Howey*'s definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299; *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990) (in crafting the securities laws "Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity . . . in the creation of '. . . schemes devised by those who seek the use of the money of others . . . .'" (quoting *Howey*, 328 U.S. at 299)).

Courts vigilantly avoid applying the *Howey* test in a manner that permits "unscrupulous marketers of investments" to cleverly evade the securities laws. *Edwards*, 540 U.S. at 394. The test aims to answer a fundamental question: whether the transaction involves "all the elements of a profit-seeking business venture." *Howey*, 328 U.S. at 300; *see also United Housing Found. v. Forman*, 421 U.S. 837, 849 (1975) (focus is "on the capital market of the enterprise system").

"Consistent with *Howey*'s focus on substance over form, [courts] look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (citing *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 756-57 (11th Cir. 2007)). The analysis turns on the economic inducements the promoter offered before and at the time of sale, and the parties' post-investment actions "can serve as evidence" of their expectations at the time of sale. *Merchant Cap.,* 483 F.3d at 760; *see also SEC v. Arcturus*, 928 F.3d 400, 411 n.13 (5th Cir. 2019).

As discussed below, the Court should analyze whether Grams are securities under *Howey* at the time they were sold. Under that analysis, the undisputed facts show that they meet all

three *Howey* factors as a matter of law.  But, even if the Court somehow analyzed the Grams as if they were not "sold" until they are issued, the undisputed facts still show they are securities.

> ### A.     The *Howey* Analysis Applies as of the Date of the Gram Purchase Agreements.

To determine whether Grams are securities, the Court should consider Grams as of the moment investors signed the Gram Purchase Agreements.  The lapse in time between execution and Telegram's performance in delivering Grams is immaterial—the Initial Purchasers made their investment decision when they entered into the agreements and were thus irrevocably bound to pay for and accept Grams, and Telegram was thus bound to deliver them.

> #### 1.     *A "sale" occurs under the Securities Act when the parties become irrevocably bound by their agreement.*

In *Howey*, a promoter marketed investments in citrus groves.  328 U.S. at 295.  The promoter's offering to investors typically involved three separate agreements:  a land sales contract by which the investor bought a narrow tract of land, which was not delivered until "full payment of the purchase price"; a warranty deed evidencing the transfer of title in the land; and a services agreement with the investor that committed the promoter's affiliate to developing the grove and marketing and selling its output for a fee.  328 U.S. at 295.  The Court held that the three documents "together" constituted an "investment contract."  *Id.* at 297-98.  The Court reasoned that the documents collectively represented "a convenient method of determining the investors' allocable shares of the profits," "whereby the investors' interests are made manifest." *Id.* at 300.  The Court rejected the defendant's argument that the promoter did not sell an investment contract because "the tangible interest which is sold"—the citrus grove tract—had "intrinsic value independent of the success of the enterprise."  *Id.* at 301.  To the contrary, it was "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."  *Id.* at 299, 301.

For the same reason, the securities laws do not generally assign any relevance to whether and when a tangible interest underlying the investment contract is delivered to the investor. The Second Circuit's decision in *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890-91 (2d Cir. 1972), where it considered when a "purchase or sale" occurred for purposes of Rule 10b-5, issued under the Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. § 240.10b-5, best illustrates the point. The court held that the "sale" occurred "when the parties to the transaction are committed to one another," and rejected appellant's argument that the time of sale was when "the securities are transferred and paid for." *Id.*; *see also id.* at 891 (sale is at "the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time"). A contrary holding, the Second Circuit reasoned, would constitute improper "reliance on formalism." *Id.* at 890.

Furthermore, this standard for determining the point of sale "holds even if the later exchange of money and securities is contingent upon the occurrence of future events, such as the satisfaction of a financing condition, at least when the contingency is not so unlikely that it renders the stock transaction extremely speculative." *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008). Thus, "a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed." *Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 559 (2d Cir. 1985).[8]

---

[8]     In *Radiation Dynamics*, the Second Circuit relied in part on the Supreme Court's directive that another securities statute, the Investment Advisors Act of 1940, must be "construed like other securities legislations 'enacted for the purpose of avoiding frauds, not technically and restrictively, but flexibly to effectuate its remedial purposes," in reach its conclusion as to the proper meaning of the term "sale." *Id.* (quoting *SEC v. Cap. Gains Research Bureau*, 375 U.S. 180, 195 (1963)). The same rule of statutory construction applies to the Securities Act. *See SEC v. Ralston Purina & Co.*, 346 U.S. 119, 124, 126 & n.10 (1953) (Securities Act has a "broadly remedial purpose" "to protect investors by promoting full disclosure of information" as well as "to prevent frauds in the sale thereof" (citation omitted)).

The Second Circuit extended *Radiation Dynamics*'s reading of "sale" in the Exchange

Act to "sale" under the Securities Act in *Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992).

There, the Court held that a "sale" occurs under the Act, 15 U.S.C. § 77b(a)(3), for purposes of

the Act's statute of limitations, when "'the parties obligate [ ] themselves to perform what they

had agreed to perform' even if the formal performance of their agreement is to be after a lapse of

time." 962 F.2d at 173 (citation omitted); *see also Grondahl v. Merritt & Harris, Inc.*, 964 F.2d

1290, 1294 (2d Cir. 1992) (applying rule to Exchange Act statute of limitations).[9]

### 2. *The Gram Purchase Agreements were legally binding "sales."*

Under this precedent, Telegram and the Initial Purchasers obligated themselves to

perform when they signed the Gram Purchase Agreements. Once the investors signed the

agreements, they were unconditionally obligated to pay for the Grams and contractually bound to

accept them, subject to meeting certain "know your customer" requirements and providing a

network address into which the Grams would be delivered. JX11 § 3; JX 12 § 3. Similarly,

Telegram bound itself to deliver Grams—on the date it launched TON. *Id.* § 2.1.

Although the Gram Purchase Agreements' "Termination Clause" provided for the

unwinding of the transaction if TON was not launched by October 31, 2019, this did not render

performance "so unlikely" as to render the transaction "extremely speculative" or otherwise

relieve Telegram of its unequivocal obligation to deliver Grams. *Cerami*, 545 F.3d at 122. From

the outset, the Offering Materials projected—and the parties understood—a TON launch date in

---

[9]      The SEC reads "sale" under the Act consistently with *Radiation Dynamics* and its progeny. *See, e.g.*, *Further Definition of 'Swap,' 'Security-Based Swap,' and 'Security-Based Swap Agreement'*, Rel. No. 33-9338, 2012 WL 2927796, at *59 n.408 (July 18, 2012) ("A purchase or sale of a security occurs at the time the parties become contractually bound, not at the time of settlement."); *Securities Offering Reform*, 70 F.R. 44722, 44765 n.391 Rel. No. 33-8591, 2005 WL 1811282 (Aug. 3, 2005) ("Courts have held consistently that the date of a sale is the date of contractual commitment.") (citing *Radiation Dynamics* and progeny).

late 2018.  *See* 56.1 at ¶ 41.  As time went on, Telegram updated investors on the technical progress in developing TON, stating only a few months after they entered into the Gram Purchase Agreements that the project was "90%" complete.  JX22 at 3.  Under Telegram's formulation, the TON launch date was simply the moment the Gram Purchase Agreements would "be converted" into Grams.  56.1 at ¶ 63.  At that moment, the Grams will be the instrument "whereby the investors' interests are made manifest."  *Howey*, 328 U.S. at 300

This legal reality comports with the parties' behavior since they entered into the agreements and with the economic fundamentals of the transaction.  Telegram understood that the Gram Purchase Agreements were binding upon signature—the very reason Telegram stated in its Form D that it had "sold" $850 million even though it had not "received" those funds, 56.1 at ¶ 185, and the reason why its CEO understands these to be legally binding agreements that both parties can sue to enforce.  *Id.* at ¶ 186.  Any claim to the contrary would come as a surprise to Telegram's investors, who made their investment decisions long ago, have paid for the Grams, and now simply await the moment of liquidity.  *Id.* at ¶ 169.

Moreover, from the perspective of market reality, Telegram set two different prices for Grams— $0.37 to Pre-Sale and $1.33 to Stage A investors—to compensate for the lockup to which the former but not the latter were subject, as Telegram recognized.  *Id.* at ¶¶ 190-92.  These differences are inconsistent with separating Grams and the Gram Purchase Agreements for purposes of *Howey*.  If Grams were merely "oranges" that have not yet been "sold," there would be no reason to set different prices for them, let alone set their price to exponentially increase with each subsequent sale.  The steep discounts to compensate for the lockup is a typical feature of initial public offerings where early investors are incentivized with lower prices but restrictions on trading, and public investors pay higher prices.  This is precisely how Telegram marketed it.

*See, e.g.*, *id.* at ¶¶ 339-42; *see also SEC v. Rubera*, 350 F.3d 1084, 1090-91 (9th Cir. 2003)

(scheme where investors "turned over substantial amounts of money. . . with the hope [of] . . .

financial gains" was an investment contract despite the existence of buyback option, rejecting

"attempts to avoid federal securities law liability by characterizing an investment as a series of

discrete transactions"). *Cf. Continental Mktg. Corp. v. SEC*, 387 F.2d 466, 470-71 (10th Cir.

1967) (contracts to sell, care, and manage live beavers were investment contracts despite tangible

nature of asset because "the beavers as mere animals and not as part of the enterprise did not

have a value consistent with the price many of the purchasers paid").

For all these reasons, the Gram Purchase Agreements were "fully binding" when

signed—the parties had "agree[d] on all the points that require negotiation." *Cerami*, 545 F.3d at

124 (citation omitted). The "sale" thus occurred on the date of the agreements. To determine

whether Telegram violated Section 5 in 2018, the Court should apply *Howey* as of that date.

**B.      The Undisputed Facts Establish that the Grams Were Investment Contracts When They Were Sold.**

Telegram offered and sold Grams, pursuant to Gram Purchase Agreements, while

promising to use investor funds to create a new, ambitious network it would integrate into its

popular Messenger in order to generate demand and value for Grams. By doing so, Telegram

raised capital for a profit-seeking venture from investors, many of who intend to sell the Grams

in the public market. Telegram's offers and sales of Grams, together with the Purchase

Agreements, are quintessential investment contracts that meet each of the three *Howey* elements.

### 1.  *Telegram obtained an investment of money.*

There can be no genuine dispute that Telegram obtained an "investment of money."

*Howey*, 328 U.S. at 301. It solicited and received payments of "Euros and U.S. Dollars"—

claiming a total of $1.7 billion—for Grams. JX11 § 2.3; JX12 § 2.3.

## 2. *The Initial Purchasers invested in a common enterprise.*

There can also be no genuine dispute that the Initial Purchasers invested "in a common enterprise." *Howey*, 328 U.S. at 301. In the Second Circuit, a common enterprise can be established by showing "horizontal commonality": "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994). "Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture." *Id.* (quoting *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir. 1984)). To establish horizontal commonality, it is sufficient to show that "each investor was entitled to receive returns directly proportionate to his or her investment stake," including as an "increase in the value of the investment." *SEC v. SG Ltd.*, 265 F.3d 42, 46-47, 51 (1st Cir. 2001) (finding horizontal commonality); *accord SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000) (finding horizontal commonality where the "return on investment was . . . directly proportional to the amount of that investment").

Although the Second Circuit has not yet decided whether a common enterprise can alternatively be established by showing "strict vertical commonality," many courts in this District have concluded that it can. *See Revak*, 18 F.3d at 88 (concluding that "broad vertical commonality" does not satisfy the common enterprise prong but declining to decide whether "strict vertical commonality" does); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) ("[C]ourts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*.") (collecting cases). "'Strict vertical commonality' requires that the fortunes of investors be tied to the fortunes of the promoter." *Revak*, 18 F.3d at 88 (emphasis and citation omitted). This can be established if there is "a direct relationship between the fortunes of the investor and . . . promoter

23

of the investment such that 'their fortunes rise and fall together.'"  *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings, LLC*, 230 F. Supp. 3d 159, 165 (S.D.N.Y. 2017) (citation omitted).

Although either horizontal or strict vertical commonality suffice, the Initial Purchasers invested in a common enterprise that satisfies both types of commonality.  With respect to horizontal commonality, Telegram sold Grams by telling investors that it would use all of their assets for an enterprise from which both the investors and Telegram could potentially profit:  the development of a new blockchain and the growth of Messenger.  *See* 56.1 at ¶¶ 56, 78, 85. Pooling was obvious because Telegram spoke of the need for "$620 million" for "supporting continuing organic user growth" for Telegram, *id.* at ¶ 122, but investors were permitted to remit much lower quantities, without Telegram distinguishing how it used the commingled funds.  *Id.* at ¶¶ 12-14; Stips. at ¶ 44.  Moreover, Telegram told investors it would use the proceeds for a common purpose: to develop Grams themselves, a vast TON network, a "TON Wallet," and other Telegram-related products.  56.1 at ¶¶ 57, 86-87.  Initial Purchasers therefore invested in a horizontally common enterprise because they pooled their investments into Telegram and its Messenger enterprise in return for Grams and understood that the value of their Grams would ultimately rise or fall in the public market based on Telegram's success in these ventures.

With respect to vertical commonality, the Initial Purchasers understood that their fortunes would rise and fall with Telegram's promoters.  As a matter of economic reality, if the price of Grams rose or fell, it would rise and fall for all Gram holders—purchasers, developers, and Telegram alike.  Moreover, Telegram told the Initial Purchasers that its executives and investment teams would be given Grams with lockup periods, 56.1 at ¶ 388, which aligned the interests and economic motivations of Telegram with those of the investors.  Indeed, one investor told Durov that he had a favorable view of using incentive Grams, because it meant employees

essentially had skin in the game.  *Id.* at ¶ 148.  Indeed, Telegram highlighted the significant number of Grams that would be "retained" by the new TON Reserve, under Telegram's control. *Id.* at ¶ 66.  To a reasonable investor, that signaled that Telegram would have a strong economic incentive to try to increase the value of the Grams for Telegram's and the investors' benefit.

> ### 3. *The Initial Purchasers reasonably expected profits derived from Telegram's entrepreneurial efforts.*

And there can be no genuine dispute that the Initial Purchasers had "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Howey*, 328 U.S. at 301.  Telegram led purchasers of Grams to reasonably expect profits from the entrepreneurial and managerial efforts of Telegram and its "team."  First, Telegram emphasized the quality of its "team" and listed specific steps the team would take to create TON, with features that would not be completely ready upon TON's launch.  *Id.* at ¶¶ 71, 86, 129-30. Second, Telegram told Initial Purchasers that Telegram's future sales of Grams would increase in price as Grams in circulation increased, such that the price at launch could potentially double from the price the Initial Purchasers had paid.  *Id.* at ¶¶ 335, 340.  Third, Telegram told Initial Purchasers that it would develop products that would require the use of Grams, such that the vast pool of Messenger users would want to buy Grams, which would in turn drive up their "demand" and "value."  *Id.* at ¶¶ 57-87.  Fourth, Telegram informed investors that it planned to continue to play a role in monitoring and developing TON after launch, and clearly signaled it would have a significant ongoing, long-term incentive to help TON and Grams succeed after launch.  *Id.* at ¶¶ 9, 26, 122-27.  Indeed, Telegram made clear that investor money would be used to continue to fund and develop Messenger after TON launched.  *Id.* at ¶¶ 122-26.  Given that Telegram had tied the success of Messenger to that of TON (and therefore Grams), these representations further fueled investors' reasonable expectations of profits from Telegram's ongoing efforts.

Based on these statements, reasonable investors understood they were purchasing Grams as an investment in the TON project as well as in Telegram. Indeed, the evidence of the actual investors' motivations demonstrates that. *E.g.*, *id.* at ¶¶ 162-63, 165, 168. Investors have provided sworn testimony that they purchased Grams with such expectations, and their internal investment memos reveal that they considered the foregoing factors in deciding whether to invest. *E.g.*, *id.* at ¶¶ 173-75. Other undisputed facts—such as the much-talked about Liquid sale for 400% returns in 2019, *see id.* at ¶¶ 227, 229—confirm that investors purchased Grams hoping to profit from the investment. Based on these undisputed facts, no reasonable factfinder could conclude that sophisticated investors spent $1.7 billion in 2018 to purchase large, varying quantities of Grams for any reason other than the expectation of profit based on Telegram's efforts. *See also id.* at ¶¶ 332-34.

**C.      Even If Analyzed At TON's Launch, Grams Are Investment Contracts.**

Even if the Court were to consider the *Howey* analysis to apply only as of the time of TON's launch—though it should not, for the reasons stated above in Part I.A—the Gram tokens are still "investment contracts" under *Howey* based on undisputed facts. As Telegram's marketing applied equally to Grams and to Gram Purchase Agreements, and given the economic reality of Grams, Grams are and will be "investment contracts" at launch.

*First*, Telegram undisputedly sold the tokens to Initial Purchasers for U.S. Dollars or Euros, a fact that does not change depending on when it is analyzed. *See* JX11, JX12 § 2.3.

*Second*, even post launch a Gram token did and will represent an interest in a "common enterprise" with others. Whether analyzed at the moment the Grams were sold or when they are distributed, the economic reality reflects that, as the market price of Grams rises or falls, all investors will get the same proportionate increase or decrease in value. Moreover, to the extent certain Telegram affiliates holding large blocks of Grams have received incentives and are

promising efforts to develop the TON ecosystem (and thus the "demand and value" for Grams, 56.1 at ¶¶ 57, 87, 173), those promoters' fortunes will continue to rise and fall in tandem with those of the purchasers of Grams in the secondary market.  *See, e.g.*, *SEC v. Glenn W. Turner Enter.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973) (a "common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment *or of third parties*") (emphasis added); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974) ("critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts").

*Third*, even post launch a purchaser of a Gram token will reasonably expect to profit from the efforts of others.  As noted, Telegram promised it would generate "demand" and therefore "value" for the Gram tokens in part based on its efforts to develop its popular Messenger app. *See, e.g.*, 56.1 at ¶¶ 57, 87.  Market actors are thus reasonably continuing to expect that Telegram will continue to grow Messenger beyond TON's launch, *see id.* at ¶ 148, 165, 166, as Telegram itself promised in its marketing.  *Id.* at ¶ 66-67, 108-110, 122-25, 127-28, 388.  Moreover, Telegram retains ownership and control over—and thus the economic incentive concerning—the remaining Grams, a continuing incentive to help TON succeed.  Finally, there can be no dispute that Telegram's current and former associates have continued to make and will continue to make efforts with respect to TON, *see generally* 56.1 at ¶¶ 272, 280, 290, 296, 298, 308-09, 311-12, 315-17; *see also* Stips. at ¶ 178, which is sufficient under *Howey*.  *See e.g.*, *Forman*, 421 U.S. at 854 ("efforts of others" includes "promoters or . . . third parties.").

## II.   TELEGRAM ENGAGED AND IS ENGAGING IN A PUBLIC DISTRIBUTION OF GRAMS TO WHICH NO EXEMPTION CAN APPLY

Based on the undisputed material facts, the SEC is entitled to summary judgment as a matter of law on its claim that Telegram made unregistered offers and sales of securities.  To

avoid liability, Telegram has the burden to prove that its transactions were exempt from these requirements. *Ralston Purina*, 346 U.S. at 126. Exemptions from registration "are construed strictly to promote full disclosure of information for the protection of the investing public." *Cavanagh*, 445 F.3d at 115; *accord Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971). Here, because Telegram's offers and sales were but an intermediary step towards its ultimate, indisputable goal—the worldwide distribution of Grams—no exemption is available.

### A.     "Distributions" Under the Securities Act and Regulation D

In its Form D, Telegram claimed an exemption from the registration requirements, including under Rule 506(c) of Regulation D, for the Gram Purchase Agreements with respect to U.S. investors. 17 C.F.R. § 230.506(c). That rule, however, requires among other conditions compliance with Rule 502(d) in order to claim the exception's "safe harbor." *Id.* Rule 502(d) in turn requires the issuer to "exercise reasonable care" to assure that the purchasers are not underwriters within the meaning of Section 2(a)(11) of the Act. 17 C.F.R. § 230.502(d) ; 15 U.S.C. § 77b(a)(11) (transactions involving underwriters are not exempt from registration). The presence of underwriters indicates a "distribution" or "public offering" for which neither the Securities Act nor the rules issued thereunder provide a registration exemption. Moreover, securities obtained in a valid private offering cannot be resold absent a registration statement or another exemption. 17 C.F.R. § 230.502(d); *see also SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir.1998) (registration is "transaction-specific," the requirement of registration applies to each act of offering or sale).

In exempting certain transactions from Section 5's requirements, Congress distinguished between transactions through which securities are distributed to the public in an offering from the issuer (which must be registered), and ordinary trading once the securities have come to rest with investors (which are typically exempt under Section 4(a)(1) of the Act, 15 U.S.C.

§ 77d(a)(1)).  Congress provided the registration protections not just where securities are sold directly to the public but also through intermediaries who either buy the security from the issuer with a view to distribute it or sell "for the issuer," *i.e.*, "underwriters."  15 U.S.C. § 77b(a)(11).

Although the Act does not define "distribution," the federal courts have uniformly held that "'distribution' is synonymous with 'public offering' as set forth under Section 4[(a)](2)." *Berckely Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 215 (3d Cir. 2006) (collecting cases); *see also Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959) ("a 'distribution' requires a 'public offering'" (citation omitted)).  Moreover, a distribution "comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'"  *R.A Holman v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (*quoting Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)); *accord In the Matter of Oklahoma-Texas Tr.*, 2 S.E.C. 764, 769, 1937 WL 32951 (Sept. 23, 1937), *aff'd*, 100 F.2d 888 (10th Cir. 1939).  Claiming an exemption under Section 4 requires "establishing that [the] sales do not constitute a disguised public distribution."  *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 369 (S.D.N.Y. 1998), *aff'd,* 155 F.3d 129 (2d Cir. 1998).

Whether sales of securities are a private offering or a public distribution is a fact-specific inquiry.  Courts typically look first at the sophistication of the ultimate offerees and their ability to obtain the information normally afforded in a registration statement.  *See Ralston Purina*, 346 U.S. at 125 ("the applicability of [the private offering exemption] should turn on whether the particular class of persons affected needs the protection of the [Securities] Act"); *United States v. Lindo*, 18 F.3d 353 (6th Cir. 1994) (finding a transaction was a public offering because the numerous buyers did not have access to the information found in registration statements).

The time during which an intermediary purchaser holds the securities is also relevant to whether the offering is part of a distribution where the securities have not yet "come to rest" with the public. *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004). But an extended holding period may be consistent with a purchase "with a view to distribution" if the purchaser was "speculatively" buying the security in hopes of "unload[ing] it on the unadvised public" when he found it profitable. *Gilligan*, 267 F.2d at 468 (purchasers bought "'with a view to distribution' despite the ten months of holding"); *see also Interpretative Releases Relating to the Securities Act of 1933 and General Rules and Regulations Thereunder*, Rel. No. 33-5121, 1970 WL 116591 (Dec. 30, 1970) ("1970 Rel."), at *1 (to determine whether "private offering exemption" applies under Section 4(a)(2) of the Act and *Ralston Purina*, an "important factor to be considered is whether the securities offered have come to rest in the hands of the initially informed group or whether the purchasers are merely conduits . . . ."). Thus, courts also look at the economic inducements of the transaction to determine whether the security was intended to "come to rest" with a private purchaser or, in reality, with public investors at large. *Cf. Geiger*, 363 F.3d at 488 (sale of securities at deep discount shows that the securities "were never meant to 'come to rest . . .'" with initial purchasers exempted under other provisions of the Act).

And although there is no bright-line quantitative metric to determine whether a distribution occurred, *see Ralston Purina*, 346 U.S. at 125; *Geiger*, 363 F.3d at 484, sales of larger amounts of securities are generally more likely to be considered part of a distribution. *See, e.g.*, *United States v. Wolfson*, 405 F.2d 779, 783 (2d Cir. 1968) ("[T]here can be no doubt that appellants' sale of 633,000 shares (25 percent of the outstanding shares . . .), was a distribution."); *Quinn*, 452 F.2d at 943 (the sale of 25,000 shares at a time when in excess of 3 million shares were issued and outstanding constituted a public distribution).

For decades, the SEC has issued official guidance consistent with these decisions. In 1962, in a Securities Act Release entitled the "Non-Public Offering Exemption" discussing *Ralston Purina* and its progeny, the SEC noted some of the factors that could be indicative of a non-public versus a public exemption. *See Non-public Offering Exemption*, Securities Act Rel. No. 33-4552, 1962 WL 69540 (Nov. 6, 1962). It explained that, for example:

> . . . a statement by the initial purchaser, at the time of his acquisition, that the securities are taken for investment and not for distribution is necessarily self-serving and not conclusive as to his actual intent. Mere acceptance at face value of such assurances will not provide a basis for reliance on the exemption when inquiry would suggest to a reasonable person that these assurances are formal rather than real . . .

*Id.* at *2.

In 1970, again discussing transactions "not involving any public offering" and *Ralston Purina*, the SEC once more observed that "[w]hether the transaction is not involving any public offering is essentially a question of fact," and repeated its warning that "the practice whereby issuers procure from the initial purchasers representations that they have acquired the securities for investment" did not lead to "conclusive" determinations of the purchaser's "actual intent." 1970 Rel., 1970 WL 116591, at *1.

## B. Telegram Has Taken Steps Towards, and Seeks to Complete, a Public Distribution of Grams

This legal framework, applied to the facts that cannot be genuinely disputed, establish conclusively that Telegram is engaged in a public offering.

*First*, the ultimate offerees are members of the public at large, unable to ask questions of Telegram or expect answers—precisely the type of individuals the Securities Act is designed to protect. Members of the public are the ultimate offerees because there is no dispute that Stage A Initial Purchasers are not restricted from reselling their Grams indiscriminately upon launch, Stips. at ¶ 93, and because Telegram even plans to distribute Grams directly to Messenger users.

56.1 at ¶ 398.  Indeed, Telegram has not provided and has no plans to provide the market any information about its finances or its operations with any regularity.  *Id.* at ¶¶ 343-46.

*Second*, Initial Purchasers undisputedly have an economic interest to resell some quantity of their Grams upon receipt or at opportune times thereafter.  Some have already expressed that intent by asking about listing Grams on digital asset platforms, *id.* at ¶ 160, by noting it in their internal investment considerations, *e.g.*, *id.* at ¶ 178, and by swearing to it to the Court.  *Id.* at ¶ 159.  Moreover, investors' purchases of assets in large amounts, that bear no relation to any possible purpose other than to resell for profit confirms these obvious intentions.  Finally, the economic inducement that Telegram itself built into the price of Grams—the price differential between Presale and Stage A purchasers, as well as the Reference Price formula suggesting a price of $3.62 at launch (and therefore an immediate return for Stage A Initial Purchasers of more than 100%, Stips. at ¶¶ 87, 94, 143)—confirms that Grams are not meant to "come to rest" in the hands of the Initial Purchasers, but in the hands of the public.

*Third*, there is also no dispute that Telegram has sold nearly 60% of the total Grams to Initial Purchasers and is prepared to make additional distributions to the public at large.  PX 73 at 2.  This further demonstrates that the Offering is a part of a larger, planned distribution.[10]

Therefore, based on the undisputed facts, Telegram cannot meet its burden to establish that the Offering is exempt from registration.

---

[10]     Telegram's own statements leave no doubt that this is true.  Telegram admits that its ultimate goal is the widespread dispersal of Grams.  *Id.* at ¶ 28; Stips. at ¶¶ 139-141.  When Telegram switched its fundraising plan from a public to a private sale of Grams, Telegram noted that the sale to the public would then occur "indirectly."  56.1 at ¶ 28.

**CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion

for summary judgment on liability in its entirety.

Dated: New York, New York
      January 13, 2020

                                        Jorge G. Tenreiro
                                        Kevin P. McGrath
                                        Ladan F. Stewart
                                        Alison R. Levine

                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE
                                        COMMISSION
                                        New York Regional Office
                                        200 Vesey Street, Suite 400
                                        New York, New York 10281
                                        (212) 336-9145 (Tenreiro)
                                        TenreiroJ@sec.gov