# Exhibit K

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
 5                                 )
                    Plaintiff,     )
 6                                 ) 19 Civ. 9439 (PKC)
         - against -               )
 7                                 )
    TELEGRAM GROUP INC. and        )
 8  TON ISSUER INC.,               )
                                   )
 9                  Defendants.    )
    _____)
10
11       **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**
12
13          Videotaped deposition of PAVEL DUROV (as
14  30(b)(6) corporate representative of Defendants and
15  also in his personal capacity), Volume 1, taken on
16  behalf of Plaintiff at Hadef & Partners, LLC, Emaar
17  Square, Building 3, Level 5, Downtown Dubai, Dubai,
18  United Arab Emirates, beginning at 11:21 a.m. and
19  ending at 9:54 p.m., on Tuesday, January 7, 2020,
20  before LEAH WILLERSDORF, Member of the British
21  Institute of Verbatim Reporters, Accredited Verbatim
22  Reporter, Qualified Realtime Reporter - Level 2,
23  International Participating Member NCRA.
24
25  JOB No. 200107LWI
                                                        1
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:12:36   1  regulations?
15:12:36   2             MR. DRYLEWSKI:  Let's just stop for one
15:12:38   3  second.  Can we go off the record --
15:12:40   4             MR. TENREIRO:  Sure.
15:12:40   5             MR. DRYLEWSKI:  -- and I can talk to you?
15:12:40   6             THE VIDEOGRAPHER:  We are going off the
15:12:42   7  record.  The time is 3:11.
15:12:45   8             (Off the record.)
15:21:45   9             THE VIDEOGRAPHER:  We are back on record.
15:21:46  10  The time is 3:21.
15:21:54  11  BY MR. TENREIRO:
15:21:54  12       Q.   Okay.  Before we went off the record I had
15:21:56  13  asked you, when you say you wanted to do things by the
15:21:58  14  book, one of the things that you had in your mind was
15:22:02  15  complying with potential securities regulations or
15:22:05  16  laws that might apply to the offering that you were
15:22:08  17  going to conduct?
15:22:13  18       A.   Yes.  I believe this was part of the
15:22:16  19  reason why we engaged with our counsel, and our goal
15:22:29  20  was, and is, to be compliant in all applicable
15:22:33  21  jurisdictions.  You know, it's -- obviously the United
15:22:38  22  States is one of them.
15:22:41  23       Q.   And have you heard of something called the
15:22:47  24  DAO Report?  D-A-O.
15:22:53  25       A.   I think I had heard about it, yes.
```

```
15:22:55   1          Q.   Do you recall when you first heard of it?
15:22:56   2               MR. DRYLEWSKI:  And I'd like you to think
15:22:59   3   about this answer.  If it comes from a conversation
15:23:03   4   with an attorney, I'd ask you to exclude that from
15:23:07   5   your answer.
15:23:07   6   BY MR. TENREIRO:
15:23:08   7          Q.   Well, can I clarify, I'm not -- when
15:23:11   8   I said "when," I mean just can you give me the month
15:23:14   9   or year.
15:23:14  10               MR. DRYLEWSKI:  Yeah.  I'm just --
15:23:15  11               MR. TENREIRO:  Is that okay?
15:23:16  12               MR. DRYLEWSKI:  That is fine.
15:23:16  13               MR. TENREIRO:  Okay.
15:23:17  14               MR. DRYLEWSKI:  And if you can answer that
15:23:18  15   question without revealing --
15:23:19  16               MR. TENREIRO:  Right.
15:23:20  17               MR. DRYLEWSKI:  -- who told you --
15:23:23  18               MR. TENREIRO:  Right.
15:23:23  19               MR. DRYLEWSKI:  -- but I just wanted
15:23:24  20   to pre-empt that in case you -- don't reveal any
15:23:27  21   attorney/client communications to the extent any took
15:23:29  22   place.
15:23:29  23               THE WITNESS:  Mmm-hmm.
15:23:30  24               MR. DRYLEWSKI:  Understood?
15:23:31  25               THE WITNESS:  Okay.
```

109

```
15:23:41  1              I think I first may have heard about it
15:23:43  2   somewhere in 2017.
15:23:44  3   BY MR. TENREIRO:
15:23:44  4        Q.   Okay.  And just for the record, what do
15:23:46  5   you understand -- I'm not asking you for legal
15:23:48  6   conclusions or anything like that, but if you had to
15:23:51  7   explain it in your own words, what do you understand
15:23:53  8   the DAO Report to be?
15:23:55  9              MR. DRYLEWSKI:  Objection to form.
15:24:32 10              THE WITNESS:  My understanding at the time
15:24:34 11   was that this DAO Report was related to a certain
15:24:43 12   token or blockchain-related offering that may have not
15:24:54 13   been done in accordance to all applicable laws and
15:24:59 14   regulations in the United States.
15:25:02 15   BY MR. TENREIRO:
15:25:03 16        Q.   And -- okay.
15:25:06 17              Now, Mr. Durov, we were discussing the
15:25:09 18   structuring of the offering -- of the private
15:25:10 19   placement, the pre-sale and the Stage A.  Do you
15:25:13 20   recall discussing that with me a few moments ago?
15:25:17 21        A.   Pre-sale and Stage A?
15:25:19 22        Q.   Right.
15:25:20 23        A.   Yeah, we discussed that.
15:25:22 24        Q.   Okay.  Was there a point in time when you
15:25:24 25   were considering raising funds that you considered
```

110

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:25:29   1  a different structure?  And by this I just mean
15:25:32   2  Telegram.  Was there a point in time in which Telegram
15:25:35   3  considered some other structure rather than what
15:25:37   4  actually happened, which was pre-sale plus Stage A?
15:26:02   5          A.   Yes.  I think at some early stages we
15:26:07   6  thought that a public offering, at least in certain
15:26:25   7  jurisdictions, could also be part of the process.
15:26:34   8          Q.   Public offering of what?
15:26:55   9          A.   This is a very good question that, after
15:27:06  10  being carefully studied and explored by us, eventually
15:27:09  11  led us to not engage in any public offering of that
15:27:17  12  kind, because we believed, at least as far as the
15:27:33  13  United States jurisdiction is concerned, that a public
15:27:41  14  offering of a right to receive Grams in the future
15:27:47  15  could be treated as an unregistered security.
15:28:13  16  And while there were several players in the market at
15:28:27  17  that time that were credible, or at least projected
15:28:31  18  a very credible image that have engaged in these kind
15:28:40  19  of activities, at least outside of the United States,
15:28:50  20  it was not fully clear how this -- how such an
15:29:01  21  offering could be implemented practically across all
15:29:07  22  jurisdictions in a way that would avoid us to decrease
15:29:18  23  complexity and unnecessary risks.
15:29:28  24               This is why we eventually gave up the idea
15:29:32  25  to conduct a public offering of interest in Grams.
```

111

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
15:29:44   1          Q.   When you were considering the public
15:29:47   2   offering, I think you mentioned of a right to receive
15:29:51   3   Grams in the future; is that correct?
15:29:55   4          A.   I believe that's what I said, yes.
15:29:57   5          Q.   Okay.  So can you explain what you meant
15:29:59   6   by that, when you -- so my question is, when you were
15:30:03   7   considering the public offering, contemplating
15:30:06   8   entering into purchase agreements such as the one
15:30:10   9   we just saw in Exhibit 41 -- sorry, it wasn't 41.  43.
15:30:24  10   Yeah, that's that one.
15:30:25  11          A.   Okay.
15:30:25  12          Q.   Sorry, let me start again.
15:30:27  13               When you were considering the public
15:30:29  14   option, was Telegram considering entering into
15:30:31  15   purchase agreements with members of the public such as
15:30:33  16   the one in Exhibit 43?
15:30:40  17          A.   This was a very early stage and we --
15:30:47  18   I don't believe we thought it through down to,
15:31:00  19   you know, the tiniest detail.  We knew, based on what
15:31:16  20   we saw at the market at that time, that there were
15:31:22  21   certain companies that seemed to be credible and
15:31:29  22   seemed to have attracted interest from institutional
15:31:36  23   investors that were either contemplating a public
15:31:40  24   offering or having done a public offering of that
15:31:49  25   kind.  At first we thought that might be a path
```

112

```
17:43:22   1   to contact anyone at the SEC?
17:43:44   2              MR. DRYLEWSKI:  Objection; form.
17:43:52   3              THE WITNESS:  You mean before which date?
17:43:55   4   BY MR. TENREIRO:
17:43:56   5        Q.   Before the date of -- when you began the
17:43:59   6   private placement.
17:44:13   7        A.   By beginning the private placement, do you
17:44:15   8   mean our first interactions with potential purchasers?
17:44:18   9        Q.   Yes.
17:44:41  10        A.   I think at that period in time we were
17:44:46  11   still in the process of finalizing the contours of the
17:44:50  12   private placement and we were doing a lot of research
17:45:01  13   and exploratory work, so we didn't -- so I don't
17:45:08  14   believe we reached out to the Securities and Exchange
17:45:21  15   Commission at that point, as we thought it was too
17:45:27  16   early due to the fact that we didn't know specifically
17:45:37  17   what we would be doing.
17:45:41  18        Q.   Okay.  And how about before you signed the
17:45:46  19   first purchase agreement?
17:45:48  20             I believe you, Mr. Durov, kind of signed
17:45:53  21   all the purchase agreements; is that correct?
17:45:55  22        A.   Yes.
17:45:56  23        Q.   Okay.  So before you, Mr. Durov, signed
17:45:58  24   the first purchase agreement, did you or anyone else
17:46:00  25   at Telegram reach out to the SEC with respect to the
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:46:37 | 1 | private placement? |
| 17:46:37 | 2 | A. I don't think we reached out to the SEC |
| 17:46:40 | 3 | before I signed the first purchase agreement. The way |
| 17:46:44 | 4 | we designed it is, the private placement, was that we |
| 17:46:59 | 5 | reserved a lot of flexibility to how the project and |
| 17:47:10 | 6 | its parts could look like, and this flexibility is |
| 17:47:17 | 7 | reflected in the purchase agreements and its |
| 17:47:20 | 8 | appendices. |
| 17:47:36 | 9 | That gave us a comfort of knowing that |
| 17:47:44 | 10 | we would be able to change certain, if not all, |
| 17:47:49 | 11 | aspects of what we're trying to build based on the |
| 17:47:59 | 12 | feedback that we could receive from the regulators, |
| 17:48:04 | 13 | including the SEC, in the following months. |
| 17:48:08 | 14 | Q. So is it fair to say the answer to my |
| 17:48:10 | 15 | question is no, you do not? |
| 17:48:13 | 16 | A. No; that was the first sentence, |
| 17:48:17 | 17 | I believe. |
| 17:48:17 | 18 | Q. Okay. Now, in terms of the remainder of |
| 17:48:21 | 19 | your answer and the flexibility, is it fair to say |
| 17:48:24 | 20 | that you today still retain that flexibility to |
| 17:48:46 | 21 | change ... |
| 17:48:48 | 22 | Right. Is it fair to say that -- so you |
| 17:48:48 | 23 | said the way you designed it was that you had |
| 17:48:52 | 24 | flexibility to change some features of the project. |
| 17:49:03 | 25 | Is it fair to say that you, to this day, retain that |

159

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                    REPORTER CERTIFICATE
 2
 3          I, the undersigned, an Accredited Verbatim
 4   Reporter in the United Kingdom, do hereby certify:
 5          That the foregoing proceedings were taken
 6   before me at the time and place herein set forth; that
 7   any witnesses in the foregoing proceedings, prior to
 8   testifying, were placed under oath; that a verbatim
 9   record of the proceedings was made by me using machine
10   shorthand which was thereafter transcribed under my
11   direction; further, that the foregoing is an accurate
12   transcription thereof.
13          I further certify that I am neither
14   financially interested in the action nor a relative or
15   employee of any attorney or any of the parties.
16          IN WITNESS WHEREOF, I have this date
17   subscribed my name.
18
19   Date: January 9, 2020
20
21   _____
     LEAH M. WILLERSDORF
22   Accredited Verbatim Reporter,
     Member of the British Institute of
23   Verbatim Reporters,
     Qualified Realtime Reporter (Level 2)
24   International Participating Member NCRA.
25
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**