# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                       :

SECURITIES AND EXCHANGE COMMISSION,   :
                                         :

                      Plaintiff,          :

                                           :

                    vs.               :     Case No. 1:19-cv-09439-PKC

                                         :

TELEGRAM GROUP INC. and TON ISSUER INC.,  :

                                         :

                  Defendants.       :

                                           :
----------------------------------------------------------------- X

## <u>BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE</u>

Lilya Tessler (*admitted pro hac vice*)
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5849
Email: ltessler@sidley.com

*Attorney for Amicus Curiae the*
*Chamber of Digital Commerce*

January 21, 2020

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ............................................................................... ii

**INTEREST OF AMICUS CURIAE** ......................................................................1

**BLOCKCHAIN TECHNOLOGY AND THE EXISTING GLOBAL LEGAL
ENVIRONMENT**.....................................................................................................3

    I.      Blockchain Technology and Digital Assets ...............................................3

    II.     Foreign Legal Systems Have Classified Digital Assets Into Distinct Categories ...4

    III.    Lack of Legal Clarity Is Stifling U.S. Technological Development Across
Industry Sectors and Opportunities for Societal Benefits.........................5

    IV.    Not All Digital Assets Should Be Regulated as Securities.......................6

**ARGUMENT** ..........................................................................................................8

    I.      THE LAW SUPPORTS DISTINGUISHING DIGITAL ASSETS FROM THE
INVESTMENT CONTRACTS PURSUANT TO WHICH THEY ARE
DISTRIBUTED ........................................................................................9

         A.     In Distinguishing a Securities Transaction From the Digital Asset, the Law
Looks to Substance Over Form...................................................9

         B.     The Economic Realities of a Transaction Are the Facts and Circumstances
Underlying a Contract, Transaction, or Scheme — Not the Characteristics
of an Asset That May Be the Subject of the Investment Contract............10

             1.     Characteristics of Digital Assets May Be Distinct From the
"Economic Realities" of the Investment Contract ........................11

             2.     Courts Currently Rely on Certain SEC Settlements That Have Not
Examined Digital Assets as Distinct From An Investment
Contract........................................................................................14

    II.     ASSETS DISTRIBUTED PURSUANT TO AN INVESTMENT CONTRACT
MAY SEPARATELY BE SOLD THROUGH AN ORDINARY COMMERCIAL
TRANSACTION ......................................................................................16

         A.     An Asset (a Commodity) May Exist Separate and Apart From the
Economic Realities of an Investment Contract..........................16

         B.     A Digital Asset That Is Not Inherently a Security Is a Commodity That
May Be the Subject of a Commercial Transaction ....................18

         C.     Commercial Transactions Involving Digital Assets Distributed Pursuant to
an Investment Contract Are Not Part of the Securities Distribution .........19

**CONCLUSION** .....................................................................................................**20**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Balestra v. ATBCOIN LLC*,
    380 F.Supp.3d 340 (S.D.N.Y. 2019)......................................................................................16

*CFTC v. McDonnell*,
    287 F. Supp. 3d 213 (E.D.N.Y. 2018) ..................................................................................8

*Cont'l Mktg. Corp. v. SEC*,
    387 F.2d 466 (10th Cir. 1967) ....................................................................................13, 18

*Great Lakes Chem. Corp. v. Monsanto Co.*,
    96 F.Supp.2d 376 (D. Del. 2000)................................................................................10, 18

*Grenader v. Spitz*,
    537 F.2d 612 (2nd Cir. 1976)...............................................................................................20

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) *cert. denied*, 494 U.S. 1078 (1990)............................13, 18, 20

*Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel*,
    439 U.S. 551 (1979)..............................................................................................................18

*Kemmerer v. Weaver*,
    445 F.2d 76 (7th Cir. 1971) .................................................................................................19

*R. A. Holman & Co. v. SEC*,
    366 F.2d 446 (2nd Cir. 1966)...............................................................................................20

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)..................................................................................................................8

*SEC v. Aaron*,
    605 F. 2d 612 (2d Cir. 1979), *vacated on other grounds, Aaron v. SEC,* 446
    U.S. 680 (1980)........................................................................................................................7

*SEC v. C. M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)........................................................................................................10, 12

*SEC v. Edwards*,
    540 U.S. 389 (2004)........................................................................................................13, 18

*SEC v. Glen-Arden Commodities, Inc.*,
    368 F. Supp. 1386 (E.D.N.Y. 1974), *aff'd sub nom. Glen-Arden Commodities,*
    *Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) .............................................................13, 18

Page

*SEC v. Hui Feng*,
   935 F.3d 721 (9th Cir. 2019) ....................................................14

*SEC v. Sierra Brokerage Servs.*,
   608 F.Supp.2d 923 (S.D. Ohio 2009) ...........................................17

*SEC v. United Benefit Life Ins. Co.*,
   387 U.S. 202 (1967)..............................................................10

*SEC v. W. J. Howey Co.*,
   151 F.2d 714 (5th Cir. 1945), *rev'd sub nom. SEC v. W.J. Howey Co.*, 328
   U.S. 293 (1946) ...................................................................12

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)...................................................... *passim*

*Solis v. Latium Network, Inc.*,
   2018 WL 6445543 (D.N.J., 2018) ..............................................16

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967)................................................................9

*U.S. v. Zaslavskiy*,
   No. 17 Cr. 647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018).................17

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975)......................................................13, 19, 20

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009) ..................................................14

**Statutes**

7 U.S.C. § 1(a)(9)...................................................................19

15 U.S.C. ch. 2 ......................................................................8

Bank Secrecy Act, 12 U.S.C. §§ 1829b, 1951-1959; 31 U.S.C. §§ 5311-5314,
   5316-5332 ..........................................................................8

NY BANK ch.2, Art. XIII-B ........................................................8

NY GEN BUS § 349 .................................................................8

**Other Authorities**

23 NYCRR pt. 200...................................................................8

iii

Page

APOLLINE BLANDIN, ET AL., GLOBAL CRYPTOASSET REGULATORY LANDSCAPE
STUDY, 21 (Apr. 2019), *available at*
https://www.jbs.cam.ac.uk/fileadmin/user_upload/research/centres/alternative-
finance/downloads/2019-04-ccaf-global-cryptoasset-regulatory-landscape-
study.pdf...............................................................................................................................4

Bermuda Digital Asset Business Act 2018 ...........................................................................5

BLOCKCHAIN ALLIANCE, https://blockchainalliance.org/ (last visited Jan. 2, 2020) ......................1

CAN. SEC. ADM'R, CSA STAFF NOTICE 21-327, GUIDANCE ON THE APPLICATION
OF SECURITIES LEGISLATION TO ENTITIES FACILITATING THE TRADING OF
CRYPTO ASSETS (Jan. 16, 2020),
https://www.osc.gov.on.ca/documents/en/Securities-
Category2/csa_20200116_21-327_trading-crypto-assets.pdf ...................................5

CFTC, AN INTRODUCTION TO VIRTUAL CURRENCY,
https://www.cftc.gov/sites/default/files/idc/groups/public/@customerprotectio
n/documents/file/oceo_aivc0218.pdf (last visited Jan. 2, 2020).................................8

Chainanalysis Team, *Chainalysis in Action: DOJ Announces Shutdown of Largest
Child Pornography Website,* CHAINALSYIS BLOG (Oct. 16, 2019),
https://blog.chainalysis.com/reports/chainalysis-doj-welcome-to-video-
shutdown ..................................................................................................................2

CHAMBER OF DIGITAL COMMERCE, NATIONAL ACTION PLAN FOR BLOCKCHAIN
(Feb. 2019), https://digitalchamber.org/wp-
content/uploads/dlm_uploads/2019/02/National-Action-Plan-for-
Blockchain_.pdf.......................................................................................................4

*Token Alliance,* CHAMBER OF DIGITAL COMMERCE,
https://digitalchamber.org/initiatives/token-alliance/ (last visited Jan. 2, 2020) ...............2, 15

CHAMBER OF DIGITAL COMMERCE, SMART CONTRACTS: 12 USE CASES FOR
BUSINESS AND BEYOND (Dec. 2016), https://digitalchamber.org/wp-
content/uploads/2018/02/Smart-Contracts-12-Use-Cases-for-Business-and-
Beyond_Chamber-of-Digital-Commerce.pdf ...........................................................6

CHAMBER OF DIGITAL COMMERCE, LEGISLATOR'S TOOLKIT FOR BLOCKCHAIN
TECHNOLOGY (Dec. 2018), https://digitalchamber.org/state-legislators-toolkit/......................5

CHAMBER OF DIGITAL COMMERCE, UNDERSTANDING DIGITAL TOKENS: MARKET
OVERVIEWS AND PROPOSED GUIDELINES FOR POLICYMAKERS AND
PRACTITIONERS (Aug. 2018), https://digitalchamber.org/download/7153/ .............................6

Daniel Palmer, *More Than Half of ICOs Fail Within 4 Months, Study Suggests*, COINDESK (July 10, 2018, 9:55 AM), https://www.coindesk.com/over-half-of-icos-fail-within-4-months-suggests-us-study .......................................................................15

DYLAN YAGA ET AL., BLOCKCHAIN TECHNOLOGY OVERVIEW, NISTIR 8202 (2018) ......................................................................................................3

FIN. CONDUCT AUTH., GUIDANCE ON CRYPTOASSETS FEEDBACK AND FINAL GUIDANCE TO CP 19/3 (July 2019), https://www.fca.org.uk/publication/policy/ps19-22.pdf ............................................5

Hester M. Peirce, Comm'r, SEC, Renegade Pandas: Opportunities for Cross Border Cooperation in Regulation of Digital Assets (July 30, 2019), https://www.sec.gov/news/speech/speech-peirce-073019 ......................................6, 7

Japan Payment Services Act of 2009 ........................................................................5

Jay Clayton, Chairman, SEC, *SEC Staff Views* (Sept. 2018), https://www.sec.gov/news/public-statement/statement-clayton-091318 ................15

Lewis Cohen, *Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens*, 65 Wayne L. Rev. 93-96, 102-106 (2019) ........................................................12

LIBRARY OF CONGRESS, REGULATION OF CRYPTOCURRENCY AROUND THE WORLD (June 2018), https://www.loc.gov/law/help/cryptocurrency/cryptocurrency-world-survey.pdf ......................................................................................................5

Munchee, Inc., Securities Act. Rel. No. 33-10445 (December 11, 2017) ..................16

Oklahoma-Texas Trust, 2 S.E.C. 764, 1937 WL 32951 (1937), *aff'd*, 100 F. 2d 888 (10th Cir. 1939) ...................................................................................................20

Paxos Trust Company, LLC, SEC No-Action Letter (Oct. 28, 2019), https://www.sec.gov/divisions/marketreg/mr-noaction/2019/paxos-trust-company-102819-17a.pdf ..........................................................................................3

Shane Shifflett & Coulter Jones, *Buyer Beware: Hundreds of Bitcoin Wannabes Show Hallmarks of Fraud,* THE WALL STREET J. (May 17, 2018) ..........................15

Singapore Payment Services Act 2019 ......................................................................5

STEVE DAVIES, ET AL., 5TH ICO / STO REPORT (2019), https://www.pwc.com/ee/et/publications/pub/PwC-Strategy&-ICO-Report-Summer-2019.pdf .........................................................................................................15

Page

Press Release, Swiss Financial Market Supervisory Authority FINMA, ICO
     Guidelines for Enquiries Regarding The Regulatory Framework for Initial
     Coin Offerings (ICOs) (Feb. 16, 2018),
     https://www.finma.ch/en/news/2018/02/20180216-mm-ico-wegleitung/ .................................5

STRATEGIC HUB FOR INNOVATION AND FIN. TECH., FRAMEWORK FOR
     "INVESTMENT CONTRACT" ANALYSIS OF DIGITAL ASSETS, SEC (Apr. 2019),
     https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-
     assets. ................................................................................................................................11

William Hinman, SEC Dir., Div. of Corp. Fin., SEC, Digital Asset Transactions:
     When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets
     Summit: Crypto (June 14, 2018), https://www.sec.gov/news/speech/speech-
     hinman-061418 .................................................................................................7, 12, 17

**INTEREST OF AMICUS CURIAE**

The Chamber of Digital Commerce ("Chamber") is a not-for-profit trade association formed in 2014 to promote the acceptance and use of digital assets and blockchain-based technologies. We represent more than 200 companies that are investing in and innovating with blockchain-based technologies, including global financial institutions, emerging technology companies, software developers, consultancies, investment firms, and law firms.[1] Our leadership team and Board of Advisors includes policy and legal experts, industry pioneers, and former regulators, including two former Chairs and a Commissioner of the U.S. Commodity Futures Trading Commission ("CFTC"), and a former Commissioner of the U.S. Securities and Exchange Commission ("SEC").

Through education, advocacy, and working closely with policymakers, regulatory agencies, and industry, the Chamber seeks to develop an environment that fosters responsible innovation, job creation, and investment. The Chamber's commitment to compliance is deeply rooted in our organization's culture and was one of the key purposes of our creation. Like all new technologies, blockchain has been abused by nefarious actors. The founding members of the Chamber came together to launch this organization to provide dedicated resources to work with government and address policy and regulatory considerations to ensure efficient and successful functioning of the market. One of the Chamber's first initiatives was the formation of the Blockchain Alliance, a resource for law enforcement agencies.[2] In addition, our members

---

[1] This brief reflects the view of the Chamber and does not reflect the views of any individual member of the Chamber.

[2] The Blockchain Alliance provides education and technical assistance and hosts information sharing sessions to support law enforcement objectives. Today, there are more than 100 governmental and commercial members of the Blockchain Alliance worldwide, including the SEC's Division of Enforcement. The Blockchain Alliance's mission is to combat criminal use of blockchain technology. *See* BLOCKCHAIN ALLIANCE, https://blockchainalliance.org/ (last visited Jan. 2, 2020).

1

provide cutting-edge analytics tools to help governments and businesses identify and mitigate risk of criminal activity and enable companies to alert law enforcement to such risks.[3] With respect to federal securities laws, the Chamber invests significant resources to promote industry compliance and provide education and technical assistance to policy makers. In 2017, when there was a significant spike in token distribution events, the Chamber launched the Token Alliance to issue a series of tools for industry and policy makers to make informed decisions when engaging in tokenized networks and applications.[4]

The Chamber's role in promoting the development of blockchain technology and digital assets gives it a strong interest in the central issue in this case: how the analysis of whether a transaction is an investment contract, and thus a "security," is applied to transactions involving digital assets. Although the Chamber does not have a view on whether the offer and sale of Grams is a securities transaction, the Chamber has an interest in ensuring that the legal framework applied to digital assets underlying an investment contract is clear and consistent. Maintaining this distinction is critical to developing a predictable legal environment through a technology-neutral precedent, which this Court has the power to do.

Many companies in the blockchain sector are actively engaged in developing and operating business models that affirmatively adopt the jurisdiction of the federal securities laws and want clear, predictable guidance on how to comply with the law.[5] In particular, the Chamber

---

[3] One of the Chamber's members, Chainalysis, provided vital assistance to law enforcement in shutting down a child pornography website. *See* Chainanalysis Team*, Chainalysis in Action: DOJ Announces Shutdown of Largest Child Pornography Website,* CHAINALSYIS BLOG (Oct. 16, 2019), https://blog.chainalysis.com/reports/chainalysis-doj-welcome-to-video-shutdown.

[4] The Token Alliance is an initiative of the Chamber co-chaired by former SEC and CFTC regulators dedicated to fostering best practices for the responsible growth of tokenized networks and applications. *See Token Alliance,* CHAMBER OF DIGITAL COMMERCE, https://digitalchamber.org/initiatives/token-alliance/ (last visited Jan. 2, 2020) for resources devoted to appropriately growing the token economy.

[5] *See, e.g.*, Paxos Trust Company, LLC, SEC No-Action Letter (Oct. 28, 2019), https://www.sec.gov/divisions/marketreg/mr-noaction/2019/paxos-trust-company-102819-17a.pdf.

respectfully asks the Court to apply the reasoning used by the U.S. Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) over 70 years ago and maintain the distinction between investment contracts and their underlying assets, making clear that an asset does not become a security simply by virtue of being the subject of an investment contract (*i.e.*, a securities transaction).

## BLOCKCHAIN TECHNOLOGY AND THE EXISTING GLOBAL LEGAL ENVIRONMENT

Blockchain is one of many novel, and rapidly evolving, technologies that are transforming financial services, retail, healthcare, real estate, and other industries. Yet blockchain technology and digital assets have been the subject of tremendous hype and regulatory focus. Unfortunately, as is often the case with new technologies, there are many misconceptions about blockchain. Below is a brief explanation of blockchain technology and digital assets and the current legal framework outside and within the United States, which informs the need for a clear application of *Howey* for this emerging technology.

## I.      Blockchain Technology and Digital Assets

Blockchain is a technology used to record information and transfer data, often referred to as digital assets. A foundational element of blockchain is a distributed ledger — a type of database. Each authenticated transaction (*i.e.*, change to the data) is added to the ledger such that the record establishes a chain of all transactions (generally grouped in blocks). Under normal operation of a blockchain network, no record of a transaction can be changed once published.[6]  A primary feature of blockchain is the ability to keep a reliable history of transactions so as to prevent "double-spending," or transfers of the same asset to different recipients. The subjects of

---

[6] *See* DYLAN YAGA ET AL., BLOCKCHAIN TECHNOLOGY OVERVIEW, NISTIR 8202 (2018).

3

these transactions are broadly referred to as digital assets, which can represent a wide variety of assets and rights.

Digital assets are not new, nor are they unique to blockchain technology. A digital asset is any electronic record that represents data contained in a centralized or decentralized database. Even within the context of blockchain technology, a digital asset is not a homogenous concept, but "an umbrella term to describe an array of tokens that may exhibit a wide range of characteristics."[7] Some digital assets may entitle a holder to certain rights related to a venture, such as the right to profits, a share of the venture's assets, voting rights, or the right to use certain services provided by the issuer. Digital assets may also, for example, be used to represent consumer goods and track each movement of the goods across a retailer's supply chain, or to streamline and track the transfer of patient medical records (recorded as a digital asset) between healthcare providers, or function as a medium of exchange, or represent a right to access a digital platform.[8]

## II.    Foreign Legal Systems Have Classified Digital Assets Into Distinct Categories

Recognizing that digital assets may be used for a variety of different purposes, regulators outside the United States have classified digital assets into three main categories: (i) payment tokens, primarily used as digital means of payment or medium of exchange; (ii) utility tokens, which allow holders to access or use a digital resource (such as a network or application); and (iii) security tokens, which represent a financial instrument similar to a traditional equity or debt

---

[7] APOLLINE BLANDIN, ET AL., GLOBAL CRYPTOASSET REGULATORY LANDSCAPE STUDY, 21 (Apr. 2019),  *available at* https://www.jbs.cam.ac.uk/fileadmin/user_upload/research/centres/alternative-finance/downloads/2019-04-ccaf-global-cryptoasset-regulatory-landscape-study.pdf.
[8] *See* CHAMBER OF DIGITAL COMMERCE, NATIONAL ACTION PLAN FOR BLOCKCHAIN (Feb. 2019), https://digitalchamber.org/wp-content/uploads/dlm_uploads/2019/02/National-Action-Plan-for-Blockchain1.pdf.

security.[9] Some jurisdictions have enacted laws and regulations or provided binding guidance

specifically applicable to certain digital assets.[10]

## III.    Lack of Legal Clarity Is Stifling U.S. Technological Development Across Industry Sectors and Opportunities for Societal Benefits

Unlike the jurisdictions described above, there is currently no one U.S. federal statute or

regulation expressly addressing digital assets recorded on a blockchain. Existing law is decades-

old and does not adequately address some of the unique characteristics of activities involving this

technology which has stifled and will continue to jeopardize a multi-billion dollar technology

sector and societal benefits in the United States.[11] Blockchain technology is not specific to

financial services, and is being developed for uses in healthcare, supply chain management,

energy, transportation, insurance, voting, and many other industries.[12] In each of these use-cases,

---

[9] BLANDIN, *supra* note 7, at 37. *See generally* LIBRARY OF CONGRESS, REGULATION OF CRYPTOCURRENCY AROUND THE WORLD (June 2018), https://www.loc.gov/law/help/cryptocurrency/cryptocurrency-world-survey.pdf

[10] *See e.g.*, Bermuda's Digital Asset Business Act, 2018, *available at* http://www.bermudalaws.bm/laws/Annual%20Laws/2018/Acts/Digital%20Asset%20Business%20Act%202018.pdf ; Japan Payment Services Act of 2009 (rev. April 1, 2017) *available at* http://www.japaneselawtranslation.go.jp/law/detail_download/?ff=09&id=2319; Singapore Payment Services Act 2019, *available at* https://sso.agc.gov.sg/Acts-Supp/2-2019/Published/20190220?DocDate=20190220; Press Release, Swiss Financial Market Supervisory Authority FINMA, ICO Guidelines for Enquiries Regarding The Regulatory Framework for Initial Coin Offerings (ICOs) (Feb. 16, 2018), https://www.finma.ch/en/news/2018/02/20180216-mm-ico-wegleitung/; FIN. CONDUCT AUTH., GUIDANCE ON CRYPTOASSETS FEEDBACK AND FINAL GUIDANCE TO CP 19/3 (July 2019), https://www.fca.org.uk/publication/policy/ps19-22.pdf; CAN. SEC. ADM'R, CSA STAFF NOTICE 21-327, GUIDANCE ON THE APPLICATION OF SECURITIES LEGISLATION TO ENTITIES FACILITATING THE TRADING OF CRYPTO ASSETS (Jan. 16, 2020), https://www.osc.gov.on.ca/documents/en/Securities-Category2/csa_20200116_21-327_trading-crypto-assets.pdf (stating digital asset trading platforms are generally not subject to Canadian securities and derivatives laws where the underlying digital asset being traded is not itself security or derivative and "the contract or instrument for the purchase, sale or delivery" of a digital asset "results in an obligation to make immediate delivery" and "is settled by immediate delivery" of the digital asset).

[11] Increased demand for blockchain has created thousands of jobs, with IBM reporting that it increased the number of employees focused on blockchain projects from 400 to 1,500 in the span of a year. Bloomberg BNA reports that blockchain-related job postings on LinkedIn increased from 1,000 in 2016 to 4,000 in 2017, and the number continues to grow as blockchain continues to develop. TechCrunch estimates that venture capital funds, and other private investors, invested $1.3 billion between January and May of 2018 into "blockchain and blockchain adjacent" early stage companies. Chamber of Digital Commerce, LEGISLATOR'S TOOLKIT FOR BLOCKCHAIN TECHNOLOGY (Dec. 2018), https://digitalchamber.org/state-legislators-toolkit/.

[12] *See* CHAMBER OF DIGITAL COMMERCE, SMART CONTRACTS: 12 USE CASES FOR BUSINESS AND BEYOND (Dec. 2016), https://digitalchamber.org/wp-content/uploads/2018/02/Smart-Contracts-12-Use-Cases-for-Business-and-Beyond_Chamber-of-Digital-Commerce.pdf.

the digital asset is only data on a blockchain.

Without a clear legal distinction between a transaction determined to be an investment contract and the digital asset that is the subject of the investment contract, these software developers, retailers, healthcare providers, advertising companies, and others may not be able to develop or use blockchain technology without unintentionally triggering the U.S. federal securities laws every time a digital asset is used as part of their network — which would result in severe and adverse consequences. The risk of violation is too great.  If each movement of digital assets across any of these blockchain networks constitutes a securities transaction, then the companies operating these systems may need to become registered broker-dealers or another type of regulated financial institution or worse, subject to severe enforcement action.

Commissioner Hester Peirce of the SEC recently said, "I often have expressed my concern that the U.S. will fall behind other countries in attracting crypto-related businesses unless we are more forward-leaning in establishing a regulatory regime with discernible parameters."[13] Commissioner Peirce's concerns may be well-founded. Research indicates that while the United States and Canada appear to be the leading center of working activity, their fundraising is often occurring elsewhere.[14] By underscoring the correct analytical framework, this Court has an opportunity to identify the "discernable parameters" of the law and provide a predictable legal environment for the use of blockchain technology to develop across industries, and enable the United States to foster innovation.[15]

## IV.    Not All Digital Assets Should Be Regulated as Securities

---

[13] Hester M. Peirce, Comm'r, SEC, Renegade Pandas: Opportunities for Cross Border Cooperation in Regulation of Digital Assets (July 30, 2019), https://www.sec.gov/news/speech/speech-peirce-073019.
[14] *See* Chamber of Digital Commerce, *Understanding Digital Tokens: Market Overviews and Proposed Guidelines for Policymakers and Practitioners* (Aug. 2018), https://digitalchamber.org/download/7153/.
[15] *See* Peirce, *supra* note 13.

Individuals and others who purchase assets – digital or tangible – in schemes in which the purchase is motivated primarily by an expectation of profit from the seller's efforts (*i.e.*, in a transaction determined to be an investment contract) should be afforded the full protections of the securities laws. However, the disclosures required by the securities laws where funds are being solicited from the public serve little purpose with respect to commercial transactions in the digital assets themselves. "[T]he impetus of the Securities Act is to remove the information asymmetry between promoters and investors" so that investors relying on the efforts of a third party are able to make an informed investment decision.[16] "As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful." However, focusing on how decentralized a blockchain network is oversimplifies the economic realities of a particular transaction. Centralized technology companies regularly offer consumers a license or subscription to use their goods or services, the value of which is contingent on the continued success of that particular entity and the network it created and supports. Yet, these are still commercial transactions, not securities transactions. The same is true for digital assets.

Furthermore, not all transactions or activities involving digital assets require the unique protections of the securities laws.[17] Depending on the relevant activity, other regulatory regimes exist to protect purchasers or counterparties. For example, fraud and market manipulation in certain digital asset transactions (depending on the facts and circumstances) is subject to CFTC

---

[16] William Hinman, SEC Dir., of Corp. Fin., SEC, Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018). *See also SEC v. Aaron*, 605 F. 2d 612, 618 (2d Cir. 1979), *vacated on other grounds, Aaron v. SEC*, 446 U.S. 680 (1980).

[17] In the context of determining whether a "note" is a security for the purposes of the U.S. federal securities laws, the Supreme Court set forth a test which considers "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990).

enforcement authority.[18] Other activities involving digital assets may also be subject to the Bank Secrecy Act, federal and state consumer protection laws, state money transmitter licensing laws, and state laws specific to virtual currency transactions, such as New York's Virtual Currency Business Activity law.[19] The Chamber respectfully requests that the Court consider these existing regulatory regimes in crafting its decision in this case.

The Chamber believes that certain activities, and not the technology, should be regulated by the appropriate regulators. This technology-neutral approach is supported by existing securities laws and precedent.

## ARGUMENT

Consistent with established securities laws, the Chamber urges this Court to distinguish the <u>subject</u> of an investment contract (the digital asset) with the securities transaction associated with it. This requires two separate analyses: (i) Whether there is an investment contract, offered in a securities transaction; and (ii) whether the subject of an investment contract is a commodity that can be sold in an ordinary commercial transaction. Further, a digital asset is not a security solely by virtue of being in digital form or recorded in a blockchain database. Uncertainty as to how federal securities laws apply to digital assets is stifling economic development in the United States. The Chamber urges the court to consider the following:

- U.S. jurisprudence consistently endeavored to ensure that the law is technology agnostic. A digital asset may be a security when it is used to represent a stock or bond. The key issue, though, is to recognize that this particular type of security (an

---

[18] CFTC, An Introduction to Virtual Currency, https://www.cftc.gov/sites/default/files/idc/groups/public/@customerprotection/documents/file/oceo_aivc0218.pdf (last visited Jan. 2, 2020); *CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018).
[19] *See e.g.*, Bank Secrecy Act, 12 U.S.C. §§ 1829b, 1951-1959, 31 U.S.C. §§ 5311-5314, 5316-5332; Federal Trade Commission Act § 5 (Unfair or Deceptive Acts or Practices), 15 U.S.C. ch. 2; NY GEN BUS § 349; NY BANK ch.2, Art. XIII-B; 23 NYCRR pt. 200.

investment contract) is distinct from the asset that is the subject of the transaction.

- The Supreme Court's *Howey* (investment contract) test examines the economic realities of a *contract, transaction, or scheme* — not the characteristics of the asset that is the subject of such a contract, transaction, or scheme. In *Howey*, specific orange groves sold pursuant to an investment contract were not themselves securities.

- On the premise that a digital asset that is the subject of an investment contract is not necessarily a security itself, the asset (a commodity) may simply be the subject of an ordinary commercial transaction.

## I.     THE LAW SUPPORTS DISTINGUISHING DIGITAL ASSETS FROM THE INVESTMENT CONTRACTS PURSUANT TO WHICH THEY ARE DISTRIBUTED

### A.      In Distinguishing a Securities Transaction From the Digital Asset, the Law Looks to Substance Over Form

The federal securities laws favor substance over form. *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). In its decision in *Howey*, the Supreme Court explained that an "investment contract for purposes of the Securities Act means a *contract, transaction or scheme* whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *Howey* at 298-99 (emphasis added).

This emphasis on the economic reality applies equally to activities involving digital assets using blockchain technology. Because a digital asset is merely an electronic record, the digital asset may be data that represents a security, a commodity, or something else. Corporate stock as a digital asset is a security, while the digital asset representing ownership in a gold bar is a commodity. The form an asset takes does not change the essential character of the asset:

9

whether corporate stock is represented by a paper certificate or electronic record does not determine if it is a security. The use of a particular technology does not and should not change the economic substance of the underlying asset. Due to the fact-specific uses of blockchain technology and digital assets, we respectfully ask this Court to apply the securities laws to digital assets as other courts have done in the past for other tangible and intangible assets, by looking to the "character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect" — and not "the nature of the assets [that] back [] a particular document or offering." *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211, (1967), (quoting *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 at 352–53 (1943)).

Where a profit-seeking scheme does not fall neatly within traditional securities instruments, the proper inquiry is whether the scheme is an investment contract.[20] The SEC staff appropriately acknowledged that there may be digital assets that are not securities and that "[t]he focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales.)"[21]

**B.    The Economic Realities of a Transaction Are the Facts and Circumstances Underlying a Contract, Transaction, or Scheme — Not the Characteristics of an Asset That May Be the Subject of the Investment Contract**

In contrast to using digital assets as representations of stocks and bonds — clear statutory

---

[20] Indeed, even instruments which in certain respects are similar to "traditional stock," such as interests in an LLC, have been found *not* to be securities when considering the totality of facts and circumstances relevant to an investment contract analysis. *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F.Supp.2d 376, 389 (D. Del. 2000).

[21] STRATEGIC HUB FOR INNOVATION AND FIN. TECH., FRAMEWORK FOR "INVESTMENT CONTRACT" ANALYSIS OF DIGITAL ASSETS, SEC (Apr. 2019) https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

examples of securities — many transactions involving sales of other digital assets may not be so easily characterized. It is through this lens that the Chamber asks this Court to assess the matter before it.

Under *Howey*, it is necessary to look not at the nature of the underlying asset, but instead the entire facts and circumstances of the offering. The investment contract reflects "all the elements of a profit-seeking business venture" whereby investors provide capital and share in the earnings and profits in a common enterprise based on the efforts of others. *Howey* at 293, 299. Therefore, this analysis necessarily determines only whether an investment contract has been entered into among the parties. It does not determine whether the subject of the investment contract is itself a security, which requires a separate analysis.

1.   Characteristics of Digital Assets May Be Distinct From the "Economic Realities" of the Investment Contract

The *subject* of an investment contract *(i.e.*, an asset or instrument distributed to purchasers of the investment contract) should not be conflated with the investment contract itself. If, as the Supreme Court in *Howey* stated, "an investment contract … means *a contract, transaction or scheme.*" An "investment contract" does not, and cannot, refer to a type of asset or instrument in isolation. *Howey*, 328 U.S. at 298–99. *See also C. M. Joiner Leasing Corp.* at 352–53. As such, it is necessary to distinguish between the nature and terms of a particular arrangement (the "economic realities") of an investment contract from the characteristics of the digital asset being sold.[22] Like so many other types of assets (which will often be commodities), digital assets may be the *subject* of an investment contract without being a security. As SEC staff noted, "investment contracts can be made out of virtually any asset, including virtual assets."[23]

---

[22] For an in-depth discussion of this distinction, *see* Lewis Cohen, *Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens*, 65 Wayne L. Rev. 93-96, 102-106 (2019).
[23] William Hinman, *supra* note 16.

11

As Director Hinman put it, "the token … all by itself is not a security, just as the orange groves in *Howey* were not … [t]he digital asset itself is simply code."[24]

A summary of *Howey* is critical for understanding this distinction. The question in *Howey* was whether affiliated companies, W. J. Howey Company and Howey-In-The-Hills Service, Inc., were jointly offering interests (that is, investment contracts) in the Howey Companies' business of developing, selling, and servicing orange groves — as opposed to the Howey Company selling deeds to citrus groves, and Howey-In-The-Hills separately contracting for a service to cultivate, manage, and market oranges (which is what the defendants endeavored to maintain). *SEC v. W. J. Howey Co.*, 151 F.2d 714, 716-717 (5th Cir. 1945), *rev'd sub nom*. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The Supreme Court determined that the Howey Companies were offering "something different from a farm or orchard coupled with management services." *Howey,* 328 U.S. at 299.  The Supreme Court looked to the expectations of the purchasers and found that, "[s]uch persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment." *Howey*, 328 U.S. at 300. The Court reasoned the plots of land on offer were so small that they "gain[ed] utility as citrus groves *only* when cultivated and developed as component parts of a larger area" and therefore, a "common enterprise managed by respondents or third parties with adequate personnel and equipment is … *essential* if the investors are to achieve their paramount aim of a return on their investments." *Howey*, 328 U.S. at 300 *(emphasis added)*. As the Supreme Court later explained, "when a purchaser is motivated by a desire to use or consume the item purchased … the securities laws do not apply." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, at 852–53 (1975). The Supreme Court has thus acknowledged that characteristics of the assets, including

---

[24] *Id.*

consumptive uses, may exist separate and apart from the investment contract.

A digital asset, as the subject of an investment contract, does not necessarily inherit the promises, representations, or obligations offered to purchasers in the securities transaction — just as any number of other assets that have been "packaged" as part of an investment contract are clearly not securities when standing alone (*i.e.*, whiskey, payphones, condos, and beavers). *See SEC v. Glen-Arden Commodities, Inc.*, 368 F. Supp. 1386 (E.D.N.Y. 1974), *aff'd sub nom. Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974); *SEC v. Edwards*, 540 U.S. 389 (2004); *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989), *cert. denied*, 494 U.S. 1078 (1990); *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967). Determining the economic realities of a transaction requires broad consideration of the relevant facts beyond the subject of the transaction. This is why, in considering the totality of a potential investment contract, the courts look to the representations and promises made by the promoter and not the nature of the asset itself. The *Howey* test is an "objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009).

A recent Ninth Circuit Court of Appeals decision illustrates the distinction between an investment contract and assets that are the subject of the investment contract. The case dealt with the question of whether investments in "EB-5 program" projects were securities. The defendant argued that the transactions were not securities because investors were motivated by the prospect of obtaining U.S. visas, not profit. The Ninth Circuit disagreed, noting that eligibility for the visa was contingent on the success of the investment. *SEC v. Hui Feng*, 935 F.3d 721, 731 (9th Cir. 2019). Yet the fact that the essential motivation for program participants to enter into the transactions was to obtain visas or that an "investor's interest in a visa is inextricably tied to the

13

financial success of the … project" did not result in the EB-5 visas themselves being considered securities. *Id.* at 731.

Similarly, digital assets (that are not securities, like EB-5 visas) may be "inextricably linked" to the successful development of a software network. An investor may invest in a software development enterprise with the expectation of profits — profits that may include the receipt of digital assets at a discount to their expected market value once the software network is developed. Such transactions are likely to be investment contracts, where the investor has invested money and relies on a software company to successfully develop the network on which the digital assets may be used. However, the investment contract sold by the software company does not transform the digital assets themselves into securities, just as EB-5 visas are not securities merely because they are only available if an investment project is successfully developed. Indeed, many digital assets could continue to exist and be used even if the parties to the investment contract are no longer in existence or the investment contract is terminated, belying any notion that the underlying digital assets themselves are securities.

2.     <u>Courts Currently Rely on Certain SEC Settlements That Have Not Examined Digital Assets as Distinct From An Investment Contract</u>

In recent years, billions of dollars have been raised through token distribution events.[25] Again, like all new technologies, blockchain has been abused by nefarious actors and there have been fraudulent actors in this space, rightfully attracting the attention of the SEC, as well as the Chamber.[26] The Commission (and the Chamber) began actively educating the market in an effort

---

[25] STEVE DAVIES, ET AL., 5TH ICO / STO REPORT (2019), https://www.pwc.com/ee/et/publications/pub/PwC-Strategy&-ICO-Report-Summer-2019.pdf. Unfortunately, a large number of these offerings appeared to be fraudulent (Shane Shifflett & Coulter Jones, *Buyer Beware: Hundreds of Bitcoin Wannabes Show Hallmarks of Fraud*, THE WALL STREET. J. (May 17, 2018), https://www.wsj.com/articles/buyer-beware-hundreds-of-bitcoin-wannabes-show-hallmarks-of-fraud-1526573115), and many projects quickly failed. *See* Daniel Palmer, *More Than Half of ICOs Fail Within 4 Months, Study Suggests*, COINDESK (Jul. 10, 2018, 9:55 AM), https://www.coindesk.com/over-half-of-icos-fail-within-4-months-suggests-us-study.
[26] *See* TOKEN ALLIANCE, *supra* note 4.

to protect investors and provide guidance to market participants. Distributions of digital assets have thus been the subject of SEC settlements and staff guidance that apply existing jurisprudence to this new technology. Given that these settlements and guidance often focused on preventing fraud and abuse, their application to legitimate projects is unclear.[27] Settled SEC enforcement actions stated that digital assets are themselves securities, but these matters did not involve securities transactions conducted in compliance with the federal securities laws, nor delivery of functional digital assets. Therefore, the SEC did not need to distinguish the digital assets from the transactions pursuant to which they were sold in order to resolve the infractions in question.[28]

Given the lack of precedent analyzing the proper characterization of digital assets under the federal securities laws, it is imperative to consider the factual differences and nuances in each case. This Court, and others, have ruled on motions to dismiss that alleged facts were sufficient to plead that a digital asset may qualify as an investment contract under the *Howey* test. *Balestra v. ATBCOIN LLC*, 380 F.Supp.3d 340, 357 (S.D.N.Y. 2019). *See also Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J., 2018). We do not believe, however, that this Court or the *Solis* court clearly distinguished the investment contract from the underlying digital asset. In *Balestra*, for example, this Court looked to *Munchee* for guidance, finding the SEC's settled administrative order instructive "given the parallels between the Munchee and ATB ICOs and the lack of precedent relating to the proper characterization of digital coins offered by initial coin

---

[27] In addition, staff guidance and statements are not binding. *See, e.g.*, Jay Clayton, Chairman, SEC, *SEC Staff Views* (Sept. 2018) https://www.sec.gov/news/public-statement/statement-clayton-091318 ("[t]he Commission's longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties.").

[28] *See* Munchee, Inc., Securities Act Release No. 10445, 2017 WL 10605969 at *1 (December 11, 2017) ("… MUN tokens were securities as defined by Section 2(a)(1) of the Securities Act because they were investment contracts ….").

offering under the federal securities laws." *Balestra* at note 12. We do not opine on the parallels

between *Munchee* and *Balestra*, but merely emphasize that the economic realities of a particular

digital asset must be based on the specific facts and circumstances of that digital asset, as

opposed to the investment contract pursuant to which the digital asset is distributed.

## II.     ASSETS DISTRIBUTED PURSUANT TO AN INVESTMENT CONTRACT MAY SEPARATELY BE SOLD THROUGH AN ORDINARY COMMERCIAL TRANSACTION

### A.     An Asset (a Commodity) May Exist Separate and Apart From the Economic Realities of an Investment Contract

Certain instruments, by design, contain inherent promises such that the economic realities

of *any* transaction involving that instrument are securities transactions. For example, as

explained in *Landreth*, stock is understood to entitle its owner to the right to receive dividends

contingent upon an apportionment of profits. Therefore, transactions in stock can be presumed to

be securities transactions even in the absence of monetary consideration. A gift of stock,

therefore, is a "sale" within the meaning of the Securities Act. *SEC v. Sierra Brokerage Servs.,*

*Inc.*, 608 F.Supp.2d 923, 941 (S.D. Ohio 2009). However, a gift of stock falls squarely within the

Securities Act because the subject of the gift is inherently a security (*i.e.*, stock, with all the

characteristics typically associated with stock.) There are no such inherent characteristics of

digital assets similar to those of stock that would cause a gift of digital assets to be a securities

transaction in every case (without otherwise meeting all the elements of the *Howey* test).[29]

"Whether a transaction or instrument qualifies as an investment contract is a highly

fact-specific inquiry. This is especially true in the context of 'relatively new, hybrid vehicle[s],'

which require 'case-by-case analysis into the economic realities of the underlying

---

[29] Digital assets may be created to represent a security (*i.e.*, stock, investment contract, or other), but there is nothing intrinsic to the form of digital assets that includes such rights and obligations.

transaction[s].'" *U. S. v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at \*4 (E.D.N.Y. Sept. 11, 2018) (*internal citations omitted*). Although it is necessary to apply *Howey* to determine whether a transaction is an investment contract, that analysis does not necessarily determine the nature of the underlying asset itself. As noted by Director Hinman, the digital asset "itself is simply code." Unlike interests in a pension plan, partnership, or management agreement, the sale of a digital asset may simply be a commercial transaction that does not necessitate any on-going relationship with a promoter who is responsible for the success or failure of an enterprise.[30] In fact, a commercial transaction may be the resale of a digital asset that was previously the subject of an investment contract or the initial sale of a digital asset that was never the subject of an investment contract.

Depending on the design of a particular digital asset, that code may represent the characteristics of stock, it may represent a right to use, like a software license, or it may simply be part of a computer protocol, like ether. Because digital assets do not inherently contain characteristics of a security, it is necessary to determine whether a "contract, transaction or scheme" involving digital assets is an investment contract. Therefore, if by analyzing the economic realities of a transaction, the elements of the *Howey* test are not met, the transaction is not an investment contract but rather an ordinary commercial transaction. "The primary goal of the securities laws is to regulate investments, and not commercial ventures." *Great Lakes Chem. Corp.*, 96 F.Supp.2d at 387. Goods do not become "securities" merely because they are the subject of a securities transaction. *See, e.g., SEC v. Glen-Arden Commodities, Inc.*, 368 F. Supp. 1386 (E.D.N.Y. 1974), *aff'd sub nom. Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d

---

[30] *See, e.g., Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979) (finding that in order for there to be an "investment" for the purposes of an investment contract, the purchaser must "[give] up some tangible and definable consideration in return for *an interest that had substantially the characteristics of a security*.").

1027 (2d Cir. 1974); *SEC v. Edwards*, 540 U.S. 389 (2004); *Hocking v. Dubois*, 885 F.2d 1449,

1462 (9th Cir. 1989) *cert. denied*, 494 U.S. 1078 (1990); *Cont'l Mktg. Corp. v. SEC*, 387 F.2d

466 (10th Cir. 1967).

> **B.**     **A Digital Asset That Is Not Inherently a Security Is a Commodity That May Be the Subject of a Commercial Transaction**

In evaluating the economic reality of a transaction, especially for investment contracts

involving contracts for the sale of goods, courts have looked to whether purchasers could have

had non-investment uses for the goods at issue.[31] Answering the question of whether contracts

for the sale, care, feeding, and ultimate resale of beavers were investment contracts, the Seventh

Circuit noted, "as a practical matter, it would have been physically impossible for the average

purchaser of live breeding beaver to take absolute possession of his animals. He would not have

had the secret food formula, the special pen design, nor would he have known anything of the

sexing and breeding of the beaver, all of which was to be provided by the Association."

*Kemmerer v. Weaver*, 445 F.2d 76, 80 (7th Cir. 1971). It is clear, however, that beavers

themselves are not securities. If the plaintiff in *Kemmerer* who purchased the investment contract

had control over the beavers purchased such that he could resell them to a professional breeder,

that secondary transaction would not be a securities transaction. To find that a sale of digital

assets is a securities transaction because the same digital assets were previously sold pursuant to

an investment contract is to disregard "the economic realities underlying a transaction" as

required by existing precedent. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

---

[31] The Commodity Exchange Act defines a "commodity" as "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." Title 7 U.S.C. § 1(a)(9).

Similarly, an investor who receives digital assets pursuant to an investment contract and subsequently sells those digital assets to a digital asset purchaser who seeks to use those digital assets in commerce has not sold a security, assuming the transaction does not otherwise meet the elements of the *Howey* test (or any other definition of a security). Here, the Court has the opportunity to distinguish the securities transaction as an investment contract from the digital asset that is the subject of that transaction, consistent with the *Howey* court. Put another way, "[w]hat distinguishes a security transaction … is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption." *Forman* at 858. *See also Grenader v. Spitz*, 537 F.2d 612, 619 (2nd Cir. 1976), focusing on the "economic realities" to distinguish "when a purchaser is motivated by a desire to use or consume the item purchased" from when a purchaser is "led to expect bonanza profits." It does not follow that, simply because Purchaser A entered into a securities transaction motivated by profit, Purchaser B is similarly motivated in a commercial transaction.[32]

### C.    Commercial Transactions Involving Digital Assets Distributed Pursuant to an Investment Contract Are Not Part of the Securities Distribution

The Second Circuit has adopted the definition of a "distribution" as "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public," first set forth by the SEC in *Oklahoma-Texas Trust*, 2 S.E.C. 764, 1937 WL 32951 AT *5 (1937), *aff'd*, 100 F. 2d 888 (10th Cir. 1939). *See also R. A.*

---

[32] The Ninth Circuit held that a *per se* rule that all secondary market sales of a condominium that included the option of participating in a rental pool arrangement "would be ill-suited to the examination of the economic reality of each transaction required by Howey … each [resale] requires an analysis of how the condominium was promoted to the investor, including any representations made to the investor, and the nature of the investment and the collateral agreement." *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) *cert. denied*, 494 U.S. 1078 (1990).

*Holman & Co. v. SEC*, 366 F.2d 446, 449 (2nd Cir. 1966). However, this formulation presumes that the instrument coming to rest in the hands of the public is, in fact, a security which has an indefinite term (such as stock in a corporation). When the security in question is an investment contract with defined terms, it is necessary to first correctly identify what the "contract, transaction, or scheme," including any distribution associated with that particular contract, is, separate and apart from the features of the asset that is the subject of the investment contract. If the investment contract terminates in accordance with its terms, the subject of that securities transaction may continue to be an asset that is independent from the security. As in *Howey*, the orange groves continued to grow and produce oranges long after the distribution of the investment contract. Furthermore, assets sold pursuant to an investment contract may continue to have value after the dissolution of the investment contract promoter. If the Howey Companies liquidated, a purchaser with a fee interest in the orange groves would continue to own that asset, even though the purchaser's investment contract had become worthless due to the liquidation.

## CONCLUSION

For the foregoing reasons, the Chamber respectfully requests this Court to distinguish the subject of the investment contract from the digital asset. This requires two separate analyses: (i) Whether there is an investment contract offered in a securities transaction; and (ii) whether the subject of the investment contract is a commodity that can be sold in an ordinary commercial transaction. We further respectfully request that the Court affirm that a digital asset is not a security solely by virtue of being in digital form or recorded in a blockchain database.

Dated: New York, New York
January 21, 2020

Respectfully submitted,

By: /s/ Lilya Tessler
Lilya Tessler (*admitted pro hac vice*)
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5849
Email: ltessler@sidley.com

*Attorney for Amicus Curiae the Chamber of
Digital Commerce*

21