UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TELEGRAM GROUP INC., and TON ISSUER INC., )<br>)<br>)<br>Defendants. )<br>) | Civil Action No.:<br>1:19-cv-09439 (PKC) |

**BRIEF OF *AMICUS CURIAE* THE BLOCKCHAIN ASSOCIATION
IN SUPPORT OF DEFENDANTS**

Keith Bradley
Benjamin Beaton (*pro hac vice* pending)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: 202-457-6000
keith.bradley@squirepb.com
benjamin.beaton@squirepb.com

*Counsel for the Blockchain Association*

i

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ..................................................................................... 1

SUMMARY OF THE ARGUMENT .................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.   Given the Lack of Regulatory Clarity Regarding Whether and When Digital Assets Are Securities Under U.S. Law, a Broad Decision Could Have Far-Reaching Repercussions for an Important Area of Emerging Technology. ......................................................... 3

   A.   Blockchain Technology Is an Important New Field. ...................................................... 3

   B.   Many Digital Assets Are Not Securities. ...................................................................... 5

   C.   The SEC Has Provided Little Regulatory Clarity on the Important Questions of Whether and When a Digital Asset Is a Security ........................................................... 7

      1.   The SEC Has Attempted to Regulate This Technology Through An Arbitrary Approach To Enforcement and Unhelpful No-Action Letters. ................................. 8

      2.   The Industry Has Been Forced to Pore Over SEC Speeches for Clues. ................. 9

      3.   The SEC's "Framework" Added Confusion Rather Than Clarity. ....................... 10

   D.   The SEC's Insistence on Closed-Door Staff Consultations Has Created a Body of Secret Law that Likewise Fails to Provide Guidance. .................................................. 12

   E.   The SEC's Approach Has Already Undermined Innovation. ....................................... 13

II.  The Purchase Agreement Model Used by Telegram Complies With U.S. Securities Laws. ...15

   A.   The Principal Purpose of Securities Laws Is to Protect Investors. ................................ 16

   B.   Telegram's Purchase Agreement Model Both Complies With Securities Laws and Addresses the Policy Concerns Underlying Those Laws. .............................................. 17

   C.   Enjoining Telegram's Token Delivery Would Needlessly Harm Investors. .................. 20

CONCLUSION ................................................................................................................... 21

## INTEREST OF *AMICUS CURIAE*[1]

The Blockchain Association is a not-for-profit organization that seeks to improve public policy to help blockchain networks and users develop and prosper in the United States. The Blockchain Association seeks to educate policymakers, courts, and the public on how blockchain technology works and how regulatory clarity can bring about a more secure, competitive, and innovative digital marketplace. The Blockchain Association is committed to creating a partnership between industry and government to share knowledge, identify opportunities, and co-create a digital future with more transparency and security. This future holds immense promise for U.S. consumers, investors, and innovators; cryptocurrency—only one application of blockchain—is by itself at least a $200 billion industry. Many other industries also stand to gain from reduced remittance fees, improved supply chains, and other advantages of the technology.

The Blockchain Association comprises 23 member companies, which themselves represent billions of dollars in value and thousands of employees in the U.S. Given this broad representation across the industry, individual members and their affiliates maintain varying contractual or business relationships with firms like Telegram, including involvement with the contracts and tokens at issue in this case. This brief, however, is submitted by the Blockchain Association, not by any individual members or their affiliates, and seeks to advance the Blockchain Association's overarching goal of clear and sensible regulatory policy, not the pecuniary interests or legal positions of any individual members or their affiliates.

---

[1] Counsel for Defendants consented to the filing of this brief, while counsel for the SEC has taken no position at this time. No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amicus curiae* or its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

This Court will be among the first to analyze whether a particular "digital asset" is deemed a security subject to SEC registration and disclosure requirements. This hotly debated question is of critical importance for innovators, investors, users, and regulators. The SEC's lawsuit also raises novel questions regarding whether companies are forbidden from raising funds from sophisticated U.S. investors, under well-established regulatory provisions, to build blockchain networks. The Court's answers to these questions will influence companies' decisions about whether to introduce blockchain products, investors' decisions about whether to support this new technology, and innovators' decisions about whether to base their companies in the U.S. or abroad. Before filing this action, the SEC had provided no clear rules regarding these questions. And what little guidance it had offered differs drastically from both existing law and its position in this case.

The Court's decision regarding whether Grams themselves were securities at the time of the Purchase Agreement (before Grams even existed) could have far-reaching effects throughout the industry. Most of the SEC's summary judgment brief addresses a question that is *undisputed*: the general model of entering into purchase agreements with accredited investors under Regulation D, designed in reliance on repeated SEC statements, is an investment contract. The agreements to deliver tokens to those investors only once the network is functional comport with the SEC's own statements. The funding model at issue both complies with the securities laws and addresses the policy concerns underlying those laws. The Court should not block a long-planned, highly anticipated product launch by interfering with a contract between sophisticated private parties. Doing so would needlessly harm the investors that securities laws were designed to protect.

## ARGUMENT

**I.      Given the Lack of Regulatory Clarity Regarding Whether and When Digital Assets Are Securities Under U.S. Law, a Broad Decision Could Have Far-Reaching Repercussions for an Important Area of Emerging Technology.**

Only a few U.S. courts have addressed the critical questions of whether and when digital assets are securities.[2] No settled law exists on the topic. The SEC has provided little clarity about its own interpretation. In fact, one SEC Commissioner has likened the SEC's guidance on this question to a Jackson Pollock painting: "splashing lots of factors on the canvas without any clear message."[3] As a result, the industry has been forced to hunt for regulatory clues among the SEC's conflicting statements, Commissioner and staff speeches, no-action letters, closed-door meetings with the SEC, and nonprecedential settlements. What guidance the industry has received, however, is inconsistent with the SEC's approach in this case. Against that backdrop of uncertainty and inconsistency, courts should give no deference to the SEC's litigation positions. Left unchecked, the SEC's policy of "regulation by enforcement" could stifle innovation and investment in this important new technology area.

### A.      Blockchain Technology Is an Important New Field.

A blockchain is a distributed ledger—a database that stores multiple copies of data across many computers in a network. The first broadly adopted application of blockchain technology was Bitcoin, the first cryptocurrency. The idea behind Bitcoin was to do for value what the Internet did for information: to make it possible to send value across the globe digitally, instantly, and securely,

---

[2] The few decisions involving digital assets that exist involve blatant fraud that renders the digital assets themselves incidental. *See, e.g., United States v. Zaslavskiy*, No. 17-cr-647, 2018 WL 4346339 at *1 (E.D.N.Y. Sept. 11, 2018) ("Defendant … is alleged to have made materially false and fraudulent representations and omissions in connection with two purported virtual currency investment schemes").

[3] Hester M. Pierce, Commissioner, Securities and Exchange Commission, How We Howey at the Securities Enforcement Forum (May 9, 2019), https://www.sec.gov/news/speech/peirce-how-we-howey-050919.

without the need for an intermediary, as easily as people can send information by attaching a file to an email.

The data stored on the Bitcoin blockchain, for example, is a record of Bitcoin transactions, but blockchains can store other types of data and serve other useful functions. One application is so-called "smart contracts," which can be understood as "programmable money." Programmers can write computer code that automatically transfers value—without any intermediary—upon a condition being met. In the music industry, a "smart contract" might transfer the equivalent of a millionth of a cent from a listener to a songwriter for every second of the songwriter's song that the user plays—automatically and without any delay or cost associated with a financial intermediary. A blockchain could also store a user's health data, along with pre-programmed permissions for that data's use. A patient might specify that her genomic data may be used for medical research but not marketing, with access permanently recorded on a blockchain and automatically executed.

Hundreds of innovators—including governments, NGOs, startups, and large public companies like IBM, Microsoft, Amazon, and Walmart—are exploring a wide variety of potential use cases for blockchain: from election security to drug tracking to identity-fraud prevention.[4]

Many U.S. legislators have also emphasized the importance of ensuring that blockchain technology can thrive in the U.S.[5] The United States Joint Economic Committee published a 2018

---

[4]   Michael del Castillo, "Blockchain 50: Billion Dollar Babies," Forbes, April 16, 2019, www.forbes.com/sites/michaeldelcastillo/2019/04/16/blockchain-50-billion-dollar-babies/; David Allessie *et al.*, "An Assessment of Pioneering Implementations in Public Services," JRC Science for Policy Report, European Commission, 2019, https://publications.jrc.ec.europa.eu/repository/bitstream/JRC115049/blockchain_for_digital_government_online.pdf.

[5] In a May 2019 letter to the National Economic Council, a bipartisan group of six congressmen wrote that "Blockchain . . . is an example of digital innovation that has the potential to transform a myriad of industries through its ability to improve the transparency, efficiency, and security of transactions and information in the financial services, healthcare, insurance, trade finance, and supply chain management sectors, among many others." Joe Mont, "Reps Urge White to Support Blockchain," Compliance Week, May 29, 2019, www.complianceweek.com/regulatory-enforcement/reps-urge-white-house-to-support-blockchain/27167.article. Congressman Tom Emmer (R-Minn.) has said he views

report on blockchain technology and cryptocurrency, emphasizing that it is important "not [to] prejudge and hinder technological developments" and recommending that policymakers, regulators, and entrepreneurs "work together to ensure developers can deploy these new blockchain technologies quickly and in a manner that protects Americans from fraud, theft, and abuse, while ensuring compliance with relevant regulations." [6]

### B.   Many Digital Assets Are Not Securities.

As discussed below, the SEC has acknowledged that at least some digital assets are not securities, and that the status of specific assets under the securities laws can shift over time. Nothing in this case calls for a broader ruling that digital assets are always or presumptively deemed securities.

The term "security" includes an "investment contract," as well as other instruments such as stocks, bonds, and transferable shares—and expressly excludes currencies.[7] Under the *Howey* test, an "investment contract" exists when there is (1) the investment of money (2) in a common enterprise (3) with a reasonable expectation of profits (4) to be derived from the efforts of others. Whether a particular digital asset at the time of its offer or sale amounts to a security depends on the specific facts and circumstances surrounding that asset. In articulating the *Howey* test, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed upon economic reality." [8] In this 1946 case, the Supreme Court found that individuals investing in a

---

"blockchain as having the greatest potential to take us into the fully fledged technological age." Jemayel Khawaja, "Meet the American Legislators Bullish on Blockchain," Consensys, Feb. 19, 2019, https://media.consensys.net/blockchain-law-congress-house-senate-2019-133e30fd5dd5.

[6] "Report on the Joint Economic Committee Congress of the United States on the 2018 Economic Report of the President, Together with Minority View," https://www.congress.gov/115/crpt/hrpt596/CRPT-115hrpt596.pdf, at 20–21, 225–26,

[7] 15 U.S.C. § 78(a)(10); *see also* 15 U.S.C. § 77b(a)(1) (including an "investment contract" but not currency).

[8] *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–300 (1946).

citrus grove entered into investment contracts because they did not merely seek to buy land or fruit—rather, they were offered the opportunity to contribute money to, and share in the profits from, the efforts of others who would grow and sell that fruit.

There are many different digital assets, some of which are nothing like *Howey*'s investment contract for an interest in profits from fruit sales. Some are purely functional assets that allow users to consume goods and services, more closely resembling a digital version of arcade tokens or airline miles (or the oranges themselves in *Howey*). As the SEC's Director of Corporate Finance, William Hinman, has acknowledged, "the token—or coin or whatever the digital information packet is called—all by itself is not a security, just as the orange groves in *Howey* were not."[9] Indeed, "the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security."[10] The SEC has also acknowledged that another way in which a digital asset may differ from a security is by not relying on the efforts of others. For example, there may be "essential tasks or responsibilities performed and expected to be performed by . . . an unaffiliated, dispersed community of network users (commonly known as a 'decentralized network')," which renders meaningless the notion of a security issuer disclosing information to investors who would otherwise be in the dark.[11]

The SEC has stated that some notable digital assets—Bitcoin and Ether, which together account for 75% of the market value of all cryptocurrencies—are not securities. For these digital

---

[9] William Hinman and Valerie Szczepanik, "Statement on 'Framework for "Investment Contract" Analysis of Digital Assets,'" U.S. Securities and Exchange Commission, April 3, 2019, www.sec.gov/news/public-statement/statement-framework-investment-contract-analysis-digital-assets.

[10] William Hinman, "Digital Asset Transactions: When Howey Met Gary (Plastic)," Remarks at the Yahoo Finance All Markets Summit: Crypto, SEC.gov, June 14, 2018, https://www.sec.gov/news/speech/speech-hinman-061418 (citing *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975)).

[11] "Framework for 'Investment Contract' Analysis of Digital Assets," U.S. Securities and Exchange Commission, Apr. 3, 2019, https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

assets, the SEC has apparently concluded that there is no "expectation of return by a third party," and there is no central party that determines the success of the enterprise.[12] Equally important for this case, a security can also later become a non-security. Director Hinman has discussed "how a digital asset can, over time, become something other than a security" when, for example, "the network on which the token or coin is to function is sufficiently decentralized."[13] The SEC has further emphasized that "the analysis of whether something is a security is not static and does not strictly inhere to the instrument."[14]

Regardless of the application of the *Howey* test to Grams specifically, the Court should recognize that digital assets have varied characteristics and may transition between security and non-security status over time.[15] That is true for the assets at issue here and also for many diverse and maturing digital assets that may be affected by early judicial decisions on these questions.

### C. The SEC Has Provided Little Regulatory Clarity on the Important Questions of Whether and When a Digital Asset Is a Security.

Innovators and investors in this technology area have received little clarity from the SEC. The SEC's actions to date have consisted of conflicting informal guidance, speeches by SEC Commissioners and staff, no-action letters for tokens that are clearly not securities, and an arbitrary approach to enforcement policy and nonprecedential settlements. All of these have been endlessly analyzed by the industry in an attempt to discern the SEC's positions.[16] Yet the regulatory

---

[12] Bob Pisani, "Bitcoin and Ether are not Securities, but some Initial Coin Offerings may be, SEC Official Says," June 14, 2018, CNBC, www.cnbc.com/2018/06/14/bitcoin-and-ethereum-are-not-securities-but-some-cryptocurrencies-may-be-sec-official-says.html.

[13] Hinman, *supra* note 10.

[14] *Id.*

[15] *Id.*

[16] Law360, *The Pitfalls of SEC's Crypto Regulation By Enforcement* (Jan. 10, 2020) ("The U.S. Securities and Exchange Commission has made it nearly impossible to predict whether the regulator will deem a specific token to be a security under its Howey test"), www.law360.com/fintech/articles/1231846/the-pitfalls-of-sec-s-crypto-regulation-by-enforcement.

uncertainty persists, exposing blockchain developers and their projects to the threat of ad hoc litigation and enforcement. [17] At least until Congress or the SEC provides greater clarity regarding the application of dated securities laws to this innovative technology, courts should exercise caution in the legal labels and remedies applied to digital assets.

> 1.    **The SEC Has Attempted to Regulate This Technology Through An Arbitrary Approach To Enforcement and Unhelpful No-Action Letters.**

The SEC has attempted to regulate blockchain technology through a series of one-off enforcement actions. [18] The SEC's approach has been described as "regulation by enforcement rather than by guidance."[19] And as an SEC Commissioner explained, "[T]he only guidance out of the SEC is a parade of enforcement actions and a set of staff guidance documents and staff no-action letters . . . these enforcement actions and guidance pieces, taken together, offer no clear path for a functioning token network to emerge." [20]

Nor has asking the SEC for permission to launch proved fruitful. For years, the industry hoped that the SEC might issue no-action letters, which might indicate parameters for tokens' status as non-securities.[21] But the no-action letters that the SEC has issued so far have analyzed

---

[17] In late 2018, a bipartisan group of members of Congress sent a letter urging the SEC to issue formal guidance for "clearing up legal uncertainties which are causing the environment for the development of innovative technologies in the United States to be unnecessarily fraught." Ted Budd *et al*., Letter to Jay Clayton at 2, Sept. 28, 2018, available at https://budd.house.gov/uploadedfiles/budd_davidson_emmer_soto_sec_letter_final.pdf.

[18] The SEC's July 2017 "DAO" report was its first action involving a token. In December 2017, the agency settled with Munchee, Inc., the developer of a food-review app. In June 2019, after 18 months of negotiations, the SEC sued Kik Interactive, Inc. for the sale of its "Kin" tokens. In September 2019, the SEC settled civil penalty charges against Block.one. And the SEC has relied on basic fraud theories to sue RECoin, PlexCoin, and AriseBank.

[19] Kollen Post, "Rep. Warren Davidson: You Have to Defend Money to Defend Freedom," Cointelegraph, Oct. 22, 2019, https://cointelegraph.com/news/rep-warren-davidson-you-have-to-defend-money-to-defend-freedom.

[20] *See* Hester M. Peirce, Commissioner, Securities and Exchange Commission, "Broken Windows: Remarks before the 51st Annual Institute on Securities Regulation," Nov. 4, 2019, www.sec.gov/news/speech/peirce-broken-windows-51st-annual-institute-securities-regulation.

[21] Nikhilesh De, "SEC's Crypto Czar Signals Some Flexibility on Token Offerings," Coindesk, Dec. 14, 2018, https://www.coindesk.com/secs-crypto-czar-signals-some-flexibility-on-token-offerings.

tokens that are unquestionably not securities—leaving commentators confused as to why the SEC would feel the need to undertake the analysis in the first place.[22] One addressed what were effectively airline miles (redeemable for flight services at $1 USD per token),[23] while the other concerned digital arcade tokens developed by a 12-year-old.[24] As many commentators have noted, both of these tokens were so clearly not securities that it seemed bizarre that the SEC would even undertake the analysis.[25]

### 2.    The Industry Has Been Forced to Pore Over SEC Speeches for Clues.

In an attempt to understand the SEC's positions, the industry has closely watched any SEC staff or Commissioner remarks that might conceivably shed light on the regulatory posture of the U.S. government.[26] Of course, these speeches were not official guidance, and it is unclear whether

---

[22] SEC, Clearing Agency Registration Under Section 17A(b)(1) Paxos Trust Company, LLC, Oct. 28, 2019 https://www.sec.gov/divisions/marketreg/mr-noaction/2019/paxos-trust-company-102819-17a.pdf; SEC, Response of the Division of Corporation Finance for Pocket of Quarters, Inc., July 25, 2019, https://www.sec.gov/corpfin/pocketful-quarters-inc-072519-2a1; Response of the Division of Corporation Finance for TurnKey Jet, Inc. April 3, 2019, https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm.

[23] Response of the Division of Corporation Finance for TurnKey Jet, Inc., *supra* note 22.

[24] Response of the Division of Corporation Finance, Pocketful of Quarters, Inc., *supra* note 22; Chelsea Roh, "12 Year Old Crypto Gaming CEO Signs Grammy Producer to ICO Crowdfunding Campaign," Sept. 7, 2018, Cryptocurrency News, https://cryptocurrencynews.com/crypto-gaming-pocketful-of-quarters/.

[25] Daniel Nathan *et al.*, The SEC's Second No-Action Relief for Digital Tokens: Meaningful Relief or a Wolf in Sheep's Clothing?, https://blogs.orrick.com/blockchain/the-secs-second-no-action-relief-for-digital-tokens-meaningful-relief-or-a-wolf-in-sheeps-clothing/ ("Turnkey tokens [are] so 'clearly not an offer of securities that I worry the staff's issuance of a digital token no-action letter . . . may in fact have the effect of broadening the perceived reach of our securities laws.'").

[26] *E.g.*, Simon Chandler, "The SEC's Guidelines and Statements Show That It's Slowly Learning to Accept ICOs," Cointelegraph, March 10, 2019, https://cointelegraph.com/news/the-secs-guidelines-and-statements-show-that-its-slowly-learning-to-accept-icos (recent speeches have noted a "softening" toward ICOs); Deborah R. Meshulam and Benjamin Klein, "Digital Asset Regulation: SEC suggests possible path from Security to Non-Security," April 25, 2019, https://www.dlapiper.com/en/us/insights/publications/2019/04/digital-asset-regulation/ ("This messaging did not appear in published guidance, memoranda, or court filings, but rather was communicated during speeches at conferences.").

the statements "truly represent[ed] the policy of the Commission or . . . just the opinion of SEC staff."[27]

The speeches have not provided much clarity in any event. SEC Chairman Jay Clayton stated in February 2018 that "all ICOs [he had] seen [were] securities."[28] The SEC's Director of Corporate Finance, meanwhile, discussed in June 2018 "how a digital asset can, over time, become something other than a security" when, for example, "the network on which the token or coin is to function is sufficiently decentralized."[29] Even taken together, such informal and nonbinding messages offer little notice to the industry regarding what innovation is permitted and what is deemed unlawful.

### 3.       The SEC's "Framework" Added Confusion Rather Than Clarity.

In April 2019, the SEC's Strategic Hub for Innovation and Financial Technology ("FinHub") posted an informal framework for analyzing whether digital assets are securities, setting forth a laundry list of 38 factors—many of which have multiple sub-parts—to "consider in assessing whether a digital asset is offered or sold as . . . a security."[30] The SEC staff described this framework as "not a rule, regulation, or statement of the Commission," in an apparent attempt

---

[27] Jerry Brito, "SEC Chairman Clayton just confirmed Commission staff analysis that found Ethereum (and cryptos like it) are not securities," Coin Center, Mar. 12, 2019, https://coincenter.org/link/sec-chairman-clayton-just-confirmed-commission-staff-analysis-that-ethereum-and-cryptos-like-it-are-not-securities; Colin Harper, "'Guidance by Enforcement': How the SEC is Slowly Shaping ICO Regulation," Bitcoin Magazine, Nov. 30, 2018, https://bitcoinmagazine.com/articles/guidance-enforcement-how-sec-slowly-shaping-ico-regulation ("Much like the outdated Securities Act, Chervinsky finds that these various references for guidance are not robust enough to substantiate actual regulation and satisfy the industry's need for clarity. And even though he thinks Congress should be bringing more to the table than it has already, the SEC should also be doing more to help the industry.").

[28] Stan Higgins, "SEC Chief Clayton: 'Every ICO I've Seen Is a Security," Coindesk, Feb. 6, 2018, https://www.coindesk.com/sec-chief-clayton-every-ico-ive-seen-security.

[29] Hinman, *supra* note 10.

[30] "Framework for 'Investment Contract' Analysis," *supra* note 11.

to characterize it as insulated from judicial review.[31] Surprisingly, the SEC did not even mention this framework in its opening briefs in this case.[32]

Although guidance was long awaited, it was immediately criticized for being too complex and "turn[ing] the 70-year-old, four-pronged *Howey* test into a 40-point-plus list of potential reasons why the SEC might consider a token offering to be an offering of securities" while "introduc[ing] new concepts, like that of an 'active participant,' which arguably broaden the reach of the *Howey* test beyond what the courts have previously interpreted."[33] An SEC Commissioner echoed these concerns, opining that the framework "could raise more questions and concerns than it answers."[34] For example, an SEC Commissioner noted the framework's "pages worth of factors, many of which seemingly apply to all decentralized networks, might contribute to the feeling that navigating the securities laws in this area is perilous business."[35] She noted that these business hurdles could discourage innovators or cause them to move their operations outside the United States: "Rather than sorting through the factors or hiring an expensive lawyer to do so, a wary company may reasonably decide to forgo certain opportunities or to pursue them in a more crypto-friendly jurisdiction overseas."[36]

---

[31] *Id.*

[32] *See* Dkt. 76, Plaintiff Securities and Exchange Commission's Memorandum of Law in Support of its Motion to Strike Telegram's First Affirmative Defense, 19 Civ. 9439 (S.D.N.Y); Dkt. 79, Plaintiff Securities and Exchange Commission's Memorandum of Law in Support of its Motion for Summary Judgment, 19 Civ. 9439 (S.D.N.Y).

[33] Diego Zuluaga, "The SEC Can't Keep Kik-ing the Crypto Can Down the Road," Coindesk, June 5, 2019, https://www.coindesk.com/the-sec-cant-keep-kik-ing-the-crypto-can-down-the-road.

[34] Peirce, "How We Howey," *supra* note 3.

[35] *Id.*

[36] *Id.*

**D.**    **The SEC's Insistence on Closed-Door Staff Consultations Has Created a Body of Secret Law that Likewise Fails to Provide Guidance.**

Compounding its failure to provide clear guidance about the application of the securities laws in this space, the SEC has repeatedly tied individual projects up in extensive pre-launch consultations. This has created "a body of secret law" with a "lack of transparency and accountability."[37] Though it "binds market participants like law," it remains "immune from judicial—and even Commission—review." [38]

Innovators are "literally told if you want to launch a token, whatever you think you want to do with it, come check with the SEC first."[39] And the SEC's Framework "encourage[s] market participants to . . . engage with the Staff through www.sec.gov/finhub." In reality, these secret negotiations are—whether intentionally or not—yet another way the SEC staff avoids giving guidance. As a Commissioner has pointed out, staff discussions "lack . . . transparency and accountability," and they are "insulated from effective oversight or review, whether by the Commission or the courts." This case illustrates the problem. Telegram discussed its plans with SEC staff for a year and a half, provided copious information, and responded to limited feedback by adjusting the design of its transaction. Answer, ECF No. 37, ¶¶ 37-42. Yet at the end, the SEC has sued, and the SEC's briefs thus far say *nothing* about the substance of those discussions. SEC Mot. to Strike, ECF No. 76, ¶¶ 4-6.

The SEC's apparent position also has stifled innovation. Engaging with the SEC is extremely costly (particularly for startups and small companies) and causes huge delays that slow innovation. It is particularly absurd to require SEC approval for tokens that are clearly not

---

[37] Hester M. Peirce, Commissioner, Securities and Exchange Commission, "SECret Garden: Remarks at SEC Speaks," April 8, 2019, https://www.sec.gov/news/speech/peirce-secret-garden-sec-speaks-040819.

[38] *Id.*

[39] Post, *supra* note 19.

securities—like those at issue in the SEC's no-action letters. TurnKey Jet, which received the first such no-action letter, reportedly spent $100,000 in legal fees to engage with the SEC over 11 months.[40] Evan before litigation, Kik spent more than $5 million in legal fees over 18 months while negotiating with the SEC.[41]

It is essential for innovation in this space that no preliminary injunction decision implies that token projects must be approved by the SEC in advance. The securities laws call for application of settled public law, not creation of a secret garden of private precedent.

### E.   The SEC's Approach Has Already Undermined Innovation.

The SEC's approach—and the resulting regulatory uncertainty—has already stifled U.S. innovation. "It is clear that there is strong interest among some investors for this type of product, and innovators in the industry have made several attempts to respond to this interest. So far, however . . . the SEC has stopped all such retail products from getting to market."[42]

Yet many investors have been dissuaded from engaging with these new technologies, and countless innovators have relocated abroad, affecting potentially thousands of American jobs in a global, hundred-billion-dollar industry. Several major projects have shut down even after raising millions of dollars in funding, citing U.S. securities law as the reason. For example, in December 2018, Basis—a stablecoin[43] project backed by Andreessen Horowitz and Bain Capital Ventures, two well-established venture capital firms with over $110 billion combined in assets—announced

---

[40] Tim Fries, "SEC Issues First No Action Letter Featuring A Tokenized Digital Asset Which Is Not A Security", The Tokenist, updated Dec. 13, 2019, https://thetokenist.io/sec-issues-first-no-action-letter-featuring-a-tokenized-digital-asset-which-is-not-a-security/.

[41] Nikhilesh De, "SEC Negotiations Have Cost Kik $5 Million, Says CEO," Coindesk, May 16, 2019, https://www.coindesk.com/sec-negotiations-have-cost-kik-5-million-says-ceo.

[42] Hester M. Pierce, Commissioner, Securities and Exchange Commission, Sept. 12, 2018, "Motherhood and Humble Pie: Remarks before the Cato Institute's FinTech Unbound Conference," www.sec.gov/news/speech/speech-peirce-091218.

[43] A "stablecoin" is a cryptocurrency backed by a reserve asset such as another cryptocurrency, fiat currencies, or exchange-traded commodities (such as metals).

that it would shut down and return $133 million raised to its investors as a result of overburdensome securities laws in the U.S.[44]

Additionally, many projects have chosen to invest outside the U.S. to avoid the SEC's uncertain approach to enforcement in favor of a more stable regulatory environment.[45] Numerous token offerings decided to exclude U.S. investors due to the harsh regulatory landscape, such as Bitfinex's LEO initial exchange offering,[46] the 0x ("ZRX") token project,[47] and even the U.S.-based CoinSeed platform. [48] Many projects have launched in Switzerland in an attempt to avoid being subject to U.S. securities law; as a result, the town of Zug, near Zurich, is unofficially referred to as "Crypto Valley."[49] This "uncertain and restrictive regulatory environment has led many digital asset projects and companies to domicile outside of the United States."[50]

---

[44] Joseph Young, "Crypto Assets to Be Regulated Differently in the US, Potential Impact on Industry", CoinTelegraph, Dec. 22, 2018, https://cointelegraph.com/news/crypto-assets-to-be-regulated-differently-in-the-us-potential-impact-on-industry.

[45] Robert Schmidt, Benjamin Bain, "SEC Chief's Crypto Skepticism Sets Up Facebook Clash Over Libra," Aug. 27, 2019, www.bloomberg.com/news/articles/2019-08-27/sec-chief-s-crypto-skepticism-sets-up-facebook-clash-over-libra.

[46] "Initial Exchange Offering of LEO Tokens For Use on iFinex Trading Platforms, Products, and Services," Bitfinex, May 8, 2019, https://www.bitfinex.com/wp-2019-05.pdf; "U.S. Residents – Frequently Asked Questions," https://support.bitfinex.com/hc/en-us/articles/115003461254-US-Residents-Frequently-Asked-Questions.

[47] Young, *supra* note 44.

[48] Anna Irrera, Michelle Price, "Cryptocurrency issuers clean up, shun U.S. investors as SEC gets tough," Reuters, Mar. 21, 2018, www.reuters.com/article/us-crypto-currencies-usa/cryptocurrency-issuers-clean-up-shun-u-s-investors-as-sec-gets-tough-idUSKBN1GX2OX.

[49] Ralph Atkins, Switzerland Embraces Cryptocurrency Culture, Financial Times, Jan. 24, 2018, https://www.ft.com/content/c2098ef6-ff84-11e7-9650-9c0ad2d7c5b5.

[50] Brad Robertson, "Lawmakers circle the airport while crypto innovators move offshore," VentureBeat, Aug. 10, 2019, https://venturebeat.com/2019/08/10/lawmakers-circle-the-airport-while-crypto-innovators-move-offshore/; Post, *supra* note 19, (Congressman Davidson lamenting that because of the SEC's "regulat[ion] by enforcement," companies are saying "Screw you guys, we're just going to launch it in Switzerland, Singapore, Malta - wherever."), https://cointelegraph.com/news/rep-warren-davidson-you-have-to-defend-money-to-defend-freedom..

## II.     The Purchase Agreement Model Used by Telegram Complies With U.S. Securities Laws.

The Simple Agreement for Future Tokens ("SAFT") investment contract model, on which Telegram based its Purchase Agreement for Grams (the "Purchase Agreement"), complies with both U.S. securities laws and the spirit behind those laws. It comports with the limited guidance the SEC has provided, which is inconsistent with the SEC's case here. Yet the SEC has bizarrely chosen to attack the decision by Telegram to use an investment contract model that was designed expressly to *comply* with the SEC's own regulations. Nothing in the securities laws or precedent—which are specific about resale restrictions—suggest that an issuer cannot enter into an investment contract with accredited investors under Regulation D and deliver the resulting product to those accredited investors in satisfaction of those contracts, merely based on theoretical resale concerns. Indeed, the SEC's briefing focuses on its argument that the Purchase Agreements are investment contracts under *Howey*, even though that question is undisputed: the contracts were treated as *exempt* securities, not non-securities. The SEC has no basis for seeking to enjoin the execution of agreements between sophisticated parties for the delivery of tokens to accredited investors.

And the SEC's argument that the not-yet-existent Grams themselves were investment contracts at the time of the Purchase Agreement is also wrong.[51] It entirely fails to address the SEC's prior views, discussed above, that a token may become a non-security when its network is functional and decentralized. That is the situation envisioned here for Grams, and the SEC has no basis for prematurely labeling them as securities before they even exist.

---

[51] *See* Dkt. 79 at 18–26.

## A.  The Principal Purpose of Securities Laws Is to Protect Investors.

The principal purpose of the federal securities laws is to protect investors.[52] Congress—and, by extension, the SEC—typically seek to protect investors by ensuring they have adequate information upon which to make investment decisions.[53] To that end, the federal securities laws have established a disclosure regime designed to ensure investors receive information that would enable them to weigh the relative merits and risks of an investment.[54] However, the federal securities laws acknowledge that some sophisticated investors may need less protection. This allows issuers and investors to operate more efficiently by avoiding some of the more burdensome aspects of registration and disclosure. Congress and the SEC have established several different categories of such investors, including "accredited investors."[55]

Telegram limited its initial offering to only "accredited investors" under Section 501(a) of Regulation D—a fact that the SEC does not dispute. These investors attested to their status by completing an SEC-required questionnaire. U.S. investors who did not complete the "United States Rep Letter" that accompanied the Purchase Agreement for Grams were not able to participate in the initial offering.[56]

---

[52] "What We Do," U.S. Securities and Exchange Commission, https://www.sec.gov/Article/whatwedo.html, ("The mission of the U.S. Securities and Exchange Commission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.")

[53] The Laws That Govern the Securities Industry, Securities Act of 1933, https://www.sec.gov/answers/about-lawsshtml.html#secact1933, (One of the "basic objectives" of the Securities Act of 1933 is to "require that investors receive financial and other significant information concerning securities being offered for public sale.")

[54] *SEC v. Sunbeam Gold Mining Co.*, 95 F.2d 699, 701 (9th Cir. 1938).

[55] 17 C.F.R. § 230.501(a) (defining "Accredited Investor").

[56] "Purchase Agreement for Grams," Section 3.a ("Conditions Precedent") https://s3.cointelegraph.com/storage/uploads/view/fdee5107cdd5585476542fb1bde166a7.pdf; Stephen O'Neal, "US SEC Halts TON Launch Over $1.7B ICO – Highest-Level Action Yet?," Cointelegraph, Oct. 12, 2019, https://cointelegraph.com/news/us-sec-halts-ton-launch-over-17b-ico-highest-level-action-yet (noting that "[t]he offering was limited to accredited investors in order to minimize the scrutiny from U.S. regulators"); Dkt. 72 at pg. 9 ("Natural persons who submitted Rep Letters for the U.S. were also required to submit a letter from a specific party verifying their status as an 'accredited investor' (as defined in the rules and regulations under the Securities Act)").

**B.     Telegram's Purchase Agreement Model Both Complies With Securities Laws and Addresses the Policy Concerns Underlying Those Laws.**

The SAFT is an investment contract offered by digital asset developers to accredited investors that complies with securities laws. Accredited investors fund a token project and receive in return the right to a certain number of the project's tokens in the future, once the tokens are fully functional. That is, "the developers use the funds to develop genuinely functional network, with genuinely functional utility tokens, and then deliver those tokens to the investors once functional."[57] The SAFT investment contract itself can be treated as a security; token developers enter into a SAFT with accredited investors only, relying on the exemption set forth in Rule 506(c) of Regulation D under the Securities Act or another applicable exemption.[58] Because the SAFT is a security, the seller files a Form D with the SEC disclosing the sale, if necessary. The seller then uses the proceeds to develop the network into a product that provides genuine utility to its users. Once the tokens are functional, the SAFT investors' rights in the SAFT are satisfied by delivery of the tokens, similar to the way a note is satisfied when a cash or a futures contract is satisfied in the applicable commodity. For the now-functional tokens, the tokens themselves are not securities, but rather are akin to *Howey's* oranges.

One advantage of this approach is that innovators do not sell tokens widely to the public at a time when purchasers are still reliant on the developers to build a functional network. In a SAFT, no prefunctional tokens are ever created or sold, let alone released to the public. This shields the SAFT transaction and eventual token distribution from the registration and disclosure requirements that would apply to an ordinary securities offering.

---

[57] Juan Batiz-Benet *et al.*, "The SAFT Project: Toward a Compliant Token Sale Framework," at 1 (Oct. 2, 2017), https://saftproject.com/static/SAFT-Project-Whitepaper.pdf.

[58] *See* 17 C.F.R § 230.506(c).

17

The SEC's argument that the Grams themselves were securities at the time of the Purchase Agreements is wrong. There is no dispute that the Purchase Agreement was a security; Telegram treated it as such, and complied with the SEC's regulations, including entering into the Purchase Agreement with only accredited investors.[59] But the Grams themselves did not exist at the time of the Purchase Agreements, nor do they exist today—indeed, if the SEC gets its way, Grams will never exist. Grams are the fruit of the accredited investors' investment, akin to *Howey*'s oranges. Investors in *Howey* invested in a fruit-growing enterprise that led to the production of oranges; the investment contract was a security, but the oranges that were produced as a result were not.

The SAFT works because, as the SEC itself has repeatedly explained, a security can give rise to a non-security.[60] Director Hinman explained that blockchain innovators might "conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and digital assets offer."[61] He noted that "[t]his allows the tokens or coins to be structured and offered in a way where it is evident that purchasers [of the tokens after the network launch] are not making an investment in the development of the enterprise."[62] This

---

[59] The SEC notes that the Securities Act does not define "distribution." Dkt. 79 at 29. It fails to acknowledge, however, that—for this very reason—the SEC has adopted rules to help issuers and purchasers of securities in private placements comply with the exemptions under the Act, primarily Rule 144. That Rule states that a selling security holder shall be deemed not to be engaged in a distribution of securities, and therefore not an underwriter with respect to such securities, thus making available the Section 4(1) exemption from registration. It applies if the resale satisfies specified conditions, including that the security holder has held the security for a specified period. Rule 144 gives purchasers of restricted securities (securities acquired from the issuer in a private placement transaction, such as the Purchase Agreements acquired by Telegram's pre-sale and Stage A offering participants) certainty regarding how they may resell restricted securities without being engaged in a "distribution" by or on behalf of an issuer.

[60] Director Hinman has discussed "how a digital asset can, over time, become something other than a security" when, for example, "the network on which the token or coin is to function is sufficiently decentralized." He has further emphasized that "the analysis of whether something is a security is not static and does not strictly inhere to the instrument." Hinman, *supra* note 10.

[61] *Id.*

[62] *Id.*

analysis tracks the SAFT process; for the SEC to now claim that such a model is noncompliant is puzzling.

Chairman Clayton has offered a similar example of how an initial investment in a "common enterprise" may lead to sales that are not securities. If an investor funds a Broadway play in exchange for presale tickets, the investment agreement might be treated as a security based on the expectation of profits from the tickets.[63] But once the show has opened, the tickets would not be securities; they would merely allow the holder to access the show, despite the existence of a secondary ticket marketplace. Similarly, if investors in a gold mining operation were promised some amount of the gold from the mining operation, the original investment might be a security, but the gold itself would not be.

The SAFT addresses potential policy and regulatory concerns by allowing only accredited investors to invest before the network is functional. The SAFT framework seeks to ensure that the appropriate laws apply to the elements of a token sale transaction. When the developers sell the SAFT to investors, they are presumptively selling a security subject to the investor protection laws. When the tokens are ultimately distributed, though, the risks that the investor protection laws seek to mitigate are absent. The network is functional, and the developers have already expended the efforts to create that functionality. In the SAFT offering, accredited investors take on appropriate investment-related risks arising out of a growing enterprise, while public consumers later take on only the consumer risk of a functional token—distinct from the concerns of securities laws. This approach harmonizes the SEC's dual mandates of investor protection and promotion of capital formation. It does so by concentrating the enterprise-related risk with accredited investors the law

---

[63]   Times   Talks,   *SEC   Chairman   Jay   Clayton   &   Andrew   Ross   Sorkin*   (November   29,   2018), https://www.timestalks.com/talks/timestalksdealbook-andrew-ross-sorkin-and-s-e-c-chairman-jon-clayton/.

treats as sophisticated enough to appreciate such risk and liquid enough to absorb it; and by allowing widespread public purchase when tokens present primarily product-related risk.

C.    **Enjoining Telegram's Token Delivery Would Needlessly Harm Investors.**

Blocking the delivery of Grams to investors would needlessly punish those investors. In this case, investors purchased the right to receive Gram tokens *when and if* Telegram completes its network launch. The Gram tokens do not currently exist, and investors have no entitlement to them until the network launch occurs. At that point, participation in a decentralized network of digital assets would not constitute an investment in regulated securities—under the SEC's own guidance. At a minimum, therefore, an injunction of future transfers based on predictions about an unbuilt network stretches far beyond the SEC's responsibility.

Prematurely blocking the delivery of tokens, moreover, would stop this innovation in its tracks. It would frustrate the investors' aims in entering into the Purchase Agreement, and would frustrate innovation by delaying the network launch. And, ironically, the SEC's action could *cause* significant investor losses. If the TON network fails to launch, under the Purchase Agreement, Telegram may have to return the proceeds (less development costs expended by Telegram in developing the TON) to investors. It is plainly inconsistent with the SEC's investor-protection mandate to harm investors who have done nothing wrong, allegedly in order to prevent theoretical future harm to some other unknown group of investors.

Telegram appears to be willing and able to perform its obligations under the Purchase Agreement. Many of the investors who entered into Purchase Agreements, meanwhile, apparently look forward to the network launch and their receipt of Gram tokens, consistent with their initial investment. Due only to the SEC's intervention, the Purchase Agreements may be not enforced. The SEC's attempt to enjoin these transactions, consistent with its ad hoc enforcement and pre-

approval approach described above, threatens to undermine Congress's choices regarding investor protection and the blockchain industry's need for capital formation and certainty.

## CONCLUSION

The Blockchain Association respectfully requests that this Court narrowly tailor its decision to avoid a broad ruling that could frustrate productive and lawful modes of investment and innovation, and reject the SEC's arguments that the not-yet-in-existence Grams were securities at the time of the Purchase Agreements.

Dated: January 21, 2020.

Respectfully submitted,

S/ *Keith Bradley*
Keith Bradley
Benjamin Beaton (*pro hac vice* pending)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: 202-457-6000
keith.bradley@squirepb.com
benjamin.beaton@squirepb.com

*Counsel for the Blockchain Association*