UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

                                        :   19 Civ. 9439 (PKC)

                 Plaintiff,   :

                                            :   **ECF Case**

         -against-              :

                                            :   **Electronically Filed**

TELEGRAM GROUP INC. and TON ISSUER   :
INC.,                                          :

                                            :

                 Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

*Attorneys for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

COUNTERSTATEMENT OF FACTS ....................................................................................6

    A.    The TON Blockchain and Grams ..........................................................................6

    B.    The Private Placement ...........................................................................................7

    C.    Defendants Place Explicit Restrictions on the Sale, Resale, or Transfer of
the Purchase Agreements or any Interests in Grams ...............................................8

    D.    Defendants Repeatedly Disclaim any Promises of Post-Launch
Development Efforts..............................................................................................9

    E.    The Public Notice ................................................................................................10

    F.    Defendants Have Investigated Resale/Transfer Issues in Certain Cases ..............10

ARGUMENT .......................................................................................................................12

I.    The SEC's Motion for Summary Judgment Should Be Denied .......................................12

    A.    Whether Grams Are Securities Depends on Their Characteristics After
Launch of the TON Blockchain ...........................................................................13

    B.    Grams Will Not Be Securities at the Time of Launch ...........................................17

        1.    The SEC Has Not Demonstrated any Common Enterprise in
Grams.....................................................................................................18

        2.    The SEC Has Not Established That Gram Purchasers Will Expect
Profits Substantially Based on Defendants' Essential Efforts .................20

II.    The SEC Cannot Establish That a "Past Violation" of the Securities Act Has
Occurred...........................................................................................................................24

CONCLUSION....................................................................................................................26

## **TABLE OF AUTHORITIES**

### **CASES**

*Avenue Capital Management II, L.P. v. Schaden*,
   843 F.3d 876 (10th Cir. 2016) ..........................................................................18

*Creative American Educational, LLC v. Learning Experience Systems, LLC*,
   No. 9:14-CV-80900, 2015 WL 2218847 (S.D. Fla. May 11, 2015),
   *aff'd*, 668 F. App'x 883 (11th Cir. 2016).......................................................22

*Frederiksen v. Poloway*,
   637 F.2d 1147 (7th Cir. 1981) ..........................................................................21

*In re General Electric Co. Securities Litigation*,
   856 F. Supp. 2d 645 (S.D.N.Y. 2012)..............................................................22

*Gugick v. Melville Capital, LLC*,
   No. 11-CV-6294 (CS), 2014 WL 349526 (S.D.N.Y. Jan. 31, 2014)................19

*International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of
   America v. Daniel*, 439 U.S. 551 (1979)..........................................................18

*Kemmerer v. Weaver*,
   445 F.2d 76 (7th Cir. 1971) ..............................................................................16

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982)...........................................................................................17

*Martin v. T.V. Tempo, Inc.*,
   628 F.2d 887 (5th Cir. 1980) ............................................................................22

*McKim v. NewMarket Technologies, Inc.*,
   370 F. App'x 600 (6th Cir. 2010) .....................................................................25

*Meyer v. Dans un Jardin, S.A.*,
   816 F.2d 533 (10th Cir. 1987) ..........................................................................22

*Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*,
   875 F.3d 107 (2d Cir. 2017)..............................................................................25

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994)..................................................................................18

*Schwartz v. Bache & Co.*,
   340 F. Supp. 995 (S.D. Iowa 1972) ..................................................................16

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) .......................................................15, 16, 20

*SEC v. Glenn W. Turner Enterprises, Inc.*,
    474 F.2d 476 (9th Cir. 1973) .......................................................................21

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)....................................................................................15

*SEC v. Koscot Interplanetary, Inc.*,
    497 F.2d 473 (5th Cir. 1974) .............................................................14, 15, 23

*SEC v. Platforms Wireless International, Corp.*,
    617 F.3d 1072 (9th Cir. 2010) .....................................................................25

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953)....................................................................................25

*SEC v. United Benefit Life Insurance Co.*,
    387 U.S. 202 (1967)....................................................................................16

*Sell It Social, LLC v. Strauss*,
    No. 15 Civ. 970 (PKC), 2018 WL 2357261 (S.D.N.Y. Mar. 8, 2018) ............25

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    253 F. Supp. 359 (S.D.N.Y. 1966) ...............................................................16

*Teague v. Bakker*,
    No. 96-2186, 1998 WL 168876 (4th Cir. Apr. 8, 1998)...................................23

*Tracinda Corp. v. DaimlerChrysler AG*,
    364 F. Supp. 2d 362 (D. Del. 2005), *aff'd* 502 F.3d 212 (3d Cir. 2007) ........22

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975)....................................................................................23

*Wals v. Fox Hills Development Corp.*,
    24 F.3d 1016 (7th Cir. 1994) .......................................................................16

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) .....................................................................18

*Woodward v. Terracor*,
    574 F.2d 1023 (10th Cir. 1978) ...................................................................22

## STATUTES

15 U.S.C. § 77b(a)(11)............................................................................................24

15 U.S.C. § 77e(c)..................................................................................................24

## REGULATIONS

17 C.F.R. § 230.502(d) ..........................................................................................25

## OTHER AUTHORITIES

Andrey Shevchenko, *Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors*, Cointelegraph, Jan. 16, 2020...............................................................12

*Krispy Kreme orders Minnesota college student to halt doughnut resale service*, Associated Press, Nov. 3, 2019.........................................................................23, 24

M. Todd Henderson & Max Raskin, *A Regulatory Classification of Digital Assets: Toward an Operational Howey Test for Cryptocurrencies, Icos, and Other Digital Assets*, 2019 Colum. Bus. L. Rev. 443 (2019)................................................23

S. Nikhilesh De & Mahishan Gnanaseharan, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018 11:58 UTC) .............................................17

Statement on Cryptocurrencies and Initial Coin Offerings (December 11, 2017) .......................16

*Verticom Inc.*, SEC No-Action Letter, 1986 WL 65214 (Feb. 12, 1986).....................................14

Willam Hinman, Director, SEC Div. of Corp. Fin., *Remarks at the Yahoo Finance All Markets Summit: Cryptor, Digital Asset Transcations: When Howey Met Gary (Plastic) (June 14, 2018) ............................................................................4, 17

Defendants respectfully submit this memorandum of law in opposition to the motion for summary judgment filed by Plaintiff Securities and Exchange Commission ("SEC").[1]

## PRELIMINARY STATEMENT

This case turns on a specific legal question — whether Grams will constitute an "investment contract" if and when they are created, thus subjecting them to ongoing registration requirements of the federal securities laws.  Apparently recognizing the answer to this question is "no," the SEC fills an entire brief with irrelevant purported facts, circular reasoning and, unfortunately, highly misleading assertions (including, in one instance, manufacturing a quotation that does not exist, *infra* n.14).  None of the SEC's supposed facts, even if true, has any bearing on the relevant issues in this case, let alone entitle the SEC to summary judgment.

Indeed, after months of discovery, the SEC has finally unveiled its flawed theory of this case:  that (a) the Court must consider whether Grams were "securities" as of the time of the private Purchase Agreements, and (b) if and when the Grams are created and issued to the initial purchasers, the purchasers will be acting as statutory underwriters in a "public distribution" of Grams, regardless of the facts and circumstances at that time.  The flaws in this theory are glaring.  Even if the SEC could establish that Grams were securities at the time the Purchase Agreements were entered into — *i.e.*, somehow before they existed and when the launch of the TON blockchain was still highly contingent on a number of factors — the Court would still need to determine whether Grams will be securities if and when they are issued.  If they are not, then any resale by the initial purchasers, by definition, cannot amount to a "distribution of securities."

In an effort to obscure these shortcomings, the SEC spends most of its brief conflating the

---

[1]  Unless otherwise indicated, all capitalized terms shall have the same meanings ascribed to them in the SEC's motion (ECF No. 79 ("Pl. SJ Br.")) and Defendants' motion for summary judgment (ECF No. 71 ("Def. SJ Br.")).  "Def. Resp. 56.1" refers to Defendants' Response to Plaintiff's 56.1 Statement, filed herewith.

Grams themselves with the Purchase Agreements privately offered to sophisticated investors, which were expressly treated as investment contracts.  For example, the SEC advocates at length for the unremarkable proposition that the Private Placement investors hoped to profit from their Purchase Agreements.  Of course they did.  Through the Private Placement, these purchasers invested their risk capital in Defendants' efforts to successfully build the TON Blockchain. Their expected return will be compensated in the form of Grams (a currency or commodity), which will be created and delivered only if the blockchain project is ready to be launched in Defendants' "sole discretion."  (*Infra* p. 7.)  If that happens, it is intended that Grams will be freely transferred, traded and used by purchasers as they see fit, just like any currency or commodity subject to the anti-fraud and anti-manipulation authority of the CFTC (and just like existing digital currencies Bitcoin and Ether, which the SEC has recognized are *not* "securities").

By simple analogy, say the private investors had pooled their money in a gold mining operation to be carried out by Telegram.  Under the terms of the offering, Telegram promised to build the project and, if successfully built, Telegram would distribute the resulting gold to the private investors as the return on their investment.  Although the mining endeavor was expressly treated as a securities offering by all, the gold in the hands of the investors would be a commodity, not a security.  The same is true of Grams themselves.  The SEC has taken the unprecedented position that *both* the mining operation, *and* the underlying gold itself, should be treated as restricted securities — an approach that is at odds with longstanding case law, the SEC's own position in other cases regarding the "fragmented" nature of investment contracts and their underlying assets (*infra* pp. 15-16), and numerous statements by high ranking SEC officials. Indeed, in every case involving an "investment contract" deemed to be a security, some underlying non-security asset is coupled with a promise by the promoter to handle an essential

2

managerial function associated with the asset.  The SEC does not identify any case in which a court has found the _underlying assets themselves_ (be they oranges, orange groves, gold coins, condominiums, cosmetics, or live beaver (_infra_ p. 16)) are also securities that cannot be resold without a registration statement.

The SEC's motion should be denied for the following separate and independent reasons.

**Grams Will Not Be Securities at the Time of Launch (_infra_ § I)**.  First, the SEC's insistence that Grams must be analyzed at the time of Private Placement (as opposed to when they are created at the time of the TON Blockchain's launch) is beside the point.  For one thing, it ignores reality — Grams do not exist and may never exist, so Grams themselves cannot be securities distinct from the Purchase Agreements evincing any right to receive them in the event they are created.  Defendants have maintained "sole discretion" to determine whether the TON Blockchain is ready to launch, warranted in the Purchase Agreements that any delivery of Grams cannot occur in violation of the law, and reserved maximum flexibility to modify the details of the project in order to comply with securities laws.  (_Infra_ p. 7.)

Tellingly, the SEC itself characterizes Grams as "worthless strings of code" and "simply a cryptographic key" — and, indeed, prior to the launch of the TON Blockchain, it is the Defendants' promise to build an operational blockchain platform that gives any value to the private investors.  That promise, and any right to receive Grams, is embodied in the Purchase Agreements expressly labeled as "securities" and treated as such.  Once the blockchain is launched, however, the resulting Grams will not carry with them any concurrent or ongoing promises by Telegram to build or develop anything further, and certainly not any promises to perform ongoing essential services, as would be required to convert Grams into investment contracts under _Howey_.  _SEC v. W.J. Howey Co_.  328 U.S. 293 at 300 (1946) (plots of land

"gain[ed] utility as citrus groves only when cultivated and developed" by the promoter).  At that point the value of Grams, as distinct instruments, will be derived from market forces and the value assigned by others, placing them outside of the definition of "investment contracts."[2]

The SEC spends surprisingly little time addressing this key issue, devoting fewer than two pages of its brief to whether Grams will constitute securities at launch with almost no citation to any case law or authorities.  Rather, the SEC focuses instead on whether the promises contained in the private Purchase Agreements constitute an investment contract — but again, Defendants admit that the Purchase Agreements are securities (and treated them as such), thus making it entirely irrelevant whether the private, sophisticated purchasers invested in a common enterprise or expected profits based on Defendants' attempts to build the TON Blockchain.  In stark contrast to the Purchase Agreements, Grams themselves have been designed not as securities, but to serve as a medium of exchange on the TON platform — a decentralized ledger over which Defendants have *affirmatively disclaimed* any commitment to post-launch managerial control.  (*Infra* pp. 9-10.)

Although the SEC argues that Telegram promised private purchasers that it would generate "demand" and therefore "value" for Grams, even if so, that would not be a promise to provide essential managerial or entrepreneurial services going forward, and it ignores that Defendants publicly explained that they "have *not* made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute *in any way* to the TON Blockchain after it launches.  In fact, it is possible that Telegram *may never do so*."  (*Infra* p. 10.)  As Defendants have emphasized, any continuing enhancements to the TON

---

[2]  *See* William Hinman, Dir., SEC Div. Corp. Fin., Remarks at the Yahoo Finance All Markets Summit: Crypto, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) (a digital token "all by itself is not a security, just as the orange groves in *Howey* were not").

Blockchain (and resulting consumptive utility of Grams) following its launch will be in the hands of the global, decentralized community of users, without any central or governing managerial party. (*Infra* p. 9.)  Thus, any profits or losses that future purchasers of Grams may obtain will not be expected from Defendants' ongoing efforts, but rather will be individual to each purchaser and the result of free market forces.  The SEC does not and cannot seriously contest these facts, which defeat its motion for summary judgment.

**Plaintiff Cannot Establish That a "Public Distribution" of Grams Will Occur (*infra* § II)**.  In light of the above, the SEC's claim that Defendants already violated Section 5 of the Securities Act by "publicly distributing" Grams is circular and incorrect.  According to the SEC, the Grams themselves should have been separately registered as "securities" on Day 1 because the Private Placement was in fact a "public distribution," and the Private Placement was a "public distribution" because Grams are a statutory security.  But this theory merely begs the essential question of the case — *i.e.*, whether Grams are to be considered "securities" at the time they are actually distributed, a question the SEC barely addresses.

Contrary to the SEC's assertion, it is simply of no moment whether Grams were "sold" on Day 1 of the Private Placement and constituted "securities" at that time.  Defendants treated the Private Placement as a security.  And, because *Howey* is a *transaction-specific* inquiry, even if Grams could be deemed securities at the time of the Private Placement, there simply will not (and can never) be any "public distribution" of a security if Grams are no longer securities at the time of the launch (*i.e.*, the earliest time Grams could possibly be distributed to the public).  The SEC's apparent position that there has already been a "public distribution" of Grams — before any Grams have been created or disseminated, and regardless of the facts or circumstances of any future sales of Grams to the public — is as illogical as it is legally baseless.

Moreover, the SEC fails to contest, and thus has waived any ability to obtain summary judgment regarding, Defendants' defense that the Private Placement was conducted pursuant to valid exemptions from registration under Rule 506 and Section 4(a)(2).  (*Infra* pp. 24-25.)  Even accepting that one must analyze Grams at the time of the Private Placement, Grams logically must be entitled to these exemptions to the same extent that the Purchase Agreements are because any interest in the right to receive Grams is embodied in, and inextricably bound up with, the Purchase Agreements themselves.  To conclude otherwise would, in the words of the SEC, constitute "improper 'reliance on formalism'" (Pl. SJ Br. 19) that should be rejected.[3]

## COUNTERSTATEMENT OF FACTS

### A.   The TON Blockchain and Grams

In 2017, the Telegram team began developing a new distributed ledger called the "TON Blockchain."  (Def. 56.1 ¶ 49.)  If launched, the TON Blockchain will include a native cryptocurrency, called "Grams," which is intended to function as a medium of exchange on the platform.  (*Id.* ¶¶ 52, 55.)  At the same time, Grams are also intended to power decentralized applications and smart contracts built upon the blockchain.  (*Id.* ¶ 58.)  The TON Blockchain will be *decentralized* and its code will be open source, meaning that anyone can access it to build upon the system, every transaction on it will be observable, and there will be no central governing body or management.  (*Id.* ¶¶ 50, 71-72.)  Telegram will have the same rights as any other third party on the system.  (*Id.* ¶ 73.)  Grams will not be created or distributed to anyone unless and until the TON Blockchain is successfully launched.  (*Id.* ¶¶ 53-54.)

---

[3]  The SEC also has not met its burden to show no material issues of fact regarding Defendants' affirmative defense based on void for vagueness/lack of fair notice.  While the SEC has separately moved to strike those defenses, its motion should be denied for the reasons set forth in Defendants' opposition thereto.

B.     **The Private Placement**

Beginning in early 2018, Telegram raised $1.7 billion in funds through a global Private Placement in order to fund the development of the TON Blockchain and create Grams.  (Def. 56.1 ¶¶ 91-92, 103.)  Defendants entered into Purchase Agreements pursuant to which purchasers paid U.S. dollars or Euros in exchange for Telegram's promise to develop the TON Blockchain and deliver a contractually agreed-upon number of Grams upon successful launch of the blockchain. (*Id.* ¶¶ 92, 106.)  Contrary to the SEC's assertion that Telegram was "bound to deliver [Grams]" at the time it entered into the Purchase Agreements, (Pl. SJ Br. at 18), the Purchase Agreements make clear that Telegram possesses the "sole discretion" as to whether the TON Blockchain is ready to launch and thus whether Grams will be created and delivered. (Def.s' Response to Plaintiff's 56.1 Statement ("Def. Resp. 56.1") ¶ 169.)  Both Defendants and the Private Placement purchasers represented and warranted that performance under the Purchase Agreements may not "violate any judgment, statute, rule or regulation applicable to it" or "contravene any law, regulation or regulatory policy applicable to the Purchaser."  (*Id.*)

Defendants also retained maximum flexibility with regard to the details of the TON project in light of the uncertain regulatory environment around digital assets.  (Def. 56.1 ¶¶ 229-230.)  To that end, Defendants required every investor to warrant that it read certain "Risk Factors," which included that "[t]he Issuer may need to change its business model to comply with [certain jurisdictions' licensing or registration requirements] (or any other legal or regulatory requirements) in order to avoid violating applicable laws or regulations." (*Id.* ¶ 172.)  Similarly, Defendants disclosed that actions by "governmental authorities" "may result in curtailment, or inability to operate, the TON Blockchain as intended," and that "[a]lthough Telegram intends for the TON Blockchain to have the features and specifications set forth in the 'Telegram Open Network' technical white paper [], changes to such features and specifications

7

may be made for any number of reasons." (*Id.* ¶¶ 174, 176.)

The Private Placement was conducted in accordance with Rule 506 of Regulation D (for U.S. Purchasers) and Regulation S (for non-U.S. purchasers) under the Securities Act. (Def. 56.1 ¶ 107.) The investors were highly sophisticated and of high net worth, with an average investment of over $10 million. (*Id.* ¶¶ 100.) The Purchase Agreements superseded any prior communications between Defendants and any purchasers regarding the development and launch of the TON Blockchain, with all purchasers confirming that they had "not relied on any representations or warranties made by the Issuer or the Parent outside of this Purchase Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer." (Def. 56.1 ¶ 200.)

## C.  Defendants Place Explicit Restrictions on the Sale, Resale, or Transfer of the Purchase Agreements or any Interests in Grams

Although the SEC vaguely references it in passing (*see* Pl. SJ Br. at 14), Defendants placed express limitations on the ability of all Private Placement purchasers to offer, sell or transfer their Purchase Agreements or any interests in the Grams themselves. Indeed, the Purchase Agreements provided that purchasers could not: "offer pledge, sell, . . . or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement *or any Tokens*" or "enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement *or any tokens*," until at least the launch of the TON Blockchain. (Def. 56.1 ¶ 203.) The Round 1 Purchase Agreements contained a "Lock-Up" provision that provided for these restrictions to be released in increments after the launch. (*Id.*)

In addition, Defendants required Private Placement purchasers to promise that they were not purchasing the right to receive Grams with an intent to distribute them as securities.

8

Specifically, purchasers warranted that "the Purchaser is purchasing the [Grams] for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof." (Def. 56.1 ¶ 209.)  In recognition that Grams were not intended to be securities when created and distributed, and consistent with the parties' warranties that performance of the Purchase Agreements could not violate any laws or regulations (*supra* pp. 6-7), each purchaser further warranted that it "reserves the right to dispose of the Tokens at any time *in accordance with applicable securities laws and the terms of this Purchase Agreement*," but "does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Tokens." (Def. 56.1 ¶ 209.)  As one of the Private Placement purchasers from whom the SEC obtained an affidavit states, the Purchase Agreements clearly restricted any right to offer or sell any interests in Grams to the public prior to launch. (*See* Stewart Decl. PX2 ¶ 21.)  These representations must be re-confirmed by each purchaser as a condition precedent to receiving Grams if and when they are created. (Def. 56.1 ¶ 212.)

**D.    Defendants Repeatedly Disclaim any
       Promises of Post-Launch Development Efforts**

Defendants disclosed to the Private Placement purchasers that they were *not* committing to the continued developed of the TON Blockchain following its launch.  For example, while the SEC's brief focuses on the statement that "Telegram will serve as a launch pad for TON," (Pl. SJ Br. at 6), which was made years ago to the Private Placement investors, this refers to Telegram's efforts to *build* the TON Blockchain, as made clear by the very next sentence (which the SEC's brief omits): "*the future of TON is in the hands of the global open-source community*." (JSF JX7 at 19.)  The private purchasers were also told that "Grams are intended to act as a medium of exchange between users in the TON ecosystem.  Grams are not investment products.  There should be no expectation of future profit or gain from the purchase, sale or holding of Grams";

"Grams do not represent [] any equity or other ownership interest in Telegram of the Issuer"; and "[n]either Telegram nor the Issuer has any fiduciary or other obligation to use the funds generated by the token sale for the benefit of the purchasers."  (Def. 56.1 ¶¶ 180, 184.)

**E.      The Public Notice**

The SEC focuses almost entirely on statements made in materials provided to the Private Placement investors two years ago, which were subject to confidentiality restrictions.  (*See, e.g.*, Pl. SJ Br. at 27 (citing to Teasers and Primers).)  In contrast, Defendants historically took care not to publicly comment on the details of the TON project, particularly given the flexibility it maintained regarding those details as it continued to attempt to engage with the SEC regarding the project.  (Def. 56.1 ¶ 218.)  Following the SEC's institution of this lawsuit and its public emphasis on the materials privately distributed to Private Placement investors, however, on January 6, 2020, Telegram posted a Public Notice on its website and social media accounts, which stated, among other things:

- "Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches.  In fact, it is possible that Telegram may never do so."

- Gram purchasers "should **NOT** expect any profits based on your purchase or holding of Grams, and Telegram makes no promises that you will make any profits.  Grams are intended to act as a medium of exchange between users in the TON ecosystem. Grams are **NOT** investment products and there should be **NO** expectation of future profit or gain from the purchase, sale or holding of Grams."

- "Grams do **NOT** represent: (a) Any equity or other ownership interest in Telegram or its affiliates; (b) Any rights to dividends or other distribution rights from Telegram or its affiliates; (c) Any governance rights in Telegram or its affiliates."

(*Id.* ¶ 277.)  The Public Notice was widely reported in the media.  (*Id.* ¶ 280.)

**F.      Defendants Have Investigated Resale/Transfer Issues in Certain Cases**

As addressed below, Defendants took the appropriate steps outlined under Regulation D

10

to ensure that the Private Placement was exempt from registration.  But, in addition to the actions taken by Defendants at the time of the Private Placement to ensure that purchasers would not engage in a public distribution of a statutory security, the record reflects that Defendants continued to take further actions to enforce their rights under the Purchase Agreements in certain circumstances and where justified.  When Defendants were made aware of specific facts suggesting that a Private Placement purchaser may have been attempting to transfer its Purchase Agreement or right to receive Grams, Telegram contacted the purchaser, emphasized adherence to the representations and warranties agreed upon in the Purchase Agreements, and sought assurances that the purchaser would abide by those restrictions.  (Def. 56.1 ¶¶ 133-158.)  In certain instances, Telegram even canceled Purchase Agreements when it was conclusively determined that representations and warranties had been violated.  (*Id.*)[4]

The SEC goes to lengths to assert that there was a "grey" market for Grams following the Private Placement, and even goes so far as to imply that Defendants encouraged it.  (Pl. SJ Br. 14.)  Although irrelevant to the legal issues in dispute, in numerous instances where Defendants were made aware of specific information tying specific investors to possible reselling efforts, they acted upon it.  (Def. 56.1 ¶¶ 133-158.)  In the face of vague or general reports of potential reselling, however, Defendants relied on public reminders to avoid scams and that any such offers were not sanctioned (*id.* ¶¶ 276-280; *see also* Def. Resp. 56.1 ¶¶ 222, 248), as well as the fact that all private purchasers would be required to reconfirm their representations as a

---

[4]  The SEC argues that finder's fees paid to certain investors, and the marketing materials those investors may have used, created a false impression that purchasing Grams was an investment in Telegram.  (Pl. SJ Br. at 7-8.)  There is no support for this contention in the record.  The materials provided to all private investors made clear that Grams did <u>not</u> represent any ownership interest in Telegram (*see, e.g.*, Def. 56.1 ¶ 180), and Pavel Durov testified that third parties did not have authority to create or distribute marketing materials and Telegram did not approve such materials.  (Def. Resp. 56.1 ¶¶ 320, 326.)  The SEC does not point to any evidence that any of these other materials were ever made generally available to the public.

*(cont'd)*

precondition to receiving any Grams at launch.  (Def. 56.1 ¶ 212.)[5]

Contemporaneous internal messages within Telegram reflect that Defendants expressed dismay at announcements regarding unofficial sales of "Grams" prior to the launch of the TON Blockchain.  (Def. Resp. 56.1 ¶¶ 235-236.)  For example, when a Japanese exchange announced in mid-2019 a purported "pre-sale" of Grams, Telegram's employees expressed frustration at the announcement and lack of knowledge as to the identity of the purported seller.  (*Id.*)  Telegram struggled with whether to publicly comment on the sale and ultimately took comfort from a subsequent article informing the public that the offering was not official.  (*Id.*)[6]

## ARGUMENT

## I.    THE SEC'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

The SEC's request for summary judgment hinges on the premise that Grams were "sold" at the same time Defendants conducted the Private Placement, and thus constituted "securities" under *Howey* at that time.  This argument is legally and factually unsupported, and ultimately irrelevant.  Even if the SEC's view were correct, the undisputed facts show that Telegram's

---

[5]  In fact, in early 2018, Defendants provided the SEC with a list of over 60 websites that Defendants were able to compile purporting to be unofficially offering "Grams."  (Def. 56.1 ¶ 287.)  It is unclear what, if anything, the SEC did with the list.

[6]  The SEC mischaracterizes the record on this point.  Although the SEC quotes from a Telegram representation that it "has not had any communications with [the exchange] or its representatives" regarding the mid-2019 announcement that it would be offering pre-launch Grams (Pl. SJ Br. at n.7), the SEC fails to provide the Court with a subsequent email from Telegram making clear that (1) the exchange had sent an email to Telegram in May 2019, to which Telegram did not respond; and (2) the exchange "previously approached Telegram back in 2018 about the possibility of listing Grams but the discussions never progressed beyond the preliminary stage."  (Def. Resp. 56.1 ¶ 234.)  The SEC cherry-picks the deposition testimony of Mr. Durov to suggest that he denied that "anyone from Telegram had met with representatives of [the exchange] with respect to their sale of Grams."  However, a review of this testimony makes clear that he was talking about any discussions between Telegram and the exchange regarding the purported *pre-launch* sale of Grams in mid-2019.  (*Id.* ¶ 233.)  Mr. Durov explained, consistent with Telegram's previous representations to the SEC and another employee's testimony, that Telegram may have had earlier conversations with the exchange about a potential *post-launch* listing of Grams on its exchange and the regulatory issues involved — not any *pre-launch* listing in violation of the Purchase Agreements.  (*Id.*)  The exchange's purported 2019 offer has since been canceled.  Andrey Shevchenko, *Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors*, Cointelegraph, Jan. 16, 2020 https://cointelegraph.com/news/liquid-cancels-sale-of-telegrams-gram-tokens-returns-funds-to-investors?utm_source=Telegram&utm_medium=social.

private offering was conducted pursuant to valid exemptions from registration. These exemptions are not invalid because the private offering was somehow a "public distribution," as the SEC claims. Rather, because Grams indisputably will not be a security at the time of distribution, there has not been — and will be never be — any "public distribution" of a security.

A. **Whether Grams Are Securities Depends on Their Characteristics After Launch of the TON Blockchain**

As a threshold matter, the SEC appears to conflate two different, and fundamentally distinct, questions: (1) whether the Purchase Agreements of the Private Placement are "securities"; and (2) whether the underlying *Grams themselves* are "securities." This distinction is fatal to the SEC's motion. Telegram has always agreed that the Purchase Agreements, as the only instrument evincing the existence and right to receive Grams, constitute "investment contracts" under *Howey*. (Def. SJ Br. at 39.) That does not mean the Grams themselves, which will be created and distributed to Private Placement purchasers and then used, bought and sold by the public following the launch of the TON Blockchain, are also "securities." Quite the opposite, as discussed further below.

The SEC asserts that "the Court should consider Grams at the moment investors signed the . . . Purchase Agreements" because "Telegram was thus bound to deliver [Grams]" at that time. (Pl. SJ Br. 18.) This is incorrect. The Purchase Agreements state that Telegram retains "sole discretion" regarding the TON Blockchain's readiness to launch (*supra* p. 7), and as the SEC acknowledges, the Purchase Agreements contain a "Termination Clause" that relieves Defendants of any obligation to create or deliver Grams if the launch does not occur by a date certain. (JSF JX11 § 7.3; *id.* JX12 § 7.3.) Telegram warranted that any actions under the Purchase Agreements may not "violate any judgment, statute, rule or regulation applicable to it," and retained broad flexibility to change the details of the project to ensure that any distribution of

13

Grams complied with securities laws.  (*Supra* p. 7.)

Read together, these provisions make clear that Telegram was not "irrevocably bound" to deliver Grams under any circumstances, but rather could determine not to issue them in its discretion if the TON Blockchain was not ready to launch by the Termination Date or if doing so would violate securities laws.  *See Verticom Inc.*, SEC No-Action Letter, 1986 WL 65214, at *1 (Feb. 12, 1986) (contemplated future IPO should not be integrated with previous private placement where "there existed no certainty that a viable business could be created"); *cf.* SEC, Office of Investor Education and Advocacy, "Investor Bulletin: Be Cautious of SAFEs in Crowdfunding" (May 9, 2017) (announcing that Simple Agreements for Future Equity ("SAFEs") do not "entitle [investors] to certain rights under . . . federal securities law" because the equity stake is only transferred "if — and only if — a triggering event occurs").  This point is underscored by Defendants' extensive efforts to engage with the SEC to obtain regulatory guidance regarding the status of Grams prior to launch.  (Def. 56.1 ¶¶ 281-287.)[7]

Even if the Court were to analyze Grams at the time of the Private Placement (before they were even created), the Grams themselves are not  "securities."  While the Purchase Agreements included Defendants' promises to pool the Private Placement investors' money in order to build the TON Blockchain and create Grams, the Grams themselves are simply commodities, like gold, silver, or sugar.  The decision in *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974), upon which the SEC relies, is instructive.  (Pl. SJ Br. at 27.)  There, the Fifth Circuit determined that a pyramid scheme involving the sale of cosmetics constituted an "investment

---

[7]  The SEC misleadingly suggests that Telegram's employees viewed Grams as "securities."  (Pl. SJ Br. at 10.)  But a review of the document that the SEC cites makes clear that the employee in question had cut-and-pasted this "security" language from an earlier "confirmation request" by an auditor, which was attached lower in the same email chain and which the SEC misleadingly failed to cite or reference.  (Def. Resp. 56.1 ¶ 189.)  In any event, the employee was referring to *the Purchase Agreements*, which have been considered securities and treated as such from the beginning.  (*Id.*)

contract" under *Howey*.  *Koscot*, 497 F.2d at 476.  In doing so, the court drew a strong distinction

between "the distribution of cosmetics" themselves, on the one hand, and the "marketing of

cosmetics and the recruitment aspects of Koscot's enterprise," on the other.  *Id.* at 475.  Notably,

the SEC itself argued that these two aspects were "*separable* and that *only the latter* are within

the definition of a security."  *Id.* (emphasis added).  The court agreed, holding that the "case-law

countenances the fragmented approach which the SEC presses upon us."  *Id.* at 476.

This "fragmented approach" urged by the SEC in *Koscot* has been routinely assumed, if

not expressly adopted, in every case involving purported "investment contracts."  Courts focus

on the promoted *agreement* between the promoter and investors, *not* the underlying product or

good that is the subject of the offering.  Indeed, in *Howey*, the Supreme Court held that the

"investment contract" at issue was the "offering [of] an opportunity to contribute money and to

share in the profits of a large citrus fruit enterprise managed and partly owned by [defendants],"

rather than the actual oranges or orange groves themselves.  *See Howey Co.*, 328 U.S. at 299-

300.  Similarly, in *SEC v. Belmont Reid & Co.*, 794 F.2d 1388 (9th Cir. 1986), the Ninth Circuit

held that certain agreements to prepay for gold coins to be extracted and minted by the promoter

were not "securities" under *Howey*, and drew a distinction between (1) a situation where

investors invest funds in a common enterprise to derive profits based on efforts relating to a

commodity, and (2) mere purchases and sales of the commodity itself (without any concurrent

service contract).  The court explained: "one can do much the same thing by buying a share in a

company mining gold.  However, that is not what was done here.  To the extent the purchasers

relied on the managerial skill of [the promoter] they did so as an ordinary buyer, having

advanced the purchase price, relies on an ordinary seller."  *Belmont Reid*, 794 F.2d at 1391.

Thus, the court concluded, any "profits to the coin buyer depended upon the fluctuations of the

gold market, not the managerial efforts of [the promoter]."  *Id.* (citation omitted).

Like the service contract in *Howey*, Telegram treated the Purchase Agreements as investment contracts and offered them pursuant to exemptions from registration.  (*Infra* pp. 24-25.)  Yet, just like the oranges in *Howey*, the gold coins in *Belmont Reid*, and the cosmetics in *Koscot*, the Grams themselves lack any corresponding service aspects that may have caused the Purchase Agreements to constitute a securities offering.  *See SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211 (1967); *see also Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 108 (7th Cir. 1994) (analyzing contracts for sale of land units, not lots themselves); *Schwartz v. Bache & Co.*, 340 F. Supp. 995, 998-99 (S.D. Iowa 1972) (analyzing contracts for sale of nickel rather than underlying nickel); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) (analyzing contracts for sale of sugar, not sugar itself); *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) (analyzing contract to care for, breed and resell live beaver, rather than beaver itself).[8]

Finally, even assuming that Grams could independently be considered "securities" at the time of the Private Placement, that still does not mean they should be considered securities following the launch of the TON Blockchain and for all times thereafter.  Rather, as the Supreme Court and SEC has recognized, the *Howey* test is <u>*transaction-specific*</u> and an instrument that may be a "security" in one context or transaction can change into a non-security in another context or transaction as the circumstances of the offering change.  As SEC Chairman Clayton recognized, "[t]he use [of cryptocurrency] can <u>*evolve*</u> toward or away from a security" and thus "[j]ust

---

[8]  Consistent with this, SEC Chairman Clayton has stated: "[i]t is possible to conduct an [ICO] without triggering the SEC's registration requirements.  For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements."  Statement on Cryptocurrencies and Initial Coin Offerings (December 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

*(cont'd)*

because [a particular instrument is] a security today doesn't mean it'll be a security tomorrow, and vice-versa."[9]  Another SEC Director agrees, stating: "the analysis of whether something is a security *is not static and does not inhere to the instrument*" itself — thus, an underlying digital asset "may *no longer* represent a security offering" once "the network on which the token or coin is to function is sufficiently decentralized."  William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018); *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("*Each transaction* must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole") (emphasis added).[10]  Accordingly, even if the Grams themselves were "securities" at the time of the Private Placement (despite not existing yet), they must evaluated at the time of their launch in order to determine the viability of the SEC's claims.[11]

### B.    Grams Will Not Be Securities at the Time of Launch

Analyzing Grams at the appropriate point in time — *i.e.*, when they will be created and distributed upon the launch of the TON Blockchain — makes clear that they will not be "securities" under *Howey*.  The SEC hardly attempts to dispute this point, devoting just two paragraphs of its entire brief to addressing it.  (Pl. SJ Br. at 26-27.)  As set forth in Defendants'

---

[9]  Nikhilesh De & Mahishan Gnanaseharan, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018 11:58 UTC), https://www.coindesk.com/sec-chief-not-icos-bad/ (last visited May 24, 2018).

[10]  Similarly, in its "Framework for 'Investment Contract' Analysis of Digital Assets," the SEC's FinHub endorsed this view by splitting its investment contract analysis into two different points in time:  (1) where the digital asset is originally offered; and (2) where a "digital asset previously sold as a security *should be reevaluated* at the time of later offers or sales."  (*Id.* (emphasis added).)  By the SEC's own admission, a digital currency that may have been a security at first may no longer be a security "at the time of later offers or sales."  (*Id.*)

[11]  Ironically, the SEC criticizes Defendants for their "improper reliance on formalism."  (Pl. SJ Br. at 19.)  But the SEC's position that the Grams must be analyzed at the time of the Private Placement and separate and apart from the only instrument evincing their existence or right to receive them is the epitome of elevating form over substance.  To the extent the SEC insists on such a formalistic approach to *Howey*, it must show that the Private Placement purchasers paid separate consideration for the Purchase Agreements (which the SEC says are investment contracts) *and* the Grams (which the SEC argues are *separate* investment contracts).  Investors in the Private Placement, of course, made only a single investment.

opening summary judgment brief, the undisputed record demonstrates that (1) there will be no post-launch "common enterprise" in Grams, and (2) post-launch Gram purchasers have not been led to expect profits based on the ongoing essential efforts of Defendants.  (Def. SJ Br. at 25-39.)

The *Howey* test is an objective one, and thus any particular investor's subjective intent is insufficient to render an instrument a security.  (Def. SJ Br. at 24); *see Ave. Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 884 (10th Cir. 2016).  Rather, courts "focus [the] inquiry on what . . . purchasers were offered or promised" by the promoter.  *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009).  Moreover, instruments will be deemed securities under *Howey* only if they bear "to a very substantial degree elements of investment contracts."  *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979).

### 1.    The SEC Has Not Demonstrated any Common Enterprise in Grams

It is unclear from the SEC's opening brief what form of commonality it claims to have proven by undisputed facts.  In all events, the record makes clear that there will be not be any "common enterprise" in Grams upon the launch of the TON Blockchain.  (Def. SJ Br. at 34-39.)  Although the SEC argues that the TON Blockchain's "promoters' *fortunes* will continue to rise and fall in tandem with those of the purchasers of Grams," it cites cases where the fortunes of the investor are tied to the promoters' "*efforts*."  (Pl. SJ Br. at 27 (emphasis added).)  As the Second Circuit has explained: broad vertical commonality requires that the "fortunes of the investors need be linked only to the *efforts* of the promoter" while strict vertical commonality "requires that the fortunes of investors be tied to the *fortunes* of the promoter."  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994).  This distinction is crucial, since the Second Circuit has held that broad vertical commonality cannot satisfy *Howey*.  *Id.*  Thus, the SEC's own proposed test, even if met, is insufficient as a matter of law.

Moreover, while "courts in this Circuit . . . have concluded that strict vertical

commonality is sufficient to demonstrate a 'common enterprise' under *Howey*," *see Gugick v. Melville Capital, LLC*, 2014 WL 349526, at *4 n.9 (S.D.N.Y. Jan. 31, 2014) (citation omitted), the SEC cannot establish that test on summary judgment either. "'[S]trict vertical commonality exists where there is a one-to-one relationship between the investor and investment manager such that there is an interdependence of *both profits and losses* of the investment.'" *Id.* at *4 (citation omitted). The SEC cannot point to any facts that establish any one-to-one relationship between post-launch Gram purchasers and Telegram. The SEC merely argues in conclusory fashion that "*to the extent* certain Telegram affiliates holding large blocks of Grams have received incentives and are promising efforts to develop the TON ecosystem, . . . those promoters' fortunes will continue to rise and fall in tandem with those of the purchasers of Grams in the secondary market." (Pl. SJ Br. at 26-27 (emphasis added).) This vague assertion, devoid of any factual detail or support, is wholly insufficient to carry the SEC's burden. *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (a "non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful").

To the contrary, secondary Gram owners are likely to have widely varying motives and interests following launch. Indeed, some owners may be interested in staking Grams and acting as validators on the blockchain in order to earn new Grams — profits that will not be shared with other owners. (McKeon Ex. 1 ¶¶ 197-198; Stewart Decl. PX12, Durov Tr. at 301:18-302:7.) Other purchasers may seek profit based on sharp increases in the free market value of Grams, which is at odds with those who may be interested in using Grams or accepting them in exchange for goods and services (and there is strong evidence that such services already have been and are in the process of being developed, *see* Def. 56.1 ¶¶ 273-274.)

19

The SEC also claims that "as the market price of Grams rises or falls, all investors will get the same proportionate increase or decrease in value." (Pl. SJ Br. at 26.) This sounds in horizontal commonality, though the SEC does not provide any further detail, nor any legal or factual support for its position. (*Id.*) As explained in Telegram's opening brief, horizontal commonality cannot be established for post-launch Grams because there will be no "pooling of funds" from Gram purchasers and no *pro rata* distribution of profits, as no such profits will exist. (Def. SJ Br. at 35-37.) The SEC's apparent position also runs contrary to well established case law, which makes clear that where, as here, free market forces determine the value of a particular asset, this is insufficient to create a "common enterprise" because the investor's decision regarding whether and when to buy and sell is an *individual* one (just like any commodity that may be traded). (Def. SJ Br. at 31; 35-37); *Belmont Reid*, 794 F.2d at 1389-91. Therefore, to the extent the SEC is claiming post-launch horizontal commonality, that too should be rejected.

### 2. The SEC Has Not Established That Gram Purchasers Will Expect Profits Substantially Based on Defendants' Essential Efforts

The record also reflects that there will not be a reasonable expectation of profits by post-launch Gram purchasers based on the essential managerial efforts of others. (Def. SJ Br. at 25-34.) First, as Defendants repeatedly have emphasized, Grams were specifically designed and marketed for their intended consumptive use as a "truly mass market cryptocurrency." (Def. SJ Br. at 25-28; Def. 56.1 ¶¶ 46, 48, 57, 164.) To avoid any possible doubt, Grams' intended consumptive use was clearly and unequivocally re-emphasized by Defendants in their Public Notice to all potential future Gram purchasers. (*Supra* p. 10; Def. SJ Br. at 26.) Moreover, Defendants' disclaimer of any promise or commitment to undertake "essential" managerial efforts following the launch of the TON Blockchain makes clear that future Gram purchasers should not reasonably expect to profit based on any such efforts. *SEC v. Glenn W. Turner*

*Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *Frederiksen v. Poloway*, 637 F.2d 1147, 1150 (7th Cir. 1981); (*see also* Def. SJ Br. at 25-28).

In its brief, the SEC puts forward a number of arguments as to why *the Private Placement purchasers* expected profits from the efforts of Defendants, which revolve around communications between Telegram and these private purchasers two years ago and under expectations of confidentiality.  (Pl. SJ Br. at 25-26.)  To start, all of these arguments apply to the Private Placement purchasers and Purchase Agreements, which Defendants *agree* should be treated as investment contracts — indeed, that is why the Private Placement was treated as a security and was conducted pursuant to exemptions from registration.

Even if these arguments applied to post-launch Grams, they are irrelevant.  Nearly all of the passages cited by the SEC refer to outdated Private Placement materials that were expressly qualified by the Risk Factors provided to every private purchaser, which reflected that Defendants were under no obligation to continue any essential efforts with respect to the blockchain platform following its launch.  (Def. SJ. Br. at 14.)  Moreover, any statements made in Private Placement materials were disclaimed in the Purchase Agreements themselves.  (Def. 56.1 ¶ 200 ("Purchaser has not relied on any representations or warranties made by the Issuer or the Parent outside of this Purchase Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer").)

If there were any remaining doubt on this point, it is removed by Defendants' Public Notice, which expressly superseded any prior statements by Telegram or anyone else regarding the details of the TON Blockchain project and emphasized that the decentralized, global community will be responsible for further development of the TON Blockchain after its launch. (Def. 56.1 ¶ 277.)  Thus, even if the Private Placement materials could be read to create an

expectation of profits (and, read holistically, they cannot), it is well established that these stale, superseded materials cannot form the basis of a securities-related claim.  *See In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 655-56 (S.D.N.Y. 2012); *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 413 (D. Del. 2005), *aff'd*, 502 F.3d 212 (3d Cir. 2007).

Although Defendants have retained discretion to possibly contribute to the TON Blockchain after launch just like any other third party, this is a far cry from the sort of "essential" managerial efforts required under *Howey*.  (Def. SJ Br. at 32-34); *see Woodward v. Terracor*, 574 F.2d 1023, 1026-27 (10th Cir. 1978) (purchase of lot from community developer did not create common enterprise, even though purchasers likely expected to profit from appreciation due to the developer's development of a community); *see also Creative Am. Educ., LLC v. Learning Experience Sys., LLC*, 2015 WL 2218847, at *16 (S.D. Fla. May 11, 2015) ("transitory" efforts of promoter insufficient under *Howey*), *aff'd*, 668 F. App'x 883 (11th Cir. 2016); *Meyer v. Dans un Jardin, S.A.*, 816 F.2d 533, 535 (10th Cir. 1987); *Martin v. T.V. Tempo, Inc.*, 628 F.2d 887, 891 (5th Cir. 1980).

Finally, the SEC argues that Telegram previously promised to "generate 'demand' and therefore 'value' for the Gram tokens in part based on its efforts to develop its popular Messenger app."  (Pl. SJ Br. at 27.)  The continued growth and popularity of Telegram and its separate Messenger application, however, simply cannot serve as a valid basis for expectation of profits in post-launch Gram purchasers.  To start, the purported "promises" upon which the SEC relies refer not to Telegram's continued development of Messenger, but rather to its "*existing* ecosystem."  (Pl. 56.1 ¶¶ 57, 87 (emphasis added).)[12]  The SEC makes no effort to explain how

---

[12]  The SEC also refers to the expectations of *certain* Private Placement purchasers in this regard.  (Pl. SJ Br. at 27.) But the SEC has made no showing as to why Private Placement purchasers have the same expectations as post-launch Gram purchasers, and in any event, subjective intent plays no role in the *Howey* analysis.  *See Teague v.*

*(cont'd)*

use of an existing ecosystem can be the basis for future expectations of profits based on further efforts. In fact, the SEC also seems to misunderstand the nature of this "ecosystem"; as explained in the Private Placement materials, it consists of a "Bot Platform" that contains "more than 800,000 unique _third-party_ bots" as of October 2017. (JSF JX9 at 13.) Thus, the "ecosystem" is simply another decentralized community of third parties — hardly a promise that Defendants will undertake efforts to improve the TON platform. In any event, read in context, these statements further underscore Telegram's emphasis on wide adoption of Grams for _consumption_ among users. _See United Hous. Found., Inc. v. Forman_, 421 U.S. 837, 858 (1975); (Def. SJ Br. at 25-28); _Ozark v. Falcon Steering Sys._, 2013 WL 708950, at *4 (W.D. Mo. 2013).

At its core, the SEC's argument is that Telegram's general reputation and success is enough to create an expectation of profits under _Howey_. This cannot be the law, as it threatens to sweep within the ambit of the securities laws a broad swath of consumer goods that could not possibly be considered securities by any rational measure, including comic books, trading cards, and even doughnuts.[13]

---

_Bakker_, No. 96-2186, 1998 WL 168876, at *3 (4th Cir. Apr. 8, 1998). Moreover, Defendants did not provide detailed information regarding Messenger to private investors for the very reason that it is a separate and independent product and venture from the TON Blockchain. (_See, e.g._, Def. Resp. 56.1 ¶ 347.) The fact that Telegram retained the right to use funds for Messenger, which was disclosed to all private investors, does not change the analysis and the SEC's emphasis on this point "confus[es] the reason and the consequence," as Telegram's CEO explained. (Stewart Decl. PX12, Durov Tr. 89:25-90:22.)

[13]  _See_ M. Todd Henderson, Max Raskin, A Regulatory Classification of Digital Assets: Toward an Operational Howey Test for Cryptocurrencies, Icos, and Other Digital Assets, 2019 Colum. Bus. L. Rev. 443, 493 (2019) ("it is unlikely that bitcoin would be classified as a security any more than baseball cards are classified as a security even though they can be sold by dealers promising an increase in value. This is precisely because there is no satisfaction of the 'others' prong of Howey."); _see also Krispy Kreme orders Minnesota college student to halt doughnut resale service_, Associated Press, Nov. 3, 2019, https://komonews.com/news/offbeat/krispy-kreme-orders-minnesota-college-student-to-halt-doughnut-resale-service (describing student's "money-making scheme" of transporting and reselling Krispy Kreme doughnuts in an area where no Krispy Kreme stores are located).

## II.  THE SEC CANNOT ESTABLISH THAT A "PAST VIOLATION" OF THE SECURITIES ACT HAS OCCURRED

The SEC appears to argue that Defendants' Private Placement violated Section 5 of the Securities Act because it was in fact a "public distribution" of securities.  (Pl. SJ Br. at 31-32.) This theory is fundamentally flawed because no public distribution of securities has or can occur. Indeed, as a matter of pure logic, in order for there to be a public distribution of securities, by definition there must be a "security" that is publicly distributed.  *See* 15 U.S.C. § 77e(c). Similarly, the Private Placement purchasers cannot be deemed underwriters if what they plan to resell is not a "security."  *See* 15 U.S.C. § 77b(a)(11) ("The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security").  While Grams will be offered and sold to the public upon the launch of the TON Blockchain, for the reasons discussed above and in Defendants' summary judgment brief, Grams will *not* be securities at the time they are created and distributed (if that occurs at all); and thus, there simply can never be a "public distribution" of securities.[14]

The SEC cannot contest that Defendants' private offering was conducted pursuant to exemptions to registration under the Securities Act.  (Def. SJ Br. at 42-47.)  Indeed, the SEC avoids the issue in its opening brief, stating in a footnote that it will "defer addressing [it], in detail."  (Pl. SJ Br. at n.1.)  In moving for summary judgment, however, the burden is on the SEC to demonstrate the lack of issues of fact, regardless of which party bears the burden of proof at trial.  *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115-17 (2d Cir.

---

[14]  In stretching to argue that the Private Placement is really a "public distribution," the SEC purports to quote Mr. Durov as saying that a sale of Grams to the public would occur "indirectly."  (Pl. SJ Br. at n.10.)  But that quoted language does not appear anywhere in the document cited.  To the contrary, Mr. Durov told a third party that Telegram was forgoing any public sale of Grams and so "Telegram as a company won't have to sell Grams or any other cryptocurrency directly to its users."  (Def. Resp. 56.1 ¶ 28.)  These are not the same things, and the SEC's inclusion of a quotation that does not exist is concerning, to say the least.

2017); *Sell It Social, LLC v. Strauss*, 2018 WL 2357261, at *9-11 (S.D.N.Y. Mar. 8, 2018). The SEC has been well aware of Defendants' position that the Private Placement qualified for exemptions to registration. (Aff. Def. ¶¶ 50-52; P.I Br. 23-25.) There also can be no dispute that Defendants satisfied the "reasonable care" standard of Rule 502(d), which *conclusively* entitles an issuer to the safe harbor. (Def. SJ Br. at 42-45.) Even assuming that one must separately analyze Grams at the time of the Private Placement, they are entitled to the same exemptions because any right to receive them is embodied in, and inextricably bound with, the Purchase Agreements themselves.[15]

Left with nothing else, the SEC asserts that "[t]he presence of underwriters indicates a 'distribution' or 'public offering,'" yet fails to point to any facts showing the "presence of underwriters," let alone the absence of material facts permitting it summary judgment. (Pl. SJ Br. at 28.) It is also beside the point, as "whether or not [the purchaser] was in fact a statutory underwriter does not bear on whether defendants exercised reasonable care under Rule 502(d)." *SEC v. Platforms Wireless Int'l, Corp.*, 617 F.3d 1072, 1091 (9th Cir. 2010). Rather, the statute focuses exclusively on an issuer's efforts at the time of the transaction, and the SEC does not point to any facts to demonstrate that those efforts were unreasonable at that time. *Id.* at 1072; *McKim v. NewMarket Techs., Inc.*, 370 F. App'x 600, 606-07 (6th Cir. 2010). The SEC's suggestion that Defendants must continuously monitor the private investors' future behavior to prevent potential underwriting activity going forward is legally and factually unsupported, and its motion for summary judgment should be denied.

---

[15] Alternatively, Defendants' private offering qualifies for the exemption under Section 4(a)(2), 17 C.F.R. § 230.500(c), which exempts private transactions "by an issuer not involving any public offering." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 120 (1953); (Def. SJ Br. at 45-47.)

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny the SEC's

motion for summary judgment in its entirety.

Dated:  New York, NY
       January 21, 2020

                              Respectfully submitted,

                               /s/ Scott D. Musoff
                              George A. Zimmerman
                              Scott D. Musoff
                              Christopher P. Malloy
                              Alexander C. Drylewski
                              SKADDEN, ARPS, SLATE,
                                MEAGHER & FLOM LLP
                              Four Times Square
                              New York, New York 10036
                              Phone:  (212) 735-3000

                              *Attorneys for Defendants*