# Exhibit 1

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
                   Plaintiff,       )
 6                                  ) 19 Civ. 9439 (PKC)
          - against -               )
 7                                  )
     TELEGRAM GROUP INC. and        )
 8   TON ISSUER INC.,               )
                                    )
 9                 Defendants.      )
     _____)
10
11       **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**
12
13            Videotaped deposition of PAVEL DUROV (as
14   30(b)(6) corporate representative of Defendants and
15   also in his personal capacity), Volume 1, taken on
16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar
17   Square, Building 3, Level 5, Downtown Dubai, Dubai,
18   United Arab Emirates, beginning at 11:21 a.m. and
19   ending at 9:54 p.m., on Tuesday, January 7, 2020,
20   before LEAH WILLERSDORF, Member of the British
21   Institute of Verbatim Reporters, Accredited Verbatim
22   Reporter, Qualified Realtime Reporter - Level 2,
23   International Participating Member NCRA.
24
25   JOB No. 200107LWI
```

1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:52:37   1                MR. DRYLEWSKI:  Yes.
12:52:37   2   BY MR. TENREIRO:
12:52:38   3         Q.   At some point Telegram began working on
12:52:41   4   something that we've been referring to as the TON or
12:52:42   5   TON Blockchain project; is that correct?
12:52:47   6         A.   Yes, we started to explore this area
12:52:49   7   somewhere in early 2017.
12:52:51   8         Q.   In early 2017?
12:52:52   9         A.   Yes.
12:52:53  10         Q.   Okay.  And when was the time when Telegram
12:52:58  11   started doing a little bit more than exploring
12:53:00  12   actually, you know, sort of developing the TON
12:53:04  13   Blockchain -- let me start again.
12:53:05  14              Why don't I ask a question like this: When
12:53:08  15   was the first time that Telegram used any,
12:53:12  16   for example, of the equipment it had for purposes of
12:53:14  17   the TON Blockchain?
12:53:34  18         A.   I think the earliest time could be summer
12:53:44  19   2017.
12:53:45  20         Q.   Summer 2017?
12:53:47  21         A.   (Nonverbal response.)
12:53:48  22         Q.   Okay.  Before -- at that time, did
12:53:53  23   Telegram's monthly expenditures on equipment change
12:53:55  24   in any way, or did they stay the same, or -- did they
12:54:01  25   change in any way?
```

65

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
14:46:12   1  in the purchase agreements.
14:46:13   2          Q.   Right.  So there were two rounds and the
14:46:16   3  first round you refer to as a pre-sale, and the second
14:46:19   4  round as Stage A; is that correct?
14:46:21   5          A.   Correct.
14:46:22   6          Q.   At some point there was a contemplated
14:46:24   7  third round; is that right?
14:46:25   8          A.   That is right.
14:46:26   9          Q.   That was going to be called Stage B?
14:46:29  10          A.   I believe that was the plan.
14:46:31  11          Q.   And why was that plan -- that did not
14:46:34  12  occur, correct?
14:46:37  13          A.   Correct, it did not occur.
14:46:39  14          Q.   Why not?
14:46:51  15          A.   Our plans related to subsequent rounds
14:46:57  16  were always subject to market conditions and other
14:47:09  17  conditions, such as regulatory environment.  In this
14:47:12  18  case specifically, I believe the main factor was that
14:47:22  19  we didn't think that the timing was right, given the
14:47:34  20  degrees in interest towards blockchain projects in the
14:47:39  21  market at that time.
14:47:43  22          Q.   Approximately when did you decide not
14:47:45  23  to do the Stage B?
14:47:59  24          A.   I think we retained a large degree of
14:48:09  25  flexibility throughout this entire process because
```

95

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:48:18 | 1 | we had no ability to predict how the market would |
| 14:48:30 | 2 | change, but by late 2018 we considered Stage B highly |
| 14:48:48 | 3 | unlikely. |
| 14:48:51 | 4 |     Q.   Okay.  And this Exhibit 42, you've signed |
| 14:48:54 | 5 | it, correct?  Or you -- yeah, you signed it, right, |
| 14:48:58 | 6 | on the last page? |
| 14:48:59 | 7 |     A.   Yeah.  I believe I did, yeah. |
| 14:49:01 | 8 |     Q.   Okay.  And did you review it before you |
| 14:49:04 | 9 | signed it? |
| 14:49:04 | 10 |     A.   I had. |
| 14:49:05 | 11 |     Q.   Okay.  And if I can direct your attention |
| 14:49:07 | 12 | to page 5 of 6 at the top, the item under "13" where |
| 14:49:13 | 13 | it says "Offering and Sales Amounts." |
| 14:49:19 | 14 |     Do you see that? |
| 14:49:19 | 15 |     A.   Yeah. |
| 14:49:21 | 16 |     Q.   Okay.  And do you see where it says "Total |
| 14:49:25 | 17 | Offering Amount" 850 million, "Total Amount Sold" |
| 14:49:31 | 18 | 850 million, "Total Remaining to be Sold" $0? |
| 14:49:36 | 19 |     Do you see that? |
| 14:49:37 | 20 |     A.   Correct. |
| 14:49:37 | 21 |     Q.   Okay.  Earlier you talked about how, for |
| 14:49:42 | 22 | Stage A, the process of, I guess, completing the |
| 14:49:45 | 23 | offering took into the autumn of 2018.  Do you recall |
| 14:49:50 | 24 | telling me that? |
| 14:49:58 | 25 |     MR. DRYLEWSKI:  Objection to form. |

96

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
14:49:58   1              THE WITNESS:  I did tell you that some of
14:50:00   2   the purchasers failed to meet their obligations, yes.
14:50:03   3   BY MR. TENREIRO:
14:50:04   4       Q.   Right.  And I think you also said earlier
14:50:06   5   that Stage A was, I think you said, fully signed by
14:50:09   6   March --
14:50:11   7       A.   Yes.
14:50:11   8       Q.   -- of 2018?
14:50:13   9       A.   Correct.
14:50:13  10       Q.   What did you mean by "fully signed"?
14:50:22  11       A.   I meant that we had signed agreements from
14:50:37  12   the private purchasers that correspond to the amount
14:50:48  13   of 850 million.
14:50:49  14       Q.   And is it signed -- so we'll get to the
14:50:53  15   purchase agreements but I think we'll agree that there
14:50:56  16   was a purchase agreement for the pre-sale and
14:50:59  17   a purchase agreement for Stage A, correct?
14:51:01  18       A.   Yes.
14:51:01  19       Q.   And when you said "signed agreements,"
14:51:04  20   do you mean signed purchase agreements or was it
14:51:06  21   something else like letters of interest in that
14:51:09  22   answer?
14:51:09  23       A.   I mean purchase agreements, so Stage A.
14:51:11  24       Q.   Okay.  So you had, by some point in March
14:51:16  25   of 2018, purchase agreements signed that would total
```

97

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
15:57:06  1   what you think is the main reason?
15:57:17  2        A.   The main reason is to make the network as
15:57:19  3   secure and as decentralized as possible.
15:57:21  4        Q.   And why was that reason not put in the
15:57:23  5   email -- or, I'm sorry, in the letter, really, to
15:57:29  6   investors?
15:57:29  7        A.   Because this letter to potential investors
15:57:35  8   deals with the narrow topic of describing the current
15:57:43  9   status of the private placement and the process
15:58:00 10   associated with it, including the steps that potential
15:58:03 11   investors have to take to participate.  It seems that
15:58:11 12   including technical details about the philosophy or
15:58:29 13   security or stability of the upcoming project was
15:58:33 14   redundant in this context.
15:58:36 15        Q.   The next sentence says:
15:58:42 16             "Throughout the process we have emphasized
15:58:44 17   the importance of Grams being widely distributed,
15:58:46 18   which we believe will allow Grams to function as a
15:58:49 19   decentralized currency."
15:58:51 20             Do you see that?
15:58:51 21        A.   Yes.
15:58:51 22        Q.   Okay.  Is that true, that throughout the
15:58:54 23   process Telegram emphasized the importance of Grams
15:58:56 24   being widely distributed?  Is that statement true?
15:59:03 25        A.   It is.  We believe it is true because we
```

124

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:59:06 | 1 | tried to make sure that we have a wide range of |
| 15:59:13 | 2 | sophisticated purchasers that come from different |
| 15:59:22 | 3 | continents which could create the balance and |
| 15:59:37 | 4 | decentralization that we were looking to create. |
| 15:59:38 | 5 |     Q.   If you go to the next page, please, |
| 15:59:45 | 6 | towards the top there is a sentence that says: |
| 15:59:47 | 7 |         "As an illustration, if the round is |
| 15:59:51 | 8 | US$1.15 billion, the price to investors will be |
| 15:59:54 | 9 | approximately $1.45 per Gram." |
| 15:59:57 | 10 |     Do you see that? |
| 15:59:57 | 11 |     A.   Yes. |
| 15:59:58 | 12 |     Q.   So there's a reference price in some of |
| 16:00:00 | 13 | the materials, including the White Paper; is that |
| 16:00:11 | 14 | correct?  For the price of Grams, I should clarify. |
| 16:00:15 | 15 |     MR. DRYLEWSKI:  Objection to form. |
| 16:00:19 | 16 |     THE WITNESS:  We used an exponential |
| 16:00:21 | 17 | formula, which was included in the primer and the |
| 16:00:24 | 18 | Technical White Paper, to be able to determine the |
| 16:00:34 | 19 | fair price per Gram during the private placement. |
| 16:00:37 | 20 | BY MR. TENREIRO: |
| 16:00:38 | 21 |     Q.   And just to try to put it in some layman's |
| 16:00:42 | 22 | terms, is it fair to say that under the exponential |
| 16:00:46 | 23 | formula the first Gram was worth $0.10? |
| 16:00:48 | 24 |     A.   I believe that's so, yes. |
| 16:00:50 | 25 |     Q.   And an exponential increase for every |

125

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
18:58:38   1              To avoid confusion, it may be worth
18:58:42   2   mentioning that an entity that has "████████" in its
18:58:53   3   name participated in the private placement, or an
18:59:21   4   entity affiliated with it, I think, could have
18:59:24   5   participated in the private placement, so this could
18:59:37   6   be that.
18:59:43   7              It could also be an effort of the fund
19:00:07   8   managers represented by ████████████████████████████
19:00:13   9   in the finders' fees agreement to introduce more high
19:00:36  10   net-worth individuals and sophisticated investors that
19:00:47  11   have also invested in one of their funds and to
19:01:08  12   introduce those people to the opportunity.
19:01:11  13   That may be it.
19:01:13  14              MR. DRYLEWSKI:  Since this didn't come
19:01:14  15   from us, do you have a date that you can represent for
19:01:17  16   this document?
19:01:18  17              MR. TENREIRO:  I think the document speaks
19:01:21  18   of "Price Per Token - 133," "Date of Investment - June
19:01:25  19   2018," "Token Unfreeze Date - December 2018."  That's
19:01:29  20   on the front page.
19:01:36  21   BY MR. TENREIRO:
19:01:36  22       Q.   So my question is, did Telegram stop
19:01:40  23   ████████████ from using a pitch deck of this
19:01:45  24   nature?
19:01:45  25              MR. DRYLEWSKI:  Objection to form.
```

184

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 19:02:00 | 1 | THE WITNESS: This question implies that |
| 19:02:02 | 2 | we were aware of those materials, and I am not certain |
| 19:02:07 | 3 | we were. Also, without knowing the exact source of |
| 19:02:17 | 4 | this document, it's difficult to say how exactly it |
| 19:02:42 | 5 | had been used or whether it is real. |
| 19:03:24 | 6 | In any case, we did not prepare those |
| 19:03:26 | 7 | documents and I don't think we ever authorized the use |
| 19:03:45 | 8 | of those documents, although if it deals with -- if it |
| 19:03:53 | 9 | deals with only those investors that were at the same |
| 19:03:59 | 10 | time investors in ▆▆▆▆▆▆▆▆▆▆, as it is stated |
| 19:04:08 | 11 | here at the top of this document, it would be logical |
| 19:04:24 | 12 | to assume that if this document was used, it was used |
| 19:04:27 | 13 | only internally among the shareholders of this fund |
| 19:04:59 | 14 | mentioned here. |
| 19:05:00 | 15 | BY MR. TENREIRO: |
| 19:05:00 | 16 | Q. Do you know of an entity called ▆▆▆ |
| 19:05:04 | 17 | ▆▆▆▆▆▆? |
| 19:05:11 | 18 | A. I'm not sure. |
| 19:05:12 | 19 | Q. Are they an investor in Telegram? |
| 19:05:15 | 20 | A. We can check. I'm not sure. |
| 19:05:19 | 21 | Q. Okay. |
| 19:05:24 | 22 | MR. DRYLEWSKI: Your reaction suggests |
| 19:05:26 | 23 | that he should know the answer to that -- |
| 19:05:29 | 24 | MR. TENREIRO: Well -- |
| 19:05:30 | 25 | MR. DRYLEWSKI: -- every investor in the |

185

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 19:11:07 | 1 | in any way. |
| 19:11:09 | 2 |     MR. DRYLEWSKI: In this particular |
| 19:11:10 | 3 | instance, yeah, I think that's a little too specific |
| 19:11:13 | 4 | for what we've done, but the witness can answer the |
| 19:11:16 | 5 | question. |
| 19:11:27 | 6 |     THE WITNESS: I think it is clear from the |
| 19:11:31 | 7 | email from John to ▇ that he's not happy with the |
| 19:11:37 | 8 | fact that this document is being distributed, even |
| 19:11:40 | 9 | though this document may have been only accessible to |
| 19:11:51 | 10 | LPs and investors of this fund. |
| 19:12:01 | 11 |     I can say in my personal capacity that |
| 19:12:16 | 12 | I was never happy when people tried to interpret what |
| 19:12:29 | 13 | we were trying to do, and, as you can see from this |
| 19:12:42 | 14 | email exchange, we reached out to the parties that we |
| 19:12:55 | 15 | thought were involved in order to get explanations |
| 19:13:02 | 16 | from them. |
| 19:13:03 | 17 | BY MR. TENREIRO: |
| 19:13:04 | 18 |     Q. And did you -- you were talking about your |
| 19:13:06 | 19 | personal capacity; "I was never happy." Okay. You |
| 19:13:15 | 20 | reached out to the parties that were involved to get |
| 19:13:18 | 21 | explanations from them. Other than doing that, did |
| 19:13:21 | 22 | you stop them in any other way from using marketing |
| 19:13:26 | 23 | materials? |
| 19:13:27 | 24 |     MR. DRYLEWSKI: Objection to form. Again, |
| 19:13:39 | 25 | objection to scope. |

189

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
21:46:34   1              MR. TENREIRO:  Let me hand you what is
21:46:37   2   Exhibit 67, TLGRM-004-20.  Why do I feel like we
21:46:43   3   already did that one?
21:46:46   4              (Exhibit 67 marked for identification.)
21:47:16   5   BY MR. TENREIRO:
21:47:16   6        Q.    So my question, Mr. Durov, is who is
21:47:20   7   Moshe Joshua?
21:47:47   8        A.    My understanding is that Moshe is a friend
21:47:51   9   of Ilia.
21:47:51  10        Q.    Okay.  And did he make -- did he send sort
21:47:56  11   of emails trying to solicit investments in Telegram on
21:48:06  12   or around November of 2017?
21:48:25  13        A.    I'm not sure whether it qualifies as
21:48:32  14   solicitation.  All I can see here is Moshe trying to
21:48:39  15   be helpful, both to his friends from the investor
21:48:58  16   community that he think would benefit from taking part
21:49:10  17   in this opportunity, and probably to Ilia as his
21:49:20  18   friend, but it is hard to say.
21:49:26  19        Q.    Okay.  So you're saying your understanding
21:49:29  20   is that Mr. Joshua was introducing some of his friends
21:49:33  21   in the investor community, perhaps to Mr. Perekopsky,
21:49:38  22   in connection with the investment in Grams, correct?
21:49:54  23              So on the second page, the email on
21:49:57  24   November 16, 2017, he says:
21:49:58  25              "I am sending you a here an NDA for
```

242

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
21:49:58   1   Telegram.  They are planning a private capital raise
21:50:01   2   and ICO related to their upcoming new technology
21:50:05   3   (TON)."
21:50:05   4              Do you see that?
21:50:07   5        A.    Yes.
21:50:09   6        Q.    "... I am personally going to be investing
21:50:13   7   in myself, otherwise I would not be sending this email
21:50:16   8   (as I have never before solicited investments)."
21:50:18   9              Do you see that?
21:50:18  10        A.    Yes.
21:50:19  11        Q.    Okay.  So did you have an understanding
21:50:21  12   that Mr. Perekopsky's friend was helping
21:50:24  13   Mr. Perekopsky connect with potential investors in
21:50:29  14   Grams?
21:50:47  15        A.    I don't know.  I think this is something
21:50:49  16   that Joshua just decided to do by himself in order to
21:51:00  17   be helpful and friendly to the parties involved.
21:51:04  18        Q.    So my question is did Telegram have an
21:51:07  19   understanding that Mr. Joshua decided to do this thing
21:51:11  20   in order to be helpful and friendly to the parties
21:51:14  21   involved?
21:51:22  22        A.    As a company, no, we didn't have this
21:51:26  23   understanding.
21:51:26  24        Q.    Okay.  But Mr. Perekopsky, I guess,
21:51:29  25   understood this?
```

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
15:04:21   1              MR. TENREIRO:  Yeah.
15:04:21   2              MR. DRYLEWSKI:  Which one?
15:04:38   3              MR. TENREIRO:  3.
15:04:41   4              MR. DRYLEWSKI:  3 we did not agree to.
15:04:44   5              MR. TENREIRO:  Okay.  Then you should
15:04:46   6    object.  And 13 and 14.
15:05:00   7              MR. DRYLEWSKI:  I'll object to scope.
15:05:06   8              MR. TENREIRO:  Okay.
15:05:07   9    BY MR. TENREIRO:
15:05:07  10         Q.   The answer, please?
15:05:50  11         A.   Are you asking whether there were any
15:05:51  12    written policies in that regard?
15:05:57  13         Q.   Any -- it can be just some directive that
15:06:01  14    the company gave employees with respect to whether
15:06:03  15    they were permitted to themselves affirmatively reach
15:06:05  16    out to digital-asset trading platforms?
15:06:08  17              MR. DRYLEWSKI:  Same objection.
15:06:15  18              THE WITNESS:  Well, I remember discussing
15:06:17  19    this topic with my colleagues sometime in 2018 and
15:06:33  20    we came to the conclusion, based on the input from our
15:06:43  21    engineering and legal teams, that it was too early and
15:07:04  22    unnecessary for us to engage in active communication
15:07:09  23    with the crypto exchanges at that moment in time.
15:07:29  24              It may also be worth noting that,
15:07:41  25    as a general matter, we saw little point in
```

322

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
15:07:50   1  proactively reaching out to exchanges, because
15:08:03   2  throughout the last two years we have been receiving,
15:08:14   3  in one way or the other, incoming inquiries from
15:08:30   4  exchanges that seemed to be very keen and most likely
15:08:47   5  commercially motivated to be among the first exchanges
15:08:57   6  that would be able to list Grams after TON Blockchain
15:09:08   7  is launched.
15:09:22   8          This is why, as a general matter,
15:09:27   9  we would, in the vast majority of cases, be approached
15:09:34  10  by exchanges and not vice versa.
15:09:42  11  BY MR. TENREIRO:
15:09:42  12      Q.  And just so that we have a clear record
15:09:44  13  and are on the same page, is it your understanding
15:09:46  14  that a digital-asset platform like Coinbase, one of
15:09:50  15  the things that it does is it permits a user to
15:09:53  16  exchange fiat currency into digital assets?  Is that
15:09:56  17  your understanding?
15:09:57  18          MR. DRYLEWSKI:  You're asking him
15:09:58  19  personally?
15:09:59  20          MR. TENREIRO:  Yeah.
15:10:02  21          MR. DRYLEWSKI:  Sorry, I hope you heard
15:10:03  22  that.
15:10:10  23          THE WITNESS:  Yes, I think this is within
15:10:12  24  the scope of the services they provide.
          25  ///
```

323

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
16:47:16  1   This is why I am confused by this inquiry.
16:47:29  2              I assume that based on this and similar
16:47:36  3   inconsistencies, my colleagues may have classified
16:47:53  4   this email as inaccurate as the person writing this
16:48:11  5   may have been misled by someone; however, I am seeing
16:48:53  6   this email for the first time and am not aware of the
16:49:08  7   exact reaction of my colleagues after receiving this
16:49:20  8   email.  It may have been ignored as coming from
16:49:38  9   a party that is not a party with which we have any
16:50:02 10   contractual obligations and is an email written by
16:50:16 11   somebody who was misled, but it's hard to say with
16:50:23 12   certainty.
16:50:23 13         Q.   Well, let's take a step back.  Do you see
16:50:25 14   that this email is sent to an email address called
16:50:31 15   ir@telegram.org?
16:50:32 16         A.   Yes.
16:50:32 17         Q.   What is that email account?
16:50:41 18         A.   I think it was an email account created at
16:50:43 19   the beginning of the private placement process used
16:50:56 20   primarily for John and Shyam to be able to accept
16:51:10 21   indications of interest from potential purchasers.
16:51:19 22         Q.   Did Telegram post that email address
16:51:22 23   somewhere, or how would someone find/know to use that
16:51:32 24   ir@telegram.org?
16:51:40 25         A.   I think it was -- it's possible that it
```

350