# Exhibit 3

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
    ---------------------------------------x
 4                                         )
    SECURITIES AND EXCHANGE COMMISSION,    )
 5                                         )
                        Plaintiff,         ) 19 Civ. 9439 (PKC)
 6                                         )
         v.                                )
 7                                         )
    TELEGRAM GROUP INC. and                )
 7   TON ISSUER INC.,                      )
 8                                         )
                        Defendants.        )
 9                                         )
    ---------------------------------------x
10
11
12                      CONFIDENTIAL
13                VIDEOTAPED DEPOSITION OF
14                     SHYAM PAREKH
15                   December 10, 2019
16
17
18                      Taken at:
19    Skadden, Arps, Slate, Meagher & Flom (UK) LLP
                      40 Bank Street
20                    Canary Wharf
                   London, E14 5DS
21
22
23
    Reported by:
24  AILSA WILLIAMS,
    Certified Court Reporter
25  JOB No. 191210MWC
```

1

CONFIDENTIAL

1    Q.  Is that answer just based on your
2  own experience and understanding as to the
3  rationale behind that decision?
4    A.  Yes.
5    Q.  As opposed to any conversations you
6  had with Mr. Hyman or anyone else at Telegram?
7    A.  Yes.  I would say these were
8  sophisticated investors again, and in the couple
9  of conversations where it came up, it was
10 relatively noncontroversial.
11   Q.  There was a second round of offering
12 which also raised $850 million, correct?
13   A.  That is correct.
14   Q.  And you were involved in contacting
15 and discussing with potential and actual investors
16 that second round as well, right?
17   A.  Yes.
18   Q.  And you are aware of the fact that
19 the second round had no lock-up provision
20 whatsoever, correct?
21   A.  I am aware of that.
22   Q.  Which meant, in simplistic terms,
23 that once the initial purchasers in the second
24 round received their Grams, they had no
25 restrictions on their ability to dispose of those

37

CONFIDENTIAL

1    The third, just for completeness, I
2 mentioned on the by and by, because many of my
3 discussions were custody related, I did mention
4 that my understanding was that a number of
5 custodians also offer OTC brokerage, so not
6 exchange but OTC brokerage solutions, that of
7 course qualify.  You have to speak to the
8 custodian to understand what they expect they can
9 and can't be able do.
10   Q.  Again, with the understanding that,
11 as you have testified, Ilya Perekopsky has been
12 primarily dealing with exchange related questions,
13 what is your understanding as to what
14 arrangements, if any, Telegram has helped
15 facilitate, in connection with the possible
16 purchase or sale of Grams after launch of the TON
17 Blockchain?
18   MR. DRYLEWSKI:  Object to form.
19   A.  I would say only the similar thing
20 as we ended up doing with custodians, which is we
21 introduced or he introduced on some of the chat
22 groups a couple of exchanges, in the same way that
23 I introduced a number of custodians to TON Labs
24 and other third parties who had assisted Telegram
25 with the testing, and therefore were familiar with

CONFIDENTIAL

1  the code, in order to sort of let those parties
2  speak bilaterally, to help answer technical
3  questions, because Telegram itself didn't have the
4  resources and the bandwidth to work with either
5  those exchanges or custodians.
6      Q.  What efforts has Telegram undertaken
7  to sign up vendors who would accept Grams as a
8  form of payment for goods or services?
9      MR. DRYLEWSKI:  Object to form.
10     A.  I can't comment.  I think you would
11  have to ask Ilya.
12     Q.  Are you aware of any vendors who
13  have agreed as of today to accept Grams as a form
14  of payment for any goods or services?
15     A.  I am not aware.
16     Q.  Have you seen in the news, for
17  example, that certain law firms have agreed to
18  accept Bitcoin in payment of legal bills?
19     A.  I actually have not seen that.
20     MR. DRYLEWSKI:  It's not Skadden.
21     MR. McGRATH:  That was my next question
22  and I don't think this requires the revealing of
23  any attorney/client communications, but counsel
24  will tell me otherwise.  Has Skadden agreed to
25  accept Grams in payment for legal --

163

CONFIDENTIAL

```
 1   email from [REDACTED] to Shyam Parekh on
 2   Saturday, April 14, 2018.
 3           MR. DRYLEWSKI:  Please feel free to look
 4   over the entire document before you answer any
 5   questions.
 6           A.  Okay.
 7           Q.  Just sort of for reference along
 8   here, the second page of the document has an email
 9   dated April 14, 2018, also from [REDACTED] to
10   Shyam.  Do you see that?  Do you recognize this
11   communication?
12           A.  Yes, I recognize the correspondence.
13           Q.  Who is [REDACTED]?
14           A.  He is with one of the investors,
15   [REDACTED].
16           Q.  On the second page of this document,
17   second page of the email chain, he is attaching a
18   document that has the wording "[REDACTED]
19   [REDACTED]", and
20   there is a reference to BF tokens on the second
21   page.  His email says:
22           "I just wanted to put on your radar, not
23   sure if it is a scam or not, but someone is
24   running an online syndicate to invest in TON."
25           Then he provides a link.  Do you recall
```

205

CONFIDENTIAL

```
 1  getting that email?
 2         A.  I do.
 3         Q.  It appears you asked him:
 4      "Thanks, ▓▓▓▓.  Will look into.  Out
 5  of interest, how did you come across these guys
 6  and their website."
 7         He responds:  "It was just a cold email
 8  to my personal email address."
 9         What if anything did you do to look into
10  that information that you received?
11         MR. DRYLEWSKI:  Objection to form.  You
12  are asking him personally or Telegram?
13         Q.  You personally, if you did anything.
14  If you didn't you can tell me.
15         A.  So I think, to shortcut this, this
16  entity, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, made an application
17  for the second round, the stage A round.  They
18  filled in all the forms.  They provided their
19  various purchase agreements signed.  KYC
20  information, et cetera.  We then received two
21  communications regarding them.  One was this, from
22  ▓▓▓▓▓, and prior to that was a notification from
23  ▓▓▓▓▓▓▓, who as you know also conducted a
24  separate review of KYC information.  So they took
25  the files from us and from our KYC adviser and
```

206

**CONFIDENTIAL**

1   then reviewed them separately, and pointed out a
2   similar thing as ▇▇▇▇ did to me, namely that
3   they seem to be operating essentially a syndicate
4   on behalf of underlying purchasers.  So to answer
5   your question, I spoke to I believe it was ▇▇▇
6   ▇▇▇▇▇▇▇ and asked him what that was about.  It
7   then was established that he seemed to be under
8   some sort of misunderstanding, and as a result we
9   rejected them as a purchaser.
10          Q.  When you say you rejected, you mean
11  Telegram rejected ▇▇▇▇▇▇▇▇▇▇▇▇▇ as a
12  purchaser.  Had they already entered into a
13  purchase agreement?
14          A.  They had signed on their side but it
15  had not been executed.
16          Q.  All right.  My understanding was
17  that the second round purchase agreements were
18  signed before the end of March 2018, is that
19  correct?
20          A.  Two things.  One, I don't know
21  exactly the date when they signed but, for
22  completeness, all the purchasers were essentially
23  asked to send back a full pack, KYC information,
24  rep letter and a signed purchase agreement.  Then,
25  if they were accepted, we would return executed

CONFIDENTIAL

1    attention to the first page of this document.  The
2    top email, which is from Nicolas de Bontin to you
3    on November 17, 2018, copying some other people.
4    He says:
5           "Great speaking with you earlier today.
6    I have attached the deck highlighting the details
7    of this potential partnership, followed by an
8    overview of our custody platform."
9           I will just ask you to read through the
10   rest of that email to refresh your recollection as
11   to what was being discussed there.  Let me know
12   when you have finished.
13          A.  I have read it, yes.
14          Q.  Do you remember receiving this email
15   from Mr. De Bontin?
16          A.  Yes, I do.
17          Q.  Do you remember the conversation you
18   had with him referenced in this email?
19          A.  Yes, I do.
20          Q.  Can you describe generally what the
21   topics of that conversation were?
22          A.  At a high level, it was follow-up on
23   the introduction from ▬▬▬, alluding to the fact
24   that others like ▬▬▬▬▬ had made similar
25   comments about wanting or needing a secure storage

212

**CONFIDENTIAL**

1    solution for their Grams, and hence referring
2    again to Coinbase, as well as others, and
3    therefore saying to Nick: "It would be
4    interesting. It is still very early." It is
5    still quite early at that stage. It was
6    November 2018. It looked unlikely that we were
7    going to meet the end of year deadline. So I made
8    clear that this was a preliminary conversation,
9    but nevertheless it would be interesting to hear
10   what their capabilities were, in terms of custody,
11   and what sort of information they would require in
12   due course in order to be able to support Grams on
13   their platform, by way of providing custody to
14   investors.
15            Q. Do you know whether Coinbase is
16   currently prepared to support Grams on their
17   network?
18            MR. DRYLEWSKI: Objection to form.
19            A. The conversations resumed a few
20   months ago, as we finally did approach the
21   expected launch at the end of October, and they
22   had a team, including a technical team, which they
23   assigned to working on this. How chose they got
24   or whether they in fact got to the finish line I
25   can't say, for obvious reasons. The discussions

213

CONFIDENTIAL

```
 1   broke off in mid-October.
 2           Q.  Why did they break off in
 3   mid-October?  Because of the lawsuit?
 4           A.  Correct.
 5           Q.  Were they communicating with anyone
 6   other than yourself at Telegram regarding their
 7   efforts to support the Grams?
 8           A.  I believe someone else, not Nick,
 9   and Ilya may have had a conversation, but I was
10   not party to that and I am afraid I don't remember
11   who the name was.  I think it was very conceptual
12   because Ilya deferred further conversations to me
13   and Nick.
14           Q.  Sorry, Ilya deferred --
15           A.  Further conversations with Coinbase
16   to me, with this gentleman Nicolas de Bontin.  If
17   I can just add one thing before we move on from
18   this document.  Nick uses this phrase in the
19   beginning, "potential partnership", and later on
20   uses "partnership".  I was at pains to stress to
21   Nick that we, Telegram, doesn't, as a matter of
22   course, and to my knowledge never has, nor is in
23   the context of custody looking for partners, that
24   the conversation was exploratory in order to
25   understand their capabilities and that we were
```

214

CONFIDENTIAL

1  referred Ledger Ventures to TON Labs. I may have
2  referred Coinbase. I am not sure whether I
3  referred Coinbase to TON Labs or it is possible
4  Coinbase, Ilya suggested refer to a different set
5  of developers. Yes, those would be the three that
6  I specifically remember; Coinbase, Ledger,
7  Anchorage.
8         Q.  Further up this email chain, you
9  sent Michelle an email on August 6, 2019,
10 basically checking in to see how she is getting on
11 with Alexander and the TON Lab guys. Do you see
12 that email?
13        A.  Yes.
14        Q.  She responds: "Thanks for checking
15 in. Thanks for the referral to ▅▅▅▅ in the
16 UK." What was that reference to ▅▅▅▅?
17        A.  ▅▅▅▅ was a purchaser in the
18 presale round, first round, UK fund, and they had
19 been -- this is all in your emails -- they had
20 sent repeated requests for calls and emails to
21 discuss this custody question, because they, under
22 I assume some queries from their auditors, were
23 trying to understand how are we going to find a
24 secure way that satisfies our auditors as to how
25 we are going to store these Grams, for potentially

247

CONFIDENTIAL

1  years?  So partly at the encouragement of folks
2  like ▆▆▆▆, you know, I was very keen to see
3  third parties develop custody solutions, so that
4  my investors, quote/unquote "my investors" had
5  options out there.  After the call with Anchorage,
6  when I had another approach from ▆▆▆▆, in
7  August, I said to ▆▆▆▆:  "Look, there is a few
8  folks who seem to be working on custody
9  solutions", and I gave them a few names, including
10 Anchorage, which is obviously what she is
11 referring to.
12         (Exhibit 12 marked for identification)
13         Q.  I am handing you a document marked
14 Exhibit 12.  It is an email exchange chain.  The
15 first Bates stamp is SEC AL271 through 275.  I
16 will ask you to briefly review this email chain
17 and I will start working from the back forward.
18         MR. DRYLEWSKI:  Take your time to review
19 the whole chain, as much of it as you need.
20         A.  Okay.  I have read it.
21         Q.  I am going to focus your attention
22 on the first two pages of the email chain, and
23 particularly there is an email on page 1, in the
24 middle of the page, July 23, 2019, from Michelle
25 Lai at Anchorage, addressed to "Hi Oleg and team".

248

CONFIDENTIAL

```
 1   partners is a reference to the first section, i.e.
 2   with the testing.
 3           Q.  She responds to you, thanking you,
 4   and then you have a following email where you say
 5   in part, this is on September 13, 2019:
 6               "To clarify, TON Labs are an independent
 7   company who have been assisting Telegram with the
 8   testing.  They are not a subsidiary or affiliate
 9   of Telegram.  So if you want to have a discussion
10   about your Grams it might be better for you and I
11   to speak."
12           Why did you feel it necessary to make
13   that clarification there?
14           A.  Because I wanted them -- so they
15   were looking clearly for a reference.  I wanted
16   ████████ not to have any -- two things.  One, if
17   they were to provide that reference I wanted it to
18   be clear to her that this was not something that
19   was coming from Telegram.  Number two, I was keen
20   that she didn't disclose anything that ultimately
21   she might consider sensitive regarding their own
22   position and what they are thinking about it or
23   doing about it, because obviously that is not
24   relevant to TON Labs, as an independent company.
25           Q.  Did anyone instruct you or tell you
```

257