UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

                                 :    19 Civ. 9439 (PKC)

                Plaintiff,     :

                                   :    **ECF Case**

           -against-        :

                                   :    **Electronically Filed**

TELEGRAM GROUP INC. and TON ISSUER : 
INC.,                                   :

                                   :

                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE TELEGRAM'S FIRST AFFIRMATIVE DEFENSE**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

*Attorneys for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ..................................................................................................5

    A.     The SEC's Lack of Public Guidance Regarding Digital Assets ............................5

    B.     Defendants Seek Guidance From the SEC and the SEC Brings Suit ..................10

STANDARD OF REVIEW ..................................................................................................14

ARGUMENT ......................................................................................................................14

I.      PLAINTIFF'S MOTION TO STRIKE SHOULD BE DENIED ....................................14

    A.     Defendants Adequately Plead That the Term "Investment Contract" Is
          Unconstitutionally Vague as Applied to This Case ................................................16

    B.     Defendants Adequately Plead That They Did Not Have Fair Notice that
          Grams, at the Time of Launch, Would Be Treated as "Securities" ......................18

          1.     This action is fundamentally different from previous SEC actions ...........19

          2.     At the time of the launch, Grams will function in the same manner as
               Bitcoin or Ether, digital assets that the SEC considers non-securities ......22

          3.     Defendants sought guidance from the SEC but did not receive it .............23

CONCLUSION....................................................................................................................24

# **TABLE OF AUTHORITIES**

Page(s)

## **CASES**

*Copeland v. Vance*,
893 F.3d 101 (2d Cir. 2018)...............................................................15, 16, 19

*Exxon Mobil Corp. v. Mnuchin*,
No. 3:17-CV-1930-B, 2019 WL 7370430 (N.D. Tex. Dec. 31, 2019) ...........16, 18, 19, 24

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).........................................................................3, 15

*General Electric Co. v. U.S. E.P.A.*,
53 F.3d 1324 (D.C. Cir. 1995) ..................................................................15

*GEOMC Co., Ltd. v. Calmare Therapeutics*,
918 F.3d 92 (2d Cir. 2019).............................................................4, 14, 16

*Glen-Arden Commodities, Inc. v. Costantino*,
493 F.2d 1027 (2d Cir. 1974)...................................................................16

*Hill v. Colorado*,
530 U.S. 703 (2000)...........................................................................15

*Landreth Timber Co. v. Landreth*,
471 U.S. 681 (1985)................................................................2, 3, 18, 23

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976)....................................................................14

*SEC v. AriseBank et al.*,
No. 3:18-cv-00186-M (N.D. Tex. filed Jan. 25, 2018).....................................8

*SEC v. Brigadoon Scotch Distributing Co.*,
480 F.2d 1047 (2d Cir. 1973)..................................................................16

*SEC v. PlexCorps*,
No. 1:17-cv-07007-CBA-RML (E.D.N.Y. filed Dec. 1, 2017) .........................8

*SEC v. REcoin Group Foundation, LLC*,
No. 1:17-cv-05725-RJD-RER (E.D.N.Y. filed Sept. 29, 2017) ........................8

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)........................................................................ *passim*

*United States v. Bowdoin*,
770 F. Supp. 2d 142 (D.D.C. 2011) ...................................................................16

*United States v. Farris*,
614 F.2d 634 (9th Cir. 1979) ..........................................................................17

*United States v. Zaslavskiy*,
No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ......................16, 17

*Upton v. SEC*,
75 F.3d 92 (2d Cir. 1996)...............................................................................18

## RULES & REGULATIONS

Federal Rule of Civil Procedure 12(f) ...........................................................................14

SEC Release No. 33-5347 (1973)..............................................................................2, 6

SEC Release No. 33-6188 (1980)..............................................................................2, 6

## OTHER AUTHORITIES

Andrew Calderaro, *SEC's CryptoMom Wants US to Learn From Chinese Digital
Innovation*, Cointelegraph (Jan. 17, 2020), https://cointelegraph.com/news/secs-
cryptomom-wants-us-to-learn-from-chinese-digital-innovation .......................................2

Chairman Jay Clayton, Public Statement on Cryptocurrencies and Initial Coin Offerings,
SEC (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-
clayton-2017-12-11 ...............................................................................................6, 22

Commissioner Hester M. Peirce, Broken Windows: Remarks before the 51st Annual
Institute on Securities Regulation (Nov. 4, 2019),
https://www.sec.gov/news/speech/peirce-broken-windows-51st-annual-institute-
securities-regulation. .................................................................................................9

Kollen Post, *Rep. Warren Davidson: You Have to Defend Money to Defend Freedom*,
Cointelegraph (Oct. 22, 2019), https://cointelegraph.com/news/rep-warren-
davidson-you-have-to-defend-money-to-defend-freedom..................................................9

Laura Shin, *Crypto Companies And Investors Fed Up With The SEC*, Forbes (May 29,
2019), https://www.forbes.com/sites/laurashin/2019/05/29/crypto-companies-and-
investors-fed-up-with-the-sec/#3f22ae527701 ...............................................................22

In re Matter of Munchee Inc., Securities Act Release No. 10445, 118 SEC Docket 975
(Dec. 11, 2017) ......................................................................................................8

Letter from Jay Clayton, Chairman, SEC, to Ted Budd, U.S. House of Representatives
(Mar. 7, 2019), https://coincenter.org/files/2019-03/clayton-token-response.pdf..............6

Nikhilesh De, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (April 5, 2018),
https://www.coindesk.com/sec-chief-not-icos-bad ............................................................5

Press Release No. 8051-19, Heath P. Tarbert, Chairman, U.S. Commodity Futures
Trading Comm'n (Oct. 10, 2019),
https://cftc.gov/PressRoom/PressReleases/8051-19 ....................................................6, 22

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:
The DAO, Exchange Act Release No. 81207, 2017 WL 7184670 (July 25, 2017) ........7, 8

SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (last modified
Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-
analysis-digital-assets .......................................................................................8, 9, 21, 22

Tom Zanki, *U.S. Feared As Losing Ground Amid Global Fintech Advances*, Law360
(Dec. 4, 2019), https://www.law360.com/banking/articles/1225127/us-feared-as-
losing-ground-amid-global-fintech-advances ...................................................................22

William Hinman, Director, Division of Corporate Finance, SEC,
Speech on Digital Asset Transactions: When Howey Met Gary (Plastic)
(June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418............5, 6, 22

Defendants respectfully submit this memorandum of law in opposition to Plaintiff Securities and Exchange Commission's ("SEC") Memorandum of Law in Support of its Motion to Strike Telegram's First Affirmative Defense (ECF No. 76) (the "MTS").

## PRELIMINARY STATEMENT

The SEC seeks to strike Defendants' First Affirmative Defense, which alleges that the SEC's interpretation of the term "investment contract" is unconstitutionally vague as applied to Defendants' yet-to-be-issued digital currency, called "Grams." To be clear, Defendants do not contend that the term "investment contract" as used in the Securities Act is facially invalid, or that the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), for determining whether an instrument qualifies as an investment contract is unconstitutionally vague. Rather, as pleaded in detail in Defendants' Answer, Defenses and Affirmative Defenses to Plaintiff's Complaint (ECF No. 37) ("Answer"), it is the SEC's interpretation as to how the *Howey* test should be applied to digital assets like Grams that is unconstitutionally vague and has led to mass confusion in the market regarding when a digital asset will be deemed a "security" subject to the registration requirements of the federal securities laws.

Although the SEC has brought enforcement actions where an issuer seeks to raise and pool funds to develop a blockchain through an unregistered initial coin offering to the public or where the post-launch token represents equity in a venture capital enterprise, the SEC has also made clear that post-launch cryptocurrencies like Bitcoin and Ether may fall outside the reach of the securities laws. To date, however, the SEC has failed to provide any meaningful guidance as to when a post-launch digital asset will be deemed a security. As explained below, the SEC's statements in this regard have been contradictory, impossible to apply, and expressly non-binding on the SEC. This stands in sharp contrast to prior situations where the SEC has provided

concrete, formal guidance on whether new asset classes would be deemed investment contracts so that industry participants may reasonably govern their actions accordingly.[1]

Indeed, just recently one of the SEC's Commissioners reportedly suggested that the SEC simply could not determine whether a given digital asset would be a security at the time of its launch, and thus was considering a "safe harbor" that would allow digital asset platforms to launch without running afoul of the federal securities laws.[2] This view confirms that the SEC's current interpretation of the *Howey* test, as applied to digital assets, effectively precludes such platforms from launching until the SEC gets around to taking regulatory action. In the meantime, the SEC is using enforcement proceedings and litigation as a means of regulation. At the time Defendants were conducting the private placement and raising funds from investors, the SEC had not taken any position that the digital assets created through that process would be deemed a "security" at the time, or that the valid private placement would be deemed a "public distribution" of a security, as the SEC now argues in this litigation. This position appears nowhere in, and is even more radical than, the SEC's confusing and informal guidance to date regarding how the securities laws should apply to such assets.

The SEC's approach also directly contravenes the Supreme Court's direction that parties to a transaction must be able to determine "whether they are covered by the Acts" *before* "they engage in extended discovery and litigation." *Landreth Timber Co. v. Landreth*, 471 U.S. 681,

---

[1] *See* SEC Release No. 33-6188 (1980) ("In an effort to resolve the uncertainty which has developed and thereby assist employers and plan participants in complying with the 1933 Act, the Commission has authorized the issuance of this release setting forth the views of its Division of Corporation Finance . . . on the application of the Act to [employee benefit] plans."); SEC Release No. 33-5347 (1973) (providing guidance in the face of "uncertainty about when offerings of condominiums and other types of similar units may be considered to be offerings of securities that should be registered pursuant to the Securities Act").

[2] Andrew Calderaro, *SEC's CryptoMom Wants US to Learn From Chinese Digital Innovation*, Cointelegraph (Jan. 17, 2020), https://cointelegraph.com/news/secs-cryptomom-wants-us-to-learn-from-chinese-digital-innovation.

696-97 (1985).  The Constitution prohibits regulation through enforcement in this manner

because "[a] fundamental principle in our legal system is that laws which regulate persons or

entities must give fair notice of conduct that is forbidden or required.  This requirement of clarity

in regulation is essential to the protections provided by the Due Process Clause of the Fifth

Amendment."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations

omitted).  The SEC has failed to provide such fair notice in this area, and as a result, the SEC's

motion to strike must fail.

In response, the SEC argues that Defendants had notice that Grams would be considered

"investment contracts" because (i) *Howey* provides a sufficient framework for determining

whether an instrument is an "investment contract," and (ii) Defendants had "actual notice"

through guidance released by the SEC in its so-called "DAO Report" and other enforcement

actions.  (MTS at 11-12.)  The SEC further argues that, because Defendants were aware that

cryptocurrency could be considered an "investment contract" in certain specific circumstances,

and Defendants took steps to avoid those circumstances, they must have been on notice that

Grams too would be an "investment contract."  None of these arguments is sufficient to grant the

SEC's motion to strike.

First, the SEC's reliance on the 1940s decision in *Howey* is unavailing, and rings

particularly hollow in light of the SEC's previous efforts to provide concrete guidance in order to

alleviate market confusion regarding the application of *Howey* to new asset classes.  (*See supra*

note 1.)  Second, contrary to the SEC's argument, the facts and circumstances regarding the

DAO Report and other SEC cryptocurrency enforcement actions are fundamentally different

from the facts and circumstances regarding the TON Blockchain and Grams.  (*See infra* pp. 19-

22.)  In fact, Defendants specifically structured the launch of Grams and the TON Blockchain for

the avowed purpose of *avoiding* the same pattern as those cases in which the SEC has found a digital currency launch constitutes "securities offerings."  (*See infra* pp. 10-12.)[3]

Finally, the SEC's position fails to acknowledge that Defendants spent over *eighteen months* seeking regulatory guidance from the SEC to ensure that their project complied with federal securities laws.  (*See infra* pp. 12-13.)  During that time, the SEC never provided any meaningful guidance as to whether Grams would be considered investment contracts if the TON Blockchain launched, including while Defendants continued to expend substantial time and effort — and private investor funds — to build the TON Blockchain.  The SEC did not make its ultimate opinion known until the eleventh hour, on the eve of the TON Blockchain's launch, when it rushed into Court seeking an "emergency" preliminary injunction to stop the project in its tracks.

As demonstrated herein, Defendants' First Affirmative Defense is both factually sufficient and legally valid.  Plaintiff's motion to strike must therefore be denied.  *GEOMC Co., Ltd. v. Calmare Therapeutics*, 918 F.3d 92 (2d Cir. 2019).

---

[3]  As set forth in Defendants' motion for summary judgment, Defendants raised funds for the TON Blockchain through a private placement that was conducted pursuant to valid exemptions from registration under the Securities Act of 1933 ("Securities Act").  Grams will only be created if and when Defendants' efforts are successful at building and launching the decentralized TON Blockchain platform.  At that point, Grams will be created and distributed to the private investors and will not be investment contracts under *Howey*.  To the contrary, Grams have been designed to serve as a bona fide medium of exchange on the TON Blockchain — a decentralized ledger over which Defendants will not have, and have affirmatively disclaimed, any ongoing essential managerial control or involvement following its launch.  (Defendants' Memorandum of Law (1) In Support of Their Motion for Summary Judgment and (2) In Opposition to Plaintiff's Application for a Preliminary Injunction (ECF No. 71) ("Def. SJ Br.").)

**A.      The SEC's Lack of Public Guidance Regarding Digital Assets**

Since the emergence of distributed ledger technology and digital currencies, the SEC has failed to provide any clear or workable guidance regarding the application of the federal securities laws to this emerging technology.  The SEC and its high-ranking officials have stated that although a cryptocurrency may be considered a security in some contexts, in others it may not, and its characterization may change over time.[5]  Despite this general proposition, however, the SEC has repeatedly failed to provide any substantive direction as to where and when to draw the line on whether a given cryptocurrency is a security (which is subject to the federal securities laws) or whether it is a currency or commodity (which is not).

One thing is certain, however: a cryptocurrency _can_ be considered a commodity and not a security.  As the SEC's Director of Corporate Finance, William Hinman, has stated, the cryptocurrencies Bitcoin and Ether, as analyzed "today," do not resemble securities and thus applying the securities laws "would seem to add little value."[6]  As Director Hinman publicly explained: "Over time, there may be _other_ sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required."[7]  He added, "it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction," and "I encourage anyone that has

---

[4]  Defendants incorporate by reference the facts set forth in Defendants' opening brief in support of their motion for summary judgment and their Local Rule 56.1 Statement in support thereof (ECF No. 75) ("Def. 56.1").

[5]  _See, e.g._, Nikhilesh De, _SEC Chief Touts Benefits of Crypto Regulation_, CoinDesk (Apr. 5, 2018), https://www.coindesk.com/sec-chief-not-icos-bad.

[6]  William Hinman, Director, SEC Division of Corporate Finance, Speech on Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[7]  _Id._ (emphasis added).

questions on a particular [offering] structure to consult with knowledgeable securities counsel or the staff."[8]  In March 2019, in a letter to Rep. Ted Budd, SEC Chairman Clayton publicly endorsed Director Hinman's comments, including his opinion that the cryptocurrency Ether is not a security.[9]  He wrote:

> I agree with Director Hinman's explanation of how a digital asset transaction may no longer represent an investment contract if, for example, purchasers would no longer reasonably expect a person or group to carry out the essential managerial or entrepreneurial efforts.  Under those circumstances, the digital asset may not represent an investment contract under the *Howey* framework.[10]

And just recently, the Chairman of the CFTC stated that Ether "is a commodity, and therefore it will be regulated under the [Commodity Exchange Act]."[11]  This is consistent with Chairman Clayton's earlier public comments indicating that it is possible to launch a new cryptocurrency without violating federal securities laws.  For example, in a 2017 statement, Clayton stated:

> It is possible to conduct an [Initial Coin Offering or "ICO"] without triggering the SEC's registration requirements.  For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements.[12]

Despite these statements, and the SEC's recognition that guidance is necessary in areas of uncertainty,[13] the SEC has failed to provide clear regulations or guidance on how new

---

[8] *Id.*

[9] Letter from Jay Clayton, Chairman, SEC, to Ted Budd, U.S. House of Representatives (Mar. 7, 2019), https://coincenter.org/files/2019-03/clayton-token-response.pdf.

[10] *Id.*

[11] Press Release No. 8051-19, Heath P. Tarbert, Chairman, U.S. Commodity Futures Trading Comm'n (Oct. 10, 2019), https://cftc.gov/PressRoom/PressReleases/8051-19.

[12] Chairman Jay Clayton, Public Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[13] *See supra* note 1.

cryptocurrencies can emerge and occupy the same space as Bitcoin and Ether without violating the federal securities laws.

Instead, the SEC has pursued regulation through enforcement, carving out certain particular fact patterns in which it has determined that an offer or sale of a digital asset will violate securities laws. For example, on July 25, 2017, the SEC publicly released an investigative report (the "DAO Report") concerning the regulation of so-called DAO Tokens.[14] According to the DAO Report, an entity called The DAO planned to raise funds from the public through the sale of DAO Tokens and use those funds for money-making "projects." DAO Report at *1. A DAO Token granted the token holder certain ownership and voting rights over which projects to fund, but any proposal put to a vote by the token holders was subject to pre-review by The DAO's "Curators." *Id.* at *3, *5. According to certain promotional materials, The DAO would earn profits by funding projects and provide DAO Token holders a return on their investment by paying dividends out of those proceeds. *Id.* at *3.

In light of the above, the SEC concluded that, under the "particular facts and circumstances of the offer and sale," DAO Tokens should be considered "investment contracts" under *Howey*, and thus "securities" subject to the registration requirements of the federal securities laws. DAO Report at *7-12. In so doing, the SEC focused on the fact that: (i) The DAO raised money from the public through its sale of DAO Tokens; (ii) "The DAO was a for-profit entity whose objective was to fund projects in exchange for a return on investment," and (iii) the efforts of The DAO's founders and Curators were essential to the enterprise and the profits that DAO Token holders would receive. *Id.* at *9. As a result, the SEC determined that

---

[14] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207, 2017 WL 7184670 (July 25, 2017).

"The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied." *Id.* at *13.

Following the release of the DAO Report in July 2017, the SEC instituted a number of enforcement actions in connection with other public offers and sales of digital assets under facts and circumstances similar to the offering outlined in the DAO Report, and some of which involved alleged schemes to defraud public investors. *See, e.g.*, *SEC v. AriseBank*, No. 18 Civ. 186 (N.D. Tex. Jan. 30, 2018); *SEC v. PlexCorps*, No. 17 Civ. 7007 (E.D.N.Y. Dec. 1, 2017); *SEC v. REcoin Group, Inc.*, No. 17 Civ. 5725 (E.D.N.Y. Sept. 29, 2017); *In re Matter of Munchee Inc.*, Securities Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017).

Then, in April 2019, the SEC's Strategic Hub for Innovation and Financial Technology ("FinHub") published its "*Framework for 'Investment Contract' Analysis of Digital Assets*" ("Framework").[15] FinHub specifically stated that the Framework "is not a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content."[16] While the Framework states that it provides guidance "for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions," the Framework falls far short of this goal.[17] Rather, the Framework provides a list of no fewer than 38 factors or "characteristics" (plus nearly 30 additional sub-factors) that FinHub claims are "especially relevant" to determining only one prong of the *Howey* test — *i.e.*, whether potential purchasers of a given digital asset will reasonably expect profits based on the

---

[15]  SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (last modified Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_edn1.

[16]  *Id.* at n.1.

[17]  *Id.* at II.

managerial or entrepreneurial efforts of others.[18]  The Framework does not provide any guidance

for weighing these numerous factors or how to apply them to the facts of any particular matter.

To the contrary, the Framework states that "no one of the following characteristics is necessarily

determinative"[19] and they are "not intended to be exhaustive in evaluating whether a digital asset

is an investment contract or any other type of security."[20]

       To date, the SEC has failed to promulgate any clear regulations or provide formal

guidance regarding how companies seeking to enter the cryptocurrency market can do so while

complying with U.S. securities laws.  This has led to sharp criticisms by lawmakers, academics,

industry participants, and even one of the SEC's own Commissioners.  As Rep. Warren

Davidson (R-OH) publicly expressed, "[t]he SEC is doing a complete patchwork of regulation.

No one knows where they're going," and its approach of regulation through enforcement has "all

the charm and inefficiencies of third-world power structures."[21]  SEC Commissioner Hester

Peirce added: "I am concerned about how the SEC has regulated this space, because I believe our

lack of a workable regulatory framework has hindered innovation and growth . . . [and] offer[s]

no clear path for a functioning token network to emerge."[22]

---

[18]  *Id.* at II.C.

[19]  *Id.* at II.C.1.

[20]  *Id.* at III.

[21]  *See* Kollen Post, *Rep. Warren Davidson: You Have to Defend Money to Defend Freedom*, Cointelegraph (Oct. 22, 2019), https://cointelegraph.com/news/rep-warren-davidson-you-have-to-defend-money-to-defend-freedom.

[22]  Commissioner Hester M. Peirce, Broken Windows: Remarks before the 51st Annual Institute on Securities Regulation (Nov. 4, 2019), https://www.sec.gov/news/speech/peirce-broken-windows-51st-annual-institute-securities-regulation.

**B.      Defendants Seek Guidance From the SEC and the SEC Brings Suit**

Against this backdrop, Defendants began contemplating in 2017 how they could raise

funds to develop the TON Blockchain.  From the beginning, Defendants recognized that they

needed to retain flexibility over both how they raised funds for their blockchain project as well as

the characteristics of the TON Blockchain itself in order to be able to react to the uncertainty in

the regulatory environment.[23]  For example, Defendants initially contemplated engaging in a

private pre-sale of the right to receive Grams in January 2018, followed by a public sale of

Grams in March 2018 (Def. 56.1 ¶ 96), but later changed their plans after the DAO Report and

the SEC's enforcement actions suggested that a public ICO could violate securities laws.[24]

Defendants instead opted to sell the right to receive Grams to a limited group of private

purchasers using contracts (the "Purchase Agreements") in part because they wanted to take "as

safe as possible [of an] approach and deal only with highly sophisticated institutional investors in

a proper, organized private placement."  (*Id.* ¶¶ 97-98.)

Rather than conduct a public ICO, Defendants determined to raise funds through a global

private placement in order to fund the development of the TON Blockchain and create Grams

("Private Placement").  (*Id.* ¶¶ 91-92, 96-98.)  Defendants entered into "Purchase Agreements"

with high net worth investors, pursuant to which purchasers paid U.S. dollars or Euros in

---

[23] *See* Declaration of Alexander C. Drylewski (ECF No. 73) ("Drylewski Decl.") Ex. 2, Durov Dep. 159:3-13 ("The way we designed it is, the private placement, was that we reserved a lot of flexibility to how the project and its parts could look like, and this flexibility is reflected in the purchase agreements and its appendices. That gave us a comfort of knowing that we would be able to change certain, if not all, aspects of what we're trying to build based on the feedback that we could receive from the regulators, including the SEC, in the following months."); Durov Dep. 159:25-160:3 ("[Q:] Is it fair to say that you, to this day, retain that flexibility to change features of how a project might look like in the future? A: That's correct.").

[24] Drylewski Decl. Ex. 8, Perekopsky Dep. 86:1-18 ("[S]ince the regulation of ICO and cryptocurrencies was not very clear, in some jurisdictions, and we thought it makes more sense to use more traditional way of fund-raising, which are like already established in the market, without creating unnecessary risks, and due to this like regulation uncertainties we decided to focus on working only with sophisticated, reputable investors.").

exchange for Defendants' promise to develop the TON Blockchain and deliver a contractually agreed-upon number of Grams upon successful launch of the blockchain. (*Id.* ¶¶ 100-103, 106.) The Private Placement was conducted in accordance with Rule 506 of Regulation D (for U.S. Purchasers) and Regulation S (for non-U.S. purchasers) under the Securities Act. (*Id.* ¶ 107.) The investors were all highly sophisticated, with an average investment of over $10 million. (*Id.* ¶ 100.) Defendants engaged local counsel in approximately 30 non-U.S. jurisdictions to advise on local securities law compliance in connection with the Private Placement. (Answer ¶ 7.)

The Purchase Agreements make clear that Telegram possesses the "sole discretion" as to whether the TON Blockchain is ready to launch and thus whether Grams will be created and delivered. (Defendants' Response to Plaintiff's Local 56.1 Statement in Support of its Motion for Summary Judgment ("Def. Resp. 56.1") ¶ 169.) Both Defendants and the Private Placement purchasers warranted that performance under the Purchase Agreements may not "violate any judgment, statute, rule or regulation applicable to [them]" or "contravene any law, regulation or regulatory policy applicable to the Purchaser." (*Id.*)

Defendants also maintained flexibility over the features of the TON Blockchain project to ensure that they could adapt to regulatory considerations. To that end, Defendants required every investor to warrant that it read certain "Risk Factors," which included that "[t]he Issuer may need to *change its business model* to comply with [certain jurisdictions'] licensing and/or registration requirements (or any other legal or regulatory requirements) in order to avoid violating applicable laws or regulations." (Def. 56.1 ¶ 172 (emphasis added).) Similarly, Defendants disclosed that actions by "governmental authorities" "may result in curtailment of, or inability to operate, the TON Blockchain as intended," (*id.* ¶ 174) and that "[a]lthough Telegram intends for the TON Blockchain to have the features and specifications set forth in the 'Telegram

Open Network' technical white paper . . . , changes to such features and specifications may be made for any number of reasons" (*id.* ¶ 176).

On February 2, 2018, counsel for Defendants contacted the SEC regarding the TON Blockchain platform and that same day, the SEC sent a letter to "Telegram LLC" which stated that "[t]he staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above and requests that your client, Telegram LLC ('Telegram'), voluntarily produce to the staff" a number of categories of documents. (*Id.* ¶¶ 281-82.) Telegram agreed to the voluntary production of documents, and the parties agreed to the scope of such production. (*Id.* ¶ 283.) Over the next 18 months, Defendants engaged in voluntary cooperation and discussions with the SEC in order to explain the details of their project and to obtain guidance regarding the potential application of the federal securities laws. (*Id.* ¶ 284.)

During this time, Defendants voluntarily (i) produced thousands of pages of messages and communications with U.S. purchasers; (ii) submitted a detailed legal memorandum on June 26, 2018, regarding their securities analysis of Grams, along with four supplemental memoranda dated November 28, 2018, February 27, 2019, March 18, 2019, and July 25, 2019; (iii) participated in three in-person presentations to the SEC, during which they answered hundreds of questions regarding the TON Blockchain, the TON Foundation, Grams and related matters; and (iv) engaged in regular email and telephone discussions with the SEC and promptly answered questions and provided additional information regarding a wide range of topics relating to the above. (*Id.* ¶¶ 284-85.)

Where the SEC did provide some limited feedback to Defendants regarding the TON Blockchain, Defendants made changes to their project in an attempt to address the SEC's concerns. (*Id.* ¶ 286.) As one example, after the SEC expressed concerns regarding the so-called

TON Foundation's anticipated ability to purchase Grams in the open market following launch of the TON Blockchain, Defendants submitted a supplemental legal memorandum setting forth their analysis that there should not be any concerns in this respect under *Howey*, but nevertheless confirming that Defendants were willing to remove the TON Foundation's Gram-buying function. (Answer ¶ 39.) Defendants also solicited the SEC's views on a number of other issues, including, among others, the structure and governance of the TON Foundation and the use of third-party exchanges where the TON Foundation might sell Grams. The SEC never provided any feedback in response to these specific requests. (*Id.*)[25]

On October 11, 2019 — 18 months after Defendants first began voluntarily engaging with the SEC and seeking feedback, and fewer than three weeks before the "Termination Date" in the Private Placement Purchase Agreements — the SEC initiated this action and filed an "Emergency Application for an Order to Show Cause, Temporary Restraining Order, and Order Granting Expedited Discovery and Other Relief." Among other things, the SEC sought to enjoin the launch of the TON Blockchain and any sale, offer or distribution of Grams. In its Complaint, the SEC alleges that Defendants had been engaged in an "ongoing illegal offering of digital-asset securities called 'Grams'" since the Private Placement began in early 2018. (Complaint (ECF No. 1) ¶ 1.) Prior to the filing, the SEC never asked Defendants whether they would agree to seek to delay the launch of the TON Blockchain and never stated that it would seek injunctive relief to stop the launch. (Answer ¶ 41.)

---

[25] After a year and a half of cooperation and mere weeks before the anticipated launch of the TON Blockchain, the SEC informed Defendants for the first time that it intended to serve a formal subpoena for even more documents. *See* Declaration of Kevin P. McGrath in Support of Plaintiff's Motion to Strike (ECF No. 83), Ex. I (Letter from C. Mahoney to SEC (Sept. 30, 2019)). Defendants expressed their disappointment that, "[d]espite [their] efforts and numerous requests to engage on the specifics of the TON project and [their] analyses, the Staff has not provided any substantial, meaningful feedback over the last eighteen months." *Id.* at 2. Although Defendants did not agree to accept service of the subpoena, they continued to "voluntarily comply with the Staff's requests for additional information and documents." *Id.* at 2-3.

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Second Circuit has instructed that "the courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). An affirmative defense may be stricken only if it (i) fails to allege facts sufficient to support the defense or (ii) is legally insufficient. *GEOMC*, 918 F.3d at 98.

Whether an affirmative defense fails to adequately plead facts is a context-specific inquiry, which favors affirmative defenses over other pleadings where more time is allowed. *GEOMC Co.,* 918 F.3d at 98. Moreover, circumstances in which facts may not readily be known to the defendant "warrant[] a relaxed application of the plausibility standard." *Id.* "When considering a motion to strike affirmative defenses, "the Court should construe 'the pleadings liberally to give the defendant a full opportunity to support its claims at trial, after full discovery has been made.'" *Haber v. Bankers Standard Ins. Co.*, No. 3:19-CV-276 (VLB), 2019 WL 7343397, at *1 (D. Conn. Dec. 31, 2019) (citation omitted). "A factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of litigation. A defendant with such a defense is entitled to a full opportunity to assert it and have it adjudicated before a plaintiff may impose liability." *GEOMC*, 918 F.3d at 98.

**ARGUMENT**

## I.   **PLAINTIFF'S MOTION TO STRIKE SHOULD BE DENIED**

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. This requirement of clarity

in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Fox Television Stations*, 567 U.S. at 253 (citations omitted). "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

In addition, "[a] statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). "A plaintiff making an as-applied challenge must show that the statute in question provided insufficient notice that his or her behavior at issue was prohibited." *Copeland*, 893 F.3d at 110 (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 745 (2d Cir. 2010)). Where an enforcement action serves as the "'initial means for announcing a particular interpretation' — or for making [the agency's] interpretation clear," the court "must ask whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations." *Gen. Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (citation omitted). "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Id.* (quoting *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)).

As demonstrated below, Defendants have sufficiently pled an affirmative defense based

on constitutional void-for-vagueness as applied to the facts and circumstances of this case, and are "entitled to a full opportunity to assert [their defense] and have it adjudicated before [Plaintiff] may impose liability." *GEOMC*, 918 F.3d at 98.

A.     **Defendants Adequately Plead That the Term "Investment Contract" Is Unconstitutionally Vague as Applied to This Case**

Defendants' challenge to the constitutional validity of the term "investment contract" as applied to Grams is sufficiently pled and Plaintiff's motion to strike should be denied. In moving to strike, the SEC relies on cases that rejected vagueness challenges to the statutory term "investment contract" *on its face*. *See SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1052 (2d Cir. 1973); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146-47 (D.D.C. 2011). As explained above, however, this is not the basis of Defendants' defense here. (*See supra* p. 1.) Rather, Defendants challenge the SEC's interpretation of the term "investment contract" *as applied* to the facts and circumstances of this case. *See Copeland*, 893 F.3d at 112 ("That a statute was lawfully applied to one set of facts does not necessarily prove that it may lawfully be applied to a different set of facts."); *Exxon Mobil Corp. v. Mnuchin*, No. 3:17-CV-1930-B, 2019 WL 7370430, at *19 (N.D. Tex. Dec. 31, 2019) (concluding that, under the circumstances, an otherwise valid regulation failed to provide fair notice to Exxon that its actions were prohibited).

Moreover, although the SEC relies on certain decisions where courts have declined to find the term "investment contract" unconstitutionally vague as applied, these cases are entirely inapposite. For example, *United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) (MTS 10), involved a straight-forward application of *Howey*. In that case, the defendant operated a scheme where he allegedly sold fake digital tokens via two public ICOs, through which he would ostensibly pool together funds to invest in real estate and

diamonds and promised returns of a minimum of 10 to 15 percent per year to token holders. *Zaslavskiy*, 2018 WL 4346339, at *2. The defendant allegedly never purchased any real estate or diamonds and did not develop any token or coin. *Id.* Contrary to the SEC's suggestion, the *Zaslavskiy* court did not reject the notion that the federal securities laws may be unconstitutionally vague as applied to cryptocurrencies in every circumstance (MTS 10). Rather, the court emphasized that "the question is whether the law under which Zaslavskiy is charged is unconstitutionally vague *as applied to his conduct*" and "[w]hether or not the investments . . . are cryptocurrencies is beside the point." *Zaslavskiy*, 2018 WL 4346339, at *2. (emphasis added).

The SEC's citation to *United States v. Farris*, 614 F.2d 634 (9th Cir. 1979), fares no better. (MTS 10.) That case involved an alleged fraudulent Ponzi scheme in which the defendants sold investors interests in notes and mortgages on real property and promised large returns on those investments. The defendants allegedly used the proceeds from new investors to fund the well-publicized returns to previous investors, which in turn attracted more new investors to fuel the scheme. *Farris*, 614 F.2d at 637. The Ninth Circuit rejected the defendants' argument that the term "investment contract" was unconstitutionally vague as applied to those circumstances, noting that "[r]easonable people in [the defendants'] position have every reason to know that if they commit fraud in selling paper such as [the defendants'], they commit a crime." *Id.* at 641.

This case is a far cry from the above examples. Indeed, this case does not involve any allegations of fraud or misrepresentation, and Defendants do not seek to challenge the constitutional validity of the term "investment contract" on its face, nor do they argue that the term cannot ever be constitutionally applied to cryptocurrencies. Rather, Defendants have pleaded that the term "investment contract" in the particular circumstances of this case — *i.e.*, as

17

*applied* to Grams at the time of launch — is unconstitutionally vague. This Court can, and should, entertain that challenge and the SEC's motion to strike should be denied. *See Exxon*, 2019 WL 7370430, at *19.

**B.    Defendants Adequately Plead That They Did Not Have Fair Notice that Grams, at the Time of Launch, Would Be Treated as "Securities"**

The SEC erroneously argues that Defendants had notice that Grams could be treated as securities because they "expressed concern that . . . the federal securities laws could potentially apply" and "decided to restructure the Offering for that very reason." (MTS 11-12.) This argument proves too much. Indeed, rather than serving as a basis to strike Defendants' defense, these undisputed facts demonstrate that Defendants made efforts to attempt to comply with the securities laws based on the limited information from the SEC at the time, and *still* did not receive sufficient notice as to whether their actions were in violation of the securities laws. These facts underscore, rather than undermine, Defendants' position that application of *Howey* in these circumstances is impermissibly vague. *See Exxon*, 2019 WL 7370430, at *18.

Indeed, taken at face value, the SEC's argument boils down to the following: (i) Defendants knew that the federal securities laws apply in Circumstance A, (ii) so Defendants changed plans from Circumstance A to Circumstance B in order to attempt to comply with the federal securities laws, and (iii) therefore, Defendants should have known that the federal securities laws *could* apply in Circumstance B. This position fails to square with logic or the law, and demonstrates precisely why the SEC's actions in this matter have left the parties to the transaction unable to reasonably determine "whether they are covered by the [Securities] Acts until they engage in extended discovery and litigation" over "elusive" concepts. *Landreth*, 471 U.S. at 696-97; *see also Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) ("Because there was substantial uncertainty in the Commission's interpretation of Rule 15c3-3(e), [the defendant] was

not on reasonable notice that [his] conduct might violate the Rule."); *Exxon*, 2019 WL 7370430, at *18 (penalty notice issued by OFAC was unconstitutional because a regulated party would not "be able to identify, with 'ascertainable certainty,' the standards with which [OFAC] expects parties to conform").  Moreover, fair notice requires that the regulated party be given a reasonable opportunity to understand what conduct *is* prohibited, not what conduct *could be* prohibited, as the SEC erroneously argues.  (MTS 2); *Copeland*, 893 F.3d at 110 (citing *Dickerson v. Napolitano*, 604 F.3d 732, 745 (2d Cir. 2010) ("A plaintiff making an as-applied challenge must show that the statute in question provided insufficient notice that his or her behavior at issue *was* prohibited." (emphasis added)); *see also Exxon*, 2019 WL 7370430, at * 13 (OFAC's interpretation of a regulation in one circumstance did not provide fair notice of its interpretation of a similar regulation in another circumstance).

### 1.    This action is fundamentally different from previous SEC actions

The SEC's reliance on the DAO Report and its previous enforcement actions involving other digital assets (MTS 2-3) fails to even acknowledge — let alone address — the critical and fundamental differences between the particular circumstances of those actions and the circumstances here.  Indeed, apart from the involvement of a purported cryptocurrency, those other actions are wholly dissimilar to this case.

Unlike other virtual currencies over which the SEC has asserted its jurisdiction to date, Defendants did not — and will never — offer any digital assets to the public through an ICO. Rather, as detailed above and at length in Defendants' motion for summary judgment (ECF No. 71), Defendants entered into *private Purchase Agreements* with a select number of high net worth, highly sophisticated purchasers that provided for the future return of a currency (Grams), but only following the completion and launch of a fully functional, decentralized TON Blockchain platform.  Significantly, and unlike the other actions upon which the SEC relies in its

motion to strike, these private agreements were offered pursuant to valid exemptions to registration under Rule 506(c) of Regulation D and/or Regulation S under the Securities Act. (*See supra* p. 11.)

Per the terms of the private Purchase Agreements, the participants' funds were used to finance the development of the TON Blockchain and no participant will receive any Grams unless and until the TON Blockchain is successfully launched. Further, the Grams themselves, deliverable pursuant to the Purchase Agreements, will constitute the purchasers' return on their investment made through the Private Placement and, just like other well-known cryptocurrencies Bitcoin and Ether, will serve as a medium of exchange on the platform going forward. (*See supra* pp. 5-7, note 4.) The Grams that will be created once the TON Blockchain launches will not bear any of the hallmarks of a security, and will not carry with them any promise from Defendants to continue to undertake efforts with respect to the TON Blockchain (and, in fact, Defendants have affirmatively disclaimed any such promises to the public (Def. 56.1 ¶ 277)). Grams also will not entitle their holders to any income, any dividends, or any interests in Defendants or any other entity, nor do they resemble stock or any other form of equity. (*See* Def. 56.1 ¶¶ 164, 200, 277.) Rather, Grams are intended to serve as a bona fide currency on the decentralized TON Blockchain with the goal of eventually becoming an alternative to traditional currencies in commercial transactions. (Def. 56.1 ¶¶ 55-56.)

Moreover, in stark contrast to the SEC's previous actions where the public was promised profits based on an investment in the digital tokens at issue, here, Defendants have taken efforts to publicly disabuse future Gram purchasers of any expectation of profits and affirmatively disclaimed any promises or commitments to undertake efforts to further develop the TON Blockchain following its launch. As Defendants have emphasized to the public:

1. "Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram may never do so."

2. Gram purchasers "should **NOT** expect any profits based on [their] purchase or holding of Grams, and Telegram makes no promises that [purchasers] will make any profits. Grams are intended to act as a medium of exchange between users in the TON ecosystem. Grams are **NOT** investment products and there should be **NO** expectation of future profit or gain from the purchase, sale or holding of Grams."

3. "Grams do **NOT** represent: (a) Any equity or other ownership interest in Telegram or its affiliates; (b) Any rights to dividends or other distribution rights from Telegram or its affiliates; (c) Any governance rights in Telegram or its affiliates."

(Def. 56.1 ¶ 277.)

In attempting to draw parallels between this case and others in which it has pursued enforcement, the SEC ignores entirely the nature of Defendants' offering and the public statements made to potential future Gram purchasers — factors that fundamentally set this case apart from others. (Def. SJ Br. 42-47; Def. 56.1 ¶¶ 91-133.)

FinHub's "Framework," which was released after Defendants conducted the Private Placement but before any launch of Grams, makes matters even worse. Framework, *supra*, note 15. Under any objective measure, the Framework is entirely unwieldy, encompassing no fewer than 60 factors and sub-factors that "are not intended to be exhaustive in evaluating whether a digital asset is an investment contract or any other type of security, and no single factor is determinative." *Id.* at III. If that were not enough, the Framework also makes clear that it "is not a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content." *Id.* at n.1.

This is a far cry from fair and intelligible notice to market participants as to whether their conduct runs afoul of the federal securities laws.[26] The Framework therefore undermines, rather than supports, the SEC's motion to strike.

### 2. At the time of the launch, Grams will function in the same manner as Bitcoin or Ether, digital assets that the SEC considers non-securities

Grams will not be launched unless and until the TON Blockchain is ready to launch in Defendants' sole discretion, at which point Grams are intended to function in the same manner as Bitcoin and Ether. (Def. 56.1 ¶¶ 53-58, 277.) As noted above, the SEC has acknowledged that both Bitcoin and Ether are not securities and thus applying the securities laws "would seem to add little value."[27] The SEC has also stated that it is possible for emerging cryptocurrencies to launch without triggering the SEC's registration requirements, such as through a Regulation D exemption.[28]

Nevertheless, the SEC has not explained _how_ or _in what circumstances_ a new digital asset platform can be built and launched in a legally compliant manner. In this action, the SEC now contends that Grams should be subject to the federal securities laws following the launch of the TON Blockchain despite the above comments from SEC officials and despite the undeniably strong parallels between Grams, Bitcoin and Ether. In so doing, the SEC appears to be saying

---

[26] _See_ Laura Shin, _Crypto Companies and Investors Fed Up With the SEC_, Forbes (May 29, 2019), https://www.forbes.com/sites/laurashin/2019/05/29/crypto-companies-and-investors-fed-up-with-the-sec/#74d55e7a7701; Tom Zanki, _U.S. Feared as Losing Ground Amid Global Fintech Advances_, Law360 (Dec. 5, 2019), https://www.law360.com/articles/1225127/us-feared-as-losing-ground-amid-global-fintech-advances ("Gary Cohn, former chief economic adviser to President Donald Trump, said the U.S. is still the world's dominant capital market but is on the 'fringe of potentially losing that position,' pointing to rapid advances in payments technology in Asia and the growth of digitized assets and securities abroad.").

[27] William Hinman, Director, Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418; _accord_ Press Release No. 8051-19, _supra_ note 11.

[28] Public Statement, _supra_ note 12 ("It is possible to conduct an [Initial Coin Offering or "ICO"] without triggering the SEC's registration requirements. For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements.").

that _all_ new cryptocurrencies are (and will be) securities, regardless of their form or the manner in which they are launched — a result directly contrary to the standard set forth in _Howey_ and which does not follow any formal rulemaking subject to notice and comment from the public. _See Landreth_, 471 U.S. at 691 (the _Howey_ economic reality test was designed to determine whether a particular instrument is an investment contract when entered into).

### 3. Defendants sought guidance from the SEC but did not receive it

The SEC's claim that "[a]lthough Telegram clearly had 'the ability to clarify the meaning of the regulation by its own inquiry' with the SEC, it deliberately and knowingly chose not to do so" is, unfortunately, a mischaracterization. (MTS 12 (citation omitted).) As noted above and detailed in Defendants' Answer and Affirmative Defenses, Defendants voluntarily engaged with the SEC over the course of 18 months as they continued to raise funds from investors and spend those funds on building the TON Blockchain. (Def. 56.1 ¶¶ 281-87.) Defendants met with the SEC in person on numerous occasions, produced thousands of pages of messages and communications with purchasers, submitted detailed legal memoranda, and engaged in regular email and telephone discussions with the SEC. (_Id._ ¶¶ 284-85.) Defendants even made changes to the TON project in an attempt to address the SEC's very limited feedback. (_Id._ ¶ 286.) In light of this record, Defendants are at a loss to understand the SEC's comment that they "deliberately and knowingly chose not" to seek guidance.[29]

---

[29] Adding to the regulatory confusion, another U.S. regulator came to the conclusion that Grams are currency or money. Indeed, the United States Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), considers TON Issuer Inc to be a Money Services Business subject to the Bank Secrecy Act. (Def. 56.1 ¶ 94.) As a result of this determination, TON Issuer Inc must register with FinCEN as a Money Services Business in the U.S. (which it did on August 30, 2019). (_Id._ ¶ 95.) By definition, Money Services Businesses do "not include: . . . [a] person registered with, and functionally regulated or examined by, the SEC or the CFTC . . . ." 31 C.F.R. § 1010.100(ff)(8)(ii).

Throughout its brief, the SEC attempts to downplay the significance of Defendants' request for guidance, stating that Defendants did not reach out until after they "made [their] first sales to investors."  (MTS 5.)  But irrespective of when Defendants first reached out, the SEC does not cite any support for the proposition that the precise timing of contact can or should negate over 18 months of voluntary cooperation, during which time the SEC was aware that Defendants had already conducted the first round of the Private Placement and was conducting a second round.  (Answer ¶¶ 35-42.)

These facts support Defendants' affirmative defense and compel denial of Plaintiff's motion.  *See Exxon*, 2019 WL 7370430, at *12 (despite Exxon's failure to seek guidance, OFAC failed to provide fair notice that Exxon's actions were proscribed and noting that "the burden of providing fair notice remains with the agency – not the regulated party").

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court deny the SEC's motion to strike.

Dated:  New York, NY
        January 21, 2020

Respectfully submitted,

  /s/ Scott D. Musoff
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

*Attorneys for Defendants*