UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :
  :
                   Plaintiff,  :      19 Civ. 9439 (PKC)
  :
         - against -  :      ECF Case
  :
TELEGRAM GROUP INC. and TON ISSUER INC.,  :
  :
            Defendants.  :
  :

------------------------------------------------------------------- x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW (1) IN FURTHER SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION AND (2) IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jorge G. Tenreiro
Kevin P. McGrath
Ladan F. Stewart
Alison R. Levine

Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

January 21, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT .......................................................................................... 1

COUNTER-STATEMENT OF FACTS .............................................................................. 2

    I.    TELEGRAM'S EQUIVOCAL CLAIM THAT IT MAY NO LONGER SUPPORT "TON" CONTRADICTS ITS PAST PROMISES TO INVESTORS. .............................. 3

    II.    TELEGRAM HAS PUT FORTH NO EVIDENCE REGARDING THE TON BLOCKCHAIN'S STATE OF DEVELOPMENT AT LAUNCH. ................................ 3

    III.    TELEGRAM'S SALES OF GRAMS TO INITIAL PURCHASERS WERE THE FIRST STEP IN ITS INTENDED PUBLIC DISTRIBUTION OF GRAMS. .................. 4

ARGUMENT ........................................................................................................................ 5

    I.    TELEGRAM SHOULD BE PRELIMINARILY AND PERMANENTLY ENJOINED FROM DELIVERING THE GRAMS IT HAS ALREADY SOLD. ............ 5

    II.    THE SEC, NOT TELEGRAM, IS ENTITLED TO SUMMARY JUDGMENT BECAUSE FUTURE OFFERS AND SALES OF GRAMS WILL BE OFFERS AND SALES OF SECURITIES. ....................................................................................... 8

        A.    Gram Purchasers Will Reasonably Expect Telegram to Expend Efforts on the TON Blockchain and Drive Up Grams' Demand and Value. .......................... 9

            1.    Telegram's representations and the economic reality of TON and Grams create reasonable expectations of significant future efforts by Telegram. ............................................................................................. 9

            2.    Telegram's eleventh-hour "Public Notice" cannot erase its past statements or economic reality. .................................................................. 11

        B.    Gram Purchasers Reasonably Will Be Attracted By the Potential for Profit. ....................................................................................................................14

        C.    Gram Purchasers Will Be Buying Into a Common Enterprise. ............................17

        D.    Telegram's "Commodity" and "Currency" Labels and Comparisons to Other Digital Assets Do Not Trump Economic Reality. ......................................19

            1.    Howey focuses broadly on the economic nature of the transaction, not narrowly on the label of the underlying instrument. ............................. 19

            2.    Grams are not Bitcoin or Ether. .................................................................. 23

    III.    TELEGRAM HAS BEEN ENGAGED, AND IS ENGAGED, IN A PUBLIC DISTRIBUTION OF GRAMS TO WHICH NO EXEMPTION CAN APPLY. ............ 25

A.  Telegram Should Be Preliminarily and Permanently Enjoined From the Illegal Public Offering it Has Been, and Is, Engaged in. ......................................26

B.  The Public Distribution Is Underway as Initial Purchasers Have Already Offered, and Reportedly Sold, Gram Interests in Secondary Transactions...........28

C.  Telegram's Offers and Sales to Initial Purchasers Were Not Otherwise Exempt.....................................................................................................................30

IV.  TELEGRAM'S EQUITABLE ARGUMENTS ARE IMPROPER................................. 34

**CONCLUSION** ...................................................................................................................... **35**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerberg v. Johnson*, 892 F.2d 1328 (8th Cir. 1989)............................................................. 26, 31

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980)..................................... 13

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ....................................... 11, 18

*Cameron v. Outdoor Resorts of Am.*, 608 F.2d 187 (5th Cir. 1979)....................................... 15, 25

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018)................................................... 21, 23

*Christensen v. Harris Cty.*, 529 U.S. 576 (2000)............................................................................ 23

*Connors v. Lexington Ins. Co.*, 666 F. Supp. 434 (E.D.N.Y. 1987) ............................................ 25

*Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir. 1981) ............................................................. 23

*Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir 1985) ................................................................................................. 14, 21

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004)............................................................................. 27

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959)....................................................... 31, 33

*Glen-Arden Commodities v. Constantino*, 493 F.2d 1027 (2d Cir. 1974) ................. 14, 17, 18, 20

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000)........................................................................... 35

*Grenader v. Spitz*, 537 F.2d 612 (2d Cir. 1976) ................................................................. 15, 16, 24

*Happy Inv. Gp. v. Lakeworld Properties, Inc.*, 396 F. Supp. 175 (N.D. Cal. 1975)................... 13

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) ...................................................... 13

*In re Bitcoin Inv. Tr.*, Release No. 78282, 2016 WL 4363462 (July 11, 2016)........................... 22

*In re BTC Trading, Corp.*, Release No. 9685, 2014 WL 6872955 (Dec. 8, 2014)....................... 22

*In re Initial Pub. Offering Secs. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................... 34

*In re Nat. Res. Corp.*, 8 S.E.C. 635, 1941 WL 36308 (Feb. 14, 1941)........................................ 10

*Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971)...................................................................... 15

*Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) ............................................................. 22

*Lewisohn Copper Corp.*, 38 S.E.C. 226 (1958) .......................................................... 26

*Long v. Shutlz Cattle Co., Inc.*, 881 F.2d 129 (5th Cir. 1989) ..................................... 10

*Miller v. Central Chinchilla Gp., Inc.*, 494 F.2d 414 (8th Cir. 1974).............................. 17, 18, 21

*Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir. 1980) ..................................... 13, 23, 25

*North Carolina v. Rice*, 404 U.S. 244 (1971) (*per curiam*).......................................... 12

*R.A Holman v. SEC*, 366 F.2d 446 (2d Cir. 1966) ...................................................... 26

*Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972) ......................... 6

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ............................................... 18

*Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7 (1st Cir. 1993).................................... 11, 13

*SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979)
    *vacated on other grounds, Aaron v. SEC*, 446 U.S. 680 (1980)........................... 26

*SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577 (2d Cir. 1982)......................... 11, 13, 17

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)............................................. 13

*SEC v. Cap. Gains Research Bureau*, 375 U.S. 180 (1963) ....................................... 34

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998), *aff'd* 155 F.3d 129 (2d Cir. 1998)........ 26

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ......................................................... 7

*SEC v. Elec. Warehouse, Inc.*, 689 F. Supp. 53 (D. Conn. 1988)................................ 35

*SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019) ............................................................... 17

*SEC v. Frank*, 388 F.2d 486 (2d Cir. 1968)................................................................. 8

*SEC v. Gentile*, 939 F.3d 549 (3d Cir. 2019)............................................................... 7

*SEC v. Glenn W. Turner Enters.*, 474 F.2d 476 (9th Cir. 1973).................................. 10

*SEC v. Keating*, No. 91 Civ. 6785, 1992 WL 207918 (C.D. Cal. July 23, 1992)........................ 35

*SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996).......................................... 25

*SEC v. Lorin*, No. 90 Civ. 7461, 1991 WL 576895 (S.D.N.Y. June 18, 1991) ..................... 34, 35

*SEC v. Mutual Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) ................................... 14

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1952) .................................................. 25, 33

*SEC v. Rosenfeld*, No. 97 Civ. 1467, 1997 WL 400131 (S.D.N.Y. July 16, 1997) ..................... 35

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ................................................ 17

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ............................................ 11, 14, 15, 18

*SEC v. Tyler*, No. 02 Civ. 0282, 2002 WL 32538418 (N.D. Tex. Feb. 21, 2002) ....................... 25

*SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946) ........................................... passim

*SEC v. Zandford*, 535 U.S. 813 (2002) ....................................................... 34

*Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543
    (D.N.J. Dec. 10, 2018) ................................................................ 17

*Teague v. Bakker*, 35 F.3d 978 (4th Cir. 1994) ................................................ 8

*United Housin Found v. Forman*, 421 U.S. 837 (1975) ................................... 14, 15, 16

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ......................................... 24

*United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339
    (E.D.N.Y. Sept. 11, 2018) ......................................................... 19, 24

*WHX Corp. v. SEC*, 362 F.3d 854 (D.C. Cir. 2004) ............................................. 23

*Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978) ........................................ 13

**Statutes**

Exchange Act, Section 15, 15 U.S.C. § 78o ..................................................... 21

Exchange Act, Section 3(a)(10), 15 U.S.C. § 78c(a)(10) ........................................ 22

Exchange Act, Section 6(a), 15 U.S.C. § 78f(a) ............................................... 21

Securities Act, Section 20(b), 15 U.S.C. § 77t(b) ............................................. 7

Securities Act, Section 4(a)(1), 15 U.S.C. § 77d(a)(1) ........................................ 31

Securities Act, Section 4(a)(2), 15 U.S.C. § 77d(a)(2) ........................................ 31

Securities Act, Section 5, 15 U.S.C. § 77e .................................................... 7

**Other Authorities**

"Framework for 'Investment Contract' Analysis of Digital Assets,"
https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ............ 15

Application of FinCEN's Regulations to Certain Business Models Involving Convertible
Virtual Currencies (May 9, 2019) ........................................................................................... 21

*Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging,
or Using Virtual Currencies* (Mar. 18, 2013) *available at*
https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-
regulations-persons-administering ........................................................................................... 22

I.R.S. Notice 2014-21, 2014-16 I.R.B. 938 (Apr. 14, 2014) ....................................................... 22

*Interpretative Releases Relating to the Securities Act of 1933 and General Rules and
Regulations Thereunder*, Rel. No. 33-5121, 1970 WL 116591 (Dec. 30, 1970) ..................... 26

Jay Clayton and Christopher Giancarlo, *Regulators are Looking at Cryptocurrency*, *Wall
St. J.*, Jan. 24, 2018 ................................................................................................................... 21

*Non-public Offering Exemption*, Securities Act Rel. No. 33-4552, 1962 WL 69540 (Nov.
6, 1962) ...................................................................................................................................... 32

Rev. Rul. 2019-24 (Oct. 28, 2019) ............................................................................................... 22

SEC Rel. No. 6863, *Offshore Offers and Sales* (Apr. 24, 1990) ............................................... 32

The SEC respectfully submits this memorandum of law in further support of its application for a preliminary injunction and in opposition to Defendants' motion for summary judgment. For the reasons stated herein, the Court should grant the SEC's preliminary injunction application and deny Defendants' motion for summary judgment.

## PRELIMINARY STATEMENT

The Court should enjoin Telegram from delivering to Initial Purchasers the Grams it sold them in 2018, because that sale was an illegal unregistered sale of securities to which no exemption from registration applies.

In its opening papers, the SEC demonstrated that the "securities" Defendants sold in 2018 were the investment contracts of which both Purchase Agreements and Grams were a part, based on the plain meaning of the word "sale" in the Securities Act, as construed by Second Circuit cases. TRO Br. at 16-22. In its opposition, Telegram ignores these cases and insists that the only thing it "sold" in 2018 was a right to the future delivery of a commodity; however, its effort to sever the "Purchase Agreements for Grams" from the Grams themselves finds no support in the law—or common sense. Indeed, the Grams were *the* representation of the holder's right to the value underlying it, the mechanism for the Initial Purchasers to realize their profit. As a matter of law, Telegram's sale of Grams (which Telegram does not claim was exempt from registration) violated Section 5 of the Act. Delivery of the Grams should thus be enjoined.

Even if the Court were to re-apply *SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946), to Grams as of the moment of delivery, the Court should nevertheless grant the SEC's application and deny Telegram's motion. Those "future" Grams will still have been offered and sold as investment contracts under *Howey*'s three-prong test. Telegram sidesteps economic reality and the manner in which it has portrayed the transaction by disclaiming its past statements, affixing

labels like "commodities," and perfunctorily comparing Grams to Bitcoin.  But *Howey* and later

cases do not look to labels or self-serving statements: they look to the entirety of the transaction,

which here shows that the offers and sales of Grams, even if analyzed at delivery, are offers and

sales of investment contracts.  Grams—the embodiment of the investors' interest in the

venture—represented a security when they were sold and will represent one upon delivery.

Telegram also tries to minimize the imminent harm resulting from the upcoming public

distribution of Grams without registration, by pointing to the sophistication of the investors who

originally entered into the Purchase Agreements.  But Telegram structured these agreements to

incentivize investors to sell their Grams quickly after delivery, all while promising to deliver

Grams regardless of whether their subsequent sales remained sales of investment contracts.

The consequences of Telegram's contentions are sweeping but not hard to grasp.  If

accepted, a company seeking to raise funds for its ventures could provide sophisticated investors

incentives to sell its securities in a public distribution without providing the disclosures that the

federal securities laws require to protect the investing public.  The Court should look to the

economic reality of the transactions and to the Initial Purchasers' role as statutory underwriters,

grant the SEC a preliminary injunction, and deny Telegram's motion for summary judgment.

## COUNTER-STATEMENT OF FACTS

The following facts—not genuinely disputed but mostly overlooked in Telegram's factual

statement about its "hopes" and "intentions," Def. Br. at 1, 4, 7, 10—support the conclusion that

Grams were *sold* as *securities* in 2018 *and* will be delivered as such upon the launch of TON.[1]

---

[1]      "TRO Br." means the SEC's TRO Memorandum at D.E. 4.  "SJ Br." means the SEC's Summary
Judgment Memorandum at D.E. 79.  "Def. Br." means Defendants' Memorandum at D.E. 71.  "Stips."
means the Parties' Stipulation at D.E. 72 and "JX" the Exhibits thereto.  "Counter 56.1" means the SEC's
Local Rule 56.1 Counter-Statement.  "PX" means Exhibits to the Declarations of Ladan Stewart at D.E.
81 and filed today.  "SEC 56.1" and "Def. 56.1" mean the parties' statements of undisputed facts (D.E.
80, 75).  Other capitalized terms not defined shall have the meaning ascribed to them in the SEC's SJ Br.

## I. TELEGRAM'S EQUIVOCAL CLAIM THAT IT MAY NO LONGER SUPPORT "TON" CONTRADICTS ITS PAST PROMISES TO INVESTORS.

At the outset of the TON project, Telegram stated that it aimed to overcome the inability of existing blockchains to carry out more than 7 to 15 transactions per second by creating an ecosystem capable of handling millions of transactions per second with hundreds of millions of users.  Counter 56.1 at ¶¶ 38-40.  Telegram promised it would undertake significant, specific efforts to achieve this goal, including integrating its popular Messenger application into TON. *Id.* at ¶¶ 1-3.  And Telegram promised to continue its efforts after TON's launch, including by releasing a complex suite of applications, engaging in price stabilization, and using un-allocated Grams to run "nodes" on the TON blockchain, raise further funds, and make incentive payments to developers.  *Id.* at ¶¶ 1-2, 13-19; *see also* SEC 56.1 at ¶¶ 66, 68, 110, 119, 166, 175-76.

In a more recent post (the "Public Notice") purporting to "supersede" its past statements, Telegram now claims it intends to walk away from some of its commitments to further develop and support TON after launch.  But the Public Notice does not actually prevent Telegram from making any such efforts.  Counter 56.1 at ¶ 8.  Consistent with Telegram's long-maintained "flexibility" with respect to its future involvement in TON, the Public Notice provides that Telegram may engage in such efforts.  *Id.* at ¶¶ 8, 11-19.  And, Telegram has every economic, legal, and reputational incentive to make significant additional efforts to support TON's growth and to spur an increase in demand and value for Grams.  Indeed, one media outlet saw the Public Notice for what it is:  "a tactic in Telegram's fight with the SEC."  *Id.* at ¶¶ 9-10.

## II. TELEGRAM HAS PUT FORTH NO EVIDENCE REGARDING THE TON BLOCKCHAIN'S STATE OF DEVELOPMENT AT LAUNCH.

In its marketing of TON, Telegram has identified few, if any, expected uses for Grams by mass consumers, claiming vaguely that Grams are "intended" to function as "currency," *e.g.*, Def. 56.1 at ¶ 180, to validate TON Blockchain transactions, or to be used in suites of

applications that it would be "nice-to-have" (but that could be offered for free). Counter 56.1 at ¶¶ 20-22; Def. Br. at 17. And, while Telegram and entities loosely affiliated with it have endeavored to ensure that investors can easily sell Grams for fiat, Telegram has put forth no evidence of any efforts to ensure that any specific vendors of goods and services will accept Grams. Counter 56.1 at ¶¶ 28-36, 81-2; *see also* SEC 56.1 at ¶¶ 195-212, ¶ 317(e). Indeed, Telegram has put forth no concrete evidence as to who, if anyone, is prepared to run applications on TON at launch or whether they will offer goods and services in Grams—beyond two vague, hearsay charts its lawyers compiled from their Internet searches. Counter 56.1 at ¶¶ 23-27.

And while Telegram repeatedly touted the ambitiousness of its proposal to create a blockchain that outperforms Bitcoin's by several orders of magnitude, *id.* at ¶¶ 38-40, Telegram has presented no concrete evidence that it has achieved that goal: merely a vague, conclusory statement that the blockchain is "fully functional and ready to be launched." Def. Br. at 17. Telegram's experts did not review the code for effectiveness, and neither opined as to its readiness, while the SEC's expert opined that substantial further work will be required before TON reaches the state Telegram envisions. *E.g.*, Counter 56.1 at ¶ 66; SEC 56.1 at ¶¶ 370-73.

## III. TELEGRAM'S SALES OF GRAMS TO INITIAL PURCHASERS WERE THE FIRST STEP IN ITS INTENDED PUBLIC DISTRIBUTION OF GRAMS.

Telegram incentivized Initial Purchasers to act as conduits for the distribution of Grams. *First*, Telegram sold 2.9 billion Grams to investors in the business of funding ventures for profit, SEC 56.1 at ¶¶ 139-45, and provided Stage A investors (who had no lockup but paid $1.33) with an economic imperative to sell their Grams after launch, before the Pre-Sale investors—who bought at $0.37, a quarter of the Stage A investors' price, with a three month lockup—did so.

*Second*, when Telegram capped the Pre-Sale at $850 million (selling each Gram at $0.37) and announced the next sale at $1.45 (then at $1.33), it created an incentive for price arbitrage

that resulted in the emergence of a "grey market," through which Pre-Sale purchasers sought to unload their Grams. Counter 56.1 at ¶¶ 85-98. The secondary market included a heavily advertised July 2019 sale of at least $1 million worth of Grams at $4 each. *Id.* at ¶¶ 149-56. Telegram admits it was aware of these and other re-sales. Def. 56.1 at ¶ 287. Indeed, it assisted this secondary market when it paid promoters to help find additional second round investors. Counter 56.1 at ¶¶ 100-56. These promoters marketed Grams, in part, by encouraging buyers to think of Grams as a potentially lucrative investment. *Id.* at ¶¶ 110-17, 129-32.

## ARGUMENT

The Court should enjoin Telegram from delivering the Grams it sold in 2018 because those sales were unregistered sales of securities in violation of the Act. TRO Br. at 17-22. Telegram's response, that whether Grams are securities should be analyzed upon delivery, is incorrect as a matter of law. *Infra* at I. But, even if the analysis were conducted then, the Grams remain securities under *Howey*. *Infra* at II. Nor can Telegram claim any exemption for its disguised public distribution, *infra* at III, or raise equitable defenses in this case. *Infra* at IV.

## I. TELEGRAM SHOULD BE PRELIMINARILY AND PERMANENTLY ENJOINED FROM DELIVERING THE GRAMS IT HAS ALREADY SOLD.

The parties agree that, in 2018, Telegram made unregistered offers and sales of "securities." The only point of contention is the purely legal question of what exactly Telegram "sold" in 2018. The SEC contends that Telegram offered and sold an investment contract when it sold Grams through Purchase Agreements for Grams. TRO Br. at 16-22. Telegram contends it "sold" only a "right to receive" Grams and that the "Grams" cannot be considered a part of what Telegram "sold" because Grams did not exist in 2018 when it entered into the Purchase Agreements. Def. Br. at 39-40. Telegram further contends that its sales of the "Purchase Agreements" were exempt from registration under Regulation D. *Id.* By contrast, because it

insists that the Grams are not properly considered a part of those securities, Telegram has never claimed any exemption for the sale of "Purchase Agreements *and* Grams."

If the Court agrees with the SEC's formulation of what Telegram "sold" in 2018—as it should for the reasons described in the SEC's opening briefs and below—the SEC will have established a "likelihood" of success of a past violation and the ongoing violation as well. Indeed, the Court need not even apply *Howey* with respect to "Purchase Agreements *and* Grams" in that scenario, because Telegram concedes that all three *Howey* prongs were met in 2018, Def. Br. at 39-40, and does not claim an exemption for "Purchase Agreements *and* Grams."

In its opening briefs, the SEC showed why the Court's Section 5 analysis should focus on the offer and sale of the "Purchase Agreements *and* Grams" as a matter of law. Under both the Act's text and controlling Circuit precedent, a "sale" occurs when the parties bind themselves to the transaction, and there is no basis to treat a "sale" any differently simply because "delivery" occurs in the future. Telegram's claim that *Howey* is applied at the point of delivery is incorrect. "Delivery" is inconsequential for purposes of "sale," which may occur even if delivery *never* does. *See* TRO Br. at 22 (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890-91 (2d Cir. 1972)); SJ Br. at 18-22 (citing cases). In other words, the Act rejects a distinction between the "sale" and the thing "sold," whenever delivered—they are one and the same.

In its opposition, Telegram does not acknowledge the *Radiation Dynamics* line of cases. It simply repeats that Grams did not exist and therefore cannot be part of the "securities" sold, Def. Br. at 39-40, an argument foreclosed by *Radiation Dynamics* and its progeny. Telegram also contends that even if its "sale" of Grams violated Section 5 in 2018, it does not matter because, upon *delivery*, Grams will not be securities. *Id.* at 40, 47-48. But that is just another version of the same argument: Telegram offers no legal basis for its implicit claim that a past

"sale" of a security in violation of the Act is superseded by a future "delivery." To the contrary, as Telegram recognizes, Def. Br. 24, 40, Section 5 is transaction-specific—it prohibits each unregistered "offer" and "sale" of a "security." 15 U.S.C. §§ 77e(a), (c).

Given that delivery is imminent, the Court has explicit statutory authority to enjoin the impending harm to the public interest. Section 20(b) of the Securities Act authorizes a preliminary injunction "upon a proper showing" that a person "is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions" of the Act. 15 U.S.C. § 77t(b). Typically, courts ask whether the SEC has shown a likelihood of success on the merits of its claim, as well as a likelihood of repetition, the same standard governing the entry of a post-judgment injunction against future violations of the relevant law. *See, e.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). Here, the SEC seeks to stop a violation in the form of an unregistered sale of securities, where the next step—the delivery of the already-sold Grams—will undisputedly occur absent an injunction. The statute's text expressly permits this "preventive injunction," which requires "a cognizable risk of future harm." *SEC v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019); 15 U.S.C. § 77t(b). The Act further specifically prohibits using interstate commerce to effect "delivery after sale" of any security sold in violation of the statute. *See* 15 U.S.C. § 77e(a)(2). Here, Telegram is about to "deliver[] after sale" securities it sold in violation of Section 5 of the Act. The Court should enjoin this delivery.

And even if the Court were to conclude—and it should not—that the relevant legal question is whether Grams will be investment contracts upon delivery, the SEC would still be entitled to a preliminary injunction and to summary judgment as described in Part II below.[2]

---

[2] Telegram claims that, to the extent the SEC raises material factual disputes, the Court must resolve them against the SEC for purposes of a preliminary injunction if no evidentiary hearing occurs. *See, e.g.*, Def. Br. at 8, 48. But the parties' preliminary injunction dispute is particularly ripe for

## II. THE SEC, NOT TELEGRAM, IS ENTITLED TO SUMMARY JUDGMENT BECAUSE FUTURE OFFERS AND SALES OF GRAMS WILL BE OFFERS AND SALES OF SECURITIES.

Even if the Court were to accept Telegram's incorrect argument that the instrument sold may be severed from the "sale" (it should not), Telegram is not entitled to summary judgment. The Grams about to be delivered will have been, and will still be, offered and sold as securities.[3]

Telegram argues that Grams about to be delivered and resold are not securities under the "common enterprise" and "reasonable expectation of profits from the efforts of others" prongs of *Howey*, for four reasons. First, that, given its present intent, no reasonable purchaser can have any expectation that Telegram will make efforts to develop TON going forward. Def. Br. at 28-30. Second, that future reasonable Gram purchasers will buy them for "use," not "profit." *Id.* at 25-28, 30-32. Third, that future purchasers of Grams will not be buying into a "common enterprise." *Id.* at 34-39. Fourth, that Grams are more properly understood to be "commodities" or "currencies," inviting comparisons to Bitcoin and Ether and suggesting that such items are categorically exempt from the Act. *E.g.*, *id.* at 10, 26, 27-28, 31. Telegram is wrong on each of these arguments based on the undisputed material facts, as described below. Telegram's motion for summary judgment should be denied and the SEC's motion granted.

---

resolution without such a hearing because it is a legal dispute. As the Second Circuit has explained, when "there is no serious dispute about the facts[,] the issues, perhaps very troublesome ones, concern the meaning and applicability of a statute or common law rule [] [t]he taking of evidence would serve little purpose . . . ; argument is what the judge requires." *SEC v. Frank*, 388 F.2d 486, 490-91 (2d Cir. 1968). Here, Telegram itself has insisted from the outset that the issues to decide *the entire case* are purely legal ones. And the SEC agrees—the issues to be decided on the SEC's request for a preliminary injunction are purely legal. To the extent Defendants or the Court disagree, the SEC respectfully reserves the right to call witnesses, specifically Defendants' agents, on February 18.

[3]     The same standard that applies to the SEC's motion for summary judgment applies here. SJ Br. at 15-16. Contrary to Telegram's suggestion, Def. Br. at 23 n.13, there is no categorical rule that whether something is a security is always a question of law. *E.g.*, *Teague v. Bakker*, 35 F.3d 978, 990-91 (4th Cir. 1994) ("[W]e cannot conclude . . . that the [instruments] are not securities. Such a determination is properly made by a jury."). Here, however, the salient facts are not genuinely in dispute, and the SEC is entitled to judgment on that element of its claim. *See generally* SJ Br. at 22-27.

### A. Gram Purchasers Will Reasonably Expect Telegram to Expend Efforts on the TON Blockchain and Drive Up Grams' Demand and Value.

#### 1. Telegram's representations and the economic reality of TON and Grams create reasonable expectations of significant future efforts by Telegram.

In arguing that Grams will not be securities when the TON Blockchain launches, Telegram first asks the Court to conclude that a Gram purchaser at the time of launch will have no expectation that Telegram will devote any further efforts to develop TON or enhance Grams' demand and value. As an initial matter, the Court should not engage in speculation about what a reasonable purchaser might expect in the future based on Telegram's shifting statements about its intentions. The *evidence* in the record is insufficient to ground any such speculation. But even if the Court were to engage in such speculation, the record compels the conclusion that a reasonable purchaser will purchase Grams with an expectation of profit based on Telegram's continued and significant efforts to develop TON to drive up Grams' demand and value.

Telegram has steadfastly maintained that Bitcoin and Ether are not a "standard cryptocurrency used for the regular exchange of value in the daily lives of ordinary people" and do not "have the capacity to replace VISA or Mastercard [sic]." JX7 (D.E. 72-7) at 3, 4. Telegram has also touted its vision for TON and Grams: that they "become a VISA/Mastercard [sic] alternative," JX7 at 5, capable of processing *millions* of transactions per second, where Bitcoin and Ethereum can only process 7 and 15, respectively. *Id.* at 4. To achieve this vision, Telegram has promised efforts by its team of experts and other third parties, some loosely associated to Telegram, "to drive demand and value for" Grams. *Id.*

Despite these ambitious claims, Telegram has put forth no concrete record evidence whatsoever as to the TON Blockchain's functionality level at the expected launch time. *See* Counter 56.1 at ¶¶ 57-66. Even Telegram is not audacious enough to contend that it is about to launch a blockchain that will be technologically capable of besting Bitcoin's a *million* times over

9

or supplant MasterCard or Visa. Thus, there is only one logical explanation, which reasonable future purchasers of Grams will understand: Telegram and its affiliates must continue to expend significant efforts to realize Telegram's vision for TON. The other possibilities would make no logical sense. If Telegram and its affiliates make no further efforts to improve TON—an abandonment Telegram has never committed itself to—but the project is to succeed, someone else would have to expend significant entrepreneurial efforts, with little financial incentive to do so. If no one else makes any significant efforts to improve TON, the project will fail.

Therefore, the only reasonable expectation any future Gram purchaser could have is that someone—logically, Telegram—is going to engage in those significant efforts. The following undisputed facts make that clear: (1) the infancy of the network; (2) the totality of Telegram's statements; (3) Telegram's prior investment of significant efforts into the project; (4) Telegram's strong financial and reputational incentives not to walk away from TON; and (5) Telegram's steadfast insistence that it retains flexibility to have significant future involvement. Put differently, the chances that Telegram will walk away from developing TON and risk backlash from purchasers who paid $1.7 billion expecting Telegram to deliver a functional product, let go of the billions of Grams it holds, or risk the reputational blowback that will occur if it launches but then abandons an ineffective blockchain, are slim to none. Reasonable investors understand that if this lawsuit ends and Telegram is free to exercise its tactical "flexibility," it will do so.

These reasonable expectations satisfy *Howey*. *See SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973) (*Howey* satisfied when there are significant "efforts made by those *other than the investor*" (emphasis added)); *accord Long v. Shutlz Cattle Co., Inc.*, 881 F.2d 129, 139 (5th Cir. 1989); *see also In re Nat. Res. Corp.*, 8 S.E.C. 635, 1941 WL 36308, at *2 (Feb. 14, 1941) (investment contract is a transaction that "involve[s] . . . the assumption and expectation

10

that the investment will return a profit without any active effort on his part, but . . . as the result of the efforts of someone else" (cited favorably in *Howey*, 328 U.S. at 299 n.5)); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 355-56 (S.D.N.Y. 2019) ("efforts of others" prong met where issuer of digital asset "conveyed to purchasers . . . that the anticipated return on their investment would be the result of [its] efforts to commercialize [a new] Blockchain . . . .").

### 2. Telegram's eleventh-hour "Public Notice" cannot erase its past statements or economic reality.

Telegram essentially contends that because it has recently stated it has no present plans to make efforts to develop TON, the Court should ignore the totality of Telegram's statements and economic reality, and conclude that Telegram's mere utterance of statements to that effect and its lack of any contractual obligation to develop TON successfully defeat *Howey*'s "expectation of profits from the efforts of others" prong. The Court should reject this argument.

*First*, as a matter of law, decades of well-settled precedent after *Howey* directs courts to look at the totality of representations made by a promoter, not just the promoter's after-the-fact statements likely made for purposes of the litigation. As the Second Circuit phrased it, when analyzing an investment contract the "[d]ecision will necessarily turn on the totality of the circumstances, not on any single one." *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982). Accordingly, a promoter "properly is held to [its] representations as to what [it] is selling, even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers." *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993). A promoter's "repeated disclaimers" are undoubtedly relevant to the analysis, but they are not the end of the story—the promoters' past "persistent representations" contrary to the disclaimers are relevant to the outcome. *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001).

*Second*, as a matter of fact, Telegram's recent, equivocal Public Notice does not erase the reasonable expectations created by its past actions and statements—to the contrary, it fuels them. The statements remind market participants that Telegram is currently running beta tests on a network bearing Telegram's name, and explicitly states that Telegram will seek to make changes to TON and to its own activities to comply with regulatory authorities, the opposite of what someone intending to fully walk away from the project would say. Counter 56.1 at ¶ 8(e). Moreover, to the extent the Public Notice warns that Telegram "cannot [] guarantee that" third parties will take over TON, *id*. at ¶ 8(d), it begs the question. It leaves the reasonable purchaser to wonder what would happen if indeed no one stepped up to develop TON—would Telegram abandon the project it has dedicated itself to for two years and in which it has a significant financial stake, or would it use at least some of the $1.3 billion it has to make those efforts?

*Third*, even Telegram's eleventh-hour equivocations end with the coda that Telegram always inserts: that it has "flexibility" to change its mind again after this case ends. *See* Def. Br. at 15, 19, 33 n.19. A reasonable investor, faced with the original statements, the equivocal recent statements, and the flexibility caveat, is more likely to look to Telegram's actual, admitted completed efforts and its economic incentives, and conclude that, if permitted, Telegram is all but certain to make future efforts for TON. *See also* Counter 56.1 at ¶ 18; SEC 56.1 at ¶ 166.[4]

*Finally*, Telegram's argument that it is not *contractually bound* to make efforts in the future, Def. Br. at 28-30, 37, should be immaterial to the Court's analysis of whether the SEC has met the third *Howey* factor. Courts "must go outside the [offering] instrument itself." *SEC*

---

[4]    Indeed, the overwhelming majority of Telegram's arguments to the Court are based on what Telegram "hopes" or "intends" Grams to be in the future, not on actual facts in the record. *See, e.g.*, Def. Br. at 1, 4, 7, 10, 19-20, 29 & n.17, 45. This case should be decided based on facts before the Court today, not on Telegram's non-committal hopes about the future. *Cf. North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (*per curiam*) (counseling against issuing opinions on "what the law would be [based] upon a hypothetical state of facts") (citation omitted).

*v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352–53, 355 (1943); *see also Aqua-Sonic*, 687 F.2d at 583 (following *Joiner*, examining promotional materials). Focusing on substance and economic reality instead of form, as the Supreme Court mandates, requires not limiting the inquiry to a contract or written instrument, because the "term 'offer' has a different and far broader meaning in securities law than in contract law." *Hocking v. Dubois*, 885 F.2d 1449, 1457–58 (9th Cir. 1989) (*en banc*); *see also SEC v. United Ben. Life Ins. Co.*, 387 U.S. 202, 211 n.15 (1967); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039–40 (10th Cir. 1980). Numerous schemes involve a written contract that is not by itself a security—such as a sale of real property or animals—that, when coupled with a promotor's other representations, amount to an investment contract. *See also Rodriguez*, 990 F.2d at 11 (court must look to "promises [that] go well beyond the legal terms of the contracts"). To conclude otherwise would create a loophole for all manner of investment schemes for profit.[5]

Telegram's attempts to obscure the representations it has already made by issuing self-serving, equivocal disclaimers does not make this case like those that Telegram cites. There, courts concluded that no investment contract had been sold at least in part because—unlike here—there were *no* representations at all about the efforts the promoter would make *and* the promoter never actually made significant efforts. *See, e.g.*, Def. Br. at 29 (citing *Rodriguez*, 990 F.2d 11); Def. Br. at 33 (citing *Noa*, 638 F.2d at 79); Def. Br. at 36-37 (citing *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978)). To the SEC's knowledge, in the principal case

---

[5]     The cases cited by Telegram do not reach a contrary conclusion. They recognize that the "promoter properly is held to his representations as to what he is selling even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers" because "commitments and promises . . . , and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise." *Rodriguez*, 990 F.2d at 11; *see also Happy Inv. Gp. v. Lakeworld Properties, Inc.*, 396 F. Supp. 175, 180-81 (N.D. Cal. 1975) (unlike here, "nothing was said about defendants' participating in efforts to draw commerce or commercial enterprises").

13

in which a court has considered both statements reasonably inducing the expectation of profits (from others' efforts) and contradictory disclaimers, *SG Ltd.*, 65 F.3d at 42, the court concluded that, given the pervasivenes of past statements (inducing an expectation of profit), disclaimers were insufficient as a matter of law to erase the past statements. This Court should do the same.

Finally, even if the Court were to conclude that Telegram's efforts post-launch will decrease from Telegram's admitted significant pre-launch efforts, those significant, pre-purchase efforts are also relevant under *Howey*. *See SEC v. Mutual Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005) ("there is no basis for excluding pre-purchase . . . activities from the analysis") (citing *Glen-Arden Commodities v. Constantino*, 493 F.2d 1027 (2d Cir. 1974); *Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir 1985)).[6]

### B. Gram Purchasers Reasonably Will Be Attracted By the Potential for Profit.

Telegram argues that Grams will not be "investment contracts" because they are "principally for . . . consumptive utility and as a medium of exchange," such as to buy things or to "power[] decentralized applications" on the TON Blockchain. Def. Br. at 25-28. Telegram's "use" argument—again based mostly on Telegram's "hopes" and "intentions"—should also fail.

The "use" or "consumption" (as opposed to "profit") concept derives from *United Housing Foundation v. Forman*, where the Supreme Court held that shares in a housing co-op, entitling the holder to lease an apartment, were not "investment contracts." 421 U.S. 837, 857-59 (1975). The Court reasoned that this result followed for at least two reasons. First, "[t]he *sole* purpose of acquiring the[] shares [was] to enable the purchaser to occupy an apartment," and

---

[6]     Given that it has spent hundreds of millions on TON, Telegram's claim that it has made fewer efforts than the "purchase and deliver" efforts present in other cases, Def. Br. at 33, is unpersuasive. Nor is Telegram's insistence that it will not have "control" or "additional powers" over the operation of the TON Blockchain consequential. Def. Br. at 2, 5, 11, 17, 29. The question is whether Telegram may be reasonably expected to make efforts to improve the desirability of TON, thus increasing demand and value for Grams—not whether Telegram continues to be in "control" of the TON ecosystem.

the shares "c[ould] not be transferred to a nontenant" and had to be sold back to the co-op at the price originally paid. *Id.* at 842-43 (emphasis added). Second, the purchasers "were attracted *solely* by the prospect of acquiring a place to live, and not by financial returns" because the agreements provided that purchasers would "be unable to resell their apartments at a profit since the apartment must first be offered back" to the co-op. *Id.* at 853-54 (emphasis added).

Thus, courts considering whether an instrument was purchased for use under *Forman* typically consider the following three factors:

(1) whether the amount sold was indicative of a true consumptive purpose; *compare Grenader v. Spitz*, 537 F.2d 612, 617-618 (2d Cir. 1976) (co-op shares were not investment contracts because "[t]he number of shares [available was] . . . clearly in proportion to the size and location of the apartment . . . .") *with Cameron v. Outdoor Resorts of America*, 608 F.2d 187, 193 (5th Cir. 1979) (since investors were sold many units, they "manifestly could not use" all of them, and the shares were investment contracts);

(2) whether the promoter, despite disclaiming that the instruments could only be "used," also made representations that "fueled expectations of profit," *SG Ltd.*, 265 F.3d at 53-54 (statements discussing potential returns "constitute[s] a not-very-subtle form of economic inducement" at odds with the bulletin in *Forman* that "nowhere" sought "to attract investors by the prospect of profits" (citing *Forman*, 421 U.S. at 854)); and

(3) whether it is reasonable to expect purchasers to "use" the item, *e.g.*, *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (contract for sale and care of beavers was investment contract because "as a practical matter, it would have been physically impossible for the average purchaser of live breeding beaver to take absolute possession of his animals . . . .").[7]

The facts in the record regarding the potential future sales of Grams belie the argument that Grams will be bought "solely" or even principally for "use." *First*, Grams will be available in the secondary market in all quantities, from infinitesimal fractions to billions, wholly unrelated to consumptive intent. SEC 56.1 at ¶ 384. Telegram makes no claim that a purchaser

---

[7] SEC staff has elsewhere summarized the factors derived from the foregoing cases that may guide the inquiry of whether purchasers of a token have "reasonable expectation of profits." *See* "Framework for 'Investment Contract' Analysis of Digital Assets," https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

will be limited to buying only the amount of Grams needed to use a certain app. (Telegram would not have needed to secure any secondary markets to achieve that sort of distribution.) Nor will the transferability of Grams be limited, as were the co-op shares in *Forman* and *Grenader*. Instead, any amount will be available to any buyer and transferable at any price. Such economic reality is inconsistent with true consumptive use. *Outdoor Resorts*, 608 F.2d at 193.

*Second*, while Telegram contends that it has marketed Grams, particularly in the recent Public Notice, for consumptive use, Def. Br. at 26-27, it does not dispute that it *also* at least pointed to the potential for profit in its marketing. This includes Telegram's statements saying its efforts were aimed at increasing "demand and value," promising market sales at increasing prices and price stabilization efforts, graphically depicting exponentially rising prices, and touting the listing of Grams on exchanges. *See, e.g.*, Counter 56.1 at ¶¶ 1-2; *see also* SEC 56.1 at ¶¶ 46, 49-50. Indeed, certain entities Telegram paid to find investors made statements that touted potentially eye-popping returns for buying Grams. *E.g.*, Counter 56.1 at ¶¶ 110-17, 129-32. Thus, the record forecloses any conclusion that "[n]owhere" does Telegram's marketing speak of the possibility of profits in addition to "uses." *Forman*, 421 U.S. at 854.

*Third*, for many of the same reasons, it is not reasonable to expect Gram purchasers to be buying them to "use" them. Telegram has never marketed any concrete, specific uses for Grams, nor made any efforts to enlist vendors who will accept Grams, and there is no concrete evidence that Grams will have any significant use. Counter 56.1 at ¶¶ 20-36. But Telegram *has* made efforts to make sure Grams are freely tradeable, facilitating investment profits. *Id.* at ¶¶ 32, 35-36; SEC 56.1. at ¶¶ 195–212, 317(e); Stips. at ¶¶ 204, 206. Nor has Telegram marketed Grams solely to those who may actually use them—to the contrary, the Public Notice was an upcoming sales ad to the world at large. Telegram's claims that Grams were marketed "principally" for

use, Def. Br. at 25, are thus belied by the record. *See also* SEC 56.1 ¶¶ 143, 158; 362, Counter 56.1 at ¶¶ 20-37. *Cf. Aqua-Sonic*, 687 F.2d at 583-84 (*Howey* prong not defeated based on theoretical "efforts" investors could make, where marketer did not seek out investors, or limit sales, based on potential purchasers' ability to actually make such efforts).

*Finally*, even if some subset of market purchasers were motivated by their desire to "use" Grams, that would not make the offer and sale of Grams something other than an investment contract. After all, investors in *Glen-Arden*, 493 F.2d at 1031, who technically bought only casks of whiskey, could have drunk it; the investors in *Miller v. Central Chinchilla Gp., Inc.*, 494 F.2d 414, 417-18 (8th Cir. 1974), sold live chinchillas as a part of an investment contract, could have made coats from them. The existence of, even the desire for, some consumptive use does not suffice to defeat *Howey*'s "expectation of profit" prong. As explained in *SEC v. Feng*, the prong is satisfied even when "the investors' primary reason to participate" in a scheme was consumptive. 935 F.3d 721, 730-31 (9th Cir. 2019) (investors sought to secure visas they would undeniably use); *see also Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (rejecting "use" argument with respect to digital asset that could supposedly unlock in-network uses, given that the platform had "limited functionality" at the time); *SEC v. Scoville*, 913 F.3d 1204, 1221 (10th Cir. 2019) (where evidence showed purchasers bought "in order to obtain the incredible returns on . . . investment" and "had no interest in the" services the promoter offered, instruments were "investment contracts").

### C. Gram Purchasers Will Be Buying Into a Common Enterprise.

Telegram offers four meritless arguments about why future Gram purchasers will not be buying into a horizontally common or strictly vertically common enterprise.

First, Telegram contends that future purchasers will not be buying into a horizontally common enterprise because Grams offer no "rights to dividends or other distribution rights."

Def. Br. at 35; *see also id.* at 4, 27. But courts have held that horizontal commonality is met where—as here—the prices of an instrument move identically, such that an investor's potential returns are always proportional to the amount invested and rise and fall with others' returns. *See* SJ Br. at 23 (citing *SG Ltd.*, 265 F.3d at 46-47, 51); *see also Balestra*, 380 F. Supp. 3d at 354 (commonality established because "value of . . . [c]oins was dictated by the success of the . . . enterprise as a whole"). No rights of the type Telegram argues Grams lack are required to meet the commonality prong.

Next, Telegram argues that, because future purchasers will control when to sell Grams, there can also be no horizontal commonality. Def. Br. at 35-36. However, in many cases where courts concluded that a promoter had sold an investment contract, purchasers had the ability to individually sell out of their investments. *E.g.*, *Glen-Arden*, 493 F.2d at 1031; *Miller*, 494 F.2d at 417. Telegram's comparison to *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994), Def. Br. at 36, is misplaced. In *Revak*, the purchasers of condos expected to make only one type of profits (rents), but there was no pooling of efforts to obtain tenants or a common management agreement. In contrast, the fortunes of Gram holders rise and fall proportionally, as whatever efforts are made to create demand and value for Grams affect their values equally.[8]

In addition, Telegram relatedly contends that, because some Gram buyers may buy them for "use" and others for "investment," each group will have a different hope about what they want to see happen to the price of Grams. Def. Br. at 38. As an initial matter, it is not clear that someone who has purchased an item to "use" it would want its value to fall. Presumably, if the item's price rises, the purchaser can buy more goods and services with it. In any event, that

---

[8] Telegram's argument that the existence of market forces and the purchasers' ability to sell Grams when they want also defeat "efforts of others," Def. Br. at 6, 31, fails for the same reasons. *See, e.g.*, *Balestra*, 380 F. Supp. 3d at 356 (control of coin holder over when to sell does not defeat "efforts of others" prong).

investors may have different hopes about their desired price for the item and therefore when to exit the investment (thereby affecting the price of the instrument for the other stakeholders) is immaterial under *Howey*, which requires *fortunes*, not desires, to move in tandem.

Finally, Telegram claims that the Public Notice statement that it has not "committed" to holding Grams, Def. Br. at 38 (there is no "commitment to hold Grams"), eliminates strict vertical commonality. Yet such commonality exists when the promoter retains some of the instruments itself, as Telegram indisputably *will do* with *billions* of Grams following their launch. *See* SEC 56.1 at ¶ 381. Telegram's equivocal statement that it has not "committed" to holding Grams cannot undo the reality that it *does* currently plan to hold Grams.

### D. Telegram's "Commodity" and "Currency" Labels and Comparisons to Other Digital Assets Do Not Trump Economic Reality.

Throughout its brief, Telegram contends that the main question before the Court is whether Grams "bought and sold by the public" in the future will *themselves* be securities, Def. Br. at 39; *see also id.* at 22 ("Grams will not be 'securities' . . . ."); *id.* at 40, 48, and posits that the answer is "no" because Grams are better thought of as commodities, *id.* at 26, 31, "currency," or akin to "Bitcoin" and "Ethereum" [sic, Ether]. *Id.* at 26-28. Telegram insists that the Act categorically excludes the offer and sale of such things from its purview. Telegram's focus is too narrow. Digital assets like Grams are representations of value—what the digital asset represents is judged on all the facts and circumstances at the time of and in the manner of offer and sale. The label one accords the asset is not controlling.

#### 1. Howey *focuses broadly on the economic nature of the transaction, not narrowly on the label of the underlying instrument.*

As a threshold matter, it is not enough to *say* that Grams are currencies or commodities— *Howey* does not turn on labels. *See United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *7 (E.D.N.Y. Sept. 11, 2018) (simply labeling an investment opportunity as "virtual

currency" or "cryptocurrency" does not transform an investment contract . . . into a currency" (citing *SEC v. Edwards*, 540 U.S. 389, 393 (2004)). More importantly, Telegram's persistent comparison of Grams to the oranges in *Howey* and its insistence that Grams' supposed status as currency or commodity forecloses the application of the Act is fundamentally flawed.

To begin with, the promoter in *Howey* never offered or sold *oranges* to any investors. It sold *land*. The land transaction, alone, was not an offer or sale of an "investment contract." What made the *entirety of the transaction* an investment contract was that the promoter did something else: it coupled the real estate sale with a management contract promising to use its experience to manage the land, grow oranges, and shares the profits with investors. Together, these two things reasonably led the investors—who were ostensibly buying land—to hope that they could passively profit. It was this entire transaction—not any piece in isolation—that constituted the offer and sale of an "investment contract." That the instrument underlying the sale (the land) had "intrinsic value" did not alter the outcome. Here, even if Grams had some intrinsic value or use as a means of exchange for goods and services (they currently do not), it would not undermine the entire transaction's status as a security as offered and sold.

This reasoning has been applied repeatedly. In *Glen-Arden*, 493 F.2d at 1036, the Second Circuit affirmed a preliminary injunction to stop a promoter who was offering and selling Scotch whisky warehouse receipts while promising buyers that it would use its expertise to select the best casks, manage storage for the whisky, and assist in selling the whisky in the future. The promoter in *Glen-Arden* made the same argument that Telegram makes here—that the underlying "thing" being sold was a "commodity" with intrinsic value and that therefore the promoter could not be engaged in the "offer and sale" of "investment contracts." *Id.* at 1033. The Second Circuit rejected this reduction of *Howey* to the terms of the purchase agreements for

whisky and looked instead to the "economic reality and the totality of circumstances surrounding the sales," in particular the inducements and promises, to conclude that "the customers were making an investment." *Id.* at 1034. In so holding, the Second Circuit noted that its holding was in line with "a long line of cases where purported sales of tangible property, service contracts, or both were held to be investment contracts." *Id.* at 1035 (collecting cases); *see also Miller*, 494 F.2d at 417-18 (contract for sale of live chinchillas). The same reasoning applies even when the "thing" underlying the "sale" may at some point be used as a substitute for currency. *See Gary Plastic*, 756 F.2d at 240 (sale of certificates of deposit were sales of investment contracts).

Conversely, many things that are securities (such as a corporate note) can be used as a "medium of exchange." Thus, as the court explained in *CFTC v. McDonnell*, a case Telegram cites, "[t]he jurisdictional authority of CFTC to regulate virtual currencies as commodities does not preclude other agencies from exercising their regulatory power . . . ." 287 F. Supp. 3d 213, 228-29 (E.D.N.Y. 2018) (quoting Jay Clayton [SEC Chair] and Christopher Giancarlo [CFTC Chair], *Regulators are Looking at Cryptocurrency*, *Wall St. J.*, Jan. 24, 2018 ("[S]ome products that are labeled cryptocurrencies have characteristics that make them securities.")).[9]

Similarly, even if Defendants could present evidence (and they have not) that Grams in the future will share the characteristics of "currency," the Securities Act *does not* categorically exempt so-called "cryptocurrencies" from regulation. *See* Def. Br. at 27. The definition of

---

[9] The designation of *Telegram* as a "Money Service Business" ("MSB") by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") similarly says nothing about whether *Grams* are being sold as securities under the Act. Defendants are correct that an MSB excludes a person "registered" with the SEC. Def. Br. at 28 n.16. Telegram is not registered with the SEC, because it is not, for example, a national securities exchange, or a broker or dealer. 15 U.S.C. §§ 78f(a); 78o(a). But that does not mean that what Telegram sells is not a security. Moreover, FinCEN's regulation of MSBs does not "affect the obligations of any participants . . . under other regulatory frameworks" such as the "federal securities laws." Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies 24 n.75 (May 9, 2019), https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.

"security" under Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C.

§ 78c(a)(10), provides that the term "'security' . . . shall not include currency."  Section 2(a) of

the Securities Act, 15 U.S.C. § 77b(a)(1), by contrast, defines "security" but does not exclude

currency.  While Defendants are correct that the two provisions are generally interpreted

coterminously, Def. Br. at 27 n.15; *see, e.g.*, *Landreth Timber Co. v. Landreth*, 471 U.S. 681,

686 n.1 (1985), the securities laws do not define "currency."

Federal regulations, however, define "currency" as "[t]he coin and paper money of the

United States or of any other country that is designated as legal tender and that circulates and is

customarily used and accepted as a medium of exchange in the country of issuance."  31 C.F.R.

§ 1010.100(m).  Thus, FinCEN, on whose authority Defendants rely, *e.g.*, Def. Br. at 28 n.16,

has concluded that "[i]n contrast to real currency, 'virtual' currency is a medium of exchange

that operates like a currency in some environments, but does not have all the attributes of real

currency.  In particular, virtual currency does not have legal tender status in any jurisdiction."

*Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or*

*Using Virtual Currencies* (Mar. 18, 2013) (discussing 31 C.F.R. § 1010.100(m)), *available at*

https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-

persons-administering.[10]  Based on FinCEN's guidance, the SEC has repeatedly distinguished

virtual currencies like Bitcoin from "real" currency.  *See, e.g.*, *In re Bitcoin Inv. Tr.*, Release No.

78282, 2016 WL 4363462, at *1 n.1 (July 11, 2016); *In re BTC Trading, Corp.*, Release No.

9685, 2014 WL 6872955, at *1 n.1 (Dec. 8, 2014).  Even if Grams were properly understood to

---

[10]      The IRS, by contrast, has specifically concluded that "virtual currency" is *not* "currency" for
purposes of the Internal Revenue Code.  *See* I.R.S. Notice 2014-21, 2014-16 I.R.B. 938 (Apr. 14, 2014);
Rev. Rul. 2019-24 (Oct. 28, 2019).  The basic point—which Telegram ignores—is that the existence of
overlapping regulatory regimes means nothing other than that each regime regulates specific types of
conduct.  Broad, sweeping conclusions should not be drawn across these regulatory areas.

be "virtual currency," *but see* Counter 56.1 at ¶¶ 81-82 (Initial Purchasers did not believe Grams would function as "currency"), this would not make them "currency" under the Act.

In sum, there is nothing unusual about an investment contract involving the sale of real estate, a commodity, a currency, or a bowl of oranges. A security exists when the investment *is being offered and sold* in such a way as to lead purchasers to reasonably expect profits from others' efforts. Here, even assuming for the sake of argument that Grams will someday function as "commodities" with intrinsic value, or as a medium of exchange, makes no difference. They were offered and sold, and are being offered and sold, as investment contracts.[11]

### 2. Grams are not Bitcoin or Ether.

Telegram also compares Grams to Bitcoin and Ether (the native tokens of the Bitcoin and Ethereum blockchains, respectively), no fewer than eight times in its submission, *e.g.*, Def. Br. at 1, 10, 26, 27-28, 31, 32, 41. Telegram argues that, because the SEC has deemed those "commodities, not securities," *id.* at 1, Grams must be commodities too.[12] Again, the *Howey* analysis does not turn on labels. Simply incanting "Bitcoin" or "Ether," let alone that one

---

[11]    The cases Telegram cites, Def. Br. at 31-32, 38-39, are consistent with these principles. Notably, Telegram has not cited a single case in which a court held that, simply because the underlying instrument was a commodity, the Securities Act did not apply. Each of the cases applied *Howey* and concluded that no investment contract was sold based on the facts of the case. *E.g.*, *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980) (seller of silver bars touted and made no efforts to increase value of investment); *accord Marini v. Adamo*, 812 F. Supp. 2d 243, 259-60 (E.D.N.Y. 2011). The converse is also true, as one case Telegram cites recognizes. *Frederiksen v. Poloway*, 637 F.2d 1147, 1150-51 (7th Cir. 1981) (simply because instrument underlying sale was "stock" did not transform venture into an investment contract).

[12]    The SEC has no authority to find that something is a "commodity." Def. Br. at 1. It has authority with respect to "securities" for relevant purposes. Even a hypothetical SEC "pronouncement" that something is not a security would not be a pronouncement that it is a "commodity." *Cf. McDonnell*, 287 F. Supp. 3d at 228 (discussing "overlapping" regulatory regimes in certain areas). Moreover, SEC "staff opinions lack force of law." *WHX Corp. v. SEC*, 362 F.3d 854, 860 (D.C. Cir. 2004) (citing *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)). But, even assuming the SEC had "acknowledged" anything with respect to Bitcoin and/or Ether, it would not affect the analysis, let alone the outcome, in this case, for the fact-specific reasons set forth herein.

*intends* its digital asset to operate like them, says nothing about the economic reality of Grams. Beyond that, Telegram's arguments are legally and factually incorrect.

As a threshold matter, it is not clear why comparing Grams to Bitcoin or Ether would advance Telegram's argument. As noted, Telegram has steadfastly maintained that Bitcoin and Ether have *not* attained widespread use as "cryptocurrency," JX7 at 3, 4, and even has noted that "**demand** for crypto-assets **comes mainly from investors, not consumers**." *Id.* at 4 (emphasis in original); *see also* Def. Br. at 10. Telegram's agrees, noting that the market prices of crypto-currencies are highly volatile. Counter 56.1 at ¶ 37; Stips. at ¶ 182. Under Telegram's own theory, this limits their adoption as "currency." Thus, to the extent Telegram contends that Grams are to "function" as Bitcoin and Ether, the inability that those assets have faced (as per Telegram) in becoming fully adopted mediums of exchange hurts Telegrams arguments.

Telegram's labels-driven analogy does not advance its arguments for additional reasons. Just as not all instruments in a similar asset class are created equal for purposes of *Howey*, not all digital assets are, either. Again, "[w]hether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry." *Zaslavskiy*, 2018 WL 4346339, at *4 (citing *Howey*, 328 U.S. at 293). "This is especially true in the context of 'relatively new, hybrid vehicle[s],' which require 'case-by-case analysis into the economic realities of the underlying transaction[s].'" *Id.* (citing *United States v. Leonard*, 529 F.3d 83, 88-89 (2d Cir. 2008)). Thus, similar instruments may nonetheless be treated differently, based on variations in their economic substance, for purposes of *Howey*. As just one example, the co-op shares in *Grenader*, 537 F.2d at 617-618, were not investment contracts because the number of shares was "clearly in

proportion to the size and location of the apartment," but the co-op shares in *Cameron*, 608 F.2d at 193, were, because purchasers could buy unlimited numbers of shares.[13]

Here, it is not even clear if Telegram means to compare Grams to Bitcoin or Ether as those instruments exist today or as they did when they were launched, and has put forth no evidence about what either are or were at their launch. At a minimum, a proper comparison would require the Court to admit evidence as to both of these projects and conduct mini-trials as to how Grams will operate at launch versus how Bitcoin or Ether operated and/or operated when, in Telegram's view of the world, the SEC "acknowledged" that those instruments were "commodities" (something the SEC has never in fact done).[14]

## III. TELEGRAM HAS BEEN ENGAGED, AND IS ENGAGED, IN A PUBLIC DISTRIBUTION OF GRAMS TO WHICH NO EXEMPTION CAN APPLY.[15]

"The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors." *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (*citing SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1952)), *vacated on other grounds, Aaron v. SEC*, 446

---

[13]     Many other examples abound. *Compare SEC v. Life Partners, Inc.*, 87 F.3d 536, 545-56 (D.C. Cir. 1996) (investment into portions of life insurance proceeds were not investment contracts because the activities of promoters were ministerial) *with SEC v. Tyler*, No. 02 Civ. 0282, 2002 WL 32538418, at *5-6 (N.D. Tex. Feb. 21, 2002) (same instruments were investment contracts because promised managerial activities by promoter were part of investment inducement); *compare Noa*, 638 F.2d at 77 (sale and custodial arrangement for silver bars was not an investment contract because no assets were pooled) *with Connors v. Lexington Ins. Co.*, 666 F. Supp. 434 (E.D.N.Y. 1987) (sale and custodial arrangement for silver or gold was investment contract because of pooling of assets).

[14]     Telegram's claim that it did not conduct an "ICO" does not support its argument, Def. Br. at 2, 12, both because Telegram did originally call the Offering an ICO for "Selling Tokens" and because this is another irrelevant labeling contention. *See* SEC 56.1 at ¶ 120.

[15]     The Court need not reach this argument if it concludes that, as the SEC has argued above, Telegram failed to properly include the Grams as part of the investment contract for which it sought an exemption from registration in its Form D filings. By explicitly stating in the Purchase Agreements that Grams were not subject to the restrictions on trading applicable to the Purchase Agreements, it is clear that Telegram did not include the Grams as part of the security for which it sought an exemption.

U.S. 680 (1980). It is designed, in other words, to help the investing public *avoid* buying into the next "boiler room pump-and-dump scheme." Def. Br. at 3. Here, even though Telegram's Offering is a quintessential public offering for which no exemption can apply, it asks the Court to excuse it from providing the investing public with that critical information.

A.    **Telegram Should Be Preliminarily and Permanently Enjoined From the Illegal Public Offering it Has Been, and Is, Engaged in.**

To conclude that Telegram's Offering was an exempt private offering, the Court must find that the large quantities of securities sold to Telegram's Initial Purchasers "came to rest" in their hands and that they are not serving as conduits (underwriters) for a larger distribution to the public. A public offering requires all of the protections afforded by registration mandated by Section 5, which cannot be circumvented by the simple expedient of selling to intermediaries in a purported private offering when those intermediaries are just the initial step in a public offering. A distribution "comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" *R.A. Holman & Co., Inc. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (*quoting Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)). Claiming an exemption requires "establishing that [the] sales do not constitute a disguised public distribution." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 368-69 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998); *see also Ackerberg v. Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989) (Congress intended "to cover all persons who might operate as conduits for the transfer of securities to the public); SJ Br. at 29-30.

Whether sales of securities are a private offering or part of a public distribution is a fact-specific inquiry. *Interpretative Releases Relating to the Securities Act of 1933 and General Rules and Regulations Thereunder*, Rel. No. 33-5121, 1970 WL 116591, at *1 (Dec. 30, 1970). In Telegram's view, the analysis begins and ends with its sales to the Initial Purchasers. But

26

Grams were not meant to come to rest with the Initial Purchasers—institutional investors, none of which plausibly purchased millions of Grams to use them, but rather to profit by reselling them into the secondary markets. Indeed, the purchaser declarations and exhibits demonstrate that Initial Purchasers' investment analysis focused on the profit potential based on the difference between the discounted price of the Grams they received in the "pre-sale" and the expected market price. *See, e.g.*, Counter 56.1 at ¶¶ 67-78; SEC 56.1 at ¶¶ 147-86. Indeed, the Initial Purchasers bought in quantities far in excess of any potential use, were depending on Telegram's efforts to facilitate trading, stabilize prices, and list Grams, and understood that, to be successful, Grams had to be widely dispersed to the public. *Id.*

Moreover, Telegram conducted the Offering by maximizing the Initial Purchasers' incentive to resell through the low presale price and the anticipation—based on Telegram's own promotional materials—that upon launch Telegram would sell Grams at no cheaper than $3.62. This is a two to nearly ten-times profit on the $0.37 and $1.33 that Initial Purchasers paid, incentivizing them to recoup their initial outlay and eliminate risk through immediate public sales. Courts look at a transaction's economic inducements, such as these, to determine whether the security was intended to "come to rest" with a private purchaser or with public investors at large. *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004) (sale of securities at deep discount shows that the securities "were never meant to 'come to rest . . .'" with initial purchasers).

Most telling is that Telegram obligated itself to launch TON and deliver Grams by October 31, 2019, regardless of whether or not Grams would still be properly considered investment contracts in subsequent resales. Despite Telegram's insistence that the Initial Purchasers took all the risk, Def. Br. at 24, the economic reality shows the opposite—these purchasers took little risk in parting with their money in 2018 because they expected at least a

contractual return of their capital, while hoping for a return plus some profit multiplier if Grams were delivered in the manner anticipated. At a minimum, Stage A purchasers will sell as many Grams as they can before the three-month lockup period expires for the Pre-Sale purchasers, who hold approximately four times as many Grams at a quarter of the price.

The economic reality of the transaction shows all the traditional attributes of sales to underwriters—persons who acquire securities with an intent to distribute them as part of a public offering. *See* 15 U.S.C. §§ 77b(a)(11), 77d(a)(1). The fact that Telegram has not yet delivered the Grams to those Initial Purchasers cannot alter that reality. This Court has jurisdiction and the statutory mandate to interrupt and prohibit an illegal public offering before public investors are induced to invest without all of the information registration would provide.

**B.      The Public Distribution Is Underway as Initial Purchasers Have Already Offered, and Reportedly Sold, Gram Interests in Secondary Transactions.**

Telegram's position appears to be that, so long as it obtained written representations, performed a "Know-Your-Customer" background check at the time the Purchase Agreements were signed, and asked Initial Purchasers to re-sign their written representations, it could close its eyes to what those purchasers intended to do with their Grams. Def. Br. at 16-17. Telegram also appears to argue that, because Grams were not "physical instruments" at the time of the Purchase Agreements, Regulation D need not apply to the Grams. *Id*. at 44-45. What happens between sale and delivery is, however, plainly relevant to whether Telegram sold to underwriters. Telegram argues that its contractual prohibition against resales sufficed to fulfill its statutory responsibilities, but it did not. What happened even while the Purchase Agreements were being signed shows that the secondary market was foreseeable and inevitable.

From the outset of the Offering, Telegram was repeatedly confronted with evidence that a secondary market existed for the Initial Purchaser's undelivered Grams; that some purchasers

(including some to whom Telegram was paying underwriters' fees) were spreading marketing materials for that secondary market; and that by July 2019 certain Initial Purchasers had in fact sold their interests in Grams at $4 each. *See* Counter 56.1 at ¶¶ 87-157; SEC 56.1 at ¶¶ 213-38.

*First*, in February 2018—while Telegram was first lining up investors—Telegram's Chief Investment Advisor John Hyman ("Hyman") repeatedly asked one of Telegram's Pre-Sale investors about the prices at which people were currently willing to trade Grams in the "grey market." The investor explained to Hyman that, because Telegram had limited the Pre-Sale to $850 million, at $0.37 per Gram, while announcing an upcoming round at $1.33 per Gram, "[a]ll of that demand [was] flowing in to the secondary market. Some willing to pay up to $1." SEC 56.1 at ¶ 214. Hyman reported this back to other Telegram employees handling the Offering, including Durov. *Id.* at ¶ 215. Telegram was repeatedly informed of other secondary market interest in 2018 and 2019, Counter 56.1 at ¶¶ 97, 112-16, 130, 157, which was continuously and widely reported in the financial press and media. *Id.* at ¶¶ 151-55; SEC 56.1 at ¶ 227-29, 247-56.

*Second*, despite Telegram's claims that it was making reasonable efforts to stop resales, there is enough evidence in the record for a fact-finder to conclude that any such efforts were symbolic. It could not have escaped Telegram's attention that two of its biggest Stage A investors—Disruptive Era Fund SP and Space Investments—were directly implicated in secondary market activity. The beneficial owners (Da Vinci Capital for Disruptive Era and Inventure Partners for Space Investments), who eventually paid Telegram a total of $72 million and $91 million, respectively, *id.* at ¶¶ 123-40, simultaneously functioned as placement agents: they caused Disruptive Era and Space Investments to sign Purchase Agreements, and then signed contracts with Telegram for 10-15% commissions for any payments made by their funds under those agreements, regardless of the actual source of the funds and the party to whom they were to

deliver the Grams.  *Id.* at ¶¶ 118-33, 134-46.  Da Vinci paid off its Purchase Agreements in numerous installments, *id.* at ¶ 126, sought commissions on those payments, *id.* at ¶ 127, and then reduced its remaining obligation from $30 million to $12 million.  *Id.* at ¶ 123.  Moreover, Telegram knew that Da Vinci Capital was sending out re-marketing materials in 2018, including some touting potential investment returns for investments in Grams.  *Id.* at ¶¶ 122, 130-33. Space Investment likewise sent invoices under its own contract, charging commission on multiple payments made to Telegram to pay off its outstanding Purchase Agreement.  *Id.* at ¶¶ 143, 146-47.  When investors asked Telegram about their having been solicited by Space Investments, Telegram responded that Space Investments was a "trusted partner."  SEC 56.1 at ¶¶ 238-40.  Disruptive Era and Space Investments were acting as underwriters—ostensibly committing to buy the securities, marketing them to investors, fulfilling their funding commitment as they sold them, and charging commissions to Telegram for doing so.

*Third*, in July 2019, one of the "biggest Asian investors" in the Offering auctioned $50 million of Grams online for $4 a Gram.  *Id.* at ¶ 242.  Telegram knew this beforehand because the digital asset platform on which Grams sold (Liquid) directly notified Telegram in May that it intended to launch that sale, and on the same day a Liquid employee notified Telegram that the auction involved one of Telegram's largest investors—Space Investments.  *Id.* at ¶¶ 235-36.[16] All of this reported activity and trading during Telegram's Offering and later in 2019 shows market conditioning for Telegram's anticipated delivery of Grams.

### C. Telegram's Offers and Sales to Initial Purchasers Were Not Otherwise Exempt.

Telegram's reliance on Rule 506(c) of Regulation D is unavailing because Regulation D does not exempt what is already prohibited.  Given the interplay between Section 4(a)(1), 15

---

[16]     There was even a secondary market for the Purchase Agreements themselves.  *Id.* at ¶¶ 91-93.

U.S.C. § 77d(a)(1), which exempts transactions *other* than by issuers selling securities through underwriters to the public, and Section 4(a)(2), *id.* § 77d(a)(2) , which exempts private offerings, the question is whether Telegram's Offering was a discrete, private offering or part of a public offering. The inquiry turns on whether Telegram can prove it exercised reasonable care to assure that its initial purchasers were not underwriters, 17 C.F.R. § 230.502(d), such that it exercised reasonable care to assure that the Grams would come to rest with the Initial Purchasers. "Since [the Act] . . . defines an 'underwriter' as 'any person who has purchased from an issuer with a view to . . . the distribution of any security' and since a 'distribution' requires a 'public offering,' . . . the question is whether there was a 'public offering.'" *Ackerberg*, 892 F.2d at 1337 (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959)).

Telegram argues that it structured private offerings of its Purchase Agreements, which it calls securities, and that the Grams that Telegram sold the Initial Purchasers—who will be free to distribute them to the public in unregistered transactions—are not. For the former, but critically not the latter, Telegram argues that it took every step necessary to meet the requirements of Rule 506(c). That provision requires, among other things, compliance with Rule 502(d), which in turn provides that issuers "shall exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of 2(a)(11)." 17 C.F.R. § 230.502(d). The Rule provides guidance as to how an issuer obtains such assurances, including placement of a restrictive legend on the security, which serves as notice to any transferee that the purchaser's shares may not be resold absent registration or exemption.

Telegram claims that every purchaser was required to verify its accredited investor status, pass an extensive KYC inquiry, and provide express representations confirming its purchase was not made with a view towards resale. Telegram also relies on its contractual prohibition in the

Purchase Agreements against "the offer, sale or transfer of any interests in Grams until at least the launch of the TON Blockchain (if not longer, in the case of lock-up provisions for the Round 1 investors)." Def. Br. at 14-15. As the SEC has explained, such statements by Telegram's underwriters are "necessarily self-serving" such that "[m]ere acceptance at face value" does not justify reliance on the exemption. *Non-public Offering Exemption*, Securities Act Rel. No. 33-4552, 1962 WL 69540, at *2 (Nov. 6, 1962). Grams will not "contain any restriction on the[ir] transferability . . . once they are delivered . . . ." *E.g.*, PX167 at 2-3; *see also* Stips. at ¶ 169.

Telegram also argues that the Offering can be separated into two exempt offerings: one to U.S. investors that met the requirements of Regulation D, Rule 506(c), and one foreign offering exempt under Regulation S. While it is theoretically possible to conduct simultaneous and compliant *separate* Regulation D and S offerings, the record does not show that Telegram did so.

*First*, Telegram did not structure two distinct offerings that distinguished between foreign and U.S. investors. Rather, Telegram conducted a single, purportedly private offering using the same materials, agreements, and restrictions for both U.S. and non-U.S. persons alike. *Id.* at ¶ 60. A compliant offering under Regulation S requires that the issuer not make directed selling efforts in the United States, which Telegram did here, and requires that that the issuer take steps to ensure that securities sold to non-US persons do not "flow back" into the United States for a period of time. *See* 17 C.F.R. § 903(a); SEC Rel. No. 6863, *Offshore Offers and Sales* (Apr. 24, 1990). Telegram's sales to U.S. investors and non-U.S. persons were part of the same Offering, and Telegram's statements and actions with respect to both are relevant to whether the Offering qualifies for a Regulation D exemption.

*Second*, Telegram's sales and pricing methods created an incentive for Initial Purchasers to engage in secondary market transactions for Grams and Telegram cannot satisfy the narrowly-

construed exemption for issuers who actually take reasonable steps to assure that their securities remain restricted. Given the secondary market transactions, Telegram cannot identify subsequent purchasers for purposes of the accreditation requirement of Rule 506(c), 17 C.F.R. § 230.506(c), or their location and residency, as required for compliance with Regulation S. Telegram's failure to ascertain information with respect to Liquid and other resellers, Counter 56.1 at ¶ 157; SEC 56.1 at ¶ 237, means that Telegram cannot meet the exemption.

Telegram's argument that it satisfied the dictates of *Ralston Purina* by ensuring that the Initial Purchasers were sophisticated and thus could "fend for themselves," Def. Br. at 46, misses the point. The prohibition on issuers selling securities in unregistered transactions protects public investors when issuers solicit their capital, not the intermediaries in whose hands the securities are never meant to rest. *Gilligan*, 267 F.2d at 466. Telegram's sales to institutional investors during the Pre-Sale was the path it chose to accomplish its goal: sell to intermediaries (who would fend for themselves) and give those intermediaries an economically sound basis (through the early discount) to provide funds to develop the architecture and partners necessary to support the inevitable sales by those underwriters to the public. If Telegram fulfills its promises and delivers Grams, the Initial Purchasers will capture their spread as compensation for the time value of their funds by flooding the public market with speculative securities without adequate disclosure. If Telegram fails to deliver, Initial Purchasers get their money back. The sales to Initial Purchasers were not sales to purchasers with whom Grams were to come to rest: the Initial Purchasers were the stepping stones towards a public distribution.

The SEC seeks to prevent Grams from being delivered to Initial Purchasers to prevent the ultimate distribution of Grams to unsophisticated investors—the very investors *Ralston Purina* seeks to protect. Those investors need protection from an issuer that seeks the benefit of capital

formation under the federal securities laws without the burden of disclosure. The disclosures required under the securities laws prevent asymmetry of information between sophisticated and unsophisticated investors. All public investors are statutorily entitled to information from Telegram about what it plans to do with their money. Durov "struggles" to grasp the relevance financial statements may have for the general public, SEC 56.1 at ¶ 347, and has determined that investors are not entitled to receive it from Telegram. That is contrary to the animating purpose of the Securities Act: to reverse the common commercial understanding of *caveat emptor* and impose the duty of *caveat vendor* on issuers when they solicit public investment. *See In re Initial Pub. Offering Secs. Litig.*, 241 F. Supp. 2d 281, 299 (S.D.N.Y. 2003) (citing *SEC v. Cap. Gains Research Bureau*, 375 U.S. 180 (1963); *SEC v. Zandford*, 535 U.S. 813 (2002)).

## IV.    TELEGRAM'S EQUITABLE ARGUMENTS ARE IMPROPER.

Though originally styled as a Due Process challenge to the Securities Act, *see* Ans. (D.E. 37) at 32-33, the true nature of Telegram's "equitable" arguments is that the SEC's supposed conduct in this case should weigh in Telegram's favor. *See* Def. Br. at 41-42. Telegram asserts that the SEC "has not provided any guidance on how it would determine whether Grams apply as an investment contract," *id.* at 41, blames the SEC for supposedly failing to "follow[] up" on "concerns" regarding the Offering, *id.* at 20-22, and suggests that it is the SEC's enforcement action and not its own statements that may turn Grams into securities. *See, e.g.*, *id.* at 5-6, 14.

Courts are typically "reluctant" to permit affirmative defenses against a government agency like the SEC "seeking to enforce a congressional mandate in the public interest." *SEC v. Lorin*, No. 90 Civ. 7461, 1991 WL 576895, at *1 (S.D.N.Y. June 18, 1991). "Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." *SEC v. Rosenfeld*, No. 97 Civ. 1467, 1997 WL 400131, at *2 (S.D.N.Y.

July 16, 1997) (quoting *SEC v. Elec. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988));

*accord Lorin*, 1991 WL 576895, at *1. Thus, "[t]he scope and conduct of the SEC's prefiling

investigation bears absolutely no relevance to [the defendant's] culpability." *SEC v. Keating*,

No. 91 Civ. 6785, 1992 WL 207918, at *4 (C.D. Cal. July 23, 1992); *see also Graham v. SEC*,

222 F.3d 994, 1007–08 (D.C. Cir. 2000) (no estoppel argument against SEC).

A party asserting an equitable estoppel defense against the SEC therefore typically faces

an uphill battle—one amplified here by Telegram's attempt to bend the facts. Telegram asserts

that the SEC "has not provided any guidance" on how it would determine whether digital assets

are securities, Def. Br. 41, but it was admittedly aware of the DAO Report, which provides

exactly such guidance, *see* SEC Br. in Supp. of Mot. to Strike (D.E. 76) at 2-4, and repeatedly

cites SEC staff guidance in support of its legal arguments. *E.g.*, Def. Br. at 7 n.6 & 24.

Telegram also continues to gloss over the fact that it did not reach out to the SEC before it sold

Grams, and that the staff had to search for Telegram's counsel. D.E. 76 at 4-5. This resulted in

an investigation by the Division of Enforcement, and the Act places the burden of compliance on

Telegram—not on the Division to "follow[] up," Def. Br. at 21, with all potential past

transgressors to provide them legal advice on how to re-structure an offering conducted in

violation of the Act.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court enter a

preliminary injunction specifically prohibiting Telegram from delivering the Grams it sold to

Initial Purchasers or from offering or selling Grams to the public, and that the Court deny

Telegram's motion for summary judgment.

Dated: New York, New York
      January 21, 2020

Jorge G. Tenreiro
Kevin P. McGrath
Ladan F. Stewart
Alison R. Levine

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov