UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　Plaintiff,　　　　　　　　　　:　　19 Civ. 9439 (PKC)
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　- against -　　　　　　　　　　　　　　　　　　　:　　ECF Case
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
TELEGRAM GROUP INC. and TON ISSUER INC.,　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　Defendants.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
------------------------------------------------------------------ x


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY
MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

Jorge G. Tenreiro
Kevin P. McGrath
Ladan F. Stewart
Alison R. Levine

*Counsel for the Plaintiff*
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

January 27, 2020

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ............................................................................................................................ 3

    I.   DEFENDANTS OFFERED AND SOLD GRAMS AS INVESTMENT CONTRACTS ............................................................................................................ 3

        A.   The *Howey* Analysis Should Be Conducted at the Time Grams Were Sold. ........... 4

        B.   Telegram Offered and Sold Grams as the Manifestation of Investors' Interest in the Venture, Which Initial Purchasers Understood. ............................. 7

        C.   The Economic Reality of Grams Will Not Change When They Are Delivered. ................................................................................................................ 10

    II.  TELEGRAM ENGAGED AND IS ENGAGING IN A PUBLIC DISTRIBUTION OF GRAMS TO WHICH NO EXEMPTION CAN APPLY. ........................................ 11

    III. TELEGRAM'S REMAINING ARGUMENTS ARE UNAVAILING. .......................... 14

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................. 11

*D'Amico v. City of N.Y.*, 132 F.3d 145 (2d Cir. 1998) ..................................................................... 14

*Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*, 756 F.2d 230 (2d Cir. 1985) .............. 10, 11

*Glen–Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) ............................ 11

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) ...................................................................... 10

*In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645 (S.D.N.Y. 2012) ......................................... 8

*Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) ............................................................... 6

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ......................................................................................... 8

*SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577 (2d Cir. 1982) ..................................................... 8

*SEC v. Belmont Reid & Co.*, 794 F.2d 1388 (9th Cir. 1986) ........................................................ 5

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ............................................................. 5

*SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137 (5th Cir. 1972) ............................................. 13

*SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974) .............................................. 5

*SEC v. Mono-Kearsage Consol. Mining Co.*, 167 F. Supp. 248 (D. Utah 1958) ........................ 13

*SEC v. Mutual Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) .................................................... 10

*SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125 (9th Cir. 1991) ..................................................... 6

*SEC v. Ralston Purina & Co.*, 346 U.S. 119 (1953) .................................................................... 12

*SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971) ................................................... 10

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ...................................................................... passim

*Slevin v. Pedersen Assocs., Inc.*, 540 F. Supp. 437 (S.D.N.Y. 1982) .......................................... 10

*United States v. Custer Channel Wing Corp.*, 247 F. Supp. 481 (D. Md. 1965)
   aff'd 376 F.2d 675 (4th Cir. 1967) ............................................................................................ 13

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) ............................................................... 14

|  | **Page(s)** |
|---|---|
| *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555 (2d Cir. 1985) | 4 |

**Statutes**

| | |
|---|---|
| Commodities Exchange Act, Section 1a, 7 U.S.C. § 1a | 15 |
| Commodities Exchange Act, Section 2, 7 U.S.C. § 2 | 15 |
| Securities Act, Section 4(a)(2), 15 U.S.C. § 77d(a)(2) | 14 |
| Securities Act, Section 5, 15 U.S.C. § 77e | 2, 3, 5 |

**Other Authorities**

| | |
|---|---|
| *Investor Bulletin: Be Cautious of SAFEs in Crowdfunding* (May 9, 2017) *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_safes | 6 |
| *Securities Act Compliance and Disclosure Interpretations*, Securities Act Question 103.04 (Aug. 14, 2009) *available at* https://www.sec.gov/divisions/corpfin/guidance/sasinterp.htm. | 6 |
| *Verticom, Inc.* No-Action Letter, 1986 WL 65214 (Feb. 12, 1986) | 6 |
| *Written Testimony of Chairman J. Christopher Giancarlo before the Senate Banking Committee* (Feb. 6, 2018) *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37 | 15 |

Plaintiff SEC respectfully submits this reply memorandum of law in further support of its motion for summary judgment against Defendants. For the reasons set forth below and in the SEC's moving papers, the Court should grant the SEC's motion for summary judgment.

## PRELIMINARY STATEMENT

In its opposition to the SEC's Motion for Summary Judgment, Telegram does not dispute that (1) the investments it marketed and sold in 2018 were securities, (2) those securities were marketed and sold through interstate commerce, and (3) no registration statement was or is in effect. Instead, Telegram argues that it can do a two-step around the registration provisions of the federal securities laws by creating an artificial distinction between a purchaser's investment in Grams and the company's delivery of Grams to that purchaser. Telegram argues in essence that this distinction somehow transforms Grams into a non-security and therefore that investors have no right to the type of key information typically found in registration statements.

This argument is a sleight of hand. If Telegram had delivered Grams upon execution of the Purchase Agreements, there could be no dispute that Telegram had sold securities because, as Telegram concedes, all of the elements of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), were met as of that moment. Telegram tries to circumvent this by arguing that Grams were not part of the securities the purchasers bought because they did not "exist," and that in any case they will be delivered as "commodities." Telegram's arguments about "existence" are a strawman (Grams will never be tangible). But, when they were offered and sold—and when they are delivered— Grams will be the computer code that evidence ownership of an underlying asset or value, recorded on a distributed ledger. The value of that asset will have depended and will still depend on Telegram's efforts to increase demand for and, thus, increase the value of that asset as purchasers reasonably expected and will expect. That asset is a security.

Telegram's attempt to avoid this economic truth by labelling Grams "commodities" also fails. Grams are not commodities. Unlike gold, comic books, and Krispy Kreme donuts—commodities Telegram compares to Grams—Grams have no intrinsic value. Whatever value Grams have results *solely* from Telegram's efforts to create a blockchain and "ecosystem," the very project the purchasers were funding. But, even if Grams were commodities, that would not change the outcome of the Court's analysis. Securities in the form of investment contracts routinely involve commodities; whether they were sold as *part* of an investment contract is another question, which depends on the entire circumstances surrounding the offer and sale.

Here, the facts show that Grams were sold as investment contracts, given Telegram's promises to engage in efforts for the blockchain through at least 2021, to issue Grams regardless of the blockchain's self-sufficiency, and to create markets for Grams, and given Telegram's discounted price structure at sale. For the Initial Purchasers, Grams serve merely as a means to cash out of their investment and realize the benefits of their sale price discount. Sophisticated purchasers understood they were buying a speculative but potentially lucrative investment opportunity manifested by Grams—not a consumable commodity like oranges.

Moreover, no exemption to the general registration requirements of the federal securities laws applies to the instruments Telegram offered and sold. Telegram sold Grams to a large group of private investors who face no restrictions from reselling—and who are incentivized to resell—to retail investors at large in Telegram's public distribution. Indeed, that is how these private investors plan to profit. Section 5's animating purpose is to require registration statements and therefore full and fair disclosure when issuers distribute securities to the public. Telegram should not be permitted to bypass this statutory requirement through inserting a piece of paper—a "Purchase Agreement"—between the private investors and public buyers.

In sum, Telegram offered and sold Grams as securities when it promised to deliver them in exchange for funds pursuant to the Purchase Agreements. That reality will not have changed if the Court permits Telegram to deliver Grams to the Initial Purchasers as part of a broad public distribution, which is in violation of Section 5, and which the Court should enjoin.

## ARGUMENT[1]

**I. DEFENDANTS OFFERED AND SOLD GRAMS AS INVESTMENT CONTRACTS.**

Telegram violated Section 5 because it has commenced a public distribution of securities without registration. Grams, through the Purchase Agreements and the representations and promises made in connection thereto, are offers and sales of investment contracts that meet the three *Howey* elements. *See also* SJ Br. at 18-26. Though Telegram accuses the SEC of pursuing a "'fragmented approach,'" Def. Opp. at 15, in reality Telegram advocates for a fragmented approach, urging the Court to analyze "Grams" divorced from the Purchase Agreements and upon delivery, arguing Grams did not exist in 2018 and are commodities. *See, e.g.*, *id.* at 1-3, 14.

None of this is correct: Telegram sold, and Initial Purchasers reasonably understood they bought and would profit through the resale of Grams, and that understanding will not change upon delivery. Despite Telegram's recently-stated "intention" (seemingly for purposes of this litigation) to only deliver Grams when certain prerequisites have purportedly been achieved (intentions that by definition constitute promises to make "efforts," under *Howey*), Telegram did not condition the delivery of Grams when it sold them on the existence of ascertainable "uses"

---

[1] "SJ Br." is the SEC's Summary Judgment brief, D.E. 79, and "Def. Opp." is Defendants' Memorandum in Opposition to that motion, D.E. 93. "Def. Br." means Defendants' Memorandum in Support of its Motion for Summary Judgment, D.E. 71, and "SEC Opp." is the SEC's Memorandum in Opposition to that motion, D.E. 98. "Def. Resp. 56.1" is the SEC's 56.1 Statement together with Defendants' Response thereto, D.E. 95, and "Counter 56.1" the SEC's Counter-Statement of Facts, D.E. 99. "Def. MTS Opp." is Defendants' brief in opposition to the SEC's motion to strike, D.E. 96. Capitalized terms not defined shall have the meaning ascribed to them in the SEC's SJ Br. and SEC Opp.

for them that would satisfy Initial Purchasers' consumptive desires. Nor did Telegram then condition delivery on the blockchain and ecosystem being so self-sufficient that no Initial Purchaser could reasonably expect Telegram to continue its efforts to increase the "demand and value" for Grams after delivery. In sum, Telegram sold Grams, and Initial Purchasers reasonably viewed and still view them, as the representation of Initial Purchasers' investment in the project and which they hope to sell for profit based on Telegram's past, ongoing, and future efforts.

### A. The *Howey* Analysis Should Be Conducted at the Time Grams Were Sold.

As explained in the SEC's moving brief, the Court should analyze Grams as part of what Telegram "sold" in 2018 because the *Howey* analysis is conducted at the time of a sale, and a "sale" occurs for purposes of the Securities Act when there is a binding agreement to receive the instrument, "even if the contract is never fully performed." *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 (2d Cir. 1985); *see also* SJ Br. at 18-20. Telegram's response—that it was not "'irrevocably bound' to deliver Grams *under any circumstances*," Def. Opp. at 14 (emphasis added)—not only asks the wrong question but is also wrong. The proper inquiry is whether Telegram was *bound* to perform and, more importantly, whether the *purchasers* had no other investment decision to make and were bound to accept delivery. The Purchase Agreements, which obligated Telegram to "issue the Token Allocation" and the Initial Purchasers to pay for and then provide a network address to accept Grams, constituted binding agreements upon both parties. *See* JX11 at §§ 2.1, 2.2(c); *see also id.* at Sch. 1 ¶ 3 (Purchase Agreements were "legal, valid and binding obligation").

Telegram's contention that the usual meaning of "sale" should not apply because Grams "do not exist" is even more flawed. Def. Opp. at 3. For example, Telegram could not reasonably contend that initial public offerings, where purchasers enter into agreements for the future delivery of stock, are not "sales," or otherwise that a seller has not "sold" a thing simply

because the buyer does not receive it at the moment of sale. Indeed, the Securities Act recognizes "delivery" as something that occurs "after" a "sale." 15 U.S.C. § 77e(a)(2). The fact that Telegram was to deliver the Grams after the Purchase Agreements were signed does not therefore mean that Telegram did not sell the Grams pursuant to those agreements and at that time. The Act also prohibits unregistered "offers," *id.* at § 77e(a), which by definition also do not require "delivery." Thus, although Telegram agrees that the Act is "transaction specific" such that *Howey* must be re-applied upon each offer and sale, *e.g.*, Def. Opp. at 5, it never explicitly attempts to argue that a "delivery" constitutes a "sale."

Telegram's claim that, because Grams are supposedly a "commodity," they cannot be a part of the investment contract represented by the Purchase Agreement makes no more sense. *Id.* at 14-16. The Supreme Court has long instructed that, in determining what constitutes an investment contract, "courts have not been guided by the nature of assets back of a particular document or offering." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352 (1943). And the Supreme Court has specifically rejected the contention that "an investment contract is necessarily missing . . . where the tangible interest which is sold has intrinsic value independent of the success of the enterprise as a whole." *Howey*, 328 U.S. at 301.

Indeed, even the cases that Telegram cites in support of its argument in fact refute it. *See* Def. Opp. at 14-16 (citing *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *SEC v. Belmont Reid & Co.*, 794 F.2d 1388 (9th Cir. 1986)). Both *Koscot* and *Belmont* involved the future delivery of tangible items. But neither case even suggests that the usual *Howey* test— which is "not . . . guided by the nature of [the] assets" underlying the instrument—is inapplicable because the underlying instrument was a commodity. Thus, the Ninth Circuit had no trouble, after *Belmont*, holding that a promoter had sold an agreement for a commodity's future delivery

5

as an investment contract. *See SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130-31 (9th Cir. 1991). In sum, even if Grams are "commodities" at the time of delivery (which they will not be), that is no reason to reductively conclude they were not sold as investment contracts, to sever them from the Purchase Agreements, or to conduct the *Howey* analysis upon their delivery.

Telegram itself concedes Grams were part of the Purchase Agreements at other times. For example, in its opposition to the SEC's motion to strike, Telegram states that "the *Howey* economic reality test was designed to determine whether a particular instrument is an investment contract *when entered into*." Def. MTS Opp. at 23 (emphasis added) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 691 (1985)). It makes the same concession elsewhere in its brief opposing summary judgment. *See* Def. Opp. at 25 (Grams "are entitled to the same exemptions [as the Purchase Agreements] because any right to receive them is embodied in, and inextricably bound with, the Purchase Agreements themselves"). And, as the SEC pointed out, SJ Br. at 10, Telegram stated in an SEC Form D that it had "sold" $850 million worth of Grams even though it had not "received" that amount when it made the statement. Def. Resp. 56.1 at ¶¶ 180, 184-86. As Telegram's slips of the pen reveal, the proper way to analyze Grams is together with the Purchase Agreements and with all of Telegram's other representations made at the time of sale.[2]

---

[2] The *Verticom, Inc.* No-Action Letter, 1986 WL 65214 (Feb. 12, 1986), and the Investor Bulletin about "Simple Agreements for Future Equity" ("SAFE") Telegram cites, Def. Opp. at 14, do not support Telegram's position. In *Verticom*, the SEC staff agreed that a start-up company's sale of notes convertible into common stock to obtain "seed" funding for its business constituted the "sale" of a separate legal security than a possible future sale of company shares. But in that case the sale of the shares in the future initial public offering would still be registered. Here, Telegram is using *the same* instrument—the Grams—to achieve both its initial and its future rounds of funding, without registering *either* sale. And although Telegram asserts that the SAFE Investor Bulletin states that agreements for the delivery of future equity "do not 'entitle [investors] to certain rights under . . . federal securities law,'" Def. Opp. Br. at 14, the bulletin is but one example of the staff explaining that a "sale" of a security that may not be delivered until a future date must nevertheless be registered at the moment of sale. Elsewhere the staff explained: "The security holder, by purchasing a convertible security that is convertible only at the option of the issuer, is in effect also deciding to accept the underlying security." *Securities Act Compliance and Disclosure Interpretations*, Securities Act Question 103.04 (Aug. 14, 2009) *available at* https://www.sec.gov/divisions/corpfin/guidance/sasinterp.htm.

### B. Telegram Offered and Sold Grams as the Manifestation of Investors' Interest in the Venture, Which Initial Purchasers Understood.

Though Telegram insists that the *Howey* analysis must be conducted upon delivery of Grams to the Initial Purchasers, it never actually tackles that analysis. Def. Opp. at 15. Instead, Telegram devotes the *Howey* analysis in its opposition to offers and sales to *retail investors*, an argument the SEC refuted in its own opposing brief, *see* SEC Opp. at 8-19, but that is not relevant to this motion. *See infra* at III. However, for purposes of this motion, and to expose the weakness of Telegram's "commodity" argument, it is worth re-examining the manner in which Telegram offered and sold Grams to Initial Purchasers, the analysis Telegram mostly avoids.

This examination shows that the Initial Purchasers understood that Grams, not the Purchase Agreements, represented their interest in the TON Blockchain project and that they would sell Grams, not the Purchase Agreements, to the public to realize their expectation of profits from Telegram's efforts to launch and develop the TON Blockchain. Telegram's current, post-litigation claims that it will completely step away do not change this reality.

First, the Purchase Agreements did not condition delivery of Grams on the TON Blockchain being fully functional and without the need for future efforts by Telegram. *See, e.g.*, JX11 at § 1.1 (Telegram committed to issue Grams upon "the public release of a version of the TON Network after completion of the test launch and security audits, as determined by the Issuer in its sole discretion"). And Telegram previously represented that it intended to remain involved through 2021, and that it would hold 52% of unsold Grams to guide further development of the ecosystem. *E.g.*, Def. Resp. 56.1 at ¶¶ 66, 68, 107, 110, 118, 119, 122, 127, 166, 175-76.

Second, Telegram touted to Initial Purchasers the price "discount" they were getting vis-à-vis Telegram's promised future sales, the type of early investing incentives that it understood are typical in IPOs. *Id.* at ¶¶ 44, 190, 192. Third, Telegram promised to create the market and

7

demand for Grams, not just by listing Grams on digital asset trading platforms, but by integrating its millions of crypto-asset-friendly Messenger users into the system. *E.g.*, *id.* at ¶¶ 46, 86-87.

Telegram's promises of future efforts, the issuance of Grams untethered to the self-sufficiency of the blockchain and ecosystem, the discounts, and the creation of markets, together created only one reasonable economic understanding of Grams for Initial Purchasers: the means to cash out of the investment, not as a "commodity" for "use" or a currency.

Telegram argues that the marketing materials are "outdated," "stale," and "superseded" by the Public Notice. Def. Opp. at 21-22. This contention runs afoul of courts' admonitions that *all* statements must be considered for purposes of *Howey*, which foreclose Telegram's attempts to brush under the rug the statements that do not support its arguments here. *E.g.*, *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 583 (2d Cir. 1982); SEC Opp. at 11.[3] The Public Notice begs the question why Telegram felt it needed such a disclaimer and underscores that Telegram had already created reasonable expectations of profits from the promise of future efforts after launch.

Given these economic realities, there can be no serious dispute that the sophisticated Initial Purchasers who bought Grams viewed them as the means by which their interests in the investment would be "made manifest" and through which they could profit, including based on Telegram's efforts. *Howey*, 328 U.S. at 300. Investors' internal memoranda considering whether to buy Grams reflect this understanding, as just a few examples show:

- "we firmly believe that the Durov Brothers, and in particular Pavel will be the guiding force behind TON . . . [w]e expect the TON reserve to be very active in exerting its influence on price;" Counter 56.1 at ¶ 84 (citing PX30 at Bates 4);

---

[3] Telegram cites to *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 655-56 (S.D.N.Y. 2012) for its incorrect contention that "it is well-established that these stale, superseded materials cannot form the basis of a securities-related claim." Def. Opp. at 22. The analysis in that case revolved around whether it was proper for a private securities claims plaintiff to *rely* on disavowed statements. Reliance is not an element of an SEC enforcement action. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019).

8

- "Our investment thesis is driven by the belief that the value of Gram tokens will be highly correlated with the GMV growth potential of the TON commerce platform itself. Our interest in TON is based on the strong and natural synergies that we believe will exist between Telegram's commerce platform and the core messaging platform, similar to WeChat," PX5, Ex. A at Bates 2963;

- "we have procured a highly attractive secondary opportunity at $0.453 per token, representing 66% discount to the last private round valuation. . . . [we] stand[] to receive principal within 7-9 months with 66% remaining stake for significant long termed upsides," Def. Resp. 56.1 at ¶ 258 (citing PX77 at Bates 831 (emphasis removed));

- Telegram's "large (42% of tokens) reserves could buy up supply at a stable cost if there is meaningful selling pressure, while the exponentially increasing cost of purchasing an additional token would keep buying demand suppressed at a certain point," Counter 56.1 at ¶ 82 (citing PX5, Ex. B at Bates 1582);

- "we also believe that because of the discount offered to participants in the resale, market conditions, momentum and scarcity, this coin will go up sharply in price in the short term. It could offer a return comparable to what we might see from a VC investment (5- 10x) that is realizable in 3-6 months (once the lockup begins to expire) instead of 7-9 years," Def. Resp. 56.1 at ¶ 174(c) (citing PX31 at Bates 3848);

see also Def. Resp. 56.1 at ¶ 166 (citing investors' sworn affidavits explaining they viewed Grams as means by which to profit from the investment based on Telegram's efforts). Investors also repeatedly spoke of Grams as the way they could realize "x" times profits on their investments. *See, e.g.*, Def. Resp. 56.1 at ¶¶ 175(d) & (e) (discussing how "integration" of Messenger could lead to "40x" returns "on our investment"); *accord id.* at ¶¶ 174(c), 176(g).

As all of this shows, Grams are not reducible to an item like "gold." *Telegram* created Grams. Unlike gold, they have no intrinsic value. The relevant question is: what value do Grams represent? The economic reality, as investors themselves succinctly explained it, is that the value Grams represent could potentially grow based on the efficacy and success of Telegram's (or other third parties') efforts to create some demand and value for them in the future, so they may be resold at a higher price. That makes Grams securities. The Initial

9

Purchasers all knew they would be selling Grams to achieve "x" times profits, not Purchase Agreements, because Telegram structured the deal that way.[4]

### C. The Economic Reality of Grams Will Not Change When They Are Delivered.

Telegram seems to recognize that, if Grams are properly analyzed when they were sold in 2018, there can be no genuine dispute that they were the core of the investment contract that Telegram admits it offered and sold. Telegram therefore insists repeatedly (and incorrectly) that the relevant time to analyze Grams is at "launch" or "delivery." *E.g.*, Def. Opp. at 3. But shifting the analysis to delivery does not change the outcome. Either way, no reasonable Initial Purchaser would think that he bought a security but is now receiving a commodity. The notion that these venture capitalists expected to be paid for their $1.7 billion investments in something akin to Krispy Kreme donuts so they could "use" them—the latest item Telegram compares to Grams in its effort to label them a commodity, *id.* at 23 & n.13—should not be taken seriously.

Nor is there any legal principle pointing to a different outcome. To the contrary, "there is no basis for excluding pre-purchase managerial activities from the analysis" because "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration . . . ." *SEC v. Mutual Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*, 756 F.2d 230 (2d Cir. 1985); *Glen–Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir.

---

[4] Telegram urges the Court to ignore the views of these sophisticated institutional investors because *Howey* is an "objective" inquiry. *E.g.*, Def. Opp. at 18. However, there is nothing remarkable about courts considering particular investors' views when undertaking the objective inquiry about reasonable expectations. *See, e.g.*, *Hocking v. Dubois*, 885 F.2d 1449, 1457-58 (9th Cir. 1989). In the context of the objective "materiality" standard of the antifraud provisions of the securities laws, for example, the Second Circuit has stated that "[t]here is little doubt that the [investor] testimony offered by the SEC was relevant to whether the release was misleading to the 'reasonable investor.'" *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1305 (2d Cir. 1971). Here, too, there is no reason why the investors' views at the time of their purchase cannot be used to confirm what is obvious from the economic reality. *See also Slevin v. Pedersen Assocs., Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y. 1982) ("The original intention of the parties is crucial to the classification of their contract [as an investment contract].")

1974)). Thus, even if the Court were to consider the date of "delivery" the relevant time of "sale," Telegram's significant, admitted efforts before then, *e.g.*, Def. Resp. 56.1 at ¶¶ 4, 13, 22, still count. This case resembles *Gary Plastic*, where the Court considered critical the promoter's promise to create a market so that the investor could sell the instrument underlying the venture— a certificate of deposit (a cash substitute the investor could also have "used"). Here, Telegram not only created the instrument, it promised to provide a ready market (purchasers on digital asset platforms) and the selling mechanism (the blockchain). At launch, Grams' character as the representation of the investment contract will not change. *See also Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (inducing purchase of coins by claim that "speed and efficiency of [new] blockchain would result in an increase in the coins' value" satisfies *Howey*).

## II.  TELEGRAM ENGAGED AND IS ENGAGING IN A PUBLIC DISTRIBUTION OF GRAMS TO WHICH NO EXEMPTION CAN APPLY.

Telegram claimed an exemption from registration only for "Purchase Agreements," and not for Grams, but still tries to argue that both are exempt because the right to receive Grams is "inextricably bound" with the agreements. Def. Opp. at 25. But once properly understood to be all part of an investment contract, neither sale nor delivery of Grams qualifies for an exemption.

Initially, Telegram planned to sell Grams directly to the investing public. Stip. at ¶ 39. Later, when it decided to directly sell Grams only to institutional investors, Telegram still understood that the ultimate goal was to complete a public distribution. For example, Durov and Hyman continued referring to the future sales into the market as sales to "retail investors," and Durov even spoke of the "TON distribution." Def. Resp. 56.1 at ¶ 144 (citing PX24); *see also id.* at ¶¶ 27-31 (citing PX12, PX16, PX19, PX20, PX21).[5]

---

[5]  Telegram correctly points out, Def. Opp. at n.14, that the email cited in the SEC's SJ Br. at n.10 (PX16 at TLGRM-011-00000040), did not contain the quoted word "indirectly." The SEC apologizes for

Telegram had an array of well-established means of obtaining financing consistent with the federal securities laws: an exempt private offering of restricted equity securities providing an ownership percentage of Telegram's business; a Regulation A offering, in which Telegram could have publicly sold up to $50 million in securities; or a registered public offering with all of the attendant benefits and costs. But Durov did not want to relinquish his unfettered control of Telegram and does not intend to provide disclosure to investors or to the public in periodic filings. Telegram attempted to bypass these investor protections by engaging in a purportedly exempt private offering on the flawed theory that Grams are not securities. The securities laws permit no such reordering of long-established rules of the road for issuers seeking public investment; they require that issuers accompany their offers and sales of securities with full and fair disclosure. Nowhere does Telegram confront the problem that its novel workaround has created: upon delivery, the Initial Purchasers are poised to sell hundreds of millions of Grams to public investors who lack information that a registration statement would provide.[6]

Under *SEC v. Ralston Purina & Co.*, 346 U.S. 119 (1953), an issuer is entitled to a private placement exemption only if it proves that the securities were not going to be resold to

---

this inadvertent error, and notes that the referenced document was quoted correctly in its 56.1 statement at paragraph 28. *See* Def. Resp. 56.1 at ¶ 28. However, the SEC's point remains the same: Durov was acknowledging that Telegram did not need to sell "directly to its users," meaning the public, because of the high demand from institutional investors. The clear import of Durov's email is that the Grams will indirectly make their way from Telegram to "its users" via these institutional investors. These institutional investors are therefore acting as Telegram's underwriters.

[6] Telegram did not even provide Initial Purchasers with information ordinarily expected by sophisticated accredited purchasers: financial statements and proposed plans for how investor money would be spent. Moreover, Initial Purchasers contractually relinquished rights of recourse one would expect to be demanded by investors in exchange for providing capital. Instead, Telegram sold at such a discount that those investors have ample room to profit by reselling to public investors outside of the channels required for securities. What Telegram offered, and what the Initial Purchasers eagerly accepted, was no restrictive legends, no holding periods beyond certain limited lockups, no legal opinions for future resales, and no registration, all of which provided Initial Purchasers with immediate liquidity not ordinarily available to traditional venture investments. Such immediate liquidity is typical, however, of that provided to underwriters who take securities with a view to distribution.

retail investors, and that the purchasers did not take as part of a public offering. *See SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 159 (5th Cir. 1972); *United States v. Custer Channel Wing Corp.*, 247 F. Supp. 481, 489 (D. Md. 1965) *aff'd* 376 F.2d 675 (4th Cir. 1967) (important factor to consider is whether the initial purchasers are merely conduits for a wider distribution).

Telegram's claimed private offering was no such thing. The premise of the private offering exemption is that the issuer sells securities while intending for those securities to come to rest with those purchasers, not with the public. As explained decades ago, "[i]f known to the company, or under circumstances reasonably placing it on notice [the issuer] transferred stock to persons . . . who claimed the right of immediate redistribution to the public and who actually made such redistribution, . . . the company must be held to have acted at its peril." *SEC v. Mono-Kearsage Consol. Mining Co.*, 167 F. Supp. 248, 252 (D. Utah 1958). Otherwise:

> an issuer with impunity, through a limited group and by a transaction private in form only, for its own benefit and for such consideration as it might exact, could distribute to the public whatever quantities of stock it desired without protection to the public contemplated by law. Neither an issuer nor an underwriter may separate parts of a series of transactions the totality of which is designed and known to constitute an unlimited offer and rely only upon that part which in form indicates that the offering was private.

*Id.* While that court found that the issuer had reason to know of the purchasers' distributive intent, no such fact-finding is required here. Telegram explicitly notified its Stage A purchasers that Grams would be unrestricted and could be resold immediately upon delivery. *See* JX6 at 2-3 (there shall be no "restriction on the transferability of Grams" upon delivery). Telegram had more than "reason to know" that Initial Purchasers "recognized no limitation upon retransfer," *Mono-Kearsage*, 167 F. Supp. at 253—Telegram told them so. *See also* Def. Resp. 56.1 at ¶¶ 114, 116. Indeed, Telegram structured its two rounds to give purchasers every financial

13

incentive to resell upon delivery.  *See supra* at I.B.  And, when confronted with the reality that there was reselling, Telegram kept selling and even paid underwriter fees to brokers.[7]

Telegram's argument that it exercised "reasonable care" to ensure its purchasers were not underwriters should not be credited.  An issuer cannot sell unrestricted securities, tell buyers that they are free to resell immediately upon delivery (which would create a market), and find shelter under Section 4(a)(2), Regulation D or Regulation S.  Public investors need the protections required by registration, and Telegram's proposed delivery of Grams should be enjoined.

### III. TELEGRAM'S REMAINING ARGUMENTS ARE UNAVAILING.

Telegram's remaining arguments, which stretch far beyond this litigation's scope, do not withstand scrutiny.  First, Telegram argues that to evaluate the SEC's claims, the Court must speculate about what Grams will be "for all times thereafter," Def. Opp. at 16, and about what expectations "secondary Gram owners are likely to have" in the future.  *Id.* at 19.  Yet this case does not concern the status of Grams "for all times" hereafter:  it turns on the status of Grams when the Purchase Agreements were signed in 2018 or, at the latest based on Telegram's argument, upon launch.  If any party asks the Court to speculate about the future, it is Telegram, failing to "offer some hard evidence showing that its version of the events is not wholly fanciful," while asking the Court to "rely on mere conclusory allegations [and] speculation," *id.* at 19 (citing *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998))—specifically, its own non-committal statements about what Grams are "intended" or "designed" to be.  *E.g.*, *id.* at 2, 4,

---

[7]  Telegram's argument that the SEC has not established the presence of underwriters, Def. Opp. at 25, has no merit.  For example, Telegram knew of a "grey market" by February 2018, and investors told Telegram about ongoing selling efforts by two of Telegram's biggest initial purchasers.  *See* Def. Resp. 56.1 at ¶¶ 213-19, 236, 325-27.  Telegram cannot feign ignorance when it was actually paying those entities, identified resellers, underwriter fees.  Paying brokers' fees qualifies as payments to underwriters. *See United States v. Wolfson*, 405 F.2d 779, 781-82 (2d Cir. 1968).  Telegram's argument that it did not know whether it would be prudent to make public statements about these resales, Def. Opp. at 10-12, is unconvincing, given its quick willingness to issue a litigation-driven Public Notice to "correct" the record.

6, 9, 20. The SEC, in contrast, contends that Grams were securities in 2018 and are securities now. (But the SEC has demonstrated in opposition to Telegram's motion that the *evidence* in the record compels the conclusion that, at least for the foreseeable future, Gram sales will continue to be sales of investment contracts. *See* SEC Opp. at 8-25.)

Next, Telegram continues to insist that Grams are like Bitcoin and Ether and thus not securities. *E.g.*, Def. Opp. at 2. But digital assets are not homogenous. Br. Chamber of Digital Commerce as *Amicus Curiae* (D.E. 86-1) at 4. Whatever Bitcoin and Ether are has everything to do with the facts and circumstances of their respective transactions, but little to do with this case. *See also* SEC Opp. at 23-25.

Finally, Telegram wrongly insists that the jurisdiction of the CFTC over futures markets should be weighed against a determination that "Grams" were sold as investment contracts. *See* Def. Opp. at 2. But, Section 2(a)(1) of the Commodities Exchange Act expressly states that nothing in that statute shall be construed as superseding or limiting the SEC's jurisdiction, 7 U.S.C. § 2(a)(1), and the statute, by its terms, is limited to futures or derivative transactions in commodities, not spot sales, unless fraud is involved. *Id.* at §§ 1a(47)(B), 2(c)(2); *see also Written Testimony of Chairman J. Christopher Giancarlo before the Senate Banking Committee* (Feb. 6, 2018) *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37 (CFTC "does not have authority to conduct regulatory oversight over spot virtual currency platforms or other cash commodities, including imposing registration requirements"); SEC Opp. Br. at 21 n.9 (noting likely narrow scope of FinCEN jurisdiction over Telegram's activities).

## CONCLUSION

For the reasons stated above and in its moving papers, the SEC respectfully requests that the Court grant its motion for summary judgment on liability in its entirety.

Dated: New York, New York
January 27, 2020

*/s/ Jorge G. Tenreiro*

Jorge G. Tenreiro
Kevin P. McGrath
Ladan F. Stewart
Alison R. Levine

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

16