UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :
                                          :   19 Civ. 9439 (PKC)

                 Plaintiff,   :

                                            :   **ECF Case**

      -against-                       :

                                            :   **Electronically Filed**

TELEGRAM GROUP INC. and TON ISSUER  :
INC.,                                           :
                                            :

                   Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

*Attorneys for Defendants*

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................................1

I.     GRAMS MUST BE ASSESSED AT THE TIME OF THEIR DISTRIBUTION..............1

II.    GRAMS WILL NOT BE SECURITIES ...........................................................................1

       A.     The Undisputed Facts Show There Will Be No Common Enterprise ....................2

       B.     Defendants Did Not Promise Profits Based On Their Undeniably
              Significant Efforts .................................................................................................3

       C.     Any Speculation About Further Efforts to Develop the Blockchain Is
              Insufficient ............................................................................................................8

       D.     The SEC's Arguments About TON's Technology Are Wrong and
              Irrelevant ...............................................................................................................9

       E.     Bitcoin, Ether and EOS Highlight the SEC's Arbitrary Position Here.................10

III.   THE SEC'S "PAST VIOLATION" THEORY LACKS MERIT ......................................11

       A.     The Private Placement Was Conducted Under Valid Exemptions to
              Registration ...........................................................................................................11

       B.     There Was Not, and Can Never Be, A "Public Distribution" of Securities...........12

       C.     The SEC's "Underwriting" Theory Lacks Any Support .......................................13

       D.     The SEC's Regulation S Arguments Are Incorrect As a Matter of Law...............15

CONCLUSION..............................................................................................................................16

**CASES**

*Alunni v. Development Resources Group, LLC*,
    445 F. App'x 288 (11th Cir. 2011) ...................................................................8

*Chapman v. Rudd Paint & Varnish Co.*,
    409 F.2d 635 (9th Cir. 1969) .........................................................................6

*Contract Buyers League v. F & F Investment*,
    300 F. Supp. 210 (N.D. Ill. 1969) ..................................................................6

*Crowley v. Montgomery Ward & Co.*,
    570 F.2d 877, 880-81 (10th Cir. 1978) ...........................................................9

*Davis v. Rio Rancho Estates, Inc.*,
    401 F. Supp. 1045 (S.D.N.Y. 1975)................................................................6

*Demarco v. LaPay*,
    No. 2:09-CV-190 TS, 2009 WL 3855704 (D. Utah Nov. 17, 2009) ..................7

*DiStiso v. Cook*,
    691 F.3d 226, 229-30 (2d Cir. 2012) ..............................................................5

*Garcia v. Santa Maria Resort, Inc.*,
    528 F. Supp. 2d 1283 (S.D. Fla. 2007) ...........................................................7

*Happy Investment Group v. Lakeworld Properties, Inc.*,
    396 F. Supp. 175 (N.D. Cal. 1975) ..............................................................7, 8

*International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of
    America v. Daniel*, 439 U.S. 551 (1979)...................................................5, 6, 8

*Kaplan v. Shapiro*,
    655 F. Supp. 336 (S.D.N.Y. 1987) .................................................................3

*Lebewohl v. Heart Attack Grill LLC*,
    890 F. Supp. 2d 278 (S.D.N.Y. 2012)............................................................10

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) .............................................................3

*McKim v. NewMarket Technologies, Inc.*,
    370 F. App'x 600 (6th Cir. 2010) ..................................................................14

*Noa v. Key Futures, Inc.*,
    638 F.2d 77, 79 (9th Cir. 1980) ...............................................................9

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)........................................................................2

*Rodriguez v. Banco Central Corp*,
    990 F.2d 7 (1st Cir. 1993).......................................................................8

*Salameh v. Tarsadia Hotels*,
    No. 09 CV 2739 DMS (CAB), 2011 WL 1044129 (S.D. Cal. Mar. 22, 2011) ..................7

*SEC v. Aqua-Sonic Products Corp.*,
    687 F.2d 577 (2d Cir. 1982)....................................................................6

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) .................................................................9

*SEC v. Glenn W. Turner, Enterprises, Inc.*,
    474 F.2d 476 (9th Cir. 1973) ...................................................................4

*SEC v. International Heritage, Inc.*,
    4 F. Supp. 2d 1378 (N.D. Ga. 1998) .........................................................7

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)..........................................................................4, 5

*SEC v. Levine*,
    849 F.3d 995 (2017)............................................................................15

*SEC v. Platforms Wireless International, Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ................................................................14

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001)..................................................................2, 7

*SEC v. W. J. Howey Co.*,
    328 U.S. 293 (1946)..............................................................................4

*Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*,
    No. 07 Civ. 5804 (GEL), 2009 WL 959775 (S.D.N.Y. Apr. 8, 2009) .............................10

*Wabash Valley Power Ass'n v. Public Service Co. of Indiana, Inc.*,
    678 F. Supp. 757 (S.D. Ind. 1988) ...........................................................6

*Warfield v. Alaniz,*
 569 F.3d 1015 (9th Cir. 2009) ........................................................................4

*Woodward v. Terracor,*
 574 F.2d 1023 (10th Cir. 1978) ......................................................................10

## REGULATIONS

17 C.F.R. § 230.502(d) .......................................................................................14

17 C.F.R. § 230.508(a) .......................................................................................15

17 C.F.R. § 230.902(j)(1)(i), (ii) ........................................................................15

17 C.F.R. § 230.903(b)(1)(i)(A) .........................................................................15

## OTHER AUTHORITIES

SEC Chairman Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings,*
 (Dec. 11, 2017) ...............................................................................................13

The SEC's Opposition[1] hinges on a misreading of relevant case law, a misunderstanding of open source decentralized platforms, and a distortion of the record. Far from raising material issues of fact, the Opposition reveals that the SEC's position rests on mere "speculation" (*infra* p. 5) and highlights why Defendants are entitled to summary judgment.

## **ARGUMENT**

## **I.       GRAMS MUST BE ASSESSED AT THE TIME OF THEIR DISTRIBUTION**

The SEC's central argument that Grams were "sold" in the 2018 Private Placement is both wrong (*see* Def. Opp. Br. 12-17) and, ultimately, irrelevant. Even if Grams existed and were "securities" at that time, the Private Placement was *expressly treated as an exempt offering of securities*. (Def. Br. 11-17.) Further, the SEC cannot dispute that an "investment contract can, at a later date, "evolve" into a non-security or the underlying asset can be sold under circumstances not constituting a securities offering. (*Id.* at 40.) Thus the SEC's claims, including whether there has been a "public distribution of a security," all turn on the question of whether Grams will be securities when actually created and distributed in the secondary market.[2]

## **II.      GRAMS WILL NOT BE SECURITIES**

When properly analyzed at the time of launch, there can be no dispute that Grams will not be securities. (Def. Br. 22-39.) The SEC admits that things like "real property or animals" are not securities, and that it is only "when coupled with a promoter's other representations" that they can "amount to an investment contract." (Opp. 13.) Defendants agree. Grams themselves

---

[1] Unless otherwise indicated, all capitalized terms shall have the same meanings ascribed to them in Defendants' motion for summary judgment (ECF No. 71 ("Def. Br.")). All case and record emphasis is added.

[2] The SEC chides Defendants for "not acknowledg[ing] the *Radiation Dynamics* line of cases" (Pl. SJ 6), but that is with good reason: *Radiation* and *Cerami* involved contracts for the sale and future delivery of *existing stock*. Here, if the TON Blockchain is launched, Grams will *not* be "securities" at the time of their distribution, so the SEC's entire argument falls apart. Unlike Plaintiff's cases, the Purchase Agreements were contracts for the contingent, future delivery of a commodity, not a security. (*Infra* § II.)

1

are mere "strings of code" (in the SEC's words); it is only Defendants' "other representations" and promises embodied in the Purchase Agreements — *i.e.*, to pool investor funds and build the TON Blockchain — that constituted an "investment contract." That is why Defendants treated the Private Placement as an exempt securities offering. (Def. Br. 11-12.) Once the TON Blockchain is launched, however, the Grams created will still be "strings of code," but without any pooling of funds or promises by Telegram to undertake any "essential" efforts that may have made the Private Placement a securities offering. Post-launch Grams will be like "real property or animals," <u>un</u>-coupled from the kinds of promises required to make them securities under *Howey*:



**A.**      <u>**The Undisputed Facts Show There Will Be No Common Enterprise**</u>

First, the SEC cannot establish any post-launch "common enterprise" in Grams. (Def. Br. 34-39.) The SEC simply ignores that "horizontal commonality" requires "the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).[3] While the Private Placement investors may have pooled their assets to fund development of the TON Blockchain, any post-launch payments by purchasers will go to sellers in the secondary market, and will not be pooled for any common purpose,

---

[3] The SEC's own cases confirm this point, as they all involved asset pooling. In *SEC v. SG Ltd.* (cited at Opp. 18), "the pooling element of horizontal commonality *jump[ed] off the screen*." 265 F.3d 42, 50 (1st Cir. 2001).

definitively foreclosing the SEC's claim of horizontal commonality.

The SEC also cannot show "strict vertical commonality" because there is no "interdependence" of the fortunes of Defendants and future Gram purchasers. *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011). Indeed, Telegram will not hold and profit from Grams (Def. 56.1 ¶¶ 89, 277; Drylewski Ex. 2 at 269:8-17) and even if its employees might, merely possessing the same asset does not establish *vertical* commonality. *Marini*, 812 F. Supp. 2d at 257 (no vertical commonality although parties owned "identical property" where promoter "was under no obligation to sell his coins at the same time [plaintiff] sold his").[4] Unlike cases where a promoter had sole control over asset sales or earned a commission only if investors profited, here there is no such arrangement or any pooling of funds among Defendants and purchasers. *See Kaplan v. Shapiro*, 655 F. Supp. 336, 341 (S.D.N.Y. 1987). Rather, purchasers will take possession of Grams and independently control their fortunes through decisions to buy or sell them (or stake them as validators, which Defendants' employees will be precluded from doing, Def. 56.1 ¶ 87), with no sharing of gains or losses on those decisions.[5]

## B. Defendants Did Not Promise Profits Based On Their Undeniably Significant Efforts

The SEC also fails to raise any issue of fact that post-launch Gram purchasers will expect profits based on Defendants' ongoing essential efforts. As the SEC must acknowledge, the core inquiry under *Howey* is what were the express or implied promises made to investors. *SEC v.*

---

[4] By arguing otherwise, the SEC confuses vertical with *horizontal* commonality. The cases it cites in support of vertical commonality (Opp. 19) actually address horizontal commonality and involved pooling of assets. Further, post-launch purchasers will have widely mixed motives. (Def. Br. 38.)

[5] The SEC's assertions that Telegram will retain "billions of Grams" (Opp. 19) is factually wrong. The only support it cites is Pavel Durov's testimony regarding Defendants' reservation of rights regarding whether to set up the TON Foundation in the future and give away Grams as incentives. (SEC 56.1 ¶ 381.) As Defendants have explained, if the TON Foundation is established in the future, it will be a not-for-profit entity governed by a majority independent board that can engage only in certain narrowly defined activities designed to promote the consumption of Grams. (Def. 56.1 ¶¶ 234-37.) If the TON Foundation is not established, the Grams held for its benefit will be locked in perpetuity. (Def. 56.1 ¶ 231.) In no event will Defendants ever have the right to profit from them.

*C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (offerings should "be judged as being what they were represented to be"); *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (*Howey* test is objective and courts "must focus [the] inquiry on what the purchasers were offered or promised"). Here, it is undisputed that Defendants not only did not promise, but they affirmatively disclaimed any obligation, to perform *any* post-launch managerial efforts (let alone "essential" managerial efforts as required under *Howey*). (Def. Br. 28-30.) The SEC responds that these statements were not sufficiently "unequivocal," but that is not the test. Rather, the SEC must establish that Defendants made promises that give rise to an expectation of profits based on their "undeniably significant" and "essential" efforts — promises simply not made here. *See SEC v. Glenn W. Turner Enters. Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946) (test aimed at "schemes devised by those who seek the use of the money of others on the promise of profits").

Significantly, the SEC asks this Court to simply ignore the Public Notice, in which Defendants made unequivocally clear that they were *not* committing to undertake any further efforts with respect to the blockchain following launch, and stating that purchasers "should NOT expect any profits based on [their] purchase or holding of Grams" and "Grams won't help you get rich." (Def. 56.1 ¶ 277.) Historically, Telegram did not publicly comment on the details of TON and Grams in light of the flexibility it preserved (for which it was actively seeking guidance from the SEC at the time, Def. 56.1 ¶ 218). The SEC's publicly filed Complaint emphasized isolated statements from materials provided to private purchasers in 2018 under expectations of confidentiality; thus, Defendants felt compelled to clarify the project through the Public Notice, which expressly supersedes all prior statements to which the public might have been made privy. (*Id.* ¶ 277.) Despite this, the SEC nonetheless continues to argue that the 2018

4

private offering materials "pointed to the potential for profit." (Opp. 16.) The problems with its position are myriad.

First, the SEC concedes that "the Court should not engage in speculation about what a reasonable purchaser might expect in the future" and that "[t]he *evidence* in the record is insufficient to ground any such speculation based on Telegram's shifting statements about its intentions." (Opp. 9.) This is a significant and candid admission. If, on the current record, the Court could do no more than speculate about the expectations of post-launch Gram purchasers, then by definition the SEC cannot support its claim that future Gram purchasers will expect to profit based on Defendants' statements, thus defeating its opposition to summary judgment and request for injunctive relief. *See DiStiso v. Cook*, 691 F.3d 226, 229-30 (2d Cir. 2012); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979).

Second, the 2018 materials were provided in the context of the Private Placement aimed at a different set of recipients — *i.e.*, sophisticated investors in a private exempt securities offering. In any event, a full review of the prior materials reveals that they clearly and primarily emphasized the intended *consumptive* value of Grams as "the first mass-market cryptocurrency." (JX7 at 5); Opp. 20 (compiling statements touting Grams' consumptive utility)). Indeed, they make clear that the entire value proposition of the project was for Grams to be widely adopted by consumptive users. (JX9 at 6, 13, 20); *Joiner*, 320 U.S. at 353. To that end, the Risk Factors appended to these materials and provided to every private purchaser stated clearly that "Grams are intended to act as a medium of exchange between users in the TON ecosystem. Grams are not investment products. There should be no expectation of future profit or gain from the

purchase or sale of Grams." (Def. 56.1 ¶ 180.)[6]

Where promotional materials reflect both consumptive purpose *and* incidental "potential for profit" (Opp. 16), *Howey* is not satisfied because it requires "*to a very substantial degree* elements of investment contracts." *Daniel*, 439 U.S. at 560; *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982) (*Howey* asks if "the scheme was being promoted *primarily* as an investment"); *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 640-41 (9th Cir. 1969); *Wabash Valley Power Ass'n v. Pub. Serv. Co. of Ind., Inc.*, 678 F. Supp. 757, 767-68 (S.D. Ind. 1988) (no investment contract even though 60% of asset in question could be used to generate profits); *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1049-50 (S.D.N.Y. 1975) ("It is inaccurate to say 'this development was being promoted as a pure investment, as opposed to a residential development which may, incidentally, be also a good investment.'"); *Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210, 224 (N.D. Ill. 1969) ("To conclude that the natural desire of any purchaser that his purchase should appreciate in value makes a 'security' of what has been purchased, is obviously to so muddle the term as to make it meaningless.").

Third, Defendants' 2018 statements were also *expressly disclaimed* in the Purchase Agreements themselves, making it unreasonable to assume that any of the sophisticated purchasers would rely on them, let alone that years later, future Gram purchasers in the secondary market who were not the intended recipients of the statements would do so. (Def.

---

[6] The SEC's focus on "exchanges" potentially listing Grams is curious, since the ability to acquire Grams and/or convert them into fiat currency is essential to their consumptive purpose. (McKeon Ex. 1 ¶¶ 26-27; Def. Resp. to SEC Counter. 56.1 ¶ 32.) Perhaps most egregiously, the SEC asserts that Defendants' earliest materials "graphically depict[ed] exponentially rising prices." (Opp. 16.) The graphic to which the SEC refers reflected the potential "Reference Price" for Grams if Telegram were to continue to sell Grams in the future, either through private rounds or a public ICO. (JX7 at 16-17.) Critically, the "Reference Price" has no bearing on the free market price of Grams following the launch, as the SEC admits, and Telegram determined not to sell any further Grams in private rounds or a public round. (JSF ¶¶ 170-71; *see* McKeon Ex. 2 ¶¶ 17, 26; PX11 ¶ 22 (Taveras Report).) Thus, this could not possibly be viewed as a promise of profits to future Gram purchasers in the market following launch.

56.1 ¶ 200); *Demarco v. LaPay*, 2009 WL 385570, at *9 (D. Utah 2009) (due to disclaimer in

sale agreement, "even if representations were made, it was inappropriate for Plaintiff to rely on

them and, without a subsequent or collateral agreement, no investment contract can exist.");

*Salameh v. Tarsadia Hotels*, 2011 WL 1044129, at *6-7 (S.D. Cal. 2011); *Garcia v. Santa Maria*

*Resort, Inc.*, 528 F. Supp. 2d 1283, 1292-93 (S.D. Fla. 2007).

Finally, if all that were not enough, any prior statements were unequivocally superseded

by the Public Notice making clear that Defendants *do not* make any promises of profits or

ongoing essential efforts once the TON Blockchain has launched.  (Def. 56.1 ¶ 200); *Happy Inv.*

*Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) (*Howey* "not fulfilled

when there are promises of the general nature made by defendants in their literature and

handouts, but no actual commitments to perform specific services.").  The SEC recognizes that

disclaimers are "undeniably relevant" but, citing *SEC v. SG Ltd.*, argues that they cannot

overcome "'persistent representations' contrary to the disclaimers."  (Opp. 11.)  But the SEC

does not (and cannot) cite any "persistent representations" that "played upon greed and fueled

expectations of profit" like those at issue in *SG*.  265 F.3d at 54.  Instead, the SEC relies on

statements made years ago to sophisticated investors that emphasized the consumptive nature of

Grams consistent with the Public Notice, which clearly and unequivocally does so as well.

In any event, as courts recognize, *Howey* permits promoters to clarify or modify their

marketing or business models to comply with securities laws.  *See, e.g.*, *SEC v. Int'l Heritage,*

*Inc.*, 4 F. Supp. 2d 1378, 1383-84 (N.D. Ga. 1998) (approving modified plan after enjoining

previous plan as an investment contract).  That is particularly appropriate here, where

Defendants have consistently maintained flexibility regarding the details of the project,

particularly in light of the continuing regulatory uncertainty.  (Def. 56.1 ¶¶ 218, 229.)[7]  Viewed

in totality, it becomes clear that any alleged expectation of profits here "is far too speculative and

insubstantial to bring the entire transaction within the Securities Acts."  *Daniel*, 439 U.S. at 562.

## C.    Any Speculation About Further Efforts to Develop the Blockchain Is Insufficient

Further underscoring that the Opposition rests on mere speculation, the SEC guesses that

some future Gram buyers may anticipate that Defendants will stay involved post launch to ensure

that TON ecosystem gets up and running.  But even accepting this, the "efforts of others" prong

is not met where a promoter commits to even substantial short-term management services to help

the successful start-up of a venture or ongoing marketing, training or other non-essential

services.  *See, e.g.*, *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 297-98 (11th Cir. 2011);

*Crowley v. Montgomery Ward & Co.*, 570 F.2d 877, 880-81 (10th Cir. 1978).  And the test is

certainly not met where, as here, the promoter makes no commitments.  *Rodriguez v. Banco*

*Cent. Corp*, 990 F.2d 7, 11 (1st Cir. 1993) (no investment contract where "[buyers] were sold

land in individual parcels with strong and repeated suggestions that the surrounding area would

develop into a thriving residential community" but no commitment); *Happy*, 396 F. Supp. at 181;

(Def. Br. 37).  Rather, the SEC is required to prove that Defendants expressly or impliedly

promised to provide ongoing post-launch managerial and entrepreneurial efforts that are essential

to ensure the success of the enterprise.  It has cited no evidence to satisfy that burden.

The SEC also speculates that if Telegram does not continue to develop the platform,

"someone else would have to."  (Opp. 10.)  That is the point of an open source decentralized

---

[7]  The SEC cites a "media outlet's" reaction to the Public Notice.  (Opp. 3.)  The same article suggests that "[t]he goal" of the Public Notice was "to make TON more decentralized," with "other developers [] creating distributed apps on the platform," a goal one would expect the SEC to support.  (PX 140.)  While subjective reactions are irrelevant under *Howey*, actual views differed from the SEC's cherry-picked materials.  (Def. Resp. to SEC Counter. 56.1 ¶ 9.)

system and exactly what Defendants have told the public.  (Def. 56.1 ¶ 277; McKeon Ex. 1 ¶¶ 99-118, 163-65, 203.)  The fact that the global community of developers and users is expected to contribute to the TON Blockchain is a compelling reason why Grams are not securities and applying the securities laws to them would "add little value."  (Def. Br. 41 & n.4).

In this regard, the SEC ignores the unique features of a *decentralized* blockchain, which achieves its purpose and becomes most valuable when no single entity controls it.  The SEC cannot dispute that Defendants marketed TON as a decentralized platform; thus, any Gram buyers seeking profits through appreciation will be dependent upon Defendants *relinquishing*, rather than assuming, control.  As Dr. McKeon explained, the market value of a digital token is driven in large part by the level of decentralized use of the platform.  (McKeon Ex. 1 ¶ 206.)  If Telegram were to take an ongoing centralized role following launch, that would be a *negative factor* for any Gram-related profits.  (*Id.*)  Further, the parties' experts agree that the other major contributor to appreciation in value is correlation to the market for *all* digital assets, further underscoring why Grams will be a commodity and not a security.  (McKeon Ex. 1 ¶¶ 209-15; PX10 ¶ 36; PX11 ¶ 51; Def. Br. 30); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980).

## D.     The SEC's Arguments About TON's Technology Are Wrong and Irrelevant

The SEC asserts that "Telegram has put forth no concrete record evidence whatsoever as to the TON Blockchain's functionality level at the expected launch time" (Opp. 9) but does not cite any authority for why this would be relevant under *Howey*.  It is the SEC's burden to prove that Grams will be securities, not Defendants' burden to prove their technology works.  This is with good reason, as *Howey* concerns what was promised to investors, not the quality of any product.  *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) ("To the extent the purchasers relied on the managerial skill of [the promoter] they did so as an ordinary buyer, having advanced the purchase price, relies on an ordinary seller.").  The SEC does not and

cannot claim that Gram buyers believe the blockchain will not work at launch — rather, it has emphasized statements that TON is developed by world-class programmers.  (SEC 56.1 ¶ 129.)

The SEC's speculation that TON will be "ineffective" (Opp. 10) is also unsupported. Telegram has provided status updates regarding the TON core components, and a "Beta Test" version of the TON code has been publicly available since March 2019, which allows any third party to test the code, develop applications for the platform, perform security analyses, and build validation nodes.  (JSF ¶¶ 130-37; McKeon Ex. 2 ¶¶ 29-30; JX20.)  According to public reports, numerous parties have been developing applications, code enhancements, and products and services for anticipated use on TON.  (Def. 56.1 ¶¶ 273-74.)[8]  Because the code will be open source, third parties can undertake these efforts following launch and have strong incentives to do so.  (McKeon Ex. 1 ¶ 203.)  The SEC's insistence on evidence of *finalized* services is both incredible (vendors logically must be waiting to see whether a launch will occur in light of this lawsuit) and irrelevant.[9]  Ultimately, the SEC's efforts to inject what are essentially consumer product issues into this securities litigation should be rejected.  *See Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (claim that development project was "dying on the vine" irrelevant under *Howey*).

E.    **Bitcoin, Ether and EOS Highlight the SEC's Arbitrary Position Here**

Plaintiff's litigation position is further undermined by its public positions regarding

---

[8]  The SEC does not dispute the existence of these public reports but says they are "hearsay."  (Opp. 4.)  The Court need not consider these public reports for their truth, only for the fact that there are public reports of widespread third-party activity to evaluate the objective expectations of future Gram buyers.  *See Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 287, 298-99 (S.D.N.Y. 2012); *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, *9 n.6 (S.D.N.Y. 2009).  Even if hearsay, Defendants' expert is entitled to rely on it under FRE 703 as evidence of development activity.

[9]  The SEC's purported expert opined that the TON test code "is missing a number of components critical to the TON Blockchain's functionality, including the core BFT consensus protocol."  (Def. Resp. 56.1 ¶ 370.)  Not only has the consensus protocol been implemented in the TON Beta Test code, but it has been publicly available for nearly *five months*.  (*Id*.; PX198 ¶¶ 25-26.)

similar cryptocurrencies Bitcoin, Ether and EOS.  (Def. Br. 41.)  The SEC staff has stated that Bitcoin is not a security because "we do not believe that current purchasers of bitcoin are relying on the essential managerial and entrepreneurial efforts of others to produce a profit."  (Def. Br. n.14.)  SEC Director Hinman, in a statement approved by SEC Chairman Clayton, has likewise said that Bitcoin and Ether do not constitute securities.  (Def. Br. 41.)  Finally, the SEC has permitted EOS Tokens to be launched, sold and traded as non-securities, despite the continuing involvement of the EOS promoters.  (*Id.* at 34.)  The SEC does not explain the incongruity of its prior positions (or address EOS at all, for that matter).  These comparisons are anything but "perfunctory" — if anything, the technology underlying TON and Grams is more likely to give rise to a useable, truly mass-market currency.  (McKeon Ex. 1 ¶¶ 216-23.)  The SEC's argument that Bitcoin and Ether "have not attained widespread use as a cryptocurrency" (Opp. 24) makes its position here even more confusing, as it seeks to shut down a project that has set out to solve the problems preventing wider consumptive adoption (Def. 56.1 ¶¶ 33-35, 57) while permitting Bitcoin and Ether to operate as non-securities.  This underscores the SEC's opaque actions in this area, leading to confusion and criticism, as the amici highlight.  (*See* ECF No. 86 & 91.)

Finally, the SEC argues that Grams can be both a "commodity" and a "security."  (Opp. 21.)  Defendants agree.  But where an instrument is clearly a commodity, the existence of another regime to protect investors (here, the CFTC and Commodity Exchange Act) militates against stretching the federal securities laws to cover questionable cases.  (Def. Br. 32.)

## III.   THE SEC'S "PAST VIOLATION" THEORY LACKS MERIT

### A.   The Private Placement Was Conducted Under Valid Exemptions to Registration

Despite its professed goal of eschewing "form over substance," the SEC engages in the epitome of nonsensical formalism by arguing that Defendants did not "claim an exemption for 'Purchase Agreements *and* Grams" at the time of the Private Placement.  (Opp. 6.)  Defendants'

private offering complied with exemptions to registration under Rule 506(c) and Section 4(a)(2), including by taking the necessary steps under Rule 502(d) to ensure that the private purchasers were not underwriters.  (Def. Br. 42-45; <u>Appendix A</u> to Def. Resp. to SEC Counter 56.1 (summarizing Defendants' reasonable care efforts).)  Both parties agree that "[a]t the time of the Private Placement, the Purchase Agreements were the only physical instrument in existence that represented any interest in Grams."  (SEC Resp. 56.1 ¶ 191.)  The SEC nevertheless argues that "Grams were not subject to the restrictions on trading applicable to the Purchase Agreements." (Opp. n.15.)  That is not true — the Purchase Agreements, as the "only physical instrument" reflecting Grams, expressly prohibited any offer, sale or transfer of Grams until at least the launch of the blockchain, at which point Defendants' promises terminate under the agreements and the Grams created will <u>*not*</u> be securities for the reasons discussed.  (JX11 § 7.1(a).)[10]

## B.      <u>There Was Not, and Can Never Be, A "Public Distribution" of Securities</u>

The SEC continues to insist that the Private Placement was in fact a "public distribution" of securities.  (Opp. 25.)  As explained below, Defendants took steps to ensure compliance with Regulation D (including Rule 502(d)), which is all that is required.  (*See* § III.C.)  In any event, the SEC's theory of why a public distribution occurred hopelessly confuses the facts.  While the SEC contends that Grams were designed to "come to rest" with public purchasers, Grams will <u>*not*</u> be a security when they are created — the earliest point they could be distributed to the public.  (Def. Br. 22-42.)  By definition, there cannot be a "public distribution of a security" where there is no security, and the private purchasers cannot be "conduits for the transfer of securities."  (Opp. 26.)  The SEC's cases involving instruments that were securities at all times

---

[10]  Defendants are separately entitled to the exemption under Section 4(a)(2), which applies to any private offering that is not a "public distribution."  (Def. Br. 45.) There was no public distribution here for the reasons discussed.

(including upon distribution) are inapposite.[11]

The SEC faults Defendants for not providing "the investing public" with "critical information." (Opp. 26.) It is unclear what "critical information" Defendants should provide post-launch purchasers, particularly given that Grams will not entitle them to any income, dividends, or equity interests in Telegram. (Def. 56.1 ¶¶ 180, 200, 277.) Because Telegram will be just one of many in the decentralized community following launch, imposing the federal disclosure regime to post-launch sales of Grams would not serve any apparent purpose.

The SEC asserts that "Telegram obligated itself to launch TON" in all circumstances and that the private investors "took little risk in parting with their money." (Opp. 27.) Both claims are refuted by undisputed facts. Defendants retain "sole discretion" to determine whether the blockchain is ready to launch, warranted that any delivery of Grams cannot violate the law, and reserved the ability to modify the project in order to comply with securities laws. (Def. Opp. Br. 7.) If the blockchain cannot launch under those conditions by the "Deadline Date," Defendants must return the unspent funds and no Grams will be created. (Def. 56.1 ¶ 201.) Investors thus took substantial risk that the blockchain might not launch, or if it does, that the market price of Grams may be lower than what they paid. (McKeon Ex. 2 ¶¶ 12-14.) In fact, some potential investors chose not to take those risks. (Pl. Counter. 56.1 ¶¶ 48-54.)[12]

## C.     The SEC's "Underwriting" Theory Lacks Any Support

In a last ditch attempt, the SEC claims that Defendants' "public distribution" is "already

---

[11]  "It is possible to conduct an [ICO] without triggering the SEC's registration requirements . . . just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product." SEC Chairman Jay Clayton, n.4 (December 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[12]  The SEC's assertion that "[i]f Telegram fails to deliver, Initial Purchasers get their money back" (Opp. 33) is factually incorrect. Under the Purchase Agreements, the purchasers would receive pro rata any *unspent* funds. The private purchasers thus risk losing all funds expended to date, which Telegram estimated to be more than 25% of the amounts invested if the launch did not occur by April 30, 2020. (Drylewski Ex. 9 at 2.)

13

underway" because some private investors may have attempted to sell interests in Grams.  (Opp. 29.)  Even if true, this is irrelevant to whether Defendants exercised reasonable care under Rule 502(d) to ensure that investors were not underwriters.  That analysis focuses on the issuer's efforts at the time of the transaction, not whether the purchasers in fact engage in underwriting. 17 C.F.R. § 230.502(d) (requiring "[r]easonable inquiry to determine if the purchaser *is acquiring* the securities for himself or for other persons"); *SEC v. Platforms Wireless Int'l, Corp.*, 617 F.3d 1072, 1091 (9th Cir. 2010) ("[W]hether or not Intermedia was in fact a statutory underwriter does not bear on whether defendants exercised reasonable care.").

Regardless, the record reflects that Defendants not only required each purchaser to represent and warrant that it was not investing with an intent to resell a security (or risk having its Purchase Agreement canceled), but Defendants will require each purchaser to reconfirm that it has not transferred any interests in Grams as a precondition to obtaining Grams at launch. (Def. 56.1 ¶ 212); *McKim v. NewMarket Techs., Inc.*, 370 F. App'x 600, 606-07 (6th Cir. 2010). The SEC does not identify any evidence that any purchasers entered into the Private Placement with intent to distribute a security — rather, the affidavits submitted by the SEC all imply that the purchasers intended for Grams to be a *non-security* by the time they are distributed, so that future sales would not be subject to securities laws.  It simply would not have made sense for these investors to intend to receive a restricted security at launch.

Finally, the record shows that Defendants investigated specific instances of reselling and requested that investors reaffirm their representations or risk cancellation.  Far from "symbolic," (Opp. 29), this resulted in Defendants excluding purchasers and canceling Purchase Agreements where justified.  (Def. 56.1 ¶¶ 133-58.)  In the face of vague or general reports of "grey market" reselling (Opp. 29), Defendants relied on public reminders to avoid scams (Def. 56.1 ¶¶ 276-80;

Def. Resp. 56.1 ¶¶ 213, 222, 248), and the obligation of all purchasers to confirm their representations as a precondition to receiving Grams at launch.  (Def. 56.1 ¶ 212.)[13]  The SEC asserts that two investors used marketing materials (Opp. 29) but all purchasers were prohibited from selling interests in Grams, did not have authority to distribute their own materials, and Telegram did not approve them.  (Def. Resp. 56.1 ¶¶ 320, 326.)  The SEC does not point to any evidence of sales by these investors or that the materials were ever made publicly available.[14]

D.     **The SEC's Regulation S Arguments Are Incorrect As a Matter of Law**

Finally, the SEC's argument that Defendants cannot rely on Reg S because they made "directed selling efforts" to the U.S. (Opp. 32) lacks all merit.  The Adopting Release states that marketing efforts in connection with a Reg D exempt offering will not constitute "directed selling efforts."  (Def. Br. n.27.)  There is also no legal prohibition on using the same materials for both U.S. and non-U.S. investors, particularly since simultaneous Reg D and S offerings are not integrated.  (*Id.*)  The SEC argues that "the issuer [must] take steps to ensure that securities sold to non-U.S. persons do not 'flow back'" to the U.S. (Opp. 32), but the Purchase Agreements strictly prohibited any reselling until at least the launch, when Grams will not be securities.  Regardless, Reg S does not impose additional restrictions on resales to the U.S. where, as here, an issuer reasonably believed at the time that there was no "substantial U.S. market interest" in the securities.  17 C.F.R. § 230.903(b)(1)(i)(A).[15]  Thus, the SEC's position should be rejected.

---

[13]  Given the totality of the record, Defendants have established reasonable care even without strict adherence to the enumerated factors in Rule 502(d).  Any conceivable non-compliance would be an insignificant deviation that does not void the exemption under Regulation D.  17 C.F.R. § 230.508(a); *SEC v. Levine*, 849 F.3d 995, 1003-05 (2017).

[14]  The SEC points to a now-canceled "pre-sale" of Grams by a Japanese exchange (Opp. 30) but internal messages reflected Telegram's frustration at the announcement and lack of knowledge regarding the seller(s).  (Def. Resp. 56.1 ¶¶ 235-36.)  A subsequent article informed the public that the offering was not legitimate (*id.*) and the purported sale was ultimately canceled.  (Def. Opp. Br. n.6.)

[15]  The SEC does not, and cannot, claim that the statutory test for "substantial U.S. market interest" has been met here.  17 C.F.R. § 902(j)(1)(i),(ii).

## **CONCLUSION**

For the foregoing reasons and those set forth in its opening brief, Defendants respectfully

request that the Court grant their motion for summary judgment in its entirety.

Dated: New York, NY
January 27, 2020

Respectfully submitted,

/s/ Scott D. Musoff
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000
george.zimmerman@skadden.com
scott.musoff@skadden.com
christopher.malloy@skadden.com
alexander.drylewski@skadden.com

*Attorneys for Defendants*