# PX2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION, :
                                       :
                             Plaintiff, :        **19 Civ. 09439 (PKC)**
                                         :
             - against - :        **ECF Case**
                                         :
TELEGRAM GROUP INC. and TON ISSUER INC. :
                                         :
                            Defendants. :
                                         :
-------------------------------------------------------------------- x

<h3 style="text-align:center">DECLARATION OF ███████████</h3>

I, ██████████, pursuant to 28 U.S.C. § 1746, declare:

1.       I make this Declaration in lieu of direct testimony in this matter because I understand that the Honorable Judge Castel has expressed a preference for this format.

2.       I reside in ██████████.

3.       I received an ████████████████████████████████████████ ████.

4.       I am a ████████████████ ██████████ ██████████ venture capital funds, based ████████████████████████████████ ████████████████████████████████████.

5.       At ██████████ my partners and I are responsible for, among other things, back office support, financing transactions, working with auditors, and working on finding and processing investments.

6.       ██████████ is an active investor in the cryptocurrency space. Our portfolios include, among others, ████████████ ████████████ goal in investing in these cryptocurrencies is to make a profit for its investors.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

7.     In or around January 2018, I learned about what was referred to as the "Telegram ICO" from my ▮▮▮▮ colleagues.  I also then read more about Telegram online, and learned that the company wanted to create a blockchain for its community of messenger users.  The "Telegram Pre-Sale" interested us because Telegram Messenger already had 100-200 million users, which in our opinion, would make it easier for them to grow a useful blockchain network.

8.     On January 13, 2018, after conferring with my ▮▮▮▮ colleagues, I emailed Pavel and Nikolai Durov, the founders of Telegram to express interest in ▮▮▮▮ investing $20 million in the Telegram Pre-Sale.  Pavel Durov replied on January 16, 2018, and connected me to John Hyman, who he introduced as the Chief Investment Adviser at Telegram.  A copy of this email chain is attached as **Exhibit A** to this Declaration.

9.     On or about January 16, 2018, I had a phone conversation with Mr. Hyman to discuss the process of investing in the Telegram Pre-Sale in more detail.

10.     Later that day, Mr. Hyman sent me an email entitled "Telegram Update," which attached an Indication of Interest form and an undated Telegram Primer.  I read both documents.  A copy of this email chain and the primer that was included is attached to my Declaration as **Exhibit B**.

11.     On January 18, 2018, Mr. Hyman sent me an email entitled "Telegram Private Placement Update," which indicated that Telegram was proposing an allocation of $10 million worth of Grams to ▮▮▮▮ in its Pre-Sale.  He attached the following documents:  (1) a Process Memorandum; (2) a KYC Form and Purchase Agreement; (3) a Telegram Pre-Sale Primer, dated January 18, 2018; (4) a Risk Factors document; and (5) a Technical White Paper dated January 18, 2018.  I, or a member of my team, reviewed each of these documents as part of our technical due diligence for ▮▮▮▮ investment into the Telegram Pre-Sale.

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

12.     On January 24, 2018, I emailed Mr. Hyman and asked to discuss information about user statistics by geography for Telegram's Messenger application.  At the time, I understood that the messenger application had between 100 million to 200 million users, but my colleagues and I wanted more granular data.  I do not recall Mr. Hyman providing me the specifics I had requested.  Attached to this Declaration as **Exhibit C** is an email exchange dated January 24, 2018, reflecting my discussions with Mr. Hyman.

13.     In addition, an analyst at ▮▮▮▮▮▮▮▮ did some independent diligence on the Telegram Messenger application's user base and comparable messaging platforms.  The results of his research, which I reviewed and found to be relevant to our decision to invest in the Telegram Pre-Sale, is summarized in **Exhibit D** attached to this Declaration.  This analyst also drafted an investment memorandum, which summarizes why ▮▮▮▮▮▮▮ decided to make the investment into Telegram.  That memorandum is attached to this Declaration as **Exhibit E**.

14.     Based on our due diligence, ▮▮▮▮▮▮▮ decided to invest in the Telegram Pre-Sale because we believed that we would ultimately be able to make a profit from selling Grams.  We believed that Telegram had a good team of developers and engineers to support the TON network, and that Grams would be faster than the Ethereum and Bitcoin networks.  Moreover, Telegram already had a captive community of users, which made it less difficult to create a new network.  Based on Telegram's offering materials, we also believed that the Telegram team would continue to support and grow the TON network after launch and make it more useful, and the value of Grams would continue to go up.

15.     On or about January 26, 2018, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ signed a "Purchase Agreement for Grams" (the "Purchase Agreement") with Ton Issuer Inc. and Telegram Group Inc., under which ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ agreed to pay

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

$10 million for 26,485,785.7 Grams, subject to certain contingencies as set forth in the Purchase Agreement.  On January 26, 2018, ████████ emailed to Telegram the signed Purchase Agreement.  Telegram emailed back the counter-signed purchase agreement on February 7, 2018.

16.     On or about February 9, 2018, ████████ wired $10 million to Telegram from their bank account located in ████████

17.     After we entered into the Purchase Agreement and wired the money to Telegram, we believed that, contingent upon the occurrence or non-occurrence of certain events as detailed in the Purchase Agreement, we had a right to receive the Grams at a future date.

18.     ████████ does not plan to use the Grams as a currency for consumptive purposes.  Rather, we intend to sell Grams for a profit at an appropriate time.

19.     No one from Telegram asked me what ████████ planned to do with the Grams after they were issued.

20.     At the time of the offering, ████████ was aware of the possibility to become a validator and it was something we considered doing.  We reached out to Telegram from time to time to learn more about the process, but have not taken any substantial steps to become a validator.  We may consider doing so in the future.

21.     My ████ colleagues alerted me that Liquid may have successfully sold rights to Grams in July 2019 in secondary markets.  Since I know some people at Liquid and I am the ████████████ ████████ family of affiliated funds, I reached out to Liquid to find out more information.  Attached as **Exhibit F** is an email chain dated July 16, 2019, reflecting this discussion.  Ultimately, however, I was reminded that we were unable to sell our

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

right to Grams pursuant to the terms of the Purchase Agreement, and we did not sell any of our right to Grams.

22.      On July 18, 2019, John Hyman, who I had previously understood worked for Telegram, emailed me from a john@gramvault.com email address regarding developments with TON Labs.  A copy of that email is attached as **Exhibit G** to this Declaration.

23.      I came to understand from my discussions with Mr. Hyman in the summer of 2019 that he had left Telegram to work on building services on top of the TON network, and specifically a wallet application.  Mr. Hyman wanted to know if ██████ was interested in investing in the wallet application project he was working on with a developer.  Mr. Hyman said he was looking to raise between $5 million and $10 million to develop this wallet.  A copy of two TON Labs slide decks Mr. Hyman emailed to me regarding this project are attached to this declaration as **Exhibit H** and **Exhibit I**.

24.      Ultimately, █████ declined to invest with Mr. Hyman in these ventures. The discussions regarding Mr. Hyman's project never advanced to the point of serious consideration of an investment because, among other reasons, it was difficult to understand what product or application we would be investing in.

25.      On or about October 16, 2019, I received an email from Shyam Parekh of Telegram asking whether █████ would agree to extend the deadline date for launching the TON network to April 30, 2020, in light of the SEC's lawsuit in this action.  █████ did not take a position one way or another and abstained from voting.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   <u>01/11/2020</u>

6