# PX3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
SECURITIES AND EXCHANGE COMMISSION,       :
:
                           Plaintiff,       :    19 Civ. 09439 (PKC)
:
        - against -       :    ECF Case
:
TELEGRAM GROUP INC. and TON ISSUER INC.       :
:
                           Defendants.       :
:
-------------------------------------------------------------- x

### DECLARATION OF ▓▓▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓▓, pursuant to 28 U.S.C. § 1746, declare:

1. I reside in ▓▓▓▓▓▓▓▓

2. I graduated from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3. Since approximately ▓▓▓▓▓▓ I have been the ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ the venture capital ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ which ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

4. As the head of ▓▓▓▓▓▓ I work with a small team of people to make investments, with a focus on financial and enterprise technology companies.

5. From time to time, ▓▓▓▓▓▓ works with ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

6. ▓▓▓▓▓▓ has participated in Initial Coin Offerings ("ICO"s) as part of its investment portfolio with the goal of selling tokens when we deem it appropriate in order to generate a positive return consistent with all applicable law.

7. Attached as **Exhibit A** to this Declaration is an email chain dated January 10, 2018, reflecting my discussion with ▓▓▓▓▓▓▓▓, a venture capital firm, and others at ▓▓▓▓▓▓

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
**CONFIDENTIAL TREATMENT REQUESTED BY** ▓▓▓▓▓▓▓▓

about the "Telegram ICO pre-sale SAFT". ▮ became interested in participating in the Telegram ICO pre-sale SAFT, among other reasons, because of the large amount of industry attention relating to the offering. I was previously familiar with Telegram because it was a popular messaging service, which I had used. As noted in **Exhibit A**, the lockup set forth in the Telegram ICO pre-sale SAFT exceeded one year, which was a longer lockup than I expected, at least when compared to ICOs of which I was previously aware.

8.  As part of our due diligence on the Telegram ICO, ▮ spoke to colleagues at other venture capital firms to get their views.

9.  On January 15, 2018, I received an email from ▮, with, what he described as, a "detailed summary of the underlying Telegram Cryptocurrency offering." The attachment to that email indicates that Telegram planned an additional offering at a higher price. A copy of that email and attachment is attached as **Exhibit B** to this Declaration.

10.  ▮ also reviewed Telegram's offering materials to gain insight into the economics and terms of the deal. For example, on or about January 10, 2018, in an email to me, ▮ who reports to me, summarized some of the terms from what he described as Telegram's "leaked whitepaper", including that the "[t]otal supply of 200 Grams [would be] split as follows: 4% for team w/ 4 year vesting, 52%+ retained by TON reserve 'to protect the nascent cryptocurrency from speculative trading and to maintain flexibility at the early stages . . .' and 44% sold based on a formula illustrated below . . . ." ▮ also pointed out that as of October 2017, Telegram had 800,000 unique and third-party bots and 52 million "regular" users, and some of Telegram's plan for the ecosystem it was building. That email is attached as **Exhibit C** to this Declaration.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
**CONFIDENTIAL TREATMENT REQUESTED BY** ▮

11. Subsequently, on or about January 23, 2018, John Hyman emailed to ▇▇▇ the following documentation, which I reviewed: (1) a Process Memorandum, which included a KYC Form and Purchase Agreement; (2) a Telegram Pre-Sale Primer, dated January 18, 2018; (3) a Technical White Paper, dated January 18, 2018; and (4) Risk Factors.

12. ▇▇▇ decided to participate in the Telegram ICO pre-sale SAFT because, among other reasons, we believed that the price of Grams would increase once the TON blockchain was publically launched, allowing us to make a profit. We reasoned that Telegram's messenger platform was an already established, positively viewed platform. Telegram's founders had already created and launched a successful messenger application, which also gave us confidence that Telegram's ICO would be successful, as compared to unknown teams with no experience bringing a product to market.

13. ▇▇▇ discussions with Telegram were primarily limited to emails. We tried, but were not able to connect with anyone from Telegram directly to have a deep due diligence call about their ICO for the sale of Grams.

14. On or about January 22, 2018, ▇▇▇ asked for a $5 million allocation of Grams from Telegram, which Telegram agreed to allocate.

15. On or about January 23, 2018, ▇▇▇ signed a "Purchase Agreement for Grams" (the "Purchase Agreement") with Ton Issuer Inc., under which ▇▇▇ agreed to pay $5 million for 13,242,893 Grams. ▇▇▇ emailed to Telegram this Purchase Agreement. Telegram emailed the counter-signed Purchase Agreement to ▇▇▇ on or about February 6, 2018.

16. ▇▇▇ entered into the Purchase Agreement understanding it was ultimately an agreement to obtain Grams. Assuming that the preconditions of the Purchase Agreement

3

were met such that ▓▓▓▓ received Grams, we hoped to be able to trade them as permitted under the Purchase Agreement and applicable law at some time after the TON blockchain became operational.

17.   On or about February 9, 2018, ▓▓▓▓ wired $5 million to Telegram from its bank account located in ▓▓▓▓

18.   ▓▓▓▓ entered into the Purchase Agreement to make a profit from the investment at a later time. ▓▓▓▓ expected at some point that there would be a secondary market for selling Grams, and that it would be able to participate in that market as permitted under the Purchase Agreement and all applicable law.

19.   ▓▓▓▓ did not have specific plans for when we would sell our Grams or how we would do so, but we planned to trade our Grams after the lockup period ended at an opportunistic time.  Attached as **Exhibit D** is an email chain dated May 23, 2019, reflecting ▓▓▓▓ and ▓▓▓▓ understanding that Grams would eventually be trading on exchanges and that we intended to sell our Grams at some point.

20.   I am not aware of plans for ▓▓▓▓ to use the Grams for consumptive purposes.

21.   No one from Telegram asked ▓▓▓▓ what it planned to do with the Grams after the Grams were issued and we did not discuss this with Telegram.

22.   I am not aware of plans for ▓▓▓▓ to act as validators for the TON network. At the time of the offering, and prior to our entering into the Purchase Agreement, no one from Telegram asked ▓▓▓▓ whether we planned to act as validators for the TON network.

23.   I heard rumors that people were trying to sell their interests in the SAFTs, despite Grams not being available, but ▓▓▓▓ was not approached directly to sell its interest.

4

Attached as **Exhibit E** is an email I received on February 14, 2018, from ▮▮▮▮ reporting one such rumor.

24. On October 16, 2019, ▮▮▮▮ received an email from Shyam Parekh of Telegram asking whether we would agree to extend the deadline date for launching the TON network to April 30, 2020, in light of this action. We agreed to this extension because, among other things, we wanted to see the project succeed and make a profit.

5

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
**CONFIDENTIAL TREATMENT REQUESTED BY** ▮▮▮▮

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 10, 2020



**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
**CONFIDENTIAL TREATMENT REQUESTED BY**