# PX4

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**  :
:
                          **Plaintiff,**     :     19 Civ. 09439 (PKC)
:
           - against -         :     ECF Case
:
**TELEGRAM GROUP INC. and TON ISSUER INC.**  :
:
                          **Defendants.**   :
:
-----------------------------------------------------------------x

## DECLARATION OF ▮▮▮

I, ▮▮▮, pursuant to 28 U.S.C. § 1746, declare:

1. I reside in ▮▮▮

2. I graduated from ▮▮▮ ▮▮▮

3. Since approximately ▮▮▮ I have worked for ▮▮▮, which is a ▮▮▮ firm. My title is ▮▮▮.

4. Within ▮▮▮ I work with a team of people that provides investment advice and recommendations to ▮▮▮ ▮▮▮

5. Since approximately ▮▮▮ I have primarily focused on researching and investing in the cryptocurrency space on behalf of ▮▮▮ For example, my team has invested in Bitcoin ("BTC"), Ethereum ("ETH") and various Initial Coin Offerings ("ICOs").

6. Once we acquire tokens in ICOs, we typically sell the tokens when we deem it appropriate in order to make a profit.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

7. In late 2017 and early 2018, I learned that a lot of people were talking about what we referred to internally as the "Telegram ICO."

8. I became interested in investing in the Telegram ICO because Telegram is one of the most popular messaging applications in the world. It has a big brand and network among crypto holders globally. I get a lot of my crypto information and research from using the application. Attached to this Declaration as **Exhibit A** is an email chain dated January 8, 2018, where I share some of my views on the Telegram ICO with my colleagues and ▮.

9. In early January, I reviewed the following documents as part of my due diligence on Telegram: (1) a Telegram White Paper dated December 3, 2017; (2) a 2-page Ton proposal; and (3); a Telegram primer.

10. Aside from reading Telegram's promotional materials, I did some additional due diligence on the ICO, including speaking to other Venture Capital firms who were considering investing in the Telegram ICO. For example, on January 6, 2018, I received an email from a friend who works at ▮, attaching a Telegram White Paper and his own notes and model, which I reviewed. That email is attached to this Declaration as **Exhibit B**.

11. Prior to investing in the Telegram ICO, ▮ and I also spoke directly with representatives of Telegram via email and on the telephone, including Pavel Durov and Shyam Parekh. I recall that we asked Mr. Durov and/or Mr. Parekh about the structure of the Telegram ICO deal and the timing of the lockup. We also asked Mr. Durov and/or Mr. Parekh about the utility of Grams and what the whole blockchain project would look like, but we did not get clear answers about what the product would look like or do, and were referred to the White Paper for more specific answers. We asked Telegram what they planned to do with the money it raised in the offering but did not get a clear answer.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

12. ▬ and I ultimately decided to invest in the Telegram ICO, because Telegram already had such a strong product and brand among crypto enthusiasts, and we believed that a team of top notch product engineers, given $1 billion, could build a useful crypto token that would appreciate in value. I had also learned through our due diligence that there was also incredibly strong demand among Venture Capital firms to get an allocation in the initial round. I believed at the time we made the investment that the upside was approximately 3-4 times our investment purchase price. Attached as **Exhibit C** to this Declaration is an email exchange dated January 17, 2018, with a colleague reflecting our thinking on the Telegram ICO.

13. ▬ and I viewed the investment in the Telegram ICO as a trade opportunity. We wanted to profit from selling the Grams once the lockup period was over. The long lockup period by ICO standards, which restricted selling our Grams for 18 months, concerned me because we intended to sell the Grams for a profit. However, we believed that the Grams would ultimately trade higher than the price we purchased the Grams. We had confidence that Telegram's management team had the resources and technical capabilities to build and launch a successful network, like the Telegram Messenger application. Attached as **Exhibit D** is an email exchange dated January 18, 2018, where a colleague and I discuss our views on the lockup period and Telegram Messenger application.

14. Based on the due diligence I did, I expected Telegram to continue to work on the TON Blockchain platform it was building after launch, which would increase the value of Grams. I also felt that Telegram's Messenger application would continue to drive demand for Grams.

15. At the time of the offering, I thought of Telegram's ICO as an investment to purchase tokens. I thought we were getting tokens created by Telegram, which we think is

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

innovative and growing. This offering stood out from most ICOs because Telegram has a popular messenger application, which is used by hundreds of millions of people. I thought Grams would have a good synergy with Telegram's Messenger application. It was a growth story in motion, unlike most ICO's which are created out of thin air.

16. Moreover, at the time we purchased the Grams, Telegram had indicated to us that there was a lot of demand for the deal that was not met, so we reasoned that high demand for Grams meant the price would rise.

17. On January 18, 2018, I sent an email to Mr. Durov with the subject "▮ allocation (▮ and wrote that we would like to invest $10 million in the Telegram ICO.

18. Later that day, Mr. Hyman sent to ▮ and me an email entitled "Telegram Private Placement Update," proposing an allocation of $10 million. He also attached a Process Memorandum, KYC Form and Purchase Agreement, an updated copy of the Pre-Sale Primer, dated January 18, 2018, a Technical White Paper, dated January 18, 2018, and Risk Factors.

19. ▮, through which to invest $10 million in the Telegram ICO.

20. On or about January 23, 2018, ▮ signed a "Purchase Agreement for Grams" (the "Purchase Agreement") with Ton Issuer Inc., under which ▮ agreed to pay $10 million for 26,485,785.7 Grams. I emailed the Purchase Agreement to Telegram that same day. Ton Issuers Inc. countersigned the purchase agreement and Telegram emailed it back to ▮ and me on or around February 7, 2019.

21. On or around February 9, 2018, ▮ wired $10 million to Telegram.

22. I personally invested $50,000 in the Telegram ICO through ▮

4

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

23.     ▇ and I do not plan to act as validators for the TON network.

24.     While it is possible that ▇ and I would use a portion of our Grams on the TON network, once issued, as a currency, as I explained earlier, we primarily hoped to sell the Grams at an opportune time for a profit.

25.     No one from Telegram asked me what we planned to do with the Grams after they were issued to us and we did not discuss this with Telegram.

26.     I heard rumors of a secondary market for selling interests in Grams before they were issued.  For example, on or about January 26, 2018, I was offered Grams for a price of $0.82 from a third party seller.  Attached as **Exhibit E** is an email dated January 26, 2018, reflecting such rumors.  Ultimately, however, we invested directly with Telegram.

27.     Neither ▇ nor I have sold any of our interests in the Grams.

28.     On or about October 16, 2019, ▇ and I received an email from Shyam Parekh of Telegram asking whether we would agree to extend the deadline date for launching the TON network to April 30, 2020, in light of the SEC's lawsuit in this action.  While we supported the extension, we did not cast a vote.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on:   January 13, 2020