# PX8



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | **19 Civ. 09439 (PKC)** |
| **- against -** | : | **ECF Case** |
| **TELEGRAM GROUP INC. and TON ISSUER INC.** | : | |
| **Defendants.** | : | |

**DECLARATION OF**

I, pursuant to 28 U.S.C. § 1746, declare:

1. I reside in

2. I graduated from . I obtained a

3. I am a which is a firm based in

4. I have worked at I co-lead early stage venture capital business.

5. has invested in cryptocurrency such as Bitcoin and Initial Coin Offerings ("ICO"s). makes investments, including those in cryptocurrency, in order to make a profit.

6. In approximately December 2017, [redacted] learned about the opportunity to participate in what we referred to internally as "the Telegram ICO" from another [redacted] firm, which introduced a [redacted] to Pavel Durov, one of the founders of Telegram.

7. [redacted] became interested in investing in the Telegram ICO because we were interested in an application that could be large and one of the applications that we thought could be large, and that we thought could have a lot of use, and use cases, was that of a smart contract platform. We had seen the scaling challenges of the Ethereum blockchain. Telegram had an opportunity to build something with better scalability.

8. On or about January 8, 2018, my [redacted] and I had a video conference call with Mr. Durov. On the call, Mr. Durov introduced himself and discussed his background. We talked about smart contracts not scaling on Ethereum and his views on why that was. We discussed his ability to create a scalable open network with his team that could support a smart contract platform. Mr. Durov talked about how he would build the Telegram Open Network ("TON") for scale from day one and architect it properly.

9. Before deciding whether to invest in the Telegram ICO, [redacted] did additional due diligence to try to understand the investment opportunity and market opportunity. This included reading Telegram's marketing materials, such as the Telegram Pre-Sale Primer and the Technical White Paper.

10. An investment memorandum summarizing the terms of the offering, due diligence and the thesis on an investment in Grams was circulated within [redacted] on or about January 9, 2018. A true and accurate copy of this memorandum is attached as **Exhibit A** to this Declaration. I reviewed this memorandum and it generally supports [redacted] thinking on this investment.

11. [REDACTED] hoped to make a profit ultimately, but did not have a plan for when that would be. We typically hold investments and sell them later hopefully for a profit.

12. I did not personally have any conversations with Telegram about [REDACTED] plan with regard to the ultimate disposition of this asset.

13. On or about January 25, 2018, [REDACTED] controlled by [REDACTED], entered into "Purchase Agreement for Grams" (the "Purchase Agreement") to pay money for a certain amount of Grams. On January 25, 2018, [REDACTED] emailed this Purchase Agreement to Telegram.

14. On or about February 12, 2018, [REDACTED] wired its payment to Telegram from its bank account located in the United States.

15. After entering into this Purchase Agreement, I understood that [REDACTED] and its affiliates owned the Grams.

16. At that time, we expected Telegram to build a product. If they built that product, and many users ended up using the product, the Grams we owned could become valuable.

17. Through inquiries from the press, I heard rumors of people trading their interests in Grams on secondary markets but [REDACTED] has not sold its interests in Grams.

18. [REDACTED] has investigated but has not made any plans to act as a validator on the TON network. To my knowledge, Telegram has not asked [REDACTED] whether we had plans to act as validators.

19. After [REDACTED] investment, we had very little contact with Telegram aside from general written updates. Sometime following our investment, I met with Shyam Parekh in [REDACTED] office. Mr. Parekh provided a general update that they were on track and were expecting to launch the network at a later date. I do not recall Mr. Parekh providing any definitive information on what applications they were building or planning to build.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 13, 2020

