# PX12

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
                      Plaintiff,    )
 6                                  ) 19 Civ. 9439 (PKC)
            - against -            )
 7                                  )
     TELEGRAM GROUP INC. and        )
 8   TON ISSUER INC.,               )
                                    )
 9                    Defendants.   )
     _____)

10

11      **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13            Videotaped deposition of PAVEL DUROV (as

14   30(b)(6) corporate representative of Defendants and

15   also in his personal capacity), Volume 1, taken on

16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17   Square, Building 3, Level 5, Downtown Dubai, Dubai,

18   United Arab Emirates, beginning at 11:21 a.m. and

19   ending at 9:54 p.m., on Tuesday, January 7, 2020,

20   before LEAH WILLERSDORF, Member of the British

21   Institute of Verbatim Reporters, Accredited Verbatim

22   Reporter, Qualified Realtime Reporter - Level 2,

23   International Participating Member NCRA.

24

25   JOB No. 200107LWI
                                                        1
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
                       Plaintiff,     )
 6                                    ) 19 Civ. 9439 (PKC)
             - against -             )
 7                                    )
     TELEGRAM GROUP INC. and          )
 8   TON ISSUER INC.,                 )
                                      )
 9                     Defendants.    )
     _____)
10

11        **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13             Videotaped deposition of PAVEL DUROV (as

14   30(b)(6) corporate representative of Defendants and

15   also in his personal capacity), Volume 2, taken on

16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17   Square, Building 3, Level 5, Downtown Dubai, Dubai,

18   United Arab Emirates, beginning at 10:23 a.m. and

19   ending at 6:09 p.m., on Wednesday, January 8, 2020,

20   before LEAH WILLERSDORF, Member of the British

21   Institute of Verbatim Reporters, Accredited Verbatim

22   Reporter, Qualified Realtime Reporter - Level 2,

23   International Participating Member NCRA.

24

25   JOB No. 200108LWI
```

250

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:52:40 | 1 | platform. |
| 11:52:40 | 2 | BY MR. TENREIRO: |
| 11:52:41 | 3 | Q.   A blogging platform? |
| 11:52:44 | 4 | A.   Yes. |
| 11:52:44 | 5 | Q.   And you're saying that is a part of |
| 11:52:46 | 6 | Messenger but could also be used independently of |
| 11:52:49 | 7 | Messenger; did I understand that correctly? |
| 11:52:51 | 8 | A.   Correct.  You don't have to be a user of |
| 11:52:53 | 9 | Telegram Messenger to use Telegraph. |
| 11:52:55 | 10 | Q.   Okay.  Other than Telegram Messenger and |
| 11:52:56 | 11 | Telegraph, in 2017 was Telegram Group Inc. offering |
| 11:53:02 | 12 | any other platforms or applications? |
| 11:53:25 | 13 | A.   I'm not sure.  It could have but I'm not |
| 11:53:27 | 14 | sure. |
| 11:53:27 | 15 | Q.   Okay.  And how many employees in 2017 did |
| 11:53:39 | 16 | Telegram Group Inc. have? |
| 11:53:54 | 17 | A.   We had about 25 to 30 employees in the |
| 11:54:01 | 18 | core team.  In addition, we used the services of |
| 11:54:05 | 19 | hundreds of independent contractors. |
| 11:54:10 | 20 | Q.   And today, how many employees does |
| 11:54:13 | 21 | Telegram Group have? |
| 11:54:17 | 22 | A.   I don't think those numbers changed |
| 11:54:20 | 23 | meaningfully. |
| 11:54:20 | 24 | Q.   Okay.  And the core -- I think what you |
| 11:54:23 | 25 | described as the core team of approximately 25, what |

32

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:54:27 | 1 | do they do, generally speaking? |
| 11:54:34 | 2 | A.   They write programming code. |
| 11:54:37 | 3 | Q.   I'm sorry, they? |
| 11:54:39 | 4 | A.   They write code. |
| 11:54:40 | 5 | Q.   Programming code, okay. |
| 11:54:41 | 6 | Is this for Telegram Messenger and |
| 11:54:43 | 7 | Telegraph?  Let's start with 2017.  Is that the |
| 11:54:47 | 8 | programming code they were writing for -- I'm sorry, |
| 11:54:49 | 9 | that they were writing? |
| 11:54:50 | 10 | MR. DRYLEWSKI:  Objection to form. |
| 11:55:04 | 11 | THE WITNESS:  It depends on which part of |
| 11:55:06 | 12 | 2017 we are talking about. |
| 11:55:07 | 13 | BY MR. TENREIRO: |
| 11:55:07 | 14 | Q.   So let's talk about before the development |
| 11:55:10 | 15 | of the TON Blockchain. |
| 11:55:13 | 16 | A.   Okay. |
| 11:55:13 | 17 | Q.   Or the beginning of the development of the |
| 11:55:15 | 18 | TON Blockchain. |
| 11:55:18 | 19 | A.   Yeah, I believe their efforts were mostly |
| 11:55:20 | 20 | focused on features, implementing features related |
| 11:55:28 | 21 | to Telegram Messenger, although we did have certain |
| 11:55:37 | 22 | experiments from time to time that not necessarily had |
| 11:55:40 | 23 | to do with Telegram Messenger directly. |
| 11:55:43 | 24 | Q.   Okay.  And today, this core team, what |
| 11:55:47 | 25 | applications or programs are they programming code |

33

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:55:52 | 1 | for? |
| 11:55:52 | 2 | MR. DRYLEWSKI:  Objection to form. |
| 11:55:55 | 3 | BY MR. TENREIRO: |
| 11:55:56 | 4 | Q.   If any, I guess. |
| 11:56:03 | 5 | A.   Those are the same applications, with the |
| 11:56:06 | 6 | addition of the work on the TON Blockchain. |
| 11:56:10 | 7 | Q.   Okay.  Let me just get some background |
| 11:56:13 | 8 | information on TON Issuer Inc.  Again, what is |
| 11:56:16 | 9 | TON Issuer Inc.? |
| 11:56:20 | 10 | MR. DRYLEWSKI:  And to the extent it's not |
| 11:56:22 | 11 | clear, I'm objecting to this line of questioning as |
| 11:56:24 | 12 | beyond the scope of the 30(b)(6) topics agreed and |
| 11:56:27 | 13 | narrowed by the parties. |
| 11:56:28 | 14 | MR. TENREIRO:  Understood. |
| 11:56:52 | 15 | THE WITNESS:  TON Issuer Inc. is a legal |
| 11:56:57 | 16 | entity created for the purpose of conducting the |
| 11:57:17 | 17 | private placement and issuing Grams at the time of |
| 11:57:22 | 18 | launch of the TON Blockchain. |
| 11:57:26 | 19 | BY MR. TENREIRO: |
| 11:57:27 | 20 | Q.   And who owns TON Issuer Inc.?  Is it |
| 11:57:31 | 21 | 100 percent owned by Telegram Group Inc.? |
| 11:57:33 | 22 | A.   It is. |
| 11:57:38 | 23 | Q.   Does it have any employees separate than |
| 11:57:41 | 24 | the 25 or so core employees that Telegram Group Inc. |
| 11:57:44 | 25 | has, plus the contractors, or are they the same ones? |

34

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:58:04 | 1 | A.   I think there are certain employees that |
| 11:58:08 | 2 | have dual roles and act as employees of both Telegram |
| 11:58:17 | 3 | Group Inc. and -- or other Telegram-related entities, |
| 11:58:23 | 4 | such as Telegram FZ LLC -- |
| 11:58:32 | 5 | (Reporter clarification.) |
| 11:58:37 | 6 | THE WITNESS:  -- and the role in |
| 11:58:43 | 7 | TON Issuer Inc. in a different capacity, whether there |
| 11:58:51 | 8 | are any employees that TON Issuer Inc. employs that |
| 11:58:58 | 9 | are not at the same time, that do not have any role at |
| 11:59:01 | 10 | other Telegram-related entities?  I'm not sure.  There |
| 11:59:08 | 11 | could be but it would be very few people, if there are |
| 11:59:14 | 12 | any. |
| 11:59:14 | 13 | BY MR. TENREIRO: |
| 11:59:15 | 14 | Q.   Okay.  And what's your title at Telegram |
| 11:59:18 | 15 | Group Inc.? |
| 11:59:18 | 16 | MR. DRYLEWSKI:  This is obviously |
| 11:59:19 | 17 | a question in his personal capacity. |
| 11:59:21 | 18 | MR. TENREIRO:  Yes. |
| 11:59:23 | 19 | THE WITNESS:  I believe I'm the director |
| 11:59:24 | 20 | of the company. |
| 11:59:25 | 21 | BY MR. TENREIRO: |
| 11:59:25 | 22 | Q.   And who's the CEO? |
| 11:59:33 | 23 | A.   I think that in the jurisdiction where |
| 11:59:39 | 24 | TON Issuer Inc. is incorporated, the term "CEO" may |
| 11:59:43 | 25 | not be necessarily applicable -- |

35

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
11:59:46  1          Q.   Sorry, I don't mean to interrupt you but
11:59:48  2    I'm just talking about Telegram Group Inc.
11:59:50  3          A.   Ah, you were talking about Telegram
11:59:53  4    Group Inc.
11:59:53  5          Q.   Yes.
11:59:54  6          A.   I act as the CEO of Telegram Group Inc.
11:59:56  7          Q.   Has that changed at any time since the
11:59:59  8    existence of Telegram Group Inc.?  Has there been any
12:00:01  9    other CEO?
12:00:02 10          A.   No, I don't think so.
12:00:02 11          Q.   Okay.  Now, you -- now, TON Issuer Inc.,
12:00:06 12    who is the CEO, if any?
12:00:15 13          A.   Although, to supplement my previous
12:00:16 14    answer, I think I have to point out that Telegram
12:00:22 15    Group Inc. was -- I think it has been renamed at
12:00:26 16    a certain point in time.  It had a different name
12:00:30 17    a few years ago, and before it got renamed to Telegram
12:00:36 18    Group Inc. it may have had a different director, but
12:00:41 19    at that point in time it was not related to the
12:00:43 20    operations of Telegram, so it may not be relevant.
12:00:47 21               I just want to clarify that.
12:00:52 22               Would you mind repeating your last
12:00:53 23    question?
12:00:54 24    BY MR. TENREIRO:
12:00:54 25          Q.   Yes.  But before I do so, just the last
```

36

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12:00:56  1   thing you said, it was not related to the operations

12:00:58  2   of Telegram, you mean Telegram Messenger?

12:00:59  3        A.   Yes.

12:01:00  4        Q.   Right, okay.  I just want to be clear

12:01:03  5   because when I say "Telegram," I'm talking about the

12:01:06  6   companies, but you seem to say "Telegram" to relate to

12:01:10  7   Messenger and that's fine, I just want to make sure

12:01:12  8   we understand what we're saying.

12:01:13  9             When you talk about Telegram, are you

12:01:15 10   talking about Messenger?  Is that how you think

12:01:18 11   about it?

12:01:20 12        A.   Yeah, I use it in the same way a consumer

12:01:29 13   would use this name, and they would mainly refer to

12:01:35 14   the messaging application.

12:01:36 15        Q.   As "Telegram"?

12:01:38 16        A.   Yes.

12:01:38 17        Q.   Right, okay.  So my prior question was

12:01:43 18   TON Issuer Inc., who was the CEO today and who has it

12:01:46 19   been for its existence, if any?

12:01:50 20        A.   I am the director of this company.

12:01:59 21   As I started to explain, I don't believe the term

12:02:06 22   "CEO" is necessarily applicable for the legal entities

12:02:13 23   incorporated in the jurisdiction where these companies

12:02:16 24   are incorporated.

12:02:21 25             But being the sole director is basically

37

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:06:31   1   of these entities owned the IP for Telegram Messenger?
12:06:34   2             MR. DRYLEWSKI:  Same objection; scope.
12:06:50   3             THE WITNESS:  If I had to guess, at least
12:06:51   4   some of the IP may have been held by Telegram
12:06:56   5   Messenger LLP.  That's the left bottom part.
12:07:00   6   BY MR. TENREIRO:
12:07:01   7        Q.   A UK entity?
12:07:03   8        A.   Yes.
12:07:03   9        Q.   Okay.  Just describe in your own words
12:07:07  10   what is Telegram Messenger.  You have talked about it
12:07:11  11   a little bit more but just give me a general
12:07:14  12   description of it.
12:07:25  13        A.   It is a social media application
12:07:28  14   supporting a wide range of use cases.  It allows its
12:07:33  15   users to communicate privately and in groups to do
12:07:46  16   Voice over IP voice calls, to host large communities
12:07:52  17   and publish broadcasts.  It also allows users to
12:08:11  18   create apps that are called bots.  It also allows
12:08:17  19   users to run polls, to share videos and voice
12:08:32  20   messages, to view contents of certain URLs and news
12:08:39  21   stories in a private way without running the risk of
12:08:45  22   being surveilled.
12:08:51  23             There are -- there's a wide range of use
12:08:56  24   cases because Telegram is a multipurpose application.
          25   ///
```

41

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:11:06 | 1 | the world as Telegram Messenger does are the messaging |
| 12:11:13 | 2 | apps owned by Facebook Corporation. |
| 12:11:17 | 3 | Q.   WhatsApp? |
| 12:11:20 | 4 | A.   WhatsApp and other services run by |
| 12:11:23 | 5 | Facebook, yeah. |
| 12:11:25 | 6 | Q.   Okay.  How many subscribers does Telegram |
| 12:11:31 | 7 | have today, approximately? |
| 12:11:34 | 8 | MR. DRYLEWSKI:  Objection; scope. |
| 12:11:42 | 9 | THE WITNESS:  "Subscribers" can be |
| 12:11:47 | 10 | a vaguely defined term, but if we use the metric that |
| 12:11:53 | 11 | is typically used in our industry, which is monthly |
| 12:12:01 | 12 | active users, I would say that Telegram has by now |
| 12:12:09 | 13 | about 300 million monthly active users. |
| 12:12:13 | 14 | BY MR. TENREIRO: |
| 12:12:13 | 15 | Q.   What about at the end of 2017, how many |
| 12:12:15 | 16 | monthly active users did Telegram have? |
| 12:12:18 | 17 | MR. DRYLEWSKI:  Objection; scope. |
| 12:12:29 | 18 | THE WITNESS:  It's hard to tell.  Based on |
| 12:12:31 | 19 | my recollection, it was somewhere around 180 million |
| 12:12:36 | 20 | users, depending on the month. |
| 12:12:39 | 21 | BY MR. TENREIRO: |
| 12:12:39 | 22 | Q.   Okay.  And who hosts the servers for |
| 12:12:44 | 23 | Telegram Messenger? |
| 12:12:44 | 24 | MR. DRYLEWSKI:  Objection; scope. |
| 12:12:57 | 25 | THE WITNESS:  Would you mind clarifying |

43

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:13:00 | 1 | the question? |
| 12:13:02 | 2 | BY MR. TENREIRO: |
| 12:13:03 | 3 | Q.   Who has control of the servers? |
| 12:13:05 | 4 | MR. DRYLEWSKI:  Same objection. |
| 12:13:16 | 5 | THE WITNESS:  Our team has full control |
| 12:13:17 | 6 | over the servers. |
| 12:13:19 | 7 | BY MR. TENREIRO: |
| 12:13:19 | 8 | Q.   Okay.  And Telegram Messenger, when did it |
| 12:13:23 | 9 | -- when did -- who created it?  Who created that app? |
| 12:13:38 | 10 | A.   It was created by a subset of the |
| 12:13:44 | 11 | engineers and managers that are still working at |
| 12:13:48 | 12 | Telegram. |
| 12:13:49 | 13 | Q.   Does that include you? |
| 12:13:50 | 14 | A.   Yes. |
| 12:13:51 | 15 | Q.   Okay.  Whose idea was it? |
| 12:13:54 | 16 | MR. DRYLEWSKI:  Objection; form. |
| 12:13:56 | 17 | Objection; scope. |
| 12:14:02 | 18 | THE WITNESS:  I believe it was my idea. |
| 12:14:03 | 19 | BY MR. TENREIRO: |
| 12:14:04 | 20 | Q.   Okay.  And when -- more or less, when was |
| 12:14:08 | 21 | it created? |
| 12:14:17 | 22 | A.   I believe we started working on this |
| 12:14:21 | 23 | technology in early 2012 and we launched it publicly |
| 12:14:34 | 24 | somewhere around August 2013. |
| 12:14:39 | 25 | Q.   From August 2013 approximately to today, |

44

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
12:18:52   1                    MR. TENREIRO:  Great.
12:18:53   2                    MR. DRYLEWSKI: -- that we're going to hand
12:18:54   3       to the witness and to you, if there's no objection.
12:18:57   4                    MR. TENREIRO:  Why don't we just hold off
12:19:00   5       for a second.  I'm going to go off this topic and when
12:19:03   6       I come back, you can, if that's okay?
12:19:05   7                    MR. DRYLEWSKI:  Fine.
12:19:05   8       BY MR. TENREIRO:
12:19:06   9            Q.   Let me just take a step back before we get
12:19:08  10       into the breakdown, Mr. Durov.
12:19:10  11                    Does Telegram charge its users for either
12:19:14  12       downloading or using the app in any way?
12:19:16  13                    MR. DRYLEWSKI:  Objection; scope.
12:19:17  14                    THE WITNESS:  It does not.
12:19:19  15       BY MR. TENREIRO:
12:19:20  16            Q.   Has it ever?
12:19:20  17                    MR. DRYLEWSKI:  Same objection.
12:19:27  18                    THE WITNESS:  No.
12:19:27  19       BY MR. TENREIRO:
12:19:27  20            Q.   Okay.
12:19:30  21                    Up until the time -- from August 2013
12:19:33  22       until the time of the offering or the raising of funds
12:19:36  23       that's at issue in this litigation, how did
12:19:39  24       Telegram -- from what sources did Telegram fund its
12:19:41  25       operations?
```

47

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:19:41  1              MR. DRYLEWSKI:  Same objection.
12:19:59  2              THE WITNESS:  The source was my personal
12:20:07  3    savings that resulted from the sale of the previous
12:20:13  4    company I started and eventually sold.  That was the
12:20:21  5    largest social network on the post-Soviet space, and
12:20:28  6    I managed to sell it at the right time.
12:20:32  7    BY MR. TENREIRO:
12:20:33  8         Q.    I might pronounce the name wrong and,
12:20:36  9    if so, I apologize.  Is this VKontakte?
12:20:39 10         A.    Yes.  We can refer to it as VK.
12:20:41 11         Q.    You refer to it as VK, okay.
12:20:44 12         A.    Yes.
12:20:44 13         Q.    All right.  So the proceeds from your sale
12:20:48 14    of VK is some of the funds that you used to fund the
12:20:53 15    operations of Telegram from August 2013, at least
12:20:57 16    until end of 2017; is that correct?
12:20:59 17              MR. DRYLEWSKI:  Objection; scope.
12:21:21 18              THE WITNESS:  Well, I definitely used
12:21:23 19    those funds to support the growth of our servers up
12:21:39 20    until 2018.  I may have used some of the funds after
12:21:47 21    that, because typically I wouldn't separate my
12:22:07 22    personal savings from the needs of Telegram Messenger
12:22:10 23    in the sense of if I see that Telegram needs more
12:22:17 24    resources, I would happily invest more because
12:22:27 25    I'm a person that prefers not to own any real estate
```

48

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
12:28:11  1   to understand a little bit.  Because you said earlier
12:28:13  2   that it's possible you might have continued to spend
12:28:15  3   some of your own savings after the private placement
12:28:18  4   happened, so I just want to make sure I understand
12:28:20  5   exactly what the 218 million is.
12:28:22  6        A.   Yeah.
12:28:23  7        Q.   So the question is, is the 218 million all
12:28:26  8   of the expenditures that Telegram has had in that time
12:28:30  9   period, or is it only the amount that has been spent
12:28:34 10   from the private placement?
12:28:36 11        A.   Ah, now I understand your question.
12:28:40 12   Those are all the expenditures.  Those are all the
12:28:53 13   expenditures that we had.
12:28:54 14        Q.   Those are all the expenditures, okay.
12:28:57 15             And is it your -- I'm sorry.
12:28:59 16        A.   But I have maybe to clarify my last answer
12:29:02 17   a little bit.  There may have been certain additional
12:29:10 18   expenses.  For example, when I paid for the rental
12:29:27 19   costs or the travel costs for my team, I would
12:29:34 20   typically cover those from my personal accounts, but
12:29:41 21   those were related to Telegram, not to myself
12:29:43 22   personally, and in that sense there may have been
12:29:48 23   certain other expenses, but I think it would be fair
12:29:53 24   to say that the majority of expenses are stated here.
12:29:59 25        Q.   Can you do better than "the majority"?
```

52

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
12:30:03   1   Is it the overwhelming majority of expenses?
12:30:06   2        A.   I would say it is the vast majority; it
12:30:10   3   should be way over 90 percent of expenses.
12:30:12   4        Q.   Okay, thank you.  And what I'm seeing --
12:30:18   5   what does "Equipment" mean?  What does that refer to?
12:30:26   6        A.   "Equipment" refers to the servers and
12:30:32   7   routers and other networking equipment that we would
12:30:37   8   buy to host the operations of both Telegram and TON.
12:30:53   9        Q.   Do you use the same equipment to host the
12:31:00  10   operations of Telegram and TON, or is it separate
12:31:02  11   equipment?
12:31:19  12        A.   We used most equipment -- we use --
12:31:22  13   I'm sorry.  We use the same equipment in most cases.
12:31:24  14        Q.   The same equipment, okay.  And what's
12:31:27  15   "Traffic Hosting Fees"?
12:31:38  16        A.   I think it's important to clarify that
12:31:41  17   unlike certain other internet services, Telegram
12:31:51  18   doesn't use -- or doesn't rely only on the help of
12:32:08  19   cloud-hosting platforms, such as AWS, to maintain its
12:32:17  20   operations, and, like, the vast majority of servers
12:32:26  21   that we use is owned by ourselves, and since we own
12:32:34  22   it, this equipment, ourselves we also have to pay to
12:32:44  23   internet providers, you know, providers of telecoms,
12:32:49  24   providers of connectivity to be able to make sure that
12:32:57  25   our servers are accessible by our users globally.
```

53

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:33:03 | 1 | Q.   And so is that traffic hosting fees, just |
| 12:33:06 | 2 | to get an answer to my question? |
| 12:33:07 | 3 | A.   Yes. |
| 12:33:08 | 4 | Q.   Okay, thanks. |
| 12:33:09 | 5 | So what I'm seeing from page 1 is that |
| 12:33:12 | 6 | approximately 41 percent of costs were spent on |
| 12:33:19 | 7 | equipment between January 2018 and January 2019, and |
| 12:33:23 | 8 | then 38 percent in the next page, which you said is up |
| 12:33:29 | 9 | to November 2019, correct? |
| 12:33:30 | 10 | A.   Yeah. |
| 12:33:31 | 11 | Q.   Okay.  So is it fair to say that |
| 12:33:34 | 12 | approximately 40 percent of the expenses of Telegram |
| 12:33:37 | 13 | are in equipment? |
| 12:33:37 | 14 | A.   That is fair. |
| 12:33:38 | 15 | Q.   Okay.  And why have you never charged |
| 12:33:41 | 16 | users a fee for using Telegram? |
| 12:33:44 | 17 | MR. DRYLEWSKI:  Objection; scope. |
| 12:34:09 | 18 | THE WITNESS:  We have a very long-term |
| 12:34:11 | 19 | vision for Telegram and we have been focused on |
| 12:34:14 | 20 | growth, and the ways our service can be used by more |
| 12:34:34 | 21 | and more people, we thought that charging a fee could |
| 12:34:39 | 22 | have been detrimental to growth. |
| 12:34:50 | 23 | As you may know, none of the other |
| 12:34:54 | 24 | competing messaging apps are charging fees from their |
| 12:34:58 | 25 | users, with the exception of really small niche ones, |

54

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:35:05   1   and I would say it wouldn't be sensible, commercially
12:35:11   2   and strategically, to start charging users.
12:35:15   3   BY MR. TENREIRO:
12:35:15   4        Q.   You would say it would or would not be?
12:35:18   5             MR. DRYLEWSKI:  I think he said "would not
12:35:19   6   be."
12:35:20   7             MR. TENREIRO:  Okay, because I saw
12:35:22   8   "would," that's why I was clarifying.
12:35:25   9             THE WITNESS:  Thank you.
12:35:26  10   BY MR. TENREIRO:
12:35:26  11        Q.   It would not be, okay.
12:35:29  12             Up until the end of December 2017, since
12:35:32  13   it was not charging fees, was Telegram generating any
12:35:36  14   other sources of revenue, such as ads or anything
12:35:39  15   else?
12:35:39  16             MR. DRYLEWSKI:  Objection; scope.
12:35:52  17             THE WITNESS:  We contemplated several
12:35:54  18   potential revenue streams for Telegram and we
12:35:58  19   considered that the ad-driven monetization could be
12:36:09  20   very profitable; however, since we are a small team
12:36:29  21   and limited in the resources that we have available
12:36:31  22   in terms of talent and time, we decided to focus on
12:36:44  23   other projects and return to these other potential
12:37:08  24   revenue streams -- I mean the consideration or the
12:37:11  25   implementation of those -- sometime later in the
```

55

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
12:47:26  1  from the question whether you can ask the questions.
12:47:28  2           MR. TENREIRO:  Our position is these
12:47:29  3  questions about the use of the private placement funds
12:47:31  4  are within the scope of 26 and 27, and within the
12:47:34  5  scope of what Judge Castel allowed us to ask yesterday
12:47:40  6  as a 30(b)(6) witness.
12:47:40  7           MR. DRYLEWSKI:  We are going to reserve
12:47:41  8  our rights to object to that characterization.
12:47:44  9  But there is no need to bog this down.  You can ask
12:47:48 10  the questions, the witness is going to answer them,
12:47:48 11  and if we have a dispute later about whether that was
12:47:50 12  within or without the scope of these topics, we can
12:47:53 13  discuss it then.
12:47:54 14           MR. TENREIRO:  Fair enough.
12:47:55 15  BY MR. TENREIRO:
12:47:55 16      Q.   Mr. Durov, so how much money has Telegram
12:47:59 17  spent since October -- since the letter to the
12:48:01 18  investors to today on equipment for the TON Blockchain
12:48:07 19  specifically?
12:48:08 20           MR. DRYLEWSKI:  Objection; scope.
12:48:10 21           MR. TENREIRO:  And, again, I disagree that
12:48:13 22  this is outside of the scope.  This is squarely within
12:48:15 23  the scope of 26 and 27.
12:48:17 24           MR. DRYLEWSKI:  Same response.
12:48:29 25           THE WITNESS:  Well, due to the fact that
```

62

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:48:31 | 1 | we use the same equipment and same suppliers for |
| 12:48:35 | 2 | equipment for both Telegram Messenger and TON, |
| 12:48:45 | 3 | it's hard to make this distinction. |
| 12:48:57 | 4 | I would assume it's -- well, it's fair to |
| 12:49:10 | 5 | say that a substantial part of the equipment costs |
| 12:49:29 | 6 | supported Telegram Messenger because Telegram is a |
| 12:49:44 | 7 | large, popular service; however, we did use a lot of |
| 12:49:52 | 8 | equipment for TON, you know, to be able to stress-test |
| 12:50:01 | 9 | it properly and also in order to stress-test the new |
| 12:50:23 | 10 | applications for TON that we are currently working on. |
| 12:50:28 | 11 | BY MR. TENREIRO: |
| 12:50:28 | 12 | Q.   How much money has been spent in equipment |
| 12:50:31 | 13 | since October 2019? |
| 12:50:32 | 14 | MR. DRYLEWSKI:  And we'll just reserve our |
| 12:50:35 | 15 | respective rights on all of this, okay.  I don't want |
| 12:50:39 | 16 | to bog you down. |
| 12:50:40 | 17 | MR. TENREIRO:  Okay. |
| 12:50:53 | 18 | THE WITNESS:  Well, my estimate would be |
| 12:51:08 | 19 | around -- somewhere around $10 million about. |
| 12:51:15 | 20 | BY MR. TENREIRO: |
| 12:51:15 | 21 | Q.   Okay.  And if you wanted to -- I'm sorry. |
| 12:51:18 | 22 | Were you finished? |
| 12:51:20 | 23 | A.   Or slightly less.  I mean, I think it's |
| 12:51:22 | 24 | possible that we spent that amount of money. |
| 12:51:23 | 25 | Q.   Okay.  If you wanted to get not an |

63

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:58:33  1   expenses, so ...
12:58:34  2        Q.   Okay.  So the more substantial share is
12:58:38  3   the core team, what you've described as the core team?
12:58:40  4        A.   Correct.
12:58:41  5        Q.   Okay.  But the core team also includes
12:58:44  6   coders and programmers, right?
12:58:47  7        A.   That's right.
12:58:47  8        Q.   Okay.  And today, do the coders and
12:58:52  9   programmers work on both Telegram Messenger and
12:58:56 10   TON Blockchain, or do some do only one?  How is that
12:59:00 11   broken up?
12:59:07 12        A.   So the engineers we employ are high-scale,
12:59:13 13   multifaceted professionals that are used to work on
12:59:27 14   a wide range of tasks and projects, and I would say
12:59:37 15   that pretty much the entire team, the entire
12:59:45 16   engineering team, has been involved in the development
12:59:47 17   of TON and its applications.
12:59:53 18        Q.   But also Telegram Messenger, at least at
12:59:56 19   various times; is that correct?
12:59:57 20        A.   Yes.
12:59:57 21        Q.   Okay.  Let me just ask you one more before
13:00:04 22   we go off the record.  The logo for Telegram is
13:00:08 23   a little paper airplane; is that correct?
13:00:11 24        A.   That's right.
13:00:11 25        Q.   Okay.  And do you have copyright over that
```

69

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
13:03:14   1   it's logical to assume that we have tried to register
13:03:24   2   the logo in most developed countries and significant
13:03:34   3   markets in order not to have bad actors trying to scam
13:03:42   4   users into believing they're downloading the messaging
13:03:52   5   app that we created.
13:03:55   6                MR. TENREIRO:  Okay.  Good time to go off?
13:03:57   7                MR. DRYLEWSKI:  Yes.
13:03:57   8                MR. TENREIRO:  Let's go off the record.
13:04:00   9                THE WITNESS:  Okay, thank you.
13:04:01  10                THE VIDEOGRAPHER:  We are going off the
13:04:02  11   record.  The time is 1:03.
13:04:04  12                (Lunch break taken.)
13:53:32  13                THE VIDEOGRAPHER:  We are back on record.
13:53:34  14   The time is 1:52.
13:53:36  15                MR. TENREIRO:  Thank you.
13:53:37  16   BY MR. TENREIRO:
13:53:37  17        Q.   Mr. Durov, at some point -- I'm sorry,
13:53:41  18   are you ready to proceed?
13:53:42  19        A.   Yes.
13:53:42  20        Q.   Okay, sorry.
13:53:44  21             At some point in 2017 and 2018, Telegram
13:53:47  22   raised funds from investors; is that correct?
13:53:49  23        A.   Yes.
13:53:49  24        Q.   And how much money was raised?
13:54:09  25        A.   Well, as a result of the private placement
```

72

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:54:12 | 1 | conducted in 2018, we raised $1.7 billion. |
| 13:54:23 | 2 | Q.   And whose idea was it to raise funds from |
| 13:54:26 | 3 | investors? |
| 13:54:37 | 4 | A.   I think it was my idea that I came to as |
| 13:54:54 | 5 | a result of discussions with my peers and other third |
| 13:55:03 | 6 | parties. |
| 13:55:04 | 7 | Q.   Other?  Third parties, okay. |
| 13:55:09 | 8 | A.   Yes. |
| 13:55:09 | 9 | Q.   Let me ask you just to go back on the |
| 13:55:12 | 10 | 1.7 billion.  How much of the 1.7 billion has Telegram |
| 13:55:15 | 11 | actually received from investors?  Has it received all |
| 13:55:18 | 12 | of it? |
| 13:55:18 | 13 | A.   Yes. |
| 13:55:18 | 14 | Q.   Okay.  And it received all of it in 2018; |
| 13:55:21 | 15 | is that correct? |
| 13:55:21 | 16 | A.   Yes, I believe so. |
| 13:55:22 | 17 | Q.   Okay.  Since 2018, has Telegram raised any |
| 13:55:28 | 18 | other funds from investors? |
| 13:55:32 | 19 | MR. DRYLEWSKI:  Objection; form. |
| 13:55:33 | 20 | Just to clarify, relating to TON? |
| 13:55:38 | 21 | MR. TENREIRO:  In any form. |
| 13:55:40 | 22 | MR. DRYLEWSKI:  Okay, thank you. |
| 13:55:41 | 23 | MR. TENREIRO:  Thank you. |
| 13:55:42 | 24 | THE WITNESS:  No, I don't think so. |
| | 25 | /// |

73

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:55:44 | 1 | BY MR. TENREIRO: |
| 13:55:44 | 2 | Q.   Okay.  I think you said it was your idea, |
| 13:55:47 | 3 | after consultation with advisors and third parties, |
| 13:55:49 | 4 | to raise the funds.  Why did you want to raise funds |
| 13:55:54 | 5 | from investors? |
| 13:55:56 | 6 | MR. DRYLEWSKI:  Objection; form. |
| 13:55:58 | 7 | Mischaracterizes the testimony; he didn't say |
| 13:56:00 | 8 | "advisors." |
| 13:56:29 | 9 | THE WITNESS:  Our plan was to create |
| 13:56:31 | 10 | a scaleable, proof-of-stake blockchain network. |
| 13:56:42 | 11 | In a proof-of-stake blockchain architecture, it is |
| 13:56:47 | 12 | very important to have a lot of value locked in |
| 13:56:52 | 13 | validator stakes.  In order to guarantee that this |
| 13:56:59 | 14 | value would be there, we would have to have some |
| 13:57:09 | 15 | people investing substantial amounts of funds in |
| 13:57:20 | 16 | exchange for Grams in the future, otherwise the |
| 13:57:30 | 17 | security and stability of the network would have been |
| 13:57:35 | 18 | affected because smaller amounts of value locked in |
| 13:57:46 | 19 | validator stakes could create an incentive for |
| 13:57:51 | 20 | potential validators to sign incorrect transactions, |
| 13:57:55 | 21 | particularly in cases where those transactions involve |
| 13:58:01 | 22 | large amounts of value. |
| 13:58:05 | 23 | MR. DRYLEWSKI:  Just to check, are you all |
| 13:58:06 | 24 | right with this air that seems to have just gone on? |
| 13:58:09 | 25 | THE VIDEOGRAPHER:  Yeah.  I mean, we are |

74

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:58:11 | 1 | fine but it is in the background.  There's nothing |
| 13:58:13 | 2 | really we can do. |
| 13:58:14 | 3 | MR. DRYLEWSKI:  Okay.  I don't know if |
| 13:58:15 | 4 | there is anything we can do about it. |
| 13:58:18 | 5 | MS. CHARMANI:  We checked and there's not. |
| 13:58:20 | 6 | MR. DRYLEWSKI:  Sorry. |
| 13:58:26 | 7 | THE VIDEOGRAPHER:  It just got louder. |
| 13:58:28 | 8 | BY MR. TENREIRO: |
| 13:58:28 | 9 | Q.   So let me ask you why 1.7 billion as |
| 13:58:34 | 10 | opposed to some other amount? |
| 13:58:48 | 11 | A.   Well, if the amount was to be too low, |
| 13:58:55 | 12 | as I was just explaining, this would lead to |
| 13:59:06 | 13 | a situation where the validators wouldn't have to |
| 13:59:15 | 14 | have -- to risk much when they validated transactions. |
| 13:59:20 | 15 | And in that sense, the larger the amount, the more |
| 13:59:23 | 16 | secure the network because it can allow for secure |
| 13:59:33 | 17 | transfer of larger amounts of value. |
| 13:59:39 | 18 | Q.   So does this -- you talked about the |
| 13:59:42 | 19 | security and the stability of the -- when you said |
| 13:59:44 | 20 | "the network," are you referring to the TON |
| 13:59:47 | 21 | Blockchain? |
| 13:59:47 | 22 | A.   Correct. |
| 13:59:48 | 23 | Q.   Okay.  So the security and stability of |
| 13:59:50 | 24 | the TON Blockchain, is it fair to say, would be |
| 13:59:55 | 25 | affected if you don't have a certain number of |

75

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
13:59:57   1   validators?  Is that what you mean?
13:59:59   2              MR. DRYLEWSKI:  Objection to form.
14:00:01   3              THE WITNESS:  Not -- that was not exactly
14:00:06   4   what I was talking about.  I was thinking more about
14:00:17   5   the aggregate value of all stakes deposited by all
14:00:22   6   validators regardless of the number of validators.
14:00:27   7   BY MR. TENREIRO:
14:00:28   8        Q.   Okay.  So the number of -- so just to make
14:00:31   9   sure the record is clear, I can deposit stakes but not
14:00:34  10   actually be selected as a validator; is that correct?
14:00:37  11        A.   That is also possible.
14:00:38  12        Q.   Okay.  So when you say -- so is it fair to
14:00:41  13   say, then, that the security and stability of the
14:00:44  14   network depends, at least in part, on there being
14:00:47  15   a lot of stakes deposited to act -- to potentially act
14:00:53  16   as validators; is that what you meant?
14:01:01  17              MR. DRYLEWSKI:  Objection to form.
14:01:01  18              THE WITNESS:  No.  I meant that the
14:01:04  19   aggregate value of all stakes that were both deposited
14:01:10  20   and accepted in validation should be high enough for
14:01:15  21   the network to be able to process large transactions
14:01:21  22   securely.
14:01:22  23   BY MR. TENREIRO:
14:01:22  24        Q.   Both the stakes that are both deposited
14:01:25  25   and accepted needs to be high enough; is that correct?
```

76

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
14:01:28   1        A.   Yes.  Yes, because it is important to have
14:01:41   2   validators running the network that are risking
14:01:48   3   substantial amounts of value in case they decide
14:01:54   4   to act in bad faith.
14:01:57   5        Q.   So if I -- what if I -- what if you sell
14:02:00   6   a certain number of Grams but none of the people to
14:02:03   7   whom you sold it decide to deposit them or stake them
14:02:09   8   in some way; would that achieve the security and
14:02:13   9   stability that you need for the TON Blockchain to
14:02:18  10   operate as you envisioned it?
14:02:20  11             MR. DRYLEWSKI:  Objection to form.
14:02:21  12             And just to clarify for the record, are
14:02:22  13   you asking this in his 30(b)(6) capacity?
14:02:24  14             MR. TENREIRO:  I am.  I am asking about
14:02:25  15   the purpose of the offering and with the vision for
14:02:30  16   use of -- you know, of the offering.
14:02:34  17             THE WITNESS:  Would you remind repeating
14:02:36  18   the question?
14:02:37  19   BY MR. TENREIRO:
14:02:37  20        Q.   Yes.  If you sold a certain number of
14:02:39  21   Grams but none of the people to whom you sold it to
14:02:42  22   actually deposited them, or otherwise staked them,
14:02:47  23   none of them did that, would that achieve the security
14:02:51  24   and stability that you envisioned for the TON
14:02:55  25   Blockchain when you conducted the offering?
```

                                                                    77

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
14:02:56   1              MR. DRYLEWSKI:  Same objection.
14:03:01   2              THE WITNESS:  Well, if we have to imagine
14:03:03   3    a hypothetical scenario under which no Gram-holders,
14:03:11   4    or future Gram-holders are willing to act as
14:03:17   5    validators, it would make the launch impossible.
14:03:23   6    BY MR. TENREIRO:
14:03:24   7         Q.   Okay.  And what number of separate
14:03:33   8    entities or individuals that are depositing or staking
14:03:38   9    their Grams and willing to act as validators in
14:03:44  10    your -- do you think you need to have so that you get
14:03:47  11    the security and stability for the network that you
14:03:50  12    envisioned?
14:03:51  13              MR. DRYLEWSKI:  Objection to form, and
14:03:54  14    objection scope.
14:04:30  15              THE WITNESS:  Well, so you're right that
14:04:33  16    in addition to the importance of having a substantial
14:04:40  17    amount of value locked in validator stakes, it is also
14:04:50  18    important to have a certain number of independent
14:04:53  19    validators running the network and signing the
14:05:03  20    transactions.  What exact number is sufficient in this
14:05:11  21    regard is a, for the most part, theoretical and
14:05:18  22    philosophical question, and I think there have been a
14:05:22  23    lot of publications on that topic by the blockchain
14:05:32  24    community.
14:05:41  25              Purely theoretically, if you have to come
```

78

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:05:44 | 1 | up with the minimum -- minimal sufficient number of |
| 14:05:52 | 2 | validators to run a network like this and for the |
| 14:05:56 | 3 | network to still qualify as a decentralized network, |
| 14:06:00 | 4 | you would need at least several completely independent |
| 14:06:03 | 5 | validators.  And the more validators you have, the |
| 14:06:07 | 6 | better. |
| 14:06:12 | 7 | BY MR. TENREIRO: |
| 14:06:12 | 8 | Q.   Can you get any more specific than |
| 14:06:14 | 9 | "at least several"? |
| 14:06:16 | 10 | Or let me ask it this way:  What's your |
| 14:06:19 | 11 | own personal view as to what, you know, a good |
| 14:06:22 | 12 | starting number would be?  Just Mr. Durov's view. |
| 14:06:58 | 13 | A.   If you look at some other blockchain |
| 14:07:02 | 14 | networks, you could see that they are able to maintain |
| 14:07:12 | 15 | decentralization even when the parties running the |
| 14:07:21 | 16 | networks -- in the case of Bitcoin, those are called |
| 14:07:26 | 17 | miners -- join their efforts into pools, and if you |
| 14:07:39 | 18 | look at the structure of these networks based on the |
| 14:07:47 | 19 | number of independent pools are out there, you will |
| 14:07:51 | 20 | see that there are several pools like that, the joint |
| 14:08:05 | 21 | efforts of which are sufficient to sign any new block |
| 14:08:13 | 22 | generated in the network. |
| 14:08:17 | 23 | If you look at some other networks, such |
| 14:08:20 | 24 | as the more recently launched EOS, I think they have |
| 14:08:33 | 25 | 20-something validators in their delegated |

79

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

14:08:38  1    proof-of-stake network.  So I think that in terms of

14:08:45  2    public perception and reputation in the community,

14:08:52  3    it would be good to have more than 20 validators at

14:08:56  4    launch.

14:08:57  5         Q.   Is it fair to say that you were preparing

14:09:00  6    to launch the TON Blockchain at some point in October

14:09:05  7    of 2019 before this litigation began?

14:09:15  8         A.   Did we -- sorry, can you repeat the

14:09:18  9    question?

14:09:19 10         Q.   Yeah.  Is it fair to say that Telegram was

14:09:22 11    preparing to launch the TON Blockchain at some point

14:09:25 12    in October 2019?

14:09:26 13         A.   That's exactly true.

14:09:26 14         Q.   And how many validators were you expecting

14:09:30 15    to have upon the launch at that point?

14:09:37 16         A.   We were expecting to have more than

14:09:40 17    20 validators.  I think we received interest from --

14:09:49 18    well, at least several validators -- potential

14:09:53 19    validators, it may be a dozen, and we were actively,

14:09:58 20    you know, processing such inquiries and requests for

14:10:05 21    validation in early October when this process was

14:10:10 22    interrupted by this started litigation.

14:10:14 23         Q.   And so the -- what was the basis for your

14:10:17 24    expectation of how many validators you were going to

14:10:21 25    have?

80

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14:19:13   1        A.   I remember them expressing an interest.
14:19:16   2   That's at least how I understand -- understood them,
14:19:19   3   yes.
14:19:19   4        Q.   Okay.  And in terms of the offering
14:19:22   5   process for the private placement, did Telegram have
14:19:26   6   any sort of policy about inquiring from potential
14:19:31   7   investors as to whether they had an intention or an
14:19:34   8   interest in acting as validators on the TON
14:19:38   9   Blockchain?
14:19:38  10             MR. DRYLEWSKI:  Objection; scope.
14:19:41  11             MR. TENREIRO:  So this is within the scope
14:19:42  12   of question -- you know, the manner in which the offer
14:19:44  13   was conducted, how the offer was conducted --
14:19:44  14             MR. DRYLEWSKI:  Where is that?
14:19:51  15             MR. TENREIRO:  -- were there scripts, what
14:19:53  16   criteria of reasons were used to decide.
14:19:55  17             MR. DRYLEWSKI:  Which topic number?
14:19:57  18             MR. TENREIRO:  The last page.  I don't
14:19:58  19   know if you want to call that topic 32 or how you want
14:20:10  20   to refer to it.
14:20:11  21             MR. DRYLEWSKI:  Objection withdrawn.
14:20:13  22   Thank you.
14:20:14  23             MR. TENREIRO:  Okay.
14:20:24  24             THE WITNESS:  We didn't have a specific
14:20:25  25   policy that would oblige our employees to ask these

                                                            85

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
14:20:34   1   questions to investors or ask the investors to fill
14:20:40   2   out a form involving such questions; we preferred to
14:21:11   3   enter into purchase agreements with well-known,
14:21:23   4   sophisticated investors, many of whom had an
14:21:31   5   established name in the technology sector.  We assumed
14:21:43   6   that -- given the fact that becoming a validator is
14:21:57   7   actually not unlike something as simple as setting up
14:22:03   8   a server in a data center in a secure way, we assumed
14:22:19   9   that a lot of our purchasers would be able to act as
14:22:33  10   validators if they chose to.
14:22:37  11   BY MR. TENREIRO:
14:22:37  12        Q.   Thank you, Mr. Durov.  I think the court
14:22:40  13   reporter -- I want to clarify the beginning of your
14:22:42  14   answer.  I think she wrote down, "We did have
14:22:45  15   a specific policy that would oblige ..."
14:22:49  16        A.   Ah, I'm sorry; we did not.
14:22:52  17        Q.   You did not.  Thank you.
14:22:58  18        So I started this line of question by
14:23:00  19   asking you why you did a public offering -- I'm sorry,
14:23:04  20   why you did a private placement in 2018, and I think
14:23:09  21   you discussed your need for people, and validators for
14:23:17  22   security and stability.  Is that correct?  Is that one
14:23:19  23   of the reasons why you raised funds from investors?
14:23:23  24        A.   This is --
14:23:24  25             MR. DRYLEWSKI:  Objection --
```

86

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:26:48 | 1 | had as a result of this opportunity cost could be at |
| 14:26:56 | 2 | least partially compensated by the funds that Telegram |
| 14:27:06 | 3 | Messenger could receive and spend in accordance -- as |
| 14:27:19 | 4 | a result of the private placement in accordance with |
| 14:27:22 | 5 | the Use of Funds section that we included in the |
| 14:27:28 | 6 | offering materials for private purchasers. |
| 14:27:35 | 7 |     Q.   Okay.  So just to make sure I understand, |
| 14:27:38 | 8 | is it fair to say that one of the reasons you decided |
| 14:27:40 | 9 | to raise funds was to fund Telegram Messenger at some |
| 14:27:42 | 10 | point? |
| 14:27:44 | 11 |     MR. DRYLEWSKI:  Objection to form. |
| 14:28:10 | 12 |     THE WITNESS:  I think one of the reasons |
| 14:28:12 | 13 | why we thought it was appropriate to spend part of |
| 14:28:18 | 14 | the funds resulting from the private placement on |
| 14:28:27 | 15 | supporting Telegram was to compensate for the |
| 14:28:30 | 16 | opportunity costs that I just described. |
| 14:28:51 | 17 |     It is also worth mentioning that at the |
| 14:28:53 | 18 | time of launch, the size and the public perception of |
| 14:29:28 | 19 | the Telegram brand could affect the perception of this |
| 14:29:42 | 20 | new decentralized network which has been built by the |
| 14:29:47 | 21 | same team.  So you can say that if there are many |
| 14:30:04 | 22 | users who are happy with Telegram, those users would |
| 14:30:19 | 23 | likely be interested to see if they can find a project |
| 14:30:33 | 24 | developed by the same team interesting, even |
| 14:30:39 | 25 | recognizing the fact that this project will not be |

88

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14:30:46  1   supported by the same team post launch.

14:30:57  2         In a similar manner, a large part of the

14:31:08  3   users that enjoyed the services of the first company

14:31:14  4   I built, VK, later decided to try Telegram, an

14:31:30  5   unrelated service that, however, has some of the same

14:31:36  6   people as its creators.  So it would be fair to assume

14:31:50  7   that spending some of the funds on sustaining and

14:32:01  8   developing the Telegram brand would be -- spend some

14:32:17  9   of the funds for sending and developing the Telegram

14:32:21 10   brand pre-launch -- I mean before the launch of TON --

14:32:24 11   would be helpful for the successful launch of TON and

14:32:31 12   could promote the consumptive use of Grams indirectly.

14:32:35 13   BY MR. TENREIRO:

14:32:35 14        Q.   Thank you.  Sorry, I didn't mean to

14:32:39 15   imply -- just picking up on the earlier part of your

14:32:42 16   answer, I didn't mean to imply there was anything

14:32:45 17   inappropriate with using funds for Telegram.  I'm just

14:32:47 18   trying to ask the basic question of why Telegram

14:32:50 19   raised funds in 2017.

14:32:52 20         So is it fair to say that one of the

14:32:54 21   reasons was to fund the operations of Telegram

14:32:58 22   Messenger?  And I'll get to the other reasons.

14:33:01 23   I'm just trying to understand all of the reasons,

14:33:02 24   that's all.

14:33:07 25        A.   I think we are risking confusing the

89

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14:33:11  1   reason and the consequence here because the reason

14:33:15  2   here was to create a new-generation blockchain

14:33:27  3   platform that our users asked us for, as we understood

14:33:31  4   their requests.  When we started to think about this

14:33:37  5   idea, we realized that it should be a proof-of-stake

14:33:41  6   system if we want to achieve the usability and speed

14:33:47  7   that our users are accustomed to.

14:33:51  8                Based on that, we realized that we would

14:33:54  9   have to come up with a way of eventually distributing

14:34:04 10   Grams, and we decided to enter the purchase agreements

14:34:09 11   with private purchasers, in order to have a sufficient

14:34:24 12   amount of value locked in validator stakes in order

14:34:29 13   for this blockchain to be secure, and only after that,

14:34:37 14   realizing that we now have access to certain funds and

14:34:46 15   at the same time we are limited in our ability to

14:34:49 16   pursue alternative potential revenue streams, due

14:35:02 17   to the fact that we are busy building TON Blockchain,

14:35:07 18   we decided that we could use some of the funds for

14:35:15 19   some of the purposes that I described, and we made it

14:35:19 20   very clear to all the purchasers in the private

14:35:24 21   placement as to how we would be using the proceeds

14:35:28 22   from the offering.

14:35:32 23        Q.   And going back to another part of your

14:35:34 24   earlier answer about how you thought -- I'm

14:35:38 25   paraphrasing here but please correct me at the end --

90

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14:35:42  1    how you thought that spending some funds on Messenger

14:35:46  2    might be beneficial to TON, you talked about an

14:35:51  3    analogy between VK and then people moving over from VK

14:35:55  4    to Messenger.

14:35:56  5             Do you recall that we just talked about

14:35:57  6    that a second ago?

14:35:59  7        A.   Yes.

14:35:59  8        Q.   Would you describe that as sort of like

14:36:01  9    brand development, I guess, or is that what you're

14:36:05 10    talking about there?

14:36:14 11        A.   I'm talking primarily about credibility

14:36:17 12    and trust, because these things are very important in

14:36:26 13    the distributed-ledger community.  I think it's

14:36:33 14    important to establish this trust by consistently

14:36:42 15    delivering high-quality products so that the new

14:37:13 16    decentralized network, at launch, could enjoy

14:37:21 17    a certain level of credibility and interest coming

14:37:28 18    from this community.

14:37:32 19        Q.   The credibility based on you and your

14:37:36 20    team's past history of delivering good products;

14:37:41 21    is that fair to say?

14:37:45 22        A.   I'm speaking more -- mainly about, for

14:37:48 23    example, things like the security of the TON

14:37:55 24    Blockchain post launch.  It would be fair to assume

14:38:03 25    that some people would be reluctant to start

                                                          91

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14:38:13  1    transferring substantial amounts of funds using a new

14:38:17  2    network unless they have a certain level of confidence

14:38:29  3    that the original team of developers that created the

14:38:32  4    core code of this network is a group of talented

14:38:39  5    individuals that have a proven track record.

14:38:43  6             Q.   Okay.  So going back to the offering, what

14:38:50  7    are the dates of the offering?  What were the dates of

14:38:53  8    the offering, the beginning and the end?

14:38:56  9             MR. DRYLEWSKI:  Objection to form.

14:38:59 10    Calls for a legal conclusion.

14:39:15 11             THE WITNESS:  I hope I had it with me

14:39:16 12    somewhere, but the top of my head, I can say that the

14:39:21 13    first round of the offering took place in January and

14:39:32 14    I believe my colleagues started to have certain

14:39:36 15    discussions with investors in early December.

14:39:41 16    BY MR. TENREIRO:

14:39:42 17             Q.   Of?  I'm sorry, of '17?

14:39:45 18             A.   Yes.

14:39:46 19             Q.   Okay.

14:39:47 20             A.   It may have been a little earlier than

14:39:50 21    that but just preliminary discussions.  The main work

14:39:58 22    started in December.  It was concluded in January for

14:40:02 23    the first round.

14:40:20 24             The second round was completely signed,

14:40:32 25    I think, one and a half months later approximately,

                                                                  92

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 14:52:55 | 1 | capacity as the corporate representative for Telegram, |
| 14:52:57 | 2 | is that the same basis for Telegram's understanding |
| 14:52:59 | 3 | that it had $850 million in signed purchase |
| 14:53:03 | 4 | agreements, or is there something else? |
| 14:53:28 | 5 |     A.   Internally, everybody in the team who was |
| 14:53:33 | 6 | related to the private placement had the understanding |
| 14:53:35 | 7 | of the importance of being able to say how many |
| 14:54:00 | 8 | purchase agreements we have signed by the other |
| 14:54:03 | 9 | parties, and for what amount these agreements -- and |
| 14:54:35 | 10 | for what amount these agreements translate to, so |
| 14:54:47 | 11 | I remember it was clearly understood by everybody |
| 14:54:58 | 12 | involved. |
| 14:54:59 | 13 |         THE COURT REPORTER:  Sorry, it was or |
| 14:55:01 | 14 | wasn't? |
| 14:55:01 | 15 |         MR. DRYLEWSKI:  I think he said "was." |
| 14:55:01 | 16 |         THE WITNESS:  Was. |
| 14:55:03 | 17 |         THE COURT REPORTER:  Thanks. |
| 14:55:03 | 18 | BY MR. TENREIRO: |
| 14:55:03 | 19 |     Q.   And when you said everybody in the team |
| 14:55:07 | 20 | was related to the private placement, can you just |
| 14:55:08 | 21 | tell me who those people are, that team? |
| 14:55:12 | 22 |     A.   Yeah.  At that point those were Ilia, |
| 14:55:15 | 23 | Shyam and John. |
| 14:55:18 | 24 |     Q.   Ilia, Shyam and John, okay. |
| 14:55:20 | 25 |         Is it fair to say that as of March 2018, |

                                                          99

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
14:55:29   1   as at the end of March 2018, Telegram had not actually
14:55:32   2   received $850 million from the Stage A purchasers?
14:55:49   3           A.   Yes.  As I said, some of the purchasers
14:55:51   4   took time in transferring funds, but at that point it
14:56:05   5   seemed natural because some of them would have
14:56:11   6   problems with -- or additional questions coming from
14:56:16   7   their banks, some of them would refer to other reasons
14:56:21   8   why it would take additional time, and given the fact
14:56:32   9   that we believed we had credible funds and individuals
14:56:47  10   sign those agreements, we had no grounds to believe
14:56:51  11   that they would act to breach the agreements,
14:56:54  12   particularly after having successfully, quickly,
14:57:03  13   concluding the first stage of the private placement
14:57:06  14   where also some of the purchasers might have taken
14:57:14  15   a couple of additional weeks to transfer, but
14:57:22  16   eventually did transfer in a reasonable time frame.
14:57:29  17           So based on our experience, we believed
14:57:31  18   that having all those purchase agreements signed by
14:57:33  19   the purchasers means that we have the comfort of
14:57:44  20   knowing those funds will eventually be transferred, or
14:57:48  21   would eventually be transferred.
14:57:55  22           Those are legally binding agreements and
14:58:01  23   if we decided to do so, we could try to start
14:58:16  24   a litigation with each of the purchasers that failed
14:58:20  25   to meet their obligations, and that was something
```

100

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:58:23 | 1 | I considered at that point in time; however, we |
| 14:58:38 | 2 | decided that it would be easy and beneficial, more |
| 14:58:46 | 3 | beneficial, for all parties involved for us just to |
| 14:58:49 | 4 | give them additional time.  After that time is up, |
| 14:58:58 | 5 | give the same opportunity to certain other purchasers. |
| 14:59:03 | 6 | Q.   Okay.  Of the 850 million that had been |
| 14:59:06 | 7 | signed by the end of March 2018, how much had Telegram |
| 14:59:12 | 8 | actually received by the end of March of 2018? |
| 14:59:32 | 9 | A.   It's hard to say.  We could have missed |
| 14:59:42 | 10 | a couple of hundred, maximum 300, million.  I believe |
| 14:59:46 | 11 | you have all the records, the banking records, that |
| 14:59:49 | 12 | correspond to the incoming payments, so I think it |
| 14:59:55 | 13 | could be restored. |
| 14:59:57 | 14 | Q.   It could be, I'm sorry, what? |
| 15:00:00 | 15 | A.   Restored.  Sorry. |
| 15:00:01 | 16 | Q.   Restored, okay. |
| 15:00:03 | 17 | Okay.  So the banking records, you're |
| 15:00:05 | 18 | saying, would reflect how much had come in by the end |
| 15:00:08 | 19 | of March of 2018? |
| 15:00:09 | 20 | A.   Yeah. |
| 15:00:09 | 21 | Q.   But is it fair to say that Telegram, even |
| 15:00:12 | 22 | though it hadn't received the funds from the purchase |
| 15:00:14 | 23 | agreements, considered the transaction completed |
| 15:00:18 | 24 | because the purchase agreement had been signed by |
| 15:00:21 | 25 | these individuals? |

101

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
15:00:21  1              MR. DRYLEWSKI:  Objection to form.
15:00:43  2              THE WITNESS:  In my business experience,
15:00:45  3    when you enter into an agreement with a credible
15:00:49  4    party, it sometimes takes more time than expected to
15:00:54  5    actually transfer funds.  Particularly in such a novel
15:01:04  6    area here, which is blockchain related, one could
15:01:15  7    expect for bank transfers to take more time than it
15:01:21  8    usually does.  That is why we had no reason to believe
15:01:29  9    that those purchasers who didn't transfer the amounts
15:01:40 10    that they owed us in March would fail to transfer
15:01:52 11    those funds later that year.
15:01:58 12              It is also possible that some of those
15:01:59 13    purchasers could have eventually transferred the funds
15:02:09 14    at a very late date, but we didn't want for this
15:02:21 15    process to drag for a longer time than is necessary.
15:02:29 16    BY MR. TENREIRO:
15:02:30 17         Q.   Right.  I'm sorry, are you finished?
15:02:32 18         A.   Yeah.
15:02:33 19         Q.   Okay.
15:02:33 20         A.   So we offered some of those purchasers
15:02:36 21    eventually to cancel those purchase agreements.
15:02:38 22         Q.   Right.  So just setting aside for a second
15:02:41 23    whether you thought that people would or would not
15:02:46 24    pay, I think I'm trying to ask a slightly different
15:02:48 25    question.
```

102

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:02:50 | 1 | On March 29, 2018, when you signed and |
| 15:02:53 | 2 | filled out Exhibit 42, and on page 5 you wrote that |
| 15:03:00 | 3 | 850 million had been sold and that 0 remaining to be |
| 15:03:03 | 4 | sold -- |
| 15:03:04 | 5 | A.   Mmm-hmm. |
| 15:03:04 | 6 | Q.   -- at that time is it fair to say that |
| 15:03:07 | 7 | Telegram understood that because it had signed and |
| 15:03:12 | 8 | countersigned 850 million worth of purchase |
| 15:03:15 | 9 | agreements, that at that time that's what you viewed |
| 15:03:17 | 10 | as the amount of transactions you had already entered |
| 15:03:20 | 11 | into? |
| 15:03:21 | 12 | A.   Yes. |
| 15:03:23 | 13 | MR. DRYLEWSKI:  Objection to form. |
| 15:03:23 | 14 | BY MR. TENREIRO: |
| 15:03:23 | 15 | Q.   And that was -- |
| 15:03:24 | 16 | A.   Could you repeat the question?  Maybe |
| 15:03:26 | 17 | I misunderstood. |
| 15:03:28 | 18 | Q.   Sure.  Is it fair to say that at the time |
| 15:03:30 | 19 | that you filled out and signed the form in Exhibit 42, |
| 15:03:35 | 20 | which is March 29, 2018, Telegram understood that it |
| 15:03:38 | 21 | had entered into transactions for $850 million? |
| 15:03:56 | 22 | A.   Yes, we had purchase agreements for |
| 15:04:00 | 23 | $850 million signed by both sides -- |
| 15:04:02 | 24 | Q.   Right. |
| 15:04:03 | 25 | A.   -- that is correct. |

103

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
15:04:03   1        Q.   And is it also correct that even though
15:04:06   2   you had not received the funds for all of them, you
15:04:08   3   understood that you had an agreement for that amount
15:04:12   4   of money already in place, a legal -- I think you
15:04:16   5   called it a legally binding agreement.  Is that
15:04:19   6   correct?
15:04:19   7        A.   That was our understanding, that those
15:04:25   8   parties owed us those amounts according to the
15:04:28   9   purchase agreements.
15:04:29  10        Q.   Okay.
15:04:58  11             MR. DRYLEWSKI:  While we're marking an
15:05:00  12   exhibit, can I get the time on the record, please?
15:05:03  13             THE VIDEOGRAPHER:  2:52.
15:05:05  14             MR. DRYLEWSKI:  Thank you.
15:05:08  15             MR. TENREIRO:  That's how long we've gone
15:05:10  16   on?
15:05:10  17             THE VIDEOGRAPHER:  Yes.
15:05:10  18             MR. TENREIRO:  Got it.
15:05:11  19             So this will be Exhibit 43.  It's a
15:05:16  20   purchase agreement and a cover page.
15:05:16  21             THE WITNESS:  Should I take it?
15:05:16  22             MR. TENREIRO:  She needs to mark it first.
15:05:46  23             (Exhibit 43 marked for identification.)
15:05:55  24             MR. DRYLEWSKI:  Please feel free to take
15:05:57  25   your time and read the entire document.  If there's
```

104

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:23:41   1              I think I first may have heard about it
15:23:43   2   somewhere in 2017.
15:23:44   3   BY MR. TENREIRO:
15:23:44   4        Q.   Okay.  And just for the record, what do
15:23:46   5   you understand -- I'm not asking you for legal
15:23:48   6   conclusions or anything like that, but if you had to
15:23:51   7   explain it in your own words, what do you understand
15:23:53   8   the DAO Report to be?
15:23:55   9              MR. DRYLEWSKI:  Objection to form.
15:24:32  10              THE WITNESS:  My understanding at the time
15:24:34  11   was that this DAO Report was related to a certain
15:24:43  12   token or blockchain-related offering that may have not
15:24:54  13   been done in accordance to all applicable laws and
15:24:59  14   regulations in the United States.
15:25:02  15   BY MR. TENREIRO:
15:25:03  16        Q.   And -- okay.
15:25:06  17              Now, Mr. Durov, we were discussing the
15:25:09  18   structuring of the offering -- of the private
15:25:10  19   placement, the pre-sale and the Stage A.  Do you
15:25:13  20   recall discussing that with me a few moments ago?
15:25:17  21        A.   Pre-sale and Stage A?
15:25:19  22        Q.   Right.
15:25:20  23        A.   Yeah, we discussed that.
15:25:22  24        Q.   Okay.  Was there a point in time when you
15:25:24  25   were considering raising funds that you considered
```

110

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

15:25:29  1   a different structure?  And by this I just mean
15:25:32  2   Telegram.  Was there a point in time in which Telegram
15:25:35  3   considered some other structure rather than what
15:25:37  4   actually happened, which was pre-sale plus Stage A?
15:26:02  5        A.   Yes.  I think at some early stages we
15:26:07  6   thought that a public offering, at least in certain
15:26:25  7   jurisdictions, could also be part of the process.
15:26:34  8        Q.   Public offering of what?
15:26:55  9        A.   This is a very good question that, after
15:27:06 10   being carefully studied and explored by us, eventually
15:27:09 11   led us to not engage in any public offering of that
15:27:17 12   kind, because we believed, at least as far as the
15:27:33 13   United States jurisdiction is concerned, that a public
15:27:41 14   offering of a right to receive Grams in the future
15:27:47 15   could be treated as an unregistered security.
15:28:13 16   And while there were several players in the market at
15:28:27 17   that time that were credible, or at least projected
15:28:31 18   a very credible image that have engaged in these kind
15:28:40 19   of activities, at least outside of the United States,
15:28:50 20   it was not fully clear how this -- how such an
15:29:01 21   offering could be implemented practically across all
15:29:07 22   jurisdictions in a way that would avoid us to decrease
15:29:18 23   complexity and unnecessary risks.
15:29:28 24        This is why we eventually gave up the idea
15:29:32 25   to conduct a public offering of interest in Grams.

111

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:29:44   1        Q.   When you were considering the public
15:29:47   2   offering, I think you mentioned of a right to receive
15:29:51   3   Grams in the future; is that correct?
15:29:55   4        A.   I believe that's what I said, yes.
15:29:57   5        Q.   Okay.  So can you explain what you meant
15:29:59   6   by that, when you -- so my question is, when you were
15:30:03   7   considering the public offering, contemplating
15:30:06   8   entering into purchase agreements such as the one
15:30:10   9   we just saw in Exhibit 41 -- sorry, it wasn't 41.  43.
15:30:24  10   Yeah, that's that one.
15:30:25  11        A.   Okay.
15:30:25  12        Q.   Sorry, let me start again.
15:30:27  13             When you were considering the public
15:30:29  14   option, was Telegram considering entering into
15:30:31  15   purchase agreements with members of the public such as
15:30:33  16   the one in Exhibit 43?
15:30:40  17        A.   This was a very early stage and we --
15:30:47  18   I don't believe we thought it through down to,
15:31:00  19   you know, the tiniest detail.  We knew, based on what
15:31:16  20   we saw at the market at that time, that there were
15:31:22  21   certain companies that seemed to be credible and
15:31:29  22   seemed to have attracted interest from institutional
15:31:36  23   investors that were either contemplating a public
15:31:40  24   offering or having done a public offering of that
15:31:49  25   kind.  At first we thought that might be a path
```

                                                              112

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:36:16 | 1 | MR. TENREIRO:  Yes, of course. |
| 15:36:17 | 2 | BY MR. TENREIRO: |
| 15:36:18 | 3 | Q.   To the extent Telegram had any desire to |
| 15:36:20 | 4 | raise funds, did the purpose of that fundraise change |
| 15:36:26 | 5 | in any way as the potential ways in which Telegram was |
| 15:36:31 | 6 | going to do it change? |
| 15:36:33 | 7 | MR. DRYLEWSKI:  Objection to form. |
| 15:36:48 | 8 | THE WITNESS:  I'm very sorry but I find it |
| 15:36:53 | 9 | very hard to grasp the question. |
| 15:36:54 | 10 | BY MR. TENREIRO: |
| 15:36:54 | 11 | Q.   Fair enough.  Let's break it down. |
| 15:36:56 | 12 | When you were doing the fundraising in |
| 15:36:58 | 13 | connection with Grams, there was -- at some point you |
| 15:37:01 | 14 | thought about maybe doing a public offering and you |
| 15:37:03 | 15 | settled on a private placement; is that correct? |
| 15:37:07 | 16 | MR. DRYLEWSKI:  Objection; form, |
| 15:37:12 | 17 | mischaracterizes the testimony. |
| 15:37:38 | 18 | THE WITNESS:  I'm sorry.  Was this |
| 15:37:41 | 19 | a summary of what I just said or ... |
| 15:37:44 | 20 | BY MR. TENREIRO: |
| 15:37:44 | 21 | Q.   No, no, I was asking -- let's just start |
| 15:37:47 | 22 | again. |
| 15:37:48 | 23 | So in connection with the raising of funds |
| 15:37:51 | 24 | for the TON Blockchain, you did a private placement |
| 15:37:57 | 25 | but you also considered at some point doing |

115

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15:37:59  1   potentially a public offering of some nature; is that

15:38:07  2   correct?

15:38:07  3        A.    Yes, we --

15:38:09  4        Q.    Okay.  And --

15:38:10  5        A.    We did consider a public offering at

15:38:14  6   earlier stages, yes.

15:38:15  7        Q.    Right.  And was the purpose of the public

15:38:16  8   offering the same purpose than that of the private

15:38:19  9   placement which you eventually conducted, i.e., to

15:38:23 10   raise funds for the TON Blockchain, and other

15:38:27 11   corporate purposes?

15:38:42 12        A.    Yeah, I think that these are the same --

15:38:48 13   more or less the same reasons.  In addition to those,

15:39:04 14   it has been noted that some members of the blockchain

15:39:10 15   community considered public distribution of tokens of

15:39:17 16   any kind a means to ensure a more democratic way to

15:39:37 17   distribute tokens.  I think this is -- this was a

15:39:44 18   popular theory among certain circles.

15:40:00 19             I think we were aware of this theory at

15:40:08 20   that point and it may have contributed to, you know,

15:40:15 21   our intention to do things in a way that would be

15:40:30 22   accepted by the blockchain community as reasonable and

15:40:38 23   in line with the ethos of the decentralized

15:40:49 24   philosophy.

15:40:49 25        Q.    And the blockchain -- is it fair to say

                                                              116

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 15:48:44 | 1 | offers and considered raising funds via selling |
| 15:48:48 | 2 | equity, as you write in this email?  Is that statement |
| 15:48:50 | 3 | true? |
| 15:49:01 | 4 | A.   I think we considered a number of |
| 15:49:03 | 5 | potential scenarios and selling equity was, among |
| 15:49:14 | 6 | these scenarios, was not our top option when it came |
| 15:49:27 | 7 | to raising funds.  The main option that we have been |
| 15:49:39 | 8 | exploring -- were exploring at the time was a number |
| 15:49:47 | 9 | of monetization strategies for Telegram. |
| 15:49:52 | 10 | Q.   Why was selling equity not your top |
| 15:49:55 | 11 | option? |
| 15:50:16 | 12 | A.   Because we were concerned that selling |
| 15:50:25 | 13 | equity could affect the company's integrity and its |
| 15:50:30 | 14 | values, and change the company's ethos and what it |
| 15:50:46 | 15 | stands for. |
| 15:50:51 | 16 | Q.   Okay.  If I could please direct your |
| 15:50:54 | 17 | attention to the third page.  At the bottom, the Bates |
| 15:50:57 | 18 | number is 11-40 and it's an email from you on |
| 15:51:04 | 19 | January 16, 2018, "Subject: Re: Update on the |
| 15:51:12 | 20 | Telegram/TON Sale." |
| 15:51:17 | 21 | Do you see that? |
| 15:51:18 | 22 | A.   Yeah. |
| 15:51:18 | 23 | Q.   Okay.  And then you say -- towards the |
| 15:51:19 | 24 | middle of this page, it says: |
| 15:51:20 | 25 | "This is the letter and and a course of |

120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16:00:55  1    subsequent Gram; is that how the formula worked?

16:00:58  2        A.   Each subsequent Gram was slightly more

16:01:01  3    expensive than the previous one; however, this was not

16:01:07  4    relevant within one stage of the private placement

16:01:24  5    because each purchaser in the same stage of the

16:01:30  6    private placement would have exactly the same price

16:01:33  7    per Gram.

16:01:34  8        Q.   Right.  So you guessed my next question.

16:01:38  9    In each of the two stages, pre-sale and Stage A, every

16:01:42  10   purchaser paid the same amount per each Gram that they

16:01:46  11   bought; is that correct?

16:01:50  12       A.   Yes.

16:01:52  13       Q.   So the formula, right, is a set of

16:01:56  14   variables; you can input the number of Grams and you

16:01:59  15   get the price, or you can put in the price and you get

16:02:02  16   the number of Grams?  Is that fair to say?

16:02:14  17       A.   All the formula does is -- I'm sorry, to

16:02:43  18   be sure I accurately respond to your question, could

16:02:45  19   you repeat it?

16:02:46  20       Q.   Yeah.  Let me try it in another way.

16:02:49  21            When Telegram was setting the price at

16:02:51  22   which, let's just say, the pre-sale investors were

16:02:54  23   going to pay per Gram, how does one go about doing

16:02:57  24   that?

16:03:02  25       A.   So using this formula, we would calculate

                                                            126

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
16:03:08   1   the aggregate value of all the Grams sold in the
16:03:18   2   offering, in this stage of the private placement.
16:03:29   3   Then we would divide this sum of value of all Grams by
16:03:39   4   the number of Grams sold.  That's how we would obtain
16:03:44   5   the average price per Gram within a stage in the
16:03:51   6   offering.
16:03:51   7        Q.   So it's just an average?
16:03:53   8        A.   Yes.
16:03:53   9        Q.   And so if -- I guess my question is what
16:03:59  10   comes first, the amount of the offering or the price
16:04:01  11   of the Grams?
16:04:34  12        A.   I think the primary consideration was the
16:04:40  13   volume of the stage of the offering we were
16:04:46  14   contemplating, and, based on that, we would be able
16:04:54  15   to understand how many Grams would be sold during that
16:05:02  16   stage and then calculate the average price per Gram.
16:05:08  17        Q.   Okay.  Now, the language that's after "End
16:05:11  18   of quote," can you please read it to yourself?
16:05:19  19        A.   Starting with "Kindly also"?
16:05:22  20        Q.   Yes.
16:05:22  21        A.   "Kindly also have a look..."
16:05:25  22        Q.   Oh, read it to yourself.
16:05:41  23        A.   Ah.  Yes.
16:05:41  24        Q.   Okay.  Are the statements there true;
16:05:44  25   the counsel you got was that making the sale
```

127

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
16:20:24  1    it's Mr. ▮▮▮▮. Can you just tell me who Mr. ▮▮▮▮
16:20:27  2    is?
16:20:39  3          A.   Mr. ▮▮▮▮ is a prominent investor in tech
16:20:45  4    company -- companies, and my personal friend for over
16:20:54  5    ten years.
16:20:58  6          Q.   Okay.  Do you see your statement, which
16:21:01  7    appears to be on 14 August 2017 at 5:31, where you --
16:21:07  8    well, at 5:28 he mentions something about:
16:21:10  9              "... would you be open to putting
16:21:12 10    25 [million] worth of shares ... in exchange for
16:21:17 11    becoming a 25 [million] shareholder [in some other
16:21:22 12    entity that's redacted]?"
16:21:28 13              You say:
16:21:30 14              "Thanks for the trust!  At this point
16:21:30 15    Telegram needs cash to keep buying more servers, but
16:21:31 16    I can start considering such ideas after we solve our
16:21:31 17    cash requirements."
16:21:32 18              Do you see that?
16:21:33 19          A.   Yes.
16:21:34 20          Q.   Was that statement true; that as of
16:21:38 21    14 August 2017 Telegram needed cash to keep buying
16:21:42 22    more servers?  Was that true?
16:22:02 23          A.   It is true that Telegram needed resources
16:22:04 24    to fund its growth.  This has always been the case.
16:22:07 25          Q.   Okay.  And "the servers" refers to -- is
```

132

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16:22:13  1    that another way of saying "equipment," something we
16:22:15  2    had been discussing earlier, or something else?
16:22:26  3         A.   Yes, servers are part of the equipment
16:22:32  4    expense category.
16:22:33  5         Q.   Right.  On the next page, please, there
16:22:37  6    appears to be a 3 September 2017 conversation.  You'll
16:22:42  7    see the reference to September 3 at the bottom of
16:22:44  8    page 1.  And then on the next page, at 11:02, you say:
16:22:55  9    ██████  sounds like a great guy, but I've
16:22:55 10    decided against doing calls/meetings the rest of this
16:22:55 11    year.  We're likely to abandon our immediate plans to
16:22:58 12    attract VC's capital unless somebody throws some
16:23:05 13    insane offer our way."
16:23:07 14         Do you see that?
16:23:07 15         A.   Yeah.
16:23:08 16         Q.   Can you explain what you meant at that
16:23:10 17    point in time, "immediate plans to attract VC's
16:23:14 18    capital"?  What plans were those, or what were you
16:23:18 19    talking about?
16:23:21 20         A.   I think in the context of this discussion,
16:23:46 21    and then also relevant to the previous question you
16:23:50 22    have asked me, it is important to note that ██████
16:24:01 23    is and was my personal friend, and the way I am
16:24:05 24    responding to his offers is a polite way intended not
16:24:13 25    to sound disrespectful or ungrateful.  This is why in

                                                              133

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
16:30:45  1              "Wouldn't it be fun to be in other's
16:30:48  2    companies.  Alternative could also do $25 million in
16:30:53  3    ████████ for $25 million of Telegram."
16:30:56  4              MR. TENREIRO:  Okay.  Thanks, Alex.
16:30:58  5    BY MR. TENREIRO:
16:31:00  6         Q.   All right.  So, Mr. Durov, I think -- just
16:31:02  7    to see if I can summarize your answer, I think you're
16:31:04  8    saying to me that Telegram needing cash to keep buying
16:31:08  9    more servers was one of the reasons you were
16:31:10 10    declining, but the other reason, which you don't
16:31:12 11    necessarily state because you're being polite, is you
16:31:16 12    don't like to invest in other companies other than
16:31:18 13    your own?
16:31:25 14         A.   Yeah, the main reason is I never invest
16:31:32 15    in the -- I may have misunderstood his offer at that
16:31:36 16    specific moment in time and just assumed he was
16:31:39 17    inviting me to invest $25 million, or something like
16:31:43 18    that.  It's hard to say because it was more than two
16:31:48 19    years ago.
16:31:48 20         Q.   Right.  But independently of investing in
16:31:51 21    his company, you agree that Telegram at that point
16:31:57 22    needed cash to keep buying servers, I think you said,
16:32:02 23    that that's always been the case?
16:32:03 24         A.   Yes.
16:32:03 25         Q.   Okay.  Then on the next page, where you
```

137

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 16:48:00 | 1 | A.   Okay.  Mmm-hmm. |
| 16:48:01 | 2 | Q.   There is a part that says "30 October |
| 16:48:05 | 3 | 2017." |
| 16:48:07 | 4 | A.   Mmm-hmm. |
| 16:48:07 | 5 | Q.   There's a statement from Mr. ████, and |
| 16:48:11 | 6 | then you say: |
| 16:48:13 | 7 | "It should work.  There are no IR people |
| 16:48:15 | 8 | in my team, just myself.  Of course, I can bring along |
| 16:48:19 | 9 | a dude who is willing to help investors (ex COO of VK, |
| 16:48:24 | 10 | founded Blackmoon, raised 30 [million] for |
| 16:48:27 | 11 | Blackmooncrypto last month)." |
| 16:48:30 | 12 | Do you see that? |
| 16:48:30 | 13 | A.   Yeah. |
| 16:48:31 | 14 | Q.   Can you tell me who that "dude" is? |
| 16:48:50 | 15 | A.   I was trying to describe Ilia -- |
| 16:49:02 | 16 | Q.   Okay. |
| 16:49:03 | 17 | A.   -- and his accomplishments to the extent |
| 16:49:09 | 18 | that I understand them. |
| 16:49:10 | 19 | Q.   Right.  I just wanted to make sure of |
| 16:49:14 | 20 | that.  So it was Mr. Perekopsky who you are referring |
| 16:49:18 | 21 | to there? |
| 16:49:19 | 22 | A.   Yes.  I was talking about him, although |
| 16:49:25 | 23 | I may have been confused about his exact track record, |
| 16:49:33 | 24 | but he was definitely ex COO of VK. |
| 16:49:39 | 25 | Q.   And what were you confused about? |

143

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 16:49:41 | 1 | A.   I mean, there's -- his involvement with |
| 16:49:55 | 2 | the company Blackmoon, or it is Blackmoon Capital, or |
| 16:50:02 | 3 | something like that, I'm not certain, and there is |
| 16:50:04 | 4 | also Blackmoon Crypto in which my understanding is he |
| 16:50:15 | 5 | was playing a more passive role and acted maybe as an |
| 16:50:21 | 6 | advisor or like a person publicly supporting that |
| 16:50:34 | 7 | project. |
| 16:50:41 | 8 | As I realized later, his involvement with |
| 16:50:44 | 9 | Blackmoon Crypto was limited and it wouldn't be |
| 16:50:49 | 10 | accurate probably to say that he could take the credit |
| 16:50:52 | 11 | for raising 30 million for Blackmoon Crypto. |
| 16:51:00 | 12 | Q.   What was the source of your confusion back |
| 16:51:02 | 13 | then? |
| 16:51:07 | 14 | A.   I'm not 100 percent certain I was |
| 16:51:10 | 15 | confused.  I may have been trying to show ███████ |
| 16:51:32 | 16 | that Ilia had certain experience, at least at some |
| 16:51:44 | 17 | level of depth, in relation to blockchain.  That is |
| 16:51:54 | 18 | why I could have mentioned that he raise 30 million |
| 16:52:04 | 19 | for Blackmoon Crypto, although it is obvious that now |
| 16:52:10 | 20 | that there are other -- and there were other members |
| 16:52:15 | 21 | in that team that were more instrumental to the |
| 16:52:19 | 22 | success of that project. |
| 16:52:29 | 23 | Q.   Okay.  Going back to Exhibit 21, the |
| 16:52:33 | 24 | two-page document that we were talking about -- |
| 16:52:36 | 25 | MR. DRYLEWSKI:  Are you done with this |

144

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:07:17 | 1 | Q.   And is it fair to say that Mr. Perekopsky |
| 17:07:21 | 2 | and Mr. Hyman obtained consent from Telegram to use |
| 17:07:25 | 3 | the marketing materials such as the one on Exhibit 22, |
| 17:07:31 | 4 | which was the two-page teaser? |
| 17:07:43 | 5 | A.   They probably did that or tried to do |
| 17:07:45 | 6 | that. |
| 17:07:46 | 7 | Q.   Okay.  Do you have any reason to believe |
| 17:07:47 | 8 | that Telegram did not give its consent to the use of |
| 17:07:51 | 9 | Exhibit 22? |
| 17:07:52 | 10 | MR. DRYLEWSKI:  Objection to form. |
| 17:08:07 | 11 | To clarify that, are you saying consent |
| 17:08:09 | 12 | pursuant to this agreement? |
| 17:08:10 | 13 | MR. TENREIRO:  Any consent. |
| 17:08:11 | 14 | MR. DRYLEWSKI:  Thank you. |
| 17:08:22 | 15 | THE WITNESS:  It's part -- it was a long |
| 17:08:24 | 16 | time ago, but it must be said that this two-pager |
| 17:08:32 | 17 | reflects our thinking and plans at a certain point in |
| 17:08:41 | 18 | time in late 2017, so I can't say it contains any |
| 17:08:49 | 19 | information which, at the time, could have been |
| 17:09:13 | 20 | regarded as false. |
| 17:09:14 | 21 | MR. TENREIRO:  Okay.  I'm going to ask |
| 17:09:16 | 22 | the court reporter to mark the next three exhibits, |
| 17:09:18 | 23 | please. |
| 17:09:19 | 24 | (Exhibit 47 marked for identification.) |
| 17:09:21 | 25 | (Exhibit 48 marked for identification.) |

150

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
17:09:26   1              MR. DRYLEWSKI:  It's been 15 minutes since
17:09:28   2    we talked about taking a break.
17:09:30   3              MR. TENREIRO:  Let me just mark these.
17:09:33   4    You said 15 to 20.  I just want to see if we can get
17:09:36   5    these out of the way.
17:09:37   6              MR. DRYLEWSKI:  Sure.
17:09:37   7              Is that okay?
17:09:38   8              THE WITNESS:  Sure.
17:10:09   9              (Exhibit 49 marked for identification.)
17:10:11  10    BY MR. TENREIRO:
17:10:12  11         Q.   The only question I have, and of course
17:10:13  12    take your time to look at these, is, as you'll see,
17:10:16  13    Exhibits 47, 48 and 49 are three primers: one of them
17:10:22  14    says "Primer," that's 47; 48 says "Pre-sale Primer"
17:10:30  15    and it's dated January 18, '18; and "Stage A Primer,"
17:10:34  16    which is Exhibit 49, says 21 February 2018.
17:10:37  17              My question is can you tell me the date of
17:10:40  18    Exhibit 47, the primer?  It's not dated so I'm trying
17:10:45  19    to figure out the date.
17:11:28  20              Or maybe the question is do you know if
17:11:29  21    this one came before the pre-sale primer or after the
17:11:35  22    Stage A primer?  Can you approximate that at least?
17:12:03  23         A.   If I have to guess, I think it's a
17:12:07  24    version, an early version that came before pre-sale
17:12:10  25    primer, and we iterated, you know, work on the primer
```

151

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:12:26  1   and we had hundreds, if not thousands, of versions; so

17:12:29  2   it's hard to tell which exactly is that.

17:12:31  3        Q.   Right.  But as the corporate

17:12:33  4   representative for Telegram, though, if I wanted to

17:12:36  5   find out the date of this document, which is

17:12:38  6   Exhibit 47, is there another person that might have

17:12:41  7   knowledge, or is there something you could refer to to

17:12:44  8   get a more exact date?

17:12:58  9        A.   The problem is we had hundreds of

17:13:01 10   different versions and they could differ from each

17:13:04 11   other by one or two words, and so without thoroughly

17:13:09 12   analyzing this document word by word and comparing it

17:13:17 13   with the versions, it's extremely difficult to point

17:13:23 14   a moment in time when it was relevant, but it was

17:13:26 15   definitely before the pre-sale primer.

17:13:29 16        Q.   Okay, thank you.  I appreciate that.

17:13:31 17             So is it fair to say that these primers

17:13:34 18   were used by Telegram in connection with the offer and

17:13:37 19   sale of Grams that we're discussing today?

17:13:45 20             MR. DRYLEWSKI:  Objection to form.

17:13:55 21             THE WITNESS:  I can confirm with a high

17:13:57 22   degree of certainty that we used the Exhibit 48 and

17:14:01 23   Exhibit 49 during the private placement, although,

17:14:15 24   to be fully certain, again I would have to analyze it

17:14:18 25   word by word.

                                                              152

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
17:17:17   1            MR. DRYLEWSKI:  Sure.
17:17:17   2            THE VIDEOGRAPHER:  We are going off the
17:17:18   3   record.  The time is 5:16.
17:17:24   4            (Off the record.)
17:37:14   5            (Exhibit 50 marked for identification.)
17:37:14   6            THE VIDEOGRAPHER:  We are back on record.
17:37:15   7   The time is 5:36.
17:37:22   8   BY MR. TENREIRO:
17:37:23   9        Q.   Mr. Durov, here is Exhibit 50, which the
17:37:27  10   court reporter marked during the break.  Please just
17:37:30  11   -- my question is if you recognize this document and,
17:37:34  12   if so, please tell me what it is.
17:37:37  13            The Bates number is 12-15925.
17:38:14  14            Do you recognize it?
17:38:16  15        A.   Yes.
17:38:16  16        Q.   What is the document?
17:38:29  17        A.   I think this is a document that gives an
17:38:36  18   overview of Telegram's history and business activity
17:38:47  19   and, from what I can tell, may have been included in
17:38:53  20   the briefing pack that we would share with banking
17:38:59  21   institutions in order to expand our banking
17:39:02  22   relationships.
17:39:02  23        Q.   Okay.  Do you know who prepared the
17:39:07  24   document?
17:39:10  25        A.   Did I prepare it?
```

155

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:39:13 1          Q.   No.  Do you know who prepared it?

17:39:17 2          A.   Well, I did, yeah.

17:39:18 3          Q.   You did, okay.

17:39:18 4          A.   Yeah.

17:39:19 5          Q.   And in terms of -- again, I don't have

17:39:21 6     a date.  I don't mean to, you know, sort of put you on

17:39:25 7     a memory test.  Just if you can tell me what the date

17:39:29 8     is approximately of this document, can you do that?

17:40:08 9               Can I direct you to page 6 of 8, if that

17:40:12 10    helps.

17:40:13 11         A.   6.

17:40:15 12         Q.   At the top.

17:40:17 13         A.   Ah, yes.

17:40:56 14              If I had to guess, this document was

17:41:00 15    drafted somewhere in late 2018 or early 2019.

17:41:07 16         Q.   Okay.  And as far as you know, are the

17:41:09 17    statements in this document correct?

17:41:12 18              MR. DRYLEWSKI:  You want him to verify

17:41:14 19    every statement in the document?

17:41:15 20              MR. TENREIRO:  Well, I'm just saying

17:41:18 21    generally speaking.  I'm not -- he prepared it and

17:41:20 22    used it for banking relationships, I think he can

17:41:23 23    testify generally if his understanding is that the

17:41:25 24    statements are true.

17:41:28 25              THE WITNESS:  Since this document was

                                                            156

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:43:22 | 1 | to contact anyone at the SEC? |
| 17:43:44 | 2 | MR. DRYLEWSKI:  Objection; form. |
| 17:43:52 | 3 | THE WITNESS:  You mean before which date? |
| 17:43:55 | 4 | BY MR. TENREIRO: |
| 17:43:56 | 5 | Q.   Before the date of -- when you began the |
| 17:43:59 | 6 | private placement. |
| 17:44:13 | 7 | A.   By beginning the private placement, do you |
| 17:44:15 | 8 | mean our first interactions with potential purchasers? |
| 17:44:18 | 9 | Q.   Yes. |
| 17:44:41 | 10 | A.   I think at that period in time we were |
| 17:44:46 | 11 | still in the process of finalizing the contours of the |
| 17:44:50 | 12 | private placement and we were doing a lot of research |
| 17:45:01 | 13 | and exploratory work, so we didn't -- so I don't |
| 17:45:08 | 14 | believe we reached out to the Securities and Exchange |
| 17:45:21 | 15 | Commission at that point, as we thought it was too |
| 17:45:27 | 16 | early due to the fact that we didn't know specifically |
| 17:45:37 | 17 | what we would be doing. |
| 17:45:41 | 18 | Q.   Okay.  And how about before you signed the |
| 17:45:46 | 19 | first purchase agreement? |
| 17:45:48 | 20 | I believe you, Mr. Durov, kind of signed |
| 17:45:53 | 21 | all the purchase agreements; is that correct? |
| 17:45:55 | 22 | A.   Yes. |
| 17:45:56 | 23 | Q.   Okay.  So before you, Mr. Durov, signed |
| 17:45:58 | 24 | the first purchase agreement, did you or anyone else |
| 17:46:00 | 25 | at Telegram reach out to the SEC with respect to the |

158

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
17:46:37  1   private placement?
17:46:37  2        A.   I don't think we reached out to the SEC
17:46:40  3   before I signed the first purchase agreement.  The way
17:46:44  4   we designed it is, the private placement, was that we
17:46:59  5   reserved a lot of flexibility to how the project and
17:47:10  6   its parts could look like, and this flexibility is
17:47:17  7   reflected in the purchase agreements and its
17:47:20  8   appendices.
17:47:36  9             That gave us a comfort of knowing that
17:47:44 10   we would be able to change certain, if not all,
17:47:49 11   aspects of what we're trying to build based on the
17:47:59 12   feedback that we could receive from the regulators,
17:48:04 13   including the SEC, in the following months.
17:48:08 14        Q.   So is it fair to say the answer to my
17:48:10 15   question is no, you do not?
17:48:13 16        A.   No; that was the first sentence,
17:48:17 17   I believe.
17:48:17 18        Q.   Okay.  Now, in terms of the remainder of
17:48:21 19   your answer and the flexibility, is it fair to say
17:48:24 20   that you today still retain that flexibility to
17:48:46 21   change ...
17:48:48 22             Right.  Is it fair to say that -- so you
17:48:48 23   said the way you designed it was that you had
17:48:52 24   flexibility to change some features of the project.
17:49:03 25   Is it fair to say that you, to this day, retain that
```

159

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

17:49:06   1   flexibility to change features of how a project might

17:49:11   2   look like in the future?

17:49:12   3        A.   That's correct.

17:49:12   4        Q.   I mean, just as one example, I think at

17:49:15   5   some point originally there was at least the idea

17:49:17   6   conveyed to investors that TON Wallet might be

17:49:23   7   integrated into Messenger, but in Exhibit 38, which we

17:49:27   8   began the morning with, which was the statement that

17:49:29   9   you posted yesterday, there is a statement that TON

17:49:35  10   Wallet will no longer be integrated into Messenger;

17:49:38  11   is that correct?

17:49:38  12        MR. DRYLEWSKI:  Objection to form.

17:49:40  13   Objection to the characterization of the document.

17:49:45  14        THE WITNESS:  I believe in that

17:49:46  15   announcement we made clear that the Wallet would not

17:49:51  16   be integrated into the Messenger applications at

17:49:55  17   launch.

17:49:56  18   BY MR. TENREIRO:

17:49:56  19        Q.   Right.

17:50:05  20        A.   And we reserved the right to do that

17:50:08  21   later, subject to regulatory approval.

17:50:10  22        Q.   Right.  Thank you.  Thanks for clarifying.

17:50:13  23        "Telegram may integrate the TON Wallet

17:50:15  24   application with the Telegram Messenger service in the

17:50:17  25   future, to the extent permitted under applicable law

160

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 17:50:20 | 1 | and governmental authorities." |
| 17:50:22 | 2 | I just read that from Exhibit 38. |
| 17:50:25 | 3 | A.   Yeah. |
| 17:50:25 | 4 | Q.   Is that what you were referring to? |
| 17:50:27 | 5 | A.   Correct. |
| 17:50:27 | 6 | Q.   Okay.  So that's one example of where you |
| 17:50:30 | 7 | retained flexibility, and retain flexibility today, |
| 17:50:33 | 8 | in terms of how you structure the TON Blockchain and |
| 17:50:37 | 9 | surrounding ecosystem?  Is that one example? |
| 17:50:41 | 10 | A.   That's one example.  The other, I think, |
| 17:50:54 | 11 | even more relevant example is when we received |
| 17:50:56 | 12 | feedback from the SEC in relation to the contemplated |
| 17:51:10 | 13 | Gram-buying function of the TON Foundation that may be |
| 17:51:17 | 14 | established in the future, and we understood that the |
| 17:51:27 | 15 | SEC was concerned with that function, and although we |
| 17:51:40 | 16 | might not fully -- might not have fully understood or |
| 17:51:48 | 17 | agreed with that view, we instantly changed our plans, |
| 17:52:09 | 18 | and at a certain point in time later informed all the |
| 17:52:13 | 19 | private placement purchasers about this change. |
| 17:52:16 | 20 | Q.   Thank you.  And is another example of |
| 17:52:19 | 21 | where you have some flexibility the existence of or |
| 17:52:24 | 22 | the parameters for functioning of the TON Foundation? |
| 17:52:27 | 23 | Is that another example? |
| 17:52:29 | 24 | A.   Yes.  I believe that flexibility is |
| 17:52:34 | 25 | allowed for in the risk factors of appendix to the |

161

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:52:46  1    primer.  I just wanted to use this example to

17:52:49  2    demonstrate our ability to react to input from

17:52:57  3    regulators.

17:52:58  4         Q.   Right.  No, fair enough.  And I'm just --

17:53:00  5    I appreciate that.  I'm just now trying to get a sense

17:53:04  6    more broadly of what flexibility and where there is

17:53:08  7    flexibility.

17:53:09  8              So I think we talked about the integration

17:53:11  9    of the TON Wallet, we talked about the buying --

17:53:16 10    formally the buying function, the existence of the

17:53:18 11    TON Foundation, and so is the -- do you retain

17:53:22 12    flexibility, for example, as to whether Telegram --

17:53:25 13    I'm sorry, as to the amount of Grams, after launch,

17:53:31 14    that Telegram and/or yourself might retain?  Is there

17:53:35 15    flexibility on that point as well?

17:53:57 16         A.   I believe so, although I don't remember

17:54:00 17    ourselves planning to have Telegram as a holder of

17:54:15 18    Grams post launch.

17:54:17 19         Q.   You mean it would be the TON Foundation or

17:54:19 20    the TON Reserve if there were Grams left; is that what

17:54:23 21    you mean?

17:54:24 22         A.   Yes, a function should go to a distinct,

17:54:40 23    separate, not-for-profit entity, TON Foundation.

17:54:50 24         Q.   Right.  And I think that -- I believe,

17:54:51 25    correct me if I am wrong, that the plan has been that

                                                                  162

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
20:44:51   1   payments to people hired to do finders' fees, or
20:44:53   2   entities hired to do finders' fees?
20:44:55   3             MR. DRYLEWSKI:  Sorry, just so the record
20:44:57   4   is clear, the "yes" in the last question was no, you
20:44:59   5   would not characterize them in that way; is that
20:45:02   6   right?
20:45:04   7             THE WITNESS:  Yeah, can we repeat this
20:45:06   8   last question?
20:45:06   9             MR. DRYLEWSKI:  Yeah, sorry, I just want
20:45:07  10   to make sure the record is clear.
20:45:09  11             MR. TENREIRO:  That's how I understood it
20:45:11  12   but let's try again.
20:45:12  13   BY MR. TENREIRO:
20:45:12  14        Q.   The payments that we discussed earlier to
20:45:14  15   entities such as Da Vinci or Gem Limited, which had
20:45:20  16   directors in common with investors, you would not
20:45:23  17   characterize those payments as payments to investors;
20:45:27  18   am I correct?
20:45:30  19        A.   You're correct, I would not characterize
20:45:32  20   these payments as payments to investors.
20:45:38  21        Q.   Okay.  You would -- and then I was going
20:45:40  22   to follow up and say you would characterize those as
20:45:43  23   payments to people making finders' fees; is that
20:45:47  24   correct?
20:45:47  25             MR. DRYLEWSKI:  Objection to form.
```

217

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 20:45:48 | 1 | BY MR. TENREIRO: |
| 20:45:49 | 2 | Q.    To entities making finders' fees. |
| 20:45:52 | 3 | MR. DRYLEWSKI:  Still objection to form. |
| 20:45:53 | 4 | MR. TENREIRO:  What's your objection? |
| 20:45:55 | 5 | MR. DRYLEWSKI:  "Entities making finder |
| 20:45:57 | 6 | fees." |
| 20:45:58 | 7 | BY MR. TENREIRO: |
| 20:45:58 | 8 | Q.    Okay.  You would characterize those as |
| 20:45:59 | 9 | payments to entities with respect to finders' fees? |
| 20:46:19 | 10 | A.    Correct. |
| 20:46:21 | 11 | MR. TENREIRO:  Okay.  Let's take a look at |
| 20:46:22 | 12 | what was marked as Exhibit 63, TLGRM-14-12081, which |
| 20:46:28 | 13 | are certain versions of ███████████ bank records |
| 20:46:32 | 14 | that you've produced. |
| 20:46:33 | 15 | (Exhibit 63 marked for identification.) |
| 20:46:51 | 16 | THE WITNESS:  Okay. |
| 20:46:51 | 17 | BY MR. TENREIRO: |
| 20:46:52 | 18 | Q.    So if you take a look at -- starting on |
| 20:46:55 | 19 | page 13 of 62, it says it at the top -- actually, |
| 20:47:10 | 20 | I'm sorry.  Go to page 16 of 62.  If you'd please go |
| 20:47:16 | 21 | to 16. |
| 20:47:16 | 22 | A.    16. |
| 20:47:27 | 23 | Q.    Do you see there, on May 4, 2018, there's |
| 20:47:31 | 24 | a credit into Telegram of slightly over $14 million |
| 20:47:35 | 25 | from Disruptive Era Fund SP of ITI Funds? |

218

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

10:28:16   1          MR. DRYLEWSKI:  Objection to form.

10:28:18   2          Do you mean Telegram's testing?  Because

10:28:20   3   there's also a testnet, I just want to be clear.

10:28:25   4          MR. TENREIRO:  Telegram's testing,

10:28:27   5   mmm-hmm.

10:28:28   6          MR. DRYLEWSKI:  Okay.

10:28:29   7          Objection to form.  Objection to

10:28:34   8   foundation.

10:28:57   9          THE WITNESS:  We consider the testing of

10:29:06  10   the core components of the TON network to be complete;

10:29:21  11   however, certain additional functionality of TON, that

10:29:35  12   would be nice to have, but that would not be necessary

10:29:42  13   for the launch.  It's still required and that is the

10:29:57  14   kind of testing that we are focused on right now.

10:30:04  15   BY MR. TENREIRO:

10:30:04  16      Q.   So let me take it in steps.  Some of the

10:30:06  17   functionality that would be nice to have but not

10:30:08  18   required, can you be more specific about what you

10:30:11  19   mean, what functionalities?

10:30:14  20          MR. DRYLEWSKI:  And just for the record,

10:30:15  21   about which topic are we in right now?

10:30:18  22          MR. TENREIRO:  I think this is -- hold on

10:30:20  23   a second.

10:30:31  24          MR. DRYLEWSKI:  I'll answer my own

10:30:33  25   question.  Is it 13?

                                                          258

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:30:34 | 1 | MR. TENREIRO:  I think so.  I just have to |
| 10:30:36 | 2 | get to it.  Yeah, 13, exactly. |
| 10:30:38 | 3 | MR. DRYLEWSKI:  Okay.  Thank you. |
| 10:30:52 | 4 | THE WITNESS:  The functionality that |
| 10:30:54 | 5 | would be nice to have but is not necessary for the |
| 10:31:00 | 6 | launch includes such components as TON VPN, TON |
| 10:31:21 | 7 | Storage and TON Proxy. |
| 10:31:24 | 8 | BY MR. TENREIRO: |
| 10:31:25 | 9 | Q.   So those are components that are still |
| 10:31:27 | 10 | being developed or tested; is that correct? |
| 10:31:32 | 11 | A.   These components are still being refined |
| 10:31:34 | 12 | and tested. |
| 10:31:35 | 13 | Q.   Okay.  And in terms of the funds, from the |
| 10:31:44 | 14 | beginning of the private placement to today, how much |
| 10:31:49 | 15 | has Telegram spent on developing the TON Blockchain? |
| 10:31:53 | 16 | How much money? |
| 10:32:34 | 17 | A.   I think, as I pointed out yesterday, |
| 10:32:41 | 18 | there's distinction between funds spent on developing |
| 10:32:54 | 19 | TON and funds spent on supporting Telegram Messenger. |
| 10:33:08 | 20 | It was not entirely possible to achieve due to the |
| 10:33:12 | 21 | fact that the same equipment and the same team could |
| 10:33:24 | 22 | have been employed for both purposes.  And internally, |
| 10:33:44 | 23 | because of the nature of the Use of Funds section |
| 10:33:55 | 24 | included in the offering materials, and -- we didn't |
| 10:34:15 | 25 | see any reason to add complexity by differentiating |

259

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 10:34:25 | 1 | between those kinds of expenses. |
| 10:34:28 | 2 |     Q.   How about your time working for Telegram |
| 10:34:33 | 3 | since the beginning of the private placement, how have |
| 10:34:37 | 4 | you divided your time, like percentage-wise, between |
| 10:34:42 | 5 | work you're doing for Telegram Messenger and work |
| 10:34:45 | 6 | you're doing for developing the TON Blockchain? |
| 10:34:47 | 7 |           MR. DRYLEWSKI:  This is his -- |
| 10:34:49 | 8 |           MR. TENREIRO:  Pavel Durov, yes. |
| 10:34:50 | 9 |           MR. DRYLEWSKI:  -- personal capacity? |
| 10:34:53 | 10 | Thank you. |
| 10:35:11 | 11 |           THE WITNESS:  It's hard to say because it |
| 10:35:14 | 12 | depends on the specific periods of time throughout the |
| 10:35:20 | 13 | last two and a half years.  I can say that I started |
| 10:35:35 | 14 | to spend significantly more time on work-related |
| 10:35:49 | 15 | processes, both TON and Telegram related, since we |
| 10:36:04 | 16 | started the TON project. |
| 10:36:24 | 17 |           Certain activities that took a significant |
| 10:36:31 | 18 | amount of my time and energy were TON related.  Among |
| 10:36:47 | 19 | those activities that not only consumed a lot of time |
| 10:36:57 | 20 | but also were unusual for me and demanding, in terms |
| 10:37:18 | 21 | of energy and effort, were almost constant interaction |
| 10:37:35 | 22 | with various legal counsel and advisors, |
| 10:37:48 | 23 | representatives of financial institutions and, |
| 10:38:04 | 24 | to a certain extent, dealing with investors. |
| 10:38:18 | 25 |           This comes on top of my involvement in the |

260

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

10:38:31  1  development process of TON, and all of these

10:38:39  2  activities that I just mentioned, constant

10:38:44  3  interactions with lawyers, advisors, with bankers and

10:38:48  4  investors, were purely, or, for the most part,

10:38:58  5  TON related.  This is why I consider a very

10:39:10  6  significant part of my energy to have been spent on

10:39:21  7  TON-related workstreams.

10:39:25  8  BY MR. TENREIRO:

10:39:25  9        Q.   TON-related?

10:39:27 10       A.   Workstreams.

10:39:28 11          MR. DRYLEWSKI:  Workstreams.

10:39:29 12          MR. TENREIRO:  Workstreams, okay.

10:39:29 13 BY MR. TENREIRO:

10:39:30 14       Q.   The TON Wallet is an application that

10:39:33 15 might be used in connection with the TON Blockchain,

10:39:36 16 correct?  That are interacting with the TON

10:39:41 17 Blockchain?

10:39:41 18       A.   Yes.

10:39:41 19       Q.   And that's an application that Telegram

10:39:43 20 has developed?

10:39:53 21       A.   Yes.

10:39:54 22       Q.   And am I correct in understanding from

10:39:56 23 your testimony that after the launch of the

10:39:59 24 TON Blockchain, Telegram will expend no efforts or

10:40:04 25 expenses with respect to the TON Wallet application,

261

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 10:40:07 | 1 | for example to fix bugs or anything of that nature, |
| 10:40:10 | 2 | or host it on your servers? |
| 10:40:13 | 3 | MR. DRYLEWSKI:  Objection to form. |
| 10:40:26 | 4 | THE WITNESS:  It is worth noting that |
| 10:40:28 | 5 | TON Wallet is just one of the potential |
| 10:40:40 | 6 | implementations of a smart contract and client-side |
| 10:40:54 | 7 | user interface required for users to be able to |
| 10:41:09 | 8 | transfer Grams to each other post launch. |
| 10:41:18 | 9 | There are other, as far as I know, |
| 10:41:28 | 10 | implementations that were built and are maintained by |
| 10:41:37 | 11 | third-party developers; however, it is fair to say |
| 10:41:49 | 12 | that at this moment in time the TON Wallet |
| 10:42:03 | 13 | implementation built by our team is the most advanced |
| 10:42:08 | 14 | and user-friendly. |
| 10:42:34 | 15 | If Telegram decides to integrate |
| 10:42:41 | 16 | TON Wallet into Telegram Messenger in the future, |
| 10:42:53 | 17 | subject to regulatory approval, we may fix certain |
| 10:43:16 | 18 | security issues if we are ever alerted to any, or |
| 10:43:26 | 19 | if we ever uncover any in the Telegram Messenger |
| 10:43:34 | 20 | application that would, at that moment in time, |
| 10:43:38 | 21 | include TON Wallet as part of it. |
| 10:43:45 | 22 | BY MR. TENREIRO: |
| 10:43:45 | 23 | Q.  So are you saying that if you do not |
| 10:43:47 | 24 | integrate TON Wallet into Telegram Messenger, Telegram |
| 10:43:50 | 25 | is going to walk away from TON Wallet and not make any |

262

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 11:00:37 | 1 | BY MR. TENREIRO: |
| 11:00:37 | 2 | Q. And after the launch of the |
| 11:00:41 | 3 | TON Blockchain, Telegram would continue to develop |
| 11:00:46 | 4 | Messenger and try to grow Messenger; is that right? |
| 11:01:06 | 5 | MR. DRYLEWSKI: Objection to scope. |
| 11:01:07 | 6 | THE WITNESS: Our vision for Telegram |
| 11:01:10 | 7 | Messenger is to provide the best customer experience. |
| 11:01:29 | 8 | In messaging and other related areas, user growth |
| 11:01:35 | 9 | comes as an inevitable byproduct of that vision. |
| 11:01:46 | 10 | It is our current plan to continue improving and |
| 11:02:05 | 11 | expanding the services provided by Telegram |
| 11:02:15 | 12 | Messenger's -- Messenger to its users. |
| 11:02:17 | 13 | BY MR. TENREIRO: |
| 11:02:18 | 14 | Q. And sitting here today, upon the launch of |
| 11:02:21 | 15 | the TON Blockchain, what percentage of the 5 billion |
| 11:02:25 | 16 | Grams to be issued will Telegram or its employees |
| 11:02:28 | 17 | hold? |
| 11:03:55 | 18 | A. The exact number of Grams, if any, |
| 11:04:05 | 19 | is still being discussed and refined. When we started |
| 11:04:13 | 20 | thinking about this distribution in late 2017, |
| 11:04:28 | 21 | we looked at the distribution of tokens in similar |
| 11:05:17 | 22 | blockchain projects at the time and, based on what |
| 11:05:26 | 23 | we saw in those other projects, we thought it would be |
| 11:05:42 | 24 | appropriate to consider distributing 4 percent of the |
| 11:05:55 | 25 | 5 billion Grams that would be issued at launch as |

267

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
11:37:30  1  questions but the answer continues to be we're still
11:37:34  2  evaluating, so --
11:37:35  3          MR. DRYLEWSKI:  I didn't hear that with
11:37:37  4  respect to the question you just asked.
11:37:38  5          MR. TENREIRO:  Well, with respect to the
11:37:40  6  other things it's been that, so I'm not sure that
11:37:42  7  that's going to do it.  I'm not sure what the
11:37:45  8  hesitation is on the percentage that has been sold.
11:37:48  9          MR. DRYLEWSKI:  It's not a hesitation.
11:37:49 10  It's making sure -- he just wants to be accurate.
11:37:51 11  He is speaking on behalf of the company right now.
11:37:53 12          Let's take a very quick break and we will
11:37:56 13  get you the answer you need.
11:37:58 14          MR. TENREIRO:  Go ahead.
11:37:59 15          THE VIDEOGRAPHER:  We are going off the
11:38:00 16  record.  The time is 11:37.
11:38:03 17          (Off the record.)
11:44:11 18          THE VIDEOGRAPHER:  We are back on record.
11:44:12 19  The time is 11:44.
11:44:14 20  BY MR. TENREIRO:
11:44:14 21      Q.   Okay.  Mr. Durov, what percentage of Grams
11:44:18 22  were sold -- of the 5 billion that were contemplated
11:44:21 23  to be issued, what percentage were sold in the private
11:44:24 24  placement?
11:44:24 25      A.   58 percent.
```

275

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:44:25 | 1 | Q.   Okay.  And the remaining 42 percent, |
| 11:44:30 | 2 | who currently, as we sit here today, will have the |
| 11:44:34 | 3 | authority to decide what to do and how to allocate the |
| 11:44:38 | 4 | remainder of the 42 percent? |
| 11:45:06 | 5 | A.   The creators of the network will be |
| 11:45:09 | 6 | responsible for the distribution mechanism at launch. |
| 11:45:21 | 7 | Q.   So the creators of the network, you mean |
| 11:45:26 | 8 | Telegram? |
| 11:45:26 | 9 | A.   Yes. |
| 11:45:26 | 10 | Q.   Okay.  And moving on to a separate topic |
| 11:45:31 | 11 | or, I guess, just moving on from this line of |
| 11:45:33 | 12 | questioning, I think yesterday we talked about whether |
| 11:45:38 | 13 | Telegram or its employees may take part in voting or |
| 11:45:42 | 14 | validation.  Do you recall generally we talked about |
| 11:45:45 | 15 | that a little bit? |
| 11:45:45 | 16 | A.   Yes. |
| 11:45:46 | 17 | Q.   And I think you said in your public notice |
| 11:45:49 | 18 | of the 6th, which I think was Monday, and if you want |
| 11:45:53 | 19 | to refer to it, it's Exhibit 38, but you said, |
| 11:45:58 | 20 | you know, Telegram and its employees -- |
| 11:46:00 | 21 | I'm paraphrasing -- will not take part in voting or |
| 11:46:02 | 22 | validating in connection with the TON Blockchain. |
| 11:46:05 | 23 | This voluntary decision was made in order to avoid any |
| 11:46:07 | 24 | perception that Telegram or its employees can or will |
| 11:46:10 | 25 | exercise control over the TON Blockchain following its |

276

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:46:13 | 1 | launch. |
| 11:46:15 | 2 | Does that sound more or less like what you |
| 11:46:18 | 3 | said? |
| 11:46:18 | 4 | A.   Yes. |
| 11:46:18 | 5 | Q.   Okay.  Now, at some point, though, prior, |
| 11:46:22 | 6 | Telegram's employees were -- it was contemplated that |
| 11:46:27 | 7 | they could participate in validating up to a certain |
| 11:46:31 | 8 | percentage of Grams available; is that not correct? |
| 11:46:43 | 9 | MR. DRYLEWSKI:  Sorry, could I have that |
| 11:46:44 | 10 | question read back.  I want to know if I need to |
| 11:46:47 | 11 | object. |
| 11:47:01 | 12 | (Whereupon, the record was read back by |
| 11:47:02 | 13 | the court reporter.) |
| 11:47:02 | 14 | MR. DRYLEWSKI:  Okay.  I wanted to know if |
| 11:47:04 | 15 | you said "disclosed" or "contemplated."  I do not |
| 11:47:08 | 16 | object. |
| 11:47:48 | 17 | THE WITNESS:  If I remember it right, when |
| 11:48:10 | 18 | we were drafting our plans in relation to the |
| 11:48:12 | 19 | distribution of Grams -- and those plans were drafted |
| 11:48:20 | 20 | in, I believe, 2017, or started to be drafted in |
| 11:48:27 | 21 | 2017 -- we didn't specifically emphasize in those |
| 11:48:52 | 22 | plans that we would limit the holders of this |
| 11:49:13 | 23 | hypothetical 4 percent from participating in |
| 11:49:22 | 24 | validation. |
| | 25 | /// |

277

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:01:29 | 1 | Europe and Asia. |
| 12:01:30 | 2 | BY MR. TENREIRO: |
| 12:01:30 | 3 | Q.   Okay.  The line that's -- speaking of, |
| 12:01:32 | 4 | when was the last time you were in the United States? |
| 12:01:38 | 5 | MR. DRYLEWSKI:  That's obviously not |
| 12:01:39 | 6 | a 30(b)(6) question, right? |
| 12:01:41 | 7 | MR. TENREIRO:  Yes. |
| 12:01:43 | 8 | THE WITNESS:  I believe it was 2016. |
| 12:01:45 | 9 | BY MR. TENREIRO: |
| 12:01:45 | 10 | Q.   Okay.  And you had a trip planned to the |
| 12:01:47 | 11 | US sometime in late 2017/early 2018 that you had to |
| 12:01:52 | 12 | cancel.  Do you recall that?  Or do you -- |
| 12:01:57 | 13 | perhaps it may be better to say you were contemplating |
| 12:01:59 | 14 | traveling to the United States based on some of the |
| 12:02:02 | 15 | messages in the chats that you've produced. |
| 12:02:05 | 16 | Do you recall that? |
| 12:02:10 | 17 | A.   I was considering the possibility to |
| 12:02:12 | 18 | travel to the United States in late 2017. |
| 12:02:16 | 19 | Q.   And why haven't you? |
| 12:02:35 | 20 | A.   Primarily, due to the changes in my |
| 12:02:45 | 21 | schedule and the fact that there didn't seem to be |
| 12:03:07 | 22 | a reason for me to go to the United States other than |
| 12:03:13 | 23 | catching up with friends. |
| 12:03:16 | 24 | Q.   Back to Exhibit 41.  The line that says |
| 12:03:21 | 25 | "Colocation" -- |

282

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:03:24 | 1 | A.    Yes. |
| 12:03:24 | 2 | Q.    -- what is that, just explain in your own |
| 12:03:42 | 3 | words, please? |
| 12:03:42 | 4 | A.    Colocation means expenses related to |
| 12:03:56 | 5 | paying for renting space in data centers to host the |
| 12:04:15 | 6 | server and networking equipment. |
| 12:04:18 | 7 | Q.    And how many such data centers do you have |
| 12:04:21 | 8 | relationships with? |
| 12:04:23 | 9 | MR. DRYLEWSKI:  Objection; scope. |
| 12:04:31 | 10 | MR. TENREIRO:  So this relates to the Use |
| 12:04:33 | 11 | of Funds but I note your objection. |
| 12:04:37 | 12 | THE WITNESS:  Just a few of them.  A small |
| 12:04:40 | 13 | number. |
| 12:04:40 | 14 | BY MR. TENREIRO: |
| 12:04:41 | 15 | Q.    So less than ten? |
| 12:04:42 | 16 | A.    Yes. |
| 12:04:42 | 17 | Q.    Okay.  All right.  We can set that aside. |
| 12:04:50 | 18 | Oh, and I think you said that you recently -- or |
| 12:04:52 | 19 | Telegram recently established a banking relationship |
| 12:04:55 | 20 | with █████████████████████████████████████ |
| 12:04:58 | 21 | ████████████████████████████.  Is that |
| 12:05:03 | 22 | accurate? |
| 12:05:04 | 23 | A.    I am not certain of the status of our |
| 12:05:07 | 24 | current relationship with ███████████.  I am aware |
| 12:05:17 | 25 | that the process of establishing a relationship has |

283

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12:06:52  1   question.

12:06:52  2              MR. TENREIRO:  Well, I mean, Telegram

12:06:54  3   obviously had a role.

12:06:57  4              THE WITNESS:  Yes, I had some degree of

12:07:03  5   involvement in that process.

12:07:04  6   BY MR. TENREIRO:

12:07:04  7        Q.   Okay.  And what factors did you consider

12:07:12  8   in terms of deciding how much to allocate -- so let me

12:07:16  9   strike that.

12:07:17 10              What factors did Telegram consider

12:07:18 11   in terms of deciding, just for that pre-sale round,

12:07:23 12   you know, how much to allocate to which investor?

12:08:05 13        A.   We looked at factors such as reputation

12:08:11 14   and sophistication of potential purchasers as well as

12:08:16 15   their experience in technology-related investments.

12:08:27 16        Q.   Anything else?

12:08:41 17        A.   Those were the main factors but,

12:08:50 18   of course, if I had a personal relationship with

12:08:59 19   an investor that happened to, at the same time, have

12:09:07 20   established a good reputation and brand, meaning

12:09:22 21   personal brand or the brand of the fund, that would

12:09:27 22   also be a factor because I could have the comfort of

12:09:59 23   knowing these people also as human beings as opposed

12:10:08 24   to businessmen.

12:10:11 25              MR. TENREIRO:  Sure.  Let's just look real

                                                                285

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:29:32  1  what you ...
12:29:33  2  BY MR. TENREIRO:
12:29:33  3       Q.   Yes.  What part of my question is
12:29:36  4  confusing you?
12:29:44  5       A.   What exactly do you mean by restricting
12:30:08  6  the Grams to be resold, because I believe this is
12:30:20  7  exactly what is put into the purchase agreements and
12:30:23  8  related materials.
12:30:25  9       Q.   When the initial purchasers receive --
12:30:31 10  let's talk about initial purchasers, for example, in
12:30:34 11  Stage A.  When they receive their Grams upon launch,
12:30:37 12  will they be able to transfer those Grams for any
12:30:40 13  purpose whatsoever, including selling them to third
12:30:43 14  parties, as currently -- as the plans are currently
12:30:53 15  contemplated?
12:30:54 16       A.   Does this question relate to Stage A or
12:30:57 17  pre --
12:30:58 18       Q.   Stage A.
12:30:59 19       A.   Stage A?
12:31:00 20       Q.   Mmm-hmm.
12:31:09 21       A.   I believe that Stage A investors, once and
12:31:15 22  if they are issued Grams, are free to spend these
12:31:35 23  Grams in any way they deem necessary.
12:31:46 24       Q.   Okay.  And my question is why did
12:31:49 25  Telegram -- why hasn't Telegram contemplated
```

292

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:54:30 | 1 | BY MR. TENREIRO: |
| 12:54:30 | 2 | Q.   Okay.   And in terms of the costs -- so did |
| 12:54:35 | 3 | you -- did Telegram have sort of a policy in place of |
| 12:54:42 | 4 | asking -- and I understand that there were some |
| 12:54:44 | 5 | representations in the purchase agreements about |
| 12:54:47 | 6 | intentions, but was there -- there's nothing in the |
| 12:54:50 | 7 | purchase agreement that requires the purchaser |
| 12:54:55 | 8 | to commit themselves to act as validators, correct? |
| 12:55:00 | 9 | A.   That is correct. |
| 12:55:00 | 10 | Q.   Okay.   So, therefore, was there any sort |
| 12:55:04 | 11 | of practice that Telegram had, or some directive by |
| 12:55:07 | 12 | the company to the employees, that were marketing the |
| 12:55:11 | 13 | offering, the private placement, to ask potential |
| 12:55:14 | 14 | investors whether they planned to -- regardless of |
| 12:55:17 | 15 | whether they could afford it, but whether they planned |
| 12:55:20 | 16 | to, you know, have a continual commitment to |
| 12:55:23 | 17 | 100 percent uptime, for example? |
| 12:55:41 | 18 | A.   As a matter of policy, Telegram employees |
| 12:55:43 | 19 | were not obliged to ask potential purchasers whether |
| 12:55:51 | 20 | they would like to commit to becoming validators |
| 12:56:00 | 21 | post-launch.   It is worth adding in this context that |
| 12:56:19 | 22 | a continual commitment to 100 percent uptime for |
| 12:56:28 | 23 | validators is something that validators are expected |
| 12:56:42 | 24 | to naturally be interested in having, because this |
| 12:56:50 | 25 | 100 percent uptime would allow them to maximize the |

301

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:57:04 | 1 | number of Grams they may be able to earn by signing |
| 12:57:25 | 2 | a larger number of transactions and validator -- |
| 12:57:34 | 3 | larger number of new blocks in the network.  So they |
| 12:57:43 | 4 | were intended to be commercially incentivized to have |
| 12:57:56 | 5 | this commitment, and in that context I don't believe |
| 12:58:11 | 6 | that insistence on such a continual commitment to |
| 12:58:16 | 7 | 100 percent uptime would be relevant or significant. |
| 12:58:19 | 8 | Q.   What percentage of Telegram's investors in |
| 12:58:22 | 9 | the private placement have ever acted as validators |
| 12:58:24 | 10 | for blocks on other blockchains? |
| 12:58:33 | 11 | MR. DRYLEWSKI:  Objection; scope. |
| 12:58:37 | 12 | MR. TENREIRO:  Let me strike that and |
| 12:58:41 | 13 | rephrase it. |
| 12:58:41 | 14 | BY MR. TENREIRO: |
| 12:58:41 | 15 | Q.   In the private placement process, did |
| 12:58:44 | 16 | Telegram compile -- I'm sorry, compile a list of how |
| 12:58:50 | 17 | many of the investors that signed up had acted as |
| 12:58:53 | 18 | validators with respect to other blockchains? |
| 12:59:03 | 19 | A.   I don't believe our employees compiled |
| 12:59:06 | 20 | such a list during the private placement process. |
| 12:59:13 | 21 | Q.   Did they do so at any time? |
| 12:59:22 | 22 | A.   I'm not certain but it would be logical |
| 12:59:32 | 23 | to assume that as the planned date of the launch of |
| 12:59:42 | 24 | the TON Blockchain was approaching, our employees |
| 12:59:55 | 25 | could at least have a certain list of investors in |

302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:00:20 | 1 | their mind who would be -- who had expressed interest |
| 13:00:26 | 2 | in validation. |
| 13:00:36 | 3 | I am not aware of any written list because |
| 13:00:41 | 4 | my understanding is a big part of such discussions |
| 13:00:49 | 5 | took place over the phone or in person, but as |
| 13:01:01 | 6 | we discussed yesterday, based on the interest for |
| 13:01:14 | 7 | validation expressed by a number of Stage A |
| 13:01:27 | 8 | purchasers, we didn't expect any difficulty with |
| 13:01:51 | 9 | regards to a potential lack of the necessary number of |
| 13:02:08 | 10 | validators at launch. |
| 13:02:13 | 11 | Q.   So my question, though, was whether |
| 13:02:17 | 12 | Telegram made a list of which of its investors had |
| 13:02:21 | 13 | acted as validators with respect to their blockchains. |
| 13:02:24 | 14 | I think you said, "I don't think we made such a list |
| 13:02:28 | 15 | during the private placement." |
| 13:02:29 | 16 | And my question was, did you make such |
| 13:02:32 | 17 | a list at any other time?  That's all. |
| 13:02:40 | 18 | A.   I don't think we made this list at any |
| 13:02:43 | 19 | other time but I'm not certain.  To clarify, you mean |
| 13:02:50 | 20 | investors that expressed interest in validating TON |
| 13:02:57 | 21 | specifically or other blockchain? |
| 13:02:59 | 22 | Q.   I'm asking about, there's the universe of |
| 13:03:02 | 23 | Telegram's private placement investors, all of them, |
| 13:03:05 | 24 | and -- I am going to get to the interest in TON in |
| 13:03:08 | 25 | a second. |

303

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:03:08 | 1 | A.   Ah, okay. |
| 13:03:08 | 2 | Q.   Right now I'm just asking which of |
| 13:03:11 | 3 | those -- does Telegram know which of those investors |
| 13:03:13 | 4 | have ever acted as validators with respect to other |
| 13:03:17 | 5 | blockchains?  That's my question. |
| 13:03:20 | 6 | MR. DRYLEWSKI:  Objection -- |
| 13:03:20 | 7 | BY MR. TENREIRO: |
| 13:03:21 | 8 | Q.   And really I'm asking for a percentage. |
| 13:03:23 | 9 | I mean, does Telegram know the proportion of them? |
| 13:03:25 | 10 | MR. DRYLEWSKI:  Objection; scope. |
| 13:03:36 | 11 | THE WITNESS:  I'm sorry, I'd like to |
| 13:03:38 | 12 | clarify that.  If your previous questions were only -- |
| 13:03:44 | 13 | also related to experience of the purchasers |
| 13:03:54 | 14 | in relation to other blockchain network, I may have |
| 13:04:01 | 15 | misunderstood the question and answered a different |
| 13:04:04 | 16 | question. |
| 13:04:26 | 17 | We didn't put together a separate list of |
| 13:04:33 | 18 | the purchasers who we would assume have experience in |
| 13:04:44 | 19 | validating other networks, although it was obvious |
| 13:04:59 | 20 | that certain investors who had experience in -- |
| 13:05:17 | 21 | who had previous experience in investing into |
| 13:05:24 | 22 | blockchain projects, such as, for example, Micky Malka |
| 13:05:27 | 23 | that we have discussed earlier, might, with a high |
| 13:05:39 | 24 | degree of probability, have experience in these |
| 13:05:45 | 25 | processes of validation or at least were closely |

304

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:05:59 | 1 | affiliated with parties that had experience in such |
| 13:06:11 | 2 | processes. |
| 13:06:18 | 3 | However, if you want a yes or no answer, |
| 13:06:20 | 4 | we did not put together such a list. |
| 13:06:23 | 5 | BY MR. TENREIRO: |
| 13:06:23 | 6 | Q.   Thank you.  As part of the KYC process, |
| 13:06:30 | 7 | Telegram collected information -- did Telegram collect |
| 13:06:32 | 8 | information, for example, to the extent that the |
| 13:06:34 | 9 | investor was like a fund, collect information about |
| 13:06:38 | 10 | fund-formation documents? |
| 13:06:45 | 11 | MR. DRYLEWSKI:  Objection; form, scope. |
| 13:07:04 | 12 | THE WITNESS:  I believe that this is one |
| 13:07:05 | 13 | of the types of documents that could have been |
| 13:07:10 | 14 | included in certain cases. |
| 13:07:13 | 15 | BY MR. TENREIRO: |
| 13:07:13 | 16 | Q.   And did Telegram have any sort of policy |
| 13:07:17 | 17 | or directive to the people reviewing KYC documents |
| 13:07:21 | 18 | to be on the look-out for whether funds-formation |
| 13:07:27 | 19 | documents permitted it to engage in validation |
| 13:07:33 | 20 | activities or whether the fund-formation documents in |
| 13:07:33 | 21 | any way might affect the ability of a fund to engage |
| 13:07:33 | 22 | in such activities? |
| 13:07:43 | 23 | (Reporter clarification.) |
| 13:07:43 | 24 | MR. DRYLEWSKI:  If you wouldn't mind |
| 13:07:44 | 25 | starting over. |

305

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:29:55 | 1 | validator elections.  This ... |
| 13:30:02 | 2 | BY MR. TENREIRO: |
| 13:30:02 | 3 | Q.   Oh, but not the test.  I mean for the |
| 13:30:05 | 4 | actual blockchain you'll need 100,000? |
| 13:30:16 | 5 | A.   Well, this threshold may be different, |
| 13:30:23 | 6 | the actual blockchain, but we don't expect it to be |
| 13:30:39 | 7 | significantly different from the setting currently |
| 13:30:45 | 8 | used in the testnet. |
| 13:30:47 | 9 | Q.   Okay.  So 5 billion Grams and 10 percent |
| 13:30:54 | 10 | restriction and 100,000, that means there could be, |
| 13:30:58 | 11 | at most, 5,000 validators, right? |
| 13:31:00 | 12 | MR. DRYLEWSKI:  Objection; scope. |
| 13:31:19 | 13 | THE WITNESS:  As I just mentioned, |
| 13:31:21 | 14 | the 10 percent and 100,000 Grams limitation are |
| 13:31:29 | 15 | configuration parameters that validators decide on |
| 13:31:35 | 16 | by majority in their vote, and so it is difficult to |
| 13:31:43 | 17 | predict how many validators can work at the same time |
| 13:31:57 | 18 | in TON post-launch since those parameters are likely |
| 13:32:08 | 19 | to be changing -- changing. |
| 13:32:17 | 20 | BY MR. TENREIRO: |
| 13:32:17 | 21 | Q.   Does that conclude your answer? |
| 13:32:18 | 22 | A.   Yes. |
| 13:32:20 | 23 | Q.   Okay. |
| 13:32:21 | 24 | (Exhibit 72 marked for identification.) |
| | 25 | /// |

311

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
16:21:16   1   And then at 7:41 a.m., John Hyman forwards or copies
16:21:21   2   a message by someone elsewhere where it says:
16:21:25   3            "Lots of people running around today
16:21:26   4   looking for allocations - looks like you denied all of
16:21:31   5   [New York] and some others on a KYC basis.  All of
16:21:34   6   that demand flowing in to the secondary market.  Some
16:21:37   7   willing to pay up to $1."
16:21:42   8            Next message:
16:21:44   9            "Update on grey market."
16:21:46  10            Do you see that, that I just read?
16:21:46  11       A.   Yes.
16:21:46  12       Q.   Mr. Durov, do you know why Mr. Hyman was
16:21:50  13   updating the TON Presale group on the gray market?
16:22:02  14       A.   My understanding is that Mr. Hyman was not
16:22:09  15   happy with potential activities in the gray market for
16:22:20  16   a variety of reasons, and he was alerting the team
16:22:36  17   to recent rumors from the market in order for us to be
16:22:46  18   able to assess those rumors, and, if there is any
16:22:59  19   actionable pieces of information, act on it.
16:23:10  20       Q.   Have you heard of an entity called Gram
16:23:15  21   Asia?
16:23:17  22       A.   I --
16:23:17  23            MR. DRYLEWSKI:  Are you asking him
16:23:18  24   personally?
16:23:19  25            MR. TENREIRO:  No, does Telegram know of
```

342

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16:23:21   1   an entity called Gram Asia.

16:23:32   2              THE WITNESS:  I don't think we have

16:23:36   3   Gram Asia as a party in any of the agreements we may

16:23:43   4   have entered into.

16:23:47   5   BY MR. TENREIRO:

16:23:48   6        Q.   So the question was if you know them?

16:23:50   7        A.   Well, in my personal capacity, I heard

16:23:59   8   about Gram Asia from press reports somewhere in the

16:24:10   9   last couple of years.

16:24:11  10        Q.   About what?  What about Gram Asia did you

16:24:14  11   hear about?

16:24:20  12        A.   There were certain confusing press reports

16:24:31  13   claiming that some cryptocurrency exchange in Japan

16:24:34  14   started to sell Grams, and we were worried that this

16:24:50  15   was an attempt to scam consumers into believing

16:24:57  16   they're buying real Grams.  I believe Gram Asia was

16:25:04  17   mentioned in connection to this alleged Gram sale.

16:25:20  18        Q.   And is that cryptocurrency trading

16:25:27  19   platform called Liquid?

16:25:29  20        A.   Yes, I believe so.

16:25:32  21              (Reporter clarification.)

16:25:35  22   BY MR. TENREIRO:

16:25:36  23        Q.   You know what The Shard in London is,

16:25:40  24   right?

16:25:40  25        A.   Shard, yes.

343

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16:25:42   1          Q.    Sometimes you and your team had meetings
16:25:44   2     there or near there with respect to TON or Grams?
16:25:48   3                MR. DRYLEWSKI:  I'm sorry, what was the
16:25:49   4     name?
16:25:50   5                MR. TENREIRO:  The Shard, the building.
16:25:54   6                MR. DRYLEWSKI:  Yes.
16:25:54   7                THE WITNESS:  Yeah.  Yes, I believe we
16:25:56   8     used facilities in The Shard for some meetings.
16:26:03   9     BY MR. TENREIRO:
16:26:04   10         Q.    Do you know who Mike Kaymaori is?
16:26:19   11         A.    I'm not sure I'm acquainted to this person
16:26:23   12    but for the last couple of years I met a lot of --
16:26:27   13    I was introduced to a lot of people, but from the top
16:26:29   14    of my head, I don't recognize that name.
16:26:32   15         Q.    What about Katsuno Konno, K-o-n-n-o?
16:26:51   16         A.    Again, I'm afraid my memory for Asian
16:26:55   17    names is not really good.
16:27:11   18         Q.    Did Telegram, meaning through its
16:27:14   19    representatives, meet with representatives from Liquid
16:27:18   20    in London in October of 2018?
16:28:02   21         A.    I'm not certain.  We did have some
16:28:06   22    investor-related meetings at that period of time.
16:28:21   23    Some of the investors wanted to be helpful and may
16:28:26   24    have introduced us to other parties during such
16:28:32   25    meetings.  I think there was at least one meeting

                                                              344

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
16:28:50  1   in London I can remember that I was a participant of
16:29:02  2   where we would meet with some Asian investors or
16:29:22  3   entrepreneurs.
16:29:27  4        Q.   And you don't remember a meeting between
16:29:31  5   Telegram and Katsuno Konno specifically is what you're
16:29:34  6   saying?
16:29:35  7             MR. DRYLEWSKI:  Objection; form.
16:29:37  8             THE WITNESS:  I mean, unfortunately
16:29:39  9   I don't recognize that name.  I may have been briefly
16:29:45 10   introduced to somebody by that name, but given the
16:29:50 11   fact that I don't recognize it, it must be a single
16:29:58 12   instance when I --
16:29:59 13             MR. DRYLEWSKI:  Was the question when he
16:30:00 14   personally ever met --
16:30:01 15             MR. TENREIRO:  Yeah, he.  Oh, no, no,
16:30:02 16   I'm sorry, I was asking about the company.
16:30:05 17             MR. DRYLEWSKI:  So anyone from Telegram?
16:30:06 18             MR. TENREIRO:  I mean Telegram through its
16:30:08 19   agents is what I was talking about.
16:30:09 20             MR. DRYLEWSKI:  Okay.
16:30:11 21   BY MR. TENREIRO:
16:30:12 22        Q.   So did Telegram meet with any
16:30:18 23   representative of Liquid about their sale of Grams?
16:30:23 24             MR. DRYLEWSKI:  Objection; scope.
16:30:27 25             THE WITNESS:  Could you repeat your
```

345

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 16:30:28 | 1 | question? |
| 16:30:29 | 2 | BY MR. TENREIRO: |
| 16:30:30 | 3 |     Q.   Did Telegram meet with any representative |
| 16:30:32 | 4 | from Liquid with respect to their sale of Grams? |
| 16:30:35 | 5 |     A.   No -- |
| 16:30:35 | 6 |         MR. DRYLEWSKI:  Same objection. |
| 16:30:37 | 7 |         THE WITNESS:  -- definitely no.  Not only |
| 16:30:50 | 8 | it hasn't been discussed in any meeting that I was |
| 16:30:53 | 9 | present at, I highly doubt that any of my colleagues |
| 16:30:56 | 10 | would support any such discussion due to the clear |
| 16:31:10 | 11 | understanding that Grams cannot be resold pre-launch, |
| 16:31:27 | 12 | and if any discussion took place related to the sale |
| 16:31:31 | 13 | of Grams, if any, it must, in that case, have been |
| 16:31:47 | 14 | related to other matters, such as, for example, |
| 16:32:04 | 15 | regulatory status of Grams post-launch in certain |
| 16:32:09 | 16 | jurisdictions or potential listing of Grams on certain |
| 16:32:17 | 17 | exchanges post-launch. |
| 16:32:27 | 18 |         I'm not aware of any meeting where |
| 16:32:39 | 19 | anything involving the potential resale of Grams |
| 16:32:48 | 20 | pre-launch took place as something that we would |
| 16:32:59 | 21 | approve of. |
| 16:33:01 | 22 | BY MR. TENREIRO: |
| 16:33:02 | 23 |     Q.   What was Telegram's reaction to learning |
| 16:33:04 | 24 | about what was potentially happening with Gram Asia |
| 16:33:10 | 25 | and Liquid? |

346

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:03:07   1            MR. DRYLEWSKI:  Understood.

17:03:08   2            MR. TENREIRO:  -- and I'm really just

17:03:09   3    showing it to him for context.

17:03:10   4            MR. DRYLEWSKI:  Okay.

17:03:11   5    BY MR. TENREIRO:

17:03:12   6        Q.   Really, the question is, did Telegram have

17:03:16   7    any sort of policy or practice about whether it would

17:03:19   8    provide financial information, you know,

17:03:23   9    or financials, to potential and actual investors in

17:03:25  10    the private placement?  That's all.

17:03:37  11        A.   Our general policy with regards to

17:03:39  12    disclosing financial and other information to the

17:03:53  13    purchasers was that we wanted each purchaser to have

17:04:29  14    a similar level of knowledge in relation to the status

17:04:37  15    of the project and in relation to Telegram.

17:04:56  16            We didn't want, as a matter of policy,

17:04:59  17    to have one or a few specific investors have more

17:05:13  18    information, or significantly more information from us

17:05:19  19    than all the other purchasers.  This, I believe, was

17:05:30  20    one of our guidelines.

17:05:34  21        Q.   So what about just providing all the

17:05:36  22    investors the financials; why was that not Telegram's

17:05:44  23    policy?

17:05:54  24        A.   Due to the fact that such reports were not

17:06:13  25    included as obligatory in the purchase agreements and

                                                            355

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:06:23  1   could create, at the same time, additional burden in

17:06:32  2   our small team, and also due to the, as we perceived

17:06:41  3   it, low relevance of such financial statements, we,

17:07:02  4   as a general matter, did not send regular updates to

17:07:11  5   the purchasers disclosing the financial details of the

17:07:32  6   company, focusing instead on the updates related to

17:07:43  7   the development status of the TON Blockchain which

17:07:49  8   we considered to be much more relevant for investors

17:08:03  9   as it could affect the timelines and development

17:08:10 10   roadmaps that, in turn, could be important for

17:08:26 11   purchasers to be able to plan their activities.

17:08:47 12            However, I believe that in October last

17:08:50 13   year we disclosed certain financial information to the

17:08:58 14   purchasers as well as our planned costs for the next

17:09:18 15   several months.

17:09:19 16        Q.   After the launch of the TON Blockchain ...

17:09:23 17            MR. TENREIRO:  Actually, before I forget,

17:09:26 18   we want some sort of representation or request on

17:09:29 19   Exhibit 77, the jurisdiction and the basis for the

17:09:31 20   redaction, the one about the IEO.  We have already

17:09:38 21   requested an unredacted version and we got it back

17:09:40 22   just the same.

17:09:42 23            MS. CHARMANI:  Okay.

17:09:45 24            MR. TENREIRO:  If I'm wrong, let me know.

17:09:49 25            Okay, sorry.  Let me go back to the

                                                              356

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:09:51 | 1 | question which was -- we can set all those exhibits |
| 17:09:54 | 2 | aside if you don't mind. |
| 17:09:55 | 3 | MR. DRYLEWSKI:  Just so I can respond on |
| 17:09:57 | 4 | the record -- |
| 17:09:57 | 5 | MR. TENREIRO:  Yeah, go ahead. |
| 17:09:58 | 6 | MR. DRYLEWSKI:  -- we will take your |
| 17:09:59 | 7 | request under consideration and, as we have with all |
| 17:10:02 | 8 | such requests, consider them and are happy to meet and |
| 17:10:05 | 9 | confer with you on them. |
| 17:10:06 | 10 | MR. TENREIRO:  Okay. |
| 17:10:09 | 11 | BY MR. TENREIRO: |
| 17:10:09 | 12 | Q.   What about any policy that Telegram might |
| 17:10:14 | 13 | have had with respect to disclosure of user growth or |
| 17:10:22 | 14 | user base for Messenger itself, did Telegram have any |
| 17:10:26 | 15 | such policy about what information, if any, it would |
| 17:10:29 | 16 | disclose to private placement purchasers? |
| 17:11:04 | 17 | A.   From time to time we posted public |
| 17:11:07 | 18 | announcements related to Telegram growth and features, |
| 17:11:19 | 19 | both on the Telegram official website and in other |
| 17:11:23 | 20 | channels, such as my personal Telegram channel. |
| 17:11:38 | 21 | We did not inform -- we did not inform the purchasers |
| 17:11:53 | 22 | separately on the changes in the popularity of |
| 17:12:11 | 23 | Telegram applications among users; however, it must be |
| 17:12:18 | 24 | noted that to a certain degree this information |
| 17:12:33 | 25 | related to growth and app downloads could be obtained |

357

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 17:12:47 | 1 | from other sources publicly available for anybody. |
| 17:12:58 | 2 | Q.  And a moment or two ago you mentioned that |
| 17:13:01 | 3 | in October, Telegram disclosed certain financial |
| 17:13:06 | 4 | information.  Was that information emailed directly |
| 17:13:10 | 5 | to the private placement purchasers, or how was it |
| 17:13:17 | 6 | disclosed to them? |
| 17:13:21 | 7 | A.  Yes, I believe it was part of the update |
| 17:13:24 | 8 | we sent to all of the purchasers by email. |
| 17:13:27 | 9 | Q.  And is there is any current plan in place |
| 17:13:33 | 10 | by Telegram in terms of what sort of financial |
| 17:13:37 | 11 | information about itself it might disclose after the |
| 17:13:41 | 12 | launch of the TON Blockchain? |
| 17:14:01 | 13 | A.  In our view, Telegram's obligations under |
| 17:14:09 | 14 | the purchase agreement, for the most part, will be met |
| 17:14:32 | 15 | at the time of launch, meaning that after the launch |
| 17:14:36 | 16 | of the TON Blockchain, Telegram will no longer be |
| 17:14:39 | 17 | actively developing TON and, as such, it is not |
| 17:15:08 | 18 | obvious why purchasers who have received Grams in the |
| 17:15:14 | 19 | event of a successful launch of the TON Blockchain |
| 17:15:23 | 20 | would need any information -- |
| 17:15:23 | 21 | Q.  So -- I'm sorry. |
| 17:15:34 | 22 | A.  -- from Telegram Messenger other than the |
| 17:15:41 | 23 | information that will be already available from public |
| 17:15:45 | 24 | sources. |
| 17:15:46 | 25 | Q.  Sorry.  So my question was not about plans |

358

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:15:50   1    to provide it to initial purchasers, but, simply,

17:15:53   2    provide it in general just to the public.  Are there

17:15:58   3    any plans?  Okay.

17:16:14   4        A.   I think that throughout its history

17:16:17   5    Telegram has been consistently updating the public on

17:16:26   6    its development, the milestones and user metrics it

17:16:35   7    reached, and its new features and plans.  I don't see

17:16:50   8    any reason why we would discontinue this practice

17:16:56   9    after the launch of the TON Blockchain.

17:17:00  10        Q.   But what about financial information about

17:17:03  11    Telegram's operations; is there any plan to provide

17:17:09  12    that to the general public after the launch of the

17:17:13  13    TON Blockchain?

17:18:01  14        A.   I must say that such plans have not been

17:18:05  15    discussed or I'm not aware of such discussions.

17:18:20  16    Being a private company, it would be unusual for

17:18:37  17    Telegram to start publishing its financial statements

17:18:52  18    and I struggle to grasp the relevance it may have for

17:19:03  19    the general public; however, as everything we do, this

17:19:14  20    aspect may be reassessed in the future if we receive

17:19:41  21    any new information that would be sufficient to change

17:19:52  22    our views on this.

17:20:03  23             MR. TENREIRO:  Let's look at Exhibit 79,

17:20:07  24    please.

17:20:08  25             MR. DRYLEWSKI:  There's about 20 minutes

                                                              359

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                    REPORTER CERTIFICATE

 2

 3            I, the undersigned, an Accredited Verbatim

 4   Reporter in the United Kingdom, do hereby certify:

 5            That the foregoing proceedings were taken

 6   before me at the time and place herein set forth; that

 7   any witnesses in the foregoing proceedings, prior to

 8   testifying, were placed under oath; that a verbatim

 9   record of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; further, that the foregoing is an accurate

12   transcription thereof.

13            I further certify that I am neither

14   financially interested in the action nor a relative or

15   employee of any attorney or any of the parties.

16            IN WITNESS WHEREOF, I have this date

17   subscribed my name.

18

19   Date: January 9, 2020

20

21   _____

22   LEAH M. WILLERSDORF
     Accredited Verbatim Reporter,
     Member of the British Institute of
23   Verbatim Reporters,
     Qualified Realtime Reporter (Level 2)
24   International Participating Member NCRA.

25
```

                                                            249

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                        REPORTER CERTIFICATE
 2
 3              I, the undersigned, an Accredited Verbatim
 4    Reporter in the United Kingdom, do hereby certify:
 5              That the foregoing proceedings were taken
 6    before me at the time and place herein set forth; that
 7    any witnesses in the foregoing proceedings, prior to
 8    testifying, were placed under oath; that a verbatim
 9    record of the proceedings was made by me using machine
10    shorthand which was thereafter transcribed under my
11    direction; further, that the foregoing is an accurate
12    transcription thereof.
13              I further certify that I am neither
14    financially interested in the action nor a relative or
15    employee of any attorney or any of the parties.
16              IN WITNESS WHEREOF, I have this date
17    subscribed my name.
18
19    Date: January 9, 2020
20
21    _____
      LEAH M. WILLERSDORF
22    Accredited Verbatim Reporter,
      Member of the British Institute of
23    Verbatim Reporters,
      Qualified Realtime Reporter (Level 2)
24    International Participating Member NCRA.
25
```

370

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**