# PX13

CONFIDENTIAL

```
1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3
      ---------------------------------------x
4     SECURITIES AND EXCHANGE COMMISSION,   )
                                            )
5                          Plaintiff,    )  19 Civ. 9439 (PKC)
                                            )
6          v.                               )
                                            )
7     TELEGRAM GROUP INC. and               )
      TON ISSUER INC.,                      )
8                                           )
                           Defendants.   )
9     _____x

10

11

12                    CONFIDENTIAL

13               VIDEOTAPED DEPOSITION OF

14                  ILYA PEREKOPSKY

15                 December 15, 2019

16

17                    Taken at:

18           McKenna Nabarro Olswang LLP
                    Cannon Place
19               78 Cannon Street
                 London, EC4N 6AF

20

21

22

23
      Reported by:
24    AILSA WILLIAMS,
      Certified Court Reporter
25    JOB No. 191215MWC
```

1

CONFIDENTIAL

```
1                   A P P E A R A N C E S
2    For the Plaintiff:
3              SECURITIES AND EXCHANGE COMMISSION
4              New York Regional Office
5              200 Vesey Street, Suite 400
6              New York, New York 10281-1022
7              BY: LADAN STEWART and JORGE G. TENREIRO
8                   Stewartl@sec.gov
9                   Tenreiroj@sec.gov
10
11   For the Defendant:
12             SKADDEN ARPS SLATE MEAGHER & FLOM
13             4 Times Square
14             New York, New York 10036
15             BY: ALEXANDER DRYLEWSKI, THANIA CHARMANI
16             and CHRISTOPHER MALLOY
17             Thania.charmani@skadden.com
18
19   ALSO PRESENT
20   NOTARY PUBLIC: KEITH ROONEY
21   COURT REPORTER: AILSA WILLIAMS
22   VIDEOGRAPHER:  WENDY VINER
23
24
25
```

2

CONFIDENTIAL

```
 1   entities or talking about a different entity
 2   affiliated with Telegram, I would of course ask
 3   you to do that.  Okay?
 4            A.  Um hum.
 5            MR. DRYLEWSKI:  Do you understand that
 6   instruction?
 7            A.  So if you will mention any specific
 8   entity you will just tell me about that, right?
 9   If it is going to be TON Issuer, you will just
10   tell me that?
11            Q.  If I want to ask you a specific
12   question about TON Issuer Inc or about Telegram
13   Group Inc, then I will use the full names of each
14   entity, but if I say generally "Telegram" I mean
15   to refer to both of those entities.
16            A.  Okay, that is clear.
17            Q.  Okay, thank you.  So, you mentioned
18   that you had learned about TON and that you had
19   offered your services to Mr. Durov, and that is
20   how you came to join Telegram.  Did I hear that
21   correctly?
22            A.  Yes.
23            Q.  Can you expand on that a little bit?
24   Tell me what you had heard about TON, when you had
25   heard it and what services you offered to
```

18

CONFIDENTIAL

1   Mr. Durov?

2          MR. DRYLEWSKI:  Objection to form.  You

3   can answer if you understand the question.

4          A.  I think we had a few discussions

5   with Pavel when he mentioned about his idea to

6   launch a new Blockchain, and we were discussing at

7   one of the meetings with him how exactly he is

8   going to raise money for this Blockchain, and

9   about the cryptocurrency that he is going to

10  launch, and just during these discussions I

11  offered him my services in fund-raising.

12         Q.  We will come back to those

13  discussions in a little bit, but first can you

14  give me a sense, after you graduated university,

15  where did you first go to work?

16         A.  I think a few months after I

17  graduated I got an offer from Pavel Durov, who was

18  at that moment the CEO of social network

19  VKontakte.

20         Q.  Can you spell that for the record?

21         A.  Now it is called VK, two letters.

22  It is easier.

23         Q.  Okay.

24         A.  He offered me to join the first

25  initial team of the company, and I joined.  So I

                                                          19

CONFIDENTIAL

```
 1    believe it was in probably -- I can be wrong on

 2    exact dates, but probably it was somewhere in

 3    2007.

 4              Q.  And before Mr. Durov made you an

 5    offer to join VKontakte, did you know him?

 6              A.  Yes, we studied together at the same

 7    university.

 8              Q.  Were you in the same class?

 9              MR. DRYLEWSKI:  Objection to form.  You

10    can answer.

11              A.  We were in the same year but not the

12    same class.

13              Q.  Were you friends?

14              A.  Yes, we were friends.

15              Q.  So by the time that he asked you to

16    join VKontakte, had Mr. Durov already created the

17    company?

18              A.  Yes, the company was already

19    created.

20              Q.  What was your position when you

21    first joined VKontakte?  Let's call it VK.

22              A.  Yes, VK, vice president.

23              Q.  What was your role?

24              A.  I was in charge of business

25    development questions, partnership, advertising,
```

20

CONFIDENTIAL

```
 1    conflict with Mr. Durov after you left VK or in
 2    connection with you leaving VK?
 3              MR. DRYLEWSKI:  Objection to form.  You
 4    can answer that question "yes" or "no", or "I
 5    don't remember".
 6              A.  I didn't have any direct conflict
 7    with Mr. Durov.
 8              Q.  Any indirect conflict?
 9              MR. DRYLEWSKI:  Objection to form.
10    Same, to the extent you remember, you can say
11    "Yes" or "no" or "I don't remember".
12              A.  I wouldn't say that I had any
13    conflicts with Mr. Durov.
14              Q.  By your earlier answer that there
15    was a confidentiality agreement, I take it that
16    the lawsuit was resolved?
17              A.  Yes.
18              Q.  In connection with that, you signed
19    a form of confidentiality agreement?
20              A.  Yes, that is correct.
21              Q.  After you left VK, in 2013 or 2014,
22    did you continue to stay in touch with Mr. Durov?
23              A.  Yes, occasionally we spoke with him.
24              Q.  Do you have an understanding of when
25    Mr. Durov launched Telegram Messenger?
```

23

CONFIDENTIAL

1              A.  I don't remember.  I don't remember.

2              Q.  Did you have any involvement with

3     Telegram Messenger at the time it was launched?

4              A.  No.

5              Q.  Before your involvement with the TON

6     project that we talked about a little earlier, and

7     that we will get to, did you have any other

8     involvement with Mr. Durov or with Telegram

9     between the time you left VK and the TON project?

10             A.  No, we didn't.  We didn't do any

11    business to together.

12             Q.  What did you do after VK?

13             A.  After VK I made a series of some

14    investments to some start-ups, and so I helped

15    them to develop from like a business point of

16    view, but I was not an employee of any company

17    until I joined Telegram and after I left VK.

18             Q.  So you were acting as an adviser to

19    start-ups?

20             MR. DRYLEWSKI:  Objection to form.  I

21    think that mischaracterizes the testimony.  Go

22    ahead.  You can answer.

23             A.  Since I invested I became a

24    shareholder, so I would say I am helping not as an

25    adviser, but I am helping as a shareholder.

                                                      24

CONFIDENTIAL

1          Q.  Okay, I am sorry, I misunderstood.

2     So you invested in some start-ups?

3          A.  Yes.

4          Q.  Which start-ups?

5          A.  There were quite a few of them.  One

6     of them was for example the company called Sum and

7     Substance.  That is just one example.  Another

8     example is Blackmoon Financial Group.  There

9     are -- I don't know, maybe three, four, five more.

10    I don't remember exactly.

11         Q.  Other than the investments in those

12    start-ups, a couple of which you have mentioned,

13    did you have any other jobs or employment between

14    VK and when you began consulting for Telegram?

15         A.  No.  So if you are asking if I was

16    an employee of the company, then the answer is no.

17         Q.  Did you have any other role with any

18    companies?

19         A.  For some time I was a consultant to

20    the fund called UCP.

21         Q.  What is UCP?

22         A.  UCP, it is a fund, quite a big fund,

23    private equity fund, and at the time UCP was a

24    shareholder of VK.

25         Q.  And does UCP stand for United

25

CONFIDENTIAL

```
 1   Capital Partners?
 2              A.  I believe so.
 3              Q.  What did you do as a consultant to
 4   UCP?
 5              A.  So there were some corporate issues
 6   between the shareholders, which I kind of helped
 7   them to settle, and also I was consultant on some
 8   other deals that they were doing.
 9              Q.  You mentioned that you had a
10   settlement with VK when you left the company.  Did
11   I hear you right?
12              A.  I wouldn't say -- it was a big
13   document with many parties involved and I think I
14   was part of the settlement, yes.
15              Q.  I was not referring to the lawsuit
16   with Mr. Durov.  I thought you said that when you
17   left VK you got like a financial package.  That is
18   how I understood your answer, a settlement of some
19   sort?
20              MR. DRYLEWSKI:  Objection to form.  You
21   can answer the question and tell her if her
22   understanding of your testimony is correct or
23   otherwise explain it.
24              A.  Yes, to be honest I just don't
25   remember how exactly this document which I signed
```

26

CONFIDENTIAL

1    in Russian should be called in English, so I am

2    just afraid to use not the right term here.

3              Q.  Okay.  Did you receive a lump sum

4    severance package when you left VK?

5              A.  I received some, yes.

6              Q.  What amount?

7              A.  I don't remember.

8              Q.  Was it several million dollars?

9              MR. DRYLEWSKI:  Objection to form.

10   Asked and answered.

11             A.  I don't remember the amount.

12             Q.  You don't remember the ballpark

13   either?

14             MR. DRYLEWSKI:  Objection to form.

15   Asked and answered several times.

16             A.  No.

17             Q.  So a few minutes ago you mentioned

18   Blackmoon Financial Group.  What is Blackmoon

19   Financial Group?

20             A.  It is a fin-tech start-up based in

21   Europe that operates in a lending space, online

22   lending space.

23             Q.  Did you start Blackmoon Financial

24   Group?

25             A.  No.

27

CONFIDENTIAL

```
 1              Q.  So you are not one of the founders?

 2              MR. DRYLEWSKI:  Objection to form.

 3              A.  It depends on what you call a

 4    founder.  So when the entity was created I was not

 5    at that moment a shareholder, but since I believe

 6    I was the first investor to the company, from this

 7    angle you can call me a co-founder.

 8              Q.  When did you first invest in

 9    Blackmoon Financial Group?

10              A.  I don't remember.  No, I don't

11    remember when.  It was more than five years ago.

12              Q.  Was it after you left VK?

13              A.  I would say around five years ago.

14    I don't remember exactly.  It was after I left VK,

15    yes.  Maybe it was 2015, but I can be wrong here.

16              Q.  Who created Blackmoon Financial

17    Group, if you know?

18              A.  Yes, it was created by Oleg Seydak.

19              Q.  Who is Oleg Seydak?

20              A.  Could you specify the question?

21              Q.  You are right, that was not a good

22    question.  Before you joined Blackmoon Financial,

23    did you know Mr. Seydak?

24              A.  Yes.  Yes, I knew him.

25              Q.  How did you know him?
```

28

CONFIDENTIAL

1          Q.  And what do you mean by "support him

2    in public"?

3          A.  I believe that we made some video

4    together that was published, so where we were

5    telling about the company.

6          Q.  And in that video were you

7    introduced as a co-founder of Blackmoon Crypto?

8          A.  I don't remember how I was

9    introduced.

10          Q.  Are you aware of any other public

11    video or document where you were put forth as a

12    co-founder of Blackmoon Crypto?

13          MR. DRYLEWSKI:  Objection to form.

14    Mischaracterizes the answer to the last question.

15    You can answer if that makes sense to you.

16          A.  I don't remember.

17          Q.  Have you ever introduced yourself to

18    anyone or represented that you were a co-founder

19    of Blackmoon Crypto?

20          A.  I don't remember how, to be honest,

21    I was introduced.

22          Q.  Do you consider yourself a

23    co-founder of Blackmoon Crypto?

24          A.  No.

25          Q.  How much did you invest in Blackmoon

33

**CONFIDENTIAL**

1    Financial Group?

2              A.   It was a long time ago.  I don't

3    remember the amount.

4              Q.   Are you today a shareholder of

5    Blackmoon Financial Group?

6              A.   Yes.  So it was a seed investment,

7    so I don't remember the number, but it was

8    probably hundreds of thousands of dollars, but I

9    could not tell you the exact figure.

10              Q.   And as a shareholder do you receive

11    dividends?

12              A.   Yes, I get some profit from the

13    company.

14              Q.   Since the time of your investment,

15    how much have you profited from Blackmoon

16    Crypto -- sorry, Blackmoon Financial Group?

17              MR. DRYLEWSKI:  Objection to form.  To

18    clarify and make sure this is clear on the record,

19    you asked about Blackmoon Financial Group?

20              MS. STEWART:  Yes.  My questions are

21    about Blackmoon Financial Group.

22              MR. DRYLEWSKI:  You can answer the

23    question if you understand it.

24              A.   I didn't calculate it for this

25    meeting, so I don't remember.

34

CONFIDENTIAL

```
 1              Q.  Do you know approximately?
 2              MR. DRYLEWSKI:  Objection to form.
 3              A.  It is very hard to say for the last
 4      four years.  No, I don't remember.
 5              Q.  Are these periodic dividends or
 6      profit sharing that you receive?
 7              MR. DRYLEWSKI:  Objection to form.
 8              A.  Yes, they are quite periodic, you
 9      can say so.
10              Q.  How often?
11              A.  Every quarter or every six months.
12              Q.  Other than these periodic dividends
13      or profit sharing, do you receive any other
14      compensation, salary, bonus any other financial
15      thing from Blackmoon Financial?
16              A.  No.
17              MR. DRYLEWSKI:  Objection to form.
18      Remember to give me a moment to object to
19      questions.
20              A.  Sorry.
21              MR. DRYLEWSKI:  No problem.
22              Q.  Do you remember the last dividend or
23      profit sharing that you received from Blackmoon
24      Financial?
25              A.  Probably in the last couple of
```

35

CONFIDENTIAL

 1   months somewhere, I don't remember.

 2          Q.   How much was that?

 3          A.   I don't remember the amount.

 4          Q.   You don't remember approximately?

 5          A.   I would say it was below 100,000

 6   dollars.

 7          Q.   Just to make sure the record is

 8   clear, have you at any point invested money in

 9   Blackmoon Crypto?

10          A.   No.

11          Q.   I should have mentioned at the

12   beginning, at any time if you want to take a

13   break, feel free, let me know and we can do that.

14          A.   Thank you.

15          MS. STEWART:  Unless you have an

16   objection I figured we stopped at 16 last time, I

17   would start with 17, because it was not named by

18   witness.  So if you can mark this as 17.

19          MR. DRYLEWSKI:  If you are asking about

20   the same documents that were used in the last

21   deposition, are we going to use the same exhibit

22   numbers or are you going to double up again?

23          MS. STEWART:  There may be a couple.  I

24   didn't have the stickered version yet so there may

25   be a couple that we would double up, but I don't

                                              36

```
 1   think it is going to be a huge thing.
 2            MR. DRYLEWSKI:  Okay.  We can talk about
 3   that later.
 4        (Exhibit 17 marked for identification)
 5            MR. DRYLEWSKI:  Please take your time
 6   and familiarize yourself with the document before
 7   answering any questions.
 8            MS. STEWART:  Mr. Perekopsky, the court
 9   reporter just handed you what we have marked as
10   Exhibit 17.  The document does not have a Bates
11   number.  The cover page says "Blackmoon
12   Whitepaper", and there is a date of March 28,
13   2018.  As your counsel mentioned, take however
14   much time you need to look at the document and let
15   me know when you are ready.
16            MR. DRYLEWSKI:  Of course, if there are
17   particular pages you want him to focus on when he
18   reviews, please let him know.
19            MS. STEWART:  I mostly am going to be
20   asking you about the people that are mentioned
21   towards the end of the document, but take however
22   much time you need to look at the document.
23                 (Pause.)
24        A.  I think you can ask questions.
25        Q.  Okay, great.  Do you know what this
```

37

CONFIDENTIAL

```
 1    in the middle of a line of questioning but just
 2    when there is a natural time for a break, we have
 3    been going for a while.
 4              A.  Actually I am fine with a break, if
 5    we can do it soon.
 6              MR. DRYLEWSKI:  Sure.
 7              MS. STEWART:  Okay, sure.
 8              Did Mr. Durov agree that it made sense
 9    for you to coordinate the fund-raising?
10              A.  Yes.  So yes, we discussed it, and
11    he wanted like to understand more how we will work
12    together, so we discussed it, shared our opinions
13    and then, yes, we came to the agreement.
14              Q.  So when you signed your consulting
15    agreement, your role was to coordinate the
16    fund-raising?  That is what you were brought on to
17    do?
18              MR. DRYLEWSKI:  Objection to form.
19              A.  I think, yes, so my role was to
20    coordinate the fund-raising, yes, and to advise on
21    fund-raise, yes.
22              Q.  At the time that you became a
23    consultant to Telegram, were there others also
24    involved in the fund-raising process at Telegram?
25              A.  Yes, I believe that John Hyman, he
```

65

CONFIDENTIAL

```
 1    became a consultant at the same time as I did.
 2              Q.   And do you have an understanding of
 3    how John Hyman came to be a consultant to
 4    Telegram?
 5              A.   I invited him.
 6              Q.   Do you have an understanding of
 7    whether Mr. Hyman previously knew Mr. Durov?
 8              A.   To my knowledge, he didn't know him
 9    before.
10              Q.   So why did you invite him to become
11    a consultant to Telegram?
12              A.   I invited him because he had a quite
13    impressive background.  As far as I remember, he
14    was head of some division or department
15    responsible for capital markets at one of the
16    large investment banks, so he definitely had a set
17    of skills required to work with a wide group of
18    sophisticated investors globally.
19              Q.   So did you suggest to Mr. Durov that
20    Telegram hire or that Telegram bring on Mr. Hyman
21    as a consultant?
22              MR. DRYLEWSKI:  Objection to form.
23              A.   Yes, I think I suggested to Pavel
24    to -- I think I suggested to Pavel basically that
25    John and I would work together on this.
```

66

1    investors that I had been talking to, they signed

2    an NDA, but not all of them.  Later on I think we

3    just included this paragraph about that

4    information is confidential to their, I believe,

5    indications of interest that we send them, and

6    probably we talked about this in the purchase

7    agreement as well, but I don't remember, so it was

8    included in other documents that they were

9    signing.

10           Q.  What was the reason for the

11   confidentiality?

12           A.  We didn't want all these materials

13   to become public and available to anybody.  So we

14   tried to target only a limited group of

15   sophisticated, accredited investors, and didn't

16   want these documents to be available to anybody.

17           Q.  Was every investor that submitted an

18   indication of interest offered an allocation?

19           A.  As far as I remember, in most cases,

20   yes.  I don't remember the other cases.

21           Q.  But do you remember that there were

22   cases where an investor that submitted an

23   indication of interest was not offered an

24   allocation?

25           A.  Excuse me, I think I didn't

121

CONFIDENTIAL

1   understand the question.  So you are asking

2   whether all of the investors who filled out this

3   form, whether all of them eventually invested,

4   right?

5           Q.  Yes?

6           A.  Or not?

7           Q.  I am asking not whether they

8   ultimately ended up investing.  I am asking

9   whether in the initial process of Telegram

10  offering particular allocations, were allocations

11  offered to everyone who had submitted an

12  indication of interest or were there some entities

13  or individuals who were not offered an allocation?

14          A.  No, we definitely offered

15  allocations not to all investors who submitted

16  this form.

17          Q.  So who decided which investors would

18  be offered allocations and which would not be?

19          A.  It was me, John and Pavel.

20          Q.  And how were the decisions made

21  about the allocations?

22          A.  We considered like a few criteria

23  here, right.  First, we tried to get only highly

24  sophisticated, reputable funds or individuals that

25  already had some track record, and in case of

                                                    122

CONFIDENTIAL

1  individuals where you could understand their

2  wealth, like the general idea how they got their

3  wealth.  Second, we tried to diversify investors

4  by geography, so we didn't want one particular

5  region of the world like to dominate in our list

6  of investors, so we were trying to be

7  decentralized even in this part.  So we tried them

8  to be decentralized all over the world.  Then, in

9  some cases, we just removed a lot of investors by

10 our own initiative, due to some information that

11 we received about them.

12       Q.  I want to break up your answer a

13 little bit.  With respect to -- you mentioned that

14 one of the criteria when you were thinking about

15 the sophistication of the investors is where the

16 individual investors got their wealth.  Did I hear

17 you correctly?

18       MR. DRYLEWSKI:  Objection to form.

19       A.  No.  I was talking about

20 sophistication when I was more talking about

21 funds, and I mean -- are you asking what do I like

22 mean by sophistication, right?  Is that right in

23 general, about this term?

24       Q.  Sure.

25       A.  So, in case of funds, right, we just

123

1    tried to take the most known, the most reputable

2    funds, with a history or with a good reputation.

3    When we are talking about individuals, we also

4    tried to include in our list only reputable people

5    with understandable sources of wealth, right, and

6    that is probably the basics.

7              Q.  And why was it important that you

8    said the individual investors had an

9    understandable source of wealth?

10             A.  We wanted to accept money only

11   from -- high quality money from high quality

12   people, and I mean that is the reason.

13             Q.  With respect to the funds, was one

14   of the factors you considered whether the funds

15   were active in the cryptocurrency space?

16             MR. DRYLEWSKI:  Objection to form.

17             A.  No, not necessarily.  Since we made

18   a decision to accept money in Fiat, sometimes

19   probably for crypto funds it was even a little bit

20   difficult to invest in Fiat, if it is crypto fund,

21   right, so by definition they probably had their

22   funds in crypto.  We didn't have this criteria

23   that we want to work only with Blockchain crypto

24   rated investors, no.

25             Q.  Was one of the factors you

                                                      124

CONFIDENTIAL

```
 1    considered in terms of the sophistication of
 2    investors their sophistication as Blockchain node
 3    validators?
 4            A.  No, no.  So TON Blockchain, the
 5    level of sophistication required to be a validator
 6    is not that high, so I would say that if this
 7    investor was sophisticated, by definition, and if
 8    he wants to become a validator, that is a doable
 9    task for all of them.
10            Q.  Other than what you have described
11    as sort of the fact that they are well known and
12    reputable, was there any other factor that you
13    looked at when considering the sophistication of
14    the investors?
15            MR. DRYLEWSKI:  Objection to form.
16            A.  So we put a process in place when we
17    were reviewing the investors, and we hired a
18    third-party provider, KYC provider, who was
19    reviewing them and sharing with us their comments
20    and their opinions.  So we just relied I would say
21    on the best practices on the market in defining
22    which investors can be accepted by us and which
23    not, and this third-party they helped us as well
24    in reviewing all the information.  Each investor
25    submitted a KYC form, and we analyzed all of these
```

125

CONFIDENTIAL

1    a lock-up?

2              MR. DRYLEWSKI:  Objection to form.

3              A.  Yes, I think I mentioned that, yes.

4              Q.  Why was the decision made to have a

5    lock-up for round one but not for round two?

6              MR. DRYLEWSKI:  Objection to form.

7              A.  It seemed natural for us that first

8    investors who paid a lower price, that they will

9    be locked up for some time, and people who paid a

10   higher price, they can use their Grams sooner.

11   Plus we thought maybe it is a little bit unfair to

12   second round rights, that they can start using

13   like their Grams immediately if they paid a lower

14   price.  It seemed fair that first stage A

15   investors should get this right to use their

16   Grams.

17             Q.  It seemed fair because they paid

18   more or for some other reason?

19             A.  Yes, because the price for their

20   Grams was higher.

21             Q.  Was there any other reason why there

22   was a lock-up for round one but not for round two?

23             MR. DRYLEWSKI:  Objection to form.

24   Asked and answered.

25             A.  I don't remember.

                                                    131

CONFIDENTIAL

```
 1              Q.  Who made the decision to have a
 2   lock-up for round one but not for round two?
 3              A.  I believe it was made by Pavel.
 4              Q.  Did you discuss that decision with
 5   Mr. Durov before he made it?
 6              MR. DRYLEWSKI:  Objection to form.
 7              A.  I think, yes, we discussed it.
 8              Q.  Was there any difference in the
 9   criteria you considered for investors in the
10   second round as opposed to the first round which
11   you have already described?
12              A.  I think the criteria in selecting
13   final investors, no, they were the same.
14              Q.  Did you and others at Telegram send
15   emails to investors from time to time with updates
16   about the Blockchain?
17              A.  Yes.  Yes, we did.
18              Q.  Who drafted those emails?
19              MR. DRYLEWSKI:  Objection to form.
20              A.  As far as I remember, Pavel in most
21   cases, based on some legal advice.
22              Q.  In general, would you and Mr. Hyman
23   and Mr. Parekh send the same form emails to all
24   investors?
25              MR. DRYLEWSKI:  Objection to form.
```

                                                    132

CONFIDENTIAL

```
 1   personally in touch with particular people that he

 2   knew?

 3              MR. DRYLEWSKI:  Objection to form.

 4              A.  Could you rephrase it, please?

 5              Q.  How did he go about introducing you

 6   to investors?

 7              A.  He was just telling us: "Here is an

 8   interesting project.  Here is the right contact to

 9   hear more."  I think that is it, something like

10   that.

11              Q.  Did Telegram compensate him for

12   these introductions?

13              A.  We never compensated anybody for any

14   introductions.

15              Q.  So why was he making the

16   introductions?

17              MR. DRYLEWSKI:  Objection to form.  You

18   can answer that question if you know.

19              A.  My personal impression, that he was

20   from this space, I think he previously worked or

21   was consultant to Ripple, which is another

22   Blockchain, and I think he was very excited in

23   general about this idea, and he just wanted to

24   help with some introductions, and he probably

25   spent a day, a few hours to do that.  So I
```

145

CONFIDENTIAL

1  wouldn't say it is something that a person would

2  expect to be compensated.

3          Q.  Did he participate in any meetings

4  with investors, along with you?

5          A.  I don't remember that, no.

6          Q.  Did Mr. Seydak?

7          A.  No, I don't remember that as well.

8          Q.  Did either Mr. Joshua or Mr. Seydak

9  invest in TON?

10         A.  Not that I am aware of.

11         Q.  Did Blackmoon Financial or Blackmoon

12  Crypto invest in TON?

13         A.  No, as far as I know, no.

14         Q.  Did you ask Mr. Joshua to reach out

15  to particular investors or did he choose who he

16  was going to reach out to?

17         A.  As far as I remember, he was based

18  in Israel, and I didn't know a lot of people from

19  Israel, but it looked helpful, since we tried to

20  reach diversification by geography, it seems

21  logical to establish some contacts in Israel, and

22  when he suggested that I didn't object, but he

23  selected people himself, I believe.

24         Q.  At this time, in 2017, did you have

25  any discussions with Mr. Joshua about any role he

146

CONFIDENTIAL

1    that I was aware that they are developing custody,

2    so I usually just gave a list, I just gave a list

3    of all companies that I knew.

4              Q.  Did you give this list of possible

5    custodians before the purchase agreements were

6    signed, like in late 2017, early 2018?

7              A.  No, because there was no companies

8    at that moment developing custodial solutions.

9              Q.  So did investors sort of before they

10   signed, did they have questions about custody that

11   you were able to answer?

12             A.  They were asking like about our

13   plans:  "Do you think that big custody companies

14   will work with Gram?"  I said yes, probably they

15   will, right, if you are going to be one of their

16   largest players and if it is one of the widely

17   used cryptocurrencies, definitely they will

18   integrate Gram, right.  So that is the question.

19   It is just a logical conclusion.

20             Q.  Did Telegram reach out to companies

21   that could provide custody solutions?

22             MR. DRYLEWSKI:  Objection to form.

23             A.  I would say the other way.  I would

24   say that they were reaching out to us rather than

25   we are reaching out to them, and the same about

166

CONFIDENTIAL

```
 1    exchanges.
 2              Q.  Which exchanges reached out to you?
 3              MR. DRYLEWSKI:  Objection to form.  To
 4    Telegram or to him personally?
 5              MS. STEWART:  To Telegram.
 6              MR. DRYLEWSKI:  You can answer that if
 7    you know.
 8              A.  Yes, I mean, to my knowledge,
 9    different channels of communications, I would say
10    probably all exchanges tried to reach out to us.
11    If they knew one on one investor, they would call
12    him and he was calling me, saying this exchange
13    wants to talk.  So many of them tried to reach out
14    to us, but my personal vision here was that it is
15    better, since our resources were very limited, you
16    didn't have enough people and time to talk to all
17    of them, but at the same time we understood the
18    importance of exchanges, because exchanges would
19    give an opportunity to users, to people to get
20    Grams.  So we thought it is important to respond
21    at least to some exchanges, and we just probably
22    chose the largest ones and exchanges that have the
23    best reputation on the market and the biggest
24    amount of users.
25              Q.  What are those exchanges?
```

167

CONFIDENTIAL

1          A.  As far as I remember, I had a

2     conversation with Binance, with Coinbase and with

3     Okex.  Why specifically these three?  We also

4     thought there about like geographical

5     diversification.  As far as I know, Coinbase was

6     more focused on United States.  Binance Is a

7     global player in many countries.  Okex is more

8     focused on Asia.  That is just my impression, from

9     what I could find in the public sources.  So for

10    me these three exchanges more or less covered the

11    world.

12          Q.  So you personally had discussion

13    with all three exchanges?

14          A.  Yes, I personally did.

15          Q.  And what is the status of those

16    discussions?

17          MR. DRYLEWSKI:  Objection to form.

18          A.  Right now all discussions are put on

19    hold, but before we put them on hold they were

20    quite active and in most cases these exchanges

21    were having more technical questions.  We didn't

22    just have resources to answer all of them because

23    they had many of them.  Since the public network

24    was already launched, and we knew that there were

25    teams of developers who were digging deep, the

                                                       168

CONFIDENTIAL

 1   test network, and they were giving us some

 2   feedback, so I decided once I get a lot of

 3   questions from exchanges, and some of the teams of

 4   developers who were testing the test network, they

 5   offered themselves help in answering these

 6   questions.  They said: "If you want us to help,

 7   and we understand that you are very limited with

 8   resources, let us help, because we understand

 9   Blockchain and we understand the testnet."  So

10   usually it ended up in some group chat in

11   Telegram, where there was an exchange of

12   representatives, me, Shyam, and some third-party

13   developers that were offering help, and I just

14   added them to this group.  Usually it was a long

15   technical discussion in this group and I didn't

16   follow.  I just didn't understand half of it.

17            Q.  Who are the third-party developers

18   that you would add to these Telegram Groups?

19            A.  In particular these are Binance and

20   Coinbase.  I believe I added people from TON Labs.

21   With Okex, I added a team of developers and they

22   were developing some solution, exchange solution

23   for Grams.  They were called Mercurio.

24            Q.  When did the discussion with these

25   exchanges get put on hold?

                                                     169

**CONFIDENTIAL**

1  probably not, because if you look at the traction

2  of many of these funds, I wouldn't say that that

3  is their strategy.  They are usually funds with a

4  long history, right, and long traction of

5  different deals, and they exist in the market not

6  one day but many years.  I wouldn't agree that

7  that is their strategy, that they expect high risk

8  or high return.  I would rather say that it is a

9  fund that used to invest long-term, the other way,

10  that is the type of investors who are not looking

11  for fast return for sure, that the funds used to

12  invest and they are not in a hurry, right, so they

13  are long-term investors, not looking for the fast

14  return, so I would say the other way around.

15       Q.  Did you ask investors what they

16  intended to do with their Grams once they were

17  issued?

18       MR. DRYLEWSKI:  Objection to form.

19       A.  I personally didn't ask that

20  because, in my opinion, it is the same like when

21  people buy something from me and they get money

22  into the account and I ask "What are you going to

23  do with your money".  So I don't think it is an

24  appropriate question to ask what people are going

25  do with their own funds after we don't have any

172

CONFIDENTIAL

1  relations anymore, right.  But sometimes they just

2  explicitly mentioned some ideas that they had.  So

3  I didn't ask this specifically but sometimes they

4  mentioned their intentions.

5       Q.  Did any investor tell you that they

6  intended to use their Grams once they were issued

7  to buy goods and services?

8       A.  I am sure that some investors were

9  sharing these kind of ideas but, as I said before,

10  since it is a fund, right, they were talking more

11  about the projects that they would probably --

12  that can potentially use the Grams and the

13  technology afterwards.  I don't remember any

14  specific conversations that they are going to --

15  of course, they understood and it was clear all

16  these investors were sophisticated, that in order

17  for this ecosystem to evolve, and in order so that

18  we had a lot of projects using Gram, it takes

19  time.  So probably on day one, after the launch,

20  definitely there will be some projects, right, but

21  still it takes time for the ecosystem to appear.

22  I am sure that many funds that invested like --

23  not funds, investors -- invested in the long run.

24  They were planning to use it, you know, to pay for

25  something but definitely maybe not on day one.

173

CONFIDENTIAL

1          Q.   When you say "I am sure they were

2     planning to use it to pay for something", what is

3     that based on?

4          A.   Because all investors clearly

5     understood, after the Grams are issued, that it is

6     a currency and basically it is their own money.

7     So if it is their own funds, of course they can

8     use them for whatever needs that they want to use

9     them.

10          Q.   Did you ask any investors whether

11     they intended to hold their Grams for a long time?

12          A.   We had a discussion.  We had a

13     conversation about them, yes.  Many many many

14     investors told me that they are long-term, yes.

15     Yes, I would say quite a lot of conversations.  In

16     many conversations they mentioned that for them it

17     is a long-term step.

18          Q.   Which investors told you that?

19          A.   I can't give you any specific names,

20     but if I look, probably many of them, most of the

21     funds, most of the large investors usually said

22     that for them it is a long-term investment, but of

23     course they didn't give us guarantee that they

24     will not do something with their Grams earlier.

25          Q.   Did any investors tell you that they

174

CONFIDENTIAL

1    intended to liquidate their Grams for a profit?

2          A.   I wouldn't say that they structured

3    their questions that way, right, but when for

4    example some investors asked me, "Are you aware of

5    any exchanges that are planning to list Grams", I

6    could assume from this question that probably they

7    are going to use exchange, they are going to sell

8    some part of their Grams, right.  So I would say

9    when people were asking about exchanges, you can

10   probably put them to this category, right, of

11   people who were like showing an interest to

12   selling part of them.

13         Q.   Did you ask any investors whether

14   they planned to validate the nodes?

15         MR. DRYLEWSKI:  Objection to form.

16         A.   I can say that a lot of investors

17   were asking about validation.  Especially the

18   closer to the launch we got, the more questions

19   were about that, and they were sending emails

20   asking in Telegram, calling, asking in meetings,

21   yes, so a lot of questions about that.

22         Q.   Who asked you about that?

23         A.   If you want I can go to the list of

24   investors, I can name you, because it was a lot of

25   people.

175

CONFIDENTIAL

```
 1    purchase agreements that ended up replacing those
 2    initial purchase agreements from the presale, when
 3    did those close?
 4              A.  I don't remember the date, but it
 5    didn't take too much time.  It was maybe a matter
 6    of a few weeks, maybe one month, something like
 7    that.  I am not sure, but probably around this
 8    timeframe.
 9          (Exhibit 30 marked for identification)
10              I have handed you what has been marked
11    Exhibit 30, TLGRM-012-00015106, which appears to
12    be an October 11, 2018 invoice.  My question will
13    be what is this document?
14              A.  It is hard for me now to say for
15    sure what is this about.  I can't comment now.  I
16    don't remember.
17              Q.  Does it appear to be an invoice from
18    Space Investments Limited and Goliat Solutions
19    Limited?
20              A.  Yes, but I just don't remember what
21    is it about.
22              Q.  Did Telegram pay fees to any of the
23    initial purchasers?
24              A.  Not that I remember, but I need to
25    double check that.
```

204

CONFIDENTIAL

```
 1              Q.  Did Telegram have side agreements
 2    with any of the initial purchasers?
 3              MR. DRYLEWSKI:  Objection to form.
 4              A.  I don't remember that now.
 5         (Exhibit 31 marked for identification)
 6              Q.  We have handed you what has been
 7    marked Exhibit 31, which is TLGRM-007-00070366 and
 8    my question will be what is this document?
 9              A.  I don't remember this particular
10    document as well.  I need to check.
11              Q.  So this document, Exhibit 31,
12    doesn't refresh your recollection as to whether
13    Telegram paid fees to any initial purchasers?
14              MR. DRYLEWSKI:  Objection to form.  Do
15    you have any emails or anything showing that he
16    got this?
17              MS. STEWART:  I do.
18              MR. DRYLEWSKI:  Thank you, that would be
19    helpful.  It may help the witness.
20              Q.  My question still stands.  Does this
21    refresh your recollection?
22              A.  No, I don't remember it from memory.
23              Q.  Do you recall receiving Exhibit 30,
24    the last document we looked at?
25              A.  No.  No, I need to check that.
```

205

CONFIDENTIAL

 1   page?

 2              A.   Very, very small, but yes.

 3              Q.   I see it.  Okay.  Does that

 4   describes the 25 percent over time that I asked

 5   you about a second ago?

 6              A.   But it is very vague, a little bit

 7   strange.

 8              Q.   Okay.  Did you do anything after

 9   receiving this email in May 2019?

10              A.   Yes, I remember I called this

11   company.  I spoke with them.  They denied the fact

12   that they were doing these deals.  And it was a

13   little bit awkward to me because, as I told you,

14   they were a stage A investor, and here it was a

15   price, 1.33, and about presale.  So they denied

16   the fact that they had been doing something like

17   that, and I didn't get any like evidence that they

18   really were trying to resell.

19              Q.   Did you send them a copy of this

20   brochure that is attached to Exhibit 35?

21              A.   I don't remember specifically that,

22   but I remember calling them.

23              Q.   Did Telegram take any action in

24   respect to ATON, after receiving this email in

25   May 2019?

                                                     226

CONFIDENTIAL

1           A.  Anyway, we will request a new rep

2   letter from them before we issued them any Grams.

3   I was not sure about this information, because

4   they already paid 1.33 per Gram.  It just didn't

5   make too much sense.  It didn't make a lot of

6   sense in selling at the same price what they

7   bought, so it was little bit inconsistent, this

8   offer.  So I made a call but they denied it, and

9   it was very unclear, everything here.  It was very

10  inconsistent, not very consistent.  It was a bit

11  inconsistent.

12          Q.  Are you aware of anyone else at

13  Telegram taking any steps in trying to confirm the

14  information that is in Exhibit 35?

15          A.  No.  No, probably it was just me

16  calling them.

17          Q.  Did ATON provide any services to

18  Telegram, putting aside the fact that they were an

19  initial purchaser -- strike that.

20          Did Telegram have any other business

21  relationship with ATON?

22          A.  ATON introduced us to a few

23  investors as well, in stage A.  That is what I

24  remember.  I don't remember any presale.  I think

25  they were from stage A.  I remember we were

                                                    227

CONFIDENTIAL

1    discussing with them potentially opening a

2    brokerage account at ATON, but I don't know how it

3    ended.  Just this.

4             Q.  Did they receive any kind of fee for

5    introducing you to other investors?

6             A.  No, I don't remember that.

7          (Exhibit 36 marked for identification)

8             Q.  We have handed you what we have

9    marked as Exhibit 36, which is TLGRM-006-00002969,

10   which appears to be an April 18, 2018 email to you

11   and some redacted individuals from another

12   redacted individual.

13            A.  Yes.  I read it.

14            Q.  Have you seen this document before?

15            A.  I don't remember it.

16            Q.  Do you know what the document is

17   referring to about personally apologizing to you

18   gentlemen for the recent event?

19            A.  No, I don't remember what was that

20   about.

21            Q.  You don't remember anything about

22   anything discussed in this document?

23            A.  No.

24            Q.  What was your practice for

25   communicating with others at Telegram, Mr. Durov,

                                                      228