# PX14

CONFIDENTIAL

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

   ------------------------------------x
4                                        )
   SECURITIES AND EXCHANGE COMMISSION, )
5                                        )
                        Plaintiff,       ) 19 Civ. 9439 (PKC)
6                                        )
        v.                               )
7                                        )
   TELEGRAM GROUP INC. and               )
7  TON ISSUER INC.,                      )
8                                        )
                        Defendants.      )
9                                        )
   ------------------------------------x
10

11

12                         CONFIDENTIAL

13               VIDEOTAPED DEPOSITION OF

14                       SHYAM PAREKH

15                    December 10, 2019

16

17

18                       Taken at:

19     Skadden, Arps, Slate, Meagher & Flom (UK) LLP
                        40 Bank Street
20                       Canary Wharf
                       London, E14 5DS
21

22

23

   Reported by:
24   AILSA WILLIAMS,
   Certified Court Reporter
25   JOB No. 191210MWC

                                                        1

CONFIDENTIAL

```
1                     A P P E A R A N C E S
2        For the Plaintiff:
3                     SECURITIES AND EXCHANGE COMMISSION
4                     New York Regional Office
5                     200 Vesey Street, Suite 400
6                     New York, New York 10281-1022
7                     212.336.9145
8                     BY: KEVIN McGRATH, LADAN STEWART,
9                         JORGE G. TENREIRO (on phone)
10                        Tenreiroj@sec.gov
11
12       For the Defendant:
13                    SKADDEN ARPS SLATE MEAGHER & FLOM
14                    4 Times Square
15                    New York, New York 10036
16                    212.735.3000
17                    BY: ALEXANDER DRYLEWSKI, THANIA CHARMANI
18                        and CHRISTOPHER MALLOY
19                        Thania.charmani@skadden.com
20
21       ALSO PRESENT
22       NOTARY PUBLIC: KEITH ROONEY
23       COURT REPORTER: AILSA WILLIAMS
24       VIDEOGRAPHER:  LINDA FLEET
25
```

2

CONFIDENTIAL

```
 1              THE VIDEOGRAPHER:  This is the
 2    videotaped deposition of Shyam Parekh in the
 3    matter of Securities and Exchange Commission
 4    versus Telegram Group Inc et al, case number 19
 5    CIV 9439 PKC.
 6              Today's date is December 10, 2019.  The
 7    time on the video monitor is 9:19 a.m.  My name is
 8    Linda Fleet with Gradillas Court Reporters.
 9              Would counsel please voice identify
10    themselves.
11              MR. McGRATH:  Kevin McGrath.
12              MS. STEWART:  Ladan Stewart, for the
13    SEC.
14              MR. McGRATH:  We have Jorge Tenreiro on
15    the phone from SEC.
16              MR. DRYLEWSKI:  Alex Drylewski from
17    Skadden Arps for the defendants and the witness.
18              MS. CHARMANI:  Thania Charmani from
19    Skadden Arps.
20              MR. MALLOY:  Christopher Malloy from
21    Skadden Arps.
22              THE VIDEOGRAPHER:  The notary will now
23    swear the witness.
24                  MR. SHYAM PAREKH
25                  Having been sworn,
```

5

CONFIDENTIAL

```
1              Testified as follows:
2         DIRECT EXAMINATION BY MR. McGRATH:
3              MR. McGRATH:  Good morning, Mr. Parekh.
4         A.  Good morning.
5         Q.  Is that how you pronounce your name,
6    "Parekh"?
7         A.  Yes.
8         Q.  My name is Kevin McGrath and this is
9    Ladan Stewart.  We have on the phone Jorge
10   Tenreiro.  We are attorneys with the Securities
11   and Exchange Commission.  We are based in New York
12   and we are representing the Securities and
13   Exchange Commission, I will refer to that as the
14   SEC, in connection with this lawsuit against
15   Telegram Group Inc and TON Issuer Inc.
16             Are you represented by counsel here
17   today?
18        A.  I am.
19             MR. McGRATH:  And you are representing
20   Mr. Parekh in his individual capacity as well as
21   the defendants in this case?
22             MR. DRYLEWSKI:  Yes.
23             MR. McGRATH:  Mr. Parekh, how old are
24   you.
25        A.  46.
```

6

CONFIDENTIAL

```
1              Q.   Where were you born?
2              A.   In the United States.
3              Q.   Are you currently a US citizen?
4              A.   I am.
5              Q.   Is English your native language?
6              A.   It is.
7              Q.   When I ask you any question, if you
8     don't understand, please let me know and I will
9     try to rephrase the question.
10             A.   Okay.
11             Q.   Are you currently taking any
12    medication that impairs your ability to think
13    clearly or to understand or respond to questions
14    that I put to you?
15             A.   No, I am not.
16             Q.   Are you aware of anything that would
17    impair your ability to understand my questions or
18    think clearly or to respond accurately today?
19             A.   No, I am not aware of anything.
20             Q.   Can you please describe your
21    educational background?
22             A.   I studied in the United States, went
23    to university at MIT, Boston, and did a bachelor's
24    degree in computer science.
25             Q.   What year did you get your degree?
```

7

CONFIDENTIAL

```
 1              A.   1992.
 2              Q.   Did you do any post college studies?
 3              A.   No.
 4              Q.   Where do you currently live?
 5              A.   In the UK.
 6              Q.   Where, what city?
 7              A.   London.
 8              Q.   How long have you lived in London?
 9              A.   23 years, approximately.
10              Q.   Where are you currently employed?
11              A.   I am self-employed, and I am a
12      consultant engaged by Telegram, in this context.
13              Q.   When you refer to Telegram, are you
14      referring to Telegram Group Inc or some other
15      entity?
16              A.   I am technically engaged with the
17      group entity of Telegram.
18              Q.   What is the name of that entity?
19              A.   Telegraph Inc.
20              Q.   Telegraph Inc.  You indicated that
21      you were a consultant?
22              A.   That is correct.
23              Q.   Is there a written consulting
24      agreement that you have with Telegram or, I am
25      sorry, Telegraph?
```

8

CONFIDENTIAL

1          A.  Yes, there is.

2          Q.  How long have you acted as a

3   consultant?

4          A.  Since January of this year.

5          Q.  Can you generally describe what your

6   responsibilities are as a consultant?

7          A.  Principally, my responsibilities

8   relate to interacting with investors, in

9   particular in connection with the anticipated

10  launch that was planned originally for October.

11         Q.  The launch of the TON network?

12         A.  Yes.

13         Q.  Just for the record, when I refer to

14  the TON network, I am referring to the Telegram

15  Open Network Blockchain Ecosystem?

16         A.  Understood.

17         Q.  Again, in terms of terminology --

18  let me back up.

19             Prior to your role as a consultant in

20  January 2019, where were you employed?

21         A.  I was employed by Telegram Holdings

22  UK Limited, which was a UK entity established by

23  Telegram, for most of 2018, and for a short period

24  in January of 2018 I was a consultant, when I

25  first became involved with this project.

9

CONFIDENTIAL

1              Q.  Consultant to Telegram Holdings UK
2        Limited?
3              A.  I can't recall the legal entity with
4        whom that original consulting agreement was with.
5        I would have to go back --
6              Q.  Are you familiar with an entity
7        called Telegram Group Inc?
8              A.  Yes.
9              Q.  What is your understanding of what
10       that entity is?
11             A.  It is the parent company for the
12       overall group.
13             Q.  Are you familiar with an entity
14       called TON Issuer Inc?
15             A.  Yes.
16             Q.  What is your understanding of what
17       that entity is?
18             A.  It is the entity in connection with
19       the issuance of the Grams upon the launch of the
20       TON network.
21             Q.  Unless there is any objection by you
22       or your counsel, I will be asking you a lot of
23       questions today about Telegram, and unless you
24       have any objection when I refer to Telegram I am
25       going to be referring to Telegram Group Inc and

                                                        10

CONFIDENTIAL

```
 1    TON Issuer Inc.  If your answer requires you to

 2    make a distinction between those two entities,

 3    please feel free to do so, but just to move this

 4    along, instead of me constantly staying "Telegram

 5    Group Inc" and/or "TON Issuer Inc", I think this

 6    will work better?

 7              MR. DRYLEWSKI:  Are you okay with that?

 8         A.   I have no issue with that.

 9         Q.   Thank you.  Where were you employed

10    prior to January 2018?

11         A.   I have been self-employed for a

12    number of years.

13         Q.   Doing what type of work?

14         A.   I am largely retired.  I am involved

15    in a few start-ups.  I manage a farm with my wife,

16    that sort of thing.

17         Q.   Before you largely retired, what

18    type of work did you do?

19         A.   I was in the financial services

20    industry for about 20 years.

21         Q.   Just at a very high level, either

22    working backwards from when you were virtually

23    retired or starting from your post college period,

24    can you briefly describe your work experience?

25         A.   From when to when?
```

11

CONFIDENTIAL

```
 1              Q.  Either way, whatever works easier
 2     for you.
 3              A.  From college --
 4              Q.  From college to when you sort of
 5     retired or working backwards?
 6              A.  So I started at a derivatives
 7     trading boutique in Chicago in New York and I was
 8     there for four years.  It was acquired by Swiss
 9     Bank Corporation.
10              Then I joined Morgan Stanley in London
11     in 1996 and apart from a brief one year away, I
12     was there until 2012.
13              Then, in 2012, I left Morgan Stanley to
14     join a start-up hedge fund, founded by a former
15     boss from my first employer, and that lasted three
16     years, before he decided to close the fund and
17     return capital, and as I say at that point I
18     retired to my farm with my wife.
19              Q.  During your period at Morgan
20     Stanley, between approximately 1996 to 2012, can
21     you briefly describe what type of work you did?
22              A.  Sure.  Most of my time was in the
23     capital markets division, principally equity
24     capital markets, but during the financial crisis
25     equity and debt capital markets relating to
```

12

CONFIDENTIAL

1    European financial institutions.

2             Q.   What type of work did you do in

3    connection with those markets?

4             A.   As I say, latterly, equity and debt

5    capital markets, my job and my team's job was

6    trying to restructure the balance sheets of

7    failing or struggling European banks during the

8    crisis.

9             Q.   During the time that you were at the

10   hedge fund, between approximately 2012 and 2015,

11   what type of responsibilities did you have?

12            A.   I was a portfolio manager in the

13   financial sector, European and US banks and

14   insurance companies.

15            Q.   What was the name of the hedge fund?

16            A.   Peak Six Advisers.

17            Q.   Who founded that firm?

18            A.   Joseph Scoby.

19            Q.   Prior to appearing here this

20   morning, what did you do to prepare for this

21   deposition?

22            A.   I had a meeting with these three

23   individuals yesterday.

24            Q.   Approximately how long did the

25   meeting last?

                                                      13

CONFIDENTIAL

```
 1              A.  With a number of breaks, we met over
 2      the course of yesterday.
 3              Q.  Was anybody else present at that
 4      meeting, other than the three attorneys sitting
 5      here today?
 6              A.  No.
 7              Q.  Did you do anything to prepare for
 8      this deposition, prior to meeting with these three
 9      attorneys yesterday?
10              A.  No.
11              Q.  Have you reviewed any documents in
12      preparation for this deposition?
13              A.  Yes.
14              Q.  Can you describe generally what type
15      of documents you reviewed?
16              MR. DRYLEWSKI:  I am going to object to
17      that question and I am going to instruct the
18      witness not to answer on attorney work product
19      grounds.  You can ask him whether any documents
20      refreshed his recollection, but you cannot ask him
21      which documents he was shown during prep.
22              MR. McGRATH:  I was going to say -- I
23      don't think that was my question.
24              I am not asking you specifically what
25      documents any attorneys showed you.  I am asking
```

14

**CONFIDENTIAL**

```
1    you what documents you reviewed in connection with

2    the deposition.  I am happy it rephrase it to say

3    did you review any documents in preparation for

4    this deposition that refreshed your recollection

5    as to any of the events relating to the TON

6    Blockchain issuance.

7              MR. DRYLEWSKI:  You can answer that

8    question "yes" or "no".

9              A.  Yes.

10             Q.  What documents?

11             MR. DRYLEWSKI:  You can answer that

12   question, if you know.

13             A.  They were a multitude of documents

14   that, as a general matter, refreshed my memory.

15             MR. McGRATH:  Did you look at the

16   emails -- were there emails that refreshed your

17   recollection?

18             MR. DRYLEWSKI:  You can answer that

19   question "yes" or "no".

20             A.  Yes.

21             Q.  Were there any offering documents

22   that refreshed your recollection?

23             MR. DRYLEWSKI:  Same instruction.

24             A.  Yes.

25             Q.  Did you discuss your deposition with
```

15

CONFIDENTIAL

```
1    anyone other than the three attorneys that are in
2    this room?
3              A.  No.
4              Q.  Have you spoken to either Pavel or
5    Nikolai Durov relating to your deposition?
6              A.  No.
7              Q.  You have not contacted then at all
8    about your deposition?
9              A.  No.
10             MR. DRYLEWSKI:  Objection.  Give me a
11   moment to put in objections.  That is asked and
12   answered.
13             Q.  I don't think it was.  I think the
14   first question was "have you spoken with" and the
15   second question was "have you communicated with".
16   In any event, we will move on.
17             Have you read the complaint in this
18   case?
19             A.  I have.
20             Q.  Have you read the answer by the
21   defendants in this case?
22             A.  I have.
23             Q.  Have you read any documents that
24   were submitted on behalf of the defendants in
25   connection with this litigation, to court?
```

16

CONFIDENTIAL

```
 1            MR. DRYLEWSKI:  Objection to form.
 2      Other than the ones he just said?
 3            MR. McGRATH:  Yes.
 4            MR. DRYLEWSKI:  You can answer that
 5      question if you understand.
 6            A.  I have, yes.
 7            Q.  What documents?
 8            A.  I am not a lawyer but I have read
 9      the responses that Telegram, with our lawyers
10      support provided to the court, if that is the
11      question you are asking.
12            Q.  Did you read the Securities and
13      Exchange Commission's motion for a temporary
14      restraining order and preliminary injunction in
15      this case?
16            A.  I did, yes.
17            Q.  Have you read any of the submissions
18      that the law firm Skadden Arps made to the
19      Securities and Exchange Commission prior to the
20      institution of the complaint in this case?
21            A.  Is that --
22            MR. DRYLEWSKI:  You can answer that
23      question with a "yes" or "no", if you know.
24            A.  Yes, I have read that.  I am
25      assuming the content is privileged but the --
```

17

CONFIDENTIAL

1          MR. McGRATH:  I am not asking you what

2     if anything you spoke with your attorneys about.

3          Have you spoken with anyone else

4     associated with Telegram in preparation for your

5     deposition here today, other than the attorneys in

6     this room?

7          A.  The only conversation would have

8     been with my colleague, Ilya Perekopsky, and

9     solely in conjunction with logistics, because he

10    does not live in the UK, so in terms of scheduling

11    his dates versus mine.

12         Q.  Where does Mr. Perekopsky currently

13    live?

14         A.  I am not 100 per cent sure.  He

15    mostly lives in Spain, but he moves around a fair

16    amount with his family.

17         Q.  If I understand your testimony

18    correctly, you didn't speak with Mr. Perekopsky

19    about any substantive matters that related to what

20    you anticipated would be asked or discussed in the

21    deposition?

22         A.  No.

23         MR. DRYLEWSKI:  Make sure that you allow

24    Kevin to finish his question before you answer,

25    for purposes of the record.

18

CONFIDENTIAL

```
 1              A.  Understood.

 2              Q.  Who is your -- strike that.

 3              Where is your office currently located,

 4       if you have one?

 5              A.  As in Telegram or Telegraph's

 6       offices?

 7              Q.  Yes.

 8              A.  So there is nothing in the UK.  I

 9       work from home, and Telegram itself, I believe

10       most of the staff are located in Dubai.

11              Q.  How did you come to be hired by

12       Telegram as a consultant?

13              A.  I was brought in to this by a

14       colleague named John Hyman.  He used to be my boss

15       at Morgan Stanley for a number of years and he had

16       been working, together with Ilya,

17       consulting/advising Telegram during the course of

18       end of 2017.  He contacted me in January of 2018

19       and explained what they were looking at and asked

20       if I might be interested in learning more and

21       possibly getting involved.

22              Q.  And what in summary did Mr. Hyman

23       tell you your anticipated role would be, if you

24       were working for Telegram?

25              A.  He explained that they were looking
```

19

CONFIDENTIAL

1    at a possible fund-raising in connection with a

2    new Blockchain network, which was supposed to be

3    technically more sophisticated than Bitcoin and so

4    forth, and the new cryptocurrency associated with

5    that, and that the role would be in assisting, as

6    we had done together in capital markets

7    transactions, assisting with managing that

8    fund-raising exercise.

9             Q.  Did you say you entered into a

10   consulting agreement in January 2017?

11            A.  That is correct.

12            Q.  Did you meet with anyone other than

13   Mr. Hyman before you entered into that consultancy

14   agreement?

15            MR. DRYLEWSKI:  Objection to form.  You

16   can answer.

17            A.  Yes.  After first speaking with

18   John, I then had a follow-up meeting face to face

19   with John and Ilya, where Ilya also gave his

20   perspective on what they were trying to

21   accomplish.

22            Q.  Did you have any communication with

23   either Pavel or Nikolai Durov prior to entering

24   into your consultancy agreement with Telegram?

25            A.  No, I don't think so.

                                                    20

CONFIDENTIAL

```
 1              Q.  What were the terms of your
 2    consultancy agreement, just in terms of
 3    compensation?
 4              MR. DRYLEWSKI:  Objection to form.  You
 5    can answer.
 6              A.  Yes, I would have to go back and
 7    look at the details, but vaguely there was a fixed
 8    sign on bonus, a monthly salary, and then a final
 9    bonus again, which was predetermined.
10              Q.  Were there any incentives built into
11    the consultancy agreement?
12              A.  No.
13              Q.  During the time that you worked for
14    Telegram as a consultant, were you always working
15    out of your home?
16              A.  Yes.
17              Q.  Who did you report to?
18              A.  Initially to John, and after John
19    departed from Telegram, to Ilya, which is who I
20    report to currently.
21              Q.  Where was Mr. Hyman located when you
22    first started working for Telegram?
23              A.  He is also UK, UK based.
24              Q.  Did he operate out of an office or
25    home, do you know?
```

21

CONFIDENTIAL

```
1              A.  Home mostly.
2              Q.  Where was Mr. Perekopsky located
3       when you first started working for Telegram?
4              A.  I am not 100 per cent sure.  As I
5       said before, I believe principally he was based
6       out of Spain.
7              Q.  Did you have anybody that reported
8       to you during the time that you worked for
9       Telegram?
10             A.  No.
11             Q.  On a daily basis, how frequently did
12      you interact with Mr. Hyman and Mr. Perekopsky
13      during the time that they were both working there?
14             MR. DRYLEWSKI:  Objection to form.  You
15      are saying any period of time?
16             MR. McGRATH:  Yes.
17             A.  During the fund raisings in the
18      first half of 2018, it would have been quite a
19      frequent interaction.  Since then it has been more
20      sporadic, depending on what has been required.
21             Q.  Do you currently have any
22      entitlement to receipt of Grams?
23             A.  I do not.
24             Q.  Have you been promised any Grams?
25             A.  I have not.
```

22

CONFIDENTIAL

1              Q.  Prior to your employment at
2    Telegram, did you have any experience working with
3    companies that were involved in the creation of
4    Blockchains?
5              A.  No.
6              Q.  Did you have any personal experience
7    in coding for Blockchains?
8              A.  No.
9              Q.  Or the creation of digital assets?
10             A.  No.
11             Q.  So when you first started working at
12   Telegram, what were you specifically asked to do?
13             MR. DRYLEWSKI:  Objection to form.  You
14   can answer.
15             A.  At that point there had been a
16   number of indications of interest already provided
17   by investors in this initial fund-raising.  So my
18   first task was really to gather those together and
19   compile a list of prospective investees and then
20   coordinate with those investees on the process, as
21   it would go, proceed from there.
22             Q.  Did you interact with both United
23   States based and foreign based potential
24   investors?
25             A.  I did.

                                                    23

CONFIDENTIAL

1          Q.  And what if any criteria were you
2     given or did you -- let me start again.
3          What if any criteria were you given in
4     terms of analyzing which potential purchasers of
5     the Grams you should interact with?
6          MR. DRYLEWSKI:  Objection to form.
7          A.  So, as I said, the investors at that
8     point had largely already been identified, and
9     their expressions, as evidenced by the letter of
10    intent, or the perceived signed letter of intent
11    from investors, in the full amount of the proposed
12    subscription, in fact well in excess.  So my
13    role -- there was not a criteria given to me, in
14    terms of interacting or identifying further
15    investors.  I am not sure if that was your
16    question.
17         Q.  What was your understanding as to
18    how Telegram was going to raise money during the
19    time that you started at Telegram forward, so
20    starting in 2018?
21         A.  Yes.
22         Q.  You were asked to interact with some
23    potential investors that were purchasers.  We call
24    them the initial purchasers in the Gram.  So I am
25    going to use that phrase.

                                                    24

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL

```
 1              A.  Okay.
 2              Q.  What was your understanding as to
 3     how much money Telegram wanted to raise?
 4              A.  I am trying to recall.  So the only
 5     figure I recall being exposed to was the 850
 6     million that was eventually raised.  So I don't
 7     know if there was any other discussions prior to
 8     that, and I was obviously informed that there was
 9     the anticipation, as we communicated to the
10     initial purchasers as well, that there would be a
11     further round or rounds.
12              Q.  Had you been told or made aware by
13     anyone or through reading of documents that prior
14     to 2017 Telegram was envisioning a two-part
15     offering, with an initial private sale intended to
16     raise approximately $600 million, followed by a
17     public sale of approximately $600 million?
18              MR. DRYLEWSKI:  Before you answer, just
19     a general instruction to the witness.  For any
20     questions that ask about whether you were told
21     anything, exclude from your answer any
22     communications you had with lawyers, to the extent
23     that there were any.
24              MR. McGRATH:  Fair enough.
25              A.  So I was not told of -- I was aware
```

25

CONFIDENTIAL

1    in general terms of two things, that that concept

2    had been discussed of a private offering followed

3    by a public offering, but I was also informed, by

4    the time I had come on board, that that concept

5    had been dropped and that there would be no public

6    offering.  There would only be one or a series of

7    private offerings.

8             Q.  Did you have any understanding as to

9    why that initial plan had changed?

10            MR. DRYLEWSKI:  I want to make clear,

11   for the record, to the extent there were any

12   conversations you had with counsel, exclude from

13   your answer the substance of any of those

14   communications.

15            A.  In general terms, the understanding

16   I was given was that given the regulatory

17   uncertainty around cryptocurrencies, and how they

18   might be treated as a regulatory matter, that it

19   was decided to take a very safe wider than wide

20   approach and stick to private institutional only

21   offerings.  That decision had been taken some time

22   prior to my coming on board.

23            Q.  Who communicated that information to

24   you?

25            A.  John Hyman told me that.

26

CONFIDENTIAL

1    offering documents to the initial purchasers in

2    the first round?

3         A.  Yes, I am.

4         Q.  Is it your understanding that the

5    lock-up provision essentially stated that the

6    initial purchasers in the first round offering

7    would receive their Grams in three, six, 12 and 18

8    month increments, and that they could not sell

9    their Grams until after those receipt periods had

10   occurred?

11        A.  Yes, the substance of what you said

12   is correct.  Just to correct the technical,

13   technically they received their Grams at the time

14   of launch, but those Grams are not released, so

15   they are not usable until the lock-up comes free

16   on the three, six, 12 and 18 months.  It is a

17   purely technical point.

18        Q.  So I understand your answer, when

19   you say they received their Grams, they legally

20   had ownership of the Grams --

21        A.  Correct.

22        Q.  -- at the time of launch, but they

23   could not -- they were not freed up to agree that

24   they could actually sell them until the lock-up

25   provision, the lock-up period had passed.  Is that

34

CONFIDENTIAL

1    correct?

2              MR. DRYLEWSKI:  Objection to form.

3              MR. McGRATH:  I didn't necessarily word

4    that the best way, but did you understand my

5    question?

6              A.  Sell or otherwise use, yes.

7              Q.  Fair enough.  Do you have any

8    understanding as to who at Telegram had decided to

9    include a lock-up provision in the agreements for

10   the initial purchasers in the first round?

11             MR. DRYLEWSKI:  Same instruction I have

12   been giving.

13             A.  I don't know.

14             Q.  Do you have any understanding as to

15   who was involved in the decision that the lock-up

16   period would include three, six, 12 and 18 month

17   increments?

18             MR. DRYLEWSKI:  Same instruction.

19             A.  Again, at the point that I joined

20   that had all been decided.  I don't know by whom.

21             Q.  Did any investor or potential

22   investor ever ask you questions about why there

23   was the lock-up provision?

24             A.  I believe, yes, I might have had

25   several conversations about that.

                                                    35

CONFIDENTIAL

```
1              Q.  Do you remember with who?

2              A.  I do not.

3              Q.  Do you remember what answers you

4     gave, generally?

5              A.  The answer that was given in general

6     was because the initial purchasers paid the lowest

7     price, or lower price than any subsequent

8     purchaser if there were further offerings, that

9     there was a lock-up provision in connection with

10    that.

11             Q.  What if any understanding did you

12    have as to why that was the case?  In other words,

13    why was it that because the initial purchasers

14    paid less for their Grams they were subject to a

15    lock-up provision?

16             MR. DRYLEWSKI:  Objection.  Same

17    instruction.

18             A.  At the risk of being sort of

19    simplistic, you know, it is relatively

20    conventional capital markets logic that if you

21    have an initial purchaser who comes in in an

22    earlier round and pays lower price, they tend to

23    have more restrictive terms, in terms of their

24    ability to take their shares or whatever might be

25    the conventional offering.
```

36

CONFIDENTIAL

```
 1    occurred.
 2              MR. DRYLEWSKI:  Object to the form of
 3    that question.  When you say "grams should be
 4    treated as securities", are you saying at the time
 5    that the purchase agreements were entered into?
 6              MR. McGRATH:  Yes.
 7              MR. DRYLEWSKI:  Or at the time when the
 8    Grams are created and actually distributed to the
 9    investors?
10              MR. McGRATH:  My question was focused on
11    at the time the purchase agreements were entered
12    into.
13              MR. DRYLEWSKI:  Okay.
14              MR. McGRATH:  I think the witness
15    understood that to be the question and his answer,
16    as I understood it, was that there were no such
17    discussions within Telegram as to whether
18    purchasers or potential purchasers should be told
19    that at the time they entered into purchase
20    agreements the Grams should be treated as
21    securities.  Is that correct?
22              A.  That is correct.
23              MR. DRYLEWSKI:  Note my objection to the
24    question.
25              MR. McGRATH:  I want to make a note to
```

46

CONFIDENTIAL

1      come back to something.  Excuse me.

2              A.  Sure.

3              Q.  Are you aware of any efforts by

4      anyone at Telegram to contact the United States

5      Securities and Exchange Commission to determine

6      the legality of the terms of the purchase

7      agreements that were provided to initial

8      purchasers in the first round before the

9      agreements were signed by the initial purchasers?

10             MR. DRYLEWSKI:  I am going to instruct

11     you to exclude from your answer any

12     information/communications with counsel.

13             A.  Can I clarify, Kevin, your question

14     is efforts by Telegram staff?

15             Q.  Let me start with that, yes.

16             A.  To contact the Commission?

17             Q.  Yes.

18             A.  No, I am not aware of any efforts by

19     Telegram staff.

20             Q.  Without getting into any discussions

21     that you may have had with counsel, are you aware

22     of any efforts that any counsel to Telegram made

23     prior to the initial round, which I believe was

24     finalized on I think the date of the purchase

25     agreements was on or about February 13, 2017?

47

CONFIDENTIAL

```
 1    Does that sound correct to you?
 2              A.   The first round purchase agreements?
 3              Q.   Yes.
 4              A.   My recollection is more like
 5    February 6.
 6              Q.   Just to avoid any confusion, let me
 7    just say are you aware of any efforts by counsel
 8    on behalf of Telegram to contact the Securities
 9    and Exchange Commission, prior to February 2017,
10    to determine the legality of the initial round
11    offering, putting aside specific conversations you
12    may have had with the attorneys?
13              MR. DRYLEWSKI:   Objection to form.  You
14    can answer that with a "yes", a "no" or "I don't
15    know".
16              A.   I am not aware.
17              Q.   Are you aware of any efforts by
18    anyone at Telegram, other than attorneys, that is
19    my first question, to contact the Securities and
20    Exchange Commission to determine the legality of
21    the terms of the second round investment that took
22    place in March 2017?
23              MR. DRYLEWSKI:   Same objection, same
24    instructions.
25              A.   So your question was by Telegram
```

48

CONFIDENTIAL

1          Q.  Were you given any instructions on
2     any different manner in which you should
3     communicate with the US versus the foreign
4     investors, in terms of either substantive
5     communications or the manner of communication, the
6     technical manner of communication?
7          A.  I can only answer based on the
8     discussions I had with the Telegram team, and the
9     answer is no.  I tried to apply the same standard
10    of communications.  All of them were sophisticated
11    purchasers, but I tried to treat them as such,
12    regardless of where they were based.
13         Q.  Were you given any training after
14    you joined Telegram, regarding how you should
15    communicate with investors?
16         A.  No.
17         Q.  Aside from any communications you
18    had with counsel, were you given any training at
19    any point during the time at Telegram regarding
20    the United States securities laws?
21         A.  Again, apart from discussions with
22    counsel, no.
23         Q.  Without getting into any specific
24    conversations you had with counsel, did you
25    communicate with counsel regarding the United

64

CONFIDENTIAL

```
1    was?
2            A.   No.
3            Q.   Again, with respect to the second
4    round, do you have an understanding that the
5    purchasers were entitled to receive Grams at a
6    price of approximately $1.33 per Gram?
7            A.   That is correct.
8            Q.   Do you have any understanding as to
9    how that price was derived?
10           A.   Once again, it is purely a
11   mathematical output of the same formula.
12           Q.   Do you have any understanding as to
13   who created that formula?
14           MR. DRYLEWSKI:   Objection to form.
15   Objection to the extent you are suggesting it is a
16   different formula.
17           Q.   To clarify, your understanding is it
18   is the same formula?
19           A.   It is.
20           Q.   Again, do you have any understanding
21   as to why that same formula resulted in a price of
22   approximately $1.33 per Gram during the second
23   round, versus 37 cents in the first round?
24           A.   Yes.   You can apply the formula, as
25   I did, and work out those numbers.   It is not that
```

68

**CONFIDENTIAL**

```
 1    complicated.
 2              Q.  Do you have an understanding of the
 3    term "reference price"?
 4              A.  Yes.
 5              Q.  As used in the offerings?
 6              A.  Yes.
 7              Q.  What is your understanding of what
 8    that term means?
 9              A.  It is the price as outputted by the
10    formula.
11              Q.  For what?
12              A.  Again, I would have to look at the
13    specific reference in the context you are using it
14    for the purchase agreement, but it is the same
15    reference price, as I understood it, in my
16    parlance, would be the reference price that comes
17    out of the formula, which then is used for the
18    offering price for the offering.
19              Q.  Do you have an understanding as to
20    what price Grams will be set at, at the time of
21    launch of the TON Blockchain?
22              MR. DRYLEWSKI:  Objection to form.
23              A.  Can I answer?
24              MR. DRYLEWSKI:  To the extent you can.
25              A.  To my mind, the question is not
```

69

CONFIDENTIAL

1    investors I spoke to at least that supply and

2    demand would set the actual market price

3    independent of whatever reference price is

4    involved.

5            Q.  That was not my question.  I was not

6    asking you what your understanding of what the

7    investors thought, at least not yet.  My

8    understanding is -- do you have any recollection

9    that there was an indication in offering documents

10   that the price of Grams would be set at $3.62

11   approximately, at the time of launch of the TON

12   Blockchain?

13           MR. DRYLEWSKI:  Same objection.  If you

14   want to point him to a document to help him on

15   this, we are more than happy.

16           MR. McGRATH:  It is fine.

17           A.  I think we would have to look at the

18   document.  As I say, I don't personally recognize

19   the way in which that question is being phrased.

20           Q.  We can come back to that.  During

21   the initial -- what we call the first round of the

22   initial offering, was there more demand for

23   investors to subscribe to that offering than the

24   $850 million that was allocated to the offering?

25           A.  Yes.  The volume or value,

                                                    71

CONFIDENTIAL

1   cumulative value of signed letters of intent

2   received was well in excess of 850 million.

3           Q.  Do you remember approximately what

4   that number was?

5           A.  As a rough guess, I would say in the

6   order of three to four times that amount.

7           Q.  Who at Telegram was involved in the

8   decision making as to which investors would be

9   allowed to invest in the first round?

10          A.  Again, as I was brought in quite

11  late and inherited, if you will, most of these

12  expressions of interest, I don't know.  I can only

13  assume it was Pavel, John and Ilya.

14          Q.  Did you ever have any discussions

15  with Pavel Durov, John Hyman or Ilya Perekopsky as

16  to what factors they looked at, if any, in

17  determining which of the potential investors would

18  actually be allowed to invest in the first round?

19          MR. DRYLEWSKI:  Objection to form.

20          A.  So at least in the calls or

21  discussions that I would have been party to, I

22  would characterize it as the sort of standard

23  capital market syndicate type discussions, around

24  is such and such an investor a credible investor?

25  ███████████████  is a well known name, for

72

CONFIDENTIAL

1    example, so they are a credible investor, for the

2    sake of argument.  Or has this investor expressed

3    interest early and been supportive for some period

4    of time?  It is standard things that in a capital

5    markets transaction one would expect to discuss.

6             Q.  When you use the term "a credible

7    investor", what do you mean by that?

8             A.  A fund that has been operating for a

9    long period of time and has a track record, has a

10   reputation, those sorts of criteria.  Nothing

11   unconventional for offerings of private placements

12   of this nature.

13            Q.  Were you involved in any of the

14   decision making that took -- strike that.  Let me

15   rephrase.

16            The second round, was that also

17   over-subscribed or at least, just to rephrase,

18   were the expressions of interest in investing in

19   the second round greater than the $850 million

20   that was sought to be raised?

21            A.  Initially, yes, but the follow

22   through after the initial expression of interest

23   was more limited.  So we had people indicating

24   that they were interested, but we didn't have the

25   same volume of expressions of interest signed as

                                                    73

CONFIDENTIAL

1    we did in the first round.

2         Q.  Who if anybody at Telegram was

3    involved in the decision making as to which

4    investors would be accepted during the second

5    round of the investment?

6         A.  Again, it would have been the same

7    group, Ilya, John Pavel, and obviously myself

8    would have been involved more actively in those

9    conversations.

10        Q.  What if any factors were considered

11   in making the decisions which second round

12   investors would be accepted?

13        A.  I would say similar criteria, but

14   accepting the fact that the demand was more

15   limited, there was, if you will, by definition,

16   less of a discussion around some of these points.

17   It is also worth mentioning that by the time the

18   second offering got fully underway, Bitcoin, the

19   market reference, if you will, had significantly

20   declined.

21        Q.  Did you become aware at any point

22   during the period January 2018 through April 2018

23   that there was information that people were

24   selling their rights to receive Grams on a

25   secondary market?

74

CONFIDENTIAL

1    that entity again, its full name, to the best of

2    your understanding?

3            A.  AID.  The rest, from memory, I

4    believe it is ███████████████████████████████

5    ████  something of that nature.

6            MR. DRYLEWSKI:  Kevin, just for the

7    record, you will find that entity's name in the

8    referenced communication that is the subject of

9    this testimony.  It had been produced to the SEC

10   in unredacted form, as to that entity.

11           MR. McGRATH:  It may be in this pile of

12   papers, but we will find that out later.  Thank

13   you.

14           A.  Sure.

15           Q.  I want to focus on Mr. Hyman for a

16   minute.  At some point did he terminate his

17   employment or consultancy agreement with Telegram?

18           A.  Yes, his engagement with Telegram

19   finished at some point in the summer.

20           Q.  Summer of --

21           A.  2018.

22           Q.  Do you have any understanding of the

23   circumstances that led to that termination of the

24   relationship?

25           A.  I don't.  I was not involved, nor

90

CONFIDENTIAL

```
1    has Mr. Hyman explained to me the circumstances.
2               Q.   All right.  Aside from Mr. Hyman,
3    did anyone else at Telegram ever provide you with
4    any information as to what led to him terminating
5    his association with Telegram?
6               A.   No.
7               Q.   Do you know where Mr. Hyman is
8    currently working?
9               A.   He is self-employed, as far as I
10   know.
11              Q.   Do you know what type of
12   self-employment he is engaged in?
13              A.   I believe he has various sort of
14   business interests and real estate.  He also does
15   some advisory work and so forth.
16              Q.   Does he do any advisory work for any
17   entities that are involved in any way with the
18   creation or operation of the TON Blockchain
19   ecosystem?
20              MR. DRYLEWSKI:  Objection to form.  You
21   can answer if you can.
22              A.   The only one that I am aware of is
23   his work with TON Labs and Gram Vault.
24              Q.   Let's start with TON Labs.  What is
25   TON Labs, based on your understanding?
```

91

CONFIDENTIAL

```
 1    they have an interest in either US or foreign
 2    based entities that are among the initial
 3    purchasers?
 4              A.  That is how it has been explained to
 5    me by John and by ██████████  himself.
 6              Q.  But you just don't know which
 7    particular entities --
 8              A.  I don't, no.
 9              Q.  Do you have any understanding as to
10    whether Mr. Hyman has an interest in any of the US
11    or foreign based entities that are among the
12    initial purchasers?
13              A.  I don't believe so, not that I am
14    aware of.
15              Q.  I had asked you a series of
16    questions focusing primarily on Mr. Hyman's
17    interaction with you in connection with his
18    association with TON Labs?
19              A.  Yes.
20              Q.  I am now going to ask you similar
21    questions regarding Mr. Hyman's interaction with
22    you in connection with his association with Gram
23    Vault.  What is your understanding as to what Gram
24    Vault is?
25              A.  So Gram Vault is, as best as I can
```

98

CONFIDENTIAL

1    establish what they are product offering is

2    effectively a quasi wallet solution.  So it is not

3    a full custody, similar to Coinbase or competitors

4    to Coinbase, but it offers similar type of

5    functionality, and then ancillary services on the

6    back of that, such as staking.

7            Q.  And when you refer to staking, what

8    are you referring to?

9            A.  Staking is the process by which

10   transactions on the TON network get validated.

11   Staking has to be undertaken by those who already

12   own Grams.  If you analogize it to stock lending,

13   it is almost like stock lending by a shareholder

14   as a way of earning some extra income.

15           Q.  Generally, what type of

16   communications have you had with Mr. Hyman

17   regarding his work on behalf of Gram Vault?

18           A.  It would only be the two things we

19   discussed before.  Number one, on a general level,

20   that he was advising them, and number two, the

21   introduction that he made with respect to custody

22   offering because, I am sure as we will discuss, a

23   number of investors, as we approached the expected

24   launch, wanted to understand "If we are looking

25   for a secure way to store our Grams, what options

99

CONFIDENTIAL

```
 1     individuals or entities involved in the staking
 2     have to put up a certain number of Grams in order
 3     to be entitled to participate in the validation
 4     process?
 5               A.   There is a minimum.  It is quite
 6     low, it is 100,000 from memory, Grams, if you want
 7     to be considered to be an active validator.
 8               Q.   What was the reasoning behind coming
 9     up with that number as a requirement, 100,000
10     Grams?
11               A.   I don't know.
12               Q.   Do you know who made that decision?
13               A.   I don't know.
14               Q.   In terms of the actual validation
15     process, I understand you may not be an expert on
16     it, I am not, but it would be fair to say that it
17     involves some sophistication in terms of how to
18     validate a Blockchain node?
19               MR. DRYLEWSKI:  Object to form.
20               A.   I would have thought so, but again I
21     am not an expert.
22               Q.   Do you have any understanding as to
23     what type of computer resources need to be applied
24     in order to validate a TON Blockchain?
25               MR. DRYLEWSKI:  Object to form.
```

129

CONFIDENTIAL

1           A.  No, but one of the attachments that

2    you will have seen sets out the minimum hardware

3    requirements.

4           Q.  Did Telegram check with any of the

5    initial purchasers to see whether they had the

6    expertise to engage in validation of TON

7    Blockchain nodes before accepting them as

8    investors?

9           MR. DRYLEWSKI:  Object to form.

10          A.  I am not aware.  I would also just

11   add that my involvement was very late, so if those

12   discussions had taken place, it would have most

13   likely predated my getting involved.

14          Q.  But as you sit here today, you are

15   not away of any such efforts by Telegram to

16   determine whether any of the potential or actual

17   initial purchasers had the technical expertise at

18   that time to engage in a TON Blockchain validation

19   process.  Is that correct?

20          A.  I am not aware of any discussions on

21   that.

22          Q.  Has Telegram been involved in any

23   conversations with the initial purchasers -- and

24   again, just to make sure we both are on the same

25   page, when I say "initial purchasers" I am

                                                    130

CONFIDENTIAL

```
 1    referring to both the first and second round
 2    purchasers.  Has Telegram undertaken any efforts
 3    after the first and second round to determine
 4    whether the initial purchasers have the capability
 5    and the technical expertise to engage in
 6    validation of a TON Blockchain node?
 7             MR. DRYLEWSKI:  A point of
 8    clarification.  You said "Telegram".  Are you
 9    asking about him personally.
10             MR. McGRATH:  No.  Anyone at Telegram,
11    including himself, but anyone else as well.
12             A.  I am not aware of any such
13    discussions.  I was not party to any such
14    discussions, if there were any.
15             Q.  Fair to say, based on your testimony
16    and the documents that have been produced that you
17    interacted with a number of the initial
18    purchasers, correct?
19             A.  Correct.
20             Q.  And in the course of those
21    interactions have you come to learn, you
22    personally, come to learn as to whether any of the
23    initial purchasers have the technical resources
24    and expertise required to engage in validation of
25    TON Blockchain nodes?
```

131

CONFIDENTIAL

1          A.  Yes.  In the context of the
2    anticipated launch in October, there was a
3    specific set of instructions that we circulated to
4    all investors if they were interested in becoming
5    validators, and there was a number of investors
6    who had questions or comments, observations on the
7    document, by which one can assume that they were
8    able or seriously interested in looking at it.
9          Q.  All right.  Let me break that up.  I
10   am going to ask you about whatever specific
11   communications you had with those investors, but
12   my question was -- let me break it up.
13          First, let's start, if you can look at
14   Exhibits 1 and 2, to the extent it refreshes your
15   recollection.  If you don't need to look at them
16   that is fine too.  Do you recall any
17   communications that you had with individual
18   purchasers, initial purchasers, regarding their
19   ability to engage in a TON Blockchain validation
20   process?
21          A.  I really don't remember.  As I say,
22   following the sending out of the instructions,
23   there were probably a dozen or so investors who
24   came back saying they were interested in
25   validation.  They had some questions, but I would

132

CONFIDENTIAL

1   struggle to remember which names on this list

2   specifically that was, without looking at the

3   email correspondence.

4           Q.   When you say approximately a dozen

5   investors, would they include both US and foreign

6   based investors?

7           A.   I am doing this from memory.   I

8   think yes, but I would say predominantly the

9   questions came from non-US investors.

10          Q.   You had indicated in one of your

11  prior answers that they asked you questions about

12  the validation process, and that you stated you

13  could assume from that that they were interested

14  in engaging in it.   Is that correct?

15          A.   That is an inference.

16          Q.   Is it is inference that you are

17  making.   My question is do you have any knowledge,

18  as you sit here today, whether any of those

19  approximately 12 investors actually had the

20  capability and the resources, both hardware and in

21  terms of technical expertise, to effectively

22  participate in or successfully participate in

23  validation of a TON Blockchain?

24          MR. DRYLEWSKI:   Object to form.

25          A.   I don't have the ability to verify

                                                    133

CONFIDENTIAL

1    that.
2            Q.   Okay.   To your knowledge, has anyone
3    else at Telegram made efforts to determine which
4    if any of the initial purchasers have the
5    technical expertise and resources to successfully
6    engage in TON Blockchain validation?
7            MR. DRYLEWSKI:   Same objection.
8            A.   I don't know if such efforts were
9    made or not.
10           Q.   To your knowledge, do you know
11   whether Telegram, and that would include you or
12   anyone else at Telegram that you are aware of,
13   asked any potential or actual initial purchasers
14   what they intended to do with the Grams after they
15   received them, prior to accepting purchase
16   agreements from them?
17           MR. DRYLEWSKI:   Object to form.
18           A.   I certainly cannot recall ever
19   asking that question of anyone.
20           Q.   To your knowledge, did anyone else
21   at Telegram ask that question of any of the
22   potential or actual initial purchasers before
23   entering into or accepting purchase agreements
24   from them?
25           A.   Not that I was ever made aware of.

134

CONFIDENTIAL

```
1                Q.  Are you aware of whether anyone at
2       Telegram, yourself or anyone else, asked any of
3       the potential or actual initial purchasers how
4       long they planned to hold the Grams before
5       accepting purchase agreements from them?
6                MR. DRYLEWSKI:  Object to form.
7                A.  I would give the same two answers.
8       I never asked the question and I was never made
9       aware of anyone else asking that question.
10               Q.  Did anyone at Telegram ask, prior to
11      accepting purchase agreements from the initial
12      purchasers, when they planned to sell their Grams,
13      if at all?
14               MR. DRYLEWSKI:  Object to form.
15               A.  Could you ask the question again?
16                    (Read back)
17               A.  Same answer as the previous two
18      questions.
19               Q.  Did anyone at Telegram, prior to
20      accepting purchase agreements from the initial
21      purchasers, ask them whether they were buying
22      Grams for consumptive use?
23               MR. DRYLEWSKI:  Object to form.
24               A.  Same two answers.
25               Q.  Do you understand what I meant when
```

135

CONFIDENTIAL

```
1    I use the term "consumptive use"?
2              A.  Yes.
3              Q.  What was your understanding of what
4    that term means?
5              A.  To use it as a commodity for
6    bartering or for purchasing goods or services, and
7    so forth.
8              Q.  And your answer is the same, that
9    you did not engage in any such questions and to
10   your knowledge no one at Telegram did?
11             A.  That is correct.
12             Q.  Did anyone at Telegram, prior to
13   accepting purchase agreements from the initial
14   purchasers, ask them whether they were buying
15   Grams with the intent to resell them and make a
16   profit?
17             MR. DRYLEWSKI:  Object to form.
18             A.  Again, I never asked the question.
19   I was never made aware of whether or not someone
20   else asked the question of any purchasers.
21             Q.  I am going to show you a document.
22   The first page of it is entitled "Annex B Purchase
23   Agreement".  It starts with Bates number TG-00114
24   and goes to Bates number ending in 52.  It is
25   numbered 39 pages.
```

136

CONFIDENTIAL

1     you are aware of?

2          A.   No.  But it is important to

3     emphasize, and I would say there were probably

4     other instances that didn't get as far along in

5     the second round of a similar fact pattern, namely

6     it was a legal purchaser but we learned through

7     conversation and KYC documentation and so forth

8     that there may have been other beneficiaries to

9     which the rights would have been transferred, and

10    we made it clear that that was not workable.

11    Sorry, come back to your follow-up question.

12          Q.   Yes, I appreciate you making that

13    clarification, and obviously feel free to do that.

14          The second question that I put to you

15    was is there -- I will rephrase it.

16          Is there anything in the representations

17    that the initial purchasers were required to make

18    in paragraph 6, either the first or second round

19    investors, that prevented them from immediately

20    selling the Grams on the date they were issued to

21    them?

22          A.   Only the lock-up provisions in

23    respect of the presale investors.

24          Q.   Right, and I tried to phrase the

25    question so that it would take that into account

149

CONFIDENTIAL

1    by using the phrase "issued to them", and by that

2    I meant issued to them after whatever lock-up

3    period expired.  So there was nothing that

4    prevented them from selling those Grams the minute

5    after they received them, following the expiration

6    of a lock-up period, correct?

7            A.   Correct, with my previous technical

8    qualification that all Grams are issued

9    immediately.  They are just programmatically

10   locked up.

11           Q.   As to the representation that the

12   initial purchasers were not purchasing the Grams

13   with a view towards or for resale in connection

14   with the sale or distribution thereof, didn't

15   Telegram expect initial purchasers to sell their

16   Grams at some point in the future?

17           MR. DRYLEWSKI:  Object to form.  You can

18   answer if you can answer a question about what

19   Telegram expected.

20           A.   I cannot answer what Telegram

21   expected.  I can comment on what I heard from

22   investors, which is a different question.

23           Q.   Right, and that is not my question.

24   Fair enough, if you cannot comment on what

25   Telegram expected.  Let me just ask you, what was

CONFIDENTIAL

1        your understanding -- strike that.

2                Are you testifying that you never had

3        any discussions with anyone else at Telegram as to

4        what investors were likely to do with their Grams

5        following issuance of them to them after the

6        launch of the TON Blockchain?

7                A.   That is correct.  I don't recall any

8        discussions of that specific topic.

9                Q.   Are you aware of any analysis that

10       anyone at Telegram performed or that Telegram

11       asked anyone outside of Telegram to perform as to

12       what initial purchasers were likely to do with the

13       Grams after issuance of them?

14               A.   Not that I am aware of.

15               Q.   Based on your understanding of the

16       manner in which the TON Blockchain ecosystem would

17       work, wasn't it important that Grams be widely

18       distributed to people, in order for that ecosystem

19       to operate in a successful manner?

20               MR. DRYLEWSKI:  Object to form.  You are

21       asking his opinion of that question?

22               MR. McGRATH:  Yes, as somebody who

23       worked for Telegram and was communicating with

24       investors, what his understanding was, as to the

25       importance of Grams being widely distributed in

151

CONFIDENTIAL

1    asked you prior to that?

2              A.   The only educated layman's comment I

3    would make is that the number of questions I got

4    asked about exchange opportunities or

5    possibilities was significantly dwarfed by the

6    number of questions I got asked about custody

7    solutions, and you would have thought, intuitively

8    or logically, that no one would be asking about

9    custody solutions unless they intended to hold

10   their Grams for some period of time, if that makes

11   sense.

12             Q.   I understand what you are saying,

13   but just to follow-up on that, the fact that

14   somebody is enquiring about custody possibilities

15   for their Grams, number one, it doesn't mean for a

16   fact that they are going to enter into a custodial

17   arrangement with some third-party with their

18   Grams, correct?

19             A.   Just to be clear, I am only --

20             MR. DRYLEWSKI:   Objection to form of the

21   question.   You had asked him whether there were

22   things that led him to believe --

23             Q.   I understand.   I am not quarreling

24   with him.   I am just following up.

25             A.   That is all.   I was answering

                                                        160

CONFIDENTIAL

1    nothing more, nothing less.

2            Q.   Secondly, it would be fair to say

3    that the fact that somebody is enquiring about

4    custodial arrangements, even if they enter into a

5    custodial arrangement doesn't preclude them from

6    selling some or all of their Grams the day after

7    they enter into that arrangement, correct?

8            A.   Of course not.

9            Q.   If any of the investors or when any

10   of the investors asked you about what arrangements

11   were being made that would permit them to sell

12   their Grams after issuance, what answers did you

13   give them?

14           A.   Three things.  First, it should be

15   emphasized that whilst I tended to take the lead

16   on the custody related queries, my colleague Ilya

17   Perekopsky took the lead on most of the exchange

18   related interactions, and as such I cannot shed

19   too much light on that.

20           Second, I did give a generic answer that

21   we have had contacts or approaches from various

22   exchanges expressing interest to be able to list

23   Grams, and we will speak with them in due course.

24   Again, as I said, Ilya tended to spearhead most of

25   those conversations with the exchanges.

161

CONFIDENTIAL

```
1              A.  I have only heard about
2     communications in the latter context.
3              Q.  So you are not aware of any
4     financial interest either of the Durov brothers
5     have in TON Labs?
6              A.  No.
7              Q.  Has Telegram agreed to provide any
8     allotment of Grams to TON Labs, other than via any
9     purchase agreements that have been entered into
10    with individual entity investors?
11             A.  Not that I am aware of.
12             Q.  You understand my question, I think
13    you indicated some people associated with TON Labs
14    have to various entities entered into purchase
15    agreements entitling them to receive Grams at some
16    point.  My question is, is there any agreement or
17    understanding with TON Labs, independent of those
18    investment agreements, that TON Labs will receive
19    Grams in the future?
20             A.  Not that I am aware of?
21             Q.  Are you familiar with an entity
22    called TON Ventures.
23             A.  Yes, I am.
24             Q.  What is your understanding of what
25    TON Ventures is?
```

167

CONFIDENTIAL

1      A.  I could be mistaken but I think

2  ████████, when I met him, explained that it was a

3  subsidiary of TON Labs.

4      Q.  Do you know what if any activities

5  TON Ventures is performing in connection with the

6  TON Blockchain ecosystem?

7      A.  So this I am doing again based on

8  brief explanation, but as I understood it TON Labs

9  was actually developing applications, whereas TON

10 Ventures was then investing in others who would

11 develop applications.  For example, Gram Vault, if

12 I am not mistaken, my memory serves me correctly,

13 the holding in Gram Vault is actually via TON

14 Ventures and not TON Labs, to give a specific

15 concrete example of how those two entities, their

16 roles.

17     Q.  Do you have any understanding as to

18 who owns TON Ventures?

19     A.  I thought they were the same.  It is

20 either TON Labs itself or the same or similar

21 shareholders as that of TON Labs, but I am not

22 sure.  This is all -- I was given a very high

23 level description.

24     Q.  Fair enough.  Have you had any

25 communications with anyone acting on behalf of TON

168

CONFIDENTIAL

1    and TON, did you have any understanding as to what

2    the breakout would be between the two entities or

3    the two applications?

4              A.   No, I didn't.

5              Q.   Last bullet point:  "The remaining

6    50 percent will be spent on business ops, wages,

7    et cetera, and ongoing legal costs due to SEC

8    litigation."  Did you convey that information to

9    ███████, in substance?

10             A.   I did.  He slightly misrepresented

11   it.  I remember when he repeated it back to me he

12   actually got it wrong.  I actually said then the

13   next big bucket is wages and operational costs and

14   then, after that, the legal costs are a distant

15   third.  That is actually the way I put it to him

16   but he slightly simplified it.

17             Q.   When you are referring to business

18   ops, wages, et cetera, did that reference apply to

19   both the individuals that were working on the TON

20   Blockchain and individuals that were working on

21   Telegram messaging?

22             MR. DRYLEWSKI:  Objection to form.

23             A.   Yes, it did.

24             Q.   Do you remember anything else that

25   you communicated with ███████ during this

                                                      238

CONFIDENTIAL

```
 1    telephone conversation -- anything at a material

 2    level, that is not referenced in his bullet

 3    points?

 4              MR. DRYLEWSKI:  Objection to form.

 5              A.  No.

 6         (Exhibit 10 marked for identification)

 7              Q.  I am showing you what has been

 8    marked as Exhibit 10, a two page document,

 9    TLGRM-5-5209 to 5210.  It contains an email from

10    ▮▮▮▮▮▮▮▮▮▮ on August 29, 2019, from ▮▮▮▮▮▮▮

11    ▮▮▮▮▮▮▮ to you, indicating in part 1 to

12    introduce you to ▮▮▮▮▮▮▮▮ on the leadership

13    team at ▮▮▮▮▮

14              "Dominant payment processor for BTC and

15    other virtual currencies.  He is interested in

16    discussing the possibility of accepting Grams on

17    their platform.  I believe he has an upcoming trip

18    to London so the timing might be good.  ▮▮▮▮▮ will

19    let you take from here.  Cheers to both of you."

20              Then there is an email from ▮▮▮▮▮▮▮ to

21    ▮▮▮▮▮▮▮▮, copying you, on August 29, 2019,

22    saying:

23              "Good to meet you.  Not sure if you know

24    but Bitpay is the largest payment processor of

25    Bitcoin in the world."
```

239