# PX34

EXECUTION COPY

*A Delaware Limited Liability Company*

Amended and Restated Limited Liability Company Operating Agreement

February 8, 2018

## NOTICE

NEITHER ███████████████████████ (THE "COMPANY") NOR THE MEMBERSHIP INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OR TERRITORIES OF THE UNITED STATES. THE OFFERING OF SUCH MEMBERSHIP INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF INTERESTS IN THE COMPANY IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD) OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT.

EXECUTION COPY

## AMENDED AND RESTATED OPERATING AGREEMENT

### OF

███████████████████

### A DELAWARE LIMITED LIABILITY COMPANY

This Operating Agreement of ████████████████ a Delaware limited liability company (the "Company"), is effective as of February __8__, 2018 (the "Effective Date").

**WHEREAS**, the Manager formed a limited liability company under the Act pursuant to the Certificate of Formation which was filed with the Secretary of State of the State of Delaware on April 18, 2017,

**WHEREAS**, the Company was initially formed primarily to hold and/or sell various investment assets of the Manager, and the Company now wishes to sell Class B and Class C Interests to (i) acquire and hold, for investment purposes, a new cryptocurrency called "Grams" (the "Investment"), which is expected to be issued by a direct or indirect subsidiary of Telegram Group, Inc. (the "Issuer"), and (ii) engage in any and all activities related or incidental thereto (together, the "Business");

**WHEREAS**, the Issuer intends to launch Grams through an initial coin offering (the "ICO") following the development and launch of the Issuer's new blockchain platform, the TON Network (the "Network Launch Date");

**WHEREAS**, the Issuer shall restrict the transfer of Grams purchased on the Network Launch Date (the "Lock-Up") as further detailed in Section 5.2:

**(a)**   The first 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is three months following the Network Launch Date (the "First Lock-Up Release Date");

**(b)**   The second 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is six months following the Network Launch Date (the "Second Lock-Up Release Date");

**(c)**   The third 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is twelve months following the Network Launch Date (the "Third Lock-Up Release Date");

**(d)**   The fourth 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is eighteen months following the Network Launch Date (the "Fourth Lock-Up Release Date" and together with the First Lock-Up Release Date, Second Lock-Up Release Date and Third Lock-Up Release Date, the "Lock-Up Release Dates");

**WHEREAS**, the Company, pursuant to the Subscription Agreements, shall sell Class B and Class C Interests to investors and to admit those investors as Members of the Company; and

**WHEREAS**, the Manager, the Members and the Company desire to set forth herein their respective agreements and rights regarding, among other relevant factors, the business of the Company, the

EXECUTION COPY

management and operation of the Company and the Interests acquired by Members.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Members hereby agree as follows:

1. **Definitions**. The following terms will have the following meanings:

"Accredited Investor" has the meaning assigned to such term under Rule 501 of Regulation D, promulgated under the Securities Act.

"Act" is the Delaware Limited Liability Company Act.

"Affiliate" means (i) a Person who is a member, director, officer, general partner or employee of the Person being considered; or (ii) a Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Person being considered.

"Agreement" means this amended and restated Operating Agreement, as amended.

"Available Cash" means, at a particular time, the cash and cash equivalents held by the Company less such cash reserves as the Manager reasonably determines are necessary to pay on a timely basis costs and expenses of any Proceeding or Indemnification Obligation, taking into account the anticipated revenues of the Company.

"Business" is defined in the Preamble.

"Business Day" is any day on which all major banks in the State of New Jersey are open for business.

"Capital Accounts" is defined in Section 4.4(a).

"Capital Contributions" means for any Member at the particular time in question the aggregate of the dollar amounts of any cash and cash equivalents contributed by such Member to the capital of the Company, plus the value, as reasonably determined by the Manager, of any property contributed by such Member to the capital of the Company.

"Carrying Value" means (a) with respect to property contributed to the Company by a Member, the value of such property at the time of contribution as determined by the Manager and (b) with respect to any other property held by the Company, the adjusted basis of such property for federal income tax purposes at the time it is acquired by the Company, in the case of each of the foregoing (i) as reduced (but not below zero) by all subsequent depreciation, cost recovery, depletion and amortization deductions with respect to such property as taken into account in determining profit and loss and (ii) as adjusted from time to time in accordance with Section 10.2(b) and Treasury Regulation § 1.704 1(b)(2)(iv)(m), and to reflect changes, additions or other adjustments to the Carrying Value for dispositions, acquisitions or improvements of Company properties, as deemed appropriate by the Manager.

"Class A Interests" shall be voting Membership Interests of the Company, granted and held exclusively by the Manager of the Company.

"Class B Interests" shall be non-voting Membership Interests of the Company, other than as provided for herein, sold and issued by the Company to Members for the specific purpose of directly acquiring the Investment.

"Class C Interests" shall be non-voting Membership Interests of the Company, other than as provided for herein, sold and issued by the Company to Members for the specific purpose of indirectly acquiring the Investment through an investment in ███████████

"Class Percentage Interests" means, for each Class of Interests and for each Member in such Class, a percentage equal to such Member's total Capital Contributions in such Class divided by the total Capital Contributions of all Members in such Class. The Class Percentage Interests of the Members in a Class shall be adjusted from time to time as provided in this Agreement but shall always equal 100%.

"Code" is the Internal Revenue Code of 1986, as amended.

"Company" is defined in the introductory paragraph.

"Confidential Matter" is defined in Section 13.7.

 means ███████████

"Effective Date" is defined in the introductory paragraph.

"Event of Bankruptcy" is any of the following:

    (a)    any assignment by such party for the benefit of creditors;

    (b)    the filing by such party of a voluntary petition in bankruptcy;

    (c)    the subjection of such party to the entry of an order for relief or, following a hearing and judicial or other authoritative determination thereof, to a declaration of insolvency in any federal or state bankruptcy or insolvency proceeding;

    (d)    the filing of a voluntary petition or answer by such party seeking for such party, a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law;

    (e)    the filing of an answer or other pleading by such party admitting all of or failing to contest at least one of the material allegations of an involuntary petition filed against such party in a proceeding of the type described in (b) – (d) above;

    (f)    such party's pursuit of, consent to, or acquiescence in the appointment of a trustee, receiver, or liquidator of such party of all or any substantial part of such party's properties if such pursuit, consent or acquiescence is demonstrably evidenced by the actions or omissions of such party; or

    (g)    the expiration of 120 days after the date of the commencement of a proceeding against such party seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law if the proceeding has not been previously dismissed, or the expiration of 90 days after the date of the appointment, without such party's consent or acquiescence, of a

trustee, receiver, or liquidator of such party or of all or any substantial part of such party's properties if the appointment has not previously been vacated or stayed, or the expiration of 90 days after the date of expiration of a stay, if the appointment has not previously been vacated.

"Family Members" include:

    (a)    the spouse, parents, grandparents, children, grandchildren, nieces, nephews, and siblings of:

        (i)    a Member who is an individual;

        (ii)    the beneficiary of a Member that is a trust and such beneficiary has a right, together with other Family Members of such beneficiary, to receive a majority of the trust assets, or

        (iii)    the sole holder of equity or other controlling interest in a Member if such Member is a business entity;

    (b)    a trust for the benefit of:

        (i)    the transferring Member, or

        (ii)    one or more Persons named in part (a) of this definition.

    (c)    a business entity in which a Member is the sole holder of equity or otherwise controls such entity.

"Family Transfer" is defined in Section 8.2.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof and any other Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Indemnification Obligation" means any indemnification obligation and any other indemnity contribution or reimbursement obligations of the Company with respect to any person, whether payable in connection with a Proceeding involving the Company or otherwise; provided, however, that it shall not include any contribution or reimbursement obligations that are a result of gross negligence or willful misconduct by the Manager.

"Indemnified Person" means the Manager, his Affiliates, and other agents. The Manager may, at its sole discretion, designate any Member, employee, representative, or other Person as an additional Indemnified Person.

"Independent" of a Person means: (a) having no direct or indirect financial interest in that Person; and (b) having no other involvement with that Person that would create a conflict of interest.

"Initial Capital Contribution" is defined in Section 4.1.

"Initial Closing" means the date on which the first Members are admitted to the Company.

"Interest" or "Membership Interest" means, with respect to any Member, (a) that Member's status as a Member, (b) that Member's Capital Account and share of the Profits, Losses and other items of income, gain, loss, deduction and credits of, and the right to receive distributions (liquidating or otherwise) from, the Company under the terms of this Agreement, (c) all other rights, benefits, and privileges enjoyed by, and obligations of, such Member (under the Act or this Agreement) in its capacity as a Member, including that Member's rights to vote, consent and approve those matters described in this Agreement, and (d) all obligations, duties and liabilities imposed on that Member under the Act or this Agreement in its capacity as a Member.

"Investment" is defined in the Preamble.

"Investment Company Act" is the Investment Company Act of 1940, as amended.

"Manager" shall mean ▮▮▮▮▮▮▮▮▮▮

"Members" means any Person who is admitted as a Member of the Company as listed on Schedule A hereto, as the same may be amended from time to time by the Manager to reflect the admission, substitution or withdrawal of any Persons as Members of the Company.

"Member Counterparty" means any Person that enters into an agreement with a Member related to a Transfer of Grams.

"Misconduct" shall have occurred if a Manager is found by a court of competent jurisdiction of first impression to have (a) committed (or enters a plea of nolo contendere to having committed) embezzlement, fraud or any other act involving material improper personal benefit against the Company or its assets, (b) willfully and materially breached this Agreement, which breach remains uncured as of the date of such finding, in a manner which had a material adverse effect on the Company, as found by a court of competent jurisdiction of first impression or (c) knowingly violated any law in a manner which had, or could have had, a material adverse effect on the Company, as found by a court of competent jurisdiction of first impression.

"Net Investment" means, as of any date the total Capital Contributions made by the Member reduced by the total amount previously distributed to that Member pursuant to Section 5.2 and Section 10.2; and which includes such Member's portion of the Setup Fee or any other expenses paid by such Member on behalf of the Company; provided that such expenses have been approved by the Manager.

"Percentage Interests" means, for each Member, a percentage equal to such Member's total Capital Contributions in the Company divided by the total Capital Contributions of all Members. The Percentage Interests of the Members shall be adjusted from time to time as provided in this Agreement but shall always equal 100%.

"Person" is an individual, partnership, limited partnership, limited liability partnership, limited liability company, corporation, trust or unincorporated organization or other entity, and a government or agency or political subdivision.

"Proceeding" means any action, claim, suit, investigation or arbitration or proceeding involving the Company's activities, whether at law or in equity, and whether by or before any court, arbitrator, governmental body or other administrative, regulatory or other agency or commission.

"Profit or Loss" means the income or loss of the Company as determined under the capital accounting rules of Treasury Regulation § 1.704 1(b)(2)(iv) for purposes of adjusting the Capital Accounts

of Members, including, without limitation, the provisions of paragraphs 1.704 1(b)(2)(iv)(g) and 1.704 1(b)(4) of those regulations relating to the computation of items of income, gain, deduction and loss.

"Recapture Income" means any gain recognized by the Company (but computed without regard to any adjustment required by Sections 734 and 743 of the Code) upon the disposition of any property or asset of the Company that does not constitute capital gain for federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

"Required Interest" means, for each Class, Members holding, individually or in the aggregate, more than fifty percent (50%) of the Class Percentage Interests of such Class of Interests.

"Representative" is defined in Section 10.2.

"Securities" or "Security" means securities of every kind and nature and rights and options, rights or warrants with respect thereto, including capital stock, notes, bonds, debentures, instruments or evidences of indebtedness, trust receipts and other business interests of every type, including interests in partnerships, joint ventures, proprietorships and other business entities.

"Securities Act" is the Securities Act of 1933, as amended.

"Securities Exchange Act" is the Securities Exchange Act of 1934, as amended.

"Substitute Member" is any Person admitted to the Company as a substitute Member pursuant to Section 8.3.

"Tax Matters Member" means such Person as may be designated under Section 7.3.

"Transfer, Transferring" means a sale, assignment, transfer, exchange, mortgage, pledge, or grant of a security interest, or other disposition or encumbrance, or the act of making such a sale, assignment, transfer, exchange, mortgage, pledge, or grant of a security interest, or other disposition or encumbrance; provided, that a distribution to Members pursuant to Section 5 shall not be a Transfer.

"Treasury Regulations" means regulations issued by the Department of Treasury under the Code. Any reference herein to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations under the Code.

**2. Organization.**

2.1     Formation. The parties to this Agreement ratify the filing of the Certificate of Formation of the Company that were filed with the Delaware Secretary of State as of April 18, 2017 pursuant to the provisions of the Act and in accordance with the further terms and provisions of this Agreement.

2.2     Name. The name of the Company is                                        or such other name or names as may be selected by the Manager.

2.3     Purpose. The business of the Company shall be to (i) for Class B and Class C Interests, (A) acquire, hold and distribute, for investment purposes, the Investment, and (B) engage in any and all activities related or incidental thereto and (ii) for Class A Interests, for any lawful business purpose in accordance with the terms herein.

2.4     Places of Business; Registered Office and Agent. The address of the registered office of the Company in the State of Delaware is One Commerce Center, 1201 N. Orange St., Suite 762, Wilmington, New Castle County, Delaware 19801; and the name of the registered agent of the Company at such address is                                        The Company's principal place of business will be located at the location determined by the Manager from time to time on notice to the other Members.

2.5     Fiscal Year. The fiscal year of the Company will end on the 31st day of December in each year. The Manager will have authority to change the ending date of the fiscal year to any other date required or allowed under the Code if the Manager determines that such change is necessary or appropriate. The Manager will promptly give notice of any such change to the Members.

2.6     Taxation. The Members intend that the Company shall each be taxed as a "partnership" for federal, state, local and foreign income tax purposes. The Members agree to take all reasonable actions, including but not limited to, the amendment of this Agreement and the execution of other documents, as may reasonably be required in order for the Company to qualify for and receive "partnership" tax treatment for income tax purposes and agree not to take any actions inconsistent therewith.

2.7     Interests and Class.

(a)     The Manager may cause the Company to issue Interests in one or more separate classes (each, a "Class" and collectively, "Classes"). As of the date hereof, the Manager has created Class A Interests, Class B Interests and Class C Interests in the Company. Each Member may be a member of one or more Classes. No new Members may be admitted into Class B or Class C following the Effective Date without the prior written consent of all Class B Members and Class C Members, respectively.

(b)     Each Class so established shall be set forth in Schedule A to this Agreement. Upon the creation of a Class, the Manager will cause Schedule A of this Agreement to be amended to set forth any specific economic or non-economic terms established with respect to a particular Class. Schedule A will be updated by the Manager from time to time in connection with the establishment of one or more additional Classes, and shall also be amended in accordance with Section 11 from time to time to reflect changes to the terms of a particular Class. Notwithstanding the foregoing, the creation of any new Class shall be deemend an amendment to this Agreement and subject to the provisions of Section 11. Subject to such limitations as may be set forth in this Agreement, the Manager shall establish and may modify

EXECUTION COPY

the investment objective and policies of each Class and all other rights and features thereof.

(c)    Interests of each Class, unless otherwise provided in Section 5.2 herein shall have the following relative rights and preferences:

(i)    Assets Held With Respect to a Particular Class. All Capital Contributions made to the Company in connection with a Capital Contribution to a particular Class, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Class for all purposes, subject only to the rights of creditors of such Class, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Class, are herein referred to as "assets held with respect to" that Class. The Manager shall use Capital Contributions made to (i) the Class B Interests ("Class B Capital Contributions") exclusively to purchase interests in the ICO, after the payment of the referral fee, as disclosed to the Class B Members (the "Class B Referral Fee") in a side letter (the "Class B Side Letter") and (ii) the Class C Interests ("Class C Capital Contributions") exclusively to purchase membership interests in ▮▮▮▮▮▮, which will be used by ▮▮▮▮▮▮ to purchase Grams in the ICO after the payment of the administrative fee, as disclosed to the Class C Members (the "Class C Referral Fee" and together with the Class B Referral Fee, the "Referral Fee"). In the event that there are any Class B Capital Contributions or Class C Capital Contributions that are not used to purchase Grams in the ICO or purchase membership interests in ▮▮▮▮▮▮ respectively, the Manager shall promptly return all such unused Class B Capital Contributions or Class C Capital Contributions to the Members holding Class B or Class C Interests, respectively. If the ICO has not occurred on or before October 31, 2019, all Class B Capital Contributions and Class C Capital Contributions shall be promptly returned to the Members holding Class B and Class C Interests, respectively, minus any Referral Fee. Notwithstanding anything in this Agreement to the contrary, the Manager may not Transfer any Grams attributable to Class B or Class C Interests without the prior written consent of all Class B or Class C Members, respectively. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Class (collectively "General Assets"), the Manager shall allocate such General Assets to, between or among any one or more of the Classes in such manner and on such basis as the Manager deems fair and equitable, and any General Assets so allocated to a particular Class shall be assets held with respect to that Class. Each such allocation by the Manager shall be conclusive and binding upon Members of all Classes for all purposes.

(ii)    Liabilities Attributable to a Particular Class. The assets of the Company held with respect to each particular Class shall be charged with all

EXECUTION COPY

liabilities, expenses, costs, charges and reserves attributable to that Class; provided, however, that there shall be no charges of any kind to the Class B Interests other than the Class B Referral Fee. The Manager agrees that the Manager shall pay all liabilities, expenses, costs, charges and reserves attributable to the Class B Interests, including any Indemnification Obligations, except pursuant to Section 6.6(c). All such liabilities, expenses, costs, charges, and reserves so charged to a Class are herein referred to as "liabilities attributable to" that Class. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Class ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Classes in such manner and on such basis as the Manager, in its sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Class shall be liabilities attributable to that Class. Each such allocation of liabilities, expenses, costs, charges and reserves by the Manager shall be conclusive and binding upon Members of all Classes for all purposes. The Manager agrees that it shall not permit the Company or any Class to incur any debt; provided, however, that the Manager may permit the Class A Interests to incur debt with the prior written consent from all Members of each Class. The Manager agrees that it shall not permit the Company or any Class to use margin to acquire assets or enter into derivative transactions of any kind. All Persons, including any Affiliates of the Manager, who have extended credit that has been allocated to a particular Class, or who have a claim or contract that has been allocated to any particular Class, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Class for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

(iii)     Distributions. Notwithstanding any other provisions of this Agreement: (A) no distribution including, without limitation, any distribution paid upon termination of the Company or of any Class with respect to any Class shall be effected other than from the assets held with respect to such Class; and (B) no Member owning an Interest with respect to any particular Class shall otherwise have any right or claim against the assets held with respect to any other Class except to the extent that such Member has such a right or claim hereunder as a Member owning an Interest with respect to such other Class.

(iv)     Equality. All Interests of each particular Class shall represent an equal proportionate interest in the assets held with respect to that Class (subject to the liabilities attributable to such Class and such rights and preferences as may have been established and designated with respect to such Class, and subject to any provisions hereunder applicable in the event of a default by a Member), and each Interest of any particular Class shall be equal to each other Interest of that Class.

## 3. Members.

3.1    Sale of Interests; Admission of Members. The Manager is authorized to cause the Company to raise capital by offering Class B and Class C Interests, or causing Interests to be offered and sold, in accordance with the provisions hereof and the Subscription Agreements. The Manager shall have the right to admit Members of existing Classes, and to receive additional Capital Contributions from existing Members of an existing Class, with the approval of all Members of such Class.

3.2    Interests. Each Member will have a Membership Interest in the Company that is proportional to that Member's Percentage Interest then in effect. The capital structure of the Company shall consist of three classes of Membership Interests: the "Class A Interests," the "Class B Interests," and the "Class C Interests," each of which shall have their own rights, preferences and designations and other rights, preferences and designations as may hereafter be established for such Class.

3.3    Voting. Except as expressly provided in this Agreement, the Articles, or by letter or operation of applicable law, Members shall have no voting, approval or consent rights. Except as expressly provided in this Agreement, on matters requiring a vote of the Members, regardless of Class of interest held, each Member shall vote in proportion to the Member's Percentage Interest as of the governing record date.

3.4    Record Date. The record date for determining the Members entitled to receive notice of any meeting, to vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager; provided that such record date shall not be more than sixty (60) or less than ten (10) calendar days prior to the date of the meeting, and not more than sixty (60) calendar days prior to any other action. In the absence of any action setting a record date, the record date shall be determined in accordance with Act

3.5    Liability of Members. The liability of the Members will be limited to the fullest extent possible under the Act. No Member other than the Manager shall take part in the control, management, direction or operation of the affairs of the Company, unless otherwise expressly provided in this Agreement, or specifically required under the Act, or shall have any power to bind the Company in their capacity as Members.

3.6    Company Property. No real or other property of the Company will be deemed to be owned by any Member individually, but will be owned by and title will be vested solely in the Company.

3.7    Meetings. Meetings of the Members for any purpose may be called only by the Manager or a Required Interest of Members of each Class. The Manager shall designate the place for any meeting and the Manager or Members calling the meeting shall give notice thereof not less than 5 calendar days' prior to the meeting date. A Required Interest of Members of each Class, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members.

3.8    Action by Written Consent. Any action of the Members may be taken without a meeting if evidenced by a written consent describing the action taken and signed by the requisite number of Members required to approve such action. Member action taken under this Section 3.8 shall be effective when the required number of Members have signed the consent, or such other effective date specified in such consent.

## 4. Capital Contributions and Capital Accounts.

4.1    Capital Contributions; Investments. The Members are each making an initial Capital Contribution in the amount shown on the Member's Subscription Agreement (the "Initial Capital

Contribution" for each such Member). No Member will be required or obligated to make any additional Capital Contributions.

4.2     Expenses. The Manager shall be responsible for the payment of all Company expenses and all expenses attributable to the Class B Interests other than the Class B Referral Fee.

4.3     No Third Party Right to Enforce. No Person other than a Member shall have the right to enforce any obligation of a Member to contribute capital hereunder and specifically no lender or other third party shall have any such rights.

4.4     Capital Accounts; Allocation of Profits or Losses.

(a)     A capital account for each Member shall be established and maintained in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations promulgated thereunder ("Capital Accounts"). The Company's net profit, net loss and items thereof shall be allocated to the capital accounts of the Members on an annual basis, at the end of each calendar year, in the manner required by Code Section 704(b) as determined by the Manager and in accordance with this Agreement.

(b)     All profit and loss attributable to a Class shall be allocated to the Capital Accounts of the Members in such Class in proportion to their Class Percentage Interests.

(c)     If additional Members are admitted to the Company subsequent to the formation of the Company, then allocations of profit and loss (including, without limitation Company expenses) attributable to periods subsequent to the formation of the Company shall be adjusted by the Manager as necessary to, as quickly as possible, cause the capital account balances of the Members to reflect the same amounts that they would have reflected if all Members had been admitted to the Company and made all of their Capital Commitments at the same time at the formation of the Company and had received allocations of profit and loss in accordance with Sections 4.4(a) and 4.4(b), all as the Manager may in his discretion determine to be equitable; provided, that no new Members may be admitted into Class B or Class C following the Network Launch Date.

## 5. Distributions.

5.1     No Right to Withdraw. No Member will have the right to withdraw or demand a distribution from the Company.

5.2     Distributions.

(a)     Distributions required under Section 2.7(c)(i) shall be made in accordance with such Section.

(b)     Subject to any applicable law, the Manager must, within 24 hours of each Lock-Up Release Date, distribute the maximum number of Grams permitted to be released from the Lock-Up to the Members, after the payment of any reasonable fees required for distribution; provided, that the Manager may make such distribution later than within 24 hours of each Lock-Up Release Date with the

written consent of the affected Members. The Lock-Up Release Dates and number of Grams to be released at each Lock-Up Release Date, are as follows:

(i)     The first 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is three months following the Network Launch Date (the "First Lock-Up Release Date");

(i)     The second 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is six months following the Network Launch Date (the "Second Lock-Up Release Date");

(iii)   The third 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is twelve months following the Network Launch Date (the "Third Lock-Up Release Date"); and

(iv)    The fourth 25% of the Grams purchased on the Network Launch Date shall be released from the restrictions in the Lock-Up on the date that is eighteen months following the Network Launch Date (the "Fourth Lock-Up Release Date" and together with the First Lock-Up Release Date, Second Lock-Up Release Date and Third Lock-Up Release Date, the "Lock-Up Release Dates").

The Manager may distribute cash in lieu of Grams only if the dollar value of the cash equals that of the Grams that should have been distributed and (i) the affected Members consent in writing to such substitution prior to distribution, or (ii) there are legal or regulatory requirements that unequivocally prohibit the distribution of Grams or unequivocally require the distribution of cash instead of Grams. Distributions made under this Section 5.2(b) shall be apportioned among the Members of an applicable Class in proportion to their respective Class Percentage Interest in such Class. Any distributions and/or allocations made under this Section 5.2(b) shall be made in the following proportions and priorities, with respect to each Class:

(i)     If such distribution is in Grams:

(A)     If the Fair Market Value of the Grams on the date of distribution is less than 250% of the initial purchase price of the Grams (for Class B Members, such initial purchase price shall equal $0.47195126 and for Class C Members, such initial purchase price shall equal $0.44368751), 100% of such Grams to the Members of a Class in accordance with their Class Percentage Interest;

(B)     if the Fair Market Value of the Grams on the date of distribution is equal to or greater than 250% of the initial purchase price of the Grams (for Class B Members, such initial purchase price shall equal $0.47195126 and for Class C Members, such initial purchase price shall equal $0.44368751), 70% of such Grams to the Members of a Class in accordance with their Class Percentage Interest and 30% to the Manager.

EXECUTION COPY

     (ii)    If such distribution is in cash, such distributions shall be made utilizing the same economic terms as set forth for distributions in Grams, as set forth in Section 5.2(b)(i) above, as determined by the Manager in good faith.

    5.3    Distributions in Kind. The Manager shall always, subject to any applicable laws or Section 5.2(b) of this Agreement, make any distributions to Class B or Class C Members in Grams, following the initial applicable Lock-Up periods, and each such Member shall agree to take such Grams subject to and will be fully bound by the terms of any agreements applicable to the Grams to which the Company is a party or is otherwise bound, including without limitation any further lock-up or holdback agreements, and each Member agrees to execute and deliver such instruments in order to effectuate the foregoing as the Manager shall request. It is understood by the Company, the Manager and the Members that the Lock-Up, which begins on the Network Launch Date and continues for 18 months, generally prohibits the Transfer of Grams during such 18 month period other than in accordance with the Lock-Up Release Dates. If property other than cash is distributed to the Members then, for all purposes of this Agreement, including, without limitation, for the purpose of charging the Members' Capital Accounts, such property shall be valued at its Fair Market Value as determined by the Manager (as defined below) and any unrealized gain or loss inherent in such property and not previously taken into account in computing Net Profits or Net Losses shall be credited or charged, as the case may be, to the Capital Accounts of Members in accordance with the provisions of Section 4.4 above.

    5.4    Fair Market Value of Grams. For purposes of this Agreement, the "Fair Market Value" of Grams shall mean (i) if Grams are then traded on an exchange, the last or closing price of Grams as represented by coinmarketcap.com as of 11:59 p.m. Eastern Time on the day prior to distribution given that the U.S. Dollar trading volume is a minimum of ten million dollars ($10,000,000) for the 24 hour period preceding the aforementioned last or closing price (the "Minimum Volume Requirement") or (ii) if Grams are not then traded on an exchange or the Minimum Volume Requirement is not met, the last known sale price of Grams by the Issuer, each as reasonably determined by the Manager.

    5.5    Withholding. Notwithstanding anything else contained in this Agreement, the Manager may, in his reasonable discretion, withhold from any distribution of cash or property in-kind to any Member pursuant to this Agreement, the following:

     (a)    as necessary or appropriate to cause the Company to comply with any foreign or federal, state or local withholding requirement with respect to any allocation, payment or distribution by the Company to any Member or other Person.

     (b)    any amounts due from such Member to the Company or the Manager or attributable to such Member pursuant to this Agreement to the extent not otherwise paid (including, without limitation, such Member's share of expenses relating to any Proceedings and Indemnification Obligations); provided, that Class B Members shall not be charged any expenses, including expenses relating to any Proceedings and Indemnification Obligations, except pursuant to Section 6.6(c).

    5.6    Dissolution of Classes B and C. Upon the Company distributing and/or allocating all assets comprised of either Class B and Class C Membership Interests, such Class shall automatically terminate, without any action required by the Company and/or the Manager, and all Class B and/or Class C Membership Interests, as applicable, shall automatically revert back to the Company and be dissolved.

    5.6    Final Distribution. The final distributions following dissolution of the Company will be made in accordance with the provisions of Section 10.

EXECUTION COPY

## 6. Management.

6.1     Management by the Manager. The Manager will have full responsibility for and charge of the overall management, control and administration of the Company in all respects. All determinations made and actions taken by the Manager pursuant to this Agreement will be binding on and conclusive as to all of the Members and will not be subject to question or review by any Member in any suit or proceeding except to the extent that any such suit or proceeding involves an alleged violation of the standards set forth in the Act. To the fullest extent permitted by law, the Members hereby consent to the exercise by the Manager of the powers conferred on him by this Agreement. The Manager may delegate authority to his Affiliates and others. The Manager will have all specific rights and powers required or appropriate to manage the Company, including, without limitation, the power and authority to do the following (except to the extent that any of the following powers are specifically limited or restricted by any other provision of this Agreement):

> (a) originate the Company's investments in Grams;
>
> (b) monitor and evaluate the Company's investments in Grams and otherwise represent the Company's interests with respect to Grams in all respects; provided, that the Manager may not Transfer any Grams attributable to Class B or Class C without the prior written consent of all Class B Members and Class C Members, respectively;
>
> (c) administer the overall operation of the Company;
>
> (d) initiate, participate in and settle judicial, arbitration, administrative or similar proceedings to protect the assets of the Company, enforce the Company's rights or otherwise defend the interests of the Company;
>
> (e) sell or otherwise dispose of all or substantially all the assets of the Company, including all Grams; provided, that the Manager may not Transfer any Grams attributable to Class B or Class C without the prior written consent of all Class B Members and Class C Members, respectively;
>
> (f) retain (as consultants and not employees) (and cause the Company to pay all fees and expenses of such Persons) Persons to render legal and accounting services to the Company as may be necessary for the efficient operations of the Company;
>
> (g) make, or cause to be made, payment by the Company any and all expenses that may be necessary for the operation, administration or management of the Company;
>
> (h) sue, complain and defend, in the name of and on behalf of the Company, and to settle, adjust, submit to arbitration and compromise all actions, suits, accounts, reckonings, claims and demands whatsoever now or hereafter pending between the Company and any other party (other than a Member); and
>
> (i) do any other acts that the Manager deems advisable to further the purposes of the Company and that are not prohibited by this Agreement or applicable law.

6.2     Certain Actions by the Manager. The following actions shall require the prior written approval of a Required Interest of Members of each existing Class:

(a)     any merger, reorganization, consolidation, dissolution or similar restructuring of the Company;

(b)     a material change to the Business of the Company;

(c)     any material amendment to this Agreement, including any amendment which can directly or indirectly alter the economic terms of any Class B or Class C Member or directly or indirectly increase the liability of any Class B or Class C Member;

(d)     an investment of Class B or Class C Capital Contributions or other Company funds from the sale of Class B or Class C Interests in any investment except Grams; or

(e)     any other decision or taking any action with respect to the Company that specifically requires the approval of the Members pursuant to this Agreement.

6.3     [Intentionally Omitted].

6.4     Investment Risk. The Members understand that the investment in the Class B and Class C Interests, as well as the subsequent investment in the Grams, involve significant risks, including, but not limited to, the risk that the Grams may decrease in value over time and/or lose all monetary value.

6.5     Reliance by Third Parties. No third party dealing with the Company shall be required to ascertain whether the Manager is acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Manager as binding on the Company.

6.6     Indemnity of the Manager, Employees, Other Agents and Other Indemnified Persons.

(a)     Indemnification – Generally. An Indemnified Person will receive liability protection to the fullest extent provided by the Act. Moreover, an Indemnified Person will not be personally liable for any arbitration award, decree, or judgment or other proceeding for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

(b)     Indemnification – Specifically. Subject to the limitations of the Act:

(i)     An Indemnified Person carrying out his, her, or its duties under this Agreement will not be liable to the Company nor to any Member for any acts, omissions, or errors of judgment the Indemnified Person believed were taken in good faith and within the scope of authority conferred by this Agreement.

(ii)     An Indemnified Person is not liable to the Company or any Member for any acts, omissions, or errors of judgment of any agent appointed by the Indemnified Person to perform any of the duties of the Indemnified Person under this Agreement.

(iii)     An Indemnified Person will not be liable to the Company or any Member for the Indemnified Person's good faith reliance on (A) the books and records of the Company or (B) information, opinions, reports or statements provided to the Company by any Person as to matters such Indemnified Person reasonably believes are within such other Person's professional or

EXECUTION COPY

expert competence (e.g., an economic report published by an economist or an accounting report created by an accountant).

(c) Limitation. In all cases, indemnification will be provided up to the extent of the net, liquid assets of the Company and no Member will have any personal liability for such expenses. The Class B Members shall not bear any costs associated with Indemnification of any person for any reason; provided, however, that notwithstanding anything else in this Agreement to the contrary, Class B Members shall be responsible for paying their pro rata share of any Indemnification Obligations that arise solely or primarily as a result of such Class B Member's (i) material breach of this Agreement or of a Member Counterparty agreement, or (ii) Event of Bankruptcy.

(d) Advances. Expenses (including legal fees and expenses) incurred by an Indemnified Person in defending any claim, demand, action, suit or proceeding subject to sub-Section (a) above will be paid by the Company in advance of the final disposition of such claim, demand, action, suit or proceeding upon receipt of an undertaking (which need not be secured) by or on behalf of the Indemnified Person (an "Indemnity Advance") to repay such amount if it will ultimately be finally determined by a court of competent jurisdiction and not subject to appeal, that the Indemnified Person is not entitled to be indemnified by the Company as authorized hereunder. The funds for any Indemnity Advance shall not come from any assets attributable to the Class B Interests.

6.7 Investments and Other Actions.

(a) Authority. The Manager is hereby authorized to execute or cause to be executed all instruments, certificates, notices and documents, and to do or cause to be done all such filing, recording, publishing and other acts as may be deemed by the Manager to be necessary or appropriate to comply with all applicable requirements for the formation or operation or, when appropriate, termination of a limited liability company in the State of Delaware and in all other jurisdictions where the Company does or will desire to conduct its business. Specifically, the Manager is hereby authorized to execute or cause to be executed all of the documents necessary to make investments in Grams.

(b) Further Assurances. If requested by the Manager, the Members will immediately execute all certificates and other documents consistent with the terms of this Agreement necessary for the Manager to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for the lawful organization and existence of the Company as a limited liability company, in all jurisdictions where the Company proposes to operate, and all other filings required to be made by the Company.

6.8 Other Business Opportunities; Affiliate Transactions; Conflicts.

(a) Each Member acknowledges that the Manager, the other Members and their respective Affiliates are or may be active in other business activities and shall be free to independently engage, invest or participate for their own account in, and receive the full benefits from, any business or activity, without consulting with the

18

Company or the Members and without offering any right to participate therein to the Company or any other Member.

(b)    The Manager may, on behalf of the Company, enter into contracts, agreements, undertakings and transactions with Members, or with Persons, firms or corporations having business, financial or other relationships with Members, provided that such transactions with such Persons and entities are on terms no less favorable to the Company than are generally available to unrelated third parties in comparable transactions.

6.90    Operating Expenses. The Manager shall be solely responsible for all of the operating expenses of the Company and shall not receive any compensation from the Company other than distributions in accordance with Article 5.

## 7. Books of Account, Records, Reports and Custody of Assets.

7.1    Maintenance of Books and Records. The Company will maintain books and records in such manner as is utilized in preparing the Company's federal information tax return in compliance with Section 6031 of the Code, and such other records as may be required in connection with the preparation and filing of the Company's required federal, state and local income tax returns or other tax returns or reports of foreign jurisdictions, including, without limitation, the records reflecting the Capital Accounts and adjustments specified in Section 4. All such books and records will at all times be made available at the principal office of the Company and will be open to the reasonable inspection and examination of the Members or their duly authorized representatives during normal business hours.

7.2    Federal, State and Local Income Tax Information. The Manager will use his commercially reasonable efforts to cause the Company to transmit to each Person who was a Member at any time during the fiscal year then ended (including any permitted assignee of a Member who so requests in writing) an Internal Revenue Service Schedule K-1 and such Company tax information as is legally required for the preparation by such Person of federal, state and local tax returns in accordance with any applicable laws, rules and regulations then prevailing. The Manager will use his discretion to obtain extensions for filing as needed. Each Member understands and agrees that the tax returns for the Company may be delayed so that it may be necessary for each Member to obtain extensions for the filing of their own tax returns. Such information will include a statement showing such Person's share of distributions, income, gain, loss, deductions and credits and other relevant fiscal items of the Company for such fiscal year. Promptly upon the request of any Member, the Manager will cause the Company to furnish such Member all United States federal, state and local income tax returns or information returns, if any, which the Company is required to file.

7.3.    Tax Matters.            shall act as Tax Matters Member of the Company pursuant to IRC §6231(a)(7).

7.4    Custody. The Manager agrees that it shall store and maintain any private key associated with a TON wallet with the highest degree of care and security and that the Manager shall provide a copy of each such private key (the "Duplicate Keys") to the Manager's attorney or a reputable third party (the "Duplicate Keys Storage Provider"). The Duplicate Keys are to be used in the event that the Manager or the Manager's successor is unable to access the private keys held by the Manager. The Manager shall ensure that the Duplicate Keys Storage Provider uses the highest degree of care and security in storing and maintaining the Duplicate Keys.

## 8. Transfer of Interests; Substitute Members.

8.1    Withdrawals, Transfers.

(a)    No Member shall have any right to voluntarily withdraw from the Company.

(b)    No Member will Transfer the Member's Interest or any rights in the Interest, or permit any legal or beneficial interest in such Member itself to be Transferred, unless such Transfer is: (i) a Family Transfer carried out in accordance with Section 8.2 of this Agreement, or (ii) approved by the Manager in the Manager's sole and absolute discretion. All attempted Transfers in violation of the terms of this Agreement will be void *ab initio*.

8.2    Family Transfer. Notwithstanding anything to the contrary contained in this Agreement, but subject to the considerations contemplated in Section 8.1, a Member, the estate of a deceased Member or attorney-in-fact or guardian of a mentally incompetent Member, may Transfer any or all of the Member's Interest to one or more Family Members of such Member (a "Family Transfer") provided that such Family Member is an Accredited Investor; however, such Family Member will not be admitted as a Member for purposes of political or voting power unless and until such Person is approved by the Manager and has executed and delivered an addendum to this Agreement in accordance with Section 8.3. In the event any such successor in interest is not approved as a Member or does not execute and deliver such addendum to this Agreement, such successor will only be entitled to the economic rights attributable to the Transferred interest as permitted hereunder.

8.3    Execution of this Agreement by Transferee. No assignee of all or any part of any Interest of a Member in the Company will be admitted to the Company as a substitute member (a "Substitute Member") unless and until:

(a)    the Manager, in his sole and absolute discretion, will have duly approved such admission,

(b)    the assignee has executed a counterpart of this Agreement (as modified or amended) and such other instruments as the Manager may reasonably deem necessary or appropriate to confirm the undertaking of the assignee to be bound by all the terms and provisions of this Agreement; and

(c)    the assignee has undertaken in writing to pay all expenses incurred by the Company in connection with such assignment and substitution.

Unless and until an assignee of Interests in the Company becomes a Substitute Member, such assignee will not be entitled to exercise any vote, consent or any other right or entitlement with respect to such Interests.

## 9. Resignation and Removal of the Manager.

9.1    Substitution of Manager. Without the consent of the Members, the Manager may substitute an Affiliate as a successor Manager. Upon the substitution of a successor Manager under this Section 9.1, the successor will succeed to all of the rights and obligations of the Manager and the prior Manager will be deemed to have withdrawn as the Manager. Except as required by applicable law, changes in the members, managers, directors, officers, employees or agents of the Manager will not require the consent of the Members and will not cause the dissolution of the Company.

9.2    Removal or Cessation of Manager. A Manager will cease to be a Manager of the Company: (i) if such Manager resigns or is dissolved; (ii) if such Manager becomes the subject party in an Event of Bankruptcy; (iii) upon the vote of a Required Interest of Members of each Class in the event of Misconduct by the Manager.

9.3    Successor Manager.

    (a)    General. Upon the removal or resignation of a Manager under Section 9.2, the Members will appoint a new Manager with each Member having the number of votes equal to the Percentage Interests held by such Member. A new Manager will be the Person which receives the approval of Members holding 51% or more of the Percentage Interests. Any successor Manager appointed by the Members to replace a Manager pursuant to this Section 9.3 will, beginning on the effective date of such appointment, have the same rights and obligations under this Agreement as the replaced Manager would have had subsequent to such date if the replaced Manager had continued to act as Manager

    (b)    Timing. The designation of such Person as a successor Manager will occur, and for all purposes will be deemed to have occurred, on the effective date of the cessation of the prior Manager.

## 10. Duration and Termination of the Company.

10.1    Term. The existence of the Company will be deemed to have commenced on the date on which the Certificate of Formation were filed with the Delaware Secretary of State and will continue until terminated as follows:

    10.1.1    The written determination of the Manager; or

    10.1.2    The sale of all or substantially all of the assets of the Company.

10.2    Winding-Up. At the termination, the Company will be dissolved and wound-up. In connection with the dissolution and winding-up of the Company, the Manager or, if he votes to appoint a liquidator or other representative (or if the Manager has been removed under Section 9.2 and not timely replaced under Section 9.3, a liquidator or other representative selected by the Members) (the "Representative"), will proceed with the sale or liquidation of all of the assets of each Class of the Company (including, to the extent feasible, the conversion to cash or cash equivalents of its assets) and will apply and distribute the proceeds of such sale or liquidation to the Members of each such Class in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

    (a)    first, to pay (or make provision for payment of) all expenses of the liquidation in satisfaction of all obligations of the Company for such expenses of liquidation; provided, that such expenses shall neither apply to nor be deducted from Class B or Class C proceeds;

    (b)    second, to pay (or to make provision for the payment of) all creditors of the Company (including Members who are creditors of the Company), in the order of priority provided by law or otherwise, in satisfaction of all debts, liabilities or obligations of the Company due such creditors and of such expenses of liquidation; provided, that such expenses shall neither apply to nor be deducted from Class B or Class C proceeds;

21

(c)    third, to the establishment of any reserve which the Manager or the Representative may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company (such reserve may be paid over by the Manager or the Representative to an escrow agent acceptable to the Manager or the Representative, to be held for disbursement in payment of any of the aforementioned liabilities and, at the end of such period as will be deemed advisable by the Manager or the Representative, for distribution of the balance in the manner provided in this Section 10.2); provided, that such reserves shall neither apply to nor be deducted from Class B or Class C proceeds; and

(d)    fourth, after the payment (or the provision for payment) of all debts, liabilities and obligations of the Company in accordance with clauses (a) and (b) above and the establishment of the reserve required under clause (c) above, to the Members in accordance with Section 5.2.

10.3    Distributions in Cash or in Kind. Upon dissolution, the Manager or the Representative may at its discretion hire independent appraisers to appraise the fair market value of Company assets not sold or otherwise disposed of and allocate any unrealized gain or loss determined by such appraisal to the Members' respective Capital Accounts as though the properties in question had been sold on the date of distribution and, after giving effect to any such adjustment, distribute said assets in the manner set forth in Section 10.2. The cost of any such appraisers shall not be borne by the Class B or Class C Interests.

10.4    Time for Liquidation. A reasonable amount of time will be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Manager or the Representative to minimize the losses attendant upon such liquidation.

10.5    Termination. Upon compliance with the foregoing distribution plan, the Manager or the Representative will execute, acknowledge and cause to be filed with the Secretary of State of the State of Delaware Certificate of Dissolution (or other appropriate document) of the Company. The provisions of this Agreement will remain in full force and effect during the period of winding up and until the filing of such Certificate of Dissolution (or other appropriate document) of the Company with the Secretary of State of the State of Delaware.

10.6    Costs and Expenses. The costs and expenses for terminating, dissolving and winding up the Company shall be payable by the Members other than the Members holding Class B or Class C Interests.

**11. Amendments.**

11.1    Amendments. Except as otherwise provided below, herein or by applicable law, this Agreement and all certificates, documents, instruments and other writings executed by the Members in connection herewith (including, without limitation, the Certificate of Formation) may be amended, from time to time, by the Manager to the extent the Manager shall determine such amendment shall be necessary, desirable, or appropriate in connection with the management or control of the Company and/or the conduct of its business and affairs. Such amendment may, by way of illustration and without limiting the scope of the foregoing in any respect, be made for the purposes of:

(a)    admitting additional or substituted Members into the Company pursuant to the terms of this Agreement;

(b)    clarifying any one or more of the provisions of this Agreement;

22

(c)   complying with, or satisfying the requirements of, the Code, the Treasury Regulations, any federal or state securities laws or regulations and/or any other law, statute, ordinance, rule, regulation, interpretation, decision, or order of, or issued, promulgated, or enacted by, any governmental authority or self-regulatory body, such as FINRA or a national securities exchange. Any such amendment may, in the sole discretion of the Manager, relate back to the date of this Agreement with such force and effect as if originally incorporated therein.

However, notwithstanding the foregoing:

(i)    any provision of this Agreement requiring the affirmative vote or consent of a specified percentage of Interests with respect to any action may be modified, amended, restated, or revoked only by the affirmative vote or consent of Members holding at least such specified percentage unless otherwise specified herein;

(ii)   no amendment of this Agreement and/or of any certificate(s), document(s), instrument(s) and/or other writing(s) executed by the Members in connection herewith (including, without limitation, the Certificate of Formation) that shall: (w) impose any liability on any Member for any debts, obligations or liabilities of the Company; (x) impose any obligation upon, or increase any obligation of, any Member to make additional Capital Contributions to the Company; or (y) except to the extent necessary to clarify a provision, provided that such clarification does not change the substance of the amended provision in the opinion of the Company's counsel, alter the allocation for tax purposes of any items of income, gain, loss, deduction, or credit with respect to any Member or Members or alter the manner of computing the distributions of any Member or Members, may be made without the consent of each of the Members who are adversely affected thereby; and

(iii)  no amendment of this Agreement and/or of any certificate(s), document(s), instrument(s) and/or other writing(s) executed by the Members in connection herewith (including, without limitation, the Certificate of Formation) that shall or may render any one or more of the Members liable, in their capacity as Members and/or Manager(s), for any or all of the debts, obligations and/or liabilities of the Company and/or of any of the other Members (whether arising in tort, contract, or otherwise) may be made without the consent of each of the Members adversely affected thereby.

EXECUTION COPY

11.2    Power of Attorney.

    (a)    Each Member agrees to execute, acknowledge, swear to, deliver, file, record and publish such further certificates, instruments and documents, and do all such other acts and things as may be required by law, or as may, in the opinion of the Manager, be necessary or desirable to carry out the intents and purposes of this Agreement.

    (b)    Each Member, whether a signatory hereto or a subsequently admitted Member, hereby irrevocably constitutes and appoints the Manager (including any successor Manager) the true and lawful attorney-in-fact of such Member, and empowers and authorizes such attorney-in-fact, in the name, place and stead of each Member, to execute, acknowledge, swear to and file, or have filed, the Certificate of Formation and any amendments thereto, and any other certificates, instruments and documents which may be required to be executed or filed under laws of any State or of the United States, or which the Manager shall deem advisable to execute or file, including without limitation all instruments which may be required to effectuate the formation, continuation, termination, distribution or liquidation of the Company and/or the sale of each Member's Interests.

    (c)    It is expressly acknowledged by each Member that the foregoing power of attorney is coupled with an interest and shall survive any assignment by such Member of such Member Interest in the Company; provided, however, that if such Member shall assign all of his Member Interest in the Company and the assignee shall become a substituted Member in accordance with this Agreement, then such power of attorney shall survive such assignment only for the purpose of enabling the Manager to execute, acknowledge, swear to and file all instruments necessary or appropriate to effectuate such substitution.

## 12. Investment/Operations Covenants.

    12.1    The Company shall use reasonable best efforts not to engage in any activities which could cause the Company to be engaged in a trade or business any income of which would be treated by any foreign Member (or any foreign partner or member of a Member) as income effectively connected with a United States trade or business under sections 871(a) or 881(a) of the Code.

    12.2    The Company will not invest in certain assets if the ownership of such assets would cause the Company to be treated as engaged in a trade or business any income from which would be treated by any foreign Member (or any foreign partner or member of a Member) as income effectively connected with a United States trade or business under sections 871(a) or 881(a) of the Code.

    12.3    The Company shall use its reasonable best efforts to ensure that all of its gross income is from dividends, interest, and capital gains and losses from the disposition of property, and rents and royalties, but only such rents and royalties as are excluded, pursuant to sections 512(b)(2) and (3) of the Code in calculating unrelated business taxable income to ensure that (a) the Company will not constitute a "business enterprise" for purposes of the excess business holdings provisions of section 4943 of the Code. The Company shall use its reasonable best efforts to ensure that the Company not enter into any transaction that would constitute participation by the Company or any Member in a "prohibited transaction" under section 4975 of the Code or in an "excess benefit transaction" under section 4958 of the Code. In no event shall this Section 12.3 be interpreted as preventing (or limiting in any respect) the Manager or the Company from participating in those activities that are customarily associated with the acquisition, holding of capital appreciation, and sale or distribution by a professionally managed investment fund of portfolio company

securities, including taking an active role in founding or serving on the boards of directors of portfolio companies.

12.4    The Company will use its reasonable best efforts to conduct the affairs of the Company so as to avoid having the Company treated as engaged in a trade or business within the United States for purposes of sections 875, 882, 884, and 1446 of the Code, so as to avoid any Member (or any partner or member of a Member) realizing gain or loss treated as effectively connected with a U.S. trade or business under section 897 of the Code and so as to avoid "effectively connected income" within the meaning of section 864 of the Code. In no event shall this Section 12.4 be interpreted as preventing (or limiting in any respect) the Manager or the Company from participating in those activities that are customarily associated with the acquisition, holding of capital appreciation, and sale or distribution by a professionally managed investment fund of portfolio company securities, including taking an active role in founding or serving on the boards of directors of portfolio companies.

### 13. Miscellaneous.

13.1    [Intentionally Omitted].

13.2    Entire Agreement. This Agreement together with the documents expressly referred to herein, including the Class B Side Letter, each as amended or supplemented, constitutes the entire agreement among the parties with respect to the subject matter herein or therein. They supersede any prior agreement or understanding among the parties hereto.

13.3    Successors and Assigns; Third Party Beneficiaries.. Except as otherwise specifically provided herein, this Agreement will be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns. The provisions of this Agreement are not intended to be for the benefit of any creditor (other than a Member who is a creditor) or other person (other than a Member, in his capacity as such, or Member Counterparty) to whom any debts, liabilities or obligations are owed by (or who otherwise have any claim against) the Company or any of the Members. For the avoidance of doubt, Member Counterparties shall be intended third party beneficiaries of this Agreement.

13.4    Severability. If any provision of this Agreement, or the application of such provision to any Person or circumstance, will be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, will not be affected thereby.

13.5    Counterparts. This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

13.6    Notices. All notices and demands, consents and other communications under this Agreement must be in writing and delivered by: (a) confirmed email or (b) an internationally recognized overnight delivery service with confirmed receipt. The physical and email addresses of the Members will be recorded via the Subscription Agreement and the address of the Company will be shown in Section 2.4. Notices, demands, consents and other communications mailed will be deemed to have been given and made three Business Days following the date mailed. Notices, demands, consents and other communications sent

by email or delivery service will be deemed to have been given on the day receipt of such notice is confirmed. Any Member may designate a different address by written notice.

13.7    Confidentiality. Each Member agrees, as set forth below, with respect to any information pertaining to any third party that the Company is under an obligation of confidentiality (collectively, "Confidential Matter"), to treat as confidential (and to only use in connection with the business of the Company) all such information, and will not disclose any Confidential Matter, provided that any Member may disclose any such information (a) as has become generally available to the public, (b) as to which such Member has received from a third party and about which such Member has no knowledge of a confidentiality agreement between such third party and the Company, (c) as may be required or appropriate in any report, statement or testimony submitted to any Governmental Authority having or claiming to have jurisdiction over such Member but only that portion of the data and information which, in the written opinion of counsel for such Member is required or would be required to be furnished to avoid liability for contempt or the imposition of any other material judicial or governmental penalty or censure, (d) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation or (e) as to which each of the other Members has consented in writing.

13.8    Interpretation. Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender will include the masculine, the feminine and the neuter. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

13.9    Manager's Standard of Care. Whenever in this Agreement the Manager is permitted or required to make a decision (a) in his "sole and absolute discretion," "sole discretion," "discretion" or under a grant of similar authority or latitude, the Manager will be entitled to consider such interests and factors as he desires, including his own interests or (b) in his "good faith" or under another express standard, the Manager will act under such express standard and will not be subject to any other or different standard imposed by this Agreement or other applicable law.

13.10    Governing Law and Venue. This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Bergen County, NJ, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

13.11    Compliance with FINRA. In the event that the Company invests in any Securities that are part of a "new issue" within the meaning of the rules of the Financial Industry Regulatory Authority, Inc. ("FINRA") (including Rule 5130), such investment shall be made in accordance with all applicable FINRA rules. In furtherance (but not limitation) of the preceding sentence, to the extent necessary to comply with FINRA rules (as determined by the Manager in his reasonable discretion) only those Members that have established through written representations satisfactory to the Manager that they do not fall within the proscription of such rules with regard to any specific new issue Securities shall have a beneficial interest in such new issue securities through their interest in the Company. Under no circumstance shall the Manager be deemed in breach of any duty to the Company by virtue of causing the Company to decline an opportunity to invest in a new issue Security.

EXECUTION COPY

13.12    Compliance with Investment Advisers Act.

(a)    The Members acknowledge and agree that the Members, solely by virtue of their status as such or their rights under this Agreement, are not intended to be clients of the Manager within the meaning of the Investment Advisers Act. Accordingly, notwithstanding any provision of this Agreement to the contrary, the Manager shall not be required to provide any Member (in its capacity as such) with any advice, analysis or reports regarding such Member's direct actual or proposed investments in any securities (including any actual or proposed co-investment by such Member with the Company).

(b)    In recognition of Rule 206(4)-8(a)(1) of the Investment Advisers Act (and other applicable laws, regulations and rules that similarly prohibit misleading communications to investors), each Member acknowledges and agrees that any and all communications from the Manager relating to the Company (including financial statements, capital call notices, proposals of amendments to this Agreement, requests for consents or waivers, and other reports, statements, notices and communications) shall be interpreted by each Member in light of all of the provisions of this Agreement.

(c)    The Manager and the Members recognize that applicable regulators, including the U.S. Securities and Exchange Commission, may enact new rules and regulations related to the characterization of the Grams, the Company, the Manager and/or the transactions contemplated herein. The Manager agrees that, should any law, rule or regulation require that the Manager must register as an investment adviser, the Manager shall promptly register as an investment adviser and fully comply with all related obligations.

13.13    Compliance with Securities Exchange Act.

(a)    The Members acknowledge and agree that the activities of the Manager in connection with the offering of interests in the Company are not intended to give rise to a requirement that any of such Persons register as a broker or a dealer under the Securities Exchange Act or any corresponding State, local, or foreign law. To the maximum extent permitted by applicable law, the Manager and the Company hereby disclaim any duties, obligations, or status as an advisor, finder, agent, broker or dealer on behalf or in respect of any Person in connection with such Person's actual or proposed investment in the Company.

(b)    Notwithstanding any provision of this Agreement to the contrary, the Manager (in his capacity as such) shall not be required to provide any services in connection with the actual or proposed transfer of all or any portion of a Member's or Assignee's interest in the Company, or in connection with any distribution by the Company, which services would give rise to a requirement that the Manager or any member thereof register as a broker or dealer under the Securities Exchange Act or any corresponding State, local or foreign law.

\* \* \* \* \*

EXECUTION COPY

## COMPANY SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.



By:
Name:
Title:

EXECUTION COPY

# MEMBER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Member Name:

Member Signature:

Class of Membership Interests Subscribed for: _____ B _____

Purchase Price: _____ $2,175,000.00 _____ USD

EXECUTION COPY

# MEMBER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Member Name:

Member Signature:

Class of Membership Interests Subscribed for: _B_

Purchase Price: $500,000

EXECUTION COPY

## MEMBER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Member Name:

Member Signature:

Class of Membership Interests Subscribed for: _____ B

Purchase Price: _____ 200  000

EXECUTION COPY

# MEMBER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Member Name:

Member Signature:

Class of Membership Interests Subscribed for: _____ B _____

Purchase Price: _____ 150000 $ _____



EXECUTION COPY

## MEMBER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

Member Name:

Member Signature:

Class of Membership Interests Subscribed for: __B__

Purchase Price: __$100,000__

SCHEDULE A

| Member Name | Capital Contribution | Class of Membership Interests | Percentage Interest |
|---|---|---|---|
| | Services | Class A | 100% |
| | $2,175,000 | Class B | 69.60% |
| | $500,000 | Class B | 16.00% |
| | $200,000 | Class B | 6.40% |
| | $150,000 | Class B | 4.80% |
| | $100,000 | Class B | 3.20% |