**PX92**

| | |
|---|---|
| **From:** | Alexander Filatov [filatov.av@globebridgers.com] |
| **Sent:** | 13/11/2018 10:00:58 |
| **To:** | perekopsky@telegram.org |
| **Subject:** | TON Ventures LP / Developing TON Ecosystem |

Dear Ilya,

As we discussed at the last meeting with Pavel / yourself, I would like to take this opportunity to offer your group participation in the TON Ventures LP fund as a Limited Partner.

The objective of the fund is to stimulate development of the upcoming TON ecosystem by investing into carefully selected teams/projects around the world that are ready to develop infrastructure and use case applications on the TON blockchain. I would love to present current vision of the pipeline to Pavel / yourself live or at Skype/zoom call.

Current LPs of the fund are all investors into TON who as a consequence passed KYC of Telegram and Credit Swiss.

Attached please find three legal documents outlining key parameters of the fund.

Administration of the fund will be done by a reputable Swiss administrator "Geneva Management Group". Legal counsel of the fund is Harney Westwood & Riegels.
Audit will be done by one of the top4 global auditing firms.

Hope this is enough to continue active dialogue. As a next step we would like our LPs to sing the term sheet in the next week or so and do a soft closing of the fund by end of November. We anticipate the first capital call to happen early/mid December.

I am happy to answer any questions that you might have. Let's make TON Ecosystem big together!

С уважением / Best regards,

Alexander Filatov
Chief Digital Enthusiast
+7-985-969-9220

*Why not dream, then plan and act to create #1 companies in the world!?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TLGRM-017-00000285

Draft : 8 November 2018

**TON VENTURES L.P.**

---

**AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT**

---

**CONTENT**

| | | |
|---|---|---|
| 1. | Definitions and interpretation | i |
| 2. | Formation and Name | vi |
| 3. | Purpose | vii |
| 4. | Registered Office | vii |
| 5. | Withdrawal of initial Limited Partner | vii |
| 6. | Commitments and Contributions | vii |
| 7. | Subsequent Closings | ix |
| 8. | Excused and Excluded Partners | x |
| 9. | Defaulting Partner | xi |
| 10. | Distributions | xiv |
| 11. | Claw-back | xv |
| 12. | Powers of the General Partner | xvi |
| 13. | Borrowing | xvii |
| 14. | Exclusion of Liability | xviii |
| 15. | Indemnification | xviii |
| 16. | Advisory Committee | xix |
| 17. | Limited Liability of Limited Partners | xx |
| 18. | Assistance of Limited Partners | xx |
| 19. | Co-Investment | xxi |
| 20. | Alternative Investment Vehicles and Parallel funds | xxi |
| 21. | Fees and Expenses of the General Partner | xxii |
| 22. | Partnership and Organisational Expenses | xxiii |
| 23. | Capital Accounts and Allocations | xxiv |
| 24. | Valuations | xxv |
| 25. | Books and Records | xxv |
| 26. | Reports to the Limited Partners | xxvi |
| 27. | Registers | xxvii |
| 28. | Partnership Meetings | xxvii |
| 29. | Withdrawal of the General Partner | xxviii |
| 30. | Transfers by Limited Partners | xxix |
| 31. | Withdrawal of Limited Partner | xxxi |
| 32. | Winding up and dissolution | xxxii |
| 33. | Power of Attorney | xxxiii |
| 34. | Automatic Exchange of Information Legislation | xxxiv |
| 35. | Side letters | xxxv |
| 36. | Amendments | xxxv |
| 37. | Confidentiality | xxxvi |

38.    Notices .................................................................................................xxxvi
39.    Miscellaneous provisions ...............................................................xxxvii
Term Sheet.............................................................................................40
Form of drawdown notice .....................................................................41

**THIS AGREEMENT** is made as a deed on

**BETWEEN**

1.  TON Ventures Ltd, an exempted company incorporated under the laws of the British Virgin Islands and registered as a foreign company in the Cayman Islands whose registered office is at 4th Floor, Harbour Place, 103 South Church Street, PO Box 10240, Grand Cayman KY1-1002, Cayman Islands (the *General Partner*);

2.  Harneys Fiduciary (Cayman) Limited (the *Initial Limited Partner*); and

3.  the Limited Partners admitted to the Partnership on the date of this Agreement.

**RECITALS**

A.  The Partnership was established under an initial exempted limited partnership agreement dated [   ] October 2018 (the *Original Agreement*) made between the General Partner, as the general partner of the Partnership and the Initial Limited Partner, and registered as an exempted limited partnership under the ELP Law on [   ] October 2018 under the name of TON Ventures L.P. and since such date has been governed by the Original Agreement; and

B.  The General Partner and the Limited Partners admitted on the date of this Agreement wish to enter into this Agreement to amend and restate the Original Agreement in its entirety.

**AGREEMENT**

1.  **DEFINITIONS AND INTERPRETATION**

1.1.  **Definitions.** In this Agreement, unless the context otherwise requires:

*Additional Amount* has the meaning given to it in Clause 7.3.

*Additional Contribution* has the meaning given to it in Clause 7.3.

*Additional Limited Partner* means any person who has been admitted to the Partnership as a Limited Partner at a Subsequent Closing in accordance with this Agreement.

*Advisory Committee* means a committee of the Partnership which will be established by the General Partner pursuant to Clause 16.

*AEOI Information* means, in respect of a Limited Partner, such information regarding the Limited Partner and its beneficial owners and such forms or documentation as may be requested from time to time by or on behalf of the General Partner to enable the General Partner and the Partnership to comply with the requirements and obligations imposed pursuant to the AEOI Legislation.

*AEOI Legislation* means any legislation, regulations or guidance in force in the Cayman Islands relating to the systematic and periodic exchange of information for tax purposes pursuant to any agreement or treaty entered into by the Cayman Islands (or any Cayman Islands government body) including the intergovernmental agreement entered into with the United States to facilitate compliance with sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any other agreement scheduled to the Tax Information Authority Law (as revised) or any regulations made under that law.

*Affiliate* means any person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the person specified and, for this purpose, a person shall be treated as being controlled by another person if that other person is able to direct its affairs and/or to control the composition of its board of directors or equivalent body provided that no SPV, Parallel Fund, Alternative Investment Vehicle or Successor Fund shall be deemed to be an Affiliate of the General Partner.

*Alternative Investment Vehicle* has the meaning given to it in Clause 20.1.

*Business Day* means a day (other than a Saturday or a Sunday) on which banks in Geneva, Switzerland and London, UK are authorised to open for normal banking business.

*Capital Account* means the account of each Partner as provided for in Clause 23.1.

*Carried Interest* means all amounts distributed, or to be distributed as appropriate, to the General Partner pursuant to Clause 10.8.

*Cause Event* means the entry of a final non-appealable judgment or order by any court of competent jurisdiction, or an admission by the General Partner in a settlement of any lawsuit, in which there is a finding that the General Partner has engaged in conduct that constitutes actual fraud, wilful default or Gross Negligence in connection with the performance of its duties under this Agreement.

*Claw-back Amount* has the meaning given to it in Clause 11.1.

*Closing* means any date determined by the General Partner as at which one or more persons may be admitted to the Partnership or an existing Limited Partner may increase its Commitment.

*Commitment* means, in respect of any Limited Partner, the amount agreed to be advanced by such Limited Partner to the Partnership pursuant to its Subscription Agreement (whether or not repaid to the Limited Partner in whole or in part) but excluding any Additional Amount.

*Commitment Expiration Date* means the date which is the end of the Investment Period.

*Contribution* means, in respect of any Limited Partner, the aggregate amount contributed to the Partnership by way of capital payment by such Limited Partner pursuant to this Agreement (and, where the context requires, by such Limited Partner to any Alternative Investment Vehicle).

*Default Amount* has the meaning given to it in Clause 9.1.

*Default Additional Amount* has the meaning given to it in Clause 9.2.

*Defaulting Partner* means a Limited Partner who fails to pay any Default Amount when due and is deemed a defaulting partner pursuant to Clause 9.1 or who fails to provide AEOI Information which required to do so and is deemed a defaulting partner pursuant to Clause 34.1.

*Disabling Event* means the bankruptcy, commencement of liquidation proceedings, insolvency or dissolution of the General Partner.

*Disposition* means the sale, exchange, redemption, repayment, repurchase or other disposition by the Partnership of all or any portion of a Portfolio Investment

for cash which is to be distributed to the Partners pursuant to Clause 10 and shall include the receipt by the Partnership of a liquidating dividend or other like distribution for cash on such Portfolio Investment or any portion thereof which are to be distributed to the Partners pursuant to Clause 10 and shall also include the distribution in-kind to the Partners of all or any portion of such Portfolio Investment as permitted hereby.

*Disposition Proceeds* means, in respect of any Portfolio Investment, all amounts received by the Partnership upon the Disposition of such Portfolio Investment, net of Partnership Expenses and reserves for Partnership Expenses (including contingent expenses) allocable to such Portfolio Investment.

*Drawdown Date* means the date specified in a Drawdown Notice on or before which each Limited Partner is required to make a Contribution to the Partnership (or an Alternative Investment Vehicle) pursuant to Clause 6.3.

*Drawdown Notice* means a written notice (which may be included in a Subscription Agreement but if not shall be substantially in the form set out in Schedule 2) pursuant to which each Limited Partner is required to make a Contribution to the Partnership (or an Alternative Investment Vehicle).

*ELP Law* means the Exempted Limited Partnership Law, 2014 (as amended) of the Cayman Islands.

*Final Closing* means the last Closing which shall take place no later than [•] or such later date as the General Partner may determine.

*Financial Year* means, in respect of the first Financial Year, the period commencing on the date of registration of the Partnership and ending on 31 December 2019 and thereafter a period of 12 calendar months ending on 31 December in each year or such other date as the General Partner may determine and notify to the Limited Partners.

*Follow-On Investment* means any further investment in or relating to an existing Portfolio Investment.

*General Partner* means TON Ventures Ltd.

*General Partner Interest* means entire interest of the General Partner in the Partnership in its capacity as the general partner of the Partnership, including the right of the General Partner to any and all benefits to which it may be entitled as provided in this Agreement, together with the obligations of the General Partner to comply with all of the terms and provisions of this Agreement.

*Gross Negligence* means, in relation to any person, a standard of conduct beyond negligence whereby that person acts with reckless disregard for the consequences of his or her action or inaction.

*IFRS* means International Financial Reporting Standards.

*Income* means income received by the Partnership (whether directly or in the form of interest, a dividend or other distribution) net of Partnership Expenses and any reserves made in respect of Partnership Expenses.

*Indemnified Party* means the General Partner, its Affiliates, and their members, officers, directors, employees, shareholders and partners, any person who serves at the request of the General Partner on behalf of the Partnership as an officer or director of an SPV and any member of the Advisory Committee.

***Initial Closing*** means the Initial Closing which shall take place on the date of this Agreement.

***Instrument of Transfer*** means a deed of adherence and instrument of transfer made between a Limited Partner, a Transferee and the General Partner which agreement shall be in a form approved by the General Partner and shall set out such terms as the General Partner may determine to effect the transfer of an Interest.

***Interest*** means the entire limited partnership interest of a Limited Partner in the Partnership at a particular time, including the right of such Limited Partner to any and all benefits to which it may be entitled as provided in this Agreement, together with the obligations of such Limited Partner to comply with all the terms and provisions of this Agreement.

***Investment*** means a Portfolio Investment or a Temporary Liquid Investment.

***Investment Period*** means the period commencing the Initial Closing and ending on the second anniversary of the Final Closing or such shorter period as the General Partner may determine pursuant to Clause 6.2 provided that the General Partner may extend the Investment Period by one (1) additional one-year period in its sole discretion.

***Limited Partner*** means any person who has been admitted to the Partnership by the General Partner as a limited partner of the Partnership in accordance with the terms of this Agreement and has not ceased to be a limited partner of the Partnership in accordance with such terms.

***Management Fee*** means the fees payable to the General Partner for the management of the Partnership pursuant to Clause 21.1.

***Net Proceeds*** means Disposition Proceeds and Income.

***Organisational Expenses*** means those costs and expenses referred to in Clause 22.1.

***Parallel Fund*** has the meaning given to it Clause 20.4.

***Partners*** means the General Partner and all Limited Partners.

***Partnership*** means TON Ventures L.P., an exempted limited partnership established under the laws of the Cayman Islands.

***Partnership Expenses*** means those fees, costs, claims and expenses, including Organisational Expenses, referred to in Clause 22.

***Percentage Interest*** means, with respect to any Limited Partner and any Portfolio Investment, the percentage that the Contribution of such Partner to that Portfolio Investment (as adjusted to reflect Additional Contributions at Subsequent Closings) bears to the total Contributions of all Limited Partners to that Portfolio Investment (as adjusted to reflect Additional Contributions at Subsequent Closings).

***Permitted Transferee*** means, in relation to any Limited Partner:

(a)     a wholly-owned subsidiary of, or the parent of, such Limited Partner or a whollyowned subsidiary of such Limited Partner's parent;

(b)   a replacement trustee or replacement trustees of such Limited Partner which holds its interest on trust for one or more beneficial owners provided that there is no change in beneficial ownership; and

(c)   any custodian or bare nominee of such Limited Partner provided there is no change in beneficial ownership of the Limited Partner's Interest.

*Portfolio Investment* means a direct or indirect interest in any securities, assets or rights in the nature of investments and digital assets, acquired by the Partnership but does not include Temporary Liquid Investments.

*Pro Rata Share* as to any Limited Partner on any date, means the percentage that such Limited Partner's Unfunded Commitment as of such date represents of the aggregate Unfunded Commitments as of such date of all Limited Partners from which a Contribution is required on such date.

*Security Interest* means a charge, assignment, encumbrance or any other agreement or arrangement having the effect of conferring security.

*SPV* means a company or entity owned or partly owned by the Partnership through which the Partnership holds one or more Portfolio Investments.

*Subscription Agreement* means an agreement entered into between the General Partner and a subscriber for an Interest, which agreement shall be in the form approved by the General Partner and shall set out such terms as the General Partner may determine, by which such subscriber agrees its Commitment and, upon acceptance by the General Partner, by which such subscriber becomes a party to this Agreement as a Limited Partner.

*Subsequent Closing* means a Closing subsequent to the Initial Closing.

*Successor Fund* means a closed end collective investment scheme with an investment objective and strategy which is substantially similar to that of the Partnership established subsequent to the Initial Closing.

*Successor General Partner* means any person admitted as the general partner of the Partnership in place of the General Partner pursuant to Clause 29.9.

*Super Majority Consent* means the approval of one or more Limited Partners entitled to vote together holding a two-thirds majority of the total Interests by value, as determined on the basis of Contributions.

*Temporary Liquid Investments* means cash, cash deposits or debt instruments issued by governments, financial institutions or companies having a maturity as at the date of their acquisition of not more than 6 (six) months or listed securities considered by the General Partner to be liquid.

*Transfer* means an assignment, transfer or other disposal (including by way of granting participation rights or by way of a synthetic transaction) of the whole or any part of an Interest.

*Transferee* has the meaning given to it in Clause 30.1.

*Unfunded Commitment* means the amount equal to the difference between the aggregate of the Commitment of a Limited Partner and the Contributions of that Limited Partner from time to time.

1.2. **Interpretation.** In this Agreement, unless the context otherwise requires:

(a)  the singular includes the plural and vice versa;

(b)  words importing any gender includes the other gender;

(c)  references to statutes are, unless otherwise specified, references to statutes of the Cayman Islands and include any statutory modification or re-enactment thereof for the time being in force;

(d)  any phrase introduced by the term "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense and meaning of the words preceding those terms;

(e)  a person includes all legal persons and natural persons and legal persons include all forms of corporate entity and any other person having capacity to act in its own name created by or in accordance with the laws or regulations of any jurisdiction;

(f)  *written* includes information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange and electronic mail in accordance with the Electronic Transactions Law (as revised) and *in writing* shall be construed accordingly;

(g)  section 8(1)(b) and section 19 of the Electronic Transactions Law (as revised) shall not apply;

(h)  references to *Dollar*, or *US Dollars* or *US$* are references to the lawful currency of the United States of America; and

(i)  a reference to a clause or a schedule, unless the context otherwise requires, is a reference to a clause of, or a schedule to, this Agreement.

1.3. **Construction.** Headings are included for ease of reference only and shall be disregarded in interpreting this Agreement.

2.   **FORMATION AND NAME**

2.1. **Formation.** The Partnership commenced on the date of the execution of the Original Agreement and was registered under the ELP Law as an exempted limited partnership on [•] October 2018.  This Agreement amends and restates the Original Agreement in its entirety.

2.2. **Term.** The Partnership shall continue until terminated pursuant to Clause 32.1.

2.3. **Name.** The business of the Partnership shall be carried on under the name "TON Ventures L.P." or such other name as the General Partner shall determine.  The General Partner shall promptly notify the Limited Partners of any change to the name of the Partnership and shall make the filing required under the ELP Law in connection with any such change.  Upon the winding up and dissolution of the Partnership, all of the Partnership's right, title and interest in and to the Partnership's name shall become the property of the General Partner and the Limited Partners shall have no right and no interest in and to the use of such name.

2.4. **Title to Partnership assets.** Title to the assets of the Partnership may be held in the name of the General Partner or the Partnership, or if the General Partner so determines, in the name of any custodian, sub-custodian or broker or any SPV

established by the General Partner on behalf of the Partnership to acquire and hold and manage Portfolio Investments. Any Portfolio Investments for which legal title is held in the name of the General Partner shall be held in trust by the General Partner as an asset of the Partnership in accordance with the ELP Law, for the use and benefit of the Partnership in accordance with the provisions of this Agreement. All Portfolio Investments shall be recorded as the property of the Partnership in the General Partner's books and records, irrespective of the name in which legal title to such assets are held.

3.  **PURPOSE**

3.1.  **Business.** The Partnership shall be capable of effecting any business permitted by this Agreement provided that such business is not prohibited under the ELP Law or by any other applicable Cayman Islands laws. The Partnership shall not undertake business with the public in the Cayman Islands other than so far as may be necessary for the carrying on of the business of the Partnership exterior to the Cayman Islands.

3.2.  **Principal purpose.** The principal purpose and investment policy of the Partnership shall be as set out in the [Term Sheet / Offering Memorandum]. Such purpose and investment policy shall be carried out in accordance with the terms of this Agreement.

3.3.  **Operation.** The Partnership may, directly or indirectly, take part in the management, supervision or control of the business or operations of any Portfolio Investment and may execute, deliver and perform all contracts and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable in order to carry out the purposes and objectives of the Partnership.

4.  **REGISTERED OFFICE**

4.1.  **Location of Registered office.** The address of the registered office of the Partnership in the Cayman Islands shall be at the offices of Harneys Fiduciary (Cayman) Limited, 4th Floor, Harbour Place, 103 South Church Street, PO Box 10240, Grand Cayman KY1-1002, Cayman Islands or such other office in the Cayman Islands as the General Partner may determine. The General Partner shall promptly notify the Limited Partners of any change to the registered office of the Partnership and shall make the filing required under the ELP Law in connection with any such change. The Partnership may have such other place or places of business as the General Partner may determine.

5.  **WITHDRAWAL OF INITIAL LIMITED PARTNER**

5.1.  **Withdrawal of Initial Limited Partner.** Immediately following the admission of one or more Limited Partners at the Initial Closing, the Initial Limited Partner shall cease to be a Partner and shall receive a return of any capital contributions made by it to the Partnership. On ceasing to be a Partner the Initial Limited Partner shall have no further interest in, right or claim against, or obligation of any kind whatsoever to, the Partnership.

6.  **COMMITMENTS AND CONTRIBUTIONS**

6.1.  **Commitment.** Each Limited Partner irrevocably agrees to make Contributions to the Partnership up to, in aggregate, the amount specified as its Commitment in its Subscription Agreement. The minimum and maximum aggregate Commitments which the General Partner may accept shall be determined by the General Partner.

6.2.  **Investment Period.**  The General Partner may terminate the Investment Period at any time if:

(a)  over [75] per cent of the aggregate Commitments are drawn down; or

(b)  in the good faith judgment of the General Partner, changes in applicable law or regulations or in business conditions make early termination of the Investment Period necessary or advisable.

6.3.  **Contributions.** At any time and from time to time on or prior to the Commitment Expiration Date, each Limited Partner shall contribute to the Partnership, on or before the relevant Drawdown Date, its Pro Rata Share of the aggregate amount to be contributed by all Limited Partners for any Portfolio Investment, for any Partnership Expenses or for any other purpose permitted by this Agreement.  Other than as set out in this Agreement, no Limited Partner shall be entitled to any interest on its Contributions.

6.4.  **Drawdown Notice.** The amount which Limited Partners are required to contribute on any Drawdown Date shall be specified by the General Partner in a Drawdown Notice.  Each Drawdown Notice shall be delivered to each Limited Partner at least 10 (ten) Business Days prior to the relevant Drawdown Date provided that a Drawdown Notice included in a Subscription Agreement may be delivered less than 10 (ten) Business Days prior to the relevant Drawdown Date.  Contributions shall be made by wire transfer of immediately available funds in US Dollars or any other currencies converted to the equivalent amount of US Dollars at the expense of the Limited Partner, to the account specified in the Drawdown Notice.

6.5.  **Currency conversion rates.** Contributions made in other currencies than the US Dollars shall be made in the equivalent US Dollar amount and any conversion rates or other expenses incurred as a result shall be borne by the relevant Limited Partner.

6.6.  **No obligation to return excess. If,** for whatever reason, a Limited Partner makes a Contribution in excess of its Pro Rata Share of the aggregate amount to be contributed by all Limited Partners, the General Partner shall not be obliged to return the excess Contribution to such Limited Partner but shall apply such excess to any future Contributions required to be made by such Limited Partner until such excess has been eliminated.

6.7.  **Return of Contributions when Portfolio Investment does not proceed.** If the General Partner determines that a proposed Portfolio Investment will not proceed, the General Partner shall return to each Limited Partner the amount of any Contribution made by such Limited Partner in respect of such Portfolio Investment adjusted to reflect:

(a)  any expenses or fees incurred in connection with the proposed acquisition of the Portfolio Investment;

(b)  any gain or shortfall arising in respect of any foreign exchange transaction entered into in anticipation of acquiring the Portfolio Investment; and

(c)  any amount that the General Partner determines is required for another Portfolio Investment or Partnership Expenses.

6.8.  **Return of Contributions not required for Portfolio Investment.** If the General Partner determines that a Portfolio Investment will not require the full amount of Contributions made in respect of such Portfolio Investment, the General Partner

may return to each Limited Partner, its pro rata share of the amount which exceeds the Contributions required to complete the acquisition of such Portfolio Investment.

6.9.   **Contributions returned subject to drawdown.** Any amount returned to Limited Partners pursuant to Clause 6.7 or Clause 6.8 prior to the Commitment Expiration Date shall be added back to Unfunded Commitments and so shall be available for further drawdown prior to the Commitment Expiration Date.

6.10.  **Limitations on drawdown.** No Drawdown Notice shall be served on any Limited Partner after the Commitment Expiration Date except to the extent that such Drawdown Notice shall require a Limited Partner to contribute any part of his Unfunded Commitment for the purposes of:

(a)   paying Partnership Expenses;

(b)   completing the acquisition of Portfolio Investments in respect of which, prior to the Commitment Expiration Date, the General Partner has entered into a binding commitment to acquire;

(c)   making a Follow-On Investment to preserve, protect or enhance the value of an existing Portfolio Investment; or

(d)   paying or making a provision for obligations of the Partnership including those under guarantees, indemnities, warranties, covenants or undertakings given pursuant to this Agreement.

7.     **SUBSEQUENT CLOSINGS**

7.1.   **Admission of Additional Limited Partners.** The General Partner may at any Closing enter into a Subscription Agreement with any person admitting such person as a Limited Partner.  Any person so admitted shall be deemed to have adhered to and agreed to be bound by the terms and conditions of this Agreement as if it has, together with all existing Limited Partners, duly executed and delivered this Agreement.

7.2.   **Increase in Commitment by Limited Partner.** The General Partner may at any Closing permit any Limited Partner to increase its Commitment.  Any Limited Partner who increases its Commitment shall be treated as if the amount of the increase were a new Commitment.

7.3.   **Payment of Additional Contribution.** Each Additional Limited Partner, and each Limited Partner that increases its Commitment at a Subsequent Closing, shall:

(a)   make a Contribution (the *Additional Contribution*) at such Subsequent Closing, or on such date as the General Partner may determine, of an amount equal to its proportionate share (based on Commitments) of the aggregate amount previously contributed by Limited Partners for Partnership Expenses and for the making of any Portfolio Investments which have not been realised in full prior to the Subsequent Closing; and

(b)   pay to the Partnership an additional amount (the *Additional Amount*) representing notional interest on the Additional Contribution (excluding any amount attributable to the payment of Management Fees) at a rate equal to fifteen (15) per cent per annum (compounded annually) from the date or dates upon which the Limited Partner's Commitment would have been drawn down had it been a Limited Partner from the Initial Closing up to the date of its payment, based upon the actual number of days elapsed in a year of 365 days.

7.4.   **Distribution of Additional Contribution and Additional Amount.** The Additional Contribution excluding any amount attributable to payment of Management Fees) and Additional Amount (excluding any amount representing notional interest on the Management Fees) will be distributed to those Limited Partners that were admitted at the Initial Closing or at a prior Subsequent Closing *pro rata* to their respective Contributions in respect of Partnership Expenses and Portfolio Investments to which the Additional Contribution relates.   That part of the Additional Contribution attributable to payment of Management Fees and that part of the Additional Amount representing notional interest thereon shall be paid to the General Partner.

7.5.   **Treatment of Additional Contribution.** Payments of Additional Contributions received by Limited Partners pursuant to Clause 7.4 shall not be treated as the proceeds of realisation of a Portfolio Investment but shall be distributed to the Limited Partners as a return of previously drawn down Commitments.  Any amount of Additional Contribution (but not any Additional Amount) distributed to any Limited Partner shall be added to each such Limited Partner's Unfunded Commitment and so shall be available for further drawdown.

7.6.   **Participation in Portfolio Investments.**  Each Additional Limited Partner, and each Limited Partner that increases its Commitment at a Subsequent Closing, shall be deemed to have made a Contribution with respect to each Portfolio Investment then still held by the Partnership in an amount equal to the product of (a) a fraction (i) the numerator of which is the aggregate of such Limited Partner's Contributions for all such Portfolio Investments after giving effect to such admission or increase, and (ii) the denominator of which is the aggregate amount of all Limited Partners' Contributions for all such Portfolio Investments after giving effect to such admission or increase, times (b) the amount of all Limited Partners' Contributions with respect to such Portfolio Investment.

7.7.   **No participation in realised Portfolio Investments.** Where a Portfolio Investment has been realised, whether in full or in part, prior to a Subsequent Closing, whether or not the proceeds of the realisation have been distributed to the Limited Partners:

(a)   an Additional Limited Partner admitted at such Subsequent Closing shall not be entitled to participate in that Portfolio Investment or any distributions resulting from such Portfolio Investment; and

(b)   a Limited Partner that increases its Commitment at such Subsequent Closing shall not be entitled to increase its participation in such Portfolio Investment to reflect its increased Commitment.

**8.**   **EXCUSED AND EXCLUDED PARTNERS**

8.1.   **Limited Partner may be excused from participation in Portfolio Investment.**  If a Limited Partner's participation in a Portfolio Investment would, in the determination of the General Partner, be reasonably likely to violate any law, regulation or governmental order to which such Limited Partner is subject, such Limited Partner may be excused by the General Partner from all of its obligation to make a Contribution relating to that Portfolio Investment (or that part of its obligation which would cause any such violation). The General Partner may require such Limited Partner to provide an opinion from legal counsel acceptable to the General Partner, in a form satisfactory to the General Partner, confirming that the Limited Partner's participation in the relevant Portfolio Investment would be reasonably likely to cause such a violation.

8.2.   **Limited Partner may be excluded from participation in Portfolio Investment.** The General Partner may exclude a particular Limited Partner from participating in all or any part of a Portfolio Investment if the General Partner determines that:

   (a)   a significant delay, extraordinary expense, violation of law or regulation or materially adverse effect on the Partnership, any Limited Partner, or any Portfolio Investment is likely to result from such Limited Partner's participation (or in the case of an exclusion from part but not all of its participation, the part of its participation in question) in such Portfolio Investment, or

   (b)   based upon a written opinion of legal counsel, such Limited Partner's participation (or in the case of an exclusion from part but not all of its participation, the part of its participation in question) in such Portfolio Investment would be reasonably likely to cause a violation of any law, regulation or order to which such Limited Partner is subject.

8.3.   **Consequences of excusing or exclusion.**   If a Limited Partner is excused or excluded from participating in a Portfolio Investment, the General Partner may require all of the Limited Partners who are not excused or excluded to increase their Contributions pro rata by an aggregate amount equal to the Contribution the excused or excluded Limited Partner would have been required to pay, provided that no Partner will be required to pay an amount in excess of its Unfunded Commitment.   If the General Partner elects to require such increase, the General Partner shall deliver to each relevant Limited Partner a Drawdown Notice in accordance with Clause 6.4.

9.   **DEFAULTING PARTNER**

9.1.   **Defaulting Partner.** If any Limited Partner fails to pay, within ten (10) Business Days of the relevant Drawdown Date, all or any portion of any Contribution required to be contributed by such Limited Partner or fails to make any other payment required to be made by it under this Agreement when required to be made, the General Partner shall promptly provide written notice of such failure to such Limited Partner specifying the outstanding amount such Limited Partner is required to pay (the *Default Amount*).   If such Limited Partner fails pay the Default Amount within ten (10) Business Days after receipt of such notice, then such Limited Partner shall be deemed a *Defaulting Partner*.

9.2.   **Payment of Default Additional Amount.** The General Partner may permit a Defaulting Partner to remedy the default by paying the Default Amount plus, if the General Partner so determines, any expenses incurred by the Partnership in relation to the default and/or an additional amount (the *Default Additional Amount*) determined by the General Partner.   The Default Additional Amount shall not exceed an amount equal to interest on the Default Amount at a rate equal to 20 per cent per annum (compounded daily) from the date the Default Amount was due and payable to the date full payment of the Default Amount is received by the Partnership.

9.3.   **No right to vote.**   Except as required by the ELP Law, any Defaulting Partner shall not be entitled to participate in any vote on, nor shall their consent be required for, any matters requiring the consent of Limited Partners pursuant to this Agreement.   The Commitment of a Defaulting Partner shall be disregarded when determining whether matters requiring the consent of Limited Partners have been validly approved.

9.4.  **Rights of General Partner on default.** On a Limited Partner being deemed a Defaulting Partner, the General Partner shall have the right to do any or all of the following:

(a)  declare a forfeiture of all or any Contributions paid by the Defaulting Partner and any amounts so forfeited shall be allocated to nondefaulting Limited Partners *pro rata* to their Commitments;

(b)  declare a forfeiture of all or any distributions of Income, Disposition Proceeds and liquidating distributions that such Defaulting Partner would otherwise receive and any amounts so forfeited shall be distributed among the other Limited Partners in proportion to their Percentage Interests in the Portfolio Investment giving rise to such distribution or, in the case of a distribution upon liquidation, in proportion to the liquidating distributions to them pursuant to Clause 32.4;

(c)  to exclude the Defaulting Partner from participating in any Portfolio Investments made after the date on which the Limited Partner is deemed to be a Defaulting Partner;

(d)  to effect the Transfer of the Defaulting Partner's Interest in accordance with Clause 9.6 at a price calculated on such basis as the General Partner deems appropriate which shall not be less than an amount equal to, in aggregate, 50 per cent of such Defaulting Partner's Capital Account;

(e)  to take any other action as the General Partner may reasonably consider to be appropriate to protect the interests of the Partnership, the General Partner and/or the non-defaulting Limited Partners.

9.5.  **Withdrawal from Portfolio Investment.** In the event that a Limited Partner is deemed to be a Defaulting Partner and as a consequence the General Partner decides not to proceed with the proposed Portfolio Investment, the Defaulting Partner shall:

(a)  reimburse the Partnership, the General Partner, any Parallel Fund and any Alternative Investment Vehicle for any out-of-pocket costs and expenses incurred by or on behalf of the Partnership, Parallel Fund or Alternative Investment Vehicle in developing, negotiating and structuring the proposed Portfolio Investment including (i) any legal, accounting, advisory, consulting or other third-party expenses in connection with the proposed Portfolio Investment, (ii) all fees (including commitment fees), costs and expenses of lenders and other financing sources in connection with the proposed Portfolio Investment, and (iii) any deposits or down payments of cash or other property which are forfeited in connection with the proposed Portfolio Investment;

(b)  indemnify the Partnership, the General Partner, any Parallel Fund and any Alternative Investment Vehicle for any liabilities any of them may incur as a result of not proceeding with the proposed Portfolio Investment.

9.6.  **Transfer of Limited Partner's Interest.** In the event that the General Partner elects to exercise its discretion to effect a Transfer of the Defaulting Partner's Interest, the following provisions shall apply:

(a)  the General Partner shall first offer to sell such Interest to all non-defaulting Limited Partners, in the proportion that each such Limited Partner's Commitment bears to the aggregate of the Commitments of all such Limited Partners.  The offer shall be made by the General Partner giving each non-

defaulting Limited Partner written notice setting out the offer price, the proposed terms of the sale (which shall be determined by the General Partner) and the date by which the offer must be accepted.  If some but not all of the non-defaulting Limited Partners accept the first offer, the General Partner shall offer the remaining part of the Interest not sold to those non-defaulting Limited Partners who have accepted the first offer on a pro rata basis.  In the event that the General Partner does not receive offers for the purchase of the whole of the Defaulting Partner's Interest, the General Partner may offer to sell the unsold portion to a third party, or may purchase the unsold portion itself, on the same terms as those offered to the non-defaulting Limited Partners;

(b) any party that purchases all or any part of the Interest of the Defaulting Limited Partner shall succeed to all the rights and obligations relating to the Interest (or part thereof) purchased;

(c) the sale proceeds shall be applied to pay to the Default Amount and any costs and expenses incurred by the Partnership in relation to the default, including any costs and expenses incurred in dealing with the Defaulting Partner and any costs (including interest) incurred as the result of any borrowings entered into to cover the Default Amount;

(d) the balance of the sale proceeds (if any) shall be paid to the Defaulting Partner but the General Partner shall not be required to pay any part of the sale proceeds to the Defaulting Partner until the Defaulting Partner has:

(i) delivered to the General Partner any and all documents that the General Partner may require in connection with the sale of the Interest; and

(ii) confirmed in writing that it has no claims against the Partnership, the General Partner, or any person purchasing the Defaulting Partner's Interest.

9.7. **Requirement for additional Contributions.** In the event that a Limited Partner fails to pay any portion of any Contribution required in respect of a Portfolio Investment and the General Partner decides to proceed with the Portfolio Investment, the General Partner may require all of the non-defaulting Limited Partners to increase their Contributions by an aggregate amount equal to the Default Amount, provided that no Partner will be required to pay an amount in excess of its Unfunded Commitment.  If the General Partner elects to require such increase, it shall deliver to each non-defaulting Limited Partner a Drawdown Notice in accordance with Clause 6.4.

9.8. **No waiver of remedy.** No right, power or remedy conferred upon the General Partner in this Clause 9 shall be exclusive, and each such right, power or remedy shall be cumulative and in addition to every other right, power or remedy whether conferred in this Clause 9 or now or hereafter available at law or in equity or by statute or otherwise. No course of dealing between the General Partner and any Defaulting Partner and no delay in exercising any right, power or remedy conferred in this Clause 9 or now or hereafter existing at law or in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power or remedy.  The General Partner shall not have any obligation to consider the best interests of a Defaulting Limited Partner when determining how to exercise its rights under this Clause 9.

**10.    DISTRIBUTIONS**

10.1.   **No right to withdraw.** Except as otherwise expressly provided in this Agreement, no Partner shall have the right to withdraw capital from the Partnership or to receive any distribution or return of its Contribution.  Distributions that are provided for in this Agreement shall be made only to Limited Partners who were Limited Partners on the applicable distribution date.

10.2.   **Distribution of Income.**  Income shall be distributed at such times and intervals as the General Partner shall determine.  The General Partner may retain such part of any income received as the General Partner consider prudent for reserves to meet future Partnership Expenses and other liabilities of the Partnership.

10.3.   **Retention of Disposition Proceeds.**  Any part of Disposition Proceeds realised from the disposal of a Portfolio Investment during the Investment Period may, in the discretion of the General Partner, be retained for reinvestment or to meet Partnership Expenses or other liabilities of the Partnership.  After the expiry of the Investment Period, Disposition Proceeds realised from the disposal of a Portfolio Investment may, in the .discretion of the General Partner, be retained to meet Partnership Expenses or other liabilities of the Partnership.  The General Partner may also retain any amount it considers necessary to create appropriate reserves for Partnership Expenses and other liabilities of the Partnership.  Disposition Proceeds from a Portfolio Investment, or any portion of a Portfolio Investment, (to the extent not retained for reinvestment or to meet Partnership Expenses or other liabilities) shall be distributed as soon as practicable after the date such Disposition Proceeds are received by the Partnership.

10.4.   **Payment of distributions.** Distributions in cash shall be made by wire transfer of immediately available funds to the account specified in the Limited Partner's Subscription Agreement unless the General Partner agrees that payment may be made to another account.

10.5.   **Partial disposal.** For all purposes of this Agreement, whenever a portion of a Portfolio Investment (but not the entire Portfolio Investment) is the subject of a Disposition, that portion shall be treated as having been a separate Portfolio Investment from the portion of the Portfolio Investment that is retained by the Partnership.  Contributions for, and prior distributions of income from, the Portfolio Investment shall be treated as having been divided between the sold portion and the retained portion on a pro rata basis.

10.6.   **Subsequent Portfolio Investment.**  For all purposes of this Agreement, whenever an investment is made in the same type of security of, or other interest in, an entity or asset in which an investment previously has been made, such subsequent investment shall be treated as a separate Portfolio Investment from the Portfolio Investment previously made, and the Contributions for, and Disposition Proceeds and income subsequently received from, such entity shall be divided between the prior Portfolio Investment and the subsequent Portfolio Investment based upon the relative amounts invested by the Partnership in such prior and subsequent Portfolio Investments.

10.7.   **In-kind distributions.** The General Partner will normally seek to make distributions in cash.   However, the General Partner may make in-kind distributions of marketable securities to Limited Partners at any time.   Upon termination or liquidation of the Partnership or the withdrawal of a Limited Partner, in-kind distributions may include non-marketable securities and other assets of the Partnership (including any digital assets).    The General Partner will seek an independent valuation of any non-marketable securities or assets prior to making any in-kind distribution and the Carried Interest, if any, payable to the General

Partner will be determined by reference to such valuation.  The General Partner will provide a minimum of 10 Business Days' advance notice of any in-kind distribution.

10.8.  **Priority of Distributions.** Distributions of Net Proceeds in respect of each Portfolio Investment will be made in the first instance to the Limited Partners in proportion to each of their Percentage Interest with respect to such Portfolio Investment. Each Limited Partner's share of Net Proceeds will then be further allocated to such Limited Partner and the General Partner in the following amounts and order of priority:

(a)  First, 100 per cent to the Limited Partner until such Limited Partner has received cumulative distributions equal to the aggregate Contributions made by the Limited Partner on or prior to the date of the relevant distribution;

(b)  Second, 100 per cent to the Limited Partner until the cumulative distributions to such Limited Partner represents a ten (10) per cent cumulative compounded per annum rate of return on the Contributions referred to in (a) above, calculated from the date on which the relevant Contribution was paid to the date on which it was repaid;

(c)  Third, 100 per cent to the General Partner until the General Partner has received 25 per cent of the sum of the cumulative distributions to the Limited Partner made pursuant to paragraph (b) above as well as to the General Partner pursuant to this paragraph (c); and

(d)  *75/25 split:* Thereafter, 75 per cent to such Limited Partner and 25 per cent to the General Partner.

10.9.  **Distributions in respect of Temporary Liquid Investments.**  Each distribution of proceeds from a temporary Liquid Investment shall be divided among all Partners (including the General Partner) pro rata in proportion to their respective interests in the funds that produced such proceeds from the Temporary Liquid Investment, as reasonably determined by the General Partner.

10.10.  **Deductions from distributions.**  The General Partner may hold back from any distribution payable to a Limited Partner an amount equivalent to any liability, cost, expense, tax, withholding or deduction incurred or suffered by the Partnership, or that in the opinion of the General Partner will be incurred or suffered by the Partnership, because of the representations, actions or inactions (directly or indirectly) of such Limited Partner.  The Limited Partner shall have no claim against the Partnership or the General Partner in respect of any amount held back pursuant to this Clause 10.8(a) but any amount not required to satisfy the liability, cost, expense, tax, withholding or deduction shall be paid to the Limited Partner.

11.  **CLAW-BACK**

11.1.  **Repayment of excess Carried Interest.** If, at the time of termination, the General Partner's cumulative distributions (exclusive of the General Partner's distributions in respect of the General Partner's committed capital) exceed 25% of the Partnership's profits, the General Partner will refund such excess distributions; provided that the General Partner shall not be required to refund an amount in excess of the cumulative distributions (exclusive of the General Partner's distributions in respect of the General Partner's committed capital) received by the General Partner less taxes paid or deemed paid by the General Partner in respect of its carried interest.

**11.2. Limit on repayment of excess Carried Interest.** In no event will the General Partner be required to return any amount which is more than the cumulative Carried Interest distributions received by the General Partner, net of income taxes thereon. The General Partner shall procure that, if necessary, its shareholders return to the General Partner sufficient distributions received by them from the General Partner arising from Carried Interest so as to enable the General Partner to meet its obligations described in this Clause 11.

**12. POWERS OF THE GENERAL PARTNER**

**12.1. General authority of General Partner.** The General Partner shall have exclusive responsibility for the management and control of the business affairs of the Partnership.   Subject to any limitations set out in this Agreement, the General Partner shall have power to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto.

**12.2. Exercise of powers by the General Partner.** All determinations to be made by the General Partner and all powers, authorities and discretions exercisable by the General Partner under this Agreement may be made and exercised by the General Partner in its sole and absolute discretion, either generally or in any particular case, subject only to any qualifications or limitations expressed in this Agreement or imposed by law.  The General Partner shall not have any obligation to consider the best interests of any particular Limited Partner when exercising any power or discretion exercisable by the General Partner under this Agreement.

**12.3. Powers of the General Partner.** without prejudice to the generality of Clause 12.1, the General Partner shall have full power and authority) on behalf of the Partnership and with the power to bind the Partnership thereby, subject to any limitations contained in this Agreement:

(a)     to direct the formulation of investment policies and strategies for the Partnership;

(b)     to make all decisions concerning the investigation, selection, negotiation, structuring, commitment to, realisation, sale, exchange, redemption, repayment, repurchase or other disposal of Portfolio Investments;

(c)     to acquire, hold, sell, transfer, exchange, charge, pledge and dispose of Portfolio Investments, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Portfolio Investments, including the exercise of any voting rights with respect to an SPV holding a Portfolio Investment, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other similar matters;

(d)     to enter into, execute, maintain and/or terminate contracts, undertakings, agreements, deeds and any and all other documents and instruments in the name of the Partnership, and do or perform all such things as it may deem to be may be necessary or advisable for, or as may be incidental to the conduct of the business of the Partnership, including entering into purchase, sale or underwriting agreements to make or dispose of Portfolio Investments which may include such representations, warranties, covenants, indemnities and guarantees as the General Partner may deem necessary or advisable;

(e)     to incorporate and to establish SPVs in connection with any Portfolio Investment or proposed Portfolio Investment;

(f)     to lend Contributions to SPVs or third parties, where necessary, to facilitate investment by the Partnership in Portfolio Investments;

(g)     to open, maintain and close bank accounts and draw cheques or other orders for the payment of money and open, maintain and close brokerage, money market fund and similar accounts;

(h)     to commence or defend legal proceedings relating to the Partnership or to any Portfolio Investment and to negotiate, compromise or settle any disputes (whether or not legal proceedings have been commenced) relating to the Partnership or to any Portfolio Investment;

(i)     generally to do all other things on behalf of the Partnership as are reasonably required in connection with or ancillary to the purposes and objectives of the Partnership as described in this Agreement; and

(j)     to take any other action permitted by this Agreement or applicable law.

12.4.  **Restrictions on investing.** The General Partner may only invest Contributions or commit the Partnership to make investments during the Investment Period. Following the expiry of the Investment Period, the General Partner will not acquire additional Portfolio Investments except that:

(a)     the General Partner may complete the acquisition of Portfolio Investments in respect of which, prior to the Commitment Expiration Date, the General Partner has entered into a binding commitment to acquire;

(b)     the General Partner may make Temporary Liquid Investments; and

(c)     the General Partner may make Follow-on Investments to preserve, protect or enhance the value of an existing Portfolio Investment.

12.5.  **Appointment of service providers.** The General Partner may appoint service providers on behalf of the Partnership including one or more investment advisers, administrators, custodians, consultants, brokers, appraisers, lawyers, attorneys, accountants, auditors and valuers.   The fees and expenses of any such service provider may be paid out of the assets of the Partnership.   Any such service provider may be appointed on such terms as the General Partner considers appropriate, including terms which authorize any such service provider to act for and on behalf of the Partnership and which provide for the service provider to be indemnified out of the assets of the Partnership.

**13.     BORROWING**

13.1.  **Right to borrow.**  If the General Partner determines that funds are necessary to carry out the business of the Partnership, the General Partner may, subject to any restrictions set out in Schedule 1, borrow such funds on behalf of the Partnership from any person (the *Lender*) on such terms as the General Partner considers appropriate (any such arrangement, a *Commitment Facility*). In connection with any Commitment Facility, the General Partner may execute, deliver and perform any credit agreement, guarantee and/or related documentation on behalf of the Partnership.

13.2.  **Granting of security.**  In connection with any Commitment Facility, subject to any restrictions set out in Schedule 1, the General Partner may pledge, hypothecate, mortgage, assign, transfer or grant a security interest in or other lien on:

(a)     the General Partner's interest;

(b)     each Limited Partner's Subscription Agreement and each Limited Partner's obligation to make Contributions under this Agreement;

(c)     any other assets, rights or remedies of the Partnership or of the General Partner under this Agreement or under any Subscription Agreement, including the right to call capital and issue Drawdown Notices, to accept additional Contributions, to receive Contributions and other payments and to exercise remedies upon a default by any Limited Partner in the payment of its Contributions; and

(d)     any other related rights, titles, interests, remedies, powers and privileges of the Partnership and/or the General Partner.

13.3.   **Assistance of Limited Partners.** If the General Partner determines that the Partnership should obtain a Commitment Facility, each of the Limited Partners agrees that the Lender (or any administrative agent or collateral agent acting on behalf of the Lender) may require each Limited Partner to comply with Drawdown Notices consistent with the terms of this Agreement, and in connection with such Commitment Facility each Limited Partner further agrees to comply with any request by the General Partner or such Lender (if authorised to make such request under the relevant security documentation) to:

(a)     confirm to such Lender the terms of their Commitments to the Partnership;

(b)     provide such financial information as may be reasonably and customarily required by such Lender; and

(c)     execute and deliver such documents as may be reasonably and customarily required in order to obtain such Commitment Facility.

13.4.   **Rights of Lender.** All rights granted to a Lender pursuant to this clause shall apply to its agents and its successors and assigns.

14.     **EXCLUSION OF LIABILITY**

14.1.   **Exclusion of liability.** To the fullest extent permitted by law, no Indemnified Party shall be liable to the Partnership or to any Limited Partner for any acts or omissions or any error of judgment or for any loss suffered by the Partnership or the Limited Partners in connection with the management of the assets of the Partnership, except those resulting from the actual fraud, wilful default or Gross Negligence of the Indemnified Party.

14.2.   **Consultation with professional advisers.** The General Partner may consult with legal counsel, accountants and other professional advisers selected by it and any act or omission suffered or taken by it on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reliance upon and in accordance with the advice of such legal counsel, accountants or other professional advisers shall be full justification for any such act or omission, and the General Partner shall be fully protected in so acting or omitting to act, provided that such legal counsel, accountants or professional advisers were selected with reasonable care.

15.     **INDEMNIFICATION**

15.1.   **Indemnity out of assets of the Partnership.** To the fullest extent permitted by law, each Indemnified Party, shall be entitled to be indemnified and held harmless out of the assets of the Partnership, from and against any and all liabilities, actions, proceedings, claims, demands, costs, damages and expenses (including any legal

expenses) whatsoever suffered or sustained by such Indemnified Party as a result of any act or failure to act in carrying out any function in connection with the Partnership, including acting as a director or the equivalent of any SPV through which a Portfolio Investment is made, provided that an Indemnified Party shall not be indemnified for:

(a)     any liabilities, actions, proceedings, claims, demands, costs, damages or expenses that such Indemnified Party incurs due to his own actual fraud, wilful default or Gross Negligence; and

(b)     any economic losses incurred as a result of owning an Interest in the Partnership or in any Portfolio Investment.

15.2.   **Expenses.** Expenses incurred by an Indemnified Party in defence or settlement of any claim that may be subject to a right of indemnification under this Agreement may be advanced by the Partnership subject to an undertaking by or on behalf of the Indemnified Party to repay such amount to the extent that it is determined ultimately that such Indemnified Party is not entitled to be indemnified under this Agreement.

15.3.   **Rights of indemnification cumulative.** The right of any Indemnified Party to the indemnification provided by this Agreement shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

15.4.   **Insurance.** The General Partner may purchase, at the expense of the Partnership, insurance to insure either or both of the General Partner or any other Indemnified Party against liability for any breach or alleged breach of their responsibilities under this Agreement or otherwise in connection with the Partnership.

16.     **ADVISORY COMMITTEE**

16.1.   **Establishment of Advisory Committee.** The General Partner shall establish a committee of the Partnership (the *Advisory Committee*) from time to time which shall meet on an ad hoc basis. The Advisory Committee shall consist of up to a maximum of five (5) members selected by the General Partner from among certain Limited Partners' representatives and third party independent experts.  Members of the Advisory Committee may comprise:

(a)     up to two (2) representatives of the General Partner;

(b)     up to two (2) representatives of the Limited Partners; and

(c)     independent experts, not being associated with the Partnership, selected by the General Partner.

16.2.   **Functions of Advisory Committee.** The Advisory Committee shall perform the following functions:

(a)     resolving issues involving conflicts of interest between the Partnership and Limited Partners, the General Partner and the Partnership, any Successor Funds and the Partnership or any other collective investment schemes managed by the General Partner or its Affiliates;

(b)     approving external independent valuation experts, as required;

(c)    signing-off on portfolio valuations as necessary but in particular any write-downs associated with Portfolio Investments; and

(d)    approving any breach of, or change to, any investment restrictions requested by the General Partner.

## 17.   LIMITED LIABILITY OF LIMITED PARTNERS

17.1.   **No Participation in management.** Except as expressly provided in this Agreement, no Limited Partner shall have the right or power to participate in the management or affairs of the Partnership or to take part in the conduct of business of the Partnership. No Limited Partner shall have the power to sign for or bind the Partnership or deal with third parties on behalf of the Partnership without the written consent of the General Partner. The exercise by any Limited Partner of any right conferred by this Agreement shall not be construed to constitute participation by such Limited Partner in the conduct of the business of the Partnership so as to make such Limited Partner liable as a general partner for the debts and obligations of the Partnership for purposes of the ELP Law.

17.2.   **Limited liability of Limited Partners.** Except as provided by applicable law or otherwise agreed by the Limited Partner:

(a)    a Limited Partner shall not have any personal liability whatsoever in its capacity as a Limited Partner, whether to the Partnership, to any of the Partners, or to the creditors of the Partnership, for the debts, liabilities, contracts, or other obligations of the Partnership or for any losses of the Partnership; and

(b)    a Limited Partner's obligation to make Contributions to the Partnership shall be limited to such Limited Partner's obligation to make Contributions, in aggregate, equal to the full amount of its Commitment in accordance with, and subject to, this Agreement.

17.3.   **No restriction on other activities.** Save as otherwise provided for in this Agreement, a Limited Partner shall be entitled to and may have business interests and engage in activities in direct competition with the Partnership and the entities in which the Partnership invests. A Limited Partner shall be entitled to and may engage in transactions with, and provide services to, the Partnership or any entity in which the Partnership invests. None of the Partnership, any Partner or any other person shall have any rights by virtue of this Agreement in any business ventures of any Limited Partner or the General Partner or its Affiliates.

17.4.   **General Partner's rights as a Limited Partner.** The General Partner shall also be a Limited Partner to the extent that it subscribes at any Closing, purchases or becomes a transferee of any Interest and to such extent shall be treated as a Limited Partner in all respects.

## 18.   ASSISTANCE OF LIMITED PARTNERS

18.1.   **Filings.** If requested by the General Partner, the Limited Partners shall immediately execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for:

(a)    the formation and operation of an exempted limited partnership under the laws of the Cayman Islands;

(b)     if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which each Limited Partner has limited liability, in all jurisdictions where the Partnership proposes to operate; and

(c)     all other filings required to be made by the Partnership or by the General Partner in connection with the Partnership.

## 19.    CO-INVESTMENT

19.1. **Co-investment rights.** The Partnership may co-invest with other parties if, in the opinion of the General Partner, an investment opportunity exists which the Partnership cannot wholly acquire, whether due to the applicable Investment Restrictions or otherwise. The General Partner shall determine the portion of unutilised investment opportunity to be offered generally and to be offered to Limited Partners or third party investors. If any Limited Partner chooses not to exercise its co-investment right, its right in respect of the Portfolio Investment may be offered by the General Partner to the other Limited Partners on a *pro rata* basis, or to third party investors.

19.2. **Right of General Partner to Co-Invest.** The General Partner and its directors, officers, employees and Affiliates may co-invest with the Partnership as third party investors at the discretion of the General Partner. However, such coinvestment will always be on condition that:

(a)     sufficient investment opportunity exists after Limited Partners have first been offered the opportunity to co-invest; and

(b)     the terms of such co-investment shall be substantially similar and no more favourable than that offered to the Limited Partners.

19.3. **Conditions on co-investment.** Any co-investment offer made under this Clause 19 may only be made on the same economic terms and conditions as those on which the Partnership invests. Where such co-investment shall be made through a collective investment scheme which is managed or sponsored by the General Partner or an Affiliate of the General Partner, it shall have economic terms which are not materially more favourable to the General Partner or its Affiliate than the terms of this Agreement.

19.4. **Restrictions on disposal.** The General Partner shall seek to ensure that no co-investor with the Partnership may dispose of any interest in any Portfolio Investment before the Partnership and any disposal will be made pro-rata with the Partnership on terms no more favourable than those applicable to the Partnership.

## 20.    ALTERNATIVE INVESTMENT VEHICLES AND PARALLEL FUNDS

20.1. **Establishment of Alternative Investment Vehicle.** The General Partner may structure the making of all or any portion of a Portfolio Investment through a separate vehicle (an *Alternative Investment Vehicle*) that will invest on a parallel basis with or in lieu of the Partnership if the General Partner determines that for legal, tax, regulatory or other reasons it is in the interests of the Partnership to do so. Limited Partners shall be required to make Contributions directly to each such Alternative Investment Vehicle to the same extent, for the same purposes and on the same terms and conditions as Limited Partners are required to make Contributions to the Partnership. Any such Contributions shall reduce the Unfunded Commitments of such Limited Partner to the same extent as if such Contributions were made to the Partnership.

20.2. **Participation in Alternative Investment Vehicle.** Each Partner shall have the same economic interest in all material respects in a Portfolio Investment made through an Alternative Investment Vehicle as such Partner would have if such Portfolio Investment had been made solely by the Partnership, and the other terms of such Alternative Investment Vehicle shall be substantially identical in all material respects to those of the Partnership, to the maximum extent possible. The General Partner shall procure, to the maximum extent possible, that the organisational or constitutional documents of such Alternative Investment Vehicle provide for the limited liability of each Limited Partner to the same extent in all material respects as is provided to each Limited Partner under the ELP Law and this Agreement.

20.3. **Distributions from Alternative Investment Vehicle.** Distributions of cash and other property and the allocations of income, gain, loss, deduction, expense and credit from an Alternative Investment Vehicle, and the determination of allocations and distributions pursuant to Clause 10, shall be determined as if each Portfolio Investment made by such Alternative Investment Vehicle were a Portfolio Investment made by the Partnership. For purposes of calculating the Carried Interest payable in respect of such Alternative Investment Vehicle, such Alternative Investment Vehicle shall be treated as if it were the Partnership which has made a separate investment.

20.4. **Establishment of Parallel Funds.** In order to facilitate investment by certain investors, the General Partner or any Affiliates may manage, sponsor, advise or establish (at the cost of such investors) one or more additional collective investment schemes, vehicles or other arrangements (each such collective investment scheme, vehicle or arrangement, a *Parallel Fund*). Each Parallel Fund will be managed by the General Partner or an affiliate of the General Partner. The voting rights of Limited Partners in the Partnership will be aggregated with those of investors in Parallel Vehicles unless the General Partner decides in any particular case that it would not be equitable to do so.

20.5. **Investment by Parallel Fund.** Each Parallel Fund will invest proportionally in all Portfolio Investments on effectively the same terms and conditions as the Partnership, subject to applicable legal, religious, tax or regulatory constraints.

21. **FEES AND EXPENSES OF THE GENERAL PARTNER**

21.1. **Management Fee.** The General Partner will receive a Management Fee, out of the assets of the Partnership, equivalent to 2 (two) per cent per annum of:

(a) during the Investment Period, the Commitment of each Limited Partner; and

(b) thereafter, the aggregate amount of Contributions made by each Limited Partner in respect of Portfolio Investments, less the Contributions made by each Limited Partner in respect of Portfolio Investments that have been realised, disposed of or written off as at the relevant date.

21.2. **Payment of Management Fee.** The Management Fee will be payable to the General Partner in US Dollars quarterly in advance. The first payment of Management Fee shall be made as soon within ten (10) Business Days following the Initial Closing.

21.3. **General Partner Expenses.** The General Partner shall be responsible for its operating expenses, costs and disbursements except to the extent these constitute Partnership Expenses. The costs and expenses to be borne by the General Partner shall include:

(a) overhead expenses of the General Partner including any direct remuneration and expenses paid to its officers and employees, rent, utility costs, office equipment, communication costs and administrative expenses; and

(b) any fees payable to any placement agents, brokers or intermediaries engaged by the General Partner in relation to the placing of Interests.

21.4. **Other fees received by the General Partner.** Organisational, break-up, monitoring, directors, advisory and other similar fees paid or payable in connection with the purchase, monitoring or disposal of Portfolio Investments or from unconsummated transactions may be earned by the General Partner or any of its Affiliates on an arm's length basis and shall be paid directly to and retained by the General Partner or its Affiliates.

22. **PARTNERSHIP AND ORGANISATIONAL EXPENSES**

22.1. **Organisational Expenses.** Except as otherwise provided in this Agreement, all legal, accounting, filing and other start-up costs and expenses incurred in connection with organising and establishing the Partnership and the General Partner and all expenses incurred in the marketing and offering of interests in the Partnership (including travel and accommodation expenses) shall be paid out of the assets of the Partnership (provided that Organisational Expenses in excess of US$250,000 shall be borne by the General Partner).

22.2. **Operating Expenses.** The costs and expenses of the operation of the Partnership shall be paid out of the assets of the Partnership. Such costs and expenses shall include:

(a) all expenses incurred in connection with the purchase, operation, monitoring, holding, restructuring, sale or proposed sale of any Portfolio Investments (including introducer, valuation, sales agent, broker, consultancy, legal and accounting fees) unless paid for by or out of the Portfolio Investment;

(b) costs and fees relating to the preparation of financial and tax reports, portfolio valuations and tax returns in relation to Portfolio Investments;

(c) interest on, and fees and expenses arising out of, all permitted borrowings;

(d) the costs of any litigation, liability insurance and indemnification or extraordinary expense or liability;

(e) costs incurred in relation to transactions which are not consummated, including consultancy, legal and accounting fees, to the extent not reimbursed by an entity in which the Partnership has invested or proposes to invest or other third parties;

(f) the Management Fee payable to the General Partner and any fees and out-of-pocket expenses incurred by the General Partner in performing its duties in relation to the Partnership, including reasonable travel and accommodation expenses;

(g) any out-of-pocket expenses incurred by any member of the Advisory Committee in performing his or her duties, including reasonable travel and accommodation expenses pre-agreed with the General Partner;

(h) communication expenses with respect to investor services including preparing, printing and distributing notices, financial statements and other reports and all expenses of meetings of Limited Partners;

(i) fees and expenses of any service provider appointed by the General Partner in connection with the affairs of the Partnership, including any investment advisers, administrators, custodians, consultants, brokers, appraisers, lawyers, attorneys, accountants, auditors and valuers;

(j) any expenses incurred in complying with any legislation or regulation applicable to the Partnership including any AEOI Legislation;

(k) all expenses of the termination or the winding up of the Partnership; and

(l) any taxes, registration fees or other governmental charges levied against the Partnership and all expenses incurred in connection with any tax audit, investigation, settlement or review of the Partnership.

22.3. **Allocation.** Partnership Expenses may be allocated against and be paid from Disposition Proceeds and Income in a manner determined by the General Partner. Each Limited Partner may be required to make a Contribution to the extent of its Unfunded Commitment for the payment of such Partnership Expenses to the extent that the Partnership does not have sufficient funds to pay such Partnership Expenses.

22.4. **Reserve.** The General Partner may withhold, on a pro rata basis, from any distributions such amounts as it considers necessary to create appropriate reserves for Partnership Expenses and liabilities, contingent or otherwise (including liabilities for indemnities, made in connection with any actual or proposed Disposition), of the Partnership as well as for any required tax withholdings.

**23.   CAPITAL ACCOUNTS AND ALLOCATIONS**

23.1. **Establishment of Capital Account.** A separate capital account (the *Capital Account*) shall be established and maintained in the books of the Partnership for each Partner. The Capital Account of each Partner shall be credited with such Partner's Contributions to the Partnership.

23.2. **Allocation of profits and losses.** Except as otherwise provided for in this Agreement, profits and losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Partnership shall be allocated among the Partners in a manner such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Partner pursuant to Clause 10.8 and Clause 32.1 if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their value in the records of the Partnership, all Partnership liabilities were satisfied (limited with respect to each non-recourse liability to the value in the records of the Partnership of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with Clause 10.8 to the Partners immediately after making such allocation.

23.3. **No requirement to pay negative balance.** No Partner shall be required to pay to the Partnership or to any other Partner the amount of any negative balance which may exist from time to time in such Partner's Capital Account (save as expressly provided herein in respect of the General Partner).

**24. VALUATIONS**

24.1. **Valuations.** The value of Portfolio Investments as at any day shall be determined in accordance with the following principles:

    (a) any security which is listed or quoted on any securities exchange or similar electronic system and regularly traded on such exchange or system will be valued at its last traded price on the relevant day or, if no trades occurred on such day, the mean between the closing bid price and the closing offer price on such day;

    (b) any security traded on an over-the-counter (*OTC*) market will be valued at its closing bid price published by the administrating body of the relevant OTC market on the relevant day or, if no such price is available the mean between the closing bid price and the closing offer price on such day obtained from an independent pricing source;

    (c) any security for which there is no active public market will be valued at its fair market value as at the relevant day, as determined by the General Partner having regard to the purchase price of the security, developments concerning the Portfolio Investment subsequent to the acquisition of the securities, any financial data and projections of the Portfolio Investment provided to the General Partner, and such other factor or factors as the General Partner may deem relevant;

    (d) any Portfolio Investment which is held subject to any restrictions on transfer or where the size of the Partnership's holding compared to the trading volume would adversely affect its marketability, shall be valued at such discount as the General Partner deems reasonably necessary to reflect the marketability and value of such Portfolio Investment.

24.2. **Adjustments to valuations.** If the General Partner determines that the valuation methods set out in Clause 24.1 do not fairly determine the fair market value of a Portfolio Investment, the General Partner shall make such adjustments or use such alternative valuation method as it reasonably deems appropriate.

24.3. **Reliance on third parties.** In determining the value of any Portfolio Investment, the General Partner may consult with and rely upon the advice of and information provided by any investment manager, investment adviser, administrator, broker, custodian, consultant, market maker or pricing services provider appointed by the General Partner.

24.4. **Determinations conclusive.** For all purposes of this Agreement, all determinations of value which have been made in accordance with the terms of this Clause 24 shall be final and conclusive on all Partners and any person claim through or under them.

**25. BOOKS AND RECORDS**

25.1. **Maintenance.** The General Partner shall keep or cause to be kept such records and books of account as are necessary to give a true and fair view of the business and financial condition of the Partnership and to explain its transactions. Such records and books of account shall be retained for a minimum period of five years from the date on which they are prepared.

25.2. **Right of inspection.** Notwithstanding any provision of the ELP Law, Limited Partners shall not be entitled to inspect the records and books of account of the Partnership or receive any information regarding the state of business and financial condition of the Partnership other than the reports referred to in Clause 25.

**26.    REPORTS TO THE LIMITED PARTNERS**

26.1.   **Reports.** Within 120 (one hundred and twenty) calendar days (subject to reasonable delays in the event of the late receipt of any necessary financial statements from any person in which the Partnership holds Portfolio Investments) after the end of each Financial Year, the General Partner shall send to each person who was a Partner during such period:

(a)     unaudited financial statements for the Partnership including a balance sheet as of the end of such period and a statement of income or loss;

(b)     a schedule of the change in the Capital Account balance of the Limited Partner; and

(c)     an unaudited summary of the value of each Portfolio Investment owned by the Partnership as estimated by the General Partner at the end of such quarter and portfolio highlights report with a general description of material events relating to the Partnership's business during such quarter, including a list of Portfolio Investments acquired and divested.

26.2.   **Quarterly report.** The General Partner, at its sole discretion, shall send a quarterly report to the Limited Partners in such format and containing such information as it may determine.

26.3.   **Financial statements.** Within 120 (one hundred and twenty) calendar days (subject to reasonable delays in the event of the late receipt of any necessary financial statements from any person in which the Partnership holds Portfolio Investments) after the end of each Financial Year, the General Partner shall send to each person who was a Limited Partner during such period:

(a)     the audited financial statements, including a statement of cash flows, an opinion or report of an internationally recognized accounting firm based upon its audit of the financial statements, and a summary of the value of each Portfolio Investment held by the Partnership as at the end of the Financial Year, as valued in accordance with this Agreement; and

(b)     a management report signed by the General Partner including a schedule of the change in the Capital Account balance of the Limited Partner during the Financial Year and a general description of material events relating to the Partnership's business during the Financial Year, including a list of Portfolio Investments acquired and divested.

26.4.   **Accounting principles.** The General Partner may choose to adopt a form of accounting principles in addition to or other than IFRS in the event that compliance with IFRS or compliance or reporting in accordance with IFRS alone would be, in the sole opinion of the General Partner, disadvantageous to the Partnership or the Limited Partners.

26.5.   **Income tax information.** Within 90 (ninety) calendar days after the end of each Financial Year, the General Partner may prepare and send, or cause to be prepared and sent, to any Limited Partner copies of information in a form and substance as may be reasonably required for such Limited Partner's income tax reporting purposes (if any), if requested by such Limited Partner. In addition, the General Partner may assist any Limited Partner, at such Limited Partner's expense and risk, to obtain such other information as such Limited Partner may reasonably request for applicable income tax reporting purposes (provided that the General Partner shall not be under any obligation, and shall not have any liability, to any such

Limited Partner in respect of the accuracy, completeness, apportionment or timeliness of any of such information).

**27.    REGISTERS**

27.1.  **Maintenance of Register of Limited Partners.** The General Partner shall maintain or cause to be maintained at the registered office of the Partnership or at such other place as the General Partner may determine, a register of limited partners (the *Register of Limited Partners*) as required by the ELP Law.  The Register of Limited Partners shall contain the name and address of each Limited Partner, the date on which a person became a Limited Partner and the date on which a person ceased to be a Limited Partner.  The Register of Limited Partners shall be updated within 21 days of the date of any change in the particulars contained in it.  The Register of Limited Partners shall be open to inspection during all usual business hours by any Limited Partner in respect of its own entry only and by any other person with the consent of the General Partner.

27.2.  **Maintenance of Record of Contributions and Payments.**  The General Partner shall maintain or cause to be maintained at the registered office of the Partnership or at such other place as the General Partner may determine, a record of contributions and payments (the *Record of Contributions*) as required by the ELP Law.  The Record of Contributions shall contain the amount and date of the Contributions of each Limited Partner and the amount and date of any payment representing a return of the whole or any part of any Contribution of any Limited Partner.  The Record of Contributions shall be updated within 21 days of the date of any change in the particulars contained in it.  The Record of Contributions shall be open to inspection during all usual business hours by any Limited Partner in respect of its own entry only.

27.3.  **Maintenance of register of security interest.**  The General Partner shall maintain or cause to be maintained at the registered office of the Partnership or at such other place as the General Partner may determine, a register of security interests (the *Register of Security Interests*) as required by the ELP Law.  The Register of Security Interests shall be open to inspection during all usual business hours by any person.

**28.    PARTNERSHIP MEETINGS**

28.1.  **No requirement for annual meeting.** The General Partner may, but shall not be obliged to, hold an annual meeting of Partners.

28.2.  **Notice.** The General Partner may call meetings of the Partners by giving at least 21 (twenty-one) calendar days' notice of the time and place of such meeting to each Limited Partner, which notice shall set out the agenda for such meeting.  The General Partner shall promptly call a special meeting of the Partners if any Limited Partner requests that a special meeting of the Partners be so called, provided that the General Partner shall not be required to call more than one meeting of the Partners in any calendar quarter.

28.3.  **Agenda.** Any meeting of Partners shall consider such matters as the General Partner considers necessary or appropriate for consideration by the Partners, and any other matters notified by any Limited Partner to the General Partner in writing for discussion at a meeting of the Partners not less than thirty (30) calendar days prior to such meeting.

28.4.  **Voting.** Any action required to be, or which may be, taken at any meeting by the Partners may be taken in writing without a meeting if consents thereto are given by the General Partner and each Limited Partner.

28.5.  **Proxy.** A Limited Partner may vote at any meeting either in person or by a proxy which such Limited Partner has duly executed in writing. The General Partner may permit persons other than Partners to participate in a meeting provided that no such person shall be entitled to vote.

28.6.  **Chairman.** The chairman of any special meeting shall be a person designated by the General Partner. A person designated by the General Partner shall also keep written minutes of all of the proceedings and votes of any such meeting.

28.7.  **Record date.** The General Partner may set in advance a record date for determining the Limited Partners entitled to notice of and to vote at any meeting or entitled to express consent to any action in writing without a meeting. No record date shall be less than 10 (ten) nor more than 60 (sixty) days prior to the date of any meeting to which such record date relates nor more than 10 (ten) days after the date on which the General Partner sets the record date for any action by written consent.

29.    **WITHDRAWAL OF THE GENERAL PARTNER**

29.1.  **No right of General Partner to withdraw.** The General Partner shall not voluntarily withdraw as the general partner of the Partnership without Super Majority Consent.

29.2.  **Removal of General Partner for Cause.** The General Partner may be removed as general partner of the Partnership by Super Majority Consent if a Cause Event occurs which cannot be cured or has not been cured within 90 days.  The General Partner shall be deemed to have cured a Cause Event if it terminates or causes the termination of the services of all individuals who engaged in the conduct constituting the Cause Event and pays to the Partnership an amount equal to any actual financial loss which such conduct had caused the Partnership.  Until a Cause Event has been cured, the General Partner shall not be entitled to deliver any Drawdown Notice except in relation to any proposed Portfolio Investment in respect of which the Partnership has entered into a legally binding agreement to invest prior to the date of the Cause Event.

29.3.  **Withdrawal of General Partner following Disabling Event.**  The General Partner shall be removed and shall cease to be the general partner of the Partnership 90 days after the occurrence of a Disabling Event or if earlier on the appointment of a Successor General Partner.  The General Partner (or its legal representative) shall promptly inform the Limited Partners of the occurrence of any Disabling Event.

29.4.  **Continuation of Partnership following removal or withdrawal.** On the removal or withdrawal of the General Partner, the Partnership shall be wound up and dissolved in accordance with the provisions of Clause 32 unless the Limited Partners, by Super Majority Consent, agree to continue the business of the Partnership and appoint a person who is willing to act as the general partner of the Partnership and who satisfies the criteria for acting as a general partner set out in the ELP Law.

29.5.  **Appointment of Successor General Partner.**  Immediately following its admission as the general partner of the Partnership, the Successor General Partner shall make any filings required under the ELP Law in connection with the withdrawal of the General Partner, the admission of the Successor General Partner.  The appointment of the Successor General Partner shall take effect on the date on which the filing required under the ELP Law is made.

29.6.  **Sale of General Partner's Interest following removal or withdrawal.** If, following the removal or withdrawal of the General Partner, the Limited Partners agree to continue the business of the Partnership the General Partner shall continue to be entitled to receive all distributions that otherwise would have been distributable to

it pursuant to this Agreement as if it had not been removed or withdrawn as the general partner of the Partnership with respect to Portfolio Investments made on or before the effective date of its removal or withdrawal and without regard to Portfolio Investments made, or fees and expenses incurred, after such date.

29.7.   **No liability of General Partner following removal or withdrawal.** On the removal or withdrawal the General Partner to the fullest extent permitted by applicable law, the General Partner shall not be liable with respect to any liability, loss, costs or expense (matured or unmatured, contingent or otherwise) to the extent arising out of, relating to, incidental to, or by virtue of any act, transaction or event in connection with the operation of the business of the Partnership on or after the date of its removal or withdrawal.   Each Indemnified Party shall continue to be entitled to the benefit of Clause 13.4 and shall continue to be entitled to be indemnified in accordance with Clause 15 as if the General Partner had not been removed as general partner of the Partnership.   No amendment to this Agreement that would alter the terms of Clause 13.4, Clause 15 or this Clause 29.7 may be made without the prior written consent of the removed General Partner if such amendment would or might adversely affect any Indemnified Party.

29.8.   **Transfer of General Partner's Interest.**   The General Partner may, at the General Partner's expense, effect a Transfer of all (but not part) of its Interest to an Affiliate provided that such Transfer does not have material adverse tax or legal consequences for the Limited Partners. The General Partner may not otherwise effect a Transfer of, or grant a Security Interest over, all or any part of its Interest without Super Majority Consent.   If the General Partner effects a Transfer of all (but not part) of its Interest to an Affiliate or other person, such Affiliate or other person shall become the general partner of the Partnership in place of the General Partner.

29.9.   **Transfer of assets and records.** On the appointment of a Successor General Partner and subject to receipt of any amounts due under Clause 29.6, the General Partner shall:

   (a)   assign, transfer or novate to the Successor General Partner all of the rights and obligations of the General Partner under or pursuant to this Agreement, each Subscription Agreement and each Side Letter, together with all the rights and obligations of the General Partner under or pursuant to any agreement or arrangement entered into on behalf of the Partnership;

   (b)   transfer to the Successor General Partner, or as it shall direct, full unencumbered legal title (to the extent possible) to all assets of the Partnership held in the name of the General Partner and shall take all necessary steps, at the expense of the Partnership, to vest good title in the Successor General Partner; and

   (c)   deliver to the Successor General Partner, or as it shall direct, all copies of all books of account, records, registers, correspondence and documents relating to the affairs of or belonging to the Partnership in the possession of, or under the control of, the General Partner.

29.10.   **Amendments to this Agreement.** The Partners agree to make such amendments to this Agreement and enter into such supplemental agreements as are required to implement the provisions of this Clause 29.

30.   **TRANSFERS BY LIMITED PARTNERS**

30.1.   **No right of Limited Partner to transfer.**   A Limited Partner may not effect a Transfer of, or grant a Security Interest over, its Interest in whole or in part to any person (a *Transferee*) without the prior written consent of the General Partner. The

General Partner may withhold its consent without giving any reason for doing so and shall withhold its consent if it considers that:

(a)    the Transfer or the granting of the Security Interest would adversely affect the Partnership or subject the Partnership or the General Partner to any adverse regulatory, tax, pecuniary or other consequences;

(b)    the Transfer or the granting of the Security Interest would or could result in a violation of any provision of this Agreement or of any applicable law, regulation or court order; or

(c)    in the case of a Transfer, the proposed Transferee would be unable to meet its obligations under this Agreement.

30.2.    **Documentation and information to be provided.**  Any Limited Partner wishing to effect a Transfer of, or grant a Security Interest over, all or any part of its Interest shall provide to the General Partner such information and documentation in connection with the Transfer or Security Interest, as the case may be, as the General Partner may request.  Such documentation may include a written opinion of legal counsel, satisfactory to the General Partner, on such matters as the General Partner may deem appropriate including that the Transfer or granting of the Security Interest will not result in any violation of applicable law or any adverse regulatory, tax, pecuniary or other consequences to the Partnership or to the General Partner.  In the case of a Transfer, any proposed Transferee may be required to demonstrate sufficient financial resources to meet any remaining obligation of the transferring Limited Partner to make Contributions.

30.3.    **Expenses.** The transferring Limited Partner shall bear all costs and expenses arising in connection with the Transfer or the granting of the Security Interest, as the case may be, including any legal, accounting and administrative fees incurred by the Partnership in connection with such Transfer or Security Interest.

30.4.    **Admission as substitute Limited Partner.**  No Transferee shall be admitted as a Limited Partner without the prior written consent of the General Partner, which the General Partner may withhold without giving any reason for doing so.  As a condition of giving its consent to the admission of the Transferee as a Limited Partner, the General Partner shall require that the proposed Transferee executes an Instrument of Transfer pursuant to which it:

(a)    acknowledges its assumption (in whole or, if the Transfer is in respect of part only, in the proportionate part) of the obligations of the transferring Limited Partner, including the obligation to pay Contributions up to the amount of the Unfunded Commitment of the Limited Partner;

(b)    agrees to be bound by all the provisions of this Agreement; and

(c)    undertakes to indemnify the Partnership and the General Partner with respect to any costs, taxes and expenses associated with the Transfer.

30.5.    **Consent not to be unreasonably withheld for Permitted Transferee.**  Subject to satisfying the requirements of this Clause 30, the consent of the General Partner to a Transfer or the admission of a Transferee as a Limited Partner shall not be unreasonably withheld if the proposed Transferee is a Permitted Transferee.  In the event that a Transferee ceases to be a Permitted Transferee, such Transferee shall, if so requested by the General Partner, effect a Transfer to the transferring Limited Partner of such Interest.

30.6. **No liability prior to admission.** A Transferee shall be admitted as a Limited Partner on the later of (i) the date on which the executed Instrument of Transfer is received by the Partnership and recorded in its books and (ii) the effective date of the Transfer. Neither the General Partner nor the Partnership shall incur any liability for allocations and distributions made in good faith to the transferring Limited Partner prior to the date on which the Transferee is admitted as a Limited Partner.

30.7. **Discharge of transferring Limited Partner.** On the admission of the Transferee as a Limited Partner the General Partner shall release the transferring Limited Partner from any future obligations and liabilities under this Agreement in respect of the Interest (in whole or, if the Transfer is in respect of part only, in the proportionate part) which is the subject of such Transfer.

30.8. **No Transfer in violation of this Clause.** Any Transfer not made, and any Security Interest not granted, in accordance with this Clause 30 shall be ineffective and shall not be recognised by the Partnership for any purpose. A Transferee that is not admitted as a Limited Partner shall have no rights to vote, to distributions, to participate in the Partnership or to any information or accounting of the affairs of the Partnership and shall not have any of the other rights of a Partner pursuant to this Agreement.

31. **WITHDRAWAL OF LIMITED PARTNER**

   **No right of Limited Partner to withdraw.** Except as expressly provided for in this Agreement, no Limited Partner shall have the right to withdraw from the Partnership or to withdraw any part of its Capital Account.

31.1. **Required withdrawal.** A Limited Partner shall be removed from the Partnership if, by reason of a change in any law, regulation or governmental order to which such Limited Partner is subject occurring after its admission to the Partnership, a violation of any such law, regulation or order is likely to result without such removal. Notwithstanding its removal, any such Limited Partner shall remain liable to the Partnership to the extent of any breach of a representation, warranty or covenant made by such Limited Partner to the Partnership arising out of or relating to such removal. A Limited Partner seeking to be removed pursuant to this Clause 31.1 shall supply such opinions of legal counsel and other information as the General Partner may reasonably request to verify such Limited Partner's right to be removed pursuant to this Clause 31.1.

31.2. **Purchase of withdrawing Partner's Interest.** Withdrawals or removals pursuant to this Clause 31 will be effected by the Partnership's purchase of such Limited Partner's Interest in the Partnership at a price equal to the Appraised Value and in addition to cash consideration, the Partnership may pay in whole or in part for any purchase of a withdrawing Partner's Interest with securities (through a distribution in-kind of Portfolio Investments) or by the issue of an interest-free promissory note becoming payable within no more than 3 years from the date of issue or issue any digital assets representing the same amount. For the purposes of this Clause 31.2, *Appraised Value* means a price equal to the value of such Interest, inclusive of the effect of any potential Carried Interest payments to the General Partner, determined on the assumption that the Portfolio Investments were sold for their fair market values, as determined by an independent valuation agent, and the proceeds therefrom were distributed to the Partners in accordance with this Agreement after credit or debit, as the case may be, for the amount of the Partnership's other assets and liabilities determined in accordance with IFRS.

31.3. **Reallocation.** If a Limited Partner withdraws or is removed from the Partnership pursuant to this Clause 31:

 (a) the portion, if any, of the Portfolio Investments attributable to the Carried Interest allocable to the General Partner with respect to such Limited Partner's Interest shall remain in the Partnership in cash or in-kind, as the case may be, and shall be held solely for the account of the General Partner;

 (b) the portion of such Limited Partner's Capital Account corresponding to such portion of the Portfolio Investments shall be allocated to the Capital Account of the General Partner; and

 (c) the General Partner shall be entitled to the proceeds from the Disposition of such portion of the Portfolio Investments at the time of their Disposition.

31.4. **Further actions.** The General Partner shall cause the books and records of the Partnership to be amended to reflect as appropriate the occurrence of any of the transactions referred to in this Clause 31 as promptly as is practicable after such occurrence.

## 32. WINDING UP AND DISSOLUTION

32.1. **Termination.** The Partnership shall be terminated upon the first to occur of any of the following events (each a *Termination Event*):

 (a) the expiry of the term of the Partnership, being the 7th (seventh) anniversary of the Initial Closing, provided that the General Partner may extend the term of the Partnership for up to two consecutive one-year periods with the consent of the Advisory Committee;

 (b) the commencement of liquidation, bankruptcy or dissolution proceedings in respect of, the making of a winding up or dissolution order in relation to, or the withdrawal or removal of the General Partner unless another person is appointed as general partner pursuant to Clause 29.4 within 90 days;

 (c) following the Commitment Expiration Date, the date as at which all Portfolio Investments have been disposed of;

 (d) on the passing of a unanimous resolution of the Limited Partners by Super Majority Consent to terminate the Partnership and General Partner consent;

 (e) the determination by the General Partner at any time that such earlier dissolution and termination would be in the best interests of the Limited Partners.

32.2. **Winding up.** Upon the occurrence of a Termination Event no further business of the Partnership shall be conducted except to the extent necessary for the orderly winding up of the affairs of the Partnership, the protection and realisation of the Portfolio Investments and the distribution of the assets of the Partnership amongst the Partners. The General Partner shall act as liquidator of the Partnership provided that in the case of any termination pursuant to Clause 32.1(b) the Limited Partners shall, by Super Majority Consent, resolve to appoint another person as liquidator on such terms, including as to remuneration as may be specified in the resolution.

32.3. **Realisation of assets.** In connection with the realisation and liquidation of the assets of the Partnership, the General Partner or liquidator, as the case may be, shall use reasonable efforts to sell the assets of the Partnership on what it considers to be the best terms available. If the General Partner or liquidator, as the case may be, is unable to sell any asset of the Partnership, it may distribute such asset in-kind. The General Partner or liquidator, as the case may be, may hire independent

valuation agents to determine the fair market value of any assets of the Partnership to be distributed in-kind.

32.4. **Distribution of liquidation proceeds.** After the sale and liquidation of the assets of the Partnership, the proceeds thereof shall be used to pay, or make provision for, all amounts due to creditors of the Partnership, including Partners who are creditors, and to meet any other liabilities of the Partnership, including the expenses of the winding-up, liquidation and dissolution of the Partnership. The remaining proceeds, if any, and any remaining assets of the Partnership shall be distributed, in one or more instalments, to the Partners in the same manner as distributions under Clause 10.8.

32.5. **Distributions in-kind.** If any Limited Partner is of the opinion that there is a reasonable likelihood that any distribution in-kind of an asset would cause such Limited Partner to be in violation of any law, regulation or governmental order, the General Partner or the liquidator, as the case may be, shall use its reasonable endeavours to make alternative arrangements for the sale or transfer into an escrow account of any such asset on mutually agreeable terms.

## 33. POWER OF ATTORNEY

33.1. **Appointment of General Partner as attorney.** Each Limited Partner irrevocably constitutes and appoints the General Partner, with full power of sub-delegation and substitution, the true and lawful attorney-in-fact and agent of such Limited Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all in accordance with the terms of this Agreement, all instruments, documents and certificates which may from time to time be required by the laws of the Cayman Islands, any jurisdiction without limitation in which the Partnership may conduct its affairs, or any political subdivision or agency thereof to effectuate, implement and continue the valid existence and affairs of the Partnership, including, without limitation, the power and authority to verify, swear to, acknowledge, deliver, record and file:

(a) all certificates and other instruments, including any amendments to this Agreement, which the General Partner deems appropriate to form, qualify or continue the Partnership as a limited partnership (or a partnership in which the limited partners have limited liability) in the Cayman Islands and all other jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(b) any amendments to this Agreement or any other agreement or instrument which the General Partner deems appropriate to:

(i) effect the sale, assignment, transfer or other disposition of a Defaulting Partner's Interest in accordance with Clause 9;

(ii) effect the substitution or removal of any Limited Partner or General Partner pursuant to this Agreement and to effect any related contemplated transfer of rights and obligations; or

(iii) effect any other amendment or modification to this Agreement, but only if such amendment or modification is duly adopted in accordance with the terms hereof;

(c) all conveyances and other instruments which the General Partner deem appropriate to reflect the dissolution and termination of the Partnership pursuant to the terms of this Agreement.

33.2. **Limit on power.** The power of attorney granted to the General Partner pursuant to Clause 33.1 shall not expand any right or duty of the General Partner and shall not be used for the purpose of increasing or extending any obligation or liability of any Limited Partner or altering the division of profit or loss or the methods of distribution in connection with the investment of any Limited Partner unless otherwise authorised pursuant to other provisions of this Agreement.   No action may be taken by the General Partner under the power of attorney that would have any adverse effect on the limited liability of any Limited Partner.   The General Partner as attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement when acting in such capacities, except to the extent authorised in this Agreement.

33.3. **Termination of power.** The power of attorney granted to the General Partner pursuant to Clause 33.1 is given to secure the obligations of each Limited Partner under this Agreement and shall be irrevocable and shall survive and not be affected by the dissolution, bankruptcy, winding up or legal disability of any Limited Partner.

33.4. **Further assurances.** Any person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorised, regular and binding, without further inquiry.  If required, each Limited Partner shall execute and deliver to the General Partner within 5 (five) calendar days after the receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall reasonably deem necessary for the purposes hereof.

34. **AUTOMATIC EXCHANGE OF INFORMATION LEGISLATION**

34.1. **Consequences of failure to provide AEOI Information.** Each Limited Partner shall provide, in a timely manner, such AEOI Information as may be requested from time to time.   If a Limited Partner provides AEOI Information that is in any way misleading, or it fails to provide any requested AEOI Information necessary to satisfy the General Partner's and/or the Partnership's obligations under any AEOI Legislation, the General Partner may deem such Limited Partner to be a Defaulting Partner and the provisions of Clause 9 shall apply accordingly.

34.2. **Disclosure of AEOI Information.**  Each Limited Partner acknowledges that any AEOI Information and/or any financial or account information with respect to the Limited Partner's Interest may be disclosed to the Cayman Islands Tax Information Authority (or any other Cayman Islands governmental body which collects information in accordance with the AEOI Legislation) and to any person or regulatory authority where the provision of that information to such person or regulatory authority is required to ensure compliance by the General Partner and the Partnership with its obligations under the AEOI Legislation or to avoid being subject to withholding tax or other liabilities under the AEOI Legislation;

34.3. **Deductions from distributions.**   The General Partner may hold back from any distribution payable to a Limited Partner an amount equivalent to any liability, cost, expense, tax, withholding or deduction incurred or suffered by the Partnership, or that in the opinion of the General Partner will be incurred or suffered by the Partnership, as a consequence of the Limited Partner failing to provide AEOI Information or providing misleading AEOI Information.   The Limited Partner shall have no claim against the Partnership or the General Partner in respect of any amount held back pursuant to this Clause but any amount not required to satisfy the liability, cost, expense, tax, withholding or deduction shall be paid to the Limited Partner.

34.4. **Limit of liability.** A Limited Partner shall have no claim against the Partnership or the General Partner for any form of damages or liability as a result of actions taken

or remedies pursued by or on behalf of the General Partner pursuant to this Clause in order to comply with AEOI Legislation. Each Limited Partner agrees to indemnify and keep indemnified the Partnership, the General Partner and its directors, officers and employees, from and against any AEOI Legislation related liability, action, proceeding, claim, demand, costs, damages, expenses (including legal expenses) penalties or taxes whatsoever which the General Partner or the Partnership may incur under the provisions of the AEOI Legislation as a result of any representation, action or inaction (directly or indirectly) of the Limited Partner.

## 35.   SIDE LETTERS

35.1.   **No Side Letters.** Neither the Partnership nor the General Partner will enter into side letters or other agreements with Limited Partners, other than (i) with respect to representations made by the Limited Partners to the Partnership, (ii) certain regulatory matters, (iii) any agreements made by the General Partner regarding the confidentiality of Limited Partner or Fund information. No Limited Partner will be granted a "most favoured nation" clause and any right negotiated by a Limited Partner that cannot be included in a side letter pursuant to the foregoing sentence will be included in this Agreement for the benefit of all Limited Partners.

## 36.   AMENDMENTS

36.1.   **Consent to amendment required.** Except as required by law, this Agreement may be amended or supplemented by the written agreement of the General Partner and Limited Partners representing not less than a Super Majority Consent provided that no such amendment shall amend this Clause 36 or without the consent of the relevant Limited Partner:

(a)   increase any Limited Partner's Commitment; or

(b)   reduce any Limited Partner's share of the Partnership's distributions, income and gains, increase any Limited Partner's share of the Partnership's losses.

36.2.   **Circumstance in which consent not required.** Notwithstanding Clause 36.1, this Agreement may be amended by the General Partner without the further consent of any Limited Partner:

(a)   to change the name of the Partnership;

(b)   to cure any ambiguity or error, provide clarity or to correct or supplement any provision of this Agreement that may be defective or inconsistent with any other provisions of this Agreement and in the case of two provisions which are inconsistent the General Partner may correct either provision;

(c)   if, in the opinion of the General Partner, such amendment does not materially adversely affect the interests of the Partnership or any Limited Partners;

(d)   if, in the opinion of the General Partner, the amendment is required by applicable laws or regulations; or

(e)   to make any amendment that is not objected to in writing by any Limited Partner within 30 (thirty) Business Days after prior notice of such amendment is given to each Limited Partner.

36.3.   **Notice.** Any amendment to this Agreement shall be notified to the Limited Partners following such amendment.

## 37.   CONFIDENTIALITY

37.1.   **Information to be kept confidential.** Each Limited Partner shall keep confidential, and not make use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns or for other routine matters required by law) or disclose to any person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Portfolio Investment (other than disclosure to such Limited Partner's employees, agents, advisers, or representatives responsible for matters relating to the Partnership).

37.2.   **Circumstances in which disclosure is permitted.** Notwithstanding Clause 37.1, a Limited Partner may disclose any such information to the extent that:

(a)   such information is or becomes generally available to the public through no act or omission of such Limited Partner;

(b)   such information is passed to an Affiliate as may be routinely required provided always that the provision of such information to any Affiliate is not adverse to the Partnership or to the General Partner;

(c)   such information otherwise is or becomes known to such Limited Partner other than by disclosure by the General Partner provided that the source of such information is not bound by a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality; and

(d)   such Limited Partner is required by law, regulation or judicial or governmental order, judgment or decree to disclose such information.

## 38.   NOTICES

38.1.   **Calculation of Elapsed Time.** Where any period of time is expressed as required for the giving of any notice or in any other case where some other action is required to be undertaken within or omitted from being taken during a specified period of time, the calculation of the requisite period of time will not include the day on which the notice is given (or deemed to be given) or the day on which the event giving rise to the need to take or omit action occurred, but shall include the day on which the period of time expires.

38.2.   **Form of Notice.** Any notice required to be given in accordance with this Agreement shall be in writing. Any notice, if posted from one country to another, must be sent airmail. Email notices may be sent by email text and/or by way of a document attached to an email in portable document format (PDF) or in Microsoft Word format and/or by any other method separately agreed between the General Partner and a Limited Partner.

38.3.   **Delivery of Notices.** Any notice required to be given in accordance with this Agreement may be delivered by hand or courier, mailed by prepaid mail, faxed or emailed to:

(a)   in the case of the General Partner, the registered office of the General Partner; and

(b)   in the case of a Limited Partner to the address shown in the register of Limited Partners or where the notice is given by email by sending it to the email address provided by such Limited Partner.

38.4.   **Deemed Receipt.** Notice shall be deemed to have been duly given:

(a)    where delivered by hand, upon receipt;

(b)    where delivered by courier, on such day as delivery is confirmed by the courier;

(c)    where mailed, on the fifth business day following the date sent;

(d)    where faxed, on the day on which an error free transmission report is generated by the sender's fax machine; or

(e)    where emailed, on the business day on which the recipient receives the email in readable form,

provided that if receipt occurs after 5.00 pm on a business day, or on a day which is not a business day, the notice shall be deemed to have been received at 9.00 am on the next business day.  For the purpose of this Clause, business day means any day which is not a Saturday, a Sunday or a public holiday in the place at or to which the notice is left or sent.

## 39.    MISCELLANEOUS PROVISIONS

39.1.   **Entire Agreement.** This Agreement and the other agreements referred to in this Agreement constitute the entire agreement among the Partners and between the Partners and the Initial Limited Partner with respect to its subject matter and supersedes and extinguishes any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature, whether in writing or oral, relating to such subject matter.

39.2.   **Severability.** If any provision in this Agreement is determined to be illegal, void, invalid or unenforceable under the laws of any jurisdiction:

(a)    such illegal, void or unenforceable provision shall be deemed to be severable from any other provision of this Agreement and shall be treated as having been severed from this Agreement in the relevant jurisdiction but the legality, validity and enforceability of the remainder of this Agreement shall not be affected;

(b)    the legality, validity and enforceability of the whole of this Agreement in any other jurisdiction shall not be affected.

39.3.   **Successors and Assigns.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any person who is not a party to this Agreement.  This Agreement shall be binding upon and inure to the benefit of the Partners, the Initial Limited Partner and their respective legal representatives, heirs, successors and permitted assigns.

39.4.   **Counterparts.** This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original and all the counterparts together shall constitute one and the same instrument.

39.5.   **Third Party Rights.** A person who is not a party to this Agreement may not, in its own right or otherwise, enforce any term of this Agreement except that any Indemnified Party may, in its own right, enforce its rights pursuant to Clause 15 subject to and in accordance with the provisions of the Contracts (Rights of Third Parties) Law, 2014. Notwithstanding any other term of this Agreement the consent of any person who is not a party to the Agreement (including any Indemnified Party) is not required for any amendment to or variation, release, rescission or

termination of this Agreement. The provisions of this Clause 39.5 shall survive the termination of this Agreement.

39.6. **Governing law.** This Agreement shall be governed by and construed in accordance with the laws of the Cayman Islands.

39.7. **Jurisdiction.** Each Partner irrevocably agrees to submit to the non-exclusive jurisdiction of the courts of the Cayman Islands over any claim or matter arising under or in connection with this Agreement. Each Limited Partner waives as a defence that any action, suit or proceeding brought in the courts of the Cayman Islands has been brought in an inconvenient forum or that the venue thereof may not be appropriate and, furthermore, agrees that venue in the Cayman Islands for any such action, suit or proceeding is appropriate.

**EXECUTION**

| | | |
|---|---|---|
| Executed and delivered as a deed by | ) | |
| **TON Ventures Ltd** | ) | |
| in its capacity as general partner of | ) | |
| **TON Ventures L.P.** | ) | (Director) |

| | | |
|---|---|---|
| Executed and delivered as a deed by | ) | |
| **TON Ventures Ltd** | ) | |
| As  attorney-in-fact  for  each  Limited | ) | (Director) |
| Partner | | |

| | | |
|---|---|---|
| Executed and delivered as a deed by | ) | |
| the Initial Limited Partner | ) | |
| | ) | |
| in the presence of | | |

Witness

1.

Term Sheet

**2.**

Form of drawdown notice

To: [Name and address of Limited Partner]

[Date]

**DRAWDOWN NOTICE**

With reference to Clause [7] of the Amended and Restated Limited Partnership Agreement for "TON Ventures L.P." (the *Limited Partnership Agreement*) please pay the following amount for the following purposes in accordance with the following payment instruction:

Amount:    US$ [•]

To:        [Bank], for final credit to the [•] account as stated below.

Value date: [•]

Purpose:   [•]

The following wiring instruction has to be given to and followed by your remitting bank, to ensure that funds are available in the account on value date as indicated above.

Please send US$ [•] via SWIFT/MT 100/direct to [Bank], for the final credit to:

"[•]", account [•]

[Bank] has to receive these payment instructions /MT100/from your remitting bank [2] days before value date as indicated above.

Non-compliance with these payment instructions may risk the closing of the transaction for the Partnership and the provisions of Clause [10] of the Limited Partnership Agreement may apply.

If you have any questions regarding the above, please contact [•], telephone [•].

_____

For and on behalf of
TON Ventures Ltd

**SUMMARY OF PROPOSED KEY FUND TERMS**
**CAYMAN ISLANDS CLOSED-ENDED EXEMPTED LIMITED PARTNERSHIP**

The following information (i) summarises certain proposed key features of the Fund and is qualified in its entirety by the Amended and Restated Limited Partnership Agreement (the "*LPA*"), as and when finalised, the terms of which may change materially from the summary below and (ii) is highly confidential and does not constitute an offer to any person nor to the public generally to subscribe for any of the Limited Partnership Interests, the proposed key terms of which are described herein. Capitalised terms not defined herein shall have the meanings given to them in the LPA.

| | |
|---|---|
| **Structure:** | TON Ventures L.P. (the "*Fund*"), which will be organised as a Cayman exempted limited partnership organised under the exempted Limited Partnership Law (as revised) of the Cayman Islands (the "*ELP Law*") and any parallel fund(s) or feeder fund(s) established to meet the tax or regulatory requirements of the Fund's limited partners (the "*Limited Partners*"). |
| **Term:** | The life of the Fund shall continue until the seventh anniversary of the Initial Closing Date, unless (a) extended at the discretion of the General Partner for up to two consecutive additional one year periods from and after such date; or (b) terminated in accordance with the terms of the LPA. |
| **Target markets** | The main geographical focus for the Fund's asset allocation will be Europe, USA and Asia but other regions may also be considered. |
| **Investment Objectives:** | The Fund is being organised to provide a limited number of select investors (the "*Limited Partners*") with an opportunity to realise substantial long-term capital appreciation in new technologies and technological companies.<br><br>The Fund will make portfolio investments and realise or dispose these investments and distribute the proceeds thereof to Limited Partners in accordance with the investment policy of the Fund. The principal purpose and investment policy of the Fund shall be to make investments within the Investment Period, of a target size of US$2,000,000 and will range from between US$500,000 and US$5,000,000 to benefit from the fast growth of new technologies in different industries. |
| **Portfolio investments** | Equity and ICO investments into new technologies and technological companies globally (fintech, blockchain, AI). |
| **Management of the Fund:** | The Fund will be managed by its general partner, TON Ventures Ltd (the "*General Partner*"), a BVI business company registered as a foreign company in the Cayman Islands under the Companies Law (as revised) of the Cayman Islands (the "*Companies Law*"). |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **Advisory Committee:** | The General Partner will establish an advisory committee which will consist of up to five (5) suitably qualified individuals appointed from time to time by the General Partner, in its discretion (the *"Advisory Committee"*). Up to two members of the Advisory Committee may be representatives (including directors) of the General Partner. The Advisory Committee will provide such advice and counsel as may be requested by the General Partner in connection with the Fund's investment, valuations, conflicts of interest and other matters affective the Fund. The role of the Advisory Committee is advisory only and the General Partner has no obligation to act in accordance with any advice or recommendation from the Advisory Committee, nor has the Advisory Committee any power to conduct the business of, or otherwise to manage, the Fund, or to approve or disapprove of any investment or deposition. |
| **Administrator:** | Geneva Management Group (the *"Administrator"*) have been appointed as the Fund's administrator to, inter alia, maintain the Register of Limited Partnership Interests of the Fund. |
| **Auditors:** | [REDACTED - PERSONAL INFORMATION] (the *"Auditors"*) have been appointed as the Fund's auditors. The General Partner may at its sole discretion replace the Auditors. The Auditors will have access at all times to the books and records of the Fund. |
| **Capital Commitment:** | Capital Commitment means with respect to each Limited Partner, the total amount of cash which such Limited Partner has agreed to contribute as capital to the Fund, as specified in the subscription agreement in the form attached to this Memorandum (*"Subscription Agreement"*) and Unfunded Commitment means with respect to each Limited Partner at any time, the amount of its Capital Commitment which, at such time, has not been called by the General Partner and remains available to be called from such Limited Partner by the General Partner under the Subscription Agreement to which such Limited Partner is a party. |
| | The Fund will seek to raise US$30,000,000 of aggregate Capital Commitments but may accept a greater or lesser amount in the discretion of the General Partner. However, the General Partner reserves the right to accept Capital Commitments of a lesser amount or a greater amount in its sole discretion. The Limited Partners will contribute capital to the Fund in instalments pro rata based on each Limited Partner's respective Capital Commitment, upon 10 days' notice. |
| | The General Partner will contribute the greater of two hundred thousand (US$200,000) and one percent (1%) of the total capital of the Fund. The General Partner may contribute its commitment in kind. The General Partner may require that certain Limited Partners deposit up to 100% of its Capital Commitment in a segregated account of the Fund to pre-fund the satisfaction of such Limited Partner's Capital Commitment. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **Minimum commitment:** | The minimum Capital Commitment of a Limited Partners is US $1,000,000.00 (one million US dollars), or such lesser amount as determined by the General Partner in its absolute discretion. The minimum Capital Commitment will not apply to any investment made by the General Partner or any General Partner Affiliate. |
| | A prospective investor applies to become an investor in the Fund by completing a Subscription Agreement in a form satisfactory to the General Partner which, among other things, contains details of the Capital Commitment being applied for by the prospective investor. The General Partner may, in its sole discretion, admit a prospective investor as an investor in the Fund with a lesser Capital Commitment than that applied for in their Subscription Agreement. |
| **Defaulting Partner:** | If a Limited Partner fails to pay in full any requested Capital Commitments, the General Partner may take certain actions which may result in a sale of such Limited Partner's interest in the Fund or a forfeiture of all or a portion of such Limited Partner's interest in the Fund. Additionally, the General Partner may pursue any available legal or equitable remedies, with the expenses of collection of the unpaid amount, including attorneys' fees, to be paid by such defaulting Limited Partner. |
| **Reinvestment:** | The General Partner may reinvest the proceeds from the disposition of investments so as to enable the Fund to invest an amount equal to up to 120% of Capital Commitments of the Limited Partners in the securities of portfolio companies and up to 150% with the approval of the Advisory Committee. |
| **Investment Period:** | The investment period of the Fund will be two (2) years from the Final Closing or such earlier date as is specified in the LPA (the *"Investment Period"*) provided that the General Partner may extend the Investment Period by one (1) additional year in its sole discretion. After the expiration of the Investment Period, further drawdowns may be made only for (i) funding new investments committed to or for which there is a fully executed term sheet prior to the end of the Investment Period, (ii) follow-on investments in existing portfolio companies, (iii) satisfying current or reasonably expected Fund expenses, liabilities or other Fund obligations (including, without limitation, the Management Fee and any indemnification obligations), (iv) making new guarantees, and making payment on guarantees, of indebtedness for existing portfolio companies or (v) fulfilment of a Limited Partner's obligation to return distributions. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **Distributions:** | The timing of distributions made by the Fund will be determined by the General Partner. A portion of net recognised capital gains and net ordinary income sufficient to pay income taxes resulting from such gains and income may, from time to time and at the discretion of the General Partner, be distributed to the Limited Partners in the proportions that such income is allocated to the Limited Partners. |

All other distributions will be made to the Limited Partners on a cumulative basis as follows:

(a)   First, 100 per cent to the Limited Partner until such Limited Partner has received cumulative distributions equal to the aggregate Contributions made by the Limited Partner on or prior to the date of the relevant distribution;

(b)   Second, 100 per cent to the Limited Partner until the cumulative distributions to such Limited Partner represents a ten (10) per cent cumulative compounded per annum rate of return on the Contributions referred to in (a) above, calculated from the date on which the relevant Contribution was paid to the date on which it was repaid;

(c)   Third, 100 per cent to the General Partner until the General Partner has received 25 per cent of the sum of the cumulative distributions to the Limited Partner made pursuant to paragraph (b) above as well as to the General Partner pursuant to this paragraph (c); and

(d)   *75/25 split:*   Thereafter, 75 per cent to such Limited Partner and 25 per cent to the General Partner.

At any time the General Partner may, in its discretion, make distributions in cash or distributions in kind of portfolio securities, with such distributions being made to all Partners in proportion to their Capital Commitment percentages.

| | |
|---|---|
| **Management Fee:** | General Partner will provide management and administrative services to the Fund. For its services to the Fund, the General Partner will receive an annual management fee equal to 2.0% per annum of: (i) during the Commitment Period, the Commitment of each Limited Partner and (ii) thereafter, the aggregated amount of Contributions made by each Limited Partner in respect of Portfolio Investments, less Contributions made by each Limited Partner in respect of Portfolio Investments that have been realised, disposed of or written off as at the relevant date. |

Management Fees will be paid quarterly in advance. From the management fee, the General Partner shall pay all normal operating expenses of the General Partner, including salaries, wages and rent.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **Fund Expenses:** | The Fund will bear all expenses incident to the organisation of the Fund, the General Partner and related entities (not to exceed US $250,000). In addition, the Fund shall also bear all costs incurred in connection with operation of its business (not to exceed US$250,000 per annum), including those costs associated with holding or sale of securities; reasonable travel expenses associated with the Fund's investment activities, all financial reporting, legal, audit, custodial, registration, financial, administrative, accounting and investment banking fees, including such services in connection with the purchase and sale of investments (whether or not consummated); insurance premiums; fees for consulting services related to portfolio investments and prospective portfolio investments (whether or not consummated); the cost of Fund meetings; expenses of litigation involving the Fund; and any extraordinary expenses of the Fund. |
| **Capital calls:** | It is anticipated that Commitments will be drawn down as needed, with not less than 10 Business Days' prior written notice. |
| | During the Investment Period, Commitments can be called for the purposes of paying Fund expenses (including Management Fees), obligations or liabilities, funding new investments and developing, preserving, protecting or enhancing the value of existing investments. |
| | After the Investment Period has ended, Commitments can be called for the purposes of paying Fund expenses (including Management Fees), obligations or liabilities, funding new investments that the General Partner approved during the Investment Period and developing, preserving, protecting or enhancing the value of existing investments. |
| **General Partner Clawback:** | If at the time the Fund is liquidated the General Partner's cumulative distributions (exclusive of the General Partner's distributions in respect of the General Partner's committed capital) exceed 25% of the Fund's profits, the General Partner will refund such excess distributions; provided that the General Partner shall not be required to refund an amount in excess of the cumulative distributions (exclusive of the General Partner's distributions in respect of the General Partner's committed capital) received by the General Partner less taxes paid or deemed paid by the General Partner in respect of its carried interest. |
| **Investment Restrictions: Conflicts of Interest** | No more than (i) 50% of total Capital Commitments of the Fund shall be invested in the securities of any single issuer (and its affiliated issuers). |
| **Borrowing and Guarantees** | The Fund may borrow money or guarantee the obligations of its portfolio companies in an amount not in excess at any one time of 15% of aggregate Capital Commitments of the Fund and with the maturity less than 1 year. |
| **Formation of a New Fund; Time and Attention:** | The members of the General Partner may, from time to time, form and separately raise capital for one or more special purpose vehicles (including an AngelList or equivalent syndicate fund vehicle) (each an *"SPV"*) to invest primarily in (i) a new investment opportunity that is too large to be allocated exclusively to the Fund, (ii) a follow-on round of a portfolio company that is too large to be allocated exclusively to the Fund, or (iii) an investment opportunity that is not appropriate for the Fund as determined in good faith by the General Partner, in its sole discretion. Each SPV may have a reduced carry and management fee. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TLGRM-008-00016710

| | |
|---|---|
| **Indemnification:** | The Fund will indemnify the General Partner, its members, employees, agents and affiliates against claims, liabilities, costs and expenses (including legal fees, judgments and amounts paid in settlement) as incurred, in connection with their activities on behalf of, or their association with, the Fund; provided that the person seeking such indemnification has acted in good faith in what such persons believed to be the best interests of the Fund and did not engage in wilful malfeasance. |
| **All Partner Clawback:** | Merger Proceeds / Withholding - If the Fund, in connection with the disposition of an investment, is required to return all or a portion of the proceeds of such disposition, or there is a withholding obligation or other tax liability, the General Partner may require the Limited Partners to return such amounts in accordance with the proportions in which such amounts were received from the Fund; provided, however, that without the consent of the LP Advisory Committee such obligation will not extend past the earlier of (a) 5 years from the date of the distribution of such proceeds and (b) 3 years from the date of the Fund's final liquidating distribution. In such event, any such return shall be treated as a return of the original distribution and not as a new contribution to the Fund.

Indemnification - If the Fund incurs an indemnification obligation that exceeds the assets of the Fund, the General Partner may require the Limited Partners to make contributions to the Fund in order to enable the Fund to satisfy such indemnification obligation. No Partner shall be required pursuant to such obligation to contribute an aggregate amount greater than the lesser of (a) 50% of the aggregate amount of distributions received by such Limited Partner and (b) 33% of such Partner's Capital Commitment to the Fund (provided, however, that the limitation provided in this clause (b) shall not apply with respect to the General Partner). |
| **Reports and Meetings:** | Beginning with the fiscal year ending on 31 December 2019 Limited Partners will receive within 120 days following the end of each year audited financial statements of the Fund and an annual review providing financial information for the Fund's investment in each of the portfolio companies of the Fund. The Fund may hold, at the General Partners discretion, an annual meeting of Limited Partners to review and discuss the Fund's investment activities. Quarterly reports will be provided to the Limited Partners, in such form as the General Partner may determine in its sole discretion. |
| **Transfer of Interests:** | A Limited Partner may not sell, assign or transfer any interest in the Partnership except under certain limited circumstances and with the prior written consent of the General Partner; provided that General Partner consent will not be required for qualifying transfers to certain permitted transferees of a Limited Partner. |
| **Parallel Fund:** | The General Partner may establish a parallel investment partnership that may not charge a management fee or carry but will invest in parallel with the Fund. The aggregate Capital Commitments of the limited partners of such parallel fund shall not exceed US$10,000,000. |
| **Feeder Fund:** | The General Partner may establish one or more feeder funds that may mirror the terms and structure of the Fund, at the discretion of the General Partner and without requiring consent from, or notice to the Limited Partners. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          TLGRM-008-00016711

| | |
|---|---|
| **Alternative Investment Vehicles:** | In order to address tax, legal, regulatory or other issues of the Fund or certain Limited Partners, the General Partner may organise one or more partnerships or other entities on substantially the same terms as the Fund to participate proportionally in certain investment opportunities with the Fund. |
| **No Side Letters:** | Neither the Fund nor the General Partner will enter into side letters or other agreements with Limited Partners, other than (i) with respect to representations made by the Limited Partners to the Fund, (ii) certain regulatory matters, (iii) any agreements made by the General Partner regarding the confidentiality of Limited Partner or Fund information. No Limited Partner will be granted a "most favoured nation" clause and any right negotiated by a Limited Partner that cannot be included in a side letter pursuant to the foregoing sentence will be included in the LPA for the benefit of all Limited Partners. |
| **Accountants:** | A recognised accounting firm selected by the General Partner in its sole discretion. |
| **Fiscal Year:** | The Fund's fiscal year runs from 1 January to 31 December each year, and its first fiscal year shall end on 31 December 2019. |
| **Legal Counsel:** | REDACTED - PERSONAL INFORMATION will serve as Cayman Islands legal counsel to the Fund. The General Partner may select separate legal counsel to advise on investments or other transactions that the Fund enters into. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**TON VENTURES L.P.**
an exempted limited partnership registered under
The Exempted Limited Partnership Law (as amended) of the Cayman Islands

**Subscription Agreement**
(Non-US Person)

**INSTRUCTIONS**

The attached Subscription Agreement is the document by which you offer to subscribe for and purchase a limited partnership interest in TON Ventures L.P. (the *Partnership*). Before completing the Subscription Agreement please read the Offering Term Sheet relating to the Partnership, the amended and restated exempted limited partnership agreement of the Partnership and the Subscription Agreement in full.

### Notes on completion of the Subscription Agreement

The Schedule to the Subscription Agreement must be completed in full. An incomplete Subscription Agreement will not be accepted.

### Supporting documentation

In order to comply with applicable anti-money laundering regulations the general partner of the Partnership is required to verify the identity of each applicant for a limited partnership interest. Unless one of the exemptions listed in Part 1 of Appendix 1 is available, applicants must provide the documentation specified in Part 2 of Appendix 1 that is appropriate to the category of applicant. All documents must be originals or copies certified by a suitable person (such as a lawyer, accountant, director or manager of a regulated institution or a notary public) as a true copy. Where documents are not in English, a notarised translation must be provided.

In addition, an applicant must complete and execute either an Individual Self-Certification form (Appendix 2) or an Entity Self-Certification form (Appendix 3) to enable the Partnership to discharge its obligations in connection with tax information reporting requirements.

### Submitting your subscription for an interest

Once completed, the Subscription Agreement and supporting documentation should be sent to:

TON Ventures Ltd
23 rue Ferdinand Hodler, 1207 Genève, Switzerland
T +41 22 3 100 100
Fax: +41 22 3 100 300
Email: sebastien@gmgfinancial.com
Attention: Sebastien Flak

The Subscription Agreement may be sent by facsimile or email but you must also send the original executed Subscription Agreement to the address above.

### Acceptance of Subscription

If your subscription is accepted by the General Partner a fully executed copy of the Subscription Agreement will be returned to you. Please note that your subscription will not be complete until it has been accepted by the General Partner.

Enquiries regarding subscription procedures should be directed to:

Sebastien Flak
Tel: +41 22 3 100 100
Email: sebastien@gmgfinancial.com

**Payment details**

If your subscription is accepted, payment of an amount representing twenty (20) per cent of your Commitment must be received in the bank account of the Partnership, in cleared funds, prior to 5:00 pm Geneva time on the relevant Closing Date.

Payment should be made in US Dollars by wire transfer to:

Intermediary Bank Name:
SWIFT Address:
Fedwire ABA:
Beneficiary Bank Name:
SWIFT Address:
Beneficiary Account Name:
Account Number:
Under reference:                 Subscription monies from [Name of Subscriber]

Note:  Please ensure that your bank identifies the name of the intended Subscriber on the wire.  Please note that the name on the originating account must match the name of the intended Subscriber otherwise your payment will be rejected.

**TON VENTURES L.P.**
an exempted limited partnership registered under
The Exempted Limited Partnership Law (as revised) of the Cayman Islands

**SUBSCRIPTION AGREEMENT**
(Non-US Person)

TON Ventures Ltd
as general partner of TON Ventures L.P.
Harneys Fiduciary (Cayman) Limited
Harbour Place
103 South Church Street
Grand Cayman KY1-1002
Cayman Islands

Fax: +41 22 3 100 300
Email: sebastien@gmgfinancial.com
Attention: Sebastien Flak

Dear Sirs

**SUBSCRIPTION FOR AN INTEREST**

I/we, the undersigned (the *Subscriber*) hereby agree with TON Ventures Ltd (the *General Partner*), on behalf of TON Ventures L.P. (the *Partnership*), as follows:

1.    **DEFINITIONS**

1.1.    In this subscription agreement (the *Agreement*) capitalised words and expressions used but not defined have the meanings given to them in the amended and restated exempted limited partnership agreement of the Partnership (the *Partnership Agreement*).

2.    **SUBSCRIPTION**

2.1.    The Subscriber hereby irrevocably applies to subscribe for a limited partnership interest (the *Interest*) in the Partnership and agrees to advance to the Partnership in accordance with the terms of the Partnership Agreement, the amount specified in Schedule 1 (the *Commitment*) in return for such Interest.

2.2.    The Subscriber acknowledges that the General Partner may accept or reject this subscription in whole or part and is not obliged to give any reason for doing so.

2.3.    The Subscriber acknowledges that acceptance by the General Partner of this subscription shall admit the Subscriber as a Limited Partner and the Subscriber shall be deemed to have adhered to and agreed to be bound by the terms and conditions of the Partnership Agreement as if it had duly executed and delivered it.

3.    **BASIS ON WHICH SUBSCRIPTION IS MADE**

3.1.    The Subscriber represents and warrants that it has received, read, fully considered and understands the Partnership Agreement and the private placement memorandum relating to the Partnership (the *Memorandum*) and is making this subscription for an Interest on the terms of the Memorandum and the Partnership Agreement.

3.2.    The Subscriber represents and warrants that:

    (a)    it is subscribing for an Interest on the basis of the information contained in the Memorandum and that it has not relied on any representations or statements made or information provided by any person in relation to the Partnership other than the information contained in the Memorandum; and

    (b)    it has been given the opportunity to ask questions of and receive written answers from, representatives of the General Partner concerning the terms

and conditions of an investment in the Partnership and all such questions have been answered to its satisfaction.

3.3.   The Subscriber represents and warrants that it has consulted with its own legal, tax and financial advisers in connection with its investment in the Partnership (or has chosen not to do so) and is not purchasing an Interest as a result of, or pursuant to:

(a)   any form of general solicitation or general advertising including any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site whose information about the Partnership is not password protected) or broadcast over television or radio; or

(b)   any seminar or meeting whose attendees, including the Subscriber, were invited as a result of, or pursuant to, any form of general solicitation or general advertising.

3.4.   The Subscriber represents and warrants that it:

(a)   is applying for an Interest at its own initiative and, if resident in the European Union or in Switzerland, acknowledges that the Memorandum and this Agreement were sent to it at its request under a procedure of a "reverse-solicitation" as defined under the EU Alternative Investment Managers Directive (2011/61/EU) or at "the initiative of the Subscriber" as described in The Revised Swiss Ordinance on Collective Investment Schemes (13 February 2013).

(b)   has the knowledge, expertise and experience in financial matters to evaluate the risks associated with an investment in the Partnership; and

(c)   is aware of the risks inherent in investing in the types of investments in which the assets of the Partnership will be invested.

3.5.   The Subscriber represents and warrants that it has evaluated its proposed investment in the Partnership in light of its financial conditions and resources and is able to bear the economic risk of its investment in the Partnership, including the inherent risk of the potential to lose its entire investment in the Partnership.

3.6.   The Subscriber represents and warrants that it is acquiring the Interest for investment purposes only and not with a view to distributing or re-selling such Interest in whole or in part.

4.   ELIGIBILITY TO INVEST

4.1.   The Subscriber represents and warrants that:

(a)   it is a person who is able to acquire and hold the Interest without breaching the law or requirements of any country, regulatory body or government authority (an *Eligible Investor*); and

(b)   it is not acting on behalf of, or for the benefit of, nor does it intend transferring its Interest to, any person who is not an Eligible Investor.

4.2.   The Subscriber agrees that it will notify the General Partner immediately if it becomes aware that it, or any person for whom it holds the Interest, has ceased to be an Eligible Investor.

4.3.   The Subscriber represents and warrants that:

(a)   it is not a "US person" within the meaning of Rule 902 of Regulation S promulgated under the US Securities Act of 1933, as amended[1] and is not subscribing on behalf of, or funding its Commitment with funds obtained from, a US Person; and

(b)   all offers to acquire the Interest were made to or by the Subscriber while the Subscriber was outside the United States, and the Subscriber's request to acquire the Interest originated while the Subscriber was outside the United States.

4.4.   The Subscriber agrees that:

(a)   it will notify the Partnership immediately if it becomes a US person or if it becomes aware that the person for whom it holds the Interest has become a US person; and

(b)   it will not attempt to sell, transfer or otherwise dispose of the Interest in whole or in part within the United States.

4.5.   The Subscriber represents and warrants that:

(a)   it is not a benefit plan investor[2] and is not investing in the Partnership on behalf of a benefit plan investor; and

(b)   any contribution made to the Partnership does not constitute the assets of an employee benefit plan for the purposes of the US Employee Retirement Income Security Act of 1974 or a "Plan" within the meaning of the US Internal Revenue Code of 1986.

## 5.   CONFIDENTIALITY

5.1.   The Subscriber agrees that it shall not duplicate or provide copies of the Partnership Agreement, the Memorandum or, this Agreement to any persons other than its legal, tax and financial advisers.

5.2.   The Subscriber hereby represents and warrants that it is not subject to any law, regulation or judicial or governmental order, judgment or decree requiring it to disclose any information or materials (whether or not confidential information) relating to the Partnership to any person(s) and it is not required by any law, regulation or judicial or governmental order, judgment or decree or any agreement or contract to obtain any consent or approval prior to agreeing to be bound by the confidentiality provisions of the Partnership Agreement.  The Subscriber represents and warrants that except as previously disclosed in writing to the General Partner, it has taken all actions and obtained all consents necessary to enable it to comply with the provisions of the Partnership Agreement related to confidential information. The Subscriber agrees that it will not use any confidential information it receives for any purpose other than monitoring and evaluating its investment in the Partnership.

---

[1]   Rule 902 of Regulation S promulgated under the US Securities Act of 1933, as amended defines a US person as (i) any natural person resident in the United States; (ii) any partnership or corporation organized or incorporated under the laws of the United States; (iii) any estate of which any executor or administrator is a US person; (iv) any trust of which any trustee is a US person; (v) any agency or branch of a foreign entity located in the United States; (vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US person; (vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (viii) any partnership or corporation if: (1) organized or incorporated under the laws of any foreign jurisdiction; and (2) formed by a US person principally for the purpose of investing in securities not registered under the US Securities Act of 1933, as amended, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of the US Securities Act of 1933, as amended) who are not natural persons, estates or trusts.

[2]   A "benefit plan investor" includes (i) an employee benefit plan that is subject to the provisions of Title I of the US Employee Retirement Income Security Act of 1974, as amended (ERISA), (ii) a "plan" that is not subject to the provisions of Title I of ERISA, but that is subject to the prohibited transaction provisions of Section 4975 of the US Internal Revenue Code of 1986, such as individual retirement accounts and certain retirement plans for self-employed individuals; and (iii) a pooled investment fund whose assets are treated as "plan assets" under section 3(42) of ERISA and any regulations promulgated thereunder because "employee benefits plans" or "plans" hold 25 per cent or more of any class of equity interest in such pooled investment fund.

TDH Ventures L.P.   3          KY:3221724_2

5.3.   The Subscriber agrees to the recording by the General Partner and/or any of its delegates or agents of telephone conversations with the Subscriber and agrees that any such recordings may be submitted in evidence in any proceedings relating to this subscription or relating to the Partnership.

**6.     INFORMATION PROVIDED IN THIS AGREEMENT**

6.1.   The Subscriber represents and warrants that the information given in this Agreement is true, accurate and complete in all respects and may be relied upon by the General Partner and/or any of its delegates and agents.

6.2.   The Subscriber agrees to notify the General Partner promptly of any change with respect to any information given in this Agreement or if any of the warranties, representations or statements in this Agreement are no longer accurate and complete in all respects.

6.3.   The Subscriber agrees that it will, if requested to do so, provide such certifications, documents or other evidence as the General Partner and/or any of its delegates or agents may reasonably require in connection with the Subscriber, including to substantiate the warranties, representations or statements contained in this Agreement.

**7.     WITHDRAWAL OF INVESTMENT**

7.1.   The Subscriber acknowledges that its Interest may not be withdrawn, transferred or redeemed save in accordance with the provisions of the Partnership Agreement.

**8.     PREVENTION OF CRIME**

8.1.   The Subscriber acknowledges that, in order to comply with applicable economic sanctions and laws and regulations aimed at the prevention of money laundering, terrorism and corruption, the General Partner and/or any of its delegates or agents may require verification of the identity of the Subscriber and the source of the Subscriber's funds.  The Subscriber undertakes to provide:

(a)   such information and documentation as the General Partner and/or any of its delegates or agents may request to verify its identity in compliance with such laws and regulations; and

(b)   any further information and documentation as the General Partner and/or any of its delegates or agents may request from time to time to ensure on-going compliance with such laws and regulations.

8.2.   The Subscriber represents and warrants that it is not, nor is any person or entity controlling, controlled by or under common control with the Subscriber, acting, directly or indirectly:

(a)   in contravention of any economic sanctions or applicable anti-money laundering, anti-terrorism or anti-corruption laws or regulations and that no commitment, contribution or payment to the Partnership by the Subscriber and no distribution by the Partnership to the Subscriber shall cause the Partnership or the General Partner to be in violation of any such laws or regulations;

(b)   on behalf of terrorist or terrorist organisations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the US Treasury Department's Office of Foreign Assets Control (*OFAC*) or on any lists or resolutions issued by the United Nations (whether through the Security Council or otherwise) pursuant to which dealings with persons specified therein are prohibited, restricted or discouraged, as such lists may be amended from time to time;

(c)   for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure unless the General Partner, after being specifically notified by the

Subscriber in writing that it is such a person, conducts further due diligence and determines that the Subscriber shall be permitted to invest in the Partnership; or

(d)     as trustee, agent, representative or nominee for a foreign shell bank,

(each such person in (a) to (d), a *Prohibited Person*).

8.3.    The Subscriber represents and warrants that to the extent the Subscriber has any beneficial owners it has carried out due diligence to establish the identities of such beneficial owners and, based on the evidence it holds of the identities of such beneficial owners, the Subscriber reasonably believes that no such beneficial owner is a Prohibited Person.

8.4.    The Subscriber agrees that to the extent the Subscriber has any beneficial owners:

(a)     it will maintain evidence of the identities of such beneficial owners during the existence of the Partnership and for at least five years from the date of the termination of the Partnership; and

(b)     it will make available such evidence and any additional evidence that the General Partner may require upon request in accordance with applicable laws and regulations.

8.5.    The Subscriber acknowledges and agrees that if any of the representations, warranties or agreements in this Clause 8 cease to be true or if the General Partner no longer reasonably believes that it has satisfactory evidence as to their truth, the General Partner may, notwithstanding anything to the contrary contained in the Partnership Agreement, any side letter or any other agreement, be obligated to take certain actions. Such actions may include prohibiting additional Contributions, restricting distributions, disclosing the Subscriber's identity to any relevant regulatory authority or taking any other action with respect to the Interest as is consistent with applicable law. The Subscriber acknowledges and agrees that if the General Partner is required to take any such action, it shall have no claim against the General Partner or the Partnership for any form of damages as a result of any of such actions and agrees not to bring any such claim.

8.6.    The Subscriber acknowledges and agrees that under the Proceeds of Crime Law (2014 Revision), if a person who is a resident in the Cayman Islands knows or suspects that a payment to the Partnership (by way of subscription or otherwise) represents proceeds of criminal conduct, that person must report his knowledge or suspicion to the reporting authority. The Subscriber acknowledges that any such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

8.7.    Where this subscription is made as trustee, custodian, nominee or otherwise on behalf of another person or persons, the Subscriber represents and warrants that:

(a)     it has carried out reasonable verification checks on, and obtained sufficient evidence as to the identity of, such person or persons on whose behalf the Subscriber shall be holding the Interest so as to satisfy itself of the identity of the underlying beneficial owner(s) and of the provenance and legitimacy of its source of funds; and

(b)     it has otherwise complied with applicable economic sanctions and the laws and regulations aimed at the prevention of money laundering, terrorism and corruption that are applicable in the jurisdiction of the Subscriber.

9.      COMMUNICATIONS FROM THE PARTNERSHIP

9.1.    The General Partner is required to deliver certain correspondence and documents to Limited Partners including financial statements, notices and regulatory communications (collectively, *Investor Communications*). The General Partner will deliver Investor Communications to the Subscriber in the manner requested by the Subscriber in this Agreement. The Subscriber may at any time upon written notice

to the General Partner change the manner in which Investor Communications are delivered to the Subscriber.

9.2.   If the Subscriber chooses to receive Investor Communications by email the Subscriber acknowledges and agrees that:

(a)   the General Partner and/or its delegates or agents may deliver any document as an attachment (which may be in Adobe's Portable Document Format (*PDF*) or such other format as the General Partner may determine) to an email or by posting the document on a password protected website and notifying the Subscriber of its availability through an email;

(b)   email messages are not secure and may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient;

(c)   neither the General Partner nor any of its delegates or agents will be liable for any interception or non-delivery of Investor Communications sent by email;

(d)   it will be solely responsible for notifying the General Partner of any change in its email address and that the General Partner may not seek to verify or confirm the Subscriber's email address as provided; and

(e)   the General Partner and/or its delegates or agents may intercept, monitor and retain e-mail messages to and from its systems as permitted by applicable law.

## 10.   DATA PROTECTION

10.1.   The Subscriber acknowledges and agrees that information supplied on this Agreement and otherwise in connection with the Subscriber's subscription for an Interest (collectively *Personal Information*) may be held by the General Partner and/or its delegates and agents and may be used for the purpose of:

(a)   processing the Subscriber's subscription and completion of information on the Partnership's register of Limited Partners and record of contributions;

(b)   carrying out the Subscriber's instructions or responding to any enquiry purporting to be given by the Subscriber or on behalf of the Subscriber;

(c)   dealing in any other matters relating to the Subscriber's Interest (including the mailing of Investor Communications); or

(d)   observing any legal, governmental or regulatory requirements of any relevant jurisdiction (including any disclosure or notification requirements to which any recipient of the data is subject).

10.2.   The Subscriber acknowledges and agrees that, subject to the requirements of applicable law, the General Partner and/or its delegates and agents may:

(a)   retain Personal Information after the Subscriber has ceased to be a Limited Partner and after the termination of the Partnership;

(b)   maintain Personal Information on computer systems based or maintained in such places as the General Partner or its delegate or agent determines, which may be in countries that have not enacted data protection legislation;

(c)   disclose and transfer Personal Information, by any method including electronically and/or by making available the original or a copy of this Agreement, to:

<ol type="i" start="1">
<li>the General Partner and/or any delegate or agent of the General Partner and/or the professional advisers of any of them and/or any of their employees, officers, directors, agents and/or affiliates; or</li>
</ol>

<ol type="i" start="2">
<li>any banking institution appointed to provide services to the General Partner and/or the Partnership and/or any of their affiliates; or</li>
</ol>

<ol type="i" start="3">
<li>any third party employed to provide administrative, computer or other services or facilities to the General Partner and/or the Partnership, or to any person to whom data is disclosed or transferred pursuant to this Clause 10.2(c); or</li>
</ol>

(d) disclose Personal Information where such disclosure is required by any law or order of any court or pursuant to any direction, request or requirement (whether or not having the force of law) of any central bank or governmental or other regulatory or taxation authority.

## 11. COMPLIANCE WITH AUTOMATIC EXCHANGE OF INFORMATION LEGISLATION

11.1. For the purposes of the following provisions, *AEOI Legislation* means any legislation, regulations or guidance in force in the Cayman Islands relating to the systematic and periodic exchange of information for tax purposes pursuant to any agreement or treaty entered into by the Cayman Islands (or any Cayman Islands government body) including the inter-governmental agreement entered into with the United States to facilitate compliance with sections 1471 to 1474 of the US Internal Revenue Code of 1986 (commonly referred to as FATCA) and any other agreement scheduled to the Tax Information Authority Law (2as revised) or any regulations made under that law.

11.2. The Subscriber acknowledges and agrees that:

(a) the Partnership is required to comply with the provisions of the AEOI Legislation;

(b) it will provide, in a timely manner, such information regarding the Subscriber and its beneficial owners and such forms or documentation as may be requested from time to time by the General Partner, its delegates or agents, to enable the General Partner to comply with the requirements and obligations imposed pursuant to the AEOI Legislation, specifically, but not limited to, forms and documentation which the General Partner may require to determine whether or not the relevant investment is a "US Reportable Account" (for the purposes of FATCA) and to comply with the relevant due diligence procedures in making such determination;

(c) any such forms or documentation requested by the General Partner, its delegates or agents pursuant to paragraph (b) above, or any financial or account information with respect to the Subscriber's investment in the Partnership, may be disclosed to the Cayman Islands Tax Information Authority (or any other Cayman Islands governmental body which collects information in accordance with the AEOI Legislation) and to any person or regulatory authority where the provision of that information to such person or regulatory authority is required to ensure compliance by the Partnership with its obligations under the AEOI Legislation or to avoid being subject to withholding tax or other liabilities under the AEOI Legislation;

(d) it waives, and/or shall co-operate with the General Partner to obtain a waiver of, the provisions of any applicable laws which:

<ol type="i" start="1">
<li>prohibit the disclosure by the General Partner, or by any of its delegates or agents, of the information or documentation requested from the Subscriber pursuant to paragraph (b) above; or</li>
</ol>

<ol type="i" start="2">
<li>prohibit the reporting of financial or account information by the General Partner, its delegates or agents required pursuant to the AEOI Legislation; or</li>
</ol>

> (iii)    otherwise prevent compliance by the Partnership with its obligations under the AEOI Legislation;

(e)    if it provides information and documentation that is in any way misleading, or it fails to provide the General Partner, its delegates or agents with the requested information and documentation necessary in either case to satisfy the General Partner's and/or the Partnership's obligations under the AEOI Legislation, the General Partner may (whether or not such action or inaction leads to compliance failures, or a risk of the Partnership and/or any of its Partners being subject to withholding tax or other liabilities under the AEOI Legislation):

> (i)    take any action and/or pursue all remedies at its disposal under the Partnership Agreement including designation of the Subscriber as a Defaulting Partner and the exercise of any of the rights and remedies specified in the Partnership Agreement; and

> (ii)    hold back from any distributions and retain an amount sufficient to discharge any liabilities, costs, expenses, taxes, withholdings or deductions incurred or suffered by the Partnership or the General Partner, or that in the opinion of the General Partner will be incurred or suffered by the Partnership or the General Partner, due to the representations, actions or inactions (directly or indirectly) by the Subscriber; and

(f)    it shall have no claim against the Partnership or the General Partner, its delegates or agents, for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the General Partner pursuant to this Clause 11 or the Partnership Agreement in order to comply with the AEOI Legislation .

11.3.    The Subscriber agrees to indemnify and keep indemnified the Partnership, the General Partner and its directors, officers and employees, from and against any AEOI Legislation related liability, action, proceeding, claim, demand, costs, damages, expenses (including legal expenses) penalties or taxes whatsoever which the General Partner or the Partnership may incur under the provisions of the AEOI Legislation as a result of any representation, action or inaction (directly or indirectly) of the Subscriber.   This indemnification shall survive the Subscriber's death or disposition of its Interest.

## 12.    POWER OF ATTORNEY

12.1.    The Subscriber irrevocably constitutes and appoints the General Partner, its successors and assigns, and the directors and/or employees of the foregoing, as its true and lawful attorneys with full power of substitution, in its name, place and stead, to execute the Partnership Agreement on its behalf and otherwise on the terms and for the purposes set out in Clause 35 of the Partnership Agreement as if that Clause was reproduced in full in this Agreement.  This Power of Attorney is given by way of securing the Subscriber's obligations under this Agreement and the Partnership Agreement and shall be irrevocable and survive and not be affected by the Subscriber's subsequent death, incapacity, disability, insolvency or dissolution or any assignment of all or any part of its Interest.  The Power of Attorney granted under this Agreement shall be exercised by the General Partner for each Limited Partner by a signature or by listing all the Limited Partners executing any instrument with a single signature of the General Partner as attorney for all of them.

## 13.    POWER AND AUTHORITY

13.1.    *If the Subscriber is an entity*: The person executing this Agreement for the Subscriber represents and warrants that he or she is duly authorised to do so and the Subscriber has the full power and authority under its governing instruments to acquire the Interest. The Subscriber represents and warrants that:

(a)   it is duly organised, validly existing and in good standing under the laws of its jurisdiction of organisation;

(b)   the execution and delivery of this Agreement and the Partnership Agreement by or on behalf of the Subscriber and performance by the Subscriber of their terms (i) are within its powers and have been duly authorised by all necessary actions on its behalf, (ii) require no action by or in respect of, or filing with, any governmental body, agency or official (except as disclosed in writing to the General Partner), and (iii) do not contravene, conflict with or constitute a breach of or default under any provision of applicable law or governmental rule, regulation or policy statement or of its certificate of incorporation or constitutional documents or other comparable organisational documents or any agreement, judgment, injunction, order, decree or other instrument binding upon it; and

(c)   this Agreement constitutes a valid and binding agreement of the Subscriber and is enforceable against the Subscriber in accordance with its terms.

13.2.   *If the Subscriber is acting as trustee, agent, representative or nominee for another person or entity (a Beneficial Owner):*   The Subscriber understands and acknowledges that the representations, warranties and agreements made in this Agreement are made by the Subscriber (a) with respect to the Subscriber, and (b) with respect to the Beneficial Owner.  The Subscriber represents and warrants that it has all requisite power and authority from the Beneficial Owner to execute and perform the obligations under this Agreement.

13.3.   *If the Subscriber is an individual:*  The Subscriber represents and warrants that (a) this Agreement constitutes a valid and binding agreement of the Subscriber and is enforceable against the Subscriber in accordance with its terms, and (b) the Subscriber has legal competence and capacity to execute this Agreement.

14.   **INDEMNITY**

14.1.   The Subscriber agrees to indemnify and keep indemnified the Partnership, the General Partner and its directors, officers and employees, from and against any and all costs, claims, demands, liabilities, expenses, damages or losses including, without limitation, consequential losses and loss of profit and all interest, penalties and legal and other professional costs and expenses due to, or arising out of, breach of any of the representations, warranties, acknowledgements, undertakings or agreements by the Subscriber contained in this Agreement.  This indemnification shall survive the Subscriber's death, insolvency or the disposition of its interest.

15.   **GENERAL**

15.1.   In this Agreement:

(a)   the singular includes the plural and vice versa;

(b)   words importing the masculine gender only include the feminine gender;

(c)   any reference to a law of the Cayman Islands is a reference to the most recent revision of such law and includes any modification or re-enactment thereof for the time being in force;

(d)   any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense and meaning of the words preceding those terms;

(e)   a person includes all legal persons and natural persons and a legal person includes all forms of corporate entity and any other person having capacity to act in its own name created by or in accordance with the laws or regulations of any jurisdiction;

(f)   headings are included for convenience only and shall not affect the construction of this Agreement;

TON Ventures L.P.   9        KY:3221724_2

(g)     any reference to a Clause or a Schedule is, unless the context otherwise requires, a reference to a clause of, or a schedule to, this Agreement; and

(h)     words and expressions not defined in this Agreement shall have the meanings given to them in the Partnership Agreement.

15.2.   The Schedules to this Agreement form part of it.

15.3.   If the Subscriber comprises more than one person, all representations, warranties, acknowledgements, undertakings and agreements by the Subscriber bind those persons jointly and each of them individually.

15.4.   This Agreement is binding on the Subscriber and its successors and permitted assigns and takes effect for the benefit of the successors and assigns of the Partnership.

15.5.   This Agreement may not be assigned in whole or in part by the Subscriber without the consent of the General Partner.

15.6.   This Agreement and each representation, warranty, acknowledgement, undertaking and agreement contained in this Agreement, shall survive the execution and delivery of this Agreement and shall be deemed to be repeated each time the Subscriber makes a contribution to or receives a distribution from, the Partnership.

15.7.   If any provision in this Agreement is determined to be illegal, void, invalid or unenforceable under the laws of any jurisdiction such illegal, void or unenforceable provision shall be deemed to be severable from any other provision of this Agreement and shall be treated as having been severed from this Agreement in the relevant jurisdiction but the legality, validity and enforceability of the remainder of this Agreement shall not be affected.

15.8.   This Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument.

**16.     GOVERNING LAW AND JURISDICTION**

16.1.   This Agreement shall be governed by, and shall be construed in accordance with, the laws of the Cayman Islands.  Each party irrevocably agrees to submit to the non-exclusive jurisdiction of the courts of the Cayman Islands in respect of any claim or matter arising under or in connection with this Agreement.

**1.**

## Particulars of Subscriber

**Registration details:**

**Full name of Subscriber:**

**Registration address:**
*(PO Boxes are not accepted for registration purposes)*

**Correspondence address:**
*(if different)*

**Telephone no:**                          **Facsimile no:**

**Email address:**

**Nationality/place of incorporation:**

**Source of funds/nature of business:**

**Commitment:**                          US$
*The minimum Commitment is US $1,000,000.00 (one million US dollars), or such lesser amount as determined by the General Partner in its absolute discretion.*

**Wiring instructions for cash distributions:**

Name of Bank:

Account No:

Account Name:

SWIFT Code:

Bank Address:

Correspondent Bank Name:

Correspondent Bank Branch:

Correspondent Bank SWIFT Code:

*The account must be held in the name of the Subscriber.  No third party payments will be made.*

**Communications:** The Subscriber would like to receive communications from the General Partner by the following means:

          ☐  **Email**        ☐  **Fax**        ☐  **Post**

*Please provide contact details below.*

Name of contact person:

Correspondence address:

Telephone no:                    Facsimile no:

Email address:

**EXECUTION BY SUBSCRIBER**

**Entity Subscriber:** Executed and delivered as a deed by the Subscriber acting by its duly authorised signatory:

.................................................................

Signature of Authorised Signatory

.............................................

Date

.................................................................

Name of Authorised Signatory

.............................................

Position/office held by Authorised Signatory

in the presence of

.................................................................

Signature of witness

.................................................................

Name of witness

**Individual Subscriber:** Executed and delivered as a deed by the Subscriber:

.................................................................

Signature of Subscriber

.............................................

Date

.................................................................

Name of Subscriber

in the presence of

.................................................................

Signature of witness

.................................................................

Name of witness

**ACCEPTANCE BY GENERAL PARTNER**

The General Partner on behalf of itself and on behalf of the Partnership hereby accepts the subscription submitted by the Subscriber on the terms set out in the Subscription Agreement.

Executed and delivered as a deed by TON Ventures Ltd in its capacity as general partner of TON Ventures L.P. acting by its duly authorised director.

Signature of director                          Date

Name of director

**APPENDIX 1**

Anti-money laundering verification requirements

## DUE DILIGENCE CHECKLIST FOR INDIVIDUALS

1. Last and First names (no initials)

2. Any previous names and reason for change

| | | |
|---|---|---|
| | *Street* | *No* |
| 3. Permanent residential address | *City* | *Postal Code* |
| | *Country* | |
| | *Street* | *No* |
| 4. Mailing address, if different from residential address | *City* | *Postal Code* |
| | *Country* | |

5. Telephone number (residential) / office

6. Fax number (residential) / office

7. Mobile telephone number

8. E-mail address

9. Date and place of birth

10. Nationality

11. Occupation (brief CV)

12. Marital Status and Family Situation

13. Please attach a certified copy of your current valid passport

14. Specify the source of the funds, i.e. transaction or business which generated the funds (in detail)

15. Please specify from which country the funds are transferred

16. Please attach an original bank reference letter

17. Name and address of lawyers*

18. Name and address of accountants*

19. Name and address of tax advisers*

20. Authority to contact lawyers, accountants and tax advisers*          Signature Client:

* Optional

The information given by the Client in this form will be used for Due Diligence purposes only, it will remain strictly confidential.

I, the undersigned, confirm that I have never been, and to the best of my knowledge am presently not threatened to be:
- (a) convicted of any criminal offence (other than minor offence in connection with the use or ownership of a motor vehicle);
- (b) adjudged bankrupt;
- (c) presently in a situation of illiquidity;
- (d) the subject of an investigation by a governmental, or other regulatory body;
- (e) a director or manager of a business entity which has been adjudged bankrupt, or compulsorily wound up during or related to my term of office.

Should the undersigned not be in a position to confirm any of the above statements (a), (b), (c), (d) and/ or (e), he/she shall comment about the statements which cannot be confirmed:

_____
_____
_____
_____
_____
_____

I declare having read and completed the above questionnaire carefully and hereby confirm that the information given above is complete and correct.

Place and date:    _____

Name and Signature of the Client:

Name:    _____

Signature:    _____

## DUE DILIGENCE CHECKLIST FOR COMPANIES

1. Exact name of the Company (no initials)

2. Please provide any former trading name(s)

3. Please attach a certified copy of the Certificate of Incorporation / Certificate of Good Standing (max. 3 months old)

4. Please attach a certified copy of a recent Certificate of Incumbency, and/or Extract of the Register of Commerce (for States where such extracts are available) (max. 3 months old)

| 5. Registered Office address | Street | No |
| | City | Postal Code |
| | Country | |

| 6. Mailing address, if different from registered office | Street | No |
| | City | Postal Code |
| | Country | |

| 7. Place of business address, if different from registered office | Street | No |
| | City | Postal Code |
| | Country | |

8. Telephone number

9. Fax number

10.    E-mail address

| 11.    Full name and personal address of    the | Name | Surname |
| 1. Directors of the Company. | Street | No |
| Please provide a separate list if the space provided is not sufficient | City | Postal Code |
| | Country | |

| 2. | Name | Surname |
| | Street | No |
| | City | Postal Code |
| | Country | |

| 12.    Full name and personal address of the undersigned (which must be an authorised signatory of the Company) | Name | Surname |
| | Street | No |
| | City | Postal Code |
| | Country | |

13.  Please attach a certified copy of the current valid passport of the Directors and of the undersigned

14.  Please attach a certified copy of the Memorandum & Articles of Association of the Company

**Signature of the Client:** _____

15.  Please state the (ultimate) beneficial owner(s) of the Company (name, address, copy passport)

17.  Specify the source of the funds of the (ultimate) beneficial owner(s) of the Company, i.e. transaction or business which generated the funds, and the business of the Company (in detail)

18.  Please specify from which country the funds are being transferred to GMG, if applicable

19.  Please attach a bank reference letter in favour of the Company

20.  Please attach a copy of the latest available accounts of the Company, audited, if available

21.  Is the Company a Private or Public company

22.  If a Public company and listed, on which stock exchange

23.  If Private, please attach a list of all the Company's shareholders*

* The Company's shareholders can be different from the (ultimate) beneficial owner(s) detailed in question 15 above.

The information given by the Company in this form will be used for Due Diligence purposes only, it will remain strictly confidential.

**I declare having read and completed the above questionnaire carefully and hereby confirm that the information given above is complete and correct.**

Place and date:      _____

Name and Signature of the Company:

Name:            _____

Signature:        _____

**APPENDIX 2**

Individual Self-Certification Form

*Instructions for completion*

*We are obliged under the Tax Information Authority Law, the Regulations, and Guidance Notes made pursuant to that Law, and treaties and intergovernmental agreements entered into by the Cayman Islands in relation to the automatic exchange of information for tax matters (collectively "AEOI"), to collect certain information about each account holder's tax status. Please complete the sections below as directed and provide any additional information that is requested. Please note that we may be obliged to share this information with relevant tax authorities. Terms referenced in this Form shall have the same meaning as applicable under the relevant Cayman Islands Regulations, Guidance Notes or international agreements.*

*If any of the information below regarding your tax residence or AEOI classification changes in the future, please ensure you advise us of these changes promptly. If you have any questions about how to complete this Form, please contact your tax advisor.*

*Please note that where there are joint account holders each investor is required to complete a separate Self-Certification form.*

**Section 1: Account Holder Identification**

| | / / | |
|---|---|---|
| Account Holder Name | Date of Birth (dd/mm/yyyy) | Place and Country of Birth |

**Permanent Residence Address:**

| | | |
|---|---|---|
| Number & Street | | City/Town |

| | | |
|---|---|---|
| State/Province/County | Post Code | Country |

**Mailing address (if different from above):**

| | | |
|---|---|---|
| Number & Street | | City/Town |

| | | |
|---|---|---|
| State/Province/County | Post Code | Country |

**Section 2: Declaration of U.S. Citizenship or U.S. Residence for Tax purposes**

Please tick either (a) or (b) or (c) and complete as appropriate.

(a)      I confirm that I am a U.S. citizen and/or resident in the U.S. for tax purposes (green card holder or resident under the substantial presence test) and my U.S. federal taxpayer identifying number (U.S. TIN) is as follows:

(b)      I confirm that I was born in the U.S. (or a U.S. territory) but am no longer a U.S. citizen as I have voluntarily surrendered my citizenship as evidenced by the attached documents.

(c)      I confirm that I am not a U.S. citizen or resident in the U.S. for tax purposes.

*Complete section 3 if you have non-U.S. tax residences.*

## Section 3: Declaration of Tax Residency (other than U.S.)

I hereby confirm that I am, for tax purposes, resident in the following countries (indicate the tax reference number type and number applicable in each country).

| Country/countries of tax residency | Tax reference number type | Tax reference number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Please indicate not applicable if jurisdiction does not issue or you are unable to procure a tax reference number or functional equivalent. If applicable, please specify the reason for non-availability of a tax reference number:

## Section 4: Declaration and Undertakings

I declare that the information provided in this form is, to the best of my knowledge and belief, accurate and complete. I undertake to advise the recipient promptly and provide an updated Self-Certification form within 30 days where any change in circumstances occurs which causes any of the information contained in this form to be inaccurate or incomplete. Where legally obliged to do so, I hereby consent to the recipient sharing this information with the relevant tax information authorities.

I acknowledge that it is an offence to make a self-certification that is false in a material particular.

Signature:

Date (dd/mm/yyyy):          /        /

**APPENDIX 3**

**Entity Self-Certification Form**

### *Instructions for completion*

*We are obliged under the Tax Information Authority Law, the Regulations, and Guidance Notes made pursuant to that Law, and treaties and intergovernmental agreements entered into by the Cayman Islands in relation to the automatic exchange of information for tax matters (collectively "AEOI"), to collect certain information about each account holder's tax status. Please complete the sections below as directed and provide any additional information that is requested. Please note that we may be obliged to share this information with relevant tax authorities. Terms referenced in this Form shall have the same meaning as applicable under the relevant Cayman Islands Regulations, Guidance Notes or international agreements.*

*If any of the information below regarding your tax residence or AEOI classification changes in the future, please ensure you advise us of these changes promptly. If you have any questions about how to complete this Form, please refer to accompanying guidelines for completion or contact your tax advisor.*

**PART I: General**

**Section 1: Account Holder Identification**

| Legal Name of Entity/Branch | Country of incorporation/ organisation |
|---|---|

**Current Residence or Registered Address:**

| Number & Street | | City/Town |
|---|---|---|
| State/Province/County | Post Code | Country |

**Mailing address (if different from above):**

| Number & Street | | City/Town |
|---|---|---|
| State/Province/County | Post Code | Country |

**PART II: US IGA**

## Section 2: U.S. Persons

Please tick and complete as appropriate.

(d)   The entity is a *Specified U.S. Person* and the entity's U.S. federal taxpayer identifying number (U.S. TIN)
is as follows:

(e)   The entity is a U.S. Person that is not a Specified U.S. Person.

Indicate exemption

*If the entity is not a U.S. person, please complete Section 3.*

## Section 3: US FATCA Classification for all Non United States Entities

Please complete this section if the entity is <u>not</u> a *U.S. Person*

3.1  If the entity is a *Registered Foreign Financial Institution*, please tick one of the below categories, and
provide the entity's *FATCA GIIN at 3.1.1*.

(a)   Reporting Model 1 FFI

(b)   Registered Deemed Compliant Foreign Financial Institution (other than a reporting Model 1 FFI,
sponsored FFI, or non-reporting IGA FFI)

(c)   Reporting Model 2 FFI

(d)   Participating Foreign Financial Institution

3.1.1    Please provide your *Global Intermediary Identification
number (GIIN)*:

(if registration in progress indicate so)

3.2  If the entity is a *Financial Institution but unable to provide a GIIN or has a Sponsored Entity GIIN*,
please complete one of the below categories:

(a)   The Entity is a Sponsored Financial Institution (sponsored by another entity that has registered as a
Sponsoring Entity) and (select one):

i.   has no US reportable accounts, is a Sponsored FI in a Model 1 IGA jurisdiction and therefore not
required to obtain a Sponsored Entity GIIN.  Please provide the Sponsoring Entity's name and
GIIN.

Sponsoring Entity's
Name:

Sponsoring Entity's
GIIN:

Cont..

ii.   Its Sponsor has obtained a Sponsored Entity GIIN on its behalf.

Please provide the Sponsoring Entity's name and GIIN, and Sponsored Entity's GIIN.

Sponsoring Entity's Name: _____

Sponsoring Entity's GIIN: _____

Sponsored Entity's GIIN: _____

(b)   The Entity is a Trustee Documented Trust.  Please provide the Trustee's name and GIIN.

Trustee's Name: _____

Trustee's GIIN: _____

(c)   The Entity is a Certified Deemed Compliant, or otherwise Non-Reporting, Foreign Financial Institution (including a Foreign Financial Institution deemed compliant under Annex II of an IGA, except for a Trustee Documented Trust or Sponsored Financial Institution).

Indicate exemption: _____

(d)   The Entity is a Non-Participating Foreign Financial Institution

**3.3 If the entity is not a Foreign Financial Institution, please confirm the Entity's FATCA status below:**

(a)   The Entity is an *Exempt Beneficial Owner.*[1]

Indicate status: _____

(b)   The Entity is an *Active Non-Financial Foreign Entity.*[2]  Indicate qualifying criteria (see Exhibit A):

(c)   The Entity is a *Direct Reporting NFFE.*[3]  Please provide the Entity's GIIN.

Direct Reporting NFFE's GIIN: _____

(d)   The Entity is a *Sponsored Direct Reporting NFFE.*[4]  Please provide the Sponsoring Entity's name and GIIN.

Sponsoring Entity's Name: _____

Sponsoring Entity's GIIN: _____

Sponsored Entity's GIIN: _____

(e)   The Entity is a *Passive Non-Financial Foreign Entity.*[5]

---

[1] - *Exempt Beneficial Owner*" means any of the entities listed as such in Annex II.I of the US IGA or Section 1.1471-6 or 1.1471-6T of the U.S. Treasury Regulations. See additional notes in Exhibit A

[2] See definition of *Active Non-Financial Foreign Entity* in Exhibit A

[3] See US Treasury FATCA Regulations. 26 CFR 1.1472-1(c)(3)

[4] See US Treasury FATCA Regulations. 26 CFR 1.1472-1(c)(5)

[5] See definition of *Passive Non-Financial Foreign Entity* in Exhibit A

**If you have ticked 3.3(e)** *Passive Non-Financial Foreign Entity*, **please complete either i. OR ii. below**

i.   Indicate the full name, address, and tax reference type and number of any *Substantial U.S. Owners*.

*If the Entity has chosen to use the definition of 'Substantial U.S. Owner' from the U.S. Treasury Regulations in lieu of the definition of 'Controlling Person' as permitted under Article 4(7) of the Agreement between the Government of the Cayman Islands and the Government of the United States of America to Improve International Tax Compliance and to Implement FATCA, please complete the table below providing details of any Substantial U.S. Owners.[6]*

*Note: The decision to utilize the definition of 'Substantial U.S. Owner' in lieu of Controlling Person is only permitted with respect to PART II: US IGA.*

| Full Name | Full residence address | Tax reference type and number |
|---|---|---|
|  |  |  |
|  |  |  |

OR

ii.   Alternatively, if you wish to use the Controlling Person definition as per the CRS definition in Exhibit B then please complete the following:

Please indicate the name of any *Controlling Person(s)*[7]:

| Full Name of any Controlling Person(s) |
|---|
|  |
|  |

**Please complete Part IV below providing further details of any ultimate Controlling Persons who are natural persons**

---

[6]   See definition of *Substantial U.S. Owner(s)* in Exhibit A.

[7]   See definition of *Controlling Person(s)* in Exhibit A.

**PART III: Common Reporting Standard**

### Section 4: Declaration of All Tax Residency [repeat any residences indicated in Part II, Section 2 (US)]

Please indicate the Entity's place of tax residence (if resident in more than one jurisdiction please detail all jurisdictions and associated tax reference number type and number).

For the purposes of the Common Reporting Standard (CRS), all matters in connection with residence are determined in accordance with the CRS and its Commentaries.

If an entity has no residence for tax purposes please indicate the jurisdiction in which its place of effective management is situated. Please indicate not applicable if jurisdiction does not issue or you are unable to procure a tax reference number or functional equivalent, and indicate the reason below.

| Jurisdiction(s) of tax residency | Tax reference number type | Tax reference number (e.g. TIN) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

If applicable, please specify the reason for non-availability of a tax reference number:

**Section 5: CRS Classification**

Provide your CRS classification by checking the corresponding box(es). Note that CRS classification does not necessarily coincide with your classification for US FATCA purposes.

5.1   If the entity is a *Financial Institution*[8], please tick this box and specify the type of Financial Institution in (a), (b), or (c) below[9]:

   (a)   Reporting Financial Institution under CRS. (Please note this classification only applies to a Financial Institution in a CRS Participating Jurisdiction. If the entity is a Financial Institution in a Non-Participating Jurisdiction[10] under CRS, proceed to 5.1 (c)).

   OR

   (b)   Non-Reporting Financial Institution under CRS. (Please note this classification only applies to a Financial Institution in a CRS Participating Jurisdiction. If the entity is a Financial Institution in a Non-Participating Jurisdiction under CRS, proceed to 5.1 (c)). Specify the type of Non-Reporting Financial Institution below:

   Governmental Entity

   International Organization

   Central Bank

   Broad Participation Retirement Fund

   Narrow Participation Retirement Fund

   Pension Fund of a Governmental Entity, International Organization, or Central Bank

   Exempt Collective Investment Vehicle

   Trust whose trustee reports all required information with respect to all CRS Reportable Accounts

   Qualified Credit Card Issuer

   Other Entity defined under the domestic law as low risk of being used to evade tax.

   Specify the type provided in the domestic law:

   OR

   (c)   Financial Institution resident in a Non-Participating Jurisdiction under CRS. Specify the type of Financial Institution below:

   i.   Investment Entity managed by another Financial Institution[11] where a controlling ownership interest is held (directly or indirectly) by a company listed on a stock exchange and subject to disclosure requirements or is a majority owned subsidiary of such a company.

   ii.   Investment Entity managed by another Financial Institution (other than i. above)

   Note: If you are either:

   (a)   a widely-held, regulated Collective Investment Vehicle (CIV) established as a trust; OR

   (b)   a pension fund established as a trust,

   you may apply the Controlling Persons test of a <u>legal person</u> as per the Controlling Person definition in Exhibit B, and where simplified due diligence procedures are permitted to be applied by the Financial Institution under the applicable AML regime[12] in relation to the Account Holder and its Controlling Persons, no further information is required.

---

[8]   See definition of *Financial Institution* in Exhibit B.

[9]   Where the entity is resident in a Participating Jurisdiction, use the terms as defined under the CRS regime in that jurisdiction. Where the entity is resident in a Non-Participating Jurisdiction, definitions under the Cayman Islands CRS regime must be used.

[10]   See definition of *Non-Participating Jurisdiction* in Exhibit B.

[11]   The managing Financial Institution must be a Financial Institution other than an Investment Entity type b) defined within the definition of a Financial Institution in Exhibit B.

[12]   Please contact the Financial Institution to confirm whether simplified due diligence procedures under the Cayman Islands AML regime may apply to you as an Account Holder (e.g. by being a regulated pension fund in an approved jurisdiction).

If you have ticked the box for 5.1(c) ii, and neither of the exemptions under (a) and (b) above applies, please indicate the name of the *Controlling Person(s)* in the table below.

| Full Name of any Controlling Person(s). *Please see definition in Exhibit B.* *(This table must not be left blank unless exemption (a) or (b) above applies)* |
| --- |
| |
| |
| |
| |
| |
| |
| |

Please also complete Part IV below providing further details of any ultimate Controlling Person(s) who are natural person(s).

iii.   Other Investment Entity (other than i. or ii. above); OR

iv.   Other Financial Institution, including a Depository Institution, Custodial Institution, or Specified Insurance Company.

**5.2**  If the entity is an *Active Non-Financial Entity* ("NFE") please tick this box and specify the type of Active NFE below:

(a)   Corporation that is regularly traded or a related entity of a regularly traded corporation.

Provide the name of the stock exchange where traded: _____

If you are a related entity of a regularly traded corporation, provide the name of the regularly traded corporation:

_____

(b)   Governmental Entity, International Organization, a Central Bank, or an Entity wholly owned by one or more of the foregoing; OR

(c)   Other Active Non-Financial Entity.  Indicate qualifying criteria (see Exhibit B):

_____

**5.3**  If the entity is a *Passive Non-Financial Entity* please tick this box.[13]

If you have ticked this box please indicate the name of the *Controlling Person(s)*. Please refer to the definition of Controlling Person in Exhibit B.

| Full Name of any Controlling Person(s) | *(must not be left blank)* |
| --- | --- |

---

[13]   Please see the definition of *Passive Non-Financial Entity* in Exhibit B.

Please complete Part IV below providing further details of any ultimate Controlling Person(s) who are natural person(s).

## Entity Declaration and Undertakings

I/We declare (as an authorised signatory of the Entity) that the information provided in this form is, to the best of my/our knowledge and belief, accurate and complete.   I/We undertake to advise the recipient promptly and provide an updated Self-Certification form within 30 days where any change in circumstances occurs, which causes any of the information contained in this form to be inaccurate or incomplete.   Where legally obliged to do so, I/we hereby consent to the recipient sharing this information with the relevant tax information authorities.

I/we acknowledge that it is an offence to make a self-certification that is false in a material particular.

Authorised Signature: _____   Authorised Signature:
_____

Position/
Title:                                                     Position/Title:

Date (dd/mm/yyyy):            /        /            Date (dd/mm/yyyy):            /        /

**PART IV: Controlling Persons**

(please complete for each Controlling Person who is a natural person)

**Section 6 – Identification of a Controlling Person**

**6.1 Name of Controlling Person:**

Family Name or Surname(s):

First or Given Name:

Middle Name(s):

**6.2 Current Residence Address:**

Line 1 (e.g. House/Apt/Suite Name, Number, Street)

Line 2 (e.g. Town/City/Province/County/State)

Country:

Postal Code/ZIP Code:

**6.3 Mailing Address:** *(please complete if different from 6.2)*

Line 1 *(e.g. House/Apt/Suite Name, Number, Street)*

Line 2 *(e.g. Town/City/Province/County/State)*

Country:

Postal Code/ZIP Code:

**6.4 Date of birth[14]** *(dd/mm/yyyy)*        ____ / ____ / ____

**6.5    Place of birth[15]**

Town or City of Birth

Country of Birth

**6.6 Please enter the legal name of the <u>relevant</u> entity Account Holder(s) of which you are a Controlling Person**

Legal name of Entity  1

Legal name of Entity  2

Legal name of Entity  3

---

[14]   The Controlling Person's date of birth is not required to be collected if the Controlling Person is not a Reportable Jurisdiction Person

[15]   The Controlling Person's place of birth is not required to be collected if the Controlling Person is not a Reportable Jurisdiction Person

**Section 7 – Jurisdiction of Residence for Tax Purposes and related Taxpayer Reference Number or functional equivalent ("TIN")**

Please complete the following table indicating:

(i)      *where the Controlling Person is tax resident;*

(ii)     *the Controlling Person's TIN for each jurisdiction indicated;[1] and,*

(iii)    *if the Controlling Person is a tax resident in a jurisdiction that is a Reportable Jurisdiction(s) then please also complete Section 10 "Type of Controlling Person".*

*If the Controlling Person is tax resident in more than three jurisdictions please use a separate sheet*

|   | Jurisdiction(s) of tax residency | Tax reference number type | Tax reference number (e.g. TIN) |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |

If applicable, please specify the reason for non-availability of a tax reference number:

_____

---

[1]   The Controlling Person's TIN is not required to be collected if the Controlling Person is not a Reportable Jurisdiction Person.

## Section 8 – Type of Controlling Person

*(Please only complete this section if you are tax resident in one or more Reportable Jurisdictions)*

| Please provide the Controlling Person's Status by ticking the appropriate box. | Entity 1 | Entity 2 | Entity 3 |
|---|---|---|---|
| a.   Controlling Person of a legal person - *control by ownership* | | | |
| b.   Controlling Person of a legal person - *control by other means* | | | |
| c.   Controlling Person of a legal person - *senior managing official* | | | |
| d.   Controlling Person of  a trust - *settlor* | | | |
| e.   Controlling Person of a trust - *trustee* | | | |
| f.   Controlling Person of a trust - *protector* | | | |
| g.   Controlling Person of  a trust - *beneficiary* | | | |
| h.   Controlling Person of a trust - *other* | | | |
| i.   Controlling Person of a legal arrangement (non-trust) - *settlor-equivalent* | | | |
| j.   Controlling Person of a legal arrangement (non-trust) - *trustee-equivalent* | | | |
| k.   Controlling Person of  a legal arrangement (non-trust) - *protector-equivalent* | | | |
| l.   Controlling Person of a legal arrangement (non-trust) - *beneficiary-equivalent* | | | |
| m.   Controlling Person of a legal arrangement (non-trust) - *other-equivalent* | | | |

**Controlling Person Declaration and Undertakings**

- I acknowledge that the information contained in this form and information regarding the Controlling Person(s) and any Reportable Account(s) may be reported to the tax authorities of the jurisdiction in which this account(s) is/are maintained and exchanged with tax authorities of another jurisdiction(s) in which [I/ the Controlling Person] may be tax resident pursuant to international agreements to exchange financial account information.

- I certify that either (a) I am the Controlling Person, or am authorised to sign for the Controlling Person, of all the account(s) held by the entity Account Holder to which this form relates; or (b) I am authorised by the Account Holder to make this declaration.

- I declare that all statements made in this declaration are, to the best of my knowledge and belief, correct and complete.

- I acknowledge that it is an offence to make a self-certification that is false in a material particular.

- I undertake to advise the recipient within 30 days of any change in circumstances which affects the tax residency status of the individual identified in Part IV of this form or causes the information contained herein to become incorrect, and to provide the recipient with a suitably updated self-certification and Declaration within 30 days of such change in circumstances.

Signature: _____

Print name:

Date (dd/mm/yyyy):  _____ / _____ / _____

Note: If you are not the Controlling Person, and not authorised to sign the Declaration on behalf of the Account Holder, please indicate the capacity in which you are signing the form on behalf of the Controlling Person.  If signing under a power of attorney or other equivalent written authorisation, on behalf of the Controlling Person, please also attach a certified copy of the power of attorney or written authorisation.

Capacity:

**EXHIBIT A**

**US IGA DEFINITIONS**

*Account Holder* means the person listed or identified as the holder of a Financial Account by the Financial Institution that maintains the account. A person, other than a Financial Institution, holding a Financial Account for the benefit or account of another person as agent, custodian, nominee, signatory, investment advisor, or intermediary, is not treated as holding the account for purposes of this Agreement, and such other person is treated as holding the account. For purposes of the immediately preceding sentence, the term "Financial Institution" does not include a Financial Institution organized or incorporated in a U.S. Territory. In the case of a Cash Value Insurance Contract or an Annuity Contract, the Account Holder is any person entitled to access the Cash Value or change the beneficiary of the contract. If no person can access the Cash Value or change the beneficiary, the Account Holder is any person named as the owner in the contract and any person with a vested entitlement to payment under the terms of the contract. Upon the maturity of a Cash Value Insurance Contract or an Annuity Contract, each person entitled to receive a payment under the contract is treated as an Account Holder.

*Active Non-Financial Foreign Entity* means any NFFE which is a Non U.S. entity that meets any of the following criteria:

(a) Less than 50 percent of the NFFE's gross income for the preceding calendar year or other appropriate reporting period is passive income and less than 50 percent of the assets held by the NFFE during the preceding calendar year or other appropriate reporting period are assets that produce or are held for the production of passive income;

(b) The stock of the NFFE is regularly traded on an established securities market or the NFFE is a Related Entity of an Entity the stock of which is traded on an established securities market;

(c) The NFFE is organized in a U.S. Territory and all of the owners of the payee are bona fide residents of that U.S. Territory;

(d) The NFFE is a non-U.S. government, a government of a U.S. Territory, an international organization, a non-U.S. central bank of issue, or an Entity wholly owned by one or more of the foregoing;

(e) substantially all of the activities of the NFFE consist of holding (in whole or in part) the outstanding stock of, and providing financing and services to, one or more subsidiaries that engage in trades or businesses other than the business of a Financial Institution, except that an NFFE shall not qualify for this status if the NFFE functions (or holds itself out) as an investment fund, such as a private equity fund, venture capital fund, leveraged buyout fund or any investment vehicle whose purpose is to acquire or fund companies and then hold interests in those companies as capital assets for investment purposes;

(f) The NFFE is not yet operating a business and has no prior operating history, but is investing capital into assets with the intent to operate a business other than that of a Financial Institution; provided, that the NFFE shall not qualify for this exception after the date that is 24 months after the date of the initial organization of the NFFE;

(g) The NFFE was not a Financial Institution in the past five years, and is in the process of liquidating its assets or is reorganizing with the intent to continue or recommence operations in a business other than that of a Financial Institution;

(h) The NFFE primarily engages in financing and hedging transactions with or for Related Entities that are not Financial Institutions, and does not provide financing or hedging services to any Entity that is not a Related Entity. provided that the group of any such Related Entities is primarily engaged in a business other than that of a Financial Institution; or

(i) The NFFE is an "excepted NFFE" as described in relevant U.S. Treasury Regulations; or

(j) The NFFE meets all of the following requirements:

    i) It is established and maintained in its country of residence exclusively for religious, charitable, scientific, artistic, cultural, athletic or educational purposes; or it is established and operated in its jurisdiction of residence and it is a professional organization, business league, chamber of commerce, labour organization, agricultural or horticultural organization, civic league or an organization operated exclusively for the promotion of social welfare;

    ii) It is exempt from income tax in its country of residence;

    iii) It has no shareholders or members who have a proprietary or beneficial interest in its income or assets;

    iv) The applicable laws of the Entity's country of residence or the Entity's formation documents do not permit any income or assets of the Entity to be distributed to, or applied for the benefit of, a private person or non- charitable Entity other than pursuant to the conduct of the Entity's charitable activities, or as payment of reasonable compensation for services rendered, or as payment representing the fair market value of property which the Entity has purchased; and

    v) The applicable laws of the Entity's country of residence or the Entity's formation documents require

that, upon the Entity's liquidation or dissolution, all of its assets be distributed to a governmental entity or other non-profit organization, or escheat to the government of the Entity's jurisdiction of residence or any political subdivision thereof.

*Code* means the U.S Internal Revenue Code of 1986, as amended.

*Controlling Person* means the natural persons who exercise direct or indirect control over an entity.  In the case of a trust, such term means the settlor, the trustees, the protector (if any), the beneficiaries or class of beneficiaries, and any other natural person exercising ultimate effective control over the trust, and in the case of a legal arrangement other than a trust, such term means persons in equivalent or similar positions. The term 'Controlling Persons' shall be interpreted in a manner consistent with the Financial Action Task Force Recommendations ("FATF").

FATF Recommendations on Controlling Persons:

Identify the beneficial owners of the customer and take reasonable measures to verify the identity of such persons, through the following information. For legal persons[2]:

(a)  The identity of the natural persons (if any - as ownership interests can be so diversified that there are no natural persons (whether acting alone or together) exercising control of the legal person or arrangement through ownership) who ultimately have a controlling ownership interest[3] in a legal person; and

(b)  to the extent that there is doubt under (a) as to whether the person(s) with the controlling ownership interest are the beneficial owner(s) or where no natural person exerts control through ownership interests, the identity of the natural persons (if any) exercising control of the legal person or arrangement through other means.

(c)  Where no natural person is identified under (a) or (b) above, financial institutions should identify and take reasonable measures to verify the identity of the relevant natural person who holds the position of senior managing official.

*Entity* means a legal person or a legal arrangement such as a trust.

*Exempt Beneficial Owners* under the US IGA include Government entities, International Organisations, Central Bank, Broad Participation Retirement Funds, Narrow Participation Retirement Funds, Pension Funds of an Exempt Beneficial Owner, and Investment Entities wholly owned by Exempt Beneficial Owners. Please refer to the IGA for detailed definitions.

*Financial Institution* means a Custodial Institution, a Depository Institution, an Investment Entity, or a Specified Insurance Company, where:

(a)  *Custodial Institution* means any entity that holds, as a substantial portion of its business, financial assets for the account of others. An entity holds financial assets for the account of others as a substantial portion of its business if the entity's gross income attributable to the holding of financial assets and related financial services equals or exceeds 20 percent of the Entity's gross income during the shorter of: (i) the three-year period that ends on 31 December (or the final day of a non-calendar year accounting period) prior to the year in which the determination is being made; or (ii) the period during which the entity has been in existence;

(b)  *Depository Institution* means any entity that accepts deposits in the ordinary course of a banking or similar business;

(c)  *Investment Entity* means any entity that conducts as a business (or is managed by an entity that conducts as a business) one or more of the following activities or operations for or on behalf of a customer: (1) trading in money market instruments (cheques, bills, certificates of deposit, derivatives, etc.); foreign exchange; exchange, interest rate and index instruments; transferable securities; or commodity futures trading; (2) individual and collective portfolio management; or (3) otherwise investing, administering, or managing funds or money on behalf of other persons. The term Investment entity shall be interpreted in a manner consistent with similar language set forth in the definition of "financial institution" in the Financial Action Task Force Recommendations; and

(d)  *Specified Insurance Company* means any entity that is an insurance company (or the holding company of an insurance company) that issues, or is obligated to make payments with respect to, a Cash Value Insurance Contract or an Annuity Contract.

*NFFE* means any Non-U.S. Entity that is not a Financial Institution as defined in US FATCA.

*Non-U.S. Entity* means an Entity that is not a U.S. Person.

*Passive Non-Financial Foreign Entity* means any NFFE that is not an Active Non-Financial Foreign Entity.

---

[2]   Measures (a) to (b) are not alternative options, but are cascading measures, with each to be used where the previous measure has been applied and has not identified a beneficial owner.

[3]   A controlling ownership interest depends on the ownership structure of the company. It may be based on a threshold, e.g. any person owning more than a certain percentage of the company (e.g. 25%).

***Related Entity*** An entity is a *Related Entity* of another entity if either entity controls the other entity, or the two entities are under common control. For this purpose control includes direct or indirect ownership of more than 50 percent of the vote or value in an entity. Notwithstanding the foregoing, either Party may treat an entity as not a related entity if the two entities are not members of the same affiliated group, as defined in Section 1471(e)(2) of the Code.

***Specified U.S. Person*** means a U.S. Person other than:

(a)  a corporation the stock of which is regularly traded on established securities markets;

(b)  any corporation that is a member of the same expanded affiliated group;

(c)  the United States or any wholly owned agency or instrumentality thereof;

(d)  any State of the United States, any U.S. Territory, any political subdivision or wholly owned agency or instrumentality of any one or more of the foregoing;

(e)  any organization exempt from taxation under section 501 (a) of the Internal Revenue Code (the "Code") or certain individual retirement plans defined in section 7701(a)(37) of the Code ;

(f)  any bank as defined in section 581 of the Code;

(g)  any real estate investment trust as defined in section 856 of the Code;

(h)  any regulated investment company defined in section 851 of the Code or any entity registered with the U.S. Securities and Exchange Commission under the Investment Company Act of 1940;

(i)  any common trust fund as defined in section 584(a) of the Code;

(j)  any trust that is exempt from tax under section 664(c) of the Code or that is described in 4947(a)(1) of the Code;

(k)  a dealer in securities, commodities, or derivative financial instruments that is registered as such under the laws of the United States or any State;

(l)  a broker as defined in section 6045(c) of the Code; or

(m) any tax-exempt trust under a plan that is described in section 403(b) or section 457(g) of the Code

***Substantial U.S. Owner*** (as defined in Regulations section 1.1473-1(b)) means generally:

(a)  With respect to any foreign corporation, any Specified U.S. Person that owns, directly or indirectly, more than 10 percent of the stock of such corporation (by vote or value);

(b)  With respect to any foreign partnership, any Specified U.S. Person that owns, directly or indirectly, more than 10 percent of the profits interests or capital interests in such partnership; and

(c)  In the case of a trust·

    i.  Any Specified U.S. Person treated as an owner of any portion of the trust under sections 671 through 679 of the IRC; and

    ii.  Any Specified U.S. Person that holds, directly or indirectly, more than 10 percent of the beneficial interests of the trust.

***U.S. Person*** means a U.S. citizen or resident individual, a partnership or corporation organized in the United States or under the laws of the United States or any State thereof, a trust if (i) a court within the United States would have authority under applicable law to render orders or judgments concerning substantially all issues regarding administration of the trust, or (ii) one or more U.S. persons have the authority to control all substantial decisions of the trust, or an estate of a decedent that is a citizen or resident of the United States. Refer to the U.S. Internal Revenue Code for further interpretation.

EXHIBIT B

CRS DEFINITIONS

*Account Holder* means the person listed or identified as the holder of a Financial Account by the Financial Institution that maintains the account. A person, other than a Financial Institution, holding a Financial Account for the benefit or account of another person as agent, custodian, nominee, signatory, investment advisor, or intermediary, is not treated as holding the account for purposes of the Common Reporting Standard, and such other person is treated as holding the account. In the case of a Cash Value Insurance Contract or an Annuity Contract, the Account Holder is any person entitled to access the Cash Value or change the beneficiary of the contract. If no person can access the Cash Value or change the beneficiary, the Account Holder is any person named as the owner in the contract and any person with a vested entitlement to payment under the terms of the contract. Upon the maturity of a Cash Value Insurance Contract or an Annuity Contract, each person entitled to receive a payment under the contract is treated as an Account Holder.

*Active Non-Financial Entity* means any NFE that meets any of the following criteria:

a)  less than 50% of the NFE's gross income for the preceding calendar year or other appropriate reporting period is passive income and less than 50% of the assets held by the NFE during the preceding calendar year or other appropriate reporting period are assets that produce or are held for the production of passive income;

b)  the stock of the NFE is regularly traded on an established securities market or the NFE is a Related Entity of an Entity the stock of which is regularly traded on an established securities market;

c)  the NFE is a Governmental Entity, an International Organisation, a Central Bank, or an Entity wholly owned by one or more of the foregoing;

d)  substantially all of the activities of the NFE consist of holding (in whole or in part) the outstanding stock of, or providing financing and services to, one or more subsidiaries that engage in trades or businesses other than the business of a Financial Institution, except that an Entity does not qualify for this status if the Entity functions (or holds itself out) as an investment fund, such as a private equity fund, venture capital fund, leveraged buyout fund, or any investment vehicle whose purpose is to acquire or fund companies and then hold interests in those companies as capital assets for investment purposes;

e)  the NFE is not yet operating a business and has no prior operating history, but is investing capital into assets with the intent to operate a business other than that of a Financial Institution, provided that the NFE does not qualify for this exception after the date that is 24 months after the date of the initial organisation of the NFE;

f)  the NFE was not a Financial Institution in the past five years, and is in the process of liquidating its assets or is reorganising with the intent to continue or recommence operations in a business other than that of a Financial Institution;

g)  the NFE primarily engages in financing and hedging transactions with, or for, Related Entities that are not Financial Institutions, and does not provide financing or hedging services to any Entity that is not a Related Entity, provided that the group of any such Related Entities is primarily engaged in a business other than that of a Financial Institution; or

h)  the NFE meets all of the following requirements:

i)  it is established and operated in its jurisdiction of residence exclusively for religious, charitable, scientific, artistic, cultural, athletic, or educational purposes; or it is established and operated in its jurisdiction of residence and it is a professional organisation, business league, chamber of commerce, labour organisation, agricultural or horticultural organisation, civic league or an organisation operated exclusively for the promotion of social welfare;

ii)  it is exempt from income tax in its jurisdiction of residence;

iii)  it has no shareholders or members who have a proprietary or beneficial interest in its income or assets;

iv)  the applicable laws of the NFE's jurisdiction of residence or the NFE's formation documents do not permit any income or assets of the NFE to be distributed to, or applied for the benefit of, a private person or non- charitable Entity other than pursuant to the conduct of the NFE's charitable activities, or as payment of reasonable compensation for services rendered, or as payment representing the fair market value of property which the NFE has purchased; and

v)  the applicable laws of the NFE's jurisdiction of residence or the NFE's formation documents require that, upon the NFE's liquidation or dissolution, all of its assets be distributed to a Governmental Entity or other non-profit organisation, or escheat to the government of the NFE's jurisdiction of residence or any political subdivision thereof.

*Controlling Person* means the natural persons who exercise direct or indirect control over an entity.

In the case of a trust, such term means the settlor(s), the trustees(s), the protector(s) (if any), the beneficiary(ies) or class(es) of beneficiaries, and any other natural person(s) exercising ultimate effective control over the trust, and in the case of a legal arrangement other than a trust, such term means persons in equivalent or similar positions. The term 'Controlling Persons' shall be interpreted in a manner consistent with the Financial Action Task Force Recommendations ("FATF").

<u>FATF Recommendations on Controlling Persons:</u>

Identify the beneficial owners of the customer and take reasonable measures to verify the identity of such persons, through the following information. <u>For legal persons</u>[4]:

(a) The identity of the natural persons (if any - as ownership interests can be so diversified that there are no natural persons (whether acting alone or together) exercising control of the legal person or arrangement through ownership) who ultimately have a controlling ownership interest[5] in a legal person; and

(b) to the extent that there is doubt under (a) as to whether the person(s) with the controlling interest are the beneficial owner(s) or where no natural person exerts control through ownership interests, the identity of the natural persons (if any) exercising control of the legal person or arrangement through other means.

(c) Where no natural person is identified under (a) or (b) above, financial institutions should identify and take reasonable measures to verify the identity of the relevant natural person who holds the position of senior managing official.

*Financial Institution* means a Custodial Institution, a Depository Institution, an Investment Entity, or a Specified Insurance Company, where:

(a) *Custodial Institution* means any entity that holds, as a substantial portion of its business, financial assets for the account of others. An entity holds financial assets for the account of others as a substantial portion of its business if the entity's gross income attributable to the holding of financial assets and related financial services equals or exceeds 20 percent of the Entity's gross income during the shorter of: (i) the three-year period that ends on 31 December (or the final day of a non-calendar year accounting period) prior to the year in which the determination is being made; or (ii) the period during which the entity has been in existence;

(b) *Depository Institution* means any entity that accepts deposits in the ordinary course of a banking or similar business;

(c) *Investment Entity* means any entity :

(A) that primarily conducts as a business one or more of the following activities or operations for or on behalf of a customer:

i) trading in money market instruments (cheques, bills, certificates of deposit, derivatives, etc.); foreign exchange; exchange, interest rate and index instruments; transferable securities; or commodity futures trading;

ii) individual and collective portfolio management; or

iii) otherwise investing, administering, or managing Financial Assets or money on behalf of other persons; or

(B) the gross income of which is primarily attributable to investing, reinvesting, or trading in Financial Assets, if the entity is managed by another entity that is a Depository Institution, a Custodial Institution, a Specified Insurance Company, or an Investment Entity described in limb (A) of this definition.

An entity is treated as primarily conducting as a business one or more of the activities described in limb (A), or an entity's gross income is primarily attributable to investing, reinvesting, or trading in Financial Assets for purposes of limb (B) if the entity's gross income attributable to the relevant activities equals or exceeds 50% of the entity's gross income during the shorter of: (i) the three-year period ending on 31 December of the year preceding the year in which the determination is made; or (ii) the period during which the entity has been in existence. The term "Investment Entity" does not include an entity that is an Active Non-Financial Foreign Entity because it meets any of the criteria in subparagraphs d) through (g) of the definition of Active NFE.

The preceding paragraph shall be interpreted in a manner consistent with similar language set forth in the definition of "financial institution" in the Financial Action Task Force Recommendations; and

(d) *Specified Insurance Company* means any entity that is an insurance company (or the holding company of an insurance company) that issues, or is obligated to make payments with respect to, a Cash Value Insurance Contract or an Annuity Contract.

---

[4]   Measures (a) to (b) are not alternative options, but are cascading measures, with each to be used where the previous measure has been applied and has not identified a beneficial owner.

[5]   A controlling ownership interest depends on the ownership structure of the company. The threshold in respect of a legal person is direct or indirect ownership or control of 10% or more of the shares or voting rights in the legal person, being the threshold specified by the Anti-Money Laundering Regulations, 2017 which implement the FATF Recommendations in the Cayman Islands.

*Non-Financial Entity* or *NFE* means any Entity that is not a Financial Institution.

*Non-Participating Jurisdiction* means a jurisdiction that is not a Participating Jurisdiction.

*Non-Reporting Financial Institution* means any Financial Institution that is:

(a) a Governmental Entity, International Organisation or Central Bank, other than with respect to a payment that is derived from an obligation held in connection with a commercial financial activity of a type engaged in by a Specified Insurance Company, Custodial Institution, or Depository Institution;

(b) a Broad Participation Retirement Fund; a Narrow Participation Retirement Fund; a Pension Fund of a Governmental Entity, International Organisation or Central Bank; or a Qualified Credit Card Issuer;

(c) any other Entity that presents a low risk of being used to evade tax, has substantially similar characteristics to any of the Entities described in subparagraphs B(1)(a) and (b), and is defined in domestic law as a Non-Reporting Financial Institution, provided that the status of such Entity as a Non-Reporting Financial Institution does not frustrate the purposes of the Common Reporting Standard;

(d) an Exempt Collective Investment Vehicle; or

(e) a trust to the extent that the trustee of the trust is a Reporting Financial Institution and reports all information required to be reported pursuant to Section I with respect to all Reportable Accounts of the trust.

*Participating Jurisdiction* means a jurisdiction (i) with which an agreement is in place pursuant to which it will provide the information specified in Section I (of the CRS), and (ii) which is identified in a published list.

*Participating Jurisdiction Financial Institution* means (i) any Financial Institution that is resident in a Participating Jurisdiction, but excludes any branch of that Financial Institution that is located outside such Participating Jurisdiction, and (ii) any branch of a Financial Institution that is not resident in a Participating Jurisdiction, if that branch is located in such Participating Jurisdiction.

*Passive Non-Financial Entity* means any: (i) Non-Financial Entity that is not an Active Non-Financial Entity; or (ii) an Investment Entity described in limb B (or subparagraph A(6)(b) of the Standard) of the definition of Investment Entity that is not a Participating Jurisdiction Financial Institution.

*Related Entity* means an entity related to another entity because (i) either entity controls the other entity; (ii) the two entities are under common control; or (iii) the two entities are Investment Entities described limb B of the definition of Investment Entity, are under common management, and such management fulfils the due diligence obligations of such Investment Entities. For this purpose control includes direct or indirect ownership of more than 50 % of the vote and value in an Entity.