# PX137

## TELEGRAM – INDICATION OF INTEREST

The terms described in this Indication of Interest are not exhaustive and are not intended to be legally binding between the parties hereto. This Indication of Interest: (i) is intended as a statement of the parties' mutual intentions only; (ii) is not intended to be, and shall not constitute, a binding or enforceable agreement between the parties; and (iii) is not intended to impose any obligation whatsoever on either party, unless otherwise expressly stated herein.

| | |
|---|---|
| Deal structure | ■ Issuance and sale by a direct or indirect subsidiary (the "**Issuer**") of Telegram Group Inc. of a new cryptocurrency called "**Grams**", which will be issued following the development and launch of a new blockchain platform (the "**TON Network**"). |
| | ■ The parties intend to use proceeds generated by the sale of Grams to develop and launch the TON Network and develop associated functionality within Telegram Messenger. |
| Gram pricing | ■ The Issuer intends to offer the ability to subscribe for Grams through a "**Pre-Sale**" and a "**Subsequent Sale**." A maximum of US$850.0 million worth of Grams is available to be subscribed for in the Pre-Sale, which is scheduled to close on or before February 9, 2018. The Subsequent Sale is expected to commence on or about March 20, 2018 and, while the number of Grams available for subscription in the Subsequent Sale is not currently known, the Issuer currently anticipates offering US$1.15 billion worth of Grams in the Subsequent Sale. |
| | ■ Based on the Pre-Sale's expected maximum subscription of US$850.0 million worth of Grams, the pricing formula for Grams described in Section A.4. of the "Telegram Open Network" technical white paper (the "**Technical White Paper**") implies an average price of US$0.37756101 per Gram subscribed for in the Pre-Sale (such average price as calculated based on the actual number of Grams subscribed for during the Pre-Sale, the "**Pre-Sale Purchase Price**"). Each Gram subscribed for in the Pre-Sale will be priced at the applicable Pre-Sale Purchase Price. |
| | ■ Purchasers in the Subsequent Sale will be required to subscribe for a minimum of US$1.0 million worth of Grams. Based on an assumed aggregate of US$1.15 billion worth of Grams subscribed for in the Subsequent Sale (and US$850.0 million worth of Grams subscribed for in the Pre-Sale), the pricing formula for Grams described in Section A.4. of the Technical White Paper implies an average price of approximately US$1.45 per Gram subscribed for in the Subsequent Sale (such average price as calculated based on the actual number of Grams subscribed for during the Subsequent Sale, the "**Subsequent Sale Purchase Price**"). Each Gram subscribed for in the Subsequent Sale will be priced at the applicable Subsequent Sale Purchase Price. |

FOIA Confidential Treatment Requested By ▮

| | |
|---|---|
| Indication of interest in respect of Grams | ▪ The Purchaser is interested in subscribing for _____ Grams in the Pre-Sale (the "**Gram Indication of Interest**") for a total assumed purchase amount of up to US$_____ (the "**Purchase Amount**"). |
| Purchase Agreement | ▪ The Issuer, Telegram Group Inc. and the undersigned purchaser (the "**Purchaser**") shall enter into a purchase agreement for Grams (the "**Purchase Agreement**"). |
| | ▪ The Purchase Agreement shall provide for (i) the payment of the Purchase Amount by the Purchaser on or prior to the Payment Date (as defined therein), which is currently expected to be February 9, 2017, and (ii) the issuance of Grams by the Issuer on the date (the "**Network Launch Date**") of the public release of a version of the TON Network after completion of the test launch and security audits, as determined by the Issuer in its sole discretion (the "**Network Launch**"). |
| | ▪ The parties hereto shall work expeditiously towards signing a definitive Purchase Agreement by no later than February 9, 2018. |
| Lock-up | ▪ The Purchase Agreement shall contain a lock-up provision (the "**Lock-Up**") under which each Purchaser in the Pre-Sale shall agree and undertake that during the period of 18 months from and including the Network Launch Date, the Purchaser shall not, without the prior written consent of the Issuer: |
| | (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by the Purchase Agreement or any Grams, or any securities convertible into or exercisable or exchangeable for the investment contract represented by the Purchase Agreement or any Grams, or publicly disclose the intention to make any such offer, sale, pledge or disposition; or |
| | (b) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by the Purchase Agreement or any Grams, |
| | whether any such transaction described in paragraphs (a) or (b) above is to be settled by delivery of the investment contract represented by the Purchase Agreement or any Grams, in cash or otherwise; provided, however, that: |
| | (i) one-quarter of the Grams of such Purchaser purchased in the Pre-Sale shall be released from the restrictions in the Lock-Up on the date that is three months following the |

2

FOIA Confidential Treatment Requested By

|  |  |
|---|---|
|  | Network Launch Date; |
|  | (ii) one-quarter of the Grams of such Purchaser purchased in the Pre-Sale (which, when added to the Grams released under paragraph (i) above, equals one-half of the Grams of such Purchaser purchased in the Pre-Sale) shall be released from the restrictions in the Lock-Up on the date that is six months following the Network Launch Date; and |
|  | (iii) one-quarter of the Grams of such Purchaser purchased in the Pre-Sale (which, when added to the Grams released under paragraphs (i) and (ii) above, equals three-quarters of the Grams of such Purchaser purchase in the Pre-Sale) shall be released from the restrictions in the Lock-Up on the date that is 12 months following the Network Launch Date; |
|  | provided, further, that the Lock-Up shall not apply to transfers of Grams to an affiliate (as defined in the Purchase Agreement) of the Purchaser to the extent that such affiliate signs a lock-up agreement with the Issuer containing substantially identical terms to the above. |
| Termination | ▪ The obligation to issue Grams pursuant to the Purchase Agreement shall automatically terminate upon the earlier of: |
|  | (a) the occurrence of (i) a voluntary termination of operations of the Issuer; (ii) a general assignment for the benefit of the creditors of the Issuer; or (iii) any other liquidation, dissolution or winding up of the Issuer, whether voluntary or involuntary (each of clauses (i), (ii) and (iii), a "**Dissolution Event**"); and |
|  | (b) 31 October 2019 (the "**Deadline Date**"), if the Network Launch has not occurred as of such date, |
|  | provided that, subject to certain exceptions enumerated in the Purchase Agreement, the Issuer shall repay to the Purchaser the Purchase Amount upon the occurrence of a Dissolution Event or immediately following the Deadline Date, as applicable. |
| Other | ▪ When returning this document, the Purchaser should specify in its covering e-mail the source of funds that it expects to fund a purchase of Grams. The Issuer will not accept a purchase of Grams conditioned on financing. |
|  | ▪ When returning this document, the Purchaser should specify in its covering e-mail any internal approvals that have been obtained prior to submitting this document, as well as any additional internal approvals that will be required prior to executing the Purchase Agreement. The Purchaser should also include a |

3

FOIA Confidential Treatment Requested By ▉

|  |  |
|---|---|
|  | statement as to any material external conditions or approvals (shareholder, regulatory or otherwise) required to execute the Purchase Agreement, and specify the timeframe necessary for meeting all conditions and obtaining all approvals. The Purchaser should also include any other relevant information which might influence its ability to execute the Purchase Agreement in a timely fashion. |
| Expenses | ▪ No expense reimbursement shall be provided by the Issuer for counsel to the Purchaser or for any other expenses of the Purchaser. Each party shall be liable for its own costs in investigating and negotiating the transaction (including this document and any binding transaction documentation). |
| Confidentiality | ▪ The Purchaser undertakes (a) to keep this Indication of Interest and any other information provided to the Purchaser or its representatives by or on behalf of the Issuer or Telegram Group Inc. secret at all times, (b) not to disclose such information or allow it to be disclosed in whole or in part to any third party without the prior written consent of the Issuer, and (c) not to use such information in whole or in part for any purpose other than in connection with its subscription for Grams. The Purchaser undertakes to take all reasonable measures to ensure the confidentiality of this Indication of Interest and any other information provided to the Purchaser or its representatives by the Issuer or Telegram Group Inc. |
| Non-binding nature | ▪ Save for the sections "Expenses", "Confidentiality", "Non-binding nature" and "Governing law and dispute resolution", this document shall not be a binding or legally enforceable agreement or commitment by the parties to negotiate towards or conclude any agreement in relation to the transactions contemplated hereby and shall not give rise to any other legal consequences or create any binding obligations on any of the parties. |
|  | ▪ The content of any executed Purchase Agreement as expressly set out therein shall represent the entire understanding and will constitute the entire agreement among the Purchaser, the Issuer and Telegram Group Inc. in relation to the subject matter thereof and the transactions contemplated thereby, and shall supersede all previous agreements, understandings or arrangements (whether express, implied, oral or written (whether or not in draft form)) among the Purchaser, the Issuer and/or Telegram Group Inc. with respect thereto. |
| Governing law and dispute resolution | ▪ This document and any claim, dispute or difference (including non-contractual claims, disputes or differences) arising out of, or in connection with, this document or its subject matter shall be governed by, and construed in accordance with, English law. |

4

- Any dispute, controversy or claim arising out of or in connection with this document, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by binding arbitration under the Rules of Arbitration of the London Court of International Arbitration. The place of arbitration shall be London, England. There shall be three arbitrators, and the parties agree that one arbitrator shall be nominated by the Issuer and one arbitrator shall be nominated by the Purchaser, in each case for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairperson of the tribunal, shall be nominated by agreement of the two party-appointed arbitrators within fourteen days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court.

5

FOIA Confidential Treatment Requested By

**For and on behalf of the Purchaser**

Name of Purchaser: ▮▮▮▮▮▮▮▮

By: ▮▮▮▮

Name: ▮▮▮▮

Title: General Counsel

Date: January 17, 2018

**For and on behalf of Telegram Group Inc.**

By: ....................................

Name: ....................................

Title: ....................................

Date: ....................................

6

FOIA Confidential Treatment Requested By ▮▮▮