# PX197

## Sales Agent Services Agreement

This Agent Services Agreement (the "Agreement") is entered as of January 15, 2018, by and among:

(1) **Telegram Corp.**, whose registered office is at Global Bank Tower, 18th Floor, 50th Avenue, P.O. Box 55 2484, Paitilla, Panama City, Panama (the "**Company**"); and

(2) **Pacific Spirit Ltd.**, whose registered office is at Suite 3, 1st Floor, La Ciotat Building, Mont Fleuri, Mahe, Seychelles (the "**Agent**").

Each of the parties may hereinafter be referred to as a "**Party**" and collectively as the "**Parties**".

WHEREAS the Company wishes to engage the Agent for the purpose of soliciting orders for and selling of Telegram Open Network (TON) tokens and Tokens Purchase Agreement (TPA) on TON tokens (each or collectively the "**Tokens**");

AND WHEREAS the Agent wishes to act in such capacity in accordance with the terms and conditions herein contained;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Company and the Agent hereto agree as follows:

1. **Purpose.** The Company hereby appoints the Agent on a non-exclusive basis as its agent for the sole purposes of soliciting orders for, and selling Tokens in accordance with the terms and conditions of this Agreement during the Initial Coin Offering of the TON project (the "ICO"). Each Party hereby acknowledges and agrees that, as at the date hereof, the framework for the ICO has not yet been finalised and accordingly the Agent shall consent to amend the terms of this Agreement as may be required or desirable for compliance by the Company, the Agent and/or the ICO process itself with any law or regulation (whether in Europe, the United States or otherwise) applicable to the ICO.

   The Agent shall serve the Company at all times faithfully, diligently, in good faith and in accordance with the terms of this Agreement and shall not allow its interests to conflict with its duties under this Agreement.

   The Parties acknowledge and agree that the Agent shall be prohibited at any time from appointing or engaging any subcontractor(s) to carry out any or all of its obligations under this Agreement (or entering into any arrangements with equivalent effect).

2. **Target amount.** The target total volume of tokens to be sold during the ICO will be specified by the Company after the initial evaluation of the existing demand. For indication purpose only the Parties consider US$850 mil (USD 850,000,000) as a potential target volume for the first round of the ICO that shall be executed in January-February 2018 (the "**First Round**") and up to US$1.15 bln (USD 1,150,000,000) as a potential target volume for the second round of the ICO that shall be executed in March-April 2018 (the "**Second Round**").

3. **Term and termination.** This Agreement shall be effective on the signing date and continue in full force and effect for a term of 6 months. Either Party may terminate this agreement with immediately effect by giving written notice to the other if:

   a. the other Party commits a material breach of any term of this agreement which breach is irremediable or (if such breach is remediable) fails to remedy such breach within 10 working days after being notified in writing to do so;

   b. the other Party repeatedly breaches any of the terms of this Agreement in such a manner as to reasonably justify the opinion that its conduct is inconsistent with it having the intention or ability to give effect to the terms of this Agreement;

   c. the other Party suspends or threatens to suspend, payment of its debts, is unable to pay its debts as they fall due, admits inability to pay its debts or is deemed unable to pay its debts within the meaning of section 123 of the Insolvency Act 1986;

   d. any petition, order or application is made or filed in connection with the winding up of the other Party, or any administrator is applied over that Party;

   e. any event occurs, or proceedings taken, with respect to the other Party in any jurisdiction to which it is subject that has an effect similar or equivalent to any of the events mentioned in clause 3(a)-(d) above; or

   f. the other Party is in breach of its compliance obligations in clause 1, clause 4, clause 14, clause 15, clause 17, clause 18 and/or clause 20 of this Agreement.

   On termination of this Agreement, clauses 6, 14, 15, 19 and 21 shall continue in force and such termination shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages in respect of any breach of the agreement existing at or before the termination date and including the right of the Agent to claim commission in accordance with clauses 12 and 13 of this Agreement. The Parties agree that the Agent shall only be entitled to commissions as defined in the clause 12 of this Agreement if the Agent has complied with its obligations pursuant to this Agreement in all material respects.

4. **Title.** The Agent shall: (i) have the right to introduce John Hayman as the Chief Investment Advisor and Ilya Perekopsky as Investment Advisor to the Company but only in respect of the ICO; (ii) be able to use the corporate email address and other communicational channels of the Company to introduce and negotiate deals with potential buyers but shall have no authority, and shall not hold itself out, or permit any person to hold itself out, as being authorised to bind the Company in any way or to be a director or officer of the Company and shall not do any act

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TLGRM-015-00000017

which might reasonably create the impression that the Agent is so authorised; (iii) not make or enter into any contracts or commitments or incur any liability for or on behalf of the Company; and (iv) disclose the restrictions on its authority outlined in this clause 4 to any person approached by the Agent in connection with its obligations under this Agreement.

5. **Indemnification.** Each Party hereby agrees to indemnify the other and hold it harmless from any loss, costs or other obligations and liabilities for any reason in respect of any breach or non-performance of this Agreement, agreements related to the sale of Tokens and agreements with Tokens purchaser (including, for the avoidance of doubt, in respect of the Company, any breach by the Agent of clause 4). The Agent is not responsible for the delivery and quality of Tokens as well as for actions taken by the Company or claims regarding Tokens and TON project unless attributable to the actions of the Agent and the Company shall not be responsible for any costs, fees or expenses of the Agent. For the avoidance of any doubt, the Parties agree that the Agent shall not be responsible for any damages incurred to the Tokens purchasers arising directly from any act or omission of the Company.

6. **Ongoing help.** The Company shall provide the Agent with legal and marketing documentation reasonably requested by the Agent and necessary for the purposes of the sales process and deal closing. For avoidance of doubts the Company shall provide (including but not limited to) the latest version of Whitepaper and updates to it: project teaser; investment deck; the standard TPA agreement; all other available marketing materials and project descriptions for the sole purpose of being used by the Agent in accordance with the terms of this Agreement. The Company is solely responsible for preparation of the legal documentation and necessary legal analysis related to the ICO and sale of Tokens. The Agent is ready to consult the Company on preparation of documentation when it's necessary. The CEO of the Company agrees to participate in meetings with potential buyers of Tokens that can be appointed by the Agent from time to time.

7. **Verification of marketing materials.** The Agent shall obtain the prior written consent of the Company on all larger marketing materials it creates before using them to promote the ICO and Tokens among potential buyers. These materials shall include teasers, decks, written pitches and videos. For the purposes of this clause 8 it is agreed by the Parties, that the prior written consent can be obtained in a form of a Telegram message received by the Agent from the Company's CEO.

8. **Tokens price.** The exact price of one TON for the ICO purposes will be specified by the Company based on evaluation of the existing demand.

9. **Minimum investment.** The Company will introduce a minimum investment for each and any third party investor that can directly deal with the Company during the ICO.

10. **Limitation on purchase.** The Company hereby confirms that it will not accept purchases from any third party investor for the amount below the limit mentioned in the Section 10 y. The Company accepts only fiat transfers unless the Agent receives the prior written consent of the Company.

11. **Commission.** For the services rendered by the Agent pursuant to this Agreement, the Agent shall be entitled to commissions at:
    a. the rate of 3% (three per cent.) upon the wholesale price of Tokens sold during the First Round and
    b. the rate of 1% (one per cent.) upon the wholesale price of Tokens sold during the Second Round.

    Any commission paid pursuant to this clause 12 shall be inclusive of any value added tax or sales tax which may be due in any jurisdiction in connection with this Agreement, and the Agent shall be solely responsible for accounting for and paying any such taxes.

    Any disputes regarding the quantum or payment of commission pursuant to this Agreement shall be referred to the Company's auditors for settlement and their decision shall, save in the case of manifest error, be binding on both Parties.

    The Company acknowledges and agrees that it is the present expectation of the Agent that costs and expenses in an amount of up to 10% of commission received shall be incurred in the course of carrying out the services provided for in this Agreement ("**Agent Expenses**"). The Agent acknowledges and agrees that, without prejudice to the right of the Agent to receive commission in accordance with the terms of this Agreement, the Company shall not be liable (whether directly or indirectly) for such Agent Expenses.

12. **Payment.** The Commission shall be paid by the Company in form of USD or EUR currency in two instalments to the account specified by the Agent in a separate notice:
    a. the commission according to the clause 12.a shall be paid within 7 days after completion of the First Round.
    b. the commission according to the clause 12.b shall be paid within 7 days after completion of the Second Round.

13. **Confidentiality.** The Company and the Agent each undertakes to the other that: (i) it shall not at any time during this agreement, and for a period of five years thereafter termination or expiry of this agreement, disclose to any person any confidential information concerning the business, affairs, customers, clients or suppliers of the other Party or of any member of the group of companies to which the other Party belongs, excepted as expressly permitted by this 14; and (ii) it shall not use the other's confidential information for any purpose other than to perform its obligations under this agreement.

    The Company and the Agent shall each be permitted to disclose the other's confidential information: (i) subject to the relevant Party procuring compliance by such person(s) with the terms of this clause, to its employees, officers,

representatives and advisers on a need to know basis only for the purposes of carrying out its obligations under this Agreement; and (ii) as may be required by law, a court of competent jurisdiction or any governmental or regulatory authority.

14. **Return of confidential information.** The Agent hereby undertakes to the Company that all documents and other records (in whatever form) containing confidential information supplied to or acquired by the Agent from the Company shall be returned promptly to the Company on termination or expiry of this agreement, and no copies shall be kept, whether digitally or otherwise.

15. **Other agents.** The Company hereby confirms that in case it hires another agents to provide similar services that are described herein then the Company shall notify the Agent on such decision.

16. **Data Protection.** Each Party shall: (i) process any personal data processed in connection with this Agreement in accordance with the Data Protection Act 1998 and any other applicable data protection legislation; (ii) process such data only so far as is necessary for the purpose of performing its obligations under this agreement; and (iii) indemnify the other against all claims and proceedings and all liability, loss costs and expenses incurred by the other as a result of any claim made or brought by a data subject or other legal person in respect of any loss, damage or distress caused to them as a result of that Party's unauthorised processing, unlawful processing, destruction of and/or damage to any personal data processed in connection with this Agreement by that Party, its employees or agents.

17. **Compliance with law.** Each Party shall at its own expense comply with all laws, regulations and sanctions applicable to its activities under this agreement from time to time. The Agent undertakes to the Company to:

    a. comply with all applicable laws, statutes and regulations relating to anti-bribery and anti-corruption including, but not limited to, the Bribery Act 2010;

    b. not engage in any activity, practice or conduct outside the UK which would constitute an offence under sections 1,2 or 6 of the Bribery Act 2010 if such activity, practice or conduct had been carried out inside the UK;

    c. immediately notify the Company in writing if: (i) any request or demand is made to the Agent for any undue financial or other advantage of any kind or such advantage is received by the Agent in connection with the performance of its obligations under this Agreement; and (ii) a foreign public official (as such term is interpreted in the Bribery Act 2010 and guidance issued under such act) becomes an officer or employee of the Agent.

18. **Remedies.** Without prejudice to any other rights or remedies, it is acknowledged that damages might not be an adequate remedy for any breach of the provisions of this letter and that, accordingly, either Party shall be entitled, without proof of special damage, to seek the remedies of injunction and specific performance and other equitable remedies for any threatened or actual breach of the provisions of this Agreement.

19. **Assignment.** The Company hereby confirms that the Agent can assign his rights and obligations hereunder once during the Term to a legal entity which in which the Agent is a beneficial owner subject to obtaining the Company's prior written consent thereto. At any other time, neither Party shall be entitled to assign or transfer any of its rights or obligations hereunder without the prior written consent of the other Party. For the avoidance of doubt, any assignee of rights under this agreement shall be considered a "Party" for the purposes of this Agreement and the relevant assignor shall procure that such assignee shall comply with the terms of this Agreement accordingly.

20. **Law and jurisdiction.** This Agreement shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the English courts.

21. **Termination of Prior Agreement.** Upon the effectiveness of this Agreement, the prior Sales Agent Service Agreement between the Company and Ilya Perekopskii dated November 29, 2017 (the "**Prior Service Agreement**") shall be terminated and be of no further force and effect, and shall be superseded and replaced in its entirety by this Agreement, save that such termination shall be without prejudice to any rights, remedies, liabilities or obligations that have accrued prior to such termination in connection with the Prior Service Agreement.

**From the Company**

Name, title: PAVEL DUROV
ATTORNEY

Signature: [signed]

**From the Agent**

Name, title: I.A. Perekopski

Signature: [signed]