# PX200

CONFIDENTIAL

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF NEW YORK
 3
       ---------------------------------x
 4                                      )
       SECURITIES AND EXCHANGE COMMISSION, )
 5                                      )
                        Plaintiff,      ) 19 Civ. 9439 (PKC)
 6                                      )
            v.                          )
 7                                      )
       TELEGRAM GROUP INC. and          )
 7     TON ISSUER INC.,                 )
 8                                      )
                        Defendants.     )
 9                                      )
       ---------------------------------x
10
11
12                       CONFIDENTIAL
13                 VIDEOTAPED DEPOSITION OF
14                       SHYAM PAREKH
15                    December 10, 2019
16
17
18                       Taken at:
19     Skadden, Arps, Slate, Meagher & Flom (UK) LLP
                         40 Bank Street
20                        Canary Wharf
                        London, E14 5DS
21
22
23
       Reported by:
24     AILSA WILLIAMS,
       Certified Court Reporter
25     JOB No. 191210MWC
```

1

```
 1   foreign entities that had either been denied an
 2   allocation or denied a request to reallocate, for
 3   various reasons.  We didn't ask you to identify
 4   them by name because of potential foreign privacy
 5   data concerns.  I have spoken with counsel over
 6   the break.
 7           What I am going to ask you now is if you
 8   look at Exhibit 2, see whether any of the names
 9   that are identified -- any of the entities that
10   are identified by name here were among the
11   entities that either were denied an initial
12   allocation or a reallocation.  Do you understand
13   my question?
14           A.   I do.  And you are happy for me to
15   cite the names of the entities?
16           MR. DRYLEWSKI:  If they appear in this
17   document then you can say the names.
18           A.   From memory, on page 4, █████████
19   had a conversation with me, asking about the
20   possibility to undertake transfer, and I have
21   explained the conditions under which that was
22   possible or not possible, and they dropped it at
23   that point because they didn't feel satisfied with
24   those conditions, presumably.  ████████████
25   ███████████████.  We don't have page numbers.
```

86

```
 1              Q.   No.
 2              A.   Similar discussion over the phone.
 3    Similarly, they dropped it.
 4              Q.   Sorry, you said ▓?
 5              A.   ▓, correct, ▓▓▓▓▓▓▓▓▓
 6    ▓▓▓▓.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, we are
 7    currently in discussions with them, because they
 8    appear to have -- it seems a somewhat complicated
 9    situation, where the entity was acquired and then
10    subsequently dissolved.  So we are trying to
11    ascertain the fact pattern to see whether that in
12    fact constituted a transfer, for which they needed
13    our permission.  So we are currently undergoing
14    that work.
15                   ▓▓▓, they wanted to undertake an
16    assignment.  They are however a sanctioned entity,
17    or one of their beneficiaries is a sanctioned
18    party, and as a result we are disputing the
19    validity of their assignment request.
20              Q.   Okay.
21              A.   Those are the ones off the top of my
22    head I recall.
23              Q.   Putting aside ▓▓▓, which you
24    indicated was a sanctioned entity, were any of the
25    requests for reallocation by those three entities
```

87

```
 1    the code, in order to sort of let those parties
 2    speak bilaterally, to help answer technical
 3    questions, because Telegram itself didn't have the
 4    resources and the bandwidth to work with either
 5    those exchanges or custodians.
 6           Q.   What efforts has Telegram undertaken
 7    to sign up vendors who would accept Grams as a
 8    form of payment for goods or services?
 9           MR. DRYLEWSKI:  Object to form.
10           A.   I can't comment.  I think you would
11    have to ask Ilya.
12           Q.   Are you aware of any vendors who
13    have agreed as of today to accept Grams as a form
14    of payment for any goods or services?
15           A.   I am not aware.
16           Q.   Have you seen in the news, for
17    example, that certain law firms have agreed to
18    accept Bitcoin in payment of legal bills?
19           A.   I actually have not seen that.
20           MR. DRYLEWSKI:  It's not Skadden.
21           MR. McGRATH:  That was my next question
22    and I don't think this requires the revealing of
23    any attorney/client communications, but counsel
24    will tell me otherwise.  Has Skadden agreed to
25    accept Grams in payment for legal --
```

163

CONFIDENTIAL

```
 1            Q.  I will just get some water.  What is
 2    your basis for answering "yes" to that question?
 3    How do you know that?
 4            A.  As you know, in early October, I
 5    sent out a communication on behalf of Telegram to
 6    all initial purchasers, essentially communicating
 7    that we were ready to launch by the end of the
 8    month, and setting out the procedures and the
 9    process, in terms of how the distribution of Grams
10    would work mechanically and what steps the
11    investors needed to take.
12            Q.  Understood.  So your answer was that
13    you sent out communications to investors advising
14    them what you have just said.  My question is how
15    did you know, what was the basis of your
16    information that the TON Blockchain was ready to
17    launch as of October 31, 2019, that formed the
18    communications that you sent?  In other words, who
19    told you that or how did you know it?
20            A.  Only the fact that we sent out this
21    official communication.
22            Q.  Right.  Did you draft that
23    communication?
24            A.  No.  I received the draft of the
25    communication and I may have made a few
```

170

```
 1    suggestions on wording changes, but the draft was
 2    provided to me.
 3           Q.  By whom?
 4           A.  I believe the draft was provided by
 5    Pavel.
 6           Q.  Did you have any communications with
 7    Pavel, prior to that communication going out to
 8    investors, as to whether or not in fact the TON
 9    Blockchain was ready to launch as of October 31,
10    2019?
11           A.  No.
12           Q.  Or with anyone else at Telegram?
13           A.  So I would have ongoing periodic
14    discussions with Ilya, who as I explained earlier
15    is my boss, and therefore he would keep me broadly
16    informed of the status of the project.
17           Q.  Okay, but just focusing particularly
18    on the state of the Blockchain as of the date that
19    the SEC's complaint was filed in this case, which
20    just for your reference was October 11, 2019, did
21    you have any communications with Ilya regarding
22    the status of the Blockchain ecosystem ability to
23    launch as of that point in time?
24           A.  Nothing that contradicted my
25    understanding that it was ready to go by the end
```

171

1  of the month.
2          Q.  Again, just for my understanding,
3  your understanding that it was ready to go at the
4  end of the month was based solely on the draft
5  communication that you had received from Pavel.
6  Is that fair to say?
7          MR. DRYLEWSKI:  Objection to form,
8  mischaracterizes the testimony.
9          A.  And, as I said, and plus the ongoing
10 interaction with Ilya, where in October and even
11 in September he had said we are on track for end
12 of October.
13         Q.  I may get to some of these documents
14 later, but I may not, but it would be fair to say
15 that there were certain status reports that you
16 forwarded to investors during the course of 2018
17 and 2019, apprizing them of the state of
18 development of the TON Blockchain ecosystem?
19         A.  Yes, that is correct.
20         Q.  As I recall, you would send an email
21 to investors and you would attach a status report
22 from time to time.  Is that correct?
23         A.  Some of the emails had attachments,
24 some didn't.
25         Q.  Did you draft any of the status

172

```
 1               CERTIFICATE OF COURT REPORTER
 2      I, Ailsa Williams, an Accredited Realtime
 3      Reporter, hereby certify that Shyam Parekh was
 4      duly sworn, that I took the Stenographic notes of
 5      the foregoing deposition and that the transcript
 6      thereof is a true and accurate record transcribed
 7      to the best of my skill and ability.  I further
 8      certify that I am neither counsel for, related to,
 9      nor employed by any of the parties to the action
10      in which the deposition was taken, and that I am
11      not a relative or employee of any attorney or
12      counsel employed by the parties hereto, nor
13      financially or otherwise interested in the outcome
14      of the action.
15
16

          A.I. Wil——

19
20
21      Signed: .................
22      AILSA WILLIAMS
23
24
25
```

276