# Exhibit K

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
                       Plaintiff,     )
 6                                    ) 19 Civ. 9439 (PKC)
           - against -                )
 7                                    )
     TELEGRAM GROUP INC. and          )
 8   TON ISSUER INC.,                 )
                                      )
 9                     Defendants.    )
     _____)
10
11        **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**
12
13             Videotaped deposition of PAVEL DUROV (as
14   30(b)(6) corporate representative of Defendants and
15   also in his personal capacity), Volume 1, taken on
16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar
17   Square, Building 3, Level 5, Downtown Dubai, Dubai,
18   United Arab Emirates, beginning at 11:21 a.m. and
19   ending at 9:54 p.m., on Tuesday, January 7, 2020,
20   before LEAH WILLERSDORF, Member of the British
21   Institute of Verbatim Reporters, Accredited Verbatim
22   Reporter, Qualified Realtime Reporter - Level 2,
23   International Participating Member NCRA.
24
25   JOB No. 200107LWI
                                                          1
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:12:36   1   regulations?
15:12:36   2            MR. DRYLEWSKI:  Let's just stop for one
15:12:38   3   second.  Can we go off the record --
15:12:40   4            MR. TENREIRO:  Sure.
15:12:40   5            MR. DRYLEWSKI:  -- and I can talk to you?
15:12:40   6            THE VIDEOGRAPHER:  We are going off the
15:12:42   7   record.  The time is 3:11.
15:12:45   8            (Off the record.)
15:21:45   9            THE VIDEOGRAPHER:  We are back on record.
15:21:46  10   The time is 3:21.
15:21:54  11   BY MR. TENREIRO:
15:21:54  12        Q.   Okay.  Before we went off the record I had
15:21:56  13   asked you, when you say you wanted to do things by the
15:21:58  14   book, one of the things that you had in your mind was
15:22:02  15   complying with potential securities regulations or
15:22:05  16   laws that might apply to the offering that you were
15:22:08  17   going to conduct?
15:22:13  18        A.   Yes.  I believe this was part of the
15:22:16  19   reason why we engaged with our counsel, and our goal
15:22:29  20   was, and is, to be compliant in all applicable
15:22:33  21   jurisdictions.  You know, it's -- obviously the United
15:22:38  22   States is one of them.
15:22:41  23        Q.   And have you heard of something called the
15:22:47  24   DAO Report?  D-A-O.
15:22:53  25        A.   I think I had heard about it, yes.
```

108

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:22:55  1          Q.   Do you recall when you first heard of it?
15:22:56  2               MR. DRYLEWSKI:  And I'd like you to think
15:22:59  3   about this answer.  If it comes from a conversation
15:23:03  4   with an attorney, I'd ask you to exclude that from
15:23:07  5   your answer.
15:23:07  6   BY MR. TENREIRO:
15:23:08  7          Q.   Well, can I clarify, I'm not -- when
15:23:11  8   I said "when," I mean just can you give me the month
15:23:14  9   or year.
15:23:14 10               MR. DRYLEWSKI:  Yeah.  I'm just --
15:23:15 11               MR. TENREIRO:  Is that okay?
15:23:16 12               MR. DRYLEWSKI:  That is fine.
15:23:16 13               MR. TENREIRO:  Okay.
15:23:17 14               MR. DRYLEWSKI:  And if you can answer that
15:23:18 15   question without revealing --
15:23:19 16               MR. TENREIRO:  Right.
15:23:20 17               MR. DRYLEWSKI:  -- who told you --
15:23:23 18               MR. TENREIRO:  Right.
15:23:23 19               MR. DRYLEWSKI:  -- but I just wanted
15:23:24 20   to pre-empt that in case you -- don't reveal any
15:23:27 21   attorney/client communications to the extent any took
15:23:29 22   place.
15:23:29 23               THE WITNESS:  Mmm-hmm.
15:23:30 24               MR. DRYLEWSKI:  Understood?
15:23:31 25               THE WITNESS:  Okay.
```

```
15:23:41   1              I think I first may have heard about it
15:23:43   2   somewhere in 2017.
15:23:44   3   BY MR. TENREIRO:
15:23:44   4        Q.   Okay.  And just for the record, what do
15:23:46   5   you understand -- I'm not asking you for legal
15:23:48   6   conclusions or anything like that, but if you had to
15:23:51   7   explain it in your own words, what do you understand
15:23:53   8   the DAO Report to be?
15:23:55   9              MR. DRYLEWSKI:  Objection to form.
15:24:32  10              THE WITNESS:  My understanding at the time
15:24:34  11   was that this DAO Report was related to a certain
15:24:43  12   token or blockchain-related offering that may have not
15:24:54  13   been done in accordance to all applicable laws and
15:24:59  14   regulations in the United States.
15:25:02  15   BY MR. TENREIRO:
15:25:03  16        Q.   And -- okay.
15:25:06  17             Now, Mr. Durov, we were discussing the
15:25:09  18   structuring of the offering -- of the private
15:25:10  19   placement, the pre-sale and the Stage A.  Do you
15:25:13  20   recall discussing that with me a few moments ago?
15:25:17  21        A.   Pre-sale and Stage A?
15:25:19  22        Q.   Right.
15:25:20  23        A.   Yeah, we discussed that.
15:25:22  24        Q.   Okay.  Was there a point in time when you
15:25:24  25   were considering raising funds that you considered
```

110

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:25:29  1  a different structure?  And by this I just mean
15:25:32  2  Telegram.  Was there a point in time in which Telegram
15:25:35  3  considered some other structure rather than what
15:25:37  4  actually happened, which was pre-sale plus Stage A?
15:26:02  5         A.   Yes.  I think at some early stages we
15:26:07  6  thought that a public offering, at least in certain
15:26:25  7  jurisdictions, could also be part of the process.
15:26:34  8         Q.   Public offering of what?
15:26:55  9         A.   This is a very good question that, after
15:27:06 10  being carefully studied and explored by us, eventually
15:27:09 11  led us to not engage in any public offering of that
15:27:17 12  kind, because we believed, at least as far as the
15:27:33 13  United States jurisdiction is concerned, that a public
15:27:41 14  offering of a right to receive Grams in the future
15:27:47 15  could be treated as an unregistered security.
15:28:13 16  And while there were several players in the market at
15:28:27 17  that time that were credible, or at least projected
15:28:31 18  a very credible image that have engaged in these kind
15:28:40 19  of activities, at least outside of the United States,
15:28:50 20  it was not fully clear how this -- how such an
15:29:01 21  offering could be implemented practically across all
15:29:07 22  jurisdictions in a way that would avoid us to decrease
15:29:18 23  complexity and unnecessary risks.
15:29:28 24              This is why we eventually gave up the idea
15:29:32 25  to conduct a public offering of interest in Grams.
```

111

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:29:44   1         Q.   When you were considering the public
15:29:47   2    offering, I think you mentioned of a right to receive
15:29:51   3    Grams in the future; is that correct?
15:29:55   4         A.   I believe that's what I said, yes.
15:29:57   5         Q.   Okay.  So can you explain what you meant
15:29:59   6    by that, when you -- so my question is, when you were
15:30:03   7    considering the public offering, contemplating
15:30:06   8    entering into purchase agreements such as the one
15:30:10   9    we just saw in Exhibit 41 -- sorry, it wasn't 41.  43.
15:30:24  10    Yeah, that's that one.
15:30:25  11         A.   Okay.
15:30:25  12         Q.   Sorry, let me start again.
15:30:27  13              When you were considering the public
15:30:29  14    option, was Telegram considering entering into
15:30:31  15    purchase agreements with members of the public such as
15:30:33  16    the one in Exhibit 43?
15:30:40  17         A.   This was a very early stage and we --
15:30:47  18    I don't believe we thought it through down to,
15:31:00  19    you know, the tiniest detail.  We knew, based on what
15:31:16  20    we saw at the market at that time, that there were
15:31:22  21    certain companies that seemed to be credible and
15:31:29  22    seemed to have attracted interest from institutional
15:31:36  23    investors that were either contemplating a public
15:31:40  24    offering or having done a public offering of that
15:31:49  25    kind.  At first we thought that might be a path
```

112

```
17:43:22   1   to contact anyone at the SEC?
17:43:44   2               MR. DRYLEWSKI:  Objection; form.
17:43:52   3               THE WITNESS:  You mean before which date?
17:43:55   4   BY MR. TENREIRO:
17:43:56   5        Q.   Before the date of -- when you began the
17:43:59   6   private placement.
17:44:13   7        A.   By beginning the private placement, do you
17:44:15   8   mean our first interactions with potential purchasers?
17:44:18   9        Q.   Yes.
17:44:41  10        A.   I think at that period in time we were
17:44:46  11   still in the process of finalizing the contours of the
17:44:50  12   private placement and we were doing a lot of research
17:45:01  13   and exploratory work, so we didn't -- so I don't
17:45:08  14   believe we reached out to the Securities and Exchange
17:45:21  15   Commission at that point, as we thought it was too
17:45:27  16   early due to the fact that we didn't know specifically
17:45:37  17   what we would be doing.
17:45:41  18        Q.   Okay.  And how about before you signed the
17:45:46  19   first purchase agreement?
17:45:48  20             I believe you, Mr. Durov, kind of signed
17:45:53  21   all the purchase agreements; is that correct?
17:45:55  22        A.   Yes.
17:45:56  23        Q.   Okay.  So before you, Mr. Durov, signed
17:45:58  24   the first purchase agreement, did you or anyone else
17:46:00  25   at Telegram reach out to the SEC with respect to the
```

| | | |
|---|---|---|
| 17:46:37 | 1 | private placement? |
| 17:46:37 | 2 |     A.   I don't think we reached out to the SEC |
| 17:46:40 | 3 | before I signed the first purchase agreement.  The way |
| 17:46:44 | 4 | we designed it is, the private placement, was that we |
| 17:46:59 | 5 | reserved a lot of flexibility to how the project and |
| 17:47:10 | 6 | its parts could look like, and this flexibility is |
| 17:47:17 | 7 | reflected in the purchase agreements and its |
| 17:47:20 | 8 | appendices. |
| 17:47:36 | 9 |     That gave us a comfort of knowing that |
| 17:47:44 | 10 | we would be able to change certain, if not all, |
| 17:47:49 | 11 | aspects of what we're trying to build based on the |
| 17:47:59 | 12 | feedback that we could receive from the regulators, |
| 17:48:04 | 13 | including the SEC, in the following months. |
| 17:48:08 | 14 |     Q.   So is it fair to say the answer to my |
| 17:48:10 | 15 | question is no, you do not? |
| 17:48:13 | 16 |     A.   No; that was the first sentence, |
| 17:48:17 | 17 | I believe. |
| 17:48:17 | 18 |     Q.   Okay.  Now, in terms of the remainder of |
| 17:48:21 | 19 | your answer and the flexibility, is it fair to say |
| 17:48:24 | 20 | that you today still retain that flexibility to |
| 17:48:46 | 21 | change ... |
| 17:48:48 | 22 |     Right.  Is it fair to say that -- so you |
| 17:48:48 | 23 | said the way you designed it was that you had |
| 17:48:52 | 24 | flexibility to change some features of the project. |
| 17:49:03 | 25 | Is it fair to say that you, to this day, retain that |

159

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

REPORTER CERTIFICATE

I, the undersigned, an Accredited Verbatim Reporter in the United Kingdom, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Date: January 9, 2020

_____
LEAH M. WILLERSDORF
Accredited Verbatim Reporter,
Member of the British Institute of
Verbatim Reporters,
Qualified Realtime Reporter (Level 2)
International Participating Member NCRA.

249