UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

                               :   19 Civ. 9439 (PKC)

                 Plaintiff,    :

                                 :   **ECF Case**

          -against-         :

                                 :   **Electronically Filed**

TELEGRAM GROUP INC. and TON ISSUER   :
INC,                                :

                                 :

             Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL 56.1 STATEMENT IN SUPPORT OF <u>ITS MOTION FOR SUMMARY JUDGMENT</u>

<div align="right">

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

*Attorneys for Defendants*

</div>

**Table of Contents**

Page

I.      Telegram Messenger ....................................................................................1

II.     The TON Offering ......................................................................................4

III.    The Offering Documents ............................................................................11

IV.     Telegram Marketed the Investment to Sophisticated and Reputable Investors ................34

V.      The Success of Telegram's Messenger Platform and the Strength of Its Team Led Investors to View TON as a Good Investment Opportunity, Likely to Generate Returns for their Firms .........................................................................37

        A.      Investors' Discussions with Telegram and Requests for Information ................37

        B.      Sworn Declarations Submitted by Eight Initial Purchasers ....................39

        C.      The Investors' Internal Investment Analyses ...........................50

VI.     Telegram Told Investors the Second Round Offering Was Completed in March 2018..................................................................................................56

VII.    Telegram Viewed Grams as Securities, and Referred to Them as Such ..........................59

VIII.   Telegram Began Discussions with a Number of Digital Asset Trading Platforms Starting in January 2018 and Continued These Discussions Right Up Until the Filing of the SEC's Lawsuit.............................................................62

IX.     As Investors Sought Liquidity, Grams Began Trading in the Secondary Market Immediately after the First Round of the Offering Closed ................................67

        A.      Hyman Makes Repeated Inquiries Regarding Secondary Trading and "Grey Market" ............................................................67

        B.      Investors Look to Buy and Sell Grams, and Telegram Is Aware of Much of these Efforts ..............................................................68

        C.      Liquid Lists Grams on Its Exchange, and Tells Telegram Beforehand................72

        D.      Other Exchanges Follow Liquid and List Grams ................................79

        E.      Other Resales ................................................................82

X.      Telegram Has Made Efforts to List Grams and to Develop the TON Blockchain and Ecosystem with the Help of Its Current and Former Business Associates ................84

        A.      Blackmoon ........................................................................87

i

B.       Gram Vault..................................................................................................91

C.       TON Ventures and TON Labs .................................................................94

XI.    Telegram Paid Promoters to Find Other Investors ............................................102

XII.   Investors' Expectation of Profit from the TON Investment Was Reasonable.................106

XIII.  Telegram Has Not Provided Investors with Financial and Other Information...............109

XIV.  TON's Validation Function ........................................................................111

XV.   Grams Will Be Securities at Launch................................................................117

XVI.  Other ....................................................................................................123

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and Section 4.G. of this Court's Individual Practices, Defendants Telegram Group Inc. ("Telegram") and TON Issuer Inc ("TON Issuer" and collectively with Telegram, "Defendants"), submit this response to Plaintiff's Local 56.1 Statement in Support of Its Motion for Summary Judgment.[1]

## I.    TELEGRAM MESSENGER

1.    Telegram Messenger[2] is a social media application that allows its users to communicate with each other, and to view contents of certain websites privately without running the risk of being surveilled.  (PX12, Durov Tr. at 41:9-25.)[3]

**Response to No. 1:      Undisputed for purposes of Plaintiff's motion but subject to clarification.  Telegram Messenger is a social media application that supports "a wide range of uses cases."  PX12 at 41:13-14.  Among other users, Telegram Messenger allows users to communicate privately and in groups, conduct voice over IP ("VOIP") calls, host large communities and publish broadcasts, create applications called "bots," create polls, share videos and access certain websites and news in a private way without the risk of surveillance.  *Id.* at 41:14-24.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

2.    Pavel Durov ("Durov"), Telegram's CEO, thinks of "Messenger" as synonymous with "Telegram."  (*Id.* at 35:14-37:16.)

---

[1] Citations to "Ex." refer to the exhibits attached to the Declarations in Opposition to Plaintiff's Motion for Summary Judgment, submitted concurrently herewith.  Exhibits attached to the Declaration of Alexander C. Drylewski ("Drylewski Declaration") (ECF No. 73), submitted in support of Defendants' Motion for Summary Judgment, are cited herein as "Drylewski Ex."  Exhibits attached to the Declaration of Christopher P. Malloy, submitted in opposition to Plaintiff's Motion for Summary Judgment, are cited herein as "Malloy Ex."  "Undisputed" means that facts are not disputed for purposes of the Plaintiff's Motion for Summary Judgment. Defendants reserve all rights to dispute any such facts at trial.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Parties' Joint Stipulation of Undisputed Facts (ECF No. 72).

[3] Exhibits to the Parties' Stipulation of Undisputed Facts are designated herein as "JX" followed by the exhibit number (e.g., JX1).  Exhibits to Plaintiff's Rule 56.1 Statement are attached to the Declaration of Ladan F. Stewart ("Stewart Declaration") (ECF. No. 81) and are designated herein as "PX" followed by the exhibit number (e.g., PX1).

**Response to No. 2:**      **Disputed.  Pavel Durov ("Pavel") testified he "use[s]" the name "Telegram" "in the same way a consumer would use this name, and they would mainly refer to the messaging application."  PX12 at 37:4-16.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

3.      From 2013 up until the time of the Telegram Open Network ("TON") offering (the "Offering"), Durov funded Messenger exclusively with his personal savings resulting from the sale of his social media network "VKontakte" or "VK."  (*Id.* at 47:20-48:16.)

**Response to No. 3:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

4.      Through 2017, Telegram's employees were principally focused on developing the Messenger application.  Today, the same team does work for both Telegram Messenger and the TON blockchain.  (*Id.* at 32:24-34:6.)

**Response to No. 4:**      **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that a "core team" of "about 25-30 [Telegram] employees" write programming code for Telegram Messenger and the TON Blockchain, and that efforts began in Summary 2017 to develop the TON project.  PX12 at 32:15-34:6; Malloy Ex. 1 at 65:3-9.**

5.      In 2017, Telegram had approximately 180 million monthly active users, whereas today it has approximately 300 million active users.  (*Id.* at 43:6-20.)

**Response to No. 5:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

6.      Telegram has full control over the servers for Telegram Messenger.  (*Id.* at 43:22-44:6.)

**Response to No. 6:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

7.      Telegram also pays for expenses relating to renting space to host the servers and networking equipment it uses for Messenger.  (*Id.* at 282:24-283:15.)

**Response to No. 7:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

8.      Telegram believes that the size and public perception of its brand could affect the perception of TON, such that if there are many users who are happy with Telegram, they would likely be interested to see if they can find a project developed by the same team.  (*Id.* at 88:7-89:12; 91:8-92:5.)

**Response to No. 8:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action, subject to clarification.  Pavel testified that if there are many users who are happy with Telegram, those users would likely be interested to see if they can find a project developed by the same team, "even recognizing the fact that this project will not be supported by the same team post launch."  PX12 at 88:7-89:12.**

9.      After the launch of TON, Telegram will continue to work on growing Messenger and its user base.  (*Id.* at 267:2-12.)

**Response to No. 9:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

10.      Telegram does not and has never charged users for either downloading or using its Messenger application in any way.  (*Id.* at 47:9-18.)

**Response to No. 10:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

11.      Telegram has never charged users a fee for using Messenger because it has a long term vision focused on growth, and believes it would not be commercially sensible to start charging users.  (*Id.* at 54:15-55:3.)

**Response to No. 11:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

12.      From the time of the Offering, "way over 90" percent of Telegram's expenses have been funded from Offering funds.  (*Id.* at 52:7-53:3.)

**Response to No. 12:      Disputed as inaccurate and misleading.  Pavel's quoted response relates to the $218 million of Private Placement proceeds spent between January 2018, and January 2019 in developing the TON Blockchain and on Messenger itself.  Malloy Ex. 4. Pavel testified that "the majority of Telegram's expenses" for the period January 2018 to January 2019 are stated in Exhibit 41.  PX12 at 52:7-53:3.  Pavel explained that he also used personal accounts to cover certain other expenses related to Telegram, such as rental**

3

and travel costs for his team.  *Id.* at 52:16-24.  **Expenses not covered by personal accounts constituted "way over 90%" of Telegram's expenses during that period.**  *Id.* **at 52:16-53:3.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

13.    Since the Offering, Telegram has not distinguished between the money spent on Messenger and money spent on TON.  (*Id.* at 62:16-63:10, 259:13-260:1.)

**Response to No. 13:    Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified "it was not entirely possible" to distinguish between funds spent on developing TON and funds spent on supporting Telegram Messenger.  PX12 at 259:13-260:1.  He stated that the same equipment and team members were employed for the same purposes.** *Id.* **Moreover, Telegram saw no reason to "add complexity by differentiating between those kinds of expenses."** *Id.* **Further, the cited information is irrelevant to Plaintiff's claims in this action.**

14.    Since the Offering, all of Telegram's coders have been involved in the development of TON as well as of Messenger.  (*Id.* at 69:8-20.)

**Response to No. 14:    Disputed as inaccurate and misleading.  Pavel testified that Telegram's "core team" of engineers have been involved in the development of the TON Blockchain as well as Messenger.  PX 12 at 69:8-20.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

15.    Because Telegram is a private company, Durov believes that it would be unusual for Telegram to start publishing its financial statements and he does not believe that such statements are relevant.  (*Id.* at 359:14-22.)

**Response to No. 15:    Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel explained that, as with everything Telegram does, this aspect may be reassessed in the future.  PX12 at 359:14-22.**

## II.    THE TON OFFERING

16.    In 2017, Messenger needed funds to keep buying more equipment and continue funding its growth.  (PX12 Durov. Tr. at 132:20-133:4, 137:20-24.)

**Response to No. 16:    Disputed as incomplete and misleading.  Pavel testified that Telegram "needed resources to fund its growth" and that "has always been the case." PX12 at 132:20-133:4.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

17.     One of Durov's friends and eventual investors suggested to Durov in August of 2017 that he (the friend) invest in Telegram and that Durov invest in the friend's company, to which Durov responded "at this point Telegram needs cash to keep buying more servers," but was non-committal on an equity investment.  (PX15 at TLGRM-017-000000553.)

**Response to No. 17:     Disputed as incomplete and inaccurate.  When asked whether the statement that "at this point Telegram needs cash to keep buying more servers," Pavel testified that "[i]t is true that Telegram needed resources to fund its growth" as "this has always been the case."  PX12 at 132:20-24.  He further clarified that he was having this conversation with a friend and he wanted to respond to his offer in "a polite way intended not to sound disrespectful or ungrateful."  PX12 at 133:16-25.  He explained that the "main reason" for declining this offer is that he does not invest in other companies other than his own.  PX12 at 137:6-19.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

18.     In September 2017, Durov told the same friend that Telegram was "likely to abandon [its] immediate plans to attract VCs capital unless somebody throws some insane offer [their] way," for example $500M for 10%.  (*Id.* at TLGRM-017-000000554.)

**Response to No. 18:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

19.     Telegram first considered doing a public offering but gave up the idea because a public offering in the United States could be treated as an unregistered security.

(PX12, Durov Tr. at 110:16-112:4.)

**Response to No. 19:     Disputed as incomplete and misleading.  Pavel testified that, after careful study and exploration of the issue, Telegram determined not to engage in a public offering.  PX12 at 110:16-112:4.  Pavel explained that it was "not fully clear . . . how such an offering could be implemented practically across all jurisdictions in a way that would [allow] us to decrease complexity and unnecessary risks."  *Id.*  Moreover, the term "public offering in the United States" lacks context.  Pavel testified that Telegram believed that "a public offering of a right to receive Grams in the future could be treated as an unregistered security" in the United States.  *Id.*  Further, Telegram chose to sell the right to receive Grams to the purchasers through Purchase Agreements because they wanted to take the safest route and work with only highly sophisticated purchasers in a Private Placement.  *See* Def. 56.1 ¶ 98.**

20.     Telegram's purpose when it was considering a private/public offering and for the Offering was the same—to raise funds for TON and Messenger's corporate purposes. (*Id.* at 115:21-116:24.)

**Response to No. 20:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  When asked whether the purpose of the then-contemplated public offering and eventual Private Placement were to "raise funds for the TON Blockchain, and other corporate purposes," Pavel testified that they were "more or less the same reasons."  PX12 at 115:21-116:24.  Further, Pavel clarified that Telegram also considered the views of the blockchain community and whether their methods would be "accepted by the blockchain community as reasonable and in line with the ethos of the decentralized philosophy."  *Id.***

21.     Selling equity was not a top option for Telegram because it was concerned it could affect the company's integrity, values, ethos, and what it stands for.  (*Id.* at 120:10-15.)

**Response to No. 21:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

22.     In January 2018, Durov told investors:  "We selected this offering size not only to give us sufficient capital to develop TON and the associated functionality within Telegram Messenger over the next number of years…."  (PX16 at TLGRM-011-00000040.)

**Response to No. 22:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The full text of passage quoted reads:**

> **"We selected this offering size not only to give us sufficient capital to develop TON and the associated functionality within Telegram Messenger over the next number of years, but also to facilitate an allocation process that will ensure that every investor that participated in it and is eligible to receive an allocation will receive one.  Throughout the process we have emphasized the importance of Grams being widely distribute, which we believe will allow Grams to function as a decentralized currency."**

**PX16 at TLGRM-011-00000040.**

23.     On or about January 16, 2018, Durov wrote: "Last year we considered raising funds via selling equity," which was "abandoned" in "favor of the current strategy" for "two fundraising stages."  (*Id.*)

**Response to No. 23:**      Disputed as incomplete and misleading.  The full text of passage Plaintiff quoted reads:

> We started a full-scale audit with [an auditor] last year when we considered raising funds via selling equity, had a few meeting with the [auditor's] London team. However, after we have abandoned the plans to sell equity in favor of the current strategy, this process was put on hold to focus on the cryptocurrency sale.
>
> We were planning to resume that process once the two fundraising stages I described earlier today have been completed.

**PX16 at TLGRM-011-00000038.**

24.      On or about January 24, 2018, Durov listed various questions he thought might be raised by investors, including "Use of funds on Telegram vs. TON."  He instructed his team to tell an investor, in response to a question about Telegram's intended use of funds from the Offering: "Our position here: ….. We see both TON and Telegram as Integral parts of the success of the project as Telegram provides the necessary user base and adoption to make the whole idea of mass market crypto-currency work. This is why we don't separate the use of funds between the two and will allocate resources where they are most needed. We also don't want to restrict ourselves to a rigid allocation of funds and budgets between TON and Telegram as we want to be able to compete and evolve in the constantly changing environment.  (PX17.)

**Response to No. 24:**      **Undisputed for purposes of Plaintiff's motions that Pavel made these statement in the cited material.  Disputed to the extent that Plaintiff asserts that Pavel "instructed his team" to use that answer in response to investor questions.**

25.      Durov also noted:  "No contingency or delays, our reputation and credibility will suffer if we delay and we are already motivated to launch according to the schedule.  If we fail to launch they will get all the remaining funds back.  If the [sic] are few/no remaining funds left and we haven't done any work they can hypothetically sue us for fraud/misrepresentation, the agreement allows for that."  (*Id.*)

7

**Response to No. 25:**     **Undisputed for purposes of Plaintiff's motion that Pavel made these statements in the cited material.**

26.     In connection with a banking application, Durov drafted a document in 2018 (PX12, Durov Tr. at 155:9–156:13), explaining that Telegram "does not plan to develop sources of revenue in the next three years, but will continue leveraging current capital to fund further growth."  (PX18 at TLGRM-012-00015929; *see also id.* at TLGRM-012-00015932 ("the company projects the budget for 2019 at $180 million and the budget for 2020 at $220 million . . . the company does not generate revenue at present, or plan to do so in the foreseeable future, and will rely on its substantial financial resources to fund this growth plan for the next several years.").

**Response to No. 26:**     **Disputed as inaccurate.  Pavel testified that the cited material "may have been included in the briefing pack that we would share with banking institutions in order to expand our banking relationships."  PX12 at 155:17-22.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

27.     When Telegram was coming up with the idea of TON, it "realized [it] would have to come up with a way of eventually distributing Grams" so they "decided to enter the purchase agreements with private purchasers" to do so.  (PX12, Durov Tr. at 89:14-90:22.)

**Response to No. 27:**     **Disputed as inaccurate, incomplete and misleading.  Pavel testified that, after realizing the TON Blockchain should be a "proof-of-stake system," Telegram "decided to enter into purchase agreements with private purchasers, in order to have a sufficient amount of value locked up in validator stakes in order for this blockchain to be secure[.]"  PX12 at 89:14-90:22.**

28.     On or about January 16, 2018, Durov told an investor that since they got such a high demand from institutional investors in the first round, "Telegram as a company won't have to sell Grams or any other cryptocurrency directly to its users."  He added: Throughout this process "we have emphasized the importance of Grams being widely distributed."  (PX16 at TLGRM-011-00000040.)  He also stated: "The counsel we got from

Skadden indicates that making the entire sale 100% institutional drastically decreases any

regulatory risks for Telegram, which is our goal." (*Id.* at TLGRM-011-00000041.)

**Response to No. 28:** **Disputed as inaccurate and misleading. The cited material is an email exchange between Pavel and a bank, not an investor. PX16. JSF ¶ 108. Moreover, the comment that Telegram has "emphasized the importance of Grams being widely distributed" comes from an email update to investors sent by Pavel to the same party. PX16 at TLGRM-011-00000040 ("This is the letter and a course of action we distributed among investors yesterday[.]"). The other two quotations, however, were not communications with purchasers in the Private Placement.**

29.    On or about May 3, 2018, Hyman told an investor that after the initial plan

change from a public to an initial so-called private offering, "principally for regulatory purposes"

that "retail investors have to wait for the blockchain launch." (PX19.)

**Response to No. 29:** **Disputed as incomplete and misleading. In response to an initial purchaser's question regarding an inaccurate Wall Street Journal ("WSJ") article, John Hyman ("Hyman") explained to the purchaser that Telegram's original plans "remain unchanged." PX19. Hyman stated, "If you recall we made it clear as far back as February that we would not do a public placing principally for regulatory purposes, [ ] at any point and that retail investors have to wait for the blockchain launch." PX19.**

30.    On the same day, Hyman told another investor:  "We decided for

regulatory reasons that we will never do any form of direct public offering." (PX20.)

**Response to No. 30:** **Disputed as incomplete and misleading. In response to an initial purchaser's question regarding the aforementioned WSJ article, Hyman explained that Telegram has decided against "any form of direct public offering," and that "the public will be able to buy [G]rams once network is working and wallets distributed on a secondary basis not from Telegram directly." PX20.**

31.    Hyman told another investor on May 3: "We had ruled out a public ico

back in January principally for regulatory reasons." (PX21.)

**Response to No. 31:** **Undisputed for purposes of Plaintiff's motion.**

32.    On or about May 7, 2018, Hyman responded to another investor who said

he had read about "a delay in the public ICO," by stating that the article "was inaccurate- had

decided back in January not to do a public ICO principally for regulatory reasons." (PX22.)

After noting that Telegram had "completed two private rounds" and was considering a third round, "subject to market conditions," he explained: "The public will get access to Grams post the blockchain launch which is on track for Q 4." (*Id.*)

**Response to No. 32:** **Undisputed for purposes of Plaintiff's motion.**

33.    Telegram employee Shyam Parekh ("Parekh") understood that the change from a private/public offering to the newly configured Offering was due to regulatory uncertainties about cryptocurrencies.  (PX14, Parekh Tr. at 25:12-26:25.)

**Response to No. 33:** **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Shyam Parekh ("Shyam") is currently a consultant engaged by Telegraph Inc., a former employee of Telegram Holdings UK Limited and a former consultant of Telegram.  JSF ¶ 29-32.  Shyam testified that, "in general terms," the understanding he was given was that because of the regulatory uncertainty around cryptocurrencies, "it was decided to take a very safe wider than wide approach and stick to private institutional only offerings."  PX14 at 26:8-22.**

34.    The price per Gram in each round of the offering was calculated by obtaining the average price of all the Grams that could be bought using the amounts raised in each round, under the Reference Price Formula.  (PX12, Durov Tr. at 126:20-127:8.)

**Response to No. 34:** **Undisputed for purposes of Plaintiff's motion but subject to clarification.  The price of Grams subscribed for in each round of the Private Placement was calculated as: (Total $ Valued Raised) / (Total Number of Grams Subscribed For).  JSF ¶145.  The "Total Number of Grams Subscribed For" was calculated as $(10^9) * I_n(1 + (\text{Total } \$ \text{ Value Raised})/((10^9) * P_n))$, where $P_n$ denotes the Reference Price of a Gram.  JSF ¶ 146.  The Reference Price of Grams at the beginning of each round was computed as $0.1 * e^{n*10^{-9}}$, where n denotes the total number of Grams subscribed for prior to that stage.  JSF ¶ 144.  Further, Pavel testified that, to calculate the price of Grams in each stage of the Private Placement "we would calculate the aggregate value of all the Grams sold in the offering, in this stage of the [P]rivate [P]lacement.  Then we would divide this sum of value of all Grams by the number of Grams sold.  That's how we would obtain the average price per Gram within a stage in the offering."  PX12 at 126:25-127:8.**

35.    The same set of Offering Documents were used for both the U.S. and the foreign investors.  (PX23 (Telegram's Response to Interrogatories) at 6, Response 1.)

**Response to No. 35:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

36.     Telegram used the "same standard of communications" with respect to

U.S. and non-U.S. investors.  (PX14, Parekh Tr. at 64:1-16.)

**Response to No. 36:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

37.     Fifty-eight percent of Grams contemplated to be issued were sold to

investors in the Offering.  (PX12, Durov Tr. at 275:21-25.)

**Response to No. 37:     Undisputed for purposes of Plaintiff's motion.**

### III.     THE OFFERING DOCUMENTS

38.     Ilya Perekopsky ("Perekopsky") and John Hyman ("Hyman") were

authorized by Telegram to use the Two Page Teaser to market Telegram's fundraising efforts.

(PX12, Durov Tr. at 150:1-20.)

**Response to No. 38:     Disputed as incomplete and misleading.  Pavel testified that the Two Page Teaser reflected Telegram's "thinking and plans at a certain point in time in late 2017."  PX12 at 150:1-20.  Further, Defendants note that:**

> **[I]n entering into the Purchase Agreements, [the purchasers] agreed not to rely on any representation, warranty, collateral contract, undertaking or other assurance (except the Issuer's Warranties, the Parent's Warranties and the Purchaser's Warranties and undertakings expressly set out in this Purchase Agreement, the Rep Letter Questionnaire, any Rep Letter and the KYC Form) made by or on behalf of any other Party before the signature of this Purchase Agreement, including during the course of negotiating this Purchase Agreement.**

**JX12 at 11.  Additionally, by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (¶ 6.3(f)); JX12 at 6 (¶ 6.3(f)).  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

39.     The Two-Page Teaser described the "Scope of Proposal" to include

"Participation in the private sale of Telegram Open Network (<<TON>>) tokens."  (JX3 at 1.)

**Response to No. 39:**        Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

40.    The Two-Page Teaser referred to a Simple Agreement for Future Tokens ("SAFT"). (*Id.* at 1.)

**Response to No. 40:**        Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

41.    The Two-Page Teaser stated: "The SAFT will give investors with the right to receive TON tokens… called Grams, after the deployment of the TON Blockchain in Q4 2018."  (*Id.* at 1.)

**Response to No. 41:**        Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

42.    The Two-Page Teaser stated: "The discount for private sale will exceed 50% of the initial public sale price, and the team expects it to exceed 70% of the price of the last token sold."  (*Id.* at 1.)

**Response to No. 42:**        Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

43.    The footnote stated: "See the next page for issuing and pricing parameters."  (*Id.* at 1.)

**Response to No. 43:**        Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

44.    The Two-Page Teaser stated: "Given the significant discount between the private placement and the public sale, it is anticipated that the lock-up period will be lifted in 4 equal tranches starting 3 months after the blockchain launch." (*Id.* at 1.)

**Response to No. 44:**        Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

45.     The Two-Page Teaser then set forth a chart outlining 25% locked for three months, 25% locked for 6 months, 25% locked for 12 months and 25% locked for 18 months. (*Id.* at 1.)

**Response to No. 45:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

46.     The Two-Page Teaser provided a Timeline that included a private sale to be closed in January-February 2018, followed by a public sale beginning March 2018, a December 2018 projected date for the token issuance for all investors and a January-March, 2019 date for listing tokens at the major cryptocurrency exchanges. (*Id.* at 1.)

**Response to No. 46:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

47.     The Two-Page Teaser stated that Telegram expected to raise $600 million in the private sale before February 2018 and $600 million plus in a public sale in March 2018. (*Id.* at 2.)

**Response to No. 47:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

48.     The Two-Page Teaser set forth a formula for calculating the price of Grams sold in the private sale and a formula for calculating the price of Grams sold in the public sale. (*Id.* at 2.)

**Response to No. 48:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

49.     The Two-Page Teaser contained a chart entitled "Private Discount" that set forth the private discount to the public sales price of Grams.  The private discount ranged from 65.2% if $400 million was raised in the public sale to 72% if $800 million was raised in the public sale.  (*Id.* at 2.)

**Response to No. 49:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

50.     The Two-Page Teaser provided a "Token Allocation Example" that stated that a $50 million investment will provide the right to receive 162.1 million Grams out of 2,564.9 million totally issued to the private and public sale investors, assuming a $600 million private and $600 million public sale, and stated: "The private sale per-token price would be **68.2%** lower than that of the public sale."[4] (*Id.* at 2 (emphasis in original).)

**Response to No. 50:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

51.     The Four-Page Teaser stated that Telegram was introducing "a next-generation multi-blockchain Proof-of Stake system – TON (Telegram Open Network) designed to host a new generation of cryptocurrencies and decentralized applications, at a massive scale." (JX4 at 1.)

**Response to No. 51:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

52.     The Four-Page Teaser stated: "To reach mainstream adaptation, a cryptocurrency, its underlying blockchain design and ecosystem require: "Speed and Scalability," "Intuitive user interfaces" and "An engaged used base."  (JX4 at 1.)

**Response to No. 52:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

53.     The Four-Page Teaser explained each of these phrases in more detail. (JX4 at 1.)

**Response to No. 53:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

---

[4] All bolded and italicized references are contained in the referenced document, unless otherwise noted.

54. The Four-Page Teaser explained that: "An engaged user base that provides pre-existing critical mass necessary for the ecosystem to grow and eventually become adopted by hundreds of millions of users. (JX4 at 1.)

**Response to No. 54:       Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

55. The Four-Page Teaser stated that: "Telegram is in a unique position to provide this combination and establish the first mass market cryptocurrency." (JX4 at 1.)

**Response to No. 55:       Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

56. The Four-Page Teaser stated that: "Telegram will use its expertise to create TON, a fast and infinitely scalable multi-blockchain architecture. …. By combining minimum transaction time with maximum security, TON can become a VISA/Mastercard alternative for the new decentralized future."  (JX4 at 1.)

**Response to No. 56:       Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

57. The Four-Page Teaser stated that:

a. "In October 2017, Telegram reached 170 million monthly users and delivered 70 billion messages every day.

b. Telegram will rely on its 10-year experience in building **user-friendly interfaces** for tens of millions to build light wallets, markets and identification services that will allow users to get on board with cryptocurrencies in an intuitive way, integrated into Telegram applications, the TON Wallet can instantly become the world's most adopted cryptocurrency.

> c.  Telegram will leverage its **existing ecosystem** of communities, developers, publishers, payment providers and merchants to drive demand and value for TON cryptocurrency." (JX4 at 1.)

**Response to No. 57:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

58.  The Four-Page Teaser stated: "Since taking cryptocurrencies mainstream in 2018 would not be possible using the existing blockchain platforms, Telegram co-founder Dr. Nikolai Durov set out to find a novel solution to match the required speed and scalability. His research resulted in the design for the Telegram Open Network – a fast and secure blockchain and network project." (JX4 at 2.)

**Response to No. 58:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

59.  The Four-Page Teaser contained a section entitled: "Telegram Messenger-TON Integration." That section stated, in part, that: "….TON light wallets will be built into Telegram applications on all platforms.  This will make over 170 million users instantly connected to the blockchain, making it immediately mainstream. This will allow millions of users to securely store their funds in the TON blockchain." (JX4 at 2.)

**Response to No. 59:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

60.  That section of the Four-Page Teaser further stated, in part, that: "Since the majority of actors in the new digital economy already have active Telegram accounts, it is natural for Telegram to offer a secure universal ID.  After passing KYC-AML (unclear) on Telegram once, users will get a virtual passport to log in to services that require user verification, which will eliminate a major point of friction for everyone engaging with crypto-assets." (JX4 at 2.)

**Response to No. 60:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

61.      That section of the Four-Page Teaser further stated, in part, that:

"Telegram's existing ecosystem will offer simple ways of buying the TON cryptocurrency

(grams) – and a range of services to drive demand and fundamental value for them.

    a.   Bot Platform;

    b.   Groups and Channels;

    c.   Digital Content and Physical Goods

    d.   A Gateway for Decentralized Services."  (JX4 at 2.)

**Response to No. 61:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

62.      The Four-Page Teaser set forth a "Roadmap" of events as follows:

    a.   Q1 2018      Launch of Telegram External ID

    b.   Q2 2018      Launch of the Minimal Viable Test Network of TON

    c.   Q3 2018      Testing and Security Audits of TON

    d.   Q4 2018      Deployment of Stable Network of TON

    e.   Q4 2018      Launch of Telegram Wallet

    f.   Q1 2019      Creation of TON-based economy in Telegram (JX4 at 3.)

**Response to No. 62:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

63.      The Four-Page Teaser stated: "To obtain the resources required to make

TON a reality, Telegram is launching a token sale. The token sale will use a provisional

Ethereum-based ERC20 Token (TON), to be converted 1:1 to native TON tokens (grams) after

deployment of TON Blockchain in 2018." (JX4 at 3.)

**Response to No. 63:**      **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

64.     ERC20 tokens are digital tokens used on the Ethereum platform.

**Response to No. 64:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

65.     The Four-Page Teaser stated that the total supply of native Ton tokens (grams) will amount to 5,000,000,000. (JX4 at 3.)

**Response to No. 65:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

66.     The Four-Page Teaser stated that: "During the initial stages of active TON development, at least 52% of the entire supply will be retained by the TON Reserve to allow for a fast and stable evolution of the platform."  (JX4 at 3.)

**Response to No. 66:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

67.     The Four-Page Teaser stated that 44% of the total supply will be sold in accordance with a formula.  (JX4 at 3.)

**Response to No. 67:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

68.     The Four-Page Teaser explained that: "The price of the first token will be $0.10 USD, and each next token will be priced one billionth higher than the previous one. As a result the additional supply coming from the TON Reserve will always be more expensive than the price paid by any of the existing buyers.  This stricture and volume should allow the market to define the fair price and volume for the token sale." (JX4 at 3.)

**Response to No. 68:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

69.     The Four-Page Teaser described Pavel Durov and Nikolai Durov as the founders and leaders of VK and Telegram.  It stated: "Between them they have over 20 years of

experience in building billion dollar companies used by hundreds of millions of people." (JX4 at 4.)

**Response to No. 69:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

70.     The Four-Page Teaser also described various awards won by each Durov, including a number of gold medals and championships in international mathematics and programming championships won by Nikolai Durov.  (JX4 at 4.)

**Response to No. 70:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

71.     The Four-Page Teaser also stated: "Telegram is a team of A-players. To become part of this team, each of its 15 developers had to either win the world's top programming contest or take the first place in one of the nation-wide multi-level coding competitions held by the founder of Telegram." (JX4 at 4.)

**Response to No. 71:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

72.     Telegram circulated three versions of a primer to potential and actual investors, a "Primer" (JX7) (referred to herein as the "Initial Primer"), a "Pre-Sale Primer" dated January 18, 2018 (JX8), and a "Stage A Primer" dated February 21, 2018 (JX9) (collectively the "Primers").

**Response to No. 72:** **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Telegram provided some potential purchasers in late 2017 and 2018 with a document entitled "Primer."  JSF ¶ 75.  Telegram distributed a document entitled "Pre-Sale Primer" to all purchasers in Round 1 of the Private Placement and a document entitled "Stage A Primer" to all purchasers in Round 2 of the Private Placement.  JSF ¶¶ 77, 80.**

73.     The undated "Initial Primer" was likely created in late 2017 before the "Presale Primer."  (PX12, Durov Tr. at 151:11-152:15.)

**Response to No. 73:** **Undisputed for purposes of Plaintiff's motion.**

19

74.     Although there were some variations in content, much of their content was identical. (JX7; JX8 and JX9.)

**Response to No. 74:     Disputed as inaccurate.  The cited materials do not support the assertion.  For instance, the "Pre-Sale Primer" and "Stage A Primer" set out more detailed information regarding the price of Grams and the Reference Price than the "Primer."  Compare JX8 and JX9 at 16-18 with JX7 at 16-17.  The "Pre-Sale Primer" and "Stage A Primer" also set out more information regarding the lock-up provisions.  *See id*.  Further, although the "Primer" contained information on Telegram's budget up to 2021, JX7 at 18, this information is absent in the "Pre-Sale Primer" and "Stage A Primer."  *See* JX8; JX9. Finally, the "Pre-Sale Primer" and "Stage A Primer" had two appendices: Appendix A attaching the January 28, 2018 Technical White Paper (JX13) and Appendix B attaching Risk Factors (JX14; JX15).  *See also* JX8 and JX9 at 25-26.**

75.     The Primers all stated: "This paper outlines a vision for a new cryptocurrency and an ecosystem capable of meeting the needs of hundreds of millions of consumers, including 200 million Telegram users." (*Id.* at 3.)

**Response to No. 75:     Undisputed for purposes of Plaintiff's motion.**

76.     The Initial Primer stated: "Launching in 2018, this cryptocurrency will be based on multi-blockchain Proof-of-Stake system – TON (*Telegram Open Network, after 2021 The Open Network*) – designed to host a new generation of cryptocurrencies and decentralized applications. (JX7 at 3.)

**Response to No. 76:     Undisputed for purposes of Plaintiff's motion.**

77.     The Pre-Sale Primer and Stage A Primer stated: "Scheduled to launch in 2018, this cryptocurrency will be based on multi-blockchain Proof-of-Stake system – TON (*Telegram Open Network, or ultimately The Open Network*) – designed to host a new generation of cryptocurrencies and decentralized applications." (JX8 at 3; JX9 at 3.)

**Response to No. 77:     Undisputed for purposes of Plaintiff's motion.**

78.     The Primers stated: "Despite their revolutionary potential, existing cryptocurrencies lack the qualities required to attract the mass consumer. There are three main hurdles.…" (JX7 at 4; JX8 at 4; JX9 at 4.)

**Response to No. 78:        Undisputed for purposes of Plaintiff's motion.**

79.     The Primers listed the third hurdle as: "The market of goods and services that can be bought with cryptocurrencies is limited, and the **demand** for crypto-assets **comes mainly from investors, not consumers.**  (*Id.*)

**Response to No. 79:        Undisputed for purposes of Plaintiff's motion.**

80.     The Primers stated: "The current state of blockchain technology resembles automobile design in 1870: it is promising and praised by enthusiasts, but inefficient and too complicated to appeal to the mass consumer."  (*Id.*)

**Response to No. 80:        Undisputed for purposes of Plaintiff's motion.**

81.     The Primers stated that, to reach mainstream adoption, a cryptocurrency – and its underlying blockchain design and ecosystem requires, as one of three listed factors, "**An engaged user base.**" (*Id.*)

**Response to No. 81:        Undisputed for purposes of Plaintiff's motion.**

82.     The Initial Primer described that factor as follows: "**An engaged user base** that serves as the pre-existing critical mass necessary for the ecosystem to grow and eventually become adopted by hundreds of millions of users." (emphasis in original). (JX7 at 4.)

**Response to No. 82:        Undisputed for purposes of Plaintiff's motion.**

83.     The Pre-Sale Primer and Stage A primer described that factor as follows: "**An engaged user base** that drives demand for services in the ecosystem and provides pre-existing critical mass for future growth."  (JX8 at 4; JX9 at 4.)

**Response to No. 83:        Undisputed for purposes of Plaintiff's motion.**

84.     The Primers stated: "Telegram is uniquely positioned to establish the first mass-market cryptocurrency by providing a platform that combines these properties." (JX7 at 5; JX8 at 5; JX9 at 5.)

**Response to No. 84:**     **Undisputed for purposes of Plaintiff's motion.**

85.     The Primers stated: "Telegram will use its expertise in encrypted distributed data storage to create TON, **a fast and inherently scalable** multi-blockchain architecture. … By combining minimum transaction time with strong security, TON can become a Visa/Mastercard alternative for the new decentralized economy." (*Id.*)

**Response to No. 85:**     **Undisputed for purposes of Plaintiff's motion.**

86.     The Primers stated: "The Telegram team will rely on its 10-year experience in building **user friendly interfaces** for tens of millions to create light wallets, exchanges, and identification services that will allow users to get on board with cryptocurrencies in an intuitive way.  Integrated into Telegram applications, the TON wallet will become the world's most adopted cryptocurrency wallet." (*Id.*)

**Response to No. 86:**     **Undisputed for purposes of Plaintiff's motion.**

87.     The Primers stated: "Telegram will leverage its **existing ecosystem** of communities, developers, publishers, payment providers, and merchants to drive demand and value for TON cryptocurrency." (*Id.*)

**Response to No. 87:**     **Undisputed for purposes of Plaintiff's motion.**

88.     The Primers contained a brief history of Telegram, including noting that: "In October 2017, Telegram reached 170 million monthly users, delivering 70 billion messages every day."  (*Id.* at 6.)

**Response to No. 88:**     **Undisputed for purposes of Plaintiff's motion.**

89.     The Initial Primer said: "At least 500000 new users join Telegram daily. At this rate, the service is expected to hit **200 million monthly users in Q1 2018**. These users can provide the required critical mass to push cryptocurrencies towards wide spread adoption." (JX7 at 6.)

**Response to No. 89:**     **Undisputed for purposes of Plaintiff's motion.**

90.     The Pre-Sale Primer and Stage A Primer said:  "Over the past twelve months, an average of more than 500,000 new users have joined Telegram daily.  At this rate, the service is expected to hit **200 million users in Q1 2018.** These users can provide the required critical mass to push cryptocurrencies toward wide spread adoption."  (JX8 at 6; JX9 at 6.)

**Response to No. 90:**     **Undisputed for purposes of Plaintiff's motion.**

91.     The Primers stated that because taking cryptocurrencies mainstream in 2018 would not be possible using the existing blockchain platforms, Dr. Nikolai Durov created the "design for the Telegram Open Network – a fast and secure network project." (JX7 at 7; JX8 at 7; JX9 at 7.)

**Response to No. 91:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The correct text of the cited material provided that Nikolai's "research resulted in the design for the Telegram Open Network — a fast and secure blockchain and network project."  JX7 at 7; JX8 at 7; JX9 at 7.**

92.     The various White Papers authored Dr. Durov describe in detail his design of the TON Network. (JX18-28)

**Response to No. 92:**     **Undisputed for purposes of Plaintiff's motion.**

93.     The Primers stated: "As a multi-blockchain project, TON requires sophisticated network protocols – such as the TON P2P Network used to access the TON blockchains – that can be reused to give a significant boost in flexibility to the platform. The

following components are scheduled to be released after the TON Blockchain core and will further increase the potential uses of the TON infrastructure." (JX7 at 9; JX8 at 9; JX9 at 9.)

**Response to No. 93:**          **Undisputed for purposes of Plaintiff's motion.**

94.   The Primers then listed the following components and described them (the following parentheticals contain quotes from the longer descriptions contained in the Primers): TON Storage ("a distributed file–storage technology"); TON Proxy ("a network proxy/anonymizer layer used to hide the identity and IP addresses of TON nodes"); TON Services ("a platform for third-party services of any kind  that enables smartphone-like friendly interfaces for decentralized apps and smart contracts, as well as a Worldwide Web-like decentralized browsing experience."); TON DNS ("a service for assigning human-readable names to accounts, smart contracts, services, and network nodes.); and TON Payments ("a platform for micropayments and a micropayment channel.") (JX7 at 9-10; JX8 at 9-10; JX9 at 9-10.)

**Response to No. 94:**          **Undisputed for purposes of Plaintiff's motion.**

95.   The Primers stated: "Telegram-TON integration will provide a clear path to cryptocurrencies for millions of people.  Telegram Messenger will not only serve as an example of the possibilities offered by integrating with TON, but will also add unique features to the TON platform, leveraging Telegram's massive user base and developed ecosystem."  (JX7 at 11; JX8 at 11; JX9 at 11.)

**Response to No. 95:**          **Undisputed for purposes of Plaintiff's motion.**

96.   The Primers stated: "TON light wallets will be built into Telegram applications, allowing millions of users to store their funds secretly in the TON blockchain." (*Id.)*

**Response to No. 96:**          **Undisputed for purposes of Plaintiff's motion.**

24

97.     The Primers stated: "Telegram mobile and desktop applications with integrated wallets will also double as TON clients, enabling secure transfers of value within the TON blockchain and interaction with TON smart contracts and applications." (*Id.*)

**Response to No. 97:**     **Undisputed for purposes of Plaintiff's motion.**

98.     The Primers stated: "According to Tokenmarket, as of late 2017, 84 percent of upcoming blockchain-based projects had an active Telegram community, more than all other major chats applications combined.  Forbes and other media outlets have called Telegram the <<cryptocurrency world's preferred messaging app>> and <<as ubiquitous to the cryptocurrency world as Snapchat is to a teenager.>>" (JX7 at 12; JX8 at 12; JX9 at 12.)

**Response to No. 98:**     **Undisputed for purposes of Plaintiff's motion.**

99.     The Primers stated: "Because the majority of actors in the new digital economy already have active telegram accounts, it is natural for Telegram to offer a secure universal ID." (*Id.*).

**Response to No. 99:**     **Undisputed for purposes of Plaintiff's motion.**

100.     The Primers stated: "…Telegram will launch a TON-based **ad exchange** where parties interested in promoting their projects can connect with the relevant channel owners and negotiate a price in a transparent and fully automated way." (JX7 at 13; JX8 at 13; JX9 at 13.)

**Response to No. 100:**     **Undisputed for purposes of Plaintiff's motion.**

101.     The Primers stated that: "Telegram's in-app economy will supply the TON market with a wide range of goods and services that can be obtained with TON coins." (*Id.*)

**Response to No. 101:**     **Undisputed for purposes of Plaintiff's motion.**

102.     The Primers contained a "Roadmap" that contained milestones for TON and Telegram. (JX7 at 15; JX8 at 15; JX9 at 15.)

**Response to No. 102:**   **Undisputed for purposes of Plaintiff's motion.**

103.   The Pre-Sale and Stage A Primer Roadmap listed the "Launch of Telegram Wallet in Q4 2018" and "Start of a TON-based economy in Telegram in Q1 2019." (JX8 at 15; JX9 at 15).

**Response to No. 103:**   **Undisputed for purposes of Plaintiff's motion.**

104.   The Initial Primer stated: "To obtain the resources required to make TON a reality, Telegram is launching a token sale in Q1 2018. The token sale will likely use a SAFT to be converted 1:1 to native TON tokens (Grams) after the deployment of the TON Blockchain in Q4 2018." (JX7 at 16.)

**Response to No. 104:**   **Undisputed for purposes of Plaintiff's motion.**

105.   The Pre-Sale Primer stated: "To obtain the resources required to make TON a reality, Telegram is launching a token sale starting in Q1 2018. The TON tokens (Grams) will be sold pursuant to purchase agreements providing for the delivery of Grams to purchasers after the launch of the TON Blockchain, which is expected to take place in Q4 2018." (JX8 at 16.)

**Response to No. 105:**   **Undisputed for purposes of Plaintiff's motion.**

106.   The Stage A Primer stated: "Telegram is conducting a token sale in two stages: an initial sale, which was completed in February 2018, and this subsequent sale. The TON tokens (Grams) are being subscribed for pursuant to purchase agreements. The purchase agreements provide for payment of fiat currency by the purchasers to Telegram in exchange for the delivery of Grams by Telegram to a TON light wallet at a TON blockchain account address designated by the applicable purchaser upon the launch of the TON Blockchain, which is expected to take place in Q4 2018." (JX9 at 16.)

**Response to No. 106:**   **Undisputed for purposes of Plaintiff's motion.**

26

107.     The Primers stated: "After the TON Blockchain is fully deployed, the annual inflation rate in the supply of Grams derived from the fundamental parameters of TON is projected at two percent and, as a result, we expect that the supply of Grams will double to 10 billion in 35 years. This inflation represents a payment made by all members of the community to the validators for keeping the system functional."  (JX7 at 16; JX8 at 16; JX9 at 16.)

**Response to No. 107:**     **Undisputed for purposes of Plaintiff's motion.**

108.     The Initial Primer stated: "During the initial stage of active TON development, at least 52 percent of the entire supply will be retained by the TON Reserve to protect the nascent cryptocurrency from speculative trading and to maintain flexibility at the early stages of the evolution of the system."  (JX7 at 16.)

**Response to No. 108:**     **Undisputed for purposes of Plaintiff's motion.**

109.     The Initial Primer included the a price formula for Grams and stated: "The price of the first token to be sold will be approximately 0.1 USD, with and each (sic) successive token will be priced one billionth higher than the previous one. As a result, the additional supply coming from the TON Reserve will always be more expensive than the price paid by any of the existing buyers." (*Id.* at 16-17.)

**Response to No. 109:**     **Undisputed for purposes of Plaintiff's motion.**

110.     The Pre-Sale Primer and Stage A Primer stated: "Ten percent of the initial supply of grams (500 million Grams) will be reserved to be used as incentives for the ecosystem – to encourage installation of third-party validators, TON Storage, and TON Proxy nodes and to reward users for activating wallets and completing the know your customer (KYC) and anti-money laundering (AML) screening procedures." (JX8 at 16; JX9 at 16.)

**Response to No. 110:**     **Undisputed for purposes of Plaintiff's motion.**

111.    The Pre-Sale Primer stated: "Telegram plans to execute the sale of Grams in two stages." It then set forth the formula for calculating the price of Grams at each stage of the sale. (JX8 at 17.)

**Response to No. 111:**    **Undisputed for purposes of Plaintiff's motion.**

112.    The Pre-Sale Primer stated: The first stage will begin in January 2018 and is scheduled to close in February 2018. No more than approximately 45 percent of the initial supply of Grams (approximately 2.25 billion Grams or 850.0 million USD of Grams calculated in accordance with the formula above) will be sold in this stage." (*Id.*)

**Response to No. 112:**    **Undisputed for purposes of Plaintiff's motion.**

113.    The Pre-Sale Primer stated that the Grams subscribed for in this stage will be subject to lock-up restrictions beginning on the date the TON Blockchain is launched and that the Grams will be released from the lock-up as follows: 25% three months after launch, 25% six months after launch, 25% twelve months after launch, and 25% eighteen months after launch. (*Id.*)

**Response to No. 113:**    **Undisputed for purposes of Plaintiff's motion.**

114.    The Pre-Sale Primer stated: "The second stage of the offering is scheduled to begin in late March 2018. Grams sold in this stage will not be subject to a lock-up period. Between the first stage and the second stage, no more than 66% of the initial supply of Grams (3.3 billion) can be sold. Grams that are not subscribed for will remain in the Ton Reserve." (*Id.*)

**Response to No. 114:**    **Undisputed for purposes of Plaintiff's motion.**

115.    The Stage A Primer set forth the same pricing formula described in the Pre-Sale Primer and stated: "The initial sale began in January 2018 and closed in February 2018. Approximately 45 percent of the initial supply of grams (approximately 2.25 billion Grams, or

850.0 million worth of Grams calculated in accordance with the formula above) were subscribed

for in the initial sale." (JX9 at 17.)

**Response to No. 115:      Undisputed for purposes of Plaintiff's motion.**

116.    The Stage A Primer stated: "Telegram is now entertaining offers for

subscriptions for Grams in the subsequent sale. No more than 21 percent of the initial supply of

Grams (approximately 1.05 billion Grams) can be sold in the subsequent sale. Grams sold in the

subsequent sale will not be subject to a lock-up following the launch of the TON Blockchain."

(*Id.*)

**Response to No. 116:      Undisputed for purposes of Plaintiff's motion.**

117.    The Stage A Primer stated that this subsequent sale would be split into two

stages, stage A, which would offer "up to 850.0 Million USD worth of Grams for subscription in

stage A" and stage B, which would offer a not yet determined amount of Grams. (*Id.* at 17-18.)

**Response to No. 117:      Undisputed for purposes of Plaintiff's motion.**

118.    Stage B did not take place. Stip. 54.

**Response to No. 118:      Undisputed for purposes of Plaintiff's motion but subject to
clarification.  The cited material does not support the assertion.**

119.    The Pre-Sale Primer and the Stage A Primer stated: "At the time the TON

Blockchain is launched, the TON Reserve will hold a minimum of 1 billion Grams. These grams

may be sold by the Ton Reserve after the launch of the Ton Blockchain at a price no less than the

reference price calculated in accordance with the following formula."  (JX8 at 18; JX9 at 18.)

**Response to No. 119:      Undisputed for purposes of Plaintiff's motion.**

120.     The Initial Primer, in a section entitled Use of Funds" stated: "Funds

raised during the Telegram ICO will be used for the development of Telegram and TON and for

the ongoing expenses required to support the growth of the ecosystem." (JX7 at 18.)

**Response to No. 120:**     **Undisputed for purposes of Plaintiff's motion.**

121.   The Initial Primer stated:  "More than 80 percent of collected funds will be spent on equipment, bandwidth, colocation, and user verification costs. The rest will be allocated for wages, offices, and legal and consulting services." (*Id.*)

**Response to No. 121:**     **Undisputed for purposes of Plaintiff's motion.**

122.   The Initial Primer stated:  "The annual budget of Telegram in 2017 amounted to $70 million, out of which $62 million were (sic) spent on equipment, bandwidth, colocation, and user verification costs.  Telegram's spending is projected at $400 million in the next three years (approximately $100 million in 2018; $130 million in 2019, and $170 million in 2020). A total spending of about $620 million to support continuing organic user growth should allow Telegram to reach one billion active users by January 1, 2022." (*Id.*)

**Response to No. 122:**     **Undisputed for purposes of Plaintiff's motion.**

123.   The Initial Primer stated: "The founders of Telegram will be responsible for the efficient use of funds resulting from any sale of tokens from the Ton Reserve. Overtime, all responsibilities related to TON and its Reserve will be transferred to the TON Foundation, a not-for-profit organization." (JX7 at 19.)

**Response to No. 123:**     **Undisputed for purposes of Plaintiff's motion.**

124.   The "Use of Funds" Sections of the Pre-Sale Primer and Stage A Primer stated: "We intend to use the proceeds raised from the offering for the development of the TON Blockchain, for the continued development and maintenance of Telegram Messenger, and for general corporate purposes at Telegram. Such expenses are expected to include, among others, equipment, bandwidth, colocation, and users verification costs, as well as wages, offices, and legal and consulting services." (JX8 at 19; JX9 at 19.)

**Response to No. 124:**     **Undisputed for purposes of Plaintiff's motion.**

125.    The "Use of Funds" Sections of the Pre-Sale Primer and Stage A Primer also stated:  "We expect that proceeds from any Grams sold by the TON Reserve following the launch of the TON Blockchain will be used to stabilize the price of Grams and to fund the continued development of the TON Blockchain and its ecosystem." (*Id.*)

**Response to No. 125:**    **Undisputed for purposes of Plaintiff's motion.**

126.    The "Use of Funds" Sections of the Pre-Sale Primer and Stage A Primer also stated: "While we currently anticipate that the funds will be used as outlined above, their actual use may vary depending upon numerous factors…." (*Id.*)

**Response to No. 126:**    **Undisputed for purposes of Plaintiff's motion.**

127.    The Initial Primer stated: "By 2021 the initial TON vision and architecture will have been implemented and deployed. TON will then let go of the <<Telegram>> element in its name and become <<The Open Network>>." (JX7 at 19.)

**Response to No. 127:**    **Undisputed for purposes of Plaintiff's motion.**

128.    The Pre-Sale Primer and the Stage A Primer, in the section entitled "Governance", stated: "Over time, all responsibilities related to TON and the TON Reserve are expected to be transferred to the TON Foundation, a not-for-profit organization. Ultimately, TON intends to let go of the 'Telegram' element in its name and become 'The Open Network.' Telegram will serve as a launch pad for TON, ensuring its technological superiority and widespread adoption at launch. But the future of TOM is in the hands of the global open-source community."  (JX8 at 20; JX9 at 20.)

**Response to No. 128:**    **Undisputed for purposes of Plaintiff's motion.**

129.    The Primers had a description of the background of the Durovs and the qualifications of its "world-class team of 15 developers." It stated: "Core team members have ten years of experience in building scalable projects for tens of millions of users. Before building

31

Telegram, they created VK, the largest Europe-based social network with more than **100 million active users**, which still enjoys a dominating share in its local markets." (JX7 at 20; JX8 at 21; JX9 at 21.)

**Response to No. 129:**     **Undisputed for purposes of Plaintiff's motion.**

130.   The Primers contained short descriptions of the technical qualifications of 11 members of the development team. (*Id.*)

**Response to No. 130:**     **Undisputed for purposes of Plaintiff's motion.**

131.   Attached to the Pre-Sale Primer was the Risk  Factors (Attachment B). (Stip. 78.)

**Response to No. 131:**     **Undisputed for purposes of Plaintiff's motion.**

132.    Telegram asked prospective investors to sign a document entitled: "Telegram – Indication of Interest ("IOI") setting forth certain terms of the offering. (Stip. 71; JX5 (Pre-Sale IOI); Stip. 73; JX6 Stage A IOI.)

**Response to No. 132:**     **Undisputed for purposes of Plaintiff's motion.**

133.   The initial IOI described the "Deal Structure" as follows: "Issuance and sale by a direct or indirect subsidiary (the **'Issuer'**) of Telegram Group Inc. of a new cryptocurrency called **'Grams'**, which will be issued following the development and launch of a new blockchain platform (the **'TON Network'**). The parties intend to use proceeds generated by the sale of Grams to develop and launch the TON Network and develop associated functionality within Telegram Messenger." (JX5 at 1.)

**Response to No. 133:**     **Undisputed for purposes of Plaintiff's motion.**

134.   The initial IOI stated: "The Issuer intends to offer the ability to subscribe for Grams through a **'Pre-Sale'** and a **'Subsequent Sale.'** (JX5 at 1.)

**Response to No. 134:**     **Undisputed for purposes of Plaintiff's motion.**

135.    The Pre-Sale IOI stated that, based on the expected maximum subscription of $850 million for the First Round, described as the Pre-Sale, an average price per Gram of $0.37756101 was expected based on the pricing formula for Grams described in the White Paper. It further stated: "Each Gram subscribed for in the Pre-Sale will be priced at the applicable Pre-Sale Purchase Price."  (JX5 at 1.)

**Response to No. 135:       Undisputed for purposes of Plaintiff's motion.**

136.    The Pre-Sale IOI stated that, based on an assumed aggregate of $US1.15 billion worth of Grams subscribed for in the Subsequent Sale (and US$850.0 million worth of Grams subscribed for in the Pre-Sale), the pricing formula for Grams implies an average price of approximately US$1.45 per Gram subscribed for in the Subsequent Sale. (JX5 at 1.)

**Response to No. 136:       Undisputed for purposes of Plaintiff's motion.**

137.    The IOI for Stage A described the "Deal Structure" as follows: " "Issuance and sale by TON Issuer Inc (the **'Issuer'**), a wholly owned subsidiary of Telegram Group Inc. (the **'Parent'**), of a new cryptocurrency called **'Grams'**, which will be issued following the development and launch of a new blockchain platform (the **'TON Network'**). The Parent and the Issuer intend to use the proceeds raised from the offering for the development of the TON Blockchain, for the continued development and maintenance of Telegram Messenger and for general corporate purposes at Telegram Messenger.  Such expenses are expected to include, among others, equipment, bandwidth, colocation, and user verification costs, as well as wages, offices, and legal and consulting services." (JX6 at 1)

**Response to No. 137:       Undisputed for purposes of Plaintiff's motion.**

138.    Telegram warranted in the Purchase Agreement, under a section entitled "Parent's Warranties and Obligations" that: "To the extent permitted by applicable law …, [Telegram] shall use its reasonable endeavors to facilitate the use of Tokens as the principal

33

currency used on Telegram Messenger by building TON Wallets into Telegram Messenger."

(JX11 at 10-11).

**Response to No. 138:**     **Undisputed for purposes of Plaintiff's motion.**

## IV.   TELEGRAM MARKETED THE INVESTMENT TO SOPHISTICATED AND REPUTABLE INVESTORS

139.   Telegram selected investors using "standard capital market syndicate type discussions, around is such and such an investor a credible investor."  (PX14, Parekh Tr. at 72:14-73:12; *see also id.* at 74:10-20.)

**Response to No. 139:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  When asked what factors Telegram considered in selecting purchasers, Shyam testified that Pavel, Hyman, Ilya Perekopsky ("Ilya") and he participated in "the sort of standard capital market syndicate type discussions[.]"  PX14 at 72:14-73:12.  They considered factors such as whether the party was "a credible investor," meaning whether they have been "operating for a long period of time and has a track record, has a reputation."  *Id.*  They also considered whether they "expressed interest early and been supportive for some period of time."  *Id.*  Further, Telegram wanted to make sure that they had "a wide range of sophisticated purchasers that come from different continents which could create the balance and decentralization that [they] were looking to create."  Malloy Ex. 1 at 124:22-125:4.  Ilya testified that they chose "sophisticated investors" and thus the representations they were signing "actually meant something."  Malloy Ex. 2 at 196:23-197:18.  Pavel explained that reputation was a "very important factor" because it enhanced Telegram's confidence in the fact that investors making the representations in the Purchase Agreements "can be trusted and those representations can be relied on."  Drylewski Ex. 2 at 287:21-288:19.**

140.   In considering how much to allocate to investors in the Offering, Telegram considered the reputation and sophistication of the purchasers and their experience in technology-related investments.  (PX12, Durov Tr. at 285:7-24.)

**Response to No. 140:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The assertion is not supported by the cited materials.  Pavel testified, with respect to Round 1 only, that Telegram considered factors such as "reputation and sophistication of potential purchasers as well as their experience in technology-related investments."  PX12 at 285:7-24.  Pavel further testified that, if he had a "personal relationship" with a purchaser who also happened to have had a "good reputation and brand, meaning personal brand or brand of the fund," Pavel would have had "the comfort of knowing these people also as human beings as opposed to businessmen."  *Id.*  Pavel explained that reputation was a "very important factor" because it enhanced Telegram's**

34

**confidence in the fact that investors making the representations in the Purchase Agreements "can be trusted and those representations can be relied on." Drylewski Ex. 2 at 287:21-288:19.**

141.    Telegram prioritized "Tier-1 firms" in determining allocations of Grams in the Presale.  (PX24.)

**Response to No. 141:**    **Disputed as inaccurate and misleading insofar as the full text of the quoted communication shows that Pavel stated, "We were planning to provide you with the same level of allocation we grant other tier-1 firms . . . , which is 15M.  But we'll have to make the final decision on Thursday after we have received the updated indications of Interest."  PX24 at 4.  He goes on to say, "In case some space is freed, I will do my best to prioritize you over other top funds."  Id.  Further, Telegram has stated that it aimed to treat all purchasers in the Private Placement equally.  See, e.g., Malloy Ex. 5 at KPCB-0000824 (Hyman informs a purchaser that he cannot provide further information on Telegram's business because "we have treated all investors equally and [the purchaser] has been given the same access to [Telegram] as your peers").**

142.    Perekopsky explained that in considering allocation criteria, Telegram considered "highly sophisticated, reputable funds or individuals that already had some track record" and that Telegram tried to diversify investors geographically, but did not consider whether the funds were "active in the cryptocurrency space" or whether they had the "sophistication as Blockchain node validators."  (PX13, Perekopsky Tr. at 122:17-125:9.)

**Response to No. 142:**    **Disputed as incomplete.  Ilya testified that three factors were considered:**

> **First, we tried to get only highly sophisticated, reputable funds or individuals that already had some track record, and in case of individuals where you could understand their wealth, like the general idea how they got their wealth. Second, we tried to diversify investors by geography, so we didn't want one particular region of the world like to dominate in our list of investors, so we were trying to be decentralized even in this part. So we tried them to be decentralized all over the world. Then, in some cases, we just removed a lot of investors by our own initiative, due to some information that we received about them.**

**PX13 at 122:23-123:11.  Ilya explained that Telegram did not "necessarily" consider whether funds were active in the cryptocurrency space, because Telegram decided to accept money in fiat and it might have been difficult for a crypto fund to invest in fiat. PX13 at 124:13-24.  Further, Ilya testified that Telegram did not consider purchasers'**

35

**sophistication as validators, because "the level of sophistication required to be a validator [on the TON Blockchain] is not so high, so I would say that if this investor was sophisticated, by definition, and if he wants to become a validator, that is a doable task for all of them."** *Id.* **at 124:25-125:9.  Additionally, Pavel testified that, because Telegram "preferred to enter into purchase agreements with well-known, sophisticated investors, many of whom had an established name in the technology sector" and assumed that "becoming a validator is actually not unlike something as simple as setting up a server in a data center in a secure way," Telegram "assumed that a lot of our purchasers would be able to act as validators if they chose to."  PX12 at 85:24-86:10.**

143.    Parekh did not ask and is not aware of anyone at Telegram asking about how long investors would hold the Grams, whether they were buying them for consumptive use, whether they were buying them to use as goods and services, or whether they intended to act as validators.  (PX14, Parekh Tr. at 130:14–131:14, 135:1–136:20, 150:23–151:14.)

**Response to No. 143:    Undisputed for purposes of Plaintiff's motion but subject to clarification.  Although Shyam might not have recalled or participated in certain discussions, Ilya testified that certain purchasers had preliminary discussions with third party vendors about potentially using Grams after the launch of the TON Blockchain.  *See* Malloy Ex. 2 at 162:6-163:3.**

144.    In January 2018, Durov told a friend and eventual Gram purchaser that he was "excited that [he'd] like to take part in the TON distribution" and that Telegram was "planning to provide you with the same level of allocation we grant other tier-1 firms . . . which is 15M."  (PX24.)

**Response to No. 144:    Undisputed for purposes of Plaintiff's motion but subject to clarification.  The full text of the quoted communication shows that Pavel stated, "We were planning to provide you with the same level of allocation we grant other tier-1 firms . . . , which is 15M.  But we'll have to make the final decision on Thursday after we have received the updated indications of Interest."  PX24 at 4.**

145.    In December 2017, Durov agreed to reserve $20M of the presale round for an investor suggested by another friend "due to their reputation."  (PX15 at TLGRM-017-00000573.)

**Response to No. 145:    Disputed as the cited material does not support this assertion.**

146.    Durov told another friend and eventual investor that he had compiled "[a] 20-page primer . . . to make the idea understandable for mass readers," and sent the friend the primer via Messenger.  (PX25 at TLGRM-007-00000310.)

**Response to No. 146:    Undisputed for purposes of Plaintiff's motion.**

## V.    THE SUCCESS OF TELEGRAM'S MESSENGER PLATFORM AND THE STRENGTH OF ITS TEAM LED INVESTORS TO VIEW TON AS A GOOD INVESTMENT OPPORTUNITY, LIKELY TO GENERATE RETURNS FOR THEIR FIRMS

### A.    Investors' Discussions with Telegram and Requests for Information

147.    One investor thanked Durov and other Telegram personnel "for the opportunity to invest in Telegram," adding "excited to be part of what you are building." (PX26.)

**Response to No. 147:    Disputed to the extent that Plaintiff suggests the quoted email indicates the purchaser received an equity position in Telegram.  Further, under the Purchase Agreements, purchasers received the right to receive Grams.  *See* Def. 56.1 at ¶¶ 98, 102.**

148.    An investor and friend of Durov's asked him whether "tokens issued to employees and developers pre-launch" would be "subject to the same lockup restrictions as the investors," explaining that "this is what typically happens for IPOs to ensure the people needed to deliver the core intellectual property have incentives to stay engaged through the lockup."  The investor added that it "would help to know to ensure your stake is as I assume it is fundamental [sic] aligned with the success of TON (more is better!)."  (PX25 at TLGRM-007-00000319.)

**Response to No. 148:    Undisputed for purposes of Plaintiff's motion but subject to clarification.  Although Telegram had previously stated the developer pool was then contemplated to have a four-year lock-up period restricting the same of Grams by "developer pool recipients," no final determination was or has been made.  JSF ¶ 158-63.  Additionally, in response to the outside purchaser's suggestions, Pavel stated, "I was uncomfortable assigning myself a specific ownership of Grams (I thought I would take some percent from the team's incentive pool)."  PX25 at TLGRM-007-00000319.  Later in**

the conversation, Pavel added, "I feel uncomfortable changing stuff at such an advanced stage to be honest. Some people would regard it as me suddenly being greedy."  *Id.* at 320.

149.    Another investor asked Telegram "what stock exchanges are you going to set-up on initially," whether "the token wallet" "is going to be a part of Telegram app," and what Telegram's "view was on initial trading price."  (PX27.)

**Response to No. 149:**      **Undisputed for purposes of Plaintiff's motion.**

150.    In Perekopsky's words, when an investor asks about exchanges, "you can probably put them to this category . . . of people who were like showing an interest to selling part of them."  (PX13, Perekopsky Tr. at 174:25-175:12.)

**Response to No. 150:**      **Disputed as misleading to the extent that Plaintiff suggests the cited material indicates that purchasers primarily asked questions about exchanges and listing on exchanges.  Ilya testified that "[m]any many many investors told me that they are long-term, yes. Yes, I would say quite a lot of conversations."  PX13 at 174:10-17.  Further, Shyam testified:**

> **[T]he number of questions I got asked about exchange opportunities or possibilities was significantly dwarfed by the number of questions I got asked about custody solutions, and you would have thought, intuitively or logically, that no one would be asking about custody solutions unless they intended to hold their Grams for some period of time, if that makes sense.**

**PX14 at 160:2-11.**

151.    One investor sent a request for detailed information about Telegram Messenger's users, demographics, retention, engagement, and commercial intent.  (PX28.)

**Response to No. 151:**      **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Hyman informed the purchaser that he cannot provide further information on Telegram's business because "we have treated all investors equally and [the purchaser] has been given the same access to [Telegram] as [their] peers."  PX28.  Further, Pavel testified:**

> **Due to the fact that such reports were not included as obligatory in the purchase agreements and could create, at the same time, additional burden in our small team, and also due to the, as we perceived it, low relevance of such financial statements, we, as a general matter, did not send regular updates to the purchasers**

> **disclosing the financial details of the company, focusing instead on the updates related to the development status of the TON Blockchain which we considered to be much more relevant for investors as it could affect the timelines and development roadmaps that, in turn, could be important for purchasers to be able to plan their activities. However, I believe that in October last year we disclosed certain financial information to the purchasers as well as our planned costs for the next several months.**

**PX12 at 355:21-356:15.**

152. Another investor's query focused on "when do investors receive the first badge [sic] of tokens and can liquidate." (PX29.)

**Response to No. 152:** **Disputed as inaccurate, incomplete and misleading, especially to the extent that Plaintiff states that the investor "focused" on this question. The sender of the email clearly discussed questions from a group of investors that "were reviewing the TON primer and ha[d] some questions." PX29. Thus, neither the sender nor the referenced "investors" posing the questions had yet entered into purchase agreements. Further, the full text of the quoted communication shows that the sender asks four different questions, only one of which refers to the timing of the delivery of the Grams. *Id.* Additionally, Defendants wish to note that the cited communication is dated January 13, 2018, and thus took place at the very early stages of the Private Placement. Further, the cited material is irrelevant to Plaintiff's claims in this action.**

153. Eight of the initial purchasers have submitted sworn declarations outlining, among other things, their views on the TON investment. These declarations are attached to the Stewart Declaration as PX 1 through PX8.

**Response to No. 153:** **Undisputed for purposes of Plaintiff's motion.**

**B.    Sworn Declarations Submitted by Eight Initial Purchasers**

154. Eight of the initial purchasers (the "Initial Purchasers") have submitted sworn declarations outlining, among other things, their views on the TON investment. These declarations are attached as PX 1 through PX 8.

**Response to No. 154:** **Undisputed for purposes of Plaintiff's motion.**

155. In summary, these Initial Purchasers' declarations state the following.

**Response to No. 155:**      Undisputed for purposes of Plaintiff's motion except to the extent that Plaintiff suggests the cited declarations and information therein are indicative of the positions of all other purchasers in the Private Placement.

156.    Prior to purchasing Grams, the following Initial Purchasers reviewed and relied upon Telegram's offering materials, including the Technical White Papers and the Pre-Sale Primers. (PX1 at ¶ 8; PX2 at ¶¶ 10, 11, Exhibit B; PX3 at ¶¶ 10, 11; PX4 at ¶ 9, 18; PX5 at ¶ 9; PX6 ¶ 2; PX 7 at ¶ 9; PX7 at ¶ 9; PX8 at ¶ 9.)

**Response to No. 156:**      Undisputed for purposes of Plaintiff's motion except to the extent that Plaintiff suggests the cited declarations and information therein are indicative of the positions of all other purchasers in the Private Placement.  Further, by entering into the Purchase Agreements, the purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]"  JX11 at 11 (¶ 6.3(f)); JX12 at 6 (¶ 6.3(f)).  Finally, the cited material is irrelevant to Plaintiff's claims in this action.

157.    The following Initial Purchasers based their decision to purchase Grams in part on their communications directly with Telegram. (PX1 at ¶ 11, Exhibit B; PX2 at ¶ 9, Exhibit B; PX4 at ¶ 11; PX5 at ¶¶ 8, 9; PX6 at ¶ 2; PX7 at ¶ 10; PX8 at ¶ 8.)

**Response to No. 157:**      Disputed as incomplete and misleading to the extent Plaintiff suggests the cited material indicates the purchasers actually "based" their decision on any communications with Telegram.  The cited materials do not support the assertion.  For instance:

    a.   **In PX2 at ¶ 9, the purchaser declared, "On or about January 16, 2018, I had a phone conversation with Mr. Hyman to discuss the process of investing in the Telegram Pre-Sale in more detail."  Exhibit B to PX2 is an email from Hyman to the purchaser, and it does not seem the purchaser responded.**

    b.   **In PX4 at ¶ 11, again, the purchaser simply declared that phone calls occurred between it and Telegram, nothing more:  "Prior to investing in the ICO, [we] spoke directly with representatives of Telegram via email and on the telephone."**

    c.   **In PX4 at ¶ 12, the purchaser went on to describe its decision to invest—these conversations are not listed (listing, instead, "brand among crypto enthusiasts," and "a team of top notch product engineers").**

      d.   In PX8 at ¶ 8, again, the purchaser simply declared that a conversation had occurred, "my partners and I had a video conference with Mr. Durov," but there is nothing to support the assertion therein that the purchasers "based" their decision on this conversation.

**Further, disputed to the extent Plaintiff suggests the cited materials is indicative or representative of the decision-making process of all other purchasers in the Private Placement. Further, Defendants note that:**

> **[I]n entering into the Purchase Agreements, [the purchasers] agreed not to rely on any representation, warranty, collateral contract, undertaking or other assurance (except the Issuer's Warranties, the Parent's Warranties and the Purchaser's Warranties and undertakings expressly set out in this Purchase Agreement, the Rep Letter Questionnaire, any Rep Letter and the KYC Form) made by or on behalf of any other Party before the signature of this Purchase Agreement, including during the course of negotiating this Purchase Agreement.**

**JX12 at 11. Additionally, by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (¶ 6.3(f)); JX12 at 6 (¶ 6.3(f)). Finally, the cited material is irrelevant to Plaintiff's claims in this action.**

      158.    The following Initial Purchasers did not purchase Grams for consumptive use. (PX2 at ¶ 18; PX3 at ¶ 20; PX4 at ¶ 24 (possible consumptive use of portion of Grams but primarily hoped to sell for profit); PX5 at ¶ 22; PX6 at ¶ 6; PX7 at ¶ 21.)

**<u>Response to No. 158:</u>    Disputed to the extent Plaintiff suggests that these purchasers believed that Grams will not have consumptive uses. For instance:**

      a.   In PX2, Exhibit E, an investment memo generated internally states that TON's "competition" will be "Litepay (Litecoin) [a] payment processor of Litecoin where retailers can accept Litecoin payments instantly . . ."

      b.   In PX5, Exhibit A, an analysis prepared by the internal team of the purchaser states: "TON could be a $100B+ commerce platform in the next four years"; "[a] truly global, decentralized, commercial platform would be transformative, enabling transactions to occur without currency-related transaction fees or long transfer times, allowing local merchants to reach a massive and engaged global audience."  PX5, Exhibit A, at 2963.

    c.   **In PX5, Exhibit B, a different member of the purchaser's team states that Telegram "has the potential to lead a highly commercialized ecosystem." PX5, Exhibit B, at 1580-81.  The analysis goes on to state that the most direct competitors of TON would be**

> **Global commerce/payment platforms for physical and digital goods or money transfers (such as Amazon, Alibaba or Paypal). In theory, T would be better by having a more global (rather than country-specific) network and lowering otherwise difficult access barriers of currency transfer costs, ID verification, and platform familiarity.  Furthermore, if the underlying blockchain technology succeeds in their mission of fast, scalable transactions at low cost, that would be unique (and transformative) in the market.**

       *Id*. at 1582.

**Further disputed to the extent that Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant for Plaintiff's claims in this action.**

    159.   The following Initial Purchasers purchased Grams in order to profit from their investments by selling Grams at an opportune time on secondary markets once the lockup period was over.  (PX1 at ¶¶ 14, 19; PX2 at ¶¶ 14, 17; PX3 at ¶¶ 12, 18, 19; PX4 at ¶¶ 12, 13, 24, Exhibit C; Exhibit D; PX5 at ¶ 21; PX6 at ¶ 6; PX7 at ¶¶ 18, 19, 21, Exhibit A; PX8 at ¶ 11.)

<u>**Response to No. 159:**</u>    **Disputed as incomplete and misleading.  For instance:**

    a.   **In PX1 ¶ 19, the purchaser stated, "At the time of the investment, [the purchaser] did not have specific plans to sell our Grams or how we would do so, but we hoped the value of Grams would appreciate and if they did we would evaluate a sale at that time. We were monitoring potential secondary markets to help us evaluate the value of what we had bought."**

    b.   **In PX6 ¶ 6, the purchaser declared, it "did not have a defined plan with respect to the potential future sale of Grams, and [it] anticipated that facts and circumstances would dictate those decisions."**

    c.   **In PX8 ¶ 11, the purchaser stated, it "hoped to make a profit ultimately, but did not have a plan for when that would be."**

**Further, disputed to the extent Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant for the Plaintiff's claims in this action.**

160.    The following Initial Purchasers purchased Grams with the hope that there would ultimately be a secondary market for trading Grams, including because of direct communications with Telegram about listing Grams on exchanges.  (PX1 at ¶¶ 14, 18; PX3 at ¶¶ 16, 19, Exhibit D; PX7 at ¶ 18.)

**Response to No. 160:**    **Disputed as incomplete and misleading.  For instance:**

    a.    **In PX3 ¶ 16, the purchaser stated:**

> **"[It] entered into the Purchase Agreement understanding it was ultimately an agreement to obtain Grams. Assuming that the preconditions of the Purchase Agreement were met such that [the purchaser]  received Grams, we hope to be able to trade them as permitted by the Purchase Agreement and applicable law at some time after the TON blockchain became operational.**

    b.    **In PX3 ¶ 18, the purchaser stated:**

> **"[It] entered into the Purchase Agreement to make a profit from the investment at a later time. [The purchaser] expected at some point that there would be a secondary market for selling Grams, and that it would be able to participate in that market as permitted under the Purchase Agreement and all applicable law.**

    c.    **PX1 ¶¶ 14, 18 and PX3 ¶¶ 16, 19 and Exhibit D do not mention any such communications with Telegram.**

**Further, disputed to the extent Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant for Plaintiff's claims in this action.**

161.    Several factors informed the following Initial Purchasers' views that an investment in Grams could be profitable.  (PX1 at ¶ 15; PX 2 at ¶¶ 13, 14, Exhibit D, Exhibit E; PX3 at ¶ 12, Exhibit B; PX4 at ¶¶ 8-15; PX5 at ¶ 12, Exhibit A; PX6 at ¶ 4; PX7 at ¶¶ 19, 21, Exhibit A; PX8 at ¶¶ 11, 16, Exhibit A.)

**Response to No. 161:**    **Disputed to the extent that Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement.**

162.    The following Initial Purchasers believed the price of Grams would ultimately trade higher than they purchased Grams for because they believed that Telegram's Messenger application would continue to grow and drive demand for Grams.  (PX1 at ¶ 15; PX2 at ¶¶ 7, 9, 13, 14, Exhibit C, Exhibit D, Exhibit E; PX3 at ¶ 12; PX4 at ¶¶ 8, 12, 13, 14, 15, Exhibit A, Exhibit C, Exhibit D; PX5 at ¶¶ 7, 9, 10, 11, 12, 13, Exhibit A, Exhibit B; PX6 at ¶ 3; PX7 at ¶¶ 19, 20, Exhibit A; PX7 at Exhibit A; PX7 at Exhibit A.)

**Response to No. 162:**      **Disputed as inaccurate and misleading to the extent Plaintiff suggests the cited materials indicate the purchasers believed the price of Grams would trade higher "because" they believed Messenger would grow and drive demand for Grams. For instance:**

> a.  **In PX1 ¶15, the purchaser indicated there were "many factors that informed our view that this investment in Grams could be profitable."  The purchaser cited the fact that "Telegram's Messenger platform was a powerful application" as just one factor.  *Id.***

> b.  **In PX2, the purchaser did not declare that he believed the price of Grams would trade higher than the purchase price because Messenger would grow and drive demand for Grams.  In PX2 ¶7, the purchaser indicated he became "interested" in the Private Placement because Messenger had a 100-200 million userbase.  In PX2 ¶9, the purchaser indicated he had a telephone conversation with Hyman about the Private Placement.  In PX2 ¶13, the purchaser indicated his colleagues conducted "independent due diligence" on Messenger's userbase and comparable messaging platforms, which he found to be "relevant."  In PX2 ¶14, the purchaser indicated the decision to invest in Grams was based on internal due diligence and listed several factors that contributed to the decision.  The purchaser did not list Messenger's growth and ability to drive demand for Grams as a factor.**

> c.  **In PX3 ¶12, the purchaser simply declared that they believed the price of Grams would increase once the TON Blockchain launched.  Among other reasons, the purchaser noted that the Telegram Messenger platform was already established.**

> d.  **In PX6 ¶3, the purchaser indicated they decided to enter into the Purchase Agreement "based in part on the strength of Telegram's leadership team and the past success of Telegram's Messenger platform."**

**Further, disputed to the extent that Plaintiff suggests the cited materials is indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant for Plaintiff's claims in this action.**

163.    The following Initial Purchasers believed the price of Grams would ultimately trade higher than they purchased Grams for based on their confidence in the Telegram founders' reputations and past success with Telegram Messenger, which gave them confidence that Telegram could build and launch the TON Network. (PX1 at ¶ 15; PX2 at ¶ 14, Exhibit E; PX3 at 12; PX4 at ¶¶ 12, 13; PX5 at Exhibit A, Exhibit B; PX6 at ¶ 3; PX7 at ¶ 19, Exhibit A; PX8 at Exhibit A.)

**Response to No. 163:**    **Disputed as incomplete and misleading.  For instance:**

   a. **In PX2 ¶ 14, the purchaser stated:**

> **[W]e believed that we would ultimately be able to make a profit from selling Grams [and] [w]e believed that Telegram had a good team of developers and engineers to support the TON network . . . .   Moreover, Telegram already had a captive community of users, which made it less difficult to create a new network.**

   b. **In PX2, Exhibit E, an investment memo drafted by the purchaser states, "Telegram will use its expertise in encrypted distributed data storage to create TON, a fast and inherently scalable multi-blockchain architecture." PX2, Exhibit E, at 2321.**

   c. **In PX5, Exhibit A, under "challenges" the analysis states: "Technical Feasibility: There is a technical question as to whether it is even possible to create TON's proposed blockchain currency, particularly in the time frame discussed. All they have thus far is a technical whitepaper that is mostly academic."  PX5, Exhibit A, at 2964.  In Exhibit B, a different member of the purchaser's team states, "Whether [Telegram] can execute properly against this potential, both from an operational and technological standpoint, remains a leap of faith, but one supported in part by the team's demonstrated ability to build special products."  PX5, Exhibit E, at 1581.**

   d. **In PX3, Exhibit A, a member of the purchaser's team states answering a question about "how successful [TON] will be," "not sure on project success, but from a user's standpt – telegram is far superior than other chat clients."  PX3, Exhibit A, at 6775.**

   e. **In PX4, Exhibit C, the declarant, talking to his team about whether they can succeed in its project, characterizes it as "a reasonable bet to make." PX4, Exhibit C, at 232.**

f.  In PX6 ¶ 3, the purchaser states that its decision to enter into the Purchase Agreement "was based in part on the strength of Telegram's leadership team and the past success of Telegram's Messenger platform." PX6 at 2.

g.  In PX7, Exhibit A, an "overview" of the project drafted by the purchaser, under "Thesis," lists "Strong technical team that has proven they can build scaled, distributed social systems," and "Risks," lists "Ability to execute on technical visions." PX7, Exhibit A, at 374.

h.  In ▇▇▇ Exhibit A, an internal analysis created by the investor states under "Investment Thesis," "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Later on, it states that Telegram's team "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" PX8, Exhibit A, at 213.

Further, disputed to the extent that Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement. Finally, disputed as irrelevant to Plaintiff's claims in this action.

164.    The following Initial Purchasers believed Grams would ultimately trade higher than the price at which they purchased Grams because Telegram told investors it planned to do additional offerings of Grams at higher prices because there was a lot of demand for Grams. (PX1 at ¶ 15, Exhibit C; PX3 at Exhibit B; PX4 at ¶¶ 12, 16, Exhibit C; PX5 at Exhibit A; PX7 at 19; PX8 at Exhibit A.)

**Response to No. 164:**    Disputed as inaccurate, incomplete and misleading. For instance:

a.  In PX1 ¶ 15, the purchaser states that the "pricing mechanism described by Telegram indicated that any future token offerings would sell Grams at a higher price." PX1, Exhibit C is a communication from Telegram stating that "the combination of the scale and quality of the demand led us to rethink our strategy for both this transaction and the next round" and lays out the pricing for the two rounds of the Private Placement. PX1, Exhibit C, at 813. Nowhere in PX1 ¶ 15 or Exhibit C, does the purchaser state that they believed they would be able to sell Grams at a higher price because Telegram communicated that there was a lot of demand for Grams.

b.  PX3, Exhibit B acknowledged the possibility that an additional round might follow the pre-sale at a higher price based on the White Paper pricing formula, but it does not support the assertion that the purchaser

46

believed they would be able to sell Grams at a higher price because Telegram communicated that there was a lot of demand for Grams.  PX3, Exhibit B, at 7278.

c.   PX5, Exhibit A states, "[o]ur investment thesis is driven by the belief that the value of Gram tokens will be highly correlated with the GMV growth potential of the TON commerce platform itself."  PX5, Exhibit A, at 2963. PX5, Exhibit A does not support the assertion that the purchaser believed they would be able to sell Grams at a higher price because Telegram communicated that there was a lot of demand for Grams.

Further, disputed to the extent Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant to Plaintiff's claims in this action.

165.   One Initial Purchaser believed Grams would ultimately trade higher than the price at which it purchased Grams because the founders were retaining a portion of Grams for themselves, which would incentivize them to deliver a successful working product and "our interests were tied to the founders' interests."  (PX7 at ¶19.)

Response to No. 165:   Disputed to the extent that Plaintiff suggests the cited materials is indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant to Plaintiff's claims in this action.

166.   At the time the following Initial Purchasers bought Grams, they believed that the Telegram team would continue to support and grow the TON network after launch.

(PX2 at ¶ 14; PX3 at Exhibit B; PX4 at ¶ 14; PX6 at ¶ 3; PX7 at ¶ 20.)

Response to No. 166:   Disputed as inaccurate and misleading.  For instance, PX3, Exhibit B does not support the assertion that the purchaser believed that Telegram would continue to support the TON network *after* launch.  Instead, it notes only that, "Capital will be used to develop TON and the associated functionality within Telegram Messenger over the next number of years."  PX3, Exhibit B, at 7278.  Further, disputed to the extent that Plaintiff suggests the cited materials are indicative or representative of the decision-making process of all other purchasers in the Private Placement.

Additionally, Defendants note that on January 6, 2020, Telegram publicly announced that it and its affiliates "have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram may never do so."  Drylewski Ex. 3 at 1.

**Moreover, by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]"  JX11 at 11 (¶ 6.3(f)); JX12 at 6 (¶ 6.3(f)).  Finally, the cited information is irrelevant to Plaintiff's claims in this action.**

167.    The following Initial Purchasers do not plan to become validators of the

TON network, or have not taken any substantial steps to do so.  (PX2 at ¶ 20; PX3 at ¶ 22; PX4

at ¶ 23; PX5 at 22; PX6 at ¶ 6; PX7 at ¶ 22; PX8 at ¶ 18.)

**Response to No. 167:        Disputed to the extent that Plaintiff suggests the cited materials are indicative or representative of the decision-making process and plans of all other purchasers in the Private Placement.  Further, disputed as irrelevant to Plaintiff's claims in this action.**

168.    Telegram did not ask the following Initial Purchasers at the time they

entered into the Purchase Agreements whether they planned to act as validators on the TON

Blockchain.  (PX3 at ¶ 22; PX6 at ¶ 6; PX7 at ¶ 23; PX8 at ¶ 8.)

**Response to No. 168:        Disputed to the extent that Plaintiff suggests the cited material are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Defendants also note that Telegram widely invited the initial purchasers to participate as validators, *see, e.g.*, Drylewski Ex. 13 ("you are eligible to take part in the validators' election process"), even providing specific and tailored technical guidance, *see, e.g.*, JX25 ("If you wish to run one or several validators, you will need . . ." and describing the technical requirements to run validators); *see, e.g.*, Malloy Ex. 6 (alex@telegram.org providing specific responses to validation troubleshooting questions). Further, the cited information is irrelevant to Plaintiff's claims in this action.**

169.    At the time the following Initial Purchasers executed the Purchase

Agreements, they understood they were entering into an agreement with Telegram to buy Grams,

which they owned at the time they transferred their funds, but which were to be delivered at a

later date.  (PX2 at ¶ 17; PX3 at ¶ 16; PX4 at ¶ 15; PX6 at 6; PX8 at ¶15.)

**Response to No. 169:        Disputed as inaccurate, incomplete and misleading.  For instance:**

        a.    **In PX2 ¶ 17, the purchaser stated, "After we entered into the Purchase Agreement and wired the money to Telegram, we believed that, contingent upon the occurrence or non-occurrence of certain events as detailed in the**

Purchase Agreement, we had *a right to receive the Grams at a future date.*" (emphasis added).

b.  In PX3 ¶ 16 the purchaser stated that it "entered into the Purchase Agreement understanding it was ultimately an agreement to obtain Grams," "[a]ssuming that the preconditions of the Purchaser Agreement were met."

c.  In PX6 ¶ 6, the purchaser stated, "The Purchase Agreements gave [the purchaser] the right to receive Grams at a future date."

**Further, Defendants note that the Purchase Agreements make clear that Telegram possesses the "sole discretion" as to whether the TON Blockchain is ready to launch and thus whether Grams will be created and delivered.  JX12 at 12 (definition of "Network Launch").  Both Defendants and the Private Placement purchasers represented and warranted that performance under the Purchase Agreements may not "violate any judgment, statute, rule or regulation applicable to it" or "contravene any law, regulation or regulatory policy applicable to the Purchaser."  JX12 at 14 (Schedule 1: Issuers' Warranties  and Parent's Warranties § 4(a)); 15 (Schedule 2: Purchaser's Warranties § 4).**

**Further disputed to the extent that Plaintiff suggests the cited materials are indicative or representative of the decision-making process and plans of all other purchasers in the Private Placement.  Finally, the cited information is irrelevant to Plaintiff's claims in this action.**

170.  Telegram did not ask the following Initial Purchasers at the time they entered into the Purchase Agreements what they planned to do with Grams after they purchased them.  (PX2 at ¶ 19; PX3 at ¶ 21; PX4 at ¶ 25; PX5 at ¶ 23; PX6 at ¶ 6; PX7 at ¶ 23; PX8 at ¶ 12.)

**Response to No. 170:      Undisputed for purposes of Plaintiff's motion but subject to clarification.  Ilya testified that he did not ask that question because: "it is the same like when people buy something from me and they get money into the account and I ask 'What are you going to do with your money.'  So I don't think it is an appropriate question to ask what people are going do with their own funds after we don't have any relations anymore . . ."  PX13 at 172:15-173:4.**

171.  The following Initial Purchasers heard rumors about interests in Grams trading on secondary markets before Grams had launched, and some discussed those rumors with Telegram.  (PX1 at ¶ 25; PX2 at ¶ 21, Exhibit F; PX3 at ¶ 23, Exhibit E; PX4 at ¶ 26, Exhibit E; PX7 at ¶ 26; PX8 at ¶ 17.)

**Response to No. 171:**     Disputed as incomplete, inaccurate and misleading.  For instance:

    a.   **In PX1 ¶ 25, the purchaser described a "discussion I had with Mr. Hyman on June 12, 2019 about one such rumor" (citing Exhibit G).  However, Exhibit G does not contain any conversation with "Telegram," but rather with Hyman in his capacity as a Gram Vault employee (using his "@gramvault.com" email), almost one year after he had left Telegram. JSF ¶ 27.**

    b.   **The remainder of the cited exhibits similarly do not show any support for the proposition that the purchasers discussed these rumors with Telegram. Instead, they show only that investors discussed unsourced and unverified rumors internally or with non-Telegram parties.  PX2 at ¶ 21 ("I reached out to Liquid"); PX3 at ¶ 23 ("I heard rumors . . . Attached . . . is an email I received on February 13, 2018, from [another employee of the purchaser] reporting one such rumor"); PX4 at ¶ 26 (citing an outside communication which does not involve Telegram); PX7 at ¶ 25 ("I heard rumors that . . . "); PX8 ¶ 17 ("Through inquiries from the press, I heard rumors . . .").**

**Further, disputed to the extent that Plaintiff suggests the cited materials is indicative or representative of the information obtained and communicated to Telegram by other purchasers in the Private Placement.  Finally, the cited information is irrelevant to Plaintiff's claims in this action.**

**C.    The Investors' Internal Investment Analyses**

       172.   In addition to those Initial Purchasers who have submitted sworn testimony in this matter, many others explained their investment rationale in internal documents and communications around the time of their investment.

**Response to No. 172:**     Undisputed for purposes of Plaintiff's motion.

       173.   For example, an "investment thesis" prepared by one of the initial purchasers in or around February 2018 states:

    a.   "[T]here is only one [digital asset project] which boasts a pre-existing network valued in the billions, and a team who has already built successful applications for hundreds of millions of users."

b.   "Telegram is projected to reach 200 million users in Q1 2018.  We cannot underestimate the potential value of existing network effects in deploying new technologies."

c.   "If TON is able to capture at least the full value of Telegram's existing user base, we see TON valued at a market capitalization of over $30B in 2021, giving an annualized return of 180% to early investors."

d.   "In the context of this offering, it is crucial to not just examine Telegram as a product, but also, Telegram as a team. . . . [T]he skills and synergies of a team that has built scalable products for tens of millions of users over an extended time period is invaluable."

e.   Telegram's user base has a "[s]trong pre-existing crypto community," "[r]apidly growing and authentic," with "demographic diversity" and "proven user experience."

f.   Forecasting "a price of $7.23 per Gram in 2021," resulting in "a 181% annualized return over three years."

g.   "Blurred Line between Telegram and TON blockchain":  "Investing in the TON Blockchain could mean that you are funding Telegram itself without gaining equity in Telegram."  (PX30.)

**Response to No. 173:**      **Disputed as incomplete and misleading.  The text of the quoted "investment thesis" also states:**

a.   **"The TON blockchain has the potential to capture sizeable market share of the rapidly growing digital payments space."  PX30 at 1.**

b.   **"The TON [] blockchain aims to be a multifaceted system: an integrated value transfer platform for the decentralized economy. In addition to the TON blockchain core, the TON infrastructure will offer many components consisting of a payments system that aims to rival the likes of Visa and**

MasterCard, storage capabilities, privacy measures and content viewing and browsing services." *Id.* at 2.

c. "The [Durovs] do not appear to be financially motivated. . . Telegram is not for sale. . . [W]hat seems to drive them is their libertarian ideals and their technological reputations.  Those driving factors would seem to result in a genuine motivation to make TON and its underlying cryptocurrency and encrypted network with fundamental utility and value." *Id.* at 4.

d. "As a new payments ecosystem is emerging, with momentum in the direction of mobile payments, we see this as a hugely bullish indicator for the mainstream adoption of TON and the use of Grams for digital payments." *Id.* at 9.

e. "If the internet is the primary provider of the decentralized transfer of information (World Wide Web), then Ton blockchain aims to be the primary provider of the decentralized transfer of value (The Open Network)." *Id.* at 12.

**Further disputed as irrelevant to Plaintiff's claims in this action.**

174.   Another investor wrote in its investment memo, dated January 2018:

a. "Telegram has some key advantages.  Its messaging application has already 180M users which would make it de facto the largest cryptocurrency wallet provider in the world.  Their engineering team is truly world-class and has demonstrated (with their messaging app) that they can deliver a user friendly and secure application to hundreds of millions of users.  It is also the leading communication platform for cryptocurrency today, with 84% of upcoming Blockchain projects having a Telegram group.  Telegram is also used as the predominant community platform for those actively buy/selling tokens, which we believe will drive up the price of TON's Gram coin post initial launch."

b. Telegram will leverage its existing ecosystem of communities, developers, publishers, payment providers, and merchants to drive demand and value for the TON currency."

c.   [W]e also believe that because of the discount offered to participants in the

resale, market conditions, momentum and scarcity, this coin will go up sharply in

price in the short term.  It could offer a return comparable to what we might see

from a VC investment (5-10x) that is realizable in 3-6 months (once the lockup

begins to expire) instead of 7-9 years.  We believe that our unique advantage as

VCs here is not our ability to form a view on the long-term value and influence

that outcome, but access.  This presale is being offered to 'blue chip' VCs that can

help signal quality to other investors in the ICO and public market.  That is why

our peer firms and ourselves are being offered the opportunity.  This access is

more like a 'friends and family' allocation in a hot IPO than a traditional VC

round."  (PX31.)

**Response to No. 174:**     **Disputed as incomplete and misleading.  The text of the quoted investment memo also states:**

a.  **"Telegram's new objective is to deliver a truly mass-market cryptocurrency (called 'GRAM') that will be used for payments and consumer-facing distributed apps (dApps) in everyday life."  PX31 at 1.**

b.  **"TON will be like a decentralized supercomputer and value transfer system. By combining minimum transaction time with maximum security, TON can become a VISA/MasterCard alternative for the new decentralized economy. GRAM tokens will serve as the principal currency for the in-app economy on Telegram and will also be available for external use. Existing bot platforms, channels and groups on Telegram should provide a natural market for paid digital content services and physical goods. Telegram's existing user base is 80% from emerging markets. These are the same markets that require solutions for digital payments to facilitate eCommerce and mCommerce, but which don't yet have the credit bureau infrastructure to support the digital payments systems of the West or China."  *Id.*

c.  **"TON is a very high-profile project that could potentially bring cryptocurrencies to the next level in terms of mainstream adoption."  *Id.* at 2.**

**Further disputed as irrelevant to Plaintiff's claims in this action.**

175.   Another investor wrote in its January 2018 investment memo:

a. "Telegram plans to leverage its large and engaged userbase and an existing ecosystem of developers, merchants, and payment providers.  Also they plan to address the scaling and governance challenges faced by various blockchains and build the foundational components like DNS, proxy, storage, etc."

b. "TON has an effective way to bootstrap the blockchain by leveraging Telegram's 200M active users.  Also, nearly 84% of crypto projects have an active Telegram community, which provides TON an engaged group of users to build upon."

c. "Telegram has one of the strongest teams that we have seen in the crypto space . . . [with] experience building scalable, decentralized systems as part of Telegram."

d. "Through its integration with Telegram, TON can incentivize thousands of existing Telegram bot developers that have built more than 800k bots to build DAPPs on top of TON platform."

e. "If [TON] becomes as big as ETH, TON could have a market cap of $75B, which would be 40x on our investment."  (PX32.)

**Response to No. 175:**     Disputed as incomplete and misleading.  The text of the quoted investment memo also includes the following omitted statements (in *italics*):

a. "*Telegram has a vision to build the first mass-market cryptocurrency. To execute on this vision,* Telegram plans to leverage its large and engaged userbase and an existing ecosystem of developers, merchants, and payment providers.  Also, they plan to address the scaling and governance challenges faced by various blockchains and build the foundational components like DNS, proxy, storage, etc. *that developers can use to build decentralized apps on top of TON.*"  PX32 at 1.

b. "*If TON fulfills its technical vision, we believe that TON can leverage its existing user base and developer ecosystem to become one of the most prominent blockchains.  If it becomes as big as ETH, TON could have a market cap of $75B, which would be 40x on our investment.*"  *Id.* at 3.

**Further disputed as irrelevant to Plaintiff's claims in this action.**

54

176.     Similarly, a different investor wrote in its analysis, dated February 2018:

a.    "Telegram is where the conversation happens for all things crypto."

b.    "TON's initial go to market will be through the Telegram Messenger ecosystem.
Telegram Messenger can serve as an example of the unique possibilities offered
by integrating with TON, while also adding features to the TON platform,
leveraging Telegram's user base and developed ecosystem."

c.    "Telegram's existing ecosystem will also be able to offer simple ways of buying
the TON coins, and a range of services to spend them on."

d.    "Telegram's founder and team . . . have proven to be repeat heavy hitters building
products and services that hundreds of millions of people are using in a short
period of time"

e.    "In the bull case, TON could be the AWS (products and services to be built on top
of it) + WeChat (all the consumer facing products that are widely used and use the
same distribution + currency) of the new blockchain world that is emerging."

f.     "The Telegram Messenger ecosystem provides a significant go to market
advantage for TON."

g.    "We believe this investment could return 10x."  (PX33.)

**Response to No. 176:     Disputed as incomplete and misleading.  The text of the quoted
analysis also states: "TON could be the AWS (products and services to be built on top of it)
+ WeChat (all the consumer facing products that are widely used and use the same
distribution + currency) of the new blockchain world that is emerging."  PX33 at 1.
Further disputed as irrelevant to Plaintiff's claims in this action.**

177.     One investor amended and restated its LLC operating agreement in

February 2018, whereby the "purpose" of the LLC would be partly to "acquire, hold and

distribute, for investment purposes, the Investment," with the "Investment" defined as to

"acquire and hold, for investment purposes, a new cryptocurrency called 'Grams'."  (PX34 at 3, 9.)

**Response to No. 177:     Disputed as incomplete or misleading.  Plaintiff omits that the parties to the agreement understood that the Purchase Agreement compromised only a future contingent right to Grams ("launch Grams . . . following the development and launch of the Issuer's new blockchain platform, the TON Network") and that there was no guaranteed or expected return.  PX34 at 3.  The cited materials provide: "The Members understand that the investment in the Class B and C Interests, as well as the subsequent investment in the Grams, involve significant risks, including, but not limited to, the risk that the Grams may decrease in value over time and/or lose all monetary value."  *Id.* at 17. Further disputed as irrelevant to Plaintiff's claims in this action.**

178.     Another investor had internal discussions about the possibility of selling 20% of the Grams "during the first three days of trading" after distribution.  (PX35 (English language translation of original Russian text).)

**Response to No. 178:     Disputed as an uncertified translation of a foreign language document.  Plaintiff purports to rely on a foreign language document, yet fails to provide a certified translation.[5]**

## VI.     TELEGRAM TOLD INVESTORS THE SECOND ROUND OFFERING WAS COMPLETED IN MARCH 2018

179.     On or about May 2, 2018, the Wall Street Journal reported that "in March, [Telegram] said it raised another $850 million from 94 investors in a second private deal and that "Telegram's latest filing, on March 29, suggested fundraising could be ongoing, but the person briefed on the matter said Telegram is no longer considering a public deal open to retail investors."  (PX 131 at 2.)

**Response to No. 179:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The cited material appears to have been written by a third-party without knowledge of Telegram's plans and procedures with respect to the Private Placement. Further, in response to an initial purchaser's question regarding the cited article, Hyman**

---

[5]     *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 & n.9 (S.D.N.Y. 2016) ("foreign-language documents cannot be reviewed or relied on by the Court . . . unless they are accompanied by certified translations into English"); *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs., Inc.*, No. 10 Civ. 5715 (S.D.N.Y. Aug. 9, 2012) (denying cross-motions for summary judgment where the parties provided only uncertified translations of a Polish-language contract that was subject of the dispute).

explained to the purchaser that Telegram's original plans "remain unchanged." PX19. Hyman stated, "If you recall we made it clear as far back as February that we would not do a public placing principally for regulatory purposes, [ ] at any point and that retail investors have to wait for the blockchain launch." PX19; *see also* PX20.

180.  On or about May 11, 2018, one investor asked for "the date the second round was completed," to which Hyman responded "March 16." (PX132.)

**Response to No. 180:**  **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that in March 2018, Telegram had received signed agreements from the private purchasers that corresponded to a total of $850 million.  Malloy Ex. 1 at 96:16-97:13.  Pavel further explained that even though some of the investors took time in transferring funds, the Purchase Agreements were legally binding and Telegram could pursue legal action if the investors did not fulfil their payment obligations.  PX12 at 99:24-101:5.**

181.  On or about March 19, 2018, however, Parekh had told Hyman that Telegram had $400 million in executed purchase agreements. (PX133.)

**Response to No. 181:**  **Undisputed for purposes of Plaintiff's motion.**

182.  As of April 6, 2018, Telegram had sent wiring instructions for $750 million but had received only $490 million. (PX134 at TLGRM-015-00000528.)

**Response to No. 182:**  **Undisputed for purposes of Plaintiff's motion.**

183.  That figure rose gradually over the next few months as Parekh, Hyman, and Perekopsky worked on obtaining new purchase agreements and payment thereon. (PX135–136.)

**Response to No. 183:**  **Undisputed for purposes of Plaintiff's motion.**

184.  As of March 2018 when it filed Forms D with the SEC, Telegram had not received $850 million from Stage A purchasers, and was missing approximately $200 to 300 million. (PX12, Durov Tr. at 99:24-100:3, 101:6-13.)

**Response to No. 184:**  **Disputed as incomplete and misleading, and subject to clarification for the reasons stated in Response to No. 180.**

185.     As of March 2018 when it filed Forms D with the SEC, although

Telegram had not received $850 million from Stage A purchasers, it considered itself to have

"sold" $850 million worth of Grams because it viewed the Gram Purchase Agreements as

"legally binding agreements," so it viewed $850 million as the amount of transactions it had

already entered into.  (*Id.* at 99:24-104:9.)

**Response to No. 185:     Disputed as incomplete and misleading, and subject to clarification in Response to No. 180.  Defendants sold the right to receive Grams if certain conditions were met as set forth in the Purchase Agreements.  *See* JX11 at 7; JX12 at 11.**

186.     When asked if it was fair to say that Telegram had not actually received

$850 million as of March 29, Telegram's CEO stated "[y]es" but explained:  "We believed that

having all those purchase agreements signed by the purchasers means that we have the comfort

of knowing those funds will eventually be transferred, or would eventually be transferred.  Those

are legally binding agreements and if we decided to do so, we could try to start a litigation with

each of the purchasers that failed to meet their obligations. . . ."  (PX12, Durov Tr. at 99:25–

101:5.)

**Response to No. 186:     Disputed as incomplete and misleading.  The full cited portion of the relevant deposition testimony provides:**

> **As I said, some of the purchasers took time in transferring funds, but at that point it seemed natural because some of them would have problems with -- or additional questions coming from their banks, some of them would refer to other reasons why it would take additional time, and given the fact that we believed we had credible funds and individuals sign those agreements, we had no grounds to believe that they would act to breach the agreements, particularly after having successfully, quickly, concluding the first stage of the [P]rivate [P]lacement where also some of the purchasers might have taken a couple of additional weeks to transfer, but eventually did transfer in a reasonable time frame. So based on our experience, we believed that having all those purchase agreements signed by the purchasers means that we have the comfort of knowing those funds will eventually be transferred, or would eventually be transferred. Those are legally binding agreements and if we**

> decided to do so, we could try to start a litigation with each of
> the purchasers that failed to meet their obligations, and that was
> something I considered at that point in time; however, we
> decided that it would be easy and beneficial, more beneficial, for
> all parties involved for us just to give them additional time. After
> that time is up, give the same opportunity to certain other
> purchasers.

**PX12 at 99:25-101:5. Further, the cited information is irrelevant to Plaintiff's claims in
this action.**

## VII.   TELEGRAM VIEWED GRAMS AS SECURITIES, AND REFERRED TO THEM AS SUCH

187.   In update emails to investors, Telegram referred to the "sale of Grams,"

not the sale of interests in the right to receive Grams. *See, e.g.*, (PX36 (email from Hyman dated

February 20, 2018: "no more than $1.7 billion worth of Grams will be sold").)

**Response to No. 187:   Disputed as misleading and incomplete to the extent Plaintiff
suggests that Telegram referred to the "sale of Grams" and not the sale of interests in the
right to receive Grams in all update emails to investors.  Further, disputed insofar Plaintiff
suggests the wording in one of the email updates to purchasers is indicative of Telegram's
views on whether purchasers were sold Grams or the "right to receive Grams" under the
Purchase Agreements.  Additionally, Defendants note that the Purchase Agreements were
designed to allow Defendants "to create and issue a new cryptocurrency called 'Grams'
('Tokens') following the development and launch of a new blockchain platform (the 'TON
Network')" and the Private Placement purchasers to "subscribe for Tokens" subject to all
of the conditions set forth in the Purchase Agreements.  JX11 at 7; JX12 at 11.**

188.   On or about February 6, 2018, a representative from one of the Initial

Purchasers told Hyman: "The other contributing factor" to a "very rough [crypto] market" was

"the regulators SEC getting hyper active last two weeks, which has caused many traditional

players that were fooling around in the space to pause pending further clarity." (PX37 at TG-

007-00000726.)

**Response to No. 188:   Undisputed for purposes of Plaintiff's motion that the speaker
made such a statement.**

189.   In an email to an investor's accountant on March 6, 2019, Parekh said that

the investor had the right to 72,835, 916.68 Grams and that "the Fund has clear title to such

securities," "will be entitled to receive . . . Grams when they are issued," and that "the securities

are not pledged." (PX38.")

**Response to No. 189:** Disputed as incomplete, inaccurate and misleading. The cited communication is a response by Shyam to a purchaser who requested "an investment confirmation." PX38. The confirmation request from the purchaser's auditors—which was attached in earlier emails in the same email chain, but Plaintiff does not cite or reference in ¶189—states:

> "[P]lease confirm that (i) the Fund has clear title to such securities; (ii) the securities are not pledged; and (iii) the securities are not held as collateral."

**Malloy Ex. 15.** In the quoted communication, Shyam copied the language drafted by the auditors in the confirmation request stating:

> "From our records (i) the Fund has clear title to such securities; (ii) the securities are not pledged; and (iii) the securities are not held as collateral."

**PX38.** Further, the full text of the quoted communication provides: "[The purchaser] invested $27.5 million into last year's offering, at a price of $0.37756101, which means that it will be entitled to receive 78,835,916.68 Grams when they are issued." *Id.* (emphasis added). It is clear that Shyam is referring to the purchaser's investment into "last year's offering," i.e. entering into the Purchase Agreements, when he copied the language from the confirmation request and confirmed regarding the Purchase Agreements: "From our records (i) the Fund has clear title to such securities; (ii) the securities are not pledged; and (iii) the securities are not held as collateral." *Id.* Defendants also note that the Purchase Agreements state that "the investment contract represented by this Purchase Agreement is treated as a security in certain jurisdictions. . ." JX11 at 9; JX12 at 14. Finally, the cited information is irrelevant to Plaintiff's claims in this case.

190. In describing the lockup provision, Parekh explained that "it is relatively

conventional capital markets logic that if you have an initial purchase who comes in in an earlier

round and pays a lower price, they tend to have more restrictive terms, in terms of their ability to

take their shares." (PX14, Parekh Tr. at 35:21-36:25.)

**Response to No. 190:** Disputed as incomplete and misleading. The full text of Shyam's relevant testimony provides:

> At the risk of being sort of simplistic, you know, it is relatively
> conventional capital markets logic that if you have an initial
> purchaser who comes in in an earlier round and pays lower
> price, they tend to have more restrictive terms, in terms of their
> ability to take their shares or whatever might be the
> conventional offering.

**PX14 at 35:21-36:25.** Shyam further clarified that his answer was based on his own
experience and understanding as to the rationale behind that decision and not on any
conversations he had with anyone at Telegram. *See* Malloy Ex. 3 at 37:1-10. He added that
"these were sophisticated investors" and "in the couple of conversations where [the lockup
provision] came up, it was relatively noncontroversial." *Id.* Further, the cited information
is irrelevant to Plaintiff's claims in this case.

191.    Parekh analogized the staking of Grams to be selected as a TON

Blockchain validator to stock lending. (*Id.* at 99:7-14.)

**Response to No. 191:**    Disputed as incomplete and misleading. The full text of the cited
testimony provides: "Staking is the process by which transactions on the TON [N]etwork
get validated. Staking has to be undertaken by those who already own Grams. If you
analogize it to stock lending, it is almost like stock lending by a shareholder as a way of
earning some extra income." **PX14 at 99:7-14.** Further, the cited information is irrelevant
to Plaintiff's claims in this case.

192.    Perekopsky explained the lockup provision as an incentive—the lower the

price, the later you would have access to your Grams: "it seemed natural for us that first

investors who paid a lower price, that they will be locked up for some time, and people who paid

a higher price, they can use their Grams sooner." (PX13, Perekopsky Tr. at 131:4-20.)

**Response to No. 192:**    Undisputed for purposes of Plaintiff's motion.

193.    Telegram did not reach out to businesses to accept Grams, but it did talk to

digital token trading exchanges because "we understood the importance of exchanges, because

exchanges would give an opportunity to users, to people to get Grams." (*Id.* at 167:2-24).

**Response to No. 193:**    Disputed as incomplete and misleading. Ilya testified that the
team did not proactively reach out to vendors before the technology was completely ready,
such as after launching the testnet, because "when you speak to the company, if you cannot
really start doing something for this company practically, it doesn't make sense to meet
them." Malloy Ex. 2 at 163:22-164:11. Further, Ilya explained that investors would
suggest companies that "can use [TON]'s cryptocurrency in the future," "as a means of

61

payment for their users" and would proceed to have conversations with such businesses that would sometimes reach out to Telegram. *Id.* at 159:7-163:19. Additionally, Ilya testified that companies who provided custody solutions and exchanges "were reaching out to [Telegram], rather than [Telegram] reaching out to them." *Id.* at 166:20-167:1. Thus to the extent Plaintiff suggests that Telegram treated vendors and exchanges differently, the assertion is inaccurate and highly misleading as Ilya testified that Telegram did not actively reach out to either but was approached by both. *See id.* at 159:7-163:19, 166:20-167:1.

194. An advisor from Blackmoon Financial Group explained to Perekopsky that price stabilization was a "common practice" in "fiat markets' IPO" as a way to "provide liquidity" and noted that this is common in crypto markets too at the time "of both listing at the exchange and the subsequent trading." (PX39.)

**Response to No. 194:** Disputed as irrelevant to Plaintiff's claims in this action and misleading insofar as the cited material does not contain any references to the TON Blockchain, Telegram or Grams. There is no evidence that the cited material has any relation to the TON blockchain whatsoever.

## VIII. TELEGRAM BEGAN DISCUSSIONS WITH A NUMBER OF DIGITAL ASSET TRADING PLATFORMS STARTING IN JANUARY 2018 AND CONTINUED THESE DISCUSSIONS RIGHT UP UNTIL THE FILING OF THE SEC'S LAWSUIT

195. On or about January 21, 2018, in response to an investor inquiring "[h]ow do investors get liquidity post lock up?" Hyman told the investor that "Telegram has been inundated with exchanges keen to list grams." (PX40.)

**Response to No. 195:** Undisputed for purposes of Plaintiff's motion but subject to clarification. The full text of the quoted communication shows that the purchaser stated, "I haven't seen any mentions on the exchanges where the Grams will be sold after the launch. How do investors get liquidity post lock up? Does telegram plan to have exchange on it[s] platform or will it use existing exchanges?" and thus was asking Hyman a question specific to exchanges, to which Hyman responded that "Telegram has been inundated with exchanges keen to list grams." PX40. Further, the cited information is irrelevant to Plaintiff's claims in this case.

196. On or about March 8, 2018, an individual representing themselves as "working closely with a former colleague who's running the process to help [Telegram] in Asia" emailed the exchange Bitmex to request a meeting, noting that Telegram is "keen to establish

relationships with potential investors in their ICO and to discuss areas of potential cooperation

with important players in the ecosystem – the second round of the ICO is basically done and

they're not planning to raise any money for several months, so for now the focus is more on

potential cooperation."  (PX42.)

**Response to No. 196:**     **Undisputed for purposes of Plaintiff's motion that the speaker in the cited material made such a statement.  Disputed to the extent that the cited material appears to have been written by a third-party without authority to speak for Telegram and without knowledge of Telegram's plans and procedures with respect to the Private Placement.  Further, the cited information is irrelevant to Plaintiff's claims in this case.**

          197.    In or around November 2018, Parekh had discussions with Coinbase.

(PX43.)

**Response to No. 197:**     **Disputed to the extent the referenced material shows that Shyam had more than one discussion with Coinbase.  Further, the cited information is irrelevant to Plaintiff's claims in this case.**

          198.    In a "deck highlighting the details of this potential partnership" (*id.*), sent

to Parekh, Coinbase outlined its exchange trading, OTC trading, and custody services.  (PX44.)

**Response to No. 198:**     **Undisputed for purposes of Plaintiff's motion but is irrelevant to Plaintiff's claims in this action.**

          199.    On or about March 18, 2019, Parekh requested from Coinbase "the listing

application papers," which Coinbase sent to Parekh later that day.  (PX45.)

**Response to No. 199:**     **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Shyam testified that he and Coinbase had the conversation referenced in the cited material, and Shyam "made clear that this was a preliminary conversation."  Malloy Ex. 3 at 212:20-213:14.  Conversations with Coinbase "resumed a few months ago, as [Telegram] finally did approach the expected launch at the end of October" but "discussions broke off in mid-October" after the SEC litigation began.  *Id.* at 213:15-214:4.**

          200.    On or about September 23, 2019, Parekh introduced a Coinbase

representative to Alexander Filatov of TON Labs (discussed below):  "I wanted to introduce you.

Nick is with Coinbase, who are looking to develop a custody and exchange solution for Grams,

in which context they had some technical queries with regard to TON.  I thought make sense for you to speak to discuss this and potentially other areas of mutual interest."  (PX46.)

**Response to No. 200:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

201.    Representatives from Coinbase and TON Labs subsequently engaged in a dialogue.  (PX47.)

**Response to No. 201:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

202.    On or about October 9, 2019, Coinbase announced that it "intends to support the secure storage of GRM" at TON's launch.  (PX48.)

**Response to No. 202:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

203.    On or about October 21, 2018, a representative from the eToro digital asset trading platform sent an email to Parekh stating:  "We would like to be one of the first exchanges to offer TON, and would appreciate if we could setup a call with a technical team to see how we can support it."  (PX49.)

**Response to No. 203:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

204.    This email was sent in response to a September 5, 2018 email from Parekh providing an update on the development of TON.  (*Id.*)

**Response to No. 204:**     **Disputed as misleading to the extent Plaintiff suggests that Shyam provided an update on the development of TON to the recipient in its capacity as an exchange.  The recipient is a purchaser in the Private Placement and received these updates at the same time as all other purchasers.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

205.    In or about March 2019, Parekh discussed possible custody solutions with Anchorage, including the desire for certain Grams holders to have "a custodian that provides brokerage/liquidity."  (PX50.)

**Response to No. 205:**     Disputed to the extent the cited material is created by a third party purporting to reflect "notes" from a communication between Anchorage and Shyam. Disputed as incomplete and misleading.  The text of the quoted material also provides:

> [M]any investors have requested third party custodial services for a few reasons: [l]ong term holders want added security[;] [o]ther holders want the ability to transact on the Telegram Network, thus want a custodian that provides brokerage/liquidity[;]  Telegram is currently in the exploration/education phase, but eventually would like to have 'several' custodians.

**PX50.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

206.    On or about April 4, 2019, in response to an investor inquiry, Parekh stated:  "As regards listing, we've had inquiries from a number of large exchanges, and are in discussions with a few of them to see how they might be able to support Grams."  (PX27.)

**Response to No. 206:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

207.    On or about June 17, 2019, Parekh was introduced via email to the founder of "one of the largest crypto exchanges in the world.  And the dominant leader in the China market.  They are very interest [sic] in ton network."  (PX51.)

**Response to No. 207:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

208.    In or about September 2019, Gram Vault (discussed below) submitted a listing request to Bittrex for Grams.  (Ex. PX52.)

**Response to No. 208:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

209.    In its corporate account request to Bittrex submitted on or about August 14, 2019, Gram Vault stated: "Gram Vault provides the Clients with services for liquidation of Grams through private and market deals.  The services are offered through a network of OTC desks and integration with all major exchanges."  (PX53.)

**Response to No. 209:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

210.    In or around September 2019, Gram Vault submitted an application to list Grams on the Poloniex digital asset trading platform.  (PX54.)

**Response to No. 210:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

211.    In or about September 2019, Telegram engaged in discussions with the exchange Binance.  As part of those discussions, Binance inquired as to when and how many tokens would be "unlocked on day 1 of exchange listing."  (PX55.)

**Response to No. 211:**     **Disputed as incomplete and misleading.  The full text of the cited communication shows that Binance inquired whether "all the initial 5 billion tokens [will] be unlocked on day 1 of exchange listing" or whether tokens sold in the first round follow a lockup schedule, to which Shyam responds that first round purchasers are subject to a staggered lockup.  PX55 at 22468.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

212.    Telegram connected Binance with TON Labs.  (PX56.)

**Response to No. 212:**     **Undisputed for purposes of Plaintiff's motion but subject to clarification.  The full text of the cited material shows that Ilya first directed Binance to Shyam who answered questions relating to the token release schedule.  PX56.  Later he added TON Labs to the conversation after specifying that he would "add some technical independent teams to help with integration."  Further, Shyam testified that TON Labs was an "independent company" and he**

> **introduced a number of custodians to TON Labs and other third parties who had assisted Telegram with the testing, and therefore were familiar with the code, in order to sort of let those parties speak bilaterally, to help answer technical questions, because Telegram itself didn't have the resources and the bandwidth to work with either those exchanges or custodians.**

**Malloy Ex. 3 162:10-163:5; 257:3-24.  Further, TON Labs has stated publicly that it is not affiliated with Telegram.  *See* "The Crypto World Still Doesn't Understand Telegram's Plan, Says TON Labs," Cryptobriefing (Sep. 29, 2019) (https://cryptobriefing.com/telegram-ton-labs/).**

## IX.   AS INVESTORS SOUGHT LIQUIDITY, GRAMS BEGAN TRADING IN THE SECONDARY MARKET IMMEDIATELY AFTER THE FIRST ROUND OF THE OFFERING CLOSED

### A.   Hyman Makes Repeated Inquiries Regarding Secondary Trading and "Grey Market"

213.    On or about February 6, 2018, Telegram's Hyman asked one of the investors: "Have you seen any ton trades yesterday."  (PX37 at TG-007-00000727.)  The investor responded:  "Not that I am aware, but the market is not transparent and very fragmented. With your docs, it's impossible to do a clean transfer, so the trading I've seen has been relationship based, as you are essentially getting married to the counterparty for 18 months. Really interesting." (*Id.*)

**Response to No. 213:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel explained that, with respect to Hyman's inquiries regarding the "grey market," "Mr. Hyman was not happy with potential activities in the gray market for a variety of reasons, and he was alerting the team to recent rumors from the market in order for us to be able to assess those rumors, and, if there is any actionable pieces of information, act on it."  PX12 at 342:9-19.**

214.    On or about February 8, 2018, the same investor told Hyman:  "Lots of people running around today looking for allocations – looks like you denied all of NY and some others on a KYC basis.  All of that demand flowing in to the secondary market.  Some willing to pay up to $1." (*Id.* at TG-007-00000728.)

**Response to No. 214:     Undisputed for purposes of Plaintiff's motion but subject to the clarification made in Response to No. 213.**

215.    That same day, Hyman copied this statement from the investor into a separate chat among himself, Durov, Perekopsky, and Parekh, along with the note "Update on grey market."  (PX57 at TLGRM-015-00000957.)

**Response to No. 215:     Undisputed for purposes of Plaintiff's motion but subject to the clarification made in Response to No. 213.**

216.    On or about February 9, 2018, Hyman again asked the same investor: "Any gray market activity in TON."  (PX37 at TG-007-00000729.)  The investor responded: "Everyone running around wiring today.  Have not heard anything new.  Will ping if I see something."  (*Id.*)

**Response to No. 216:    Undisputed for purposes of Plaintiff's motion but subject to the clarification made in Response to No. 213.**

217.    Hyman followed up on or about February 12, 2018: "Anything new . . . . Price wise where's activity."  (*Id.*)  The investor responded: "60-70 still."  (*Id.*)

**Response to No. 217:    Undisputed for purposes of Plaintiff's motion but subject to the clarification made in response to No. 213.**

218.    On or about February 23, 2018, Hyman once again asked: "have you seen any grey market gram activity if so at what prices."  (*Id.* at TG-007-00000730.)  The investor responded: "Lots of activity.  It's all between 70-90 cents.  The spreads are wide to with middle men taking 7-15% on the deals."  (*Id.*)

**Response to No. 218:    Undisputed for purposes of Plaintiff's motion but subject to the clarification made in Response to No. 213.**

219.    On or about March 1, 2018, Hyman again asked the investor: "have you seen any green market activity in the telegram tokens . . . grey market."  (*Id.*)  The investor replied:  "It's been quiet lately.  We saw a deal fall apart two days ago as the buyers are kind of marginal now."  (*Id.* at TG-007-00000731.)

**Response to No. 219:    Undisputed for purposes of Plaintiff's motion but subject to the clarification made in Response to No. 213.**

**B.    Investors Look to Buy and Sell Grams, and Telegram Is Aware of Much of these Efforts**

220.    On or about March 14, 2018, a representative from one of the investors noted in an internal email that another investor is "selling part of their 1st round at 74 cents – that

68

is almost 2x cheaper.  They invested $9M, and are ready to sell 50% or 25% of what they have

for $9M or $4.5M."  (PX58.)

**Response to No. 220:       Disputed as misleading to the extent Plaintiff suggests that Telegram was aware of this communication, which is between third-parties.  Additionally, Defendants note that when in receipt of information that specific purchasers were selling Grams, they would generally follow up to investigate whether the purchasers had taken actions that resulted in breaches of their contractual representations, and have imposed the penalty of cancellation on certain investors where necessary.  Def. 56.1 ¶¶ 133-158. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

221.    On or about April 5, 2018, an individual contacted a potential investor

about an opportunity to purchase "6mm grams, so a total ticket size including fees of $7.8mm" at

a price of $1.30 per Gram.  (PX59.)

**Response to No. 221:       Disputed as misleading to the extent Plaintiff suggests that Telegram was aware of this information.  The cited material is a communication between third-parties and there is no evidence to suggest that they communication such information to Telegram.  Further, the quote is by a third-party who is not a purchaser in the Private Placement and thus could not be reselling Grams.  PX59.  Additionally, Defendants note that when in receipt of information that specific purchasers were selling Grams, they would generally follow up to investigate whether the purchasers had taken actions that resulted in breaches of their contractual representations, and have imposed the penalty of cancellation on certain investors where necessary.  Def. 56.1 ¶¶ 133-158.**

222.    On or about April 14, 2018, a representative from another investor

forwarded to Parekh an email from "BNK to the Future.com" stating:  "Telegram Token Sale:

We have been given an allocation in the Telegram token sale which is our first 'priority access'

deal for BF Token (BFT) holders.  Those that are not token holders yet are still able to apply for

any remaining allocations before Tuesday March 13, 2018.  For more details and to apply click

here.  NOTE – This particular deal is not open to US investors."  (PX60 at 16196.)

**Response to No. 222:       Disputed as incomplete and misleading.  The full text of the cited material shows that the investor forwarding the email from "BNK to the Future" stated: "I just wanted to put it on your radar. Not sure if it's scam or not . . .," "It was just a cold email to my personal email address."  PX60.  Shyam testified that BNK to the Future made an application for Round 2 of the Private Placement, but following this communication and information resulting from the KYC process, Shyam confronted representatives of BNK to**

the Future about the reported information and Telegram rejected them as a purchaser. **Malloy Ex. 3 at 205:7-207:9.**

Defendants note that on January 21, 2018, Pavel posted the following tweet: "If you see or receive offers to 'buy Grams', let us know at http://t.me/notoscam."  **Drylewski Ex. 16, Pavel Durov (@durov) Twitter at SEC-SEC-E-0002661.  Additionally, on November 28, 2019, Telegram posted the following tweet: "Some websites offer Grams to the public and pretend to be affiliated with Telegram.  Please be aware that these websites are not official and have no affiliation with Telegram.  No Grams have been issued to anyone, and Telegram is not involved in any sales of Grams."  Malloy Ex. 13.  Further, in March 2018, Telegram provided the SEC with a list of approximately 60 websites that Telegram believed had been fraudulently offering to sell Grams.  *See* Drylewski Ex. 4 at 26.**

223.    On the same email chain, on or about April 13, 2018, a different investor forwarded to Parekh an earlier email from BNK to the Future.com, stating:  "Congratulations to Telegram:  We syndicated $16,258,117 from our qualifying investors on our Online Investment Platform as part of their $1.7bn raised to date."  (*Id.* at 16198.)

**Response to No. 223:       Disputed as incomplete and misleading for the reasons stated in Response to No. 222.**

224.    On or about July 9, 2018, a representative of a crypto trading firm and affiliate of one of the initial purchasers emailed Hyman, Perekopsky, and Kudina:  "[our firm] is one of the largest crypto trading firms in the world, and provide the deepest liquidity, in the [sic] more names than anyone in the ecosystem, and as such, I was hoping you could help me.  I have been trying to have a discussion with the Treasury group at Telegram, to discuss our value proposition, relative to Telegram's cryptocurrency liquidity needs."  (PX61 at 712.)

**Response to No. 224:       Undisputed for purposes of Plaintiff's motion but subject to clarification.  There is no evidence to suggest that Telegram ever responded to the cited material.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

225.    On or about May 16, 2019, a representative of a digital asset trading platform identifying itself as "the top 1-10 largest crypto exchange according to the CoinMarketCap," emailed Telegram's Perekopsky:  "I'm contacting you because [REDACTED] is considering listing IOU notes on Grams and your cooperation and comments would be much

appreciated!  We do believe that our proposal is extremely important and beneficial for

Telegram."  (PX62 at TLGRM-007-00071955.)

**Response to No. 225:   Undisputed for purposes of Plaintiff's motion but subject to clarification.  There is no evidence to suggest that Telegram ever responded to the cited material.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

226.    The email went on to state:  "While the PA with Telegram prohibits sale

or transfer of rights on Grams we believe that it originally arises from the Reg.D requirement of

the 12 months prohibition on resale.  And since the 12 months period has passed from the deal

closing date for both rounds we believe that Telegram may be able to grand [sic] permission to

the seller on transfer of its rights to the SPV.  In the scenario when Telegram is not in a position

to permit such transfer we may proceed with a pure credit type of IOU notes and cover the risk

by a guarantee of future delivery of Grams or financial settlement on the price difference from

independent sources with no link to PA with Telegram."  (*Id.*)

**Response to No. 226:   Undisputed for purposes of Plaintiff's motion but subject to clarification.  There is no evidence to suggest that Telegram ever responded to the cited material.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

227.    On or about August 19, 2019, CoinDesk, which describes itself as a

"leader in blockchain news," published an article titled "Early Investors in Telegram Crypto See

400% Returns – But buyers Risk It All."  (PX63.)  The article noted that "[b]etween over-the-

counter (OTC) desks, sales on small cryptocurrency exchanges, and at least one investment fund,

opportunities to buy the tokens, known as grams, before the blockchain's Oct. 31 launch date are

not hard to find."  (*Id.*)

**Response to No. 227:   Undisputed for purposes of Plaintiff's motion but subject to clarification to the extent that there is no assurance that the quoted article written by a third-party is reliable or valid.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

228.    The article further noted that "the purchase agreement's restrictive terms didn't stop investors who wanted to exit – it only made the secondary market for grams an underground business." (*Id.*)  The article quoted an OTC trader as follows:  "There are more and more offerings of the gram tokens, with a price tag from $1.60 to $2." (*Id.*)  The article relayed another OTC trader's statement that buyers and sellers only sign IOUs, or a paper saying that one side of the deal owes assets to the other. (*Id.*)

**Response to No. 228:**    **Undisputed for purposes of Plaintiff's motion but subject to clarification to the extent that there is no assurance that the quoted article written by a third-party is reliable or valid.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

**C.    Liquid Lists Grams on Its Exchange, and Tells Telegram Beforehand**

229.    The August 19 CoinDesk article described a secondary sale whereby "[i]in June of [2019], Japan-based crypto exchange Liquid announced a sale of grams in partnership with Gram Asia, reportedly one of the original investors in TON.  The sale was not available to residents of the U.S. or Japan.  The sale started July 10 at $4 per token and was completed in a couple of weeks.  According to Liquid's website, tokens purchased during the sale were subject to vesting: buyers won't get them immediately after the launch of TON, but in several tranches three, six, 12 and 18 months after the launch . . . Seth Melamed, global head of business development and sales at Quoine, the parent company of Liquid . . . noted [ ] that the gram sale made the exchange's user base grow tremendously: about 25,000 new users signed up in July, compared to only 5,000 new users in June.  Roughly half of them bought the placeholder tokens that will be swapped for grams after the network launch. . . . It's not clear, however, what happens if Gram Asia loses its allocation as a result of a public re-sell campaign. . . . Asked how Liquid will make sure Gram Asia delivers the tokens, Melamed said the two entities have a contract.  'There is another entity that acts as a guarantor to deliver Liquid Gram in the event

Gram Asia fails to perform its contractual obligation,' Melamed said, refusing to identify the

third-party guarantor." (PX63.)

**Response to No. 229:** **Undisputed for purposes of Plaintiff's motion but irrelevant for purposes of Plaintiff's motion.  Further, disputed that the quoted article written by a third-party is reliable or valid.**

230.    In or about November 2018, Perekopsky emailed two representatives of

Liquid/Quione as well as a representative of Koinvestor:  "Let me introduce you to our legal

team from Skadden [who] have seen the questions [sic] the Japanese regulator.  Before we

proceed with answers could we make a phone call together to understand better some details."

(PX64.)  Perekopksy copied two Skadden attorneys on his email.  (*Id.*)

**Response to No. 230:** **Disputed as misleading to the extent Plaintiff suggests that this introduction was related to the purported sale discussed in the August 2019 CoinDesk article cited by Plaintiff in No. 229 above.  Further, Telegram informed Plaintiff on October 25, 2019, that Liquid had previously approached Telegram in 2018 about the possibility of listing Grams, but the discussions never progressed beyond the preliminary stage and the parties never had any discussions in 2019 about listing Grams.  Malloy Ex. 12.  Additionally, in subsequent communications between Skadden and Liquid in January 2019, it is made clear that the communications refer to listing Grams as they specifically discuss preparation of a "JFSA [Japanese Financial Services Agency] submission document" and "the application to list Grams in Japan."  Malloy Ex. 8; PX65.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

231.    A few days later, Skadden emailed the same group asking:  "Regarding

the application to list Grams in Japan, can you advise if there are certain Japanese law firms that

you've worked with in the past . . ."  (PX65.)

**Response to No. 231:** **Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 230.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

232.    On or about January 24, 2019, a representative from Liquid/Quione

emailed Durov:  "It has been a while but thank you for hosting us when we visited you last year.

I have been updated by Katsu, [REDACTED] and Ilya that things are progressing well in terms

of listing Gram on our exchange. . . ."  (PX127.)

**Response to No. 232:**     Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 230.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

233.     When asked at his deposition in January 2020 if he had met with Liquid with respect to their sale of Grams, Durov responded "definitely no" and he could not recall meeting anyone from Liquid.  (PX12, Durov Tr. at 345:22–346:7.)

**Response to No. 233:**     Disputed as inaccurate, incomplete and misleading. The cited material does not support the assertion that Pavel "could not recall meeting anyone from Liquid."  In the cited testimony, Pavel is asked: "So did Telegram meet with any representative of Liquid *with respect to their sale of Grams*?"  PX12 at 345:22-346:7 (emphasis added).  And Pavel responds to that question: "[D]efinitely no."  *Id.*  However, Plaintiff omits the remaining text of Pavel's answer to this specific question.  The full text of his answer provides:

> [D]efinitely no. Not only it hasn't been discussed in any meeting that I was present at, I highly doubt that any of my colleagues would support any such discussion due to the clear understanding that Grams cannot be resold pre-launch, and if any discussion took place related to the sale of Grams, if any, it must, in that case, have been related to other matters, such as, for example, regulatory status of Grams post-launch in certain jurisdictions or potential listing of Grams on certain exchanges post-launch. I'm not aware of any meeting where anything involving the potential resale of Grams pre-launch took place as something that we would approve of.

*Id.* at 346:3-21. Ilya also testified, "we actually had a call with Liquid before [the announced pre-launch sale in mid-2019], maybe a year before that. Liquid reached out to us, suggesting help in working with the Japanese regulator, about status of Gram in Japan."  Malloy Ex. 2 at 222:10-18.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

234.     In response to the SEC staff's request to Telegram about the purported offering of Grams by Liquid, Telegram's counsel, Skadden, sent the following email to the SEC staff on or about July 9, 2019:  "Unfortunately Telegram does not have any further information to provide regarding the Liquid announcement – it has not had any involvement with Liquid or its announcement; does not know which Gram purchasers (if any) could be involved; does not have any information about and has not had any communications with 'Gram Asia'; and has not

74

had any communications with Liquid or its representatives regarding the purported offering."

(PX41.)

**Response to No. 234:**     **Disputed as incomplete and misleading.  On October 25, 2019, Skadden sent an email to the SEC staff clarifying that:**

> **We wanted to write to you in connection with our email to the Staff dated July 9, 2019 . . . In connection with our ongoing review of the facts in the context of the litigation, it has come to our attention that Liquid sent an email to Telegram on May 29, 2019, which addressed Liquid's apparent intention to "launch an Initial Exchange Offering (IEO) with our partner Gram Asia who will contribute Grams."  We understand that Telegram did not respond to the email and has never had any communications with Liquid, "Gram Asia," or any of their representatives regarding the purported "Initial Exchange Offering."  Liquid had previously approached Telegram back in 2018 about the possibility of listing Grams but the discussions never progressed beyond the preliminary stage and the parties never had any discussions in 2019 about listing Grams.  Telegram intends to produce the May 2019 email from Liquid in connection with the litigation after the parties reach agreement on an appropriate protective order.**

**Malloy Ex. 12.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

235.    On or about May 28, 2019, Perekopsky received the following email from Liquid:  "We are happy to learn that the Telegram Open Network testing process in on good track and reaffirms your plans that you disclosed in the White Paper.  We as Liquid exchange would also like to be helpful and contribute to the development of TON ecosystem.  It is our strong belief that the more investors from different parts of the world invest in TON the better it is for the ecosystem.  We are continuously receiving a lot of demand from Asian retail investors.  To satisfy this demand we would like to launch an Initial Exchange Offering with our partner Gram Asia who will contribute grams.  There will be no trading before the grams are issued by TON.  Investors will receive grams only after the issue of grams and release of lockup.  The proceeds from the IEO will be kept by Liquid and distributed only when grams are received by

investors.  The IEO will be targeted to investors from Asia excluding Japan as well as excluding

the USA and all other prohibited countries.  Next week we are planning to launch the marketing

of the IEO and would be great to get your quote for the press release which will be published

through the mainstream media such as TechCrunch. . . . ."  (PX66.)

**Response to No. 235:**       **Undisputed for purposes of Plaintiff's motion but subject to
clarification.  Ilya testified that he was aware of reports that the Liquid exchange was
selling Grams and he received an email about those plans.  Malloy Ex. 2 at 221:11-18.  He
clarified that "it was very difficult to understand what was real and what was not," because
for example, Liquid purported to be working with Gram Asia, but Gram Asia was not a
Private Placement purchaser.  Id. at 221:19-222:8.  Ilya added that when he spoke with
people about this issue, he "always" said "if you could find out more information please let
us know."  Id.  A contemporaneous communication between Ilya and Pavel on June 11,
2019, shows that Telegram not only did not know who was behind the purported Liquid
sale of Grams but was also strategically thinking about a possible public response stating
that "[they] have nothing to do with this."  Malloy Ex. 7 at TLGRM-031-00000004.  Later
in the conversation, Ilya states: "We decided not to comment. . . .[I]f you comment once,
you open the door to ppl [sic] wondering why you're not commenting on everything else
that comes out going-forward."  Id. at TLGRM-031-00000005.  Further, the cited
information is irrelevant to Plaintiff's claims in this action.**

                236.    On or about May 28, 2019, Telegram received another email from Liquid:

"[W]e have been told that we will be doing an IEO for the GRAM token working with an entity

called Space Investments Limited registered in Cayman Islands.  Is there any association to

Space Investments Limited and TON Issuer Inc and Telegram Group Inc?"  (PX67.)

**Response to No. 236:**       **Disputed as incomplete and misleading.  This May 28, 2019 email
was sent from an unverified gmail address, with no verification that it was in fact "from
Liquid," to the address IR@telegram.org, PX67, which was sporadically used during this
time period and was created at the beginning of the Private Placement to be used for
accepting indications of interest from potential purchasers.  Malloy Ex. 1 at 350:13-21.  As
Malloy Ex. 7 at 4 makes clear, Telegram employees did not know who may have been
involved in the announced Liquid sale at the time.  Further, on January 11, 2020, Telegram
sent [redacted] a letter via email asking them to confirm whether they had
been cooperating with Liquid.com and asking them to reconfirm the representations in
their signed purchase agreement.  Malloy Ex. 9.  On January 14, 2020, [redacted]
[redacted] responded to Telegram's inquiry, stating that they "are not (and have not been)
cooperating with Liquid.com in any respect," and reconfirming the representations in their
signed Purchase Agreements.  Malloy Ex. 10.  On January 10, 2020, it was reported
publicly that Liquid canceled the sale and returned all funds to investors who participated.
See "Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors,"**

**Andrey Shevchenko, Cointelegraph (Jan. 16, 2020) (https://cointelegraph.com/news/liquid-cancels-sale-of-telegrams-gram-tokens-returns-funds-to-investors).  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

237.    There is no evidence in the record that Telegram took any steps to reach out to Space Investments Limited ("Space Investments") in response to this email until January 11, 2020—two days ago.  (PX68.)

**Response to No. 237:**    **Undisputed for purposes of Plaintiff's motion but subject to clarification.  On January 11, 2020, Telegram sent** ███████████████████ **a letter via email asking them to confirm whether they have not been cooperating with Liquid.com and asking them to reconfirm the representations in their signed Purchase Agreement.  Malloy Ex. 9.  On January 14, 2020,** ███████████████████ **responded to Telegram's inquiry, stating that they "are not (and have not been) cooperating with Liquid.com in any respect," and reconfirming the representations in their signed Purchase Agreements.  Malloy Ex. 10. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

238.    In or around March 2018, Hyman responded to an investor inquiry about Space Investments stating that it was "a trusted partner and funds invested via them will reach us."  (PX119.)

**Response to No. 238:**    **Undisputed for purposes of Plaintiff's motion.**

239.    On or around September 29, 2018, an investor contacted Telegram about "an offer of cooperation" from Space Investments.  (PX120.)

**Response to No. 239:**    **Undisputed for purposes of Plaintiff's motion but subject to clarification.  The full text of the cited material shows that the purchaser who contacted Telegram had received a business proposal from** ███████████████ **and was reaching out to Telegram for "Due Diligence note."  PX120.  Ilya responded stating that** ████████████████ **participated in the Private Placement and "has been cleared from AML/KYC perspective by our KYC provider . . . and by our bank . . ."  Id.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

240.    Perekopsky responded that Space Investments "is a reliable partner of Telegram in a few projects and investor to TON.  They participated in the Pre-sale round and participated in stage 'A' round. The total volume of their investment to Grams exceeds $60M.

Space has been cleared from AML/KYC perspective by our KYC provider Lawson Conner and

by our bank Credit Suisse. They still have available allocation in the current round." (*Id.*)

**Response to No. 240:      Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 239.**

241.    The Liquid "Gram Token Sale" began on or around July 10, 2019.

(PX69.)

**Response to No. 241:      Disputed as inaccurate and misleading.  Although Liquid advertised a "Gram Token Sale" in July 2019, Gram tokens did not exist at this time because the Telegram Open Network had not yet launched.  As explained in Response to Nos. 230, 233, 234 and 235, Telegram had no involvement in this alleged sale and did not know who did.  On January 10, 2020, it was reported publicly that Liquid canceled the sale and returned all funds to investors who participated.  *See* "Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors," Andrey Shevchenko, Cointelegraph (Jan. 16, 2020) (https://cointelegraph.com/news/liquid-cancels-sale-of-telegrams-gram-tokens-returns-funds-to-investors).  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

242.    Liquid noted on its website: "We are working with Gram Asia for the

purposes of this sale.  Gram Asia is the largest holder of Gram tokens from Asia, and a trusted

partner of Liquid, with a long-standing relationship forged through business ties."  (PX2, Ex. F.)

**Response to No. 242:      Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to Nos. 230, 233, 234 and 235.  Further, Telegram has no involvement with "Gram Asia," and this entity is not a Private Placement purchaser.  *See* Malloy Ex. 2 at 221:19-222:8.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

243.    On or about June 11, 2019, an analyst from an affiliate of one of the TON

investors emailed Gram Asia:  "we specialize in providing two-sized, institutional-sized liquidity

for 40+ cryptoassets.  We are also investors in Telegram tokens and plan to be market-making

from day 1.  How about a chat on ways we can work together?"  (PX70.)

**Response to No. 243:      Undisputed for purposes of Plaintiff's motion. Further, the cited info is irrelevant to Plaintiff's claims in this action.**

244.    On or about June 12, 2019, a representative from one of the investors told Perekopsky: "BTW, I am going to talk to the Liquid exchange about their TON listing.  Will lyk what I learn…"  Perekopsky responded:  "Ok, thanks."  (PX71 at TLGRM-017-00000521.)

**Response to No. 244:       Undisputed for purposes of Plaintiff's motion.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

245.    On or about July 4, 2019, an investor asked Parekh for "the official Telegram position" on the "Gram Asia/Liquid exchange news about the impending listing and sale of Grams," "considering that there are very strong and broad restrictions on transfer of Grams prior to official launch/listing."  (PX72.)

**Response to No. 245:       Undisputed for purposes of Plaintiff's motion.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

246.    Parekh responded on or about July 7, 2019:  "We have seen those stories, but they are completely unconnected with Telegram.  We have not commented publicly on the advice of counsel, but I would refer you to this article on Cointelegraph:

https://cointelegraph.com/news/sale-of-telegrams-token-gram-on-exchange-liquid-is-not-official-source."  (*Id.*)

**Response to No. 246:       Undisputed for purposes of Plaintiff's motion.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

D.    **Other Exchanges Follow Liquid and List Grams**

247.    The CoinDesk article referenced above also states:  "A few small exchanges followed Liquid's lead: a Korean exchange, Upxide, announced it was selling Grams in partnership with Liquid on July 14 and Bitforex offered its users "Gram IOUs."  (PX63.)

**Response to No. 247:       Undisputed for purposes of Plaintiff's motion but disputed whether the quoted article written by a third-party is reliable or valid.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

248.    The article went on to note: "The secrecy in the secondary market encourages fraud: according to [an OTC trader], many of the traders he saw advertising gram deals aren't actually investors in Telegram, and most OTC offerings are blatant scams." (*Id.*)

**Response to No. 248:     Undisputed for purposes of Plaintiff's motion but disputed whether the quoted article written by a third-party is reliable or valid.  Moreover, during the Private Placement, on January 21, 2018, Pavel sent the following tweet: "If you see or receive offers to 'buy Grams', let us know at http://t.me/notoscam." Drylewski Ex. 16. Additionally, on November 28, 2019, Telegram posted the following tweet: "Some websites offer Grams to the public and pretend to be affiliated with Telegram. Please be aware that these websites are not official and have no affiliation with Telegram.  No Grams have been issued to anyone, and Telegram is not involved in any sales of Grams."  Malloy Ex. 13.**

249.    [RESERVED]

**Response to No. 249:     No response needed.**

250.    [RESERVED]

**Response to No. 250:     No response needed.**

251.    The email further stated: "The main advantage of this scheme is that we're building the 'safety layer' and reduce the risks related to the direct exposure on purchase agreements and SEC." (*Id.*)

**Response to No. 251:     Disputed as Plaintiff does not identify any support for this assertion.**

252.    On or about August 19, 2019, representatives from an affiliate of one of the investors circulated the August 19, 2019 CoinDesk article referenced above and also noted based on press reports:  "Another token sale for Telegram happening on Tekenomy.  Same price as Liquid 1Gram = 4USDT."  (PX74.)

**Response to No. 252:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  Defendants note that on January 21, 2018, Pavel posted the following tweet: "If you see or receive offers to 'buy Grams', let us know at http://t.me/notoscam." Drylewski Ex. 16.  Additionally, in March 2018, Telegram provided the SEC with a list of approximately 60 websites that Telegram believed had been fraudulently offering to sell Grams.  *See* Drylewski Ex. 4 at 26.  Further, Telegram decided not to comment on such unfounded reports as to not create an expectation that a lack of comment can be**

interpreted as an approval and confuse the public. *See* **Malloy Ex. 7 at 5 ("We decided not to comment [on Liquid]. . . .[I]f you comment once, you open the door to ppl [sic] wondering why you're not commenting on everything else that comes out going-forward."). Further, the cited information is irrelevant to Plaintiff's claims in this action.**

253.    On or about August 10, 2019, Perekopsky and Parekh received an email

from Decentral Park attaching a research report on TON. (PX75.) The research report, entitled

"The Current State of Telegram Open Network, A sleeping giant awakens," noted that "[i]n

March 2019, the little known Xena exchange listed a leveraged, cryptocurrency-settled

derivative contract for the GRM token (XGRAM), which in the first month of trading reached up

to $8 per XGRAM, though in a highly illiquid environment. At the moment, the price per

XGRAM stands at $3.30. . . . The Chinese exchange Lbank has also listed a Gram/ETH futures

pair, which at the time of writing trades at the equivalent of $1.00." (*Id.* at TLGRM-012-

00016231.)

**Response to No. 253:      Undisputed for purposes of Plaintiff's motion but subject to clarification. Defendants note that on January 21, 2018, Pavel posted the following tweet: "If you see or receive offers to 'buy Grams', let us know at http://t.me/ notoscam." Drylewski Ex. 16. Additionally, in March 2018, Telegram provided the SEC with a list of approximately 60 websites that Telegram believed had been fraudulently offering to sell Grams. *See* Drylewski Ex. 4 at 26. Further, Telegram decided not to comment on such unfounded reports as to not create an expectation that a lack of comment can be interpreted as an approval and confuse the public. *See* Malloy Ex. 7 at 5 ("We decided not to comment [on Liquid]. . . .[I]f you comment once, you open the door to ppl [sic] wondering why you're not commenting on everything else that comes out going-forward."). Further, the cited information is irrelevant to Plaintiff's claims in this action.**

254.    The Decentral Park report also noted that the Liquid exchange's

"physically settled futures sale for $4 per Gram" raised $12.5 million. (*Id.* at TLGRM-012-

00016231–32.)

**Response to No. 254:      Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 253.**

255.    The Decentral Park report further noted the sale "unsecured futures agreements" by ATAIX for $3.99 per Gram in September 2019.  (*Id.* at TLGRM-012-00016232.)

**Response to No. 255:    Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 253.**

**E.    Other Resales**

256.    The August 19, 2019 CoinDesk article describes "another notable offering [ ] from a large player in Russia.  ATON, an asset management and investment banking company based in Moscow, with reportedly $2.5 billion in assets under management, sent its clients an intriguing proposal in May.  In a 13-slide presentation obtained by CoinDesk, ATON presented TON as a potential rival to Mastercard and offered indirect interest in grams, in the form of shares in a specially created investment vehicle, New Technology Fund SPC Limited, registered in the British Virgin Islands. . . . The fund offers investors access to future grams, the presentation says, at a price of $1.33 per token.  Investors will get 25 percent in 12–18 months and the last tranche in 18–24 months. . . . While the offering may have been a violation of the agreement with Telegram, the investors who talked to CoinDesk noted a possible loophole that can allow the participants in token sale to sell their allocation quietly.  When signing the paperwork with Telegram, investors had to disclose their beneficiaries with shares larger than 25 percent, and after the deal, notify Telegram if new shareholders of such size bought in.  However, changes smaller than 25 percent don't have to be reported, and this might be a way to hide re-selling. . . One of the investors said that, according to his information, ATON has already sold the shares in the gram-based fund worth $10 million.  'Everyone was shocked when people got that presentation.  But ATON said they got written permission from Telegram,' he added." (PX63.)

**Response to No. 256:**    Disputed as quoted language appears to be from an unverified article written by an outside third-party with no knowledge of Telegram's policies and procedures with respect to the Purchase Agreements.  Further, disputed whether the quoted article written by a third-party is reliable or valid.  Defendants note that on May 25, 2019, a Private Placement purchaser informed Telegram that they had received an offer to purchase Grams from another purchaser called ███████ ████████ (a.k.a. ███████████████████████).  Def. 56.1 ¶ 141; Drylewski Ex. 10 at 7.  Ilya identified certain issues with the materials that called into question their authenticity and he reached out to ████████ and requested that the company address these allegations and affirm that they were not in breach of their Purchase Agreement.  Def. 56.1 ¶ 142; Drylewski Ex. 10 at 7; Malloy Ex. 2 at 224:2-227:11.  ████████ denied that they were engaged in any activities that would constitute a breach of their Purchase Agreement.  Def. 56.1 ¶ 143; Drylewski Ex. 10 at 7.

257.    On or about April 10, 2019, one of the initial purchasers entered into a "Participation Agreement" with another entity (the "Participant"), whereby the Participant would "receive a participation in the purchase of 5,297,157.14024602 tokens among the Tokens that [the investor] will be entitled to by subscribing a total participation amount of US$2,400,000." (PX76.)

**Response to No. 257:**    Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language, but Defendants note that this document is unverified, are unaware of its source or the reliability thereof, does not appear to have been sent to Telegram and appears to be an agreement between third-parties.  Further, the cited material is irrelevant to Plaintiff's claims in this action.

258.    A memorandum to the Participant's operating committee, dated March 23, 2019, stated:  "We believe Telegram represents a dominant leader in the crypto instant messaging and social media space, with a highly scalable platform to drive and capitalize on digital asset's global mainstream application. . . . Given [the Participant's] relationship with the seller, **we have procured a highly attractive secondary opportunity at $0.453 per token, representing 66% discount to the last private round valuation.**  Assuming targeted exchange listing in 4Q19 at a price at least on par with previous round ($1.33 per token), [Participant] **stands to receive principal within 7-9 months with 66% remaining stake for significant long termed upsides.**"  (PX77 at 831 (emphasis in original).)

**Response to No. 258:**     Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language, but Defendants note that this document is unverified, are unaware of its source or the reliability thereof, does not appear to have been sent to Telegram and appears to be an agreement between third-parties. Further, Plaintiff selectively quotes from the cited material and omits other information contained therein, such as:

> Fully integrated with Telegram, TON present[s] the combination of having one of the largest developer ecosystem, with distribution network across 200 million crypto native user base, in order to efficiently and effectively build out an Apple App Store-like integrated portal for millions of users to access products, services, and contents offered by TON as its "killer dApp."

**PX77 at 816.**

## X.     TELEGRAM HAS MADE EFFORTS TO LIST GRAMS AND TO DEVELOP THE TON BLOCKCHAIN AND ECOSYSTEM WITH THE HELP OF ITS CURRENT AND FORMER BUSINESS ASSOCIATES

259.     Durov and Perekopsky met in university and subsequently worked together at VKontakte.  (PX13, Perekopsky Tr. at 19:12-20:14)

**Response to No. 259:**     Undisputed for purposes of Plaintiff's motion.

260.     In 2017, Durov hired Perekopsky to work for Telegram and help raise funds for Telegram, while he understood that Perekopsky was involved with Blackmoon Crypto as a fundraiser for that company.  (PX12, Durov Tr. at 143:5-144:22.)

**Response to No. 260:**     Disputed to the extent Plaintiff suggests the cited language indicates Ilya had an active role with Blackmoon Crypto.  Pavel stated that he was "trying to describe [Ilya] . . . and his accomplishments to the extent that [he understood] them." PX12 at 143:5-144:22.  He further clarified that his understanding, with respect to Ilya's role in Blackmoon Crypto, was that Ilya was "playing more of a passive role and acted maybe as an advisor or like a person publicly supporting that project."  *Id.*  Further, Ilya testified:

> At the very beginning when Oleg [Seydak] was founding this new company [Blackmoon Crypto], he asked me to help at a level of advisory, so he was organizing some advisory board, you can say so, and he asked me to support him more actually in public, like in this new project."

84

**Malloy Ex. 2 at 32:20-25. Ilya further testified that he does not have any financial interest in Blackmoon Crypto and that when he joined Telegram, he "stopped all [his] activities related to Blackmoon Crypto at all." PX13 at 36:7-10; Malloy Ex. 2 at 79:1-20. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

261.    Durov discussed with a friend on or about October 30, 2017 that

Perekopsky would "help run point" on the offering, noting he "raised $30M for

Blackmooncrypto last month." (PX15 at TG-017-00000559.)

**Response to No. 261:    Disputed as incomplete and misleading. When questioned about the conversation in the cited material, Pavel testified that he "may have been confused about [Ilya's] exact track record" during the conversation. PX12 at 143:5-144:22. Pavel clarified:**

> **I'm not 100 percent certain I was confused. I may have been trying to show [the purchaser] that [Ilya] had certain experience, at least at some level of depth, in relation to blockchain. That is why I could have mentioned that he raise 30 million for Blackmoon Crypto, although it is obvious that now that there are other – and there were other members in that team that were more instrumental to the success of that project.**

*Id.* **Further, the cited information is irrelevant to Plaintiff's claims in this action.**

262.    Perekopsky recruited Hyman to Telegram. (PX13, Perekopsky Tr. at

66:2-25.)

**Response to No. 262:    Undisputed for purposes of Plaintiff's motion.**

263.    Hyman in turn recruited Parekh to Telegram in approximately January

2018, as Hyman was Parekh's old boss at Morgan Stanley. (PX14, Parekh Tr. at 19:11-24.)

**Response to No. 263:    Undisputed for purposes of Plaintiff's motion.**

264.    As detailed below, Perekopsky's friend and partner at Blackmoon Crypto,

Oleg Seydak, was involved in the Telegram offering from the very start, and continued his

involvement when he, along with Hyman and others, formed Gram Vault in 2018.

**Response to No. 264:    Disputed as to the use of the term "involved in." Disputed as inaccurate and misleading. Ilya testified that Oleg Seydak is not a Private Placement purchaser, and Plaintiff does not cite any document or evidence to support this statement.**

85

**PX13 146:8-10.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

265.    As also detailed below, Hyman, along with two other founders of Gram Vault—Alexander Filatov and Michel Lejnev—is also associated with TON Ventures.  Filatov is also the CEO of TON Labs.

**Response to No. 265:    Disputed as to the term "associated with" and Plaintiff does not city any document or evidence to support this statement.  Further, the cited information is irrelevant for Plaintiff's claims in this action.**

266.    Perekopsky testified that because of Telegram's very limited internal resources, the Telegram team relied on their friends and colleagues to do some of the work. (PX13, Perekospky Tr. at 167:2-169:7.)

**Response to No. 266:    Disputed as inaccurate, incomplete and misleading.  Ilya testified:**

> **So many [exchanges] tried to reach out to us, but my personal vision here was that it is better, since our resources were very limited, you didn't have enough people and time to talk to all of them, but at the same time we understood the importance of exchanges, because exchanges would give an opportunity to users, to people to get Grams. So we thought it is important to respond at least to some exchanges . . .**

**PX13 at 167:2-169:16.  Ilya further testified:**

> **Since the public network was already launched, and we knew that there were teams of developers who were digging deep, the test network, and they were giving us some feedback, so I decided once I get a lot of questions from exchanges, and some of the teams of developers who were testing the test network, _they offered themselves help in answering these questions_.**

**_Id._ (emphasis added).  Moreover, the cited information does not support the assertion that Telegram "relied on their friends and colleagues" to do work related to the TON Blockchain or Grams.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

267.    Durov told a friend and investor in April 2019 that Telegram's tech team was "stretched too thin" but that there was a "dev team" "affiliated with large 2nd stage

investors" who had "invested a lot of time into studying what we do." (PX15 at TLGRM-017-00000599.)

**Response to No. 267:** **Disputed as incomplete and inaccurate. In response to a purchaser's request to speak with someone on the Telegram team regarding "staking infrastructure," Pavel responded that the Telegram team is "stretched too thin. But there's this dev team that invest a lot of time into studying what we do (they are affiliated with large 2nd stage investors). They are currently testing the smart contract building on our testnet, and can probably provide some guidance. . ." PX15 at TLGRM-017-00000599. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

A.   **Blackmoon**

268.   Blackmoon Finance Limited (which does business as Blackmoon Financial Group) has the following ownership structure: 33.39% by Four Rooms LTD which is in turn 100% owned by Seydak; 32.17% by Perekopsky; 18% by Flint Capital VC; and 16.44% by other monitory shareholders, each of whom owns less than 3.5%. (PX78 at 25.)

**Response to No. 268:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

269.   Through Four Rooms LTD, of which he is 100% owner, Seydak owns 100% of Blackmoon VF Ltd (which does business as as Blackmoon Crypto). (*Id.* at 25.)

**Response to No. 269:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

270.   Through Four Rooms LTD, of which he is 100% owner, Seydak owns 100% of Swiss Digital Group AG (which does business as Gram Vault). (*Id.* at 25.)

**Response to No. 270:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

271.   Seydak is the Founder and CEO of Blackmoon Crypto. (PX79 at 22.)

**Response to No. 271:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

272.   Perekopsky is Blackmoon Crypto's Co-Founder. (*Id.* at 22.)

**Response to No. 272:**    Disputed as incomplete and misleading.  Ilya testified that he currently has no involvement with Blackmoon Crypto.  Malloy Ex. 2 at 32:13-33:5.  Ilya clarified that "[a]t the very beginning when Oleg was founding [Blackmoon Crypto], he asked [Ilya] to help at a level of advisory, . . . to support him more actually in public[.]"  *Id.* at 32:17-33:5.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

273.    Sergey Vasin is Blackmoon Crypto's Chief Operating Officer.  (*Id.* at 22.)

**Response to No. 273:**    Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

274.    Moshe Joshua joined Blackmoon Crypto as Chief Product Officer in or about November 2017.  (PX80.)

**Response to No. 274:**    Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

275.    Hyman was, as of March 2018, an Advisor to Blackmoon Crypto.  (PX79 at 24.)

**Response to No. 275:**    Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

276.    In or around November 2017, Seydak, Perekopsky, Hyman, and Nicolas Tranter had "advanced negotiations" with several asset managers on behalf of Blackmoon Crypto.  (PX80.)

**Response to No. 276:**    Disputed insofar as this is an unverified document authored by a third party, and the cited information is irrelevant to Plaintiff's claims in this action.

277.    According to Blackmoon Crypto's white paper, published in or around March 2018, under the heading "Our History":  "Blackmoon Financial Group is a financial technology and investment management company incorporated in Ireland that has been operational since August 2014, having its roots in venture capital investments in financial technology since 2012.  The company is lead [sic] by Oleg Seydak, entrepreneur, financial technology investor, founder of Blackmoon Financial Group, former co-founding partner of Flint

Capital; and Ilya Perekopsky, entrepreneur and IT angel-investor, and former vice president and

chief commercial officer of VK.com."  (PX79 at 11.)

**Response to No. 277:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

278.     The white paper goes on to state that in 2014:  "Oleg and his friend Ilya

Perekopsky, then vice president at VK.com, teamed up to found and make initial investments in

Blackmoon Financial Group."  (*Id.*)

**Response to No. 278:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

279.     Perekopsky reviewed the Blackmoon Crypto white paper at the time it was

created.  (PX13, Perkeopsky Tr. at 37:8-38:8.)

**Response to No. 279:**     **Disputed as inaccurate, incomplete and misleading.  Ilya testified only that he "saw" this document when it was created but he is not sure whether he reviewed it.  Malloy Ex. 2 at 37:8-38:14.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

280.     Perekopsky continues to receive dividends from Blackmoon Financial

Group to this day, every quarter or six months.  (*Id.* at 34:10-36:6.)

**Response to No. 280:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.  Defendants note that Ilya also testified that he does not, and has never, received any dividends from Blackmoon Crypto.  PX13 at 79:1-20.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

281.     In or about November 2017, Blackmoon Crypto's Moshe Joshua

("Joshua") sent emails to a number of prospective investors "soliciting investments" in TON,

noting:  "I believe this is a one-of-a-kind opportunity, tailored to your investment views and

current focus, one I am personally going to be investing in myself."  Joshua copied Perekosphy

on the emails, whom he introduced to the prospective investors as "Telegram's Chief Investment

Adviser, who is in charge of managing the capital raise."  Blackmoon Crypto's Seydak was

copied on all of these emails.  (PX81; *see also* PX82–86.)

**Response to No. 281:**    Disputed as misleading.  Ilya testified that in 2017 Moshe Joshua ("Moshe" or "Joshua") made "some introductions."  Malloy Ex. 2 at 143:24-144:20.  Ilya stated that it was Moshe who suggested to Ilya that he, Joshua, could make the introductions, and Ilya did not object.  *Id.*  When making the introductions, Ilya testified he understood that Moshe "was acting as Moshe, like as an individual."  *Id.* at 144:15-20.  Further, Ilya explained:

> As far as I remember, [Joshua] was based in Israel, and I didn't know a lot of people from Israel, but it looked helpful, since we tried to reach diversification by geography, it seems logical to establish some contacts in Israel, and when he suggested that I didn't object, but he selected people himself, I believe.

*Id.* at 146:14-23.  Additionally, when questioned about this document Pavel testified, "All I can see here is Moshe trying to be helpful, both to his friends from the investor community that he think would benefit from taking part in this opportunity, and probably to [Ilya] as his friend, but it is hard to say."  Malloy Ex. 1 at 242:13-242:18.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

282.    In addition to sending to each prospective investor a non-disclosure

agreements on behalf of Telegram, Joshua sent to at least one investor Telegram's white paper

and primer.  (PX85.)

**Response to No. 282:**    Disputed as incomplete and misleading.  The cited material does not support the assertion that Moshe acted "on behalf of Telegram" in any capacity.  Ilya testified that his "personal impression" was that Joshua

> was from [the blockchain] space, I think he previously worked or was consultant to Ripple, which is another blockchain, and I think he was very excited in general about this idea, and he just wanted to help with some introductions, and he probably spent a day, a few hours to do that.  So I wouldn't say it is something that a person would expected to be compensated.

PX13 at 145:15-146:2.  Further, when questioned about this document Pavel stated, "I think this is something that Moshe just decided to do by himself in order to be helpful and friendly to the parties involved."  Malloy Ex. 1 at 243:11-17.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

283.    At least one of these outreaches by Joshua led to an in-person "informal

meet & greet" in London on or about January 10, 2018, with Perekopsky, Hyman, Seydak, and

Joshua in attendance.  (PX87.)

**Response to No. 283:** **Disputed to the extent Plaintiff suggests the cited language indicates Blackmoon-affiliated individuals solicited prospective purchasers on behalf of Telegram. Further, disputed to the extent the cited material does not support the assertion that the meeting was a direct result of efforts by Blackmoon-affiliated individuals. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

284.    Joshua emailed Perekopsky on or about June 6, 2018 to provide a "SUMMARY OF BIZ-DEV RESPONSIBILITIES" which included "Market-Making/Liquidity Providers," negotiating with crypto exchanges, and helping investors towards "a smoother liquidation" of Grams. (PX88.) Joshua also stated: "this will be easier and more powerful with an official Telegram title (ie with @telegram and a formal agent relationship in place). It goes without saying that once I open these forms of communication officially, I expect the weight of responsibility to grow." (*Id.*)

**Response to No. 284:** **Disputed as misleading for the reasons stated in Responses to Nos. 281-83. Further disputed to the extent Plaintiff suggests the cited language indicates Blackmoon-affiliated individuals solicited prospective purchasers on behalf of Telegram. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

285.    Also on or about June 6, 2018, Seydak emailed Perekopsky about "price stabilisation mechanics," which described the obligation of "stabilization agents" to include "provid[ing] liquidity to avoid strong market movements, that is to be a market maker" and "buying out the stock if the price goes down below a certain predefined level." (PX39.)

**Response to No. 285:** **Disputed as misleading. When asked if he had any conversations in "late 2017 going to 2018" with Seydak about Seydak, Blackmoon Crypto or Blackmoon Financial's involvement with the TON Blockchain, Ilya testified, "In 2018, I don't remember any discussions. So if I had any discussions they were very preliminary, very early in November/December 2017. I don't remember any discussions after that except that I think [Seydak] sometimes sent some ideas that he thought could be helpful for us, and that is it." Malloy Ex. 2 at 147:10-21. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

**B.    Gram Vault**

286.    Gram Vault was founded by Seydak, Hyman, Alexander Filatov, and Michel Lenjev. (PX89 at p.8).

**Response to No. 286:**     **Undisputed for purpose of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

287.     According to an investor presentation by Gram Vault entitled "The original custodian of the Telegram Open Network":

a.   In June 2017, Pavel Durov has the "original idea of the TON and Grams" and "Gram Vault founders become advisers to the Telegram on its tokens sale."

b.   In November 2017, "Gram Vault founders participated in preparation of the TON documentation and communication with investors."

c.   In June to December 2018, "A set of meetings with the Telegram team. Consolidation of positions of a few largest investors and preparation for the launch of Gram Vault."

d.   In December 2018, "Gram Vault is founded by a group of 5 founding partners representing interest of more than $600 mil invested in Grams." (*Id.* at p. 4.)

**Response to No. 287:**     **Undisputed for purpose of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

288.     Vasin (who, as noted, is Blackmoon Crypto's Chief Operating Officer) is also employed by Gram Vault.  (PX54.)

**Response to No. 288:**     **Undisputed for purpose of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

289.     As part of its application to list Grams on the Poloniex exchange, Seydak described Gram Vault's business model as follows:  "We provide holistic services to the original investors in TON.  These services include safekeeping, stacking [sic] (proof of stake mining), buying and selling of Grams.  Concerning the latter the clients buy and sell from us with a deferred delivery from our side.  We do the OTC and market deals to hedge/balance our position."  (PX78 at 14.)

**Response to No. 289:** **Undisputed for purpose of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

290.    Vasin made the following representations to Poloniex on behalf of Gram Vault:

a.   When asked "How are you associated with this project?  What is your position with the team?"  Vasin responded "COO at the largest custody of Gram tokens (75% of the second round, 50% of the first).  Telegram itself doesn't work with the exchanges."

b.   When asked "Please list the members of your leadership team and the URLs of their LinkedIn/Github pages.  What are their backgrounds?" Vasin responded with names and biographies of Nikoali Durov, Pavel Durov, and certain Telegram engineers."

c.   When asked "Who are your advisors?" Vasin responded "Skadden."

d.   When asked "What date did the ICO start on, and when did it end?" Vasin responded "2018-01-20, 2018-03-04."

e.   When asked "If your project is live: How many users have you acquired?  How many users are active?" Vasin responded "Telegram Messenger has a 300mln+ user base."  (PX54.)

**Response to No. 290:** **Disputed as inaccurate and misleading.  Disputed to the extent that the cited material is unverified and written by a third-party.  Further, Sergey Vasin is not a Telegram employee and had no participation in the development of the TON Blockchain.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

291.    Hyman, Lejnev, and Filatov (through Genesis Digital Ltd., of which he is co-founder (PX89 at 8)) have contributed funds to Swiss Digital Group, including close to $700,000 by Hyman in July 2019.  (PX90.)

**Response to No. 291:**     Disputed as inaccurate, incomplete and misleading.  The cited
information does not support the stated assertion.  For instance, PX90 does not support the
assertion that Filatov contributed funds to Swiss Digital Group.  Further, the cited
information is irrelevant to Plaintiff's claims in this action.

292.    Gram Vault purports to represent initial purchasers with approximately

$700 million in investments in TON.  (PX91.)

**Response to No. 292:**     Undisputed for purposes of Plaintiff's motion but irrelevant to
Plaintiff's claims in this action.

## C.    TON Ventures and TON Labs

293.    As detailed below, three of the founders of Gram Vault—Hyman, Filatov,

and Lejnev—are associated with TON Ventures LP ("TON Ventures").

**Response to No. 293:**     Undisputed for purposes of Plaintiff's motion but irrelevant to
Plaintiff's claims in this action.

294.    TON Ventures purports to be composed of initial purchasers of Grams.

(PX92.)

**Response to No. 294:**     Undisputed for purposes of Plaintiff's motion but irrelevant to
Plaintiff's claims in this action.

295.    TON Labs was founded in or about May 2018.  (PX93 at SEC-SEC-E-

0038698.)

**Response to No. 295:**     Undisputed for purposes of Plaintiff's motion but irrelevant to
Plaintiff's claims in this action.

296.    TON Labs is affiliated with TON Ventures.  (PX14, Parekh Tr. at 167:24–

168:23.)

**Response to No. 296:**     Undisputed for purposes of Plaintiff's motion but irrelevant to
Plaintiff's claims in this action.

297.    Filatov is TON Lab's Managing Partner and CEO.  (PX93 at SEC-SEC-E-

00386700.)

**Response to No. 297:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

298. Gram Vault and TON Labs are "sister" companies. (PX94.)

**Response to No. 298:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

299. Geneva Management Group acts as the Administrator for TON Ventures

(PX92), and as a "strategic partner" of Swiss Digital Group (PX89 at 4).

**Response to No. 299:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

300. Hyman is associated with TON Ventures and uses the email exchange

"@ton.ventures." (PX95; PX14, Parekh Tr. at 91:7-92:6.)

**Response to No. 300:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

301. Filatov is associated with a foreign investor that invested a total of $95

million in the Offering. (PX96–98.)

**Response to No. 301:** **Disputed as not supported by the cited material. PX96-98 show that** ▓▓▓▓▓▓▓ **signed the Purchase Agreement associated with** ▓▓▓▓▓▓▓ **There is no reference to Alexander Filatov in the cited material. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

302. Lejnev is a beneficial owner of more than 25% of that same foreign

investor. (PX99.)

**Response to No. 302:** **Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 301.**

303. As noted, Lejnev are Filatov are both founders of Gram Vault (PX89),

and, on or about February 29, 2019 Lejnev became a director of Swiss Digital Group (PX100).

**Response to No. 303:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

304.     On or about November 13, 2018, Filatov, on behalf of the foreign investor with whom and Lejnev are affiliated, emailed Perekopsky:  "As we discussed at the last meeting with Pavel / yourself, I would like to take this opportunity to offer your group participation in the TON Ventures LP fund as a Limited Partner.  The objective of the fund is to stimulate development of the upcoming TON ecosystem by investing into carefully selected teams/projects around the world that are ready to develop infrastructure and use case applications on the TON Blockchain."  (PX92.)

**Response to No. 304:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

305.     In or around April 2019, Steven Yun from Koinvestor emailed a leading crypto market maker seeking assistance with liquidating $700 million of Grams after launch, and noted "[i]t is this GramVault, which has the trust of largest investors, that I am affiliated to carry out the OTC transactions."  (PX101–PX102.)

**Response to No. 305:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

306.     In or around July 2019, Gram Vault (Seydak and Hyman), TON Labs (Filatov), and Telegram (Parekh) were in discussions with Anchorage in connection with a potential partnership whereby Anchorage would serve as custodian for some of Gram Vault's U.S. clients.  (PX94, PX103.)

**Response to No. 306:     Disputed as to the phrase "in potential partnership."  Telegram was never a partner of Anchorage, though Shyam testified that he had conversations with Anchorage about its ability to potentially provide custody services to some investors in the Private Placement.  *See*, *e.g.*, Malloy Ex. 3 at 247:8-248:11.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

307.     Noting that "the Telegram developer team is totally focused on the finalization and testing of the network," Parekh directed Anchorage "to talk with Alexander and

his developers at TON Labs, who as mentioned have been assisting Telegram with the testing

these last few months" to discuss Anchorage's technical questions.  (PX103.)

**Response to No. 307:**      **Disputed as incomplete and misleading.  The full text of the quoted testimony provides:**

> **So the issue as I alluded on the call is that the Telegram developer team is totally focused on the finalisation and testing of the network, and it has been very challenging to get their time to support 3rd party queries such as below. Hopefully that'll change as the launch draws nearer but for now it is what it is. The best bet for you therefore is to talk with Alexander and his developers at TON Labs, who as mentioned have been assisting Telegram with the testing these last few months, and as such have a detailed technical knowledge of the system and can answer your technical queries.**

**PX103.  Further, disputed to the extent that Plaintiff suggests the cited material indicates Telegram is affiliated with TON Labs.  Shyam has represented to purchasers and other entities that "TON Labs [is] an independent company who have been assisting Telegram with the testing. They aren't a subsidiary or affiliate of Telegram, so if you want to have a discussoon [sic] about your grams it might be better for you and I to speak."  *See*, *e.g.*, PX110.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

308.    According to Anchorage's contemporaneous notes, Parekh noted on a call:

"Because the Telegram team is so stretched (TON Labs has more engineers than Telegram).

They have been partners of telegram for 6 months and helping testing from day one."  (PX104.)

**Response to No. 308:**      **Disputed to the extent that Plaintiff suggests the cited material indicates Telegram and TON Labs are affiliated entities.  They are not.  JSF ¶ 182.  Shyam has represented to purchasers and other entities that "TON Labs [is] an independent company who have been assisting Telegram with the testing. They aren't a subaidiary [sic] or affiliate of Telegram, so if you want to have a discussoon [sic] about your grams it might be better for you and I to speak."  *See*, *e.g.*, PX110.  Further, Shyam testified:**

> **[He] introduced a number of custodians to TON Labs and other third parties who had assisted Telegram with the testing, and therefore were familiar with the code, in order to sort of let those parties speak bilaterally, to help answer technical questions, because Telegram itself didn't have the resources and the bandwidth to work with either those exchanges or custodians.**

**Malloy Ex. 3 at 162:10-163:5; 257:3-24.  Further, TON Labs has publicly stated that it is not affiliated with Telegram.  *See* "The Crypto World Still Doesn't Understand Telegram's**

97

Plan, Says TON Labs," Cryptobriefing (Sep. 29, 2019) (https://cryptobriefing.com/telegram-ton-labs/).  Further, the cited information is irrelevant to Plaintiff's claims in this action.

309.    The conversations among Gram Vault, TON Labs, Telegram, and Anchorage continued in October 2019.  (PX105.)

**Response to No. 309:**    **Undisputed for purposes of Plaintiff's motion that certain conversations took place among the listed parties in 2019, but the cited information is irrelevant to Plaintiff's claims in this action.**

310.    In or around August 2019, Telegram gave consent to an investor to disclose its Purchase Agreements to Gram Vault to permit onboarding with Gram Vault. (PX106.)

**Response to No. 310:**    **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Ilya testified that if any particular purchaser reached out to Telegram asking for permission to disclose the Purchase Agreement to custody companies, they would deal with the request on a case-by-case basis.  *See* Malloy Ex. 2 at 217:13-218:18.  He further stated that they usually grant permission.  *Id.*  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

311.    In or about August 2019, Perekopsy, Parekh, and Filatov discussed listing Grams on Binance.  (PX130.)  Binance indicated that they had "been in touch with TON Labs" but that they had more questions, to which Perekopsky responded: "Listing on Binance will be great for your and our users I think.  So let's try to make it happen."  (*Id.* at 5–6.)

**Response to No. 311:**    **Undisputed for purposes of Plaintiff's motion that these individual discussed the potential that Grams could be listed on Binance following the launch of the TON Blockchain, but irrelevant to Plaintiff's claims in this action.**

312.    In or around October 2019, Seydak on behalf of Gram Vault participated in a call with Telegram's counsel to discuss delivering the Grams directly to GramVault. (PX128.)

**Response to No. 312:**    **Disputed as incomplete and misleading.  The full text of the cited material shows that Shyam emailed Oleg Seydak stating that Telegram spoke with counsel to discuss the process where purchasers could have their Grams sent directly to Gram**

**Vault for custody purposes and whether this was acceptable from a legal perspective. PX128. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

313. An article published by CoinDesk on or around September 10, 2019—after Blackmoon Crytpo's announcement that it would be the first exchange to sell Grams—stated: "[A] fledgling exchange with fewer than 4,000 users . . . has an edge, in part because of its relationship with a custodian that claims to have signed up over a third of the investors," noting that Seydak is the CEO of both Blackmon and Gram Vault. (PX107.)

**Response to No. 313:** **Disputed to the extent that the quoted article written by a third-party is reliable or valid. Disputed as incomplete and misleading. The first sentence of the article reads: "When Telegram launches its long-awaited blockchain sometime this month or next, the go-to marketplace for the new gram tokens could be a fledgling exchange with fewer than 4,000 users." And it proceeds to state: "*At least, that's what Blackmoon Crypto is hoping*. But the Malta-registered exchange *arguably* has an edge, in part because of its relationship with a custodian that claims to have signed up over a third of the investors in Telegram's early-2018 token sale." PX107 (emphasis added). Further, the cited information is irrelevant to Plaintiff's claims in this action.**

314. The article goes on: "Another possible advantage for Blackmoon is its association with the secretive messaging app company behind the $1.7 billion TON project. . . . According to people familiar with the TON development and investment processes, Blackmoon is part of a network of loosely affiliated entities working with Telegram on the infrastructure for the blockchain and token." The article also notes that Blackmoon Financial Group was co-founded by Perekopsky, Telegram's Vice President. (*Id.*)

**Response to No. 314:** **Disputed as incomplete and misleading. The article went on to state, "Blackmoon Crypto denies any direct link with Telegram, however." PX107. Further, the article stated:**

> **"Blackmoon crypto exchange has no relation to Ilya Perekopsky nor anyone else employed by Telegram," Seydak told CoinDesk by email. "While we partnered with Ilya in other business ventures, I happen to be the exchange's sole shareholder and its General Manager. Blackmoon crypto exchange was founded in October 2018 without Ilya's participation. The company has developed its own independent technical integration strategy of the new blockchain from Telegram. It doesn't have, need nor**

> plan to develop any affiliation with the Telegram team to pursue
> its targets."

**PX107.  Disputed to the extent that the quoted article written by a third-party is reliable or valid.**

315.    In a promotional communication circulated by Blackmoon Crypto in September 2019 entitled, "Why Grams will be traded on Blackmoon?", Blackmoon Crypto stated: "Traders will have access to Grams tokens on the Blackmoon Exchange right after Telegram Open Network launch.  Real on-chain Grams, available for withdrawal to Telegram native wallet. No lock-up.  No futures or other derivatives.  To provide our clients with access to Grams, Blackmoon partnered with <u>Gram Vault</u> – a Swiss-regulated custodian for the original investors of Telegram Open Network. This will make on-chain Grams available on Blackmoon when Telegram blockchain goes live and Grams are minted."  (PX108.)

**Response to No. 315:**    **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

316.    The Blackmoon Crypto posting also referred to such features as: "Market, limit, stop and stop-limit orders conditional on market movements"; "Powerful chart tools with multiple tabs"; "Price alerts and customized trading workspaces"; and "More than 200 trading pairs including tokenized assets."  (*Id.*)

**Response to No. 316:**    **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in the action.**

317.    The close nature of the relationship with Telegram of Blackmoon, Gram Vault, Ton Ventures/TON Labs was apparent to players in the cryptocurrency markets. For example:

　　a.   A representative of an affiliate of one of the initial purchasers noted that Gram Vault is "very close to the founders" of Telegram.  (PX109.)

b.  Another firm noted in a research paper that "Blackmoon Financial Group [is] an entity indirectly connected to TON's Executive Team," (PX75 at TLGRM-012-00016234), and pointed favorably to the fact that this group had already officially announced that it would list Grams, thus providing them liquidity.  (*Id.*)  This firm also noted "TON has two main research groups working on TON's development; TON core and TON Labs. . . . A direct affiliation of TON Labs and TON core has never been confirmed, but from the speed of reaction on fresh TON releases one can conclude that TON Labs are the first to receive direct updates from TON core. It is also known that REDACTED TON Labs, invested in TON in 2018 while still being a partner at VC fund SP capital and helped to organise the Gram token sale." (*Id.* at TLGRM-012-00016251.)

c.  In an email to an investor, Parekh referred to TON Labs as independent, but "one of [Telegram's] partners . . . who have been assisting Telegram with testing of the network and who are also building various applications to run on the TON Network." (PX110.)

d.  A representative of another investor viewed Hyman as being "from Telegram" even in June 2019, a year after Hyman had left Telegram.  (PX111 at 4.)

e.  Filatov (at a TON Labs email address), emailed Perekopsky, Parekh, Hyman (at a TON Ventures email address), and Seydak (at a Gram Vault email address): "Dear team, we will try hard to close Coinbase on the listing (along with 100 questions answered today) and support.  Agreed on a separate call with [Gram Vault], timing tbc for later this week / early next week."  (PX95.)

**Response to No. 317:**     **Disputed as inaccurate and misleading.  Further, disputed to the extent that Plaintiff suggests the cited material indicates Telegram is or was perceived as**

affiliated with Blackmoon, Gram Vault, TON Labs or TON Ventures.  For instance, Defendants note that PX107 appears to have been written by an outside third-party with no direct knowledge of the relationship, to the extent there is any, between and among these entities.  Further, Blackmoon has publicly denied any direct connection to Telegram and Ilya's involvement.  *Id.*  TON Labs has publicly denied any affiliation with Telegram as well.  *See* "The Crypto World Still Doesn't Understand Telegram's Plan, Says TON Labs," Cryptobriefing (Sep. 29, 2019) (**https://cryptobriefing.com/telegram-ton-labs/**).  Further, the information cited is irrelevant to Plaintiff's claims in this action.

## XI.     TELEGRAM PAID PROMOTERS TO FIND OTHER INVESTORS

318.    Telegram entered into a finder's fee agreement with ATON, a Russian broker and asset manager, in June 2018, whereby ATON would undertake to introduce potential investors to Telegram in exchange for 10% of the gross proceeds of the investment. (PX112.)

**Response to No. 318:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  Telegram entered into a finder's fee agreement with** ██████ **, whereby** ██████ **would "receive 10% of the gross proceeds received by Telegram" pursuant to each purchase agreement under the terms of the agreement.  PX112.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

319.    Telegram has paid at least $1.2 million in finder's fees to ATON pursuant to this agreement.  (PX115.)

**Response to No. 319:     Undisputed for purposes of Plaintiff's motion.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

320.    In May 2019, an individual representing themselves as "an investor of Telegram" sent an email to Parekh, attaching a marketing brochure (in Russian) from ATON and stating: "this week i have received an offer, where i can purchase Telegram tokens the same price (1,33$) as bought it 1 year ago only with a 3-month lock-up, so its obvious that the seller is the first round investor.  I believe that this action violates rights os [sic] the second round investors cause we bought the tokens more expensive but with the time advantage."  (PX113 at TLGRM-012-00015883.)  An English language translation of the marketing brochure (TLGRM-012-00015885 – 97) is attached as PX114.

**Response to No. 320:** **Undisputed for purposes of Plaintiff's motion but subject to clarification. Telegram's agreement with ▆▆▆▆ provides that "Telegram will prepare all materials related to closing the Deal" and includes representations that ▆▆▆▆ "shall not solicit, engage with or negotiate with any Potential Investor in any jurisdiction in a manner in which to do so would constitute a violation of the relevant laws or regulations of that jurisdiction." PX112. The agreement further specifies that ▆▆▆▆ will only engage with purchasers in "jurisdictions agreed between the parties." PX112. All purchasers engaged by ▆▆▆▆ pursuant to the agreement were located in jurisdictions outside the U.S. Malloy Ex. 11. Ilya testified that he spoke with ▆▆▆▆ regarding the referenced supposed brochure and "they denied the fact that they were doing these deals." He also testified that the brochure "didn't make too much sense." PX13 at 226:8–227:16. Further, the information cited is irrelevant to Plaintiff's claims in this action.**

321.    The marketing brochure noted: "Telegram is one of the largest and fastest growing messengers in the world" (*id.* at 15887); "simplicity and safety of crypto currency exchange: TON wallet in-built into Telegram" (*id.* at 15888); "in 2019 the crypto currency market demonstrates growth again" (*id.* at 15899); and "Evaluation of TON Board" of "the value of one Gram" at "+494%" (*id.* at 15892).

**Response to No. 321:** **Disputed as incomplete and misleading. The brochure states that "the value of one Gram, USD" was at "1.33" for "Stage A" and the "Evaluation of TON Board" at "+494%." PX114 at 15892. Further, the information cited is irrelevant to Plaintiff's claims in this action.**

322.    A 37-page equity analysis on TON Telegram dated May 15, 2019, prepared by ATON was obtained by at least one investor and was available online. (PX116.)

**Response to No. 322:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in the action.**

323.    Telegram entered into a similar commission agreement with Da Vinci Capital Group ("Da Vinci") whereby Telegram would pay Da Vinci 10% of gross proceeds of any investment Da Vinci introduced to Telegram.

**Response to No. 323:** **Disputed insofar as it misconstrues the provisions of the agreement. Further, the information cited is irrelevant to Plaintiff's claims in this action.**

324.    Telegram admits it paid Da Vinci finders' fees. (PX12, Durov Tr. at 217:14–218:10.)

**Response to No. 324:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in the action.**

325.     On or about June 22, 2018, an individual contacted an affiliate of one of the investors, stating: "we have an opportunity to participate in Telegram.  We have an interesting opportunity available to participate in TON Fund at 1.33 USD price please see the teaser attached. The price is at 1.33 as during the second round and we will only take a minimum fee for the fund (2.00%, and 10% performance fee).  According to news, there is strong positive news flow that will be released in early July. They expect the round 3 at 2.22 USD be done to wide range of investors in the autumn backed up by the issuance of the new blockchain mechanism and payment products.  The tokens are expected to be issued by the year end." (PX117.)

**Response to No. 325:**     **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that at some point there was a contemplated third round to be called "Stage B" but that "it did not occur" because "plans related to subsequent rounds were always subject to market conditions and other conditions, such as regulatory environment. In this case specifically, I believe the main factor was that we didn't think that the timing was right, given the degrees in interest towards blockchain projects in the market at that time."  Malloy Ex. 1 at 95:6-96:3.**

326.     The email attached a slide deck prepared "for Da Vinci Capital Investors Only," describing an "opportunity to invest in one of the largest ICO in the history of cryptocurrencies." (*Id.* at 8465.)

**Response to No. 326:**     **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that Telegram did not prepare and did not ever authorize the use of these documents.  Malloy Ex. 1 at 184:22-185:14.  Further, Telegram's agreement with ████ provides that "Telegram will prepare all materials related to closing the Deal[.]"  Malloy Ex. 14.  Further, Pavel testified "it would be logical to assume that if this document was used, it was used only internally among the shareholders of this fund mentioned here."  Malloy Ex. 1 at 185:6-14.  Further, the information cited is irrelevant to Plaintiff's claims in the action.**

327.     On or about February 20, 2018, Hyman emailed an unidentified individual attaching marketing material from Da Vinci, and stated: "The following has been forwarded to

us.  Can you please explain why you are talking about a price below the contemplated issue price

– it makes no sense and is confusing people."  (PX118.)

**Response to No. 327:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

    328. The marketing document attached to Hyman's email referred to a

"'Subsequent Sale' Subscription to Telegram (Gram) Token sale, March 2018"; noted the deal

would be "managed by Da Vinci Capital (the Investment Manager) with the advisory support of

AddCapital"; listed the price for Grams as "from ~$1.1 to ~$1.45 per Token"; noted the

"[b]ooming market of crypto assets['] [growth] by 79x'"; and stated that it "will provide instant

liquidity" upon delivery of Grams.  (*Id.*)

**Response to No. 328:**     **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that "it is clear" from Hyman's email that he is displeased that this document is being distributed even though this document might have been available to a limited number of investors of that specific fund.  PX118; Malloy Ex. 1 at 189:6-10.  Pavel further clarified, that he "was never happy when people tried to interpret what [Telegram] was trying to do" and they "reached out to the parties that we thought were involved to get explanations from them."  *Id.* at 189:11-16.  He further testified "it would be logical to assume that if this document was used, it was used only internally among the shareholders of this fund mentioned here."  *Id.* at 185:6-14.**

    329. Telegram entered into a similar finder's fee agreement with a third entity,

Space Investments, whereby Space Investments would earn 15% of gross proceeds of any

purchase agreements it facilitated on behalf of Telegram.  (PX138.)

**Response to No. 329:**     **Disputed as incorrect and inaccurate.  Further, disputed as the cited material does not support the assertion that Telegram entered into a finder's fee agreement with ▮▮▮▮▮▮▮▮.  PX138.**

    330. As noted, Liquid informed Telegram in or around May 2019 that it "will

be doing an IEO for the GRAM token working with Space Investments."  (PX67.)

**Response to No. 330:**     **Disputed as incomplete and misleading.  This May 28, 2019 email was sent from an unverified gmail address, with no verification that it was in fact "from Liquid," to the address IR@telegram.org, PX67, which was sporadically used during this time period and was created at the beginning of the Private Placement to be used for**

accepting indications of interest from potential purchasers.  Malloy Ex. 1. 350:13-21.
**Telegram employees began using the address again around August 2019 and then October
2019.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

331.    Telegram admits these payments were payments for finders' fees.  (PX12,
Durov Tr. at 217:14–218:10.)

**Response to No. 331:    Undisputed for purposes of Plaintiff's motion but subject to
clarification.  Pavel testified that these were payments for finders's fee and would not
"characterize these as payments to investors."  PX12 at 217:14-20.  Further, the cited
information is irrelevant to Plaintiff's claims in this action.**

## XII.   INVESTORS' EXPECTATION OF PROFIT FROM THE TON INVESTMENT
##        WAS REASONABLE

332.    It was reasonable for a purchaser to buy Grams in Pre-Sale and Stage A
with the expectation of profit derived from the work of Telegram in developing the TON
Blockchain.  (PX10 (Expert Report of Patrick B. Doody ("Doody Report")) at ¶¶ 5, 15-53.)

**Response to No. 332:    Disputed.  Mr. Doody's unsworn expert report does not constitute
admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.**

333.    It was unlikely that a reasonable purchaser of Grams in Pre-Sale and Stage
A would acquire Grams in order to purchase goods and services, because, among other reasons,
there was no identifiable uses for Grams at that time.  (*Id.* ¶¶ 5; 8-9; 50-53.)

**Response to No. 333:    Disputed.  Mr. Doody's unsworn expert report does not constitute
admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.
*See* McKeon Ex. 1 ¶¶ 135-69; Exhibit 4.**

334.    It did not make sense from a business perspective to tie up substantial
capital for approximately one year or more just to purchase a potential currency that might not be
widely accepted in the future.  (*Id.* ¶¶ 5, 53.)

**Response to No. 334:    Disputed.  Mr. Doody's unsworn expert report does not constitute
admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.
*See* McKeon Ex. 1 ¶¶ 135-69, Exhibit 4; McKeon Ex. 2 ¶ 28-32.**

335.     Telegram's Reference Price formula's provision that the TON Foundation would never sell Grams at a price below the Reference Price, which would always be higher than the price the Pre-Sale and Stage A investors paid for their Grams, sent a strong signal to potential purchasers that there potential for profit would not be negatively impacted when Grams are sold from the TON Reserve.  (*Id.* ¶ 38.)

**Response to No. 335:     Disputed.  Mr. Doody's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.  *See* McKeon Ex. 2 ¶¶ 16-27.**

336.     The Reference Price formula sent a strong signal to potential purchasers that Telegram would protect their investment from losses.  (*Id.* ¶¶ 6, 37-46.)

**Response to No. 336:     Disputed.  Mr. Doody's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.  *See* McKeon Ex. 2 ¶¶ 16-27.  Moreover, the Reference Price formula will bear no relationship to the market price of Grams following launch.  JSF ¶ 171.**

337.     The Reference Price formula's various price support mechanisms provided a strong incentive to buy Grams with the intent to generate a profit based on Telegram's efforts.  (*Id.* ¶¶ 38-42.)

**Response to No. 337:     Disputed.  Mr. Doody's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.  *See* McKeon Ex. 2 ¶¶ 16-27.  Moreover, the Reference Price formula will bear no relationship to the market price of Grams following launch.  JSF ¶ 171.**

338.     Reasonable purchasers of Grams at network launch are also likely to still be purchasing Grams as an investment with the intent to profit from the effort of Telegram, rather than purchasing Grams to buy goods and services, given that there appear to be only minimal commercial uses for Grams anticipated at launch.  (*Id.* ¶¶ 9, 52.)

**Response to No. 338:     Disputed.  Mr. Doody's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.  *See* McKeon Ex. 1 ¶¶ 135-69, Exhibit 4; McKeon Ex. 2 ¶ 28-32.  Numerous third parties have developed or are in the process of developing goods and services to be used in connection with Grams and the TON Blockchain upon its launch.  *Id.* at Exhibit 4.**

339.    Pre-Sale and Stage A investors received large discounts from the expected

Reference Price at launch of the TON Blockchain.  (PX11 (Expert Report of Carmen A. Taveras

("Taveras Report")) ¶¶ 25–32.)

**Response to No. 339:      Disputed.  Dr. Taveras' unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid. *See* McKeon Ex. 2 ¶¶ 16-27.  Further disputed that investors "received large discounts." Moreover, the Reference Price formula will bear no relationship to the market price of Grams following launch.  JSF ¶ 171.**

340.    Investors in Pre-Sale expected to receive a 91.1% discount from the

expected Reference Price at launch based on the information contained in the January 2018

Indication of Interest letter.  (*Id.*¶ 30.)

**Response to No. 340:      Disputed.  Dr. Taveras's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid. *See* McKeon Ex. 2 ¶¶ 16-27.  Further disputed that investors "received large discounts."  Moreover, the Reference Price formula will bear no relationship to the market price of Grams following launch.  JSF ¶ 171.**

341.    Investors in the Stage A expected to receive a 75.1% discount from the

expected Reference Price at launch based on the information contained in the February 2018

Indication of Interest letter.  (*Id.*)

**Response to No. 341:      Disputed.  Dr. Taveras's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid. *See* McKeon Ex. 2 ¶¶ 16-27.  Further disputed that investors "received large discounts."  Moreover, the Reference Price formula will bear no relationship to the market price of Grams following launch.  JSF ¶ 171.**

342.    Pre-Sale and Stage A Investors could expect to make a combined profit of

$5,844,901 for each round if the Reference Price formula's Gram buyback provision was used to

buy back all their Grams.  (*Id.*)

**Response to No. 342:      Disputed.  Dr. Taveras's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid. *See* McKeon Ex. 2 ¶¶ 16-27.  Further disputed that investors "received large discounts."  Moreover, the Reference Price formula will bear no relationship to the market price of Grams following launch.  JSF ¶ 171.**

## XIII.   TELEGRAM HAS NOT PROVIDED INVESTORS WITH FINANCIAL AND OTHER INFORMATION

343.    On or about March 6, 2019, Parekh told auditors working on behalf of one of the initial purchasers:  "We have not provided financial statements for Telegram Group Inc or any of its subsidiaries, as this is not contemplated in the Purchase Agreement signed in connection with the offering."  (PX38.)

**Response to No. 343:      Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified:**

> **Due to the fact that such reports were not included as obligatory in the purchase agreements and could create, at the same time, additional burden in our small team, and also due to the, as we perceived it, low relevance of such financial statements, we, as a general matter, did not send regular updates to the purchasers disclosing the financial details of the company, focusing instead on the updates related to the development status of the TON Blockchain which we considered to be much more relevant for investors as it could affect the timelines and development roadmaps that, in turn, could be important for purchasers to be able to plan their activities. However, I believe that in October last year we disclosed certain financial information to the purchasers as well as our planned costs for the next several months.**

**PX12 at 355:21-356:15.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

344.    On or about May 27, 2019, Parekh told another investor:  "We have not provided any financial statements, as this was not part of the Purchase Agreement entered into by investors in the two rounds."  (PX121.)

**Response to No. 344:      Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 343.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

345.    On or about May 28, 2019, Parekh told that investor:  "We have not provided investors any valuation information."  (PX122.)

**Response to No. 345:**     Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 343.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

346.     During the Offering, when asked by an investor for information regarding Telegram's Messenger's user base, Perekopsky replied:  "Telegram is not in a position to provide further information – we have treated all investors equally and [your firm] has been given the same access to the Company as your peers."  (PX28.)

**Response to No. 346:**     Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons stated in Response to No. 343.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

347.     Telegram did not have a policy of providing investors financials for Telegram and Durov "struggles" to grasp the relevance [financial statements] may have for the general public.  (PX12, Durov Tr. at 355:21-356:15; 359:10-22.)

**Response to No. 347:**     Disputed as incomplete and misleading.  The complete text of Pavel's relevant testimony provides:

> **Due to the fact that such reports were not included as obligatory in the purchase agreements and could create, at the same time, additional burden in our small team, and also due to the, as we perceived it, low relevance of such financial statements, we, as a general matter, did not send regular updates to the purchasers disclosing the financial details of the company, focusing instead on the updates related to the development status of the TON Blockchain which we considered to be much more relevant for investors as it could affect the timelines and development roadmaps that, in turn, could be important for purchasers to be able to plan their activities. However, I believe that in October last year we disclosed certain financial information to the purchasers as well as our planned costs for the next several months.**

**PX12 at 355:21-356:15.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

## XIV.   TON'S VALIDATION FUNCTION

348.   Telegram's vision for the TON blockchain requires that the aggregative value of stakes deposited and accepted in validation be high enough for the network to be able to process large transactions securely.  (PX12, Durov Tr. at 72:27-78:5.)

**Response to No. 348:**   **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

349.   Durov believes it would be good to have more than 20 validators at launch.  (*Id.* at 78:7-80:4.)

**Response to No. 349:**   **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified:**

> **[I]n addition to the importance of having a substantial amount of value locked in validator stakes, it is also important to have a certain number of independent validators running the network and signing the transactions. What exact number is sufficient in this regard is a, for the most part, theoretical and philosophical question, and I think there have been a lot of publications on that topic by the blockchain community.  Purely theoretically, if you have to come up with a minimum – minimal sufficient number of validators to run a network like this and for the network to still qualify as a decentralized network, you would need at least several completely independent validators.  And the more validators you have, the better.**

**PX12 at 78:15-79:6.  Further, Pavel testified, "If you look at some other networks, such as the more recently launched EOS, I think they have 20-something validators in their delegated proof-of-stake network. So I think that in terms of public perception and reputation in the community, it would be good to have more than 20 validators at launch." PX12 at 79:23-80:4.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

350.   Durov believes it is difficult to predict how many validators the TON blockchain will have upon launch.  (*Id.* at 311:9-19.)

**Response to No. 350:**   **Disputed as incomplete and misleading.  In the cited material, Pavel was asked: "So 5 billion Grams and 10 percent restriction and 100,000 [minimum Grams to be a validator], that means there could be, at most, 5,000 validators, right?"  To which he responded, "[T]he 10 percent and 100,000 Grams limitation are configuration parameters that validators decide on by majority in their vote, and so it is difficult to**

predict how many validators can work at the same time in TON post-launch since those parameters are likely to be changing." **PX12 at 311:9-19. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

351.    Telegram did not have a policy obligating its employees to ask investors if they had any intention or interest in acting as validators on the TON blockchain, or to fill out a form recording information regarding their interest. (*Id.* at 85:4-86:10.)

**Response to No. 351:     Disputed as incomplete and misleading.  Pavel explained:**

> **[W]e preferred to enter into purchase agreements with well-known, sophisticated investors, many of whom had an established name in the technology sector. We assumed that – given the fact that becoming a validator is actually not unlike something as simple as setting up a server in a data center in a secure way, we assumed that a lot of our purchasers would be able to act as validators if they chose to.**

**PX12 at 86:2-10.  Ilya explained that the "sophistication as Blockchain node validators" was not a criteria, because for "TON Blockchain, the level of sophistication required to be a validator is not that high, so I would say that if this investor was sophisticated, by definition, and if he wants to become a validator, that is a doable task for all of them." PX13 at 125:4-125:9.  Shyam testified that when he circulated to purchasers a set of instructions on how to become a validator, "there were probably a dozen or so investors who came back saying they were interested in validation."  PX14 at 131:20-134:9.  He noted that some of these purchasers "had questions or comments, observations on the [instructions], by which one can assume they were able or seriously interested in looking at it."  *Id.*  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

352.    Parekh did not ask and is not aware of anyone at Telegram asking about whether the investors were going to participate in the validation process (PX14, Parekh Tr. at 130:14–131:14), nor about whether they had the ability to do so (*id.* 134:10-25).

**Response to No. 352:     Disputed as incomplete and misleading.  Ilya explained that the "sophistication as Blockchain node validators" was not a criteria, because for "TON Blockchain, the level of sophistication required to be a validator is not that high, so I would say that if this investor was sophisticated, by definition, and if he wants to become a validator, that is a doable task for all of them."  PX13 at 125:4-125:9.  Additionally, Pavel testified that because Telegram "preferred to enter into purchase agreements with well-known, sophisticated investors, many of whom had an established name in the technology sector" and "becoming a validator is actually not unlike something as simple as setting up a server in a data center in a secure way," Telegram "assumed that a lot of our purchasers**

would be able to act as validators if they chose to." PX12 at 85:24-86:10. Further, the cited information is irrelevant to Plaintiff's claims in this action.

353.    Parekh spoke to only a dozen or so investors that had vague interests in acting as validators. (*Id.* at 131:20–134:9.)

**Response to No. 353:**    Disputed as incomplete and misleading. Disputed as to the use of the term "vague interests." In the cited material, Shyam stated that he has difficulty remembering specific communications with purchasers, but he recalls one instance when he circulated to purchasers a set of instructions on how to become a validator, and in response to that email, "there were probably a dozen or so investors who came back saying they were interested in validation." He noted that some of these purchasers "had questions or comments, observations on the document, by which one can assume they were able or seriously interested in looking at it." PX14 at 131:20-134:9. Further, the cited information is irrelevant to Plaintiff's claims in this action.

354.    Perekopsky similarly explained that in considering allocation criteria, Telegram did not consider whether the funds were "active in the cryptocurrency space" or whether they had the "sophistication as Blockchain node validators." (PX13, Perekopsky Tr. 122:17-125:9.)

**Response to No. 354:**    Disputed as incomplete and misleading. In the cited material, Ilya stated that the "sophistication as Blockchain node validators" was not a criteria, because for "TON Blockchain, the level of sophistication required to be a validator is not that high, so I would say that if this investor was sophisticated, by definition, and if he wants to become a validator, that is a doable task for all of them." PX13 at 125:4-125:9. Additionally, Pavel testified that, because Telegram "preferred to enter into purchase agreements with well-known, sophisticated investors, many of whom had an established name in the technology sector" and because "becoming a validator is actually not unlike something as simple as setting up a server in a data center in a secure way," Telegram "assumed that a lot of our purchasers would be able to act as validators if they chose to." PX12 at 85:24-86:10. Further, the cited information is irrelevant to Plaintiff's claims in this action.

355.    Investors have submitted sworn testimony that they did not intend to act as validators. (*See supra* at ¶¶ 158-60; 167.)

**Response to No. 355:**    See Response Nos. 158-60, 167.

356.    Investors have confirmed that Telegram did not ask them, prior to their investments, whether they intended to act as validators. (*See supra* at ¶ 168.)

113

**Response to No. 356:**       **See Response No. 168.**

357.   Stage A Grams purchasers are free to spend Grams however they deem necessary upon launch.  (PX13, Perekopsky Tr. at 292:9-23.)

**Response to No. 357:**       **Disputed as not supported by the cited material.**

358.   During the pre-launch phase of network development, Telegram has been the primary contributor to productivity growth.   (PX126 (Expert Report of Stephen McKeon Expert on behalf of Defendants ("McKeon Report")) ¶ 203.)

**Response to No. 358:**       **Disputed as incomplete, misleading and unsupported.  Dr. McKeon's cited paragraph states in full:**

> **During the pre-launch phase of network development, although third-party development has been significant, Telegram has been a primary contributor to productivity growth.  However, once the network is launched, all network participants are incentivized to contribute to future growth as the network transitions to a public good in which economic surplus is shared. For example, a firm that wishes to operate their own messaging service on TON would invest their own development time into improving the network. Telegram cannot shut this competitor down by manipulating the chain, and the competitor could profit from the network through the economic value communicated through the chain. Both firms can contribute to a shared public good (TON) and both would benefit from doing so. Similarly, Telegram can develop a wallet and integrate it into Messenger, which increases both network effects and network functionality, but so too can an independent developer and there is evidence that competitive services are already being developed as described earlier.**

**McKeon Ex. 1  ¶ 203.**

359.   Network effects and platform productivity are significant determinants of token prices.  (*Id.* ¶ 200.)

**Response to No. 359:**       **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Dr. McKeon stated in full:**

> **Cong, Li, and Wang (2019) develop a theoretical model of token valuation and find that network effects and platform**

> **productivity are significant determinants of token prices. Cong, Li, and Wang (2019) model the prices of tokens as a function of (i) Users' desire to participate in the system (network effects) and (ii) Functionality improvement over time. In related work, Pagnotta and Buraschi (2018) also find that platform productivity and network effects are significant determinants of fundamental value.**

**McKeon Ex. 1 ¶ 200.**

360. Telegram will continue to have significant influence and control over the success and value of Grams going forward through Telegram Messenger. (*Id.* ¶ 50 ("Marketing materials indicate that the limitations of alternative cryptocurrencies was a primary motivation for the development of TON, as none of the existing cryptocurrencies were viewed as viable for deployment to the hundreds of millions of users of the Telegram Messenger application.").)

**Response to No. 360:     Disputed as Plaintiff's characterization of Dr. McKeon's opinion is incomplete, misleading and unsupported. Further, Defendants note that on January 6, 2020, Telegram publicly announced that it and its affiliates "have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram may never do so." Drylewski Ex. 3 at 1.**

361. It was reasonable for investors to purchase Grams to finance the development of the TON Blockchain with the expectation of profit to be derived from the success of the TON blockchain. (*Id.* ¶ 70 ( "The development of a new blockchain network is often financed by purchasers that provide capital well in advance of network launch. They may be motivated by the prospect of investment returns from price appreciation and/or an intention to use the resultant cryptoasset for utility purposes such as providing validation services.").)

**Response to No. 361:     Disputed as Plaintiff's characterization of Dr. McKeon's opinion is incomplete, misleading and unsupported. As Dr. McKeon clearly opined, purchasers may be motivated by both the prospect of investment returns from price appreciation in addition to an intention to use the cryptoasset for utility purposes. McKeon Ex. 1 ¶ 70.**

362. Purchases of large quantities of a cryptocurrency, especially prior to the launch of the blockchain, are more consistent with an intent to profit from the later sale of the

cryptocurrency rather than to purchase it for consumptive use. (*Id.* ¶ 71 ("Once network goes live and the native asset is distributed to early purchasers, they are able to sell the assets on secondary markets, where it becomes feasible for consumers to purchase the assets in smaller quantities that are consistent with a wider variety of consumptive uses."); *see also id* ¶ 76 (noting that the vast majority of wallets for Ether, in one data set, held "less than 10 ETH, which may be consistent with consumptive use rather than investment purposes." Conversely, holding large amounts of a cryptocurrency is more consistent with investment intent."), *see also id* ¶ 135 ("Cryptocurrency users are typically motivated by one of two reasons, which may not be mutually exclusive. The first is profit, typically through price appreciation, and the second is consumptive utility value, which can take many forms.").)

**Response to No. 362:** **Disputed as Plaintiff's characterization of Dr. McKeon's opinion is incomplete, misleading and unsupported.**

363.     It was reasonable for initial purchasers to purchase Grams with the intent to profit from their subsequent sale in the secondary markets. (*Id.* ¶ 73 ("Similar to markets for commodities, cryptoasset market participants consist of both consumers and speculators.").)

**Response to No. 363:** **Disputed as Plaintiff's characterization of Dr. McKeon's opinion is incomplete, misleading and unsupported.**

364.     The validation process requires substantial technical resources. (*Id.* ¶ 89 ("As in any PoS blockchain designed to ensure high transaction count and fast processing speeds, a TON validator operation is not a trivial activity, and it requires considerable disk space, computing power, network bandwidth, as well as a continual commitment to 100% uptime. The specifications of the TON blockchain require that validators use high-performance (multi-processor) servers with good network connectivity and a sufficient amount of accessible memory.").)

**Response to No. 364:**     Disputed as Plaintiff's characterization of Dr. McKeon's opinion is incomplete, misleading and unsupported.

## XV.   GRAMS WILL BE SECURITIES AT LAUNCH

365.     Reasonable investors in the market expect that the return on Grams will be directly correlated to Telegram's efforts post-launch.

**Response to No. 365:**     Disputed.  Plaintiff provides no cited materials or information to support this assertion, which amounts to an improper legal conclusion.  Further, as Dr. McKeon opined, "While the methodologies above address the idiosyncratic, or network-specific, component of returns, it is also important to note the systematic, or market-wide, component.  Cryptoasset returns are highly correlated."  McKeon Ex. 1 ¶ 209.  "Any profits related to price appreciation from systematic returns are not attributable to the efforts of any particular party, but rather to the market forces broadly defined."  *Id.* ¶ 210.  Additionally, on January 6, 2020, Telegram published a Public Notice, which explained:

> [I]f you are considering whether to purchase Grams once the TON Blockchain platform is launched, we want you to know certain things. Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram may never do so. Rather, it is Telegram's goal and hope that the decentralized community of third-party developers and others will contribute to the TON ecosystem through the development of applications and smart contracts. It will be the sole responsibility of third parties and the community to adopt and implement such applications or smart contracts on the TON Blockchain in the manner they choose. Telegram does not, and cannot, guarantee that anyone will adopt or implement such features or provide such services, on any given timetable or at all.
>
> . . .
>
> Telegram will have no control over TON
>
> The code for the TON Blockchain will always be open source and publicly viewable. Once it is launched, Telegram will occupy the same position as any other party with respect to the TON Blockchain and will not have any control over, any unique rights within, or any responsibility for the management of, the TON Blockchain.

> **Telegram or its employees may, but do not commit to, hold any Grams following the launch of the TON Blockchain. To the extent they do, they will not take part in voting or validating in connection with the TON Blockchain. This voluntary decision was made in order to avoid any perception that Telegram or its employees can or will exercise control over the TON Blockchain following its launch.**

**Drylewski Ex. 3 at 1-2.**

366.    For example, one fund that invests specifically in digital assets and blockchains explicitly tied the market price for Grams to the number of active users on Telegram's Messenger, predicting a price of $2.67 in the first year of Grams, up to $4.51 by year five, even assuming Messenger users use Grams as currencies.  (PX75 at TLGRM-012-000216233.)

**Response to No. 366:    Disputed to the extent that Plaintiff suggests the quoted language is indicative of the positions of other purchasers in the Private Placement.  Defendants note that the fund was not a purchaser in the Private Placement.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

367.    This same fund noted positively the "250M (and growing) active users on its front-end" for TON, referring to Messenger, but noted that "interoperability appears a long way out" and that "it is common for blockchain networks to spend at least one or two years post Mainnet launch to achieve a stable state."  (*Id.* at TLGRM-012-00016220.)

**Response to No. 367:    Disputed to the extent that Plaintiff suggests the quote language is indicative of the positions of other purchasers in the Private Placement.  Defendants note that the fund was not a purchaser in the Private Placement.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

368.    On a business call with Parekh following the filing of the SEC Complaint, one investor continued to ask Telegram about "Telegram's messaging activity" and the "growth" rate for the app, as well as what percentage of Telegram's expenses would be spent on Messenger vs. TON "in the next ~6 months."  (PX123.)

**Response to No. 368:**   Disputed as misleading.  The email exchange indicates only that a purchaser and Shyam spoke regarding a "Telegram business update" and does not support the assertion that the purchaser "continued to ask" Telegram any questions.  PX123.  Further, the cited information is irrelevant to Plaintiff's claims in this action.

369.   Another investor asked Telegram whether wallet will be integrated into

Messenger. (PX124.)

**Response to No. 369:**   Undisputed for purposes of Plaintiff's motion but subject to clarification.  The purchaser asked, "Is there an update on the token wallet? Is it going to be a part of Telegram app? Can I install and try it now?"  PX124.  Shyam responded that Telegram was still in the middle of testing and will provide further updates after testing is complete.  *Id.*  Further, the cited information is irrelevant to Plaintiff's claims in this action.

370.   The publicly-released "testnet" version of the TON Blockchain code,

while complete enough to run simple transactions on simulated assets, lacks critical components

that would be required in a fully developed and running system.  (PX9 (Expert Report of

Maurice P. Herlihy ("Herlihy Report")) ¶¶ 8; 27-28; 34.)

**Response to No. 370:**   Disputed.  Dr. Herlihy's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.  For instance, Dr. Herlihy opined that the TON Blockchain's core BFT protocol is missing.  However, the implementation of the consensus algorithm has been available since September 7th 2019 at https://github.com/ton-blockchain/ton/tree/master/catchain and https://github.com/ton-blockchain/ton/tree/master/validator-session, and the code controlling the distribution of validator awards has also been available since the same date at https://github.com/ton-blockchain/ton/blob/master/crypto/smartcont/elector-code.fc.

371.   There is no systematic analysis proving either the design or specific

implementation of these components is secure and correct. (*Id.* ¶¶ 8; 29-32; 35.)

**Response to No. 371:**   Disputed.  Dr. Herlihy's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.  Further disputed as irrelevant to Plaintiff's claim in this action.

372.   Potential users cannot evaluate the security and effectiveness of the TON

Blockchain (and the utility of the Gram token) until these software components have been

developed, released, and their security and performance evaluated and established.  (*Id.* ¶¶ 8; 33; 36.)

**Response to No. 372:**    Disputed.  Dr. Herlihy's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid. *See* McKeon Ex. 2 at ¶¶ 44-46.  Further disputed as irrelevant to Plaintiff's claim in this action.

373.    Few, if any, of the suite of services that the Telegram public documents claim will eventually be purchasable by Gram holders appear to exist today and the TON Blockchain is not yet mature enough to support them.  (*Id.* ¶¶ 8; 37.)

**Response to No. 373:**    Disputed.  Dr. Herlihy's unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid, or supported in any way.  *See* McKeon Ex. 2 at ¶¶ 28-32.

374.    From the outset of the Offering through the present, Telegram has reserved for itself the flexibility to change features of the TON project, including with respect to TON wallet, the TON foundation, and the role of Telegram in validating blockchain nodes.

(PX12, Durov Tr. at 158:23-162:19, 276:17-277:25, 301:2-9.)

**Response to No. 374:**    Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that the Private Placement was designed such that Telegram

> **reserved a lot of flexibility to how the project and its part could look like, and this flexibility is reflected in the purchase agreements and its appendices. That gave us a comfort of knowing that we would be able to change certain, if not all, aspects of what we're trying to build based on the feedback that we could receive from the regulators, including the SEC, in the following months.**

**PX12 at 159:2-13.  Further, in its January 6, 2020 Public Notice, Telegram stated it "reserves all rights to further add to, clarify or revise these or any other aspects of the TON Blockchain or Grams.  We look forward to providing more information as we get closer to the anticipated launch of the TON Blockchain."  Drylewski Ex. 3 at 3.**

375.    Telegram retains flexibility to make efforts with respect to TON wallet post launch.  (*Id.* at 261:22-262:21.)

**Response to No. 375:**    **Undisputed for purposes of Plaintiff's motion but subject to clarification.  The full text of Pavel's relevant testimony states:**

> **It is worth noting that TON Wallet is just one of the potential implementations of a smart contract and client-side user interface required for users to be able to transfer Grams to each other post launch.  There are other, as far as I know, implementations that were built and are maintained by third-party developers; however, it is fair to say that at this moment in time the TON Wallet implementation built by our team is the most advanced and user user-friendly.  If Telegram decides to integrate TON Wallet into Telegram Messenger in the future, subject to regulatory approval, we may fix certain security issues if we are ever alerted to any, or if we ever uncover any in the Telegram Messenger application that would, at that moment in time, include TON Wallet as part of it.**

**PX12 at 261:22-262:21 (emphasis added).**

376.    Durov told an investor and friend in 2018 that the advice of his lawyers was that Telegram "retain flexibility" with respect to how they would handle the TON foundation.  (PX25 at TLGRM-017-00000320.)

**Response to No. 376:**    **Disputed as incomplete.  Pavel stated:**

> **We've talked a lot with Skadden about our ideas re Foundation. While I was pushing it forward, their advice was clear - in times when the future (and current) regulation is uncertain, retain flexibility. It made a lot of sense to me, as it seems to go in line with the larger Telegram approach, which we employ not only on legal matters, but also on the engineering side and product-wise.**

**PX25 at TLGRM-017-00000320.**

377.    Defendants "have reserved and continue to reserve all rights to change, modify, or eliminate the existence or functions of the TON Foundation."  (PX23 at 8, Response 2.)

**Response to No. 377:**    **Undisputed for purposes of Plaintiff's motion.**

378.    Telegram has stated that it "may in its sole discretion determine whether to develop applications for users on the TON Blockchain." (*Id.* at 31, Response 16.)

**Response to No. 378:**    **Undisputed for purposes of Plaintiff's motion.**

379.    Telegram has stated that "TON Foundation will determine whether to sell Grams by comparing the Reference Price . . . and current market price of Grams.  The TON Foundation will be responsible for determining which exchanges are utilized for this purpose and how such price determination is being made, and the TON Foundation will make this information publicly available." (*Id.* at 31, Response 16.)

**Response to No. 379:**    **Disputed as incomplete and misleading.  The full text of Defendants' response to Interrogatory No. 16 provides:**

> **Because the TON Blockchain has not yet launched, Defendants have reserved and continue to reserve all rights to change, modify, or eliminate the existence or details of the TON Blockchain, the TON Foundation, or any 'price stabilization' functions. Subject to that reservation of rights, Defendants currently contemplate that the TON Foundation will determine whether to sell Grams by comparing the Reference Price (as defined below) and current market price of Grams. The TON Foundation will be responsible for determining which exchanges are utilized for this purpose and how such price determination is being made, and the TON Foundation will make this information publicly available. If the price of Grams on third-party exchanges exceeds the Reference Price, the TON Foundation may, but is not obligated to, sell Grams from the TON Reserve into the market at a price equal to or greater than the Reference Price. Defendants anticipate that the TON Foundation's selling of Grams by the TON Reserve may have the intended effect of lowering the market price of Grams in certain circumstances.**

**Drylewski Ex. 4 at 31.  Further, Defendants have communicated to the public that the TON Foundation may never be established.  JSF ¶ 149; Drylewski Ex. 3 at 2.  From its inception, the TON Foundation was intended to "retain flexibility" so as to comply with regulations. Drylewski Ex. 12; JX14, JX15, Risk Factors ¶ 16.**

380.    Telegram's recent public statement, released on or about January 6, 2020, noted: "Telegram reserves all rights to further add to, clarify or revise these or any other aspects of the TON Blockchain or Grams."  (PX125.)

**Response to No. 380:**    **Undisputed for purposes of Plaintiff's motion.**

381.    Telegram retains authority over what to do with the 42% of Grams not sold in the Offering.  (PX12, Durov Tr. at 277:1-9.)

**Response to No. 381:**    **Disputed as the cited material does not support the assertion.**

**XVI.  OTHER**

382.    The Ton Foundation's ability to buy and sell Grams pursuant to the Reference Price formula is not enough to guarantee stability in the market price of Grams. (PX11 (Taveras Report) at ¶¶ 8-24; 33-51.)

**Response to No. 382:**    **Disputed.  Dr. Taveras' unsworn expert report does not constitute admissible evidence.  It is also disputed that such an opinion is relevant, reliable or valid.**  **_See_** **McKeon Ex. 2 ¶¶ 16-27.  Further, disputed to the extent Plaintiff states that the TON Foundation, if ever established, will have the ability to buy Grams.  As originally contemplated, the TON Foundation would also have had the ability to buy Grams.  JSF ¶¶ 165, 167.  However, through discussions with the SEC, Defendants decided to remove the TON Foundation's Gram-buying function to alleviate concerns articulated by the SEC. JSF ¶ 168.  Finally, the cited information is irrelevant to Plaintiff's claims in this action.**

383.    Digital assets like Grams are not suited to serve as a currency given that they are subject to "periods of volatility clustering" and a "higher frequency of extreme returns." (PX129 (Rebuttal Expert Report of Stephen McKeon) ¶ 52.)

**Response to No. 383:**    **Disputed as inaccurate and misleading.  It is undisputed that Dr. McKeon stated the reliable and valid expert opinions in the cited material.  However, in the cited material, Dr. McKeon was actually providing criticism of Plaintiff's own expert, Dr. Taveras, stating:**

> **Finally, prior research has documented at least two features of cryptoasset returns that violate assumptions underlying Dr. Taveras' use of Geometric Brownian Motion (GBM) in her simulation analysis. The first is periods of volatility clustering (Othman et al., 2019). Hence it is incorrect to assume constant**

> sigma, as it is more accurately modelled as time varying. The
> second is that log returns of cryptoassets violate the normality
> assumption in GBM.  Cryptoasset log returns exhibit "fat tails,"
> meaning a higher frequency of extreme returns, relative to what
> would be expected under a normal distribution.

**McKeon Ex. 2 ¶ 52.**

384.   Grams will be available to the public in any quantity, even fractional

quantities.  (PX12, Durov Tr. at 301:19-24.)

**Response to No. 384:     Disputed as the cited material does not support this assertion.
Further disputed as incomplete and misleading.  When asked whether if the TON
Blockchain launches, the average person will be able to buy Grams "in any quantity, even
fractional quantities," Pavel testified that although that is the current plan, "[t]his is
dependent on several factors."  Drylewski Ex. 2 at 300:19-24.**

385.   From time to time Telegram updates the market on the size of its

Messenger user base.  (*Id.* at 357:12-359:22.)

**Response to No. 385:     Disputed as incomplete and misleading.  Pavel testified that
throughout Telegram's history, "Telegram has been consistently updating the public on its
development, the milestones and user metrics it reached, and its new features and plans. I
don't see any reason why we would discontinue this practice after the launch of the TON
Blockchain."  PX12 at 359:4-9.  Some of Telegram's updates are publicly available here:
https://telegram.org/blog.**

386.   Parekh was not aware of any efforts by Telegram to contact the SEC prior

to the Pre-Sale. (PX14, Parekh Tr. 47:3-48:16.)

**Response to No. 386:     Undisputed for purposes of Plaintiff's motion but subject to
clarification.  In the 18 months prior to this action, Defendants engaged in good faith and
voluntary discussions with the SEC, provided productions of thousands of documents,
submitted detailed legal memoranda, provided presentations and engaged in regular email
and telephone discussions with the SEC.  *See* ECF No. 37, Defenses ¶¶ 37-39.  Telegram
incorporated and made changes in accordance with the SEC's feedback and concerns.  *Id.*
¶ 39.  Further, as Pavel testified, Telegram "reserved a lot of flexibility to how the project
and its parts could look like," in part, to accommodate "feedback that we could receive
from the regulators, including the SEC, in the following months."  PX12 at 158:23-159:13.**

387.   As late as July 2019, Telegram was planning to distribute approximately

250 million free Grams following the network launch. (PX 138 at 2.)

**Response to No. 387:      Disputed as the cited material does not support the assertion. Disputed as inaccurate, incomplete and misleading.  It is currently contemplated that, upon launch of the TON Blockchain or immediately thereafter, 5% of the total initial supply of Grams (i.e., 250,000,000 Grams) may be distributed on a first-come, first-served basis to users of Telegram Messenger in order to promote the consumptive adoption of Grams as a currency.  The Grams would be offered in an amount that is commensurate with consumptive use based on the market price of Grams (e.g., an amount of Grams totaling a small amount of value as measured in fiat currency).  In order to receive Grams, users would need to request them from a bot programmed into Telegram Messenger and provide a valid address for a standalone wallet application (either TON Wallet or a third party wallet) that would not be integrated into Messenger.  Defendants remain open to modifying any aspect of these incentive payments in order to comply with applicable laws and regulations.  *See* Drylewski Ex. 5, Response to Interrogatory No. 15.**

388.    Both the Pre-Sale Primer and the Stage A Primer stated: "Four percent of the initial supply of Grams (200 million Grams) will be reserved for the development team, subject to a 4-year vesting period." (JX8 at 16; JX9 at 16.)

**Response to No. 388:      Disputed as incomplete and misleading.  The documents cited have been expressly superseded and Telegram informed the public on January 6, 2020, that its employees and founders may, but have not committed to, hold Grams following the launch of the TON Blockchain.  Drylewski Ex. 3 at 3.  Additionally, Telegram has told the public that any Grams held by its employees or founders cannot be used for voting of validating functions in connection with the TON Blockchain.  *Id.***

Dated:   New York, New York
         January 21, 2020

      Respectfully submitted,

      /s/ Scott D. Musoff
      George A. Zimmerman
      Scott D. Musoff
      Christopher P. Malloy
      Alexander C. Drylewski
      SKADDEN, ARPS, SLATE,
       MEAGHER & FLOM LLP
      Four Times Square
      New York, New York 10036
      Phone:  (212) 735-3000

      *Attorneys for Defendants*