# Exhibit 1

CONFIDENTIAL

```
1                  UNITED STATES DISTRICT COURT
2                  SOUTHERN DISTRICT OF NEW YORK
3
4    SECURITIES AND EXCHANGE COMMISSION, )
                                         )
5                        Plaintiff,      )
                                         )
6       v.                               )19 Civ. 9439 (PKC)
                                         )
7    TELEGRAM GROUP INC. and             )
     TON ISSUER INC.,                    )
8                                        )
                         Defendants.     )
9    _____)
10
11
12                  C O N F I D E N T I A L
13                  VIDEOTAPED DEPOSITION OF
14                         JOHN HYMAN
15                     February 4th, 2020
16
17                        Taken at:
18       CMS CAMERON McKENNA NABARRO OLSWANG LLP
19                     78 CANNON STREET
20                     LONDON EC4N 6AF
21
22
23
     Taken by:
24   DIANE DAVIDSON,
     Court Reporter
25   JOB No. 200204MWC
```

1

```
 1              MR. DRYLEWSKI:  Objection to form.
 2         A.   From memory, no.  It had received indications
 3   of interest for in excess of $850 million.
 4         Q.   Indications of interest -- what do you mean by
 5   "indications of interest" just for the record?
 6         A.   I mean orders that were signed, orders from
 7   investors with a price commitment.
 8         Q.   There was a document called "indications of
 9   interest", correct?
10         A.   Correct.
11         Q.   Is it your recollection or your testimony by
12   some time in March Telegram had received signed indications of
13   interest totalling at least $850 million?
14         A.   To my recollection, yes.
15         Q.   Who was collecting the indications of interests
16   that you received?  Was anybody collecting them?
17         A.   Telegram was collecting them, a combination of
18   three individuals discussed, myself, Shyam Parekh and Ilya
19   Perekopsky, were keeping them.  By this point things were a
20   little bit more institutionalized.  There was a process of
21   getting an indication of interest then starting, the getting
22   documentation fully signed by the investors, getting -- there
23   was obviously a number of clearances that then needed to
24   occur.  Telegram had appointed a firm called Lawson Connor, I
25   believe they were called, to do their KYC and relevant
```

53

```
 1  customer checks on people, and then ultimately also Credit
 2  Suisse, the receiving bank, had to do the same.  There was a
 3  process that took some time to clear the backlog of people, so
 4  the getting the order was in a sense, that didn't finalized
 5  the process, this was not like back in my days at a big bank
 6  where you were dealing with a hundred institutional investors
 7  that everybody knew and were set up and dealt with the firm
 8  regularly.  You had to establish a whole different set of
 9  ground rules.  From memory in the Stage A, we had less
10  household institutional interest, so it took more time for
11  these investors to go through that process.  They were less
12  used to it.
13           Q.   You said "documentation fully signed by the
14  investors", what do you mean by -- what documentation?
15           A.   I am trying to remember, there was a purchase
16  agreement and then there was obviously a series of questions.
17  There would be passports and information about the beneficial
18  owners, potential beneficial owners that gave them the Grams.
19           Q. The first that typically was the indication of
20  interest and then subsequent to that these documents that you
21  mentioned?
22           A.   Correct.
23           Q.   At what point did Credit Suisse enter the
24  picture?
25           A.   What do you mean at what point?
```

54

1  company itself we put in about a million Swiss francs or
2  dollars, it's the same approximately.
3         Q.   The other people that you mentioned also put
4  in some money?
5         A.   Yes, exactly.
6         Q.   Do you know how much they put in?
7         A.   I think it was pro rata to their
8  shareholdings.
9         Q.   Pro rata to the shares.  Okay.  Did Gram Vault
10 ever engage in fundraising efforts of their own?
11        A.   Not beyond that, no.
12        Q.   Did Gram Vault ever solicit funds from any
13 investors other than beyond that?
14        A.   Not that I am aware of.
15        Q.   Okay.  When Mr. Seydak approached you about
16 the potential of being involved with Gram Vault, can you give
17 me a little more specifically what did he say Gram Vault was
18 about?
19        A.   The essence of it was, and this is what had
20 resonance with me, it was unclear who would be capable of
21 providing custody solutions to the investors in the TON
22 system, and a lot of the investor base were not experienced
23 crypto investors, so they needed a wallet, an institutional
24 wallet, custody that could help them; that was the essence of
25 it.  They had, their claim was they had a number of the large

125

CONFIDENTIAL

1  investors who were committed or semi-committed to using this
2  as their custody vehicle, but they needed help in getting
3  marketing, particularly the custody and services like staking
4  to a broader investor group.
5           Q.   Was the idea that Gram Vault would make money
6  somehow from this venture?
7           A.   Yes.
8           Q.   How?
9           A.   You charge a -- to me it was a bit akin to
10 prime brokerage in the traditional financial world, right;
11 there were storages fees, there was an annual fee -- I can't
12 recall what it was, but there was annual fee for storage --
13 there was staking was potentially a lucrative revenue source,
14 as clearly you would need people to validate transactions, and
15 it was not clear how many of the investors could do that
16 themselves, and then there was potential for trading, if and
17 when trading occurred.
18          Q.   Potential for trading by whom?
19          A.   By being the custodian that you would
20 ultimately help these investors with their liquidity options;
21 not by being a market maker yourself but, if you like, being
22 an advisor, a liquidity advisor to the investors.
23          Q.   But there were some conversations like about
24 finding market makers, right?
25          A.   I believe there were.  I was not involved in

1  any meaningful conversation.  I have never talked to any
2  market makers, I have never talked to any exchanges myself.
3             Q.    Exchanges, what do you mean by exchanges?
4             A.    The exchanges that trade cryptocurrencies.
5             Q.    Like Coinbase?
6             A.    Coinbase, exactly.
7             Q.    Just so that we're clear, when you say "market
8  makers", who do you mean by that term, "market makers"?
9             A.    Something like about DRW, somebody like -- as
10 I understand it in the crypto world there are lots of, there
11 is no central pool of liquidity for a lot of these
12 transactions, so there are people who make markets or aim to
13 the provide liquidity.
14            Q.    So the idea was that Gram Vault wasn't going
15 to be looking on the liquidity side but more on the custody
16 side; is that a fair summary?
17            A.    Yes.  The focus I had, and where I was helping
18 them, was in going to existing investors and looking for their
19 custody business.  Clearly the custody is the first, everybody
20 was going to need some form of custody solution.  They could
21 create it for themselves but that's not easy and you have got
22 to have the expertise to do it.  And when I go back to one of
23 the issues I had back at the beginning, a lot of investors
24 were terrified, which I understand, you lose your USB and tens
25 of millions of dollars vanishes and you lose your job.  So,

127

1  right, the focus that I had, where I helped them, was making a
2  series of introductions to investors; I was not an employee
3  and I wasn't schooled in signing them up or going through the
4  KYC process, or anything else, but I helped them make some
5  introductions and tried to hold people's hands if they needed
6  solutions.  Frankly a lot of the investors had proactively
7  come to me at different points to do that.
8           Q.   In other words, I guess the principal value
9  add for you to make introductions to potential clients
10 essentially?
11          A.   Exactly.
12          Q.   Okay.  You knew these potential clients
13 because you had talked to them in your role --
14          A.   Yeah.
15          MR. DRYLEWSKI:  Objection to form.
16          Q.   Do you know, did you discuss this with
17 Telegram in any way "is it going to be okay with you if I call
18 your investors"?
19          A.   No.  I had no restrictions in my, I had no
20 restrictions from the settlement agreement.
21          Q.   Right.  Do you know if Telegram became aware
22 that you were engaged in these efforts?
23          MR. DRYLEWSKI:  Objection to form.
24          A.   They may have been aware.  From time to time I
25 was talking to Shyam Parekh about different topics but never

128

```
 1              Q.   You said this began sometime around the
 2   beginning of 2019?
 3              A.   February/March 2019.
 4              Q.   Okay.  Are those efforts to get people to sign
 5   up with Gram Vault, are they still ongoing?
 6              A.   Not at this point, no.
 7              Q.   Is that because of the litigation?
 8              A.   Yes.  Obviously once the litigation took place
 9   and the launch is postponed there is no point in -- I think
10   everything was frozen.
11              Q.   Did Gram Vault enter into any formal
12   agreements with potential clients about the custody solution?
13              A.   There were varying -- I believe they did.  I
14   had no first-hand knowledge of exactly where things stood.  I
15   believe a number of clients had entered into, had actually
16   signed agreements.  I think they may have even taken some
17   deposits, but, I am not, I can't give you -- I know everything
18   has been put on hold and I believe any deposits were refunded,
19   but I don't have first-hand knowledge or oversight of that.
20              Q.   I think you mentioned earlier, you said that
21   you were not directly involved with conversations, exchanges
22   such as Coinbase or Kraken.  Were you aware as to whether
23   exchanges were reaching out to Telegram while you were working
24   at Telegram for a potential listing of Grams?
25              MR. DRYLEWSKI:  Objection to form.
```

131

```
 1              Q.  Did you ever hear of anyone else being
 2   confused about your role at this point in time?
 3              MR. LIFTIK:  Objection.
 4              A.  I didn't hear of anyone being confused.  I was
 5   always very clear with people what I was doing and what I was
 6   representing.
 7              Q.  What did you tell them you were doing and
 8   representing?
 9              MR. LIFTIK:  Objection.
10              A.  I told them I left Telegram the year before, I
11   was helping a couple of businesses who were looking to be
12   involved in the ecosystem and network for TON Labs; that was
13   it.
14              Q.  Do you see there is some sort of a slide deck
15   that's attached; I will just tell you that is the attachment
16   to this email.  Are you familiar with this slide deck?
17              A.  I have seen it, yes.
18              Q.  Can you tell us the purpose of this slide
19   deck?
20              MR. DRYLEWSKI:  Objection to form.
21              A.  It was an overview that was used to talk to
22   clients and counterparties and other people that Gram Vault
23   would want to do business with.
24              Q.  Was this deck used with respect to a potential
25   venture or with respect to business from clients?
```

140

```
 1  colleagues."  Then there is a deck; what is this deck?
 2          A.   This deck is a TON Labs deck talking about
 3  what TON labs were doing with the ecosystem.
 4          Q.   Were you receiving any compensation from TON
 5  Labs for this kind of work?
 6          A.   No.
 7          Q.   So why were you doing this work?
 8          A.   I was working on the basis of having the
 9  potential to get equity compensation if we were successful in
10  raising funds.
11          Q.   This is in TON Labs or TON ventures?
12          A.   TON Labs.
13          Q.   Did this have anything to do with your work
14  for Gram Vault?
15          A.   No.  As I said to you, this, this -- I picked a
16  couple of these, I was keen to see how, having spent all that
17  time with the Telegram Open Network at the beginning I was
18  keen to see how things would evolve.  I cherry-picked a couple
19  of these start-ups to help -- that's the nature in helping
20  start-ups, right, you kind of use your contacts, help them
21  with some business development and hope that a percentage of
22  them are successful.
23          Q.   Mr. Filatov was also involved with TON Labs,
24  is that right?
25          A.   Yes, he was the CEO of TON Labs?
```

159

```
 1              MR. LIFTIK:  Objection.
 2         A.   Well, I think that is irrelevant.
 3         Q.   Let us take a break so we can check and make
 4    sure we have covered everything, we are almost done.
 5              THE VIDEOGRAPHER:  Going off the record, the time
 6    is 3.04 p.m.
 7              THE VIDEOGRAPHER:  Back on the record, the time is
 8    3.14 p.m.
 9         Q.   Mr. Hyman have you ever been present at any
10    meetings between Mr. Filatov and Mr. Durov?
11         A.   No.
12         Q.   Have you ever participated in phone
13    conversations between the two of them?
14         A.   No.
15         Q.   Do you know whether Mr. Durov has any
16    financial interest in TON Labs or TON Ventures?
17              MR. DRYLEWSKI:  Objection to form.
18         A.   No.
19         Q.   Do you know if Mr. Perekopsky has any interest
20    in TON Labs or TON Ventures?
21              MR. DRYLEWSKI:  Objection.
22         A.   No.
23         Q.   Do any of them have any financial interest in
24    Gram Vault?
25         A.   No.
```

169

```
 1                MR. DRYLEWSKI:  Same objection.
 2           Q.   Has Mr. Durov ever expressed to you any
 3  interest in having a financial interest in Gram Vault in the
 4  future?
 5           A.   No.
 6           Q.   Has Mr. Perekopsky ever expressed such
 7  interest to you?
 8           A.   No.
 9           Q.   With respect TON Labs/TON Ventures, have
10  either Mr. Durov or Mr. Perekopsky ever expressed any such
11  interest to you about having to a financial interest in the
12  future?
13           A.   No.
14           Q.   Is that a no?
15           A.   No.
16           Q.   Have you ever given any funds to the Globe
17  Bridge entity?
18           A.   No.
19           Q.   I think that is all we have for now, thank
20  you.  We might ask more questions after Mr. Drylewski does to
21  the extent we have time left, but thank you, Mr. Hyman.
22                MR. DRYLEWSKI:  Let's go off the record and
23  discuss.
24                THE VIDEOGRAPHER:  We are going off the record, the
25  time is 3.15 p.m.
```

170

1           THE VIDEOGRAPHER:  Back upon the record, the time
2    is 3.16 p.m.
3           Examined by MR. DRYLEWSKI
4           MR. DRYLEWSKI:  Good afternoon Mr. Hyman, you
5    testified earlier about some activity that an investor named
6    Aton undertook with respect to the private placement.  I just
7    want to make sure that I am clear on your testimony there.
8    When you discussed activities that Aton may have been involved
9    in, did that include Aton finding or introducing potential
10   investors to Telegram?
11          A.   Yes, I should have been, I probably used, I
12   was probably clumsy in my terminology.  Aton, as you say, were
13   introducing and marketing investors to Telegram.
14          Q.   Would that include, if you understand it, to
15   be some of Aton's own investors; did they have their own
16   internal investors?
17          A.   I understand that Aton actually have the most
18   developed wealth management business in Russia, more akin to
19   Charles Schwab, or whatever, if you want to put it that way,
20   and they were introducing their investors, yes.
21          Q.   Understood.  At any point did you become aware
22   of Aton ever selling its allocation of Grams to other
23   investors?
24          A.   No, and I don't believe they acted in a
25   principal manner.

171

```
 1              Q.   What do you mean by that exactly?
 2              A.   Buying Grams for their own account, I think
 3   they identified and found investors.
 4              Q.   Understood.  But to the extent that Aton did
 5   purchase any Grams, and I am not representing that they did,
 6   you don't have any understanding sitting here that they resold
 7   those Grams to anyone?
 8              A.   No understanding.
 9              Q.   And you have no understanding sitting here
10   today that Aton ever entered into a purchase agreement that it
11   then violated with telegram?
12              MR. TENREIRO:  Objection.
13              A.   Correct.
14              Q.   In terms of marketing materials that Aton may
15   have had and that you may have been shown, did Telegram ever
16   authorize Aton to create marketing materials relating to
17   Grams?
18              A.   In the time I spent Telegram never authorized
19   anybody, Russia or anywhere else, to create marketing
20   materials.
21              Q.   Aton or anybody else for that matter?
22              A.   Correct.
23              Q.   At your time at Telegram or since, are you
24   aware whether Telegram ever proved any marketings materials by
25   Aton or any other third party relating to Grams?
```

172

CONFIDENTIAL

1          MR. TENREIRO:  Objection.
2          A.   I am not aware but I would be very doubtful
3  they ever would.
4          Q.   You were also shown earlier today some, what
5  looked like, marketing materials relating to Gram Vault and
6  TON Labs, did Telegram to your knowledge ever authorize or
7  approve any of the content in those marketing materials?
8          A.   I have no knowledge or belief that they did.
9          MR. DRYLEWSKI:  Let us go off the record for one
10 second because those are my documents.
11         THE VIDEOGRAPHER:  Going off the record, the time
12 is 3.19 p.m.
13         THE VIDEOGRAPHER:  Back on the record, the time is
14 3.20 p.m.
15         MR. DRYLEWSKI:  Mr. Hyman, you were earlier shown
16 what has been marked as Exhibit 48, which on the cover is
17 called a Telegram Pre-Sale Primer; do you have that?
18         A.   Yes, I do.
19         Q.   You do you recall whether there were numerous
20 iterations of the primer?
21         A.   I recall there were, there was a later
22 version, I think there was, some of the original marketing
23 materials were not properly institutionalized and I think
24 there were, they were updated after that sort of pre-marketing
25 period that we did and I think there was a clear out-reach to

173

1  every prospective investor to make sure they understood that
2  those materials were not to be relied on.  As I said, there
3  was a much, and I mentioned this before, there was a proper
4  effort which I know Pavel was personally very involved with
5  around the risk factor element of all of this.
6           Q.   You have just pre-empted a question, if you
7  turn to the last page of this exhibit, you see here it reads:
8  "Appendix B, Risk Factors", do you see that?
9           A.   Mm hmm.
10          Q.   What does that refer to, if you know?
11          A.   I presume it refers to risk factors, but I
12 don't know that.
13          Q.   Do you know that risk factors this means?
14          A.   I don't know specifically, no.
15          Q.   Do you recall that investors were given a list
16 of risk factors?
17          MR. TENREIRO:  Objection.
18          A.   Yes, I mentioned this previously, yes, I do
19 recall that, but I cannot derive it from here.  I do recall
20 that there was a proper list of risk factors produced, as
21 would you have any kind of document for the financial services
22 business.
23          Q.   Does this document refresh your recollection
24 that those risk factors were attached to this version of the
25 primer that went to the private investors?

174

```
 1              A.   Yes, that's correct.  I actually do remember
 2   now sending that out, yes.
 3              Q.   Do you remember if any of the primers or other
 4   offering materials that were given to investors in the context
 5   of the private placement were done so under expectations that
 6   they would be kept confidential?
 7              MR. TENREIRO:  Objection.
 8              A.   Yes, the whole aim -- originally we were
 9   seeking to get NDAs from everybody.  It proved practically
10   very difficult because the VC community won't sign NDAs as a
11   matter of principle and, as I said, the whole project just
12   grew in expectation.  But the original concept was to keep
13   this private.  Obviously Telegram were very sensitive to
14   disclosing its own plans and IP and didn't want this made
15   public.
16              Q.   In your practise of communicating with private
17   investors, did you convey those thoughts about wanting to keep
18   these materials private?
19              A.   Definitely.
20              (Exhibit 109 marked for identification)
21              Q.   Take your time and review this, Mr. Hyman, but
22   I have one or two questions on it.
23   (Pause)
24              A.   Okay.
25              Q.   Mr. Hyman, does this look like the list of
```

175

```
 1  risk factors that was attached to the primer or other offering
 2  materials that went to private investors?
 3              MR. TENREIRO:  Objection.
 4          A.  Correct, yes, it does.
 5          Q.  Was it your expectation that investors in the
 6  private placement would have read and understood these risk
 7  factors?
 8          A.  Yes, I believe so.
 9          Q.  You can put that to the side.
10              (Exhibit 110 marked for identification)
11          Q.  Mr. Hyman, feel free to look through the
12  entire document but I am going to ask you a question focusing
13  on page 11, Bates TG-001 - a whole bunch of 0s -- 25.
14          A.  Okay.
15          Q.  Mr. Hyman, I mean, do you remember that in
16  purchase agreements that each private placement purchaser
17  signed, the purchasers made certain warranties?
18          A.  Yes, I do.
19          Q.  If you look on page 11 of this purchase
20  agreement -- first of all, is this an example of a purchase
21  agreement that investors entered into in connect with the
22  private placement?
23          A.  Yes, it is.
24          Q.  If you look at Section 6 on page 11 of the
25  document you have been handed, is this an example of the
```

176

1  warranties that the purchaser made with respect to the private
2  placement?
3           A.   Correct.
4           Q.   If you look at 6.3, I am going to read 6.3(f):
5  "The Purchaser understands and expressly accepts that, (f) the
6  Purchaser has not relied on any representations or warranties
7  made by the Issuer or the Parent outside of this purchase
8  agreement, including, but not limited to, conversations of any
9  kind, whether oral or electronic communication or any white
10 paper or primer"; did I read that correctly?
11          A.   Yes, you did.
12          Q.   Do you recall that every purchaser warranted
13 in its purchase agreement to that, what I just read?
14          A.   Yes, they did.
15          Q.   Was this your understanding, while you were
16 working for Telegram in connection with the private placement,
17 that each private placement purchaser read and understood the
18 warranties that it was making?
19          A.   That's correct.
20          Q.   Did any private purchaser ever express
21 confusion or questions about the warranties that it was being
22 asked to make?
23          A.   Not in my experience, no.
24          Q.   I don't have any other questions.
25          MR. TENREIRO:  I have a couple which should take

177