# Exhibit A



QUOINE Pte. Ltd.
(UEN 201414068E)
8 Orange Grove Road #06-02
Singapore 258342

11 July 2019

Upside Inc.
13F 134, Teheran-ro
Gangnam-gu, Seoul
Korea
Liquid account email address: jisoon.lim@metaps-plus.com

## Letter Agreement Regarding the Gram Token Sale

Dear Seungyeon Kim,

1. We write in relation to "The Gram Token Sale" commencing July 10, 2019 08:00 UTC where your company Upside Inc., or any of its related companies with a verified Liquid Account, will purchase Gram tokens (such entity, the "**Purchaser**") from Gram Asia Ltd. ("**Seller**") through the Liquid platform operated by Quoine Pte. Ltd. ("**Quoine**") which is providing the platform for such sale (the "**Gram Token Sale**"). Capitalized terms used but not defined in this Letter Agreement have the meanings given to them in the enclosed Terms of Sale.

2. In connection with the Gram Token Sale, Purchaser acknowledges and agrees that (a) its submission of a purchase order for Grams in the Gram Token Sale through the Liquid platform will constitute its agreement to the Terms of Sale that apply to all offers to purchase, and actual purchases of Grams during the Gram Token Sale, and (b) upon such submission of a purchase order, the Terms of Sale will be effective and binding on Purchaser.

3. Notwithstanding anything to the contrary in the Terms of Sale or the Liquid platform, Quoine and Seller hereby agree that the following terms will apply to Grams purchased by Purchaser in the Gram Token Sale:

    a. **Purchase Price per Gram**: USDC 3.5

    b. **Aggregate Purchase Price**: USDC 9,975,000

    c. **Aggregate Number of Grams**: 2,850,000

4. In accordance with the Terms of Sale, during the Gram Token Sale, Purchaser will submit one or more purchase orders for the number of Grams obtained by dividing the Aggregate Purchase Price set out in 3.b above by the purchase price per Gram displayed on the Liquid platform (such number, the "**Interim Quantity**"). Notwithstanding the Interim Quantity reflected in Purchaser's Liquid account, Purchaser will be deemed to have ordered the Aggregate Number of Grams set out in 3.c above. Subject to the Terms of Sale (including without limitation the Delivery Schedule and the fulfilment or waiver of the Conditions Precedent), Quoine shall deliver the applicable portion of the Aggregate Number of Grams on each Settlement Date.

5.  In the event of any conflict between the terms set forth in this Letter Agreement and those set forth in the Terms of Sale, the terms of this Letter Agreement will prevail.

6.  Any term of this Letter Agreement may be amended or waived only with the written consent of Purchaser and Quoine.

7.  This Letter Agreement is governed by the laws of Singapore. All disputes, controversies or claims arising out of or relating to this Letter Agreement, including any question regarding the existence, validity or termination of this Letter Agreement, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre in accordance with the provisions of Clause 22.2 of the Terms of Sale.

8.  If the matters set out in this Letter Agreement are in accordance with your understanding, please countersign a copy in the space below to indicate Purchaser's acknowledgement and agreement to the same, and return such countersigned copy to Quoine, whereupon this Letter Agreement will serve as confirmation that Purchaser and Quoine have agreed to the matters contained herein.

Enclosure: Terms of Sale (10 July 2019)

---

| **Quoine Pte. Ltd.** | **Upside Inc.** |
|---|---|
| (signature) | (signature) |
| Name: Kariya Kayamori | Name: Seungyeon Kim |
| Title: CEO | Title: CEO |
| Address: 8 Orange Grove Road #06-02 Singapore 258342 | Address: 13F 134, Teheran-ro, Gangnam-gu, Seoul, Korea |

2



QUOINE Pte. Ltd (UEN 201414068E)

THE GRAM TOKEN SALE

TERMS OF SALE

The terms and conditions in this document ("**Terms of Sale**") apply to all offers to purchase, and actual purchases of Grams (as defined below), on or through the Liquid Platform (the "**Gram Token Sale**") between:

(A) Gram Asia Ltd. (the "**Seller**"), as the seller of the Grams;
(B) each Purchaser (as defined below); and
(C) Quoine Pte. Ltd. (UEN 201414068E) ("**Quoine**"), as the operator of the Liquid Platform and facilitator of the Gram Token Sale,
(each a "**Party**" and collectively, "**Parties**").

By participating in the Gram Token Sale, you agree to enter into and be bound by these Terms of Sale as a **Purchaser**. These Terms of Sale are accepted and entered into by all Parties on the date upon which the Purchaser has indicated acceptance of the same.

# 1 DEFINITIONS

1.1 Unless the context otherwise requires, terms defined in the Terms of Use (as defined below) shall have the same meaning when used in these Terms of Sale, and in addition, the following terms shall have the respective meaning corresponding to them:

(a) "**Administrative Fee**" means the fee to be paid by the Purchaser to Quoine as described in Clause 3.3 for processing a cancelled or voided Purchase Order, which will be 15% of the value of such Purchase Order unless otherwise notified by Quoine;

(b) "**Committed Funds**" means the Funds constituting the Price transferred by a Purchaser from his Liquid Account to, and thereafter held in, the Escrow Wallet, which are deemed committed for such Purchaser's Purchase Order(s) and includes, where the context requires, Funds that had been disbursed to the Seller from the Escrow Wallet;

(c) "**Conditions Precedent**" has the meaning given to it in Clause 4.2(c);

(d) "**Delivery Schedule**" has the meaning given to it in Clause 4.4(a);

(e) "**Encumbrance**" means any mortgage, charge, security interest, lien, pledge, assignment by way of security, equity, claim, right of pre-emption, any right to acquire, right of first refusal, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including retention of title claim), conflicting claim of ownership or any agreement or arrangement to create any of the foregoing or any other encumbrance of any nature whatsoever (whether or not perfected);

(f) "**Escrow Wallet**" means the designated cold wallet(s) maintained by the Escrow Agent, the Digital Asset Address(es) of which will be as notified by Quoine to the Purchaser from time to time;

(g) "**Escrow Agent**" shall refer to Quoine in its capacity as the provider of escrow services in relation to the Committed Funds;

(h) "**Funding Currency**" means either United States Dollars (USD) or USDC;

(i) "**Grams**" means the Digital Asset to be issued by the Token Issuer, that would constitute the native cryptocurrency of the blockchain platform called the Telegram Open Network (TON);

1

Confidential pursuant to Securities Exchange Act s.24(d).

| | | |
|---|---|---|
| (j) | **"Price"** means the amount denominated in either Funding Currency, required as consideration for Grams under a Purchase Order, as set out on the Liquid Platform; |
| (j) | **"Purchaser"** means any individual, corporation or any other type of entity who has a Liquid Account registered on the Liquid Platform in accordance with the Terms of Use who participates in the Gram Token Sale through the submission of a Purchase Order; |
| (k) | **"Purchase Order"** means an order of Gram tokens that the Purchaser has committed to purchase, for such quantities as the Purchaser has indicated on the Liquid Platform during the Sale Period; |
| (l) | **"Purchase Transaction"** shall have the meaning ascribed to it in Clause 4.2(a); |
| (m) | **"Quoine Parties"** and **"Quoine Party"** shall have the meaning ascribed to it in Clause 11.2; |
| (n) | **"Liquid Platform"** means the online platform operated by Quoine to provide Services, including the IEO Market on which the Gram Token Sale will be held; |
| (o) | **"Restricted Countries"** means Afghanistan, Albania, Bahamas, Belarus, Bosnia & Herzegovina, Botswana, Burundi, Cambodia, Canada, Central African Republic, Cote D'Ivoire, Crimea, Cuba, Democratic People's Republic of Korea, Democratic Republic of Congo, Eritrea, Ethiopia, Ghana, Guinea, Guinea-Bissau, Iran, Iraq, Japan, Kosovo, Kyrgyzstan, Laos, Lebanon, Liberia, Libya, Macedonia, Malawi, Mali, Moldova, Mozambique, Myanmar (Burma), Pakistan, Serbia, Somalia, South Sudan, Sudan, Syria, Tanzania, Timor-Leste, Trinidad & Tobago, Tunisia, Turkmenistan, Uganda, United States of America (USA) and USA territories, Uzbekistan, Venezuela, Yemen, and Zimbabwe; |
| (p) | **"Sale Period"** means the duration for which Purchase Orders may be submitted by Purchasers on the Liquid Platform, which will commence at 8:00AM UTC, 10 July 2019 to 8:00AM UTC, 17 July 2019 unless otherwise notified by Quoine on the Liquid Platform; |
| (q) | **"Settlement Date"** means each date as described in Clause 4.4(c) upon which Quoine facilitates the discharge of part of the Seller's and Purchaser's delivery and settlement obligations under the Purchase Transaction in accordance with the Delivery Schedule; |
| (r) | **"Terms of Use"** means the Liquid Terms of Use relating to the online access to the Site and Services (including the Liquid Platform) by any person (a copy of which is accessible at https://www.liquid.com/), as may from time to time be amended, supplemented and/or substituted and reposted by Quoine; |
| (s) | **"Token Issuer"** means TON Issuer, Inc., the entity that will create and issue Grams; and |
| (t) | **"USDC"** means "USD Coin", a USD-backed cryptographic stablecoin that was developed by the CENTRE Consortium. |

1.2 In these Terms of Sale, unless the context otherwise requires:

(a) headings are for convenience only and do not affect the interpretation of these Terms of Sale;
(b) person refers to an individual, a firm, a body corporate or an unincorporated association;
(c) any reference to any legal entity or individual persons includes, where appropriate, a reference to its authorized agents, delegates, successors or nominees;
(d) a reference to "including" means "including, without limitation";
(e) words importing the singular include the plural and vice-versa;
(f) words importing a gender will include all other genders; and
(g) reference to "days" shall be construed as calendar days.

## 2 GENERAL

2.1 Purchasers are bound by both the Terms of Use and these Terms of Sale. If there is any conflict between

2

the two in respect of the matters set out in these Terms of Sale, these Terms of Sale will prevail only to the necessary extent to resolve such conflict. For the avoidance of doubt, all other terms of the Terms of Use (to the extent that they are not inconsistent with these Terms of Sale) shall continue to bind the Purchasers.

2.2  Unless otherwise expressly provided, the clauses in these Terms of Sale shall continue and bind Parties throughout the entire Gram Token Sale until all Purchase Transactions contemplated herein have concluded and all Grams due to the Purchaser have been delivered in accordance with Clause 4.

**3  ELIGIBILITY TO PARTICIPATE**

3.1  A person must have a Liquid Account and fulfil the following conditions at all times during the Gram Token Sale to participate as a Purchaser:

(a)  the person must satisfy and pass Quoine's Screening Procedures;
(b)  the person must not be residing, located, domiciled, incorporated or established in any of the Restricted Countries; and
(c)  the person must fulfil such other internal policies and requirements of Quoine as may be imposed from time to time to maintain his Liquid Account and use the Liquid Platform,
(collectively, the "**Eligibility Criteria**").

3.2  Notwithstanding Clause 3.1, Quoine retains the sole and absolute discretion at all times to determine whether to allow a person to participate as a Purchaser in the Gram Token Sale. Without limiting the generality of the foregoing, Quoine may at any time take any necessary action, including voiding or cancelling a Purchase Order and/or disqualifying a person from participating as a Purchaser, when Quoine believes:

(a)  such action is appropriate in order to comply with its legal or regulatory obligations; or
(b)  such person has not satisfied the Eligibility Criteria.

3.3  When a Purchase Order is cancelled or voided by Quoine for the reasons specified under Clause 3.2(a) or (b), the Purchaser's Committed Funds shall be returned to his Liquid Account less the Administrative Fee.

3.4  The Purchaser shall promptly notify Quoine if any facts arise that could result in such Purchaser no longer meeting the Eligibility Criteria.

**4  GRAM PURCHASE TRANSACTION**

**4.1  Purchase Orders**

(a)  The Purchaser may submit a Purchase Order on the Liquid Platform during the Sale Period provided that the Purchaser has sufficient Funding Currency in his Liquid Account for the Price of such Purchase Order. All Purchase Orders must meet the minimum value of Gram tokens that must form the subject of a Purchase Order as specified on the Liquid Platform during the Sale Period. The Purchaser may not withdraw or cancel Purchase Orders after the point of submission.

(b)  Quoine will process the Purchase Orders and update Purchasers' Liquid Accounts with the quantity of Gram Tokens to reflect the Grams that have been ordered thereunder. This is for

3

reference purposes only and does not represent actual ownership of the Grams. Title and ownership of the Grams will only pass in accordance with the terms of the Purchase Transaction as set out in Clauses 4.2 to 4.4.

(c) Quoine will not process Purchase Orders submitted after the total aggregate amount of Grams underlying all Purchase Orders processed by it reaches the total quantity of Grams made available by the Seller for the Gram Token Sale.

(d) For avoidance of doubt, the submission of a Purchase Order does not constitute any legal obligation or responsibility on Quoine or the Seller to process and/or fulfil any part of such Purchase Order as a Purchase Transaction until the fulfillment or waiver of the Conditions Precedent on a Settlement Date in accordance with Clause 4.2(c). Quoine shall have the right to void or cancel the whole or any part of an unfulfilled Purchase Order that is pending delivery and settlement under Clause 4.4. Quoine's determination on any matter relating to Purchase Orders shall be final and binding on both the Seller and Purchaser.

4.2 **Purchase Transaction**

(a) Upon the terms and subject to the conditions set out in these Terms of Sale, the Seller agrees to sell, and the Purchaser agrees to purchase, the entire legal and beneficial ownership of the Grams that are the subject of the Purchaser's Purchase Order(s) (the "**Purchase Transaction**"). The delivery and settlement of the Purchase Transaction and discharge of both Parties' obligations thereunder shall be in accordance with Clause 4.4.

(b) In consideration of the foregoing, the Purchaser agrees to pay the Price for his Purchase Order(s) in either of the Funding Currencies. The Purchaser and Seller agree and acknowledge that unless otherwise agreed between Quoine and the Seller in writing, USDC will be used as the settlement currency for all payment obligations between them for any matters in connection with the Purchase Transaction and the rate of exchange between the two Funding Currencies shall be fixed at 1:1.

(c) The Seller and Purchaser each irrevocably authorise Quoine to act on their behalf to facilitate the delivery and settlement of Grams and Committed Funds under the Purchase Transaction in accordance with the procedures as described in Clause 4.4(c). The Seller and Purchaser further agree that Quoine shall not be obliged to facilitate such delivery and settlement unless it has established to its satisfaction that all of the following conditions precedent have been fulfilled (unless waived, whether in whole or in part, by Quoine) on each Settlement Date:

(i) all representations, warranties and undertakings of the Purchaser under these Terms of Sale (including, in particular, those set out in Clause 8) continue to be true, accurate and not misleading in all material aspects;

(ii) all representations, warranties and undertakings of the Seller under these Terms of Sale (including, in particular, those set out in Clause 8) continue to be true, accurate and not misleading in all material aspects;

(iii) Quoine (as Escrow Agent) is in possession of sufficient Committed Funds in the Escrow Wallet attributable to the Purchaser for the full discharge of the Purchaser's payment obligations to the Seller on such Settlement Date; and

4

(iv) Quoine has received sufficient Grams from the Seller within the timeframe contemplated under Clause 4.4(b) sufficient to fully discharge the Seller's obligation to deliver Grams to all Purchasers on such Settlement Date,
(collectively, the "**Conditions Precedent**").

**4.3 Escrow for Committed Funds**

(a) The Purchaser authorizes Quoine to do all acts necessary to effect the transfer of Funds in the relevant Funding Currency constituting the Price from the Purchaser's Liquid Account to the Escrow Wallet for his Purchase Order, and such Funds shall thereafter be deemed to be Committed Funds. Where the Funding Currency is USD, the Purchaser further authorizes Quoine to convert the Funds into the settlement currency, USDC, prior to effecting transfer of the Funds to the Escrow Wallet. Purchasers shall be solely liable for any loss or shortfall of Committed Funds while held in the Escrow Wallet until such Committed Funds are disbursed by Quoine on Settlement Date unless in the case of Quoine's gross negligence, fraud or willful misconduct.

(b) The Committed Funds will be deemed to be committed for the purchase of the Grams. Purchasers may not request any withdrawal of Committed Funds. If for any reason the Purchase Transaction contemplated is subsequently terminated, cancelled or withdrawn for any reason (which Quoine may not be able to disclose to the Purchaser), Quoine will promptly notify the Purchaser and facilitate the return of any remaining undisbursed Committed Funds (in USDC) to the Purchaser's Liquid Account. For avoidance of doubt, Quoine will facilitate the return of all Committed Funds (in USDC) to the Purchaser's Liquid Account in the event that TON mainnet is not launched by 30 November 2019.

(c) If Quoine cancels or voids any whole or part of a Purchase Order under Clause 4.1(d) to which Committed Funds have been provided by the Purchaser, it shall facilitate the return of the corresponding value of Committed Funds (in USDC) to the Purchaser's Liquid Account, less any Administrative Fee that may apply under Clause 3.3.

(d) Quoine shall maintain and operate the Escrow Wallet holding the Committed Funds in its capacity as Escrow Agent. All Committed Funds held in the Escrow Wallet pending disbursement to the Seller as contemplated in Clause 4.4 shall remain the beneficial property of the Purchaser, and shall not be not subject to any Encumbrance from Quoine (as the Escrow Agent) or the Seller.

(e) Each Purchaser hereby expressly and irrevocably authorizes Quoine as Escrow Agent to disburse the relevant portion of their Committed Funds to the Seller upon Quoine's receipt of the Grams from the Seller in accordance with Clause 4.4(c).

**4.4 Delivery and Settlement**

(a) Grams sold by the Seller in the Gram Token Sale shall be delivered to Purchasers in four equal-sized tranches in accordance with the restrictions imposed by Token Issuer for Grams subscribed during the Token Issuer's initial sale, whereby Grams are non-transferable until they are released from lock-up in four-equal sized tranches 3, 6, 12 and 18 months after the launch of the TON mainnet (projected to occur on 31 October 2019). The Seller shall deliver the proportionate quantity of Grams after the Token Issuer releases the Grams pursuant to the aforementioned

Confidential pursuant to Securities Exchange Act s.24(d).

schedule, such that the Purchaser shall receive 25% of the total quantity of Grams due to them on each Settlement Date (the Seller's delivery schedule as described in this Clause 4.4(a) shall be hereinafter referred to as the "**Delivery Schedule**").

(b) The Seller shall transfer the relevant quantity of Grams to be delivered to <u>all</u> Purchasers in accordance with the Delivery Schedule to Quoine's designated Digital Asset Address within twenty four (24) hours after each release of Grams by the Token Issuer as described in Clause 4.4(a).

(c) No later than five (5) days after receipt of the Grams from the Seller under Clause 4.4(b), and subject to the fulfillment or waiver of the Conditions Precedent on a Settlement Date under Clause 4.2(c), on the Settlement Date:

  (i) Quoine shall facilitate the discharge of the Seller's and Purchaser's delivery and settlement obligations under the Purchase Transaction by allocating the relevant amount of Grams to each Purchaser by updating the Digital Asset holdings in the Purchaser's Liquid Account; and
  (ii) Quoine shall promptly initiate the disbursement of the corresponding portion of Committed Funds in the Escrow Wallet due to the Seller's designated Digital Asset Address.

(d) Upon Quoine's completion of the steps in Clauses 4.4(c)(i) and 4.4(c)(ii):

  (i) the Grams shall be deemed to have been delivered by, and title and risk in the Grams shall be deemed to have passed from, the Seller to the Purchaser; and
  (ii) Committed Funds shall be deemed to have been delivered by, and the title and risk in the Committed Funds shall be deemed to have passed from, the Purchaser to the Seller.

(e) Where there are insufficient Committed Funds in the Escrow Wallet for the full discharge of <u>all</u> Purchasers' outstanding payment obligations to the Seller:

  (i) the Seller shall have no obligation under these Terms of Sale to deliver Grams under Clause 4.4(b);
  (ii) Quoine shall have no authority to allocate any Grams under Clause 4.4(c)(i), even if it has received Grams from the Seller; and
  (iii) where applicable, Quoine shall facilitate the clawback of any Grams that were allocated to Purchasers in error, and Purchasers must return any such Grams withdrawn from their Liquid Accounts, in accordance with the terms set out in Clause 7.4. Quoine shall thereafter arrange for the return of such Grams to the Digital Wallet Address designated by the Seller.

4.5 For avoidance of doubt, once delivered, the holding of the Grams in the Purchaser's Liquid Account will be governed by the Terms of Use.

## 5 DEFAULT AND TERMINATION

5.1 In the event Quoine fails to make, initiate or facilitate the onward delivery of the Committed Funds to the Seller's designated Digital Asset Address within the time specified under Clause 4.4(c), Quoine shall:

Confidential pursuant to Securities Exchange Act s.24(d).

(a) make arrangements to promptly deliver any outstanding Committed Funds overdue to the Seller under Clause 4.4(c); and

(b) pay to the Seller a penalty equal to 5% of the value of the Committed Funds that was due but not paid to the Seller on such date.

5.2 The Seller's failure to make, initiate or facilitate the transfer of the Grams to Quoine within the time specified under Clause 4.4(b) shall be deemed to be a failure of the Seller to deliver the Grams to the Purchaser by the Settlement Date and therefore an event of default by the Seller under Clause 5.3.

5.3 In the event that the Seller fails to deliver the requisite quantity of Grams to fully discharge its obligation to all Purchasers under Clause 4.4 by the Settlement Date, this shall be considered an event of default by the Seller and Quoine shall have the discretion to take any action as it deems fit, including (without limitation):

(a) terminating these Terms of Sale henceforth (on behalf of Purchasers) and facilitate the return of any remaining undisbursed Committed Funds to the Purchasers' Liquid Accounts; and/or

(b) agreeing (on behalf of the Purchasers) to any delayed delivery by the Seller of any outstanding Grams due on such Settlement Date.

5.4 Parties agree that Quoine shall have the right at any time to immediately suspend and/or terminate the whole or part of these Terms of Sale (including any outstanding obligations of any Party or Purchase Transactions hereunder) if it becomes aware that the Seller or such Purchaser or any of their related companies, directors, officers, agents, shareholders, partners, and employees is or has been:

(a) subject to actual or potential proceedings or a formal investigation relating to an offence or illegal misconduct under any law in any jurisdiction;

(b) a party to actual or potential civil proceedings relating to potential fraud, misrepresentation or dishonesty on its part in any jurisdiction,

provided that Quoine has provided the Seller with documentary evidence forming the basis of such awareness before exercising its rights under this Clause.

5.5 Purchasers hereby irrevocably authorize Quoine to undertake any action that it deems fit (in its sole and absolute discretion) in order to preserve the Purchasers' rights and interests under these Terms of Sale on their behalf.

# 6 TAX

Parties are solely responsible for understanding and complying with their own tax obligations (including the payment of all taxes imposed by relevant authorities on any payments or interests received) in all jurisdictions in which those obligations arise and relating to the transactions contemplated hereunder.

# 7 QUOINE'S DUTIES AS AGENT AND ADMINISTRATION

## 7.1 Appointment of Quoine

(a) The Seller and the Buyer irrevocably appoint Quoine to act as their exclusive agent under and in connection with the delivery and settlement of the Purchase Transaction contemplated

7

hereunder, including in respect of its acting as an Escrow Agent. Unless otherwise expressly provided in these Terms of Sale, Parties acknowledge that Quoine's role (including its provision of the Liquid Platform and the Services, and its role as an Escrow Agent) is strictly administrative in nature.

(b) Quoine shall have only those duties, obligations and responsibilities expressly specified in these Terms of Sale (and no others shall be implied).

(c) Quoine shall not be bound to account to any Purchaser for any sum or the profit element of any sum received by it for its own account (whether by way of commission, fee or otherwise) or to exercise any discretion or take any action in respect of any Purchaser's Committed Funds.

## 7.2 Additional Rights and Discretions of Quoine

(a) Quoine may rely on any representation, notice or document by the other Parties believed by Quoine to be genuine, correct and appropriately authorized.

(b) Quoine may assume (unless it has received notice to the contrary) that no default or any other analogous event under these Terms of Sale or generally in relation to the Gram Token Sale has occurred.

(c) Quoine may act through its personnel and agents or may delegate some of its functions or obligations to other third parties. Notwithstanding the foregoing, Quoine shall not delegate its maintenance and operation of the Escrow Wallet as the Escrow Agent and the handling of Grams or Committed Funds to any third party.

(d) Quoine may (but shall not be obliged to) take such action in the exercise of any of its powers and duties under these Terms of Sale as it considers in its discretion to be appropriate.

(e) Notwithstanding any other provision of any document to the contrary, Quoine is not obliged to do or omit to do anything if it would or might, in its reasonable opinion, constitute a breach of any law, regulation, its obligations, any fiduciary duty or duty of confidentiality.

## 7.3 No independent power

The Purchasers shall not have any independent power to enforce these Terms of Sale (or the corresponding documentation relating thereto) or to exercise any rights, power, authority or discretion arising in connection therewith, except through Quoine. Purchasers agree that Quoine may conduct any enforcement or recourse actions on their behalf in its sole discretion.

## 7.4 Clawback and Payment/Delivery Obligations

If Quoine makes, initiates or facilitates delivery, return or payment of Grams or Committed Funds to any Party in error (whether as a result of its own acts or omissions or otherwise), then such Party that received such delivery, return or payment shall transfer the same to Quoine on demand.

## 7.5 Partial Delivery

If by a Settlement Date, the Seller only effects a partial delivery of Grams of a quantity that is insufficient to discharge fully its delivery obligations to all Purchasers, Quoine shall have the absolute discretion (as provided under Clause 4.2(c) and 5.3) to conduct settlement and delivery by disbursing the Grams received on a *pro rata* basis to the Purchasers in accordance to the relative sizes of their Purchase Order on the Settlement Date in partial discharge of the Seller's delivery obligations. For avoidance of doubt, as part of its discretion Quoine reserves the right to reject any partial delivery as a total failure of the Seller to perform

8

its delivery obligations on a Settlement Date should it determine that the quantity of Grams delivered is too insubstantial to be meaningfully distributed to Purchasers.

### 7.6 Calculations and Rates

In relation to any amounts due and owing under these Terms of Sale, or any litigation or arbitration proceeding arising out of or in connection therewith, the entries made in the accounts, ledgers or books (in any medium or form) maintained by Quoine are *prima facie* evidence of the matters to which they relate. Any determination by Quoine of a rate or amount under these Terms of Sale, in the absence of manifest error, shall be conclusive evidence of the matters to which it relates.

### 7.7 Fees

If any Party owes an amount to Quoine (whether in its capacity as Escrow Agent or otherwise) under these Terms of Sale or generally in relation to the Gram Token Sale, Quoine has the right without the need for further notice or reference to any such Party, to deduct from any Committed Funds held in the Escrow Wallet that are from or due to such Party, any charges and other amounts (including the Administration Fees) due to Quoine under these Terms of Sale or such other agreement relating to the Gram Token Sale to which the Party and Quoine is a party to and apply the amount deducted in or towards satisfaction of the amount owed.

## 8 REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS

8.1 Each of the Seller and the Purchaser represents, warrants and undertakes on the date these Terms of Sale is entered into and on each day these Terms of Sale continue to be binding that:

    (a) it has the legal right, power and capacity to enter into (and, if necessary, has taken all necessary action to authorize), exercise its rights and perform and comply with its obligations under these Terms of Sale;

    (b) these Terms of Sale constitute, or will when executed constitute, legal, valid and binding obligations in accordance with its terms;

    (c) if it is not a natural person, the execution and delivery of these Terms of Sale and the transactions contemplated hereby have been duly authorized by all necessary corporate or other entity action;

    (d) it enters into the Terms of Sale as principal and not as an agent on behalf of any other party;

    (e) all actions, conditions and things required to be taken, fulfilled and done have been so taken fulfilled and done, including the obtaining of any necessary exemptions, consents or license or governmental, regulatory approvals, or the making of any filing or registration in order to enable it to lawfully enter into, exercise its rights and perform and comply with the obligations under these Terms of Sale;

    (f) it has not been declared insolvent (bankrupt), and does not meet the criteria of insolvency or such other criteria established for the filing of a bankruptcy petition against it by any third party under the applicable law;

    (g) its entry into, exercise of its rights and/or performance of or compliance with its obligations under this Terms of Sale, do not and will not violate, or exceed any power or restriction granted or imposed by any law, regulation, constitutional documents, authorization, any agreement or instrument binding upon it or any of its assets or constitute a default or termination event (however described) under any agreement or instrument, authorization directive or order

9

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-MAS-E-0000078

whether or not having the force of law to which it is subject; and

(h)  any representation, information or statement made by it in these Terms of Sale is true and correct to the best of their knowledge in all material aspects.

8.2  The Seller additionally represents, warrants, and undertakes on the date these Terms of Sale is entered into and on each day these Terms of Sale continue to be binding that:

(a)  the Seller on each Settlement Date will be the sole legal and beneficial owner of the Grams delivered;

(b)  there is no, and on each Settlement Date will not be any, Encumbrance affecting any of such Grams, nor any agreement to create any such Encumbrance; and

(c)  there are no, and on each Settlement Date there will not be any, agreements, arrangements, judgments or any other restrictions of any kind that prohibit or restrict its ability to enter into and to perform its obligations under these Terms of Sale.

8.3  Each Purchaser additionally represents, warrants, and undertakes on the date these Terms of Sale is entered into and on each day these Terms of Sale continue to be binding that:

(a)  he satisfies, and will continue to satisfy, the Eligibility Criteria;

(b)  prior to the submission of any Purchase Order, he had the opportunity to review these Terms of Sale including the risk disclosures set out within, and fully understands the contents thereof and the legal and financial implications arising from participating in the Gram Token Sale;

(c)  all Committed Funds are his own funds or assets, and are not from any financing or otherwise subject to any Encumbrance; and

(d)  his participation in the Gram Token Sale is on his own initiative and he is solely responsible for compliance with local laws.

## 9  ACKNOWLEDGEMENTS AND DISCLAIMERS

9.1  Notwithstanding anything contained herein in these Terms of Sale, the following are specifically acknowledged and agreed to by Purchasers:

(a)  You acknowledge that Quoine shall not be responsible or liable for the accuracy of the information, representations, warranties or undertakings provided by the Seller that are relayed through the Liquid Platform, the Services or otherwise through Quoine. However, Quoine may from time to time, but without any obligation to do so, update or amend the information provided by, or relating to, the Seller.

(b)  You shall not rely on any information that is relayed through the Liquid Platform, the Services or otherwise through Quoine in committing Funds to, or participating in, the Gram Token Sale. You shall undertake your own research, analysis, and assessment to form your own opinion, and obtain specific professional advice as you consider necessary or appropriate before entering into, or accepting, these Terms of Sale and/or making any Purchase Order.

(c)  You shall be responsible for keeping informed of any developments relating to the TON mainnet project, the financial condition of the Token Issuer, and all other external circumstances bearing upon the risk of non-delivery or delayed delivery of the Grams.

9.2  Quoine gives no representation, warranty or undertaking to any Purchaser as to the creditworthiness of the Seller, the viability of the TON mainnet or possible utility of Grams, and is not personally liable to the

Confidential pursuant to Securities Exchange Act s.24(d).                                                                              SEC-MAS-E-0000079

Purchaser in the event the Seller is in breach of any of its representations, warranties or obligations under the Terms of Sale, including its failure to deliver the Grams. Purchasers waive all their rights and shall have no claims against Quoine if they do not receive the Grams expected to be delivered hereunder.

**10   PURCHASERS' LIQUID ACCOUNT**

10.1  The Purchaser may not close their Liquid Account until he has received all the Grams due to him under the Gram Token Sale, or until the Gram Token Sale has been terminated or cancelled for any reason. Any closure of the Purchaser's Liquid Account may result in his loss to claim any Grams yet to be delivered.

10.2  Nothing in these Terms of Sale will prejudice Quoine's rights as the provider of the Liquid Platform or the Services under the Terms of Use including its rights to terminate or suspend Liquid Accounts, and accordingly any such rights extend to any Grams to be delivered to a Purchaser's Liquid Account under the Gram Token Sale.

**11   LIMITATION OF LIABILITY**

11.1  To the maximum extent permitted by law, Quoine hereby expressly excludes all conditions, warranties and other terms that might otherwise be implied by law into these Terms and Conditions.

11.2  Quoine (including where it acts in the capacity as Escrow Agent), and all of its related companies, directors, officers, agents, shareholders, partners, and employees (collectively the "**Quoine Parties**" and each a "**Quoine Party**"), shall not be liable to any person, including Purchasers, for any direct, indirect, punitive, incidental, special, consequential damages, losses, expenses, liabilities under any causes of action or any damages whatsoever, including damages for loss of use or data, loss of opportunity, loss of goodwill, loss of profits (including revenue or anticipated profits) or losses to third parties, arising out of or in any way connected with:

(a)  any failure by Purchasers to receive the Grams expected or recover any part of their Committed Funds as a result of the Seller's default or failure to comply with its obligations;
(b)  any action taken by such person under or in connection with its participation in the Gram Token Sale and, for avoidance of doubt, no Purchaser may take any proceedings against any officer, employee or agent of Quoine in respect of any claim it might have against Quoine;
(c)  the adequacy, accuracy or completeness of any information (whether oral or written) supplied by or through the Site, the Liquid Platform, Quoine, or any other person in or in connection with the Gram Token Sale or the transactions contemplated thereunder;
(d)  any losses to any person or any liability arising as a result of taking or refraining from taking any action in relation to these Terms of Sale or any other agreement in connection with the Gram Token Sale;
(e)  the exercise of, or the failure to exercise, any judgment, discretion or power given to it by or in connection with the Terms of Sale or generally in respect of the Gram Token Sale;
(f)  any loss or damage (whether direct or indirect), howsoever caused, as a result of any cyber attacks, computer viruses, trojan horses, worms or similar items or processes arising from the use of the Liquid Platform, the Site and/or the Services (including escrow services under this Agreement);
(g)  any failure to process a Purchase Order;
(h)  the Purchaser's participation in the Gram Token Sale;
(i)  the Seller's failure to perform its obligations under or in connection with these Terms of Sale;

11

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-MAS-E-0000080

(j) the maintenance, provision and operating of the Site, the Liquid Platform and the Services by Quoine during the Sale Period;

(k) any delay (or any related consequence) in delivering or transferring Grams, Committed Funds or any other Digital Assets or Legal Tender in connection with these Terms of Sale, to or from a Party if such Quoine Party has taken all necessary steps as soon as reasonably practicable to comply with its obligations; or

(l) any negligence, default or fraud by any third party service provider, debt collector or law firm in the provision of its respective services.

11.3 In the event a court of competent jurisdiction adjudges that Quoine is liable for damages, losses, expenses or other liabilities notwithstanding Clauses 11.1 and 11.2 above, Quoine's aggregate liability to any the Purchaser in respect of any claim made against it (whether in contract, tort, strict liability or otherwise including negligence, default, fraud or otherwise to the extent permitted under law) shall at all times be limited to the total amount of undisbursed Committed Funds relating to such underlying Purchase Order(s) forming the subject to the claim that are attributable to the relevant Purchaser held by or in the control of Quoine under these Terms of Sale (in its capacity as Escrow Agent), and shall not extend to any assets held by Quoine for itself or any other person.

11.4 The aggregate liability of the Seller to a Purchaser in respect of a claim for any damages, losses, expenses or other liabilities (whether in contract, tort, strict liability or otherwise including negligence, default, fraud or otherwise to the extent permitted under law) shall at all times be limited to the amount equal to the Committed Funds received by the Seller from such Purchaser in respect of such Purchase Order(s) forming the underlying subject of the Purchaser's claim. The limitations set out in this Clause 11.4 shall not apply to any claim against the Seller which is the consequence of fraud by or on behalf of the Seller.

11.5 If a fact or circumstance that gives rise to a Purchaser's claim against either the Seller or Quoine is reasonably capable of remedy by the such Party without cost or loss to the Purchaser, the Purchaser shall allow such Party fifteen (15) days within the date the cause of action arose to remedy the relevant fact or circumstances. Such Party shall not be liable in respect of the relevant claim to the extent that such Party remedies the relevant matter or circumstances (without cost or loss to the Purchaser) within the aforementioned period.

11.6 Nothing in this agreement shall prejudice Purchaser's duty under any applicable laws to mitigate any loss or liability which is the subject of a claim against any other Party.

**12     INDEMNITY**

Without prejudice to the other provisions herein, the Seller and each Purchaser (each an "**Indemnifying Party**") hereby severally undertakes to indemnify, defend, and hold harmless the Quoine Parties (in such capacity, collectively the "**Indemnified Parties**" and individually an "**Indemnified Party**") from and against all actions, proceedings, costs, claims, expenses (including all legal costs on a full indemnity basis), demands, liabilities, losses (whether direct, indirect or consequential) and damages (whether in tort, contract or otherwise) whatsoever and howsoever arising, including claims made by third parties and claims for defamation, infringement of intellectual property rights, death, bodily injury, wrongful use of computers, unauthorized or illegal access to computers (including hacking), property damage or pecuniary losses which the Indemnified Parties may sustain, incur, suffer or pay arising out of, in connection with or pursuant to any of the following:

Confidential pursuant to Securities Exchange Act s.24(d).    SEC-MAS-E-0000081

(a) any breach of these Terms of Sale including a breach of the Indemnifying Party's representations, warranties, obligations, covenants and undertakings hereunder;
(b) an Indemnified Party acting as the agent of such Indemnifying Party in relation to these Terms of Sale or the transactions contemplated hereunder (unless the Indemnified Party has already been reimbursed or indemnified in relation to such cost, loss or liability);
(c) the access to and/or the use of the Site, the Liquid Platform or the Services by any person for the Gram Token Sale, whether or not such access or use was authorized or whether it was due to any act or omission on its part including any transmission error or delay via the internet of any instruction or Purchase Order;
(d) the violation by an Indemnifying Party of any rights of another person or entity or the breach by such Indemnifying Party of any statutory requirement, duty or law;
(e) any actions taken by any Indemnified Party under or in connection with Clause 5 (including fees incurred in relation to any third party debt collection agencies or legal fees); or
(f) any commercially reasonable actions taken by Quoine under these Terms of Sale.

## 13 CONFIDENTIALITY

13.1 The Seller and each Purchaser must maintain strict confidentiality and secrecy of all information of a proprietary or confidential nature that it receives, through the Liquid Platform or otherwise from Quoine, pursuant to or in connection with any matter relating to the Gram Token Sale (including information regarding the Token Issuer, the TON mainnet project, the Seller, Quoine or any Purchaser).

13.2 The obligation in Clause 13.1 shall not apply to:

(a) any information which is required to be disclosed pursuant to any applicable legal requirement or legal process issued by any court or any competent government authority or rules or regulations of any relevant regulatory body but only in relation to and to the extent of such information necessary and only to such persons as required by court, law, rules or regulation;
(b) any information which is or becomes generally known to the public, other than by reason of a breach of confidentiality obligations; and
(c) any information which the Party derives on its own, without the use of any confidential information described in Clause 13.1.

13.3 The Seller and Purchaser shall observe the above-mentioned restrictions and shall take all reasonable steps to minimize the risk of disclosure of confidential information, by ensuring that only its employees, directors, consultants and advisers (if any) whose duties will require them to possess any of such information shall have access thereto, and that they shall be instructed to treat the same as confidential.

13.4 The obligations herein shall endure without limit in point of time except and until any confidential information enters the public domain as set out above (otherwise than as a result of a breach of this Clause 13 or any other confidentiality obligations).

## 14 FORCE MAJEURE

Each Party shall not be in breach of these Terms of Sale, nor be liable for any failure or delay in the performance of any other obligations under these Terms of Sale, arising from or attributable to acts, events, omissions, accidents beyond its reasonable control, including any of the following:

13

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-MAS-E-0000082

(a)     acts of God, including fire, flood, earthquake, windstorm or other natural disaster;
(b)     war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, breaking off of diplomatic relations or similar actions;
(c)     acts of any government or authority;
(d)     any changes in law or regulations preventing Quoine from performing its obligations under this Terms of Sale;
(e)     terrorist attack, civil war, civil commotions or riots;
(f)     any labor disputes, including strikes, industrial action or lockouts;
(g)     nuclear, chemical or biological contamination or sonic boom;
(h)     fire, explosion or accidental damage;
(i)     interruption or failure of utility service, including electric power, gas or water;
(j)     collapse of building structures, failure of plant machinery, machinery, computers, computer systems, or vehicles; and/or
(k)     any interruption to the Liquid Platform or Services outside the reasonable control of Quoine.

If any such delay or non-performance continues for a period in excess of thirty (30) days, Quoine shall have the right to terminate these Terms of Sale by giving the Purchasers and the Seller seven (7) days' notice prior to such termination without affecting any rights accruing prior to such termination.

## 15    NOTICES AND COMMUNICATIONS

15.1   All communications between the Purchaser and the Seller for any matters relating to the Gram Token Sale will be through Quoine. Purchasers shall not contact the Seller directly. Purchasers shall promptly notify Quoine if Purchasers are contacted directly by the Seller or any other person (including another Purchaser) requesting details relating to the Purchaser's participation in the Gram Token Sale, including their transactions thereunder.

15.2   All Communications to the Purchaser in connection with these Terms of Sale or generally in relation to the Gram Token Sale may be sent by Quoine in any manner or medium whatsoever, including through such modes as permitted in the Terms of Use. Any such notice, demand or communication aforesaid by Quoine to a Purchaser shall be deemed to have been duly served immediately upon transmission or sending, as the case may be.

15.3   Unless otherwise notified by Quoine, any notices or other communication by a Purchaser to Quoine in connection with these Terms of Sale or any matters relating to the Gram Token Sale must be in English, in writing and sent by electronic mail to support@liquid.com. Any such electronic mail by a Purchaser to Quoine shall be deemed to have been duly served upon written acknowledgement by Quoine of the same or otherwise no later than three (3) days' from the date of transmission.

## 16    RELATIONSHIP OF QUOINE AND PURCHASER

Other than as expressly provided in these Terms of Sale, nothing herein shall be construed to:

(a)     create a partnership, joint venture or employment relationship between Parties;
(b)     constitute Quoine as a trustee or fiduciary of any person; or
(c)     confer authority on Quoine to enter into agreements of any kind on behalf of another Party.

## 17    ASSIGNMENT

Confidential pursuant to Securities Exchange Act s.24(d).    SEC-MAS-E-0000083

Other than as expressly agreed by the other Parties in writing, any rights or obligations of the Seller, the Purchaser or Quoine hereunder may not be novated, transferred or assigned. Subject to reasonable notice to the other Parties, Quoine may transfer its rights or obligations hereunder without the need for consent from any other Party by providing three (3) days' notice to the other Parties.

**18      SEVERANCE**

If any provision of these Terms of Sale or part thereof is rendered void, illegal or unenforceable by any applicable law, it shall be rendered void, illegal or unenforceable to that extent and no further. Such provision will not affect or impair the legality, validity, or enforceability in that jurisdiction of any other provision of these Terms of Sale or the legality, validity, or enforceability under the applicable law of any other jurisdiction of such provision or any other provision in these Terms of Sale. Subject to Clause 21.1, the Parties shall use all reasonable endeavors to replace such a provision with a valid and enforceable substitute provision that carries out, as closely as possible, the intentions of the Parties under these Terms of Sale.

**19      CONTRACT (RIGHTS OF THIRD PARTIES) ACT (CHAPTER 53B)**

Save for the Seller, the Purchaser, Quoine and the Quoine Parties, no other person will have any right whatsoever under the Contracts (Rights of Third Parties) Act (Chapter 53B) to enforce these Terms or Sale or have the benefit of any of its terms.

**20      ENTIRE AGREEMENT**

These Terms of Sale and the documents referred to or incorporated in it constitute the entire agreement between all the Parties relating to the subject matter of these Terms of Sale and supersedes and extinguishes any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature whatsoever, whether or not in writing, between the Parties in relation to the subject matter of this agreement.

**21      AMENDMENTS**

21.1    Purchasers hereby jointly and severally irrevocably appoint Quoine as their representative and authorize it to agree on such modified or amended terms with the Seller, without having to obtain the Purchasers' prior consent, to restructure any remaining obligations under these Terms of Sale and to amend, at any time and as often as it deems necessary, these Terms of Sale in any manner that Quoine deems appropriate in order to facilitate the transactions contemplated hereunder. Purchasers acknowledge and agree that any amendments to these Terms of Sale by Quoine shall be done in accordance with what Quoine deems to be in the best interests of the Purchasers and to be reasonable and any such Purchasers shall thereafter be so bound by the revised terms.

21.2    Any amendments to these Terms of Sale shall only be effective upon written acknowledgement and acceptance by Quoine (including its acceptance on behalf of Purchasers) and the Seller.

**22      GOVERNING LAW & DISPUTE RESOLUTION**

22.1    These Terms of Sale are governed by the laws of Singapore.

Confidential pursuant to Securities Exchange Act s.24(d).                                                                                     SEC-MAS-E-0000084

22.2 All disputes, controversies or claims arising out of or relating to these Terms of Sale, including any question regarding the existence, validity or termination of these Terms of Sale, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre (the "**Rules**"), which rules are deemed to be incorporated by reference in this clause. Part II of the International Arbitration Act (Cap. 143A), as amended from time to time, will apply to any arbitration proceedings commenced under this Clause. The seat of the arbitration will be Singapore. The Tribunal will consist of one arbitrator. The language of the arbitration will be English. If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of these Terms of Sale, the prevailing party will be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled. Any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. The arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any dispute and to grant any remedy that would otherwise be available in court. However, the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by these Terms of Sale. For any arbitration, the Party filing the claim will pay the filing fee and the Parties will split the remaining arbitration fees and costs. Judgment upon any arbitration award may be entered and enforced in any court of competent jurisdiction.

Confidential pursuant to Securities Exchange Act s.24(d).    SEC-MAS-E-0000085