# Exhibit 2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
                         Plaintiff,  )
6                                    ) 19 Civ. 9439 (PKC)
         - against -                 )
7                                    )
    TELEGRAM GROUP INC. and          )
8   TON ISSUER INC.,                 )
                                     )
9                        Defendants. )
    _____ )
10

11       **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13            Videotaped deposition of PAVEL DUROV (as

14   30(b)(6) corporate representative of Defendants and

15   also in his personal capacity), Volume 1, taken on

16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17   Square, Building 3, Level 5, Downtown Dubai, Dubai,

18   United Arab Emirates, beginning at 11:21 a.m. and

19   ending at 9:54 p.m., on Tuesday, January 7, 2020,

20   before LEAH WILLERSDORF, Member of the British

21   Institute of Verbatim Reporters, Accredited Verbatim

22   Reporter, Qualified Realtime Reporter - Level 2,

23   International Participating Member NCRA.

24

25   JOB No. 200107LWI

                                                          1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:35:26 | 1 | MR. TENREIRO:  I'm just asking about -- |
| 11:35:28 | 2 | I'm not sure it relates to any topic.  I'm just |
| 11:35:31 | 3 | asking about the -- |
| 11:35:31 | 4 | MR. DRYLEWSKI:  Okay.  Objection, based on |
| 11:35:34 | 5 | scope. |
| 11:35:34 | 6 | You can answer that question in your |
| 11:35:36 | 7 | personal capacity.  And I'd instruct the witness |
| 11:35:38 | 8 | to exclude from the answer the substance of any |
| 11:35:41 | 9 | conversations with counsel. |
| 11:35:42 | 10 | THE WITNESS:  Sure.  So, as you know, |
| 11:35:59 | 11 | Telegram, until yesterday, didn't comment on its work |
| 11:36:07 | 12 | related to TON, and the reason why we did not comment |
| 11:36:15 | 13 | is we didn't want our users and consumers in general |
| 11:36:25 | 14 | to have any expectations in relation to TON; however, |
| 11:36:31 | 15 | it came to our attention that due to this vacuum, or |
| 11:36:41 | 16 | the perceived vacuum of announcements from our team, |
| 11:36:45 | 17 | some users were being scammed by certain third |
| 11:36:53 | 18 | parties, and while we warned our users against -- |
| 11:37:01 | 19 | about those scams on numerous occasions before, we |
| 11:37:04 | 20 | decided that it is worth posting a more extensive |
| 11:37:09 | 21 | piece explaining to the users the current status of |
| 11:37:18 | 22 | TON and Grams so that they wouldn't be misled by bad |
| 11:37:24 | 23 | actors trying to trick them into, you know, buying |
| 11:37:30 | 24 | something that is not related to what we are trying to |
| 11:37:32 | 25 | build. |

23

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:46:37  1    private placement?

17:46:37  2        A.   I don't think we reached out to the SEC

17:46:40  3    before I signed the first purchase agreement.  The way

17:46:44  4    we designed it is, the private placement, was that we

17:46:59  5    reserved a lot of flexibility to how the project and

17:47:10  6    its parts could look like, and this flexibility is

17:47:17  7    reflected in the purchase agreements and its

17:47:20  8    appendices.

17:47:36  9            That gave us a comfort of knowing that

17:47:44 10    we would be able to change certain, if not all,

17:47:49 11    aspects of what we're trying to build based on the

17:47:59 12    feedback that we could receive from the regulators,

17:48:04 13    including the SEC, in the following months.

17:48:08 14        Q.   So is it fair to say the answer to my

17:48:10 15    question is no, you do not?

17:48:13 16        A.   No; that was the first sentence,

17:48:17 17    I believe.

17:48:17 18        Q.   Okay.  Now, in terms of the remainder of

17:48:21 19    your answer and the flexibility, is it fair to say

17:48:24 20    that you today still retain that flexibility to

17:48:46 21    change ...

17:48:48 22            Right.  Is it fair to say that -- so you

17:48:48 23    said the way you designed it was that you had

17:48:52 24    flexibility to change some features of the project.

17:49:03 25    Is it fair to say that you, to this day, retain that

                                                                   159

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:49:06 | 1 | flexibility to change features of how a project might |
| 17:49:11 | 2 | look like in the future? |
| 17:49:12 | 3 | A.   That's correct. |
| 17:49:12 | 4 | Q.   I mean, just as one example, I think at |
| 17:49:15 | 5 | some point originally there was at least the idea |
| 17:49:17 | 6 | conveyed to investors that TON Wallet might be |
| 17:49:23 | 7 | integrated into Messenger, but in Exhibit 38, which we |
| 17:49:27 | 8 | began the morning with, which was the statement that |
| 17:49:29 | 9 | you posted yesterday, there is a statement that TON |
| 17:49:35 | 10 | Wallet will no longer be integrated into Messenger; |
| 17:49:38 | 11 | is that correct? |
| 17:49:38 | 12 | MR. DRYLEWSKI:  Objection to form. |
| 17:49:40 | 13 | Objection to the characterization of the document. |
| 17:49:45 | 14 | THE WITNESS:  I believe in that |
| 17:49:46 | 15 | announcement we made clear that the Wallet would not |
| 17:49:51 | 16 | be integrated into the Messenger applications at |
| 17:49:55 | 17 | launch. |
| 17:49:56 | 18 | BY MR. TENREIRO: |
| 17:49:56 | 19 | Q.   Right. |
| 17:50:05 | 20 | A.   And we reserved the right to do that |
| 17:50:08 | 21 | later, subject to regulatory approval. |
| 17:50:10 | 22 | Q.   Right.  Thank you.  Thanks for clarifying. |
| 17:50:13 | 23 | "Telegram may integrate the TON Wallet |
| 17:50:15 | 24 | application with the Telegram Messenger service in the |
| 17:50:17 | 25 | future, to the extent permitted under applicable law |

160

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:50:20 1 and governmental authorities."

17:50:22 2          I just read that from Exhibit 38.

17:50:25 3     A.   Yeah.

17:50:25 4     Q.   Is that what you were referring to?

17:50:27 5     A.   Correct.

17:50:27 6     Q.   Okay.  So that's one example of where you

17:50:30 7 retained flexibility, and retain flexibility today,

17:50:33 8 in terms of how you structure the TON Blockchain and

17:50:37 9 surrounding ecosystem?  Is that one example?

17:50:41 10     A.   That's one example.  The other, I think,

17:50:54 11 even more relevant example is when we received

17:50:56 12 feedback from the SEC in relation to the contemplated

17:51:10 13 Gram-buying function of the TON Foundation that may be

17:51:17 14 established in the future, and we understood that the

17:51:27 15 SEC was concerned with that function, and although we

17:51:40 16 might not fully -- might not have fully understood or

17:51:48 17 agreed with that view, we instantly changed our plans,

17:52:09 18 and at a certain point in time later informed all the

17:52:13 19 private placement purchasers about this change.

17:52:16 20     Q.   Thank you.  And is another example of

17:52:19 21 where you have some flexibility the existence of or

17:52:24 22 the parameters for functioning of the TON Foundation?

17:52:27 23 Is that another example?

17:52:29 24     A.   Yes.  I believe that flexibility is

17:52:34 25 allowed for in the risk factors of appendix to the

161

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:54:53  1   the TON Foundation cannot serve as a validator on the

17:55:05  2   TON Blockchain; is that correct?

17:55:16  3        A.   Yes.  I believe we have a plan to allow

17:55:26  4   the TON Foundation to use Grams in the TON Reserve for

17:55:32  5   validation, to the extent we could implement this

17:55:44  6   limitation into the structure, both from an

17:56:02  7   engineering perspective and from a legal perspective.

17:56:06  8        Q.   I just want to make sure I have a clear

17:56:09  9   record.

17:56:09 10             MR. DRYLEWSKI:  Yeah.

17:56:09 11   BY MR. TENREIRO:

17:56:10 12        Q.   So you believe you have a plan to allow

17:56:12 13   the TON Foundation to act as a validator?

17:56:14 14        A.   No.

17:56:15 15        Q.   Oh, okay.

17:56:16 16             MR. DRYLEWSKI:  Yeah.  So "could," I think

17:56:16 17   it was "could not."

17:56:18 18             MR. TENREIRO:  Okay.

17:56:18 19             THE WITNESS:  Sorry.

17:56:19 20             MR. TENREIRO:  Yeah.

17:56:19 21             THE WITNESS:  Could not.

17:56:19 22             MR. TENREIRO:  Okay.

17:56:20 23   BY MR. TENREIRO:

17:56:23 24        Q.   Okay.  So my followup question is,

17:56:26 25   is there flexibility, from your perspective, on that

163

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17:56:28 1   point as well, such that you could at some point later

17:56:33 2   in the future change your mind and permit the TON

17:56:35 3   Reserve to act as one of many validators on the TON

17:56:56 4   Blockchain?

17:56:56 5         A.   No, we never wanted to retain that

17:57:00 6   flexibility.  It was our -- it has been our plan

17:57:10 7   to disallow that kind of use of Grams by the TON

17:57:18 8   Foundation in order to make sure that the public

17:57:31 9   perception of the network is in line with expectations

17:57:54 10  people would reasonably have from a decentralized

17:58:00 11  network.

17:58:00 12        Q.   Okay.  We can set that document aside,

17:58:07 13  which is Exhibit 50.

17:58:08 14             You were talking about banking

17:58:10 15  relationships and I believe that -- is it fair to say

17:58:13 16  that during the term of the private placement, your

17:58:16 17  primary banking relationship -- ███████████████████

███████████   ████████████████████████████████████

17:58:22 19             MR. DRYLEWSKI:  Objection, I think to

17:58:24 20  scope.

17:58:25 21             Is that in one of the topics?

17:58:26 22             MR. TENREIRO:  It's the Use of Funds

17:58:29 23  topic.

17:58:32 24             MR. DRYLEWSKI:  Use of Funds topic, okay.

17:58:45 25             THE WITNESS:  Yes, I think you could say

164

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

20:08:36  1   completely or because the purchaser suddenly decided

20:08:42  2   to change their plans and, given the situation --

20:09:17  3   I'm sorry.  So as a result of the situation

20:09:21  4   surrounding this specific investor, decided to

20:09:27  5   decrease the number of Grams that they would subscribe

20:09:30  6   for in the purchase agreements.

20:09:34  7            So those agreements had to be canceled in

20:09:36  8   order to have new agreements signed reflecting the

20:09:42  9   updated number of Grams and amounts in US dollars or

20:09:57 10   euro.

20:09:58 11        Q.    So tens of purchase agreements is your

20:10:01 12   kind of estimate?

20:10:01 13        A.    That's my estimate.

20:10:03 14        Q.    Okay.  And in terms of these funds --

20:10:06 15   I'll go on a break after this.

20:10:08 16            MR. DRYLEWSKI:  Thank you.

20:10:08 17   BY MR. TENREIRO:

20:10:09 18        Q.    I'm sorry, did you want to say something

20:10:12 19   else?

20:10:13 20        A.    Just to clarify, that by tens of

20:10:23 21   agreements, I don't mean investors, I don't mean

20:10:26 22   purchasers; I mean separate purchase agreements --

20:10:31 23        Q.    Sure.

20:10:32 24        A.    -- and one purchaser may have entered into

20:10:36 25   multiple purchase agreements.

209

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4  SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
 5                                   )
                         Plaintiff,  )
 6                                   ) 19 Civ. 9439 (PKC)
           - against -               )
 7                                   )
    TELEGRAM GROUP INC. and          )
 8  TON ISSUER INC.,                 )
                                     )
 9                       Defendants. )
    _____)

10

11       **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13              Videotaped deposition of PAVEL DUROV (as

14  30(b)(6) corporate representative of Defendants and

15  also in his personal capacity), Volume 2, taken on

16  behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17  Square, Building 3, Level 5, Downtown Dubai, Dubai,

18  United Arab Emirates, beginning at 10:23 a.m. and

19  ending at 6:09 p.m., on Wednesday, January 8, 2020,

20  before LEAH WILLERSDORF, Member of the British

21  Institute of Verbatim Reporters, Accredited Verbatim

22  Reporter, Qualified Realtime Reporter - Level 2,

23  International Participating Member NCRA.

24

25  JOB No. 200108LWI
```

250

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:25:37 | 1 | Q.   Okay.  So with respect to the 1.3 billion |
| 10:25:40 | 2 | that is left from the private placement, sitting here |
| 10:25:43 | 3 | today, what are Telegram's plans for those funds, |
| 10:25:46 | 4 | the use of those funds? |
| 10:25:57 | 5 | A.   Would you mind specifying the period of |
| 10:25:59 | 6 | time for ... |
| 10:26:00 | 7 | Q.   Let's say for the next year. |
| 10:26:19 | 8 | A.   My expectation is that we will continue |
| 10:26:26 | 9 | to spend funds in a manner similar to which took place |
| 10:26:39 | 10 | last year or this year -- or, yeah, last year and the |
| 10:26:43 | 11 | beginning of this year.  So we don't anticipate big |
| 10:26:51 | 12 | changes up until the launch of TON when we expect that |
| 10:27:07 | 13 | certain expenses might go down due to the fact that we |
| 10:27:10 | 14 | will no longer be spending resources on developing and |
| 10:27:18 | 15 | testing TON. |
| 10:27:19 | 16 | Q.   So is it your expectation that after the |
| 10:27:21 | 17 | launch of the blockchain, Telegram will spend no funds |
| 10:27:25 | 18 | at all on TON or the blockchain? |
| 10:27:36 | 19 | A.   Yes, other than potential expenses on any |
| 10:27:54 | 20 | legal costs or litigations that may result in the |
| 10:28:00 | 21 | process. |
| 10:28:01 | 22 | Q.   So is it -- is the testing of the |
| 10:28:05 | 23 | TON Blockchain complete as of today, or do you expect |
| 10:28:09 | 24 | it will be complete by the launch?  What's the status |
| 10:28:12 | 25 | of the testing? |

257

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:28:16 | 1 | MR. DRYLEWSKI:  Objection to form. |
| 10:28:18 | 2 | Do you mean Telegram's testing?  Because |
| 10:28:20 | 3 | there's also a testnet, I just want to be clear. |
| 10:28:25 | 4 | MR. TENREIRO:  Telegram's testing, |
| 10:28:27 | 5 | mmm-hmm. |
| 10:28:28 | 6 | MR. DRYLEWSKI:  Okay. |
| 10:28:29 | 7 | Objection to form.  Objection to |
| 10:28:34 | 8 | foundation. |
| 10:28:57 | 9 | THE WITNESS:  We consider the testing of |
| 10:29:06 | 10 | the core components of the TON network to be complete; |
| 10:29:21 | 11 | however, certain additional functionality of TON, that |
| 10:29:35 | 12 | would be nice to have, but that would not be necessary |
| 10:29:42 | 13 | for the launch.  It's still required and that is the |
| 10:29:57 | 14 | kind of testing that we are focused on right now. |
| 10:30:04 | 15 | BY MR. TENREIRO: |
| 10:30:04 | 16 | Q.   So let me take it in steps.  Some of the |
| 10:30:06 | 17 | functionality that would be nice to have but not |
| 10:30:08 | 18 | required, can you be more specific about what you |
| 10:30:11 | 19 | mean, what functionalities? |
| 10:30:14 | 20 | MR. DRYLEWSKI:  And just for the record, |
| 10:30:15 | 21 | about which topic are we in right now? |
| 10:30:18 | 22 | MR. TENREIRO:  I think this is -- hold on |
| 10:30:20 | 23 | a second. |
| 10:30:31 | 24 | MR. DRYLEWSKI:  I'll answer my own |
| 10:30:33 | 25 | question.  Is it 13? |

258

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:47:09 | 1 | voted on or -- under the protocols and procedures of |
| 10:47:13 | 2 | the TON Blockchain?  Is that one of the things that, |
| 10:47:15 | 3 | in theory, the TON Foundation could do if it ever |
| 10:47:18 | 4 | existed? |
| 10:48:11 | 5 | A.   Since the TON Foundation, as contemplated |
| 10:48:27 | 6 | at a certain point in time in the past, was modeled |
| 10:48:35 | 7 | after the Ethereum foundation and the Bitcoin |
| 10:48:41 | 8 | foundation, foundations relevant to the similar but |
| 10:48:52 | 9 | older and less, we believe, efficient networks, one of |
| 10:49:02 | 10 | its planned functions that we discussed was to be |
| 10:49:20 | 11 | able to, based on the input from the blockchain |
| 10:49:26 | 12 | community and relevant experts, put forward proposals |
| 10:49:47 | 13 | in relation to the future of TON Blockchain in the |
| 10:49:59 | 14 | same way as any other organization or group of people, |
| 10:50:17 | 15 | if they would like so, will be able to put forward |
| 10:50:24 | 16 | proposals in relation to the future of TON Blockchain. |
| 10:50:39 | 17 | Those proposals, though, would not, and will not, |
| 10:50:51 | 18 | be able to affect any property or functionality in the |
| 10:51:03 | 19 | TON Blockchain, or change the way how it would work, |
| 10:51:32 | 20 | unless validators/parties that will be hosting |
| 10:51:45 | 21 | the network agree, in their majority, to implement |
| 10:52:05 | 22 | proposed changes, be it changes proposed by the |
| 10:52:18 | 23 | hypothetical TON Foundation or any other organization |
| 10:52:33 | 24 | of that kind that may be established in the future by |
| 10:52:46 | 25 | third parties. |

264

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:57:07 | 1 | Q.   And for that reason, Telegram has retained |
| 10:57:09 | 2 | flexibility in its offering documents for the private |
| 10:57:13 | 3 | placement to change its mind about the level of |
| 10:57:16 | 4 | involvement it might have with some of these issues; |
| 10:57:18 | 5 | is that correct? |
| 10:57:30 | 6 | A.   Generally speaking, Telegram reserved |
| 10:57:39 | 7 | a very large degree of flexibility described in the |
| 10:57:48 | 8 | offering materials, in the purchase agreement and |
| 10:57:54 | 9 | its appendices.  I believe that in certain parts of |
| 10:58:22 | 10 | the offering materials we make it clear for the |
| 10:58:36 | 11 | purchasers that the future of the TON Blockchain is -- |
| 10:58:52 | 12 | would be in the hands of decentralized, open source |
| 10:59:05 | 13 | community.  I think this was almost a direct quote |
| 10:59:19 | 14 | from the primer, if I'm not mistaken. |
| 10:59:21 | 15 | MR. TENREIRO:  It's "decentralized." |
| 10:59:22 | 16 | MR. DRYLEWSKI:  I was going to check after |
| 10:59:24 | 17 | the answer was done. |
| 10:59:25 | 18 | MR. TENREIRO:  Yeah.  I got it. |
| 10:59:30 | 19 | THE WITNESS:  Thank you. |
| 10:59:30 | 20 | MR. TENREIRO:  I'm sorry.  Were you |
| 10:59:33 | 21 | finished?  I apologize. |
| 10:59:40 | 22 | THE WITNESS:  And based on that, I think |
| 11:00:08 | 23 | it was -- it is clear that the degree of Telegram's |
| 11:00:24 | 24 | involvement in developing and supporting TON |
| 11:00:36 | 25 | post-launch would be limited. |

266

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:10:46 | 1 | BY MR. TENREIRO: |
| 11:10:46 | 2 | Q.    But let's, I think -- let's break -- |
| 11:10:48 | 3 | MR. DRYLEWSKI:  Telegram, the entity. |
| 11:10:48 | 4 | MR. TENREIRO:  Yeah, let's break it up |
| 11:10:51 | 5 | because he might be struggling. |
| 11:10:53 | 6 | THE WITNESS:  Sure. |
| 11:10:53 | 7 | BY MR. TENREIRO: |
| 11:10:54 | 8 | Q.    So let's try Telegram first. |
| 11:10:56 | 9 | A.    Okay.  So Telegram does not intend to hold |
| 11:10:58 | 10 | any Grams post launch. |
| 11:11:02 | 11 | Q.    So the unsold Grams will go to who? |
| 11:11:17 | 12 | A.    The unsold Grams, provided the network |
| 11:11:30 | 13 | is launched with unsold Grams, will be locked until |
| 11:11:38 | 14 | the creation of, the establishment of the |
| 11:11:41 | 15 | TON Foundation.  If the TON Foundation is never |
| 11:11:51 | 16 | established, those unsold Grams will be locked for |
| 11:11:57 | 17 | perpetuity. |
| 11:11:58 | 18 | Q.    And what's the percentage of the 5 billion |
| 11:12:02 | 19 | that those locked Grams would be? |
| 11:12:08 | 20 | A.    I think we had the -- |
| 11:12:13 | 21 | MR. DRYLEWSKI:  Let's go off the record |
| 11:12:14 | 22 | for one second if that's okay. |
| 11:12:16 | 23 | MR. TENREIRO:  Okay. |
| 11:12:16 | 24 | THE VIDEOGRAPHER:  We are going off the |
| 11:12:18 | 25 | record.  The time is 11:12. |

269

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:23:31 | 1 | "28 percent of the initial supply of Grams would be |
| 11:23:31 | 2 | allocated to the TON Reserve to be used by the |
| 11:23:33 | 3 | TON Foundation as described [therein]"? |
| 11:23:44 | 4 | A.   I think this is an accurate reflection |
| 11:24:05 | 5 | of our plans -- |
| 11:24:06 | 6 | Q.   Accurate and. |
| 11:24:08 | 7 | A.   ... reflection of our plans, yeah. |
| 11:24:10 | 8 | Q.   An accurate reflection, okay. |
| 11:24:11 | 9 | Then if you go to page 29 where there is |
| 11:24:18 | 10 | Interrogatory No. 15 and a response also.  If you |
| 11:24:21 | 11 | could focus on the first paragraph first that |
| 11:24:23 | 12 | describes: |
| 11:24:24 | 13 | "... Defendants currently contemplate that |
| 11:24:25 | 14 | approximately 10% of the initial supply of Grams will |
| 11:24:29 | 15 | be allocated for incentive payments to TON Blockchain |
| 11:24:29 | 16 | users... The Incentives Pool is expected to managed by |
| 11:24:33 | 17 | the TON Foundation." |
| 11:24:34 | 18 | Oh, page 29. |
| 11:24:36 | 19 | A.   Yes, okay. |
| 11:24:46 | 20 | Q.   So is that statement accurate? |
| 11:25:42 | 21 | A.   It is accurate that we plan to distribute |
| 11:26:00 | 22 | approximately 10 percent in the initial supply of |
| 11:26:03 | 23 | Grams among the users of the TON Blockchain, subject |
| 11:26:15 | 24 | to certain conditions.  It is, however, worth noting |
| 11:26:23 | 25 | that in light of the uncertain status of the |

271

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:26:36 | 1 | TON Foundation, one of the mechanics of distributing |
| 11:26:59 | 2 | those 10 percent of Grams that we have been discussing |
| 11:27:14 | 3 | is that in case the TON Foundation is not established |
| 11:27:33 | 4 | or, theoretically speaking, for some reasons could |
| 11:27:54 | 5 | never be established and we come to such a conclusion, |
| 11:28:03 | 6 | then we were discussing ways to distribute those |
| 11:28:29 | 7 | 10 percent of the initial supply among the users |
| 11:28:39 | 8 | directly at launch so that if the incentive pool, |
| 11:29:28 | 9 | as a concept, is considered to be applicable as |
| 11:30:23 | 10 | a result of the ongoing analysis and continuing legal |
| 11:30:29 | 11 | processes, while the TON Foundation, for some reasons, |
| 11:30:45 | 12 | is not feasible as a concept, we could treat the |
| 11:31:04 | 13 | incentives pool separately from the TON Foundation and |
| 11:31:18 | 14 | could still try to find compliant ways to implement |
| 11:31:39 | 15 | the idea of distributing 10 percent among the users |
| 11:31:50 | 16 | in order to increase and promote the consumptive use |
| 11:32:00 | 17 | of the new currency. |
| 11:32:06 | 18 | Q.   Thank you.  I'm just trying to get an |
| 11:32:09 | 19 | answer to my question now, which is: What percentage |
| 11:32:11 | 20 | of Grams of the 5 billion is Telegram's employees |
| 11:32:14 | 21 | going to have upon the launch?  It's just a number. |
| 11:32:17 | 22 | MR. DRYLEWSKI:  I think he just answered |
| 11:32:18 | 23 | that question. |
| 11:32:19 | 24 | MR. TENREIRO:  I don't think so. |
| | 25 | /// |

272

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:32:20 | 1 | BY MR. TENREIRO: |
| 11:32:21 | 2 | Q. I just want a number. |
| 11:32:37 | 3 | A. I can reconfirm that Telegram will not |
| 11:32:39 | 4 | hold any Grams post launch. We mentioned in the |
| 11:32:59 | 5 | offering materials that we plan to distribute |
| 11:33:06 | 6 | 4 percent of Grams, which should be around 200 million |
| 11:33:20 | 7 | Grams, I believe, among the development team, and |
| 11:33:57 | 8 | we are still evaluating, under the circumstances, |
| 11:34:08 | 9 | whether we would proceed with that initial plan of |
| 11:34:19 | 10 | distributing all or some of those 200 million Grams |
| 11:34:40 | 11 | among the developers that worked on TON. |
| 11:34:50 | 12 | Q. So what percentage of the Grams were sold |
| 11:34:53 | 13 | in the private placement? |
| 11:36:00 | 14 | A. In order to make sure I accurately answer |
| 11:36:03 | 15 | your question, may I look at the documents in my email |
| 11:36:19 | 16 | and ... |
| 11:36:20 | 17 | MR. DRYLEWSKI: What we can do, I think, |
| 11:36:22 | 18 | Jorge, this isn't meant to be a memory test, is we can |
| 11:36:25 | 19 | get the information for you, we can take a quick break |
| 11:36:28 | 20 | and he can answer the question because it's a knowable |
| 11:36:31 | 21 | answer; he just doesn't know the percentages right |
| 11:36:33 | 22 | now. We're talking about a lot of different numbers. |
| 11:36:35 | 23 | So does that work for you? |
| 11:36:37 | 24 | MR. TENREIRO: Sure. Let's just get the |
| 11:36:38 | 25 | numbers and get an answer. We've been at this for, |

273

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:44:25 | 1 | Q.   Okay.  And the remaining 42 percent, |
| 11:44:30 | 2 | who currently, as we sit here today, will have the |
| 11:44:34 | 3 | authority to decide what to do and how to allocate the |
| 11:44:38 | 4 | remainder of the 42 percent? |
| 11:45:06 | 5 | A.   The creators of the network will be |
| 11:45:09 | 6 | responsible for the distribution mechanism at launch. |
| 11:45:21 | 7 | Q.   So the creators of the network, you mean |
| 11:45:26 | 8 | Telegram? |
| 11:45:26 | 9 | A.   Yes. |
| 11:45:26 | 10 | Q.   Okay.  And moving on to a separate topic |
| 11:45:31 | 11 | or, I guess, just moving on from this line of |
| 11:45:33 | 12 | questioning, I think yesterday we talked about whether |
| 11:45:38 | 13 | Telegram or its employees may take part in voting or |
| 11:45:42 | 14 | validation.  Do you recall generally we talked about |
| 11:45:45 | 15 | that a little bit? |
| 11:45:45 | 16 | A.   Yes. |
| 11:45:46 | 17 | Q.   And I think you said in your public notice |
| 11:45:49 | 18 | of the 6th, which I think was Monday, and if you want |
| 11:45:53 | 19 | to refer to it, it's Exhibit 38, but you said, |
| 11:45:58 | 20 | you know, Telegram and its employees -- |
| 11:46:00 | 21 | I'm paraphrasing -- will not take part in voting or |
| 11:46:02 | 22 | validating in connection with the TON Blockchain. |
| 11:46:05 | 23 | This voluntary decision was made in order to avoid any |
| 11:46:07 | 24 | perception that Telegram or its employees can or will |
| 11:46:10 | 25 | exercise control over the TON Blockchain following its |

276

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:46:13 | 1 | launch. |
| 11:46:15 | 2 | Does that sound more or less like what you |
| 11:46:18 | 3 | said? |
| 11:46:18 | 4 | A.   Yes. |
| 11:46:18 | 5 | Q.   Okay.  Now, at some point, though, prior, |
| 11:46:22 | 6 | Telegram's employees were -- it was contemplated that |
| 11:46:27 | 7 | they could participate in validating up to a certain |
| 11:46:31 | 8 | percentage of Grams available; is that not correct? |
| 11:46:43 | 9 | MR. DRYLEWSKI:  Sorry, could I have that |
| 11:46:44 | 10 | question read back.  I want to know if I need to |
| 11:46:47 | 11 | object. |
| 11:47:01 | 12 | (Whereupon, the record was read back by |
| 11:47:02 | 13 | the court reporter.) |
| 11:47:02 | 14 | MR. DRYLEWSKI:  Okay.  I wanted to know if |
| 11:47:04 | 15 | you said "disclosed" or "contemplated."  I do not |
| 11:47:08 | 16 | object. |
| 11:47:48 | 17 | THE WITNESS:  If I remember it right, when |
| 11:48:10 | 18 | we were drafting our plans in relation to the |
| 11:48:12 | 19 | distribution of Grams -- and those plans were drafted |
| 11:48:20 | 20 | in, I believe, 2017, or started to be drafted in |
| 11:48:27 | 21 | 2017 -- we didn't specifically emphasize in those |
| 11:48:52 | 22 | plans that we would limit the holders of this |
| 11:49:13 | 23 | hypothetical 4 percent from participating in |
| 11:49:22 | 24 | validation. |
| | 25 | /// |

277

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:12:09  1              "We were planning to provide you with the
12:12:11  2    same level of allocation we grant other tier-1 firms
12:12:15  3    such as ████████████ which is 15 [million]."
12:12:20  4              Do you see that?
12:12:21  5         A.   Yes.
12:12:22  6         Q.   Can you tell me what you meant by "tier-1
12:12:26  7    firms"?
12:12:26  8              MR. DRYLEWSKI:  And this is a question
12:12:28  9    to him in his personal capacity?
12:12:30 10              MR. TENREIRO:  Yeah.
12:12:30 11              MR. DRYLEWSKI:  Thank you.
12:12:44 12              THE WITNESS:  I think it is common
12:12:46 13    knowledge that there are certain venture capital funds
12:12:56 14    in Silicon Valley and elsewhere that are universally
12:13:05 15    considered to have the best track record in the
12:13:29 16    industry, and such VCs, and in some cases individual
12:13:37 17    investors, are often referred to as "tier 1 funds,"
12:13:45 18    at least the firms.  At least that is how I use this
12:13:51 19    word.
12:13:52 20    BY MR. TENREIRO:
12:13:52 21         Q.   Okay.  And why -- I think you mentioned
12:13:56 22    reputation a couple times.  Why does reputation -- why
12:14:01 23    was that a factor that Telegram considered in the
12:14:04 24    allocation decision?
12:14:24 25         A.   Reputation was very important if -- a very
```

287

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:14:30  1   important factor for us when deciding which purchasers
12:14:43  2   should be admitted to participating in the private
12:14:51  3   placement, because when entering the purchase
12:15:00  4   agreements, investors were obliged by the agreement
12:15:20  5   to make representations, including representations
12:15:38  6   that confirmed that they're buying an interest in
12:15:57  7   Grams on their own behalf and not on behalf of some
12:16:07  8   other parties, and not with the view to reselling this
12:16:18  9   interest in Grams.  They would then have to reconfirm
12:16:35 10   those representations at the time when Grams would be
12:16:56 11   issued to them, and it was a clear condition that they
12:17:03 12   would have to reconfirm those representations in order
12:17:08 13   to receive Grams at launch.
12:17:22 14            It was important that we have reputable
12:17:28 15   investors, to the extent it is possible, and other
12:17:51 16   considerations that we have most confidence in the
12:18:09 17   fact that the people making these representations
12:18:28 18   can be trusted and those representations can be relied
12:18:30 19   on.
12:18:31 20        Q.   Is there any other reason why their
12:18:35 21   reputation matter, other than the reasons you just
12:18:38 22   mentioned, or was that it?
12:18:56 23        A.   Well, having well-known, reputable firms
12:19:06 24   as parties in the purchase agreements could also allow
12:19:17 25   to decrease complexity in terms of necessary
```

288

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:19:40 | 1 | processes, such as obtaining KYC source-of-wealth |
| 12:19:51 | 2 | information for these purchasers. |
| 12:19:55 | 3 | Q. And why does a VC, a venture capitalist |
| 12:20:00 | 4 | firm's, track record matter? Why is that a factor? |
| 12:20:11 | 5 | A. VCs with track record, in our view, could |
| 12:21:16 | 6 | be trusted and would, with a high degree of |
| 12:21:30 | 7 | probability, be able to better understand the nature |
| 12:21:39 | 8 | of the project that we were undertaking. |
| 12:21:50 | 9 | Q. Other than I think you mentioned |
| 12:21:54 | 10 | reputation, track record, brand name, experience in |
| 12:21:58 | 11 | this space, were there other factors -- and you said |
| 12:22:02 | 12 | those were the -- I'm just trying to make sure |
| 12:22:05 | 13 | I understood. |
| 12:22:05 | 14 | You said those were the factors, also |
| 12:22:07 | 15 | potentially personal relationships that you might have |
| 12:22:09 | 16 | had. Any other factors that I am missing that |
| 12:22:14 | 17 | Telegram considered in deciding the allocations in the |
| 12:22:22 | 18 | pre-sale round? |
| 12:22:30 | 19 | A. I believe there could be certain other |
| 12:22:33 | 20 | factors which include the fact that those purchasers |
| 12:22:50 | 21 | were only admitted to the allocation if -- to the |
| 12:22:54 | 22 | purchase -- private placement if they were |
| 12:22:58 | 23 | sophisticated, accredited investors, and high |
| 12:23:11 | 24 | net-worth individuals. Another factor I could think |
| 12:23:17 | 25 | of, for example, is if, after meeting or speaking or |

289

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:23:36 | 1 | communicating in another way with a potential |
| 12:23:40 | 2 | purchaser, we were not able to get confident that the |
| 12:24:04 | 3 | purchaser, potential purchaser clearly understands the |
| 12:24:15 | 4 | nature of our project and its limitations, including |
| 12:24:19 | 5 | some of the limitations later reflected in the |
| 12:24:33 | 6 | purchase agreement and the appendices to the primer, |
| 12:24:37 | 7 | we would, with a higher degree of probability, decline |
| 12:24:54 | 8 | to admit such a potential purchaser to the private |
| 12:24:59 | 9 | placement. |
| 12:25:00 | 10 | Another example could be when we would, |
| 12:25:26 | 11 | during the process of defining the allocation, receive |
| 12:25:38 | 12 | certain rumors from the market that would indicate |
| 12:25:41 | 13 | that this potential purchaser did not fully understand |
| 12:25:52 | 14 | the nature of what we were doing or the limitations |
| 12:25:59 | 15 | imposed for the purchase agreement, we would, with |
| 12:26:08 | 16 | a very high degree of probability, cancel the |
| 12:26:16 | 17 | allocation of such a potential purchaser or, if this |
| 12:26:24 | 18 | allocation hadn't even been considered prior to that, |
| 12:26:39 | 19 | we would not pursue this opportunity related to such |
| 12:27:18 | 20 | purchaser in any way. |
| 12:27:34 | 21 | Q.   And in terms of ensuring that these |
| 12:27:36 | 22 | initial purchasers were not buying the Grams to resell |
| 12:27:40 | 23 | them, why not just lock up the Grams, all the Grams |
| 12:27:46 | 24 | from being resold? |
| 12:27:47 | 25 | MR. DRYLEWSKI:  Objection; form. |

290

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12:31:52  1   restricting the ability of those Grams to be

12:31:56  2   transferred for resale as opposed to be transferred

12:32:00  3   for validation or use in applications or some other

12:32:06  4   use with respect to the blockchain?

12:32:08  5               Let me strike this and just lay

12:32:10  6   a foundation.

12:32:11  7               You're familiar that in blockchain

12:32:14  8   technology, are you not, that you can restrict the

12:32:16  9   transfer of tokens on blockchains for certain --

12:32:19 10   within certain parameters?  Are you familiar with that

12:32:21 11   generally?

12:32:29 12        A.   I understand that developers of some

12:32:34 13   blockchain projects may seek to do so.

12:32:36 14        Q.   Okay.  So why didn't Telegram seek -- why

12:32:40 15   isn't Telegram seeking to do so, to restrict the

12:32:43 16   ability of the initial purchasers in Stage A to

12:32:47 17   transfer the Grams, except for certain uses only?

12:33:11 18        A.   Grams were designed to be a mass-market

12:33:20 19   currency, used for consumptive purposes.  We were

12:33:35 20   hoping to build upon the ideas of older, decentralized

12:33:45 21   networks such as Bitcoin and Ethereum, and

12:33:54 22   significantly improve their speed, scaleability and

12:34:02 23   ease of use, so that consumers that are currently

12:34:14 24   struggling with limitations existing in these older

12:34:24 25   networks that I just mentioned would be able to enjoy

293

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:34:41 | 1 | a more efficient service and achieve their goals in |
| 12:34:51 | 2 | a more efficient and user-friendly way so that, |
| 12:34:59 | 3 | as a result, the resulting cryptocurrency will -- |
| 12:35:07 | 4 | the resulting cryptocurrency could achieve wider |
| 12:35:17 | 5 | adoption and be used in commerce and all sorts of |
| 12:35:39 | 6 | applications for a wide range of purposes. |
| 12:36:06 | 7 | We thought that given these |
| 12:36:27 | 8 | considerations, it was necessary to make sure that |
| 12:36:44 | 9 | consumers can interact with this new currency in the |
| 12:36:56 | 10 | similar way they interact with less efficient and |
| 12:37:15 | 11 | older blockchain networks.  We believe that to achieve |
| 12:37:30 | 12 | these goals, it would not be beneficial to impose |
| 12:37:48 | 13 | limitations on the participants in the ecosystem that |
| 12:37:59 | 14 | are absent in other similar networks such as Bitcoin |
| 12:38:09 | 15 | and Ethereum. |
| 12:38:10 | 16 | Q.   So my question was not about imposing |
| 12:38:13 | 17 | limitations on the participants in the ecosystem but |
| 12:38:15 | 18 | simply limitations on the ability of the initial |
| 12:38:18 | 19 | purchasers to transfer their Grams for sale as opposed |
| 12:38:21 | 20 | to giving them to mass markets for adoption for the |
| 12:38:25 | 21 | purposes you just described. |
| 12:38:48 | 22 | A.   As I just mentioned, it was critical |
| 12:39:04 | 23 | to achieve a wide adoption for this new cryptocurrency |
| 12:39:12 | 24 | in order for it to have the utility and consumptive |
| 12:39:27 | 25 | use for consumers.  Based on that, it was beneficial |

294

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12:44:56   1  BY MR. TENREIRO:

12:44:56   2       Q.   Maybe I should ask it this way: Is there

12:45:01   3  a belief -- was there a belief, when this

12:45:04   4  interrogatory answer was submitted, that Grams

12:45:07   5  would be worth $3 to $7 at some point?

12:45:10   6            MR. DRYLEWSKI:   Objection to form.

12:45:12   7            Grams worth 3 to 7 -- I guess, what do you

12:45:16   8  mean Grams that would be worth that?   In the

12:45:17   9  aggregate?  All Grams?  A Gram?

12:45:17  10  BY MR. TENREIRO:

12:45:19  11       Q.   You wrote the answer; so what did you mean

12:45:22  12  there, "Grams worth approximately 3 to 7" --

12:45:26  13            MR. DRYLEWSKI:   Okay, that's a different

12:45:27  14  question.   Okay.

12:45:28  15            THE WITNESS:   I think, to avoid confusion,

12:45:31  16  it is important to point out that it is not implied

12:45:34  17  here that one Gram will be worth $3 to $7.

12:45:41  18  BY MR. TENREIRO:

12:45:42  19       Q.   Okay.

12:46:07  20       A.   What is implied here is that after the

12:46:09  21  successful launch of the network as it is currently

12:46:19  22  contemplated, there will be a certain market price of

12:46:26  23  Grams formed by market forces.

12:46:45  24       Q.   So it's whatever the price -- so if the

12:46:48  25  price, by market forces, is, I don't know, $20, then

297

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:50:45 | 1 | Was the potential amount that you allocated to each |
| 12:50:49 | 2 | investor related to, you know, their ability to have |
| 12:50:58 | 3 | considerable disk space, computing power, network |
| 12:51:02 | 4 | bandwidth, as well as a continual commitment to |
| 12:51:06 | 5 | 100 percent uptime? |
| 12:51:08 | 6 | MR. DRYLEWSKI:  Objection; form. |
| 12:51:44 | 7 | THE WITNESS:  As you know, we only |
| 12:51:48 | 8 | admitted high net-worth individuals and established |
| 12:52:02 | 9 | funds in private placement, and it was an inevitable |
| 12:52:32 | 10 | consequence of this that such individuals or funds |
| 12:52:41 | 11 | would be able to rent -- to afford to pay for the |
| 12:53:07 | 12 | computing power necessary in the validation process, |
| 12:53:14 | 13 | because, in my understanding, the cost of renting or |
| 12:53:38 | 14 | acquiring equipment for validation, although |
| 12:53:43 | 15 | considerable for an average person, can be regarded |
| 12:53:52 | 16 | as negligible compared to the amounts of funds |
| 12:53:57 | 17 | invested by each of the purchasers. |
| 12:54:03 | 18 | BY MR. TENREIRO: |
| 12:54:03 | 19 | Q.   And the average person, if the |
| 12:54:06 | 20 | TON Blockchain launches, will be able to buy Grams |
| 12:54:09 | 21 | in any quantity, even in fractional quantities, right? |
| 12:54:17 | 22 | MR. DRYLEWSKI:  Objection; form. |
| 12:54:22 | 23 | THE WITNESS:  This is dependent on several |
| 12:54:25 | 24 | factors but this is the plan. |
| | 25 | /// |

300

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

13:44:13   1   would be used as a number required for the network

13:44:34   2   to function, unlike in some maybe other competing

13:44:41   3   blockchain projects; so there was no way to

13:44:49   4   definitively answer that question.

13:44:53   5            MR. TENREIRO:  Okay.  Just a couple more

13:44:55   6   questions and then we can -- just to finish this

13:44:57   7   topic, if you don't mind?

13:44:59   8            MR. DRYLEWSKI:  Sure.

13:44:59   9   BY MR. TENREIRO:

13:45:00  10      Q.   I think you mentioned at some point today,

13:45:02  11   but correct me, has Telegram completed all of the

13:45:05  12   tests on the TON Blockchain for the TON Blockchain?

13:45:09  13            MR. DRYLEWSKI:  Objection; form.

13:45:35  14            THE WITNESS:  As I previously indicated,

13:45:39  15   by October 2019 we concluded the vigorous testing of

13:46:01  16   the core components of the TON Blockchain that

13:46:16  17   we considered necessary for the project to be able to

13:46:31  18   be launched as a decentralized network.  At the same

13:46:59  19   time, we, given the change of the deadline date for

13:47:08  20   this project, are using this additional time to work

13:47:33  21   on a few nice-to-have features.  In addition, we keep

13:48:07  22   reviewing the feedback from the open-source community

13:48:21  23   security researchers that we previously incentivized

13:48:34  24   to help us with the testing process.

          25   ///

316

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:50:09 | 1 | Q.   Can you tell me who these individuals or |
| 14:50:12 | 2 | entities are, these open-source community security |
| 14:50:18 | 3 | researchers that you had previously incentivized? |
| 14:50:29 | 4 | A.   I think that in September last year |
| 14:50:35 | 5 | we launched a contest for smart contract engineers and |
| 14:50:54 | 6 | security researchers that promised a price fund of |
| 14:51:08 | 7 | up to $400,000 to be distributed among the winners in |
| 14:51:24 | 8 | this competition.  As a result, we had a lot of people |
| 14:51:48 | 9 | from the industry looking at the code of the |
| 14:51:53 | 10 | TON Blockchain, testing how the TON Blockchain and |
| 14:52:07 | 11 | its virtual machine work, and seeing whether they |
| 14:52:14 | 12 | could find any security issues with the project. |
| 14:52:26 | 13 | Q.   And these people are still doing some of |
| 14:52:28 | 14 | that work is what you're saying? |
| 14:52:31 | 15 | MR. DRYLEWSKI:  Objection; form. |
| 14:52:42 | 16 | THE WITNESS:  The prize budget that we |
| 14:52:52 | 17 | intended to be distributed among security researchers |
| 14:53:04 | 18 | which would be able to alert us to critical issues |
| 14:53:19 | 19 | that they may find in the code of the TON Blockchain |
| 14:53:34 | 20 | is still there and we have indicated publicly that |
| 14:53:43 | 21 | we continue accepting and rewarding individuals that |
| 14:53:51 | 22 | could help us test the network in the way I just |
| 14:54:10 | 23 | described. |
| 14:54:11 | 24 | MR. TENREIRO:  Let's look at Exhibit 73, |
| 14:54:14 | 25 | please.  We just marked it.  It's 17-332. |

318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:12:47 | 1 | from other sources publicly available for anybody. |
| 17:12:58 | 2 | Q.   And a moment or two ago you mentioned that |
| 17:13:01 | 3 | in October, Telegram disclosed certain financial |
| 17:13:06 | 4 | information.  Was that information emailed directly |
| 17:13:10 | 5 | to the private placement purchasers, or how was it |
| 17:13:17 | 6 | disclosed to them? |
| 17:13:21 | 7 | A.   Yes, I believe it was part of the update |
| 17:13:24 | 8 | we sent to all of the purchasers by email. |
| 17:13:27 | 9 | Q.   And is there is any current plan in place |
| 17:13:33 | 10 | by Telegram in terms of what sort of financial |
| 17:13:37 | 11 | information about itself it might disclose after the |
| 17:13:41 | 12 | launch of the TON Blockchain? |
| 17:14:01 | 13 | A.   In our view, Telegram's obligations under |
| 17:14:09 | 14 | the purchase agreement, for the most part, will be met |
| 17:14:32 | 15 | at the time of launch, meaning that after the launch |
| 17:14:36 | 16 | of the TON Blockchain, Telegram will no longer be |
| 17:14:39 | 17 | actively developing TON and, as such, it is not |
| 17:15:08 | 18 | obvious why purchasers who have received Grams in the |
| 17:15:14 | 19 | event of a successful launch of the TON Blockchain |
| 17:15:23 | 20 | would need any information -- |
| 17:15:23 | 21 | Q.   So -- I'm sorry. |
| 17:15:34 | 22 | A.   -- from Telegram Messenger other than the |
| 17:15:41 | 23 | information that will be already available from public |
| 17:15:45 | 24 | sources. |
| 17:15:46 | 25 | Q.   Sorry.  So my question was not about plans |

358