UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :
                        Plaintiff,     :     19 Civ. 9439 (PKC)
                                       :
        - against -                    :     ECF Case
                                       :
TELEGRAM GROUP INC. and TON ISSUER INC.,:
                                       :
                        Defendants.    :
                                       :
------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
APPLICATION AND MEMORANDUM OF LAW IN SUPPORT THEREOF FOR
ISSUANCE OF A LETTER OF REQUEST**

Plaintiff Securities and Exchange Commission ("SEC") respectfully applies to this Court for issuance of a Letter of Request to the Senior Master of the High Court (Queen's Bench Division) of England and Wales for international judicial assistance, pursuant to the Hague Convention of March 18, 1970, on Taking Evidence in Civil or Commercial Matters, in the form attached as Ex. 1 hereto.[1]  The purpose of this application is to obtain testimony and documents from John Hyman ("Hyman" or "witness"), a witness located in the United Kingdom.

Hyman is a former employee of Defendants Telegram Group Inc. and TON Issuer Inc. ("Telegram"), described by Telegram's founder and CEO in January 2018 as the Chief Investment Advisor at Telegram with "all the knowledge regarding the [then] current status of the private sale of TON," and the person who "runs the distribution of Grams."  In the following months, Hyman communicated with Grams purchasers, confirmed transaction details, and provided ongoing updates to investors about investments.  Through his prior employment at

---

[1]  References to "Ex." are to the SEC's Exhibits filed concurrently herewith.

Telegram during critical events in the securities offering at issue in this litigation, and now through his current role at an entity currently engaged in providing certain services to Grams investors, the witness obtained knowledge about the securities transactions entered into by Telegram and its investors.

## MEMORANDUM OF LAW

**I.     THE ALLEGATIONS**

The SEC alleges that, from January to March 2018, Telegram raised more than $1.7 billion from 171 investors (the "Initial Purchasers"), including $424.5 million from 39 United States investors, through an unlawful unregistered offer and sale of digital asset securities known as "Grams" (the "Offering"). ¶¶ 2, 44.[2]  Initial Purchasers entered into agreements ("Gram Purchase Agreements") pursuant to which Telegram promised to deliver 2.9 billion Grams (out of five billion minted). *Id.*  The SEC further alleges that those offers and sales of securities, which were not registered with the SEC, were the first unlawful step in achieving Telegram's stated goal—the mass distribution of securities to the investing public worldwide. ¶¶ 99-104.

**A.     The Grams Offering**

In late 2017, Telegram announced its intent to introduce "next-generation multi-blockchain" systems "designed to host a new generation of cryptocurrencies and decentralized applications, at a massive scale." ¶ 38.  Telegram called this yet-to-be created "ecosystem" the "Telegram Open Network" or "TON."  To make its vision of a "TON ecosystem" a reality, Telegram began plans to solicit funds from investors. *Id.*  Initially, Telegram envisioned a two-part offering to occur in 2018, with a "private" sale round to raise $600 million, to be immediately followed by a "public sale" for "$600M+ . . . in March 2018." ¶ 100.  Telegram

---

[2]     References to "¶" are to the SEC's Complaint in this matter (D.E. 1).

later changed the way it structured its Offering of Grams to the public. First, in early 2018, Telegram initiated a global offering to venture capitalists and large hedge funds (the Initial Purchasers), whereby it ultimately raised $1.7 billion in two rounds (the "Initial Stage"). ¶¶ 44, 52. Second, as provided under the Gram Purchase Agreements, Telegram would deliver Grams to Initial Purchasers as soon as possible—but no later than October 31, 2019 (the "Deadline Date"). ¶ 42. Telegram fostered the expectation, including by the way Telegram itself structured the Initial Stage, that the Initial Purchasers would act as conduits for reselling or otherwise distributing Grams to the investing public. ¶ 99. For example, while Grams purchased in the first round were subject to certain lock-up provisions, Grams purchased in the second round could be immediately resold upon delivery. ¶ 52. Moreover, Telegram's marketing materials made clear that the success of their project required the widespread adoption of Grams by as many individuals as possible. ¶¶ 103-04.

> **B.   Telegram Marketed Grams as Investment Contracts and the Initial Stage was Part of Telegram's Unlawful Unregistered Distribution of Grams**

Telegram's marketing materials reasonably led purchasers of Grams to view them as an investment into a common enterprise from which they could hope to profit based on Telegram's efforts to develop a business. ¶¶ 57-94. As relevant here, Telegram led reasonable investors to expect that they would be able to profit from their investment in Grams in various ways. First, Telegram sold Grams to Initial Purchasers at $0.38 and $1.33 per Gram, a deep discount to the price at which Grams will be sold upon launch, projected by Telegram to be $3.62 per Gram. ¶¶ 45, 89. Second, although Telegram purported in the Gram Purchase Agreements to restrict Initial Purchasers' ability to resell their Grams before the Distribution Date, a secondary market for trading in Grams developed during the Initial Stage of the Offering. ¶ 82. Third, Telegram ensured that initial purchasers, venture capitalists, acquired substantial quantities of Grams that

would far exceed any purported use of the Grams in whatever ecosystem Telegram promised in the future. All told, Initial Purchasers had an economic incentive to resell quickly upon release to capture profits from their discounted purchase price. Telegram thus understood and intended that the Initial Purchasers would act as conduits for distributing and reselling Grams into the secondary market, and did not take reasonable steps to ensure that Initial Purchasers were not purchasing Grams with an intent to distribute and resell to other investors. To the contrary, Telegram intended all along that Initial Purchasers distribute their Grams as broadly as possible, and all participants understood that success in the venture depended on such broad dissemination. ¶¶ 52, 99-104.

### C. Telegram Did Not Register the Offer and Sale of Grams and Provided Investors with None of the Disclosures Required by the Securities Laws

The federal securities laws require issuers of securities to provide public investors with fulsome disclosures before they are invited to purchase securities. Telegram did not register the Offering of Grams with the Commission. ¶ 46. On February 13 and March 29, 2018, Telegram filed Forms D with the Commission with respect to the Grams Purchase Agreements, claiming that the Grams Purchase Agreements were exempt from the registration requirements of the federal securities laws under Regulation D issued thereunder. ¶¶ 49, 112-13. However, Telegram did not claim an exemption from registration for the Grams themselves and, in any event, the exemption from registration under Regulation D is not available to Telegram. ¶ 113. Nor did Telegram prepare, file, or distribute any other registration statement or disclosure document required under the federal securities laws. ¶ 112.

### D. Violations

The SEC alleges that, by engaging in the acts alleged in the Complaint, Defendants each violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

## II. NECESSITY FOR ISSUANCE OF A LETTER OF REQUEST

### A. The Witness Is Beyond the Court's Compulsory Process and Has Refused to Appear Voluntarily

The SEC moves this Court, pursuant to Fed. R. Civ. P. 28(b),[3] to issue a Letter of Request directed to the Senior Master of the High Court (Queen's Bench Division) of England and Wales, requesting the examination by deposition John Hyman, a citizen and resident of the United Kingdom. The SEC moves for issuance of a Letter of Request because the witness is in the United Kingdom and is not a United States national subject to this Court's compulsory process under Rule 45 of the Federal Rules of Civil Procedure. *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 305 (S.D.N.Y. 2009) ("[F]oreign nationals living abroad are not subject to subpoena service outside the United States.").

The undersigned attempted to secure the voluntary deposition of the witness by contacting his counsel, Greg Campbell, in London, England. After repeated inquiry, Mr. Campbell notified the undersigned that Mr. Hyman would appear voluntarily for a deposition and sought and received potential dates from the undersigned. *See* Ex. 2. In the week that followed, Mr. Campbell has refused to return multiple phone calls and emails regarding Mr. Hyman's deposition. Because of the expedited schedule set forth in this matter, there is an urgent need to seek assistance from the authorities in the United Kingdom as set forth herein.

### B. The Hague Convention

Article 1 of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention" or "the Convention") authorizes a judicial authority

---

[3] Rule 28 provides four ways in which a district court may obtain depositions in a foreign country: "(A) under an applicable treaty or convention; (B) under a letter of request whether or not captioned a 'letter rogatory'; (C) on notice, before a person authorized to administer oaths either by federal law or by the law in the place of examination; or **(D)** before a person commissioned by the court to administer any necessary oath and take testimony." Fed. R. Civ. P. 28(b)(1).

of a signatory state to request the competent authority of another signatory state to obtain evidence by means of a Letter of Request. *See* Hague Convention, 23 U.S.T. 2555, *reprinted in* 28 U.S.C. § 1781. The United Kingdom and the United States are signatories to the Hague Convention. *United Nat'l Ret. Fund v. Ariela Inc.*, 643 F. Supp. 2d 328, 332-33 (S.D.N.Y. 2008) (United States is a signatory to the Hague Convention); *CFTC v. Lake Shore Asset Mgmt. Ltd.*, No. 07 Civ. 3598, 2008 WL 1883308, at *5 (N.D. Ill. Apr. 24, 2008) (the United States and the United Kingdom are signatories to the Hague Convention).[4] Her Majesty's Senior Master of the High Court (Queen's Bench Division) of England and Wales (the "Senior Master") has been designated as the competent authority to receive Letters of Request for execution in the United Kingdom. Thus, this Court may properly issue a Letter of Request to the Senior Master.

The Hague Convention's procedures are available to a court without regard to whether the evidence is sought from third parties, or whether the evidence is located in a foreign state or within control of a party subject to the jurisdiction of the court. *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522, 541 (1987). Accordingly, resort to the Convention's procedures is appropriate since they provide the most effective means by which the SEC may obtain testimony of a United Kingdom witness for presentation at the preliminary injunction hearing and at trial. Finally, although the decision whether to issue any given request for assistance lies within the Court's discretion, *see, e.g.*, *SEC v. Founding Partners Capital Mgmt. Co.*, No. 09 Civ. 229 (JES), 2009 WL 5214974, at *1 (M.D. Fla. Dec. 29, 2009) (citation omitted), most courts recognize that district courts have limited discretion to deny the request. *See, e.g.*, *In re Complaint of Bankers Trust Co.*, 752 F.2d 874,

---

[4] The United States ratified the Hague Convention on October 7, 1972. 23 U.S.T. 2555, T.I.A.S. No. 7444, *reprinted in* 28 U.S.C. § 1781 note.

889-90 (3d Cir. 1984) (trial court has only limited discretion to deny application for issuance of letters rogatory); *Zassenhaus v. Evening Star Newspaper Co.*, 404 F.2d 1361, 1364 (D.C. Cir. 1968) (explaining that "good reason" is required to deny request). In considering whether to grant requests for foreign assistance, the Court should not weigh the evidence sought or determine whether the witness will actually be able to give the requested testimony. *See DMBS Consultants Ltd. v. Computer Assocs. Int'l, Inc.*, 131 F.R.D. 367, 369 (D. Mass. 1990). The question of whether a foreign country's local law would create an obstacle for the request is best dealt with by the receiving foreign court. *See, e.g., Crouch v. Liberty Pride Corp.*, No. 15 Civ. 974 (JS), 2016 WL 4718431, at *2 (E.D.N.Y. Sept. 9, 2016) (granting Letter of Request to United Kingdom under the Convention).

    C.    **Authority of the High Court of England and Wales**

The Senior Master of the High Court (Queen's Bench Division) of England and Wales is the designated competent authority in the United Kingdom to accept any Letter of Request issued by this Court. It is the undersigned's understanding, after consultation with local counsel, that the witness will be afforded rights to assert certain privileges. Additionally, a United Kingdom officer (i.e., an examiner) appointed by the Senior Master will preside over depositions.

**III.    TESTIMONY AND DOCUMENT PRODUCTION SOUGHT IN THE UNITED KINGDOM**

    A.    **Witnesses**

The SEC wishes to obtain testimony from Hyman, who is located in the United Kingdom, was employed by Defendants during the period at issue in the SEC's Complaint, and orchestrated the sales of Grams to Initial Purchasers.

Hyman was instrumental in helping Telegram effect the Offering and has first-hand knowledge about the Offering, the manner in which it was marketed and communicated to

investors, and the nature and extent of Defendants' efforts (if any) to ensure that the Grams sold to Initial Purchasers would not be distributed to the public and, conversely, the nature and extent of Defendants efforts (if any) to effect a wide distribution of Grams to the public, in part, through the Initial Purchasers.  For example, in an early January 2018 email exchange between Pavel Durov ("Durov"), Telegram's founder and co-owner, and a representative for an eventual United States-based investor in Grams, Durov called Hyman the chief investment advisor for Telegram and suggested a meeting between Durov, Hyman, and the investor's representative.  *See* Ex. 3 at 1.  Around the same time, Durov emailed another U.S.-based potential investor, introduced him to Hyman (whom he again called chief investment advisor at Telegram), and stated that Hyman "has all the knowledge regarding the current status of the private sale of TON and will be happy to share it . . . ." Ex. 4 at 1.  To another representative of an eventual U.S.-based investor, Pavel said Hyman "runs the distribution of Grams."  Ex. 5 at 1; *see also* Ex. 6 at 1 (Durov telling another U.S.-based investor that "John [Hyman]. . . is in charge of the [TON ICO] process").

The evidence shows that Hyman did in fact communicate with over a dozen investors regarding the sale of Grams, including to allocate investments among the Initial Purchasers, Ex. 7, field questions about Telegram itself and the Offering, *e.g.*, Ex. 8, and provide investors with updates about Telegram's fund-raising efforts, *e.g.*, Exs. 9, 10.  The evidence shows that Hyman possesses unique knowledge about Telegram's plans to effectuate a public Offering of Grams and its execution during 2018.  *See, e.g.*, Ex. 11 at 1 (May 2018 email from Hyman explaining "[w]e decided for regulatory reasons that we will never do any form of direct public offering, . . . the public will be able to buy grams once network is working . . . not from Telegram directly").

Not only was Hyman Telegram's chief investment advisor with respect to the Offering, he himself became an investor in Grams in early 2018, while he was helping Telegram raise funds from Initial Purchasers. *See* Ex. 12.

Hyman also had developed first-hand knowledge about the interest of investors in trading in Grams. For example, in connection with his role as Telegram's chief investment advisor, Hyman was asked to answer questions from an Initial Purchaser about how "the everyday consumer [will] acquire GRAMs," and whether there would be "an easy way" for a user who "wants to convert GRAMs to fiat." Ex. 13. And, in February of 2018, while Hyman was busy determining the level of allocation for initial purchasers of Grams, Hyman was investigating and aware of an emerging secondary market for trading in Grams, before even the Deadline Date. One representative of a U.S.-based investor in Grams texted Hyman that "last week the secondary market [for Grams] was c. 0.70 and holding steady." Ex. 14 at 16 (row 224). Hyman promptly replied: "Thanks please keep me posted on [Grams]." *Id.* (row 225). That individual continued to update Hyman on "demand [for Grams] flowing in to the secondary market" and that "[s]ome [were] willing to pay up to $1," to which Hyman responded: "Thanks for update" and "How was today market wise." *Id.* at 18 (rows 239, 241-242); *see also id.* at 19 (row 263 (Hyman asking "Any grey market activity in TON[?]")); *id.* at 20 (row 270 (Hyman: "Hi Stan have you seen any grey market gram activity if so at what prices"). The text log between Hyman and this individual indicates that they spoke a number of times on the phone. *E.g.*, *id.* at 18 (rows 245, 247-48, 251-52); 20 (rows 270, 282-83); 23 (rows 316, 318).

Finally, and even though he appears to no longer be employed at Telegram, Hyman has maintained an active role with respect to Grams up to the present, with specific involvement in efforts to create a secondary market for trading in Grams. Hyman appears to be currently

9

employed at a Swiss entity known as Gram Vault ("Gram Vault"). *E.g.*, Exs. 15, 16. In a June 2019 email, copying Hyman, from the CEO of Gram Vault to a U.S.-based investor, the CEO explained that "Gram Vault is a provider of safekeeping, trading and staking services to investors in the Telegram blockchain." Ex. 15 at 4. In that email, Hyman was introduced as being "from Telegram." *Id.* Indeed, as recently as September 18, 2019, Hyman emailed another U.S-based investor in Grams, from a Gram Vault email address, telling the investor he "wanted to update [him] on the progress of the Telegram project," that "*[w]e* are now very close to launch of the Telegram Open Network and the grams you invested in," and that he wished to discuss "trading mechanics of the grams" with the investor. Ex. 16 at 1 (emphasis added).

The foregoing demonstrates that Hyman's testimony is critical to a variety of issues at the heart of this litigation. First, Hyman's testimony is relevant to the issue of whether or not Grams are securities under *SEC v. J.W. Howey & Co.*, 328 U.S. 293 (1946). As the Supreme Court has explained, the *Howey* test asks, among other things, "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and *the economic inducements held out to the prospect*." *SEC v. United Ben. Life Ins. Co.*, 387 U.S. 202, 211 (1967) (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-353 (1943)) (emphasis added). Accordingly, "[c]onsistent with *Howey*'s focus on substance over form, [courts] look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (citing *Merchant Cap.* 483 F.3d at 756-57); *see also SEC v. Arcturus*, 928 F.3d 400, 411 n.13 (5th Cir. 2019). (describing as "unpersuasive" the contention that district court could not consider evidence of post-investment conduct to determine *Howey* analysis and collecting cases); *Slevin v. Pedersen Assocs., Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y. 1982) ("The original intention of the parties is

crucial to the classification of their contract [as an investment contract or otherwise]."). Accordingly, the representations that Hyman may have made to the Initial Purchasers of Grams are relevant to the dispute before the Court about the status of Grams as investment contracts.

In this litigation, Telegram has also asserted that Grams are not investment contracts under *Howey* because Grams have "uses" other than as investment vehicles. It has also asserted that the sale of the purchase agreements (but not of Grams) is exempt from Section 5 of the Securities Act under Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c) (*see* Telegram Answer (D.E. 37 ¶ 51). Regulation D, however, requires, among other things, Telegram to undertake reasonable care that purchasers are not acquiring with an intent to distribute the securities in a public offering and to ensure that securities purchased in the private transaction may not be resold absent registration under Securities Act, or pursuant to a valid exemption therefrom. *Id.* § 502(d). Hyman's testimony is relevant to Telegram's asserted defenses. Specifically, there is evidence that while Hyman was Telegram's chief investment advisor—soliciting and raising funds for the Grams Offering—he was also keeping an active eye on the already-developing Grams' secondary market. *See generally* Ex. 14. And Hyman was asked questions evidencing investors' intentions with respect to Grams—to liquidate them, rather than to "use" them as a currency or otherwise. *E.g.*, Ex. 13. Finally, to the extent that Hyman continues to be involved with Telegram's and others' efforts with respect to Grams, including "providing . . . trading . . . services to investors" in Grams, Ex. 15, his testimony is relevant to Telegram's claimed future "use" of Grams as something distinct from investment contracts, subject to fulsome disclosures.

**B.   Documents**

The SEC also requests that Hyman be ordered to produce documents and communications in his possession, custody, and control relating to the foregoing topics. These

11

include private text or messaging app conversations between Hyman and other individuals, such as the one set forth in Exhibit 14, and any documents that Hyman currently has in his possession, custody, or control regarding the services his current employer is providing with respect to "trading mechanics of [G]rams." Ex. 16. These documents are relevant to the claims and defenses at issue in this case for the same reasons Hyman's testimony is relevant.

Accordingly, the SEC respectfully requests that Hyman be ordered to produce (1) the communications via texts or messaging apps, between January 1, 2018, and the present, between Hyman and any of the following Telegram employees who participated in the Offering: Pavel Durov, Shyam Parekh, and Ilya Perekopsky; (2) the communications, between January 1, 2018, and the present, between Hyman and the entities who invested in the Offering for whom he served as chief investor advisor to Telegram; (3) communications, between May 1, 2018, and the present, between Hyman and any employee of Gram Vault with respect to the Offering or to Grams; (4) documents, dated between February 1, 2018, and the present, regarding Hyman's own investment in Grams; and (5) the written agreements, and communications evidencing agreements, governing the relationship between Hyman and Telegram.

## IV.    CONCLUSION

Because the SEC has demonstrated that the Convention's procedures are likely to provide access to evidence that will be admissible and relevant at the preliminary injunction hearing and the trial of this civil action, and because the testimony and documents sought are necessary in order for the Court to do justice in this case, the SEC respectfully requests that the Court issue the proposed Order granting the SEC's Application.

Dated: New York, New York
       December 5, 2019

_____
Jorge G. Tenreiro
Kevin P. McGrath

12

                                        Ladan F. Stewart  
                                        Attorneys for Plaintiff  
                                        SECURITIES AND EXCHANGE  
                                        COMMISSION  
                                        New York Regional Office  
                                        200 Vesey Street, Suite 400  
                                        New York, New York 10281  
                                        (212) 336-9145 (Tenreiro)  
                                        TenreiroJ@sec.gov