Skadden, Arps, Slate, Meagher & Flom llp

ONE MANHATTAN WEST

NEW YORK 10001-8602
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(212) 735-2129
DIRECT FAX
(917) 777-2129
EMAIL ADDRESS
ALEXANDER.DRYLEWSKI@SKADDEN.COM

March 31, 2020

**BY ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

RE:   *SEC v. Telegram Group Inc., et al.*, 19-cv-9439 (PKC)(S.D.N.Y.)

Dear Judge Castel:

On behalf of Defendants, we respectfully write in further support of our March 27, 2020 letter (ECF 229) and in response to the SEC's letter (ECF 230). The SEC's letter misconstrues the law and the record.

First, Telegram's request is not "procedurally barred." (SEC Letter at 1.) Under Rule 62(d) of the Federal Rules of Civil Procedure, "the Court's power to preserve the status quo includes the power to clarify the terms of an injunction." *Flatiron Health, Inc. v. Carson*, 2020 WL 416423 at *3 (S.D.N.Y. Jan. 27, 2020). Thus, a party may seek to clarify the scope of an injunction at any time. *See Broker Genius, Inc. v. Seat Scouts LLC*, 2019 WL 5203474, at *3 (S.D.N.Y. Sept. 23, 2019); *see also Abdi v. Nielsen*, 287 F. Supp. 3d 327, 333 (W.D.N.Y. 2018). In fact, courts have modified injunctions after a request for clarification in similar circumstances. *See, e.g.*, *Eli Lilly & Co. v. Arla Foods Inc.*, 2017 WL 5244681, at *1 (E.D. Wis. July 18, 2017) ("[A] modification of the injunction will preserve the status quo by clarifying for the parties precisely what [defendant] is, and is not, enjoined from . . . [and] is therefore within the scope of this court's authority pursuant to Rule [62(d)]."), *aff'd*, 893 F.3d 375 (7th Cir. 2018).

The SEC incorrectly suggests that Telegram's letter raised the *Morrison* issue "for the first time in this litigation." (SEC Letter at 1.) The SEC ignores that Telegram pleaded in its Answer and Affirmative Defenses that the SEC

Hon. P. Kevin Castel
March 31, 2020
Page 2

"lacks extraterritorial authority over any of the transactions between Telegram and foreign purchasers." (ECF 37 at 34.) The SEC never moved to strike that defense, despite having moved to strike other affirmative defenses. (*See* ECF 70.) In addition, the Court did not grant the SEC's motion to enjoin "Telegram from 'delivering any Grams to *any* person or entity or taking *any other steps* to effect *any* unregistered offer or sale of Grams,'" as the SEC contends. (SEC Letter at 1 (emphasis in original).) Rather, the Order "prohibit[s] the delivery of Grams to the Initial Purchasers" because the Court found that there was no proper exemption for the Private Placement. (Order at 43.) Accordingly, Telegram respectfully submits that the preliminary injunction cannot apply extraterritorially to Purchase Agreements with foreign investors entered outside of the United States, as they involved a foreign issuer, foreign investor, and contracts entered into abroad under foreign law. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012).

The SEC's response on the substantive law is equally without merit. As explained in Defendants' March 27 letter, the Second Circuit has made clear that *Morrison* creates a presumption against extraterritoriality, and sets forth a "transactional test" that looks to whether a transaction is one "in securities listed on domestic exchanges [or] domestic transactions in other securities," *Absolute Activist*, 677 F.3d at 66, 69-70 — it is insufficient to point merely to a party's location, as the SEC attempts to do with respect to future hypothetical purchasers of Grams. *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215-216 (2d Cir. 2014) (a domestic transaction "is not alone sufficient to state a properly domestic claim under" *Morrison*); *see also Sullivan v. Barclays PLC*, 2017 WL 685570, at *29-30 (S.D.N.Y. Feb. 21, 2017) (Castel, J.) (plaintiffs failed to allege a domestic transaction when they asserted only that they were U.S. residents and entered into futures contracts on U.S. terminals).

The SEC does not contest that the limitations set forth in *Morrison* apply to its claim under Section 5. Rather, the SEC argues that "Telegram is about to engage in an unregistered sale of securities into the United States markets to United States investors." (SEC Letter at 2.) But, unsurprisingly, the SEC does not cite any authority for that proposition, and cannot dispute that if Defendants, who are non-U.S. entities, enter into contracts outside of the United States with strictly non-U.S. counterparties to deliver a security abroad, then *Morrison* dictates that the U.S. securities laws cannot apply to those transactions. By arguing otherwise, the SEC seeks to improperly expand the federal securities laws to foreign transactions where the only conceivable nexus to the United States is the potential that the instrument may be purchased by U.S. purchasers in the future. That is simply a repackaging of the now-defunct "conducts and effects" test. *See Absolute Activist*, 677 F.3d at 70

Hon. P. Kevin Castel
March 31, 2020
Page 3

("[A]llegations that the Funds were heavily marketed in the United States and that United States investors were harmed by the defendants' actions, while potentially satisfying the now-defunct conduct and effects test, [] do not satisfy the transactional test announced in *Morrison*."); *see also In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 473 (S.D.N.Y. 2013) (assertion that "buy orders were placed from the United States and the injuries were suffered in the United States" is "predicated on precisely the approach the Supreme Court rejected in *Morrison*").[1]

Finally, the SEC argues that "Telegram paid commissions to foreign brokers to find new investors [and] those brokers solicited investors in the United States." (SEC Letter at 2.) This is unsupported by the record and ultimately irrelevant to the question at hand. Telegram entered into a limited number of "finder's fee" arrangements with certain foreign counterparties in order to find potential investors, with whom Telegram would then negotiate and enter into Purchase Agreements. (Def. 56.1 Resp. ¶¶ 318-31 (ECF No. 95); Def. Counter 56.1 Resp. ¶¶ 101-10, 124-27, 143-45 (ECF. No. 120).) The agreements expressly stated that the finders would only engage with purchasers in "jurisdictions agreed between the parties," which at all times *excluded* the United States. (Def. Counter 56.1 Resp. ¶¶ 110, 124, 143.) The agreements also stated that the counterparties "shall not solicit, engage with or negotiate with any Potential Investor in any jurisdiction in a manner in which to do so would constitute a violation of the relevant laws or regulations of that jurisdiction," and the record reflects that any third party finders did not have authority to create or distribute marketing materials, and Telegram did not approve such materials. (PX112 at 2; PX138 at 2; PX174 at 2; *see also* Def. Counter 56.1 Resp. ¶¶ 110, 124, 143; Def. 56.1 Resp. ¶¶ 320, 326.) The SEC also fails to inform the Court that the SEC obtained all of the invoices through which companies charged Telegram for their finding services, which reflect that *all* of the investors that were "found" and entered Purchase Agreements with Telegram are non-U.S. entities. (PX175; PX176; PX188; Malloy Ex. 11.)

Regardless, under the Order Telegram would still be enjoined from delivering Grams to the U.S. purchasers. But that does not provide a basis to sweep *all* of Telegram's foreign Purchase Agreements with non-U.S. purchasers within the

---

[1] *See also In re Societe Generale Sec. Litig.*, 2010 WL 3910286, at *6 (S.D.N.Y. Sept. 29, 2010) ("By asking the Court to look to the location of 'the act of placing a buy order,' and to ... 'the place of the wrong,' Plaintiffs are asking the Court to apply the conduct test specifically rejected in *Morrison*."); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 624 (S.D.N.Y.2010) ("[T]o carve out of the new rule [Plaintiffs'] purchase ... of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test.").

reach of the U.S. securities laws, contrary to *Morrison* and Second Circuit precedent. *Parkcentral*, 763 F.3d at 215-216 (rejecting application of U.S. securities laws "to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it"); *see also Banco Safra S.A. - Cayman Islands Branch v. Samarco Mineracao S.A.*, 2019 WL 2514056, at *1, 5-6 (S.D.N.Y. June 18, 2019) (transaction between Brazilian/Cayman Island plaintiff and Brazilian defendant was not a "domestic transaction" despite the use of US-based brokers and bank accounts); *see also Loginovskaya v. Batratchenko*, 764 F.3d 266, 273-75 (2d Cir. 2014).[2]

       Defendants respectfully request that the Order be clarified to exclude Telegram's delivery of Grams to non-U.S. purchasers who entered into Purchase Agreements outside of the United States, as required under controlling law.

                           Respectfully submitted,

                           /s/ Alexander C. Drylewski

cc:     All counsel of record (by ECF)

---

[2] The SEC attaches what purports to be the banking records of two third parties, which it suggests reflect "millions of dollars from investors, including some in the United States." (SEC Letter at 2; Ex. B.) But even if the records are relevant (and they are not), the SEC does not explain how these documents show such transactions. One of the third parties is a venture capital firm. (SEC 56.1 ¶ 138 (ECF No. 80).) The SEC makes no attempt to identify which payments made to and from that entity relate to the TON project, as opposed to any other business activities, let alone purported purchases of interests in Grams by U.S. purchasers.