UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SECURITIES AND EXCHANGE COMMISSION, :
                                     :   19 Civ. 9439 (PKC)
                Plaintiff,    :
                                      :   **ECF Case**
        -against-        :
                                      :   **Electronically Filed**
TELEGRAM GROUP INC. and TON ISSUER  :
INC.,                                    :
                                      :
                Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### PLAINTIFF'S RESPONSE AND COUNTER-STATEMENT
### TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT,
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jorge G. Tenreiro
Kevin P. McGrath
Ladan F. Stewart
Alison R. Levine

Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

January 21, 2020

# TABLE OF CONTENTS

Page

I.   Blockchains and Digital Currencies ................................................................... 1

    A.   Blockchains ................................................................................................ 1

    B.   Digital Currencies .................................................................................... 6

    C.   Problems with Current Blockchains and Their Cryptocurrencies ............ 10

II.  Telegram Decides to Create a Better Blockchain ............................................ 11

    A.   Telegram and its Founders ...................................................................... 11

    B.   The TON Blockchain and Grams ............................................................ 14

    1.   Features of the TON Blockchain ............................................................. 18

    2.   Validation ................................................................................................ 25

    C.   Telegram Conducts a Private Placement ................................................ 30

    1.   Round 1 of the Private Placement ........................................................... 36

    2.   Round 2 of the Private Placement ........................................................... 38

    3.   KYC Processes ........................................................................................ 39

        (a)   Lawson Conner KYC .......................................................................... 41

        (b)   Credit Suisse KYC .............................................................................. 41

        (c)   Rep Letters ........................................................................................... 41

    D.   The Private Placement Materials ............................................................ 53

    E.   The Purchase Agreements ....................................................................... 62

    1.   Public Availability of the Private Placement Materials .......................... 75

III. Development of the TON Blockchain .............................................................. 77

    A.   The TON Foundation and TON Reserve ................................................ 81

    B.   Contemplated Launch and Creation of Grams ........................................ 89

    C.   The TON Beta Version and Early Third Party Developments ................ 90

i

IV.  Telegram's Public Communications........................................................102

V.  Telegram Sought Guidance from and Actively Engaged With the SEC ........................106

COMMISSION'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS ........111

A.  Telegram's Claims that It May No Longer Support "TON" After Launch
    Contradict Its Past Promises to Investors........................................................111

        i.  Telegram's Pre-Litigation Statements ........................................111

        ii.  Telegram's January 6, 2020 Public Notice ................................114

        iii.  Telegram Has Not Committed to Walking Away from TON and
              Has Always Sought to Retain Its "Flexibility" ........................115

B.  Telegram Has Put Forth No Evidence Regarding the TON Blockchain's State of
    Development at Launch ........................................................................117

        i.  Telegram Marketed Few, if Any, Expected Uses for Grams..................117

        ii.  Telegram Set Out to Create a Revolutionary Blockchain Based on
              Ambitious Technological Goals ........................................119

        iii.  Many Have Expressed Doubts from the Start about Telegram's
              Ability to Create the TON Platform It Marketed....................120

        iv.  Telegram Does Not Claim—in Its Submissions to the Court, in the
              Public Notice, or Elsewhere—that, Upon Launch, the TON
              Blockchain Will Operate as Originally Envisioned.................123

C.  Telegram's Sales of Grams to Initial Purchasers Were the First Step in Its
    Intended Public Distribution of Grams ........................................................125

        i.  The Built-In Pricing Mechanism for Grams Incentivized Initial
              Purchasers to Sell Grams in the Secondary Market....................125

        ii.  Initial Purchasers Planned to Sell—and Some Did Sell—Grams for
              Profit in the Secondary Market ........................................129

        iii.  Telegram Paid Millions of Dollars to Promoters, Themselves Also
              TON Initial Purchasers, To Find Other Initial Purchasers.................132

        1.  ATON 132

        2.  Da Vinci Capital ........................................................135

        3.  Space Investments and Liquid ........................................138

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and Section 4.G. of this Court's Individual Practices, Plaintiff Securities and Exchange Commission (the "Commission"), submits this Response to Defendants Telegram Group Inc. ("Telegram") and TON Issuer Inc. ("TON Issuer" and collectively with Telegram, "Defendants"), Local Rule 56.1 Statement in Support of Their Motion for Summary Judgment.[1]

To the extent the Commission does not controvert particular assertions by Defendants, the Commission does not thereby concede that any such uncontroverted assertion constitutes a material fact, or that the cited evidence would be admissible at trial.  Nor does it thereby admit the truth of those assertions for purposes other than resolution of this Motion. To the extent that the Commission does not controvert assertions that a witness testified to a particular fact, the Commission does not thereby concede that the witness is credible on that point or that the fact to which the witness testified is not disputed.  The Commission does not hereby respond to the assertions of fact made in the subheadings.

# I.    BLOCKCHAINS AND DIGITAL CURRENCIES

## A.    Blockchains

1.      A blockchain is a ledger.  McKeon Ex. 1 ¶¶ 26-27.

**Commission Response**: The Commission does not controvert the assertion contained in Paragraph 1.

---

[1] "Stips." means the Parties' Stipulation (D.E. 72) and "JX" the Exhibits thereto.  "Counter 56.1" means the SEC's Local Rule 56.1 Counter-Statement.  "DX" means Exhibits to the Declaration of Alex Drylewski (D.E. 73). "PX" means Exhibits to the Decl. of Ladan Stewart, dated January 15, 2020 (D.E. 81) or Exhibits to the Decl. of Ladan Stewart, dated January 21, 2020.  "SEC 56.1" and "Def. 56.1" mean the parties' statements of undisputed facts (D.E. 80, 75).  Other capitalized terms not defined shall have the meaning ascribed to them in the SEC's SJ Br. (D.E. 79). "Def. Br." means Defs.' Mem. L. in Supp. of their Mot. for Summ. J. and in Opp. to the SEC's App. for a Prelim. Inj. (D.E. 71).  References to "SEC Counter 56.1" are to Plaintiff's Counter Statement of Undisputed Facts starting at page 111 below.

2.      A ledger is a mechanism that is used to reach consensus and agreement about a set of facts, serving as the source of truth regarding the current and historical state of accounts, transactions, and/or events.  McKeon Ex. 1 ¶ 26.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 2.

3.      In contrast to standard ledgers, a blockchain is decentralized and distributed, meaning the ledger is maintained by multiple parties, often referred to as validators, miners, and/or nodes.  McKeon Ex. 1 ¶ 26.

Commission Response: The Commission objects to the assertions contained in Paragraph 3 on the ground that the terms "decentralized" and "distributed" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim that purports to apply to all blockchains without any factual basis to do so.

4.      These parties (validators, miners, and/or nodes) manage and operate the blockchain network.  McKeon Ex. 1 ¶ 27.

Commission Response: The Commission objects to the assertion contained in Paragraph 4 on the ground that the terms "manage" and "operate" are vague and ambiguous and disputes the assertion on the ground that the cited reference to the McKeon Report does not support the assertion with any facts but instead consists solely of a conclusory claim that purports to apply to all blockchain networks without any factual basis to do so.

5.      A public blockchain ecosystem typically consists of core blockchain developers and/or an ecosystem foundation (organizations that contribute to open source development by

funding projects by third party developers and/or contributing to core protocol development), validators, application and services developers, and users.  McKeon Ex. 1 ¶ 78.

          <u>Commission Response</u>: The Commission objects to the assertions contained in Paragraph 5 on the ground that the phrases "public blockchain ecosystem" "core  blockchain developers" "ecosystem foundations" "core protocol development" "manage" and "operate" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim that purports to apply to all public blockchain ecosystems without any factual basis to do so.

6.      These categories of participants are not mutually exclusive.  McKeon Ex. 1 ¶ 79.

          <u>Commission Response</u>: The Commission disputes the assertion contained in Paragraph 6 on the ground that the cited reference to the McKeon Report does not support the assertion with any facts but instead consists solely of a conclusory claim that purports to apply to all public blockchain ecosystems without any factual basis to do so.

7.      In a blockchain network, transactions are grouped together over some time interval and posted to the ledger in "blocks."  McKeon Ex. 1 ¶ 27.

          <u>Commission Response</u>: The Commission objects to the assertions contained in Paragraph 7 on the ground that the phrase "blockchain network" is vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim that purports to apply to all blockchain networks without any factual basis to do so.

8.      Each "block" is cryptographically linked to the previous block, creating an unbroken chain of valid transactions, hence the term "blockchain."  McKeon Ex. 1 ¶ 27.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 8.

9.     Many blockchains are described as "decentralized," meaning that any ongoing governance and oversight of the ledger is not conducted by a single or centralized source, but rather by a decentralized community of users.  McKeon Ex. 1 ¶ 27.

Commission Response: The Commission objects to the assertions contained in Paragraph 9 on the ground that the terms "decentralized," "governance" and "oversight" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim that purports to apply to "many blockchains" without any factual basis to do so.

10.    Decentralization eliminates the existence of a central point of failure, thereby generating ledgers that are more resistant to manipulation or control by a single party. McKeon Ex. 1 ¶ 28.

Commission Response: The Commission objects to the assertions contained in Paragraph 10 on the ground that the terms "decentralization," and "central point of failure" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim that decentralization generates ledgers more resistant to manipulation or control by a single party without any factual support.

11.    Decentralization reduces the ability of centralized parties to extract rents from users of the ledgers.  McKeon Ex. 1 ¶ 28.

Commission Response: The Commission objects to the assertion contained in Paragraph 11 on the ground that the term "decentralization," is vague and ambiguous and

4

disputes the assertion on the ground that the cited reference to the McKeon Report does not support the assertion with any facts but instead consists solely of a conclusory claim without any factual support.

12.     Decentralization incentivizes broad based participation by third party software developers to create applications that utilize the ledger and expand its functionality.  McKeon Ex. 1 ¶ 28.

Commission Response: The Commission objects to the assertion contained in Paragraph 12 on the ground that the term "decentralization" is vague and ambiguous and disputes the assertion on the ground that the cited reference to the McKeon Report does not support the assertion with any facts but instead consists solely of a conclusory claim without any factual support.

13.     A "smart contract" is software code, incorporated into certain blockchain protocols, that executes an outcome automatically based on a set of pre-specified conditions. McKeon Ex. 1 ¶ 31.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 13.

14.     Smart contracts control the value to be exchanged in a given transaction. McKeon Ex. 1 ¶ 31.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 14.

15.     In a blockchain protocol that includes smart contracts, the ledger is recording not only accounts and balances, but also the state of the contracts.  McKeon Ex. 1 ¶ 32.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 15.

16.     The typical essential function of a blockchain is the processing of transactions and posting them to the ledger, commonly referred to as "validation."  McKeon Ex. 1 ¶ 79.

Commission Response: The Commission objects to the assertions contained in Paragraph 16 on the ground that the phrase "typical essential function" is vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

17.     The "validation" function is performed by validators.  McKeon Ex. 1 ¶ 79.

Commission Response: The Commission does not controvert the assertion contained in Paragraph 17.

18.     Validators are typically compensated for performing their work in the form of cryptoassets.  McKeon Ex. 1 ¶ 80.

Commission Response: The Commission does not controvert the assertion contained in Paragraph 18.

19.     In order to achieve consensus regarding the validity of transactions within a block, an algorithm must exist that makes it difficult for validators to post invalid blocks. McKeon Ex. 1 ¶ 81.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 19.

**B.     Digital Currencies**

20.     Digital assets, or "cryptoassets," are units of account that are native to blockchains.  McKeon Ex. 1 ¶ 33.

6

Commission Response: The Commission does not controvert the assertions contained in Paragraph 20.

21.     Digital currencies, or "cryptocurrencies," are a subset of cryptoassets that are used to store value or as a medium of exchange.  McKeon Ex. 1 ¶ 33.

Commission Response: The Commission objects to the assertions contained in Paragraph 21 on the ground that the terms "digital currencies," "cryptocurrencies," "value" and "medium of exchange" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

22.     Bitcoin was the first decentralized cryptocurrency.  McKeon Ex. 1 ¶ 33.

Commission Response: The Commission objects to the assertion contained in Paragraph 22 on the ground that the term "decentralized cryptocurrency" is vague and ambiguous and disputes the assertion on the ground that the cited reference to the McKeon Report does not support the assertion with any facts but instead consists solely of a conclusory claim without any factual support.

23.     Ether is another cryptocurrency, which is the native asset of the Ethereum blockchain.  McKeon Ex. 1 ¶ 49.

Commission Response: The Commission objects to the assertions contained in Paragraph 23 on the ground that the term "cryptocurrency" is vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

7

24.     In contrast to fiat currencies, which are those managed by central banks, cryptocurrencies can be transferred solely by software, removing third party intermediation from the transaction.  McKeon Ex. 1 ¶ 34.

        Commission Response: The Commission objects to the assertions contained in Paragraph 24 on the ground that the term "cryptocurrencies" and the phrase "third party intermediation" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

25.     Ownership of cryptocurrency is proven through possession of "private keys." McKeon Ex. 1 ¶ 35.

        Commission Response: The Commission objects to the term "cryptocurrency" on the ground that it is vague and ambiguous.  Subject to and without waiving that objection, the Commission does not otherwise controvert the assertion contained in Paragraph 25.

26.     A "private key" is similar to a password.  McKeon Ex. 1 ¶ 35.

        Commission Response: The Commission does not controvert the assertion contained in Paragraph 26.

27.     Users of a blockchain and its native assets store private keys in a "digital wallet." McKeon Ex. 1 ¶ 35.

        Commission Response: The Commission does not controvert the assertions contained in Paragraph 27.

28.     A "digital wallet" is similar to a bank account, but rather than being maintained by a bank, a digital wallet is simply a piece of software through which custody of the assets remains with the user.  McKeon Ex. 1 ¶ 35.

8

Commission Response: The Commission does not controvert the assertions contained in Paragraph 28.

29.     Blockchain ledgers record the addresses of digital wallets and the balance of any unspent native assets in each account.  McKeon Ex. 1 ¶ 30.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 29.

30.     Cryptocurrencies are a completely separate yet similar method for recording and transferring value and ownership in comparison to traditional fiat currencies.  McKeon Ex. 1 ¶ 36.

Commission Response: The Commission objects to the assertions contained in Paragraph 30 on the ground that the terms "cryptocurrencies" and "value" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

31.     Cryptocurrencies possess functionality with regard to electronic transmission of value that is not easily replicated within systems that administer transmission of value via fiat currencies.  McKeon Ex. 1 ¶ 36.

Commission Response: The Commission objects to the assertions contained in Paragraph 31 on the ground that the terms "cryptocurrencies" and "functionality" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

9

32.     Blockchains and cryptocurrencies facilitate types of digital commerce that are cost prohibitive or functionally challenging with fiat currency.  McKeon Ex. 1 ¶ 45.

  Commission Response: The Commission objects to the assertions contained in Paragraph 32 on the ground that the terms "blockchains" and "cryptocurrencies" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

### C. Problems with Current Blockchains and Their Cryptocurrencies

33.     Currently available cryptocurrencies, such as Bitcoin and Ether, have problems relating to their scalability (the ability to increase transaction volume), transactions speeds, and usability.  McKeon Ex. 1 ¶ 50.

  Commission Response: The Commission objects to the assertions contained in Paragraph 33 on the ground that the terms "cryptocurrencies" and "usability" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

34.     In particular, the consensus mechanism for validation known as "Proof of Work," which is used by both Bitcoin and Ethereum, inherently suffers from problems relating to resource consumption and scalability.  McKeon Ex. 1 ¶ 83.

  Commission Response: The Commission disputes the assertions contained in Paragraph 34 on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

35.     Bitcoin and Ethereum's Proof of Work systems also suffer from a lack of decentralization of the primary function of the network—block production—due to mining pools.  McKeon Ex. 1 ¶¶ 172-73.

     Commission Response: The Commission objects to the assertions contained in Paragraph 35 on the ground that the phrases "lack of centralization," "primary function of the network," and "mining pools" are vague and ambiguous and disputes the assertions on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of a conclusory claim without any factual support.

## II.     TELEGRAM DECIDES TO CREATE A BETTER BLOCKCHAIN

### A.     Telegram and its Founders

36.     In approximately 2006, Pavel Valeryvich Durov founded VKontakte, a social media networking application based in Russia that is similar to Facebook.  Joint Stipulation of Undisputed Facts ("JSF") ¶ 9, filed concurrently herewith.

     Commission Response: The Commission does not controvert the assertions contained in Paragraph 36.

37.     Pavel served as the CEO of VKontakte starting in 2006.  Drylewski Ex. 1 at 1; JSF ¶ 10.

     Commission Response: The Commission does not controvert the assertions contained in Paragraph 37.

38.     In 2014, Pavel was named the most promising Northern European leader under 30 by the Nordic Business Forum. Drylewski Ex. 1, Nordic Business Forum article; JX7, Primer at 21.

     Commission Response: The Commission does not controvert the assertions contained in Paragraph 38.

11

39.     Dr. Nikolai Durov, Pavel's brother, served as the lead developer of VKontakte starting in 2006.  JSF ¶ 11.

       <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 39.

40.     Nikolai has Ph.D.'s from Bonn University and Saint-Petersburg State University. JSF ¶ 12.

       <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 40.

41.     Nikolai is the Chief Technology Officer of Telegram and an accomplished mathematician and programmer who has won two World Championships in programming and three Gold Medals in the International Mathematical Olympiads, among other achievements. JSF ¶¶ 8, 12.

       <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 41.

42.     Telegram was founded in 2013 by Pavel and Nikolai.  JSF ¶ 16.

       <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 42.

43.     Telegram Messenger has 300 million monthly users, as of October 2019.  ECF No. 1 ¶ 16.

       <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 43.

44.     Telegram operates Telegram Messenger without profit motive.  JX8, Pre-Sale Primer, at TG-001-00000058.

Commission Response: The Commission disputes the assertion contained in Paragraph 44 on the ground that Telegram by its own admission raised approximately $1.7 billion from the Initial Purchasers and it did so in part by touting its Telegram Messenger application and Messenger's growing customer base as a means of driving demand for Grams. JX8, Pre-Sale Primer, at TG-001-00000059. ("These users can provide the required critical mass to push cryptocurrencies towards widespread adoption.")

45.     Pavel Durov is the Chief Executive Officer ("CEO") of Telegram. JSF ¶ 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 45.

46.     Pavel and Nikolai determined that limitations inherent in existing cryptocurrencies, including slow transaction speeds, inability to scale, and poor user interfaces, would prevent the widescale adoption of these currencies for consumptive use. See Drylewski Ex. 2, Pavel Durov Deposition ("Durov Dep.") at 293:18-294:15.

Commission Response: The Commission objects to the term "cryptocurrencies" used in Paragraph 46 on the ground that it is vague and ambiguous. Subject to and without waiving this objection, the Commission does not controvert the assertions contained in Paragraph 46 to the extent that they purport to state what Pavel and Nikolai concluded, but disputes that these conclusions were correct given that the cited testimony does not contain factual support for these conclusions.

47.     Pavel and Nikolai instead set out to design a new distributed ledger technology that would dramatically reduce transaction time, as well as be fully scalable and user friendly. JSF ¶ 37; Drylewski Ex. 2, Durov Dep. at 293:18-294:15.

Commission Response: The Commission disputes the assertions contained in Paragraph 47 on the ground that the cited reference to JSF ¶ 37 does not support the claim that Pavel and Nikolai set out to design a new distributed ledger technology but only that they stated that they wished to develop such a technology, which the Commission does not controvert.

48.     Pavel and Nikolai also wanted to create a native asset on their blockchain that could develop into a truly mass-market cryptocurrency.  JSF ¶¶ 139, 141; Drylewski Ex. 2, Durov Dep. at 293:18-294:15.

Commission Response: The Commission objects to the term "cryptocurrency" used in Paragraph 48 on the ground that it is vague and ambiguous.  The Commission disputes the assertions contained in Paragraph 48 on the ground that the cited reference to JSF ¶ 139 does not support the claim that Pavel and Nikolai wanted to create a "mass-market cryptocurrency" but instead that, from at least the initiation of the Offering, they hoped that Grams would achieve a wide user base beyond the Initial Purchasers, which the Commission does not controvert.

**B.     The TON Blockchain and Grams**

49.     In 2017, Telegram began developing a new blockchain network, the "Telegram Open Network" or "TON Blockchain."  Drylewski Ex. 3, Public Notice.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 49.

50.     The TON Blockchain will be decentralized after it is launched.  McKeon Ex. 1 ¶¶ 19, 188-93.

Commission Response: The Commission disputes this assertion.  It is not supported by the referenced citations to the McKeon Report.  McKeon admitted in his report that: "I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer, which would be required to conduct such a review."

14

McKeon Ex. 1 ¶ 14. Instead, McKeon merely assumes, for purposes of rendering other opinions unrelated to the actual state of the TON Blockchain at launch, that the TON Blockchain will have the features Telegram claims it will have. "First, I assume that at the time of the contemplated public distribution of Grams, TON will be fully operational and have governance structure, consensus protocol, block validation mechanism, decentralized services and other features as described in the materials I reviewed and relied upon listed in Appendix A, subject to the additional assumptions below." (*Id.*)

The above-cited paragraphs in the McKeon report merely report what the TON Blockchain is "designed" to be or do, not what it will in fact be or do at the time of its launch. See, e.g., "Upon the launch of the mainnet, TON blockchain is designed to be a trustless decentralized blockchain…" (*Id.* ¶ 19); "The TON governance system provides for several built-in mechanisms designed to achieve the decentralization of the block validation process…" (*Id.* ¶ 188); "These features …indicate that TON is designed to be more decentralized than these existing alternatives." (*Id.* ¶193).

Because (1) Telegram has not made the actual code of the TON Blockchain in its full intended state at launch available for review; and (2) whether the TON Blockchain will be fully decentralized cannot be determined until after it has been launched and has been operational for a period of time, the Commission cannot present facts essential to justify its opposition to this claim, *see* Fed. R. Civ. P. 56(d), other than to state that the citations Telegram relies upon do not support this claim.

51. The TON Blockchain will be released as entirely open source code. Drylewski Ex. 4. Defendants' Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, at 8-9.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 51.

52.     In late 2017, Telegram also began developing a native cryptocurrency for the TON Blockchain, called "Grams."  JSF ¶ 38.

Commission Response: The Commission objects to the term "cryptocurrency" on the ground that the term is vague and ambiguous. The Commission also disputes the assertion contained in Paragraph 52 on the ground that the cited reference does not support the assertion. JSF ¶ 38 refers to Grams as digital assets, not cryptocurrencies but the Commission does not dispute that the Durovs began contemplating the idea of creating Grams in 2017.

53.     Grams will not be created unless and until the TON Blockchain is launched. Drylewski Ex. 3 at 1.

Commission Response: The Commission objects to the phrase "created" on the grounds that it is vague and ambiguous.  Subject to and without waiving this objection, the Commission does not controvert the assertion contained in Paragraph 53 to the extent that it asserts that Telegram will not issue the software code that represents the Grams on the TON Blockchain unless and until the TON Blockchain is launched.

54.     Grams will not be distributed to anyone unless and until the TON Blockchain is launched.  Drylewski Ex. 3.

Commission Response: The Commission objects to the phrase "distributed" on the ground that it is vague and ambiguous.  Subject to and without waiving this objection, the Commission does not controvert the assertion contained in Paragraph 54 to the extent that it asserts that Telegram will not issue the software code that represents the Grams unless and until the TON Blockchain is launched.

16

55. Grams are intended to function as a store of value and medium of exchange on the TON Blockchain, similar to the functionality of Bitcoin. McKeon Ex. 1 ¶ 221; JX14, Round 1 Risk Factors, at 6.

Commission Response: The Commission objects to the phrase "intended to function" on the ground that it is unclear whose "intent" is being referenced, and objects to the phrases "store of value" and "medium of exchange" on the grounds that they are vague and ambiguous. Subject to and without waiving these objections, the Commission disputes the assertion contained in Paragraph 55 on the ground that Grams were intended to function as investments by many of the Initial Purchasers (SEC Counter 56.1 ¶¶ 67–99; SEC 56.1 ¶¶ 147–78) and on the ground that it will be reasonable for purchasers of Grams at the launch of the TON Blockchain to purchase them as investments (SEC Counter 56.1 ¶¶ 67–84).

56. Telegram anticipates that Grams will be immediately useable (i) as tender for commercial transactions and a medium of exchange for users on the TON Blockchain, which will be capable of quickly processing and recording such transactions; (ii) to serve as stakes deposited by third parties in order to be randomly selected to serve as validators to validate transactions on the TON Blockchain and thereby be awarded more Grams; (iii) to serve as capital lent out to validators and others; and (iv) to serve as voting power for Gram holders required to support or oppose changes in the TON Blockchain protocol. Drylewski Ex. 4, Defendants' Responses and Objections to Plaintiff's First Set of Interrogatories, at 7.

Commission Response: The Commission disputes the assertion contained in Paragraph 56 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion. *See also* SEC Counter 56.1 ¶¶ 20–37.

57.     Grams' faster intended transaction speeds were designed to make Grams superior to other available virtual currencies, such as Bitcoin and Ether, in order to fulfill their primary consumptive purpose.  Drylewski Ex. 2, Durov. Dep. at 293:18-294:15.

Commission Response: The Commission objects to the phrases "other available virtual currencies" and "primary consumptive function" as vague and ambiguous and to the term "intended" as vague and ambiguous given that it is unclear whose intent is being referred to.  The Commission disputes the assertions contained in Paragraph 57 to the extent that they purports to assert that Grams are a virtual currency, that they are superior to Bitcoin or Ether or that their primary consumptive purpose is currently to serve as a virtual currency, on the ground that the cited testimony does not support any of those claims as being in fact true.  *See also* SEC Counter 56.1 ¶¶ 38–66.

58.     Grams are also intended to be used as a means to power decentralized applications ("dApps") and smart contracts built on the TON Blockchain, similar to the functionality of Ether.  McKeon Ex. 1 ¶¶ 151-52, 221.

Commission Response: The Commission objects to the phrase "power decentralized applications" as vague and ambiguous and to the term "intended" as vague and ambiguous in that it is unclear whose intent is being referred to.  The Commission disputes the assertions contained in Paragraph 58 on the ground that the cited reference to the McKeon Report does not support the assertions with any facts but instead consists solely of conclusory claims without any factual support.

    *1.    Features of the TON Blockchain*

59.     Smart contracts and dApps on the TON Blockchain will run on a computation layer known as the Telegram Virtual Machine ("TVM").  JX24, Telegram Open Network Virtual Machine (September 6, 2019), at 1; McKeon Ex. 1 ¶151.

Commission Response: The Commission disputes the assertion set forth in Paragraph 59 on the ground that the cited references do not support the assertion as to what will in fact occur on the TON Blockchain after launch. JX24 only states what Telegram intends to happen in the future and the citation to the McKeon Report is inadmissible hearsay given that McKeon admitted: "I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer, which would be required to conduct such a review" and given that McKeon further admitted that he merely "assume[d] that at the time of the contemplated public distribution of Grams, TON will be fully operational and have governance structure, consensus protocol, block validation mechanism, decentralized services and other features as described in the materials I have reviewed and relied upon…." D.E. 74-1 (McKeon Rep.) at ¶ 14. Thus, McKeon has no first-hand knowledge of the actual state of the TON Blockchain at launch.

60. The TVM will be used to execute smart contract logic. JX24 at 32; McKeon Ex. 1 ¶151.

Commission Response: The Commission disputes the assertion set forth in Paragraph 60 on the ground that the cited references do not support the assertion as to what will in fact occur on the TON Blockchain after launch. JX24 only states what Telegram intends to happen in the future and the citation to the McKeon Report is inadmissible hearsay given that McKeon admitted: "I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer, which would be required to conduct such a review" and given that McKeon further admitted that he merely "assume[d] that at the time of the contemplated public distribution of Grams, TON will be fully operational and have governance structure, consensus protocol, block validation mechanism, decentralized services

and other features as described in the materials I have reviewed and relied upon…." D.E. 74-1 (McKeon Rep.) at ¶ 14.  Thus, McKeon has no first-hand knowledge of the actual state of the TON Blockchain at launch.

61.     The ability of TON to function as a decentralized supercomputer is driven by the TVM.  McKeon Ex. 1 ¶ 151.

Commission Response: The Commission disputes the assertion set forth in Paragraph 61 on the ground that the cited reference does not support the assertion as to what will in fact occur on the TON Blockchain after launch.  The citation to the McKeon Report is inadmissible hearsay given that McKeon admitted: "I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer, which would be required to conduct such a review" and given that McKeon further admitted that he merely "assume[d] that at the time of the contemplated public distribution of Grams, TON will be fully operational and have governance structure, consensus protocol, block validation mechanism, decentralized services and other features as described in the materials I have reviewed and relied upon…." Thus, he has no first-hand knowledge of the actual state of the TON Blockchain at launch.

62.     Telegram has developed two features, TON DNS and TON Payments, to be available to be launched with the TON Blockchain.  Drylewski Ex. 4 at 11.

Commission Response: The Commission disputes the assertion contained in Paragraph 62 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

63.     TON DNS is "a service for assigning human-readable names to accounts, smart contracts, services, and network nodes."  JX9, Stage A Primer at 10.

Commission Response: The Commission disputes the assertion contained in Paragraph 63 on the ground that the cited reference, the Stage A Primer, is inadmissible hearsay as to what TON DNS is or will be at launch of the TON Blockchain but the Commission does not controvert the assertion to the extent that it purports to accurately quote the referenced document.

64.     TON Payments is "a platform for micropayments and a micropayment channel network," which "can be used for instant off-chain value transfers between users, bots, and other services."  JX9 at 10.

Commission Response: The Commission disputes the assertion contained in Paragraph 64 on the ground that the cited reference, the Stage A Primer, is inadmissible hearsay as to what TON Payments is or will be at launch of the TON Blockchain but the Commission does not controvert the assertion to the extent that it purports to accurately quote the referenced document.

65.     Telegram is planning to have two additional features, TON Storage and TON Proxy, developed and implemented into the TON Blockchain at launch.  Drylewski Ex. 4 at 11.

Commission Response: The Commission disputes the assertion contained in Paragraph 65 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

66.     TON Storage will be "a distributed file-storage technology, accessible through the TON [Peer-to-Peer] Network and available for storing arbitrary files, with torrent-like access technology and smart contracts used to enforce availability."  JX9 at 9.

Commission Response: The Commission disputes the assertion contained in Paragraph 66 on the ground that the cited reference, the Stage A Primer, is inadmissible hearsay as to what TON Storage is or will be at launch of the TON Blockchain but the Commission does not controvert the assertion to the extent that it accurately quotes the referenced document.

67.     TON Proxy will be "a network proxy/anonymizer layer used to hide the identity and IP addresses of TON nodes," which "can be used to create decentralized VPN services and blockchain-based TOR alternatives to achieve anonymity and protect online privacy," similar to the Invisible Internet Project.  JX9 at 9.

Commission Response: The Commission disputes the assertion contained in Paragraph 67 on the ground that the cited reference, the Stage A Primer, is inadmissible hearsay as to what TON Proxy is or will be at launch of the TON Blockchain but the Commission does not controvert the assertion to the extent that it purports to accurately quote the referenced document.

68.     Telegram has developed the TON Wallet, a software application which will operate as a non-custodial cryptographic wallet to hold and transfer Grams at the time of launch. Drylewski Ex. 4 at 11.

Commission Response: The Commission disputes the assertion contained in Paragraph 68 on the ground that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

22

69.     Telegram intends to release the TON Wallet as a stand-alone application that will compete with other wallet applications developed by third parties.  Drylewski Ex. 2, Durov Dep. at 160:4-161:5; McKeon Ex. 1 ¶¶ 157-62.

Commission Response: The Commission disputes the assertion contained in Paragraph 69 on the ground that, in the cited testimony of Pavel Durov, he admitted that while Telegram had previously stated that it intended to integrate TON Wallet into Telegram Messenger, as of January 6, 2020, it announced that it currently planned not to integrate TON Wallet into Telegram Messenger but that it reserved its right to integrate TON Wallet into Telegram Messenger in the future to the extent permitted by law or governmental authorities. Thus, the assertion contained in Paragraph 69 is an incomplete statement of even Telegram's stated intention and its true intention cannot be determined based on the cited references. Similarly, the cited references to the McKeon Report do not support the assertion contained in Paragraph 69 because it is inadmissible hearsay, and in fact contains multiple levels of hearsay as McKeon relies upon website reports and Telegram's representations rather than any firsthand knowledge.  *See also* SEC Counter 56.1 ¶¶ 8–19.

70.     Following the launch of the TON Blockchain, any third party will be able to see the TON Blockchain code and develop applications for the TON Blockchain.  McKeon Ex. 1 ¶ 99.

Commission Response: The Commission disputes the assertion set forth in Paragraph 70 on the ground that the cited reference does not support the assertion as to what will in fact occur on the TON Blockchain after launch.  The citation to the McKeon Report is inadmissible hearsay given that McKeon admitted: "I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer, which

would be required to conduct such a review" and given that McKeon further admitted that he merely "assume[d] that at the time of the contemplated public distribution of Grams, TON will be fully operational and have governance structure, consensus protocol, block validation mechanism, decentralized services and other features as described in the materials I have reviewed and relied upon…." D.E. 74-1 (McKeon Rep.) at ¶ 14. Thus, McKeon has no first-hand knowledge of the actual state of the TON Blockchain at launch.

71.     As an open source code, third party developers cannot be excluded from developing upon, and using the functionality of, the core protocol. McKeon Ex. 1 ¶ 222.

        Commission Response: The Commission disputes the assertion set forth in Paragraph 71 on the ground that the cited reference does not support the assertion as to what will in fact occur on the TON Blockchain after launch. The citation to the McKeon Report is inadmissible hearsay given that McKeon admitted: "I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer, which would be required to conduct such a review" and given that McKeon further admitted that he merely "assume[d] that at the time of the contemplated public distribution of Grams, TON will be fully operational and have governance structure, consensus protocol, block validation mechanism, decentralized services and other features as described in the materials I have reviewed and relied upon…." D.E. 74-1 (McKeon Rep.) at ¶ 14. Thus, McKeon has no first-hand knowledge of the actual state of the TON Blockchain at launch.

72.     The TON Blockchain will be a decentralized system with no central governing body or management. Drylewski Ex. 3.

        Commission Response: The Commission disputes the assertion contained in Paragraph 72 on the ground that the cited evidence, a self-serving Public Notice issued by

Telegram on January 6, 2020 is inadmissible hearsay and contains no factual support for this conclusory assertion.

73.     Telegram has informed the public that it will not have any control over, any unique rights within, or any responsibility for the management of the TON Blockchain. Drylewski Ex. 3; Drylewski Ex. 4 at 31.

Commission Response: The Commission does not controvert the assertion contained in Paragraph 73 that Telegram has made the referenced public statements as contained in the cited self-serving Public Notice issued by Telegram on January 6, 2020 but it disputes that those statements reflect what Telegram's role will in fact be with respect to the TON Blockchain post-launch given that the Public Notice is inadmissible hearsay and given that the other cited reference, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion. *See also* SEC Counter 56.1 ¶¶ 1–19.

2.     *Validation*

74.     Telegram selected a "Proof of Stake" consensus mechanism for the TON Blockchain.  JSF ¶ 122.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 74.

75.     Validators for the TON Blockchain will be required to validate proposed blocks, perform computations for smart contracts, and digitally sign valid blocks.  JSF ¶ 123.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 75.

76.     The TON Blockchain will allow validators to aggregate stakes to foster decentralization by promoting involvement by a broader group of stakeholders.  JSF ¶ 124.

25

Commission Response: The Commission disputes the assertions contained in Paragraph 76 on the ground that the cited reference, JSF ¶ 124, does not support the assertion. JSF ¶ 124 merely states that it is Telegram's stated intention to allow validators to aggregate stakes to foster decentralization by promoting involvement by a broader group of stakeholders, not that the TON Blockchain will in fact operate in this manner or for the referenced reasons. The Commission further disputes the assertions in Paragraph 76 because they refer to a claimed future action by Telegram that cannot be proven or disproven at this time.

77.     At launch, Gram holders who wish to be validators must "stake" a minimum of 100,000 Grams.  JSF ¶ 125.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 77.

78.     Following launch, the minimum number of Grams required to be staked will be a configurable parameter that can be changed by vote of the validators.  JSF ¶ 125.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 78.

79.     Once every validation period, any Gram holder or group of Gram holders seeking to be a validator for the next validation period can stake the minimum number of Grams required to be eligible for selection as a validator for the next period.  JSF ¶ 126.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 79.

80.     The TON Blockchain will automatically and randomly select a predetermined number of validators from amongst the largest stakeholders for that period.  JSF ¶ 126.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 80.

81.     Validators who correctly validate a block will automatically be rewarded with newly minted, system-generated Grams.  JSF ¶ 127.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 81.

82.     If validators incorrectly validate a block, they will automatically lose part of their stake and will be temporarily suspended from acting as a validator.  JSF ¶ 128.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 82.

83.     Based on these validation efforts, Telegram expects that the supply of Grams will increase by approximately 2% annually as newly minted Grams are automatically generated and paid to validators.  JSF ¶ 129.

Commission Response:  The Commission does not controvert that the assertion contained in Paragraph 83 accurately quotes the cited reference, but the Commission disputes the assertion because it refers to a future action that cannot be proven or disproven at this time.

84.     As currently contemplated, after the TON Blockchain launches, Defendants will allocate 4% of Grams to a "Developer Pool."  JSF ¶ 158.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 84, but the Commission disputes that the assertion is evidence as to what Telegram will in fact do in the future.  Telegram is not legally prevented from changing the "Developer Pool" allocation after launch and, given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the

future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

85. Pavel and Nikolai Durov are currently anticipated to each receive 1% of the initial supply of Grams from the Developer Pool. Drylewski Ex. 5 at 4; JSF ¶ 159.

<u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 85 but the Commission disputes that the assertion is evidence as to what Telegram will in fact do in the future. Telegram is not legally prevented from changing the Durovs' allocation from the "Developer Pool" after launch and, given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

86. Telegram has stated that the developer pool will have a four-year lock-up period restricting the sale of Grams by developer pool recipients. JSF ¶ 160.

<u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 86 but the Commission disputes that the assertion is evidence as to what Telegram will in fact do in the future. Telegram is not legally prevented from changing the referenced lock-up period after launch and, given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

87. Telegram informed the public on January 6, 2020 that, to the extent Pavel Durov, Nikolai Durov, or any Telegram employees holds any Grams following launch of the TON

Blockchain, they will not be allowed to take part in any voting or validating activities on the TON Blockchain. JSF ¶ 161.

        <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 87 but the Commission disputes that the assertion is evidence as to what Telegram will in fact do in the future. Telegram is not legally prevented from allowing the Durovs or other Telegram employees from taking part in voting or validating activities after launch and, given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

88.      Telegram will not hold any Grams after the launch of the TON Blockchain. Drylewski Ex. 2, Durov Dep. at 273:3-11.

        <u>Commission Response</u>: The Commission disputes the assertions contained in Paragraph 88. Paragraph 88 refers to a claimed future action by Telegram that cannot be proven or disproven at this time. Also, the evidence cited by Telegram does not support the assertion. It merely establishes that Telegram has stated that that it presently is not obligated to hold any Grams after launch of the TON Blockchain. Telegram is not legally prevented from holding Grams after launch, and in fact retains authority over what to do with the 42% of Grams not sold in the Offering (SEC 56.1 ¶ 381), and given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

89.      Telegram has told the public that its employees and founders may, but have not committed, hold Grams following launch of the TON Blockchain. Drylewski Ex. 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 89 but the Commission disputes that the assertion is evidence as to what Telegram will in fact do in the future. . Telegram is not legally prevented from allowing its founders or employees to hold Grams after launch and, given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

90.     Telegram has told the public that any Grams held by its employees or founders cannot be used for voting of validating functions in connection with the TON Blockchain. Drylewski Ex. 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 90 but the Commission disputes that the assertion is evidence as to what Telegram will in fact do in the future. Telegram is not legally prevented from allowing its founders or employees to use Grams for voting or validation functions after launch and, given its documented history of changing its claims as to what it will or will not do with respect to the TON Blockchain and Grams in the future (SEC Counter ¶¶ 56.1 11–19), its current stated intention is not reliable evidence as to what it will in fact do in the future.

### C.     Telegram Conducts a Private Placement

91.     In order to develop the TON Blockchain, Telegram needed to raise funds.  JSF ¶ 38.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 91 except to the extent the assertion suggests that Telegram raised funds solely for the TON Blockchain and not for Telegram Messenger.  (*See* SEC 56.1 ¶¶ 1–14.)

92. Telegram decided to raise the funds by selling interests in the right to receive Grams. JSF ¶ 38.

Commission Response: The Commission objects to the phrase "interests in the right to receive Grams" as vague and ambiguous and disputes that the phrase accurately characterizes what Telegram sold to the Initial Purchasers. It is the Commission's position, as set forth in more detail in its legal memoranda and supporting filings submitted in support of its motion for a preliminary and permanent injunction and in support of its motion for summary judgment and its opposition to Defendants' motion for summary judgment, that the Defendants sold Grams to the Initial Purchasers, not merely the "right to receive" Grams. However, to avoid undue and cumbersome repetition in this Response, the Commission asserts this objection generally as to all such references, rather than repeat this objection in detail in response to every reference by Defendants to the "interests in the right to receive Grams." The Commission does so without waiving its objection to that phrase as vague and ambiguous and without waiving its dispute that the phrase accurately reflects what was sold to the Initial Purchasers.

The Commission does not, however, controvert the assertion contained in Paragraph 92 to the extent that it asserts that Telegram decided to raise funds by selling Grams.

93. Telegram created a wholly owned subsidiary, TON Issuer, to sell the interests in the right to receive Grams. *See* JSF ¶ 2.

Commission Response: The Commission objects to the phrase "interests in the right to receive Grams" but does not otherwise controvert the assertions contained in Paragraph 93.

94.     The United States Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") considers TON Issuer to be a Money Services Business subject to the Bank Secrecy Act.  JSF ¶ 175; Drylewski Ex. 6, Money Services Business Registration.

     Commission Response: The Commission does not controvert the assertion contained in Paragraph 94.

95.     TON Issuer registered as a Money Services Business in the U.S. with FinCEN on August 30, 2019.  JSF ¶ 176; *see also* Drylewski Ex. 6.

     Commission Response: The Commission does not controvert the assertion contained in Paragraph 95.

96.     Defendants initially contemplated engaging in a private pre-sale of the right to receive Grams in January 2018, followed by a public sale of Grams in March 2018.  JSF ¶ 39.

     Commission Response: The Commission objects to the phrase "right to receive Grams" but does not otherwise controvert the assertions contained in Paragraph 96.

97.     Defendants instead opted to sell the right to receive Grams to a limited group of private purchasers (the "Private Placement purchasers") using contracts (the "Purchase Agreements").  JSF ¶ 40.

     Commission Response: The Commission objects to the phrase "Private Placement" as an incorrect legal characterization of Defendants' offer and sale of Grams to potential and actual Initial Purchasers during the two rounds that commenced in January and March 2018.  It is the Commission's position, as set forth in more detail in its legal memoranda and supporting filings submitted in support of its motion for a preliminary and permanent injunction and in support of its motion for summary judgment and its opposition to Defendants' motion for summary judgment, that the Defendants engaged in an unregistered, non-exempt

32

public distribution of securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act") in connection with their offer and sale of Grams to the Initial Purchasers, not a Private Placement. However, to avoid undue and cumbersome repetition in this Response, the Commission asserts this objection generally as to all such references, rather than repeat this objection in detail in response to every reference by Defendants to the "Private Placement." The Commission does so without waiving its objection to that phrase as legally incorrect and without waiving its dispute that the phrase accurately reflects the legal status of the Offering.

The Commission also objects to the phrase "right to receive Grams" and otherwise disputes the assertions contained in Paragraph 97 on the ground that they incorrectly characterize what was sold to the Initial Purchasers.

98.     Defendants chose to sell the right to receive Grams to the Private Placement purchasers through the Purchase Agreements because they wanted to take "as safe as possible [of an] approach and deal only with highly sophisticated institutional investors in a proper, organized private placement." Drylewski Ex. 7, Shyam Parekh Deposition ("Parekh Dep.") at 28:11-14; Drylewski Ex. 8, Ilya Perekopsky Deposition ("Perekopsky Dep.") at 86:15-18 ("we decided to focus on private placements and we decided to focus on working only with sophisticated, reputable investors").

Commission Response: The Commission objects to the phrases "right to receive Grams" and "Private Placement" and disputes the assertions contained in Paragraph 98 on the ground that they incorrectly state what was sold to the Initial Purchasers and the legal status of the Offering. Subject to and without waving these objections and disputes, and without waiving its right to challenge the credibility of these witnesses, the Commission does not controvert that the cited individuals testified to the cited statements.

33

99.     Defendants hired John Hyman, in part, because "he . . . had a set of skills required to work with a wide group of sophisticated investors globally."  Drylewski Ex. 8, Perekopsky Dep. at 66:16-18.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 99.

100.     The Private Placement purchasers were highly sophisticated and of high net worth, with an average investment of approximately $10 million.  Drylewski Ex. 2, Durov Dep. at 300:7-17.

Commission Response: The Commission objects to the phrase "Private Placement" but does not otherwise controvert the assertions contained in Paragraph 100.

101.     Defendants ultimately engaged in two rounds of such sales, which took place between January 2018 and March 2018 (the "Private Placement").  JSF ¶¶ 40-41.

Commission Response: The Commission objects to the phrase "Private Placement" but does not otherwise controvert the assertions contained in Paragraph 101 that Defendants engaged in two rounds of sales commencing in January and March 2018, except that it disputes that the rounds ended in March 2018.  There is ample evidence that Telegram continued to raise money in connection with each round well after March 2018.  *See, e.g.,* SEC Counter 56.1 ¶¶ 102, 123, 141.

102.     In total, Telegram sold the right to receive nearly 2.9 billion Grams.  JSF ¶ 43.

Commission Response: The Commission does not controvert the assertion contained in Paragraph 102.

103.     In total, Telegram raised $1.7 billion in the Private Placement.  JX1, Round 1 Form D, at 5; JX2, Round 2 Form D, at 5.

34

Commission Response: The Commission objects to the phrase "Private Placement" and states that it cannot confirm or deny the assertion that Telegram in fact raised $1.7 billion in the Offering until it receives unredacted bank records.

104. In determining allocations in the Private Placement, Telegram focused on a number of factors, including, but not limited to, reputation, track record, brand name and experience with blockchain technology. Drylewski Ex. 2, Durov Dep. at 287:21-290:20.

Commission Response: The Commission objects to the phrases "Private Placement" and also objects to the terms "reputation," "track record," "brand name," and "experience with blockchain technology," as vague and ambiguous. Subject to and without waiving these objections, Telegram does not otherwise controvert the fact that Pavel Durov testified that Telegram took the referenced factors into account in determining allocations. *But see* SEC 56.1 ¶¶ 139–45.

105. Telegram considered reputation, in particular, to be very important in the allocation process. Drylewski Ex. 2, Durov Dep. at 287:21-290:20.

Commission Response: The Commission objects to the word "reputation" as vague and ambiguous. Subject to and without waving this objection, the Commission does not controvert the fact that Pavel Durov testified that Telegram considered reputation to be very important in determining allocations.

106. Defendants accepted payments in the Private Placement in either U.S. dollars or Euros. *See* Drylewski Ex. 2, Durov Dep. at 209:7-10.

Commission Response: The Commission objects to the phrase "Private Placement" but does not otherwise controvert the assertions contained in Paragraph 106.

107.    The Private Placement was conducted in accordance with Rule 506 of Regulation D (for U.S. purchasers) and Regulation S (for non-U.S. purchasers) under the Securities Act of 1933 ("Securities Act").  JX1 at 5; JX2 at 5; Drylewski Ex. 4 at 6.

Commission Response: The Commission objects to the phrase "Private Placement" and disputes the legal conclusion contained in Paragraph 107 that the offering was conducted in accordance with Rule 506 of Regulation D and Regulation S, as set forth in more detail in the Commission's memorandum of law in support of its motion for a TRO and a preliminary injunction, and in its motion for summary judgment and its opposition to Defendants' motion for summary judgment.

In addition, the cited references do not support the assertion.  JX1 and JX2 are the Form D's that Telegram filed with the Commission asserting an exemption from registration under the above-referenced provisions.  However, those forms do not prove that Telegram in fact was entitled to rely upon, and complied with all of the provisions necessary to rely upon, those provisions.  Finally, Drylewski Ex. 4 at 6 is merely Telegram's conclusory responses to interrogatories. They contain no factual support for this assertion and are inadmissible to establish this assertion.

### 1.    Round 1 of the Private Placement

108.    The first round of the Private Placement ("Round 1") began in January 2018.  JSF ¶ 46.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 108, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

109.    In Round 1, Defendants raised a total of $850 million from 81 Private Placement purchasers worldwide.  JSF ¶¶ 48, 49.

36

Commission Response: The Commission objects to the phrase "Private Placement" and states that it cannot currently confirm or deny the assertion that Telegram in fact raised $850 million in Round 1 of the Offering until it receives unredacted bank records. In addition, the referenced citations do not support the assertion; they merely state that Telegram reported raising the referenced amount, not that Telegram in fact raised that amount.

110.    On February 13, 2018, Defendants filed a Form D noticing "purchase agreements for cryptocurrency" for amounts totaling $850 million that began on January 29, 2018.  JSF ¶ 48.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 110.

111.    Round 1 was exempt from the registration requirements for securities under Rule 506(c) of the Regulation D and/or Regulation S of the Securities Act.  JX1 at 5.

Commission Response: The Commission disputes the legal conclusion contained in Paragraph 111 that Round 1 was exempt from the registration requirements for securities under Rule 506(c) of Regulation D and /or Regulation S of the Securities Act, as set forth in more detail in the Commission's memorandum of law in support of its motion for a TRO and a preliminary injunction, and in its memorandum of law in support of its motion for summary judgment and in opposition to Defendants' motion for summary judgment.

In addition, the cited reference does not support the assertion.  JX1 is the Form D that Telegram filed with the Commission asserting an exemption from registration under the above-referenced provisions. However, that form does not prove that Telegram in fact was entitled to rely upon, and complied with all of the provisions necessary to rely upon, those provisions.

112.    Defendants' Form D for Round 1 stated: "The issuers intend to use the proceeds for the development of the TON Blockchain, the development and maintenance of Telegram Messenger and the other purposes described in the offering materials."  JX1 at 5.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 112.

2.    *Round 2 of the Private Placement*

113.    The second round of the Private Placement ("Round 2") began in February 2018. JSF ¶ 54.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 113 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

114.    In Round 2, Defendants raised a total of $850 million from 94 Private Placement purchasers worldwide.  JSF ¶ 55.

Commission Response: The Commission objects to the phrase "Private Placement" and states that it cannot currently confirm or deny the assertion that Telegram in fact raised $850 million in Round 2 of the Offering until it receives unredacted bank records. In addition, the referenced citation does not support the assertion; it merely states that Telegram reported raising the referenced amount, not that Telegram in fact raised that amount.

115.    On March 29, 2018, Defendants filed a Form D noticing "purchase agreements for cryptocurrency" for amounts totaling $850 million.  JSF ¶ 58.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 115.

116.    Round 2 was exempt from the registration requirements for securities under Rule 506(c) of the Regulation D and/or Regulation S of the Securities Act.  JX2 at 5.

Commission Response: The Commission disputes the legal conclusion contained in Paragraph 116 that Round 2 was exempt from the registration requirements for securities under Rule 506(c) of Regulation D and /or Regulation S of the Securities Act, as set forth in more detail in the Commission's memorandum of law in support of its motion for a TRO and a preliminary injunction, and in its memorandum of law in support of its motion for summary judgment and in opposition to Defendants' motion for summary judgment.

In addition, the cited reference does not support the assertion. JX2 is the Form D that Telegram filed with the Commission asserting an exemption from registration under the above-referenced provisions. However, that form does not prove that Telegram in fact was entitled to rely upon, and complied with all of the provisions necessary to rely upon, those provisions.

117.    Defendants' Form D for Round 2 stated: "The issuers intend to use the proceeds for the development of the TON Blockchain, the development and maintenance of Telegram Messenger and the other purposes described in the offering materials." JX2 at 6.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 117.

### 3.    KYC Processes

118.    In connection with the Private Placement, Defendants undertook know-your-customer ("KYC") and anti-money laundering ("AML") processes for all Private Placement purchasers. Drylewski Ex. 4 at 19.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 118 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

119.    As part of these KYC and AML processes, Defendants distributed the Purchase

Agreements alongside KYC Forms that requested information from all Private Placement purchasers concerning their ownership structure (if they were entities). Drylewski Ex. 4 at 19.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 119 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

120. The KYC Forms required natural persons to provide a certified copy of a valid, government-issued photo identification card, such as a driver's license or passport. Drylewski Ex. 4 at 19.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 120 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

121. For Private Placement purchasers other than natural persons (such as corporations, partnerships, and trusts), the KYC Forms required that they provide the following:

> a. a document evidencing legal existence of the entity such as the certified copy of articles of incorporation, a government issued business license, partnership agreement or trust instrument; and
>
> b. a certified copy of a valid, government-issued photo identification card such as a driver's license or passport for at least one of the following:
>     i. a director of the entity;
>     ii. persons with 25% or more ultimate beneficial ownership of the entity;
>     iii. a partner/member of the equity; or
>     iv. a managing executive of the entity.

Drylewski Ex. 4 at 19.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 121 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

(a)    Lawson Conner KYC

122.    In connection with the Private Placement, Defendants also engaged Lawson Conner Services Ltd. ("Lawson Conner"), a UK-based provider of regulatory infrastructure and managed compliance services and software.  Drylewski Ex. 4 at 19.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 122 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

123.    Lawson Conner reviewed the KYC Forms submitted for all Private Placement purchasers (the "KYC Process").  Drylewski Ex. 4 at 19-20.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 122 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

(b)    Credit Suisse KYC

124.    After Lawson Conner conducted its KYC/AML Process, Defendants engaged Credit Suisse to conduct an additional review of the KYC Forms.  Drylewski Ex. 4 at 20.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 124.

125.    Credit Suisse conducted its own proprietary KYC process on the KYC Forms. Drylewski Ex. 4 at 20.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 125.

(c)    Rep Letters

126.    Representation letter questionnaires ("Rep Letters") were prepared by U.S. or applicable local counsel and completed by each Private Placement purchaser for each jurisdiction

41

(a) in which the Private Placement purchaser resides (if the Private Placement purchaser was a natural person), (b) in which the Private Placement purchaser was formed (if the Private Placement purchaser was an entity), (c) in which the Private Placement purchaser or its representative(s) received the offer to enter into the Purchase Agreement and (d) in which the Private Placement purchaser or its representative(s) would place its buy order.  Drylewski Ex. 4 at 20.

<u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 126 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

127.    The Rep Letters covered numerous jurisdictions.  Drylewski Ex. 4 at 20.

<u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 127.

128.    The Rep Letters required the Private Placement purchaser to represent that the Private Placement purchaser was eligible to participate in the Private Placement pursuant to applicable local law.  Drylewski Ex. 4 at 20.

<u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 128 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

129.    Certain of the Rep Letters required additional supporting documentation where such supporting documentation was required under applicable law.   Drylewski Ex. 4 at 20.

<u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 129.

130.    Natural persons who submitted U.S. Rep Letters were also required to submit a

letter from a specified third party, verifying their status as an "accredited investor" (as defined in the rules and regulations under the Securities Act). Drylewski Ex. 4 at 20.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 130.

131. If the Private Placement purchaser was an entity, the Private Placement purchaser was required to indicated whether the Private Placement purchaser (a) was formed for the purpose of entering into the Purchase Agreement and/or purchasing Grams or (b) solicited investors to participate in the investment directly or indirectly through an entity or otherwise. Drylewski Ex. 4 at 20.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 131 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

132. If the Private Placement purchaser answered affirmatively to either question, the Private Placement purchaser was required to complete and deliver to the Defendants a Rep Letter for each person that held an equity or similar interest in the Private Placement purchaser. Drylewski Ex. 4 at 20.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 132 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

133. From time to time, Defendants have inquired as to whether certain Private Placement purchasers had agreed to transfer or sell their interests in Grams, and, in some instances, sought assurances that no transfers or sales had or would take place, advised the Private Placement purchasers not to make such transfers or sales, and/or canceled the relevant

Purchase Agreements.  Drylewski Ex. 5 at 2; Drylewski Ex. 9, Requests for Consent to Amend

Pre-Sale and Stage A Purchase Agreements, at TLGRM-005-00005508 and TLGRM-005-

00005588 ("Pursuant to the terms of your Purchase Agreement, prior to any issuance of Grams

to you, you are required to represent to us that you have not violated these [transferability

restriction] provisions.  In addition, it is possible that we may require further information from

you, including as part of our ongoing AML procedures and our interactions with Governmental

Authorities."); Drylewski Ex. 8, Perekopsky Dep. at 183:19-185:20; Drylewski Ex. 7, Parekh

Dep. at 79:10-81:5.

          <u>Commission Response</u>:  The Commission disputes the assertions in paragraph 133

on the grounds that the evidence cited does not support the statement that it is cited for.

Drylewski Ex. 5 at 2, which cites to TG-007-00000512, does not support the assertions in

paragraph 133 because the referenced document is a chat between Pavel Durov and an investor,

not a communication between Perekopsky and Avolta.  Drylewski Ex. 7 does not support the

assertions in paragraph 133 because Perekopsky testified about cancelling prospective investor's

allocations, not cancelling executed Purchase Agreements ("I heard rumors that people even

until they invested were already trying to resell. . . . If I heard some rumor . . . that somebody

was trying to resell, we just removed this investor from the list.") (PX199, Perekopsky Tr. at

183:23-25; 184:1-7).  The Commission further disputes Telegram's legal conclusion in

paragraph 133 characterizing the Offering as a "Private Placement."  The Commission does not

controvert that Drylewski Ex. 9 and TLGRM-005-00005588 are documents that reminded

purchasers of the transferability restrictions contained in the Purchase Agreements.  The

Commission does not controvert that Parekh testified that Telegram cancelled two Purchase

Agreements based on information that they had received that the Initial Purchasers were offering

Grams in a secondary market.

134. On February 15, 2018, Ilya Perekopsky reached out to  stating that an article reporting that ▮ was reselling Grams raised "concern[s]." Drylewski Ex. 10, Defendants' Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories at 6.

      Commission Response:  The Commission does not controvert the assertions contained in Paragraph 134, except the Commission notes that the name, email address, and all other identifying information about the recipient of the email to which Telegram cites (TLGRM-008-00003269) have been redacted as "personal information" in the copy of the document produced to the Commission, and the Commission cannot see from the face of the document whether the recipient is ▮▮▮.

135. Ilya Perekopsky requested that ▮ confirm whether the statements in the article were false and reaffirm its representations under the Purchase Agreement that ▮ will not transfer any interest in its rights to receive Grams.  Drylewski Ex. 10 at 6.

      Commission Response:  The Commission does not controvert the assertions contained in Paragraph 135, except the Commission notes that the name, email address, and all other identifying information about the recipient of the email to which Telegram cites (TLGRM-008-00003269) have been redacted as "personal information" in the copy of the document produced to the Commission, and the Commission cannot see from the face of the document whether the recipient is ▮.

136. In response, ▮ confirmed that the article was false and reaffirmed its continued compliance with the terms of its Purchase Agreement.  Drylewski Ex. 10 at 6-7.

      Commission Response:  The Commission does not controvert the assertions

contained in Paragraph 136, except the Commission notes that the name, email address, and all other identifying information about the sender of the email to which Telegram cites (TLGRM-008-00003269) have been redacted as "personal information" in the copy of the document produced to the Commission, and the Commission cannot see from the face of the document whether the email is from █████ or whether the email makes representations with respect to █████ .

137.    On March 7, 2018, Ilya Perekopsky spoke with ████████████████████ regarding whether █████ had entered into an agreement for an impermissible transfer of interests in Grams.  Drylewski Ex. 10 at 7.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 137.

138.    █████ stated that pursuant to counsel's and Telegram's instructions prohibiting the transfer, it did not, and would not, pursue a transfer.  Drylewski Ex. 10 at 7.

Commission Response:  The Commission disputes the assertions in paragraph 138 on the grounds that it mischaracterizes the evidence.  According to the document Telegram cites, TG-007-00000698-699, a █████ representative stated: "We had a couple of interests early on, that's when we contacted Telegram.  Once we heard from our attorneys . . . , that they had heard from Skadden that it cannot be resold, we stopped pursuing.  We have not resold any grams.  We don't plan to resell any grams.  Yes, we have been approached by some folks for access, but we have not resold."

139.    On August 20, 2018, █████ requested permission to assign part of its interests under its Purchase Agreements to a third party.  Drylewski Ex. 10 at 7.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 139.

140.    Telegram declined ████s request and stated that such an assignment and amendment to its Purchase Agreements was impermissible.  Drylewski Ex. 10 at 7.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 140.

141.    On May 25, 2019, a Private Placement purchaser informed Telegram that they had received an offer to purchase Grams from another investor called ████████████ ████████████████████████████  Drylewski Ex. 10 at 7.

Commission Response:  The Commission does not controvert the assertions contained in Paragraph 141, except the Commission notes that the date of the referenced communication took place on May 24, 2019, and the name, email address, and all other identifying information about the sender of the email that Telegram cites (TLGRM-012-00015898) have been redacted as "personal information" in the copy of the document produced to the Commission, and the Commission cannot see from the face of the document whether the offer to purchase Grams was from ████.

142.    Ilya Perekopsky reached out to ████ and requested that the company address these allegations and affirm that they were not in breach of their purchase agreement.  Drylewski Ex. 10 at 7.

Commission Response:  The Commission does not controvert the assertions contained in Paragraph 142.

143.    ████ denied that they were engaged in any activities that would constitute a breach of their purchase agreement.  Drylewski Ex. 10 at 7.

Commission Response:  The Commission disputes the assertion in paragraph 143

on the grounds that it mischaracterizes the evidence. Perekopsky testified that ██████████ simply "denied the fact that they were doing these deals." (PX199, Perekopsky Tr. at 226:10-18).

144. On June 7, 2018, ████████████ requested Telegram's permission to pay for its right to receive Grams via an assignment of its Purchase Agreement to █████████████ Drylewski Ex. 10 at 7.

Commission Response: The Commission does not controvert the assertion contained in Paragraph 144, except the Commission notes for clarification that the email chain Telegram cites (TLGRM-011-00018740-18741) begins on May 24, 2018, and states on June 7, 2018: "I'm sure you know already based on the emails we have been exchanging with REDACTED that we are about to execute the round gram purchase through the service provided by ████████████. We are in the final steps to execute the payment (ether) and if you can give us a simple confirmation email stating that this is the advised and confirmed process by Telegram to purchase 2nd round 'gram', it would be appreciated."

145. Under this proposed arrangement, ████████████ would subsequently pay the purchase amount to Telegram and transfer any Grams to █████████████ once they were issued. Drylewski Ex. 10 at 7.

Commission Response: The Commission disputes the assertion contained in Paragraph 145 on the grounds that the cited evidence, Telegram's response to an interrogatory, does not cite to evidence to support the terms of the proposed arrangement with Bank to the Future.

146. Telegram advised ███████████ that the proposed structure was not permissible because it would violate the representations and provisions in the Purchase Agreement and

denied the request.  Drylewski Ex. 10 at 7-8.

Commission Response:  The Commission disputes the assertion contained in Paragraph 146 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

147.    On April 14, 2018, Telegram became aware of facts indicating that ▆▆▆▆▆▆ ▆▆▆ was running an online syndicate to invest in TON.  Drylewski Ex. 10 at 8.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 147, except to note that the evidence supports that Telegram became aware of facts indicating that ▆▆▆▆▆▆▆▆ may be running an online syndicate to invest in TON by at least March 2018.  See, e.g., TLGRM-015-00000512.

148.    Telegram investigated this information and rejected ▆▆▆▆▆▆▆▆ investment for Round 2 of the Private Placement.  Drylewski Ex. 10 at 8.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 148 except the Commission objects to the phrase "Private Placement."

149.    In February 2018, Telegram became aware of facts indicating that ▆▆▆▆ had failed to disclose the fact that it was a Special Purpose Vehicle that solicited funds for investment in the Private Placement and was therefore in breach of its Purchase Agreement.  Drylewski Ex. 10 at 8.

Commission Response:  The Commission objects to the phrase "Private Placement" and disputes the assertion contained in Paragraph 149 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

49

150.     Based upon its investigation, Telegram terminated ████████ Purchase Agreement.  Drylewski Ex. 10 at 8.

Commission Response:  The Commission disputes the assertion contained in Paragraph 150 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

151.     In June 2018, Telegram became aware of facts indicating that ████████ may have been in breach of his Purchase Agreement by failing to disclose the source of funds for his investment.  Drylewski Ex. 10 at 8.

Commission Response:  The Commission disputes the assertion contained in Paragraph 151 on the grounds that the evidence Telegram cited is insufficient to support the assertion.  Mr. Perekopsky's testimony is not based upon first-hand knowledge of the situation and Hyman's Settlement Agreement does not address this assertion.  In addition, the Commission has not had the opportunity yet to take the deposition of ████████ to assess the assertion contained in paragraph 151.

152.     Following its investigation into the matter and discussions with ████████, Telegram terminated ████████ Purchase Agreement.  Drylewski Ex. 10 at 8.

Commission Response:  The Commission disputes the assertion contained in Paragraph 152 on the grounds that the evidence Telegram cited is insufficient to support the assertion.  Mr. Perekopsky's testimony is not based upon first-hand knowledge of the situation and Hyman's Settlement Agreement does not address this assertion.  In addition, the Commission has not had the opportunity yet to take the deposition of Mr. Hyman to assess the assertion contained in paragraph 152.

153.     Telegram also received requests to transfer Purchase Agreements by ███████

████████████████████████████████████████, both of which Telegram

declined.  Drylewski Ex. 10 at 8.

      <u>Commission Response</u>:  The Commission disputes the assertions contained in

Paragraph 153 because the evidence Telegram cites does not support the assertion that Telegram

declined the transfers.  Parekh testified:  "Altshuler had a conversation with me, asking about the

possibility to undertake transfer, and I have explained the conditions under which that was

possible or not possible, and they dropped it at that point because they didn't feel satisfied with

those conditions, presumably. ███████████████████ . . . Similar discussion over

the phone.  Similarly, they dropped it."  PX200 Parekh Tr. 86:18-2.

154.     In January 2018, Ilya Perekopsky reached out to ███████████████

stating that Telegram had received information suggesting that ██████ was purporting to be

selling Grams.  Drylewski Ex. 5 at 2.

      <u>Commission Response</u>:  The Commission disputes the assertion contained in

Paragraph 154 on the grounds that the cited evidence, Telegram's response to an interrogatory,

cites to a document that does not support the statement, making it inadmissible and insufficient

to support the assertion.

155.     Mr. Perekopsky requested that ██████ confirm whether the information regarding

their purported sales was false.  Drylewski Ex. 5 at 2.

      <u>Commission Response</u>:  The Commission disputes the assertion contained in

Paragraph 155 on the grounds that the cited evidence, Telegram's response to an interrogatory,

cites to a document that does not support the statement, making it inadmissible and insufficient

to support the assertion.

51

156.     ████ confirmed that it was not selling Grams and affirmed its compliance with the terms of its Purchase Agreement.  Drylewski Ex. 5 at 2.

Commission Response:  The Commission disputes the assertion contained in Paragraph 156 on the grounds that the cited evidence, Telegram's response to an interrogatory, cites to a document that does not support the statement, making it inadmissible and insufficient to support the assertion.

157.     On January 11, 2020, Telegram reached out to Space Investments Limited ("Space Investments") stating that it became aware of facts suggesting that Space Investments may have had involvement with an entity called Liquid.com (which purports to be a cryptocurrency exchange in Japan) regarding an initial exchange offering of Grams.  Drylewski Ex. 5 at 2.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 157 except the Commission notes that Telegram became aware of the facts suggesting Space Investments' involvement with Liquid in May 2019.  SEC 56.1 ¶¶ 236–37.

158.     Telegram referred Space Investments to its representations under the Purchase Agreement and asked Space Investments to confirm that it is not (and has not been) cooperating with Liquid.com in this regard and that it has at all times acted (and will continue to act) in accordance with the terms of the Purchase Agreement.  Drylewski Ex. 5 at 2.

Commission Response:  The Commission does not controvert the assertion contained in Paragraph 158 except the Commission notes that Telegram became aware of the facts suggesting Space Investments' involvement with Liquid in May 2019.  SEC 56.1 ¶¶ 236–37.

### D. The Private Placement Materials

159.    The Private Placement Materials were sent by Telegram to some potential and all actual Private Placement purchasers.  JSF ¶ 64.

   <u>Commission Response</u>:  The Commission does not controvert the assertions contained in Paragraph 159 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

160.    In late 2017, Defendants distributed to some prospective and actual purchasers preliminary materials regarding certain anticipated plans for TON ("Teasers").  JSF ¶ 66.

   <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 160.

161.    One of the Teasers was a two-page document (the "Two Page Teaser").  JSF ¶ 67.

   <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 161.

162.    Defendants also distributed a four-page document (the "Four Page Teaser").  JSF ¶ 69.

   <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 162.

163.    In the Four Page Teaser, Defendants stated that the Durovs have "[b]etween them . . . over 20 years of experience in building billion dollar companies used by hundreds of millions of people."  JX4, Four Page Teaser, at 4.

   <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 163.

164.    In the Four Page Teaser, Defendants described the "challenge" behind creating Grams as follows:

Bitcoin has established itself as the <<digital gold>>, and Ethereum proved to be an efficient platform for token crowd sales. However, a cryptocurrency used for regular value exchange in the daily lives of ordinary people is yet to be created. The blockchain ecosystem needs a decentralized counterpart of everyday money – a truly mass market cryptocurrency.

JX4 at 1.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 164.

165.     Telegram created a document titled "Pre-Sale Primer," dated January 18, 2018, that it distributed to potential investors in Round 1 of the Private Placement.  JSF ¶ 77; JX8.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 165 except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

166.     Attached to the Pre-Sale and Stage A Primers as Appendix B was a list of risk factors titled "Certain Risks Associated with the Purchase, Sale and Use of Grams," the "Round 1 Risk Factors" and "Round 2 Risk Factors," respectively, and the "Risk Factors," collectively. JSF ¶¶ 78, 100, 102; JX14, Round 1 Risk Factors; JX15, Round 2 Risk Factors.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 166.

167.     The Risk Factors warned: "**A purchase of Grams involves a high degree of risk.  You should carefully consider the risks and uncertainties described below before deciding to purchase Grams.  The occurrence of any of the following risks could result in you losing all or part of your investment**."  JX14, JX15 at 1 (emphasis original).

Commission Response: The Commission does not controvert the assertions contained in Paragraph 167.

54

168.     The Risk Factors' first paragraph was titled "Uncertain Regulatory Framework." JX14, JX15 at 1.

        <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 168.

169.     The Uncertain Regulatory Framework paragraph read as follows in the Round 1 Risk Factors:

> The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions. . . . Telegram and the wholly owned subsidiary that Telegram intends to create to act as the issuer in the token sale (the "**Issuer**"), as applicable, may cease the distribution of Grams, cease the development of the TON Blockchain or cease operations in a jurisdiction in the event that governmental or other actions make such distribution, development and/or operations unlawful or commercially undesirable to continue.

JX14 at 1.

        <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 169.

170.     The Uncertain Regulatory Framework paragraph read as follows in the Round 2 Risk Factors:

> The regulatory status of cryptographic tokens, digital assets and blockchain technology and its applications is unclear or unsettled in many jurisdictions. . . . Telegram and TON Issuer Inc, the wholly owned subsidiary that Telegram formed to act as the issuer in the token sale (the "**Issuer**"), as applicable, may cease the distribution of Grams, cease the development of the TON Blockchain or cease operations in a jurisdiction in the event that governmental or other actions make such distribution, development and/or operations unlawful or commercially undesirable to continue.

JX15 at 1.

        <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 170.

171.    The Risk Factors' second paragraph was titled "Legal and Regulatory Factors Relating to Telegram's Business Model Might Present Barriers to Success."  JX14 at 1.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 171.

172.    The Legal and Regulatory Factors Relating to Telegram's Business Model Might Present Barriers to Success read as follows:

The TON Blockchain will operate in a new and developing legal and regulatory environment. There is no established body of law or court decisions concerning blockchain and smart contracts, and the law regarding token sales and cryptocurrencies is developing. As a result, it is possible that there could be legal disputes over the interpretation of smart contracts used in connection with the TON Blockchain, thus undermining the functionality of the TON Blockchain and Grams. To the extent licenses or other authorizations are required in one or more jurisdictions in which the Issuer operates or will operate, there is no guarantee that the Issuer will be granted such licenses or authorizations. The Issuer may need to change its business model to comply with these licensing and/or registration requirements (or any other legal or regulatory requirements) in order to avoid violating applicable laws or regulations or because of the cost of such compliance. Uncertainty in how the legal and regulatory environment will develop could negatively impact the Issuer.

JX14 at 1; JX15 at 1-2.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 172.

173.    The Risk Factors' third paragraph was titled "Risks of Government and Private Actions."  JX14, JX15 at 2.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 173.

174.    The Risks of Government and Private Actions paragraph read as follows:

The cryptocurrency market is new and may be subject to heightened oversight and scrutiny, including investigations or enforcement actions. There can be no assurance that governmental authorities will not examine the operations of

56

Telegram and the Issuer, or enact regulations or pursue enforcement actions against Telegram or the Issuer, which may result in curtailment of, or inability to operate, the TON Blockchain as intended, or judgments, settlements, fines or penalties against Telegram and the Issuer. In addition, non-governmental parties may bring private legal actions against Telegram or the Issuer, either individually or as a class, which may result in curtailment of, or inability to operate, the TON Blockchain as intended, or judgments, settlements, fines or penalties against Telegram and the Issuer.

JX14, JX15 at 2.

      Commission Response: The Commission does not controvert the assertions contained in Paragraph 174.

175.    The Round 1 Risk Factors' fifth paragraph was titled "Risks Associated with the Development and Launch of the TON Blockchain." JX14 at 2; JX15 at 3.

      Commission Response: The Commission does not controvert the assertions contained in Paragraph 175.

176.    The Risks Associated with the Development and Launch of the TON Blockchain paragraph read as follows:

The TON Blockchain (which for purposes of these risk factors, includes the TON "light wallet") has not yet been developed and its development will require significant capital, the expertise of Telegram's management and substantial time and effort by skilled developers and other parties. Telegram may not retain the services of developers with the technical skills and expertise needed to successfully develop the TON Blockchain and progress it to a successful launch. In addition, even if the TON Blockchain is successfully developed and launched, there can be no assurance that the TON Blockchain will function as intended or that it will be able to sustain long-term operation of Grams or other large scale D-apps or cryptocurrencies. Although Telegram intends for the TON Blockchain to have the features and specifications set forth in the "Telegram Open Network" technical white paper (the "**Technical White Paper**"), changes to such features and specifications may be made for any number of reasons. There can be no assurance that the TON Blockchain or Grams will function as described in the Technical White Paper or will be launched according to the milestones set forth in the "Roadmap" section of the [relevant] Primer.

Telegram plans to incorporate various technology solutions into the TON Blockchain, including, but not limited to, the various components of the TON

Platform, infinite sharding, instant hybercube routing, 2-D distributed ledgers and proof-of-stake approach (each as described in the "Telegram Open Network (TON)" section of the [relevant] Primer). Some or all of these technology solutions may be new and/or relatively untested. There is significant risk to building and implementing such new technologies that may have never been used, or that are being used in different ways. There is no guarantee that such technologies will operate as intended or as described in the Technical White Paper or the [relevant] Primer or will be launched according to the milestones set forth in the "Roadmap" section of the [relevant] Primer.

JX14 at 2-3; JX15 at 3.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 176.

177. The Risk Factors' twelfth paragraph was titled "Risks Associated With Integrating the TON Blockchain and Telegram Messenger." JX14, JX15 at 5.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 177.

178. The Risks Associated With Integrating the TON Blockchain and Telegram Messenger paragraph read as follows:

Although Telegram intends to integrate the TON Blockchain with Telegram Messenger as described in the "Telegram Messenger-TON Integration" section of the [relevant] Primer, Telegram may be unable to achieve the intended technical integration between the TON Blockchain and Telegram Messenger on the terms described in the [relevant] Primer. As a result, adoption of Grams as a form of currency within Telegram Messenger's existing ecosystem may be more limited than anticipated.

JX14 at 5; JX15 at 6.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 178.

179. The Risk Factors' thirteenth paragraph was titled "Risks Associated With The Offer and Sale of Grams." JX14, JX15 at 6.

> Commission Response: The Commission does not controvert the assertions

contained in Paragraph 179.

180. The Risks Associated With The Offer and Sale of Grams paragraph contained the

following disclosures:

> Telegram and the Issuer intend to complete the . . . sale in two stages, as described
> in the "Token Distribution" section of the [relevant] Primer.
>
> * * *
>
> Grams are intended to act as a medium of exchange between users in the TON
> ecosystem. Grams are not investment products. There should be no expectation
> of future profit or gain from the purchase or sale of Grams. Grams do not
> represent (i) any equity or other ownership interest in Telegram or the Issuer,
> (ii) any rights to dividends or other distribution rights from Telegram or the Issuer
> or (iii) any governance rights in Telegram or the Issuer.

JX14, JX15 at 6.

> Commission Response: The Commission does not controvert the assertions

contained in Paragraph 180.

181. The Risk Factors' fourteenth paragraph was titled "Risk of Price Volatility."

JX14 at 6; JX15 at 7.

> Commission Response: The Commission does not controvert the assertions

contained in Paragraph 181.

182. The Risk of Price Volatility paragraph explained that the price of Grams would be

subject to market forces, stating as follows:

> The prices of cryptocurrencies have historically been subject to dramatic
> fluctuations and are highly volatile, and the market price of Grams may also be
> highly volatile. Several factors may influence the market price of Grams,
> including, but not limited to:
>
> - Global supply of cryptocurrencies, both with respect to the number of
>   different cryptocurrencies and the supply of each individual
>   cryptocurrency;

59

- Global demand for cryptocurrencies, which can be influenced by the growth of acceptance of cryptocurrencies as payment for goods and services, the security of online cryptocurrency exchanges and digital wallets that hold cryptocurrencies, the perception that the use and holding of cryptocurrencies is safe and secure, and the regulatory restrictions on their use;

- Changes in software, software requirements or hardware requirements underlying blockchain technologies;

- Fiat currency withdrawal and deposit policies of cryptocurrency exchanges on which cryptocurrencies may be traded and liquidity on such exchanges;

- Interruptions in service from or failures of major cryptocurrency exchanges;

- Investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in cryptocurrencies;

- Monetary policies of governments, trade restrictions, currency devaluations and revaluations; and

- Regulatory measures, if any, that affect the use of cryptocurrencies.

A decrease in the price of a single cryptocurrency may cause volatility in the entire cryptocurrency industry and may affect other cryptocurrencies, including Grams. For example, a security breach that affects investor or user confidence in Bitcoin or Ethereum may affect the industry as a whole and may also cause the price of Grams and other cryptocurrencies to fluctuate.

JX14 at 6-7; JX15 at 7; JSF ¶ 170.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 182.

183. The Risk Factors' fifteenth paragraph was titled "Risks Associated with the Issuer and Use of Funds." JX14 at 7.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 183.

184.    The Risks Associated with the Issuer and Use of Funds paragraph read as follows:

Telegram expects the Issuer to transfer all or a significant portion of the funds generated by the token sale to Telegram.  While Telegram and the Issuer intend to use the funds as described in the "Use of Funds" Section of the [relevant] Primer, there is no restriction on Telegram's or the Issuer's use of the funds generated from the token sale or on Telegram's ability to transfer those funds to, or make payments for the benefit of, its affiliates.  There can be no assurance that the Issuer or Telegram will have sufficient funds to make payments of any Termination Amount (as defined in the Purchase Agreements) as and when required under the terms of the Purchase Agreements. Neither Telegram nor the Issuer has any fiduciary or other obligation to use the funds generated by the token sale for the benefit of the purchasers, except as otherwise expressly provided in the Purchase Agreements in connection with Telegram's and the Issuer's contingent obligation to repay any Termination Amount.

JX14 at 7; JX15 at 7-8.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 184.

185.    The Risk Factors' sixteenth paragraph was titled "Risk Associated with the TON Foundation."  JX14, JX15 at 8.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 185.

186.    The Risks Associated with the TON Foundation paragraph read as follows:

Over time, Telegram intends to establish the TON Foundation and to transfer responsibilities related to TON and the TON Reserve to the TON Foundation, as described in the "Governance" section of the [relevant] Primer.  There is, however, no timetable for the establishment of the TON Foundation or the transfer of the responsibilities related to TON and the TON Reserve to the TON Foundation, and it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON Foundation may differ from current expectations.

JX14, JX15 at 8.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 186.

61

E.    **The Purchase Agreements**

187.    Telegram initially contemplated a public offering of Grams following the Private Placement.  JSF ¶ 39.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 187, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

188.    Given the legal uncertainty surrounding public offerings of digital assets, however, Telegram "decided that [it] should take a safer, as safe as possible approach and deal only with highly sophisticated institutional investors in a proper, organized private placement." Drylewski Ex. 7, Parekh Dep. at 28:10-14.

Commission Response: The Commission disputes the assertion contained in paragraph 188 on the ground that the phrase "proper, organized private placement" is a legally incorrect characterization of the Offering.  Subject to and without waving this objection and dispute, and without waiving its right to challenge the credibility of these witnesses, the Commission does not controvert that the cited individuals testified to the cited statement.

189.    Defendants ultimately determined that they would sell the right to receive Grams to Private Placement purchasers using the Purchase Agreements.  JSF ¶ 40.

Commission Response: The Commission objects to the phrases "right to receive Grams" and "Private Placement" and disputes the assertions contained in Paragraph 189 on the ground that they incorrectly state what was sold to the Initial Purchasers and the legal status of the Offering.  In addition, JSF ¶ 40 does not use the objected-to phrases.  Subject to and without waving these objections and disputes, the Commission does not dispute that Defendants sold Grams to the Initial Purchasers pursuant to the Purchase Agreements.

190.    Defendants used separate Purchase Agreements for each round of the Private Placement: one for Round 1 (the "Round 1 Purchase Agreements") and one for Round 2 (the "Round 2 Purchase Agreements").  JSF ¶¶ 40, 85-86.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 190, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

191.    At the time of the Private Placement, the Purchase Agreements were the only physical instrument in existence that represented any interest in Grams.  *See* JX11, Round 1 Purchase Agreement; JX12, Round 2 Purchase Agreement § 6.3(f).

Commission Response: The Commission does not controvert the assertions contained in Paragraph 191, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

192.    Defendants distributed the Purchase Agreements to certain potential purchasers who completed indications of interest.  JSF ¶ 82, 92.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 192.

193.    The Purchase Agreements contained, among other things, the following legend:

**NOTICE TO RESIDENTS OF THE UNITED STATES**

THE OFFER AND SALE OF THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**U.S. SECURITIES ACT"),** OR UNDER THE SECURITIES LAWS OF ANY U.S. STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT OR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

JX11, JX12 at 1 (emphasis original).

        <u>Commission Response</u>: The Commission does not controvert the assertions

contained in Paragraph 193.

        194.    As explained in the Purchase Agreements, the Purchase Agreements were

designed to allow Defendants "to create and issue a new cryptocurrency called '**Grams**'

('**Tokens**') following the development and launch of a new blockchain platform (the '**TON**

**Network**')" and the Private Placement purchasers to "subscribe for Tokens." JX11 at 7

(emphasis original); JX12 at 11 (emphasis original).

        <u>Commission Response</u>: The Commission objects to the term "cryptocurrencies"

on the ground that it is vague and ambiguous and objects to the phrase "Private Placement" on

the ground that it is a legally incorrect characterization of the Offering. Subject to and without

waiving these objections, the Commission does not controvert that the documents referenced in

Paragraph 194 contain the quoted phrases.

        195.    Per the Round 1 Purchase Agreements, the issuance of Grams "is conditional

upon the satisfaction by the [Private Placement] Purchaser or waiver by [TON] Issuer of the

following conditions precedent:

    (a) the Purchaser executing and delivering to the Issuer an executed Rep Letter, a
completed KYC Form and such other documents relating to this Purchase
Agreement as the Issuer may reasonably request;

    (b) the Purchaser having satisfied its obligations under clause 2.2;

    (c) the Purchaser having provided to the Issuer a network address to which the
Tokens comprising the Purchaser's Token Allocation shall be issued pursuant to
clause 2.1; provided that if the Purchaser has not provided a network address to
the Issuer in accordance with this clause 3(c) on or prior to the date that is twenty-
four months following the Network Launch Date, the obligation of the Issuer to
deliver Tokens to the Purchaser hereunder shall cease and the Issuer shall have no
further obligations to the Purchaser hereunder; and

(d) the Purchaser's Warranties remaining true, accurate and not misleading on the Network Launch Date.

JX11 § 3.

Commission Response:  The Commission objects to the phrase "Private Placement" on the ground that it is a legally incorrect characterization of the Offering.  Subject to and without waiving this objection, the Commission does not controvert that the document referenced in Paragraph 195 contains the quoted phrases except for the inserted phrase "Private Placement" before "Purchaser."

196.    The Rep Letters referenced in the Round 1 conditions precedent was attached to the Round 1 Purchase Agreements.  JSF ¶ 89.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 196.

197.    The Round 2 Purchase Agreements contained similar conditions precedent:

(a) the Purchaser executing and delivering to the Issuer (i) a completed Rep Letter Questionnaire; (ii) all executed Rep Letters required pursuant to the Rep Letter Questionnaire or otherwise required by the Issuer in its sole discretion; (iii) a completed KYC Form; and (iv) such other documents relating to this Purchase Agreement as the Issuer may reasonably request (including, but not limited to, a certification that neither the Purchaser nor any Purchaser Investor has breached any provision of this Purchase Agreement, including, but not limited to, clause 10);

(b) the Purchaser having satisfied its obligations under clause 2.1;

(c) the Purchaser having provided to the Issuer a network address to which the Tokens comprising the Purchaser's Token Allocation shall be issued pursuant to clause 2.1; provided that if the Purchaser has not provided a network address to the Issuer in accordance with this clause 3(c) on or prior to the date that is twenty-four months following the Network Launch Date, the obligation of the Issuer to deliver Tokens to the Purchaser hereunder shall cease and the Issuer shall have no further obligations to the Purchaser hereunder; and

65

(d) the Purchaser's Warranties remaining true, accurate and not misleading on the Network Launch Date.

JX12 § 3.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 197.

198.    Telegram distributed the Rep Letters referenced in the Round 2 conditions precedent alongside (but not attached to) the Round 2 Purchase Agreements.  Drylewski Ex. 11, Rep Letter Questionnaire.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 198.

199.    Private Placement purchasers agreed to a series of "Warranties and Undertakings" in the Purchase Agreements.  JX11, JX12 § 6.

> Commission Response: The Commission objects to the phrase "Private Placement" but does not otherwise controvert the assertions contained in Paragraph 199.

200.    As part of these Warranties and Undertakings, the Private Placement purchasers warranted that they understood and expressly accepted the following:

(a) the Purchaser has read and understands the [relevant] Primer, as well as the "Technical White Paper" attached as Appendix A thereto and the "Risk Factors" attached as Appendix B thereto;

(b) this Purchase Agreement and the Tokens involve significant risks, all of which the Purchaser fully and completely acknowledges and assumes, including, but not limited to, the risk that the Tokens may decrease in value over time and/or lose all monetary value and the other risks listed in Appendix B to the [relevant] Primer;

(c) a significant portion of the funds generated by this Purchase Agreement and the . . . Purchase Agreements are expected to be retained by the Parent for its own purposes rather than committed solely to the development and launch of the TON Network;

(d) . . . no federal or state agency or any other Governmental Authority has passed on or made any recommendation or endorsement of this Purchase Agreement or the Tokens or the fairness or suitability of the investment in the Tokens, nor has any Governmental Authority passed upon or endorsed the merits of this offering;

(e) the Tokens will be created and delivered to the Purchaser at the sole risk of the Purchaser on an "as is" basis;

(f) the Purchaser has not relied on any representations or warranties made by the Issuer or the Parent outside of this Purchase Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer;

(g) the Purchaser bears sole responsibility for any taxes as a result of the matters and transactions the subject of this Purchase Agreement, and any future acquisition, ownership, use, sale or other disposition of Tokens (each a "**relevant matter**") held by or on behalf of the Purchaser. To the extent permitted by law, the Purchaser agrees to indemnify, defend and hold the Issuer, the Parent and any of their respective Affiliates, employees or agents (including developers, auditors, contractors or founders) harmless on an after-tax basis for any claim, liability, assessment or penalty with respect to any taxes (other than any net income taxes of the Issuer that result from the Issuance) associated with or arising from any relevant matter;

(h) the Purchaser is not entitled, as a Party to this Purchase Agreement, to vote or receive dividends or be deemed the holder of shares of the Issuer or the Parent for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of a shareholder of the Issuer or the Parent or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights to purchase shares of the Issuer or the Parent or otherwise;

(i) each of the Issuer and the Parent retains all right, title and interest in all of their respective intellectual property, including, without limitation, inventions, ideas, discoveries, software, processes, marks, methods, information and data, whether or not protectable by patent, copyright or trademark. The Purchaser may not use any of the Issuer's or the Parent's intellectual property for any reason without the Issuer's or the Parent's prior written consent. Notwithstanding the foregoing, use by the Purchaser of Telegram Messenger in accordance with the terms and conditions thereof shall not be a violation of this clause 6.3(i);

(j) none of the documentation prepared by the Issuer or the Parent in connection with the Issuance or the development of the TON Network will constitute a Prospectus for the purposes of the Prospectus Directive and no Prospectus will be

prepared, approved by any competent authority or published for the purposes of the Prospectus Directive; and

(k) the Parent may transfer responsibility for the further development and maintenance of the TON Network to a not-for-profit organization [expected to be] called the "TON Foundation" at such point in time and on such terms as the Parent shall determine in its sole discretion.

JX11, JX12 § 6.3.

> Commission Response: The Commission objects to the phrase "Private Placement" but does not otherwise controvert the assertions contained in Paragraph 200.

201. The Purchase Agreements further provided that they "will automatically terminate upon the earlier of:

(a) the Issuance;

(b) the occurrence of a Dissolution Event prior to the Deadline Date (as defined below); and

(c) 31 October 2019 (the "**Deadline Date**"), if the Network Launch has not occurred as of such date,

provided that . . . if the Purchase Agreement is terminated under clause 7.1(b) or 7.1(c), the Issuer and the Parent shall be jointly and severally liable to the Purchaser for the payment of the Termination Amount upon the occurrence of a Dissolution Event or immediately following the Deadline Date, as applicable. Any Termination Amount shall be paid in U.S. Dollars, unless otherwise agreed by the Parties.

JX11, JX12 § 7.1.

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 201.

202. Effective October 23, 2019, a majority of the Private Placement purchasers consented to amend the Purchase Agreements to extend the Deadline Date (as defined in the

Purchase Agreements) from October 31, 2019, to April 30, 2020.  Drylewski Ex. 7, Parekh Dep.

at 194:15-195:11.

       <u>Commission Response</u>: The Commission does not controvert the assertions

contained in Paragraph 202, except that it disputes Telegram's legal conclusion characterizing

the Offering as a "Private Placement."

203.    The Round 1 Purchase Agreement included a "Lock-Up" clause, which stated that

Private Placement purchasers in Round 1 could not:

(a)    offer, pledge, sell, . . . or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement or any Tokens . . .; or

(b)    enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement or any Tokens,

. . . <u>provided</u>, <u>however</u>, that:

(i)    one-quarter of the Token Allocation shall be released from the restrictions in this clause 10 on the date that is three months following the Network Launch Date;

(ii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraph (i) above, equals one-half of the Token Allocation) shall be released from the restrictions in this clause 10 on the date that is six months following the Network Launch Date; and

(iii)    one-quarter of the Token Allocation (which, when added to the Tokens released under paragraphs (i) and (ii) above, equals three-quarters of the Token Allocation) shall be released from the restriction in this clause 10 on the date that is 12 months following the Network Launch Date.

JSF ¶ 95; JX11 § 10.

       <u>Commission Response</u>: The Commission does not controvert the assertions

contained in Paragraph 203, except that it disputes Telegram's legal conclusion characterizing

the Offering as a "Private Placement."

204.     The Round 2 Purchase Agreement did not contain the "Lock-Up" clause that was included in the Round 1 Purchase Agreement.  JSF ¶ 93.

        Commission Response: The Commission does not controvert the assertions contained in Paragraph 204.

205.     The Purchase Agreements contained an express restriction on assignments.  JX11 § 11; JX12 § 10.

        Commission Response: The Commission does not controvert the assertions contained in Paragraph 205.

206.     The Round 1 Assignment Clause read as follows:

11.1 Subject to clauses 11.2 and 11.3, no Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement or subcontract or delegate in any manner whatsoever its performance under this Purchase Agreement (each of the above, a "**dealing"**) without the prior written consent of the Purchaser, in the case of a dealing by the Issuer or the Parent, or the Issuer and the Parent, in the case of dealing by the Purchaser.

11.2 The Issuer and the Parent shall be entitled, without the consent of the Purchaser, after having given no less than three Business Days' prior written notice to the Purchaser, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all their respective obligations and liabilities under this Purchase Agreement (i) to any of their respective Affiliates; or (ii) in connection with a reorganisation of the Issuer or the Parent (including a change in the domicile or jurisdiction of incorporation of the Issuer or the Parent).

11.3 The Purchaser shall be entitled, without the consent of the Issuer or the Parent, after having given no less than three Business Days' prior written notice to the Issuer and the Parent, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all its obligations and liabilities under this Purchase Agreement to any of its Affiliates (an "**Assignee"),** provided that the Assignee: (i) undertakes in writing to the Issuer and the Parent to be bound by the Purchaser's obligations and liabilities under this Purchase Agreement; (ii) warrants in writing to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date of the assignment or transfer with respect to itself (as if each reference to the Purchaser is construed as

a reference to the Assignee); and (iii) delivers such other documents to the Issuer relating to this Purchase Agreement as the Issuer may reasonably request.

JX11 § 11 (emphasis original).

Commission Response: The Commission does not controvert the assertions contained in Paragraph 206.

207.    The Round 2 Assignment Clause read as follows:

10.1 Subject to clause 10.4, the Purchaser agrees and undertakes that during the Restricted Period it shall not, without the prior written consent of the Issuer and the Parent:

> (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer, encumber or dispose of, directly or indirectly (through a direct or indirect transfer, encumbrance or disposition of any interest in any entity, contract or otherwise), the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, or any securities convertible into or exercisable or exchangeable for the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, or publicly disclose the intention to make any such offer, sale, pledge or disposition; or

> (b) enter into any swap or other agreement that transfers, directly or indirectly, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, whether any such transaction described in paragraphs (a) or (b) of this clause 10.1 is to be settled by delivery of the investment contract represented by this Purchase Agreement (or any interest therein) or any Tokens, in cash or otherwise.

10.2 Subject to clauses 10.3 and 10.4, no Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement or subcontract or delegate in any manner whatsoever its performance under this Purchase Agreement (each of the above, a "**dealing")** without the prior written consent of the Purchaser, in the case of a dealing by the Issuer or the Parent, or the Issuer and the Parent, in the case of dealing by the Purchaser.

10.3 The Issuer and the Parent shall be entitled, without the consent of the Purchaser, after having given no less than three Business Days' prior written

71

notice to the Purchaser, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all of their respective obligations and liabilities under this Purchase Agreement (i) to any of their respective Affiliates; or (ii) in connection with a reorganisation of the Issuer or the Parent (including a change in the domicile or jurisdiction of incorporation of the Issuer or the Parent).

10.4 The Purchaser shall be entitled, without the consent of the Issuer or the Parent, after having given no less than three Business Days' prior written notice to the Issuer and the Parent, to assign the benefit of this Purchase Agreement (in whole or in part) or transfer any or all its obligations and liabilities under this Purchase Agreement to any of its Affiliates (an "**Assignee**"), <u>provided</u> that the Assignee: (i) undertakes in writing to the Issuer and the Parent to be bound by the Purchaser's obligations and liabilities under this Purchase Agreement; (ii) warrants in writing to the Issuer and the Parent that each of the Purchaser's Warranties is true, accurate and not misleading as at the date of the assignment or transfer with respect to itself (as if each reference to the Purchaser is construed as a reference to the Assignee); and (iii) delivers such other documents to the Issuer relating to this Purchase Agreement as the Issuer or the Parent may reasonably request.

JX12 § 10 (emphasis original).

> <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 207.

208.     The Purchase Agreements contained a Schedule 2, titled "Purchaser's Warranties."  JSF ¶ 89; JX11, JX12.

> <u>Commission Response</u>: The Commission does not controvert the assertions contained in Paragraph 208.

209.     The Private Placement purchasers warranted, in part, the following to Defendants under the Purchaser's Warranties in the Round 1 Purchase Agreement:

1. if the Purchaser is an entity, the Purchaser is validly formed, in existence and duly registered under the laws of its jurisdiction of formation;

2. the Purchaser has the full legal capacity, power and authority to execute and deliver this Purchase Agreement and to perform its obligations hereunder;

3. this Purchase Agreement will, when executed, constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in

accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

4. the entry into this Purchase Agreement and the consummation of the transactions contemplated thereby is lawful under the laws of the jurisdiction of the Purchaser's incorporation and the jurisdiction in which it operates (if different), and such purchase will not contravene any law, regulation or regulatory policy applicable to the Purchaser;

5. it has been advised that the investment contract represented by this Purchase Agreement is a security and that the offers and sales thereof have not been registered under any country's securities laws and, therefore, the investment contract represented by this Purchase Agreement cannot be resold except in compliance with each applicable country's laws;

6. the Purchaser is purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof (provided, however, that by making the representations and warranties herein, except as set forth in this Purchase Agreement, the Purchaser does not agree to hold any of the Tokens for any minimum or other specific term and reserves the right to dispose of the Tokens at any time in accordance with applicable securities laws and the terms of this Purchase Agreement). The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Tokens;

7. the Purchaser is a sophisticated party with sufficient knowledge and experience in financial and business matters to evaluate properly the merits and risks of entering into this Purchase Agreement, including the merits and risks associated with subscribing for Tokens. The Purchaser understands that its investment hereunder and in the Tokens involves a high degree of risk. The Purchaser has conducted its own analysis and made its own decision to enter into this Purchase Agreement and agree to purchase the Tokens and has obtained such independent advice (including accounting, legal and tax advice) in this regard as it deemed appropriate; and the Purchaser has not relied in such analysis or decision on any Person other than its own independent representatives. The Purchaser and its representatives have been afforded the opportunity to make inquiries of the Issuer and/or the Parent. The Purchaser can afford a complete loss of its investment hereunder, should such loss occur, and without any financial hardship, should such loss occur;

JX11 Schedule 2.

> Commission Response: The Commission does not controvert the
assertions contained in Paragraph 209, except that it disputes Telegram's legal conclusion
characterizing the Offering as a "Private Placement."

210.   The Round 2 Purchase Agreement contained identical Purchaser's Warranties as
Round 1 above, except for the following:

> 6. the Purchaser is entering into the investment contract represented by this
Purchase Agreement and purchasing this security and the Tokens for its own
account, not for the benefit of any other person (other than any Purchaser
Investor) and not with a view towards, or for resale in connection with, the sale or
distribution thereof (provided, however, that by making the representations and
warranties herein, except as set forth in this Purchase Agreement, the Purchaser
does not agree to hold any of the Tokens for any minimum or other specific term
and reserves the right to dispose of the Tokens at any time in accordance with
applicable securities laws and the terms of this Purchase Agreement). The
Purchaser does not presently have any agreement or understanding, directly or
indirectly, with any Person to distribute this security or any of the Tokens;

JX12 Schedule 2.

> Commission Response: The Commission does not controvert the
assertions contained in Paragraph 210.

211.   The Round 2 Purchase Agreement was labeled "**PRIVATE &
CONFIDENTIAL**" and included the following confidentiality clause:

13.1 Subject to clause 13.2, the Purchaser agrees that:

> (a) the Purchaser shall, and shall cause its Affiliates and representatives
and any Purchaser Investor to, (i) keep this Purchase Agreement and any
other information provided to the Purchaser or its Affiliates or
representatives or any Purchaser Investor by or on behalf of the Issuer or
the Parent secret at all times, except with the prior written consent of the
Issuer and the Parent, (ii) not disclose such information or allow such
information to be disclosed in whole or in part to any third party without
the prior written consent of the Issuer and the Parent, (iii) not use such
information in whole or in part for any purpose other than in connection
with the transactions contemplated by this Purchase Agreement, and (iv)
undertake to take all reasonable measures to ensure the confidentiality of
this Purchase Agreement and any other information provided to the

Purchaser or its Affiliates or representatives or any Purchaser Investor by the Issuer or the Parent; and

(b) the Purchaser shall not, and shall cause its Affiliates and representatives and any Purchaser Investor to not, without the prior written consent of the Issuer and the Parent, use the Issuer or the Parent's name or logo, or the name or logo of any of their Affiliates or representatives, in any manner or format (including in any reference in or links to websites, press releases or otherwise).

13.2 Notwithstanding the obligations set forth in clause 13.1, the Purchaser may, without the prior written consent of the Issuer or the Parent, disclose to a third party this Purchase Agreement and any other information provided to the Purchaser or its Affiliates or representatives or any Purchaser Investor by or on behalf of the Issuer or the Parent to the extent required by applicable law (including any applicable rule or regulation or by subpoena, writ, warrant, order or directive of a court, arbitrator or governmental regulatory body, agency or authority), in which case the Purchaser shall (i) promptly notify the Issuer and the Parent of such requirement and cooperate with the Issuer and the Parent to limit the information disclosed to only such information that the Purchaser, as advised by counsel, is required by applicable law to disclose and (ii) seek to obtain a protective order over, or confidential treatment of, such information.

JX12 § 13 (emphasis original).

Commission Response: The Commission does not controvert the assertions contained in Paragraph 211.

212.    Telegram intends to require each Private Placement purchaser to repeat its representations at the launch of the TON Blockchain as a condition precedent to receiving any allocation of Grams.  Drylewski Ex. 2, Durov Dep. at 287:25-288:13.

 1.    *Public Availability of the Private Placement Materials*

213.    The Round 1 Purchase Agreements prohibited Private Placement purchasers from offering the Purchase Agreements or any Grams to others and from publicly disclosing the intention to make any such offers.  JSF ¶ 96.

75

Commission Response: The Commission does not controvert the assertions contained in Paragraph 213, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

214.     The Round 2 Purchase Agreements prohibited Private Placement purchasers from offering the Purchase Agreements or any Grams to others and from publicly disclosing the intention to make any such offers.  JX12 § 10.1(a).

Commission Response: The Commission does not controvert the assertions contained in Paragraph 214, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

215.     The Round 2 Purchase Agreements required Round 2 Private Placement purchasers not to disclose the information provided by the Defendants to any third parties absent prior written consent of the Defendants.  JSF ¶ 97.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 215, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

216.     Despite these restrictions by Telegram, the Private Placement Materials have become public.  JSF ¶ 98.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 216, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

217.     Additionally, certain of the Private Placement Materials, including the Technical Whitepaper, the Primers, and the Purchase Agreements, were placed on the Internet and, as such, are accessible to the public at large.  JSF ¶ 99.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 217, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

218.    Telegram was careful not to publicly comment on any of these materials or otherwise make any statements about the details of the anticipated project to the public, particularly in light of the legal and regulatory uncertainty and the flexibility it had reserved regarding those details.  Drylewski Ex. 3; Drylewski Ex. 2, Durov Dep. at 23:10-25.

Commission Response: The Commission objects to the phrases "otherwise make any statements about the details of the anticipated project to the public" and "particularly in light of the legal and regulatory uncertainty" in Paragraph 218 as vague and ambiguous.  In addition, the Commission disputes the assertions contained in Paragraph 218 on the ground that the cited documents do not support such broad reaching assertions.  Drylewski Ex. 3 is Telegram's self-serving Public Notice dated January 6, 2020 and is inadmissible by Telegram to prove that Telegram did not publicly comment or otherwise make any statements at any point in time regarding the TON project to the public.  Nor is it admissible by Telegram to prove the alleged motivations underlying Telegram's decisions.  The Commission does not controvert that Pavel Durov testified that Telegram allegedly did not comment publicly on its work related to the TON project, but reserves its right to challenge his credibility.

## III.    **DEVELOPMENT OF THE TON BLOCKCHAIN**

219.    The TON Blockchain was fully developed and ready to be launched as of October 31, 2019.  Drylewski Ex. 7, Parekh Dep. at 169:5-8, 169:25-170:11; *see also* Drylewski Ex. 2, Durov Dep. at 258:9-14 (describing the testing of the core components of the TON network as complete).

77

Commission Response: The Commission disputes the assertion that TON Blockchain was fully developed and ready for launch as of October 31, 2019. First, the testimony of Shyam Parekh cited does not support the assertion in Paragraph 219. Parekh admitted that his understanding as to the status of the TON Blockchain in October 2019 was second hand based on what Pavel Durov and Ilya Perekopsky told him. PX200, Parekh Tr. at 170:1-172:12. Parekh did not confirm with Durov prior to that communication going out that the TON Blockchain was in fact ready to launch at the end of October 2019. Id. at 171:6-11. Parekh's role at Telegram was assisting in the Round One and Round Two fund raises by interacting with potential and actual Initial Purchasers. PX14 (D.E. 81-14), Parekh Tr. at 19:11-20:8. His background was in the financial services industry. Perekh Dep. Tr. at 11:9-13; 18. He had no prior experience in coding for blockchains or the creation of digital assets. Id. at 23:1-10. Perekopsky also had no firsthand knowledge of the status of the TON Blockchain. His role at Telegram was also focused on assisting in the Round One and Round Two fund raises by interacting with potential and actual Initial Purchasers. PX199, Perekopsky Tr. at 61:14-19; 69:4-21. He had no prior experience in coding for blockchains or the creation of digital assets. Id. at 68:8-69:3; 69:4-21; 71:16-72:7.

Similarly, the cited testimony of Pavel Durov does not support the assertion in Paragraph 219. Durov merely testified that as of the date of his deposition, January 8, 2020, the testing of what he considered the core components of the TON network was complete but that testing of certain additional functionality that, in his opinion, was not necessary but "would be nice to have" but that "it's still required" was ongoing. PX12 (D.E. 81-12), Durov Tr. at 258:9-15. That testimony does not support the assertion that the TON Blockchain was fully developed and ready to launch as of October 31, 2019.

78

220.    Defendants have reserved the right to change, modify or eliminate any aspects of the TON Blockchain platform until its launch.  Drylewski Ex. 9 at TLGRM-005-00005507 – TLGRM-005-00005508, TLGRM-005-00005587 – TLGRM-005-00005588; Drylewski Ex. 2, Durov Dep. at 159:18-160:3, 161:6-19.

Commission Response: The Commission objects to this assertion on the ground that the phrase "reserved the right" is vague and ambiguous.  Subject to and without waiving this objection, the Commission does not controvert the assertion contained in Paragraph 220 to the extent that it refers to what the Defendants have stated.

221.    From October 31, 2019 to the present, Defendants continued to undertake efforts to develop certain features that could be used on the TON Blockchain.  JSF ¶ 210.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 221.

222.    These are "nice-to-have" features but not essential to the operation of the TON Blockchain.  Drylewski Ex. 2, Durov Dep. at 316:14-24.

Commission Response: The Commission objects to this assertion in Paragraph 222 on the ground that the phrase "nice-to-have" and the phrase "essential to the operation of the TON Blockchain" are vague and ambiguous and it is also vague and ambiguous what "features" are being referenced here.  Subject to and without waving these objections, the Commission does not controvert the fact that Defendants undertook efforts to develop some features that could be used on the TON Blockchain after October 31. 2019.  However, because the Defendants fail to identify what features they are referring to, the Commission disputes that these non-specified features were "non-essential" to the operation of the TON Blockchain.

223.    After the launch of the TON Blockchain, Defendants will have no obligation to develop TON Blockchain applications.  JSF ¶ 172; Drylewski Ex. 2, Durov Dep. at 358:13-24.

Commission Response: The Commission objects to this assertion in Paragraph 223 on the ground that the words "obligation" and "applications" are vague and ambiguous.  The Commission also disputes the assertions contained in Paragraph 223 on the ground that the cited evidence does not support this assertion.  JSF ¶ 172, in relevant part, states only that (1) Telegram issued a statement to the public on January 6, 2020 that: "it is under no obligation or commitment to develop any applications after launch of the TON Blockchain"; and (2) "The Offering Materials do not explicitly require Telegram to establish the TON Foundation or transfer any money or Grams to it."  Telegram's January 6, 2020 statement that it has no obligation to do something is not evidence that it in fact has no such obligation, particularly in light of Telegram's numerous prior statements to the Initial Purchasers regarding what it planned to do to develop and support the TON Blockchain before and after its launch.  That the Offering Materials do not explicitly require Telegram to establish the TON Foundation or transfer money or Grams to it is also not proof that it Telegram has no such obligation and is certainly not proof that it has no obligation to develop any TON Blockchain applications.

Finally, the cited reference to Pavel Durov's testimony in Paragraph 222 also does not support this assertion, because Durov merely testified to Telegram's "view" of its obligations under the Purchase Agreement.  (PX12 (D.E. 81-12), Durov Tr. at 358:13–20.)  Telegram's self-serving "view' of its obligations is not dispositive of what its obligations in fact are.

224.    To the contrary, Defendants made representations to investors at all times that they were not required to, and indeed may not, make any additional efforts with respect to the

development of the TON Blockchain following its launch.  Drylewski Ex. 3; *see also* Drylewski

Ex. 2, Durov Dep. at 257:16-21, 266:22-25; JX11 § 7.1.

        <u>Commission Response</u>: The Commission objects to the assertions in Paragraph

224 on the grounds that the phrases "at all times" and "were not required to" are vague and

ambiguous.  The Commission further disputes the assertions contained in Paragraph 224 on the

grounds that the cited evidence does not support the assertions.  Drylewski Ex. 3 is Telegram's

eleventh hour public statement issued on January 6, 2020 and cannot support the assertion that

Telegram made certain representations to investors "at all times."  Similarly, in his cited

testimony, Durov merely testified to what his expectation was regarding the Telegram's

expenditure of funds post-launch (PX12 (D.E.81-12) Durov Tr. at 257:16-21); and that the

Offering materials reserved for Telegram "a very large degree of flexibility" (*id.* at 266:6-14)

such that, in his view, it was made clear to investors that the degree of Telegram's involvement

post-launch would be limited (*id.* at 266:22-25).  But telling investors that Telegram reserved a

"very large degree of flexibility" is not evidence they may not make any additional efforts post-

launch and neither statement supports the assertion that investors were told at all times that

Telegram had no obligation to make any additional efforts post-launch of the TON Blockchain.

        Finally, JX11 § 7.1 also does not support the assertions in Paragraph 224.  It merely

provides, in relevant part, that the Purchase Agreement will automatically terminate upon

issuance of the Grams, the occurrence of a dissolution event prior to the deadline date, or the

deadline date, which is defined as October 31, 2019.

      **A.**    **The TON Foundation and TON Reserve**

      225.    Defendants informed some potential and all actual Private Placement purchasers

that they intended to establish an entity called the TON Foundation, which, if established, will be

a not-for-profit organization.  JSF ¶ 147.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 225, except that it disputes Telegram's legal conclusion characterizing the Offering as a "Private Placement."

226.     Defendants have not yet decided whether to establish the TON Foundation.  JSF ¶ 149.

Commission Response: The Commission disputes the assertion contained in Paragraph 226 on the ground that the cited reference does not support the assertion.  JSF ¶ 149 merely states that Defendants have not yet determined the details of the TON Foundation and have communicated to the public that it will not be established at the launch of the TON Blockchain and may never be established.  Given Telegram's documented history of changing representations as to what it may or may not do regarding the TON Blockchain, its current self-serving litigation-driven stated intentions is not reliable evidence as to what its true intentions are with respect to the TON Foundation.

227.     Defendants have communicated to the public that the TON Foundation may never be established.  JSF ¶ 149.

Commission Response: Subject to and without waiving the objections and disputes set forth in the Commission's response to Paragraph 226, the Commission does not controvert the assertions contained in Paragraph 227.

228.     Defendants previously communicated to the Private Placement purchasers that the TON Foundation may never be established.  JSF ¶ 148.

Commission Response: Subject to and without waiving the objections and disputes set forth in the Commission's response to Paragraph 226, the Commission does not

82

controvert the assertions contained in Paragraph 228, except that it disputes Telegram's legal

conclusion characterizing the Offering as a "Private Placement."

229.    From its inception, the TON Foundation was intended to "retain flexibility" so as

to comply with regulations.  Drylewski Ex. 12, January 22, 2018 Email; JX14, JX15 ¶ 16.

Commission Response: The Commission disputes the assertion in Paragraph 229

on the ground that the cited references do not support the assertion.  JX14 and JX15 ¶ 16 do not

state that the TON Foundation was intended to "retain flexibility" or that any such intention was

"so as to comply with regulations."  And Drylewski Ex. 12, is a January 22, 2018 email by a

third party that is inadmissible hearsay as to what Telegram's intentions may or may not be.

230.    Pavel explained to an individual investor in 2018:

We've talked a lot with [counsel] about our ideas re Foundation. While I was
pushing it forward, their advice was clear – in times when the future (and current)
regulation is uncertain, retain flexibility. It made a lot of sense to me, as it seems
to go in line with the larger Telegram approach, which we employ not only on
legal matters, but also on the engineering side and product-wise.

Drylewski Ex. 12.

Commission Response: The Commission does not controvert the

assertions contained in Paragraph 230 to the extent that they accurately reflect what Pavel

testified to, but the Commission reserves its right to challenge the credibility of this

witness.

231.    In the event the TON Foundation is never founded, the Grams allocated to it will

be locked for perpetuity.  Drylewski Ex. 2, Durov Dep. at 269:9-17; Drylewski Ex. 5 at 5.

Commission Response: The Commission does not controvert the

assertions contained in Paragraph 231 to the extent that they accurately reflect what Pavel

testified to, but the Commission reserves its right to challenge the credibility of this

witness.  And Drylewski Ex. 5 at 5, is Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

232.    The TON Foundation will be directed by a board of directors called the TON Foundation Board.  JSF ¶ 153; Drylewski Ex. 5 at 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 232.

233.    If established in the future, it is currently contemplated that the TON Foundation Board will have five members.  JSF ¶ 154; Drylewski Ex. 5 at 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 233.

234.    Pavel and Nikolai Durov intend to be two of the TON Foundation Board members.  JSF ¶ 154; Drylewski Ex. 5 at 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 234.

235.    As currently contemplated, the other members of the TON Foundation Board will be independent directors with no connection to Telegram or its affiliates and with experience in blockchain technology and/or TON.  JSF ¶ 154; Drylewski Ex. 5 at 3.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 235.

236.    If established in the future, it is currently contemplated that the TON Foundation could publish non-binding opinions and research results regarding the TON Blockchain's development and policy.  JSF ¶ 174.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 236.

237.    If established in the future, it is currently contemplated that the TON Foundation is expected to provide small incentives rewards of Grams to users of the TON Blockchain platform to promote the consumptive use of Grams.  JSF ¶¶ 155, 157; *see also* Drylewski Ex. 2, Durov Dep. at 271:13-272:17.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 237.

238.    If established in the future, it is currently contemplated that the TON Foundation is expected to, in certain circumstances, sell Grams in the market in order to attempt to dampen the upward volatility in the event that the free market price for Grams gets too high.  JSF ¶¶ 152, 165-66, 211.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 238.

239.    In the event that the market price of Grams exceeds the Reference Price, the TON Foundation may elect (but is not required) to sell Grams from the TON Reserve where the lowest acceptable bid price would be the Reference Price.  JSF ¶¶ 165-66.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 239.

240.    The Reference Price is determined by a formula based on the total number of Grams in existence, which is set forth in Appendix A to the Technical Whitepaper.  JSF ¶¶ 143-44.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 240.

241. The Reference Price of a Gram at the beginning of each round of the Private Placement was computed as: $0.1 * e^{n*10^{-9}}$, where n denotes the total number of Grams subscribed for prior to that stage. JSF ¶ 144.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 241.

242. Defendants expect that the Reference Price of a Gram will be $3.62475487 at the launch of the TON Blockchain. JSF ¶ 143.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 242.

243. The Reference Price does not bear any relationship to, or dictate in any way, the free market price for Grams following launch of the TON Blockchain. JSF ¶ 171.

Commission Response: The Commission disputes the assertions contained in Paragraph 243 on the grounds that the cited reference does not support these assertions. JSF ¶ 171 merely states that: "The Reference Price of Grams does not dictate the free market price of Grams following the launch of the TON Blockchain." That does not support the assertion that the Reference Price bears no relationship to the free market price of Grams and, in fact, the Reference Price does bear a relationship to and can have an impact on the market price of Grams. Indeed, Telegram intended one of the purposes of the TON Foundation to be to impact the market price of Grams by selling Grams into the market if the market price rose above the Reference Price, which could lower the market price of Grams, and of buying Grams at no lower

than half the Reference Price if the market price fell below half the Reference Price, which would raise the market price of Grams.  *See, e.g.,* JSF ¶¶ 165, 167; JX18 at 130.

244.    The TON Foundation will not have any legal or technical ability to change the TON Blockchain code, its validation processes or its parameters.  Drylewski Ex. 2, Durov Dep. at 264:5-25.

Commission Response: The Commission disputes the assertions contained in Paragraph 244 on the grounds that the cited reference does not support the assertions.  The cited reference consists only of the testimony of Pavel Durov as to his opinion as to the future ability of a TON Foundation that has not yet been created to change the operation of a TON Blockchain that has not yet been launched.  Telegram fails to set forth any admissible evidence to support the assertion as to the future ability of a not–yet formed entity to impact a not-yet operational TON Blockchain network.

245.    None of the Grams held by the TON Foundation could be used for voting or validating.  Drylewski Ex. 2, Durov Dep. at 163:24-164:11, 276:10-277:4; Drylewski Ex. 13, October 2, 2019 Email.

Commission Response: The Commission disputes the assertions contained in Paragraph 245 on the grounds that the cited references do not support the assertions.  The cited references to the testimony of Pavel Durov and to an email from Telegram at most support the assertion that Telegram does not currently intend for the TON Foundation to use Grams for voting or validation, not that they could never be used for that purpose if either Telegram and/or the TON Foundation subsequently decide to cause the TON Foundation use such Grams for voting or validating.

246. The TON Foundation's anticipated functions were modeled after, and are similar to, the role the Ethereum Foundation plays with respect to the Ethereum blockchain. McKeon Ex. 1 ¶¶ 129-34; Drylewski Ex. 2, Durov Dep. at 264:5-25.

Commission Response: The Commission objects to the phrases "TON Foundation's anticipated functions," "were modeled after," "are similar too," and "the role Ethereum Foundation plays with respect to the Ethereum blockchain" on the grounds that they are vague and ambiguous. The Commission also disputes the assertions contained in Paragraph 246 on the grounds that the references to the alleged role that the Ethereum Foundation plays with respect to the Ethereum blockchain are based on conclusory, hearsay statements contained in the McKeon report, which are inadmissible, and on the ground that citation to Durov's testimony merely refers to one anticipated function of the TON Foundation that is allegedly similar to an Ethereum Foundation function, namely the ability to propose but ostensibly not implement changes to the blockchain absent approval of a majority of "validators/parties."

247. As originally contemplated, the TON Foundation would also have had the ability to buy Grams from the market in order to attempt to prevent the price of Grams from getting too low. JSF ¶¶ 165, 167.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 247.

248. Through discussions with the SEC, Defendants decided to remove the TON Foundation's Gram-buying function to alleviate concerns articulated by the SEC. JSF ¶ 168.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 248.

249.     Telegram is willing to consider other changes to the TON Foundation's functions from what is currently contemplated or to forego the TON Foundation entirely.  Drylewski Ex. 2, Durov Dep. at 271:24-272:5; Drylewski Ex. 5 at 3.

**B.     Contemplated Launch and Creation of Grams**

250.     The initial supply of Grams will be set at 5 billion.  JSF ¶ 138.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 250.

251.     Telegram hopes that, after launch, Grams will achieve a wide user base, beyond the Private Placement purchasers.  JSF ¶ 139.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 251.

252.     Following the launch of the TON Blockchain, the free market price of Grams will be subject to the market forces of supply and demand.  JSF ¶ 170; Drylewski Ex. 2, Durov Dep. at 297:20-23; McKeon Ex. 1 ¶¶ 209-10, 215.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 252.

253.     After launch, holders of Grams will be able to individually determine how to use their Grams.  *See* Drylewski Ex. 4 at 7; *see also* McKeon Ex. 1 ¶ 51.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 253.

254.     Gram holders can individually decide to use the Grams, exchange them for fiat currency, stake them, or simply hold them, among other uses.  *See* Drylewski Ex. 4 at 7; McKeon Ex. 1 ¶¶ 51, 63-68, 137, 154.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 254, except to note that the minimum amount of Grams needed to "stake" for validation is 100,000. JSF ¶ 125. The Commission also notes that there is no evidence in the record of any actual "uses" of Grams post-launch and respectfully points the Court to the Commission's response to the Defendants 56.1 Statement at Paragraph 275.

255. Any profits that Gram holders achieve will be the result of their own decisions (and market forces) and based on the timing of those decisions. Drylewski Ex. 7, Parekh Dep. at 70:6-71:4; McKeon Ex. 1 ¶¶ 209-10, 215.

Commission Response: The Commission disputes the assertions contained in Paragraph 255 on the grounds that the cited references do not support the assertions. In the cited reference to his testimony, Parekh merely testified to his understanding that supply and demand would set the market price of Grams independent of the reference price but he did not address and did not exclude the possibility that supply and demand for Grams may be based on the efforts of Telegram to develop the TON Blockchain and Telegram's efforts to drive demand for and the value of Grams. The cited references to the McKeon Report does not support the assertions with any facts but instead consists solely of conclusory claims without any factual basis to do so. The Commission further disputes the assertions in Paragraph 255 on the grounds that Defendants have made significant managerial and entrepreneurial efforts to develop and launch the TON Blockchain, e.g., JSF ¶¶ 1-7, such that any profits achieved will be principally as a result of Telegram's past and expected future efforts.

C.   The TON Beta Version and Early Third Party Developments

256. Prior to the launch of the production version of the TON Blockchain, Telegram made publicly available a test version of the TON Blockchain (the "Beta Test Version"). JSF ¶ 130.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 256.

257.    Telegram began rolling out the Beta Test Version in March 2019 and gradually added information over time until early September 2019.  JSF ¶ 131.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 257.

258.    Telegram completed rolling out of the beta-test network in early September 2019. JSF ¶ 132.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 258.

259.    The Beta Test Version enables third-party developers to view the TON Blockchain's open-source code and to develop and test certain applications and interfaces that may be offered when the production version of the TON Blockchain launches.  JSF ¶ 133.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 259.

260.    The Beta Test Version is currently publicly available at the following domain: https://test.ton.org/download.html.  JSF ¶ 134.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 260.

261.    The website includes open source code and step-by-step instructions regarding how to create and test applications and smart contracts on the TON Blockchain.  JSF ¶ 135.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 261.

262. Anyone in the world can access the code and follow the instructions to build and test smart contracts and applications for the TON Blockchain, as well as learn about the process to become a TON validator.  JSF ¶ 136.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 262, except to note that not the entirety of the TON Blockchain code and/or related applications appears to be available.

263. As of November 22, 2019, tens of thousands of parties had downloaded the TON Light Client and TON Light Wallet from the Beta Test website.  Drylewski Ex. 4 at 12.

Commission Response: The Commission disputes the assertion contained in Paragraph 263 on the grounds that the cited evidence, Telegram's conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible and insufficient to support the assertion.

264. Defendants hosted a series of contests on Telegram called "TON Contests," in which they solicited submissions from third parties that could be used to improve the TON Blockchain.  Drylewski Ex. 4 at 12; *see also* Drylewski Ex. 2, Durov Dep. at 318:4-23.

Commission Response: The Commission objects to the assertion contained in Paragraph 264 on the grounds that Telegram's reliance on its own conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence; it is inadmissible hearsay and insufficient to support the assertion. Subject to and without waiving this objection, the Commission does not otherwise controvert the assertion contained in Paragraph 264.

265. In response to the first stage of TON Contests, 66 parties submitted solutions and 41 parties produced working smart contracts.  Drylewski Ex. 4 at 12.

Commission Response: The Commission disputes the assertion contained in Paragraph 265 on the grounds that the cited evidence, its own conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible hearsay and insufficient to support the assertion.

266.    The submissions resulted in at least 50 new smart contracts for use in connection with competing versions of four applications.  Drylewski Ex. 4 at 12.

Commission Response: The Commission disputes the assertion contained in Paragraph 266 on the grounds that the cited evidence, its own conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible hearsay and insufficient to support the assertion.

267.    The results of the first stage of the TON Contests are available at: https://contest.com/blockchain.  Drylewski Ex. 4 at 12.

Commission Response: The Commission disputes the assertion contained in Paragraph 267 on the grounds that the cited evidence, its own conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible hearsay and insufficient to support the assertion.

268.    On December 7, 2019, Telegram announced the second stage of the TON Contests.  Drylewski Ex. 14, Telegram Contest Documents at 2.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 268.

269.    Only winners from the first stage of the TON Contests can participate.  Drylewski Ex. 14 at 2.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 269.

270.    The goal of the second stage of the TON Contests is to "build one or two TON-based smart-contracts (decentralized services) that can become popular with consumers." Drylewski Ex. 14 at 2.

Commission Response: The Commission does not controvert that the stated goal of the TON Contests is stated in Paragraph 270.

271.    There are currently 27 submissions from 27 contestants for the second stage of the TON Contests.  Drylewski Ex. 15, Blockchain Contest, Stage 2.

Commission Response: The Commission disputes the assertions contained in Paragraph 271 on the grounds that the document cited in support of the assertion is an inadmissible hearsay document of unspecified origin, reliability, and authenticity.

272.    Defendants anticipate that the smart contracts developed during the TON Contests are likely to operate on the TON Blockchain at the time of its launch.  Drylewski Ex. 4 at 12.

Commission Response: The Commission disputes the assertions contained in Paragraph 272 on the grounds that the cited evidence, Telegram's own conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible hearsay and insufficient to support the assertion.  The Commission also objects to the phrase "smart contracts developed during the TON Contests" as vague and ambiguous on the ground that it is not clear what specific smart contracts are encompassed by this phrase.  The Commission also disputes the assertions contained in Paragraph 272 on the grounds that it is not a statement of fact subject to verification but rather pure speculation as to a future event, namely that unspecified smart contracts are "likely" to operate on the TON Blockchain in the future.

273.     There have been numerous public reports, websites, and articles regarding the development of applications and services for the TON Blockchain.  Drylewski Ex. 4 at 12.

<u>Commission Response</u>: The Commission disputes the assertion contained in Paragraph 273 on the grounds that the cited evidence, Telegram's own conclusory response to an interrogatory merely setting forth a chart summarizing and selectively characterizing certain website claims of unknown origin and reliability, is inadmissible hearsay.  Indeed, the cited reference itself contains the caveat: "Without making any representations as to the accuracy or completeness of the following…"  *See, e.g.*, Drylewski Ex. 4 at 12.

274.     The following is a chart of public reports, websites and other resources regarding the development or potential development of applications and uses for Grams and the TON Blockchain by third parties:

| Name | Developer | Notes Based on Third Party Description | Link(s) |
|------|-----------|----------------------------------------|---------|
| SOL2TVM compiler | TON Labs | Tool to ensure contract compatibility between Ethereum platform and TON Virtual Machine | https://www.coindesk.com/telegrams-blockchain-will-be-compatible-with-ethereum-ton-labs-says<br><br>https://cryptobriefing.com/telegram-ton-labs/<br><br>https://cointelegraph.com/news/report-telegrams-ton-blockchain-to-be-compatible-with-ethereum-dapps<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |
| LLVM compiler | TON Labs | LLVM-based compiler designed to convert sources from multiple high-level languages into its IR and then into TVM bytecode | https://ton.dev/toolchain<br><br>https://docs.ton.dev/86757ecb2/p/04a4ba |

| TON Labs Local Node | TON Labs | TON Labs proprietary implementation of TON Node | https://ton.dev/node-se <br><br> https://docs.ton.dev/86757ecb2/p/04a4ba |
|---|---|---|---|
| TON Labs SDK | TON Labs | CLI tool for streamlined usage | https://ton.dev/node-se <br><br> https://docs.ton.dev/86757ecb2/p/04a4ba |
| TON Labs Toolchain | TON Labs | Compiler kit with the latest versions of TON Labs LLVM and Sol2TMV compilers | https://ton.dev/node-se <br><br> https://docs.ton.dev/86757ecb2/p/04a4ba |
| Ton Labs Node SE | TON Labs | Provides a set of developer tools to develop and compile smart contracts in Solidity, C and C ++; run, deploy and test contracts locally using client libraries for Rust, React Native, Web and Node.js; and make various queries to key blockchain objects using GraphQL protocol with subscription options | https://ton.dev/node-se |
| Button Wallet | Button | Wallet that supports BTC, ETH, LTC, BCH, ETC, Waves, Stellar Lumens (XLM) and ERC-20 tokens; will facilitate exchange of Grams for other cryptocurrencies | https://www.forbes.com/sites/billybambrough/2019/08/26/telegrams-300-million-users-could-soon-be-trading-bitcoin-and-cryptodespite-serious-security-warning/#1aa7fb523fe9 <br><br> https://buttonwallet.com/ |
| Mercuryo Pay | Mercuryo | Allows customers to pay with BTC & ETH; will process Grams once TON Blockchain launches | https://mercuryo.io/business/acquiring/ |
| AdGram | AdGram | Advertising platform that allows advertisers to create advertising campaigns and channel owners to monetize their audience | https://adgram.io/ |
| BeProducers | BeProducers | Facilitates production of films for Gram holders | https://beproducer.pro/news-and-analytics/d1f08a5e-262f-48d3-87be-020530e2317d |

| TON dApps Marketplace | CryptoBazar | Includes pre-selected projects to be launched on TON Blockchain | https://ton.cryptobazar.io/ |
|---|---|---|---|
| Drimsim SIM | Drimsim Global | Universal SIM and mobile expense card | https://m.facebook.com/334908 950536095/posts/43290581740 3074?d=n&substory_index=0& sfns=mo<br><br>https://twitter.com/drimsimglob al/status/1197175207649304577 ?s=21<br><br>https://blog.drimsim.com/drimsi m-budet-prinimat-crypto-gram |
| Denim | Denim | Dating application for TON Blockchain | https://dcntrlzd.app/2019/11/17/ denim/ |
| Unovis | Unovis Forum | Marketplace for art using TON Blockchain | https://dcntrlzd.app/2019/10/23/ unovis/ |
| DareApp | Eristica | Mobile video platform | https://dcntrlzd.app/2019/10/13/ dareapp/ |
| Posh.space | Posh.space | Digital fashion store | https://dcntrlzd.app/2019/10/12/ poshspace/<br><br>https://posh.space/ |
| Pregnancy Tracker | Mobile Dimension LLC | Pregnancy related app | https://dcntrlzd.app/2019/10/10/ pregnancy-tracker/<br><br>https://pregnancytracker.app/ |
| U-Robot | u-robot | Chat-bot app; customized online store or personal page | https://dcntrlzd.app/2019/10/09/ urobot/<br><br>http://u-robot.net |
| Incognito | Incognito | Mobile network related app | https://dcntrlzd.app/2019/10/08/ incognito/ |
| Kelvpn | Kelvpn | VPN marketplace operating on top of decentralized network | https://dcntrlzd.app/2019/10/07/ kelvpn/<br><br>https://kelvpn.com/ |

|  |  |  |  |
|---|---|---|---|
| EzDapps | Apla | Dapps Marketplace | https://dcntrlzd.app/2019/10/06/ezapps/ |
| Spatium | Spatium | Wallet with enterprise-level security | https://dcntrlzd.app/2019/10/05/spatium/<br><br>https://spatium.net/ |
| Viewst | Viewst | Uses micropayments channel network to accept payments from users on TON Blockchain network as well as from other services; uses file-distributed storage technology for keeping assets and optimizing storage for large video files;<br>provides optimized templates to create digital graphic assets for Telegram channels and other TON Services | https://viewst.com/ |
| Worldwide Hackathon | Optimal.one | Worldwide Hackathon for the promotion of TON Blockchain projects | http://www.optimal.one/ |
| ParJar | Parachute | Allows users to send cryptocurrency tips on Telegram | https://beincrypto.com/cryptocurrency-tips-on-telegram-reach-500000-milestone-in-just-a-year/ |
| TON-based real-time advertising platform | Appreciate | Proposed real-time advertising platform on top of TON Blockchain | |
| copperbits/TON | Copperbits (on GitHub) | R&D group focused on TON Blockchain on GitHub | https://github.com/copperbits/TON<br><br>https://t.me/ton_research |
| TON.Broxus | Finex Future | Java wrapper for TON | https://github.com/broxus/ton-client |
| Atomic TON Wallet | Atomic | Universal cryptocurrency wallet | https://atomicwallet.io/ton-wallet |

| | | | |
|---|---|---|---|
| TON_tokens | EmelyanenkoK | Simple tokens for TON | https://github.com/EmelyanenkoK/TON_tokens |
| ton_client | formony | Python API client for TON | https://github.com/formony/ton_client |
| TON Watcher | TON Center | Will allow users to search for addresses or blocks on TON Blockchain | https://tonwatcher.com/ |
| TON.shi Public API | TON.sh | HTTP-based experimental interface for developers; explorer to search for addresses or transactions on TON Blockchain | https://ton.sh/api |
| School register project | Andrei Marchenko | Project implements a register for giving grades to students in a school or university | https://github.com/ftkvyn/ton-register |
| Goods purchasing ecosystem project | Andrei Marchenko | Project creates an ecosystem for selling and purchasing goods on TON blockchain | https://github.com/ftkvyn/ton-goods |
| TON Auction | Denis Olshin | Multi-purpose smart-contract for TON blockchain implementing both an auction system and a shop | https://github.com/deNULL/ton-auction |
| TRC20 Token | Github user | A standard interface for tokens in TON (like ERC20 in Etherium) | https://github.com/cod1ng-studio/TRC20 https://tontalk.org/threads/184/ |
| TON Lotto | @combot / TON.sh | Lottery bot for TON testnet implemented as a Telegram bot that interacts with the TON smart contract | https://tontalk.org/threads/156/ |
| The Chat Game | EmelyanenkoK | RPG game with random items drop based on activity in chat rooms | https://ton.sh/e/tcg https://github.com/EmelyanenkoK/TheChatGame |
| OracleHub | EmelyanenkoK | Data provider platform that aims to create transparent registry of independent oracles | https://github.com/EmelyanenkoK/OracleHub |
| TON Mixer | @dkaraush | Project tries to transfer Grams through mixer nodes so they cannot be tracked in the open network | https://tonweb.site/-1:2bcc9840e7b9ec6b77fe3543b4eefbf3ba6c69fd98f362b3d3b2f4b752adb5e8/index.html https://github.com/dkaraush/ton-mixer |
| dApp for TON that allows delegation of GRAMs to validators in | BUTTON Wallet team | Project allows anyone to create delegation pool and become validator; allows anyone to earn interest by delegating Grams to potential Validators. (Risks will be handled by reputation system | https://github.com/button-tech/ton-delegation-pool |

| non-custodial way | | and security deposits); non-custodial web-based solution | |
|---|---|---|---|
| TON Decentralized Exchange | Github user | Implements a fully decentralized exchange with the support of the exchange of grams, extra currencies and TRC20 tokens | https://github.com/cod1ng-studio/ton-exchange |
| A Charity Foundation TON Smart Contract | Github user | Implements simple Foundation model where each incoming payment will be multiplied by specified campaign factor and sent to the destination | https://github.com/dblokhin/ton-charity-foundation |
| Smart contract lottery | Github user | Lottery smart contract where players buy any of 64 squares (or several), after a while the smart contract sets a win amount for each square | https://github.com/Arseny271/tonGame |
| Ring signature based mixer contract | Github user | Smart contract that can help obfuscates Grams | https://github.com/adoriasoft/ton_payment_mixer |
| Pool TON Service | vanasprin and alexhol | Allows to pool user funds in the TON blockchain network for some specific purpose and the subsequent proportional distribution of the funds (if necessary) | https://github.com/vanasprin/pool_ton |
| TON Staking Solutions | Eugene Koinov | Fully decentralized solution based on mutual mistrust principle at the crossroad of blockchain, finance and security | https://github.com/koinov/ton-staking |
| ICO smart contract | Github user | Allows user to conduct a fundraising event for the initial coin offer (ICO) for various projects | https://github.com/plexar88/ico |
| Dota2 auto chess | Github user | Project uses TON as a payment system and trust source for a popular game, Dota2 Autochess | https://github.com/KStasi/Ton-Dich5 |
| TON Web | @dkaraush | A website portal for TON | https://tonweb.site/-1:d9bb6fde2410a2445f4e213013f5a0ac584a580a67478fa2992be4bae24c3079/index.html |
| Fungible token smart contract | Github user | Fungible token smart contract | https://github.com/adoriasoft/ton_fungible_token |
| messenger | Github user | Messenger for TON | https://github.com/AlexGor-dev/messenger |
| contract_manager | Github user | Manager contracts for ton blockchain | https://github.com/AlexGor-dev/contract_manager |
| A gambling smartcontract for Telegram | Denis Olshin | Smart-contract for TON blockchain implements a platform | https://github.com/deNULL/ton-gamble |

| Open Network (TON) | | for different gambling activities (such as lotteries or card games) | |
|---|---|---|---|
| Lottery "3 of 13" smart-contract | Github user | Lottery smart contract | https://github.com/alunegov/ton-contest-2 |
| MadelineTon.js | Daniil Gentili | Pure JS client-side implementation of the Telegram TON blockchain protocol | https://github.com/danog/madelineTon.js |
| TON freestyle | Github user | Tools for creating freestyle smart contracts | https://github.com/Skydev0h/ton-freestyle |
| Ton (Gram) Validator Staking Pool | 2masternodes | Validation aggregator | https://2masternodes.com/ton-validator-pool |
| Xeus-Fift | Github user | Jupyter kernels for Fift, FunC and TVM assembler | https://github.com/atomex-me/xeus-fift https://tontalk.org/threads/158/ |
| TON Labs Cloud | TON Labs | Public cloud providing access to testnet | https://eu-central-1.large.testnet.ton.dev/graphql https://tontalk.org/threads/149/ https://decrypt.co/12531/telegrams-sec-battle-hasnt-stopped-ton-labs-pressing-ahead |

Drylewski Ex. 4 at 12-16; Drylewski Ex. 10 at 2-6.

Commission Response: The Commission disputes the assertions contained in Paragraph 274 on the grounds that the cited evidence, Telegram's own conclusory response to an interrogatory merely setting forth a chart summarizing and selectively characterizing certain website claims of unknown origin and reliability, is inadmissible hearsay. Indeed, the cited reference itself contains the caveat: "Without making any representations as to the accuracy or completeness of the following…" *See, e.g.*, Drylewski Ex. 4 at 12. The Commission further disputes the implication that the items listed herein will constitute "resources regarding the development or potential development of applications and uses for Grams . . . ." The SEC's expert has examined some of the entries listed in Paragraph 274 and concluded that many of those are underdeveloped. *See* PX9 (D.E. 81-9) at ¶ 37, App'x C; *see also* SEC Counter 56.1 at ¶ 26.

275.     From time to time, Defendants have had communications with numerous parties regarding the potential development of applications and uses for Grams on the TON Blockchain, including TON Labs, ▮▮ (potential integration with TON), ▮▮ (proposed real-time advertising platform on top of TON Blockchain), DrimSim, Telefonica, Payphone, CryptoBazaar, Beproducer, Everstake, Mercuryo, PrivatBank, KupiBilet, WEBPAY, participants in TON Contests, and Private Placement purchasers.  Drylewski Ex. 4 at 9.

    Commission Response: The Commission disputes the assertions contained in Paragraph 275 on the grounds that the cited evidence, Telegram's own conclusory response to an interrogatory merely setting forth this assertion without any supporting evidence, is inadmissible hearsay and insufficient to support the assertion.

## IV.     TELEGRAM'S PUBLIC COMMUNICATIONS

276.     During the Private Placement, on January 21, 2018, Pavel Durov sent the following tweet: "If you see or receive offers to 'buy Grams', let us know at http://t.me/notoscam."  Drylewski Ex. 16, Pavel Durov (@durov) Twitter at SEC-SEC-E-0002661.

    Commission Response: The Commission does not controvert the assertion contained in Paragraph 276.

277.     On January 6, 2020, Telegram published a notice (the "Public Notice"), which explained the following:

> You may have heard that since **2017** the team at Telegram has been developing a new blockchain platform called the **TON Blockchain** and native cryptocurrency called **Grams**.  We hope that as a result of this project Grams will become a true complement to traditional currencies, improving the **speed**, **efficiency** and **security** of everyday commercial transactions globally.  We believe that the TON Blockchain technology will create a stable ecosystem and represents a significant improvement upon previous platforms in terms of **speed**, **usability** and **scalability**.

There have been a lot of rumors in the media and speculation about the details of this project. Telegram has been careful **not to speak publicly** about these rumors while we continue to build the TON Blockchain platform and work out the exact details of the project to ensure that the TON Blockchain and Grams can operate in a way that is **compliant** with all relevant **laws and regulations**.

In light of recent events, we wanted to take the time to publicly clarify certain aspects of the TON Blockchain and Grams as we continue to prepare for a successful launch of the project.

\* \* \*

**Nobody can buy or sell grams yet**

First, it has come to our attention that certain websites appear to be offering Grams to the public. These websites sometimes refer to the offers as "token presales," and some pretend to be affiliated with Telegram. As we've warned you on numerous occasions, these are **NOT** official Telegram websites, they have **NO** affiliation with Telegram, and **NO** Grams have been issued yet to anyone. Neither Telegram nor any of its affiliates are involved in any public sales or presales of Grams. To the contrary, the TON Blockchain on which Grams will function is still in a **Beta Test** phase and you can access the Beta Test website at https://test.ton.org/download.html. Only once the TON Blockchain launches will Grams be created and available to purchase.

\* \* \*

**TON will be decentralized and maintained by third parties**

Second, if you are considering whether to purchase Grams once the TON Blockchain platform is launched, we want you to know certain things. Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches. In fact, it is possible that Telegram may never do so. Rather, it is Telegram's goal and hope that the **decentralized community of third party developers** and others will contribute to the TON ecosystem through the development of applications and smart contracts. It will be the sole responsibility of **third parties** and the community to adopt and implement such applications or smart contracts on the TON Blockchain in the manner they choose. Telegram does not, and cannot, guarantee that anyone will adopt or implement such features or provide such services, on any given timetable or at all.

\* \* \*

**Telegram will have no control over TON**

103

The code for the TON Blockchain will always be **open source** and **publicly viewable**. Once it is launched, Telegram will occupy the **same position** as **any other party** with respect to the TON Blockchain and **will not have any control** over, any unique rights within, or any responsibility for the management of, the TON Blockchain.

Telegram or its employees may, but do not commit to, hold any Grams following the launch of the TON Blockchain. To the extent they do, they will **not take part in voting or validating** in connection with the TON Blockchain. This voluntary decision was made in order to avoid any perception that Telegram or its employees can or will exercise control over the TON Blockchain following its launch.

\* \* \*

### Grams won't help you get rich

Third, you should **NOT** expect an profits based on your purchase or holding of Grams, and Telegram makes no promises that you will make any profits. Grams are intended to act as a **medium of exchange** between users in the TON ecosystem. Grams are **NOT** investment products and there should be **NO** expectation of future profit or gain from the purchase, sale or holding of Grams.

Grams do **NOT** represent:

- Any equity or other ownership interest in Telegram or its affiliates
- Any rights to dividends or other distribution rights from Telegram or its affiliates
- Any governance rights in Telegram or its affiliates.

\* \* \*

In deciding whether to purchase Grams, you should be fully aware of the risk that Grams may decrease in value over time or even lose **all monetary value**. There are a number of risks related to purchasing cryptocurrencies like Grams, including volatility in cryptocurrency markets, the possibility of increasing regulation of cryptocurrency exchanges, and other risks.

\* \* \*

### And if you already heard about TON...

Finally, we wanted to provide further clarity regarding some technical and governance aspects of the TON Blockchain. Please note that the below is intended to **supersede and replace** all prior materials or communications regarding the TON Blockchain and Grams to the extent of any conflict or

potential conflict, including the information and details set forth in the TON Whitepapers or any previous communications or materials by Telegram or anyone else:

**(1)** Telegram is under no obligation, and makes no promise or commitment, to ever establish a **TON Foundation** or similar entity in the future.

**(2)** At the time of the anticipated launch of the TON Blockchain, Telegram's TON Wallet application is expected to be made available solely on a **stand-alone basis** and will not be integrated with the Telegram Messenger service. In this regard, the TON Wallet is expected to **compete** with any other wallet applications designed and offered by **third parties**. Telegram may integrate the TON Wallet application with the Telegram Messenger service in the future to the extent permitted under applicable laws and governmental authorities.

Telegram reserves all rights to further add to, clarify or revise these or any other aspects of the TON Blockchain or Grams. We look forward to providing more information as we get closer to the anticipated launch of the TON Blockchain.

*January 6, 2020*
*The Telegram Team*

*This communication contains forward-looking statements, including statements of plans, objectives, expectations, development status and intentions. Any number of factors could cause actual results to differ materially from those contemplated by any forward-looking statements, including but not limited to the risks identified herein.*

Drylewski Ex. 3 (emphasis original).

> Commission Response: The Commission does not controvert the assertions contained in Paragraph 277, except it respectfully directs the Court to the Public Notice (DX3 (D.E.73-3) for a full and complete reproduction of its contents.

278. Telegram's Public Notice is available online at https://telegram.org/blog/ton-gram-notice. Drylewski Ex. 3.

> Commission Response: The Commission does not controvert the assertion contained in Paragraph 278.

279.     Telegram also published a link to the Public Notice on its Twitter account, which is available online at https://twitter.com/telegram/status/1214144878071943168.  Drylewski Ex. 17, Telegram Messenger Twitter (January 6, 2020).

Commission Response: The Commission does not controvert the assertion contained in Paragraph 279.

280.     The Public Notice has also received significant media coverage.  *See, e.g.*, Drylewski Ex. 18, "Telegram says TON Wallet won't integrate with its messaging app at launch" (Jan. 6, 2020).

Commission Response: The Commission does not controvert the assertion contained in Paragraph 280.  *See also*, SEC Counter 56.1 at ¶ 10. "Telegram isn't going to merge its cryptocurrency wallet and messenger app – for now" (Jan. 7, 2020) (citing PX141); *id.* at 9 "Distancing the Ton Wallet from the Telegram app. . . makes sense if you're trying not to trip the 'efforts of others' prong of the Howey test, but not if you're actually trying to distribute a useful token to your target users."  PX140.

## V.     TELEGRAM SOUGHT GUIDANCE FROM AND ACTIVELY ENGAGED WITH THE SEC

281.     On February 2, 2018, counsel for Telegram reached out to the SEC regarding the TON Blockchain.  ECF No. 37, Defendants' Affirmative and Other Defenses ("Defenses") ¶ 36.

Commission Response: The Commission denies the allegation contained in Paragraph 281 on the ground that it misleadingly suggests that Telegram reached out to the SEC first.  In fact, the SEC began efforts to contact Telegram's counsel no later than January 31, 2018 and Telegram's counsel contacted the SEC on February 2, 2018 in specific response to the SEC's prior outreach.  *See* McGrath Decl., dated Jan. 13, 2020, exs. G, H (D.E. 77-7, 77-8).

282. On February 2, 2018, the SEC sent a letter to "Telegram LLC," which stated that "[t]he staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above and requests that your client, Telegram LLC ('Telegram'), voluntarily produce to the staff" a number of categories of documents. ECF No. 37, Defenses ¶ 36.

Commission Response: The Commission does not controvert the assertions contained in Paragraph 282.

283. Both sides agreed to the scope of Telegram's voluntary production of documents, and over the next 18 months, Telegram engaged in good faith and voluntary discussions with the SEC in order to explain the details of its project and to obtain guidance regarding the potential application of the federal securities laws. ECF No. 37, Defenses ¶ 36.

Commission Response: The Commission disputes the phrases "in good faith" and "voluntarily," and notes that Defendants refused to accept service of an administrative subpoena by staff of the SEC's Division of Enforcement. See id. at Ex. I (D.E. 77-9). The Commission also disputes the statement that an entity may "obtain guidance" from the Division of Enforcement staff post-conduct.

284. Between February 2018 and the commencement of this litigation, Telegram voluntarily: (i) provided productions of thousands of pages of messages and communications with U.S. purchasers; (ii) submitted a detailed legal memorandum on June 26, 2018, regarding its securities analysis of Grams, along with four supplemental memoranda dated November 28, 2018, February 27, 2019, March 18, 2019, and July 25, 2019; (iii) participated in three in-person presentations to the SEC, during which it answered hundreds of questions regarding the TON Blockchain, the TON Foundation, Grams and related matters; and (iv) engaged in regular email and telephone discussions with the SEC and promptly answered questions and provided

additional information regarding a wide range of topics relating to the above.  ECF No. 37,

Defenses ¶ 37.

> Commission Response:   The Commission objects to the phrase "voluntarily," and notes that Defendants refused to accept service of an administrative subpoena by staff of the SEC's Division of Enforcement.  *See id*. at Ex. I (D.E. 77-9).  The Commission otherwise does not dispute that the communications between Defendants' counsel and certain SEC staff listed in Paragraph 284 took place.

285.    A timeline of Telegram's voluntary efforts follows:

- February 6, 2018 – Voluntary production of documents (Vol. 1)

- February 13, 2018 – Voluntary production of documents (Vol. 2)

- March 9, 2018 – Voluntary production of documents  (Vol. 3)

- April 18, 2018 – In-person presentation to SEC

- May 14, 2018 – Voluntary production of documents (Vol. 4)

- June 26, 2018 – Submission of Initial Memorandum of Law

- July 24, 2018 – Call with SEC

- July 31, 2018 – Call with SEC

- August 14, 2018 – Call with SEC

- September 4, 2018 – Call with SEC

- October 3, 2018 – Voluntary production of documents (Vols. 5 & 6)

- October 11, 2018 – Call with SEC

- November 13, 2018 – Voluntary production of documents (Vol. 7)

- November 14, 2018 – Call with SEC

- November 20, 2018 – Submission of Supplemental Memorandum of Law

- December 13, 2018 – Call with SEC

- February 6, 2019 – In-person presentation to SEC

- February 27, 2019 – Submission of Second Supplemental Memorandum of Law

- March 11, 2019 – Call with SEC

- March 12, 2019 – Call with SEC

- March 18, 2019 – Submission of Third Supplemental Memorandum of Law

- March 25, 2019 – Email response to SEC questions

- May 28, 2019 – Letter to SEC enclosing documents; email response to SEC questions

- June 14, 2019 – Email response to SEC questions

- June 15, 2019 – Email response to SEC questions

- June 28, 2019 – Call with SEC

- July 9, 2019 – Email responding to SEC questions

- July 18, 2019 – In-person presentation to SEC, CFTC and FinCEN

- July 25, 2019 – Submission of Fourth Supplemental Memorandum of Law

- September 3, 2019 – Email response to SEC questions

- September 9, 2019 – Email response to SEC questions

- September 12, 2019 – Email response to SEC questions

- September 27, 2019 – Email response to SEC questions

- September 30, 2019 – Letter to SEC

- October 1, 2019 – Letter to SEC enclosing documents

- October 3, 2019 – Letter to SEC enclosing documents

- October 4, 2019 – Letter to SEC enclosing documents

- October 10, 2019 – Email response to SEC questions

- October 11, 2019 – Letter to SEC

ECF No. 37, Defenses ¶ 38.

      Commission Response:  The Commission objects to the phrase "voluntarily," and notes that Defendants refused to accept service of an administrative subpoena by staff of the SEC's Division of Enforcement.  *See id.* at Ex. I (D.E. 77-9).  The Commission otherwise does not dispute that the communications between Defendants' counsel and certain SEC staff listed in Paragraph 285 took place.

      286.    Where the SEC did provide some limited feedback to Telegram regarding the TON Blockchain, Telegram made changes in an attempt to address the SEC's concerns.  ECF No. 37, Defenses ¶ 39.

      Commission Response:  The Commission disputes the use of the word "limited" in Paragraph 286 as vague and ambiguous and to the extent it implies that there is an obligation, legal or otherwise, for Staff of the SEC's Division of Enforcement to provide potential securities laws violators "feedback" or the implication that it is anyone but Defendants' obligation to ensure that their activities comply with the federal securities laws.  The Commission further disputes that Defendants "made" changes to a system they claim is not yet in existence and over which they maintain maximum "flexibility."  *See* SEC 56.1 at ¶¶ 374-380.

      287.    In March 2018, Telegram provided the SEC with a list of approximately 60 websites that Telegram believed had been fraudulently offering to sell Grams.  Drylewski Ex. 4 at 26.

      Commission Response:  The Commission disputes the assertion contained in Paragraph 287 that Telegram believed the referenced websites had been fraudulently offering to

sell Grams on the ground that the evidence cited in support of the characterization of Telegram's state of mind is the response of Telegram's lawyers to an interrogatory and therefore is inadmissible hearsay. The Commission does not otherwise controvert the assertion that, in March 2018, Telegram's counsel provided the SEC with a list of 60 websites offering to sell Grams.

## COMMISSION'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Telegram's Claims that It May No Longer Support "TON" After Launch Contradict Its Past Promises to Investors

#### i. Telegram's Pre-Litigation Statements

1. In a Whitepaper Telegram "published" to the public (Def. Br. at 13, Stips. at ¶¶ 118-20) at the outset of the TON project, Telegram represented that it would, among other things:

    a. create and launch the new TON Blockchain and a suite of applications alongside it—TON Storage, TON Proxy, TON DHT, TON Services, TON DNS, TON Payments (collectively, the "TON Applications")—"either from the very beginning or at a later time" (JX18 (D.E. 72-18) at 3–4, 99);

    b. engage in price-stabilization efforts, including by buying and selling Grams into the market at increasingly higher prices (*id.* at 128);

    c. transfer 200 million Grams to the control of the TON Foundation to pay as "rewards" "to the developers of the open source TON software, with a minimum two-year vesting period" (*id.* at 131);

    d. use un-allocated Grams through the "TON Reserve . . as validator stakes" such that the "TON Foundation will have a majority of votes during the first deployment phase of the TON Blockchain" (*id.* at 130); and

111

  e. sell Grams and use the proceeds for "the development and deployment of the TON Project," including the TON Foundation installing "an initial set of . . . nodes" for the additional Applications (*id.*).

  2. Telegram made statements similar to the above in other materials about TON, such as stating in the Primer that Telegram would:

  a. develop the complimentary suite of Applications referenced in the Whitepaper, which Telegram described as "sophisticated network protocols . . . scheduled to be released *after* the TON Blockchain core" to "further increase the potential uses of the TON infrastructure" (JX7 (D.E. 72-7) at 9 (emphasis added));

  b. integrate its popular Messenger app, which then boasted at least 170 million monthly users, to capture built-in "demand and value for [Grams]" (*id.* at 5–6); and

  c. sell Grams into the open market post-launch at increasing prices through the TON Reserve, and providing the graphical representation reproduced below (*id.* at 17);



11.  See section A.4 in the Technical White Paper, «Original price of Grams».

3.      In the Primer, Telegram gave an estimated timeline for the launch of TON, provided that it would launch, in the first quarter of 2019 (*id.* at 15), and noted that "the initial TON vision and architecture will have been implemented and deployed" by 2021, at which point "the continuous evolution of the TON Blockchain [would] be maintained by the TON Foundation" (*id.* at 19).

4.      The Primer listed two potential categories of uses for Grams in the network: for use in connection with and as payments for "validation" of new blocks in the TON

113

blockchain, and to use with the suite of Applications, although the latter "services [could] be free" as well.  (*Id.* at 13-14.)

     5.     The Primer is accessible to the public.  (Stips. at ¶ 99.)

     6.     On or about October 8, 2019, Telegram published terms of service for "Grams Wallet" to govern use of the application "whether as a standalone application or as incorporated into the Telegram Messenger application."  (PX139.)

     7.     By this time in October 2019, Telegram had approximately "300 million monthly active users." (PX12 (D.E. 81-12), Durov Tr. at 43:11–13.)

### ii.     Telegram's January 6, 2020 Public Notice

     8.     On or about January 6, 2020, Telegram issued a "Public Notice About the TON Blockchain and Grams" (the "Public Notice").  (DX 3 (D.E. 73-3).)  In the Public Notice, Telegram made the following statements, among others:

     a.     "[I]t is possible that Telegram may never" "develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches."  (*Id.* at 1.)

     b.     "Telegram or its employees may, but do not commit to, hold any Grams following the launch of the TON Blockchain."  (*Id.* at 2.)

     c.     Telegram "may integrate the TON Wallet application with the Telegram Messenger service in the future" to the extent permitted by law.  (*Id.*)

     d.     While it is Telegram's "goal and hope" that third parties will take over TON, it "cannot [ ] guarantee that anyone" will do so. " (*Id.* at 1.)

     e.     "Telegram has been careful **not to speak publicly** about" "rumors in the media and speculation about the details of [the TON] project" "to ensure that the TON

Blockchain and Grams can operate in a way that is **compliant** with all relevant **laws and regulations**." (*Id.* (emphasis in original).)

    f.   "[T]he TON Blockchain on which Grams will function is still in a Beta Test phase." (*Id.*)

    9.    One media report noted the Public Notice was "likely a tactic in Telegram's fight with the SEC" and quoted the founder of a cryptocurrency research firm as saying: "Distancing the Ton Wallet from the Telegram app. . . makes sense if you're trying not to trip the 'efforts of others' prong of the Howey test, but not if you're actually trying to distribute a useful token to your target users." (PX140.)

    10.    Another media outlet reported that "Telegram isn't going to merge its cryptocurrency wallet and messenger app – for now" and noted that "perhaps the intent to separate the apps at launch is to reinforce Telegrams [sic] claims that it doesn't have control over its Blockchain, but that remains to be seen. . . ." (PX141.)

    **iii.**    **Telegram Has Not Committed to Walking Away from TON and Has Always Sought to Retain Its "Flexibility"**

    11.    Telegram has not—in the Public Notice or otherwise—*committed* to walking away from the TON project after launch.

    12.    Telegram has not—in the Public Notice or otherwise—*committed* to not holding or selling Grams after the launch of TON.

    13.    Telegram has not—in the Public Notice or otherwise—*committed* that it will not integrate the TON Wallet into the Messenger app, which Telegram will indisputably continue to develop after the launch of TON.

    14.    Telegram has not—in the Public Notice or otherwise—*committed* to never establishing the TON Foundation after the launch of TON.

15.     Telegram has at all times maintained, and continues to maintain, that it has the flexibility to do all of the things enumerated above if it so chooses in the future, including flexibility with respect to the TON Wallet, the TON Foundation, whether to permit its employees to act as validators and hold Grams, and other features of TON.  (*See, e.g.*, *infra* ¶¶ 16–19.)

16.     For example, Durov told one Initial Purchaser in January 2018:  "We've talked a lot with Skadden about our ideas re Foundation.  While I was pushing it forward, their advice was clear – in times when the future (and current) regulation is uncertain, retain flexibility . . . . If we want to be able to evolve and adapt to a constantly changing environment, we shouldn't limit ourselves in any significant way. . . As you and [REDACTED] said during our dinner in Paris, nobody knows when the time is right to move everything to the Foundation.  This time may come tomorrow.  It may come next year. Or in ten years.  So we made sure we left that door open without guaranteeing any restricting timeframe."  (PX25 (D.E. 81-25) at TLGRM-007-00000320.)

17.     Durov testified that Telegram has from the start reserved for itself the flexibility to change features of the TON project, including with respect to TON Wallet, the TON Foundation, and the role of Telegram in validating blockchain nodes.  (PX12 (D.E. 81-12), Durov Tr. at 158:23–162:19, 261:22–262:21, 276:17–277:25, 301:2–9.)

18.     Hyman told an Initial Purchaser on a telephone call in January 2018 that the "[p]lan is to have the option or ability to intervene in the market but in an understandable and predictable [way]" through the TON reserve.  (PX1 (D.E. 81-1), Ex. B at Bates 1907.)

19.     Defendants state in their interrogatory responses that they "have reserved and continue to reserve all rights to change, modify, or eliminate the existence or details of the TON Blockchain, the TON Foundation, or any 'price stabilization' functions."  (PX23 (D.E. 81-

116

23) at 31; *see also id.* at 8; Def. Br. at 13–14, 19 (discussing "the flexibility [Telegram]

maintained regarding [the] details" of the TON project).)

## B. Telegram Has Put Forth No Evidence Regarding the TON Blockchain's State of Development at Launch

### i. Telegram Marketed Few, if Any, Expected Uses for Grams

20. Telegram in the Primer spoke of the Applications (*see supra* ¶ 2) that

could use Grams as well as the use of Grams in connection with validation activities. (JX7 (D.E.

72-7) at 14.) But the Primer also noted that the Applications could function without Grams:

"All of these services can be free for the users since the application owners may choose to cover

the corresponding fees, and adopt a freemium or an advertisement-based business model." (*Id.*)

21. Telegram is still working on the Applications which are not ready for

launch but which Durov described as "nice to have." (PX12 (D.E. 81-12), Durov Tr. at 258:9–

259:12.)

22. The Public Notice does not provide a list of vendors that will be accepting

Grams in exchange for goods and services, or apps that may accept Grams.

23. Telegram has submitted a chart of "public reports, websites and other

resources regarding the development or potential development of applications and uses for

Grams." (DX4 (D.E. 73-4) at 12–16 (Resp. No. 5); *see also* DX10 (D.E. 73-10) at 2–5.)

24. Telegram's chart does not distinguish which potential applications have

been developed, which are in the process of development, and which are theoretical.

25. There is no direct, reliable evidence in the record regarding the nature or

state of any of the potential applications listed in Telegram's chart.

26. Prof. Maurice Herlihy reviewed the applications listed in Telegram's

submission and concluded that only eight of the 50 applications therein listed are actually

existing products that could theoretically use Grams for in-app payments assuming they in fact become integrated into the TON Blockchain.  (PX9 (D.E. 81-9) Expert Report of Maurice P. Herlihy ("Herlihy Rep.") at ¶ 37 & App'x C.)

27.     Professor Herlihy is of the opinion that most of the remaining potential applications in Telegram's chart are compiler code potentially usable to assist operation of the network.  (*Id.*)

28.     The record contains no evidence that Telegram took any steps towards lining up vendors that would accept Grams as a form of payment.  (*See, e.g.*, PX199, Perekopsky Tr. at 163:22–164:18 ("We didn't proactively reach out to vendors.").)

29.     Parekh testified that he was not aware of anyone who planned to use Grams as a payment for goods or services as of December 2019.  (PX200, Parekh Tr. at 163:12–15.)

30.     On or about August 29, 2019, a representative of BitPay, "the largest payment processor of Bitcoin in the world," contacted Telegram about "the possibility of accepting Grams on [the BitPay] platform."  (PX142.)

31.     Telegram did not respond to BitPay's email.   (PX14 (D.E. 81-14), Parekh. Tr. 239:7–24.)

32.     Telegram tried "hard to close" digital asset platforms to permit users to trade Grams in exchange for fiat currency.  (SEC 56.1 at ¶ 317(e); *see generally id.* at ¶¶ 195–212.)

33.     There is no evidence in the record that Telegram or anyone else has marketed Grams to secondary market purchasers as currency or commodities.

34.     There is no evidence in the record that the association of entities working

in conjunction with Telegram—Blackmoon Crypto, Gram Vault, TON Ventures and TON Labs (*see* SEC 56.1 at ¶¶ 268–317)—attempted to procure any vendor that would accept Grams in exchange for goods or services.

35.　Blackmoon Crypto marketed its services to secondary market purchasers as providing the ability to trade fiat currency into Grams: "Traders will have access to Gram tokens on the Blackmoon Exchange right after Telegram Open Network launch. Real on-chain Grams, available for withdrawal to Telegram native wallet. No lock-up. No futures or other derivatives." (PX108 (D.E. 81-108) at 1.)

36.　When Blackmoon Crypto provided Telegram a "SUMMARY OF BIZ-DEV RESPONSIBLITIES" in June 2018, it included "Market-Making/Liquidity Providers," negotiating with crypto exchanges, and helping Initial Purchasers towards "a smoother liquidation" of Grams, but did not include anything about finding uses for Grams—as a commodity or medium of exchange. (PX88 (D.E. 81-88).)

37.　Telegram's expert acknowledges that cryptoassets "experience a higher frequency of extreme returns." (PX129 (D.E. 81-129) Rebuttal Rep. of Stephen McKeon at ¶ 52.) This is inconsistent with use of such cryptoassets as a currency. (*Id.*)

### ii.　Telegram Set Out to Create a Revolutionary Blockchain Based on Ambitious Technological Goals

38.　Telegram told readers of the Primer that Bitcoin and Ethereum "don't have the capacity to replace VISA or Mastercard" because "[i]n their current architecture they are limited to a maximum of only 7 transactions per second for Bitcoin and 15 transactions per second for Ethererum, resulting in insufficient speeds and higher transaction costs." (JX7 (D.E.72-7) at 4.)

39.　Telegram explained to readers that "[t]o reach mainstream adoption [] a

119

cryptocurrency [] and its underlying blockchain" have to, among other things, "allow for processing millions of transactions per second and accommodating hundreds of millions of active users." (*Id.*)

40. The Primer explained that Telegram's "vision"—the purpose of the TON project—was to "establish the first mass-market cryptocurrency" meeting these conditions. (*Id.* at 4-5.)

41. As part of the "Risk Factors" appendix to the Pre-Sale and Stage A Primers, Telegram acknowledged "Risks Relating to the Further Development and Acceptance of Blockchain Technology and Cryptocurrencies." (JX14 (D.E. 72-14) at ¶ 4.)

42. It also warned Initial Purchasers that development of the TON Blockchain and the TON wallet would require "significant capital, the expertise of Telegram's management and substantial time and effort by skilled developers and other parties," and that there could be "no guarantee that such [new] technologies will operate as intended . . . ." (*Id.* at ¶ 5.)

### iii. Many Have Expressed Doubts from the Start about Telegram's Ability to Create the TON Platform It Marketed

43. In a February 2018 article titled "Telegram: Crypto for the Masses," the Economist noted that Telegram's "bold ambitions could still fail to be realized" because research into the technology Telegram intends to use like "infinite sharding" and "hypercube routing" "was abandoned years ago by other developers." (PX143.)

44. In March 2018, The New York Times published an article titled "Virtual Currency Offerings May Hit a New Peak with Telegram Coin Sale." (PX144.) The article noted skepticism about Telegram's project by certain venture capitalists who have invested the most in the virtual currency space, noting "the most obvious reason to be skeptical of the project is that there is not even a prototype – just a 132-page paper promising what the system will look like

one day." (*Id.*) The article cited to a "scathing essay" by one analyst "noting that the Telegram team has given no evidence that they will be able to solve the problems that have dogged everyone else." (*Id.*)

45. This essay, published in January 2018 and titled "$600 Million TONs of Crap," described Telegram's 132-page whitepaper as saying "nothing substantial about the hard parts of designing a decentralized protocol. It is essentially a wishlist of things they want to have, and how it will work assuming that their wishlist doesn't crash and burn. It does not make any substantial contributions to proof of stake research. . . . I do not know how [TON] will work. I cannot, in 132 pages, gain the slightest intuition as to how to go about proving that the hard problems it needs to solve will be solved. I certainly would not put a single cent I care more than nil about losing into this. Mostly, because I think this is an opportunistic ploy." (PX145.)

46. The venture capital firm whose analyst published the essay declined to invest in the Offering. (PX194 at Bates 665.)

47. Similarly, a representative of a prospective Initial Purchaser who received Telegram's Offering Documents, noted in a January 2018 email that Telegram's "timeline and their product roadmap seems aggressive, bordering on delusional . . . best guess is that they actually don't know what they're going to build, so they're throwing out every protocol application possible and will whittle it down once they start building." (PX146.)

48. This individual further stated that "although Telegram does have an impressive user base, the team doesn't really have any relevant experience in the blockchain space, their proof of stake goal is ambitious and largely unproven" and went on to note: "If the minimums were a lot lower I think I could get behind this as a flyer and a bet based on our pre-sale discount." (*Id.*)

49.     Another representative of that prospective Initial Purchaser noted that "it looks like they are trying to boil the ocean – the storage layer problem itself is going to be hard to pull off. . . ." (*Id.*)

50.     This prospective Initial Purchaser ultimately passed on the opportunity to invest in the Offering, noting: "This is a PASS.  They are trying to be the next Ethereum.  I think we will stick with the present Ethereum."  (*Id.*)

51.     An analyst at another venture capital firm wrote in January 2018 to an Initial Purchaser, "we've decided to avoid a deep dive into TON altogether.  The long lock up means it doesn't fit our liquidity profile well.  Early indications from people I respect suggest it's a 'coinflip' in the sense that it's a sky high valuation for vaporware," and cited to the essay referenced in paragraph 45 above.  (PX147.)

52.     Some of the firms that did ultimately invest also noted potential problems with Telegram's technological aspirations for TON.  (*See, e.g.*, *infra* ¶¶ 53–56.)

53.     For example, one Pre-Sale Initial Purchaser stated in its internal investment memorandum that the "scope of what the TON team is proposing is extremely ambitious" and that while "they mention that they will implement various components of TON protocol like TON Storage, TON PROXY, TON DNS, TON Payments, and TON Services to facilitate the development of apps on TON," they "fail to detail their plans for execution or address whether they have sufficient resources to implement these components, each of which is a massive undertaking."  (PX32 (D.E. 81-32) at Bates 4.)

54.     This Initial Purchaser further noted: "[We] haven't seen any code for the TON blockchain, and the roadmap is bare bones; we are investing in the promise of a new blockchain rather than an actual product, and trusting the team a great deal in the process."  (*Id.*

122

at Bates 5.)

55.     Another Initial Purchaser wrote an internal email recommending that the firm participate in the Offering but noted as "challenges" that "there is a technical question as to whether it is even possible to create TON's proposed blockchain currency, particularly in the time frame discussed.  All they have thus far is a technical whitepaper that is mostly academic. Bitcoin is an early iteration of a transactional currency, but is still a sophisticated one, and it has yet to crack the code on fast transactions at low costs."  (PX5 (D.E. 81-5), Ex. A at Bates 2964).

56.     An engineer from that same firm wrote:  "[W]e'll probably make money on TON if only because of the hyped sale of tokens to a broad user base. . . . But technically/fundamentally, it's probably not going to fully materialize into the project they're selling or even something of value in the long term" and cited to the essay about TON published by another firm and referenced in paragraph 45 above.  (PX148.)

### iv.     Telegram Does Not Claim—in Its Submissions to the Court, in the Public Notice, or Elsewhere—that, Upon Launch, the TON Blockchain Will Operate as Originally Envisioned

57.     Perekopsky admitted that "after the launch [of TON] . . . still it takes time for the ecosystem to appear" and that to the extent anyone is planning to use Grams "to pay for something" that would be "definitely maybe not on day one."  (PX13 (D.E. 81-13), Perekopsky Tr. at 173:5–25.)

58.     Telegram's expert opines that to achieve the "decentralization" of the blockchain Telegram desires, there should be 1,000 potential validators.  (PX126 (D.E. 81-126) Expert Rep. of Stephen McKeon ("McKeon Rep.) at ¶ 189.)

59.     Durov believes that it will be hard to predict how many validators the blockchain will have upon launch.  (PX12 (D.E. 81-12) at 311:9-19.)

60. On or about October 2, 2019, Parekh sent an email to all Initial Purchasers titled "Action Required: Telegram Open Network Development Update" stating, among other things, "because you participated in the Private Placement, you are eligible to take part in the validators' election process. If you are planning to use your Grams for validation, please follow the technical instructions attached to this email." (PX149.)

61. [RESERVED]

62. Defendants have not contacted *any* persons or entities to request that they act as validators on the TON Blockchain upon its launch. (Stips. at ¶ 214.)

63. Prof. Herlihy, the SEC's expert in blockchain technology, analyzed the "beta version" of the TON Blockchain's code and concluded that "much of this code performs routine and mundane functions . . . [that] would be performed in essentially the same way in any blockchain." (PX9 (D.E. 81-9) Herlihy Rep. at ¶ 5.)

64. Prof. Herlihy observed 36 validators on the TON Beta version (*id.* at ¶ 33), though the identities of these validators are not in the record.

65. Prof. Herlihy concluded that "substantial further engineering work will be required to 'tune' the [TON] Blockchain before it can reach the size and speed described in the public documents." (*Id.*)

66. Neither of Telegram's experts analyzed or offered any opinion regarding the effectiveness of the code for the beta version of the blockchain and neither provided any opinion as to whether the TON Blockchain will function as originally envisioned upon launch. (PX126 (D.E. 81-126) McKeon Rep. at ¶ 14 ("I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer."); PX198 (Expert Report of Andrew Lewis-Pye).)

124

**C.**    **Telegram's Sales of Grams to Initial Purchasers Were the First Step in Its Intended Public Distribution of Grams**

      **i.**    **The Built-In Pricing Mechanism for Grams Incentivized Initial Purchasers to Sell Grams in the Secondary Market**

67.    As detailed in the SEC 56.1, the Initial Purchasers bought Grams because they believed Grams would generate returns once sold in the secondary market. (SEC 56.1 at ¶¶ 147–86.)

68.    Telegram's pricing mechanism for Grams was communicated to Initial Purchasers in various ways, including through the pricing graph reproduced above in paragraph 2 and through other communications. (*See, e.g.*, *infra* ¶¶ 69–71.)

69.    For example, on or about January 15, 2018, Telegram emailed a "Telegram Private Placement Update" email to dozens of prospective Initial Purchasers who had expressed interest in investing in the Pre-Sale round of the Offering. (*See, e.g.*, PX1 (D.E. 81-1) Ex. C; PX150.)

70.    The January 15, 2018 email stated that Telegram had received "expressions of interest for over US$3.75 billion of Grams from approximately one hundred Initial Purchasers" and that they had "decided to increase the volume of this round to US$850 million. Based on the formula in the White Paper, this results in a price of US$0.37756101 per Gram. We selected this offering size not only to give us sufficient capital to develop TON and the associated functionality within Telegram Messenger over the next number of years, but also to facilitate an allocation process that will ensure that every Initial Purchaser that participated in it and is eligible to receive an allocation will receive one." (PX1 (D.E. 81-1), Ex. C.)

71.    The January 15, 2018 email also announced a next offering round, which was expected to start in mid-March 2018, and raise $1.15 billion, such that "the price to Initial

Purchasers will be approximately US$1.45 per Gram." (*Id.*)

72. One Initial Purchaser concluded, based on the pricing mechanism described in Telegram's January 15, 2018 email, that purchasing Grams could be profitable because "the seemingly low valuation in the ICO pre-sale was an interesting risk/reward opportunity. The pricing mechanism described by Telegram indicated that any future token offerings would sell Grams at a higher price." (PX 1 at ¶ 15).

73. Another Initial Purchaser sent a summary to several other venture capital firms, which highlighted that Telegram would conduct another offering in March 2018, where the price offered to Initial Purchasers would be approximately US$1.45 per Gram. (PX3 at Exhibit B, Bates 7278.)

74. On or about January 10, 2018, an analyst who worked at one of the Initial Purchasers summarized some of the terms of the Telegram offering for his colleagues, writing "Supply: Total supply of 200 Grams split as follows: 4% for team w/ 4 year vesting, 52%+ retained by TON reserve 'to protect the nascent cryptocurrency from speculative trading and to maintain flexibility at the early stages. . .' and 44% sold based on a formula illustrated below ($0.10 to $1.00 per token depending on timing)." (PX3 (D.E. 81-3), Ex. C at Bates 6769.) This analyst attached a screenshot of the pricing graph depicted in Telegram's Primer, as reproduced in paragraph 2 above. (*Id.*, Ex. C at Bates 6771.)

75. Another representative of an Initial Purchaser stated in a sworn declaration that some of the reasons the firm believed Grams would trade higher than what the firm purchased them for were that "a portion of Grams was going to be retained by Telegram to support the trading value for Grams, as well as by the founders personally" and that "we believed at the time we invested that Telegram planned future offerings of Grams at a higher price and we

felt it would be a popular ICO."  (PX7 (D.E. 81-7) at ¶ 19.)

76.  A representative of another Initial Purchaser declared that at the time his firm made the investment the firm believed "the upside was approximately 3-4 times our investment purchase price."  (PX4 (D.E. 81-4) at ¶ 12.)  This was based in part on Telegram's indication to this firm that "there was a lot of demand for the deal that was not met, so we reasoned that high demand for Grams meant the price would rise."  (*Id.* at ¶ 16.)

77.  Another Initial Purchaser stated in its investment thesis memorandum that "we expect the token to become a top 10 coin given the company's high profile, the project's magnitude, and the cryptocurrency community's dominant use of the product, which would lead to a return of 2-5x within 12 months post launch."  (PX31 (D.E. 81-31) at Bates 3848.)  The memorandum also stated: "we also believe that because of the discount offered to participants in the resale, market conditions, momentum and scarcity, this coin will go up sharply in price in the short term.  It could offer a return comparable to what we might see from a VC investment (5-10x) that is realizable in 3-6 months (once the lockup begins to expire) instead of 7-9 years. . . . This presale is being offered to 'blue chip' VCs that can help signal quality to other Initial Purchasers in the ICO and public market."  (*Id.* at Bates 3848-49.)

78.  Similarly, another Initial Purchaser stated in its investment analysis memo that the firm was "purchasing Grams at a significant discount to the ICO price" and that the firm thought "this investment could return 10x."  (PX33 (D.E. 81-33) at Bates 11.)

79.  On or about February 19, 2018, Telegram sent an email to one of the Initial Purchasers titled "Telegram Update."  Hyman wrote:  "We can confirm that the proceeds of your purchase totaling 15 million USD have been received in full and you have been allocated an entitlement to 39,728,878.6 Grams, according to the terms of the purchase agreement.  As you

know, we closed the initial round of the TON private placement in early February, raising a total of $850 million at a price of US$0.37756101 per Gram. . . . We are now preparing to launch the next round of the offering. . . . The target size for each stage is still to be determined, but we currently anticipate offering US$850 million of Grams in Stage A, at a price of US$1.33003701 per Gram."  (PX151.)

80.    Another Initial Purchaser noted that "with a circulating supply of 4.24 billion Grams (assuming the TON Reserve holds 20% of the total supply) we can forecast a price of $7.23 per Gram in 2021 if the TON blockchain is to capture 100% of the value of Telegram itself."  (PX 30 (D.E. 81-30) at Bates 10.)

81.    There is no evidence in the record that Initial Purchasers believed Grams would function as an efficient medium of exchange or as an efficient way to acquire goods and services upon the launch of the TON network.

82.    On or about January 12, 2018, an employee of an Initial Purchaser emailed to his team some questions and answers about the Telegram Offering that his team had been discussing.  One question posed was: "What can be done to minimize currency volatility and how does that impact this round of Initial Purchasers? [ ] and I discussed this question with John Hyman @ T – the idea is that their large (42% of tokens) reserve could buy up supply at a stable cost if there is meaningful selling pressure, while the exponentially increasing cost of purchasing an additional token would keep buying demand suppressed at a certain point.  But I suspect we will still see hyper volatility of the token price in 2018 prior to the launch of the commercial platform, and Initial Purchasers will need to get comfortable with this near-term volatility." (PX5 (D.E. 81-5) Ex. B at Bates 1582.)

83.    A January 16, 2018 investment analysis by another employee of the same

Initial Purchaser stated: "Based on the pricing formula for each token, we would be purchasing the tokens at a 50%+ discount assuming full Initial Purchaser interest is met during the pre-sale (the $ amount invested is the integral of the exponential curve shown on page 17 of the attached TON Primer, which is always at least 50% below the market value of those tokens)." (*Id.* Ex. A at Bates 2964.) The investment analysis also noted that "Tokens are a speculative asset, rather than a tested and proven mode of transaction. Given that token values are likely to skyrocket early on and be susceptible to massive price swings (just like bitcoin or any other cryptocurrency today), it will be challenging for commercial transactions to occur until the price stabilizes – the timing of which is impossible to predict." (*Id.*)

84. Another Initial Purchaser's investment memorandum stated that transition to the "TON Foundation" is expected to be completed by 2021, and that "we firmly believe that the Durov Brothers, and in particular Pavel will be the guiding force behind TON." (PX30 (D.E. 81-30) at Bates 4). It also stated: "In the TON White Paper, Telegram has outlined the ability for the TON reserve to buy and sell tokens in order to stabilize the market price of Grams so that the price 'may be less prone to sudden spikes (and drops).' We expect the TON reserve to be very active in exerting its influence on price; decreased Gram volatility is advantageous in that the blockchain is more useable (transaction fees are more consistent) and users feel more comfortable transacting in Grams (consistent store of value)." (*Id.* at Bates 3.)

### ii. Initial Purchasers Planned to Sell—and Some Did Sell—Grams for Profit in the Secondary Market

85. Initial Purchasers understood that after the deployment of the TON blockchain, "Grams will list on exchanges and become publicly tradable in Q1 2019." (PX30 at Bates 3; *see also* JX8 at 15; JX9 at 15.)

86. Initial Purchasers also knew, as early as February 2018 during the Pre-Sale

129

round, that there was a "grey market" for interests in Grams.  (PX37 (D.E. 81-37) at Bates 726 – 31; SEC 56.1 at ¶¶ 213–19.)

87.   In an email dated February 20, 2018, an employee of an Initial Purchaser told a colleague regarding Telegram: "People are already flipping the Telegram ICO for millions, even though it's not on sale yet" and cited to an article.  (PX152.)

88.   Initial Purchasers understood there was even a secondary market for the Purchase Agreements themselves.  (*See, e.g.*, *infra* ¶¶ 89–91.)

89.   For example, in April 2019, BSG Cayman Limited, entered into an agreement with an Initial Purchaser of Grams to "receive a participation in the purchase of $5,297,157.14 tokens" for US$2,400,000.  (PX76 (D.E. 81-76) at Bates 839).

90.   BSG sent one of the Initial Purchasers its Operating Committee's memorandum about Telegram, dated March 23, 2019.  (PX77 at Bates 815.)

91.   The BSG investment memorandum states:  "BSG has procured a rare opportunity to invest through a secondary purchase, based on $0.453 token price at $2.27B valuation.  This represents a highly attractive 66% discount to the last round $1.33 token price at $6.65B valuation." (*Id.* at Bates 815, 831.)  The memorandum also states:  "In terms of exit, [the] team will target for the earliest investment principal repayment, with longer holding of remaining stake for upside optimization.  A direct listing on a cryptocurrency exchange is expected to be 6 months after launch of the mainnet, as indicated by TON's management, and discussions are underway with global top exchanges."  (*Id.* at Bates 828.)

92.   Some Initial Purchasers contemplated selling their Grams immediately after the lockup period was over. (*See, e.g.*, *infra* ¶¶ 93–95.)

93.   For example, on or about January 18, 2018, one Initial Purchaser told a

colleague that the next round "is more interesting than this (realize it will be at a higher price) but I can buy more then AND sell it right away 18 months in crypto is a lifetime." (PX169.)

94.     In its Summary Investment Analysis Memorandum from February 2018, another Initial Purchaser explained that the firm would be purchasing Grams at US$0.37756101, a significant discount to the ICO price of US$1.145 per Gram, and stated "[w]e will be able to sell 1/4 of our Grams 3 months post launch and will be able to sell all of them 18 months post-launch." (PX33 (D.E. 81-33) at Bates 8).

95.     In May 2018, another Initial Purchaser forwarded to Hyman a "cold email" from an unidentified party that offered "a direct [ ]SAFT between the Initial Purchaser and Telegram after signing an agency agreement.  Our terms vary depending on the investment amount and include: a) entry fee %; (b) % from upside (the latter we consider a gentleman's agreement since token are in possession of the Initial Purchaser)." (PX153.)

96.     Indeed, even Telegram expected these venture capital firms to sell their Grams to the public. (*See, e.g.*, *infra* ¶¶ 97–98.)

97.     For example, on or about May 3, 2018, an Initial Purchaser asked Hyman why Telegram had decided not to do a public offering.  Hyman replied: "We decided for regulatory reasons we will never do any form of direct public offering . . . [t]he pubic will be able to buy grams once network is working and wallets distributed but on a secondary basis not from Telegram directly." (PX20.)

98.     Similarly, in June 2018, Hyman told an Initial Purchaser that Telegram "ruled out the public ICO," and "think now- the right thing is to have the crypto community [ ] buy in once its trading and allow the market to evolve naturally." (PX1, Exhibit D).

99.     The "Sales Agent Services Agreement" between Telegram Corp. and

Perekopsky, dated January 15, 2018, stated as the "Purpose" of the agreement: "The Company hereby appoints [Perekopsky] on a non-exclusive basis as its agent for the sole purposes of soliciting orders for, and selling Tokens in accordance with the terms and conditions of this Agreement during the Initial Coin Offering of the TON project (the "ICO")." (PX197 at TLGRM-015-00000017.)

### iii. Telegram Paid Millions of Dollars to Promoters, Themselves Also TON Initial Purchasers, To Find Other Initial Purchasers

#### 1. ATON

100.    On or about February 20, 2018, Ilya Davydov ("Davydov") of ATON Capital Group ("ATON"), a Russian asset manager and broker, indicated interest in investing in the Stage A round of the Offering. (PX154.)

101.    On or about March 18, 2018, ATON signed a Purchase Agreement to buy $7 million of Grams. (PX155.)

102.    Over the next several months, Davydov, on behalf of ATON, introduced purchasers to Telegram, supplied know-your-customer and representation documents on their behalf, and those customers signed Purchase Agreements with Telegram. (PX156; PX157; PX158; PX159; PX160; PX161; PX162; PX163.)

103.    On or about June 25, 2018, Telegram and ATON Financial Holding ("ATON Financial") entered into an agreement whereby ATON Financial undertook to introduce potential investors to Telegram and collect and provide to Telegram "required know-your client materials and securities law representation letters." (PX112 (D.E. 81-112) at 1.)

104.    Telegram agreed to pay ATON Financial 10% of the gross proceeds received by Telegram. (*Id.*)

105.    An invoice dated June 26, 2018 listed commissions owed to ATON

Financial for amounts totaling $12 million in connection with seven Purchase Agreements. (PX164.)

106. The invoice further stated that according to the agreement "dated June 25, 2018, the total fee for the services rendered is 10% of the gross proceeds received by Telegram pursuant to each contract." (*Id.*)

107. On or about August 3, 2018, Telegram wired a payment of $1.2 million to ATON Financial in the Cayman Islands. (PX115 (D.E. 81-115).)

108. For five of the seven Purchase Agreements listed on the June 26, 2018 invoice from ATON Financial, the "Date of Purchase Agreement" is *after* the date of the invoice. (PX164.)

109. Telegram's bank account statements show that at least three of the seven purchasers listed on the June 26, 2018 invoice wired money to Telegram *after* the date of the invoice (June 26, 2018), and that one purchaser paid on June 25, 2018. (PX136 (D.E. 81-136).) The other three are not listed on the bank account statement. (*Id.*)

110. As detailed in the SEC 56.1, in May 2019, Telegram received from an Initial Purchaser a copy of an ATON marketing brochure that touted Telegram as "one of the largest and fastest growing messengers in the world" and provided an "evaluation" for the value of Grams to go up as much as "+494%". (PX113 (D.E. 81-113); PX114 (D.E. 81-114) (English translation) at TLGRM-012-00015887, 892; SEC 56.1 at ¶¶ 320–21.)

111. The brochure noted that ATON would receive an "initial charge" of "2% from the sum of the invested funds" and a "Success fee" of "20% from the growth of the assets' value." (PX114 at TLGRM-012-00015894.)

112. ATON prepared a 37-page equity research analysis on "TON Telegram"

dated May 15, 2019 (the "ATON Equity Analysis"). (PX116 (D.E. 81-116).)

113. At least one Initial Purchaser obtained a copy of the ATON Equity Analysis. (*Id.*)

114. The ATON Equity Analysis noted: "**The main competitive advantage of TON is access to Telegram's ecosystem.** The TON creators plan to build their own cryptocurrency, GRAM, based on the TON platform. The integration of the TON network and cryptocurrency with Telegram will enable the scaling-up of the project and introduce TON to millions of users. For example, it is anticipated that TON light wallets will be built into Telegram clients with millions of Telegram users being able to store their funds securely in TON's network . . ." (*Id.* at Bates 1008 (emphasis in original).)

115. The ATON Equity Analysis also provided "a valuation range of $3.8-6.2 per Gram," and notes: "Price discovery for the cryptocurrency has already started. While official GRAM trading has not started yet, several crypto exchanges (Mofex and Xena) have started to quote Telegram futures. For example, Xena Exchange is offering non-deliverable GRAM futures (XGRAM), expiring at the launch of the token or in Feb 2020 at around $5.9. Since the launch, XGRAM has been trading in a range of $1.8-2.4 which is close to the implied value of Stage B ($2.2) should it take place." (*Id.* at 986.)

116. A different version of the ATON Equity Analysis was published online by Cointelegraph in June 2019 (the "Second ATON Equity Analysis"). (PX166.)

117. The Second ATON Equity Analysis provides "a valuation range of $2.1-8.0 per GRAM." (PX165, available at https://s3.cointelegraph.com/cointelegraph_ton_research_by_aton.pdf.)

### 2. Da Vinci Capital

118.  On or about February 20, 2018, "Disruptive Era Fund SP of ITI Funds SPC", a Cayman entity, provided Telegram an IOI for a $50 million Purchase Agreement, signed by Oleg Jelezko ("Jelezko") as "Partner, Da Vinci Capital Management Limited."  (PX167 at TLGRM-019-00001770.)

119.  Jelezko has, directly or indirectly, a beneficial ownership of 25% or greater of Disruptive, and has "significant responsibility to control, manage or direct" Disruptive. (PX168 at TLGRM-003-00002857–58.)

120.  Jelezko is the CEO, Managing Partner, and Director of Da Vinci Capital Management Ltd ("Da Vinci Capital"), which in turn serves as a financial adviser to Disruptive. (*Id.* at TLGRM-003-00002858; PX117 at Bates 8465; *see also* PX170.)

121.  Jelezko represented that Disruptive Era would be purchasing the investment for its own account and would not be soliciting Initial Purchasers to participate in the investment.  (PX167 at TLGRM-019-00001770–71.)

122.  On or about February 20, 2018, Hyman received marketing materials apparently prepared by Da Vinci Capital. (PX118 (D.E. 81-118).)

123.  After several amendments to purchase amounts and payment dates, Disruptive Era Fund SP ("Disruptive") ended up with three separate Purchase Agreements in the Stage A round of the Offering for the following amounts: $45,658,780.21 executed on or about March 19, 2018; $14,024,941.22 executed on or about May 2, 2018; and $12,452,232.92 executed on or about November 1, 2018; totaling approximately $72,136,000.  (PX171; PX172; PX173.)

124.  Da Vinci Capital and Telegram also entered into an agreement on or about June 22, 2018, whereby Da Vinci Capital undertook to introduce potential investors to Telegram.

135

(PX174 at TLGRM-015-00001263.)

125.    Telegram agreed to pay Da Vinci Capital 10% of the gross proceeds received by Telegram.  (*Id.*)

126.    Telegram's bank account statements show at least 19 separate payments from Disruptive in 2018 totaling approximately $45.4 million.  (PX136 (D.E. 81-136).)

127.    Da Vinci Capital submitted at least two invoices, signed by Jelezko, for 10% fees in connection with seven payments made by Disruptive between August and October 2018.  (PX175; PX176.)  Those fees were not calculated on the basis of investments of other purchasers but, rather, were apparently based on the amounts paid by Disruptive on its own Purchase Agreements.

128.    Telegram admits these payments were payments with respect to finders' fees.  (PX12 (D.E. 81-12), Durov Tr. at 217:14–218:10.)

129.    On the same day that it signed its commission agreement with Telegram, Da Vinci Capital, through its affiliate ITI Capital (PX170), sent a slide deck (the "Da Vinci Deck"), along with a two-page "Messenger teaser," to at least one member of the public who was also an Initial Purchaser.  (PX117 (D.E. 81-117) at Bates 8454–66; *see also* SEC 56.1 at ¶¶ 325–26.)

130.    In the Da Vinci Deck, Da Vinci Capital described a six-step process for the "standard market behavioral pattern [that] will take place in Dec-2018 during [Gram] tokens' unfreeze" (*Id.* at 8464.):

   a.   "Institutional and retail Initial Purchasers that did not manage to participate in the Token sale will try to get into the project rapidly, therefore, will push price up" (*id.*)

136

b. "Some of the Initial Purchasers (including those who received first 25% batch of Tranche #1 unfrozen), over satisfied with 8x+ returns, will start fixing their positions and dumping the price" (*id.*)

c. "After the first batch at the particular level (approx. below $1.33 per token) TON Reserve will start to buy tokens from the market to maitain the fair value of tokens" (*id.*)

d. "With further increase of awareness, number of Initial Purchasers will gradually increase, driving price up until the new batch of Tranche #1 tokens has been unfrozen" (*id.*)

e. "In June 2019, the last frozen batch of ~11% of total supply Grams (Tranche #1) will be unfrozen and will make all Grams fully transferrable" (*id.*)

f. "There are at least 2 options of price movement after Tranche 1 token are unfrozen: (i) Tranche #1 and #2 Initial Purchasers are seeing excess returns and starting to fix it – price goes down; (ii) whales are continuing to consolidate Grams, slightly increasing own blended valuation to become verified nodes of TON – price goes up"  (*id.*)

131.    The graphical representation included in the Da Vinci Deck is reproduced below.  (*Id.*)



132.    As noted on the graph in the Da Vinci Deck, "potential zones for the exit" include December 2018 "with return of 5-8x" and June 2019 "with return of 15-20x."  (*Id.*)

### 3.    Space Investments and Liquid

133.    In February 2018, Space Investments, Ltd. ("Space Investments"), a Cayman entity, provided Telegram an IOI for a $50 million Purchase Agreement and represented that it would be purchasing the investment for its own account and would not be soliciting Initial Purchasers to participate in the investment.  (PX177.)

134.    In February 2018, Space Investments Limited executed two Purchase Agreements for $15 million and $1 million in the presale round of the Offering.  (PX178; PX179.)

135.    The Purchase Agreements were signed by Maria Elia ("Elia") as Director of Space Investments.  (PX178 at TLGRM-014-00016892; PX179 at TLGRM-014-00016824.)

136.    Space Investments wired $16 million to Telegram in February 2018. (PX136 (D.E. 81-136).)

137.    In an internal document tracking potential Initial Purchasers and allocations, Telegram included the purchaser "InVenture (Space Investments)."  (PX180.)

138.    InVenture Partners ("InVenture") is a venture capital firm.  (PX181.)

139.    In March 2019, Space Investments executed with Telegram a Stage A Purchase Agreement for $91 million.  (PX182.)

140.    This agreement was signed Elia and lists sergey@ivprs.com as the contact for Space Investments.  (*Id.* at TLGRM-007-00032727; PX183.)

141.    After a number of amendments, the amount of Space Investments' Stage A purchase appears to have been reduced to approximately $50,202,000—through an agreement dated July 2, 2018 for $23,500,025, and an agreement dated December 3, 2018 for $26,792,039.24.  (PX184; PX185; PX186; PX187.)

142.    Between March and November 2018, Space Investments made 14 wire payments to Telegram totaling $50,292,000.  (PX136 (D.E. 81-136).)

143.    On or about June 15, 2018, Elia signed, on behalf of Gem Limited, a commission agreement with Telegram, whereby Gem Limited undertook to introduce potential investors to Telegram.  (PX138 (D.E. 81-138) at TLGRM-015-00001267.)

144.    Telegram agreed to pay Gem Limited 15% of the gross proceeds received by Telegram.  (*Id.*)

145.    Gem Limited sent Telegram an invoice dated October 11, 2018 pursuant to that contract.  (PX188.)  The invoice specifies that a 15% commission is owed on five payments made on a July 2, 2018 Space Investments Purchase Agreement, and for two payments

made on a July 2, 2018 Purchase Agreement with another purchaser. (*Id.*)

146.    Telegram emailed the Gem Limited invoice to its bank for payment on or about October 19, 2018. (*Id.*).

147.    Telegram admits these payments were payments with respect to finders' fees. (PX12 (D.E. 81-12), Durov Tr. at 217:14–218:10.)

148.    As noted in the SEC 56.1, Liquid informed Telegram in or around May 2019 that it "will be doing an IEO for the GRAM token working with Space Investments." (PX67 (D.E. 81-67); SEC 56.1 at ¶¶ 236 –37.)

149.    As detailed in the SEC 56.1, Liquid conducted a secondary sale of Grams in July 2019, which it publically announced in June 2019. (SEC 56.1 at ¶¶ 229, 241–42.)

150.    News of Liquid's sale of Grams was widespread. For example, CoinDesk reported on or about June 11, 2019 that "Messaging Giant Telegram's ICO Token Is at Last Going on Public Sale." (PX190.)

151.    Cointelegraph similarly reported on or about June 11, 2019: "Liquid Cryptocurrency Exchange to Host Public Phase of Telegram ICO." (PX191.)

152.    Another Cointelegraph article published on or about June 14, 2019 quoted the CEO of Liquid as describing the process of reaching the agreement with Gram Asia as follows: "It was natural. We knew the Gram Asia people. We also believed in Telegram Open Network and its community. […] A limited scope compared with $1.7 billion. But let's do a proper public sale so that Telegram users and greater community can participate in before the actual listing that will happen in October." (PX192 (alteration in original).]

153.    According to media reports, Liquid sold at least $4 million in Gram interests (approximately one million Grams at $4 per Gram). (PX193.)

154.    Another media outlet, in reporting on the Liquid sale, noted "even before Gram is released to the public, Telegram Messenger's cryptocurrency may have appreciated by 200% from last year."  (PX194.)

155.    When asked whether the Liquid sale was "sanctioned by Telegram," one of the Initial Purchasers responded:  "Liquid is not an official launch for GRAMs, rather a secondary transaction trading.  Telegram does not have the capacity to track and prevent all of it."  (PX195.)

156.    After learning about Liquid's planned secondary sale in May 2018, Telegram did not reach out to Liquid.  (PX199, Perekopsky Tr. at 221:19–223:19.)

157.    In February 2018, Perekopsky told an investor that Telegram "will go easier on Russians at the second round" of the Offering and that the investor "can pack in there all of those willing from the first round."  (PX201 at TG-007-00000682.)

Dated:   New York, New York
         January 21, 2020

                              Respectfully submitted,


                              ___/Jorge Tenreiro_____
                              Jorge G. Tenreiro
                              Kevin P. McGrath
                              Ladan F. Stewart
                              Alison R. Levine

                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE
                              COMMISSION
                              New York Regional Office
                              200 Vesey Street, Suite 400
                              New York, New York 10281
                              (212) 336-9145 (Tenreiro)
                              TenreiroJ@sec.gov