UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :
                                     :
                       Plaintiff,    :    19 Civ.
                                     :
          - against -                :    ECF Case
                                     :
TELEGRAM GROUP INC. and TON ISSUER INC., :
                                     :
                                     :
                       Defendants.   :
                                     :
------------------------------------------------------------x

## DECLARATION OF DAPHNA A. WAXMAN

I, Daphna A. Waxman, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am a member of the Bar of the State of New York.

2.  I am employed as Senior Counsel in the New York Regional Office of Plaintiff Securities and Exchange Commission (the "Commission"). I submit this declaration in support of the Commission's emergency application (the "Application") for an Order to Show Cause, Temporary Restraining Order, and Order Granting Expedited Discovery and Other Relief against Defendants Telegram Group Inc. and TON Issuer Inc. (collectively, "Defendants").

3.  I am familiar with the facts and circumstances herein. I make this Declaration based upon (i) my personal knowledge, (ii) information and documents obtained by the Commission during its investigation of this matter, (iii) information provided to me by members of the staff of the Commission, and (iv) certain other documents that are described herein. Because the Commission submits this Declaration for the limited purpose of supporting the Application, I have not set forth each and every fact that I know about this matter.

1

**Background on Digital Tokens**

4.  The term "digital asset" or "digital token" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens."[1] Entities have offered and sold digital tokens in fundraising events in exchange for consideration.

5.  Generally, digital tokens may entitle holders to certain rights related to a venture underlying the fundraising event, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These digital tokens may also be traded on online platforms and traded for other digital assets or fiat currency. Often, the coins or tokens are tradable upon delivery to investors.

6.  Issuers of digital tokens typically release a "whitepaper" or other marketing materials describing the project and the terms of the issuance. To participate, investors are generally required to transfer funds to the issuer's account. After the completion of the issuance, the issuer will deliver its unique token to the participants' unique address on a distributed ledger or blockchain.

7.  In some instances, the digital tokens may continue to be sold by the issuer. In others, they may only be obtained after issuance by purchasing them on secondary markets.

---

[1] A blockchain or distributed ledger is a peer-to-peer database spread across a network, that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions. Blockchains or distributed ledgers can also record "smart contracts," essentially computer programs designed to execute the terms of a contract when certain triggering conditions are met.

2

**Background on the Investigation**

8. On or about January 8, 2018, Commission staff within the Division of Enforcement ("Enforcement staff") learned through media reports that Defendants had or were about to offer and sell digital tokens called Grams to the public and certain named purchasers.

9. On or about January 29, 2018, Enforcement staff began reaching out to those named purchasers to obtain additional information about Defendants' activities related to the potential offer and sale of Grams and to obtain Defendants' contact information.

10. Subsequently, on February 2, 2018, I received an e-mail from Erich T. Schwartz ("Schwartz") of the law firm of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden") stating that he represented the Defendants.

11. On February 2, 2018, I sent Schwartz a letter containing Enforcement staff's first request to produce documents to the Commission on a voluntary basis (the "February 2nd document request").

12. On February 13, 2018, Telegram Group Inc. and TON Issuer Inc. filed a Form D noticing "purchase agreements for cryptocurrency" for amounts totaling $850 million. The date of the first sale was January 29, 2018.

13. On March 29, 2018, Telegram Group Inc. and TON Issuer Inc. filed a Form D for an additional $850 million raised through purchase agreements. The Form D indicated that the date of the first sale was March 14, 2018.

14. On March 25, 2019, counsel for Defendants informed me that Telegram had released a beta version of the TON Blockchain to developers.

15. Attached hereto as **Exhibit A** and **Exhibit B** are true and correct copies of the Form Ds filed by Telegram Group Inc. and TON Issuer Inc., both British Virgin Islands

3

companies, on February 13, 2018 and March 29, 2018, respectively, evidencing the sale of Grams through purchase agreements with investors in two rounds for amounts totaling $1.7 billion.

16. On February 13, 2018, Defendants began a rolling production of documents in response to the February 2nd document request.

17. Since the February 2nd document request, Enforcement staff has made additional requests for documents and other information on a voluntary basis and counsel has provided information in response to those requests on a rolling basis and up until the date of this declaration.

18. During a call with Skadden attorneys Colleen P. Mahoney and Alexander C. Drylewski on September 26, 2019, Enforcement staff asked Defendants' counsel whether they would accept service of a subpoena on behalf of Defendants.

19. In a letter dated September 30, 2019, Defendants' counsel informed me that they were not authorized to accept service of an administrative subpoena on behalf of Defendants at that time.

**Pavel and Nikolai Durov Create Telegram Messenger**

20. In 2013, Pavel and Nikolai Durov founded Telegram, a messaging app (hereafter referred to as "Messenger") that provides free messaging and other communication services to approximately 300 million monthly users. Attached here as **Exhibit C** is a true and correct copy of the history of Telegram, which is available on Telegram's website at https://telegram.org/blog/6-years.

21. Messenger's infrastructure and technological underpinnings provide users with the ability to engage in fully encrypted communications and transactions, including "Secret

4

Chats." Attached hereto as **Exhibit D** is a true and correct copy of a "Telegram FAQ," which provides general information about Messenger and is available on the Internet as of October 10, 2019, at Telegram's website at https://telegram.org/faq.

22. Upon information and belief, Messenger has also become a ubiquitous messaging application for the cryptocurrency community.

**The Offering of Grams to Purchasers**

23. Pavel Durov marketed Grams from late 2017 through early 2018 using the following written materials, hereinafter referred to as the "Offering Documents." The Offering Documents consisted of a two-page and four-page "Teaser," at least two versions of a "Primer" at least three versions of a "Whitepaper," and at least two versions of a "Term Sheet" entitled "Telegram – Indication of Interest."

24. Attached hereto as **Exhibit E** is a true and correct copy of a two page Teaser.

25. Attached hereto as **Exhibit F** is a true and correct copy of a four page Teaser.

26. Attached hereto as **Exhibit G** is a true and correct copy of the 2017 Primer.

27. Attached hereto as **Exhibit H** is a true and correct copy of the 2018 Primer.

28. Attached hereto as **Exhibit I** is a true and correct copy of the Telegram Open Network Technical White Paper authored by Dr. Nikolai Pavel dated December 3, 2017.

29. Attached hereto as **Exhibit J** is a true and correct copy of the Telegram Open Network Technical White Paper authored by Dr. Nikolai Pavel dated January 18, 2018.

30. Attached hereto as **Exhibit K** is a true and correct copy of the Telegram Open Network Technical White Paper authored by Dr. Nikolai Pavel dated September 5, 2018.

31.     Attached hereto as **Exhibit L** is a true and correct copy of an Indication of Interest ("IOI"), partially redacted for privacy/proprietary information reasons, provided by a Round One purchaser dated January 17, 2018.

32.     Attached hereto as **Exhibit M** is a true and correct copy of an IOI, partially redacted for privacy/proprietary information reasons, provided by a Round Two purchaser dated February 20, 2018.

33.     Pavel Durov personally marketed the offering and solicited purchasers of Grams in conversations with purchasers who were located in the United States via Messenger chats, by e-mail, and over the phone. For example, attached hereto as **Exhibit N** is a true and correct copy of excerpts of a chat on Messenger, partially redacted for privacy information reasons, between Pavel Durov and a representative of one purchaser entity between September 15, 2017, and May 28, 2018.

34.     Attached hereto as **Exhibit O** is a true and correct copy of a January 8, 2018 e-mail chain, partially redacted for privacy/proprietary information reasons, among representatives of one purchaser entity that discussed Telegram, TON and Grams.

35.     Attached hereto as **Exhibit P** is a true and correct copy of a January 8, 2018 e-mail, partially redacted for privacy/proprietary information reasons, between representations of one purchaser entity regarding Telegram and Grams.

36.     Attached hereto as **Exhibit Q** is a true and correct copy of an internal purchaser memo, redacted for proprietary information reasons, dated January 9, 2017, but on information and belief actually written on January 9, 2018, regarding Telegram and Grams.

37.     Attached hereto as **Exhibit R** is a true and correct copy of a list of United States based Grams purchasers, partially redacted for privacy/propriety information reasons, and

divided into Round One Gram purchasers and Round Two Gram purchasers, provided by Defendants' counsel by e-mail dated February 27, 2019.

38. Attached hereto as **Exhibit S** is a true and correct copy of a list of non-United States based Grams purchasers, partially redacted for privacy/propriety information reasons, provided by Defendants' counsel by e-mail dated October 4, 2019.

39. On February 27, 2019, Telegram's counsel represented to me by letter that, as of January 31, 2019, Telegram had spent approximately $218 million of the $1.7 billion raised through the purchase agreements to support the development of Messenger and the TON Blockchain.

## TON Foundation

40. Attached hereto as **Exhibit T** is a true and correct copy of draft Articles of Association for the TON Foundation, which counsel provided to me by e-mail on October 7, 2019.

## TON Wallet

41. On October 3, 2019, counsel informed me that, on October 2, 2019, Telegram had sent Grams purchasers a correspondence that stated the TON Blockchain would launch in late October and requested that purchasers provide Telegram with a blockchain address by October 16, 2019 to receive their Grams. Attached hereto as **Exhibit U** is a true and correct copy of the October 3, 2019 letter from Defendants' counsel regarding the timing of the launch of the TON Blockchain and providing information concerning the TON Key Generator software.

## Secondary Market Trading of Grams

42. In response to an e-mail inquiry from me on September 12, 2019, Defendants' counsel represented to me in an e-mail dated September 12, 2019, that the digital asset platforms

Coinbase, Binance, OKEx, and Huobi had approached Telegram regarding listing Grams on their respective platforms.

43. On information and belief, Grams were also being purportedly sold in various unauthorized secondary trading markets. On June 25, 2019, before the official launch of the TON Blockchain and the delivery of Grams, Liquid.io ("Liquid") published on their website a video stating that Grams would be available to trade on their platform on July 10, 2019. Attached hereto as **Exhibit V** is a true and correct copy of a screen shot of Liquid's June 25, 2019, video, which is also accessible on the Internet as of October 10, 2019, at https://www.youtube.com/watch?v=Chkw-rtgt6Y.

44. Liquid's website also displayed information about the availability to purchase Grams. Attached hereto as **Exhibit W** is a true and correct copy of a July 12, 2019 screen shot of Liquid's website regarding the availability of Grams for purchase on Liquid's platform.

45. The digital asset platforms Bittrex and Poloniex also received requests to list Grams on their respective platforms from an individual, whose affiliation with Telegram is unknown but who identified himself as the "COO at the largest custod[ian] of Gram tokens (75% of the second round, 50% of the first)."

46. Attached hereto as **Exhibit X** is a true and correct copy of a September 20, 2019 e-mail submission, partially redacted for privacy information reasons, from an individual regarding an application to list Grams on the Poloniex platform.

47. Attached hereto as **Exhibit Y** is a true and correct copy of a September 27, 2019 e-mail submission from the same e-mail address, partially redacted for privacy information reasons, regarding an application to list Grams on the Bittrex platform.

48. The digital asset platform Coinbase also published a blog stating that it would "explore support for new digital assets," including Grams, and provided a link to Telegram's website. Attached hereto as **Exhibit Z** is a true and correct copy of September 19, 2019 blog post announcing Grams as a potential listing on Coinbase's website. The blog post is also accessible on the Internet as of October 10, 2019, at https://blog.coinbase.com/coinbase-continues-to-explore-support-for-new-digital-assets-70419575eac4

49. During the investigation, Enforcement staff subpoenaed Coinbase for documents related to Grams. Attached hereto as **Exhibit AA** is a true and correct copy of September 13, 2019 meeting notes, partially redacted for proprietary information reasons, produced by Coinbase.

50. On September 13, 2019, Blackmoon Crypto also published a blog entitled "Why Grams will be traded on Blackmoon?" The blog stated that "[t]raders will have access to Gram tokens on the Blackmoon Exchange right after Telegram Open Network launch. Real on-chain Grams, available for withdrawal to Telegram native wallet. No lock-ups. No futures or other derivatives." Attached hereto as **Exhibit BB** is a true and correct copy of a September 13, 2019, blog post containing the foregoing statements. The blog post is also accessible on the Internet as of October 10, 2019, at https://news.blackmooncrypto.com/why-grams-will-be-traded-on-blackmoon-4e2d57f83b62.

51. Attached hereto as **Exhibit CC** is a true and correct copy of a purchase agreement for Grams with a Round One purchaser.

52. Attached hereto as **Exhibit DD** is a true and correct copy of a purchase agreement for Grams with a Round Two purchaser.

53. Attached hereto as **Exhibit EE** is a true and correct copy of a July 25, 2019 letter from Defendants' counsel summarizing the details of the sales of Grams.

54. Attached hereto as **Exhibit FF** is a true and correct copy of Appendix B to **Exhibit H**.

## Timing of TON Blockchain Beta and Launch of TON Blockchain

55. In an e-mail dated March 25, 2019, Defendants' counsel informed me that Defendants have "begun to roll out [the TON Blockchain] test network."

56. In e-mails dated August 29, 2019, September 4, 2019, and September 26, 2019, to Defendants' counsel, I requested that Telegram provide, among other things, the precise timing of the launch of the TON Blockchain. In response, Defendants' counsel informed me that the launch would occur in "mid or late October, and in all events prior to the [October 31, 2019] deadline set forth in the Purchase Agreements."

57. In a letter dated October 9, 2019 to Defendants' counsel, I again requested that Telegram provide, among other things, the precise timing of the launch of the TON Blockchain information. In an e-mail to me dated October 10, 2019, Defendants' counsel confirmed receipt of the inquiry and stated as follows: "We're endeavoring to get answers to your questions as quickly as possible, though it's possible it may not be by your deadline of COB [October 10, 2019]." Counsel failed to respond on October 10, 2019 to an e-mail request later that day from the Enforcement staff for a "rolling response" to its inquiries.

58. As of the date of this declaration, Defendants have not filed any registration statement or other disclosure document with the Commission, or distributed such filing or document to the public, as required by the federal securities laws.

59. Attached hereto as **Exhibit GG** is a true and correct copy of excerpts of a chat on Messenger, partially redacted for privacy information reasons, between Pavel Durov and a representative of one purchaser entity between October 24, 2017, and April 19, 2018.

60. Attached hereto as **Exhibit HH** is a true and correct copy of an IOI, partially redacted for privacy/proprietary information reasons, provided by a potential purchaser in this District dated March 2, 2018.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2019
New York, New York

_____
Daphna A. Waxman