# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SECURITIES AND EXCHANGE COMMISSION, :
                                    :   19 Civ. 9439 (PKC)
                        Plaintiff,  :
                                    :   **ECF Case**
            -against-               :
                                    :   **Electronically Filed**
TELEGRAM GROUP INC. and TON ISSUER  :
INC,                                :
                                    :
                        Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANTS' RESPONSE TO PLAINTIFF'S
COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS
IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
George A. Zimmerman
Scott D. Musoff
Christopher P. Malloy
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

*Attorneys for Defendants*

Table of Contents

Page

I. Telegram's Claims that It May No Longer Support "TON" After Launch
   Contradict Its Past Promises to Purchasers ........................................................1

   A. Telegram's Pre-Litigation Statements ...................................................1

   B. Telegram's January 6, 2020 Public Notice ..........................................13

   C. Telegram Has Not Committed to Walking Away from TON and Has
      Always Sought to Retain Its "Flexibility" ............................................15

II. Telegram Has Put Forth No Evidence Regarding the TON Blockchain's State of
    Development at Launch ....................................................................................19

    A. Telegram Marketed Few, if Any, Expected Uses for Grams................19

    B. Telegram Set Out to Create a Revolutionary Blockchain Based on
       Ambitious Technological Goals ............................................................26

    C. Many Have Expressed Doubts from the Start about Telegram's Ability to
       Create the TON Platform It Marketed ..................................................27

    D. Telegram Does Not Claim—in Its Submissions to the Court, in the Public
       Notice, or Elsewhere—that, Upon Launch, the TON Blockchain Will
       Operate as Originally Envisioned ........................................................35

III. Telegram's Sales of Grams to Initial Purchasers Were the First Step in Its
     Intended Public Distribution of Grams .............................................................40

     A. The Built-In Pricing Mechanism for Grams Incentivized Initial Purchasers
        to Sell Grams in the Secondary Market ................................................40

     B. Initial Purchasers Planned to Sell—and Some Did Sell—Grams for Profit
        in the Secondary Market ......................................................................52

     C. Telegram Paid Millions of Dollars to Promoters, Themselves Also TON
        Initial Purchasers, To Find Other Initial Purchasers.............................58

        1. ATON ........................................................................................58

        2. Da Vinci Capital ........................................................................64

        3. Space Investments and Liquid ..................................................70

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and Section 4.G. of this Court's Individual Practices, Defendants Telegram Group Inc. ("Telegram") and TON Issuer Inc ("TON Issuer" and collectively with Telegram, "Defendants"), submit this response to Plaintiff's Counter-Statement To Defendants' Local Rule 56.1 Statement in Further Support of Defendants' Motion For Summary Judgment.[1]

## I.   TELEGRAM'S CLAIMS THAT IT MAY NO LONGER SUPPORT "TON" AFTER LAUNCH CONTRADICT ITS PAST PROMISES TO PURCHASERS

### A.   <u>Telegram's Pre-Litigation Statements</u>

1.   In a Whitepaper Telegram "published" to the public (Def. Br. at 13, Stips. at ¶¶ 118-20) at the outset of the TON project, Telegram represented that it would, among other things:

a.   create and launch the new TON Blockchain and a suite of applications alongside it—TON Storage, TON Proxy, TON DHT, TON Services, TON DNS, TON Payments (collectively, the "TON Applications")—"either from the very beginning or at a later time" (JX18 (D.E. 72-18) at 3–4, 99);

b.   engage in price-stabilization efforts, including by buying and selling Grams into the market at increasingly higher prices (*id.* at 128);

---

[1] Citations to "Ex." refer to the exhibits attached to the Declarations in Opposition to Plaintiff's Motion for Summary Judgment, submitted concurrently herewith. Exhibits attached to the Declaration of Alexander C. Drylewski ("Drylewski Declaration") (ECF No. 73), submitted in support of Defendants' Motion for Summary Judgment, are cited herein as "Drylewski Ex." Exhibits attached to the Declaration of Christopher P. Malloy ("Malloy Declaration") (ECF No. 94), submitted in opposition to Plaintiff's Motion for Summary Judgment, are cited herein as "Malloy Ex." Exhibits attached to the Declaration of Scott D. Musoff, submitted in further support of Defendants' Motion for Summary Judgment, are cited herein as "Musoff Ex." "Undisputed" means that facts are not disputed for purposes of the Plaintiff's Motion for Summary Judgment. Defendants reserve all rights to dispute any such facts at trial.

    c.   transfer 200 million Grams to the control of the TON Foundation to pay as

        "rewards" "to the developers of the open source TON software, with a minimum

        two-year vesting period" (*id.* at 131);

    d.   use un-allocated Grams through the "TON Reserve . . as validator stakes" such

        that the "TON Foundation will have a majority of votes during the first

        deployment phase of the TON Blockchain" (*id.* at 130); and

    e.   sell Grams and use the proceeds for "the development and deployment of the

        TON Project," including the TON Foundation installing "an initial set of . . .

        nodes" for the additional Applications (*id.*).

**Response to No. 1:**       **Disputed as inaccurate and misleading.  The White Paper, dated December 3, 2017 (the "December 2017 White Paper"), was not "published to the public at the outset of the TON project," but rather was "distributed to various prospective and actual purchasers."  JSF ¶ 118; JX18.  Defendants made the March 2, 2019 Telegram Open Network White Paper available online as part of the testnet, which Defendants gradually rolled out from March to September 2019, and far from the "outset of the TON project." JSF ¶¶ 120, 131.  Additionally, Defendants did not "represent[] that [they] would" take the stated actions or any actions at all.  The December 2017 White Paper made clear that it was a proposal and contained a disclaimer on the front page that stated: "This text is not intended to be the ultimate reference with respect to all implementation details.  Some particulars are likely to change during the development and testing phases."  JX18 at 1.**

        a.  **Undisputed to the extent that the December 2017 White Paper contemplates creating the TON Applications.  As stated above, Defendants did not represent that they would take any action. JX18 at 1.  At this time, Telegram has developed two features, TON DNS and TON Payments, to be available to be launched with the TON Blockchain, and is planning to have two additional features, TON Storage and TON Proxy, developed and implemented into the TON Blockchain *at launch*.  Def. 56.1 ¶¶ 62, 65. Pavel Durov ("Pavel") testified that these are "nice to have" features, but not "core components" for the launch.  PX12 at 258:9-259:12; McKeon Ex. 1 at ¶ 55 ("these components aren't essential to the core functionality of the TON platform, they may be viewed as 'nice-to-have' features.").**

          **Further, disputed to the extent Plaintiff implies that Telegram committed to develop TON Applications "at a later time."  As Telegram stated in its January 6, 2020 Public Notice ("Public Notice"), "Telegram and its affiliates have not made any promises or commitments to develop any**

applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches.  In fact, it is possible that Telegram may never do so."  Def. 56.1 ¶ 277; Drylewski Ex. 3. The Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer and the Purchase Agreements, expressly provided:

> Although Telegram intends for the TON Blockchain to have the features and specifications set forth in the [Technical White Paper], changes to such features and specifications may be made for any number of reasons. There can be no assurance that the TON Blockchain or Grams will function as described in the Technical White Paper or will be launched according to the milestones set forth in the  "Roadmap" section of the [relevant] Primer.

Def. 56.1 ¶ 176; JX14 at 2-3; JX15 at 3.

Defendants note that by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (§ 6.3(f)); JX12 at 6 (§ 6.3(f)).

b.  Disputed as inaccurate and misleading.  As stated above, Defendants did not represent that they would take any action.  JX18 at 1.  Moreover, Defendants did not represent that they would engage in any price-stabilization efforts.  Rather, the December 2017 White Paper stated that the TON Reserve "reserves the right to buy some Grams back."  JX18 at 130.  The December 2017 White Paper contemplated that the TON Reserve would sell Grams, but also expressly "reserve[d] the right not to sell any of the remaining Grams at all."  JX18 at 128, 130.  Further, disputed to the extent Plaintiff states that the TON Foundation, if ever established, will have the ability to buy Grams.  As originally contemplated, the TON Foundation would also have had the ability to buy Grams from the market in order to attempt to prevent the price of Grams from getting too low. JSF ¶¶ 165, 167.  However, through discussions with the SEC, Defendants decided to remove the TON Foundation's Gram-buying function to alleviate concerns articulated by the SEC.  JSF ¶ 168.

Defendants note that by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (§ 6.3(f)); JX12 at 6 (§ 6.3(f)).

Additionally, the Public Notice stated, "Grams won't help you get rich[.] [Y]ou should NOT expect any profits based on your purchase or holding of Grams, and Telegram makes no promises that you will make any profits. Grams are intended to act as a medium of exchange between users in the TON ecosystem.  Grams are NOT investment products and there should be NO expectation of future profit or gain from the purchase, sale or holding of Grams."  Def. 56.1 ¶ 277; Drylewski Ex. 3.  "In deciding whether to purchase Grams, you should be fully aware of the risk that Grams may decrease in value over time or even lose all monetary value.  There are a number of risks related to purchasing cryptocurrencies like Grams, including volatility in cryptocurrency markets, the possibility of increasing regulation of cryptocurrency exchanges, and other risks."  *Id*.

Further, the Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer and the Purchase Agreements, expressly provided:

> 13. Risks Associated With The Offer and Sale of Grams. . . . Grams are intended to act as a medium of exchange between users in the TON ecosystem.  Grams are not investment products.  There should be no expectation of future profit or gain from the purchase or sale of Grams. JX14 at 6; JX15 at 6.

> 14. Risk of Price Volatility.  The prices of cryptocurrencies have historically been subject to dramatic fluctuations and are highly volatile, and the market price of Grams may also be highly volatile. Several factors may influence the market price of Grams, including," but not limited to: global supply and demand of cryptocurrencies, changes in software and hardware underlying blockchain technologies, monetary policies of governments, currency devaluations and revaluations, and regulatory measures that affect the use of cryptocurrencies. JX14 at 6-7; JX15 at 7.

The Risk Factors further stated:

> Over time, Telegram intends to establish the TON Foundation and to transfer responsibilities related to TON and the TON Reserve to the TON Foundation, as described in the "Governance" section of the [relevant] Primer.  There is, however, no timetable for the establishment of the TON Foundation or the transfer of the responsibilities related to TON and the TON Reserve to the TON Foundation, and it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON

4

Foundation may differ from current expectations.  JX14
at 8; JX15 at 8.

Finally, the Risk Factors expressly provided that the features of the TON
Blockchain were subject to change:

Although Telegram intends for the TON Blockchain to
have the features and specifications set forth in the
"Telegram Open Network" technical white paper (the
"Technical White Paper"), changes to such features and
specifications may be made for any number of reasons.
There can be no assurance that the TON Blockchain or
Grams will function as described in the Technical White
Paper or will be launched according to the milestones set
forth in the  "Roadmap" section of the [relevant] Primer.
JX14 at 2-3; JX15 at 3.

c.  **Disputed as inaccurate and misleading.  As stated above, Defendants did
not represent that they would take any action.  JX18 at 1.  Moreover,
Defendants did not represent that "rewards" would be paid to the
developers of the open source TON software.  Rather, the December 2017
White Paper states that "some 'rewards' *may* be paid . . . to the developers
of the open source TON software. . ." JX18 at 131 (emphasis added).
Moreover, as the Public Notice states: "Telegram is under no obligation,
and makes no promise or commitment, to ever establish a TON Foundation
or similar entity in the future."  Def. 56.1 ¶ 277; Drylewski Ex. 3.
Defendants have communicated to the public and the Private Placement
purchasers that the TON Foundation may never be established.  JSF ¶¶
148, 149.  If the TON Foundation is never established, the Grams allocated
to it will be locked in perpetuity.  Def. 56.1 ¶ 231; Drylewski Ex. 5 at 5.**

**Further, it is currently contemplated that, upon the launch of the TON
Blockchain or immediately thereafter, 10% of Grams will be reserved for
ecosystem incentive payments.  Drylewski Ex. 5 at 5.  As currently
contemplated, half of those Grams (5% of the initial supply of Grams) will
be distributed to Telegram users at or immediately following the launch of
the TON Blockchain as described in Response to Interrogatory No. 15
above.  *Id.*  The other half (5% of the initial supply) will be held in a wallet
address assigned to the TON Foundation in the event that the TON
Foundation is ever established in the future.  *Id.*  If the TON Foundation is
established, the incentive Grams held in its wallet may be distributed by
the TON Foundation as incentives to promote the consumptive use of
Grams as determined by the TON Foundation's board of directors.  For
example, the TON Foundation may offer a small amount of Grams to
Gram users on the TON Blockchain as a reward for spending Grams as a
currency (e.g., if a user spends 10 Grams on goods and services, she may be
rewarded one Gram from the TON Foundation).  These user incentives**

5

would be decided upon and implemented by the TON Foundation's board of directors in the event that the TON Foundation is ever established. *Id.*

d.  Disputed as inaccurate and misleading.  As stated above, Defendants did not represent that they would take any action. JX18 at 1.  Moreover, Defendants have not decided whether they will establish the TON Foundation and have communicated that to the Private Placement purchasers and the public.  Def. 56.1 ¶¶ 226-28, 277; JSF ¶ 149.  In the event the TON Foundation is never founded, the Grams allocated to it will be locked for perpetuity.  Def. 56.1 ¶ 231.  In the event the TON Foundation is established, it will not have any legal or technical ability to change the TON Blockchain code, its validation processes or its parameters and none of the Grams held by the TON Foundation could be used for voting or validating.  Def. 56.1 ¶¶ 244-45.

Additionally, the Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer and the Purchase Agreements, expressly provided:

> Over time, Telegram intends to establish the TON Foundation and to transfer responsibilities related to TON and the TON Reserve to the TON Foundation, as described in the 'Governance' section of the Telegram Pre-Sale Primer.  There is, however, no timetable for the establishment of the TON Foundation or the transfer of the responsibilities related to TON and the TON Reserve to the TON Foundation, and *it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON Foundation may differ from current expectations*.  JX14 at 8; JX15 at 8 (emphasis added).

e.  Disputed as inaccurate and misleading.  As stated above,  Defendants did not represent that they would take any action.  JX18 at 1.  Moreover, Defendants did not represent that they would sell Grams and use the proceeds for the development and deployment of the TON Project.  Rather, the December 2017 White Paper contemplated that the TON Reserve would sell Grams, but also expressly "reserve[d] the right not to sell any of the remaining Grams at all."  JX18 at 128, 130.

Additionally, as stated above, Defendants have not decided whether to establish the TON Foundation and have communicated that to the Private Placement purchasers and the public.  Def. 56.1 ¶ 226-28, 277; JSF ¶ 149.  In the event the TON Foundation is established, it will not have any legal or technical ability to change the TON Blockchain code, its validation processes or its parameters and none of the Grams held by the TON Foundation could be used for voting or validating.  Def. 56.1 ¶¶ 244-45.  As

6

noted above, Defendants expressly disclosed in the Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer and the Purchase Agreements that "it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON Foundation may differ from current expectations." JX14 at 8; JX15 at 8.

Finally, the Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer and the Purchase Agreements, expressly provided:

> The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether governmental authorities will regulate such technologies. It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications. Such changes could negatively affect Grams in various ways, including, for example, through a determination that Grams are regulated financial instruments that require registration or through the imposition of onerous liquidity requirements. Telegram and the wholly owned subsidiary that Telegram intends to create to act as the issuer in the token sale (the "Issuer"), as applicable, may cease the distribution of Grams, cease the development of the TON Blockchain or cease operations in a jurisdiction in the event that governmental or other actions make such distribution, development and/or operations unlawful or commercially undesirable to continue.

JX14 at 1; JX15 at 1-2.

2.      Telegram made statements similar to the above in other materials about TON, such as stating in the Primer that Telegram would:

a.  develop the complimentary suite of Applications referenced in the Whitepaper, which Telegram described as "sophisticated network protocols . . . scheduled to be released *after* the TON Blockchain core" to "further increase the potential uses of the TON infrastructure" (JX7 (D.E. 72-7) at 9 (emphasis added));

7

    b.  integrate its popular Messenger app, which then boasted at least 170 million

        monthly users, to capture built-in "demand and value for [Grams]" (*id.* at 5–6);

        and

    c.  sell Grams into the open market post-launch at increasing prices through the TON

        Reserve, and providing the graphical representation reproduced below (*id.* at 17);

    [image omitted]

**Response to No. 2:**      **Disputed as inaccurate and misleading.** As stated in Response to No. 1 above, the December 2017 White Paper made clear that it was a proposal and Defendants did not represent that they would take any action in the December 2017 White Paper. JX18 at 1. Thus, the Primer did not contain "statements similar" to those alleged in the Commission's Counterstatement of Undisputed Material Facts No. 1. Rather, like the December 2017 White Paper, the Primer made clear that it was a proposal and stated that it provided a "general overview of the *proposed* technology and its uses." JX7 at 3 (emphasis added). Defendants also note that by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (§ 6.3(f)); JX12 at 6 (§ 6.3(f)).

    a.  **Disputed as inaccurate and misleading.** In the first instance, the Primer did not describe the TON Applications as "sophisticated network protocols," rather it described the "TON P2P Network used to access the blockchains" as a sophisticated network protocol. JX7 at 9. Additionally, although the Primer contemplated that some of the TON Applications would be released after the TON Blockchain core, the Primer also makes clear that it was a proposal and that contained an "[o]utline of the [v]ision," and that the timeline for the launch of the TON Blockchain and its Applications was a "roadmap." JX7 at 3-4, 15. Moreover, the Risk Factors attached to the Pre-Sale Primer, Stage A Primer and Purchase Agreements as Appendix B also expressly stated that "[t]here is no guarantee that such technologies will operate as intended or as described in the Technical White Paper or the [relevant] Primer or will be launched according to the milestones set forth in the 'Roadmap' section of the [relevant] Primer." Def. 56.1 ¶ 176; JX14 at 2-3; JX15 at 3. At this time, Telegram has developed two features, TON DNS and TON Payments, to be available to be launched with the TON Blockchain, and is planning to have two additional features, TON Storage and TON Proxy, developed and implemented into the TON Blockchain *at launch*. Def. 56.1 ¶¶ 62, 65.

        **Further, disputed to the extent Plaintiff implies that Telegram committed to develop TON Applications "at a later time."** As Telegram stated in the

Public Notice, "Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches.  In fact, it is possible that Telegram may never do so."  Def. 56.1 ¶ 277; Drylewski Ex. 3.

Defendants note that by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (§ 6.3(f)); JX12 at 6 (§ 6.3(f)).

b.  Disputed as inaccurate and misleading.  The Primer did not state that Defendants "would integrate [their] popular Messenger app . . . to capture built-in 'demand and value for [Grams].'"  Rather, the Primer states that "Telegram will leverage its existing ecosystem of communities, developers, publishers, payment providers, and merchants to drive demand and value for TON cryptocurrency."  JX7 at 5.

Further, the Public Notice states:

> At the time of the anticipated launch of the TON Blockchain, Telegram's TON Wallet application is expected to be made available solely on a <u>stand-alone basis</u> and will not be integrated with the Telegram Messenger service.  In this regard, the TON Wallet is expected to <u>compete</u> with any other wallet applications designed and offered by <u>third parties</u>.  Telegram may integrate the TON Wallet application with the Telegram Messenger service in the future to the extent permitted under applicable laws and governmental authorities."

Def. 56.1 ¶ 277; Drylewski Ex. 3 (emphasis in the original).

Moreover, the Risk Factors attached as Appendix B to the Pre-Sale and Stage A Purchase Agreements contained a paragraph disclosing the "Risks Associated With Integrating the TON Blockchain and Telegram Messenger," which read as follows:

> Although Telegram intends to integrate the TON Blockchain with Telegram Messenger as described in the "Telegram Messenger-TON Integration" section of the [relevant] Primer, Telegram may be unable to achieve the intended technical integration between the TON Blockchain and Telegram Messenger on the terms described in the [relevant] Primer.  As a result, adoption

of Grams as a form of currency within Telegram Messenger's existing ecosystem may be more limited than anticipated.

Def. 56.1 ¶ 177; JX14 at 5; JX15 at 6.

c.  Disputed as incomplete and misleading.  In the first instance, Defendants note that the graphic to which Plaintiff refers reflected the potential "Reference Price" for Grams if Telegram were to continue to sell Grams in the future, either through private rounds or a public ICO.  JX7 at 16-17. Further, the Primer makes clear that it was a "proposal" that contained an "[o]utline of the [v]ision" for the TON project.  *Id.* at 3-4.  Defendants later determined not to conduct further private or public sales of Grams, so the Reference Price was never used for pricing further sales of Grams from Defendants.  Rather, at launch, the price of Grams will be determined by market forces of supply and demand.  JSF ¶ 170.  Moreover, the market price of Grams will not be dictated by the Reference Price.  JSF ¶¶ 170-71.

While Defendants have reserved the right to establish the TON Foundation, which may have the ability to sell Grams into the market if the free market price of Grams exceeds the Reference Price at that time, this function is designed solely to attempt to lower the market price of Grams to reduce upward price volatility and to promote the consumptive use and utility of Grams as a bona fide digital currency.  Drylewski Ex. 4 at 31.

As Pavel testified, "after the successful launch of the network as it is currently contemplated, there will be a certain market price of Grams formed by market forces."  Drylewski Ex. 2 at 297:20-23.

Shyam Parekh ("Shyam") also testified that "the price [of Grams] will be what it will be, based on supply and demand for any currency, dollar, euro, pound. It will be up, down, sideways. It has nothing to do with the reference price. . . [A]ny such calculation of a reference price was purely a mathematical output and is not a reflection of what any of us or any of the investors actually expected the actual price to be. There was a very clear understanding internally, and with the investors I spoke to at least that supply and demand would set the actual market price independent of whatever reference price is involved."  PX14 at 69:25-71:4, Drylewski Ex. 7 at 70-71.

Dr. McKeon opined, "While [certain methodologies] address the idiosyncratic, or network-specific, component of returns [for cryptoassets], it is also important to note the systematic, or market-wide, component. Cryptoasset returns are highly correlated."  McKeon Ex. 1 ¶ 209.  "Any profits related to price appreciation from systematic returns are not attributable to the efforts of any particular party, but rather to the market forces broadly defined."  *Id.* ¶ 210.

10

**Moreover, as stated above, Defendants have not decided whether to establish the TON Foundation and have communicated that to the Private Placement purchasers and the public. Def. 56.1 ¶ 226-28, 277; JSF ¶ 149. Defendants expressly disclosed in the Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer and the Purchase Agreements that "it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON Foundation may differ from current expectations." JX14 at 8; JX15 at 8.**

**Defendants also note that Pavel testified that, after careful study and exploration of the issue, Telegram determined not to engage in a public offering. PX12 at 110:16-112:4. Pavel explained that it was "not fully clear . . . how such an offering could be implemented practically across all jurisdictions in a way that would [allow] us to decrease complexity and unnecessary risks." *Id.* Moreover, the term "public offering in the United States" lacks context. Pavel testified that Telegram believed that "a public offering of a right to receive Grams in the future could be treated as an unregistered security" in the United States. *Id.* Further, Telegram chose to sell the right to receive Grams to the purchasers through Purchase Agreements because they wanted to take the safest route and work with only highly sophisticated purchasers in a Private Placement. *See* Def. 56.1 ¶ 98.**

**Finally, by entering into the Purchase Agreements, purchasers expressly disclaimed any reliance on "any representations or warranties made by the Issuer or the Parent outside this Purchase Agreement, including but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper or primer[.]" JX11 at 11 (§ 6.3(f)); JX12 at 6 (§ 6.3(f)).**

3.      In the Primer, Telegram gave an estimated timeline for the launch of TON, provided that it would launch, in the first quarter of 2019 (*id.* at 15), and noted that "the initial TON vision and architecture will have been implemented and deployed" by 2021, at which point "the continuous evolution of the TON Blockchain [would] be maintained by the TON Foundation" (*id.* at 19).

**Response to No. 3:      Disputed as inaccurate and misleading. As stated in Response to No. 2, the Primer makes clear that it contains only a proposal; any statements in the Primer were expressly disclaimed by the Purchase Agreements; and the Risk Factors appended to the Primer stated that the details of the project could be change for any number of reasons, including compliance with applicable laws and regulations. *See* Response to No. 2. Further, the excerpted quotes are misleading. The Primer stated that it**

estimated the "[d]eployment of the stable version of TON" would occur in the fourth quarter of 2018, not the first quarter of 2019.  JX7 at 15.

Moreover, as stated above, Defendants have not decided whether to establish the TON Foundation and have communicated that to the Private Placement purchasers and the public.  Def. 56.1 ¶ 226-28, 277; JSF ¶ 149.  In the event that the TON Foundation is established, it will not have any legal or technical ability to change the TON Blockchain code, its validation processes or its parameters and none of the Grams held by the TON Foundation could be used for voting or validating.  Def. 56.1 ¶¶ 244-45.  As noted above, Defendants expressly disclosed in the Risk Factors that were attached as Appendix B to the Pre-Sale Primer, Stage A Primer, and the Purchase Agreements that "it is possible that the TON Foundation may never be established or that the responsibilities and/or assets transferred to the TON Foundation may differ from current expectations."  JX14 at 8; JX15 at 8.

> 4.  The Primer listed two potential categories of uses for Grams in the network: for use in connection with and as payments for "validation" of new blocks in the TON blockchain, and to use with the suite of Applications, although the latter "services [could] be free" as well. (*Id.* at 13-14.)

**Response to No. 4:**  Disputed as inaccurate, incomplete and misleading for the reasons stated in Responses to Nos. 1 and 2 above.  Moreover, the Primer listed a range of uses for Grams thus describing them as only "two potential categories" is misleading.  The Primer emphasizes the potential for the widescale adoption of Grams as a currency for consumptive use.  For example, the Primer also states that users can buy and sell advertisements in public channels, order the delivery of physical goods, and support publishers and content creators.  JX7 at 13-14.  Further, the full text of the quoted statements, provides that "*In addition* to payments for all digital and physical assets sold by individual merchants within the Telegram ecosystem and on other projects integrated with TON," the Grams can be used in connection with validation activities, payment for services provided by apps built on the platform, payment for storing data securely in a decentralized way, payment for registering blockchain-based domain names and hosting TON-sites, payment for hiding identity and IP addresses and payment for bypassing censorship imposed by local ISPs.  *Id.* (emphasis added).  The Primer also explained that Telegram envisioned that "[a] whole new economy saturated with goods and services sold for cryptocurrency will be born — similar to WeChat's fiat-based marketplace, but not confined to a centralized service."  *Id.* at 5.  In addition to being used in the TON Applications and in connection with validation activities, Defendants anticipate that Grams will be immediately useable (i) as tender for commercial transactions and a medium of exchange for users on the TON Blockchain and (ii) to serve as voting power for Gram holders required to support or oppose changes in the TON Blockchain protocol.  Def. 56.1 ¶ 56.  Further, there have been numerous public reports, websites, and articles regarding the development of applications and uses of Grams and the TON Blockchain by third parties.  *See* Drylewski Ex. 4 at 12-16; Drylewski Ex. 10 at 2-6.

5.     The Primer is accessible to the public. (Stips. at ¶ 99.)

**Response to No. 5:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The Primer was distributed to some potential and all actual purchasers in late 2017 and early 2018 under the expectations of confidentiality.  JSF ¶¶ 75.  Despite restrictions by Defendants, the Offering Materials were placed on the internet by unknown third parties and have become accessible to the public without Defendants' consent.  JSF ¶¶ 98-99.**

6.     On or about October 8, 2019, Telegram published terms of service for "Grams Wallet" to govern use of the application "whether as a standalone application or as incorporated into the Telegram Messenger application." (PX139.)

**Response to No. 6:     Disputed because the cited materials do not support the stated proposition.  The terms of service state that they were "last updated" on October 8, 2019. PX139.**

7.     By this time in October 2019, Telegram had approximately "300 million monthly active users." (PX12 (D.E. 81-12), Durov Tr. at 43:11–13.)

**Response to No. 7:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

**B.     Telegram's January 6, 2020 Public Notice**

8.     On or about January 6, 2020, Telegram issued a "Public Notice About the TON Blockchain and Grams" (the "Public Notice"). (DX 3 (D.E. 73-3).) In the Public Notice, Telegram made the following statements, among others:

a.  "[I]t is possible that Telegram may never" "develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches." (*Id.* at 1.)

b.  "Telegram or its employees may, but do not commit to, hold any Grams following the launch of the TON Blockchain." (*Id.* at 2.)

c.  Telegram "may integrate the TON Wallet application with the Telegram Messenger service in the future" to the extent permitted by law. (*Id.*)

13

d.   While it is Telegram's "goal and hope" that third parties will take over TON, it

"cannot [ ] guarantee that anyone" will do so. " (*Id.* at 1.)

e.   "Telegram has been careful **not to speak publicly** about" "rumors in the media

and speculation about the details of [the TON] project" "to ensure that the TON

Blockchain and Grams can operate in a way that is **compliant** with all relevant

**laws and regulations**." (*Id.* (emphasis in original).)

f.   "[T]he TON Blockchain on which Grams will function is still in a Beta Test

phase." (*Id.*)

**Response to No. 8:**      **Undisputed for purposes of Plaintiff's motion.  The full text of the
Public Notice is included in paragraph 277 of Defendants' Local Rule 56.1 Statement and
in Drylewski Ex. 3.**

9.      One media report noted the Public Notice was "likely a tactic in

Telegram's fight with the SEC" and quoted the founder of a cryptocurrency research firm as

saying: "Distancing the Ton Wallet from the Telegram app. . . makes sense if you're trying not to

trip the 'efforts of others' prong of the Howey test, but not if you're actually trying to distribute a

useful token to your target users." (PX140.)

**Response to No. 9:**      **Undisputed for purposes of Plaintiff's motion that the speaker in
the cited material made such a statement.  Disputed to the extent that the cherry-picked
material appears to have been written by a third-party without authority to speak for
Defendants and without knowledge of Defendants' plans for the future of the TON Project
or reasons for releasing the Public Notice.  The same article also suggested, among other
things, that "[t]he goal" of the Public Notice was "to make TON more decentralized," with
"other developers [] creating distributed apps on the platform."  PX140.  Defendants note
that although the subjective reaction of the market is irrelevant to the legal claims in this
case, the SEC's selection of only certain cherry-picked articles does not provide any
evidence of how potential Gram purchasers viewed the Public Notice.  *See, e.g.*,
https://twitter.com/telegram/status/1214144878071943168 (comment to Telegram's twitter
Public Notice post stating, "So TON seems really separated from Telegram.").  Further, the
cited information is irrelevant to Plaintiff's claims in this case.**

10.      Another media outlet reported that "Telegram isn't going to merge its

cryptocurrency wallet and messenger app – for now" and noted that "perhaps the intent to

14

separate the apps at launch is to reinforce Telegrams [sic] claims that it doesn't have control over

its Blockchain, but that remains to be seen. . . ." (PX141.)

**Response to No. 10:**    **Undisputed for purposes of Plaintiff's motion that the speaker in the cited material made such a statement.  Disputed to the extent that the cherry-picked material appears to have been written by a third-party without authority to speak for Defendants and without knowledge of Defendants' plans for the future of the TON Project or reasons for releasing the Public Notice.  Further, the cited information is irrelevant to Plaintiff's claims in this case.**

C.    **Telegram Has Not Committed to Walking Away from TON and Has Always Sought to Retain Its "Flexibility"**

11.    Telegram has not—in the Public Notice or otherwise—*committed* to

walking away from the TON project after launch.

**Response to No. 11:**    **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Defendants have expressly stated on multiple occasions and from the beginning of the TON Project that they are not required to, and indeed may not, take any additional efforts with respect to the development of the TON Blockchain following its launch.  Drylewski Ex. 3; *see also* Drylewski Ex. 2 at 257:16-21, 266:22-25.  Specifically, the Public Notice states: "Telegram will have no control over TON . . . Once [the TON Blockchain] is launched, Telegram will occupy the same position as any other party with respect to the TON Blockchain and will not have any control over, any unique rights within, or any responsibility for the management of, the TON Blockchain."  Drylewski Ex. 3.  It further states: "Telegram and its affiliates have not made any promises or commitments to develop any applications or features for the TON Blockchain or otherwise contribute in any way to the TON Blockchain platform after it launches.  In fact, it is possible that Telegram may never do so."  *Id.*  Moreover, the Primer stated that "Telegram will serve as a launch pad for TON . . . but the future of TON is in the hands of the global open-source community."  JX7 at 19.**

12.    Telegram has not—in the Public Notice or otherwise—*committed* to not

holding or selling Grams after the launch of TON.

**Response to No. 12:**    **Disputed.  Telegram has committed not to hold any Grams for its own benefit at any time following the launch of the TON Blockchain.  Def. 56.1 ¶ 88; Drylewski Ex. 2, Durov Dep. at 273:3-11.  The only scenario in which Defendants would hold any Grams following launch is to provide small incentive payments to Gram users to promote the consumptive use of Grams.  Drylewski Ex. 5 at 5; JSF ¶¶ 157, 163.  Defendants will in no way be able to use these Grams or profit from them.  Further, neither Telegram nor its employees will "take part in voting or validating in connection with the TON Blockchain.  This voluntary decision was made in order to avoid any perception that Telegram or its employees can or will exercise control over the TON Blockchain following**

15

its launch." Drylewski Ex. 3.  Further, disputed as irrelevant to the Plaintiff's claims in this action.

13.     Telegram has not—in the Public Notice or otherwise—*committed* that it will not integrate the TON Wallet into the Messenger app, which Telegram will indisputably continue to develop after the launch of TON.

**Response to No. 13:        Undisputed for purposes of Plaintiff's motion but subject to clarification.  Defendants have expressly stated on multiple occasions and from the beginning of the TON project that they reserved the right to change, modify or eliminate any aspects of the TON Blockchain platform, including the TON Wallet, until its launch and that they will have no obligation to develop TON Blockchain applications after the launch of the TON Blockchain.  Def. 56.1 ¶ 176; JX14 at 2-3; JX15 at 3.  The full text of the relevant part of the Public Notice states, "At the time of the anticipated launch of the TON Blockchain, Telegram's TON Wallet application is expected to be made available solely on a stand-alone basis and will not be integrated with the Telegram Messenger service.  In this regard, the TON Wallet is expected to compete with any other wallet applications designed and offered by third parties.  Telegram may integrate the TON Wallet application with the Telegram Messenger service in the future to the extent permitted under applicable laws and governmental authorities."  Drylewski Ex. 3.  Further, disputed as irrelevant to the Plaintiff's claims in this action.**

14.     Telegram has not—in the Public Notice or otherwise—*committed* to never establishing the TON Foundation after the launch of TON.

**Response to No. 14:        Undisputed for purposes of Plaintiff's motion but subject to clarification.  Defendants have expressly stated on multiple occasions that they have not yet decided whether to establish the TON Foundation and have communicated to the Private Placement purchasers and the public that the TON Foundation may never be established.  JSF ¶¶ 148-49; Def. 56.1 ¶¶226-28.  The full text of the relevant part of the Public Notice states, "Telegram is under no obligation, and makes no promise or commitment, to ever establish a TON Foundation or similar entity in the future."  Drylewski Ex. 3.  Further, disputed as irrelevant to the Plaintiff's claims in this action.**

15.     Telegram has at all times maintained, and continues to maintain, that it has the flexibility to do all of the things enumerated above if it so chooses in the future, including flexibility with respect to the TON Wallet, the TON Foundation, whether to permit its employees to act as validators and hold Grams, and other features of TON. (*See, e.g., infra* ¶¶ 16–19.)

**Response to No. 15:        Undisputed for purposes of Plaintiff's motion.  Defendants have at all times maintained, and continue to maintain, that they retain flexibility over all aspects**

16

**of the TON project, in part in order to comply with applicable legal and regulatory requirements.  Def. 56.1 ¶ 176; JX14 at 2-3; JX15 at 3.**

16.    For example, Durov told one Initial Purchaser in January 2018: "We've talked a lot with Skadden about our ideas re Foundation. While I was pushing it forward, their advice was clear – in times when the future (and current) regulation is uncertain, retain flexibility . . . . If we want to be able to evolve and adapt to a constantly changing environment, we shouldn't limit ourselves in any significant way. . . As you and [REDACTED] said during our dinner in Paris, nobody knows when the time is right to move everything to the Foundation. This time may come tomorrow. It may come next year. Or in ten years. So we made sure we left that door open without guaranteeing any restricting timeframe." (PX25 (D.E. 81-25) at TLGRM-007-00000320.)

**Response to No. 16:**        **Disputed as incomplete and misleading.  The full text of the quoted communication states:**

> **We've talked a lot with Skadden about our ideas re Foundation. While I was pushing it forward, their advice was clear - in times when the future (and current) regulation is uncertain, retain flexibility.  It made a lot of sense to me, as it seems to go in line with the larger Telegram approach, which we employ not only on legal matters, but also on the engineering side and product-wise.**
>
> **I think we both don't know what the laws and markets will be even in 5 months from now, let alone 5 years.  If we want to be able to evolve and adapt to a constantly changing environment, we shouldn't limit ourselves in any significant way.  Nobody knows the future and nobody can do responsible planning for more that [sic] a few months ahead.  The only parties that would benefit from us being restricted in ways we can evolve and invest resources are probably our competitors.**
>
> **As you and [REDACTED] said during our dinner in Paris, nobody knows when the time is right to move everything to the Foundation.  This time may come tomorrow.  It may come next year.  Or in ten years.  So we made sure we left that door open without guaranteeing any restricting timeframe.**

17

**PX25 at TG-007-00000320.**

      17.    Durov testified that Telegram has from the start reserved for itself the

flexibility to change features of the TON project, including with respect to TON Wallet, the

TON Foundation, and the role of Telegram in validating blockchain nodes. (PX12 (D.E. 81-12),

Durov Tr. at 158:23–162:19, 261:22–262:21, 276:17–277:25, 301:2–9.)

**Response to No. 17:**      **Undisputed for purposes of Plaintiff's motion but subject to
clarification. Pavel testified that the TON Foundation will not act as a validator and the
Public Notice states that neither Telegram nor its employees can act as validators.
Drylewski Ex. 2 at 163:12-14; Drylewski Ex.3. Further, Defendants have at all times
maintained, and continue to maintain, that they retain flexibility over all aspects of the
TON project, in part in order to comply with applicable legal and regulatory requirements.
Def. 56.1 ¶ 172; JX14 at 1, 2-3; JX15 at 1-2, 3. For example, Defendants have committed to
removing the TON Foundation's Gram-buying function to alleviate concerns articulated by
the SEC. JSF ¶ 168.**

      18.    Hyman told an Initial Purchaser on a telephone call in January 2018 that

the "[p]lan is to have the option or ability to intervene in the market but in an understandable and

predictable [way]" through the TON reserve. (PX1 (D.E. 81-1), Ex. B at Bates 1907.)

**Response to No. 18:**      **Disputed to the extent that the cited material is created by a third-
party purporting to reflect "notes" from a communication between a purchaser and
Hyman. Further, disputed that the purchaser's notes are an accurate and
contemporaneous reflection of the purchaser's conversation with Hyman. The purchaser
represented that the conversation with Hyman occurred on January 11, 2018, but the notes
are dated January 29, 2018 – 18 days after the purported conversation. PX 1 at 2, Exhibit
B. Also, disputed to the extent that Plaintiff added the word "way" to the purchaser's
notes. Finally, disputed as misleading to the extent Plaintiff implies that the purported
statement by Hyman in January 2018, reflects Telegram's current plans. Defendants note
that the Risk Factors stated:**

> **Over time, Telegram intends to establish the TON Foundation
> and to transfer responsibilities related to TON and the TON
> Reserve to the TON Foundation, as described in the
> "Governance" section of the [relevant] Primer. There is,
> however, no timetable for the establishment of the TON
> Foundation or the transfer of the responsibilities related to TON
> and the TON Reserve to the TON Foundation, and it is possible
> that the TON Foundation may never be established or that the
> responsibilities and/or assets transferred to the TON
> Foundation may differ from current expectations.**

**JX14 at 8; JX15 at 8.  Further, disputed for the reasons stated in Response to No. 2 above. While Defendants have reserved the right to establish the TON Foundation, which may have the ability to sell Grams into the market if the free market price of Grams exceeds the Reference Price at that time, this function is designed to attempt to lower the market price of Grams to reduce upward price volatility and to promote the consumptive use and utility of Grams as a bona fide digital currency.  Drylewski Ex. 4 at 31.**

19.     Defendants state in their interrogatory responses that they "have reserved and continue to reserve all rights to change, modify, or eliminate the existence or details of the TON Blockchain, the TON Foundation, or any 'price stabilization' functions." (PX23 (D.E. 81-23) at 31; *see also id.* at 8; Def. Br. at 13–14, 19 (discussing "the flexibility [Telegram] maintained regarding [the] details" of the TON project).)

**Response to No. 19:**     **Undisputed for purposes of Plaintiff's motion.**

## II.     TELEGRAM HAS PUT FORTH NO EVIDENCE REGARDING THE TON BLOCKCHAIN'S STATE OF DEVELOPMENT AT LAUNCH

### A.     Telegram Marketed Few, if Any, Expected Uses for Grams

20.     Telegram in the Primer spoke of the Applications (*see supra* ¶ 2) that could use Grams as well as the use of Grams in connection with validation activities. (JX7 (D.E. 72-7) at 14.) But the Primer also noted that the Applications could function without Grams: "All of these services can be free for the users since the application owners may choose to cover the corresponding fees, and adopt a freemium or an advertisement-based business model." (*Id.*)

**Response to No. 20:**     **Disputed as inaccurate and misleading.  First, disputed to the extent that it suggests these Applications could function without the TON Blockchain, which they clearly could not.  Second, disputed to the extent that Plaintiff suggests that Grams can only be used in the TON Applications or with validation activities.  In addition to being used in the TON Applications and in connection with validation activities, Defendants anticipate that Grams will be immediately useable (i) as tender for commercial transactions and a medium of exchange for users on the TON Blockchain and (ii) to serve as voting power for Gram holders required to support or oppose changes in the TON Blockchain protocol.  Def. 56.1 ¶ 56.  Further, there have been numerous public reports, websites, and articles regarding the development of applications and uses of Grams and the TON Blockchain by third parties.  *See* Drylewski Ex. 4 at 12-16; Drylewski Ex. 10 at 2-6.**

21.     Telegram is still working on the Applications which are not ready for launch but which Durov described as "nice to have." (PX12 (D.E. 81-12), Durov Tr. at 258:9–259:12.)

**Response to No. 21:     Disputed as inaccurate and misleading.  The complete text of the referenced testimony provides: "We consider the testing of the core components of the TON network to be complete; however, certain additional functionality of TON, that would be nice to have, but that would not be necessary for the launch.  It's still required and that is the kind of testing that we are focused on right now."  PX12 at 258:9-259:12.  Further, Defendants note that at this time, Telegram has developed two features, TON DNS and TON Payments, to be available to be launched with the TON Blockchain, and is planning to have two additional features, TON Storage and TON Proxy, developed and implemented into the TON Blockchain *at launch*.  Def. 56.1 ¶¶ 62, 65.**

22.     The Public Notice does not provide a list of vendors that will be accepting Grams in exchange for goods and services, or apps that may accept Grams.

**Response to No. 22:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  Defendants have submitted a list of public reports, websites and other resources regarding the development or potential development of applications and uses for Grams and the TON Blockchain to Plaintiff.  These sources are publicly available for anyone to view.  Def. 56.1 ¶ 274; Drylewski Ex. 4 at 12-16; Drylewski Ex. 10 at 2-6; *see also* McKeon Ex. 2 ¶¶ 28-30.**

23.     Telegram has submitted a chart of "public reports, websites and other resources regarding the development or potential development of applications and uses for Grams." (DX4 (D.E. 73-4) at 12–16 (Resp. No. 5); *see also* DX10 (D.E. 73-10) at 2–5.)

**Response to No. 23:     Undisputed for purposes of Plaintiff's motion.**

24.     Telegram's chart does not distinguish which potential applications have been developed, which are in the process of development, and which are theoretical.

**Response to No. 24:     Disputed as inaccurate and misleading.  These sources provided in the chart are publicly available, so anyone can visit the links to determine the current status of any of the potential applications listed.  Further, disputed to the extent Plaintiff suggests that none of the applications on the list provided by Defendants have been developed for use on the TON Blockchain.  The listed applications are developed by third parties and Defendants cannot warrant if and when they are or will be complete.  Further, disputed to the extent Plaintiff suggests that the list is comprehensive and that other applications do not exist.  As Defendants have stated, "[b]ecause the TON Blockchain has**

not yet launched, the existence and development of all potential applications, smart contracts or other services on the TON Blockchain is not currently known and may not be known unless and until the TON Blockchain is launched." Drylewski Ex. 4 at 16.

25. There is no direct, reliable evidence in the record regarding the nature or state of any of the potential applications listed in Telegram's chart.

**Response to No. 25:** **Disputed for the reasons stated in Response to No. 24.**

26. Prof. Maurice Herlihy reviewed the applications listed in Telegram's submission and concluded that only eight of the 50 applications therein listed are actually existing products that could theoretically use Grams for in-app payments assuming they in fact become integrated into the TON Blockchain. (PX9 (D.E. 81-9) Expert Report of Maurice P. Herlihy ("Herlihy Rep.") at ¶ 37 & App'x C.)

**Response to No. 26:** **Disputed. Dr. Herlihy's unsworn expert report does not constitute admissible evidence. It is also disputed that such an opinion is relevant, reliable or valid. McKeon Ex. 1 at ¶¶ 154-65; McKeon Ex. 2 at ¶¶ 28-32. Further, disputed as irrelevant to Plaintiff's claim in this action. Finally, disputed to the extent Plaintiff suggests that the list is comprehensive and that other applications do not exist. As Defendants have stated, "[b]ecause the TON Blockchain has not yet launched, the existence and development of all potential applications, smart contracts or other services on the TON Blockchain is not currently known and may not be known unless and until the TON Blockchain is launched." Drylewski Ex. 4 at 16.**

27. Professor Herlihy is of the opinion that most of the remaining potential applications in Telegram's chart are compiler code potentially usable to assist operation of the network. (*Id.*)

**Response to No. 27:** **Disputed. Dr. Herlihy's unsworn expert report does not constitute admissible evidence. It is also disputed that such an opinion is relevant, reliable or valid. Further, disputed as irrelevant to Plaintiff's claim in this action. McKeon Ex. 1 at ¶¶ 154-65, Exhibit 4; McKeon Ex. 2 at ¶¶28-32.**

28. The record contains no evidence that Telegram took any steps towards lining up vendors that would accept Grams as a form of payment. (*See, e.g.*, PX199, Perekopsky Tr. at 163:22–164:18 ("We didn't proactively reach out to vendors.").)

21

**Response to No. 28:**      Disputed as incomplete and misleading.  Ilya testified that the team did not proactively reach out to vendors before the technology was completely ready, such as after launching the testnet, because **"when you speak to the company, if you cannot really start doing something for this company practically, it doesn't make sense to meet them."  Malloy Ex. 2 at 163:22-164:11.  Further, Ilya testified that several of the purchasers with experience in blockchains had conversations with vendors and companies who expressed interest in using Grams after the launch.  *Id.* at 159:7-164:18 ("If they were funds, for example, they were saying: 'Okay, we have different companies in our portfolio, start-ups, and we think that this blockchain, TON and cryptocurrency as a means of payment can potentially be very interesting for our projects that we have in our portfolio.'").  In particular, Ilya testified that two companies expressed interest in integrating Grams into their online marketplace "when [Grams are] readily available."  *Id.* at 162:2-163:19.**

29.      Parekh testified that he was not aware of anyone who planned to use Grams as a payment for goods or services as of December 2019. (PX200, Parekh Tr. at 163:12–15.)

**Response to No. 29:**      Disputed as incomplete and misleading.  Shyam testified that he did not have any knowledge of any efforts taken to sign up vendors who would accept Grams as a form of payment.  The complete testimony states:

> **Q. What efforts has Telegram undertaken to sign up vendors who would accept Grams as a form of payment for goods or services?**
>
> **. . .**
>
> **A. I can't comment. I think you would have to ask Ilya.**
>
> **Q. Are you aware of any vendors who have agreed as of today to accept Grams as a form of payment for any goods or services?**
>
> **A. I am not aware.**

**PX200 at 163:6-15.  Further, disputed for the reasons stated in Response to No. 28.**

30.      On or about August 29, 2019, a representative of BitPay, "the largest payment processor of Bitcoin in the world," contacted Telegram about "the possibility of accepting Grams on [the BitPay] platform." (PX142.)

**Response to No. 30:**      Undisputed for purposes of Plaintiff's motion.  Further, disputed for the reasons stated in Response to No. 28.**

22

31.     Telegram did not respond to BitPay's email. (PX14 (D.E. 81-14), Parekh.

Tr. 239:7–24.)

**Response to No. 31:**     Disputed to the extent Plaintiff suggests that Defendants have not or will not attempt to integrate Grams for use with third-party vendors. Disputed for the reasons stated in Response to No. 28.

32.     Telegram tried "hard to close" digital asset platforms to permit users to

trade Grams in exchange for fiat currency. (SEC 56.1 at ¶ 317(e); *see generally id.* at ¶¶ 195–

212.)

**Response to No. 32:**     Disputed as inaccurate, incomplete and misleading.  Defendants did not state they tried "hard to close" any digital asset platform.  Rather, Alexander Filatov of TON Labs, Inc. —an independent company, not affiliated with Defendants— stated that he will "try hard to close Coinbase."  PX95; *see also* JSF ¶¶ 179-182; Malloy Ex. 3 at 257:3-24; "The Crypto World Still Doesn't Understand Telegram's Plan, Says TON Labs," Cryptobriefing (Sep. 29, 2019) (**https://cryptobriefing.com/telegram-ton-labs/**) ("'*TON will be the fastest decentralized blockchain in the market,'* explained Filatov, but when people write about TON Labs, they still '*confuse us with Telegram.*'") (emphasis in original).  Further, Ilya testified that companies who provided custody solutions and exchanges "were reaching out to [Telegram], rather than [Telegram] reaching out to them."  PX13 at 166:20-167:1.

Finally, disputed to the extent Plaintiff suggest that communications with exchanges implies that the Grams will bear characteristics of securities.  As Pavel explained, "The vision for Grams is that of a mass-market, multipurpose currency used by a big number of consumers. This currency would be not unlike other popular cryptocurrencies and digital currencies, and in that sense, for consumers to be able to transact in Grams freely and use Grams as a means of exchanging value, there would need to be certain services or platforms that would allow consumers to obtain Grams from the market; so it was our expectation that just like currencies such as Bitcoin and Ethereum are listed and traded on exchanges such as Coinbase and similar services, Grams would be likewise convertible to other currencies, as we believe it is a fundamental characteristic of currency to be exchangeable."  Musoff Ex. 1 at 324:8-22.

33.     There is no evidence in the record that Telegram or anyone else has

marketed Grams to secondary market purchasers as currency or commodities.

**Response to No. 33:**     Disputed as inaccurate and misleading.  Further, disputed that use of the term "marketed" is vague and ambiguous.  As Ilya testified, Telegram did not proactively reach out to vendors before the technology was completely ready, such as after launching the testnet, because "when you speak to the company, if you cannot really start doing something for this company practically, it doesn't make sense to meet them."  Malloy

Ex. 2 at 163:22-164:11.  Further, Ilya testified that several of the purchasers with experience in blockchains had conversations with vendors and companies who expressed interest in using Grams after the launch.  *Id.* at 159:7-164:18 ("If they were funds, for example, they were saying: 'Okay, we have different companies in our portfolio, start-ups, and we think that this blockchain, TON and cryptocurrency as a means of payment can potentially be very interesting for our projects that we have in our portfolio.'").  In particular, Ilya testified that two companies expressed interest in integrating Grams into their online marketplace "when [Grams are] readily available."  *Id.* at 162:2-163:19.

Further, Defendants have consistently characterized Grams as a currency, commodity and medium of exchange during the Private Placement.  *See, e.g.*, JX7 at 5 ("Telegram is uniquely positioned to establish the first mass-market cryptocurrency by providing a platform that combines these properties."); JX8 at 5 (same); JX9 at 5 (same).  The Public Notice also emphasized that "Grams won't help you get rich" because Grams are a currency, "NOT investment products and there should be NO expectation of future profit or gain from the purchase, sale or holding of Grams."  Def. 56.1 ¶ 277; Drylewski Ex. 3 Finally, the cited information is irrelevant to Plaintiff's claims in this action.

34.     There is no evidence in the record that the association of entities working in conjunction with Telegram—Blackmoon Crypto, Gram Vault, TON Ventures and TON Labs (*see* SEC 56.1 at ¶¶ 268–317)—attempted to procure any vendor that would accept Grams in exchange for goods or services.

**Response to No. 34:**     Disputed as misleading and inaccurate.  None of the cited material indicates that the referenced entities are an "association of entities working in conjunction with Telegram".  *See* Defendants' Response to Plaintiff's Local 56.1 Statement in Support of Its Motion for Summary Judgment (ECF No. 95) ("Defendants' 56.1 Response"), Responses to Nos. 268–317.  To the contrary, none of these entities is an affiliate of Telegram.  JSF ¶¶ 179-203.  Shyam has represented to purchasers and other entities that "TON Labs [is] an independent company who have been assisting Telegram with the testing.  They aren't a subsidiary or affiliate of Telegram, so if you want to have a discussoon [sic] about your grams it might be better for you and I to speak."  *See* PX110; *see also* Malloy Ex. 3 at 257:3-24.  And some have publicly confirmed as much.  *See* The Crypto World Still Doesn't Understand Telegram's Plan, Says TON Labs," Cryptobriefing (Sep. 29, 2019) (https://cryptobriefing.com/telegram-ton-labs/) ("'*TON will be the fastest decentralized blockchain in the market,*' explained Filatov, but when people write about TON Labs, they still '*confuse us with Telegram.*'") (emphasis in original); PX107 ("'Blackmoon crypto exchange has no relation to Ilya Perekopsky nor anyone else employed by Telegram,' Seydak told CoinDesk by email.").  Finally, the cited information is irrelevant to Plaintiff's claims in this action.

35.     Blackmoon Crypto marketed its services to secondary market purchasers as providing the ability to trade fiat currency into Grams: "Traders will have access to Gram

tokens on the Blackmoon Exchange right after Telegram Open Network launch. Real on-chain

Grams, available for withdrawal to Telegram native wallet. No lock-up. No futures or other

derivatives." (PX108 (D.E. 81-108) at 1.)

**Response to No. 35:     Undisputed for purposes of Plaintiff's motion that the referenced materials contain the quoted language but subject to clarification.  There is no assurance that the quoted article written by a third-party is reliable, valid or reflects Defendants' views.  Disputed to the extent Plaintiff suggests the cited material indicates Blackmoon is affiliated with or made these statements on behalf of Defendants.  Blackmoon has publicly denied any connection with Telegram.  *See* PX107; *see also* Defendants' 56.1 Response, Responses to Nos. 268-85, 314, 317.  Further, disputed as irrelevant to Plaintiff's claims in this action.**

36.     When Blackmoon Crypto provided Telegram a "SUMMARY OF BIZ-

DEV RESPONSIBILITIES" in June 2018, it included "Market-Making/Liquidity Providers,"

negotiating with crypto exchanges, and helping Initial Purchasers towards "a smoother

liquidation" of Grams, but did not include anything about finding uses for Grams—as a

commodity or medium of exchange. (PX88 (D.E. 81-88).)

**Response to No. 36:     Disputed as misleading and inaccurate.  Further, disputed to the extent Plaintiff suggests the cited material indicates Blackmoon is affiliated with or made these statements on behalf of Defendants.  Blackmoon has publicly denied any connection with Telegram.  *See* PX107; *see also* Defendants' 56.1 Response, Responses to Nos. 268-85, 314, 317.  Further, disputed for the reasons stated in Response to No. 32.  Finally, the cited information is irrelevant to Plaintiff's claims in this action.**

37.     Telegram's expert acknowledges that cryptoassets "experience a higher

frequency of extreme returns." (PX129 (D.E. 81-129) Rebuttal Rep. of Stephen McKeon at ¶

52.) This is inconsistent with use of such cryptoassets as a currency. (*Id.*)

**Response to No. 37:     Disputed as inaccurate and misleading.  Plaintiff misquotes and mischaracterizes Dr. McKeon's opinion.  Nowhere in the cited material does Dr. McKeon state that "cryptoassets 'experience a higher frequency of extreme returns'" or suggest that fact is "inconsistent with use of such cryptoassets as a currency."  In the cited material, Dr. McKeon was actually providing criticism of the methodology used by Plaintiff's own expert, Dr. Taveras, stating (text omitted by Plaintiff in italics):**

> *Finally, prior research has documented at least two features of cryptoasset returns that violate assumptions underlying Dr.*

*Taveras' use of Geometric Brownian Motion (GBM) in her simulation analysis. The first is periods of volatility clustering (Othman et al., 2019).  Hence it [is] incorrect to assume constant sigma, as it is more accurately modelled as time varying. The second is that log returns of cryptoassets violate the normality assumption in GBM.  Cryptoasset log returns exhibit "fat tails," meaning a* **higher frequency of extreme returns,** *relative to what would be expected under a normal distribution.*

**McKeon Ex. 2 ¶ 52.**

**B.    Telegram Set Out to Create a Revolutionary Blockchain Based on Ambitious Technological Goals**

38.    Telegram told readers of the Primer that Bitcoin and Ethereum "don't have the capacity to replace VISA or Mastercard" because "[i]n their current architecture they are limited to a maximum of only 7 transactions per second for Bitcoin and 15 transactions per second for Ethererum, resulting in insufficient speeds and higher transaction costs." (JX7 (D.E.72-7) at 4.)

**Response to No. 38:        Undisputed for purposes of Plaintiff's motion.**

39.    Telegram explained to readers that "[t]o reach mainstream adoption [] a cryptocurrency [] and its underlying blockchain" have to, among other things, "allow for processing millions of transactions per second and accommodating hundreds of millions of active users." (*Id.*)

**Response to No. 39:        Undisputed for purposes of Plaintiff's motion.**

40.    The Primer explained that Telegram's "vision"—the purpose of the TON project—was to "establish the first mass-market cryptocurrency" meeting these conditions. (*Id.* at 4-5.)

**Response to No. 40:        Undisputed for purposes of Plaintiff's motion but subject to clarification.  The full text of the quoted material provides, "Telegram is uniquely positioned to establish the first mass-market cryptocurrency by providing a platform that combines these properties."  JX7 at 5 ("these properties" referring to (1) speed and scalability; (2) intuitive user interfaces; and (3) an engaged user base).  Further, disputed**

26

as to the use of the term "purpose" and to the extent Plaintiff suggests there is only one purpose behind the TON Blockchain project.  As Pavel testified, "[t]he vision for Grams is that of a mass-market, multipurpose currency used by a big number of consumers.  This currency would be not unlike other popular cryptocurrencies and digital currencies, and in that sense, for consumers to be able to transact in Grams freely and use Grams as a means of exchanging value, there would need to be certain services or platforms that would allow consumers to obtain Grams from the market . . ."  Musoff Ex. 1 at 324:8-16.

41.     As part of the "Risk Factors" appendix to the Pre-Sale and Stage A Primers, Telegram acknowledged "Risks Relating to the Further Development and Acceptance of Blockchain Technology and Cryptocurrencies." (JX14 (D.E. 72-14) at ¶ 4.)

**Response to No. 41:**     **Undisputed for purposes of Plaintiff's motion.**

42.     It also warned Initial Purchasers that development of the TON Blockchain and the TON wallet would require "significant capital, the expertise of Telegram's management and substantial time and effort by skilled developers and other parties," and that there could be "no guarantee that such [new] technologies will operate as intended . . . ." (*Id.* at ¶ 5.)

**Response to No. 42:**     **Undisputed for purposes of Plaintiff's motion.**

**C.     Many Have Expressed Doubts from the Start about Telegram's Ability to Create the TON Platform It Marketed**

43.     In a February 2018 article titled "Telegram: Crypto for the Masses," the Economist noted that Telegram's "bold ambitions could still fail to be realized" because research into the technology Telegram intends to use like "infinite sharding" and "hypercube routing" "was abandoned years ago by other developers." (PX143.)

**Response to No. 43:**     **Undisputed for purposes of Plaintiff's motion but subject to clarification to the extent that there is no assurance that the quoted article written by a third-party is reliable or valid.  Moreover, the quoted article also states:**

> **One potential obstacle is technology. Unlike other projects funded by ICOs, which rely on existing technology, Telegram plans to build a new blockchain, a type of decentralised ledger, with a new architecture, notes Lex Sokolin of Autonomous, a research firm.  That is entirely achievable; Filecoin, for example, has already done so for data storage.**

Further, disputed to the extent Plaintiff suggests that the above material means the TON Blockchain is not currently ready to be launched.  PX12 at 258:9-259:12; McKeon Ex. 1 ¶ 29; JX20; JX22.  Further, disputed to the extent that Plaintiff suggests the cited material is representative of the status of the TON Blockchain testnet.  The TON Blockchain testnet is completely open source and has been publicly available beginning in March 2019 and completely available since September 2019.  Def. 56.1 ¶¶ 256-58.  This has allowed the open-source community and third parties to develop and test certain applications and interfaces that may be offered when the production version of the TON Blockchain launches and perform security analyses.  *Id.* at ¶ 259.  Pavel testified:

> [Defendants] consider the testing of the core components of the TON network to be complete; however, certain additional functionality of TON, that would be nice to have, but that would be nice to have, but that would be necessary for launch.  It's still required and that is the kind of testing that we are focused on right now.

Drylewski Ex. 2 at 258:9-14.  Further, Pavel testified:

> I think that in September last year we launched a contest for smart contract engineers and security researchers that promised a price fund of up to $400,000 to be distributed among the winners in this competition.  As a result, we had a lot of people from the industry looking at the code of the TON Blockchain, testing how the TON Blockchain and its virtual machine work, and seeing whether they could find any security issues with the project.

*Id.* at  318:4-12.  Pavel stated that Telegram continues to review feedback from security researchers from the open-source community.  Drylewski Ex. 2 at 316:14-24.  Finally, the cited material is irrelevant for Plaintiff's claims in this action.

44.     In March 2018, The New York Times published an article titled "Virtual Currency Offerings May Hit a New Peak with Telegram Coin Sale." (PX144.) The article noted skepticism about Telegram's project by certain venture capitalists who have invested the most in the virtual currency space, noting "the most obvious reason to be skeptical of the project is that there is not even a prototype – just a 132-page paper promising what the system will look like one day." (*Id.*) The article cited to a "scathing essay" by one analyst "noting that the Telegram team has given no evidence that they will be able to solve the problems that have dogged everyone else." (*Id.*)

**Response to No. 44:**     Undisputed for purposes of Plaintiff's motion but subject to
clarification to the extent that there is no assurance that the quoted article written by a
third-party is reliable or valid.  Disputed to the extent that Plaintiff suggests the cited
material is representative of the opinions of all other analysts or other venture capitalists.
For instance, in response to the referenced essay, one purchaser stated to another
individual, "Fwiw, I don't think [the author] is right and a lot of strong technical folks have
given a more balanced/mature view than his."  Musoff Ex. 2.  The other individual replied,
"[The author] is brilliant but very often wrong."  *Id.*  Further, disputed to the extent
Plaintiff suggests that the above material means that the TON Blockchain is not ready to be
launched.  *See* Response to No. 43 above.  Finally, the cited material is irrelevant for
Plaintiff's claims in this action.

45.     This essay, published in January 2018 and titled "$600 Million TONs of

Crap," described Telegram's 132-page whitepaper as saying "nothing substantial about the hard

parts of designing a decentralized protocol. It is essentially a wishlist of things they want to have,

and how it will work assuming that their wishlist doesn't crash and burn. It does not make any

substantial contributions to proof of stake research. . . . I do not know how [TON] will work. I

cannot, in 132 pages, gain the slightest intuition as to how to go about proving that the hard

problems it needs to solve will be solved. I certainly would not put a single cent I care more than

nil about losing into this. Mostly, because I think this is an opportunistic ploy." (PX145).

**Response to No. 45:**     Undisputed for the purposes of Plaintiff's motion that the cited
essay contained such statements but subject to clarification to the extent that there is no
assurance that the quoted article written by a third-party is reliable or valid.  For instance,
the author of the cited article was a blockchain analyst and quantitative trader at a
prospective purchaser that did not receive an allocation in the Private Placement.  *See*
PX145; Musoff Ex. 3 at TLGRM-028-00000015; Musoff Ex. 4.  Moreover, Defendants
object to the extent that Plaintiff suggests the cited material is representative of the
opinions of all other purchasers.  For instance, in response to the referenced essay, one
purchaser stated to another individual, "Fwiw, I don't think [the author] is right and a lot
of strong technical folks have given a more balanced/mature view than his."  Musoff Ex. 2.
The other individual replied, "[The author] is brilliant but very often wrong."  *Id.*  Further,
disputed to the extent Plaintiff suggests that the above material means that the TON
Blockchain is not ready to be launched.  *See* Response to No. 43 above.  Finally, the cited
material is irrelevant for Plaintiff's claims in this action.

46.     The venture capital firm whose analyst published the essay declined to

invest in the Offering. (PX194 at Bates 665.)

29

**Response to No. 46:**       Disputed as incorrect and misleading.  The venture capital firm
Plaintiff references did not receive an allocation in the Private Placement and published
this article after failing to receive an allocation.  *See* **Musoff Ex. 3 at TLGRM-028-
00000015; Musoff Ex. 4.  Pavel shared a link to the essay with Shyam, Ilya and Hyman,
stating "People from Pantera which e-mail I've ignored posted an attack on Telegram[.]"
Musoff Ex. 3 at TLGRM-028-00000015.  Further, disputed to the extent Plaintiff suggests
that the above material means that the TON Blockchain is not ready to be launched.  *See*
Response to No. 43 above.  Finally, the cited material is irrelevant for Plaintiff's claims in
this action.**

47.       Similarly, a representative of a prospective Initial Purchaser who received

Telegram's Offering Documents, noted in a January 2018 email that Telegram's "timeline and

their product roadmap seems aggressive, bordering on delusional . . . best guess is that they

actually don't know what they're going to build, so they're throwing out every protocol

application possible and will whittle it down once they start building." (PX146.)

**Response to No. 47:**       Disputed as incomplete and misleading.  The full text of the quoted
email shows that the, in the first paragraph below, the prospective purchaser was quoting
the statements of another individual:**

> **Spoke with [another individual].  His high level thoughts were
> to agree that the timeline and their produce roadmap seems
> aggressive, bordering on delusional.  He said his best guess is
> that they actually don't know what they're going to build, so
> they're throwing out every protocol application possible and
> will whittle it down once they start building.  He also mentioned
> that although Telegram does have an impressive user base, the
> team doesn't really have any relevant experience in the
> blockchain space, their proof of Stake goal is ambitious and
> largely unproven, and he hasn't spoken with any "A Grade" (his
> words) investors who think they'll invest here.**
>
> **. . .**
>
> **If the minimums were a lot lower I think I could get behind this
> as a flyer and a bet based on our pre-sale discount... but with a
> $5M minimum investment I think that puts this out of the
> feasibility range. . . .**

**PX146 at 367.  Further, disputed to the extent that there is no assurance that these
statements made by a third-party are reliable or valid.  Additionally, disputed to the extent
Plaintiff suggests that the above material means that the TON Blockchain is not ready to be**

**launched.** *See* **Response to No. 43 above.  Finally, the cited material is irrelevant for Plaintiff's claims in this action.**

48.     This individual further stated that "although Telegram does have an impressive user base, the team doesn't really have any relevant experience in the blockchain space, their proof of stake goal is ambitious and largely unproven" and went on to note: "If the minimums were a lot lower I think I could get behind this as a flyer and a bet based on our pre-sale discount." (*Id.*)

**Response to No. 48:**     **Disputed for the reasons stated in Response to No. 47.**

49.     Another representative of that prospective Initial Purchaser noted that "it looks like they are trying to boil the ocean – the storage layer problem itself is going to be hard to pull off. . . ." (*Id.*)

**Response to No. 49:**     **Disputed for the reasons stated in Response to No. 47.**

50.     This prospective Initial Purchaser ultimately passed on the opportunity to invest in the Offering, noting: "This is a PASS. They are trying to be the next Ethereum. I think we will stick with the present Ethereum." (*Id.*)

**Response to No. 50:**     **Disputed for the reasons stated in Response to No. 47.**

51.     An analyst at another venture capital firm wrote in January 2018 to an Initial Purchaser, "we've decided to avoid a deep dive into TON altogether. The long lock up means it doesn't fit our liquidity profile well. Early indications from people I respect suggest it's a 'coinflip' in the sense that it's a sky high valuation for vaporeware," and cited to the essay referenced in paragraph 45 above. (PX147.)

**Response to No. 51:**     **Disputed as incomplete and misleading.  The full text of the analyst's email states:**

> **We've decided to avoid a deep dive into TON altogether.  The long lock up means it doesn't fit our liquidity profile well.  Early indications from people that I respect suggest that it's a**

"coinflip" in the sense that it's a sky high valuation for vaporeware [sic].

Real use case, easy transaction, and good team behind it, but you're talking about writing a huge check for a promise that the team will eventually build something. Much of the crypto market can be described similarly, but I at least want better liquidity to speculate along those lines.

Plaintiff fails to mention that the purchaser responded to the analyst at the venture capital firm stating, "Fwiw, I don't think [the author] is right and a lot of strong technical folks have given a more balanced/mature view than his." Musoff Ex. 2. The analyst replied, "[The author] is brilliant but very often wrong." *Id.*

Further, Defendants object to the extent that Plaintiff suggests the cited material is representative of the opinions of all other purchasers. Further, Defendants note that as Plaintiff acknowledges, the entity who received that email is an Initial Purchaser and thus ultimately participated in the Private Placement. Finally, the cited material is irrelevant to Plaintiff's claims in this action.

52.    Some of the firms that did ultimately invest also noted potential problems with Telegram's technological aspirations for TON. (*See, e.g.*, *infra* ¶¶ 53–56.)

**Response to No. 52:**    Disputed as inaccurate and misleading for the reasons stated in Responses to Nos. 53-56.

53.    For example, one Pre-Sale Initial Purchaser stated in its internal investment memorandum that the "scope of what the TON team is proposing is extremely ambitious" and that while "they mention that they will implement various components of TON protocol like TON Storage, TON PROXY, TON DNS, TON Payments, and TON Services to facilitate the development of apps on TON," they "fail to detail their plans for execution or address whether they have sufficient resources to implement these components, each of which is a massive undertaking." (PX32 (D.E. 81-32) at Bates 4.)

**Response to No. 53:**    Disputed as incomplete and misleading. The text of the quoted investment memo also includes the following omitted statements:

  a.  "Telegram has a vision to build the first mass-market cryptocurrency. To execute on this vision, Telegram plans to leverage its large and engaged userbase and an existing ecosystem of developers, merchants, and payment

providers.  Also, they plan to address the scaling and governance challenges faced by various blockchains and build the foundational components like DNS, proxy, storage, etc. that developers can use to build decentralized apps on top of TON.  This vision is extremely ambitious; if Telegram is successful in implementing its plans, TON could be one of the most valuable cryptoasset [sic] in the market." PX32 at 00000003.

b. "Telegram has one of the strongest teams that we have seen in the crypto space.  While they have less blockchain-specific background than some other teams in the space, they do have experience building scalable, decentralized systems as a part of Telegram.  Further, these systems have the same underlying principles as blockchains (without the economic layer of a cryptoasset).  Also, Telegram founders have a product philosophy that aligns with crypto.  From the beginning they have built the app with an emphasis on privacy, free speech, and distributed technology.  Moreover, as evident by the success of Telegram app, the team has a track record of shipping interfaces that are intuitive and easy to use, two qualities that are missing in almost all crypto apps.  Finally, the raw horsepower of the core team is impressive; Telegram's developers have won ACM ICPC (one of the toughest programming competitions in the world), as well as a number of Top Coder challenges and nationwide programming competitions." *Id.* at 00000004.

c. The memo ultimately concluded: "Telegram has the potential to take decentralized applications mainstream.  They have an ambitious vision, but also the user base, developer ecosystem, and technical and product skills to execute on that vision.  If successful, we believe TON has the potential to become one of the top few global cryptoassets, with a market cap in the hundreds of billions." *Id.* at 00000006.

*See also* Defendants' 56.1 Response, Response to No. 175.  Further, Defendants note that the purchaser ultimately participated in the Private Placement.  Finally, the cited material is irrelevant to Plaintiff's claims in this action.

54.     This Initial Purchaser further noted: "[We] haven't seen any code for the TON blockchain, and the roadmap is bare bones; we are investing in the promise of a new blockchain rather than an actual product, and trusting the team a great deal in the process." (*Id.* at Bates 5.)

**Response to No. 54:**     Disputed as incomplete and misleading for reasons stated in Response to No. 53.  Defendants note that the purchaser ultimately participated in the Private Placement.  Further, disputed to the extent Plaintiff suggests that the above material means that the TON Blockchain is not ready to be launched.  *See* Response to No. 43 above.  Finally, the cited material is irrelevant to Plaintiff's claims in this action.

55.     Another Initial Purchaser wrote an internal email recommending that the firm participate in the Offering but noted as "challenges" that "there is a technical question as to whether it is even possible to create TON's proposed blockchain currency, particularly in the time frame discussed. All they have thus far is a technical whitepaper that is mostly academic. Bitcoin is an early iteration of a transactional currency, but is still a sophisticated one, and it has yet to crack the code on fast transactions at low costs." (PX5 (D.E. 81-5), Ex. A at Bates 2964).

**Response to No. 55:       Undisputed for the purposes of Plaintiff's motion but subject to clarification.  The text of the quoted internal email also stated: "The Deal Team . . . are in favor of making this investment . . ."  PX5, Exhibit A at 2963.  Further, Defendants note that the purchaser ultimately participated in the Private Placement.  Further, disputed to the extent Plaintiff suggests that the above material means that the TON Blockchain is not ready to be launched.  *See* Response to No. 43 above.  Finally, the cited material is irrelevant to Plaintiff's claims in this action.**

56.     An engineer from that same firm wrote: "[W]e'll probably make money on TON if only because of the hyped sale of tokens to a broad user base. . . . But technically/fundamentally, it's probably not going to fully materialize into the project they're selling or even something of value in the long term" and cited to the essay about TON published by another firm and referenced in paragraph 45 above. (PX148.)

**Response to No. 56:       Undisputed for the purposes of Plaintiff's motion that the cited essay contained such statements but disputed to the extent that the referenced article was written by a third party and there is no assurance that it is reliable or valid.  PX148.  For instance, the author of the cited article was a blockchain analyst and quantitative trader at a prospective purchaser that did not receive an allocation in the Private Placement.  *See* PX145; Musoff Ex. 3 at TLGRM-028-00000015; Musoff Ex. 4.  Moreover, Defendants object to the extent that Plaintiff suggests the cited material is representative of the opinions of other purchasers.  For instance, in response to the referenced essay, another purchaser stated to another individual, "Fwiw, I don't think [the author] is right and a lot of strong technical folks have given a more balanced/mature view than his." Musoff Ex. 2. The other individual replied, "[The author] is brilliant but very often wrong."  *Id.* Defendants note that the purchaser ultimately participated in the Private Placement. Further, disputed to the extent Plaintiff suggests that the above material means that the TON Blockchain is not ready to be launched.  *See* Response to No. 43 above.  Finally, the cited material is irrelevant to Plaintiff's claims in this action.**

**D.** **Telegram Does Not Claim—in Its Submissions to the Court, in the Public Notice, or Elsewhere—that, Upon Launch, the TON Blockchain Will Operate as Originally Envisioned**

57.     Perekopsky admitted that "after the launch [of TON] . . . still it takes time for the ecosystem to appear" and that to the extent anyone is planning to use Grams "to pay for something" that would be "definitely maybe not on day one." (PX13 (D.E. 81-13), Perekopsky Tr. at 173:5–25.)

**Response to No. 57:**     Disputed as incomplete and misleading.  Ilya testified with respect to purchasers who planned to hold Grams in that long term that (omitted language in italics):

> *I am sure that some investors were sharing these kind of ideas but, as I said before, since it is a fund, right, they were talking more about the projects that they would probably -- that can potentially use the Grams and the technology afterwards.  I don't remember any specific conversations that they are going to -- of course, they understood and it was clear all these investors were sophisticated, that in order for this ecosystem to evolve, and in order so that we had a lot of projects using Gram, it takes time.  So probably on day one,* after the launch, *definitely there will be some projects, right, but* still it takes time for the ecosystem to appear.  *I am sure that many funds that invested like -- not funds, investors -- invested in the long run.  They were planning to use it, you know,* to pay for something *but* definitely maybe not on day one.
>
> . . .
>
> *Because all investors clearly understood, after the Grams are issued, that it is a currency and basically it is their own money.  So if it is their own funds, of course they can use them for whatever needs that they want to use them.*

**PX13 at 173:8-174:9.**

58.     Telegram's expert opines that to achieve the "decentralization" of the blockchain Telegram desires, there should be 1,000 potential validators. (PX126 (D.E. 81-126) Expert Rep. of Stephen McKeon ("McKeon Rep.) at ¶ 189.)

**Response to No. 58:**        Disputed as incomplete, misleading and unsupported by the cited materials.  Dr. McKeon's cited paragraph addresses the number of validators as the scale of the TON Blockchain increases with time and user base, and states in full:

> First, to be valid under the BFT protocol, blocks must collect signatures of at least two-thirds of all the validators (by stake), and these signatures must be included in the new block for the block to be trusted.  If too many signatures are to be included into each and every block, more data would have to be stored by all full nodes and propagated through the entire ledger, and more processing power would have to be spent to check these signatures.  *In this respect, TON blockchain actually sets more ambitious goals for itself in terms of the decentralization of the block validation process and, specifically, aims at increasing the initial set of validators from approximately 100 validators (for Testnet) to approximately 1,000 validators.  In this respect, TON blockchain is designed to be notably more decentralized than other existing PoS protocols: for example, comparable PoS blockchains EOS and Steemit rely only on 21 validators in their respective validator sets, whereas other PoS blockchains such as TRON, Stellar, Ark, Cosmos and Lisk, all have between 27 and 101 validators in their validation protocols.  Delegated Proof of Stake algorithms, such as EOS, have further threats to decentralization due to voting cartels.  In addition, TON validation protocol is designed to be visibly more decentralized than existing major PoW cryptoassets, discussed above, which is widely decentralized in theory with respect to block production, but in reality all suffer from an increasing concentration of mining hash power in the hands of a few large pools.*

**McKeon Ex. 1 ¶ 189 (emphasis added).  Moreover, Pavel testified that approximately 20 validators at the time of launch "would be good to have."  PX12 at 79:13-80:4.  Dr. Herlihy detected 36 validators on the testnet.  PX9 ¶ 33.**

59.        Durov believes that it will be hard to predict how many validators the

blockchain will have upon launch. (PX12 (D.E. 81-12) at 311:9-19.)

**Response to No. 59:**        Disputed as incomplete and misleading.  In the cited material, Pavel was asked: "So 5 billion Grams and 10 percent restriction and 100,000 [minimum Grams to be a validator], that means there could be, at most, 5,000 validators, right?"  Pavel responded: "[T]he 10 percent and 100,000 Grams limitation are configuration parameters that validators decide on by majority in their vote, and so it is difficult to predict how many validators can work at the same time in TON post-launch since those parameters are likely to be changing."  PX12 at 311:9-19.  Moreover, Pavel testified that approximately 20 validators at the time of launch "would be good to have."  PX12 at 79:13-**

**80:4.  Dr. Herlihy detected 36 validators on the testnet.  PX9 ¶ 33.  *See* Defendants' 56.1 Response, Response to No. 350.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

60.     On or about October 2, 2019, Parekh sent an email to all Initial Purchasers titled "Action Required: Telegram Open Network Development Update" stating, among other things, "because you participated in the Private Placement, you are eligible to take part in the validators' election process. If you are planning to use your Grams for validation, please follow the technical instructions attached to this email." (PX149.)

**Response to No. 60:      Undisputed for the purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

61.     [RESERVED]

**Response to No. 61:      No response needed.**

62.     Defendants have not contacted *any* persons or entities to request that they act as validators on the TON Blockchain upon its launch. (Stips. at ¶ 214.)

**Response to No. 62:      Disputed as inaccurate and misleading.  Defendants invited the purchasers to participate as validators, *see*, *e.g.*, Drylewski Ex. 13 ("you are eligible to take part in the validators' election process"), even providing specific and tailored technical guidance, *see*, *e.g.*, JX25 ("If you wish to run one or several validators, you will need . . ." and describing the technical requirements to run validators); Malloy Ex. 6 (alex@telegram.org providing specific responses to validation troubleshooting questions).**

**Further, Ilya explained that for "TON Blockchain, the level of sophistication required to be a validator is not that high, so I would say that if this investor was sophisticated, by definition, and if he wants to become a validator, that is a doable task for all of them."  PX13 at 125:4-9.  Additionally, Pavel testified that because Telegram "preferred to enter into purchase agreements with well-known, sophisticated investors, many of whom had an established name in the technology sector" and "becoming a validator is actually not unlike something as simple as setting up a server in a data center in a secure way," Telegram "assumed that a lot of our purchasers would be able to act as validators if they chose to."  PX12 at 85:24-86:10.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

63.     Prof. Herlihy, the SEC's expert in blockchain technology, analyzed the "beta version" of the TON Blockchain's code and concluded that "much of this code performs

routine and mundane functions . . . [that] would be performed in essentially the same way in any

blockchain." (PX9 (D.E. 81-9) Herlihy Rep. at ¶ 5.)

**Response to No. 63:**      Disputed to the extent that Dr. Herlihy's unsworn expert report
**does not constitute admissible evidence. It is also disputed that such an opinion is relevant,
reliable or valid. Further, disputed in that Dr. Herlihy's opinions were specifically
rebutted by Dr. Lewis-Pye.  *See* PX198 ¶¶ 25-29.  Finally, disputed as irrelevant to
Plaintiff's claim in this action.**

> 64.    Prof. Herlihy observed 36 validators on the TON Beta version (*id.* at ¶

33), though the identities of these validators are not in the record.

**Response to No. 64:**      Undisputed for purposes of Plaintiff's motion that the speaker in
**the cited material made such a statement. Disputed to the extent that Dr. Herlihy's
unsworn expert report does not constitute admissible evidence. It is also disputed that such
an opinion is relevant, reliable or valid. For instance, Dr. Lewis-Pye observed:**

> **I note the Herlihy Report's observation that 36 validators were
> detected on the TON testnet, well more than the limit of 21 block
> producers for EOS. All else being equal, this larger set of
> validators (as opposed to 21 block producers) will decrease
> centralisation risks and (while the details of the protocol are
> significant here) will also tend to decrease vulnerability to
> Denial-of-Service attacks.**

**PX189 ¶ 22. Likewise, Dr. McKeon also opined:**

> **In this respect, TON blockchain is designed to be notably more
> decentralized than other existing PoS protocols: for example,
> comparable PoS blockchains EOS and Steemit rely only on 21
> validators in their respective validator sets, whereas other PoS
> blockchains such as TRON, Stellar, Ark, Cosmos and Lisk, all
> have between 27 and 101 validators in their validation protocols.**

**McKeon Ex. 1  ¶ 189.  Further, disputed as irrelevant to Plaintiff's claim in this action.**

> 65.    Prof. Herlihy concluded that "substantial further engineering work will be

required to 'tune' the [TON] Blockchain before it can reach the size and speed described in the

public documents." (*Id.*)

**Response to No. 65:**      Undisputed for purposes of Plaintiff's motion that the speaker in
**the cited material made such a statement. Disputed to the extent that Dr. Herlihy's
unsworn expert report does not constitute admissible evidence. Further, disputed in that**

**Dr. Herlihy's opinions were specifically rebutted by Dr. Lewis-Pye. PX198 ¶¶ 25-29. It is also disputed that such an opinion is relevant, reliable or valid.**

66.     Neither of Telegram's experts analyzed or offered any opinion regarding the effectiveness of the code for the beta version of the blockchain and neither provided any opinion as to whether the TON Blockchain will function as originally envisioned upon launch. (PX126 (D.E. 81-126) McKeon Rep. at ¶ 14 ("I have not reviewed the TON source code, nor do I claim to have expertise as a software engineer or blockchain code developer."); PX198 (Expert Report of Andrew Lewis-Pye).)

**Response to No. 66:     Disputed to the extent Plaintiff suggests that Dr. McKeon's and Dr. Lewis-Pye's opinions are incomplete, misleading and unsupported. Further, disputed to the extent that Plaintiff suggests the cited material is representative of the status of the TON Blockchain testnet. The TON Blockchain testnet is completely open source and has been publicly available beginning in March 2019 and completely available since September 2019. Def. 56.1 ¶¶256-58. This has allowed the open-source community and third parties to develop and test certain applications and interfaces that may be offered when the production version of the TON Blockchain launches and perform security analyses. *Id.* at ¶ 259. Pavel testified:**

> **[Defendants] consider the testing of the core components of the TON network to be complete; however, certain additional functionality of TON, that would be nice to have, but that would be nice to have, but that would be necessary for launch. It's still required and that is the kind of testing that we are focused on right now.**

**Drylewski Ex. 2 at 258:9-14. Further, Pavel testified:**

> **I think that in September last year we launched a contest for smart contract engineers and security researchers that promised a price fund of up to $400,000 to be distributed among the winners in this competition. As a result, we had a lot of people from the industry looking at the code of the TON Blockchain, testing how the TON Blockchain and its virtual machine work, and seeing whether they could find any security issues with the project.**

***Id.* at 318:4-12. Pavel stated that Telegram continues to review feedback from security researchers from the open-source community. *Id.* at 316:14-24.**

III.   **TELEGRAM'S SALES OF GRAMS TO INITIAL PURCHASERS WERE THE FIRST STEP IN ITS INTENDED PUBLIC DISTRIBUTION OF GRAMS**

A.   **The Built-In Pricing Mechanism for Grams Incentivized Initial Purchasers to Sell Grams in the Secondary Market**

67.   As detailed in the SEC 56.1, the Initial Purchasers bought Grams because they believed Grams would generate returns once sold in the secondary market. (SEC 56.1 at ¶¶ 147–86.)

**Response to No. 67:   Disputed as inaccurate and misleading for the reasons stated in Defendants' 56.1 Response, Responses to Nos. 147-186.  Further, disputed to the extent that Plaintiff suggests the cited materials of particular purchasers are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Finally, disputed as irrelevant to Plaintiff's claims in this action.**

68.   Telegram's pricing mechanism for Grams was communicated to Initial Purchasers in various ways, including through the pricing graph reproduced above in paragraph 2 and through other communications. (*See, e.g.*, *infra* ¶¶ 69–71.)

**Response to No. 68:   Disputed as inaccurate and misleading. The pricing mechanism for Grams was set according to a formula set forth in Appendix A to the Technical White Paper. JSF ¶ 143; JX13.  The Technical White Paper was attached to the Round One Purchase Agreements as Appendix A.  JSF ¶ 90.  An identical technical white paper was attached to Round Two Purchase Agreements as Appendix A.  *Id.* ¶ 95.  Defendants also note that the graphic to which Plaintiff refers reflected the potential "Reference Price" for Grams if Telegram were to continue to sell Grams in the future, either through private rounds or a public ICO.  JX7 at 16-17.  Further, the Primer makes clear that it was a "propos[al]" that contained an "[o]utline of the [v]ision" for the TON project at the time.  *Id.* at 3-4.  Moreover, as stated in Responses to No. 2 above, the market price of Grams will be dictated by market forces of supply and demand, not by the Reference Price.  JSF ¶¶ 170-71.**

69.   For example, on or about January 15, 2018, Telegram emailed a "Telegram Private Placement Update" email to dozens of prospective Initial Purchasers who had expressed interest in investing in the Pre-Sale round of the Offering. (*See, e.g.*, PX1 (D.E. 81-1) Ex. C; PX150.)

**Response to No. 69:**      Disputed as misleading for the reasons stated in Responses to Nos.
**2 and 68, above.  Defendants note that the market price of Grams will be dictated by**
**market forces of supply and demand, not by the Reference Price.  JSF ¶¶ 170-71.**

70.      The January 15, 2018 email stated that Telegram had received

"expressions of interest for over US$3.75 billion of Grams from approximately one hundred

Initial Purchasers" and that they had "decided to increase the volume of this round to US$850

million. Based on the formula in the White Paper, this results in a price of US$0.37756101 per

Gram. We selected this offering size not only to give us sufficient capital to develop TON and

the associated functionality within Telegram Messenger over the next number of years, but also

to facilitate an allocation process that will ensure that every Initial Purchaser that participated in

it and is eligible to receive an allocation will receive one." (PX1 (D.E. 81-1), Ex. C.)

**Response to No. 70:**      Undisputed that the referenced communication contains the
**quoted statements.**

71.      The January 15, 2018 email also announced a next offering round, which

was expected to start in mid-March 2018, and raise $1.15 billion, such that "the price to Initial

Purchasers will be approximately US$1.45 per Gram." (*Id.*)

**Response to No. 71:**      Disputed to the extent Plaintiff claims that in the cited
**communication, Telegram "announced a next offering round."  In the cited material,**
**Hyman noted that "[i]n terms of the next round, we expect that it will start in mid-March**
**2018, and we expect that it will be sized at US$1.15 billion."  PX1 (D.E. 81-1), Exhibit C**
**(emphasis added).**

72.      One Initial Purchaser concluded, based on the pricing mechanism

described in Telegram's January 15, 2018 email, that purchasing Grams could be profitable

because "the seemingly low valuation in the ICO pre-sale was an interesting risk/reward

opportunity. The pricing mechanism described by Telegram indicated that any future token

offerings would sell Grams at a higher price." (PX 1 at ¶ 15).

**Response to No. 72:**      Disputed as incomplete and misleading.  In PX1, the purchaser
**stated that "[t]here were many factors that informed our view that this investment in**

41

Grams could be profitable," only one of which was the "seemingly low valuation in the ICO pre-sale." PX1 ¶ 15.  Further, disputed for the reasons stated in Responses to Nos. 2 and 68, above.  Defendants note that the market price of Grams will be dictated by market forces of supply and demand, not by the Reference Price.  JSF ¶¶ 170-71.

73.     Another Initial Purchaser sent a summary to several other venture capital firms, which highlighted that Telegram would conduct another offering in March 2018, where the price offered to Initial Purchasers would be approximately US$1.45 per Gram. (PX3 at Exhibit B, Bates 7278.)

**Response to No. 73:      Disputed as inaccurate and misleading.  Disputed as to the characterization of the sender as an Initial Purchaser because that entity was ultimately not accepted as a purchaser in the TON Blockchain. Def. 56.1 ¶¶ 149-150.  Further, disputed as to the characterization that the summary "highlighted" that Telegram would conduct another offering and that the summary was sent to "several other venture capital firms."  The cited communication indicates that the summary was only sent to one other firm, and simply states the fact that Telegram would conduct another round.  PX3 at Exhibit B.  Further, disputed for the reasons stated in Responses to Nos. 2 and 68, above. Defendants note that the market price of Grams will be dictated by market forces of supply and demand, not by the Reference Price.  JSF ¶¶ 170-71.  Finally, disputed as irrelevant to Plaintiff's claims in this action.**

74.     On or about January 10, 2018, an analyst who worked at one of the Initial Purchasers summarized some of the terms of the Telegram offering for his colleagues, writing "Supply: Total supply of 200 Grams split as follows: 4% for team w/ 4 year vesting, 52%+ retained by TON reserve 'to protect the nascent cryptocurrency from speculative trading and to maintain flexibility at the early stages. . .' and 44% sold based on a formula illustrated below ($0.10 to $1.00 per token depending on timing)." (PX3 (D.E. 81-3), Ex. C at Bates 6769.) This analyst attached a screenshot of the pricing graph depicted in Telegram's Primer, as reproduced in paragraph 2 above. (*Id.*, Ex. C at Bates 6771.)

**Response to No. 74:      Disputed to the extent that Plaintiff suggests the cited materials of particular purchasers are indicative or representative of the decision-making process of all other purchasers in the Private Placement.  Further, disputed for the reasons stated in Responses to Nos. 2 and 68, above.  Defendants note that the market price of Grams will be dictated by market forces of supply and demand, not by the Reference Price.  JSF ¶¶ 170-71.  Finally, disputed as irrelevant to Plaintiff's claims in this action.**

75.     Another representative of an Initial Purchaser stated in a sworn declaration that some of the reasons the firm believed Grams would trade higher than what the firm purchased them for were that "a portion of Grams was going to be retained by Telegram to support the trading value for Grams, as well as by the founders personally" and that "we believed at the time we invested that Telegram planned future offerings of Grams at a higher price and we felt it would be a popular ICO." (PX7 (D.E. 81-7) at ¶ 19.)

**Response to No. 75:**     Disputed as incomplete and misleading for the reasons stated in Responses to Nos. 2 and 68, above.  Defendants also note that the market price of Grams will be dictated by market forces of supply and demand, not by the Reference Price.  JSF ¶¶ 170-71.

76.     A representative of another Initial Purchaser declared that at the time his firm made the investment the firm believed "the upside was approximately 3-4 times our investment purchase price." (PX4 (D.E. 81-4) at ¶ 12.) This was based in part on Telegram's indication to this firm that "there was a lot of demand for the deal that was not met, so we reasoned that high demand for Grams meant the price would rise." (*Id.* at ¶ 16.)

**Response to No. 76:**     Disputed as incomplete and misleading.  The purchaser stated that the purchaser learned through due diligence that there was strong demand.  The full text states:

> [REDACTED] and I ultimately decided to invest in the Telegram ICO, because Telegram already had such a strong product and brand among crypto enthusiasts, and we believed that a team of top notch product engineers, given $1 billion, could build a useful crypto token that would appreciate in value. I had also learned through our due diligence that there was also incredibly strong demand among Venture Capital firms to get an allocation in the initial round.  I believed at the time we made the investment that the upside was approximately 3-4 times our investment purchase price.  Attached as Exhibit C to this Declaration is an email exchange dated January 17, 2018, with a colleague reflecting our thinking on the Telegram ICO.

**PX4 (D.E. 81-4) at ¶ 12.**

43

**The email reflecting the purchaser's thinking on the Telegram ICO reflects that the purchaser chose to invest in the TON Blockchain because of the purchaser's belief that Defendants could build a useful cryptocurrency.  The email states:**

> **The one thing I really like is that every crypto enthusiast I know is literally glued to TGram all day – it is the absolute center of the crypto world.  So if you were to try to get adoption of a coin among the 1% of the world that owns crypto, you couldn't think of a better way than Telegram issuing a token.**
>
> **However this only matters if they are able to create a currency which is actually useful. The white paper is way overly broad and vague, so I agree with [REDACTED]'s criticisms, but this is essentially a bet that a team of top notch tech guys, given $1 billion, can build a useful crypto.  I think that's a reasonable bet to make.  It's not like the folks at ICX and NEO and FUN have a monopoly on blockchain engineers.**
>
> **Obviously the valuation is high and the lockup sucks, but I felt the same way about Tezos and Filecoin, and they've traded very well in futures markets so far despite the drama around Tezos.**
>
> **The upside on Tgram is probably like 3-4x, which seems weak for crypto but is still a great investment if it works.  I have more work to do on this one, but I think I'll probably invest like $50k or so and think of it as a quasi venture investment moreso than a hot ICO.**

*Id.* **at Exhibit C.**

77.     Another Initial Purchaser stated in its investment thesis memorandum that "we expect the token to become a top 10 coin given the company's high profile, the project's magnitude, and the cryptocurrency community's dominant use of the product, which would lead to a return of 2-5x within 12 months post launch." (PX31 (D.E. 81-31) at Bates 3848.) The memorandum also stated: "we also believe that because of the discount offered to participants in the resale, market conditions, momentum and scarcity, this coin will go up sharply in price in the short term. It could offer a return comparable to what we might see from a VC investment (510x) that is realizable in 3-6 months (once the lockup begins to expire) instead of 7-9 years. . . . This

presale is being offered to 'blue chip' VCs that can help signal quality to other Initial Purchasers

in the ICO and public market." (*Id.* at Bates 3848-49.)

**Response to No. 77:**      Disputed as incomplete and misleading.  The text of the quoted
investment memo also states:

   a.  **"Telegram's new objective is to deliver a truly mass-market
       cryptocurrency (called 'GRAM') that will be used for payments and
       consumer-facing distributed apps (dApps) in everyday life."  PX31 at 1.**

   b.  **"TON will be like a decentralized supercomputer and value transfer
       system.  By combining minimum transaction time with maximum security,
       TON can become a VISA/MasterCard alternative for the new decentralized
       economy.  GRAM tokens will serve as the principal currency for the in-app
       economy on Telegram and will also be available for external use.  Existing
       bot platforms, channels and groups on Telegram should provide a natural
       market for paid digital content services and physical goods. Telegram's
       existing user base is 80% from emerging markets. These are the same
       markets that require solutions for digital payments to facilitate eCommerce
       and mCommerce, but which don't yet have the credit bureau
       infrastructure to support the digital payments systems of the West or
       China."  *Id.***

   c.  **"TON is a very high-profile project that could potentially bring
       cryptocurrencies to the next level in terms of mainstream adoption."  *Id.* at
       2.**

**Further, disputed as irrelevant to Plaintiff's claims in this action.**

             78.      Similarly, another Initial Purchaser stated in its investment analysis memo

that the firm was "purchasing Grams at a significant discount to the ICO price" and that the firm

thought "this investment could return 10x." (PX33 (D.E. 81-33) at Bates 11.)

**Response to No. 78:**      Disputed as incomplete and misleading.  The text of the quoted
analysis also states:

   a.  **"TON could be the AWS (products and services to be built on top of it) +
       WeChat (all the consumer facing products that are widely used and use the
       same distribution + currency) of the new blockchain world that is
       emerging."  PX33 at 000011.**

   b.  **"Over time, we believe TON can appreciate significantly in value. TON is
       not just a blockchain – it is a scalable platform that will allow users to
       safely hold cryptocurrency (custody), protect their identity, and maintain**

> **control of their own data.  It will also become a platform for developers,
> wherein they can create and distribute applications and / or services. TON
> has an opportunity to become a worldwide WeChat + AWS with enhanced
> features and capabilities.”  *Id.*

**Further, disputed as irrelevant to Plaintiff's claims in this action.**

79.     On or about February 19, 2018, Telegram sent an email to one of the Initial

Purchasers titled "Telegram Update." Hyman wrote: "We can confirm that the proceeds of your

purchase totaling 15 million USD have been received in full and you have been allocated an

entitlement to 39,728,878.6 Grams, according to the terms of the purchase agreement. As you

know, we closed the initial round of the TON private placement in early February, raising a total

of $850 million at a price of US$0.37756101 per Gram. . . . We are now preparing to launch the

next round of the offering. . . . The target size for each stage is still to be determined, but we

currently anticipate offering US$850 million of Grams in Stage A, at a price of US$1.33003701

per Gram." (PX151.)

**Response to No. 79:        Undisputed for purposes of Plaintiff's motion.**

80.     Another Initial Purchaser noted that "with a circulating supply of 4.24

billion Grams (assuming the TON Reserve holds 20% of the total supply) we can forecast a price

of $7.23 per Gram in 2021 if the TON blockchain is to capture 100% of the value of Telegram

itself." (PX 30 (D.E. 81-30) at Bates 10.)

**Response to No. 80:        Disputed as incomplete and misleading.  The text of the quoted
"investment thesis" also states:**

> a.  **"The TON blockchain has the potential to capture sizeable market share of
>     the rapidly growing digital payments space."  PX30 at 1.**
>
> b.  **"The TON [] blockchain aims to be a multifaceted system: an integrated
>     value transfer platform for the decentralized economy.  In addition to the
>     TON blockchain core, the TON infrastructure will offer many components
>     consisting of a payments system that aims to rival the likes of Visa and
>     MasterCard, storage capabilities, privacy measures and content viewing
>     and browsing services."  *Id.* at 2.**

46

c. "The [Durovs] do not appear to be financially motivated. . . Telegram is not for sale. . . [W]hat seems to drive them is their libertarian ideals and their technological reputations.  Those driving factors would seem to result in a genuine motivation to make TON and its underlying cryptocurrency and encrypted network with fundamental utility and value."  *Id.* at 4.

d. "As a new payments ecosystem is emerging, with momentum in the direction of mobile payments, we see this as a hugely bullish indicator for the mainstream adoption of TON and the use of Grams for digital payments."  *Id.* at 9.

e. "If the internet is the primary provider of the decentralized transfer of information (World Wide Web), then Ton blockchain aims to be the primary provider of the decentralized transfer of value (The Open Network)."  *Id.* at 12.

**Further, disputed as irrelevant to Plaintiff's claims in this action.**

81.    There is no evidence in the record that Initial Purchasers believed Grams would function as an efficient medium of exchange or as an efficient way to acquire goods and services upon the launch of the TON network.

**Response to No. 81:**    Disputed.  Evidence in the record shows that Initial Purchasers, whose declarations were submitted in support of Plaintiff's motion, understood that Grams were intended to, and believed that they would, function as an efficient medium of exchange and as an efficient way to acquire goods and services upon the launch of the TON Network.  For example:

a. An internal investment memo by one investment firm stated that TON's "competition" will be "Litepay (Litecoin) [a] payment processor of Litecoin where retailers can accept Litecoin payments instantly . . ." and "Bitpay (Bitcoin) [c]urrently the largest bitcoin payment processor in the world, serving industry-leading merchants on six continents . . ." PX2, Exhibit E, at 2321-22.

b. An internal analysis prepared by another purchaser stated: "TON could be a $100B+ commerce platform in the next four years"; "[a] truly global, decentralized, commercial platform would be transformative, enabling transactions to occur without currency-related transaction fees or long transfer times, allowing local merchants to reach a massive and engaged global audience."  PX5, Exhibit A, at 2963.

An internal email by a different member of the same purchaser's team stated that Telegram "has the potential to lead a highly commercialized

ecosystem." *Id.* Exhibit B, at 1580-81.  The purchaser's analysis further stated that the most direct competitors of TON would be:

> Global commerce/payment platforms for physical and digital goods or money transfers (such as Amazon, Alibaba or Paypal).  In theory, T would be better by having a more global (rather than country-specific) network and lowering otherwise difficult access barriers of currency transfer costs, ID verification, and platform familiarity.  Furthermore, if the underlying blockchain technology succeeds in their mission of fast, scalable transactions at low cost, that would be unique (and transformative) in the market.

> *Id.* at 1582.

c.  In an internal analysis created by a different investment firm, one purchaser stated that "[a]n investment in GRM currency rests on: 1) [t]he potential to build a superior Ethereum-like smart contract blockchain (TON). 2) Telegram's ability to credibly build TON. . ." The analysis further stated that Telegram's team "seems experienced, special, and plausibly suited to building scalable blockchain systems more quickly and capably than the incumbents."  PX8, Exhibit A, at 213.

d.  In an email from another purchaser, the purchaser stated to his team that it was a "reasonable bet to make" that Telegram would be "able to create a currency which is actually useful." PX4, Exhibit C, at 232.

e.  A memorandum authored by another purchaser stated that "[t]he TON blockchain has the potential to capture sizeable market share of the rapidly growing digital payments space."  PX30 at 1.

f.  The memorandum further stated:  "As a new payments ecosystem is emerging, with momentum in the direction of mobile payments, we see this as a hugely bullish indicator for the mainstream adoption of TON and the use of Grams for digital payments."  *Id.* at 9.

g.  A memorandum authored by another investment firm stated: "TON is a very high-profile project that could potentially bring cryptocurrencies to the next level in terms of mainstream adoption."  PX31 at 2.

h.  The memorandum made clear that the investment firm understood and believed that Grams would be an efficient medium of exchange, stating:

> TON will be like a decentralized supercomputer and value transfer system.  By combining minimum transaction time with maximum security, TON can become a VISA/MasterCard alternative for the new

> **decentralized economy. GRAM tokens will serve as the principal currency for the in-app economy on Telegram and will also be available for external use. Existing bot platforms, channels and groups on Telegram should provide a natural market for paid digital content services and physical goods. Telegram's existing user base is 80% from emerging markets. These are the same markets that require solutions for digital payments to facilitate eCommerce and mCommerce, but which don't yet have the credit bureau infrastructure to support the digital payments systems of the West of China.**

> *Id.* **at 1.**

> i. **Yet another investment firm stated in an internal memorandum that "TON could be the AWS (products and services to be built on top of it) + WeChat (all the consumer facing products that are widely used and use the same distribution + currency) of the new blockchain world that is emerging."** *Id.* **at 1.**

**Finally, disputed as irrelevant to Plaintiff's claims in this action.**

82.     On or about January 12, 2018, an employee of an Initial Purchaser emailed to his team some questions and answers about the Telegram Offering that his team had been discussing. One question posed was: "What can be done to minimize currency volatility and how does that impact this round of Initial Purchasers? [ ] and I discussed this question with John Hyman @ T – the idea is that their large (42% of tokens) reserve could buy up supply at a stable cost if there is meaningful selling pressure, while the exponentially increasing cost of purchasing an additional token would keep buying demand suppressed at a certain point. But I suspect we will still see hyper volatility of the token price in 2018 prior to the launch of the commercial platform, and Initial Purchasers will need to get comfortable with this near-term volatility." (PX5 (D.E. 81-5) Ex. B at Bates 1582.)

**Response to No. 82:     Disputed as incomplete and misleading. The quoted text is a small portion of a larger discussion regarding the purchaser's due diligence on the TON Blockchain. In the same email chain, another member of the purchaser's team stated that "Telegram's already global network, growing & engaged user base (particularly in the**

crypto community), and phenomenal product (with a strong security-oriented brand) has the potential to lead a highly commercial ecosystem." *Id.* at Exhibit B at 1580-81.  The purchaser further stated:

> Global commerce/payment platforms for physical and digital goods or money transfers (such as Amazon, Alibaba or Paypal). In theory, T would be better by having a more global (rather than country-specific) network and lowering otherwise difficult access barriers of currency transfer costs, ID verification, and platform familiarity.   Furthermore, if the underlying blockchain technology succeeds in their mission of fast, scalable transactions at low cost, that would be unique (and transformative) in the market.

*Id.* at 1582.

Moreover, an analysis prepared by the same investment team stated: "TON could be a $100B+ commerce platform in the next four years"; "[a] truly global, decentralized, commercial platform would be transformative, enabling transactions to occur without currency-related transaction fees or long transfer times, allowing local merchants to reach a massive and engaged global audience."  PX5, Exhibit A, at 2963.

83.    A January 16, 2018 investment analysis by another employee of the same Initial Purchaser stated: "Based on the pricing formula for each token, we would be purchasing the tokens at a 50%+ discount assuming full Initial Purchaser interest is met during the pre-sale (the $ amount invested is the integral of the exponential curve shown on page 17 of the attached TON Primer, which is always at least 50% below the market value of those tokens)." (*Id.* Ex. A at Bates 2964.) The investment analysis also noted that "Tokens are a speculative asset, rather than a tested and proven mode of transaction. Given that token values are likely to skyrocket early on and be susceptible to massive price swings (just like bitcoin or any other cryptocurrency today), it will be challenging for commercial transactions to occur until the price stabilizes – the timing of which is impossible to predict." (*Id.*)

**Response to No. 83:**        **Disputed as incomplete and misleading for the reasons stated in Response to No. 82.**

84.     Another Initial Purchaser's investment memorandum stated that transition to the "TON Foundation" is expected to be completed by 2021, and that "we firmly believe that the Durov Brothers, and in particular Pavel will be the guiding force behind TON." (PX30 (D.E. 81-30) at Bates 4). It also stated: "In the TON White Paper, Telegram has outlined the ability for the TON reserve to buy and sell tokens in order to stabilize the market price of Grams so that the price 'may be less prone to sudden spikes (and drops).' We expect the TON reserve to be very active in exerting its influence on price; decreased Gram volatility is advantageous in that the blockchain is more useable (transaction fees are more consistent) and users feel more comfortable transacting in Grams (consistent store of value)." (*Id.* at Bates 3.)

**Response to No. 84:**     **Disputed as incomplete and misleading.  The first quote is taken out of context.  The full text stated:**

> **Telegram has stated that the Telegram Open Network will eventually be renamed "The Open Network." This would seemingly reflect the teams [sic] ambition that TON does not only occupy a network within the Telegram ecosystem, but rather more grandly, the global open source community.  To add to this transition, Telegram has also outlined that all responsibilities related to TON and the TON reserve will eventually be transferred to the "TON Foundation" a not for profit organization.  This transition is expected to be completed by 2021.  Whatever the case, whether the above transitional changes eventuate or not, we firmly believe that the Durov brothers, and in particular Pavel will be the guiding force behind TON.**

**PX30 at 4 (citations omitted).**

**In the same memorandum, the purchaser further stated:**

> **Historically, in matters of user protection and privacy, the Durov's have acted with integrity.  Durov was forced into an unceremonious exit from VK amidst speculation of government intervention when he refused to release personal information of select VK users requested by the Russian state.  Additionally, the Durov's do not appear to be financially motivated. Telegram has been personally funded by Pavel Durov through his Digital Fortress fund.  Furthermore, Telegram is not for sale.**

> Durov stated that he'll continue to dismiss buy-in offers from
> Silicon Valley investors. "*Even for $20 billion, its not for sale . . .
> that's a lifetime guarantee.*"  Rather, what seems to drive them
> is their libertarian ideals and their technological reputations.
> Those driving factors would seem to result in a genuine
> motivation to make TON and its underlying cryptocurrency an
> encrypted network with fundamental utility and value.

*Id.* (emphasis in original) (citations omitted).

Further, disputed as to the relevance of the second quote to Plaintiff's claims in this action.
As originally contemplated, the TON Foundation would also have had the ability to buy
Grams.  JSF ¶¶ 165, 167.  However, through discussions with the SEC, Defendants decided
to remove the TON Foundation's Gram-buying function to alleviate concerns articulated
by the SEC.  JSF ¶ 168.

## B.   <u>Initial Purchasers Planned to Sell—and Some Did Sell—Grams for Profit in the Secondary Market</u>

85.   Initial Purchasers understood that after the deployment of the TON

blockchain, "Grams will list on exchanges and become publicly tradable in Q1 2019." (PX30 at

Bates 3; *see also* JX8 at 15; JX9 at 15.)

<u>Response to No. 85:</u>       Disputed as inaccurate and misleading.  The full text of the cited
document stated:

> Grams will not be delivered to participants until full deployment
> of the TON blockchain, *expected* to take place in Q4 2018.
> Subsequently, Grams will list on exchanges and become publicly
> traded in Q1 2019.  However, Grams sold in the first stage will
> be subjected to lock up provisions, released in four equal
> tranches after deployment (18-months to receive full allocation).

PX30 at 3.

Further, disputed as to the characterization that the Pre-Sale Primer or the Stage A Primer
state that Grams will list on exchanges.  *See* JX8; JX9.  Also disputed as to the
characterization that the memorandum of one Initial Purchaser contains the
understanding of all the Initial Purchasers.  Finally, disputed as irrelevant to Plaintiff's
claims in this action.

86.     Initial Purchasers also knew, as early as February 2018 during the Pre-Sale round, that there was a "grey market" for interests in Grams. (PX37 (D.E. 81-37) at Bates 726 – 31; SEC 56.1 at ¶¶ 213–19.)

**Response to No. 86:      Disputed as to the characterization that the conversation of one Initial Purchaser reflects the knowledge or understanding of all, or any of the other, Initial Purchasers.**

**Moreover, Pavel explained that, with respect to Hyman's inquiries regarding the "grey market," "Mr. Hyman was not happy with potential activities in the gray market for a variety of reasons, and he was alerting the team to recent rumors from the market in order for us to be able to assess those rumors and, if there is any actionable pieces of information, act on it." PX12 at 342:9-19.**

**Further, Defendants took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements.  *See* Appendix A.  Specifically, the Purchase Agreements contained express restrictions on the transfer, sale or assignment of the Purchase Agreement.  Def. 56.1 ¶¶ 192-93, 206-10.  These provisions stated:**

> **[N]o Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement . . . without the prior written consent of the Purchaser [. . .]**
>
> **. . . .**
>
> **[T]he Purchaser agrees and undertakes that during the Restricted Period it shall not, without the prior written consent of [Defendants]: offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer, encumber or dispose of, directly or indirectly . . ., the investment contract represented by this Purchase Agreement . . . or any Tokens . . ., or publicly disclose the intention to make any such offer, sale, pledge or disposition [. . .]**

*Id.* ¶ 206-207.

**The Private Purchasers further warranted to Defendants that "the Purchaser is purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof . . . The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the**

Tokens." *Id.* at ¶ 209.  Moreover, the issuance of Grams "is conditional upon the satisfaction by the [Private Placement] Purchaser or waiver by [TON] Issuer of the of . . . the Purchaser's Warranties remaining true, accurate and not misleading on the Network Launch Date." *Id.* at ¶ 195.  Defendants intend to require each Private Placement purchaser to repeat its representations at the launch of the TON Blockchain as a condition precedent to receiving any allocation of Grams.  *Id.* at ¶ 212.  Defendants also note that they limited the Private Placement to highly reputable, sophisticated investors to further ensure that the above representations would be honored.  *See id.* ¶¶ 98-100, 188, 209.

From time to time, Defendants have also inquired as to whether certain Private Placement purchasers had agreed to transfer or sell their interests in Grams, and, in some instances, sought assurances that no transfers or sales had or would take place, advised the Private Placement purchasers not to make such transfers or sales, and/or canceled the relevant Purchase Agreements.  *Id.* ¶ 133; *see also id.* at ¶¶ 134-58.

Finally, disputed as irrelevant to Plaintiff's claims in this action.

87.      In an email dated February 20, 2018, an employee of an Initial Purchaser told a colleague regarding Telegram: "People are already flipping the Telegram ICO for millions, even though it's not on sale yet" and cited to an article. (PX152.)

**Response to No. 87:**      Disputed as to the characterization that the individual who sent the email is an employee of an Initial Purchaser.  *See* https://www.linkedin.com/in/jamey-spencer-89421872 (LinkedIn page of the individual indicating he is employed at an investment firm).  Further, disputed for the reasons set forth in Response to No. 86.

88.      Initial Purchasers understood there was even a secondary market for the Purchase Agreements themselves. (*See, e.g.*, *infra* ¶¶ 89–91.)

**Response to No. 88:**      Disputed for the reasons stated in Response to No. 86.  Further, disputed as irrelevant to Plaintiff's claims in this action

89.      For example, in April 2019, BSG Cayman Limited, entered into an agreement with an Initial Purchaser of Grams to "receive a participation in the purchase of $5,297,157.14 tokens" for US$2,400,000. (PX76 (D.E. 81-76) at Bates 839).

**Response to No. 89:**      Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language, but Defendants note that this document is unverified, are unaware of its source or the reliability thereof, and Plaintiff does not provide any evidence that it was ever sent to Telegram or that Telegram or its employees were ever aware of it, and appears to be an agreement solely between third parties.  Further, disputed for the reasons stated in Response to No. 86 above.  Defendants

note that they took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements. *See* Appendix A. Finally, the cited material is irrelevant to Plaintiff's claims in this action.

90. BSG sent one of the Initial Purchasers its Operating Committee's

memorandum about Telegram, dated March 23, 2019. (PX77 at Bates 815.)

**Response to No. 90:** Disputed as not supported by the cited material. The cited material does not show that the referenced document was sent to an Initial Purchaser. Defendants note that this document is unverified, are unaware of its source or the reliability thereof, and Plaintiff does not provide any evidence that it was ever sent to Telegram or that Telegram or its employees were ever aware of it. Further, disputed for the reasons stated in Response to No. 86 above. Finally, the cited material is irrelevant to Plaintiff's claims in this action.

91. The BSG investment memorandum states: "BSG has procured a rare

opportunity to invest through a secondary purchase, based on $0.453 token price at $2.27B

valuation. This represents a highly attractive 66% discount to the last round $1.33 token price at

$6.65B valuation." (*Id.* at Bates 815, 831.) The memorandum also states: "In terms of exit, [the]

team will target for the earliest investment principal repayment, with longer holding of remaining

stake for upside optimization. A direct listing on a cryptocurrency exchange is expected to be 6

months after launch of the mainnet, as indicated by TON's management, and discussions are

underway with global top exchanges." (*Id.* at Bates 828.)

**Response to No. 91:** Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language, but disputed for the same reasons set forth in Responses to Nos. 89 and 90 above. Further, Plaintiff selectively quotes from the cited material and omits other information contained therein, such as:

> **Fully integrated with Telegram, TON present[s] the combination of having one of the largest developer ecosystem, with distribution network across 200 million crypto native user base, in order to efficiently and effectively build out an Apple App Store-like integrated portal for millions of users to access products, services, and contents offered by TON as its "killer dApp."**

**PX77 at 816.**

92.     Some Initial Purchasers contemplated selling their Grams immediately

after the lockup period was over. (*See, e.g.*, *infra* ¶¶ 93–95.)

**Response to No. 92:**     Disputed as inaccurate and misleading.  *See* **Responses to Nos. 93-95 below.  Further, disputed as irrelevant to Plaintiff's claims in this action, particularly as to where Plaintiff does not provide any evidence that any purported communications or statements were ever sent to Telegram or that Telegram or its employees were ever aware of such communications or statements.**

93.     For example, on or about January 18, 2018, one Initial Purchaser told a

colleague that the next round "is more interesting than this (realize it will be at a higher price) but

I can buy more then AND sell it right away 18 months in crypto is a lifetime." (PX169.)

**Response to No. 93:**     Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language, but disputed to the extent Plaintiff suggests that the cited document reflects an intent by the Initial Purchaser to sell Grams immediately after the lockup period.  Further, Plaintiff does not provide any evidence that the cited material was ever sent to Telegram or that Telegram or its employees were ever aware of such communications or statements.  Finally, disputed as irrelevant to Plaintiff's claims in this action.**

94.     In its Summary Investment Analysis Memorandum from February 2018,

another Initial Purchaser explained that the firm would be purchasing Grams at US$0.37756101, a

significant discount to the ICO price of US$1.145 per Gram, and stated "[w]e will be able to sell

1/4 of our Grams 3 months post launch and will be able to sell all of them 18 months post-launch."

(PX33 (D.E. 81-33) at Bates 8.)

**Response to No. 94:**     Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language, but disputed to the extent Plaintiff suggests that the cited document reflects an intent by the Initial Purchaser to immediately sell Grams after the lockup period.  Defendants note that this document is unverified, are unaware of its source or the reliability thereof, and Plaintiff does not provide any evidence that it was ever sent to Telegram or that Telegram or its employees were ever aware of it.  Finally, disputed as irrelevant to Plaintiff's claims in this action.**

95.     In May 2018, another Initial Purchaser forwarded to Hyman a "cold

email" from an unidentified party that offered "a direct [ ]SAFT between the Initial Purchaser

and Telegram after signing an agency agreement. Our terms vary depending on the investment

amount and include: a) entry fee %; (b) % from upside (the latter we consider a gentleman's agreement since token are in possession of the Initial Purchaser)." (PX153.)

**Response to No. 95:** **Undisputed for purposes of Plaintiff's motion insofar as the referenced document appears to contain the quoted language. Disputed to the extent Plaintiff suggests that the unidentified party is an Initial Purchaser. Moreover, the email indicates that no sale ever took place and the email sender declined to reveal the identity of the purported offeror. Defendants also note that they took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements. *See* Appendix A. Finally, disputed as irrelevant to Plaintiff's claims in this action.**

96.    Indeed, even Telegram expected these venture capital firms to sell their Grams to the public. (*See, e.g.*, *infra* ¶¶ 97–98.)

**Response to No. 96:** **Disputed as incorrect and misleading to the extent Plaintiff suggests that Defendants expected purchasers to violate the terms of their Purchase Agreements and sell their rights to receive Grams prior to the launch of the TON Blockchain, which Telegram did not. *See* Response to No. 86 above.**

97.    For example, on or about May 3, 2018, an Initial Purchaser asked Hyman why Telegram had decided not to do a public offering. Hyman replied: "We decided for regulatory reasons we will never do any form of direct public offering . . . [t]he pubic will be able to buy grams once network is working and wallets distributed but on a secondary basis not from Telegram directly." (PX20).

**Response to No. 97:** **Disputed as incomplete and misleading. In the cited material, in response to an initial purchaser's question as to whether Telegram was planning "on an ICO once network is live," Hyman explained that Telegram has decided against "any form of direct public offering," and that "the public will be able to buy [G]rams once network is working and wallets distributed on a secondary basis not from Telegram directly." If and when the TON platform was successfully launched and Grams were created, the intent was for Grams to be a currency and/or commodity, not a security. Def. 56.1 ¶¶ 55, 277; Drylewski Ex. 3.**

98.    Similarly, in June 2018, Hyman told an Initial Purchaser that Telegram "ruled out the public ICO," and "think now- the right thing is to have the crypto community [ ] buy in once its trading and allow the market to evolve naturally." (PX1, Exhibit D).

**Response to No. 98:**      Disputed as to the accuracy of the quoted communication.
**Further, disputed for the reasons in Response to No. 97 above.  The cited document
contains notes of a conversation and do not reflect a transcription of the communication.
PX1, Exhibit D.  Further, disputed to the extent Plaintiff suggests that the cited materials
support the proposition that "Telegram expected these venture capital firms to sell their
Grams to the public."  If and when the TON platform was successfully launched and
Grams were created, the intent was for Grams to be a currency and/or commodity, not a
security.  Def. 56.1 ¶¶ 55, 277; Drylewski Ex. 3.**

99.      The "Sales Agent Services Agreement" between Telegram Corp. and

Perekopsky, dated January 15, 2018, stated as the "Purpose" of the agreement: "The Company

hereby appoints [Perekopsky] on a non-exclusive basis as its agent for the sole purposes of

soliciting orders for, and selling Tokens in accordance with the terms and conditions of this

Agreement during the Initial Coin Offering of the TON project (the "ICO")." (PX197 at

TLGRM-015-00000017.)

**Response to No. 99:**      Disputed as incomplete and misleading.  Pavel explained that, "at
that period of time we discussed with Il[y]a potential terms of our work together . . . and
this agreement represents a draft that was created in the process of trying to find an
appropriate way to achieve this goal; however, this was an early version of our potential --
of the terms of our potential collaboration.  It was never acted upon and was discarded,
replaced by, I think, another document." Musoff Ex. 1 at 146:8-147:18.  Defendants also
note that the cited agreement is dated January 15, 2018, and reflected Telegram's plans at
the time.  Pavel testified that, after careful study and exploration of the issue, Telegram
determined not to engage in a public offering.  PX12 at 110:16-112:4.  Pavel explained that
it was "not fully clear . . . how such an offering could be implemented practically across all
jurisdictions in a way that would [allow] us to decrease complexity and unnecessary risks."
*Id.*  Moreover, the term "public offering in the United States" lacks context.  Pavel testified
that Telegram believed that "a public offering of a right to receive Grams in the future
could be treated as an unregistered security" in the United States.  *Id.*  Further, Telegram
chose to sell the right to receive Grams to the purchasers through Purchase Agreements
because they wanted to take the safest route and work with only highly sophisticated
purchasers in a Private Placement.  *See* Def. 56.1 ¶ 98.  Further, disputed as irrelevant to
Plaintiff's claims in this action.**

C.      **Telegram Paid Millions of Dollars to Promoters, Themselves Also TON Initial
        Purchasers, To Find Other Initial Purchasers**

        1.      ATON

100.     On or about February 20, 2018, Ilya Davydov ("Davydov") of ATON

Capital Group ("ATON"), a Russian asset manager and broker, indicated interest in investing in

the Stage A round of the Offering. (PX154.)

**Response to No. 100:     Undisputed for the purposes of Plaintiff's motion.**

101.     On or about March 18, 2018, ATON signed a Purchase Agreement to buy

$7 million of Grams. (PX155.)

**Response to No. 101:     Disputed as inaccurate and misleading.  Under the Purchase Agreements, purchasers received the right to receive Grams, which was highly contingent on a number of factors, including purchasers' satisfaction of all conditions precedent and defendants' ability to successfully build the TON Blockchain and deem it ready to launch in their "sole discretion."  *See* Def. 56.1 at ¶¶ 98, 102; JX11 at 8; JX12 at 12.**

102.     Over the next several months, Davydov, on behalf of ATON, introduced

purchasers to Telegram, supplied know-your-customer and representation documents on their

behalf, and those customers signed Purchase Agreements with Telegram. (PX156; PX157;

PX158; PX159; PX160; PX161; PX162; PX163.)

**Response to No. 102:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  On June 25, 2018, Telegram entered into an agreement with ATON, whereby ATON would "receive 10% of the gross proceeds received by Telegram" pursuant to each purchase agreement under the terms of the agreement.  PX112.  The agreement further provides, "[ATON] is responsible for cooperation with investors in order to obtain all required know-your-client materials and securities law representation letters requested by Telegram, but [ATON] does not guarantee the successful completion of the Deal."  *Id.*  The agreement also provides that "Telegram will prepare all materials related to closing the Deal" and includes representations that ATON "shall not solicit, engage with or negotiate with any Potential Investor in any jurisdiction in a manner in which to do so would constitute a violation of the relevant laws or regulations of that jurisdiction."  *Id.*  The agreement further specifies that ATON will only engage with purchasers in "jurisdictions agreed between the parties."  *Id.*  All purchasers engaged by ATON pursuant to the agreement were located in jurisdictions outside the U.S.  Malloy Ex. 11.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

103.     On or about June 25, 2018, Telegram and ATON Financial Holding

("ATON Financial") entered into an agreement whereby ATON Financial undertook to introduce

potential investors to Telegram and collect and provide to Telegram "required know-your client

materials and securities law representation letters." (PX112 (D.E. 81-112) at 1.)

**Response to No. 103:     Undisputed for purposes of Plaintiff's motion but subject to the clarifications stated in Response to No. 102 above.**

104.   Telegram agreed to pay ATON Financial 10% of the gross proceeds

received by Telegram. (*Id.*)

**Response to No. 104:     Undisputed for purposes of Plaintiff's motion but subject to the clarifications stated in Response to No. 102 above.**

105.   An invoice dated June 26, 2018 listed commissions owed to ATON

Financial for amounts totaling $12 million in connection with seven Purchase Agreements.

(PX164.)

**Response to No. 105:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The date on the invoice of June 26, 2018 is a clerical error, as it is only one day after execution of the agreement and the dates of purported payments range from June 20, 2018 to July 18, 2018.  Musoff Ex. 5.  Rather, the correct date of the invoice is July 26, 2018.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

106.   The invoice further stated that according to the agreement "dated June 25,

2018, the total fee for the services rendered is 10% of the gross proceeds received by Telegram

pursuant to each contract." (*Id.*)

**Response to No. 106:     Undisputed for purposes of Plaintiff's motion but subject to the clarifications in Response to No. 105 above.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

107.   On or about August 3, 2018, Telegram wired a payment of $1.2 million to

ATON Financial in the Cayman Islands. (PX115 (D.E. 81-115).)

**Response to No. 107:     Undisputed for purposes of Plaintiff's motion.  Further, the information cited is irrelevant to Plaintiff's claims in this action.**

108.    For five of the seven Purchase Agreements listed on the June 26, 2018 invoice from ATON Financial, the "Date of Purchase Agreement" is *after* the date of the invoice. (PX164.)

**Response to No. 108:    Disputed as incorrect.  Due to a clerical error, the cited invoice was dated June 26, 2018.  The true date of the invoice is July 26, 2018.  Musoff Ex. 5.  In light of the correct invoice date, *none* of the Purchase Agreements listed on the invoice are dated after the date of the invoice.  Further, as Plaintiff's exhibit demonstrates, Telegram did not make payments to ATON pursuant to the invoice until August 3, 2018, when it wired in one transaction the total amount owed.  PX115.  Finally, the information cited is irrelevant to Plaintiff's claims in this action.**

109.    Telegram's bank account statements show that at least three of the seven purchasers listed on the June 26, 2018 invoice wired money to Telegram *after* the date of the invoice (June 26, 2018), and that one purchaser paid on June 25, 2018. (PX136 (D.E. 81-136).) The other three are not listed on the bank account statement. (*Id.*)

**Response to No. 109:    Disputed as incorrect.  Due to a clerical error, the cited invoice was dated June 26, 2018.  The true date of the invoice is July 26, 2018.  Musoff Ex. 5.  In light of the correct invoice date, *none* of the payments from the purchasers were received after the date of the invoice.  Further, as Plaintiff's exhibit demonstrates, Telegram did not make payments to ATON pursuant to the invoice until August 3, 2018, when it wired in one transaction the total amount owed.  PX115.  As Telegram's bank account statements show, the above four payments cited by Plaintiffs were all wired before the date of the corrected invoice on July 26, 2018.  PX136.  Finally, the information cited is irrelevant to Plaintiff's claims in this action.**

110.    As detailed in the SEC 56.1, in May 2019, Telegram received from an Initial Purchaser a copy of an ATON marketing brochure that touted Telegram as "one of the largest and fastest growing messengers in the world" and provided an "evaluation" for the value of Grams to go up as much as "+494%". (PX113 (D.E. 81-113); PX114 (D.E. 81-114) (English translation) at TLGRM-012-00015887, 892; SEC 56.1 at ¶¶ 320–21.)

**Response to No. 110:    Undisputed for purposes of Plaintiff's motion but subject to clarification.  Telegram's agreement with ATON provides that "Telegram will prepare all materials related to closing the Deal" and includes representations that ATON "shall not solicit, engage with or negotiate with any Potential Investor in any jurisdiction in a manner**

61

**in which to do so would constitute a violation of the relevant laws or regulations of that jurisdiction." PX112. The agreement further specifies that ATON will only engage with purchasers in "jurisdictions agreed between the parties." *Id.* All purchasers engaged by ATON pursuant to the agreement were located in jurisdictions outside the U.S. Malloy Ex. 11. Further, disputed on the ground that the cited document is unverified hearsay that has not been authenticated or is admissible. Indeed, Ilya testified that he spoke with ATON regarding the referenced supposed brochure and "they denied the fact that they were doing these deals." PX13 at 226:11-12. He also testified that the brochure "didn't make too much sense" for a number of reasons that put into doubt the authenticity of the document in question. *Id.* at 226:8-227:16. Pavel also testified that Telegram did not authorize the finders to use any marketing or promotional materials in connection with their arrangement. Musoff Ex. 1 at 176:2-7. Further, the information cited is irrelevant to Plaintiff's claims in this action.**

111.    The brochure noted that ATON would receive an "initial charge" of "2% from the sum of the invested funds" and a "Success fee" of "20% from the growth of the assets' value." (PX114 at TLGRM-012-00015894.)

**Response to No. 111:    Undisputed for purposes of Plaintiff's motion but subject to clarification for the reasons set out in Response to No. 110. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

112.    ATON prepared a 37-page equity research analysis on "TON Telegram" dated May 15, 2019 (the "ATON Equity Analysis"). (PX116 (D.E. 81-116).)

**Response to No. 112:    Disputed on the ground that the document cited is unverified hearsay purportedly prepared by a third party. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

113.    At least one Initial Purchaser obtained a copy of the ATON Equity Analysis. (*Id.*)

**Response to No. 113:    Disputed on the ground that the document cited is unverified hearsay purportedly prepared by a third party. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

114.    The ATON Equity Analysis noted: "**The main competitive advantage of TON is access to Telegram's ecosystem.** The TON creators plan to build their own cryptocurrency, GRAM, based on the TON platform. The integration of the TON network and cryptocurrency with Telegram will enable the scaling-up of the project and introduce TON to

millions of users. For example, it is anticipated that TON light wallets will be built into Telegram

clients with millions of Telegram users being able to store their funds securely in TON's

network . . ." (*Id.* at Bates 1008 (emphasis in original).)

**Response to No. 114:**      **Disputed on the ground that the document cited is unverified
hearsay purportedly prepared by a third party.  Further, the cited material appears to
have been written by a third-party without knowledge of Telegram's plans and procedures
with respect to the Private Placement.  Finally, the cited information is irrelevant to
Plaintiff's claims in this action.**

        115.    The ATON Equity Analysis also provided "a valuation range of $3.8-6.2

per Gram," and notes: "Price discovery for the cryptocurrency has already started. While official

GRAM trading has not started yet, several crypto exchanges (Mofex and Xena) have started to

quote Telegram futures. For example, Xena Exchange is offering non-deliverable GRAM futures

(XGRAM), expiring at the launch of the token or in Feb 2020 at around $5.9. Since the launch,

XGRAM has been trading in a range of $1.8-2.4 which is close to the implied value of Stage B

($2.2) should it take place." (*Id.* at 986.)

**Response to No. 115:**      **Disputed on the ground that the document cited is unverified
hearsay purportedly prepared by a third party.  The cited material appears to have been
written by a third-party without knowledge of Telegram's plans and procedures with
respect to the Private Placement.  Further, the information cited is irrelevant to Plaintiff's
claims in this action.**

        116.    A different version of the ATON Equity Analysis was published online by

Cointelegraph in June 2019 (the "Second ATON Equity Analysis"). (PX166.)

**Response to No. 116:**      **Disputed on the ground that the document cited is unverified
hearsay purportedly prepared by a third party.  Further, the information cited is
irrelevant to Plaintiff's claims in this action.**

        117.    The Second ATON Equity Analysis provides "a valuation range of $2.1-

8.0 per GRAM." (PX165, available at

https://s3.cointelegraph.com/cointelegraph_ton_research_by_aton.pdf.)

**Response to No. 117:**    Disputed on the ground that the document cited is unverified hearsay purportedly prepared by a third party.  The cited material appears to have been written by a third-party without knowledge of Telegram's plans and procedures with respect to the Private Placement.  Further, the full text of the cited material provides:

> Valuing cryptocurrencies is more than a challenge . . . but currencies with a predictable user base and understood useability such as Telegram's GRAM may be more easily valued using classical methods such as equation of exchange (Quantity Theory) due to their identifiable utility value.  Using the equation of exchange gives us an indicative value range of $2.1-8.0 per GRAM, *although this is a completely theoretical exercise given that the TON project has not been completed nor any GRAMs issued at the date of this report.*

**PX165 (emphasis added).  Finally, the information cited is irrelevant to Plaintiff's claims in this action.**

### 2.    Da Vinci Capital

118.    On or about February 20, 2018, "Disruptive Era Fund SP of ITI Funds SPC", a Cayman entity, provided Telegram an IOI for a $50 million Purchase Agreement, signed by Oleg Jelezko ("Jelezko") as "Partner, Da Vinci Capital Management Limited." (PX167 at TLGRM-019-00001770.)

**Response to No. 118:**    Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this case.

119.    Jelezko has, directly or indirectly, a beneficial ownership of 25% or greater of Disruptive, and has "significant responsibility to control, manage or direct" Disruptive. (PX168 at TLGRM-003-00002857–58.)

**Response to No. 119:**    Undisputed for purposes of Plaintiff's motion but subject to clarification.  The cited material lists, in addition to Jelezko, 13 other individuals and/or entities as direct or indirect beneficial owners of Disruptive.  PX168 at TLGRM-003-00002857-58.  Further, the cited material is irrelevant to Plaintiff's claims in this case.

120.    Jelezko is the CEO, Managing Partner, and Director of Da Vinci Capital Management Ltd ("Da Vinci Capital"), which in turn serves as a financial adviser to Disruptive.

(*Id.* at TLGRM-003-00002858; PX117 at Bates 8465; *see also* PX170.)

**Response to No. 120:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

121.     Jelezko represented that Disruptive Era would be purchasing the investment for its own account and would not be soliciting Initial Purchasers to participate in the investment. (PX167 at TLGRM-019-00001770–71.)

**Response to No. 121:**     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.

122.     On or about February 20, 2018, Hyman received marketing materials apparently prepared by Da Vinci Capital. (PX118 (D.E. 81-118).)

**Response to No. 122:**     Undisputed for purposes of Plaintiff's motion but subject to clarification.  Pavel testified that "it is clear" from Hyman's email that he is displeased that this document was being distributed even though this document might have been available to a limited number of purchasers of that specific fund.  PX118; Malloy Ex. 1 at 189:6-10. Pavel further clarified, that he "was never happy when people tried to interpret what [Telegram] was trying to do" and they "reached out to the parties that we thought were involved to get explanations from them."  Malloy Ex. 1 at 189:11-16.  He further testified that "it would be logical to assume that if this document was used, it was used only internally among the shareholders of this fund mentioned here."  *Id.* at 185:6-14.  Plaintiff also does not provide any evidence that these purported materials were ever distributed to the public.

123.     After several amendments to purchase amounts and payment dates, Disruptive Era Fund SP ("Disruptive") ended up with three separate Purchase Agreements in the Stage A round of the Offering for the following amounts: $45,658,780.21 executed on or about March 19, 2018; $14,024,941.22 executed on or about May 2, 2018; and $12,452,232.92 executed on or about November 1, 2018; totaling approximately $72,136,000. (PX171; PX172; PX173.)

**Response to No. 123:**     Undisputed for purposes of Plaintiff's motion but subject to clarification.  Disruptive entered into an April 16, 2018 Purchase Agreement that was amended pursuant to a Deed of Amendment to Purchase Agreement for Grams on May 2, 2018, decreasing the purchase amount from $14,857,500 to $14,024,941.22.  PX172. Disruptive entered into a June 20, 2018 Purchase Agreement that was amended pursuant to a Deed of Amendment to Purchase Agreement for Grams on November 2, 2018, decreasing the purchase amount from $30 million to $12,452,232.92.  PX173.

65

Further, the information cited is irrelevant to Plaintiff's claims in this action.

124.    Da Vinci Capital and Telegram also entered into an agreement on or about

June 22, 2018, whereby Da Vinci Capital undertook to introduce potential investors to Telegram.

(PX174 at TLGRM-015-00001263.)

**Response to No. 124:    Disputed insofar as it misconstrues the provisions of the agreement. Telegram's agreement with Da Vinci provides that "Telegram will prepare all materials related to closing the Deal" and includes representations that Da Vinci "shall not solicit, engage with or negotiate with any Potential Investor in any jurisdiction in a manner in which to do so would constitute a violation of the relevant laws or regulations of that jurisdiction." PX174. The agreement further specifies that Da Vinci shall "subject to applicable law, identify and introduce Telegram to Potential Investors located or resident in Russia and other such jurisdictions as may be agreed between the parties from time to time." PX174. The purchaser engaged by Da Vinci pursuant to the agreement was located outside the U.S. PX175; PX176. Further, the information cited is irrelevant to Plaintiff's claims in the action.**

125.    Telegram agreed to pay Da Vinci Capital 10% of the gross proceeds

received by Telegram. (*Id.*)

**Response to No. 125:    Disputed as inaccurate and misleading. The full text of the cited provision in the agreement provides that "[I]f Telegram succeeds in signing any purchase agreement(s) for Grams with one or more Potential Investors identified by Company pursuant to this agreement (each such purchase agreement, a 'Contract'), Company will receive 10% of the gross proceeds received by Telegram pursuant to each Contract (the 'Fee')". PX174. Further, the information cited is irrelevant to Plaintiff's claims in the action.**

126.    Telegram's bank account statements show at least 19 separate payments

from Disruptive in 2018 totaling approximately $45.4 million. (PX136 (D.E. 81-136).)

**Response to No. 126:    Undisputed that there were 19 payments, but disputed as to the amount. Further, subject to clarification that Disruptive had an allocation of $72.14 million through Purchase Agreements and these were payments made on those obligations. Finally, disputed as irrelevant to Plaintiff's claims in this action.**

127.    Da Vinci Capital submitted at least two invoices, signed by Jelezko, for

10% fees in connection with seven payments made by Disruptive between August and October

2018. (PX175; PX176.) Those fees were not calculated on the basis of investments of other

purchasers but, rather, were apparently based on the amounts paid by Disruptive on its own

Purchase Agreements.

**Response to No. 127:** **Disputed as inaccurate and misleading. The cited material does not support the assertion that the fees shown on the cited invoice "were not calculated on the basis of investments of other purchasers." The invoices were issued by Da Vinci Capital and listed fees in connection with payments made by Disruptive Era, a separate and distinct entity. PX175; PX176. As Pavel explained, "Oleg Jelezko is not the sole beneficiary of Disruptive Era Fund SP, and I guess that Oleg was helpful in having other beneficiaries of that fund enter into additional purchase agreements later in 2018, for which he, as a manager representing Da Vinci Capital Group Limited, was entitled to a fee in accordance to the finder's fee agreement." Musoff Ex. 1 at 202:17-202:24. Further, Pavel testified that they "thought it was fair, and in the spirit of the finder's fee agreement" to reward the efforts of investors with multiple beneficiaries who "reintroduce[d] those beneficiaries to the offering, [made] them aware that there was still an opportunity to invest due to the fact that certain purchasers failed to meet their contractual obligations." Musoff Ex. 1 at 206:21-207:9.**

128.   Telegram admits these payments were payments with respect to finders'

fees. (PX12 (D.E. 81-12), Durov Tr. at 217:14–218:10.)

**Response to No. 128:** **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

129.   On the same day that it signed its commission agreement with Telegram,

Da Vinci Capital, through its affiliate ITI Capital (PX170), sent a slide deck (the "Da Vinci

Deck"), along with a two-page "Messenger teaser," to at least one member of the public who was

also an Initial Purchaser. (PX117 (D.E. 81-117) at Bates 8454–66; *see also* SEC 56.1 at ¶¶ 325–

26.)

**Response to No. 129:** **Disputed as inaccurate and misleading. Further, disputed to the extent that Plaintiff suggests the cited material indicates that ITI Capital had authority to and acted on behalf of Da Vinci Capital. Disputed to the extent that Plaintiff characterizes the attached slide deck as the "Da Vinci Deck." Nothing in the slide deck supports that characterization. Further, Telegram's agreement with Da Vinci provides that "Telegram will prepare all materials related to closing the Deal[.]" Malloy Ex. 14. Moreover, in another instance where Hyman became aware of certain marketing materials distributed by Da Vinci, Pavel testified that "it is clear" from Hyman's email that he is displeased that this document is being distributed even though this document might have been available to a limited number of purchasers of that specific fund. PX118; Malloy Ex. 1 at 189:6-10. Pavel further clarified, that he "was never happy when people tried to interpret what**

**[Telegram] was trying to do" and they "reached out to the parties that we thought were involved to get explanations from them."  Malloy Ex. 1 at 189:11-16.  He further testified "it would be logical to assume that if this document was used, it was used only internally among the shareholders of this fund mentioned here."  *Id.* at 185:6-14.  Additionally, disputed as misleading to the extent Plaintiff characterizes a private purchaser as "a member of the public" to imply that the referenced materials were distributed to the public, which there is no support for in the cited materials.  Finally, the information cited is irrelevant to Plaintiff's claims in the action.**

130.    In the Da Vinci Deck, Da Vinci Capital described a six-step process for the "standard market behavioral pattern [that] will take place in Dec-2018 during [Gram] tokens' unfreeze" (*Id.* at 8464.):

a.    a. "Institutional and retail Initial Purchasers that did not manage to participate in the Token sale will try to get into the project rapidly, therefore, will push price up" (*id.*)

b.    "Some of the Initial Purchasers (including those who received first 25% batch of Tranche #1 unfrozen), over satisfied with 8x+ returns, will start fixing their positions and dumping the price" (*id.*)

c.    "After the first batch at the particular level (approx. below $1.33 per token) TON Reserve will start to buy tokens from the market to maitain the fair value of tokens" (*id.*)

d.    "With further increase of awareness, number of Initial Purchasers will gradually increase, driving price up until the new batch of Tranche #1 tokens has been unfrozen" (*id.*)

e.    "In June 2019, the last frozen batch of ~11% of total supply Grams (Tranche #1) will be unfrozen and will make all Grams fully transferrable" (*id.*)

f.    "There are at least 2 options of price movement after Tranche 1 token are unfrozen: (i) Tranche #1 and #2 Initial Purchasers are seeing excess returns and

68

starting to fix it – price goes down; (ii) whales are continuing to consolidate

Grams, slightly increasing own blended valuation to become verified nodes of

TON – price goes up" (*id.*)

**Response to No. 130:** **Undisputed for the purposes of Plaintiff's motion that the cited material contained such statements but subject to clarification to the extent that there is no assurance that the quoted article written by a third-party is reliable or valid. Further, disputed for the reasons stated in Response to No. 129.**

131.   The graphical representation included in the Da Vinci Deck is reproduced

below. (*Id.*)



**Response to No. 131:** **Undisputed for the purposes of Plaintiff's motion that the cited material contained such statements but subject to clarification to the extent that there is no assurance that the quoted article written by a third-party is reliable or valid. Further, disputed for the reasons stated in Response to No. 129.**

132.    As noted on the graph in the Da Vinci Deck, "potential zones for the exit" include December 2018 "with return of 5-8x" and June 2019 "with return of 15-20x." (*Id.*)

**Response to No. 132:      Undisputed for the purposes of Plaintiff's motion that the cited material contained such statements but subject to clarification to the extent that there is no assurance that the quoted article written by a third-party is reliable or valid.  Further, disputed for the reasons stated in Response to No. 129.**

3.    Space Investments and Liquid

133.    In February 2018, Space Investments, Ltd. ("Space Investments"), a Cayman entity, provided Telegram an IOI for a $50 million Purchase Agreement and represented that it would be purchasing the investment for its own account and would not be soliciting Initial Purchasers to participate in the investment. (PX177.)

**Response to No. 133:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

134.    In February 2018, Space Investments Limited executed two Purchase Agreements for $15 million and $1 million in the presale round of the Offering. (PX178; PX179.)

**Response to No. 134:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

135.    The Purchase Agreements were signed by Maria Elia ("Elia") as Director of Space Investments. (PX178 at TLGRM-014-00016892; PX179 at TLGRM-014-00016824.)

**Response to No. 135:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

136.    Space Investments wired $16 million to Telegram in February 2018. (PX136 (D.E. 81-136).)

**Response to No. 136:      Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

137.    In an internal document tracking potential Initial Purchasers and allocations, Telegram included the purchaser "InVenture (Space Investments)." (PX180.)

**Response to No. 137:     Disputed to the extent Plaintiff suggests that the quoted language in the cited document is indicative of any entity or affiliation between entities that ultimately signed a purchase agreement.  Further, disputed as irrelevant to Plaintiff's claims in this motion.**

138.    InVenture Partners ("InVenture") is a venture capital firm. (PX181.)

**Response to No. 138:     Undisputed that PX181 indicates that InVenture Partners is a venture capital firm.  Disputed as irrelevant to Plaintiff's claims in this motion.**

139.    In March 2019, Space Investments executed with Telegram a Stage A Purchase Agreement for $91 million. (PX182.)

**Response to No. 139:     Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

140.    This agreement was signed Elia and lists sergey@ivprs.com as the contact for Space Investments. (*Id.* at TLGRM-007-00032727; PX183.)

**Response to No. 140:     Undisputed for purposes of Plaintiff's motion but subject to clarification.  The agreement was signed *by* Elia.  Further, the cited information is irrelevant to Plaintiff's claims in this action.**

141.    After a number of amendments, the amount of Space Investments' Stage A purchase appears to have been reduced to approximately $50,202,000—through an agreement dated July 2, 2018 for $23,500,025, and an agreement dated December 3, 2018 for $26,792,039.24. (PX184; PX185; PX186; PX187.)

**Response to No. 141:     Disputed as inaccurate.  The amount of Space Investments' Stage A purchase was $50,292,064.24.  PX184; PX185; PX186; PX187.**

142.    Between March and November 2018, Space Investments made 14 wire payments to Telegram totaling $50,292,000. (PX136 (D.E. 81-136).)

**Response to No. 142:     Disputed as inaccurate.  Between March and November 2018, Space Investments made 14 wire payments to Telegram totaling $50,292,064.24, the precise**

**amount owed under its Purchase Agreements with Defendants.  Further, disputed as irrelevant to Plaintiff's claims in this action.**

143.   On or about June 15, 2018, Elia signed, on behalf of Gem Limited, a

commission agreement with Telegram, whereby Gem Limited undertook to introduce potential

investors to Telegram. (PX138 (D.E. 81-138) at TLGRM-015-00001267.)

**Response to No. 143:**   **Undisputed for purposes of Plaintiff's motion but subject to clarification.  Under the agreement, Gem Limited shall "subject to applicable law, identify and introduce Telegram to Potential Investors located or resident in Russia and other such jurisdictions as may be agreed between the parties from time to time."  PX138.  The agreement also provided that "Telegram will prepare all materials related to closing the Deal, endeavor to answer all questions of investors and reasonably cooperate with Company's instructions."  PX138.  Further, disputed as irrelevant to Plaintiff's claims in this action.**

144.   Telegram agreed to pay Gem Limited 15% of the gross proceeds received

by Telegram. (*Id.*)

**Response to No. 144:**   **Disputed insofar as it misconstrues the provisions of the agreement.  The agreement stated: "If Telegram succeeds in signing any purchase agreement(s) for Grams with one or more Potential Investors identified by Company pursuant to this Agreement . . . Company will receive 15% of the gross proceeds received by Telegram pursuant to each Contract (the 'Fee')."  PX 138.  Further, disputed as irrelevant to Plaintiff's claims in this action.**

145.   Gem Limited sent Telegram an invoice dated October 11, 2018 pursuant to

that contract. (PX188.) The invoice specifies that a 15% commission is owed on five payments

made on a July 2, 2018 Space Investments Purchase Agreement, and for two payments made on a

July 2, 2018 Purchase Agreement with another purchaser. (*Id.*)

**Response to No. 145:**   **Disputed as inaccurate.  The invoice dated October 11, 2018, pursuant to the agreement between Gem Limited and Telegram specifies that a 15% commission is owed on five payments made on a July 2, 2018 Space Investments Purchase Agreement, and for three payments made on a July 2, 2018 Purchase Agreement with another purchaser.  PX188 at TLGRM-017-00000227.  Further, disputed as irrelevant to Plaintiff's claims in this action.**

146.   Telegram emailed the Gem Limited invoice to its bank for payment on or

about October 19, 2018. (*Id.*)

**Response to No. 146:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claims in this action.**

147.   Telegram admits these payments were payments with respect to finders'

fees. (PX12 (D.E. 81-12), Durov Tr. at 217:14–218:10.)

**Response to No. 147:**     **Undisputed for purposes of Plaintiff's motion but irrelevant to Plaintiff's claim in this action.**

148.   As noted in the SEC 56.1, Liquid informed Telegram in or around May

2019 that it "will be doing an IEO for the GRAM token working with Space Investments."

(PX67 (D.E. 81-67); SEC 56.1 at ¶¶ 236 –37.)

**Response to No. 148:**     **Disputed as incomplete and misleading.  This May 28, 2019 email was sent from an unverified gmail address, with no verification that it was in fact "from Liquid," to the address IR@telegram.org, PX67, which was sporadically used during this time period and was created at the beginning of the Private Placement to be used for accepting indications of interest from potential purchasers.  Malloy Ex. 1 at 350:13-21.  As Malloy Ex. 7 at 4 makes clear, Telegram employees did not know who may have been involved in the announced Liquid sale at the time. In fact, contemporaneous Telegram internal messages reflect dismay at the Liquid announcement and frustration at the lack of knowledge regarding the identity of the purported seller(s).  *See* Malloy Ex. 7.**

**Further, on January 11, 2020, Telegram sent Space Investments Limited a letter via email asking them to confirm whether they had been cooperating with Liquid.com and asking them to reconfirm the representations in their signed Purchase Agreement.  Malloy Ex. 9.  On January 14, 2020, Space Investments Limited responded to Telegram's inquiry, stating that they "are not (and have not been) cooperating with Liquid.com in any respect," and reconfirming the representations in their signed Purchase Agreement.  Malloy Ex. 10.  On January 10, 2020, it was reported publicly that Liquid canceled the sale and returned all funds to purchasers who participated.  *See* "Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors," Andrey Shevchenko, Cointelegraph (Jan. 16, 2020) (https://cointelegraph.com/news/liquid-cancels-sale-of-telegrams-gram-tokens-returns-funds-to-investors).**

**Defendants note that they took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements.  *See* Appendix A.**

**Further, the cited information is irrelevant to Plaintiff's claims in this action.**

149.   As detailed in the SEC 56.1, Liquid conducted a secondary sale of Grams in

July 2019, which it publically announced in June 2019. (SEC 56.1 at ¶¶ 229, 241–42.)

**Response to No. 149:**    **Disputed as inaccurate and misleading. Although Liquid advertised a "Gram Token Sale" in July 2019, Gram tokens did not exist at this time because the Telegram Open Network had not yet launched. As explained in Defendants' 56.1 Response, Responses to Nos. 230, 233, 234, 235, and 236. Telegram had no involvement in this alleged sale and did not know who did. In fact, contemporaneous Telegram internal messages reflect dismay at the Liquid announcement and frustration at the lack of knowledge regarding the identity of the purported seller(s).** *See* **Malloy Ex. 7. Moreover, Ilya and Pavel took comfort in the fact that the Cointelegraph article "laid out plain and clear" that the sale was not legitimate.** *Id.* **On January 10, 2020, it was reported publicly that Liquid canceled the sale and returned all funds to purchasers who participated.** *See* **"Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors," Andrey Shevchenko, Cointelegraph (Jan. 16, 2020) (https://cointelegraph.com/news/liquid-cancels-sale-of-telegrams-gram-tokens-returns-funds-to-investors). Defendants note that they took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements.** *See* **Appendix A. Further, disputed as irrelevant to Plaintiff's claims in this action.**

150.    News of Liquid's sale of Grams was widespread. For example, CoinDesk reported on or about June 11, 2019 that "Messaging Giant Telegram's ICO Token Is at Last Going on Public Sale." (PX190.)

**Response to No. 150:**    **Undisputed for the purposes of Plaintiff's motion that the cited article contained such statements but disputed to the extent that the quoted article was written by a third-party and there is no assurance that it is reliable or valid. PX190. Further, disputed for the reasons stated in Response to No. 149.**

151.    Cointelegraph similarly reported on or about June 11, 2019: "Liquid Cryptocurrency Exchange to Host Public Phase of Telegram ICO." (PX191.)

**Response to No. 151:**    **Undisputed for the purposes of Plaintiff's motion that the cited article contained such statements but disputed to the extent that the quoted article was written by a third-party and there is no assurance that it is reliable or valid.** *See* **PX191. The cited article itself noted: "A message [] from an** *unofficial TON channel* **on Telegram wrote that Liquid could be attempting to catch on the hype surrounding the as-of-yet unreleased token, and that investors should wait for official information from Telegram." PX191 (emphasis added). Further, disputed for the reasons stated in Response to No. 149 and as irrelevant to Plaintiff's claims in this action.**

152.    Another Cointelegraph article published on or about June 14, 2019 quoted the CEO of Liquid as describing the process of reaching the agreement with Gram Asia as follows: "It was natural. We knew the Gram Asia people. We also believed in Telegram Open

74

Network and its community. [...] A limited scope compared with $1.7 billion. But let's do a proper public sale so that Telegram users and greater community can participate in before the actual listing that will happen in October." (PX192 (alteration in original).]

**Response to No. 152:** **Undisputed for the purposes of Plaintiff's motion that the cited article contained such statements but disputed to the extent that the quoted article was written by a third-party and there is no assurance that it is reliable or valid.** ***See* PX192. Further, subject to clarification as set out in Defendants' 56.1 Response, Response to No. 242. The cited article states, "The upcoming IEO at Liquid is a public sale of gram . . . , which is the native token of TON. The Liquid deal *was not made with Telegram* but with Gram Asia, the largest Gram holder in Asia." PX192 (emphasis added). Telegram has no involvement with "Gram Asia," and this entity is not a Private Placement purchaser. *See* Malloy Ex. 2 at 221:19-222:8. Although Liquid advertised a "Gram Token Sale" in July 2019, Gram tokens did not exist at this time because the Telegram Open Network had not yet launched. As explained in Defendants' 56.1 Response to Nos. 230, 233, 234, 235 and 236, Telegram had no involvement in this alleged sale and did not know who did. In fact, contemporaneous Telegram internal messages reflect dismay at the Liquid announcement and frustration at the lack of knowledge regarding the identity of the purported seller(s). *See* Malloy Ex. 7 at TLGRM-031-00000005. Moreover, Ilya and Pavel took comfort in the fact that the cointelegraph article "laid out plain and clear" that the sale was not legitimate. *Id.*; *see also* https://cointelegraph.com/news/sale-of-telegrams-token-gram-on-exchange-liquid-is-not-official-source. On January 10, 2020, it was reported publicly that Liquid canceled the sale and returned all funds to purchasers who participated. *See* "Liquid Cancels Sale of Telegram's Gram Tokens, Returns Funds to Investors," Andrey Shevchenko, Cointelegraph (Jan. 16, 2020) (https://cointelegraph.com/news/liquid-cancels-sale-of-telegrams-gram-tokens-returns-funds-to-investors). Defendants note that they took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements. *See* Appendix A. Further, the cited information is irrelevant to Plaintiff's claims in this action.**

153. According to media reports, Liquid sold at least $4 million in Gram interests (approximately one million Grams at $4 per Gram). (PX193.)

**Response to No. 153:** **Undisputed for the purposes of Plaintiff's motion that the cited article contained such statements but disputed to the extent that the quoted article was written by a third-party and there is no assurance that it is reliable or valid. *See* PX193. Further, subject to the clarification set out in Responses to Nos. 149 and 152. Defendants also note that they took the necessary steps to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were not in any way transferring or assigning their interests under the Purchase Agreements. *See* Appendix A. Finally, disputed as irrelevant to Plaintiff's claims in this action.**

154.     Another media outlet, in reporting on the Liquid sale, noted "even before

Gram is released to the public, Telegram Messenger's cryptocurrency may have appreciated by

200% from last year." (PX194.)

**Response to No. 154:**     **Disputed as not supported by the cited material.  Further,**
**disputed for the reasons stated in Responses to Nos. 148-153 above.**

155.     When asked whether the Liquid sale was "sanctioned by Telegram," one

of the Initial Purchasers responded: "Liquid is not an official launch for GRAMs, rather a

secondary transaction trading. Telegram does not have the capacity to track and prevent all of it."

(PX195.)

**Response to No. 155:**     **Undisputed for purposes of Plaintiff's motion that the speaker in**
**the cited material made such a statement.  Disputed for the reasons stated in Responses to**
**Nos. 148-153 above.  Defendants also note that they took the necessary steps to conclusively**
**establish "reasonable care" under Rule 502(d) to ensure that the private purchasers were**
**not in any way transferring or assigning their interests under the Purchase Agreements.**
***See* Appendix A.  Further, the cited information is irrelevant to Plaintiff's claims in this**
**action.**

156.     After learning about Liquid's planned secondary sale in May 2018,

Telegram did not reach out to Liquid. (PX199, Perekopsky Tr. at 221:19–223:19.)

**Response to No. 156:**     **Disputed as inaccurate and misleading.  Ilya testified that he was**
**aware of reports that the Liquid exchange was selling Grams and he received an email**
**about those plans. Malloy Ex. 2 at 221:11-18.  He clarified that "it was very difficult to**
**understand what was real and what was not," because for example, Liquid purported to be**
**working with Gram Asia, but Gram Asia was not a Private Placement purchaser.  *Id*. at**
**221:19-222:8.  Ilya added that when he spoke with people about this issue, he "always" said**
**"if you could find out more information please let us know."  *Id*.  For example, in a message**
**between Ilya and one investor, the investor said he would investigate the purported Liquid**
**sale and let Ilya know if he found out anything.  Musoff Ex. 6 at TLGRM-017-00000520-**
**521.  Further, a contemporaneous communication between Ilya and Pavel on June 11,**
**2019, shows that Telegram not only did not know who was behind the purported Liquid**
**sale of Grams but was also considering a possible public response stating that "[they] have**
**nothing to do with this."  Malloy Ex. 7 at TLGRM-031-00000004.  Later in the**
**conversation, Ilya states: "We decided not to comment. . . .[I]f you comment once, you open**
**the door to ppl [sic] wondering why you're not commenting on everything else that comes**
**out going-forward."  *Id*. at TLGRM-031-00000005.  Moreover, Ilya and Pavel took comfort**
**in the fact that the cointelegraph article "laid out plain and clear" that the sale was not**
**legitimate.  *Id.*; *see also* "Sale of Telegram's Token GRAM on Exchange Liquid is Not**

**Official: Source", William Suberg, Cointelegraph (Jun. 11, 2019),**
**https://cointelegraph.com/news/sale-of-telegrams-token-gram-on-exchange-liquid-is-not-**
**official-source.  Further, Pavel testified:**

> On a few occasions we published statements that would inform
> the public that there had been a lot of fraudulent activity in
> relation to Grams and we warned our users and the public at
> large that all sales in ICOs involving Grams were fraudulent
> and not real in any case.  By this, I mean public sales in ICOs.
> And users should be looking at our official website,
> telegram.org, if they were seeking a confirmation that a certain
> sale indeed was related to Telegram.  And without such an
> official announcement from Telegram posted on its website, no
> report related to public sale of Grams should be trusted.  I
> believe that such announcements were helpful to warn the
> public from participating in activities such as the one conducted
> by the Liquid exchange.  In addition, in this specific case we
> were, in a certain way, grateful for the press to point out that a
> Liquid sale was not official and, based on that, I don't believe
> we published any additional announcement that would
> specifically relate to Liquid as similar topics have been
> addressed before in our public announcements, and this specific
> incident was addressed in some of the media reports.

**Musoff Ex. 1 at 348:6-349:4.**

**Further, Defendants note that on January 21, 2018, Pavel posted the following tweet: "If**
**you see or receive offers to 'buy Grams', let us know at http://t.me/ notoscam."  Drylewski**
**Ex. 16.  Additionally, in March 2018, Telegram provided the SEC with a list of**
**approximately 60 websites that Telegram believed had been fraudulently offering to sell**
**Grams.  *See* Drylewski Ex. 4 at 26.  Defendants also note that they took the necessary steps**
**to conclusively establish "reasonable care" under Rule 502(d) to ensure that the private**
**purchasers were not in any way transferring or assigning their interests under the**
**Purchase Agreements.  *See* Appendix A.  Finally, the cited information is irrelevant to**
**Plaintiff's claims in this action.**

157.    In February 2018, Perekopsky told an investor that Telegram "will go

easier on Russians at the second round" of the Offering and that the investor "can pack in there

all of those willing from the first round." (PX201 at TG-007-00000682.)

**Response to No. 157:    Disputed as an uncertified translation of a foreign language**
**document and thus inappropriate for purposes of summary judgment.  Plaintiff purports**

to rely on a foreign language document, yet fails to provide a certified translation.  Further, the cited information is irrelevant to Plaintiff's claims in this action.[2]

Dated:   New York, New York
         January 27, 2020

                                        Respectfully submitted,

                                         /s/ Scott D. Musoff
                                        George A. Zimmerman
                                        Scott D. Musoff
                                        Christopher P. Malloy
                                        Alexander C. Drylewski
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        Four Times Square
                                        New York, New York 10036
                                        Phone:  (212) 735-3000
                                        Fax:  (212) 735-2000
                                        george.zimmerman@skadden.com
                                        scott.musoff@skadden.com
                                        christopher.malloy@skadden.com
                                        alexander.drylewski@skadden.com

                                        *Attorneys for Defendants*

---

[2] *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 & n.9 (S.D.N.Y. 2016) ("foreign-language documents cannot be reviewed or relied on by the Court . . . unless they are accompanied by certified translations into English"); *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs., Inc.*, No. 10 Civ. 5715 (S.D.N.Y. Aug. 9, 2012) (denying cross-motions for summary judgment where the parties provided only uncertified translations of a Polish-language contract that was subject of the dispute).

## DEFENDANTS' REASONABLE CARE EFFORTS

| Rule 502(d)<br>Requirements | Defendants' Actions<br>Satisfying Requirements |
|---|---|
| "Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons"  17 C.F.R. § 230.502(d)(1) | <ul><li>Each Round 1 purchaser was required to represent and warrant that:<ul><li>"[T]he Purchaser is purchasing the Tokens for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof . . . .  The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Tokens."  Def. 56.1 ¶ 209.</li><li>"[T]he Purchaser is entering into this Purchase Agreement and purchasing Tokens on its own behalf and not for the benefit of any other person."  JX11 Schedule 2 § 19.</li></ul></li><li>Each Round 2 purchaser was required to represent and warrant that:<ul><li>"[T]he Purchaser is entering into the investment contract represented by this Purchase Agreement and purchasing this security and the Tokens for its own account, not for the benefit of any other person (other than any Purchaser Investor) and not with a view towards, or for resale in connection with, the sale or distribution thereof . . . The Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute this security or any of the Tokens."  Def. 56.1 ¶ 210.</li></ul></li></ul> |

| Rule 502(d) Requirements | Defendants' Actions Satisfying Requirements |
|---|---|
| | • The Purchase Agreements contained anti-assignment clauses:<br><br>○ "[N]o Party may assign the benefit of this Purchase Agreement (in whole or in part) or transfer, declare a trust of, pledge or otherwise dispose of in any manner whatsoever its rights and obligations under this Purchase Agreement . . . without the prior written consent of the Purchaser . . ."  Def. 56.1 ¶ 206.<br><br>○ "[T]he Purchaser agrees and undertakes that during the Restricted Period it shall not, without the prior written consent of [Defendants]:<br><br>  a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer, encumber or dispose of, directly or indirectly . . ., the investment contract represented by this Purchase Agreement . . . or any Tokens . . ., or publicly disclose the intention to make any such offer, sale, pledge or disposition . . ."<br><br>  Def. 56.1 ¶ 207.<br><br>• The Round 1 Purchase Agreements contained a further "lock-up" clause:<br><br>○ "[T]he Purchaser agrees and undertakes that during the Restricted Period it shall not, without prior written consent of the Issuer:<br><br>  a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, the investment contract represented by this Purchase Agreement or any Tokens . . . or |

| Rule 502(d)<br>Requirements | Defendants' Actions<br>Satisfying Requirements |
|---|---|
| | b) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the investment contract represented by this Purchase Agreement or any Tokens . . ."<br><br>Def. 56.1 ¶ 203.<br><br>• The above representations must be repeated at the time of the launch as a condition precedent to receiving Grams.  Def. 56.1 ¶ 212; JX11 § 3(d); JX12 3(d).<br><br>• Defendants limited the Private Placement to highly reputable, sophisticated investors to further ensure that the above representations would be honored.  Def. 56.1 ¶¶ 98-100, 188, 209.<br><br>• Defendants continued to follow up with purchasers where facts suggested they may have taken actions that resulted in breaches of their contractual representations, and in some instances, excluded purchasers from the Private Placement or canceled Purchase Agreements.  Def. 56.1 ¶¶ 133-158. |
| "Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available" 17 C.F.R. § 230.502(d)(2) | • The Purchase Agreements stated:<br><br>    o "[The Purchaser] has been advised that the investment contract represented by this Purchase Agreement is a security and that the offers and sales thereof have not been registered under any country's securities laws and, therefore, the investment contract represented by this Purchase Agreement cannot be resold except in compliance with each applicable country's laws." Def. 56.1 ¶¶ 209-210.<br><br>• The Purchase Agreements contained the legend set forth below. |

| Rule 502(d)<br>Requirements | Defendants' Actions<br>Satisfying Requirements |
|---|---|
| "Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities" 17 C.F.R. § 230.502(d)(3) | • The Purchase Agreements included a prominent legend stating:<br><br>**NOTICE TO RESIDENTS OF THE UNITED STATES**<br><br>THE OFFER AND SALE OF THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**U.S. SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF ANY U.S. STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT OR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.<br><br>Def. 56.1 ¶ 193. |