# Exhibit G

# Exhibit 1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK


SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
               Plaintiff,      )
                               ) 19 Civ. 9439 (PKC)
     - against -               )
                               )
TELEGRAM GROUP INC. and        )
TON ISSUER INC.,               )
                               )
               Defendants.     )
_____)


     **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**


          Videotaped deposition of PAVEL DUROV (as
30(b)(6) corporate representative of Defendants and
also in his personal capacity), Volume 1, taken on
behalf of Plaintiff at Hadef & Partners, LLC, Emaar
Square, Building 3, Level 5, Downtown Dubai, Dubai,
United Arab Emirates, beginning at 11:21 a.m. and
ending at 9:54 p.m., on Tuesday, January 7, 2020,
before LEAH WILLERSDORF, Member of the British
Institute of Verbatim Reporters, Accredited Verbatim
Reporter, Qualified Realtime Reporter - Level 2,
International Participating Member NCRA.


JOB No. 200107LWI
```

1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
12:52:37   1              MR. DRYLEWSKI:  Yes.
12:52:37   2   BY MR. TENREIRO:
12:52:38   3         Q.   At some point Telegram began working on
12:52:41   4   something that we've been referring to as the TON or
12:52:42   5   TON Blockchain project; is that correct?
12:52:47   6         A.   Yes, we started to explore this area
12:52:49   7   somewhere in early 2017.
12:52:51   8         Q.   In early 2017?
12:52:52   9         A.   Yes.
12:52:53  10         Q.   Okay.  And when was the time when Telegram
12:52:58  11   started doing a little bit more than exploring
12:53:00  12   actually, you know, sort of developing the TON
12:53:04  13   Blockchain -- let me start again.
12:53:05  14              Why don't I ask a question like this:  When
12:53:08  15   was the first time that Telegram used any,
12:53:12  16   for example, of the equipment it had for purposes of
12:53:14  17   the TON Blockchain?
12:53:34  18         A.   I think the earliest time could be summer
12:53:44  19   2017.
12:53:45  20         Q.   Summer 2017?
12:53:47  21         A.   (Nonverbal response.)
12:53:48  22         Q.   Okay.  Before -- at that time, did
12:53:53  23   Telegram's monthly expenditures on equipment change
12:53:55  24   in any way, or did they stay the same, or -- did they
12:54:01  25   change in any way?
```

65

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:46:12 | 1 | in the purchase agreements. |
| 14:46:13 | 2 | Q. Right. So there were two rounds and the |
| 14:46:16 | 3 | first round you refer to as a pre-sale, and the second |
| 14:46:19 | 4 | round as Stage A; is that correct? |
| 14:46:21 | 5 | A. Correct. |
| 14:46:22 | 6 | Q. At some point there was a contemplated |
| 14:46:24 | 7 | third round; is that right? |
| 14:46:25 | 8 | A. That is right. |
| 14:46:26 | 9 | Q. That was going to be called Stage B? |
| 14:46:29 | 10 | A. I believe that was the plan. |
| 14:46:31 | 11 | Q. And why was that plan -- that did not |
| 14:46:34 | 12 | occur, correct? |
| 14:46:37 | 13 | A. Correct, it did not occur. |
| 14:46:39 | 14 | Q. Why not? |
| 14:46:51 | 15 | A. Our plans related to subsequent rounds |
| 14:46:57 | 16 | were always subject to market conditions and other |
| 14:47:09 | 17 | conditions, such as regulatory environment. In this |
| 14:47:12 | 18 | case specifically, I believe the main factor was that |
| 14:47:22 | 19 | we didn't think that the timing was right, given the |
| 14:47:34 | 20 | degrees in interest towards blockchain projects in the |
| 14:47:39 | 21 | market at that time. |
| 14:47:43 | 22 | Q. Approximately when did you decide not |
| 14:47:45 | 23 | to do the Stage B? |
| 14:47:59 | 24 | A. I think we retained a large degree of |
| 14:48:09 | 25 | flexibility throughout this entire process because |

95

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
14:48:18   1   we had no ability to predict how the market would
14:48:30   2   change, but by late 2018 we considered Stage B highly
14:48:48   3   unlikely.
14:48:51   4           Q.   Okay.  And this Exhibit 42, you've signed
14:48:54   5   it, correct?  Or you -- yeah, you signed it, right,
14:48:58   6   on the last page?
14:48:59   7           A.   Yeah.  I believe I did, yeah.
14:49:01   8           Q.   Okay.  And did you review it before you
14:49:04   9   signed it?
14:49:04  10           A.   I had.
14:49:05  11           Q.   Okay.  And if I can direct your attention
14:49:07  12   to page 5 of 6 at the top, the item under "13" where
14:49:13  13   it says "Offering and Sales Amounts."
14:49:19  14                Do you see that?
14:49:19  15           A.   Yeah.
14:49:21  16           Q.   Okay.  And do you see where it says "Total
14:49:25  17   Offering Amount" 850 million, "Total Amount Sold"
14:49:31  18   850 million, "Total Remaining to be Sold" $0?
14:49:36  19                Do you see that?
14:49:37  20           A.   Correct.
14:49:37  21           Q.   Okay.  Earlier you talked about how, for
14:49:42  22   Stage A, the process of, I guess, completing the
14:49:45  23   offering took into the autumn of 2018.  Do you recall
14:49:50  24   telling me that?
14:49:58  25                MR. DRYLEWSKI:  Objection to form.
```

96

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:49:58 | 1 | THE WITNESS: I did tell you that some of |
| 14:50:00 | 2 | the purchasers failed to meet their obligations, yes. |
| 14:50:03 | 3 | BY MR. TENREIRO: |
| 14:50:04 | 4 | Q. Right. And I think you also said earlier |
| 14:50:06 | 5 | that Stage A was, I think you said, fully signed by |
| 14:50:09 | 6 | March -- |
| 14:50:11 | 7 | A. Yes. |
| 14:50:11 | 8 | Q. -- of 2018? |
| 14:50:13 | 9 | A. Correct. |
| 14:50:13 | 10 | Q. What did you mean by "fully signed"? |
| 14:50:22 | 11 | A. I meant that we had signed agreements from |
| 14:50:37 | 12 | the private purchasers that correspond to the amount |
| 14:50:48 | 13 | of 850 million. |
| 14:50:49 | 14 | Q. And is it signed -- so we'll get to the |
| 14:50:53 | 15 | purchase agreements but I think we'll agree that there |
| 14:50:56 | 16 | was a purchase agreement for the pre-sale and |
| 14:50:59 | 17 | a purchase agreement for Stage A, correct? |
| 14:51:01 | 18 | A. Yes. |
| 14:51:01 | 19 | Q. And when you said "signed agreements," |
| 14:51:04 | 20 | do you mean signed purchase agreements or was it |
| 14:51:06 | 21 | something else like letters of interest in that |
| 14:51:09 | 22 | answer? |
| 14:51:09 | 23 | A. I mean purchase agreements, so Stage A. |
| 14:51:11 | 24 | Q. Okay. So you had, by some point in March |
| 14:51:16 | 25 | of 2018, purchase agreements signed that would total |

97

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:57:06 | 1 | what you think is the main reason? |
| 15:57:17 | 2 | A. The main reason is to make the network as |
| 15:57:19 | 3 | secure and as decentralized as possible. |
| 15:57:21 | 4 | Q. And why was that reason not put in the |
| 15:57:23 | 5 | email -- or, I'm sorry, in the letter, really, to |
| 15:57:29 | 6 | investors? |
| 15:57:29 | 7 | A. Because this letter to potential investors |
| 15:57:35 | 8 | deals with the narrow topic of describing the current |
| 15:57:43 | 9 | status of the private placement and the process |
| 15:58:00 | 10 | associated with it, including the steps that potential |
| 15:58:03 | 11 | investors have to take to participate. It seems that |
| 15:58:11 | 12 | including technical details about the philosophy or |
| 15:58:29 | 13 | security or stability of the upcoming project was |
| 15:58:33 | 14 | redundant in this context. |
| 15:58:36 | 15 | Q. The next sentence says: |
| 15:58:42 | 16 | "Throughout the process we have emphasized |
| 15:58:44 | 17 | the importance of Grams being widely distributed, |
| 15:58:46 | 18 | which we believe will allow Grams to function as a |
| 15:58:49 | 19 | decentralized currency." |
| 15:58:51 | 20 | Do you see that? |
| 15:58:51 | 21 | A. Yes. |
| 15:58:51 | 22 | Q. Okay. Is that true, that throughout the |
| 15:58:54 | 23 | process Telegram emphasized the importance of Grams |
| 15:58:56 | 24 | being widely distributed? Is that statement true? |
| 15:59:03 | 25 | A. It is. We believe it is true because we |

124

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
15:59:06   1   tried to make sure that we have a wide range of
15:59:13   2   sophisticated purchasers that come from different
15:59:22   3   continents which could create the balance and
15:59:37   4   decentralization that we were looking to create.
15:59:38   5        Q.   If you go to the next page, please,
15:59:45   6   towards the top there is a sentence that says:
15:59:47   7             "As an illustration, if the round is
15:59:51   8   US$1.15 billion, the price to investors will be
15:59:54   9   approximately $1.45 per Gram."
15:59:57  10             Do you see that?
15:59:57  11        A.   Yes.
15:59:58  12        Q.   So there's a reference price in some of
16:00:00  13   the materials, including the White Paper; is that
16:00:11  14   correct?  For the price of Grams, I should clarify.
16:00:15  15             MR. DRYLEWSKI:  Objection to form.
16:00:19  16             THE WITNESS:  We used an exponential
16:00:21  17   formula, which was included in the primer and the
16:00:24  18   Technical White Paper, to be able to determine the
16:00:34  19   fair price per Gram during the private placement.
16:00:37  20   BY MR. TENREIRO:
16:00:38  21        Q.   And just to try to put it in some layman's
16:00:42  22   terms, is it fair to say that under the exponential
16:00:46  23   formula the first Gram was worth $0.10?
16:00:48  24        A.   I believe that's so, yes.
16:00:50  25        Q.   And an exponential increase for every
```

125

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
18:58:38   1              To avoid confusion, it may be worth
18:58:42   2   mentioning that an entity that has "Da Vinci" in its
18:58:53   3   name participated in the private placement, or an
18:59:21   4   entity affiliated with it, I think, could have
18:59:24   5   participated in the private placement, so this could
18:59:37   6   be that.
18:59:43   7              It could also be an effort of the fund
19:00:07   8   managers represented by Da Vinci Capital Group Ltd.
19:00:13   9   in the finders' fees agreement to introduce more high
19:00:36  10   net-worth individuals and sophisticated investors that
19:00:47  11   have also invested in one of their funds and to
19:01:08  12   introduce those people to the opportunity.
19:01:11  13   That may be it.
19:01:13  14              MR. DRYLEWSKI:  Since this didn't come
19:01:14  15   from us, do you have a date that you can represent for
19:01:17  16   this document?
19:01:18  17              MR. TENREIRO:  I think the document speaks
19:01:21  18   of "Price Per Token - 133," "Date of Investment - June
19:01:25  19   2018," "Token Unfreeze Date - December 2018."  That's
19:01:29  20   on the front page.
19:01:36  21   BY MR. TENREIRO:
19:01:36  22        Q.   So my question is, did Telegram stop
19:01:40  23   Da Vinci Capital from using a pitch deck of this
19:01:45  24   nature?
19:01:45  25              MR. DRYLEWSKI:  Objection to form.
```

184

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 19:02:00 | 1 | THE WITNESS: This question implies that |
| 19:02:02 | 2 | we were aware of those materials, and I am not certain |
| 19:02:07 | 3 | we were. Also, without knowing the exact source of |
| 19:02:17 | 4 | this document, it's difficult to say how exactly it |
| 19:02:42 | 5 | had been used or whether it is real. |
| 19:03:24 | 6 | In any case, we did not prepare those |
| 19:03:26 | 7 | documents and I don't think we ever authorized the use |
| 19:03:45 | 8 | of those documents, although if it deals with -- if it |
| 19:03:53 | 9 | deals with only those investors that were at the same |
| 19:03:59 | 10 | time investors in Da Vinci Capital, as it is stated |
| 19:04:08 | 11 | here at the top of this document, it would be logical |
| 19:04:24 | 12 | to assume that if this document was used, it was used |
| 19:04:27 | 13 | only internally among the shareholders of this fund |
| 19:04:59 | 14 | mentioned here. |
| 19:05:00 | 15 | BY MR. TENREIRO: |
| 19:05:00 | 16 | Q. Do you know of an entity called ▇▇▇ |
| 19:05:04 | 17 | ▇▇▇▇▇▇▇? |
| 19:05:11 | 18 | A. I'm not sure. |
| 19:05:12 | 19 | Q. Are they an investor in Telegram? |
| 19:05:15 | 20 | A. We can check. I'm not sure. |
| 19:05:19 | 21 | Q. Okay. |
| 19:05:24 | 22 | MR. DRYLEWSKI: Your reaction suggests |
| 19:05:26 | 23 | that he should know the answer to that -- |
| 19:05:29 | 24 | MR. TENREIRO: Well -- |
| 19:05:30 | 25 | MR. DRYLEWSKI: -- every investor in the |

185

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 19:11:07 | 1 | in any way. |
| 19:11:09 | 2 | MR. DRYLEWSKI:  In this particular |
| 19:11:10 | 3 | instance, yeah, I think that's a little too specific |
| 19:11:13 | 4 | for what we've done, but the witness can answer the |
| 19:11:16 | 5 | question. |
| 19:11:27 | 6 | THE WITNESS:  I think it is clear from the |
| 19:11:31 | 7 | email from John to Oleg that he's not happy with the |
| 19:11:37 | 8 | fact that this document is being distributed, even |
| 19:11:40 | 9 | though this document may have been only accessible to |
| 19:11:51 | 10 | LPs and investors of this fund. |
| 19:12:01 | 11 | I can say in my personal capacity that |
| 19:12:16 | 12 | I was never happy when people tried to interpret what |
| 19:12:29 | 13 | we were trying to do, and, as you can see from this |
| 19:12:42 | 14 | email exchange, we reached out to the parties that we |
| 19:12:55 | 15 | thought were involved in order to get explanations |
| 19:13:02 | 16 | from them. |
| 19:13:03 | 17 | BY MR. TENREIRO: |
| 19:13:04 | 18 | Q.   And did you -- you were talking about your |
| 19:13:06 | 19 | personal capacity; "I was never happy."  Okay.  You |
| 19:13:15 | 20 | reached out to the parties that were involved to get |
| 19:13:18 | 21 | explanations from them.  Other than doing that, did |
| 19:13:21 | 22 | you stop them in any other way from using marketing |
| 19:13:26 | 23 | materials? |
| 19:13:27 | 24 | MR. DRYLEWSKI:  Objection to form.  Again, |
| 19:13:39 | 25 | objection to scope. |

189

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
21:46:34   1              MR. TENREIRO:  Let me hand you what is
21:46:37   2   Exhibit 67, TLGRM-004-20.  Why do I feel like we
21:46:43   3   already did that one?
21:46:46   4              (Exhibit 67 marked for identification.)
21:47:16   5   BY MR. TENREIRO:
21:47:16   6         Q.   So my question, Mr. Durov, is who is
21:47:20   7   Moshe Joshua?
21:47:47   8         A.   My understanding is that Moshe is a friend
21:47:51   9   of Ilia.
21:47:51  10         Q.   Okay.  And did he make -- did he send sort
21:47:56  11   of emails trying to solicit investments in Telegram on
21:48:06  12   or around November of 2017?
21:48:25  13         A.   I'm not sure whether it qualifies as
21:48:32  14   solicitation.  All I can see here is Moshe trying to
21:48:39  15   be helpful, both to his friends from the investor
21:48:58  16   community that he think would benefit from taking part
21:49:10  17   in this opportunity, and probably to Ilia as his
21:49:20  18   friend, but it is hard to say.
21:49:26  19         Q.   Okay.  So you're saying your understanding
21:49:29  20   is that Mr. Joshua was introducing some of his friends
21:49:33  21   in the investor community, perhaps to Mr. Perekopsky,
21:49:38  22   in connection with the investment in Grams, correct?
21:49:54  23              So on the second page, the email on
21:49:57  24   November 16, 2017, he says:
21:49:58  25              "I am sending you a here an NDA for
```

242

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 21:49:58 | 1 | Telegram.  They are planning a private capital raise |
| 21:50:01 | 2 | and ICO related to their upcoming new technology |
| 21:50:05 | 3 | (TON)." |
| 21:50:05 | 4 | Do you see that? |
| 21:50:07 | 5 | A.   Yes. |
| 21:50:09 | 6 | Q.   "... I am personally going to be investing |
| 21:50:13 | 7 | in myself, otherwise I would not be sending this email |
| 21:50:16 | 8 | (as I have never before solicited investments)." |
| 21:50:18 | 9 | Do you see that? |
| 21:50:18 | 10 | A.   Yes. |
| 21:50:19 | 11 | Q.   Okay.  So did you have an understanding |
| 21:50:21 | 12 | that Mr. Perekopsky's friend was helping |
| 21:50:24 | 13 | Mr. Perekopsky connect with potential investors in |
| 21:50:29 | 14 | Grams? |
| 21:50:47 | 15 | A.   I don't know.  I think this is something |
| 21:50:49 | 16 | that Joshua just decided to do by himself in order to |
| 21:51:00 | 17 | be helpful and friendly to the parties involved. |
| 21:51:04 | 18 | Q.   So my question is did Telegram have an |
| 21:51:07 | 19 | understanding that Mr. Joshua decided to do this thing |
| 21:51:11 | 20 | in order to be helpful and friendly to the parties |
| 21:51:14 | 21 | involved? |
| 21:51:22 | 22 | A.   As a company, no, we didn't have this |
| 21:51:26 | 23 | understanding. |
| 21:51:26 | 24 | Q.   Okay.  But Mr. Perekopsky, I guess, |
| 21:51:29 | 25 | understood this? |

243

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:04:21 | 1 | MR. TENREIRO: Yeah. |
| 15:04:21 | 2 | MR. DRYLEWSKI: Which one? |
| 15:04:38 | 3 | MR. TENREIRO: 3. |
| 15:04:41 | 4 | MR. DRYLEWSKI: 3 we did not agree to. |
| 15:04:44 | 5 | MR. TENREIRO: Okay. Then you should |
| 15:04:46 | 6 | object. And 13 and 14. |
| 15:05:00 | 7 | MR. DRYLEWSKI: I'll object to scope. |
| 15:05:06 | 8 | MR. TENREIRO: Okay. |
| 15:05:07 | 9 | BY MR. TENREIRO: |
| 15:05:07 | 10 | Q. The answer, please? |
| 15:05:50 | 11 | A. Are you asking whether there were any |
| 15:05:51 | 12 | written policies in that regard? |
| 15:05:57 | 13 | Q. Any -- it can be just some directive that |
| 15:06:01 | 14 | the company gave employees with respect to whether |
| 15:06:03 | 15 | they were permitted to themselves affirmatively reach |
| 15:06:05 | 16 | out to digital-asset trading platforms? |
| 15:06:08 | 17 | MR. DRYLEWSKI: Same objection. |
| 15:06:15 | 18 | THE WITNESS: Well, I remember discussing |
| 15:06:17 | 19 | this topic with my colleagues sometime in 2018 and |
| 15:06:33 | 20 | we came to the conclusion, based on the input from our |
| 15:06:43 | 21 | engineering and legal teams, that it was too early and |
| 15:07:04 | 22 | unnecessary for us to engage in active communication |
| 15:07:09 | 23 | with the crypto exchanges at that moment in time. |
| 15:07:29 | 24 | It may also be worth noting that, |
| 15:07:41 | 25 | as a general matter, we saw little point in |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:07:50 | 1 | proactively reaching out to exchanges, because |
| 15:08:03 | 2 | throughout the last two years we have been receiving, |
| 15:08:14 | 3 | in one way or the other, incoming inquiries from |
| 15:08:30 | 4 | exchanges that seemed to be very keen and most likely |
| 15:08:47 | 5 | commercially motivated to be among the first exchanges |
| 15:08:57 | 6 | that would be able to list Grams after TON Blockchain |
| 15:09:08 | 7 | is launched. |
| 15:09:22 | 8 |       This is why, as a general matter, |
| 15:09:27 | 9 | we would, in the vast majority of cases, be approached |
| 15:09:34 | 10 | by exchanges and not vice versa. |
| 15:09:42 | 11 | BY MR. TENREIRO: |
| 15:09:42 | 12 |     Q.   And just so that we have a clear record |
| 15:09:44 | 13 | and are on the same page, is it your understanding |
| 15:09:46 | 14 | that a digital-asset platform like Coinbase, one of |
| 15:09:50 | 15 | the things that it does is it permits a user to |
| 15:09:53 | 16 | exchange fiat currency into digital assets?  Is that |
| 15:09:56 | 17 | your understanding? |
| 15:09:57 | 18 |       MR. DRYLEWSKI:  You're asking him |
| 15:09:58 | 19 | personally? |
| 15:09:59 | 20 |       MR. TENREIRO:  Yeah. |
| 15:10:02 | 21 |       MR. DRYLEWSKI:  Sorry, I hope you heard |
| 15:10:03 | 22 | that. |
| 15:10:10 | 23 |       THE WITNESS:  Yes, I think this is within |
| 15:10:12 | 24 | the scope of the services they provide. |
| | 25 | /// |

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 16:47:16 | 1 | This is why I am confused by this inquiry. |
| 16:47:29 | 2 | I assume that based on this and similar |
| 16:47:36 | 3 | inconsistencies, my colleagues may have classified |
| 16:47:53 | 4 | this email as inaccurate as the person writing this |
| 16:48:11 | 5 | may have been misled by someone; however, I am seeing |
| 16:48:53 | 6 | this email for the first time and am not aware of the |
| 16:49:08 | 7 | exact reaction of my colleagues after receiving this |
| 16:49:20 | 8 | email.  It may have been ignored as coming from |
| 16:49:38 | 9 | a party that is not a party with which we have any |
| 16:50:02 | 10 | contractual obligations and is an email written by |
| 16:50:16 | 11 | somebody who was misled, but it's hard to say with |
| 16:50:23 | 12 | certainty. |
| 16:50:23 | 13 | Q.   Well, let's take a step back.  Do you see |
| 16:50:25 | 14 | that this email is sent to an email address called |
| 16:50:31 | 15 | ir@telegram.org? |
| 16:50:32 | 16 | A.   Yes. |
| 16:50:32 | 17 | Q.   What is that email account? |
| 16:50:41 | 18 | A.   I think it was an email account created at |
| 16:50:43 | 19 | the beginning of the private placement process used |
| 16:50:56 | 20 | primarily for John and Shyam to be able to accept |
| 16:51:10 | 21 | indications of interest from potential purchasers. |
| 16:51:19 | 22 | Q.   Did Telegram post that email address |
| 16:51:22 | 23 | somewhere, or how would someone find/know to use that |
| 16:51:32 | 24 | ir@telegram.org? |
| 16:51:40 | 25 | A.   I think it was -- it's possible that it |

350