# Exhibit H

# Exhibit 2

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

    ---------------------------------------x
4  SECURITIES AND EXCHANGE COMMISSION,   )
                                         )
5                         Plaintiff,     ) 19 Civ. 9439 (PKC)
                                         )
6      v.                                )
                                         )
7  TELEGRAM GROUP INC. and               )
   TON ISSUER INC.,                      )
8                                        )
                          Defendants.    )
9  _____x

10

11

12               CONFIDENTIAL

13          VIDEOTAPED DEPOSITION OF

14              ILYA PEREKOPSKY

15             December 15, 2019

16

17               Taken at:

18       McKenna Nabarro Olswang LLP
                 Cannon Place
19             78 Cannon Street
               London, EC4N 6AF

20

21

22

23
   Reported by:
24  AILSA WILLIAMS,
    Certified Court Reporter
25  JOB No. 191215MWC

                                              1

CONFIDENTIAL

```
 1    other than Mr. Seydak?
 2            A.  I am sure that they do but my
 3    contact with the company is only Oleg.
 4            Q.  Are you familiar with an entity
 5    called Blackmoon Crypto?
 6            A.  Yes.
 7            Q.  What is Blackmoon Crypto?
 8            A.  To my knowledge, I am not very
 9    updated about the company, so I am just trying to
10    remember.  So when it was created, the idea was to
11    I think tokenize different assets, using their
12    Blockchain and cryptocurrencies.
13            Q.  Do you have any involvement with
14    Blackmoon Crypto?
15            A.  No.  Could you repeat the question?
16    Do I have now?
17            Q.  Do you have today?
18            A.  No, I don't.
19            Q.  Did you at any point?
20            A.  At the very beginning when Oleg was
21    founding this new company, he asked me to help at
22    a level of advisory, so he was organizing some
23    advisory board, you can say so, and he asked me to
24    support him more actually in public, like in this
25    new project.
```

32

CONFIDENTIAL

1          Q.  And what do you mean by "support him

2     in public"?

3          A.  I believe that we made some video

4     together that was published, so where we were

5     telling about the company.

6          Q.  And in that video were you

7     introduced as a co-founder of Blackmoon Crypto?

8          A.  I don't remember how I was

9     introduced.

10         Q.  Are you aware of any other public

11    video or document where you were put forth as a

12    co-founder of Blackmoon Crypto?

13         MR. DRYLEWSKI:  Objection to form.

14    Mischaracterizes the answer to the last question.

15    You can answer if that makes sense to you.

16         A.  I don't remember.

17         Q.  Have you ever introduced yourself to

18    anyone or represented that you were a co-founder

19    of Blackmoon Crypto?

20         A.  I don't remember how, to be honest,

21    I was introduced.

22         Q.  Do you consider yourself a

23    co-founder of Blackmoon Crypto?

24         A.  No.

25         Q.  How much did you invest in Blackmoon

33

CONFIDENTIAL

```
 1   think it is going to be a huge thing.
 2              MR. DRYLEWSKI:  Okay.  We can talk about
 3   that later.
 4         (Exhibit 17 marked for identification)
 5              MR. DRYLEWSKI:  Please take your time
 6   and familiarize yourself with the document before
 7   answering any questions.
 8              MS. STEWART:  Mr. Perekopsky, the court
 9   reporter just handed you what we have marked as
10   Exhibit 17.  The document does not have a Bates
11   number.  The cover page says "Blackmoon
12   Whitepaper", and there is a date of March 28,
13   2018.  As your counsel mentioned, take however
14   much time you need to look at the document and let
15   me know when you are ready.
16              MR. DRYLEWSKI:  Of course, if there are
17   particular pages you want him to focus on when he
18   reviews, please let him know.
19              MS. STEWART:  I mostly am going to be
20   asking you about the people that are mentioned
21   towards the end of the document, but take however
22   much time you need to look at the document.
23                   (Pause.)
24         A.  I think you can ask questions.
25         Q.  Okay, great.  Do you know what this
```

37

1    document is?

2              A.   Yes.

3              Q.   What is it?

4              A.   It is a whitepaper for Blackmoon

5    Crypto.

6              Q.   Have you seen it before?

7              A.   I think yes, when it was created I

8    saw it.

9              Q.   Did you review it before it was

10   published?

11             A.   I am not sure.

12             Q.   Who created it, if you know?

13             A.   My guess, it was created by the

14   founder of Blackmoon Crypto, Oleg Seydak.

15             Q.   I am going to turn your attention to

16   page 22 of 27.

17             A.   Okay.

18             Q.   Do you see in the top row your name,

19   and you are listed as co-founder?  Do you see

20   that?

21             A.   Yes.

22             Q.   Does this refresh your recollection

23   that you were represented to be a co-founder of

24   Blackmoon Crypto?

25             MR. DRYLEWSKI:  Objection to form.

                                                    38

CONFIDENTIAL

1           Q.   What about with Blackmoon Crypto,

2   same question?

3           MR. DRYLEWSKI:  Objection to form.

4           A.   As for Blackmoon Crypto, I never

5   received any money from them, so like salary or

6   dividends or something, so I never signed any

7   contract with Blackmoon Crypto.  So it was just a

8   verbal agreement with Oleg at the very beginning

9   that I would support the project and I would kind

10  of speak about the projects like a few times maybe

11  in public.  Then, as you noticed, I made maybe a

12  few introductions, right, like business

13  introductions, but this ended with nothing, so we

14  never signed any employment consultancy agreement.

15  I never received any like other means of payment

16  from Blackmoon Crypto.  When I came to the

17  agreement with Pavel that I would join Telegram, I

18  just stopped all my activities related to

19  Blackmoon Crypto at all.

20          Q.   When you say the agreement with

21  Pavel to join Telegram, do you mean when you

22  joined as a consultant or when you became an

23  employee?

24          A.   I would say in December 2017,

25  probably, I already -- maybe I like had a call or

79

CONFIDENTIAL

1    definitely soon after presale, right, but when we

2    started sending some particular materials, right,

3    it was probably a little bit later, but I don't

4    remember the dates.

5            Q.   Were you having discussions about

6    round two while round one was still happening?

7            A.   No.   No, but since we closed the

8    presale, I think these discussions started quite

9    soon.

10           Q.   When did round two close?

11           A.   I don't remember.   I don't remember

12   exactly.   It took a bit longer to close it but I

13   don't remember when.

14           Q.   Was it in 2018?

15           MR. DRYLEWSKI:   Objection to form.

16           A.   Yes.

17           Q.   Was it in the first half of 2018 or

18   the second half?

19           A.   I think it was signed in the first

20   half of 2018.

21           Q.   You mean all of the purchase

22   agreements were signed in the first half of 2018?

23           A.   I think so.

24           Q.   In 2017, did Moshe Joshua reach out

25   to potential investors on behalf of Telegram?

                                                    143

CONFIDENTIAL

```
 1              A.  When, sorry?

 2              Q.  In 2017.

 3              MR. DRYLEWSKI:  Objection to form.

 4              A.  I think he could make some

 5   introductions.

 6              Q.  Who asked him to do that?

 7              A.  He I think suggested doing that to

 8   me and I didn't object.  There were a lot of

 9   introductions at this time.

10              Q.  Had you discussed with Mr. Joshua

11   the TON project?

12              MR. DRYLEWSKI:  Objection to form.

13              A.  He definitely understood the idea,

14   yes.

15              Q.  When he made those introductions,

16   was he acting on behalf of Blackmoon Crypto?

17              MR. DRYLEWSKI:  Objection to form.

18              A.  I don't think it is accurate to say

19   so.  I think he was more acting as Moshe, like as

20   an individual.

21              Q.  Did Oleg Seydak introduce you or

22   anyone at Telegram to investors?

23              A.  I don't remember that.

24              Q.  When Mr. Joshua would introduce you

25   to investors, was it a matter of him putting you
```

144

CONFIDENTIAL

```
 1    would play in the TON project going forward?

 2              A.   Not that I remember.

 3              Q.   What about with Mr. Seydak?

 4              A.   Let me just remember.  No, I don't

 5    think we discussed their roles.  So I would say

 6    that since Oleg was also from this space, he was

 7    very excited about the project of course, and he

 8    wanted to help as much as he could, but probably

 9    that is it.

10              Q.   What do you remember about the

11    discussions, if any, that you had with Mr. Seydak

12    in let's say late 2017 going to 2018, about

13    whether he or Blackmoon Crypto or Blackmoon

14    Financial would be involved with TON?

15              A.   In 2018, I don't remember any

16    discussions.  So if I had any discussions they

17    were very preliminary, very early in

18    November/December 2017.  I don't remember any

19    discussions after that except that I think he

20    sometimes sent some ideas that he thought could be

21    helpful for us, and that is it.

22              Q.   And you don't remember even

23    generally what your discussions with him were in

24    2017 about his potential involvement in TON?

25              MR. DRYLEWSKI:  Objection to form.
```

147

CONFIDENTIAL

1  investors before they invested in either of the

2  two rounds.  We talked a little bit about

3  particular conversations that you had in meetings

4  in December 2017, but I now want to talk more

5  broadly.  Okay?

6           A.  Okay.

7           Q.  What types of questions do you

8  remember investors asking you?  I know it is a

9  broad question, but if there is categories that

10  you recall investors asking about, that would be

11  helpful.

12           A.  First of all I can say that most of

13  them tried to be helpful, so when they understood

14  the idea, the project, what we are doing, what we

15  are building, most of them -- many of them tried

16  to be helpful.  If they were funds, for example,

17  they were saying:  "Okay, we have different

18  companies in our portfolio, start-ups, and we

19  think that this Blockchain, TON and cryptocurrency

20  as a means of payment can potentially be very

21  interesting for our projects that we have in our

22  portfolio."  They said that if they become

23  investors, and even if they will not become

24  investors they still will do their best efforts

25  actually to help us in our effort to make this

159

CONFIDENTIAL

1  cryptocurrency widely used, and they suggested

2  that this help, if we were talking about funds,

3  through their portfolio companies, right, so they

4  were sometimes just mentioning some companies

5  saying "I think these companies can use your

6  cryptocurrency in the future".

7        Q.  What do you mean, "use your

8  cryptocurrency in the future"?

9        MR. DRYLEWSKI:  Objection to form.  If

10 you were not done answering the question, you can

11 finish your response before answering the new

12 question.

13       A.  Um hum.  So which question should I

14 finish first?

15       Q.  Why don't you answer my question

16 before we leave that topic and then you can

17 continue telling me what else you remember

18 investors asking about.

19       A.  For example, if one investor, let's

20 say, was a shareholder in a company like Uber,

21 right, and they said okay, it is interesting

22 because potentially they can integrate Gram as a

23 means of payment for their users, just one

24 example, so when we were talking about paying for

25 services, for goods, or maybe making some

160

CONFIDENTIAL

```
 1    transfers between companies, in this regard.

 2            Your previous question, what else did we

 3    discuss at the meetings basically, right?  What

 4    questions they asked?

 5            Q.  Right.

 6            A.  So they were asking of course

 7    questions about primer, about lock-ups, about

 8    price in the presale, in stage A, for the Gram,

 9    and about how complicated is this technology.  You

10    know, just logical questions based on materials

11    that they saw.  As I said, they always wanted to

12    be supportive.  So if these companies had some

13    background in Blockchains, they often said:

14    "Okay, let's test something once it is ready."  So

15    questions like that.  They were asking about since

16    the amounts were quite large, what is the safest

17    way to keep Grams.  They were asking my advice,

18    what do I think if we invest and get the Grams,

19    what do we think is the safest way to keep them.

20    They were asking about speed, whether we really

21    believed that the speed that we expected to

22    develop for the speed of transactions that we can

23    really do that.  So questions like that.

24            Q.  With which investor did you discuss

25    possibly integrating Grams into Uber?
```

161

CONFIDENTIAL

1          MR. DRYLEWSKI:  Objection to form.

2          A.  I didn't say that I was discussing

3    in particular Uber.  I was discussing another

4    company.  It is called I believe Get Taxi.

5          Q.  Get Taxi?

6          A.  Get Taxi.  It is a competitor to

7    Uber, quite a big company in -- I don't know where

8    but in Europe for sure.  I don't know about other

9    countries.  It is just one example.  I remember

10   discussing some marketplaces like fashion

11   marketplaces, like Farfetch, for example.  It is

12   also a big online shopping website.  So just

13   another example.  I believe that they were having

14   conversations, preliminary conversations, with

15   teams and these companies, and they expressed

16   interest in using Grams after the launch.

17         Q.  Just to make sure I understand, you

18   think that prospective investors were having

19   preliminary conversations with certain vendors

20   about using Grams after launch?

21         A.  Yes, in particular about these two

22   names that I mentioned, yes.  They had some

23   preliminary discussions.

24         Q.  What was the fashion marketplace you

25   mentioned?

                                                    162

CONFIDENTIAL

1           A.   I think it was Farfetch, and I think

2    one of the investors was a friend with somebody at

3    the top level of the company.

4           Q.   After these investors actually ended

5    up investing, did you have follow-up conversations

6    with them about these two vendors, Get Taxi and

7    Farfetch?

8           A.   With Farfetch they proposed

9    organizing meetings a couple of times.  We just

10   could not -- didn't find time to meet.  I think

11   the CEO of Get Taxi sent us an email saying that

12   they are planning to use Gram as a means of

13   payment, but when it is readily available.  I

14   think there was an email coming from him.

15          Q.   When did that email come?

16          A.   So everybody expected launch to

17   happen at the end of October, and I think this

18   email came afterwards, because they wanted to

19   clarify what they probably have to expect.

20          Q.   So it was a recent email?

21          A.   Yes.

22          Q.   Were there any other vendors that

23   Telegram had discussions with about those vendors

24   using Grams as a form of currency?

25          A.   We didn't proactively reach out to

                                                    163

CONFIDENTIAL

1  vendors.  It was in our opinion a little bit too

2  early.  Because when you speak to the company, if

3  you cannot really start doing something for this

4  company practically, it doesn't make sense to meet

5  them.  So once we launch, right, it makes sense,

6  at least when there was some testnet, right, maybe

7  at this stage it made sense at least that they

8  could see the technology, right, but before that

9  it just didn't make lots of sense to meet them,

10 because the technology was not completely ready

11 yet.

12          Q.  Did you meet with them once testnet

13 was out?

14          A.  I didn't meet them.  I am just

15 saying about investors, right.  So they mentioned

16 some vendors and they mentioned that they would do

17 their best efforts to help us in making this

18 currency widely spread.

19          Q.  And other than the two examples you

20 mentioned with Get Taxi and Farfetch, are there

21 other vendors that investors, as far as you know,

22 have reached out to?

23          A.  I will not remember the names of

24 companies right now.  I believe that in one of the

25 documents that we provided to you there was a list

164

CONFIDENTIAL

```
 1   why I got back to them saying that I received

 2   your -- maybe I was -- yes, so maybe I was a

 3   little bit explicit here about I wanted to stop it

 4   from happening, from reselling.  I believed that

 5   this party that showed me this agreement, they

 6   never signed it, because otherwise they would show

 7   it to me.  So I believed that after this message

 8   they probably quitted this idea of trying to

 9   resell, but anyway they denied it, right, as far

10   as I see.

11            Q.  So there is a denial in this text --

12            A.  Yes.

13            Q.  Was there any further conversation

14   or follow-up?

15            A.  No.  I mean, of course this

16   agreement was not signed.  Besides, anybody could

17   print anything, right, and put the name of this

18   entity there, right, but still, yes, I saw some

19   documents, or I read it -- I don't know whether it

20   was truth or not, but anyway I just made sure that

21   I did my best efforts in this particular case to

22   stop it from happening, if it was happening.

23            Q.  Other than these texts, did you do

24   anything else with respect to this issue with

25   Turiya Ventures?
```

196

CONFIDENTIAL

```
 1            MR. DRYLEWSKI:  Objection to form.
 2            A.  I think I didn't but, as you
 3  probably know, they signed the rep letters.  They
 4  were acting on their behalf when they were
 5  entering into purchase agreement, and we clearly
 6  stated that we are going to ask for another rep
 7  letter confirming the same before we issued Grams.
 8  So my assumption always was that, okay, I do my
 9  best efforts not to allow this happening, this
10  reselling, but anyway, since we tried to choose
11  sophisticated investors, and for us these rep
12  letters that they were signing at the beginning
13  and at the end, right, so at the signing, when
14  they were signing, before getting the Grams, these
15  rep letters actually meant something.  It is not
16  just papers.  So anyway I knew that they have to
17  sign it again, so for me basically this case was
18  more or less solved at this stage.
19            Q.  Did there come a point later when
20  Turiya asked you to refund one of their
21  allocations, and you can see that later in this
22  chat?
23            A.  Um hum.
24            MR. DRYLEWSKI:  Objection to form.
25            Q.  Did you say "yes"?
```

197

CONFIDENTIAL

```
 1   is launched, if it is in fact launched?
 2            A.  I don't know.  I don't know yet.
 3            Q.  Have you had any discussions with
 4   Mr. Durov or with anyone else at Telegram about
 5   whether or not you would stay after launch?
 6            A.  Not yet.
 7            Q.  I am handing you what we have marked
 8   as Exhibit 33, which is Bates TLGRM-004-000409.
 9   It appears to be a July 18, 2019 email to you from
10   someone at Gram Vault.  Let me know when you have
11   reviewed it, please.
12            A.  Okay.
13            Q.  Did you approve Gram Vault's request
14   that copies of purchase agreements be provided to
15   them?
16            A.  I don't think -- I don't remember.
17   I don't think so.
18            Q.  You don't think so?
19            A.  No.
20            Q.  Do you recall discussing this issue
21   with anyone?
22            A.  Yes, and I think our decision was
23   that --
24            MR. DRYLEWSKI:  Before you answer, if
25   that yes is that you discussed this with legal
```

217

**CONFIDENTIAL**

 1  counsel, then do not reveal the substance of any

 2  communications you had with legal counsel about

 3  this.  If it was someone other than lawyers, then

 4  you can talk about the substance of that

 5  conversation.  Is that clear?

 6          A.  Yes.  I think that we made a

 7  decision that if any particular investor reaches

 8  out to us, asking like our permission to disclose

 9  purchase agreements to, for example, some custody

10  companies, then we will deal on like each case

11  differently.  I remember that there were

12  particular investors reaching out to us later on

13  asking for our permission to disclose their

14  purchase agreement to some third parties.

15          Q.  Did you grant permission in those

16  cases?

17          A.  Yes, usually, yes, we granted, as

18  far as I remember.

19          Q.  I am handing you now what we have

20  marketed as Exhibit 34, which is Bates

21  TLGRM-004-0000418, an October 7, 2019 email at the

22  top.

23      (Exhibit 34 marked for identification.)

24          Please let me know when you are ready.

25          A.  Okay.

218

CONFIDENTIAL

1          Q.  What steps, if any, did you take to

2    try to distinguish the scams from the ones

3    involving investors?

4          A.  We didn't take any probably

5    proactive steps here.  When I heard something I

6    tried to learn more about that case, but in most

7    cases it was very difficult actually to understand

8    whether there was really somebody behind this

9    exchange, or this exchange was just selling

10   something that they don't have.

11         Q.  Were you aware of reports that the

12   Liquid exchange was selling Grams in partnership

13   with Gram Asia?

14         A.  Yes, I believe they even sent us an

15   email, this exchange sent us an email, telling us

16   about their plans.  And then later, in the news

17   actually, I read that they were trying to do

18   something like that.

19         Q.  What did you do when you received

20   the email from Liquid, informing you of their

21   plan?

22         A.  It was very difficult to understand

23   what was real and what was not, right.  Like, for

24   example, they said "Gram Asia", but this investor

25   is not on our list.  So when I just spoke with

                                                    221

CONFIDENTIAL

```
 1    people and they asked me something about that, I
 2    always told them:  "Okay, if you could find out
 3    more information, please let us know."
 4    Apparently, if you even had a call with Liquid,
 5    they wouldn't disclose, like, the real names of
 6    the people behind, but Gram Asia was not our
 7    investor, so it was not clear what we can do in
 8    this situation.
 9              Q.  Did you have a call with Liquid?
10              A.  No.  No, we didn't have.  As I
11    recall, we actually had a call with Liquid before
12    that, long before that, maybe a year before that.
13    Liquid reached out to us, suggesting help in
14    working with the Japanese regulator, about status
15    of Gram in Japan.  I think we had maybe one call
16    about that, but it didn't go anywhere, so it was
17    just a call and that is it.  Then I didn't hear
18    from them until the email, a year later.
19              Q.  I want to make sure I understood
20    your answer a couple of answers ago.  Did you say
21    that if you were to have a call with Liquid they
22    wouldn't reveal who their investors were?
23              A.  They would probably tell there is
24    Gram Asia, which is not our investor, and that is
25    another deadlock for us, right, because it doesn't
```

222

CONFIDENTIAL

```
 1              A.  Okay.
 2              Q.  This appears to be an email from an
 3    investor who is redacted to Mr. Parekh, which Mr.
 4    Parekh then forwards to you.  Is that right?
 5              A.  I think so.
 6              Q.  Do you recall receiving this email?
 7              A.  Yes, I remember.
 8              Q.  The email attaches what appears to
 9    be a marketing brochure from ATON, is that right?
10              A.  Yes.
11              Q.  And ATON was an investor in TON?
12              A.  Yes, they were an investor.
13              Q.  Were they an investor in the first
14    round or the second round, or both?
15              A.  I think in stage A, second.
16              Q.  Now, the presentation that is
17    attached is in Russian.  The cover email from the
18    investor describes the presentation and says that
19    it is offering Grams at a price of 1.33.  Do you
20    see that in the cover email?
21              A.  Yes.
22              Q.  Is that accurate, looking at the
23    presentation that is in Russian?
24              A.  Yes, this is the price here, 1.33,
25    yes.
```

CONFIDENTIAL

```
 1              Q.  Does the presentation also specify
 2    that investors would get 25 percent of their
 3    tokens in a period of three to nine months, 25
 4    percent more in six to 12 months, and then another
 5    25 percent in 12 to 18 months, and then the last
 6    tranche in 18 to 24 months?
 7              A.  I don't see where they specify this.
 8    I don't see a portion where it is referring to how
 9    much the investors would get over a period of
10    time.
11              MR. DRYLEWSKI:  Is there a particular
12    page you could direct the witness to?
13              MS. STEWART:  I wish I had that with me
14    but I don't, and I can't read Russian.
15              A.  I don't see this, anything about
16    this lock-up three months.
17              Q.  Okay.  You see that the cover email
18    says that --
19              A.  Yes, in the small text below.  I
20    have found it.
21              Q.  On what page?
22              A.  10.
23              Q.  I am sorry, which page?
24              A.  Page 10.
25              Q.  Is there a Bates number on that
```

225

CONFIDENTIAL

```
 1   page?
 2            A.   Very, very small, but yes.
 3            Q.   I see it.  Okay.  Does that
 4   describes the 25 percent over time that I asked
 5   you about a second ago?
 6            A.   But it is very vague, a little bit
 7   strange.
 8            Q.   Okay.  Did you do anything after
 9   receiving this email in May 2019?
10            A.   Yes, I remember I called this
11   company.  I spoke with them.  They denied the fact
12   that they were doing these deals.  And it was a
13   little bit awkward to me because, as I told you,
14   they were a stage A investor, and here it was a
15   price, 1.33, and about presale.  So they denied
16   the fact that they had been doing something like
17   that, and I didn't get any like evidence that they
18   really were trying to resell.
19            Q.   Did you send them a copy of this
20   brochure that is attached to Exhibit 35?
21            A.   I don't remember specifically that,
22   but I remember calling them.
23            Q.   Did Telegram take any action in
24   respect to ATON, after receiving this email in
25   May 2019?
```

                                                    226

CONFIDENTIAL

1          A.   Anyway, we will request a new rep

2    letter from them before we issued them any Grams.

3    I was not sure about this information, because

4    they already paid 1.33 per Gram.  It just didn't

5    make too much sense.  It didn't make a lot of

6    sense in selling at the same price what they

7    bought, so it was little bit inconsistent, this

8    offer.  So I made a call but they denied it, and

9    it was very unclear, everything here.  It was very

10   inconsistent, not very consistent.  It was a bit

11   inconsistent.

12          Q.   Are you aware of anyone else at

13   Telegram taking any steps in trying to confirm the

14   information that is in Exhibit 35?

15          A.   No.  No, probably it was just me

16   calling them.

17          Q.   Did ATON provide any services to

18   Telegram, putting aside the fact that they were an

19   initial purchaser -- strike that.

20          Did Telegram have any other business

21   relationship with ATON?

22          A.   ATON introduced us to a few

23   investors as well, in stage A.  That is what I

24   remember.  I don't remember any presale.  I think

25   they were from stage A.  I remember we were

                                                    227

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**