# Exhibit I

# Exhibit 3

CONFIDENTIAL

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
       ---------------------------------------x
 4                                            )
       SECURITIES AND EXCHANGE COMMISSION,    )
 5                                            )
                        Plaintiff,            ) 19 Civ. 9439 (PKC)
 6                                            )
           v.                                 )
 7                                            )
       TELEGRAM GROUP INC. and                )
 7     TON ISSUER INC.,                       )
 8                                            )
                        Defendants.           )
 9                                            )
       ---------------------------------------x
10
11
12                       CONFIDENTIAL
13                 VIDEOTAPED DEPOSITION OF
14                      SHYAM PAREKH
15                    December 10, 2019
16
17
18                       Taken at:
19     Skadden, Arps, Slate, Meagher & Flom (UK) LLP
                        40 Bank Street
20                      Canary Wharf
                       London, E14 5DS
21
22
23
       Reported by:
24     AILSA WILLIAMS,
       Certified Court Reporter
25     JOB No. 191210MWC
```

1

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL**

1     Q.  Is that answer just based on your
2  own experience and understanding as to the
3  rationale behind that decision?
4     A.  Yes.
5     Q.  As opposed to any conversations you
6  had with Mr. Hyman or anyone else at Telegram?
7     A.  Yes.  I would say these were
8  sophisticated investors again, and in the couple
9  of conversations where it came up, it was
10 relatively noncontroversial.
11    Q.  There was a second round of offering
12 which also raised $850 million, correct?
13    A.  That is correct.
14    Q.  And you were involved in contacting
15 and discussing with potential and actual investors
16 that second round as well, right?
17    A.  Yes.
18    Q.  And you are aware of the fact that
19 the second round had no lock-up provision
20 whatsoever, correct?
21    A.  I am aware of that.
22    Q.  Which meant, in simplistic terms,
23 that once the initial purchasers in the second
24 round received their Grams, they had no
25 restrictions on their ability to dispose of those

37

CONFIDENTIAL

1         The third, just for completeness, I
2    mentioned on the by and by, because many of my
3    discussions were custody related, I did mention
4    that my understanding was that a number of
5    custodians also offer OTC brokerage, so not
6    exchange but OTC brokerage solutions, that of
7    course qualify.  You have to speak to the
8    custodian to understand what they expect they can
9    and can't be able do.
10        Q.  Again, with the understanding that,
11   as you have testified, Ilya Perekopsky has been
12   primarily dealing with exchange related questions,
13   what is your understanding as to what
14   arrangements, if any, Telegram has helped
15   facilitate, in connection with the possible
16   purchase or sale of Grams after launch of the TON
17   Blockchain?
18        MR. DRYLEWSKI:  Object to form.
19        A.  I would say only the similar thing
20   as we ended up doing with custodians, which is we
21   introduced or he introduced on some of the chat
22   groups a couple of exchanges, in the same way that
23   I introduced a number of custodians to TON Labs
24   and other third parties who had assisted Telegram
25   with the testing, and therefore were familiar with

162

**CONFIDENTIAL**

1   the code, in order to sort of let those parties
2   speak bilaterally, to help answer technical
3   questions, because Telegram itself didn't have the
4   resources and the bandwidth to work with either
5   those exchanges or custodians.
6          Q.  What efforts has Telegram undertaken
7   to sign up vendors who would accept Grams as a
8   form of payment for goods or services?
9          MR. DRYLEWSKI:  Object to form.
10         A.  I can't comment.  I think you would
11  have to ask Ilya.
12         Q.  Are you aware of any vendors who
13  have agreed as of today to accept Grams as a form
14  of payment for any goods or services?
15         A.  I am not aware.
16         Q.  Have you seen in the news, for
17  example, that certain law firms have agreed to
18  accept Bitcoin in payment of legal bills?
19         A.  I actually have not seen that.
20         MR. DRYLEWSKI:  It's not Skadden.
21         MR. McGRATH:  That was my next question
22  and I don't think this requires the revealing of
23  any attorney/client communications, but counsel
24  will tell me otherwise.  Has Skadden agreed to
25  accept Grams in payment for legal --

163

CONFIDENTIAL

1  email from ███████████ to Shyam Parekh on
2  Saturday, April 14, 2018.
3          MR. DRYLEWSKI:  Please feel free to look
4  over the entire document before you answer any
5  questions.
6          A.  Okay.
7          Q.  Just sort of for reference along
8  here, the second page of the document has an email
9  dated April 14, 2018, also from ███████████ to
10 Shyam.  Do you see that?  Do you recognize this
11 communication?
12         A.  Yes, I recognize the correspondence.
13         Q.  Who is ███████████?
14         A.  He is with one of the investors,
15 ███████████████████████████.
16         Q.  On the second page of this document,
17 second page of the email chain, he is attaching a
18 document that has the wording "BNK to the
19 future.com invest in the future of finance", and
20 there is a reference to BF tokens on the second
21 page.  His email says:
22         "I just wanted to put on your radar, not
23 sure if it is a scam or not, but someone is
24 running an online syndicate to invest in TON."
25         Then he provides a link.  Do you recall

205

CONFIDENTIAL

```
 1   getting that email?
 2           A.  I do.
 3           Q.  It appears you asked him:
 4           "Thanks, ▓▓▓▓▓.  Will look into.  Out
 5   of interest, how did you come across these guys
 6   and their website."
 7           He responds:  "It was just a cold email
 8   to my personal email address."
 9           What if anything did you do to look into
10   that information that you received?
11           MR. DRYLEWSKI:  Objection to form.  You
12   are asking him personally or Telegram?
13           Q.  You personally, if you did anything.
14   If you didn't you can tell me.
15           A.  So I think, to shortcut this, this
16   entity, Bank to the Future, made an application
17   for the second round, the stage A round.  They
18   filled in all the forms.  They provided their
19   various purchase agreements signed.  KYC
20   information, et cetera.  We then received two
21   communications regarding them.  One was this, from
22   ▓▓▓▓▓▓, and prior to that was a notification from
23   ▓▓▓▓▓▓▓▓▓▓, who as you know also conducted a
24   separate review of KYC information.  So they took
25   the files from us and from our KYC adviser and
```

206

```
 1  then reviewed them separately, and pointed out a
 2  similar thing as ▌▌▌▌ did to me, namely that
 3  they seem to be operating essentially a syndicate
 4  on behalf of underlying purchasers.  So to answer
 5  your question, I spoke to I believe it was ▌▌
 6  ▌▌▌▌▌▌▌▌ and asked him what that was about.  It
 7  then was established that he seemed to be under
 8  some sort of misunderstanding, and as a result we
 9  rejected them as a purchaser.
10          Q.  When you say you rejected, you mean
11  Telegram rejected Bank to the Future as a
12  purchaser.  Had they already entered into a
13  purchase agreement?
14          A.  They had signed on their side but it
15  had not been executed.
16          Q.  All right.  My understanding was
17  that the second round purchase agreements were
18  signed before the end of March 2018, is that
19  correct?
20          A.  Two things.  One, I don't know
21  exactly the date when they signed but, for
22  completeness, all the purchasers were essentially
23  asked to send back a full pack, KYC information,
24  rep letter and a signed purchase agreement.  Then,
25  if they were accepted, we would return executed
```

207

1  attention to the first page of this document.  The
2  top email, which is from Nicolas de Bontin to you
3  on November 17, 2018, copying some other people.
4  He says:
5          "Great speaking with you earlier today.
6  I have attached the deck highlighting the details
7  of this potential partnership, followed by an
8  overview of our custody platform."
9          I will just ask you to read through the
10 rest of that email to refresh your recollection as
11 to what was being discussed there.  Let me know
12 when you have finished.
13         A.  I have read it, yes.
14         Q.  Do you remember receiving this email
15 from Mr. De Bontin?
16         A.  Yes, I do.
17         Q.  Do you remember the conversation you
18 had with him referenced in this email?
19         A.  Yes, I do.
20         Q.  Can you describe generally what the
21 topics of that conversation were?
22         A.  At a high level, it was follow-up on
23 the introduction from ▇▇▇, alluding to the fact
24 that others like ▇▇▇▇▇▇ had made similar
25 comments about wanting or needing a secure storage

212

1    solution for their Grams, and hence referring
2    again to Coinbase, as well as others, and
3    therefore saying to Nick: "It would be
4    interesting. It is still very early." It is
5    still quite early at that stage. It was
6    November 2018. It looked unlikely that we were
7    going to meet the end of year deadline. So I made
8    clear that this was a preliminary conversation,
9    but nevertheless it would be interesting to hear
10   what their capabilities were, in terms of custody,
11   and what sort of information they would require in
12   due course in order to be able to support Grams on
13   their platform, by way of providing custody to
14   investors.
15           Q.  Do you know whether Coinbase is
16   currently prepared to support Grams on their
17   network?
18           MR. DRYLEWSKI:  Objection to form.
19           A.  The conversations resumed a few
20   months ago, as we finally did approach the
21   expected launch at the end of October, and they
22   had a team, including a technical team, which they
23   assigned to working on this. How chose they got
24   or whether they in fact got to the finish line I
25   can't say, for obvious reasons. The discussions

213

```
 1   broke off in mid-October.
 2           Q.  Why did they break off in
 3   mid-October?  Because of the lawsuit?
 4           A.  Correct.
 5           Q.  Were they communicating with anyone
 6   other than yourself at Telegram regarding their
 7   efforts to support the Grams?
 8           A.  I believe someone else, not Nick,
 9   and Ilya may have had a conversation, but I was
10   not party to that and I am afraid I don't remember
11   who the name was.  I think it was very conceptual
12   because Ilya deferred further conversations to me
13   and Nick.
14           Q.  Sorry, Ilya deferred --
15           A.  Further conversations with Coinbase
16   to me, with this gentleman Nicolas de Bontin.  If
17   I can just add one thing before we move on from
18   this document.  Nick uses this phrase in the
19   beginning, "potential partnership", and later on
20   uses "partnership".  I was at pains to stress to
21   Nick that we, Telegram, doesn't, as a matter of
22   course, and to my knowledge never has, nor is in
23   the context of custody looking for partners, that
24   the conversation was exploratory in order to
25   understand their capabilities and that we were
```

214

CONFIDENTIAL

1   referred Ledger Ventures to TON Labs.  I may have
2   referred Coinbase.  I am not sure whether I
3   referred Coinbase to TON Labs or it is possible
4   Coinbase, Ilya suggested refer to a different set
5   of developers.  Yes, those would be the three that
6   I specifically remember; Coinbase, Ledger,
7   Anchorage.
8           Q.  Further up this email chain, you
9   sent Michelle an email on August 6, 2019,
10  basically checking in to see how she is getting on
11  with Alexander and the TON Lab guys.  Do you see
12  that email?
13          A.  Yes.
14          Q.  She responds:  "Thanks for checking
15  in.  Thanks for the referral to Atomico in the
16  UK."  What was that reference to Atomico?
17          A.  Atomico was a purchaser in the
18  presale round, first round, UK fund, and they had
19  been -- this is all in your emails -- they had
20  sent repeated requests for calls and emails to
21  discuss this custody question, because they, under
22  I assume some queries from their auditors, were
23  trying to understand how are we going to find a
24  secure way that satisfies our auditors as to how
25  we are going to store these Grams, for potentially

247

CONFIDENTIAL

1  years?  So partly at the encouragement of folks
2  like Atomico, you know, I was very keen to see
3  third parties develop custody solutions, so that
4  my investors, quote/unquote "my investors" had
5  options out there.  After the call with Anchorage,
6  when I had another approach from Atomico, in
7  August, I said to Atomico:  "Look, there is a few
8  folks who seem to be working on custody
9  solutions", and I gave them a few names, including
10 Anchorage, which is obviously what she is
11 referring to.
12         (Exhibit 12 marked for identification)
13         Q.  I am handing you a document marked
14 Exhibit 12.  It is an email exchange chain.  The
15 first Bates stamp is SEC AL271 through 275.  I
16 will ask you to briefly review this email chain
17 and I will start working from the back forward.
18         MR. DRYLEWSKI:  Take your time to review
19 the whole chain, as much of it as you need.
20         A.  Okay.  I have read it.
21         Q.  I am going to focus your attention
22 on the first two pages of the email chain, and
23 particularly there is an email on page 1, in the
24 middle of the page, July 23, 2019, from Michelle
25 Lai at Anchorage, addressed to "Hi Oleg and team".

248

```
 1  partners is a reference to the first section, i.e.
 2  with the testing.
 3          Q.  She responds to you, thanking you,
 4  and then you have a following email where you say
 5  in part, this is on September 13, 2019:
 6          "To clarify, TON Labs are an independent
 7  company who have been assisting Telegram with the
 8  testing.  They are not a subsidiary or affiliate
 9  of Telegram.  So if you want to have a discussion
10  about your Grams it might be better for you and I
11  to speak."
12          Why did you feel it necessary to make
13  that clarification there?
14          A.  Because I wanted them -- so they
15  were looking clearly for a reference.  I wanted
16  Monica not to have any -- two things.  One, if
17  they were to provide that reference I wanted it to
18  be clear to her that this was not something that
19  was coming from Telegram.  Number two, I was keen
20  that she didn't disclose anything that ultimately
21  she might consider sensitive regarding their own
22  position and what they are thinking about it or
23  doing about it, because obviously that is not
24  relevant to TON Labs, as an independent company.
25          Q.  Did anyone instruct you or tell you
```

257