# Exhibit P

# Exhibit 1

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

```
 1               UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
                        Plaintiff,   )
 6                                    ) 19 Civ. 9439 (PKC)
          - against -                 )
 7                                    )
     TELEGRAM GROUP INC. and          )
 8   TON ISSUER INC.,                 )
                                      )
 9                      Defendants.  )
     _____)
10

11      **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12

13              Videotaped deposition of PAVEL DUROV (as

14   30(b)(6) corporate representative of Defendants and

15   also in his personal capacity), Volume 1, taken on

16   behalf of Plaintiff at Hadef & Partners, LLC, Emaar

17   Square, Building 3, Level 5, Downtown Dubai, Dubai,

18   United Arab Emirates, beginning at 11:21 a.m. and

19   ending at 9:54 p.m., on Tuesday, January 7, 2020,

20   before LEAH WILLERSDORF, Member of the British

21   Institute of Verbatim Reporters, Accredited Verbatim

22   Reporter, Qualified Realtime Reporter - Level 2,

23   International Participating Member NCRA.

24

25   JOB No. 200107LWI
```

1

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

16:54:35  1               MR. TENREIRO:  I'll try to keep 15 minutes

16:54:36  2  in mind.

16:54:37  3               MR. DRYLEWSKI:  Thank you.

16:54:38  4               MR. TENREIRO:  Let's mark 46, please.

16:54:42  5               (Exhibit 46 marked for identification.)

16:54:45  6               MS. CHARMANI:  Jorge, could you tell me

16:54:47  7  the Bates number, please?

16:54:49  8               MR. TENREIRO:  Yeah, 15-17.  It's the

16:54:52  9  sales agent services agreement with Pacific Spirit.

16:55:10 10               MS. CHARMANI:  Thank you.

16:55:14 11  BY MR. TENREIRO:

16:55:14 12      Q.   So, Mr. Durov, my question, with respect

16:55:16 13  to this document, is going to be if you recognize your

16:55:19 14  signature on the third page?

16:55:29 15      A.   Yes.

16:55:29 16      Q.   Okay.  And is it fair to say that

16:55:33 17  Telegram -- at least one Telegram entity entered into

16:55:36 18  an agreement on or around January 15, 2018, with an

16:55:40 19  entity called Pacific Spirit Ltd.?

16:55:45 20      A.   I think this is what this agreement says,

16:55:54 21  yes.

16:55:54 22      Q.   Okay.  I just want to get some context

16:55:56 23  from you.  What was the purpose of this agreement?

16:55:59 24  I understand there's a clause there that says

16:56:03 25  "Purpose," but from your perspective what was the

146

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 16:56:06 | 1 | purpose of the agreement? |
| 16:56:07 | 2 | MR. DRYLEWSKI:  Objection to form. |
| 16:56:08 | 3 | Just to clarify, his personal? |
| 16:56:11 | 4 | MR. TENREIRO:  No, Telegram's. |
| 16:56:13 | 5 | MR. DRYLEWSKI:  Thank you. |
| 16:56:13 | 6 | MR. TENREIRO:  Telegram's. |
| 16:57:19 | 7 | THE WITNESS:  I think at that period of |
| 16:57:21 | 8 | time we discussed with Ilia potential terms of our |
| 16:57:44 | 9 | work together, including, of course, the rights and |
| 16:58:12 | 10 | guarantees that he would enjoy as a person working |
| 16:58:21 | 11 | with me on the TON-related offering, and this |
| 16:58:42 | 12 | agreement represents a draft that was created in the |
| 16:58:53 | 13 | process of trying to find an appropriate way to |
| 16:59:03 | 14 | achieve this goal; however, this was an early version |
| 16:59:25 | 15 | of our potential -- of the terms of our potential |
| 16:59:43 | 16 | collaboration. |
| 16:59:47 | 17 | It was never acted upon and was discarded, |
| 16:59:58 | 18 | replaced by, I think, another document. |
| 17:00:04 | 19 | BY MR. TENREIRO: |
| 17:00:05 | 20 | Q.   Okay.  So Pacific Spirit, do you know what |
| 17:00:15 | 21 | that is?  Pacific Spirit Limited? |
| 17:00:22 | 22 | A.   I understand it is an offshore entity |
| 17:00:26 | 23 | based in Seychelles and my understanding at the time |
| 17:00:30 | 24 | was that it was a vehicle used by Ilia to make sure he |
| 17:00:54 | 25 | could structure the terms of our work together in a |

147

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18:30:48  1          MR. DRYLEWSKI:  Objection to form.

18:30:57  2          THE WITNESS:  The nature of this

18:31:09  3  arrangement related to finders' fees implied that the

18:31:27  4  other party would introduce us to potential purchaser.

18:31:50  5  We never authorized any third party to use any

18:32:02  6  marketing materials or promotional materials for the

18:32:07  7  purposes of this activity.

18:32:15  8  BY MR. TENREIRO:

18:32:16  9       Q.   Okay.  But -- so were you aware of ATON's

18:32:19 10  marketing materials?

18:32:21 11          MR. DRYLEWSKI:  Objection to form.

18:32:32 12          THE WITNESS:  I think it's important to

18:32:33 13  clarify, as I mentioned before, that there are

18:32:37 14  different legal entities that starts with "ATON" and

18:32:44 15  we can easily get confused here.

18:32:47 16          To answer your question, I think I have

18:32:55 17  reviewed a document that is related to what you are

18:33:00 18  describing in preparation for this deposition.

18:33:05 19          MR. TENREIRO:  Let's mark --

18:33:06 20          MR. DRYLEWSKI:  To clarify, is your

18:33:08 21  question whether he, meaning Telegram --

18:33:09 22          MR. TENREIRO:  Telegram.

18:33:10 23          MR. DRYLEWSKI:  -- was aware at the

18:33:11 24  time --

18:33:11 25          MR. TENREIRO:  At any time.

176

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 19:45:30 | 1 | Group Limited. |
| 19:45:31 | 2 | Q.   Right, so -- which is also listed as a |
| 19:45:34 | 3 | beneficial owner in this form that we are looking at |
| 19:45:37 | 4 | of Disruptive Era? |
| 19:45:54 | 5 | A.   Yes, I think it's not unimaginable that |
| 19:45:58 | 6 | certain legal entities can share beneficiaries. |
| 19:46:03 | 7 | Q.   Sure.  My question is, in Exhibit 43 |
| 19:46:15 | 8 | we see that Telegram had already entered into a |
| 19:46:17 | 9 | purchase agreement with Disruptive Era in March of |
| 19:46:21 | 10 | 2016, which is before the finder's fee agreement with |
| 19:46:27 | 11 | Da Vinci Capital in June.  So why is Da Vinci Capital |
| 19:46:31 | 12 | billing Telegram, then, in September and November for |
| 19:46:37 | 13 | finding a fund that Telegram already had a |
| 19:46:40 | 14 | relationship with?  That's what I don't understand. |
| 19:46:44 | 15 | MR. DRYLEWSKI:  I'm going to object. |
| 19:46:46 | 16 | Object to the scope. |
| 19:47:35 | 17 | THE WITNESS:  As you can see from this |
| 19:47:37 | 18 | document, Oleg Jelezko is not the sole beneficiary of |
| 19:47:56 | 19 | Disruptive Era Fund SP, and I guess that Oleg was |
| 19:48:41 | 20 | helpful in having other beneficiaries of that fund |
| 19:48:59 | 21 | enter into additional purchase agreements later in |
| 19:49:10 | 22 | 2018, for which he, as a manager representing Da Vinci |
| 19:49:25 | 23 | Capital Group Limited, was entitled to a fee in |
| 19:49:30 | 24 | accordance to the finder's fee agreement. |
| | 25 | /// |

202

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 19:56:14 | 1 | October 2018. |
| 19:56:23 | 2 | A.   Yes. |
| 19:56:23 | 3 | Q.   Do you see that? |
| 19:56:24 | 4 | A.   I see that. |
| 19:56:25 | 5 | Q.   Okay.  These three documents together, can |
| 19:56:26 | 6 | you explain to me, as a corporate representative of |
| 19:56:29 | 7 | Telegram, what's happening here when, in February, |
| 19:56:34 | 8 | Space Limited has entered into a purchase agreement, |
| 19:56:37 | 9 | signed by Marie Elia, and then in June you enter into |
| 19:56:41 | 10 | a finder's fee agreement with Gem Limited signed by |
| 19:56:45 | 11 | the same person, who then bills you in October for |
| 19:56:48 | 12 | a finder's fee agreement for an entity, Space |
| 19:56:51 | 13 | Investments, that Telegram already had a relationship |
| 19:56:54 | 14 | with? |
| 19:57:02 | 15 | A.   Yes.  First of all, I think it's worth |
| 19:57:06 | 16 | noting that in the small financial world in Russia, |
| 19:57:24 | 17 | it is not unimaginable for the same director to work |
| 19:57:33 | 18 | at different legal entities, so I am not surprised by |
| 19:57:40 | 19 | the fact that we have the same person signing |
| 19:57:51 | 20 | different agreements. |
| 19:57:59 | 21 | Second, as I mentioned earlier when we |
| 19:58:08 | 22 | were discussing the question related to Disruptive Era |
| 19:58:21 | 23 | Fund, those legal entities investing in Telegram may |
| 19:59:00 | 24 | have multiple beneficiaries, some of which could |
| 19:59:19 | 25 | have been hesitant to increase their interest in |

206

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 19:59:35 | 1 | Grams, and even though this investor participated in |
| 20:00:09 | 2 | the private investment -- sorry, placement prior to |
| 20:00:22 | 3 | summer 2018, additional efforts may have been required |
| 20:00:48 | 4 | to reintroduce those beneficiaries to the offering, |
| 20:01:03 | 5 | to make them aware that there was still an opportunity |
| 20:01:11 | 6 | to invest due to the fact that certain purchasers |
| 20:01:15 | 7 | failed to meet their contractual obligations.  And we |
| 20:01:27 | 8 | thought it was fair, and in the spirit of the finder's |
| 20:01:31 | 9 | fee agreement, to reward those efforts. |
| 20:01:36 | 10 | Q.    And what sort of policies or checks did |
| 20:01:39 | 11 | Telegram have in place to make sure that further |
| 20:01:43 | 12 | efforts had in fact been required before paying these |
| 20:01:46 | 13 | finders' fees? |
| 20:01:47 | 14 | MR. DRYLEWSKI:  Before?  I'm sorry, |
| 20:01:48 | 15 | I missed it. |
| 20:01:49 | 16 | BY MR. TENREIRO: |
| 20:01:49 | 17 | Q.    Before paying these finders' fees, with |
| 20:01:52 | 18 | respect to entities that already had a relationship |
| 20:01:54 | 19 | with Telegram? |
| 20:01:55 | 20 | A.    As you can see, looking at the dates when |
| 20:02:24 | 21 | those events were taking place, we had waited |
| 20:02:52 | 22 | a substantial amount of time to allow the potential |
| 20:03:06 | 23 | purchasers to -- that have entered into the purchase |
| 20:03:11 | 24 | agreements, to transfer funds and also to allow the |
| 20:03:15 | 25 | existing investors to increase their interest in Grams |

207

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:10:13 | 1 | BY MR. TENREIRO: |
| 15:10:14 | 2 |     Q.   Okay.  Now, in order for the vision of TON |
| 15:10:17 | 3 | and Grams that Telegram has, is it necessary for Grams |
| 15:10:21 | 4 | to trade on exchange of digital-asset platforms such |
| 15:10:31 | 5 | as Coinbase? |
| 15:10:32 | 6 |        MR. DRYLEWSKI:  Objection; scope, and |
| 15:10:39 | 7 | form. |
| 15:11:04 | 8 |        THE WITNESS:  The vision for Grams is that |
| 15:11:06 | 9 | of a mass-market, multipurpose currency used by a big |
| 15:11:23 | 10 | number of consumers.  This currency would be not |
| 15:11:36 | 11 | unlike other popular cryptocurrencies and digital |
| 15:11:51 | 12 | currencies, and in that sense, for consumers to be |
| 15:12:07 | 13 | able to transact in Grams freely and use Grams as |
| 15:12:13 | 14 | a means of exchanging value, there would need to be |
| 15:12:23 | 15 | certain services or platforms that would allow |
| 15:12:36 | 16 | consumers to obtain Grams from the market; so it was |
| 15:12:57 | 17 | our expectation that just like currencies such as |
| 15:13:05 | 18 | Bitcoin and Ethereum are listed and traded on |
| 15:13:23 | 19 | exchanges such as Coinbase and similar services, Grams |
| 15:13:49 | 20 | would be likewise convertible to other currencies, |
| 15:13:59 | 21 | as we believe it is a fundamental characteristic of |
| 15:14:08 | 22 | currency to be exchangeable. |
| 15:14:13 | 23 |       It must also be noted that from a purely |
| 15:14:23 | 24 | theoretical perspective, there could be other ways for |
| 15:14:35 | 25 | consumers to exchange one currency into the other |

324

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
16:38:30   1   BY MR. TENREIRO:
16:38:31   2        Q.   Did Telegram issue any sort of public
16:38:33   3   statement about what was happening with the Liquid
16:38:37   4   exchange?
16:38:38   5             MR. DRYLEWSKI:  Objection; scope.
16:38:56   6             THE WITNESS:  On a few occasions
16:39:03   7   we published statements that would inform the public
16:39:08   8   that there had been a lot of fraudulent activity
16:39:22   9   in relation to Grams and we warned our users and
16:39:42  10   the public at large that all sales in ICOs involving
16:40:03  11   Grams were fraudulent and not real in any case.
16:40:28  12   By this, I mean public sales in ICOs.  And users
16:40:35  13   should be looking at our official website,
16:40:44  14   telegram.org, if they were seeking a confirmation that
16:40:59  15   a certain sale indeed was related to Telegram.
16:41:14  16             And without such an official announcement
16:41:17  17   from Telegram posted on its website, no report related
16:41:35  18   to public sale of Grams should be trusted.  I believe
16:41:46  19   that such announcements were helpful to warn the
16:42:01  20   public from participating in activities such as the
16:42:17  21   one conducted by the Liquid exchange.
16:42:31  22             In addition, in this specific case
16:42:55  23   we were, in a certain way, grateful for the press
16:43:09  24   to point out that a Liquid sale was not official and,
16:43:31  25   based on that, I don't believe we published any
```

348

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16:43:43   1   additional announcement that would specifically relate

16:43:49   2   to Liquid as similar topics have been addressed before

16:44:05   3   in our public announcements, and this specific

16:44:16   4   incident was addressed in some of the media reports.

16:44:24   5                   (Exhibit 77 marked for identification.)

16:44:28   6                   MR. TENREIRO:  Can we take a look at

16:44:30   7   Exhibit 77, please.  007-73455.

16:45:13   8   BY MR. TENREIRO:

16:45:13   9         Q.    Mr. Durov, the question is, is this one

16:45:17  10   of the emails where someone reached out to Telegram

16:45:24  11   to inquire about potential resales for Grams?

16:45:39  12                   MR. DRYLEWSKI:  Objection; scope.

16:45:50  13                   THE WITNESS:  I'm not sure what this email

16:45:57  14   is about.  It is confusing that it uses terms such as

16:46:09  15   "IEO."

16:46:16  16   BY MR. TENREIRO:

16:46:17  17         Q.    Is that "initial exchange offering,"

16:46:20  18   as far as you understand how that term is used in the

16:46:23  19   digital-asset world?

16:46:25  20         A.    My understanding of this term is that

16:46:29  21   "IEO" is the offering that is relevant for tokens of

16:46:42  22   an exchange.  I don't see how this term could be

16:46:53  23   applicable for TON because TON does not represent

16:47:04  24   an exchange; rather, it is a blockchain network

16:47:10  25   similar to Bitcoin and Ethereum, but more efficient.

349